## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 13-cv-00324-RGA |
| HMS AMERICAN QUEEN | ) | |
| STEAMBOAT COMPANY LLC, and | ) | **CONFIDENTIAL** |
| AMERICAN QUEEN STEAMBOAT | ) | **FILED UNDER SEAL** |
| OPERATING COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

\* \* \* \* \* \* \* \* \* \* \*

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Richard A. Barkasy (#4683)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
824 N. Market Street, Suite 800
Wilmington, DE 19801
Phone:  (302) 888-4554
Fax:  (302) 888-1696
rbarkasy@schnader.com

-and-

Dennis D. Murrell (*pro hac vice*)
Brian P. McGraw (*pro hac vice*)
**MIDDLETON REUTLINGER**
401 S. 4th Street, Suite 2600
Louisville, Kentucky 40202
Phone: (502) 584-1135
Fax: (502) 561-0442
dmurrell@middletonlaw.com
bmcgraw@middletonlaw.com

*Attorneys for Defendants*

**December 20, 2016**

## TABLE OF CONTENTS

I.     STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ........................1

II.    SUMMARY OF ARGUMENT ................................................................................2

III.   STATEMENT OF RELEVANT FACTS ................................................................5

    A.    PART ONE: FACTS RELEVANT TO ACL'S ABANDONMENT DEFENSE AND HMS'S CLAIM FOR TRADEMARK INFRINGEMENT ...............................5

        1.   The Rich History of "Steamboating" in the United States ...................5

        2.   The *American Queen* Vessel and Associated Trademarks ...................5

        3.   Ambassadors Ends its Majestic America Line and Attempts to Sell the *American Queen* ..................................................................9

        4.   MARAD Acquires the *American Queen* and Immediately Seeks to Sell.............................................................................10

        5.   Defendants Acquire the *American Queen* and All Associated Trademark Rights......................................................................11

        6.   The Plaintiff and its Operations from 1999 to the Present..................13

    B.    PART TWO: FACTS RELEVANT TO THE "GREAT AMERICAN" DOMAIN NAME DISPUTE ...............................................................................15

IV.   SUMMARY OF APPLICABLE LAW ...............................................................19

    A.    SUMMARY JUDGMENT STANDARD .....................................................19

    B.    TRADEMARK RIGHTS AND INFRINGEMENT UNDER THE LANHAM ACT...............................................................................................19

    C.    ABANDONMENT OF TRADEMARK RIGHTS .................................................21

    D.    CYBERSQUATTING ................................................................................22

V.    ARGUMENT ....................................................................................................22

    A.    THE AMERICAN QUEEN MARKS WERE NEVER ABANDONED.....................................22

        1.   Defendants Own Incontestable Trademarks with Priority over ACL as to the Term "America" ...................................................22

        2.   There has Been no Three-Year Period of Non-Use of the AMERICAN QUEEN Marks ..........................................................23

        3.   ACL Cannot Demonstrate by Clear and Convincing Evidence that There was Intent Not to Resume Use of the AMERICAN QUEEN Marks......................................................................26

i

4.   The AMERICAN QUEEN Marks Carry Significant Residual Goodwill ........................................................................30

B.   SUMMARY JUDGMENT SHOULD ENTER ON HMS'S CLAIM FOR TRADEMARK INFRINGEMENT AGAINST ACL ..............................34

1.   Similarity of Marks ....................................................................35

2.   Similarity of Goods/Services ....................................................36

3.   Strength of the AMERICAN QUEEN Marks .............................36

4.   Similarity in Channels of Trade ................................................38

5.   Similarities in Target Markets ..................................................38

6.   Sophistication of Customers/Price ............................................39

7.   ACL's Intent ..............................................................................39

8.   Evidence of Actual Confusion ..................................................40

C.   SUMMARY JUDGMENT SHOULD ENTER ON ACL'S CYBERSQUATTING CLAIM ....................................................42

CONCLUSION ........................................................................................45

## TABLE OF AUTHORITIES

**Cases**

*A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*
237 F.3d 198 (3d Cir. 2000)........................................................................20, 36

*American Motors Corp. v. Action Age, Inc.,*
178 U.S.P.Q. 377, 379 (1973)....................................................................31

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.,*
793 F.3d 313 (3d Cir. 2015)......................................................................40

*Beech-Nut Packing Co. v. P. Lorillard Co.,*
273 U.S. 629 (1927).................................................................................23

*Carnivale v. Staub Design, LLC,*
547 Fed. Appx. 114 (3d Cir. 2013)...........................................................43

*Cash Processing Servs. v. Ambient Entm's,*
418 F. Supp. 2d 1227 (D. Nev. 2006).......................................................29

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).................................................................................19

*Checkpoint Sys. V. Check Point Software Techs., Inc.*
269 F.3d 270 (3d Cir. 2001)......................................................................36

*Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.,*
214 F.3d 432 (3d Cir. 2000)......................................................................20, 34

*Continental Distilling Corp. v. Old Charter Distillery Co.,*
188 F.2d 614 (D.C. Cir. 1950)..................................................................23

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,*
109 F.3d 275 (6th Cir. 1997) ....................................................................40-41

*Defiance Button Mach. Co. v. C&C Metal Prods. Corp.,*
759 F.2d 1053 (2d Cir. 1985)....................................................................26, 31, 33

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler,*
442 F.3d 812 (3d Cir. 2006).....................................................................21

*Eh Yacht, LLC v. Egg Harbor, LLC,*
84 F. Supp.2d 556 (D.N.J. 2000) .............................................................21, 23, 26, 28-29

*Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.,*
458 F.3d 931 (9th Cir. 2006) ....................................................................23

*Exxon Corp. v. Humble Exploration Co.,*
695 F.2d 96 (5th Cir. 1984) ......................................................................21

*Ferrari S.P.A. Esercizio Fabbriche Automobili e Corse v. McBurnie,*
11 U.S.P.Q. 2d 1843 (S.D. Cal. 1989) ......................................................31

*Fisons Horticulture, Inc. v. Vigoro Indust., Inc.*
30 F.3d 466 (3d Cir. 1994)........................................................................19, 35

iii

*Ford Motor Co. v. Summit Motor Prods.*
930 F.2d 277 (3d Cir. 1991)...........................................................................36-37

*Green v. Fornario*,
386 F.3d 100 (3d Cir. 2007)................................................................................43

*Interpace Corp. v. Lapp, Inc.*,
721 F.2d 460 (3d Cir. 1983)..................................................................19, 34-35

*King of the Mountain Sports, Inc. v. Chrysler Corp.*,
185 F.3d 1084 (10th Cir. 1999) ..........................................................................41

*Kos Pharms., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004)................................................................................35

*Lamont v. New Jersey*,
637 F.3d 177 (3d Cir. 2011)................................................................................19

*Marshak v. Green*,
746 F.2d 927 (2d Cir. 1984)................................................................................30

*McLean v. Fleming*,
96 U.S. 245 (1877)..............................................................................................30

*Merry Hull & Co. v. Hi-Line Co., Inc.*,
243 F. Supp. 45 (S.D.N.Y. 1965)........................................................................26

*Premier Dental Prods. Co. v. Darby Dental Supply Co.*,
794 F.2d 850 (3d Cir. 1986)................................................................................20

*Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*,
148 F.3d 417 (4th Cir. 1998) ..............................................................................40

*Sabinsa Corp. v. Creative Compounds, LLC*
609 F.3d 175 (3d Cir. 2010)...................................................35, 36, 38-40

*Saratoga Vichy-Spring Co. v. Lehman*,
625 F.2d 1037 (2d Cir. 1980)........................................................................21, 27

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
978 F.2d 947 (7th Cir. 1992) ..............................................................................31

*Seidelmann Yachts, Inc. v. Pace Yacht Corp.*,
1989 U.S. Dist. LEXIS 17486 (D. Md. Apr. 26, 1989) ................................26-27

*Shields v. Zuccarini*,
254 F.3d 476 (3d Cir. 2001)..........................................................................22, 42

*Sylvania Elec. Prods. v. Dura Elec. Lamp Co.*,
247 F.2d 730 (3d Cir. 1957)..........................................................................20, 34

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992) .......................................................................................19-20

*United States Jaycees v. Phila. Jaycees*,
639 F.2d 134 (3d Cir. 1981)..........................................................................21, 23

*Versa Prods. Co. v. Bifold Co. (Mfg.)*,
50 F.3d 189 (3d Cir. 1995)..................................................................................39

**Statutes**

Fed. R. Civ. P. 56......................................................................................................19
15 U.S.C. § 1114.................................................................................................1, 2, 20
15 U.S.C. § 1125....................................................................................2, 20, 22, 42-43
15 U.S.C. § 1127..............................................................................................21, 23, 29
15 U.S.C. § 1137......................................................................................................19

**Treatises**

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
§ 2:15, at 2-36 (2003)..............................................................................................30
§ 16:1, at 16-4 (2015)..........................................................................................20, 34
§ 17:11, at 17-19 (2015)............................................................................................29
§ 11:83, at 11-257 (2015)...........................................................................................37

Defendants, HMS American Queen Steamboat Company, LLC and American Queen Steamboat Operating Company, LLC (collectively "HMS"), by counsel, hereby submit the following opening brief in support of their motion for partial summary judgment on Count VI of the Fourth Amended Complaint, Counts II-V of the Counterclaim, and on the trademark abandonment defense asserted by Plaintiff, American Cruise Lines, Inc. ("ACL").

## I.  STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

This case was filed in February, 2013 as a breach of contract and cybersquatting dispute over the terms of a settlement agreement entered between the parties in 2012 and HMS's continued ownership (but not use) of a domain name following that settlement agreement.[1] *See* Plaintiff's original Complaint, Docket Entry ("D.I.") 1, pp. 4-20. Over the years the case has evolved into a mutual trademark infringement suit over the parties' respective uses, as part of either vessel names or company names, and/or ownership of registered trademarks incorporating the term *American*. *See* ACL's Fourth Amended Complaint [D.I. 129] and HMS's Answer and Counterclaim to the Fourth Amended Complaint [D.I. 132]. The operative Complaint sets forth the following claims against HMS: breach of contract (Count I); registered trademark infringement under §1114 of the Lanham Act based on HMS's use of the company name *American Queen Steamboat Company* and the vessel names *American Queen* and *American Empress*, and based on its use of *American* terms in its paid search advertising campaign (Count II); registered trademark infringement under §1114(a) of the Lanham Act based on HMS's alleged use of *Mississippi Queen*, *Queen of the Mississippi*, and *Queen of the West* as paid search terms (Count III); common law trademark infringement based on HMS's use of the term *American* (Count IV); false designation of origin

---

[1] There was also a claim for unregistered trademark infringement brought under §43(a) of the Lanham Act based on the alleged use by HMS of the term *Great American Steamboat*. *See* Count II of D.I. 1. ACL has seemingly abandoned that claim in the operative Complaint.

1

under §1125(a) of the Lanham Act based on HMS's use of the term *American* (Count V); cybersquatting under §1125(d) of the Lanham Act (Count VI); violation of the Delaware Uniform Deceptive Practices Act (Count VII); and common law unfair competition (Count VIII).

HMS asserts a counterclaim alleging that ACL infringes HMS's registered trademarks to the term *American Queen* under §1114 of the Lanham Act through ACL's recent naming and use of the vessels *American Eagle*, *American Pride*, *America* and other *American (plus another term)* vessels in direct competition with HMS (Count II) and through ACL's use of the term *American Queen* (and similar terms) as paid search terms in Internet marketing (Count I). HMS asserts related claims for false designation of origin under the Lanham Act (Counts III and IV), common law unfair competition (Count VI), and violation of the Delaware Uniform Deceptive Trade Practice Act (Count V).[2]

All discovery has closed and HMS now moves for partial summary judgment.

## II.    SUMMARY OF ARGUMENT

At its heart, this case is about who has the priority right to register the term *American* as part of a trademark and then use (and prevent others from using) that term in connection with domestic cruise ship operations. On one side is HMS, who owns federally registered and presumptively valid trademark rights to the term *American Queen* and uses that term as a trademark, as the name of its flagship vessel, and as part of the name of its company. HMS's *American Queen* rights date back to <u>1993</u> – when applications were first filed for that mark by HMS's predecessors.

---

[2] There are additional Counterclaims seeking cancellation of certain of ACL's registered trademarks. *See* Counts VII through XII. These claims are subject to ACL's pending motion to dismiss [D.I. 134].

On the other side is ACL, who also owns registered trademarks incorporating the term *American*, uses *American* as part of the name of its company, and uses the term as part of the names of some of its vessels (some of which now cruise side-by-side on the same rivers, competing directly against HMS's vessels).  ACL's claimed rights date back to <u>1999</u>, when it allegedly first used its *American Cruise Lines* name in interstate commerce.

Under this timeline of use and/or registration, HMS has priority as against ACL to the term *American*. HMS, then, has the ability to prevent ACL from using marks which are confusingly similar to the well-known *American Queen* trademarks and/or which would result in ACL unfairly competing with HMS in the market. After filing this lawsuit and likely realizing that it did not have priority rights, ACL manufactured a claim that the *American Queen* trademarks were abandoned. ACL's claim seemingly stems from the ceasing of operations and bankruptcy of one of the previous owners of the *American Queen* vessel and marks.

Predicate to a finding of abandonment, however, is that there has been a period of non-use of the mark – with the Lanham Act focusing on a <u>three-year</u> period of non-use. Further, a party seeking abandonment must establish by clear and convincing evidence that there was not an intent to resume use of the mark at some point during or at the end of the period of non-use.  ACL cannot establish either of these two elements. That is, from 1995 through today the *American Queen* vessel either successfully operated (generating millions of dollars in cruise revenue) or, as is the case between April, 2008 and December, 2010, was an asset that its respective owner actively sought to sell. As soon as HMS acquired the *American Queen* in December, 2010 (and its associated trademarks), it began taking steps to relaunch the vessel in the same market and to resume all use of the *American Queen* marks.  HMS did, in fact, relaunch the vessel – to great success.  Because

the undisputed facts fail to support ACL's abandonment defense, summary judgment should enter in favor of HMS.

Without a finding of abandonment, ACL has no defense to HMS's claim for trademark infringement based on ACL's recent actions in naming and operating the vessels *American Eagle*, *American Pride*, *America* and *American (plus a single word)* to compete directly against HMS's *American Queen* and *American Empress* vessels in the Mississippi and Columbia/Snake River markets. ACL has no defense because nearly all the Third Circuit's likelihood of confusion factors weigh in favor of a finding of infringement. This is especially true here where there is a staggering amount of actual consumer confusion being directed to ACL where consumers are actually seeking to sail on HMS's vessels but contacting ACL by mistake.

Unrelated to the dueling claims centered around the parties' respective uses of the term *American* is ACL's claim that HMS engaged in cybersquatting through its continued ownership (but not use) of the domain name greatamericansteamboat.com ("GASC.com") following the parties' settlement of previous litigation. This claim has no merit. At the time the GASC.com domain name was registered by HMS, ACL had never even used the term *Great American*. ACL had no rights to the term *Great American* at all when the domain name was registered. This alone negates ACL's claim. Notwithstanding the fact that the GASC.com domain name was registered by HMS (or its predecessors) well before ACL had ever used the term *Great American* in any form, there is no evidence that ACL's *Great American* marks have ever been distinctive or famous – further negating ACL's cybersquatting claim. Nor is there evidence in this case that would support a finding of bad faith under the Lanham Act's cybersquatting provision.

### III.    STATEMENT OF RELEVANT FACTS

**A.    PART ONE: FACTS RELEVANT TO ACL'S ABANDONMENT DEFENSE AND HMS'S CLAIM FOR TRADEMARK INFRINGEMENT**

### 1. The Rich History of "Steamboating" in the United States

Steamboats were once the backbone of the country's transportation system up through the Civil War.  Following the Civil War, railroads began to dominate the market for passengers and freight.  To compete with the railroad industry, steamboats became increasingly luxurious floating palaces built for elegance and speed. The boats were constructed with grand ballrooms and casinos, setting the stage for adventure stories told by some of America's iconic authors. The modern cruise industry has come to embrace these historic steamboats as symbols of the history and culture of river communities during the growth and development of the country.[3] The U.S. cruise industry has grown significantly over the last few decades, including the rapid growth of the cruising segment along the Mississippi River and out west on the Columbia and Snake Rivers.

### 2. The *American Queen* Vessel and Associated Trademarks

One of the most successful U.S. cruise ship operators of all time was The Delta Queen Steamboat Company ("Delta Queen"). Its original flagship, the *Delta Queen,* is one of the most well-known river cruising vessels ever to have operated and is listed on the National Register of Historic Places. For years, Delta Queen ran overnight cruises along the Mississippi on the *Delta Queen* and its sister vessel, the *Mississippi Queen*. Starting in 1993, Delta Queen instituted plans to build a new vessel, a vessel that would be the largest, most luxurious paddlewheel steamboat ever built – an unparalleled vessel in the U.S. river cruising market. This vessel was to be named the *American Queen*.

---

[3] *See* HMS's Responses to ACL's First Set of Interrogatories, No. 10, pp. 10-17 (discussing the history of steamboats), excerpts attached as **Exhibit 1**.

As construction on the *American Queen* began, Delta Queen started taking steps to establish trademark rights in and to the name of the vessel. On March 26, 1993, Delta Queen filed four separate trademark applications for the mark *American Queen* for use in connection with a variety of goods/services.[4]

Construction of the *American Queen* was completed in 1994. The vessel was designed to trade off consumers' nostalgia with America's rich river boat history. It was built with the carrying capacity of 436 passengers in its 222 state rooms. The interiors of the *American Queen* include a grand double height dining room modeled after the famous *JM White* steamboat and show lounge made of polished mahogany, rich fabrics and Tiffany glass. The vessel contains a complete replica of the Ford Theatre.[5]

The *American Queen* was placed into service by Delta Queen during the 1995 sailing season. The vessel ran overnight cruise itineraries along the Mississippi, Ohio, Cumberland and Tennessee Rivers. *See* Deposition of Rick Simonson ("Simonson Depo."), May 26, 2016, p. 98.[6] Soon thereafter, the applications for *American Queen* filed in the Trademark Office by Delta Queen went on to registration. The following trademark registrations issued to Delta Queen, are currently owned by HMS, and are at issue in the present dispute (*see* Ex. 2):

| MARK | FILING DATE | REGISTRATION DATE | REG. NO. | FIRST USE IN COMMERCE |
|---|---|---|---|---|
| AMERICAN QUEEN | March 26, 1993 | Jan. 30, 1996 | 1,953,532 | Sept. 1994 |

---

[4] *See* Certificates of Registration and Chain of Title for the *American Queen* marks, attached as **Exhibit 2**.

[5] *See* HMS 1398-1488, attached as **Exhibit 3**. pp. 23-26. *See also* Deposition of John Waggoner ("Waggoner Depo."), 6/10/14, p. 85. Cited portions of Mr. Waggoner's deposition are attached as **Exhibit 4.**

[6] Cited portions of Mr. Simonson's deposition are attached as **Exhibit 5**. Mr. Simonson is a former sales representative for Delta Queen, Ambassadors and HMS who was involved in sales for the *American Queen* since it was launched in 1995.

| AMERICAN QUEEN | March 26, 1993 | Jan. 30, 1996 | 1,953,533 | Sept. 1994 |
|---|---|---|---|---|
| AMERICAN QUEEN | March 26, 1993 | Jan. 23, 1996 | 1,951,681 | Sept. 1994 |
| AMERICAN QUEEN | March 26, 1993 | Jan. 30, 1996 | 1,953,534 | Sept. 1994 |
| AMERICAN QUEEN | June 15, 1993 | March 5, 1996 | 1,960,672 | Sept. 1994 |

These registrations will hereinafter collectively be referred to as the "*American Queen* marks."

The *American Queen* was operated successfully by Delta Queen from 1995 to 2006 and during that time sailed at between 80 and 90% occupancy. Simonson Depo., pp. 98-100, 115-116. There was high customer demand for the vessel. *Id*., pp. 101-103. Between the years 1997 and 2000, for example, the *American Queen* generated total annual revenues of $34.2 million (1997), $34 million (1998), $37 million (1999), and $37.5 million (2000).[7]

There were also significant expenditures associated with marketing of the *American Queen* by Delta Queen. For example, in 2000 Delta Queen spent a total of $74.7 million in "selling, general and administrative" expenses (which included marketing expenses) for the entire fleet of vessels, including the *American Queen*.[8] In 1999, there were consolidated selling, general and administrative expenses, including marketing, totaling $56.8 million. *Id*. The consolidated expenses for 1998 totaled $44.2 million. *Id*. These expenses for 1996 and 1995 were $45.4 million and $48.6 million, respectively.[9] In 1994, these expenses were $43.2 million.[10] In terms of further marketing, in 1997 the Delta Queen vessels were featured or mentioned in over 2,000 articles in publications including *Travel and Leisure*, the *New York Times* and *Los Angeles Times* newspapers

---

[7] *See* Ex. 3 hereto, p. 75; *see also* HMS 57162-57172, attached as **Exhibit 6.**

[8] *See* HMS 97011-97098, p. 20, attached as **Exhibit 7**. HMS acknowledges that this data is aggregate for all of the Delta Queen vessels and not all of these figures can be attributed solely to the marketing of the *American Queen*. Nonetheless, the expenditures are significant.

[9] *See* HMS 96686-96736, p. 15, attached as **Exhibit 8**.

[10] *See* HMS 96642-96685, p. 16, attached as **Exhibit 9**.

and *Travel Holiday* and *McCalls* magazines. *See* Ex. 8, p. 4. Similarly, in 1996, the Delta Queen vessels were featured or mentioned in over 3,000 articles. *See* Ex. 9, p. 4. In addition, in 1996, for example, Delta Queen distributed roughly 1.4 million copies of a full color brochure featuring all of Delta Queen's cruises. *Id*. Mr. Simonson confirmed that there were over a million pieces of direct mail distributed to customers and/or potential customers each year. Simonson Depo., p. 104.

Eventually, in 2006, Ambassadors International, Inc. ("Ambassadors"), acquired Delta Queen, America West Steamboat Company, and, later, Windstar Cruises, and merged them to form the *Majestic America Line*. *See* Deposition of Diane Moore ("Moore Depo."), 2/11/14, pp. 18-19, 24-25.[11]  The *American Queen* was acquired as part of this transaction. *Id*., p. 25. Ambassadors operated the *American Queen* as part of the Majestic America Line during the 2007 and 2008 cruise seasons. Moore Depo., pp. 78, 82; Simonson Depo., pp. 124-125. For Ambassadors, the *American Queen* had itineraries on the Mississippi and Ohio Rivers.  Simonson Depo, p. 123. The *American Queen* generated substantial profits for Ambassadors. In 2007 and 2008, for example, the *American Queen* generated total revenue of $35.1 million and $33.5 million, respectively. *See* Ex. 3, pp. 70-74.

From 1995 until 2008, the operation of the *American Queen* was a success by industry standards. The *American Queen* earned an average EBITDA of about $12 million per year and operated at revenues of around $34 million per year.  *See* Ex. 3, pp. 70-75; *see also* Ex. 6.[12]  During

---

[11] Cited portions of Ms. Moore's deposition are attached as **Exhibit 10**.  Ms. Moore was the former President of Ambassadors with respect to the Majestic America Line.  *Id*., pp. 20-21.

[12] There is evidence of record that the *American Queen* went out of service at points during the 2002 and 2006 sailing seasons due to either the bankruptcy of Delta Queen after 9/11 or the sale of the vessel to Ambassadors in 2006 following Hurricane Katrina.  Nonetheless, the testimony is that the vessel operated for 12 years between 1995 and 2008. *See* Deposition of Christopher Kyte ("Kyte Depo."), 11/21/13, p. 169. Cited portions are attached as **Exhibit 11**. Mr. Kyte was the former President of *American Queen Steamboat Company* and also ran an independent travel

that time, the vessel averaged 20,000 passengers per season with the total during the period estimated as "…roughly a quarter of a million people." *See* Kyte Depo., pp. 168-169. It is estimated that millions of people, other than those who actually sailed on the vessel, would have seen advertisements for the vessel or any of the various souvenirs sold with the vessel's name on them. *Id*.  In April, 2008, the *American Queen* was an asset valued at roughly $50 million.[13]

### 3.  Ambassadors Ends its Majestic America Line and Attempts to Sell the *American Queen*

In April 2008, Ambassadors announced that it was ceasing operations of the Majestic America Line and would be winding down those operations following the 2008 season. Moore Depo., pp. 21, 51.  Ambassadors further announced that it was going to sell off assets of Majestic America Line, including the *American Queen* – though Ambassadors indicated that it was committed to the brand during the remainder of 2008.[14]

After the announcement to sell all assets of the Majestic America Line, Ambassadors engaged in discussions with potential buyers for the *American Queen*. *See* Ex. 13. One of the potential buyers interested in acquiring the *American Queen* was current President and CEO of HMS's parent company, HMS Global Maritime, Mr. John Waggoner. Waggoner Depo., pp. 73, 93. On May 30, 2008, Mr. Waggoner met with representatives of Ambassadors to discuss the possible acquisition.[15]  In that meeting the *American Queen* was identified as the "best producer" for Ambassadors and it was noted that a 2009 sailing schedule was actually created but never released. *Id*. Ambassadors also made clear during that meeting that should there be a sale; the

---

agency, Uncommon Journeys, which sold cruises on the *American Queen* from 1995 through 2008. *Id*., pp. 14-15
[13] *See* HMS 57066-57125, attached as **Exhibit 12**.
[14] *See* HMS 60541, attached as **Exhibit 13**; and Moore Depo., p. 55.
[15] *See* HMS 60564-60569, attached as **Exhibit 14**.

rights to all names would be transferred with the vessels. *Id.* Following the meeting Mr. Waggoner issued a letter of intent to Ambassadors to purchase the vessel.[16]

Ambassadors continued to operate through November, 2008 – with the last cruise on the *American Queen* taking place early that month. Moore Depo., pp. 59-60. Marketing efforts continued up through the last cruise in November, 2008 – with Ambassadors attempting to fill its remaining cruises by reaching out to past guests, sending out further direct mail marketing, conducting further email marketing, and conducting marketing with travel agent partners. Moore Depo., pp. 58-59; 83. Just after the last cruise, the *American Queen* was formally surrendered to the U.S. Government on November 15, 2008.[17]

### 4. MARAD Acquires the *American Queen* and Immediately Seeks to Sell

Upon surrender to the U.S. Government, the *American Queen* was laid up at the U.S. reserve fleet in Violet, Louisiana. *See* Ex. 1, p. 11. By March, 2009, the U.S. Government had placed advertisements to the general public promoting the proposed sale of the *American Queen*.[18] The United States Maritime Administration ("MARAD") ultimately purchased the *American Queen* on May 19, 2009 for $18 million, which included not only the vessel but "the boilers, engines, machinery, masts, spars, rigging, boats, anchors, cables, chains, tackle, tools, bunkers, pumps and pumping equipment, apparel, furniture, fittings and equipment, spare parts and all other appurtenances…."[19]

---

[16] *See* HMS 60579, attached hereto as **Exhibit 15**.
[17] The U.S. Government held a security agreement for the *American Queen* which was declared in default due to Ambassadors failure to make the required mortgage payments – which is why the U.S. Government maintained rights to the vessel. Ambassador maintained non-recourse debt and Ambassadors was only going to sell the *American Queen* to a third party if the sale proceeds were greater than the existing debt to MARAD.
[18] *See e.g.*, HMS 2488-2492 and 2400-2405, attached as **Exhibit 16**.
[19] *See* HMS 2478-2482, attached as **Exhibit 17**; and HMS 56992-57001, attached as **Exhibit 18**.

Upon taking control of the *American Queen*, MARAD equipped the vessel with de-humidification units and sealed it in order to prevent mildew formation and to preserve the vessel for sale and future use.[20]  MARAD actively sought to sell the *American Queen* as soon as it was purchased. By July of 2009 it had engaged a third party, AMA Capital Partners, to advertise and promote the vessel for sale.[21]

### 5.   Defendants Acquire the *American Queen* and All Associated Trademark Rights

Sometime in 2010, Mr. Waggoner and HMS learned of the proposed sale of the *American Queen*, and other vessels by MARAD.  *See* Ex. 1, p. 13.  By December, 2010, HMS had a strategic plan in place to acquire the *American Queen*.  *See* Ex. 3.[22] Mr. Waggoner believed that the *American Queen* was an iconic vessel with notoriety and goodwill among consumers and he felt there was significant value in the *American Queen* vessel and name. Waggoner Depo., p. 185.  The goodwill and strong customer loyalty were primary attractions of the *American Queen* in the mind of HMS. Waggoner Depo., pp. 101-102.

On December 31, 2010, the *American Queen* was sold by agreement from MARAD to HMS through public auction at a price of $15.5 million – though the closing didn't take place until August of 2011 as HMS worked on obtaining financing.[23]

After purchasing the vessel, HMS reached out to Ambassadors regarding the registered trade names, URLs, and marketing material for the *American Queen*. *See* Deposition of Jeffrey

---

[20] *See* HMS 57126-57151, p. 19, attached as **Exhibit 19**; *see also* Ex. 3, p. 28.

[21] *See* HMS 57152-57161, attached as **Exhibit 20**; *see also* Ex. 6.

[22] Among other actions, HMS American Queen Steamboat Company, LLC was formed in Delaware on May 12, 2010 with the goal of acquiring the *American Queen* and its intellectual property rights. *See* Ex. 1, p. 13. American Queen Steamboat Operating Company, LLC, formerly known as Great American Steamboat Company, was formed to serve as the operating entity for the vessel.  *Id.*

[23] *See* HMS 1685-1702, attached as **Exhibit 21**; and HMS 1679-1684, attached as **Exhibit 22**.

Krida ("Krida Depo."), 11/18/14, p. 117.[24] At this same time, ACL was in discussions with Ambassadors in an attempt to acquire the *American Queen* marks – even though it had not purchased the vessel. *See* Deposition of Charles A. Robertson ("Robertson Depo"), 12/11/14, pp. 213-215.[25] Although HMS believed it acquired all of the intellectual property along with the vessel, out of an abundance of caution, HMS ultimately entered into an agreement with Ambassadors where all rights to the *American Queen* marks were assigned to HMS in exchange for payment of $15,000.[26] The $15,000 was a negotiated amount. *Id.*; *see also* Krida Depo., p. 124 (indicating that Ambassadors proposed anywhere from $15,000 to $50,000 for the assignment).

Shortly after the closing in August, 2011, the *American Queen* was moved to a shipyard in Louisiana for refurbishment by HMS. Waggoner Depo., p. 219. Even prior to the closing, HMS retained third party, Travel Marketing Resources ("TMR"), to handle electronic marketing for the *American Queen*, including building the website, email/Internet marketing, and search engine optimization. *See* Deposition of Travel Marketing Resources ("TMR Depo."), 2/12/14, pp. 38-40.[27] By the end of August, 2011, HMS had further developed the initial website, or "splash page" for the advertising of the *American Queen* at GASC.com.[28]

---

[24] Cited portions of Mr. Krida's deposition are attached as **Exhibit 23**. Mr. Krida is the former president of *American Queen Steamboat Company*.

[25] Cited portions of Mr. Robertson's deposition are attached as **Exhibit 24**. Mr. Robertson is the CEO of ACL.

[26] *See* Feb. 25, 2011 Assignment Agreement, attached **Exhibit 25**; *see also* Krida Depo., pp. 121-122; and Deposition of Mark Detillion ("Detillion Depo."), 2/14/14, p. 55. Cited portions of Mr. Detillion's deposition are attached as **Exhibit 26**. Mr. Detillion was CFO of Ambassadors at the time of the transfer of trademark rights.

[27] Cited portions of the TMR Deposition are attached as **Exhibit 27**.

[28] *Id.*, pp. 15-16. HMS had already sent out some initial email blasts to travel agents with limited information due to advertising restrictions by May, 2010. *See* ACL 7140, attached as **Exhibit 28**. The website "splash" page had actually been set up as early as December, 2010. *See* HMS 208, attached as **Exhibit 29**.

HMS officially opened its doors in Memphis, Tennessee on September 8, 2011.  Ex. 1, p. 15; *see also* Waggoner Depo., pp. 129-130.  It was at this time that HMS began significant work with respect to the marketing of the *American Queen*. Defendants received the required FMC bond on September 16.  *Id.,* p. 220. Immediately after obtaining the bond, the *American Queen* website went live with full itineraries and prices. *See* Deposition of Tim Rubacky ("Rubacky Depo."), 11/16/13, pp. 51-52;[29] *see also* Krida Depo., p. 140. Defendants then engaged in marketing of the vessel through email blasts, print advertisements[30], press releases, direct mailings, post cards, brochures, webinars, television and print interviews, trade shows and travel agent and/or industry events – all of which featured reference to the *American Queen* brand.[31]

The first booking of passage on the *American Queen* by HMS was made on September 28, 2011.[32] Within the first month of operation and by October 31, 2011, HMS had approximately $1.8 million in booked revenue based on bookings reserved by around 500 guests.[33] HMS spent $853,052 in advertising and marketing expenses by the end of October, 2011[34] and spent a total of $3,122,593 in pre-launch marketing related to the *American Queen*.[35] The first commercial cruise on the *American Queen* by HMS was on April 13, 2012. Waggoner Depo., p. 119.

**6.  The Plaintiff and its Operations from 1999 to the Present**

ACL began operating vessels under the name *American Cruise Lines* in and around 2000, though it began marketing its cruises as early as 1999 – at least four years after the *American*

---

[29] Cited portions of Mr. Rubacky's deposition are attached as **Exhibit 30**.  Mr. Rubacky is the former head of marketing for HMS.
[30] The first print ads were run on October 7, 2011. *See* Ex. 1, p. 15.
[31] *See* Ex. 1, pp. 26-28; *see also* HMS's Responses to ACL's Second Set of Interrogatories, No. 33, pp. 11-12, attached as **Exhibit 31**.
[32] *See* HMS 58112-58113, attached as **Exhibit 32**.
[33] *See* Ex. 32; *see also* HMS 66901-66924, attached as **Exhibit 33**.
[34] *See* HMS 65944-65961, attached as **Exhibit 34**.
[35] *See* HMS 58038-58059, attached as **Exhibit 35**.

*Queen* first set sail for Delta Queen.  ACL is headquartered in Connecticut and bills itself as the "#1 Operator of River/Intercostal Waterway Cruises in the U.S."[36]  ACL offers cruises throughout the United States and, at present, offers itineraries on cruises in direct competition with HMS on the Mississippi River as well as the Columbia and Snake Rivers.[37]  ACL and HMS are the primary competitors in the U.S. river cruising market.

ACL's first vessel was the *American Eagle*, which began operating in the coastal Maine, New England, Hudson River, Chesapeake Bay, and Florida/South Carolina coastal river markets in 2000.  *See* Ex. 37.  Next for ACL came the *American Glory*, which began running similar coastal itineraries starting in 2002. *Id*. In 2005, ACL launched the *American Spirit* to run those same itineraries.  In 2007 came the *American Star*, again running the U.S. coastal market itineraries. At the end of the 2009 season the *American Eagle* was taken out of service. *Id*. Then, in 2010, ACL began operating a vessel named *Independence* in the coastal market and a vessel named *Queen of the West* – which it had acquired from Ambassadors – on the Columbia/Snake Rivers in the Pacific Northwest.  The operation of the *Queen of the West* in 2010 marked the first time ACL operated cruises in what would be considered the U.S. inland river market.  *Id*. ACL began operating cruises on a vessel named the *Queen of the Mississippi* along the Mississippi River in 2012, specifically, August 2012 (though promotional and sales activity began for that vessel as early as 2010). This was ACL's first entry into the Mississippi River market.  *Id*.

From 2010 through 2015, ACL operated itineraries on the Columbia/Snake Rivers on the *Queen of the West*.  From 2012 through 2015, ACL operated itineraries on the Mississippi River on the *Queen of the Mississippi*. Those vessels were competing directly with HMS's *American*

---

[36] *See* ACL 11772-824 (at ACL 11776), attached as **Exhibit 36**.
[37] *See* ACL 25540-25623, attached as **Exhibit 37** (showing all vessels and itineraries operated by ACL from 2000 through the end of 2015 season).

*Queen* and *American Empress* vessels in those markets during that time. At no time prior to 2015 did any of ACL's *American* vessels operate in the Mississippi River or Columbia/Snake River markets.

Circumstances changed in 2015. It was then that ACL began offering cruises on the Mississippi River on a vessel renamed the *American Eagle*. *See* Ex. 37. *See also* Deposition of Charles B. Robertson ("C.B. Robertson Depo. #2), pp. 47-48.[38] Following the 2015 season, ACL renamed the original *Queen of the Mississippi* to *American Pride* and relocated it to the Columbia/Snake River market for the 2016 sailing season. *Id.*, pp. 47-48. The *American Eagle* sailed during the 2015 season and was then renamed to *Queen of the Mississippi* for 2016. *Id.* In 2016, ACL launched another vessel on the Mississippi River called the *America*. *Id.*, pp. 49-50. ACL currently operates the following 8 vessels: *American Pride* (Columbia/Snake); *America* (Mississippi); *Queen of the Mississippi* (Mississippi), *American Star* (coastal); *American Spirit* (coastal); *American Glory* (coastal); and *Independence* (coastal). *Id.*, p. 47. ACL has other vessels currently under construction which it intends to operate in direct competition with HMS using the term *American* as the leading term in a two word vessel name. *Id.*, pp. 51-53.

**B.    PART TWO: FACTS RELEVANT TO THE "GREAT AMERICAN" DOMAIN NAME DISPUTE**

In anticipation of purchasing the *American Queen* and needing an operating entity for the vessel, HMS formed a Delaware limited liability company under the name *Great American Steamboat Company* on June 8, 2010.[39] That name was the brainchild of one of the former owners

---

[38] Cited portions of Mr. Robertson's deposition are attached hereto as **Exhibit 38**. Mr. Robertson is the Vice-President and head of marketing for ACL.

[39] *See* Sec. of State Formation, attached as **Exhibit 39**; *see also* Ex.1.

and officers of HMS, Christopher Kyte.[40]  My Kyte, prior to being involved with HMS, had formed

a business entity under that name in Louisiana.  Kyte Depo., pp. 35-36.

On July 4, 2010, Mr. Kyte registered the <u>GASC.com</u> domain name.[41]  *See* Kyte Depo., p.

38. Mr. Kyte eventually transferred all rights to the <u>GASC.com</u> domain names to HMS. The

domain names were registered in preparation for the marketing of the *American Queen* vessel –

with a "splash" website opening on the page starting in December, 2010.  *See* <u>Ex. 29</u>.

At least as early as February, 2011, ACL became aware that a *Great American Steamboat*

*Company* was going to be operating the *American Queen* on the Mississippi River in direct

competition with its *Queen of the Mississippi* vessel.[42]  The next month, on March 30, 2011, ACL

filed a trademark application for the mark *Great American Steamboat Cruise*.[43] ACL claims to

have sent out marketing material using that term on March 25, 2011.[44] ACL later went on to use

that term in marketing materials for a particular cruise starting on October 20, 2012.[45] ACL has

only used the term *Great American Steamboat* intermittently over the years. Charles B. Robertson

indicated that the phrase was first used in some print and email advertisements sent to a limited

amount of consumers back in 2011 as more of a "test" case. *See* C.B. Robertson Depo., pp. 165-

166. The phrase was only used in connection with a single direct mail piece and in a couple of

---

[40] A subsidiary entity of HMS's parent company, HMS Global Maritime, Inc., once operated under the name Great American Ferries, LLC starting in 2006. *See* documents labeled HMS 99618-99620, attached as **Exhibit 40**.

[41] Mr. Kyte also registered the following domain names: <u>greatamericansteamboatcompany.org</u>, <u>.net</u>, <u>.info</u>, and <u>.biz</u>.  These were all originally registered on July 26, 2011. All of the "greatamericansteamboatcompany" domain names at issue will be collectively referred to as the "<u>GASC.com</u> domain name."

[42] *See* ACL 7135, attached as **Exhibit 41**; *see also* Deposition of Charles B. Robertson, 2/10/15 ("C.B. Robertson Depo."), p. 23. Cited portions are attached as **Exhibit 42**.

[43] *See* Certificate of Registration, attached as **Exhibit 43.**

[44] *See* date referenced as first use date in <u>Ex. 43</u>.

[45] *See* Certificate of Registration, attached as **Exhibit 44**.

email advertisements. *Id.*, pp. 135-136. ACL's former head of Internet marketing, Vincent Van Oss, testified that the term was never used in Internet marketing except as a paid search term starting in March, 2013. *See* Deposition of Vincent Van Oss ("Van Oss Depo."), pp. 64-65.[46] Mr. Van Oss didn't even consider *Great American Steamboat* to be a brand of ACL. *Id.*, p. 70. After the initial use in 2011, the phrase was not used again by ACL until 2015. C.B. Robertson Depo., pp. 165-166. Mr. Robertson considers *Great American Steamboat* to be a "languishing" brand and admits that its use has been minimal. *Id.*, pp. 172, 135.

After ACL filed its first application in March, 2011, HMS filed its own trademark application for the mark *Great American Steamboat Company*, based on the name it had been using in promotional material, as a business name and as a domain name starting as early as 2010. The present dispute takes its roots in the competing trademark applications (and uses) for *Great American* by the parties. ACL first filed a lawsuit against HMS in this Court alleging trademark infringement (the "First Action"). *See* case styled *American Cruise Lines v. HMS American Queen Steamboat Company, LLC, et al*, Case No. 1:11CV889, U.S. District Court for the District of Delaware. ACL claimed that HMS's use and attempted registration of the mark *Great American Steamboat Company* infringed upon its alleged prior rights to the mark *Great American Steamboat Cruise* and/or related use of the term *Great American*. ACL and HMS seemingly resolved their differences and were able to agree to settle the First Action by the end of January, 2012. The parties entered into a formal settlement agreement, effective February 9, 2012.[47] While the specific terms of settlement are now in dispute, the gist of the agreement, which is not in dispute, was that HMS would cease using the phrase and mark *Great American Steamboat Company* (and anything

---

[46] Cited portions of Mr. Van Oss's deposition are attached as **Exhibit 45**.
[47] *See* Settlement Agreement, attached as **Exhibit 46**.

confusingly similar thereto) and transition to a new business name and/or brand – surrendering its rights to the *Great American Steamboat Company* name and mark to ACL in exchange for a monetary payment. *See* Ex. 46. The final deadline for HMS to complete the transition to a new name under the Settlement Agreement was November 5, 2012. *Id*.

As a result of the settlement, HMS changed the name of the operating entity from *Great American Steamboat Company* to *American Queen Steamboat Company*. This name fell in line with the name of the iconic vessel. *See* Waggoner Depo., pp. 97-98, 185. HMS continued to use the GASC.com domain name as its primary web address until around July 18, 2012, when it instead began using the domain name americanqueensteamboatcompany.com ("AQSC.com"). *See* TMR Depo., pp. 49-50. The GASC.com domain names mirrored to the AQSC.com domain name until November, 2012. *Id*., pp. 52-54. At that time, all of the GASC.com domain names were deactivated and no longer resolved to an active website. *Id*., p. 29.

Despite this change, ACL contacted Defendants in October, 2012, concerned about what it perceived to be lingering use of the term *Great American* in some form. During these conversations, ACL demanded that HMS transfer to it the GASC.com domain names – arguing that those domain names should be transferred pursuant to the Settlement Agreement. HMS refused to transfer the domain names since those domain names were not included as part of that agreement.[48] ACL initiated the present lawsuit in February, 2013 following HMS's refusal to hand over the GASC.com domain names in response to ACL's demands.

---

[48] *See* HMS 2783-2786 and 2782, attached as **Exhibit 47**.

# IV.   SUMMARY OF APPLICABLE LAW

## A.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome "and a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party's initial burden is met by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Here, the facts relating to the transfer of rights to and use of the *American Queen* vessel and marks are not in dispute. Nor are the facts related to HMS's actions with respect to the GASC.com domain name.

## B.   TRADEMARK RIGHTS AND INFRINGEMENT UNDER THE LANHAM ACT

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indust., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) (citing *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983) (hereinafter "Lapp")). A trademark is defined in the Lanham Act, 15 U.S.C. §1137 as including "any word, name, symbol, or device or any combination thereof" used "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 768 (1992). The purpose of a trademark is to allow "buyers to identify the goods to which it is affixed as from a particular source and distinguishes those goods from similar merchandise of others." *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986).

It has long been established that the "basic rule of trade-mark ownership in the United States is priority." J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16:1, at 16-4 (2015). Priority, in both common law and registration rights, all "build upon this foundation of **first-in-time, first in-right**." *Id*. (Emphasis added). For federal registrations, "a constructive use priority dates from the date of filing of the application." *Id*. at 16-2.

To state a claim for both trademark infringement and unfair competition under the Lanham Act, a plaintiff must prove the following elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc*., 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. §1114, and federal unfair competition, 15 U.S.C. §1125, by identical standards"). "If the mark at issue is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved." *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 438 (3d Cir. 2000). Stated differently, once a party asserting trademark rights has presented a certificate of registration to the court then there is a presumption under the law that the party is the owner of valid and protectable trademark rights. *Sylvania Elec. Prods. v. Dura Elec. Lamp Co*., 247 F.2d 730, 732 (3d Cir. 1957) ("the registration of a trade-mark by the Patent Office furnishes an evidentiary presumption of validity.").

C.    **ABANDONMENT OF TRADEMARK RIGHTS**

Trademark abandonment is extremely difficult to prove.  Being in the nature of a forfeiture of rights, the elements of abandonment must be "strictly proved." *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981). The "strictly proved" standard means that abandonment must be shown by clear and convincing evidence.  *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (recognizing that because it constitutes the forfeiture of a property right, abandonment must be proven by clear and convincing evidence and finding no abandonment where the owner of the mark sought to sell the business under the mark); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) (party seeking abandonment has high burden of proof). ACL seeks a finding that the *American Queen* marks have been abandoned in order to (1) defend against the infringement claim asserted against it; and (2) offensively seek to prevent HMS from using and/or registering the terms *American Queen*, *American Queen Steamboat Company* and/or *American Empress*.

The issue of abandonment is governed by §45 of the Lanham Act, 15 U.S.C. §1127, which provides in pertinent part as follows:

> *A mark shall be deemed 'abandoned' . . .*
>
> *(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances.* **Nonuse for 3 consecutive years** *shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.*

*See* 15 U.S.C. §1127 (emphasis added). A party asserting abandonment of trademark must prove (1) discontinuance of use of the mark and (2) an intent not to resume use within a reasonably foreseeable time in the future.  *Eh Yacht, LLC v. Egg Harbor, LLC*, 84 F. Supp. 2d 556, 564 (D.N.J. 2000) (citing *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96 (5th Cir. 1984)).

## D.    CYBERSQUATTING

"Cybersquatting" is the bad faith, abusive registration and use of the distinctive trademarks of others as Internet domain names, with the intent to profit from the goodwill associated with those trademarks. *See Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001). The Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. §1125(d), makes it illegal for a person to register or to use with the "bad faith" intent to profit from an Internet domain name that is "identical or confusingly similar" to the distinctive or famous trademark or Internet domain name of another person or company. *See* 15 U.S.C. §1125(d). Parties asserting a cybersquatting claim are required to prove the following elements: (1) that it owns a distinctive or famous mark entitled to protection; (2) that the defendant's domain name is "identical or confusingly similar to" the distinctive mark; and (3) that the defendant registered the domain name with the bad faith intent to profit from it. *Shields,* 254 F.3d at 482. The law requires the mark at issue to be distinctive at the time the domain name at issue was registered and requires a showing of bad faith intent to profit from the domain name at the time the domain name was registered. *Id.*

## V.    <u>ARGUMENT</u>

### A.    THE *AMERICAN QUEEN* MARKS WERE NEVER ABANDONED

#### 1.  Defendants Own Incontestable Trademarks With Priority Over ACL as to the Term "American"

The *American Queen* has been in operation since 1995 and has enjoyed great success over the years. It is undisputed that the *American Queen* marks were registered with the Trademark Office in 1996 – with priority dating back to 1993 when the applications were first filed. *See* DI 129, ¶¶ 24, 38; *see also* D.I. 132, ¶ 13, p. 41; *see* <u>Ex. 2</u>. HMS, then, has senior rights to the term *American* as against ACL based on its acquisition of the *American Queen* vessel and associated marks and its continued use of those marks after the acquisition. HMS's rights are superior to any

rights ACL claims to have in its alleged *American* family of marks – effectively eliminating ACL's infringement claim assuming there is no finding of abandonment on the part of HMS or its predecessors. In order to effectuate an end-around of HMS's incontestable federal trademark registrations, ACL argues that all trademark rights to the *American Queen* marks have been abandoned. However, ACL is not able to meet the high burden of proof to show that the *American Queen* marks were abandoned. There has been no three-year period of non-use and there is no evidence that there was no intent to resume use by the owners of the *American Queen* marks.

## 2.   There Has Been No Three-Year Period of Non-Use of the *American Queen* Marks

Under the first prong of the abandonment test, ACL must establish by clear and convincing evidence that there has been a discontinuance of use of the mark. *See Eh Yacht*, 84 F. Supp. 2d at 565. The Lanham Act defines use of a mark as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. §1127. It is not the law that "the slightest cessation of use causes a trademark to roll free, like a fumbled football, so that it may be pounced on by any alert opponent." *Continental Distilling Corp. v. Old Charter Distillery Co*., 188 F.2d 614, 619 (D.C. Cir. 1950). The statutory standard calls for complete disuse. Temporary non-use has been found insufficient to support a finding of abandonment. *See Beech-Nut Packing Co. v. P. Lorillard Co.,* 273 U.S. 629 (1927); *United States Jaycees,* 639 F.2d at 139. "If there is continued use, a prospective intent to abandon the mark or business does not decide the issue of abandonment." *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc*., 458 F.3d 931, 937 (9th Cir. 2006).

ACL will likely claim that the alleged non-use period began when Ambassadors surrendered the vessel on November 15, 2008 and ended when the vessel was relaunched by HMS in April, 2012. However, this position ignores the activity that took place between November,

2008 and April, 2012, including the continued efforts to try and sell the vessel and the marketing, promotional and sales activity performed by HMS after it acquired the vessel.

As to the continued efforts to sell the vessel, before and after Ambassadors announced that it was going to cease operations for the 2009 season it was actively seeking to sell the vessel. *See* Exs. 13, 14 and 15. Then, within four months of taking control of the vessel after Ambassadors' surrender in November, 2008, the U.S. Government started advertising the *American Queen* for sale to the general public. *See* Ex. 16. Two months later, the *American Queen* was acquired by MARAD, who hired a third party to broker the sale of the vessel and equipped the vessel with physical safeguards to preserve its marketability. *See* Exs. 3, 19 and 20. By December of 2010, HMS entered into an agreement for the purchase of the *American Queen*. *See* Exs. 21 and 22.

HMS did not formally close on the vessel until August 3, 2011. Even prior to the closing, HMS undertook some limited marketing activity for the *American Queen* – including the setting up of a "splash" website and sending out some basic email advertisements. *See* Exs. 28 and 29. By the end of September, 2011, HMS had engaged in significant marketing for the vessel – with marketing consisting of website use, email blasts, print advertisements, press releases, direct mailings, post cards, brochures, webinars, television and print interviews, trade shows and travel agent and/or industry events – all of which featured reference to the *American Queen* brand. *See Id.*; and Ex. 1. HMS sold its first ticket on September 28, 2011. By the end of October, 2011, HMS had nearly $1.8 million in booked revenue and had spent over $800,000 in marketing expenses.[49]

The following timeline is illustrative of the activity which occurred with respect to the *American Queen* and *American Queen* marks between March, 2008 (the date it was announced

---

[49] *See* Exs. 32, 33 (bookings) and 35 (2011 marketing expenses).

24

that the *American Queen* would not operate in 2009) and April, 2012 (the day the *American Queen* was first sailed by HMS):[50]



AMERICAN QUEEN ACTIVITY (2008-2012)    

Using the November 15, 2008 date as the triggering of the alleged non-use period, the Court can analyze the use of the mark between November, 2008 and November, 2011 as the three-year period of alleged non-use. During that period you have continuing efforts to sell the vessel from November 2008 until it was actually sold in December, 2010. Then, you have HMS acquiring the vessel, engaging in hundreds of thousands of dollars in marketing and booking nearly $1.8 million in revenue by the end of October, 2011. There is no three-year period of non-use in this case. Any non-use that did take place was excused by the continued efforts to sell on the part of

---

[50] A full size version of this timeline is attached as **Exhibit 48**.

HMS's predecessors and by HMS's preparations to resume operations of the *American Queen* after its acquisition.

### 3. ACL Cannot Demonstrate by Clear and Convincing Evidence that There was Intent Not to Resume Use of the *American Queen* Marks

As to the second element of the abandonment test--intent not to resume use--ACL must show that the circumstances clearly and convincingly establish an intent not to resume use of the *American Queen* marks by one of the marks' owners. *Eh Yacht*, 84 F. Supp. 2d at 565. In this case, the *American Queen* may have transferred hands due to the cessation of the Majestic American Line by Ambassadors, but that alone does not demonstrate an immediate discontinuance of the mark with intent not to resume use. It is well established that the cessation of a business does not "automatically and immediately terminate its rights to a mark." *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985) ("neither the separation from tangible assets, by itself, nor the termination of a business, by itself, will necessarily and immediately vitiate a mark or its goodwill.") Further, the goodwill of an insolvent's mark is not automatically destroyed upon the bankruptcy and/or ceasing of operations of the owner. *Merry Hull & Co. v. Hi-Line Co., Inc.*, 243 F. Supp. 45, 50 (S.D.N.Y. 1965). As shown by the efforts of Ambassadors to sell the business, the efforts of MARAD to market and sell the vessel, and the efforts of HMS upon purchase of the vessel, ACL does not have any evidence, let alone clear and convincing evidence, that there was no intent to continue use of the *American Queen* marks.

The case of *Seidelmann Yachts, Inc. v. Pace Yacht Corp*., No. JH-87-3490, 1989 U.S. Dist. LEXIS 17486 (D. Md. Apr. 26, 1989) is particularly analogous to our case. In *Seidelmann*, the mark at issue was used, and eventually registered by the original owner in connection with the manufacture of yachts. The original owner later transferred the trademark rights, along with the associated yacht lines, to Mission Marine Associates. *Id.* at *3. Three years after the acquisition,

Mission Marine began to suffer financial difficulties unrelated to the line of yachts sold under the mark. *Id.* As a result, Mission Marine filed for bankruptcy and ceased all advertising and manufacturing. Mission Marine representatives admitted that the company had no intent to resume operations under the mark and were ceasing all operations. *Id.* at *4. As part of the bankruptcy, Mission Marine unsuccessfully attempted to sell the specific yacht line at issue, with the associated trademark rights, as a separate asset.  Five years after the bankruptcy and after use of the mark had ceased, Mission Marine separately sold the trademark rights to the plaintiff, who also manufactured yachts but did not purchase any of the Mission Marine physical assets during the bankruptcy. *Id.* at *6.

        In the subsequent infringement action, the defendant claimed that the mark at issue was abandoned by Mission Marine when it ceased operations and declared bankruptcy. The court disagreed and held there was no abandonment – finding that the defendant failed to show there was not intent to resume use of the mark. *See also Saratoga Vichy Spring Co.*, 625 F.2d 1037 (holding intent to resume business operations was not required to overcome the presumption of abandonment and finding no abandonment where owner was forced to involuntarily close its bottling facility and did not resume operations for over seven-years since, during the use hiatus, the owner continuously attempted to sell the business, goodwill and trademark).

        Acknowledging that abandonment is fact specific, the district court in *Seidelmann* considered the fact that Mission Marine was forced to file bankruptcy due to financial problems "with a division unrelated" to the mark at issue. *Id.* at 22. The court recognized that goodwill was still associated with the mark, there was intent to manufacture the yachts in substantially the same in nature and quality as the earlier yachts, and purchaser of the mark intended to resume operations

within a reasonable time, leading to the logical conclusion that the mark was never abandoned. *Id.* at 25-26.

Similarly, in *Eh Yacht,*, 84 F. Supp. 2d at 557, the plaintiff acquired a yacht-building business which included the business' trademarked name, EGG HARBOR, from the statutory receiver court-appointed to wind up the financial affairs of Marine Acquisitions, Inc. ("Marine"). Marine obtained ownership of the mark following the purchase of Egg Harbor Yacht Co. after it suffered financial setbacks. *Id.* at 559-560. Marine ceased operation in November of 1997 after several cash flow issues caused temporary suspensions of production. *Id.* at 560. Plaintiff eventually purchased all of Marine's assets in September of 1999.  The defendant claimed that the original mark was abandoned by Marine when Marine ceased operation and had no intent to reopen or use the trademark. *Id.*

Despite the fact that Marine closed its doors, the EGG HARBOR name continued to be in the marketplace and carried substantial goodwill.  The court looked for objective evidence of the intent to abandon and found ambiguous testimony regarding the plaintiff's decision to cease production due to financial constraints. In granting preliminary injunction to plaintiff, the Court found that the "defendants have failed to show by clear and convincing evidence that there was no intent to resume use of the EGG HARBOR mark, and the EGG HARBOR mark did not begin to 'roll free' at the moment that Marine ceased manufacture of the boats." *Id.* at 567. The Court granted temporary injunction in favor of the plaintiff finding it likely that the trademark remained with the assets when purchased through the receivership even after the closing of Marine. *Id.*

ACL is likely to cite to the deposition testimony of Diane Moore, wherein she indicated that Ambassadors had no intention of operating the *American Queen* again after the 2008 season and that there was no intent to continue operations at all under the Majestic America Line. *See*

28

Deposition of Diane Moore, 5/24/16 ("Moore Depo. #2"), pp. 42-43.[51] ACL will also cite to her testimony that Ambassadors had no intent to continue using the *American Queen* marks after the vessel was surrendered to MARAD in 2008. *Id*. at pp. 44-45. However, what Ms. Moore further testified to, and what the record has established, is that it was always Ambassador's intent to try and sell the *American Queen*, the *American Queen* marks, and all associated assets once it knew it was not going to operate the vessel again following the 2008 sailing season. *Id*. at pp. 67, 70-71. As the operations manager, Ms. Moore was admittedly not involved in the efforts to subsequently sell the assets or the marks.  It is undisputed that John Waggoner negotiated the potential purchase of the *American Queen* marks prior to the turnover of the vessel to MARAD and that Ambassador's subsequently negotiated the sale of those same marks to Mr. Waggoner and Defendants.

The requisite intent under §1127 can be the former owner of a mark, such as Ambassadors, but it also may be the intent of a third party as well.  As Professor McCarthy points out, citing to *EH Yacht, LLC v. Egg Harbor, LLC*, "if a manufacturer got into financial difficulty and closed its doors, the manufacturer may have not intended to resume business under the mark, but the creditors might very well have an intention to resume use within a reasonable time after seizing the assets to help defray the debts owed them."  McCarthy, Section 17.11, at 17-19 (2015); (citing *EH Yacht, LLC*, 84 F. Supp. 2d 556). The court in *Cash Processing Servs.* also relied on *Eh Yacht* in confirming that the test for abandonment can rest on a third party's intent to use the mark and "*any* valid intent to resume use within a reasonable time becomes relevant." *Cash Processing Servs. v. Ambient Entm't*, 418 F. Supp. 2d 1227, 1234 (D. Nev. 2006) (quoting *EH Yacht*, 84 F. Supp. 2d at 566). In analyzing the intent requirement, this court should look not just to the intentions of Ambassadors, but also to the intentions of the U.S. Government and MARAD in

---

[51] Cited portions of Ms. Moore's second deposition are attached as **<u>Exhibit 49</u>**.

seizing the *American Queen* with the intention to sell the vessel to continue its services and HMS's intent to resume its use.

ACL takes the untenable position in this case that Ambassador's bankruptcy and/or ceasing of operations in 2008 equates to intent not to resume use resulting in the abandonment of any trademark rights. Again, this position ignores the continued attempts to sell the vessel by the previous owners of the *American Queen* from Ambassadors, to the U.S. Government, to MARAD. Here, Ambassadors declared that it intended to sell its assets – including the *American Queen* vessel. The vessel eventually ended up in the hands of MARAD and it immediately and continuously attempted to sell the vessel upon acquisition. The intent by all parties that took possession of the *American Queen* was either to sell the vessel as an asset (Ambassadors, U.S. Government, and MARAD) or to resume use of the trademarks upon acquisition (HMS). There is no evidence of intent not to resume use of the *American Queen* marks.

### 4. The *American Queen* Marks Have Significant Residual Goodwill

Even if it were determined that there was a three-year period of non-use and/or an intent not to resume use of the *American Queen* marks, that would not be the end of the analysis. That is, the concept of "goodwill" is critical to an understanding of abandonment as it can apply to both the concept of use and intent to resume use. A trademark symbolizes the goodwill that a party has built in a product or business. *McLean v. Fleming*, 96 U.S. 245 (1877). Goodwill in a mark describes the consumer recognition or drawing power of a trademark. *See* McCarthy, 2:15 at 2-36. A trademark "has no independent significance apart from the goodwill it symbolizes." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984). When goodwill persists for some time in the minds of the consuming public the mark is said to have residual goodwill.

Residual goodwill relates to abandonment when use of a mark is discontinued but the consuming public still believes there is a continuity of the source of the goods or services. If residual goodwill exists, courts have held that the public interest should be protected by refusing to allow appropriation of even a long abandoned mark. *See e.g., American Motors Corp. v. Action Age, Inc.,* 178 U.S.P.Q. 377, 379 (1973) (holding finding of residual goodwill prevented finding of abandonment); *Ferrari S.P.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 11 U.S.P.Q. 2d 1843 (S.D. Cal. 1989) (holding strong goodwill in mark prevented finding of abandonment); *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947 (7th Cir 1992) (holding no abandonment even where the mark was out of use for a long period of time and/or the original use was sporadic because of the existence of residual goodwill); and *Defiance Button*, 759 F.2d at 1060 (applying the concept of residual goodwill to prevent abandonment of mark even after long period of non-use).

In this case, the *American Queen* is an iconic American river cruising vessel.  During the *American Queen's* operation from 1995 through 2008 it serviced roughly 250,000 passengers and averaged nearly $34 million per year in revenue. *See* <u>Exs. 3 and 6</u>. Millions of dollars were invested in marketing for the vessel – and it is estimated that millions of consumers would have come into contact with advertising for the *American Queen* (wherein the *American Queen* marks were referenced). *See* <u>Exs. 7, 8 and 9</u>.

The following timeline is illustrative of the history of the operation of the *American Queen* vessel over the years:[52]

---

[52] A full size version of this timeline is attached as **<u>Exhibit 50</u>**.



The *American Queen* operated with great success – garnering a strong reputation among the consuming public. The *American Queen* developed a loyal following among consumers and travel agents. For example, Rick Simonson, testified that when it became known that the *American Queen* was going to be relaunched by HMS, "People were hungry to sell it. People were hungry to buy it." Simonson Depo., p. 41. He further indicated that travel agents were "ecstatic" about the vessel's return. *Id.*, pp. 137-138. *See also* Waggoner Depo., pp. 101-102 (discussing loyal following). These statements are backed up by Mr. Simonson's testimony that he made substantial sales for the *American Queen* in 2012 (the year of relaunch). Simonson Depo., p. 41 ("all they had to do was say the boat was back and they had people buying it."). Third parties have also

recognized the iconic nature of the *American Queen* vessel. *See e.g,* TMR Depo., pp 46-47 ("Well, for people that are into paddlewheeling, you know, river cruising, the American Queen was -- is an icon in American cruising.  I mean, that -- that vessel is really a sentimental favorite of people."); and Moore Depo., pp. 76-77 (confirming that the *American Queen* was well recognized).

When HMS purchased the *American Queen*, it was understood that it was purchasing an asset which already held significant brand recognition and value and that it would continue to cultivate the already existing consumer recognition. Waggoner Depo., pp. 97-98, 185. HMS sought specifically to trade on the public's favorable association with the *American Queen* name.  *Id*. The residual goodwill to the *American Queen* marks did not dissipate simply because the *American Queen* did not operate during the 2009 through 2011 sailing seasons (and/or during the 2002 and 2006 seasons).

The residual goodwill and value of the *American Queen* marks is further established by the fact that HMS paid $15,000 for the assignment of the *American Queen* marks even after Ambassadors had relinquished rights to the vessel. Even ACL saw that there was some value to those marks when it attempted to purchase the *American Queen* marks from Ambassadors at the same time (settling instead for rights to the *Mississippi Queen* mark). Robertson Depo., pp. 213-215. *See Seidelman Yachts, Inc.*, 1989 U.S. Dist. LEXIS 17486 at *23-24 (acknowledging that an assignee's willingness to pay money for a mark is evidence that the mark had not lost its value as an indication of origin and a symbol of goodwill); *see also Defiance Button Mach. Co.,* 759 F.2d 1053 (finding that an offer of $10,000 for a mark and goodwill demonstrates that they have not lost their value and significance as an indication of origin even after a bankruptcy proceeding).

The goodwill of the *American Queen* marks did not erode between the last trip in November of 2008 and the purchase of the vessel in 2010. The goodwill of the *American Queen*

33

transferred with the purchase of the vessel and was maintained by the high quality services offered by HMS. Because of the residual goodwill that exists, it is in the consuming public's interest for there to be no finding of abandonment in this case.

**B.**    **SUMMARY JUDGMENT SHOULD ENTER ON HMS'S CLAIM FOR TRADEMARK INFRINGEMENT AGAINST ACL**

Since the *American Queen* marks were never abandoned, priority, the "basic rule of trademark ownership," governs. McCarthy, § 16:1, at 16-4 (2015).  A look at the factual timeline reveals that HMS's predecessors filed the applications for the *American Queen* marks in 1993. *See* Ex. 2. On the other hand, ACL first began using the term *American* when it first used the name *American Cruise Lines* in commerce in 1999.[53]  HMS, then, has the ability to prevent ACL from using marks which are confusingly similar to the *American Queen* marks and/or which would result in ACL unfairly competing with HMS in the market.

Assuming ACL's abandonment defense fails, there can be no dispute that HMS is the owner of valid, incontestable trademark rights to the *American Queen* marks. *See Sylvania Elec. Prods.*, 247 F.2d at 732 ("when a party asserting trademark rights presents a registration, that party is the owner of valid and protectable trademark rights."). The question then is whether ACL's use of the vessel names *American Eagle*, *American Pride*, *America*, and *America (plus another term)* is likely to cause confusion among the relevant consuming public.

Likelihood of confusion is said to exist "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Commerce Nat'l Ins. Servs.,* 214 F.3d at 438-39. Trademark infringement cases typically turn on the "likelihood of confusion" factors in the Third Circuit. *See Lapp*, 721 F.2d at 439. The *Lapp* factors include the following:

---

[53] *See* Certificate of Registration, attached as **Exhibit 51**.

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to expand into the defendant's market.

*Id.* No single factor is dispositive and any combination of factors can be considered in determining whether there is a likelihood of confusion. *Fisons*, 30 F.3d at 476. Each of these factors are addressed below.[54]

### 1. Similarity of Marks

Marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010) (citing *Fisons*, 30 F.3d at 477). The proper test of similarity is not a side-by-side comparison but, rather, "whether the labels create the same overall impression when viewed separately." *Sabinsa*, 609 F.3d at 183- (citing *Kos Pharms, Inc. v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004)). "The degree of similarity…needed to prove likely confusion will vary with the difference in the goods…. Where the goods…are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Sabinsa*, 609 F.3d at 183-184 (citing *Kos*, 369 F.3d at 713).

The comparison at issue here is between the term *American Queen* and the terms *American Eagle*, *American Pride* and *America*. While the marks at issue are not identical, all feature the

---

[54] There is no need to address the length of time the parties have coexisted without actual confusion since actual confusion has throughout the parties' coexistence. There is also no need to discuss the market expansion factor as the parties are already competing in the exact same market.

common use of the dominant term "American" or "America" as the leading term of a competing vessel name. When you couple the similarity in names with the similarity in services, trade channels, and target marks there is a high likelihood of confusion in this case.

### 2. Similarity of Goods/Services

The parties here offer virtually identical services from the standpoint that they both generally operate overnight cruise ship services using the same itineraries on the Mississippi River and Columbia/Snake Rivers. Both companies use similar types of vessels (paddle wheel style vessels) for these cruises.[55]

### 3. Strength of the *American Queen* Marks

A strong mark is "one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product." *Checkpoint Sys. v. Check Point Software Techs., Inc*., 269 F.3d 270, 282 (3d Cir. 2001) (citations omitted). If "a second comer adopts a mark substantially identical to a strong mark, there is a correspondingly high likelihood that consumers will mistakenly associate the newcomer's product with the owner of the strong mark." *Id*. In order to determine the relative strength of a particular trademark, in addition to looking at the inherent features of a mark, courts can look to the factual evidence of the mark's commercial strength or of marketplace recognition of the mark. *Sabinsa*, 609 F.3d at 184-185 (citing *A & H Sportswear*, 237 F.3d at 221). In determining the commercial strength of a mark, courts may look to the length of time the mark has been in use. *Ford Motor Co. v. Summit Motor*

---

[55] The primary distinction between the parties' services and vessels relates to the amenities offered and the general style of the vessel. By way of example, the *American Queen* is larger vessel that is more steeped in tradition – trying to draw a nostalgia toward the golden years of steamboat travel. *See* Ex. 1. By contrast, ACL's vessels are smaller and touted as more modern, state of the art and luxurious. *See* C.B. Robertson Depo. #2, pp. 75-76; and Deposition of Susan Shultz ("Shultz Depo."), pp. 82-83 (cited portions attached hereto as **Exhibit 52**.

*Prods.*, 930 F.2d 277, 297 (3d Cir. 1991) (noting that Ford had a strong mark in the "Ghosted GT" because it had used the mark for more than twenty years, extensively advertised and marketed the mark, and had a distinctive design.). Courts can also look to evidence of sales and advertising of products or services sold under the mark. *See* McCarthy, §11:83, at 11-257.

The *American Queen* is an icon in the U.S. river cruising industry and it has been that way since it was introduced in 1995 as the world's largest and most luxurious steamboat ever built. From that point on it had a loyal following – and was consistently the best performer for each of its owners over the years. Multiple witnesses have acknowledged the renown of the *American Queen*. *See e.g*, TMR Depo., pp. 46-47 ("… the *American Queen* was—is an icon in American cruising …."); Moore Depo., p. 77 (*see* previous); Kyte Depo., pp. 168-169 (confirming that the *American Queen* was well known for riverboats); *see also* Simonson Depo., p. 41; and Waggoner Depo., pp. 85, 97-98.

In terms of sales, the *American Queen* generated average annual revenues of more than $34 million between 1998 and 2008.[56] The *American Queen* was in high demand among consumers throughout its operation by Delta Queen.[57] While it was operated by Ambassadors, it enjoyed the highest revenues of any of the vessels in Ambassadors' fleet.[58] It is estimated that the *American Queen* carried over 250,000 passengers during its operations from 1995 through 2008. Kyte Depo., pp. 168-169. When the *American Queen* was reintroduced by HMS, travel agents were "hungry" and "eager" to sell the *American Queen* to their customers because there was such a demand for the famous vessel. *See* Simonson Depo., pp. 137-138.

---

[56] *See* Ex. 3, p. 75; and Ex. 6.
[57] Simonson Depo., pp. 98-103.
[58] *See* HMS 97181, attached as **Exhibit 53**; *see also* Simonson Depo., pp. 121-123.

In terms of marketing, over the years millions of people, other than those who actually sailed on the vessel, would have seen marketing for the vessel.  Kyte Depo., pp. 168-169.  HMS's predecessors spent millions of dollars in marketing for the vessel.  *See* <u>Exs. 7-9</u>. HMS itself spends a considerable amount on marketing the *American Queen*. During the initial launch of the company HMS spent millions of dollars to market the vessel.[59] HMS spent over $3 million in pre-launch sales and marketing costs.[60] HMS spent ▆▆▆▆▆▆ on marketing and advertising in 2012 (the first full year of operations for *the American Queen*), ▆▆▆▆▆▆ in 2013, ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ through June of 2016.[61]

HMS's expert, Dr. Basil Englis, confirms that the *American Queen* mark is strong through his expert witness report and testimony. *See* Expert Witness Report of Basil Englis, pp. 12-14, attached hereto as **Exhibit 56** (discussing confusion factors and concluding that the *American Queen* mark was strong).

### 4.  Similarity in Channels of Trade

Both parties acknowledge that they are direct competitors that advertise through similar channels. This factor weighs in favor of a likelihood of confusion finding.  *See Sabinsa*, 609 F.3d at 188 ("The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion.").

### 5.  Similarities in Target Markets

There is also no dispute that the parties generally market to the same customers: mostly ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *See* Waggoner Depo., pp. 88-89; Rubacky Depo., pp. 8-9; and  Robertson Depo., pp. 188-189.  Many of the parties' respective customers are

---

[59] *See* HMS 56778-56788, attached as **Exhibit 54.**
[60] *See Id*., *see also* <u>Ex. 35</u>.
[61] *See* HMS 94078-94080, 94504, 100669-100671 and100709, attached as **Exhibit 55**.

38

repeat passengers and experienced cruisers. *Id*. Given the identical nature of the parties' respective target market, this factor also weighs in favor of a finding of likelihood of confusion.

### 6.   Sophistication of Customers/Price

Both parties target high priced cruises to a sophisticated consumer.  HMS's cruises range from around ███████████ per person for a seven night cruise. *See* Deposition of Eric Welter, 6/15/16 ("Welter Depo."), pp. 39-40.[62]  Similarly, ACL's cruises average around ██████ per person for a ten-night cruise. C.B. Robertson Depo. #2, p. 73. This is a high dollar amount wherein customers are likely to exercise a great deal of care before making a purchasing decision. *See Sabinsa*, 609 F.3d at 186. Both parties also conduct a significant amount of business through travel agents. In those situations, consumers are relying on the travel agent to serve as a market intermediary who handles the purchasing decision. Here, there has been evidence produced showing that consumers and travel agents have been confused. *See* Englis Report, pp. 17-18 (discussing purchaser care and use of travel agents in great detail).  This factor is neutral or could be argued both ways in terms of its relevancy to the present determination.

### 7.   ACL's Intent

The Third Circuit holds that a defendant's intent to confuse or deceive as to the product's source is highly probative of likelihood of confusion. *See Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 205 (3d Cir. 1995). As will be discussed in the section on actual confusion, ACL was aware of actual consumer confusion being directed to it at least as early as 2010. The confusion has existed since 2010 and has, for the most part, remained consistent.  C.B. Robertson Depo. #2, pp. 41-42. Despite full knowledge of the confusion and full knowledge of HMS's claim to

---

[62] Cited portions of Mr. Welter's deposition are attached hereto as **<u>Exhibit 57</u>**.  Mr. Welter is the current head of marketing for HMS.

trademark rights to the term *American Queen*, ACL took steps to alter its longstanding vessel naming convention and change the names of the vessels that competed with HMS and began using *American* named vessels instead. This can be seen as a sign of purposefully attempting to lure away those potential customers who are looking to book cruises on the *American Queen*.

Finally, when confused customers have contacted ACL seeking to book on the *American Queen* or *American Empress*, ACL continues to try and sell those consumers on ACL's cruises. *See* Deposition of Dylan Bernstein ("Bernstein Depo."), pp. 22-24;[63] and Shultz Depo., pp. 162-164. ACL confirmed that it is likely that confused customers have booked on the *American Eagle* and/or the *America* thinking they were booking with HMS. C.B. Robertson Depo. #2, pp. 80-81, 92. The introduction of similar types of vessels, offering similar itineraries and using similar names by ACL is likely to cause confusion. ACL is aware of this confusion and has not acted to alter its practices. Indeed, it would appear that ACL intentionally tries to benefit from these actions and the resulting confusion. As a result, this factor weighs in favor of a likelihood of confusion.

### 8. Evidence of Actual Confusion

The Third Circuit holds that the actual confusion factor is particularly significant. *See Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt.*, LLC, 793 F.3d 313, 320 (3d Cir. 2015). According to the Third Circuit, evidence of actual confusion is highly probative of a likelihood of confusion. *Sabinsa*, 609 F.3d at 187. Courts from around the country have indicated that there is no better evidence of likelihood of confusion then the existence of actual confusion in the market. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417 (4th Cir. 1998) (substantial evidence of actual confusion supports finding of summary judgment of likelihood of confusion and infringement); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109

---

[63] Cited portions attached as **Exhibit 58**.

F.3d 275, 284 (6th Cir. 1997) ("evidence of actual confusion is undoubtedly the evidence of likelihood of confusion"); and *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999) ("evidence of actual confusion in the marketplace is often considered the best evidence of likelihood of confusion.").

Here, ACL became aware of confusion in the market starting in 2010 – and began documenting instances of confusion internally starting in October, 2011. *See* Shultz Depo., pp. 115-116. More than 150 instances of confusion between the two companies and their trademarks have been documented by ACL between 2011 and 2016.[64] ACL produced documentation of the instances of confusion that it has recorded since 2011 and provided an actual confusion log.[65] The instances of confusion documented by ACL's employees include confusion on the part of travel agents as well as on the part of consumers. This confusion is analyzed in great detail in the expert witness report of HMS's expert, Basil Englis. *See* Ex. 56, pp. 8-12.

Actual confusion evidence is also provided through the surveys and report of ACL's expert, Hal Poret. Mr. Poret conducted both a main test survey and control test survey on confusion. His main survey was designed to test whether consumers were confused between the parties' respective company names. Deposition of Hal Poret, 10/5/16 ("Poret Depo."), pp. 55-56.[66] His control survey was designed to test how much confusion was created when the company names were taken out of the equation. *Id.*, pp. 80-82, 85-86. Mr. Poret's control survey resulted in a confusion rate of 33.5% - meaning 33.5% of the survey respondents indicated they were confused

---

[64] HMS acknowledges that some confusion has been directed to it as well. However, not of the frequency and extent of the confusion that has been directed to ACL.  For example, John Waggoner indicated that HMS receives around ████████████ from consumers looking to contact ACL. *See* Waggoner Depo., pp. 47-55.
[65] *See* ACL Confusion Log, attached as **Exhibit 59**.
[66] Cited portions are attached as **Exhibit 60**.

based on factors <u>other than the company names</u>. *Id.*, p. 62. What is more, as part of Mr. Poret's survey, the survey respondents were asked to provide a brief explanation as to why they were confused. Those verbatim results were recorded and attached as part of Mr. Poret's expert report. Some survey respondents confirmed that they were confused over the parties' respective vessel names.[67]  Examples of the verbatim answers include: "Because the boat in the first section [for ACL] was the *American Queen* …."; "[i]t said *American Queen* both times"; "I'm pretty sure I saw a ship named the *American Queen* in the first section of the survey [the ACL section]…."; "boat is the same"; "[i]t says *American Queen*"; and "I think the ship's names, *American Queen*, is the same as the first cruise line's ship." *See* <u>Ex. 61</u>.

Finally, HMS's expert, Basil Englis, provides an in depth analysis of the likelihood of confusion factors and concludes based on the evidence and based on his expert opinions that there is a likelihood of confusion in this case.  *See* <u>Ex. 56</u>, pp. 4, 7-21 ("The introduction of similar types of vessels, offering similar itineraries and using similar names by ACL is likely to cause confusion" and providing opinions and analysis on all the *Lapp* factors). This factor weighs heavily in favor of a finding of likelihood of confusion.

## C.    SUMMARY JUDGMENT SHOULD ENTER ON ACL'S CYBERSQUATTING CLAIM

ACL claims that HMS violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d) by registering domain names with the words *Great American* in bad faith.  D.I. 129 at ¶¶ 174 – 175. As stated above, cybersquatting claims are generally reserved for conduct that constitutes the bad faith and abusive registration of domain names. *Shields*, *supra*. Most cybersquatting cases turn on the issue of "bad faith."  As such, the Lanham Act has set forth

---

[67] *See* Main Survey Verbatim Responses, attached as **Exhibit 61**.

42

a number of factors for a court to consider in evaluating whether there is bad faith conduct in a

given case.  *See* 15 U.S.C. § 1125(d)(i).  These factors includes the following:

1. The trademark or other intellectual property rights of the person, if any, in the domain name;
2. The extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
3. The person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
4. The person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
5. The person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
6. The person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
7. The person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
8. The person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
9. The extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 USCS §1125(d)(i); *see also Carnivale v. Staub Design, LLC*, 547 Fed. Appx. 114, 116 (3d Cir.

2013) (these factors "should be applied in a holistic manner and 'not [as a] mechanical exercise.'")

(quoting *Green v. Fornario*, 486 F.3d 100, 106 (3d Cir. 2007)).

The following timeline is illustrative of the actions of the parties with respect to the term

*Great American* and the GASC.com domain names:[68]

---

[68] A full size version of this timeline is attached as **Exhibit 62**.



ACL does not own either a famous or distinctive trademark incorporating the term *Great American* and did not when the domain names at issue were first registered back in 2010 and/or 2011. ACL did not even use that term until March, 2011.  Since ACL had never even used the term *Great American* when the term was purchased as part of the GASC.com domain names, it would impossible for HMS to have had bad faith intent to profit from that domain name at the expense of ACL when the domain names were registered.[69] The facts show that HMS purchased the domain name and began using the term *Great American* well before ACL, with the legitimate intent to use that term as the name of the *American Queen's* operating entity.

---

[69] There is likewise no evidence that ACL has ever used the exact mark *American Steamboat Company*.

44

After beginning negotiations to acquire the *American Queen*, and the related intellectual property, HMS formed the *Great American Steamboat Company* and registered the GASC.com domain names as early as July of 2010. In December of 2010, HMS even opened the website splash page featuring the name *Great American Steamboat Company*. This was all before ACL ever used thebm term *Great American Steamboat*. The mark was not yet distinctive to ACL who filed its application for *Great American Steamboat Cruise* three months later on March 30, 2011. Given the limited amount of use of the term *Great American Steamboat* by ACL from 2011 through today, there is nothing to indicate that this mark is either distinctive or famous.

The majority of the "bad faith" factors weigh in HMS' favor here as well. For example, there is no evidence that HMS had the intent to obtain the GASC.com domain names in order to sell them. Additionally, there is no evidence that HMS provided misleading contact information when applying to register the domain names. The domain names were registered in order to market and sell the *American Queen* and to otherwise promote the legitimate business of the company. HMS obtained the domain names with the *bona fide* intent of offering cruises on the *American Queen* as demonstrated by the relevant splash pages and email blasts. Lastly, the GASC.com domain names were not used at all by HMS after the deadline set forth in the settlement agreement for HMS to cease all use of the term *Great American Steamboat*.

There is no genuine dispute as to the facts related to the cybersquatting claim. ACL is unable to make a sufficient showing regarding a distinct mark, and HMS's alleged bad faith. This Court should grant summary judgment in HMS's favor as to the ACL's claim under the ACPA.

## CONCLUSION

Based on the foregoing, and as set forth herein, the Court should enter partial summary judgment in favor of HMS.

45

Dated: December 20, 2016

Respectfully submitted,

s/Richard A. Barkasy

_____
Richard A. Barkasy (#4683)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
824 N. Market Street, Suite 800
Wilmington, DE 19801
Phone:  (302) 888-4554
Fax:  (302) 888-1696
rbarkasy@schnader.com

-and-

Dennis D. Murrell (*pro hac vice*)
Brian P. McGraw (*pro hac vice*)
**MIDDLETON REUTLINGER**
401 S. 4th Street, Suite 2600
Louisville, Kentucky 40202
Phone: (502) 584-1135
Fax: (502) 561-0442
dmurrell@middletonlaw.com
bmcgraw@middletonlaw.com

*Attorneys for Defendants*