IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-324 (RGA) |
| | ) | |
| HMS AMERICAN QUEEN STEAMBOAT | ) | Redacted Public |
| COMPANY LLC and AMERICAN QUEEN | ) | Version |
| STEAMBOAT OPERATING COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF AMERICAN CRUISE LINES' OPENING BRIEF
IN SUPPORT OF ITS MOTION TO (I) PRECLUDE DR. BASIL ENGLIS
FROM TESTIFYING AT TRIAL ON LIKELIHOOD OF CONFUSION, (II) TO
LIMIT CATE ELSTEN TESTIMONY AT TRIAL TO CALCULATIONS OF DAMAGES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Stephen J. Kraftschik (#5623)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
skraftschik@mnat.com
    *Attorneys for American Cruise Lines, Inc.*

OF COUNSEL:

David McI. Williams (*pro hac vice*)
Michael R. Naccarato (*pro hac vice*)
GORMAN & WILLIAMS
36 S. Charles Street, Suite 900
Baltimore, MD  21201-3114
(410) 528-0600

December 20, 2016

## TABLE OF CONTENTS

Page

I.     NATURE AND STAGE OF THE PROCEEDINGS ..........................................................1

II.    SUMMARY OF ARGUMENT AND RELEVANT FACTS ...........................................1

III.   ARGUMENT .................................................................................................................2

       A.   STANDARDS UNDER RULE 702 AND DAUBERT..........................................2

            1.   Qualified ..............................................................................................2

            2.   Reliable Methodology and Validation ..........................................................3

            3.   Fit – Relevant and Will Assist Jury ............................................................3

       B.   DR. ENGLIS IS NOT QUALIFIED IN COMMERCIAL
            MARKETING OR THE CRUISE INDUSTRY.....................................................4

            1.   No Experience in Commercial Marketing ....................................................4

            2.   No Experience in the Cruise Industry ..........................................................5

            3.   Dr. Englis' Experience is in Quantitative Analysis ....................................5

       C.   DR. ENGLIS' EXPERTISE IS CONSUMER SURVEYS, BUT
            HE WAS NOT ALLOWED TO CONDUCT A SURVEY...................................6

       D.   DR. ENGLIS DID NOT FOLLOW A DISCIPLINED
            METHODOLOGY, HIS OPINIONS ARE NOT RELIABLE...............................6

            1.   No Disciplined Methodology; Little, if Any, Independent
                 Work ......................................................................................................6

            2.   Dr. Englis' Opinions Are the Opinions of Others, Not
                 Based on Any Facts Verified by Him ........................................................8

                 a.   Assumed "Iconic" Status of Vessel ...............................................10

                 b.   Assumed Revenues ........................................................................10

                 c.   Assumed Marketing Expenses .......................................................11

                 d.   Assumed Content of Marketing and Advertising ..........................12

                 e.   Assumed Consumer Demand..........................................................13

E.    Examples of Actual Confusion are Unconnected to Dr. Englis' Opinions and Should Be Excluded...............................................13

F.    DR. ENGLIS' OPINIONS ON INTENT ARE IMPROPER AND SHOULD BE EXCLUDED...............................................................14

G.    DR. ENGLIS' PROPOSED SUMMARIES OF AQSC'S ALLEGATIONS ARE UNRELIABLE, UNCONNECTED TO HIS OPINIONS, AND SHOULD BE EXCLUDED..............................14

H.    MS. ELSTEN'S PROPOSED TESTIMONY UNCONNECTED TO HER DAMAGES OPINIONS SHOULD BE PRECLUDED.......................15

1.    Ms. Elsten's Opening Report..................................................16

2.    Ms. Elsten's Rebuttal Report.................................................17

a.    Ms. Elsten's Rebuttal Addressing Mr. Rosenthal's Opinions Should be Excluded because it is Contrary to the Law, Ipse Dixit, and Outside her Expertise ........................17

b.    Ms. Elsten's Opinions on Abandonment Should be Excluded .............................................................18

c.    Ms. Elsten's Proposed Testimony that Incidents of Actual Confusion Indicate More Harm to AQSC than American is Based on Insufficient Facts, Flawed Methodology, and is Unreliable.......................................19

d.    Ms. Elsten's Proposed Testimony that American's Survey Expert Indicated that No More than 20% of Consumers Were Likely to Be Confused by AQSC's Use of the Disputed Mark Lacks Foundation, is Unconnected to Her Damages Opinion, and is Likely to Confuse the Jury ..................................20

IV.    CONCLUSION...............................................................20

<u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Advanced Medical Optics, Inc. v. Alcon, Inc.*,
No. Civ.A, 03-1995-KAJ, 2005 WL 782809 (D. Del. 2005) ................................5, 16, 17, 19

*AstraZeneca LP v. TAP Pharm. Prods.*,
444 F. Supp.2d 278 (D. Del. 2006)......................................................................................14

*B. Braun Melsungen AG v. Terumo Med. Corp.*,
749 F.Supp.2d 210 (D. Del. 2010)........................................................................................3

*Betterbox Communications Ltd. v. BB Technologies, Inc.*,
300 F.3d 325 (3d Cir. 2002)..................................................................................................9

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)..................................................................................................4

*Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.*,
921 F.2d 467 (3d Cir. 1990)..................................................................................................9

*Crowley v. Chait*,
322 F.Supp.2d 530 (D.N.J.,2004) ...................................................................................10, 14

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)...................................................................................................2, 3, 4, 6

*De Jager Const., Inc. v. Schleininger*,
938 F. Supp. 446 (W.D. Mich. 1996) ..................................................................................16

*Diaz v. Johnson Matthey, Inc.*,
893 F. Supp. 358 (D.N.J.1995) .............................................................................................5

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.*,
625 F. Supp. 571 (D.N.J.1985) .............................................................................................9

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)..................................................................................................3

*Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc.*,
546 F. Supp.2d 155 (D.N.J. 2008) ....................................................................................8, 16

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)....................................................................................................3

*Inventio AG v. Thyssenkrupp Elevator Corp.*,
No. CV 08-874-RGA, 2014 WL 554853 (D. Del. Feb. 6, 2014) ...........................................17

*Kos Pharm., Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004)...........................................................................4

*Kumho Tire v. Carmichael*,
526 U.S. 137 (1999)........................................................................................6

*Lauria v. Amtrak*,
145 F.3d 593 (3d Cir.1998)............................................................................4

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
306 F. App'x 781 (3d Cir.2009) ....................................................................4

*Montgomery County v. Microvote Corp.*,
320 F.3d 440 (3d Cir. 2003)..........................................................................9

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
345 F.Supp.2d 431 (D. Del. 2004)...............................................................14

*Pharmacia Corp. v. Alcon Laboratories, Inc.*,
201 F.Supp.2d 335 (D.N.J. 2002) .................................................................9

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ...........................................................................8

*Schneider ex rel. Estate of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)......................................................................3, 4

*SEC v. Lipson*,
46 F.Supp.2d 758 (N.D.Ill.1998) ............................................................8, 15

*Surace v. Caterpillar, Inc.*,
111 F.3d 1039 (3d Cir. 1997).........................................................................5

*Thompson v. Haynes*,
305 F.3d 1369 (Fed. Cir. 2002)....................................................................18

*Tyco Indus. Inc. v. Lego Sys. Inc.*,
5 U.S.P.Q.2d 1023, 1987 WL 44363 (D.N.J.1987), *aff'd*, 853 F.2d 921 (3d
Cir. 1988) .......................................................................................................9

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir.2003)..............................................................................8

*United States v. Tomasian*,
784 F.2d 782 (7th Cir.1986) ........................................................................15

*Waldorf v. Shuta*,
142 F.3d 601 (3d Cir.1998)............................................................................3

**Other Authorities**

29 C. Wright & V. Gold, *Federal Practice & Procedure* § 6273 (3d ed. 1997) .......................... 15

**Rules and Statutes**

Fed. R. Evid. 403 ........................................................................................................................ 8

Fed. R. Evid. 702 ..................................................................................................................... 2, 3

Fed. R. Evid. 703 ...................................................................................................................... 15

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff American Cruise Lines, Inc.'s Fourth Amended Complaint was filed March 31, 2016, amending and restating American's prior claims for, among other things, breach of contract, infringement of American's registered and common law trademarks, false and misleading designation of origin, violation of federal anti-cybersquatting law, violation of Delaware Deceptive Trade Practices Act, and common law unfair competition. *See* D.I. 129. Expert discovery closed on October 28, 2016. D.I. 154. A hearing on summary judgment motions is scheduled for April 12, 2017. A trial date has not been set.

## II.    SUMMARY OF ARGUMENT AND RELEVANT FACTS

<u>Basil G. Englis, Ph. D</u>. Dr. Englis is a quantitative analyst and survey expert who was retained by AQSC to provide an opinion of the likelihood of confusion between the parties' trademarks. Exh. A at 3. AQSC, however, instructed Dr. Englis not to conduct a survey. Instead, AQSC spoon-fed information to Dr. Englis that he, in turn, put into his report ("I was retained to review documents . . . and to provide an opinion as to likely confusion"). *Id*. Dr. Englis has no experience in the marketing or advertising industry. Dr. Englis did not research branding, consumer behavior, or any aspect of the cruise industry relevant to this dispute. He teaches a few general marketing courses. Without a survey, he is not qualified to opine on the likelihood of confusion caused by trademarks and names used by competitors in the overnight passenger cruise industry, the particular industry within which this case arises. Dr. Englis' opinions do not fit what is needed - a marketing analysis - nor what he is qualified to do - conduct a survey. As a result, Dr. Englis' testimony would be of no assistance to the Court or jury, and all of his disclosed opinions and proffered testimony should be stricken.

<u>Cate M. Elsten</u>. Ms. Elsten was retained by AQSC to provide a damages opinion. Exh. D

at 1 ("I have been asked to provide an opinion regarding damages . . . ."). Ms. Elsten states in the Introduction to her Opening Report that she assumed liability and does not provide opinions relevant to a determination of liability. *Id*. ("As in all cases … an assumption that liability will be found is necessary as a basis for my analysis. This does not imply I have been engaged to provide opinions on issues relevant to a determination of liability or have determined that such liability exists.") Nonetheless, only 8 out of the 26 pages in her Opening Report relate to the calculation of damages. *See* Exh. D at 17-24. The vast majority of her Opening Report is unconnected to her damages opinion and unabashedly designed to summarize alleged facts, serve as a vehicle to admit into evidence hearsay, and to usurp the role of the finder of fact.

Similarly, in her Rebuttal Report, Ms. Elsten offers legal opinions on the abandonment of the AMERICAN QUEEN trademark (Exh. E at 7-9) and the reliability of opinions provided by American Cruise Lines damages expert, as measured against an improper legal standard and an *ipse dixit*[1] marketing analysis. *See* Exh. E at 10-29, 34-36. Ms. Elsten's damages opinions are <u>not</u> challenged in this brief. American Cruise Lines seeks to limit Ms. Elsten's testimony to her damages opinion, as summarized in Section III.C of her Opening Report (Exh. D at 18-24) and Sections III.F and IV in her Rebuttal Report (Exh. E at 29-34).

## III.    ARGUMENT

### A.    <u>Standards Under Rule 702 and *Daubert*</u>

#### 1.    Qualified

Federal Rule of Evidence 702 requires that only reliable testimony, offered with a sufficient factual basis, be admitted. Rule 702's requirements have been examined in detail by

---

[1] He himself said it; a bare assertion resting on the authority of an individual. Black's Law Dictionary. (4th Ed.).

the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and have been said to embody "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741–43 (3d Cir. 1994)); *see also B. Braun Melsungen AG v. Terumo Med. Corp.,* 749 F.Supp.2d 210, 222 (D. Del. 2010). In terms of expert qualifications, an inquiry under Rule 702 must address whether the expert witness has "'specialized knowledge' regarding the area of testimony." *Elcock,* 233 F.3d at 741 (quoting *Waldorf v. Shuta,* 142 F.3d 601, 625 (3d Cir.1998)). The basis of this specialized knowledge may be "practical experience as well as academic training and credentials." *Id.* (internal quotation marks and citation omitted). At a minimum, however, "a proffered expert witness must ... possess skill or knowledge greater than the average layman." *Id.* (internal quotation marks and citation omitted). The United States Court of Appeals for the Third Circuit has tended to apply this standard liberally. *Id.*; *see also Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir. 2003).

### 2. Reliable Methodology and Validation

With regard to the second requirement of reliability, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590; *Schneider,* 320 F.3d at 404. The information provided by experts should be "ground[ed] in the methods and procedures of science" and be "more than subjective belief or unsupported speculation." *Id.* In examining this requirement, a court's focus must be on "principles and methodology" rather than on the conclusions generated by the expert. *Daubert,* 509 U.S. at 595; *Schneider,* 320 F.3d at 404.

### 3. Fit – Relevant and Will Assist Jury

- 3 -

The third requirement of expert testimony, the "fit" requirement, "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 591–92 (internal quotation marks and citation omitted); *see also Schneider,* 320 F.3d at 404. The standard for fit, however, is not a high one; it is met "when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Meadows v. Anchor Longwall & Rebuild, Inc.,* 306 F. App'x 781, 790 (3d Cir.2009) (quoting *Lauria v. Amtrak,* 145 F.3d 593, 600 (3d Cir.1998)).

**B.    Dr. Englis Is Not Qualified in Commercial Marketing or the Cruise Industry**

**1.  No Experience in Commercial Marketing**

Dr. Englis lacks practical experience qualifying him as an expert on the likelihood of confusion between competitors in the travel industry.[2] Dr. Englis has been a professor most of his life. Exh. B at 38:10-39:9. He has never worked at an advertising agency or in a marketing department; has never managed a brand or corporate brand family; and, has never written advertisements or made media buys for a company. Exh. B at 41:4-20.

Although Dr. Englis teaches a few general marketing courses on consumer behavior and marketing strategy (Exh. B at 12:24-13:7), generalized marketing knowledge is insufficient to support specific opinions on travel industry marketing practices, prominence of competitors and brands, differentiation of services, and drivers of consumer purchases. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) (excluding testimony, holding ". . . background,

---

[2] *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004) (listing factors adapted by the Third Circuit for considering likelihood of confusion between competitors). Dr. Englis does not have practical experience to evaluate these factors.

education, and training may provide an expert with general knowledge to testify about general matters, [but] more specific knowledge is required to support more specific opinions."); *see also Advanced Medical Optics, Inc. v. Alcon, Inc.*, No. Civ.A, 03-1995-KAJ, 2005 WL 782809, at *9 (D. Del. 2005). While practical experience may result in "specialized knowledge" qualifying an expert, Dr. Englis has none in marketing or the overnight passenger cruise industry.

Courts exclude experts when training and experience are lacking in the area in which testimony is offered. *See, e.g., Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997) (affirming exclusion of electrical and mechanical engineer with 20 years of experience because of little or no training and experience in designing equipment for human safety); *Diaz v. Johnson Matthey, Inc.,* 893 F. Supp. 358, 373 (D.N.J.1995) (doctor excluded from testifying about salt allergy because he had limited experience with patients and limited familiarity with literature regarding the illness).

## 2.  No Experience in the Cruise Industry

Dr. Englis, admittedly, is not an expert in the travel industry (Exh. B at 75:18-21) and has little experience with that industry.[3] As a result, Dr. Englis does not have knowledge of competitors in the travel industry, relative market share, market segmentation, marketing practices, branding similarities and differences, relative importance of cruise brands and vessels names, or drivers of consumer demand. Exh. B at 128:20-132:7.

## 3.  Dr. Englis' Experience is in Quantitative Analysis

Dr. Englis is a survey expert.  He is an experimental social psychologist trained in research methodologies relating to social sciences.  Exh. B at 38:10-39:9. Dr. Englis' service as

---

[3] Dr. Englis testified that he was retained once by American Airlines to conduct a likelihood of confusion survey based on use of keywords, but has not worked in the travel industry as an expert witness or otherwise. Exh. B at 25:14-26:7; 73:10-74:11.

an expert witness has been, for the most part, to design and conduct surveys. Exh. B at 78:17-24. He has been engaged as an expert more than a dozen times on likelihood of confusion issues where he typically performed quantitative studies or surveys to support his opinions. Exh. B at 42:21-43:13. Dr. Englis' "specialized knowledge" on likelihood of confusion derives from his training, skill and experience in quantitative analysis, not from practical experience.

### C. Dr. Englis' Expertise is Consumer Surveys, But He Was Not Allowed to Conduct a Survey

Dr. Englis is a survey expert whom AQSC instructed <u>not</u> to conduct a survey. AQSC made the strategic decision not to commission a survey in this matter. *See* Exh. B at 97:10-98:20 (When he raised the issue, Dr. Englis was told AQSC did not want a survey.). Instead, AQSC asked Dr. Englis to review documents and provide an opinion on likelihood of confusion. Exh. A at 3; Exh. B at 94:10-97:6. Without conducting a survey, Dr. Englis cannot apply his specialized knowledge to assist the trier of fact to understand the evidence or determine a fact in issue.

### D. Dr. Englis Did Not Follow a Disciplined Methodology, His Opinions Are Not Reliable

#### 1. No Disciplined Methodology; Little, if Any, Independent Work

Dr. Englis failed to employ "methods and procedures of science," but rather, based his opinions on subjective belief or unsupported speculation. Dr. Englis did nothing to acquaint himself with the cruise industry and its customs and practices and, overall, did very little to investigate facts. As in *Kumho Tire v. Carmichael*, 526 U.S. 137, 153-154 (1999), Dr. Englis' opinion was written without the use of a credible methodology, analysis or technique regarding the particular matters to which his testimony is directly relevant, namely, confusion in the marketplace and the source of confusion. Given these deficiencies, Dr. Englis' opinions should be rejected by the Court as failing to meet the *Daubert* standard for reliability.

- 6 -

The universe of information considered by Dr. Englis in forming his opinions consists of documents and deposition transcripts provided by AQSC' counsel and review of a few websites. Exh. B at 132:23-133:15. Dr. Englis did not review the entirety of deposition transcripts, but instead skimmed documents or performed limited searches for terms relating to a particular topic. Exh. B at 82:24-83:21. Dr. Englis did not interview customers, prospective customers, or travel agents (Exh. B at 132:8-22) or conduct or review any studies relating to sources of confusion. Exh. B at 134:22-135:1. Dr. Englis did not even read reports of American Cruise Lines' experts or bother to issue a rebuttal report addressing any opinion. Exh. B at 79:18-82:14. As indicated by Dr. Englis, he was asked to review documents and provide an opinion. Exh. A at 3. This is what he did and no more. As a result, Dr. Englis does not have "good grounds" for his opinions.

In fact, Dr. Englis testified that <u>all</u> of his opinions in this matter are based on his assumption that AQSC' "American Queen" mark has seniority over all American Cruise Lines marks; and, his opinions would "flip" to conclude that AQSC' actions are causing confusion if the "American Queen" mark is not found to be senior. Exh. B at 125:11-127:7; 229:12-230:4.[4] By his own admission, Dr. Englis' opinions on likelihood of confusion depend on which marks are found to infringe, if any. As a result, Dr. Englis cannot assist the trier of fact in understanding evidence or determining a fact in issue given his opinions are based on his assumption of facts and subject to change. Further, Dr. Englis' opinions are totally dependent on seniority, a legal issue separate from likelihood of confusion.

---

[4] Additionally, Dr. Englis assumed all existing and future marks used by AQSC are or will be senior to American Cruise Lines' marks without conducting any analysis. *See, e.g.*, Exh. B, 230:5-231-7 (Dr. Englis did not consider whether AQSC's "American Empress" mark relates to its "American Queen" mark.).

### 2. Dr. Englis' Opinions Are the Opinions of Others, Not Based on Any Facts Verified by Him

AQSC seeks to use Dr. Englis to summarize alleged facts known by others. Such testimony comes "dangerously close to usurping the jury's function" and "implicates Rule 403 as a 'needless presentation of cumulative evidence' and 'a waste of time.'" *United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir.2003); *SEC v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand."). Also, Dr. Englis' proffered summaries of alleged facts would unduly prejudice American Cruise Lines and should be precluded.

Dr. Englis' opinions regarding the strength of the AMERICAN QUEEN trademark are unreliable because the opinions are not based on sufficient facts or data. For example, Dr. Englis states *ipse dixit* that "[s]trong trademarks are widely known brands in their industries" and then summarizes self-serving testimony and cherry-picked documents provided by AQSC to support his conclusion that the vessel named *American Queen* was well-known. Exh. A at 12, ¶ 53. Dr. Englis assumes without explanation that a "known" vessel *per se* means the name of the vessel constitutes a strong trademark. *Id*, ¶ 53-57. He fails to explain, however, why he "believes" the AMERICAN QUEEN trademark is strong, when the mark purportedly became strong, the relevant market(s) in which the mark is strong, or known services associated with the mark. Also, Dr. Englis fails to explain use of trademarks and branding practices in the travel industry, including the relevance or importance of a vessel name, if any, to marketing and selling cruises. He offers no foundation to connect use of vessel names to his opinions or issues in this case. "[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc.*, 546 F. Supp.2d 155, 181 (D.N.J. 2008) (quoting *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996)).

Dr. Englis should have applied his expertise in research methodologies to answer questions regarding the strength of marks in this case and the relevance of vessel names to selling cruises, if any. Dr. Englis testified that a survey could be developed to determine whether a trademark is strong and widely known in the industry (Exh. B, 72:10-23; 244:16-245:2) and to determine the "fame" of a mark. Exh. B at 68:25-69:15. AQSC, however, instructed Dr. Englis not to conduct a survey, presumably because it knew the results would be unfavorable.[5] Instead of a survey, AQSC provided Dr. Englis with cherry-picked information and asked him to produce a report. Deprived of empirical data from a survey and related scientific testimony to assist the finder of fact, the Court is left with only personal knowledge or practical experience of Dr. Englis to evaluate in achieving its reliability gatekeeping function. *Betterbox Communications Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (citation omitted). Here, Dr. Englis testified knowing nothing of the cruise industry and has never worked in commercial marketing.

Dr. Englis has no basis to opine on the strength of the AMERICAN QUEEN mark absent conducting a survey and interpreting the results. Dr. Englis' opinions on the strength of the AMERICAN QUEEN mark should be excluded because he lacks the expertise to support his opinions. These opinions should also be excluded because they are based solely on information selectively provided by AQSC's counsel and not independently tested or verified. *See, e.g Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003) (excluding

---

[5] The failure to conduct a survey justifies an inference "that the [party] believes the results of the survey will be unfavorable." *Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 475 (3d Cir. 1990); *see also Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F. Supp. 571, 583 (D.N.J.1985); *Tyco Indus. Inc. v. Lego Sys. Inc.,* 5 U.S.P.Q.2d 1023, 1033, 1987 WL 44363 (D.N.J.1987), *aff'd,* 853 F.2d 921 (3d Cir. 1988); *Pharmacia Corp. v. Alcon Laboratories, Inc.,* 201 F.Supp.2d 335, 373 (D.N.J. 2002).

testimony, in part, because opinion based on a sampling of tapes selected by counsel); *Crowley v. Chait*, 322 F.Supp.2d 530, 547 (D.N.J.,2004) (barring testimony based on review of depositions and deposition summaries provided by counsel).

Following are examples of unreliable and insufficient facts and data on which Dr. Englis bases his opinion regarding the strength of the AMERICAN QUEEN mark.

### a.  Assumed "Iconic" Status of Vessel

Dr. Englis concludes that the vessel named *American Queen* is "iconic," "luxurious" and had "fame" based solely on the testimony of AQSC' Chairman and former electronic marketing vendor. *See* Exh. A at 12 ¶¶ 54-55. Relying on these self-serving representations, Dr. Englis *assumed* that the vessel named *American Queen* was prominent and had meaning to consumers interested in a cruise.  Exh. B at 178:13-25.  This opinion lacks foundation and is speculative.

### b.  Assumed Revenues

Dr. Englis relies on inaccurate historical, *ipse dixit*, passenger and financial information provided in AQSC's responses to interrogatories, AQSC's investor solicitation materials, and the testimony of AQSC's former president. *See* Exh. A at 5 ¶¶ 14-15; Exh. A at 12 ¶¶ 56-57. Also, he "spins" unreliable or incomplete information that results in misleading statements of (alleged) facts. For example, compare paragraphs 57 and 14 of Dr. Englis' report. Exh. A at 5 ¶ 14; Exh. A at 12 ¶ 57. In paragraph 57, Dr. Englis lists total <u>annual</u> revenues purportedly generated by operation of the *American Queen* vessel, by year, for the periods 1997 – 2000 and 2007 –2008. Conspicuously absent are the annual revenue numbers for the six-year period 2001 – 2006 when the *American Queen* vessel was out-of-service in the operator's bankruptcy or owned by Delaware North, a private company. No data is available for this time period; Dr. Englis refers to none.

In paragraph 14, however, Dr. Englis concludes that the *American Queen* vessel "generated average annual revenues of more than $34 million between 1998 and 2008" notwithstanding the absence of data for almost half of that time period, which makes this statement misleading.[6] Assumed financial and statistical data in Dr. Englis' report for the years 2001 – 2006 is without foundation. Other historical financial and statistical data is based on AQSC's untested representations, and is also unreliable.

### c.  Assumed Marketing Expenses

Dr. Englis relies on clearly inaccurate information to conclude that "significant expenditures" have been "associated with marketing of the *American Queen* vessel over the years." *See* Exh. A at 13 ¶ 58. For example, Dr. Englis cites to a 10-k Annual Report filed with the Securities and Exchange Commission showing "selling, general and administrative" expenses and represents that the holding company's expenses are indicative of the amount spent to market cruises on the *American Queen* vessel during 1998, 1999, and 2000.  In fact, the cited to expenses are those of a holding company that operated multiple cruise lines of which Delta Queen Steamboat Company, then operator of the *American Queen* vessel and several other *Queen* vessels, was only one.

Dr. Englis, however, admits that he does not understand the data he cited and relies on. Dr. Englis testified that he (1) did not realize the cited selling, general and administrative expenses related to multiple cruise lines owned by a holding company[7]; (2) did not know what

---

[6] Similarly, Dr. Englis relied on AQSC "estimated" passenger counts and ignored no passenger data is available for the six-year period 2001 – 2006. Exh. B, 166:22-25.

[7] *See* Exh. C (excerpt from 2000 10-k Annual Report cited by Dr. Englis at 13, n. 65-67; Bates stamped HMS 97011-97098). The 10-k report is for a holding company that operates four (4) cruise lines. Exh. C at HMS 97012. The numbers relied on by Dr. Englis come from the consolidated statements for the entire company. *See* Exh. C at HMS 97034.

portion of the cited selling, general and administrative expenses, if any, was actually spent on marketing and, (3) conceded that he has reviewed no evidence of even a single advertisement having been published during this time containing the words "American Queen." Exh. B at 246:20-251:19. Similarly, Dr. Englis cites the consolidated selling and general administrative expenses for the entire holding company for the years 1994, 1995, and 1996 as being marketing expenses for cruises on the *American Queen* vessel.[8]

Dr. Englis' use of selling, general and administrative expenses of the holding company operating multiple cruise lines does not fit his opinion on marketing expenses, if any, relating to the *American Queen* vessel and is of no help to the trier of fact. Moreover, proffered testimony on this information is likely to mislead the jury and will unduly prejudice American Cruise Lines. Further, Dr. Englis has no training or experience as an accountant and therefore, is not qualified to interpret financial data contained in 10-k Annual Reports.

### d.  Assumed Content of Marketing and Advertising

Dr. Englis' conclusion that vessels formerly operated by the Delta Queen Steamboat Company were "featured or mentioned" in thousands of articles and millions of brochures is without foundation. *See* Exh. A at 13, ¶ 59. The 10-k Annual Reports cited by Dr. Englis state that "Delta Queen Steamboat Company" or its "'Steamboatin' vacations" were featured or mentioned in articles. *See* Exh. F at HMS 96645 and Exh. G at HMS 96689. The referenced 10-k reports do not describe the content of advertisements. Dr. Englis speculates as to the number and

---

[8] *See* Exh. F (excerpt from 1996 10-k Annual Report cited by Dr. Englis at 13, n. 69, Bates stamped HMS 96642-96685); Exh. G (excerpt from 1997 10-k Annual Report cited by Dr. Englis at 13, n. 68, Bates stamped HMS 96686-96736). The 10-k reports are for a holding company that operates two (2) cruise lines and a hotel, among other things. The numbers relied on by Dr. Englis come from the consolidated statements of the entire company.  Exh. F at HMS 96703.

types of advertisements that may have mentioned vessels, if any. If Dr. Englis would have researched the travel industry, he would know that promotion and marketing in the industry focus on corporate brand name, itineraries, and destinations. The documents relied on by Dr. Englis do not support is assumption that vessels were featured in the articles.

### e. Assumed Consumer Demand

Dr. Englis' *ipse dixit* conclusion that there "was apparently pent up demand" for cruises on the vessel named *American Queen* when placed back in service in 2012 is without basis and conflicts with his other opinions. *See* Exh. A at 13 ¶ 60. Dr. Englis relies solely on the testimony of a former employee of AQSC, and admits there is no empirical evidence that initial ticket sales would have been different if the vessel named had changed. Exh. B at 184:4-17.

Dr. Englis did not consider whether American Cruise Lines' operation of paddlewheel riverboat cruises on the Columbia and Snake Rivers for two years, and advertising nationally paddlewheel riverboat cruises on the Mississippi River more than a year, prior to AQSC first offering cruise services created demand. Exh. B at 184:4-186:20; 200:9-201:5. Nor did Dr. Englis consider whether AQSC benefited from consumers and travel agents associating it with American Cruise Lines. Further, Dr. Englis' opinions directly conflict. He states in paragraph 60 of his report that "pent up demand" existed due to failure of "reasonable substitutes" in the market while stating in paragraph 70 that American Cruise Lines' cruises services relating to the Columbia and Snake River and the Mississippi River are "essentially substitutes."

### E. Examples of Actual Confusion are Unconnected to Dr. Englis' Opinions and Should Be Excluded

Dr. Englis cites examples of actual confusion in his report. Exh. A at 8-11 ¶¶ 30-50. He testified that the examples do not inform as to source of confusion or provide helpful information other than to simply note that confusion exists between the companies. Exh. B at 142:19-25;

234:4-235:14. Both parties assert confusion exists in the U.S. overnight passenger cruise market. There is no need for Dr. Englis to summarize documents and testimony regarding instances of actual confusion for the jury. The jury has the ability to consider the information on its own. *Crowley*, 322 F.Supp.2d at 553 (stating expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand) (citation omitted).

### F.  Dr. Englis' Opinions on Intent are Improper and Should Be Excluded

Dr. Englis' opinions that American Cruise Lines intended to infringe AQSC's trademarks are legal determinations that he is not qualified to make, and should be excluded. *See* Exh. A at 20-21, ¶¶ 98-101. *See AstraZeneca LP v. TAP Pharm. Prods.,* 444 F. Supp.2d 278, 293 (D. Del. 2006) (precluding expert opinion of what party recognized, felt, concluded, or was concerned about); *Oxford Gene Tech. Ltd. v. Mergen Ltd.,* 345 F.Supp.2d 431, 443 (D. Del. 2004) (recognizing that expert witnesses are not "permitted to testify ... regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred.").

### G. Dr. Englis' Proposed Summaries of AQSC's Allegations are Unreliable, Unconnected to His Opinions, and Should Be Excluded

In Section VII (Background) of his report Dr. Englis summarizes facts alleged in AQSC's Counterclaim and responses to interrogatories. *See* Exh. A at 4-7, ¶¶ 12-24. He begins each paragraph with the phrase "It is my understanding that …" demonstrating his lack of knowledge regarding provided statements of fact and signaling that he is simply summarizing representations made by AQSC. For example, Dr. Englis states in paragraph 14 that the operation of the *American Queen* vessel was "a success by industry standards," but admits he did not analyze industry standards and does not know what level of revenue would indicate "success" or if success was measured by net profit, information not provided to him. Exh. B at 164:12-166:15. As another example, Dr. Englis testified that AQSC provided him an estimate of

- 14 -

the number of people who cruised aboard the vessel *American Queen* during the period 1996-2008. Exh. B at 166:22-25.

AQSC attempts to use Dr. Englis as a vehicle for admission into evidence of otherwise inadmissible hearsay testimony. *United States v. Tomasian,* 784 F.2d 782, 786 (7th Cir.1986) ("Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay."); *see also* 29 C. Wright & V. Gold, *Federal Practice & Procedure* § 6273, p. 312 (3d ed. 1997) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury."). Dr. Englis' inadmissible hearsay and summary of facts alleged by AQSC are not connected to likelihood of confusion and should be stricken.

## H. Ms. Elsten's Proposed Testimony Unconnected to Her Damages Opinions Should Be Precluded

As stated in her reports, Ms. Elsten has been retained by AQSC solely as a damages expert and expressly has not been retained to "provide opinions on issues relevant to a determination of liability." Exh. D at 1; Exh. E at 1. Ms. Elsten has a background in management accounting and intellectual property licensing, and American Cruise Lines does not challenge her qualifications to offer damages opinions.

The only damages theory in Ms. Elsten's opening report is that American's profits should be disgorged and transferred to AQSC. Exh. D at 17-24. Similarly, Ms. Elsten's rebuttal report regarding American's damages primarily addresses a lost profits theory of damages. Exh. E at 29-34. Ms. Elsten's reports, however, are replete with opinions, statements and factual summaries unrelated to her damages opinions. AQSC should not be allowed to use Ms. Elsten as a vehicle for the admission into evidence of otherwise inadmissible hearsay and to summarize facts. *See, e.g., Tomasian,* 784 F.2d at 786; *Lipson,* 46 F. Supp.2d at 763. Ms. Elsten, moreover,

- 15 -

should not be permitted to offer testimony or opinions on topics outside of her area of expertise – damages. *See Advanced Med. Optics*, 2005 WL 782809 at *2 ("Expert testimony can only be received from someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and the expert's opinion must be confined to that field."); *see also De Jager Const., Inc. v. Schleininger*, 938 F. Supp. 446, 449 (W.D. Mich. 1996) ("The first problem with Humes' testimony is that it blurs the distinction between substantive liability and a calculation of damages.").

### 1. Ms. Elsten's Opening Report

Only 8 of 26 pages of Ms. Elsten's opening expert report on damages relate directly to her damages opinion regarding disgorgement of American Cruise Lines' profits; most of the rest of her report is directed to facts and opinions unrelated to her opinion and outside the realm of her expertise. Specifically, despite the fact that Ms. Elsten's only theory of AQSC's damages is disgorgement of American's profits (which is based solely on the calculation of American's revenues and net profits relating to its use of the vessel names *America*, *American Eagle*, and *American Pride*), her report summarizes in detail factual information that is wholly unconnected to her damages theory, such as the history and business of the AQSC. *See* Exh. D at 2-16. Furthermore, even though Ms. Elsten stated that she assumed liability and disclaimed expertise on issues relevant to a liability determination (*see* Exh. D at 1), she analyzes evidence related to confusion and provides an opinion regarding confusion. *See, e.g.,* Exh. D at 18 ("All of these examples are indicative of confusion by potential or actual customers who were interested in the American Queen, not ACL vessel cruises, but called ACL unintentionally."). Rather than merely stating her assumptions, or adopting the opinions of other experts, Ms. Elsten is analyzing and opining on topics outside of her area of expertise and without foundation.

Ms. Elsten should be precluded from offering testimony beyond American Cruise Lines' revenue relating to the accused vessel names, deductions therefrom that Ms. Elsten believes are warranted, and net profits subject to disgorgement.  Summaries of facts unrelated to the opinions for which Ms. Elsten is offered as an expert should be precluded. *See Inventio AG v. Thyssenkrupp Elevator Corp.*, No. CV 08-874-RGA, 2014 WL 554853, at *3 (D. Del. Feb. 6, 2014) ("Plaintiff fails to point the Court to any conclusion that actually uses this information. Therefore the Court finds that the overall revenues are irrelevant to the expert's conclusion and is therefore inadmissible for the purposes of this trial."). Additionally, Ms. Elsten's analysis and opinions on liability issues (i.e., confusion) should not be permitted at trial.  *Advanced Med. Optics,* 2005 WL 782809 at *2.

### 2.  Ms. Elsten's Rebuttal Report

Ms. Elsten should be limited to testifying only with respect to the portions of her Rebuttal Report that actually relate to her opinion regarding the amount of lost profits to which American Cruise Lines is entitled. The substantial majority of Ms. Elsten's Rebuttal Report, however, is unrelated to her damages opinion, beyond her area of expertise, or improper *ipse dixit.*

### a.  Ms. Elsten's Rebuttal Addressing Mr. Rosenthal's Opinions Should be Excluded because it is Contrary to the Law, *Ipse Dixit*, and Outside her Expertise

Nineteen (19) pages of Ms. Elsten's Rebuttal Report address the opinions offered by American's damages expert, Mr. Rosenthal. Ms. Elsten opines that Mr. Rosenthal's opinions are unreliable and do not meet the "but for" causation standard for lost profits. Ms. Elsten's argument is replete with *ipse dixit*, contrary to the law, outside of her expertise, and must be excluded.

For example, Ms. Elsten's opinions regarding Mr. Rosenthal's analysis are contrary to

the law. Ms. Elsten asserts in her Rebuttal Report that Mr. Rosenthal's damages calculations are based on the assumption "that [AQSC] and [American's] offerings are homogeneous commodities that are perfect substitutes" and that "any customer who purchased an [AQSC] cruise would have selected [American] *but for* use of the accused marks." Exh. E at 11. Ms. Elsten ignores the fact that Mr. Rosenthal's conclusions relating to diverted sales concern only a small percentage of AQSC's customers. Moreover, Ms. Elsten does not appreciate the distinction under the law between proof of fact of damages, which requires some certainty, and the amount of damages, which may be estimated. *Thompson v. Haynes*, 305 F.3d 1369, 1382 (Fed. Cir. 2002) (citations omitted).

In addition to arguing an improper legal standard, Ms. Elsten argues for a marketing standard to be applied in damages calculations not supported by facts or law. Ms. Elsten, citing to a marketing textbook, asserts *ipse dixit* that Mr. Rosenthal should have evaluated the "marketing mix" of each company to determine if an itinerary offered by American Cruise Lines that was a day shorter or that included a port different than AQSC's cruise (or some other negligible difference), would have rendered the cruise an unacceptable substitute to the customer who purchased a cruise from AQSC. AQSC's marketing expert, Dr. Englis, however, has the opinion that similar itineraries, vessels types and goods offered make the parties' services "essentially substitutes." *See* Exh. A at 15 ¶ 70. Ms. Elsten's opinions on the applicable legal standard, Mr. Rosenthal's assumptions, and the need to perform a marketing analysis to make a damages calculation reliable should be precluded because they lack foundation, Ms. Elsten lacks the marketing expertise to support the opinions, and the testimony is likely to confuse the jury.

### b. Ms. Elsten's Opinions on Abandonment Should be Excluded

Ms. Elsten is not qualified to render a legal opinion that the American Queen mark was

- 18 -

not abandoned. In her rebuttal report, Ms. Elsten states that the opinions of ACL's damages expert are based on the assumption that the "American Queen" mark was abandoned and then sets out to prove the mark was not abandoned. *See* Exh. E at 7-9. First, Ms. Elsten mistakenly equates an assumption of liability for purposes of calculating damages as tantamount to rendering an opinion on the merits of claims and defenses in this action. Second, Ms. Elsten seeks, inappropriately, to provide a legal conclusion on abandonment that is outside the scope of her expertise. *Advanced Med. Optics*, 2005 WL 782809 at *2. Ms. Elsten offers no standard or opinion on what constitutes "use" of a mark for purposes of the Lanham Act. She summarizes purported facts in AQSC's answers to interrogatories and assumes that money spent retaining sales consultants constitutes promotion and marketing of a trademark under the Lanham Act. *See* Exh. E at 8. This proposed testimony is inappropriate, unconnected to Ms. Elsten's damages opinions, and likely to mislead the jury. Ms. Elsten should be precluded from offering this testimony.

### c. Ms. Elsten's Proposed Testimony that Incidents of Actual Confusion Indicate More Harm to AQSC than American is Based on Insufficient Facts, Flawed Methodology, and is Unreliable

Ms. Elsten states as a matter of fact at the end of her Rebuttal Report that recorded incidences of confusion indicate that AQSC has been harmed more than American Cruise Lines. Exh. E at 35. She states *ipse dixit* that incidences of confusion indicate that consumers called American intending to contact AQSC. Ms. Elsten provides no analysis and simply ignores that consumers could be contacting American because they believe AQSC is affiliated with the company or because AQSC's adoption of "American" as the first word in its cruise line brand name is causing confusion in the market. Ms. Elsten is not qualified to render opinions on liability and her opinions are speculative. She should be precluded from providing opinions on

actual confusion and likelihood of confusion in this matter.

> **d.  Ms. Elsten's Proposed Testimony that American's Survey Expert Indicated that No More than 20% of Consumers Were Likely to Be Confused by AQSC's Use of the Disputed Mark Lacks Foundation, is Unconnected to Her Damages Opinion, and is Likely to Confuse the Jury**

Ms. Elsten states as a matter of fact at the end of her Rebuttal Report that American Cruise Lines' survey expert, Dr. Poret, indicated that no more than 20% of consumers were likely to be confused by AQSC's use of the disputed mark, and that there is no evidence supporting a likelihood of confusion. Exh. E at 36. Ms. Elsten, however, completely mischaracterizes Dr. Poret's report and testimony. Dr. Poret testified that a 20.5% net confusion rate reflects significant likelihood of confusion. Contrary to Ms. Elsten's representation, Dr. Poret does not indicate in his report that there is no evidence of a likelihood of confusion. Further, Ms. Elsten improperly seeks to provide testimony that the survey results demonstrating confusion should be applied to damages calculations. *See* Exh. E at 36, where Ms. Elsten writes "… if an award based on any measure of [AQSC's] sales or profits before deduction of all relevant expenses is considered, such award should be reduced to no more than 20.5% of the total." According to Ms. Elsten, plaintiffs must prove a 100% net confusion rate in a survey to be entitled to 100% of infringement damages.  This opinion lacks foundation, is contrary to the law, and likely to confuse the jury.

## IV.    CONCLUSION

For the forgoing reasons, American Cruise Lines respectfully requests that the Court exclude all opinions and proffered testimony of Dr. Basil Englis and all opinions and proffered testimony of Cate Elsten not directly related to her calculation of damages.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Stephen J. Kraftschik*
Mary B. Graham (#2256)
Stephen J. Kraftschik (#5623)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
skraftschik@mnat.com
   *Attorneys for American Cruise Lines, Inc.*

OF COUNSEL:

David McI. Williams (*pro hac vice*)
Michael R. Naccarato (*pro hac vice*)
GORMAN & WILLIAMS
36 S. Charles Street, Suite 900
Baltimore, MD  21201-3114
(410) 528-0600

December 20, 2016
10656508