IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-324 (RGA) |
| | ) | |
| HMS AMERICAN QUEEN STEAMBOAT | ) | Redacted Public |
| COMPANY LLC and AMERICAN QUEEN | ) | Version |
| STEAMBOAT OPERATING COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**AMERICAN CRUISE LINES, INC.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Morris, Nichols, Arsht & Tunnell LLP
Mary B. Graham (#2256)
Stephen J. Kraftschik (#5623)
1201 N. Market Street
  P.O. Box 1347
  Wilmington, DE  19899-1347
  (302) 658-9200
mgraham@mnat.com
skraftschik@mnat.com
*Attorneys for American Cruise Lines, Inc.*

Of Counsel:
David McI. Williams (*pro hac vice*)
Michael R. Naccarato (*pro hac vice*)
GORMAN & WILLIAMS
36 S. Charles Street, Suite 900
Baltimore, MD  21201-3114
(410) 528-0600

December 20, 2016

## TABLE OF CONTENTS

Page(s)

I.    NATURE AND STAGE OF PROCEEDINGS                                          1

II.   SUMMARY OF ARGUMENT                                                      1

III.  STATEMENT OF FACTS                                                       2

      A.   Before 1999                                                         4

      B.   USPTO Grants "Distinctive" Status to AMERICAN CRUISE
           LINES Marks                                                         6

      C.   American Cruise Lines' Family Of AMERICAN Vessel Marks              8

      D.   American Cruise Lines' National Marketing Under Its AMERICAN
           Marks                                                              9

      E.   Expansion To The Pacific Northwest, Mississippi River, And Alaska  11

      F.   AQSC Enters The Market As "Great American Steamboat Company"       13

      G.   First Lawsuit And Settlement - AQSC Agreed To Surrender The GREAT
           AMERICAN STEAMBOAT Marks And Derivatives                          13

      H.   Facts Related to AQSC's Breach of Settlement Agreement             15

           1.   Refusal to Surrender Domain                                   15

           2.   AQSC's Using GREAT AMERICAN STEAMBOAT Mark As PPC
                Keyword                                                       16

      I.   AQSC Adopts The AMERICAN QUEEN STEAMBOAT COMPANY
           Brand                                                             17

      J.   Survey Evidence – Likelihood of Confusion                          20

      K.   AQSC Augments the Competitive Impact of its Corporate Brand Name   21

IV.   ARGUMENT                                                                24

      A.   Legal Standard for Summary Judgment                                24

      B.   There Is No Genuine Dispute of Fact That AQSC's Use Of "American
           Queen Steamboat Company" Is Likely to Cause Confusion – Plaintiff Is
           Entitled To Summary Judgment On Counts II, V, VII, and VIII As A
           Matter Of Law                                                     25

i

        1.     American Cruise Lines Owns the AMERICAN CRUISE LINES Marks and It Is A Valid And Legally Protectable Mark    26

        2.     AQSC'S Use of the Name and Mark "American Queen Steamboat Company" in Advertising and Selling Cruise Ship Services is Likely to Cause Confusion, Mistake, and to Deceive    26

   C.    There Is No Genuine Dispute Of Fact As To AQSC's Breach Of The Settlement Agreement - Plaintiff Is Entitled To Summary Judgment    49

        1.     The February 9, 2012 Settlement Agreement Is A Valid Contract, and American Cruise Lines Fully Performed Its Obligations Thereunder    49

        2     AQSC Breached the Settlement Agreement by Failing to Surrender the Domain Name    50

        3.     AQSC Has Breached the Settlement Agreement by Continuing to Use the GASC Marks as PPC Keywords    51

V.    CONCLUSION    53

# TABLE OF AUTHORITIES

**Cases**

*A & H Sportswear*,
    237 F.3d at 210                                                     *passim*

*Accu Personnel, Inc. v. AccuStaff, Inc.*,
    823 F.Supp. 1161 (D.Del. 1993)                                 31

*ACCU Personnel, Inc. v. AccuStaff, Inc.*,
    846 F.Supp. 1191 (D.Del.,1994)                                 25

*Alliance Bank v. New Century Bank*,
    742 F.Supp.2d 532 (E.D. Pa. 2010)                             28

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
    805 F.2d 920 (10th Cir.1986)                                    32

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
    174 F.3d 1036 (9th Cir. 1999)                                  51

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)                                       24-25

*Century 21 Real Estate Corp. v. Lendingtree, Inc.*,
    425 F.3d 211 (3d Cir. 2005)                                    43

*Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*,
    333 F.Supp.2d 239 (D.Del.,2004)                              25

*Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*,
    269 F.3d 270 (3d Cir. 2001)                             27-29, 39

*Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc.*,
    214 F.3d 432 (3d Cir. 2000)                             25-26, 32

*Country Floors, Inc. v. Gepner*,
    930 F.3d 1056 (3d Cir. 1991)                               28-29

*Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*,
    628 F.2d 500 (5th Cir.1980)                                39

*Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*,
    30 F.3d 466 (3d Cir. 1994)                                  *passim*

*Giant Food, Inc. v. Nation's Foodservice, Inc.*,
710 F.2d 1565 (Fed. Cir. 1983) ....................................................................... 28

*Goya Foods, Inc. v. Condal Distribs., Inc.*,
732 F.Supp. 453 (S.D.N.Y.1990) ..................................................................... 40

*In re Shell Oil Co.*,
992 F.2d 1204 (Fed. Cir 1993) ......................................................................... 38

*Interpace Corp. v. Lapp, Inc.*,
721 F.2d 460 (3d Cir. 1983) ................................................................ 27, 29, 47-48

*Kos Pharmaceuticals, Inc. v. Andrx Corp.*,
369 F.3d 700 (3d Cir., 2004) ..................................................................... *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 ................................................................................................... 24

*McGregor–Doniger, Inc. v. Drizzle, Inc.*,
599 F.2d 1126 (2d Cir.1979) ........................................................................... 31

*McNeil Labs. Inc. v. American Home Prods. Corp.*,
416 F. Supp. 804 (D.N.J. 1976) ....................................................................... 46

*Minnesota Min. and Mfg. Co. v. Taylor*,
21 F.Supp.2d 1003 (D.Minn.,1998) ................................................................ 51

*Morgenstern Chem. Co. v. G.D. Searle & Co.*,
253 F.2d 390 (3rd Cir. 1958) ........................................................................... 44

*Mut. of Omaha Ins. Co. v. Novak*,
836 F.2d 397 (8th Cir.1987) ........................................................................... 39

*National Fire & Marine Ins. Co. v. Robin James Const., Inc.*,
478 F. Supp. 2d 660 (D. Del. 2007) ................................................................. 49

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer
Pharmaceuticals Co.*,
290 F.3d 578 (3d Cir. 2002) ....................................................................... 39-41

*Opticians Assoc. of Am. V. Independent Opticians of Am.*,
920 F.2d 187 (3d Cir. 1990) ....................................................................... 27, 30

*Planned Parenthood Federation of America, Inc. v. Bucci*,
1997 WL 13313 ........................................................................................... 4, 51

*Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*,
405 F.Supp.2d 680 (E.D.Va., 2005) ................................................................ 31

*RJR Foods, Inc. v. White Rock Corp.*,
   603 F.2d 1058 (2d Cir.1979)                                                39

*Robertson v. Allied Signal, Inc.*,
   914 F.2d 360 (3d Cir. 1990)                                                24

*Sabinsa Corp. v. Creative Compounds, LLC*,
   609 F.3d 175 (3d Cir. 2010)                                                29

*Sanofi-Aventis v. Advancis Pharmaceutical Corp.*,
   453 F.Supp.2d 834 (D. Del. 2006)                                        33, 37

*Sara Lee Corp. v. Kayser–Roth Corp.*,
   81 F.3d 455 (4th Cir.1996)                                                 39

*Stored Value Solutions, Inc. v. Card Activation Technologies, Inc.*,
   796 F. Supp. 2d. 520 (D. Del. 2011)                                        24

*Tree Tavern Prods., Inc. v. Conagra, Inc.*,
   640 F.Supp. 1263 (D.Del. 1986)                                             29

*Williams v. Borough of West Chester, Pa.*,
   891 F.2d 458 (3d Cir. 1989)                                                24

**Rules and Statutes**

15 U.S.C 1052(f)                                                               6

15 U.S.C. § 1057(b)                                                           26

15 U.S.C. §§ 1058 and 1065                                                    26

15 U.S.C. § 1114                                                              25

15 U.S.C. § 1125(a)(1)                                                        25

Fed. R. Civ. P. 56(c)                                                         24

## LIST OF DECLARATIONS

I.  Declaration of Charles A. Robertson (herein "CAR Dec") and Exhibits

II.  Declaration of Charles B. Robertson (herein "CBR Dec") and Exhibits

III.  Declaration of Susan Renner (herein "Renner Dec") and Exhibits

IV.  Declaration of Wayne H. Xu (herein "Xu Dec") and Exhibits

V.  Declaration of Christine Duffy (herein "Duffy" Dec") and Exhibits

VI.  Declaration of Peter Kent (herein "Kent Dec") and Exhibits

VII.  Declaration of Bruce Silverman (herein "Silverman Dec") and Exhibits

VIII.  Declaration of Hal Poret (herein "Poret Dec") and Exhibits

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff American Cruise Lines, Inc.'s Fourth Amended Complaint was filed March 31, 2016, amending and restating American Cruise Line's prior claims for, among other things, breach of contract, infringement of its registered and common law trademarks, false designation of origin, in violation of federal law, anti-cybersquatting law, violation of Delaware Deceptive Trade Practices Act, and common law unfair competition. D.I. 129. On November 16, 2016, the Court entered an Order extending the dispositive motions deadline and establishing a briefing schedule.  D.I. 161.  American Cruise Lines has moved for summary judgment for infringement of American's word mark AMERICAN CRUISE LINES, Reg. No. 3,019,486 (the "'486 Mark") and its word mark AMERICAN CRUISE LINES with design:

 Reg. No. 3025982 (the "'982 Mark"), and for unfair competition under federal and state law and for breach of a settlement agreement contract with Defendants HMS American Queen Steamboat Company LLC, and American Queen Steamboat Operating Company, LLC (collectively "AQSC").

This is American Cruise Line's opening brief in support of that motion.

## II.    SUMMARY OF ARGUMENT

The parties agree there is actual confusion in the U.S. overnight passenger cruise services market as to source, affiliation, or sponsorship of cruise ship services advertised and sold under the "American" brand, although they disagree as to cause.  American Cruise Lines has advertised and sold cruise ship services under its "American" brand since 1999 and has operated vessels having an "American" name since 2000.   American Cruise Lines' principal, Charles A. Robertson, has been active in the U.S. rivers and coastal overnight passenger cruising industry

under an "American Cruise Lines" brand for more than 40 years and is well-known and respected. Beginning in the 1970s, Mr. Robertson originated and developed the "American Cruise Lines" brand with a predecessor U.S. rivers and coastal waterways cruising company ("Old ACL").

Like Old ACL the current plaintiff American Cruise Lines operates riverboats and coastal vessels named under a patriotic theme, most having "American" as the first word of the name, ███████████████████████████████████████████████████████ ██████. American Cruise Lines' substantial national marketing has resulted in steady growth and market penetration. The "American Cruise Lines" brand was well established long before the "American Queen Steamboat Company" brand first appeared in 2012.

Brand names are important. American Cruise Lines contends – and the record shows - that AQSC's actions in adopting and using "American" as the first word in their cruise lines brand name is the primary source of confusion in the market. AQSC's actions to build a family of "American" named vessels to reinforce its "American Queen Steamboat Company" brand has increased and perpetuated that confusion. AQSC has purposefully sought to hijack American Cruise Lines' rights in the word "American" in American Cruise Lines' brand name and to trade on American Cruise Lines' long established goodwill.

## III.    STATEMENT OF FACTS

The following facts are not undisputed.

### Overview

The history of the AMERICAN CRUISE LINES mark and brand begins in the early 1970's, when Old ACL, the corporate predecessor to the present plaintiff American Cruise Lines, began offering overnight passenger cruises under that same brand on U.S. coasts and rivers on a

growing fleet of vessels. Following Old ACL's bankruptcy that concluded late in the 1990's, the present plaintiff American Cruise Lines restarted the original cruising business and beginning in 1999 began marketing nationally under the AMERICAN CRUISE LINES brand and mark. As it appeared on the 1999 American Cruise Lines website, the AMERICAN CRUISE LINES brand mark, subsequently registered with the U.S Patent Office, emphasized the word "AMERICAN":

 CBR Dec Ex 1. The design used by Old ACL had a similar appearance and the same emphasis on the word "American." CAR Dec ¶9.

From 1999 forward, American Cruise Lines grew its fleet of vessels and itineraries. American Cruise Lines' affiliate purchased a paddlewheel riverboat for operation in the Pacific Northwest in 2009 and American Cruise Lines began booking passengers. Marketing under the AMERICAN CRUISE LINE brand increased and by 2010 American Cruise Lines began cruising operations in the Pacific Northwest. By mid-2010 American Cruise Lines also sold bookings for riverboat cruises on the Mississippi River. American Cruise Line's marketing for Mississippi River cruises under the AMERICAN CRUISE LINES mark grew rapidly with direct mail, magazine ads, and sales of bookings in 2010 and 2011.

American Cruise Lines was established in the market advertising riverboat cruising nationally on the Pacific Northwest in 2009 and on the Mississippi in 2010, under its distinctive brand mark emphasizing the term "American" long before AQSC, then marketing under the "Great American Steamboat Company" brand, first began marketing riverboat cruises and excepting booking finally in late September, 2011.

AQSC did not adopt or market under the AMERICAN QUEEN STEAMBOAT COMPANY mark until July, 2012. Soon thereafter the record shows evidence of consumer confusion as to origin, source, sponsorship, or affiliation of the respective services of (1)

3

American Cruise Lines, operating under its AMERICAN CRUISE LINES brand marks, and (2) AQSC, operating under its AMERICAN QUEEN STEAMBOAT COMPANY mark. ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ A more detailed statement of facts follows:

### A. **Before 1999**

1. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Shortly thereafter, Old ACL began advertising and marketing overnight passenger cruise ship services on a nationwide basis. CAR Dec Ex 3-4.

2. At least as early as October 3, 1974, Xu Dec Ex 1, Old ACL advertised cruise ship services on rivers and coastal waters under its AMERICAN CRUISE LINES mark, including among others, cruising on coastal waters on its first vessel *American Eagle*; and beginning in 1983 cruising on the Mississippi River on the vessel *America*. CAR Dec Ex 4-5. Old ACL also advertised Mississippi River cruises during the 1970s and 1980s under its AMERICAN CRUISE LINES mark aboard its vessels *Independence, Savannah*, and *New Orleans*. CAR Dec Ex 5-12; Xu Dec Ex. 2.

3. Following an initial public offering by Old ACL in the mid-1980s, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ In 1988, under the then CEO, Old ACL filed for protection in bankruptcy. Xu Dec Ex 5; CAR Dec ¶3.

4. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

5.      In 1991, during the Old ACL bankruptcy, Mr. Robertson incorporated "American Lines, Ltd." in Delaware. CAR Dec Ex 14**.** In proceedings on a proposed sale of intellectual property rights from Old ACL to American Lines, Ltd., Xu Dec Ex. 6, the bankruptcy Trustee announced his intent to reserve the right to use the AMERICAN CRUISE LINES mark during the bankruptcy. Xu Dec Ex 6. In 1999, one month after the final decree closing the Old ACL bankruptcy, *Id.* at Ex. 8, American Lines, Ltd. changed its name to "American Cruise Lines, Inc.," the plaintiff here, and began marketing overnight passenger cruises on its first vessel, *American Eagle*. CAR Dec Ex 15; CBR Dec Ex 2 at ACL 01086**.**

6.      Members of the travel industry, such as Frommers, Cruise Critic, and others, saw continuity and a continuing commercial impression between the Old ACL and the current plaintiff American Cruise Lines, including same name, logos, itineraries and concepts. CAR Dec ¶6; CBR Dec Ex 3-6.

7. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

### B. USPTO Grants "Distinctive" Status to AMERICAN CRUISE LINES Marks

8.      In 1999, American Cruise Lines filed for and was granted a registration for its AMERICAN CRUISE LINES word mark on the Supplemental Register. After continuous use of the mark for five consecutive years, on November 29, 2005, the AMERICAN CRUISE LINES mark was registered on the Principal Register in Class 39 (Reg. No. 3019486) (the "'486 Mark") for "cruise ship services; transportation of passengers by ship" with first use July 30, 1999.

9.      On October 14, 2004, American Cruise Lines also filed for registration of its AMERICAN CRUISE LINES word mark with design, and on December 13, 2005, it was registered on the Principal Register in Class 39 (Reg. No. 3025982) (the "'982 Mark"), also for "cruise ship" services; transportation of passengers by ship.

10.     As used in both the '486 Mark and the '982 Mark, the USPTO granted the word "American" the status of "distinctive" under 15 U.S.C 1052(f) for the cruise ship services market. Xu Dec Ex 8-9. (The '486 mark and '982 mark are referred to collectively herein as AMERICAN CRUISE LINES)

11.     Both marks became "incontestable" under §15 of the Lanham Act, 15 U.S.C. §1065 after continuous use for five consecutive years subsequent to the date of registration. The '486 Mark became incontestable on March 9, 2011, and the '982 Mark became incontestable on March 17, 2011. Xu Dec Ex 8-11.

12.     The '982 Mark emphasizes the first word "AMERICAN" of the design in much larger font than is used for "cruise lines." Xu Dec Ex 9. As consistently used by American Cruise Lines on its website and in all of its marketing, the word "American" in the mark is further emphasized by being printed in a different color than the words "cruise lines" and the patriotic theme is emphasized by printing the design brand mark in red, white, and blue. CBR Dec ¶3.

 [http://www.americancruiselines.com/](http://www.americancruiselines.com/) (last accessed 12/10/16).

13.    Since as early as 1999, American Cruise Lines has continuously marketed overnight passenger cruise ship services nationally and specifically for the Mississippi River System, the Columbia and Snake Rivers, other river systems, and the coasts of the United States under the AMERICAN CRUISE LINES service marks. American Cruise Line's market penetration is notable; it has attracted passengers to its ships from every state in the nation as well as from many foreign countries. CAR Dec ¶7; CBR Dec Ex 7-12, 20.

14.    Since it first began marketing its services in 1999, American Cruise Lines has consistently promoted its services on a national basis using the word "American" as the key descriptor in its name. CAR Dec ¶8; Silverman Dec. Ex. 1 at ¶¶ 49-58.

15.    Corporate branding identifies the organization as the source of the product or service offered. In the overnight passenger cruise ship industry, the services offered include a full range of services, much more than simply transporting passengers from place to place. CAR Dec ¶10; Xu Dec Ex 13, 24:17-25:20; 26:7-27:17.

16.    The former President of Ambassadors International, a prior owner of the vessel *American Queen*, testified in deposition to the importance of company brands. Xu Dec Ex 14, 36:15-18. She distinguished between the name of a vessel and the company that operates the brand. When asked "Did you consider the name of the vessels [operated by Ambassadors] to be brands?" she replied: "They weren't brands; they were just different products within the brand." Xu Dec Ex 15, 20:22-21:1.

C. **American Cruise Lines' Family Of AMERICAN Vessel Marks**

17.    In the cruise ship industry, ships operated under a single company brand name are often named to incorporate all, or part, of the company brand name to reinforce and tie the ship to the operator's overall brand. It is also not uncommon for different company brands to use some parts of a ship name also used by another brand. CAR Dec. ¶11; Duffy Dec Ex 1, ¶¶20, 23.

18.    In accord with industry practice, since 2000, as American Cruise Lines has expanded into new routes with new vessels, it has named them under a patriotic theme, often with the term "American" as the first word, in order to reinforce the prominence of the term "American" as the differentiator in its AMERICAN CRUISE LINES marks.  Many of these vessels have legacy names previously used by Old ACL. CAR Dec. ¶12; Duffy Dec Ex 1, ¶24.

19.    ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████

20.    Trade professionals and national publications often refer to American Cruise Lines simply as "American." CAR Dec ¶12; CBR Dec Ex 13-19. A 1986 *Times Picayune* article "Set Sail along the Mississippi" referred to Old ACL simply as "American." CAR Dec Ex. 13.

21.    American Cruise Lines has protected its rights in the names of its "American" fleet with trademarks for the name of each vessel. Xu Dec Ex 19-24. ████████████████
████████████████████████████████████████████
████████████████████████████████████.

22.    ████████████████████████████████████
████████████████████████████████████████████

8

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

**D.  American Cruise Lines' National Marketing Under Its AMERICAN Marks**

23.    American Cruise Lines' plan was always to expand and grow by offering new cruise itineraries and destinations wherever possible. New cruises itineraries offer American Cruise Lines important sales opportunities. For this reason, it was always American Cruise Lines' plan to expand back to cruising on the Mississippi River where Old ACL had previously cruised. CAR Dec ¶14; Silverman Dec. Ex. 1, ¶70.

24.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

25.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████

26.    Since 1999, American Cruise Lines has expanded its fleet from one vessel to five, while expanding to and introducing new itineraries. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

27.    ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

28.    American Cruise Lines advertises nationally and internationally using digital media platforms, including American Cruise Lines' website, launched in 1999, and social media sites. CBR Dec ¶32-34. ████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████.

29.    ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

30.    ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

31. ████████████████████████████████████████

████████████████████████████████████████████

American Cruise Lines' AMERICAN CRUISE LINES mark and its family of vessel marks have achieved widespread public recognition throughout the United States in connection with American Cruise Lines' overnight passenger cruise ship services. American Cruise Lines has also received numerous cruise line industry awards. CAR Dec ¶21; CBR Dec Ex 13, 15-19, Xu Dec Ex 55.

### E. Expansion To The Pacific Northwest, Mississippi River, And Alaska

32. Beginning in 2009, American Cruise Lines expanded to offer cruise services on the in the Pacific Northwest (Columbia/Snake Rivers) under its AMERICAN CRUISE LINES marks. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████

33. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ A November 11/24/99 *Travel Weekly* article described American Cruise Lines' plan to begin operations on the Columbia and Snake rivers in August, 2010. CBR Dec Ex 33. On January 1, 2010, American Cruise Lines notified its Eagle Society (alumni) passengers of the new route offerings by email, CAR Dec Ex 20, and also soon issued an additional ad to its entire consumer mailing list. CBR Dec Ex 34. On June 2, 2012, American Cruise Lines began offering cruises in

Alaska aboard the *American Spirit*. CBR Dec Ex 26, at ACL49039, 49051 ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

34.    On August 20, 2010, American Cruise Lines began its marketing campaign for its expansion to the Mississippi River with a press release announcing that it was "building a 140-passenger paddlewheel boat to operate on the Mississippi River starting in 2012." CBR Dec Ex 36. On September 21, 2010, American Cruise Lines announced its Mississippi River expansion to the trade press. CBR Dec Ex 37; Silverman Dec Ex 1, ¶91.

35.    American Cruise Lines first advertised its upcoming cruises on the Mississippi river in October, 2010 on the *Agent at Home* website. CBR Dec Ex 38. A print ad promoting American Cruise Lines' Mississippi river cruises appeared in the November/December 2010 issue of *Preservation Magazine*. CBR Dec Ex 39. On March 3, 2011, American Cruise Lines issued an e-mail blast to past guests headlined "A Brand New Paddlewheeler is Coming to the Mississippi" and sent similar messages to Eagle Society members and travel agents, with a follow-up to previous recipients on March 9, 2011. CBR Dec Ex 40. American Cruise Lines' print ad headlined "Riverboatin' on the Mississippi" appeared in the August 2011 edition of *Southern Living Magazine*. CBR Dec Ex 41; Silverman Dec Ex 1, ¶92-94).

36.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

**████████████████████████████████████████████**

**████████████████████████**

### F.  **AQSC Enters The Market As "Great American Steamboat Company"**

37.     The principals of AQSC, John Waggoner and Christopher Kyte, originally chose the name and brand "Great American Steamboat Company" for their enterprise to provide cruise ship services and operate the vessel *American Queen*. Xu Dec Ex 30, 17:15-18:25, 36:11-38:5, 226:8-24; Ex 31, 97:8–99:17.

38.     AQSC closed the purchase of the *American Queen v*essel from the U.S. Maritime Administration ("MarAd") in August 2011, ████████████████████████████████

**████████████████████████████████████████████**

**████████████████████████████████████████████**

**████████████████████████████████████████████**

**████████████████████████████████**

39.     AQSC did not begin to operate the *American Queen* in commerce until April, 2012 when it first provided overnight cruising under the GREAT AMERICAN STEAMBOAT brand. Xu Dec Ex 33.

### G.  **First Lawsuit And Settlement - AQSC Agreed To Surrender The GREAT AMERICAN STEAMBOAT Marks And Derivatives**.

40.     American Cruise Lines learned of AQSC's intention to offer overnight passenger cruise ship services in the U.S. market and in order to protect its "AMERICAN" brand and "American Steamboat" marks contested AQSC's contended use of "Great American Steamboat Company". After an exchange of letters proved unavailing, on September 30, 2011, American

Cruise Lines filed suit[1] (the "Prior Suit") in this Court against Defendant HMS and Defendant AQSOC (then named Great American Steamboat Company) for, *inter alia*, infringement of American Cruise Lines' service marks GREAT AMERICAN STEAMBOAT COMPANY, GREAT AMERICAN STEAMBOAT CRUISE, and AMERICAN STEAMBOAT COMPANY, and related false association, and unfair competition.

41. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

42.    American Cruise Lines entered into the Settlement Agreement ███████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████  ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████  ████



43.     American Cruise Lines fully performed its obligations under the Settlement Agreement. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

44.     ████████████████████████████████████████

████████████████████████████████ After February 9, 2013, American Cruise Lines was entitled to all ownership and full use of the GREAT AMERICAN STEAMBOAT trademarks and derivatives thereof.

### H.  Facts Related to AQSC's Breach of Settlement Agreement

#### (a) Refusal to Surrender Domain

45.     The domain name, www.greatamericansteamboatcompany.com (the "Domain Name") was under the control of AQSC prior to November 6, 2011 (Kent Dec Ex 1, ¶¶160, 162).

46.     On November 6, 2012, and at all times thereafter, AQSC has refused to surrender the Domain Name to American Cruise Lines despite request. Xu Dec Ex 35, No. 25. AQSC retains control of the Domain Name, it is still registered to AQSC and AQSC has not transferred or released it to American Cruise Lines for registration. Kent Dec. Ex 1, ¶¶160, 163, 170.

47.     The ".com" top level domain (TLD) for a website is the most commonly used TLD and most important for marketing, at least in the United States. AQSC's retention of control of the Domain Name has, as a practical matter, prevented American Cruise Lines from effective

---

██████████████████████████████████████.

CAR Dec Ex 21.

use of the GREAT AMERICAN STEAMBOAT trademarks in essential internet marketing. CBR Dec ¶¶5, 6; Kent Dec Ex 1, ¶¶30, 33, 38-40, 172-76, 189; Xu Dec Ex 31, 99:4-17.

48.    █████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████ By refusing to release the Domain Name to American Cruise Lines, AQSC prevented American Cruise Lines, █████████████████████████

█████████████████████████████████████████████████

██████████████████████████

### (b) AQSC's Using GREAT AMERICAN STEAMBOAT Mark As PPC Keyword

49.    AQSC marketed their cruise services through the use of Pay Per Click ("PPC") ads, which are advertisement links to a sponsor's website that appear in response to a user entering "keywords" (or "Adwords") in Google, Bing, and Yahoo search engines. Kent Dec Ex 1, ¶¶72-76.

50.    AQSC purchased and used PPC keywords incorporating various American Cruise Lines service marks, █████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████

---

[3] Google's explanation of types of keyword matching, including "exact match" and "broad match," is found at https://support.google.com/adwords/answer/2497836?hl=en (last accessed 12/9/2016).

51.   ████████████████████████████████████

████████████████████████████████████████

██████████████████

52.   As a result, prospective customers, travel agents, and others ██████████

████████████████████████████████████████

██████████████████████████ are still exposed to an ad for AQSC's website.

### I.   AQSC Adopts The AMERICAN QUEEN STEAMBOAT COMPANY Brand

53.   Prior to AQSC's adopting the brand "American Queen Steamboat Company" in 2012, no such brand existed. No prior owner of the vessel *American Queen* incorporated the vessel name in its brand name. CAR Dec ¶45; Silverman Dec Ex 2, ¶42.

54.   On April 26, 2011, Defendant HMS had filed a service mark application with the PTO, U.S. Application Serial No. 85305162, for THE AMERICAN QUEEN STEAMBOAT COMPANY mark for use in Class 39 and Class 43. Defendant HMS alleged first use of the mark on June 20, 2012. Xu Dec Ex 39. The PTO granted the registration on February 5, 2013 (Reg. No. 4,286,568).

55.   A press release also issued by AQSC on June 20, 2012 stating that the effective date for the change of the company's brand name to "American Queen Steamboat Company" would take effect on July 1, 2012. Xu Dec Ex 37; 38, 119:11-121:8; 51.

56.   As AQSC transitioned to the AMERICAN QUEEN STEAMBOAT COMPANY corporate brand name beginning in July of 2012, American Cruise Lines began to document actual marketplace confusion caused by the new name. By September 11, 2012, less than three months after the name change, a cruise passenger on the *Cruise Critic* website posted a question about American Cruise Lines' vessel in the newly created forum for questions about AQSC.

CBR Dec Ex 49. By the spring of 2013, instances of actual confusion were occurring often, Xu Dec Ex 40, 109:18-110:1, even on a daily basis. Xu Dec Ex 30, 129:11-15.

57.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

instances of actual confusion are caused by the confusing similarity between the two company's corporate brand names, both of which start with the word "American." Xu Dec Ex 40, 95:21-96:1. ████████████████████████████████



58.     The documented instances of confusion reflect passengers and others who failed to distinguish between AQSC and American Cruise Lines. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

59.     Confusion among AQSC passengers has resulted in them attributing to American Cruise Lines their unhappiness with their experience on AQSC's ships. CBR Dec Ex 55, 56.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

60.     Even vendors have been confused. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

61.     Confusion also occurs among professional travel agents. █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

62.     ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

63.    ████████████████████████████████████████

██████████████████████████████████████████████████

███████

**J.    Survey Evidence – Likelihood of Confusion**

64.    ████████████████████████████████████████

████████████████████.  ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███

65.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

66.    ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

67.    ████████████████████████████████████████

██████████████████████████████████████████████████

20

██████████████████████████████████████████████████

███████████████████████████

### K.  **AQSC Augments the Competitive Impact of its Corporate Brand Name**

68.    AQSC  began  using ████████████████████████████████████

███████████████ as a paid keyword to trigger the appearance of their Internet sponsored

link ads when first launching their pay-per-click (PPC) Internet marketing program in October,

2011██████████████████████████████████████████████

████████████████████████

69.    ██████████████████████████████████████

████████████████████████████████████████████

70.    ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

71.    ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

72.    As of July 25, 2016, the exact term ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

73. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

74. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

75. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

76.    AQSC regards itself as being a direct competitor of American Cruise Lines in PPC advertising. ████████████████████████████████████

████████████████████████████████████████

████

████████████████████████████████

████████████████

████████████████████████████████

████████████████

77.    AQSC admits that its use of variations of American Cruise Lines' trademarked terms as a PPC advertising keywords has resulted in users requesting brochures through AQSC's website advertising AQSC's cruise services as follows: ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████

78.    AQSC has copied American Cruise Lines by renaming its newly acquired paddlewheel riverboat *Empress of the North* with "American" as the first word. In May, 2013, AQSC announced that it would purchase the *Empress of the North*, refurbish and operate the vessel on the Columbia and Snake Rivers with the same ports of call as American Cruise Lines, and rename the boat *American Empress*. Xu Dec Ex 58. Before AQSC decided to change the name of the *Empress of the North* to *American Empress*, AQSC knew that American Cruise Lines already operated a riverboat on the Columbia and Snake rivers and knew the ports of call of that boat. Xu Dec Ex 35, No. 49-51. The *Empress of the North* was acquired and renamed in January 2014 and AQSC began offering overnight passenger cruise ship services aboard *American Empress* on the Columbia and Snake Rivers in April, 2014 in direct competition with American Cruise Lines. Xu Dec Ex. 53, No. 17; CBR Dec Ex 26, ACL 49032.

79.    In September, 2016, AQSC announced that it would begin construction of a boat named *American Duchess* and begin offering overnight passenger cruise ship services aboard it on the Mississippi River in June, 2017. CBR Dec Ex 58.

80.    AQSC's chairman, John Waggoner, has made clear he well understands the importance of naming vessels with the first word "American" as a means to emphasize the AQSC brand. █████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

## IV.   ARGUMENT

### a.   Legal Standard for Summary Judgment

A party is entitled to summary judgment when there is "no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not a "disfavored procedural shortcut" but "an integral part of the Federal Rules . . . designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotations omitted). Consistent with this purpose, once the moving party shows the absence of a genuine issue of material fact, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87(1986).

It is thus clear that a non-moving party must adduce more than a mere scintilla of evidence in its favor to ward off summary judgment and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553. Nor may a party create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 383 n. 12 (3d Cir. 1990). Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989); *see also Stored Value Solutions, Inc. v. Card Activation Technologies, Inc.*, 796 F. Supp. 2d 520, 526-27 (D. Del. 2011). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the

burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

**B. There Is No Genuine Dispute of Fact That AQSC's Use Of "American Queen Steamboat Company" Is Likely to Cause Confusion – Plaintiff Is Entitled To Summary Judgment On Counts II, V, VII, and VIII As A Matter Of Law**

AQSC's adoption and use of "American Queen Steamboat Company" as a corporate brand and tradename under which it advertises and sells cruise ship services is likely to - and is – causing confusion regarding source of cruise ship services and infringes American's cruise lines brand and incontestable, registered AMERICAN CRUISE LINES service mark in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), Delaware Deceptive Trade Practices Act, 6 Del. C. §§ 2531, *et seq.*, and constitutes unfair competition under Delaware common law.  As there is no genuine dispute of material fact, American Cruise Lines moves for judgment on Counts II, V, VII, and VIII of the Fourth Amended Complaint.[4]

To establish a claim of trademark infringement under the Lanham Act, a plaintiff must prove that (1) its mark is valid and legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services.[5] *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir., 2000) (citing *Commerce Nat. Ins. Services, Inc. v.*

---

[4] American Cruise Lines does not waive its infringement claims in Counts II, V, VII and VIII relating to its other marks or waive claims in Counts III, IV, or VI not presented for summary judgment and expressly reserves all rights.

[5] Under federal law, the standard for proving trademark infringement, 15 U.S.C. § 1114, and unfair competition, 15 U.S.C. § 1125(a)(1) are identical. *A & H Sportswear*, 237 F.3d at 210. The same standards apply to proving unfair competition under Delaware law, *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F.Supp.2d 239, 244, n. 13 (D.Del.,2004). Also, proving likelihood of confusion demonstrates violation of the Delaware Deceptive Trade Practices Act. *ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1213 (D.Del.,1994).

*Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000).

**1. American Cruise Lines Owns the AMERICAN CRUISE LINES Marks and It is a Valid and Legally Protectable Mark**

The first two requirements for infringement – ownership and validity – are clearly established in the record. Federal registration of a mark is *prima facie* evidence of validity, protectability, and ownership. *See* 15 U.S.C. § 1057(b). Additionally, "[if a mark] is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved." *Commerce*, 214 F.3d at 438 (citation omitted). American Cruise Lines received the registration for the word mark AMERICAN CRUISE LINES ('486 Mark) on November 29, 2005 on the Principal Register in Class 39, with a first use date of July 30, 1999, and the mark became incontestable on March 9, 2011 under 15 U.S.C. §§ 1058 and 1065. *See* Xu Dec Ex 8 and 10. American Cruise Lines received the registration for the word mark AMERICAN CRUISE LINES with design ('982 Mark) on December 13, 2005 on the Principal Register in Class 39, with a first use date of July 30, 1999, and the mark became incontestable on March 17, 2011 under 15 U.S.C. § 1065. See Xu Dec Ex 9 and 11.

The incontestable status of the AMERICAN CRUISE LINES mark proves that there is no genuine dispute of fact that American Cruise Lines owns the mark and that it is valid and legally protectable.

**2. AQSC's Use of the Name and Mark "American Queen Steamboat Company" in Advertising and Selling Cruise Ship Services is Likely to Cause Confusion, Mistake, and to Deceive**

AQSC's use of "American Queen Steamboat Company" as a cruise line brand name creates a high likelihood of confusion with the AMERICAN CRUISE LINES brand name and service mark. Consumers and travel agents viewing AQSC's cruise line brand name are likely to assume that the cruise ship services it represents are associated with American Cruise Lines'

cruise ship services provided under its AMERICAN CRUISE LINES mark. *See Fisons Horticulture, Inc. v. Vigoro Industries, Inc*., 30 F.3d 466, 472 (3d Cir. 1994) (citation omitted).

The Third Circuit, in *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir. 1983), adopted a non-exhaustive list of factors for courts to consider in evaluating likelihood of confusion, (the "*Lapp* factors"). Historically, the *Lapp* factors were used by courts when considering non-competing services. *Kos Pharmaceuticals, Inc. v. Andrx Corp*., 369 F.3d 700, 709 (3d Cir., 2004). In cases concerning competing services, courts generally examined only the registered mark, determined whether it was or became distinctive, and compared it against the challenged mark. *Opticians Assoc. of Am. V. Independent Opticians of Am.,* 920 F.2d 187, 195 (3d Cir. 1990).

In *A & H Sportswear,* the Third Circuit adapted the *Lapp* factors to make applicable to competing services recognizing use of the factors would help courts evaluate likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc*., 237 F.3d 198, 212 (3d Cir., 2000). The Third Circuit has since noted, however, that when services directly compete, mark similarity is the most important factor in determining likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.,* 269 F.3d 270, 281 (3d Cir. 2001); *A & H Sportswear, Inc.*, 237 F.3d at 214; *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 476 (3d Cir. 1994). In fact, the Third Circuit has advised that courts "should feel free to consider only the similarity of the mark themselves" if the services offered directly compete and the marks are very similar. *A & H Sportswear, Inc.*, 237 F.3d at 214.

There is no question that American Cruise Lines and AQSC are direct competitors. Both offer the same services, namely, arranging overnight passenger cruises and tours, operating vessels, and providing ancillary services such as the sale of trip cancellation insurance, air travel,

and hotel stays. Xu Dec Ex 53, No. 17. Both companies offer overnight passenger cruise ship services on U.S. waterways, including, cruise experiences on paddlewheel riverboats operating on the Mississippi, Columbia, and Snake Rivers.[6] Both companies market to the same target audience using the same marketing and sales channels.[7] Because the parties are competitors, the Court's primary focus in determining likelihood of confusion should be on the similarity of the marks.

### a. Lapp Factor 1: AQSC's Infringing Mark is Very Similar to American Cruise Lines' Mark

The first Lapp factor weighs in favor of finding a likelihood of confusion because the marks AMERICAN CRUISE LINES and AMERICAN QUEEN STEAMBOAT COMPANY have a high degree of similarity in that they both utilize the same dominant first word, "American," and "create the same overall impression when viewed separately." *Fisons*, 30 F.3d at 477. Courts should "compare the appearance, sound and meaning of the marks" in assessing their similarity. *Checkpoint*, 269 F.3d at 281. If the services are directly competitive, which they are here, "the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 713 (3d Cir. 2004) (citing 3 McCarthy § 23:20.1).

In comparing two marks, "each must be viewed in its entirety" and "it is proper to give greater force and effect to [a] dominant feature." *Alliance Bank v. New Century Bank*, 742 F.Supp.2d 532, 556 (E.D. Pa. 2010) (quoting *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570 (Fed. Cir. 1983)). If the dominant portions of the two marks are the same, confusion is likely. *Country Floors, Inc. v. Gepner*, 930 F.3d 1056, 1065 (3d Cir. 1991) (finding

---

[6] CAR Dec Ex 18-19; CBR Dec Ex 38-41; Xu Dec Ex 27, 33.
[7] CAR Dec ¶17, CBR Dec Ex 20-21, 28, 42; Xu Dec Ex 17; 58:21-59:12; Kent Dec Ex 1, ¶¶72-76.

dominant portions of two marks, "Country," in "Country Floors" and "Country Tiles," are the same, confusion is likely); *see also Checkpoint*, 269 F.3d at 281-282 (upholding District Court's finding that "Check Point Software Technologies, Inc." was very similar to "Checkpoint Systems," because dominant portion of each parties' mark was first word, "Checkpoint."); *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183-85 (3d Cir. 2010) (finding an over impression of similarity between the marks "ForsLean" and "Forsthin"); *Lapp, Inc.*, 721 F.2d at 463 ("Lapp" and "Lapp Cable" are identical for all practical purposes); *Tree Tavern Prods., Inc. v. Conagra, Inc.*, 640 F.Supp. 1263, 1270 (D.Del. 1986) ("[S]imilarity between the marks 'Side Dish' and 'Bankquet Side Dish for One' is obvious.").

The first word, "American," is the dominant portion of AMERICAN CRUISE LINES and AMERICAN QUEEN STEAMBOAT COMPANY, and the marks are confusingly similar because they create the same overall impression. The word "American" in the AMERICAN CRUISE LINE mark is the distinctive and most important part in its brand name because it uniquely designates American Cruise Lines as the source of cruise ship services in the U.S. overnight passenger cruise market. Silverman Dec Ex 1, ¶ 21.  It is essential to American Cruise Lines' brand identity. Notably, American Cruise Lines disclaimed exclusive rights to the words "cruise lines" when registering the marks. Xu Dec Ex 8 and 9. Similarly, Defendant HMS disclaimed "steamboat company," when filing its application demonstrating that both companies viewed the word "American" as dominant in their mark. Xu Dec. Ex 39, '568 registration; *see Country Floors*, 930 F.2d at 1065 (finding it logical that disclaimed matter is not usually regarded as dominant part of mark).

In fact, the USPTO has determined that the word "American" in the registered service mark AMERICAN CRUISE LINES is distinctive in the cruise ship services market when

granting §2(f) status to the mark on March 9, 2011 after five years of continuous use. Xu Dec Ex 10. The PTO granted §2(f) status to AMERICAN QUEEN STEAMBOAT COMPANY mark on August 30, 2011 without the mark ever having been used. Xu Dec Ex 64. American Cruise Lines was the first entity to use the word "American" over a long-enough period of time in the cruise ship services market to earn the right to have the word "American" in its brand name be declared distinctive.



. Silverman Dec. Ex 1, ¶49. Because of this practice, the overwhelming majority of cruise ship operators have very unique brand names with little or no similarity to others. Duffy Dec Ex 1, ¶26.

. *Opticians Assn. of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) ("if the impression created by marks is essentially the same, it is very probable that the marks are confusingly similar"). The phrases following "American" in the parties' marks are generic ("Cruise Lines" and "Steamboat Company") and non-descriptive ("Queen") terms that have little effect on customers' association with the respective brands. *See Fisons*, 30 F.3d at 477 (citing J. Thomas McCarthy, *3 McCarthy on Trademarks and Unfair Competition*, § 23:50 (4th ed. 2000)).

████████████████████████████████████

████████████████████████████████████

███████████████████

### b. Lapp Factor 2: AMERICAN CRUISE LINES Is a Strong Mark Entitled to Protection

The strength of a mark is measured by its tendency to identify the services sold under the mark as emanating from a particular source. *Accu Personnel, Inc. v. AccuStaff, Inc*., 823 F.Supp. 1161, 1165 (D.Del. 1993) (citing *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). When measuring the strength of an owner's mark, the Court must evaluate two factors: (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition). *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 221 (3d Cir. 2000). Of these two considerations, commercial strength is more important, because (i) a conceptually weak but commercially strong mark can obtain secondary meaning, as illustrated by such examples as AMERICAN Airlines, PAYLESS Drug Stores and KENTUCKY FRIED CHICKEN; and, (ii) conceptual distinctiveness alone does not inform the degree to which a mark is associated with a particular source. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc*., 405 F.Supp.2d 680, 690–91 (E.D.Va., 2005) (citations omitted).

In the present case, it is clear that the American Cruise Lines mark is both conceptually and commercially strong. Thus, this factor also militates in favor of finding a likelihood of confusion.

### 1. *Conceptual Strength*

To determine conceptual strength and whether a mark is protectable as a trademark, courts divide marks into the following four categories (1) arbitrary or fanciful (e.g. "Kodak"); (2)

suggestive (e.g. "Coppertone"); (3) descriptive (e.g. "Security Center"); or (4) generic (e.g. "Diet Soda"). *A & H Sportswear,* 237 F.3d at 221.  In order to qualify for protection under the Lanham Act a mark must be distinctive; that is, either suggestive, arbitrary/fanciful, or descriptive with a demonstration of secondary meaning.  *Id.* at 221-222. Generic marks do not receive any protection. *Id.* This classification system is used primarily to determine whether a mark is protectable, but is not dispositive on conceptual strength or necessarily indicative of whether a mark is strong.  *Id.* at 222. Stronger marks receive greater protection because they carry greater recognition in the marketplace, making a similar mark more likely to cause confusion.  *Id.*

American Cruise Lines' mark is incontestable and "conclusively presumed to be either nondescriptive or to have acquired secondary meaning." *Pennzoil-Quaker State*, 2008 WL 4107159, at *11–12 (W.D. Pa. Sept. 2, 2008) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir.1986)). Secondary meaning is acquired when the mark is "not only an identification of the product or services, but also a representation of the origin of those products or services." *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir.2000). "That is, a term that has achieved secondary meaning identifies the source of the product rather than the product itself." *Id.*

The AMERICAN CRUISE LINES mark has acquired a strong secondary meaning within the cruise industry and is distinctive.  American Cruise Lines's principal, Charles A. Robertson, marketed, sold, and operated cruises under the AMERICAN CRUISE LINE brand in the 1970's and 1980's, along different U.S. waterways, including the Mississippi River. Mr. Robertson and his company were pioneers in the U.S. cruise industry and were well-known and respected. The term "American" became synonymous with American Cruise Lines as evidenced by a 1986 publication referring to the company simply as "American." CAR Dec Ex 13.

Since restarting American Cruise Lines in 1999 after the bankruptcy of the first company concluded, American Cruise Lines has continuously used the AMERICAN CRUISE LINES service mark in interstate commerce in connection with marketing and selling nationally overnight passenger cruise ship services. CBR Dec Ex 3-5. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

Similar to the old company, the reborn American Cruise Lines has long been identified by industry professionals and national publications simply as "American." *See* CAR Dec ¶12; CBR Dec Ex 13-19 (articles in national publications and trade journals during the period 2005 – 2016 referring to American Cruise Lines simply as "American."). *Sanofi-Aventis v. Advancis Pharmaceutical Corp.*, 453 F.Supp.2d 834, 851 (D. Del. 2006) (finding mark referenced in national publications, industry awards, and knowledge of party within the industry evidence of marketplace recognition and strength of mark).

In fact, members of the travel industry see continuity between the old company and the reborn American Cruise Lines. CAR Dec ¶6; CBR DEC Ex 3-6. This is attributable to over 40 years of Mr. Robertson's contributions to the industry and his efforts to keep American Cruise Lines' branding and promotion of its AMERICAN CRUISE LINES mark relatively consistent over the years.[8] Similarities between the old and new operations of American Cruise Lines, and

---

[8] *See* CBR DEC Ex 6 at ACL 48600 ("Originally formed in the late 1970s, American Cruise Lines operated more or less successfully until new ownership drove it into the ground in the late 1980s. Jump forward to 2000, and the original owner decides to jump back into the business. Rather than reinventing the wheel, he uses the same name, the same basic ship design, similar

the consistent use of the brand name "American Cruise Lines" in promoting and selling cruise ship services nationally, have made the AMERICAN CRUISE LINES mark very strong.

The consuming public has grown to understand that "American" is a source of high quality cruise ship services that provides its guests with an all-around, relaxing, all-American experience. The company has received numerous industry awards ranking it, among other things, as the "World's Leading Small Ships Cruise Line," "World's Leading River Cruise Company," North America's Leading River Cruise Company," and "Best Paddlewheel River Cruise in Washington." CAR Dec ¶21. Xu Dec Ex ¶55.

Today, when one sees or hears the name "American" within the cruise line industry one immediately thinks of American Cruise Lines. Even competitors within the cruise line industry recognize and accept that American Cruise Lines is commonly known in the market as "American."[9]



### 2. *Commercial Strength*

When determining whether a mark has "commercial strength" courts typically find that

sales revenues and advertising expenditures are important evidence of marketplace recognition. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 224 (3d Cir. 2000); *see also, Fisons,* 30 F.3d at 479 (strength may be shown through consumer awareness and financial investment in the mark). By this measure, the AMERICAN CRUISE LINES mark is strong.





For most of the four-year period 2009 to 2013, American Cruise Lines was the only cruise line marketing, selling, and operating overnight passenger, paddlewheel riverboat cruises along the Columbia and Snake Rivers. By the time AQSC first began to advertise its cruise ship services on the Columbia and Snake Rivers in mid-August 2013, ████████████████████████████████████████████████ ████████████████████████████████████████████████

In August, 2010, American Cruise Lines began advertising and selling nationally under its AMERICAN CRUISE LINES brand cruise ship services on the Mississippi River.[13] For more than one year, American Cruise Lines was the only cruise line marketing and selling overnight, passenger paddlewheel riverboat cruises along the Mississippi River. By September 15, 2011, when AQSC asserts it began marketing cruise ship services (under the Great American Steamboat Company brand),████████████████████████████████████ ████████████████████████████████████████████████

The undisputed facts clearly show American Cruise Lines' extensive and pervasive

---

[12] CBR Dec Ex 21; Xu Dec Ex 17, 58:21-59:12.
[13] CBR Dec Ex 36-37, 39-41; Silverman Dec Ex 1, ¶91-92, 94.

national advertising of its expanding and varied cruise ship services under the AMERICAN CRUISE LINES brand and mark, in different channels and for many years. The undisputed facts also demonstrate ███████████████ widespread recognition of American Cruise Lines in national consumer and trade publications, and its receipt of numerous industry awards. Additionally, the facts show that American Cruise Lines is a legacy brand, first used in the 1970's and 1980's, and that the company and its principal, Charles A. Robertson, are well-known in the industry. In *Sanofi-Aventis*, given comparable facts, this Court found that the mark had "great commercial strength" and was entitled to a high level of protection. *Sanofi-Aventis*, 453 F.Supp.2d at 850. The Court should hold similarly here.  There is no genuine dispute that the AMERICAN CRUISE LINES mark is both conceptually and commercially strong.

### c. Lapp Factor 3: Price Of The Goods And Other Factors Indicative Of The Care And Attention Of Consumers When Making A Purchase

Generally, when the price of a service is higher, consumers tend to exercise a heightened level of care in evaluating service providers before making purchase decisions. The prices of competing cruise ship services are significant – typically thousands of dollars per guest for a week-long cruise. CBR Dec Ex 27. The high price of cruises would seem to indicate that consumers would exercise care when making purchase decisions, but purchasing a cruise vacation is quite different from other significant purchases, such as vehicles.

Many cruise company customers are first-time purchasers, which means that they are new to the process. Silverman Dec Ex 1, ¶107. Cruise lines are unfamiliar to consumers who typically know little about the ports of call on the various itineraries being offered. There is no opportunity for a "test drive," and consumers cannot rely on a wide network of informed friends, relatives, and business colleagues for advice and counsel. *Id.* Even if friends or relatives have cruised with American Cruise Lines or AQSC, their recommendation could be in the form of

"Go cruise with 'American,'" leading to confusion or ignorance of the fact that two companies offer similar overnight passenger cruise ship services with the first name "American." ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

Factors specific to the travel industry can reduce care normally occasioned by a higher price and influence consumers' purchase decisions. As discussed in more detail, *infra*, many consumers purchase cruises with American Cruise Lines and AQSC through intermediaries, such as travel agents and third-party websites. Xu Dec Ex 32, 143:25-145:15. ████████████

██████████████████████████████████████████ Travel agents can influence purchasing decisions, and, as provided[14] there is ample evidence of travel agents being confused between the cruise ship services offered by American Cruise Lines and AQSC. *In re Shell Oil Co.*, 992 F.2d 1204, 1208 (Fed. Cir 1993) (indicating that "even sophisticated purchasers can be confused by very similar marks"). Although the average travel agent may have more knowledge about service providers and are arguably less susceptible to confusion, the Court should apply the lower standard of care relevant to consumers. *Ford Motor Co.*, 930 F.2d 277, 293 (3d Cir. 1991) ("When the buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class).

As a result, the standard of care and attention made prior to purchasing American Cruise Lines or AQSC's cruise ship services is comparatively low despite the price of the cruises. The Court should find this factor neutral.

---

[14] Xu Dec Ex 4, 36:4-37:21; Ex 45, 274:1-13.

### d. Lapp Factors 4 and 6: Immediacy of Confusion from AQSC's Use of Mark And Evidence Of Actual Confusion

Lapp Factors number 4 and number 6 concern the length of time AQSC used the mark without evidence of actual confusion arising and whether such use resulted in actual confusion. *Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 709 (3d Cir. 2004). Although evidence of actual confusion is not required to prove likelihood of confusion, such evidence strengthens American Cruise Lines' case. *Checkpoint Systems v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 291 (3rd Cir. 2001).

There is significant evidence of actual confusion in this matter, including testimony and documentary evidence provided by employees, customers, travel agents and vendors, as well as survey evidence identifying AQSC's use of "American" as the first term of its corporate brand name as a significant source of confusion. These factors weigh strongly in favor of finding a likelihood of confusion due to AQSC's use of the AMERICAN QUEEN STEAMBOAT COMPANY mark.

### i. Survey Evidence Identifies AQSC's Use of "American" as the First Word in Its Corporate Brand Name as a Significant Source of Confusion

The Third Circuit Court of Appeals and other courts have held that survey evidence of 15% confusion is sufficient to demonstrate actual confusion. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.,* 290 F.3d 578, 594 (3d Cir. 2002); *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 466–67 & n. 15 (4th Cir.1996) (15–20% confusion was sufficient to establish "actual confusion ... to a significant degree"); *Mut. of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 400–01 (8th Cir.1987) (survey showing 10–12% confusion sufficient); *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir.1979) (15–20% confusion sufficient); *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.,* 628 F.2d 500,

507 (5th Cir.1980) (15% confusion sufficient); *Goya Foods, Inc. v. Condal Distribs., Inc.,* 732 F.Supp. 453, 457 n. 7 (S.D.N.Y.1990) (9–10% confusion was sufficient to demonstrate "meaningful evidence of actual confusion").

In this matter, ███████████ conducted a scientific online sequential lineup survey focused on the specific cause of the confusion. ███████████ The survey explains how use of two randomized survey respondent groups produces a measure of net confusion. ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ AQSC's use of "American" as the first term of its corporate brand is a significant source of confusion.

> ii.    AQSC's Pervasive Use of American Cruise Lines' Trademarked Terms as Paid Keywords is Likely to Cause Confusion

In October, 2011 AQSC first used American Cruise Lines' brand name and service mark AMERICAN CRUISE LINES as a paid keyword in its PPC Internet marketing program and

continues to use it today.[15] In fact, AQSC has used/is using ███████████████



    iii.    <u>Instances of Actual Confusion</u>

    Late June, 2012 AQSC issued a press release regarding its 2013 cruise season and buried

in the announcement the change of its corporate brand name to AMERICAN QUEEN

STEAMBOAT COMPANY, effective July 1, 2012.  Xu Dec Ex 37; 38, 119:11-121:8; 51. Less

than three months later, shortly after AQSC began to advertise under the new name, confusion

ensued. ███████████████████████████████████

███████████████████████████    ███████████████

███████████████████████████████.

[15] ████████████████████████
[16] ████████████████████████████████

AQSC concedes actual confusion exists. █████████████████████

████████████████████████████████████ Confusion in the

market is varied and widespread. ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████ . ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ ██████████████████████

████████████████████████████████████████████

████████████████████████████

Examples of other types of confusion include confused travel agents at trade shows believing that AQSC is affiliated with American Cruise Lines. Xu Dec Ex 4, 36:4-37:21. ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Even personnel in AQSC's marketing department have testified that incidences of actual confusion are caused by the confusing similarity between the two company's corporate brand names, both of which start with the word "American." ███████████████████████

█████████████████████████████████

---

[17] ███████████████████████████████████████████

████████████████████████████████████████████

[REDACTED]

[REDACTED] The significant amount of evidence of actual confusion makes a strong likelihood of confusion in the future. *Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 249 (3d Cir. 2005). Given the actual and immediate confusion resulting from AQSC's use of the mark, factors 4 and 6 weigh heavily for a finding of likelihood of confusion.

### e. Lapp Factor 5: AQSC Intended to Benefit From American Cruise Lines' Goodwill in Adopting the Mark

In evaluating this factor, courts look at whether the defendant chose the mark to promote confusion to capitalize on the senior user's goodwill and whether defendant gave adequate care to investigating its proposed mark or had knowledge of similar marks or allegations of potential confusion. *Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700, 721 (3d Cir. 2004).

AQSC adopted the AMERICAN QUEEN STEAMBOAT COMPANY mark with full knowledge of American's prior use of the corporate brand name and service mark AMERICAN CRUISE LINES to indicate a source of cruise ship services. [REDACTED]

[REDACTED]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ There is no genuine dispute of fact that AQSC had full knowledge of the prior use of the corporate brand name and mark AMERICAN CRUISE LINES. *See Morgenstern Chem. Co. v. G.D. Searle & Co.,* 253 F.2d 390, 394 (3rd Cir. 1958) (holding that intent to trade upon the goodwill of the senior user may be found when the junior user had knowledge of the senior user's mark).

Undisputed facts in the record demonstrate that AQSC adopted the AMERICAN QUEEN STEAMBOAT COMPANY brand and mark to cause confusion in the market to usurp and trade on the goodwill and reputation of the industry leader, American Cruises Lines.  AQSC had full knowledge of the AMERICAN CRUISE LINES brand and the company's family of "American" marks prior to its decision to begin building its own family of "American" marks.

Prior to AQSC's adopting the name "American Queen Steamboat Company" in 2012, no such brand existed. No prior owner of the vessel *American Queen* incorporated the vessel name in its brand name. CAR Dec ¶45; Silverman Dec Ex 2 ¶42. ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

_____

███████ █████████████████████████████████████

███████████████████████████████████████

44



To accomplish its goals, AQSC acquired the paddlewheel riverboat *Empress of the North* and changed its name to *American Empress* and operates the vessel on the Columbia and Snake Rivers with the same ports of call as American Cruise Lines. Xu Dec Ex 58. Also, AQSC has recently announced that it would begin construction of a boat named *American Duchess* and begin offering overnight passenger cruise ship services aboard it on the Mississippi River and Ohio Rivers in direct competition with American Cruise Lines.

Further, during the course of this litigation AQSC has filed trademark applications for the vessel names *American Princess*, *American Countess*, *American Contessa*, and *American Duchess*, and just a few weeks ago on December 5, 2016, filed applications to register the marks

"Uniquely American River Cruises," "Uniquely American Coastal Cruises," and "Uniquely American Great Lakes Cruises."    The above facts demonstrate AQSC's deliberate actions to cause confusion and to usurp and trade on the goodwill and reputation of American Cruise Lines.

As discussed *supra*, AQSC has also pervasively used – and continues to use - American's AMERICAN CRUISE LINES mark and its other "American" trademarks as paid keywords in AQSC's Internet marketing program ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

The intent in clear. Also, AQSC's use of paid keywords incorporating ███████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ tends to show something more than simply a desire to advertise competing services.

In *McNeil Labs. Inc. v. American Home Prods. Corp.,* 416 F. Supp. 804, 807 (D.N.J. 1976), the court held that defendant intended to trade upon the goodwill in plaintiffs TYLENOL mark when the defendant selected the mark EXTRANOL for its extra-strength pain reliever *after* confirming by survey that EXTRANOL would remind consumers of TYLENOL. The court observed that "courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *McNeil,* 416 F. Supp. at 807.  Here, there is no genuine dispute of fact that AQSC knew of American's  AMERICAN CRUISE LINES brand and mark, its "American" family of marks, and that the consumers would think of American Cruise Lines when viewing the AMERICAN QUEEN STEAMBOAT COMPANY mark.  This factor weighs heavily in favor of finding likelihood of confusion.

### f.   Lapp Factor 7: American Cruise Lines and AQSC Market And Advertise Through The Same Trade Channels And Media

The seventh Lapp Factor favors a finding of likelihood of confusion because American Cruise Lines and AQSC both advertise and market their cruise services through the same channels. *Kos Pharm., Inc.*, 369 F.3d at 722 ("The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion").

Both American Cruise Lines and AQSC nationally and internationally market their overnight passenger cruise ship services ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████

There is no factual dispute that American Cruise Lines and AQSC use the same commerce channels to market their services to the same people. Therefore, because customers could reasonably conclude that one company offers both competing cruise services, this factor favors a finding of likelihood of confusion. *Fisons*, 30 F.3d at 481 ("The question is whether the consumer might . . . reasonably conclude that one company would offer both of these related products.").

### g.   Lapp Factor 8: American Cruise Lines and AQSC Sales Efforts are Directed to the Same Target Market

There is an increased likelihood of confusion because American Cruise Lines and AQSC both advertise and market to the same people ████████████████████ *Lapp*, 721 F.2d at 463-464 (there is stronger likelihood of confusion when parties target their sales efforts to same consumers).

As stated above, American Cruise Lines and AQSC are competitors, offer substantially similar overnight paddlewheel cruises, and therefore share the same target markets.  There is no

factual dispute that American Cruise Lines and AQSC's target markets consist of the same demographic and psychographic profiles. Both American Cruise Lines' and AQSC's target demographic profile consist ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

The substantial overlap between American Cruise Lines and AQSC's target markets are undeniable, and the Court should find a high likelihood of confusion.

### h.  Lapp Factor 9: Relationship Of The Goods In The Minds Of Consumers

The similarity of AQSC's and American Cruise Lines' operations also results in a high likelihood of confusion. *Lapp*, 721 F.2d at 462 ("The closer the relationship between the products, … the greater the likelihood of confusion."). Both American Cruise Lines and AQSC provide overnight passenger cruise ship services and offer cruises on paddlewheel riverboats operating on the Mississippi, Snake, and Columbia rivers. Both offer similar itineraries, pre-cruise hotel stays, shore excursions, and various forms of entertainment. AQSC has extended the similarities even to the naming convention of their boats by incorporating "American" followed by a term such as "Empress" or "Dutchess", CBR Dec Ex 58; Xu Dec Ex 58, although American Cruise Lines was the first to adopt this naming convention in the 1970s, with the *American Eagle*. Car Dec Ex 3-4.

Because of the similarities in American Cruise Lines and AQSC's services and operations, the ninth Lapp factor also leads to a finding of a likelihood of confusion.

48

**C.   There Is No Genuine Dispute Of Fact As To AQSC's Breach Of The Settlement Agreement - Plaintiff Is Entitled To Summary Judgment**

To establish a claim for breach of contract, the plaintiff must show: "the existence of a contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *National Fire & Marine Ins. Co. v. Robin James Const., Inc.*, 478 F. Supp. 2d 660, 662 (D. Del. 2007).

**i.   The February 9, 2012 Settlement Agreement Is A Valid Contract, and American Cruise Lines Fully Performed Its Obligations Thereunder**

49

### ii. AQSC Breached the Settlement Agreement by Failing to Surrender the Domain Name

The Domain Name is important to using the GASC Marks in internet marketing. The ".com" domain is the most important "top level domain" in commercial use. Kent Dec Ex 1 at 9, ¶¶33-37. Consumers generally assume that a company would have the ".com" version of their brand name as a domain. Kent Dec Ex at 47, ¶172. AQSC knows the importance of the Domain Name.



Courts routinely find that a "mark" and the "mark.com" are virtually identical, constituting the same trademark. *See Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1055 (9th Cir. 1999) (collecting cases). *See also Minnesota Min. and Mfg. Co. v. Taylor*, 21 F.Supp.2d 1003, 1005 (D.Minn.,1998) (ordering defendant to relinquish domain names incorporating plaintiff's mark and colorable imitations thereof).

The Random House Webster's Unabridged Dictionary defines "derivative," when used as a noun, as "something derived." Random House Webster's Unabridged Dictionary, 2d ed., 2001.



### iii. AQSC has Breached the Settlement Agreement by Continuing to Use the GASC Marks as PPC Keywords

After the November 5, 2012 cessation date, AQSC has used – and continues to use - the

---

[20]    Indeed, in *Planned Parenthood Federation of America, Inc. v. Bucci*, 1997 WL 13313 (S.D.N.Y. March 24, 1997(Wood, J.), the Court made clear that a domain may itself be a trademark.

GASC Marks as PPC Keywords ████████████████████████████ to trigger the appearance of its ads when Internet users type "great american steamboat company" or variations into Internet search engines. Kent Dec Ex 1 at 53, ¶¶ 196-200; Xu Dec Ex 36, 56-57. The fact AQSC has "used" the GASC Marks by bidding for the Great American Steamboat Company and American Steamboat Company marks with Google and the other search engines is evident from the nature of the PPC search engine results process ████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████

This use of the American Cruise Lines' GASC Marks by AQSC as PPC Keywords is part of a campaign by AQSC to target many American Cruise Lines' trademarked terms in PPC advertising, a campaign for which AQSC has paid substantial funds ████████████████ ██████████████████████████████████████████████████████ ████████████████████████████ The substantial sums spent by AQSC on this campaign each year, which actively uses numerous trademarked terms registered by American Cruise Lines, suggests that AQSC's PPC campaign with American Cruise Lines' trademarked terms is entirely deliberate. Kent Dec Ex 1 at ¶207.

These acts not only demonstrate that AQSC has breached the settlement agreement, but also illustrate continued deliberate acts of AQSC to cause confusion in the market and to trade on American Cruise Lines' goodwill and reputation.

AQSC materially breached the settlement agreement by continued use of the Domain Name and refusal to surrender it to American Cruise Lines. As a result of this breach, American has been deprived of the benefit of the bargain and has incurred damages ████████████████ ████████████████████████████████████████

## V.    CONCLUSION

For the foregoing reasons, Plaintiff, American Cruise Lines, respectfully requests that the Court enter summary judgment in favor of American Cruise Lines on its claims for breach of contract (Count I), trademark infringement (Count II), False Designation of Origin (Count V), Violation of Delaware UDTPA (Count VII), and common law unfair competition (Count VIII).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Stephen J. Kraftschik*
Mary B. Graham (#2256)
Stephen J. Kraftschik (#5623)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
mgraham@mnat.com
skraftschik@mnat.com
   *Attorneys for American Cruise Lines, Inc.*

OF COUNSEL:

David McI. Williams (*pro hac vice*)
Michael R. Naccarato (*pro hac vice*)
GORMAN & WILLIAMS
36 S. Charles Street, Suite 900
Baltimore, MD  21201-3114
(410) 528-0600

December 20, 2016