IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., Plaintiff, v. HMS AMERICAN QUEEN STEAMBOAT COMPANY LLC and AMERICAN QUEEN STEAMBOAT OPERATING COMPANY, LLC, Defendants. | ) | C.A. No. 13-324 (RGA) Redacted Public Version Filed 2/1/17 |

**SECOND DECLARATION OF WAYNE H. XU IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**VOLUME 1 OF 3**
**(DECLARATION AND EXHIBITS 66-88)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
mgraham@mnat.com
skraftschik@mnat.com

*Attorneys for American Cruise Lines, Inc.*

OF COUNSEL:

David McI. Williams (*pro hac vice)*
Michael R. Naccarato (*pro hac vice)*
Wayne H. Xu *(pro hac vice)*
GORMAN & WILLIAMS
36 S. Charles Street, Suite 900
Baltimore, MD 21201-3114
(410) 528-0600

January 25, 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., Plaintiff, | ) | |
| v. | ) | C.A. No. 13-324 (RGA) |
| HMS AMERICAN QUEEN STEAMBOAT COMPANY LLC, and AMERICAN QUEEN STEAMBOAT OPERATING COMPANY, LLC, Defendants. | ) | |

**SECOND DECLARATION OF WAYNE H. XU IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Wayne H. Xu, being over the age of eighteen (18), am an attorney at Gorman & Williams, which represents American Cruise Lines, Inc. ("American Cruise Lines") in the above-referenced case, and I have personal knowledge of the matters set forth in this Declaration. I am competent to testify regarding these matters and state as follows:

1. Exhibit 66, ACL 50114, is a true and accurate copy of a newspaper article written in *The Des Moines Register* on May 4, 1975 entitled "Delta Queen Gets Sister."

2. Exhibit 67, ACL 50069, is a true and accurate copy of an advertisement placed in *The Los Angeles Times*, on March 18, 1984 captioned "Steamboatin' to the World's Fair 'The Most Relaxing Way to Enjoy its Treasure!'"

3. Exhibit 68, HMS0096642 – HMS0096685, received from AQSC on May 24, 2016, is a true and accurate copy of American Classic Voyages Co.'s year 1996 Annual Report (Form 10-K) filed with the United States Securities and Exchange Commission ("SEC").

4. Exhibit 69, HMS0097011 – HMS0097098, received from AQSC on May 24, 2016, is a true and accurate copy of American Classic Voyages Co.'s year 2000 Annual Report (Form 10-K) filed with the SEC.

5. Exhibit 70, HMS0060622 – HMS0060632, received from AQSC on June 17, 2014, is a true and accurate copy of the January 9, 2008 report of the marine survey of the *American Queen*.

6. Exhibit 71, HMS0100669 – HMS0100700, received from AQSC on July 21, 2016, is a true and accurate copy of [REDACTED].

7. Exhibit 72, HMS0060841 – HMS0060872, received from AQSC on July 18, 2014, is a true and accurate copy of [REDACTED].

8. Exhibit 73, ACL 43820 – ACL 43821, is a true and accurate copy of the Delta Queen Steamboat Company's webpage (https://www.deltaqueen.com/cruises/steamboatin.htm) from 2005.

9. Exhibit 74, ACL 43581 – ACL 43582, is a true and accurate copy of DQSC's webpage (https://www.deltaqueen.com/cityscapes/index.htm) from 2005.

10. Exhibit 75 is a true and accurate copy of [REDACTED].

11. Exhibit 76, HMS0096686 – HMS0096736, received from AQSC on May 24, 2016, is a true and accurate copy of American Classic Voyages Co.'s year 1997 Annual Report (Form 10-K) filed with the SEC.

12. Exhibit 77, MARAD0157 – MARAD0159, received as a result of a FOIA Request to MarAd, is a true and accurate copy of a letter from Elizabeth R. Megginson, Acting Deputy

Maritime Administrator and Chief Counsel of MarAd, to Stephen Flynn, Assistant Director, Admiralty Branch of MarAd, regarding "Default of Title XI Obligations."

13. Exhibit 78 is a true and accurate copy of [redacted].

14. Exhibit 79, is a true and accurate copy of a web article written in *Marine Link*, on January 28, 2003, entitled "PVA: The Return of the American Queen."

15. Exhibit 80, ACL 43746 – ACL 43815, is a true and accurate copy Delta Queen Steamboat Company, Inc.'s 2004/2005/2006 Brochure.

16. Exhibit 81, ACL 50084 – ACL 50085, is a true and accurate copy of DQSC's September 7, 2005 press release to its passengers regarding the cancellation of cruises due to Hurricane Katrina, that was captured from the "Wayback Machine's" record of DQSC's webpage (http://www.deltaqueen.com) on August 23, 2016.

17. Exhibit 82, ACL 03225 – ACL 03330, is a true and accurate copy of Ambassadors International, Inc.'s year 2006 Annual Report (Form 10-K) filed with the SEC.

18. Exhibit 83, ACL 03331 – ACL 03451, is a true and accurate copy of Ambassadors International, Inc.'s year 2007 Annual Report (Form 10-K) filed with the SEC.

19. Exhibit 84, HMS0060564 – HMS0060569, received from AQSC on June 17, 2014, is a true and accurate copy of an email chain entitled "FW: minutes from meeting Friday/comments," and its attachment, the May 30, 2008 "Meeting Notes – [redacted]."

20. Exhibit 85 is a true and accurate copy of the Declaration of Mark Detillion in Support of Chapter 11 Petitions and First Day Motions, filed on April 1, 2011 in the United States Bankruptcy Court for the District of Delaware (Case No. 11-11002-KG).

21. Exhibit 86 is a true and accurate copy of [REDACTED].

22. Exhibit 87, HMS0098048, received from AQSC on May 24, 2016, is a true and accurate copy of Majestic America Line's Statement of Operations for the Year Ended December 31, 2006.

23. Exhibit 88, HMS0001398 – HMS0001488, received from AQSC on August 29, 2013, is a true and accurate copy of [REDACTED].

24. Exhibit 89, HMS0098047, received from AQSC on May 24, 2016, is a true and accurate copy of Majestic America Line's Statement of Operations for the Year Ended December 31, 2007.

25. Exhibit 90 is a true and accurate copy of [REDACTED].

26. Exhibit 91 is a true and accurate copy of Ambassadors International, Inc. Q4 2007 Earnings Call Transcript, dated March 12, 2008.

27. Exhibit 92 is a true and accurate copy of Ambassadors International, Inc. Q1 2008 Earnings Call Transcript, dated May 28, 2008.

28. Exhibit 93, HMS0060799 – HMS0060801, received from AQSC on June 17, 2014, is a true and accurate copy of Ambassadors International, Inc.'s April 29, 2008 press release, published in *Yahoo Finance*, announcing its plans to sell Majestic America Line.

29. Exhibit 94, HMS0060537 – HMS0060538, received from AQSC on June 17, 2014, is a true and accurate copy of the October 25, 2007 memorandum from Joe Ueberroth and David Giersdorf to "All Team Members" regarding "Organizational Announcement."

30. Exhibit 95, ACL 03614 – ACL 03744, is a true and accurate copy of Ambassadors International, Inc.'s year 2008 Annual Report (Form 10-K) filed with the Securities and Exchange Commission ("SEC").

31. Exhibit 96, HMS0001871– HMS0001880, is a true and accurate copy of the "Verified Complaint for Foreclosure on First Preferred Ship Mortgage Against *American Queen*, Etc., *In Rem*," filed in the U.S. District Court Eastern District of Texas (Civil No. 1:09-CV-0198) on February 24, 2009.

32. Exhibit 97, MARAD0008 – MARAD0009, received as a result of a FOIA Request to MarAd, is a true and accurate copy of a memorandum from Daniel C. Ladd, Office of Marine Financing of MarAd, to Sean T. Connaughton, Maritime Administrator of MarAd, regarding "AQ Boat, LLC (AQ) Payment of Title XI debt after Default with letter demanding payment."

33. Exhibit 98 is a true and accurate copy of excerpts of "Defendants' Answers To Plaintiff's First Set Of Interrogatories" in this litigation, dated February 10, 2014.

34. Exhibit 99 is a true and accurate copy of accurate copy of an article written by Jerry Limone in *Travel Weekly* on May 18, 2010 entitled "Mississippi Queen sold for scrap."

35. Exhibit 100, ACL 03864 – ACL 03926, is a true and accurate copy of Ambassadors International, Inc.'s year 2010 Annual Report (Form 10-K) filed with the SEC.

36. Exhibit 101 is a true and accurate copy of [REDACTED] [REDACTED].

37. Exhibit 102, MARAD0305 – MARAD0306, received as a result of a FOIA Request to MarAd, is a true and accurate copy of a summary the of AQSC's offers to MarAd for the purchase of the *American Queen*.

38. Exhibit 103, HMS0002478-HMS0002482, received from AQSC on September 6, 2013 is a true and accurate copy of the May 1, 2009 Order for Interlocutory Sale of Vessel Pursuant to Supplemental Admiralty Rule E(9) in the United States District Court for the Eastern District of Texas Beaumont Division (Civil No. 1:09-CV-0198).

39. Exhibit 104, HMS0056992 – HMS00567001, received from AQSC on November 21, 2013, is a true and accurate copy of the Coast Guard's General Index or Abstract of Title for Official No. 1030765 (*American Queen*).

40. Exhibit 105, HMS0057152 – HMS0057161, received from AQSC on December 31, 2013, is a true and accurate copy of the July 2009 "American Queen & Empress of the North - Vessel Overview," created by AMA Capital Partners.

41. Exhibit 106, HMS0057162 – HMS0057172, received from AQSC on December 31, 2013, is a true and accurate copy of the August 2009 "American Queen & Empress of the North - Additional Information" created by AMA Capital Partners.

42. Exhibit 107, MARAD0060 – MARAD0077, received as a result of a FOIA Request to MarAd, is a true and accurate copy of the December 31, 2010 Standard Contract of Sale of the *American Queen*.

43. Exhibit 108, MARAD0033, received as a result of a FOIA Request to MarAd, is a true and accurate copy of the June 22, 2011 letter from Congressman Steve Cohen to Ray LaHood, Secretary of Transportation, and David Matsuda, Maritime Administrator requesting that they grant a short extension of the closing deadlines for the purchase of the *American Queen*.

44. Exhibit 109, MARAD0405 – MARAD0406, received as a result of a FOIA Request to MarAd, are invoices for the payment of extension fees and custodial costs related to AQSC's extensions of the closing date.

45. Exhibit 110, MARAD0410, received as a result of a FOIA Request to MarAd, is a true and accurate copy of MarAd's internal memorandum entitled "Sale of *American Queen* Status of July 12, 2011."

46. Exhibit 111 is a true and accurate copy of [REDACTED].

47. Exhibit 112, HMS0001679 – HMS0001681, is a true and accurate copy of the July 28, 2011 Bill of Sale for the *American Queen*.

48. Exhibit 113 is a true and accurate copy of a May 7, 2010 email from Jeffrey D. Krida to Mark Detillion [REDACTED].

49. Exhibit 114 is a true and accurate copy of excerpts of "Defendant's Responses to Plaintiff's First Set of Requests for Admissions of Fact (Nos. 1-70)" in this litigation, dated September 10, 2015.

50. Exhibit 115, HMS0000285 – HMS0000291, received from AQSC on August 23, 2013, is a true and accurate copy of the February 25, 2011 [REDACTED].

51. Exhibit 116, is an extract of HMS0060978 – HMS0065842, [REDACTED].

52. Exhibit 117, ACL 44755 – ACL 44766, is a true and accurate copy of American Cruise Lines' brochure entitled Historic Antebellum South.

53. Exhibit 118, ACL 44748 – ACL 44753, is a true and accurate copy of American Cruise Lines' brochure entitled Great Rivers of Florida.

54. Exhibit 119, ACL 17181, is a true and accurate copy of an article in AARP's website entitled "American Cruise Lines Children's Programs."

55. Exhibit 120, ACL 50991 – ACL 51009, is a true and accurate copy of Cruise Critic Reviews, accessed on January 5, 2017.

56. Exhibit 121, HMS0000576 – HMS00578, is a true and accurate copy of a trademark application from Delta Queen Steamboat Co.

57. Exhibit 122, HMS0000333 – HMS000346, is a true and accurate copy of filings in the USPTO by DNPS Delta Queen Steamboat Company and Delta Queen Steamboat Company, Inc.

58. Exhibit 123 is a true and accurate copy of [REDACTED].

59. Exhibit 124 is a true and accurate copy of [REDACTED].

60. Exhibit 125 is a true and accurate copy of a January 16, 2007 email from Vacation.com to Cindy Rollins regarding "Majestic America Line Special – March/April Offer," [REDACTED].

61. Exhibit 126, ACL 48638 – ACL 48646, is a true and accurate copy of the November 18, 2009 [REDACTED]

62. Exhibit 127 is a true and accurate copy of the October 30, 2008 web article in *Cruise Critic* entitled "Majestic America Line To Be Shuttered."

63. Exhibit 128, AMB_XANTERRA0010-AMB_XANTERRA0015, is a true and accurate copy of the April 21, 2006 Bill of Sale for the *American Queen*.

64. Exhibit 129 is a true and accurate copy of excerpts of "Majestic America Line Information Memorandum 2008," [REDACTED].

65. Exhibit 130, MARAD0010, received as a result of a FOIA Request to MarAd, is a true and accurate copy of a statement made by MarAd entitled "Sale of AMERICAN QUEEN" regarding sale of the *American Queen* [REDACTED].

66. Exhibit 131 is a true and accurate copy of the April 25, 2006 Assignment and Assumption of Trademarks by and between Delta Queen Steamboat Company, Inc. and Ambassadors Cruise Group, LLC.

67. Exhibit 132 is a true and accurate copy of the August 4, 2009 Bill of Sale for the *American Queen*.

68. Exhibit 133 is a true and accurate copy of accurate copy of an article written by Michelle Baran in *Travel Weekly* on June 22, 2009 entitled "U.S puts river ships on the market."

69. Exhibit 134 is a true and accurate copy of Exhibit 8 to the June 11, 2014 [REDACTED].

70. Exhibit 135 is a true and accurate copy of [REDACTED].

71. Exhibit 136, HMS0094866 to HMS0094876, received from AQSC on September 29, 2015, a true and accurate copy of [REDACTED].

72. Exhibit 137, HMS0094743 to HMS0094795, received from AQSC on September 29, 2015, is a true and accurate copy of [REDACTED].

73. Exhibit 138 is a true and accurate copy of the January 23, 2013 Coast Guard Vessel Documentation information printout showing vessels with the name *American Queen*.

74. Exhibit 139 is a true and accurate copy of a list published by the Coast Guard Merchant Vessels database showing 295 of vessels with names beginning with the term "American."

75. Exhibit 140, HMS0095711 – HMS0096150, received from AQSC on January 19, 2016, is a true and accurate copy of [REDACTED].

76. Exhibit 141 is a true and accurate copy of [REDACTED].

77. Exhibit 142 is a true and accurate copy of a Registration Certificate issued by the United States Patent and Trademark Office ("USPTO") to American Cruise Lines on April 12, 2016 for the service mark GREAT AMERICAN STEAMBOAT COMPANY (Reg. No. 4936950).

78. Exhibit 143, ACL 48895, is a true and accurate copy of a newspaper article written in *The Times-Picayune* on May 19, 1985 by Paul Grimes entitled "See U.S. on inland, coastal cruises."

79. Exhibit 144 is a true and accurate copy of [REDACTED].

80. Exhibit 145 is a true and accurate copy of [REDACTED].

81.   Exhibit 146, is a true and accurate copy of the Certificate of Incorporation for DQSC, Inc., dated June 18, 1995 and filed on June 19, 1995.

82.   Exhibit 147, is a true and accurate copy of the Certificate of Merger of The Delta Queen Steamboat Co. with and into DQSC, Inc. dated October 15, 1985 and filed on November 1, 1985.

83.   Exhibit 148, is a true and accurate copy of the Certificate of Amendment of Certificate of Incorporation of The Delta Queen Steamboat Co., changing the name of the corporation to "American Classic Voyages Co." dated and filed on May 17, 1994.

84.   Exhibit 149, is a true and accurate copy of the Certificate of Incorporation of DQSC-2, Inc. filed on July 26, 1993.

85.   Exhibit 150, is a true and accurate copy of the Certificate of Amendment of Certificate of Incorporation of DQSC-2, Inc., changing the name of the corporation to "The Delta Queen Steamboat Co." dated and filed on May 17, 1994.

86.   Exhibit 151, is a true and accurate copy of the Certificate of Amended Articles of Incorporation of The Delta Queen Steamboat Co. dated April 30, 1980.

87.   Exhibit 152, HMS0000552-555, received from AQSC on Aug 23, 2013, is a true and accurate copy of a Statement of Use asserting the first use of the AMERICAN QUEEN Marks is September 1994 and June 1995.

Pursuant to 28 U.S.C. § 1746, I declare under the penalties of perjury that the foregoing is true and correct.

Executed in Baltimore City, Maryland this 25th day of January, 2017.

Wayne H. Xu

# Exhibit 66

Case 1:13-cv-00324-RGA Document 224 Filed 02/01/17 Page 14 of 300 PageID #: 15613

Newspapers.com

https://www.newspapers.com/image/8967065

Downloaded on Sep 8, 2016

# Delta Queen gets sister

CINCINNATI, OHIO — America's newest paddle-wheel steamboat has been named Mississippi Queen. It is the first overnight passenger steamboat to be built since her sister-ship the Delta Queen in 1926. Her construction is more than 80 per cent complete. When the top deck and the pilothouse are added, she will be six-and-a-half decks high. She will make her maiden voyage from Cincinnati on Mar. 2, 1976.

Like the Delta Queen, the Mississippi Queen will cruise the Mississippi River system which is made up of the Mississippi, the Ohio, the Illinois, the Arkansas and the Cumberland rivers.

The Queen recalls the grandeur of the Nineteenth Century when steamboats ruled the transportation industry. The Mississippi Queen is keeping alive America's 160-year tradition of travel by river boat. And the Queen serves as a reminder that the Mississippi Queen and the Delta Queen are sisterships.

Miss Betty Blake, executive vice-president and general manager of the Delta Queen Steamboat Company, says "The new boat is not a duplicate of the Delta Queen." And "We intend to continue operating the Delta Queen for as long as Congress grants us exemption from the Safety at Sea Law." The current exemption expires Nov. 1, 1978.

EUR

TWO EUROPEAN HOLIDAY T

Planned to make the best and money. Ideal for the

AN A.A.A. ITC (Inclusive Tou

Visiting Switzerland, Austri Departing from Des Moine

AAA
Iowa

*Please contact . . .*

2050 Grand Avenue
Des Moines, Iowa 50312

Sennett-AAA World Travel
6th and Mulberry Streets
Des Moines, Iowa 50309

Copyright © 2016 Newspapers.com. All Rights Reserved.

# Exhibit 67

Case 1:13-cv-00324-RGA Document 224 Filed 02/01/17 Page 16 of 300 PageID #: 15615

Newspapers.com

The Los Angeles Times (Los Angeles, California) · Sun, Mar 18, 1984 · Page 18

https://www.newspapers.com/image/173394225

Downloaded on Sep 7, 2016

SAVE UP TO $945 Per Couple

# STEAMBOATIN' TO THE WORLD'S FAIR

## "The Most Relaxing Way To Enjoy Its Treasures!"

Steamboatin' on the Magnificent Mississippi Queen® or the Legendary Delta Queen® is an experience where history unfolds 'round every bend. Days are filled with grand dining and intriguing shore tours to historic rivertowns, antebellum mansions and civil war battlefields. At night your steamboat becomes a cabaret, with ragtime, dixieland, dancing and more. The 1984 Louisiana World's Fair in the city of New Orleans offers you treasures from around the world: the Sun King Exhibit with objects from Versailles and the Louvre, Treasures of the Vatican, and much more. And the Fair offers a world of comfort... monorail cars, covered walkways and air conditioned exhibits.

**Two types of Steamboatin' World's Fair Vacations to choose from:**

**WORLD'S FAIR HOLIDAY VACATIONS**

At the end of a relaxing river cruise, you'll spend two days docked alongside the Fair. The Steamboat becomes your first class hotel, restaurant and rest stop whenever you want it. You'll enjoy the Fair's treasures well-rested, well-fed and well-pampered. And admission is included in your package.

**WORLD'S FAIR VACATIONS**

These great vacations arrive and depart just steps away from the Fair entrance. Use our New Orleans Holiday Stayover program to see the Fair and New Orleans before or after your Steamboatin' Cruise. Holiday stayover and World's Fair admission are extra.

**Vacations with a good selection of suites, staterooms, and cabins still available are listed below. And don't miss the 15% (saves up to $945 per couple) savings off regular fares.**

**For reservations or further information, see your travel agent or call toll-free 800-543-1949 or complete this coupon and mail today:**

THE DELTA QUEEN STEAMBOAT CO., 511 Main Street, Box LA62 Cincinnati, Ohio 45202

☐ I am interested in the World's Fair or World's Fair Holiday Cruises checked, please rush information.

☐ I cannot go Steamboatin' to the World's Fair but would like a 1984 Brochure on all Steamboatin' vacations.

**All of these vacations sail roundtrip from New Orleans except Delta Queen Cruise No. 431 which sails from New Orleans to Memphis**

| Please Check | Vacation | Departure Date | No. of Nights | Cruise Number | Steamboat | 15% SAVINGS |
|---|---|---|---|---|---|---|
| ☐ | | 05/04/84 | 7 | 316 | MQ | |
| ☐ | | 05/11/84 | 7 | 317 | MQ | |
| ☐ | | 05/18/84 | 7 | 417 | DQ | |
| ☐ | | 06/01/84 | 7 | 320 | MQ | |
| ☐ | | 06/08/84 | 7 | 321 | MQ | |
| ☐ | | 06/15/84 | 9 | 322 | MQ | YES |
| ☐ | | 07/13/84 | 7 | 325 | MQ | |
| ☐ | | 07/20/84 | 7 | 326 | MQ | YES |
| ☐ | | 07/27/84 | 7 | 327 | MQ | YES |
| ☐ | | 08/03/84 | 7 | 328 | MQ | YES |
| ☐ | | 08/10/84 | 7 | 329 | MQ | YES |
| ☐ | | 08/17/84 | 7 | 330 | MQ | YES |
| ☐ | | 08/17/84 | 7 | 431 | DQ | YES |
| ☐ | | 08/24/84 | 7 | 331 | MQ | YES |
| ☐ | | 08/31/84 | 7 | 332 | MQ | |

MQ = Mississippi Queen DQ = Delta Queen = World's Fair Holidays = World's Fair Vacation

NAME

ADDRESS

CITY STATE ZIP

TELEPHONE ( ) AREA CODE TRAVEL AGENT

MISSISSIPPI QUEEN and DELTA QUEEN OFFICIAL STEAMBOATS OF THE 1984 WORLD'S FAIR

Copyright © 2016 Newspapers.com. All Rights Reserved.

# Exhibit 68

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
FORM 10-K

[ X ] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (FEE REQUIRED)
FOR THE YEAR ENDED DECEMBER 31, 1996
OR
[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 (NO FEE REQUIRED)

COMMISSION FILE NUMBER: 0-9264

AMERICAN CLASSIC VOYAGES CO.
(Exact name of registrant as specified in its charter)

| DELAWARE | 31-0303330 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| TWO NORTH RIVERSIDE PLAZA, CHICAGO, ILLINOIS | 60606 |
| (Address of principal executive offices) | (Zip Code) |

(312) 258-1890
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: NONE

Securities registered pursuant to Section 12(g) of the Act:
COMMON STOCK, $.01 PAR VALUE
(Title of Class)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [ X ] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S- K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10- K or any amendment to this Form 10- K. [ ]

The aggregate market value of voting stock held by non- affiliates of the registrant was $67.0 million based upon average bid and asked prices of $10.125 per share on March 24, 1997 on The Nasdaq Stock Market. Using beneficial ownership of stock rules adopted pursuant to Section 13 of the Securities Exchange Act of 1934, certain persons designated as affiliates for purposes of this computation may not be held to be affiliates upon judicial determination.

As of March 24, 1997, there were 13,910,835 shares of Common Stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**

PART III Portions of the registrant's definitive Proxy Statement, which will be filed with the Securities and Exchange Commission by April 28, 1997.

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX**

| ITEM | DESCRIPTION | PAGE |
|---|---|---|
| Part I | | |
| Item 1 | Business | 3 |
| Item 2 | Properties | 9 |
| Item 3 | Legal Proceedings | 10 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 10 |
| Part II | | |
| Item 5 | Market for Registrant's Common Equity and Related Stockholder Matters | 11 |
| Item 6 | Selected Financial Data | 11 |

Item 7 Management's Discussion and Analysis of Financial Condition and Results of Operations............... 11
Item 8 Financial Statements and Supplementary Data........ 11
Item 9 Changes in and Disagreements with Accountants on Accounting and Financial Disclosure............ 11
Part III
Item 10 Directors and Executive Officers of the Registrant. 12
Item 11 Executive Compensation............................ 12
Item 12 Security Ownership of Certain Beneficial Owners and Management.................................... 12
Item 13 Certain Relationships and Related Transactions..... 12
Part IV
Item 14 Exhibits, Financial Statement Schedules, and Reports on Form 8-K........................... 13

AMERICAN CLASSIC VOYAGES CO.
PART I

ITEM 1. BUSINESS
GENERAL

American Classic Voyages Co. and its subsidiaries (the "Company") is the leading provider of overnight passenger cruises on inland waterways in the continental U.S. and among the Hawaiian islands. The Company operates two cruise lines under the names of The Delta Queen Steamboat Co. ("Delta Queen") and American Hawaii Cruises ("American Hawaii"). Delta Queen currently operates three vessels having 1,024 total passenger berths, providing two- to 14- night paddlewheel- driven steamboat cruise vacations on the Mississippi, Ohio, Cumberland, Tennessee, Arkansas, Illinois and Atchafalaya Rivers as well as the Intracoastal Waterway. American Hawaii, acquired in August 1993 (the "Acquisition"), operates one vessel having 817 total passenger berths, providing three- , four- and seven- night inter- island cruises in Hawaii. American Hawaii also owns the Constitution steamship which was removed from service on June 27, 1995. The Constitution will not be returned to service and will remain in wet berth at a shipyard in Portland, Oregon while the Company explores various other options for the vessel.

The Company believes it is the largest owner and operator of U.S. flag passenger vessels. Since non- U.S. flag vessels are prohibited under Federal law from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port, the Company's U.S. flag designation, arising from having U.S. built, owned and crewed vessels, provides it with significant marketing and operating advantages. As an American flag carrier, there are certain restrictions on foreign ownership of the Company's common stock.

The Company, a Delaware corporation incorporated in 1985, is a holding company, which owns and controls: (i) The Delta Queen Steamboat Co., ("DQSC"), formerly known as DQSC- 2, Inc., which operates Delta Queen through various subsidiaries; and (ii) Great Hawaiian Cruise Line, Inc. ("GHCL"), which operates American Hawaii, through various subsidiaries. DQSC also owned and operated the Maison Dupuy Hotel (the "Hotel"), located in New Orleans, prior to its sale on October 16, 1996. The Company employed 1,470 persons as of December 31, 1996. The Company's executive offices are located at Two North Riverside Plaza, Chicago, Illinois, 60606, and its telephone number is (312) 258- 1890.

During March 1992, the Company completed an initial public offering of 4,140,000 shares of its $0.01 par value common stock at a public offering price of $13.50 per share. In December 1993, the Company completed a public offering of an additional 2,760,000 shares of common stock at a price of $16.00 per share.

**REVIEW OF 1996**

In 1996, the Company returned to profitable operations by reporting operating income, excluding one- time charges, of $7.9 million as compared to a 1995 net operating loss, also excluding one- time charges, of $8.6 million. This operating improvement was mainly due to the turnaround of the American Hawaii operations which realized a 95% increase in gross profit as a result of reducing costs and improving yields since the second half of 1995. At the Delta Queen line, the Company utilized additional capacity of the American Queen which produced lower than historical fare per passenger night ("fare per diems") as gross profit increased only 9% though there was an 18% increase in revenues. This increase in

Delta Queen capacity, among other factors, had reduced the booking window for a large portion of its inventory to three months in advance of a cruise versus its optimal schedule of six to nine months in advance. Management took steps in the first half of 1996 to correct this trend and saw positive results by the end of 1996 in its 1997 advance reservations levels which were both higher in occupancy and fare per diems than at the end of 1995.
In 1996, the Company also made strategic decisions to better position itself for the future with regard to its asset base. The Company decided not to return the Constitution to service after reviewing the scope and cost of a reconstruction project, thereby recognizing a $38.4 million impairment write- down (1996 one- time charge mentioned above) in the first quarter of 1996. In addition, the Company sold the Maison Dupuy Hotel, its only non- strategic asset, for $22.0 million of cash and additional future payments of up to $2.0 million in the fall of 1996 and recognized an $11.7 million gain related to this sale.

**NARRATIVE DESCRIPTION OF BUSINESS**

The Company owns and operates two cruise lines: Delta Queen, which consists of three U.S. flag paddlewheel steamboats and American Hawaii, which consists of one U.S. flag ocean liner offering overnight cruise vacations among the Hawaiian islands. The Company does not offer gaming on its vessels. American Hawaii also owns the Constitution steamship which will not be returned to service and will remain in wet berth at a shipyard in Portland, Oregon while the Company explores various other options for the vessel. The Company, through Delta Queen, also owned and operated the Maison Dupuy Hotel located in the New Orleans' French Quarter, prior to its sale on October 16, 1996.
Delta Queen- - Steamboatin'(R) Cruise Line
Delta Queen markets its steamboats as the "Legendary Delta Queen", the "Magnificent Mississippi Queen" and the "Grand American Queen" and the cruise experience using its Steamboatin' registered servicemark. Delta Queen's steamboats travel along the Mississippi, Ohio, Cumberland, Tennessee, Arkansas, Illinois and Atchafalaya Rivers, as well as the Intracoastal Waterway. Ports of embarkation/debarkation include New Orleans, St. Paul, Memphis, St. Louis, Pittsburgh, Cincinnati, Louisville, Nashville, Chattanooga, Little Rock, Tulsa and Galveston. Other ports of call, such as Hannibal, Missouri; Prairie du Chien, Wisconsin; Vicksburg and Natchez, Mississippi; Ottawa, Illinois and Shiloh, Tennessee include locations of historical or cultural significance. The Company also promotes special cruise packages revolving around specific seasonal and activity themes including: "In The Good Old Summertime," an old- fashioned American summertime experience including barbershop quartets, barbecues and ice cream socials; "Fall Foliage," an opportunity to experience autumn colors on the Ohio and northern Mississippi rivers; "Kentucky Derby" cruises that include attendance at the Kentucky Derby horse race; "The Great Steamboat Race," a reenactment of the famous 19th Century race between the Natchez and the Robert E. Lee steamboats; "Old Fashioned Holidays," a southern- style Thanksgiving and Christmas, including Cajun and ante- bellum customs of these holidays; "Spring Pilgrimage" cruises, highlighting springtime in the Old South which include tours of ante- bellum homes; "Music of the River" cruises, exploring the origin and development of America's rich musical heritage; "World War II" cruises, commemorating the war years at home and abroad; and "Civil War" cruises, which take an insightful look into our nation's past by visiting battle sites and historical reenactments. In its continuing effort to upgrade its cruise product, Delta Queen recently introduced several new theme cruises such as "Dixie Fest" cruises, celebrating Dixie's diverse flavors in food and music; and "The Year that Was..." cruises, in conjunction with Reminisce magazine, reliving the music and memories of the 1940s.
The Steamboatin' cruise fare for an average five- night cruise, as stated in the 1997 cruise brochure, ranges from luxurious suites at $636 per person per night to interior cabins with bunk beds at $250 per person per night, based on double occupancy. The fare also includes three full service meals per day, along with mid- afternoon snacks and a late night buffet, and day and night entertainment on the vessels.
To reach additional customers, Delta Queen has developed products which combine its steamboat cruises with escorted tours and overnight stays at historic port cities. It can provide these combined land and cruise packages at a lower average per diem price to a customer than a cruise- only trip. Delta Queen offers additional services and products to its passengers, including trip cancellation insurance, bar services, beauty salon services, photographs, shore excursions and gift shop products. Delta Queen also distributes a line of specialty products through its onboard gift shops utilizing the Steamboatin' logo. As a convenience to its passengers, Delta Queen will also arrange hotel accommodations and air and land transportation to and from the cruise embarkation and/or debarkation point.

HMS0096644

American Hawaii- - American Hawaii Cruise Line
American Hawaii features three- , four- and seven- night cruise vacations among the Hawaiian islands. Ports of call include Hilo and Kona on the Big Island of Hawaii; Kahului, Maui; Nawiliwili, Kauai; and Honolulu, Oahu. Many cruise passengers also choose to extend their stay in Hawaii, purchasing hotel accommodations through American Hawaii.
American Hawaii offers more than 50 optional shore excursion activities of interest to its passengers, including helicopter rides, snorkeling, sea tours and other excursions to observe some of the spectacular natural Hawaiian sights. The itinerary also affords an opportunity to view Mount Kilauea, one of the world's few active volcanoes, and the soaring sea cliffs of the inaccessible Na Pali coast.

American Hawaii offers theme cruises organized around specific activities or seasons, including: "Whales in the Wild" cruises, in which passengers can observe whales that make Hawaii their winter playground;
"Aloha Fest" cruises, which emphasize native Hawaiian ceremonies and rituals; and "Big Band" cruises featuring 1940's Big Band orchestra music and Golden Age of Movies film screenings.
Cruise fares on American Hawaii range in price, based on double occupancy, from luxurious suites at $456 per person per night to interior cabins with a single sofa bed and fold- away upper berth at $164 per person per night, as advertised in the 1997 cruise brochure. The fare also includes three full service meals per day, along with mid- afternoon snacks and a late evening buffet, as well as day and night entertainment on the Independence. American Hawaii also offers seasonal youth programs to attract passengers with children, as the Independence has a large number of cabins that can accommodate three and four passengers.
American Hawaii offers additional services and products to its passengers, including trip cancellation insurance, bar services, beauty salon services, photographs, shore excursions and gift shop products. American Hawaii also distributes a line of specialty products through its onboard gift shops utilizing the "American Hawaii Cruises" logo. American Hawaii also offers air transportation arrangements to and from the Hawaiian islands through agreements with several major commercial airlines as well as hotel accommodations on the Hawaiian islands.

**MARKETING**

The Company markets Delta Queen and American Hawaii lines separately.
Delta Queen is marketed as an opportunity to experience an historical mode of travel reflecting a bygone era which is part of the American heritage, and promotes its steamboat vacation package as a casual, relaxed, educational and cultural experience. The Company believes individuals are attracted to its paddlewheel steamboat cruises because of the quality of its vacations and the unique characteristics of the steamboat experience, including the connection to American history.
Delta Queen also places full color advertisements in publications such as Gourmet, Family Circle, Reader's Digest and Modern Maturity, which typically appeal to the Company's target customers. In addition, Delta Queen utilizes newspaper advertising in selected major markets. Its cruise vacations are often the subject of feature articles in general interest, travel and leisure magazines, vacation guides and newspaper travel sections, such as The New York Times, The Washington Post and Better Homes & Gardens. In 1996, Delta Queen was featured or mentioned in approximately 3,000 articles. The Company believes this media exposure provides an important source of promotion and actively seeks such exposure through its in- house public relations department.
Each year, Delta Queen distributes approximately 1.4 million copies of a full color sales brochure illustrating its paddlewheel steamboat vacations. These brochures are sent, in response to specific inquiries, to accredited travel agencies targeted by Delta Queen and to former passengers. In addition, Delta Queen has a direct mail system which solicits both past and prospective passengers.
American Hawaii is marketed as an authentic Hawaiian experience and targets individuals interested in the romance, exotic imagery and convenience of visiting the different Hawaiian islands aboard a classic ocean liner. The Company promotes its Hawaiian vacation package as a unique way to explore the Hawaiian islands and learn about Hawaiian culture.
American Hawaii places full color advertisements in publications such as Modern Maturity and Travel & Leisure and purchases newspaper advertising in selected major markets for specific promotions. American Hawaii has been the subject of feature articles in national travel and leisure magazines, vacation guides and newspaper travel sections while marketing tie- ins have been implemented with partners such as Dole Packaged Foods Corp. Approximately 700,000 full color sales brochures illustrating American Hawaii's operations are distributed each year to travel agencies and to prospective customers in response to specific inquiries.

**SALES**

The Company maintains separate field sales and reservation staffs for Delta Queen and American Hawaii. The Company sells its cruise products primarily through two major channels, of which the most significant channel is travel agents operating throughout the U.S. The Company has programs which educate travel agents about the unique nature of the Company's travel experiences, the vessels' itineraries, special programs, theme cruises and pricing policies. To assist in obtaining reservations from travel agents, the Company engages in both consumer and trade- oriented advertising, including direct mailings of the Company's literature to travel agencies. The Company maintains contact with travel agents through Delta Queen's 14 and American Hawaii's 13 field sales personnel who conduct educational seminars and attend trade shows. The Company's second major sales channel is group travel organizers, consisting of clubs, travel agencies and tour operators who arrange for the sale of cruise vacations at discounted fares. The Company provides a variety of incentives to these organizers, including fare discounts and promotional materials. During 1996, no single travel agency or consortium accounted for more than 10% of the Company's revenues.

**PRICING AND ADVANCE RESERVATIONS**

The Company issues separate full color sales brochures for each of Delta Queen and American Hawaii, which contain descriptive information, itineraries and fare schedules, prior to the beginning of each upcoming calendar year. The Company prices its cruise fares, based on cabin category, using a single pricing schedule for each cruise line throughout the calendar year. As an inducement for passengers to book early, the Company generally offers an early booking discount which typically consists of the current year's fares to passengers who book more than three months in advance for the upcoming year. In addition, the Company offers to group travel organizers and others certain discounts from the Company's published fare schedule. From time to time, in order to stimulate demand, the Company may offer discounts from the Company's published fare schedule. In 1996, due to the additional capacity brought on by the American Queen, Delta Queen's yields decreased compared to the yields of prior years.

The Company actively markets its cruises up to one year prior to the cruise year and the level of advance reservations at any given date provides the Company with an indication of its future fare revenue. A significant portion of such reservations is booked more than six months in advance of the cruise date. Generally, customers must pay a $200 to $250 refundable deposit within 14 days of booking a cruise on Delta Queen and a $300 refundable deposit within one week of booking a cruise on American Hawaii and both cruise lines require the balance of the cruise fare to be remitted 60 days in advance of the departure date. Cancellations received less than 60 days prior to departure are subject to a cancellation charge ranging from 25% to 100% of the cruise fare. For a nominal fee, the Company also offers trip cancellation insurance through a third- party insurer which allows the customers to reduce their exposure to cancellation charges. As of December 31, 1996, advance reservations for the 1997 cruise year for both Delta Queen and American Hawaii combined were $82.6 million. However, the Company cannot specifically determine the amount of revenues to be derived from advance reservations as there can be no assurance that any particular advance reservation will result in any revenue to the Company.

**SEASONALITY**

The Company's operations are seasonal. At Delta Queen, historically there is greater passenger interest at higher yields in the spring and fall months of the year and the vessels typically undergo an annual lay- up in January. In 1996, Delta Queen's revenues and operating income included a full year of operations for the American Queen which was introduced in June of 1995. American Hawaii historically experienced greater passenger interest in the summer and fall months of the year. During the summer months in particular, American Hawaii tends to have average occupancy in excess of 100% as the number of families sharing cabins with children increases significantly during this period.

The Company's 1996 results are not comparable to 1995 due to (i) the introduction of the American Queen in June of 1995 and (ii) the 1995 mid- year removal of the Constitution and the subsequent full year out- of- service period in 1996. In 1997, the Independence will be out of service for a four- week period beginning May 17, 1997 for a drydock, therefore, the Company's 1997 results will not be comparable to prior years.

**COMPETITION**

The vacation industry is highly fragmented and characterized by a significant degree of competition among a large number of participants, including cruise lines, land- based destination resorts, sightseeing tours and a wide range of other vacation options. The Company's vessels compete against all of these vacation options. Since leisure spending is discretionary, adverse economic conditions which affect the Company's customer base, including uncertainty over inflation and interest rate fluctuations, may negatively impact the Company's performance.

The Company believes that it is the largest provider of overnight cruise vacations on U.S. flag vessels, and that its cruise experience differentiates the Company's vacation packages from other overnight cruise vacations and other vacation alternatives. The Company further believes its principal competitive strengths include: (i) a high level of recognition by, and familiarity with, its customer base; (ii) the distinctive nature of its products as an opportunity to experience historical aspects of American heritage and the beauty of the Hawaiian islands; and (iii) the vessels' status as U.S. flag vessels with predominantly American crews.

All of the Company's vessels are registered under the U.S. flag for coastwide trade, which requires that they be U.S. built, owned and crewed. Federal maritime laws prohibit non- U.S. flag vessels from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port. Should the law be amended or repealed, other entities, including those with greater resources than the Company, could introduce overnight non- U.S. flag vessels on inland waterways and among the Hawaiian islands in direct competition with the Company's vessels. See "Government Regulation" below. The entry of direct competition could adversely affect the Company's ability to maintain or further increase occupancy or prices for cruise vacations and could result in lower margins, thereby adversely affecting the profitability of the Company's business.

**GOVERNMENT REGULATION**

Federal maritime law currently prohibits non- U.S. flag vessels from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port. Periodically there has been debate about the potential amendment or repeal of this law and the broader cabotage laws encompassed under the Merchant Marine Act of 1920, also known as the Jones Act. In August 1995, the Company helped to organize the Maritime Cabotage Task Force ("MCTF"), a broad national coalition of 415 companies, associations and unions representing all modes of domestic transportation. The MCTF is responsible for monitoring potential adverse changes in legislation that could affect the U.S. maritime industry and publicizing the economic and national security issues relevant to maintaining a strong U.S. flag vessel industry. Through the coalition's efforts, numerous legislators and key Congressional staff members have been made aware of the substantive issues and positions surrounding any changes to this legislation. In 1996, a bill was introduced to modify the Jones Act but did not receive significant support.

The Company is subject to various Federal and state regulations which affect the operations of its vessels. Most importantly, the Company's vessels, as U.S. flag vessels, are subject to regulations promulgated by the U.S. Department of Transportation and enforced by the U.S. Coast Guard ("Coast Guard"). The Coast Guard conducts both scheduled and unannounced inspections to determine compliance with these regulations and has the authority to delay or suspend cruises. The Delta Queen vessels must be drydocked for an inspection of the hulls' exteriors every five years. Previously, American Hawaii was required to drydock the Independence approximately every 18 months for a similar procedure. The Coast Guard is empowered to increase the interval between inspections and accordingly, the Company has requested and received permission from the Coast Guard to lengthen the interval of the drydocking of the Independence to every 30 months, subject to annual hull surveys. In May 1997, the Independence will be out of service for a four- week period for its once every 30- month drydock. The Mississippi Queen was drydocked, as scheduled, in December 1995 while the Delta Queen was drydocked in mid- December 1996 as the Company had received a one- year extension on its five- year drydocking interval.

The Company, like other entities that operate vessels on U.S. waterways, is subject to certain Federal, state and local health and safety laws, regulations and ordinances, such as the Clean Air Act, Clean Water Act, Ocean Dumping Act, Occupational Safety and Health Act, Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation and Liability Act. Periodically, the Company incurs expenditures to keep its vessels in compliance with such environmental laws and regulations. The Company does not anticipate making any material expenditures in 1997 with respect to environmental matters. However, the coverage and attendant compliance costs associated with such laws, regulations and ordinances may result in future additional costs to the Company's operations.

The Safety of Life at Sea Convention, or SOLAS, to which the U.S. is a party, requires that passenger vessels for 50 or more passengers be constructed of fire retardant materials. Since the Delta Queen's superstructure is wood, the vessel requires a legislative exemption from the SOLAS requirement. Since 1968 Congress has granted the Delta Queen seven consecutive Congressional exemptions from this SOLAS requirement because of fire prevention and safety enhancements made to the vessel and the Delta Queen's historic status. The legislation exempting the Delta Queen requires the Company to notify potential passengers that the Delta Queen does not comply with applicable fire standards and prohibits the Company from disclaiming liability for loss due to fire caused by the Company's negligence. The current exemption has been extended to November 1, 2008. The Company's ability to operate the Delta Queen is dependent upon retaining its current Congressional exemption and obtaining additional exemptions subsequent to 2008. For ocean- going passenger vessels, fire safety amendments to SOLAS require that certain enhancements to life safety systems must be made by October 1, 1997. The Independence will be brought into compliance during its spring 1997 drydock as discussed above.
The Company has alcoholic beverage licenses for the Independence. In addition, the Company has alcoholic beverage licenses for the Delta Queen, Mississippi Queen and American Queen in Louisiana, and may determine to file additional applications in certain of the other states in which the steamboats operate. The Company does not anticipate any material expenses, delay or other adverse developments if it files additional applications or licenses. In addition, the Company may be required to qualify to do business in, or to pay or remit taxes or fees to, certain states or political subdivisions thereof. In addition, the Company may be subject to fines or other penalties for failure to comply with laws and regulations of one or more states requiring licensing, qualification or other action. Neither the costs of compliance by the Company with such laws or regulations, nor penalties imposed or sought to be imposed on the Company for noncompliance have been material in the past. However, no assurance can be given that such costs or penalties may not increase in the future.
The Company's vessels are also subject to regulation under the Federal Food, Drug and Cosmetic Act and the Public Health Service Act.
The Federal Maritime Commission ("FMC") regulates passenger vessels with 50 or more berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. The Company has been approved as a self- insurer by the FMC, and therefore, subject to continued approval, is not required to post security for passenger cruise deposits. The FMC has recently reviewed its standards and in June 1996 issued proposed regulations to increase the financial responsibility requirements. The Company filed its position on the proposals, as it believes that the FMC's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. If implemented, these proposed regulations would be phased in over time and, among other things, require operators qualifying as a self- insurer, such as the Company, to satisfy a working capital test, in addition to the existing net worth test, and to provide third- party coverage for 25% of its unearned passenger revenue in the form of a surety bond or similar instrument. At this time, the Company cannot predict if the proposed changes will be approved as currently constituted, or at all. If they are implemented, the proposed changes would require that the Company establish a bond to cover a portion of its passenger deposits and payments, which may impact the Company's liquidity.

**INSURANCE**

The Company carries marine liability insurance on its vessels through Steamship Mutual Underwriting Association (Bermuda) Limited ("Steamship Mutual"), a non- profit, mutual protection and indemnity association. The Company's marine liability insurance arrangements are typical of common marine industry practices and, subject to certain deductibles, provide coverage for losses, other than hull physical damage losses, resulting from its activities as a ship owner, including casualty damage by the vessels and claims by crew members, passengers and other third parties. The policy has no maximum limit of liability coverage, except for a $500 million limit, per occurrence, for oil pollution liability claims. As a member of Steamship Mutual, the Company pays its annual premiums based largely on its risk characteristics and loss experience, and the loss experience of other members. In addition, because Steamship Mutual and other maritime mutual indemnity associations around the world pool a portion of their loss experience in risk sharing arrangements, Steamship Mutual also may be affected by the loss experience of other mutual protection and indemnity organizations.
The Company's annual protection and indemnity insurance premium consists of an advance call which recently has approximated 71% of the expected total annual premium, and a supplemental call determined by Steamship Mutual's managing directors later in the year. The Company may be liable for a supplemental call in excess of the anticipated amount in the event that Steamship Mutual incurs heavy losses or experiences unusual circumstances.

The Company also carries hull and machinery coverage with various insurers, which insures against physical loss and damage to the vessels, subject to a $750,000 deductible and/or co- payment requirements per occurrence per vessel. Although the Company believes the risk of a total loss of the vessels is remote, it acknowledges that the replacement costs would exceed these coverage amounts.

In addition, the Company maintains contingency coverage for lost revenue in the event the Company is forced to cancel a cruise, in whole or in part, or incurs additional expense to prevent or reduce a loss. Coverage for the lost revenue under the policy is subject to a deductible of seven days, insured between 27% and 40% of any loss and is limited to $3.0 million on the Delta Queen vessels and $4.0 million on the Independence. The coverage for additional expenses incurred to prevent a loss is subject to a $100,000 aggregate deductible and provides coverage up to $1.0 million.

The Company believes its insurance coverage is adequate based on the Company's assessment of the risks to be insured, the probabilities of loss and the relative cost of available coverages.

**EMPLOYEES**

The Company employed 1,470 persons as of December 31, 1996. Of the vessels' onboard employees, the American Maritime Officers of the AFL- CIO ("American Maritime Officers") represented approximately 116 individuals, and the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District of the AFL- CIO ("Seafarers") represented approximately 676 individuals. The American Maritime Officers' contracts for Delta Queen and American Hawaii expire in February 2004 and May 2000, respectively, and the Seafarers' contracts for Delta Queen and American Hawaii expire in December 2003 and May 2000, respectively. Since 1986, the Company has not experienced any work stoppages, and believes its relations with its employees are good.

**ITEM 2. PROPERTIES**

The Company's principal physical properties include the four vessels, the Delta Queen, Mississippi Queen, American Queen and Independence. The Constitution was removed from service on June 27, 1995. It will not be returned to service and will remain in wet berth at a shipyard in Portland, Oregon while the Company explores various options for the vessel. The Company also owned and operated the Maison Dupuy Hotel prior to its sale on October 16, 1996. In addition, the Company leases the Robin Street Wharf facility in New Orleans, Louisiana and office space in Chicago, Illinois and Honolulu, Hawaii.

**DELTA QUEEN**

The Delta Queen was constructed in 1926 and has undergone several refurbishments. The Delta Queen is 285 feet long and is powered by twin reciprocating steam engines which generate 2,000 horsepower to drive its paddlewheel. It has a steel hull, a wooden superstructure and 174- passenger berths based on double occupancy. During the 1996/1997 lay- up, the Delta Queen had its Coast Guard mandated once every five- year hull inspection.

**MISSISSIPPI QUEEN**

The Mississippi Queen was placed in service in 1976 and has 414- passenger berths based on double occupancy. The vessel is 382 feet long, has a steel hull and superstructure and is powered by twin reciprocating steam engines which generate 2,000 horsepower to drive its paddlewheel. In January 1996, the Company completed a cosmetic renovation of the boat and had its Coast Guard mandated once every five- year hull inspection.

**AMERICAN QUEEN**

The American Queen, was placed in service in June 1995. The vessel is 418 feet long, 89 feet wide and can accommodate 436 passengers based on double occupancy. The steel hull and superstructure is partially powered by twin reciprocating steam engines which, when combined with a supplemental propulsion system, generates 3,500 horsepower to drive a wooden/steel paddlewheel.

**INDEPENDENCE**

The Independence steamship was built in 1951 and has undergone several refurbishments, most recently in 1994. The vessel is 682 feet long, 89 feet wide, has a steel hull and superstructure and is powered by twin steam turbines providing 5,100 horsepower. The Independence has 817- passenger berths, based on double occupancy. In the spring of 1997, the Independence will be out of service for a four- week period for a drydock that will include 1997 SOLAS upgrades, the addition of approximately 28 passenger cabins and public area enhancements.

**ROBIN STREET WHARF FACILITY**

The New Orleans office building, located at Robin Street Wharf, contains approximately 30,000 square feet. The Company has been granted a preferential assignment and right to use the Robin Street Wharf by the Board of Commissioners of the Port of New Orleans (the "Board of Commissioners"). Of the approximately 190,000 square feet of property covered by the preferential assignment, approximately 1,000 linear feet represents river frontage access. The preferential assignment may be terminated at any time by the Board of Commissioners, upon 60 days notice, provided that the Board of Commissioners determines that the wharf is needed for a non- passenger, superior maritime use. The Company believes it is unlikely that the Board of Commissioners will terminate the preferential assignment. If the assignment were to be terminated, the Board of Commissioners would be required to reimburse the Company for a portion of the unamortized cost of its wharf improvements. The Company believes that it could relocate its boarding, docking and office facilities to another location in New Orleans without a material adverse impact on the operations of the Company.

**CHICAGO LEASE**

The Company's principal executive offices, and American Hawaii's passenger services and administrative offices are located at Two North Riverside Plaza, Chicago, Illinois. The Company and American Hawaii currently lease approximately 37,000 square feet from Two North Riverside Joint Venture Limited Partnership, an Illinois limited partnership, controlled by an affiliated company, Equity Group Investments, Inc. The Company pays an annual rate of approximately $167,000 for approximately 37,000 square feet which it believes to be a competitive rate for comparable space from an unaffiliated landlord. In March 1997, the Company announced its decision to relocate the American Hawaii - Chicago office to New Orleans by the fall of 1997.

**HAWAII LEASE**

American Hawaii leases approximately 40,000 square feet of office, warehouse and parking space at 2100 Nimitz Highway, Honolulu, Hawaii at a rental of approximately $25,000 per month. This lease expires in May 1998.

## ITEM 3. LEGAL PROCEEDINGS

There are no material legal proceedings, to which the Company is a party or of which any of its property is the subject, other than ordinary routine litigation and claims incidental to the business. The Company believes it maintains adequate insurance coverage and reserves for such claims.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None

# PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS

(a) The Company's common stock trades on the Nasdaq National Market tier of the Nasdaq Stock Market under the symbol: AMCV. On March 24, 1997, the last reported sale price for the Company's common stock was $10.125 per share. The following table indicates the high and low sales price information for shares of the Company's common stock as

reported by The Nasdaq Stock Market:

| | | High | Low |
|---|---|---|---|
| QUARTER ENDED: | December 31, 1996 | $13.25 | $8.50 |
| | September 30, 1996 | 10.00 | 6.75 |
| | June 30, 1996 | 9.50 | 7.38 |
| | March 31, 1996 | 11.38 | 8.00 |
| QUARTER ENDED: | December 31, 1995 | 12.00 | 9.38 |
| | September 30, 1995 | 13.06 | 9.63 |
| | June 30, 1995 | 12.00 | 8.63 |
| | March 31, 1995 | 14.50 | 9.75 |

(b) The number of stockholders of record of common stock on March 24, 1997 was approximately 725.
(c) In the second half of 1995, the Company's board of directors elected not to declare a dividend and determined that any future dividend declarations will be based on the Company's operating performance and its planned capital needs.

**ITEM 6. SELECTED FINANCIAL DATA**

Information with respect to the Company's selected financial data is set forth under "Selected Financial Data" on page 16.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

Management's discussion and analysis is set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" on page 17.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The consolidated financial statements and supplementary data are as set forth in the "Index to Financial Statements" on page 15.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**PART III**

**ITEMS 10, 11, 12 AND 13 DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT, EXECUTIVE COMPENSATION, SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

The Company will file a definitive proxy statement with the Securities and Exchange Commission pursuant to Regulation 14A under the Securities Exchange Act of 1934 (the "Proxy Statement") relating to the Company's Annual Meeting of Stockholders to be held on June 11, 1997, not later than April 28, 1997. Information required by Items 10 through 13 will appear in the Proxy Statement and is incorporated herein by reference.

## PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(a)(1) Financial Statements.
The consolidated financial statements of the Company are set forth in the "Index to Financial Statements" on page 15.

(a)(2) Financial Statement Schedules.

Financial Statement Schedules, except those indicated in the "Index to Financial Statements" on page 15, have been omitted because they are not applicable, not required under the instructions, or all the information required is set forth in the financial statements or the notes to the financial statements.

(a)(3) Exhibits are as set forth in the "INDEX TO EXHIBITS" on page 43. (b) Reports on Form 8- K:
Form 8- K dated October 31, 1996 announcing the closing of the sale of
the Maison Dupuy Hotel with pro forma financial statements.

## SIGNATURES

Pursuant to the requirements of Section 13 and 15(d) of the Securities and Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date March 28, 1997

AMERICAN CLASSIC VOYAGES CO.
By / s / Philip C. Calian
Philip C. Calian
Chief Executive Officer

Pursuant to the requirements of the Securities and Exchange Act of 1934, as amended, has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

/ s / Samuel Zell Chairman of the Board

---

Samuel Zell

/ s / Philip C. Calian President and Chief Executive Officer ------------------------- (Principal Executive Officer), Director Philip C. Calian

/ s / Kathryn F. Gray Controller, Treasurer and Chief Accounting Officer
------------------------- (Principal Accounting Officer)
Kathryn F. Gray
/ s / Sheli Z. Rosenberg Director
Sheli Z. Rosenberg
/ s / Arthur A. Greenberg Director
Arthur A. Greenberg
/ s / Ann Lurie Director

Ann Lurie

| | |
|---|---|
| / s / Corinne C. Boggs | Director |
| Corinne C. Boggs | |
| / s / Jerry R. Jacob | Director |
| Jerry R. Jacob | |
| / s / Jon E. M. Jacoby | Director |
| Jon E. M. Jacoby | |

## AMERICAN CLASSIC VOYAGES CO.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page Number |
|---|---|
| Selected Financial Data | 16 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 17 |
| Independent Auditors' Report | 23 |
| Consolidated Financial Statements | |
| Consolidated Statements of Income | 24 |
| Consolidated Balance Sheets | 25 |
| Consolidated Statements of Cash Flows | 26 |
| Consolidated Statements of Changes in Stockholders' Equity | 27 |
| Notes to Consolidated Financial Statements | 28 |
| Financial Statement Schedules | |
| Schedule I - Condensed Financial Information of Registrant | 38 |

## AMERICAN CLASSIC VOYAGES CO.

## SELECTED FINANCIAL DATA

| | Year Ended December 31, | | | | Fiscal Year Ended March 31, |
|---|---|---|---|---|---|
| | 1996 | 1995 | 1994 | 1993(1) | 1993 |
| INCOME STATEMENT DATA | | | | | |
| (Amounts in thousands) | | | | | |
| Revenues | $191,542 | $189,821 | $195,197 | $121,689 | $ 66,725 |
| Gross profit | 67,863 | 51,895 | 51,569 | 38,708 | 32,190 |
| Special one-time charges(2) | 38,390 | 5,900 | 5,699 | -- | -- |
| Operating (loss) income | (30,465) | (14,535) | (4,438) | 6,349 | 12,586 |
| Other income (3) | 11,729 | -- | -- | -- | -- |
| Net interest (expense) income | (7,199) | (4,002) | 672 | 577 | 1,051 |
| Net (loss) income | $(17,636) | $ (9,671) | $ (983) | $ 4,220 | $ 9,181 |
| PER SHARE INFORMATION | | | | | |
| (Amounts in thousands, except per share data) | | | | | |
| Common and common equivalent shares | 13,802 | 13,763 | 14,085 | 11,641 | 11,334 |
| (Loss) earnings per share(2) (3) | $ (1.28) | $ (0.70) | $ (0.07) | $ 0.36 | $ 0.81 |
| Cash dividends per share | $ -- | $ 0.08 | $ 0.16 | $ 0.16 | $ 0.04 |
| OPERATING STATISTICS | | | | | |
| Fare revenue per passenger night | $ 217 | $ 210 | $ 202 | $ 220 | $ 273 |

| | | | | | |
|---|---|---|---|---|---|
| Total revenue per passenger night............ | $ 288 | $ 290 | $ 29[illegible] | $ 302 | $ 328 |
| Weighted average operating days(4): | | | | | |
| DELTA QUEEN................................ | 347 | 263 | 339 | 339 | 338 |
| AMERICAN HAWAII............................ | 366 | 272 | 303 | 147 | -- |
| Vessel capacity per day (berths)(5): | | | | | |
| DELTA QUEEN................................ | 1,024 | 1,024 | 588 | 596 | 593 |
| AMERICAN HAWAII............................ | 817 | 1,594 | 1,544 | 1,526 | -- |
| Capacity passenger nights(6)................ | 654,666 | 701,768 | 666,841 | 426,185 | 200,730 |
| Passenger nights(7)......................... | 643,891 | 628,660 | 632,373 | 382,823 | 185,016 |
| Physical occupancy percentage(berths)(8)..... | 98.4% | 89.6% | 94.8% | 89.8% | 92.2% |
| BALANCE SHEET DATA (at period end) | | | | | |
| (Amounts in thousands) | | | | | |
| Total assets............................... | $211,864 | $247,473 | $227,798 | $192,598 | $ 66,500 |
| Current portion of long-term debt........... | 4,100 | 3,746 | -- | -- | -- |
| Long-term debt.............................. | 85,898 | 103,272 | 65,000 | 15,000 | -- |
| Total stockholders' equity.................. | 54,982 | 71,413 | 82,105 | 84,786 | 41,909 |

(1) Includes the effects of the Mississippi River flooding and the Acquisition.
(2) In 1996, the Company decided not to renovate and return the Constitution to service, resulting in write- down costs of $38.4 million ($1.89 per share - net of tax). In 1995, the Company incurred a $5.9 million ($0.28 per share- net of tax) one- time charge that represented costs associated with the introduction of the American Queen in June of 1995. In 1994, the Company incurred $5.7 million ($0.20 per share- net of tax) in one- time charges due to problems related to the renovation of the Independence.
(3) In 1996, the Company sold its Maison Dupuy Hotel located in New Orleans, Louisiana for a gain of $11.7 million ($.57 per share - net of tax).
(4) Weighted average operating days for each cruise line is determined by dividing capacity passenger nights for each cruise line by the cruise line's total vessel capacity per day.
(5) Vessel capacity per day represents the number of passengers each cruise line can carry assuming double occupancy for cabins which accommodate two or more passengers. Some cabins on the Independence and the American Queen can accommodate three or four passengers.
(6) Capacity passenger nights is determined by multiplying the actual operating days of the vessel by each vessel's capacity per day.
(7) A passenger night represents one passenger spending one night on a vessel; for example, one passenger taking a three-night cruise would generate three passenger nights.
(8) Physical occupancy percentage is passenger nights divided by capacity passenger nights.

## AMERICAN CLASSIC VOYAGES CO.

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### OVERVIEW

American Classic Voyages Co. ("AMCV", or along with its subsidiaries, the "Company"), is a holding company which owns and controls The Delta Queen Steamboat Co. ("DQSC") and Great Hawaiian Cruise Line, Inc. ("GHCL"). The Company, through its various subsidiaries, operates two cruise lines: The Delta Queen Steamboat Co. ("Delta Queen"), which owns and operates the American Queen, Mississippi Queen and Delta Queen steamboats; and American Hawaii Cruises ("American Hawaii"), which owns and operates the Independence steamship. American Hawaii also owns the Constitution steamship which was removed from service on June 27, 1995. The Constitution will not be returned to service and will remain in wet berth at a shipyard in Portland, Oregon while the Company explores various other options for the vessel. American Hawaii was acquired by the Company in August 1993 (the "Acquisition"). Delta Queen also owned and operated the Maison Dupuy Hotel (the "Hotel") which is located in New Orleans, prior to its sale on October 16, 1996.

The Company changed its year end to December 31, effective April 1, 1993. The following is a review of the Company's

HMS0096654

consolidated operating results, liquidity, capital resources and financial condition for the calendar years ended December 31, 1996, 1995 and 1994 (referred to herein as 1996, 1995 and 1994).

**REVIEW OF 1996**

In 1996, the Company's results of operations were significantly affected by the following factors: (i) the successful turnaround of American Hawaii's operations; (ii) the decision not to return the Constitution to service and subsequent write- down of $38.4 million; and (iii) the absorption of additional capacity at Delta Queen following the introduction of the American Queen in June of 1995. American Hawaii's 1996 revenues decreased by 10% due to the removal of the Constitution in June 1995 which resulted in a 17% decrease in passenger nights. Gross profit increased by 95% due to realizing operating cost savings on the Independence from cost reduction efforts undertaken since the second half of 1995. In addition, American Hawaii reduced selling, general and administrative ("SG&A") expenses by 25%. In April 1996, the Company announced its decision not to renovate or return the Constitution to service. In connection with this decision, the Company recognized an impairment write- down of $38.4 million in the first quarter of 1996. In 1996, Delta Queen's revenues increased by 18% and operating costs increased by 23% resulting only in a 9% increase in gross profit. This is mainly a result of a full year operations of the American Queen which increased passenger nights by 32%. Delta Queen's fare revenue per passenger night ("fare per diems") decreased by 11% due to management's strategy of discounting fares in 1996 in an effort to maintain historically high occupancy levels and to help shift the booking cycle to its optimal schedule of six to nine months in advance. These factors, among others, resulted in the Company recognizing a consolidated operating loss of $30.5 million in 1996. Excluding the impairment write- down, the Company had consolidated operating income of $7.9 million versus a consolidated operating loss of $8.6 million in 1995. The 1995 operating loss also excluded a one- time pre- opening charge of $5.9 million related to the introduction of the American Queen in June 1995. For 1996, the Company's net loss was $17.6 million or $1.28 per share as compared to a 1995 net loss of $9.7 million or $0.70 per share.

In February 1996, the Company settled its dispute with Newport News Shipbuilding and Dry Dock Company (the "Shipyard") and paid an additional $8.7 million of which $6.4 million was paid in March 1996 and the balance of the settlement of $2.3 million was paid in April 1996.

In March 1996, the Company completed the refinancing of its long- term debt by securing $6.9 million of U.S. Government guaranteed ship financing through the U.S. Department of Transportation Maritime Administration ("MARAD"). The Company used a portion of the proceeds to fund amounts owed to the Shipyard as part of the settlement discussed above.

In April 1996, the Company modified the total borrowing availability under its amended and restated credit agreement with a group of financial institutions with The Chase Manhattan Bank (formerly Chemical Bank), as agent (the "Credit Agreement"). The Credit Agreement provided a revolving credit facility, subject to certain covenants, of up to $25.0 million with a final maturity on March 31, 1999. Upon the sale of the Hotel (as discussed below) the borrowing availability was reduced to $15.0 million and the Company will be required every calendar year to maintain a 30- day period during which the outstanding borrowings cannot exceed $7.5 million.

In October 1996, the Company sold its Hotel in New Orleans for $22.0 million in cash (the "Disposition") and future payments of up to $2.0 million. The sale of the Hotel resulted in gain of $11.7 million. The cash received from the sale was used in part to reduce debt and the balance of the proceeds will be used for general corporate purposes.

**YEAR ENDED DECEMBER 31, 1996 COMPARED TO YEAR ENDED DECEMBER 31, 1995**

Consolidated revenues increased $1.7 million to $191.5 million for 1996 from $189.8 million for 1995 representing a $3.3 million increase in cruise revenues offset by a $1.6 million decrease in Hotel revenues as a result of the Hotel being sold on October 16, 1996. American Hawaii's revenues decreased $10.5 million, or 10%. This decrease was mainly due to a 31% decrease in capacity as a result of the Constitution's removal from service on June 27, 1995, partially offset by improvements on the Independence in fare per diems which increased by 15% compared to 1995. Delta Queen's revenues increased $13.8 million, or 18%, reflecting a 32% increase in passenger nights for the period, offset by a 11% decrease in fare per diems. The decrease in fare per diems as compared to 1995 was attributable to management's strategy of discounting fares in 1996 in an effort to maintain historically high occupancy levels and to help shift the booking cycle of

when a majority of its cabin inventory is sold to its optimal schedule of six to nine months in advance. The consolidated fare per diems for 1996 increased 3% to $217 as the increase in American Hawaii's fare per diems more than offset the decrease in Delta Queen's fare per diems. Consolidated total revenue per passenger night ("total revenue per diems") decreased by 1% to $288 due to a reduction in the percentage of passengers at both cruise lines electing to purchase air travel through the Company.

Consolidated cost of operations decreased to $123.7 million for 1996 from $137.9 million for the comparable period of 1995. Of this decrease, $0.5 million represents a reduction of Hotel related cost of operations. American Hawaii's operating costs decreased $24.6 million primarily due to the Constitution's removal from service and realization of operating cost savings on the Independence as a result of cost cutting efforts undertaken since the second half of 1995. Delta Queen's operating costs increased $10.9 million, or 23%, primarily due to the addition of the American Queen.

Consolidated SG&A decreased to $45.4 million for 1996 from $48.6 million for the same period in 1995. Delta Queen's additional capacity resulted in increased marketing and corporate overhead expenditures but was offset by the reduction in American Hawaii's marketing and corporate overhead expenditures as only one ship was in operation. The $2.6 million increase in depreciation and amortization expense represents a $3.0 million increase in depreciation expense offset by a $0.3 million decrease in amortization expense. The increase in depreciation was due to the addition of the American Queen while depreciation at American Hawaii remained unchanged as the increased depreciation on the Independence was offset by the suspension of depreciation on the Constitution upon its removal from service in the prior year.

After evaluating the scope and cost of the Constitution reconstruction project as well as considering various alternatives, the Company announced on April 29, 1996 its decision not to renovate or return the Constitution to service. In connection with this decision, the Company recognized an impairment write- down of $38.4 million in the first quarter of 1996. Excluding this write- down, the consolidated operating income for 1996 was $7.9 million as compared to an operating loss, before one- time pre- opening costs of $5.9 million, of $8.6 million in 1995.

The $38.4 million impairment write- down was composed of (a) $36.1 million directly related to the write- down of the vessel and its allocated goodwill to an estimated salvage value of $2.5 million, and (b) $2.3 million which represented the remaining goodwill balance from the American Hawaii acquisition. The Company has reserved for the estimated costs to be incurred on behalf of the Constitution until its eventual disposition. These costs include insurance, wet berthing fees and general maintenance of the vessel. As of December 31, 1996, the balance of this reserve was $2.8 million. The impairment write- down was recognized in accordance with the Statement of Financial Accounting Standards ("SFAS") No. 121, "Accounting for the Impairment of Long- Lived Assets and for Long- Lived Assets to be Disposed of", which the Company adopted effective January 1, 1996.

Interest expense increased $2.4 million due to a greater outstanding debt balance in 1996 and capitalization of interest costs in 1995 related to the American Queen construction. The Company's consolidated effective tax rate was lower in 1996 as compared to 1995. As the minority interest in GHCL was redeemed in December 1995, the net loss for 1996 reflected 100% ownership of GHCL by the Company.

**YEAR ENDED DECEMBER 31, 1995 COMPARED TO YEAR ENDED DECEMBER 31, 1994**

Consolidated revenues decreased $5.4 million to $189.8 million in 1995 from $195.2 million in 1994 due to a $24.0 million decrease in revenues of American Hawaii offset by $18.6 million increase in the revenues of Delta Queen. The primary cause of this was a 16% reduction in passenger nights at American Hawaii due to unsold capacity in the second quarter of 1995. This unsold capacity resulted from the postponement of the Constitution out- of- service period commencement from March 1995 to June 1995. Delta Queen's increase reflected a 38% increase in passenger nights due to the addition of the American Queen in June 1995. Consolidated passenger nights of 628,660 in 1995 were slightly lower than 1994 as Delta Queen's increase was offset by a decrease at American Hawaii due to the Constitution being out of service for the entire second half of 1995. These factors also affected consolidated occupancy in 1995 which decreased to 89.6% from 94.8% in 1994. Consolidated fare per diems of $210 for 1995 represented an increase of 4% which included a 2% increase in American Hawaii fare per diems and a 4% decrease in Delta Queen's fare per diems. Delta Queen's capacity was a smaller component of consolidated capacity, therefore, Delta Queen's decrease in fare per diems did not offset American Hawaii's increase. The decrease at Delta Queen reflected management's strategy of offering higher discounts to maintain occupancy levels on the Delta Queen and Mississippi Queen in light of the addition of the American Queen. Consolidated total revenue per diems decreased 2% to $290 as a result of a drop in air travel revenues at

both cruise lines.
Consolidated cost of operations decreased to $137.9 million for 1995 from $143.6 million in the comparable period of 1994. American Hawaii's operating costs decreased 15% due primarily to lower passenger expenses and air travel costs related to the decline in the number of passengers in 1995. Delta Queen's operating costs increased 25%, in part reflecting higher operating costs associated with its increase in capacity in 1995. Consolidated gross profit of $51.9 million was only slightly higher than the prior year. Delta Queen's gross profit increased 31% due to the addition of the American Queen offset by American Hawaii's 36% drop in gross profit which was attributable to the combined effects of lower revenue levels without a corresponding decrease in cruise operating costs in the first half of 1995.
Consolidated SG&A before non- recurring charges increased to $48.6 million for 1995 from $43.2 million for 1994. This reflected a $3.0 million increase in marketing expenses and a $2.3 million increase in general and administrative expenses. Marketing expenditures for 1995 were higher at both cruise lines. Delta Queen's expenditures were higher due to the addition of the American Queen. American Hawaii's marketing expenditures were both accelerated and increased in the first half of 1995 to offset the effects of the rescheduled Constitution out- of- service period. The increase in general and administrative expenses was a result of higher overhead costs at Delta Queen related to the increased capacity and higher corporate overhead expenses somewhat offset by a decrease in American Hawaii costs due to the cost reduction plan implemented during the second half of 1995. The $5.9 million one- time pre- opening charge at Delta Queen represented costs associated with the pre- inaugural activities and shakedown cruises of the American Queen prior to her first cruise in June 1995. In 1994, the non- recurring charges of $5.7 million were primarily related to costs associated with the cancellation of four cruises in October 1994 and customer satisfaction problems encountered subsequent to the Independence's return to service.
Consolidated depreciation and amortization expense increased to $11.9 million for 1995 from $7.1 million for 1994 primarily due to higher depreciation expense at both cruise lines. Delta Queen's depreciation increased due to the addition of the American Queen. American Hawaii's increase was related to the renovation of the Independence offset somewhat by the suspension of depreciation on the Constitution.
The consolidated operating loss of $14.5 million in 1995 versus $4.4 million in the comparable period of 1994 reflected a larger operating loss at American Hawaii.
Interest income increased to $1.7 million in 1995 from $1.4 million in 1994 due to interest received on the escrow account maintained in connection with litigation with the Shipyard. Interest expense increased $5.0 million reflecting higher borrowing levels, higher interest rates, and the capitalization of interest costs in 1994 related to the American Queen construction. The Company's consolidated effective tax rate was lower in 1995 as compared to 1994.
The Company's consolidated net loss for 1995 of $9.7 million versus $1.0 million for the same period in 1994 primarily reflected the decreased profitability of American Hawaii associated with the effects of the postponed Constitution out- of- service period from March 1995 to June 1995 and the $5.9 million one- time pre- opening charge.

## LIQUIDITY, CAPITAL RESOURCES AND FINANCIAL CONDITION

Operating Activities
The Company's liquidity improved in 1996, as a result of the improved operating performance of American Hawaii, reduced capital expenditures and the Disposition. For 1996, cash provided by operations was $15.0 million as compared to cash used by operations of $9.9 million and $4.8 million in 1995 and 1994, respectively. In 1996, American Hawaii's operating results improved as a result of the cost reduction efforts started in the second half of 1995 as well as improved fare per diems and occupancy as discussed further under Results of Operations. Operating cash usage in 1995 and 1994 substantially reflect the lower operating performance of American Hawaii in both years, the one- time charge related to the launch of the American Queen in 1995, and in 1994, the one- time payment of $16.9 million made in respect of liabilities assumed pursuant to the Acquisition.
Passenger cruise deposits, as reflected in unearned passenger revenues, increased $3.1 million as of December 31, 1996 due to strong bookings for 1997, both in fare per diem and occupancy, at Delta Queen. At December 31, 1995, passenger cruise deposits decreased due to lower advance reservations levels at American Hawaii at the end of 1995, compared to 1994, as the Constitution was still in service.
Capital Expenditures
The Company's capital expenditures were $15.4 million in 1996 as compared to $45.2 million in 1995 and $62.8 million in 1994. The largest portion of the 1996 capital expenditures was $11.4 million related to the Independence, which

included $8.7 million paid to the Shipyard in March 1996, as part of the litigation settlement for work performed in 1994. Other significant capital expenditures included $2.6 million for the Delta Queen and Mississippi Queen lay- ups, including completion of the Mississippi Queen cosmetic renovation.
The Company's 1997 planned capital commitments of approximately $18.0 million include expenditures for the drydock of the Independence, the drydock of the Delta Queen and other routine capital improvements to vessels, computer systems and shoreside facilities expansion. The Independence will be out of service for a four- week period beginning May 17, 1997 for a drydock to comply with U.S. Coast Guard requirements. In addition, 1997 SOLAS upgrades will be made, as well as passenger area enhancements and the build- out of approximately 28 new cabins. This drydock is estimated to cost approximately $12.0 million. The Company entered into a contract with Cascade General for $5.5 million to conduct a portion of the renovation work to be performed during the upcoming drydock of the Independence. The Delta Queen's drydock was completed in January 1997 and included work to comply with its five- year U.S. Coast Guard mandated hull inspection as well as other minor refurbishments. The Company anticipates that these capital commitments will be funded from cash on hand and cash from operations.
Debt
During 1995, subsidiaries of both DQSC and GHCL issued debt guaranteed by the U.S. Government through MARAD. On August 24, 1995, a subsidiary of DQSC (the "Issuer Subsidiary- AQ") issued bonds in the amount of $36.4 million with a 25- year life bearing interest at a fixed rate of 7.68%, and issued notes in the amount of $24.2 million maturing in ten years with a floating interest rate equal to London Interbank Offered Rate ("LIBOR") plus .25%. Interest and level principal payments are due semi- annually beginning with the first payment made on February 24, 1996. This debt is secured by a first mortgage on the American Queen and contains various covenants which, among other things, requires the compliance with certain financial ratios at the end of each year. In the event these ratios are not satisfied, the Issuer Subsidiary- AQ would be prohibited from making distributions of cash to DQSC. In addition, the Issuer Subsidiary- AQ would be required to set aside funds equal to one- year's debt service and make certain reserve fund deposits, calculated as a percentage of the Issuer Subsidiary- AQ net income. These deposits could only be released with the permission of the Secretary of Transportation. On December 7, 1995, a subsidiary of GHCL (the "Issuer Subsidiary- SSI") issued bonds in the amount of $13.2 million with a 20- year life bearing interest at a fixed rate of 6.84%, and issued notes in the amount of $13.2 million maturing in ten years with a floating interest rate equal to LIBOR plus .27%. Interest and level principal payments are due semi- annually beginning with the first payment made on June 7, 1996. This debt is secured by a first mortgage on the Independence and contains various covenants which, among other things, requires the compliance with certain financial ratios at the end of each year. In the event these ratios are not satisfied, the Issuer Subsidiary- SSI would be required to set aside funds equal to one- year's debt service.

On March 28, 1996, Issuer Subsidiary- SSI issued $6.9 million of debt guaranteed by the U.S. Government through MARAD. This debt is the second series ("Series B") of the $26.4 million issue that was completed on December 7, 1995 and therefore contains the same covenants and security as the original issue which was guaranteed by GHCL and secured by the first mortgage of the Independence. The Series B debt consists of $3.4 million of notes due December 7, 2005 with a floating interest rate equal to LIBOR plus .27% and $3.5 million of 7.46% fixed rate bonds due December 7, 2015. Interest payments on the notes and bonds, as well as principal payments on the notes, are payable semi- annually beginning with the first payment made on December 7, 1996. Principal payments on the bonds are payable semi- annually beginning June 7, 2006. In addition, these two series required Issuer Subsidiary- SSI to have $2.2 million on deposit, ($1.6 million was deposited on December 7, 1995 and $0.6 million with Series B) representing six months of debt service which will be released when either the Issuer Subsidiary- SSI or GHCL meets certain cash flow and debt to equity ratios. The debt service deposit is expected to be released to the Company in 1997 as GHCL has met the required cash flow and debt to equity ratios as of December 31, 1996.
The Company used a portion of the proceeds from the Series B financing to fund amounts owed to the Shipyard as part of the litigation settlement. The remaining proceeds were used, in part, to pay down a portion of amounts outstanding under its revolving credit facility.
On April 22, 1996, the Company modified the total borrowing availability under its Credit Agreement. The Credit Agreement provides a revolving credit facility, subject to certain covenants, of up to $25.0 million with a final maturity on March 31, 1999. Upon the sale of the Hotel on October 16, 1996, the borrowing availability was reduced to $15.0 million and the Company will be required every calendar year to maintain a 30- day period during which the outstanding borrowings cannot exceed $7.5 million. Borrowings bear interest, at the option of the Company, equal to either (i) the

greater of The Chase Manhattan Bank's prime rate or certain alternative base rates plus a margin ranging from 0% to 1.25%, or (ii) LIBOR plus a margin ranging from 1.0% to 2.25%. The Company is also required to pay a commitment fee on the unused portion of the facility at a rate ranging from 0.375% to 0.5% per annum. The Credit Agreement is guaranteed by AMCV and secured by substantially all the assets of DQSC, excluding the American Queen. The Credit Agreement contains various limitations, restrictions and financial covenants which, among other things, requires maintenance of certain financial ratios, restricts additional indebtedness, limits intercompany advances to $20.0 million and limits the payment of dividends from DQSC to AMCV to $2.0 million per annum.

As of December 31, 1996, the Company was in compliance with all covenants under its various debt agreements.

The Company believes it will have adequate access to capital resources, both internally and externally, to meet its short-term and long- term capital commitments. Such resources may include cash on hand and the ability to secure additional financing through the capital markets. The Company continually evaluates opportunities to increase capacity, particularly with regard to the American Hawaii business. In addition, the Company also evaluates opportunities to strategically grow its business. If it would elect to increase capacity or pursue a strategic business opportunity, the Company may seek to secure additional financing. Notwithstanding, there can be no assurances that the Company will choose to increase capacity or strategically grow its business, or, if it elects to do so, that it will obtain additional financing.

Sale of Hotel

On October 16, 1996, the Company sold its subsidiary which owns the Hotel in New Orleans for $22.0 million in cash. In addition, the Company entered into a Profit Participation Agreement with the buyer which will provide for future payments of up to $2.0 million based on the future performance of the Hotel within the next seven years. The Company will also receive preferred rates at the Hotel for its passengers and employees who require lodging in New Orleans for the next two years. In return, the Company has agreed to provide the buyer a minimum of $0.6 million of this business in each of these years. Upon the sale of the Hotel, the Company was required to pay down its then outstanding borrowings, which were $9.5 million, under its Credit Agreement. The balance of the Hotel sale proceeds will be used for general corporate purposes.

Dividends

In the second half of 1995, the Company's board of directors elected not to declare a dividend and determined that any future dividend declarations will be based on the Company's operating performance and its planned capital needs.

Other

In March 1996, as part of the litigation settlement with the Shipyard, the remaining balance of $6.4 million maintained in an escrow account was released to the Shipyard. In addition, during 1996, $1.8 million was released to the Company from the MARAD escrow account maintained for remaining American Queen construction costs.

The Federal Maritime Commission ("FMC") regulates passenger vessels with 50 or more berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. The Company has been approved as a self- insurer by the FMC, and therefore, subject to continued approval, is not required to post security for passenger cruise deposits. The FMC has recently reviewed its standards and in June 1996 issued proposed regulations to increase the financial responsibility requirements. The Company filed its position on the proposals, as it believes that the FMC's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. If implemented, these proposed regulations would be phased in over time and, among other things, require operators qualifying as a self- insurer, such as the Company, to satisfy a working capital test, in addition to the existing net worth test, and to provide third- party coverage for 25% of its unearned passenger revenue in the form of a surety bond or similar instrument. At this time, the Company cannot predict if the proposed changes will be approved as currently constituted, or at all. If they are implemented, the proposed changes would require that the Company establish a bond to cover a portion of its passenger deposits and payments, which may impact the Company's liquidity.

Factors Concerning Forward- Looking Statements

Certain statements in "Management's Discussion and Analysis of Financial Condition and Results of Operations" constitute "forward- looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward- looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward- looking statements. Such factors include, among others, the following: general economic and business conditions which may impact passenger yields and occupancy; weather patterns

HMS0096659

affecting either the inland waterways in the Continental U.S. or the Hawaiian Islands; unscheduled repairs and drydocking of the Company's vessels; construction delays and/or cost overruns during regularly scheduled lay- ups and/or drydocks; the impact of changes in laws and implementation of government regulations, such as those proposed by the FMC; an increase in capacity at American Hawaii or pursuit of a strategic business opportunity; and the ability to obtain additional financing.

**INDEPENDENT AUDITORS' REPORT**

The Board of Directors and Stockholders
American Classic Voyages Co.

We have audited the consolidated balance sheets of American Classic Voyages Co. and subsidiaries as of December 31, 1996 and 1995, and the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the years in the three- year period ended December 31, 1996. In connection with our audits of the consolidated financial statements, we also have audited the financial statement schedule. These consolidated financial statements and financial statement schedule are the responsibility of management of American Classic Voyages Co. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of American Classic Voyages Co. and subsidiaries as of December 31, 1996 and 1995 and the results of their operations and their cash flows for each of the years in the three- year period ended December 31, 1996, in conformity with generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ KPMG Peat Marwick LLP
KPMG Peat Marwick LLP

Chicago, Illinois
February 19, 1997

**AMERICAN CLASSIC VOYAGES CO.**

**CONSOLIDATED STATEMENTS OF INCOME**

(In thousands, except per share data)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| Revenues.................................... | $ 191,542 | $189,821 | $195,197 |
| Cost of operations (exclusive of depreciation and amortization shown below)................ | 123,679 | 137,926 | 143,628 |
| Gross profit................................ | 67,863 | 51,895 | 51,569 |
| Selling, general and administrative expenses.. | 45,367 | 48,613 | 43,191 |
| Depreciation and amortization expense......... | 14,571 | 11,917 | 7,117 |
| Impairment write-down (Note 4)................ | 38,390 | -- | -- |
| One-time pre-opening costs.................... | -- | 5,900 | -- |
| Non-recurring charges......................... | -- | -- | 5,699 |
| Operating loss................................ | (30,465) | (14,535) | (4,438) |
| Interest income............................... | 912 | 1,706 | 1,389 |
| Interest expense.............................. | 8,111 | 5,708 | 717 |
| Other income.................................. | 11,729 | -- | -- |
| Loss before income taxes and minority interest | (25,935) | (18,537) | (3,766) |
| Income tax benefit............................ | 8,299 | 6,308 | 1,451 |
| Minority interest in loss..................... | -- | (2,558) | (1,332) |
| Net loss...................................... | $ (17,636) | $ (9,671) | $ (983) |
| PER SHARE INFORMATION: | | | |
| Average common and common equivalent shares outstanding................................ | 13,802 | 13,763 | 14,085 |
| Loss per share................................ | $ (1.28) | $ (0.70) | $ (0.07) |
| Cash dividends declared per share............. | $ -- | $ 0.08 | $ 0.16 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED BALANCE SHEETS

(In thousands except shares and par value)

| | December 31, | |
|---|---|---|
| | 1996 | 1995 |
| ASSETS | | |
| Cash and cash equivalents................ | $ 17,908 | $ 6,048 |
| Restricted short-term investments........ | 2,957 | 10,681 |
| Accounts receivable...................... | 3,734 | 1,134 |
| Prepaid expenses and other current assets | 7,640 | 6,612 |
| Total current assets..................... | 32,239 | 24,475 |
| Property and equipment, net.............. | 166,883 | 211,959 |
| Deferred tax asset....................... | 10,968 | 4,325 |
| Other assets............................. | 1,774 | 1,995 |
| Goodwill, net............................ | -- | 4,719 |
| Total assets............................. | $211,864 | $247,473 |
| LIABILITIES | | |
| Accounts payable......................... | $ 10,683 | $ 13,073 |
| Other accrued expenses................... | 24,532 | 27,437 |
| Current portion of long-term debt........ | 4,100 | 3,746 |
| Unearned passenger revenues.............. | 31,669 | 28,532 |
| Total current liabilities................ | 70,984 | 72,788 |
| Long-term debt, less current maturities.. | 85,898 | 103,272 |
| Total liabilities........................ | 156,882 | 176,060 |
| COMMITMENTS AND CONTINGENCIES | | |
| STOCKHOLDERS' EQUITY | | |
| Preferred stock, $.01 par value (5,000,000 shares authorized, none issued and outstanding).................. | -- | -- |
| Common stock, $.01 par value (20,000,000 shares authorized, 13,867,829 and 13,769,512 shares issued and | | |

| | | |
|---|---|---|
| outstanding, respectively) | 139 | 138 |
| Additional paid-in capital | 75,252 | 74,048 |
| Accumulated deficit | (20,409) | (2,773) |
| Total stockholders' equity | 54,982 | 71,413 |
| | $211,864 | $247,473 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

(Amounts in thousands)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| OPERATING ACTIVITIES | | | |
| Net loss | $ (17,636) | $ (9,671) | $ (983) |
| ADJUSTMENTS TO RECONCILE NET INCOME TO NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | | | |
| Depreciation and amortization | 14,571 | 11,917 | 7,117 |
| Minority interest | -- | (2,558) | (1,332) |
| Impairment write-down (Note 4) | 38,390 | -- | -- |
| Gain on sale of Maison Dupuy Hotel | (11,729) | -- | -- |
| Changes in Certain Working Capital Accounts and Other | | | |
| Accounts receivable | (2,600) | 190 | (724) |
| Accounts payable | (2,305) | (3,971) | 11,003 |
| Accrued liabilities | (289) | 1,537 | 431 |
| Liabilities assumed in the Acquisition | -- | -- | (16,910) |
| Other assets | (6,400) | (6,869) | (1,589) |
| Unearned passenger revenues | 3,137 | (2,534) | 1,975 |
| Prepaid expenses and other | (123) | 2,012 | (3,792) |
| Net cash provided by (used in) operating activities | 15,016 | (9,947) | (4,804) |
| INVESTING ACTIVITIES | | | |
| Decrease (increase) in restricted investments | 7,724 | 9,706 | (5,012) |
| Capital expenditures | (15,355) | (45,227) | (62,854) |
| Proceeds from sale of Maison Dupuy Hotel | 21,522 | -- | -- |
| Net cash provided by (used in) investing activities | 13,891 | (35,521) | (67,866) |
| FINANCING ACTIVITIES | | | |
| Proceeds from borrowings | 6,903 | 117,018 | 50,000 |
| Repayments of borrowings | (23,923) | (75,000) | -- |
| Purchase of subsidiary minority interest | -- | (105) | -- |
| Issuance of common stock | 368 | 80 | 148 |
| Dividends | -- | (1,101) | (2,199) |
| Deferred financing fees | (395) | (1,600) | -- |
| Net cash (used in) provided by financing activities | (17,047) | 39,292 | 47,949 |
| Increase (decrease) in cash and cash equivalents | 11,860 | (6,176) | (24,721) |
| Cash and cash equivalents, beginning of period | 6,048 | 12,224 | 36,945 |
| Cash and cash equivalents, end of period | $ 17,908 | $ 6,048 | $12,224 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Cash paid (refunded) during the period for: | | | |
| Interest (net of capitalized interest) | $ 7,364 | $ 3,000 | $ 617 |
| Income taxes | $ 450 | $ (119) | $(1,569) |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**AMERICAN CLASSIC VOYAGES CO.**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

(Amounts in thousands)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| COMMON STOCK | | | |
| Balance, beginning of period | $ 138 | $ 138 | $ 137 |
| Issuance of common stock.... | 1 | -- | 1 |
| Balance, end of period...... | 139 | 138 | 138 |
| ADDITIONAL PAID-IN CAPITAL | | | |
| Balance, beginning of period | 74,048 | 73,968 | 73,468 |
| Issuance of common stock.... | 1,204 | 80 | 500 |
| Balance, end of period...... | 75,252 | 74,048 | 73,968 |
| (ACCUMULATED DEFICIT) | | | |
| RETAINED EARNINGS | | | |
| Balance, beginning of period | (2,773) | 7,999 | 11,181 |
| Net loss.................... | (17,636) | (9,671) | (983) |
| Dividends................... | -- | (1,101) | (2,199) |
| Balance, end of period...... | (20,409) | (2,773) | 7,999 |
| Total Stockholders' Equity.. | $ 54,982 | $ 71,413 | $ 82,105 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**AMERICAN CLASSIC VOYAGES CO.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

In May 1994, the stockholders of The Delta Queen Steamboat Co. approved a change to the company's name to American Classic Voyages Co. In connection with the name change, DQSC- 2, Inc., a subsidiary of the American Classic Voyages Co., changed its name to "The Delta Queen Steamboat Co.".

**NATURE OF OPERATIONS**

American Classic Voyages Co., through its subsidiaries, operates two cruise lines under the names of The Delta Queen Steamboat Co. and American Hawaii Cruises. The Delta Queen Steamboat Co., through its subsidiaries, owns and operates the American Queen, Mississippi Queen and Delta Queen steamboats which conduct overnight cruise operations on certain U.S. inland waterways ("Delta Queen"). Delta Queen also owned and operated the Maison Dupuy Hotel (the "Hotel") located in New Orleans, prior to its sale on October 16, 1996. American Hawaii Cruises, through its subsidiaries owns and operates the Independence steamship providing overnight cruises between the Hawaiian islands. American Hawaii also owns the Constitution steamship which will not be returned to service and will remain in wet berth at a shipyard in Portland, Oregon while the Company explores various other options for the vessel.

**PRINCIPLES OF CONSOLIDATION**

The accompanying Consolidated Financial Statements include the accounts of American Classic Voyages Co. ("AMCV")

and its wholly owned subsidiaries, The Delta Queen Steamboat Co. ("DQSC"), and Great Hawaiian Cruise Line, Inc. ("GHCL") (collectively with such subsidiaries, the "Company"). The Company acquired an 80% interest in GHCL in August 1993 and subsequently in 1995 acquired the remaining 20% interest from minority interest shareholders as discussed further in Note 2. The accompanying Consolidated Financial Statements have been prepared in accordance with generally accepted accounting principles. All significant intercompany accounts and transactions have been eliminated in consolidation. Certain previously reported amounts have been reclassified to conform to the 1996 presentation.

**USE OF ESTIMATES**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**CASH AND CASH EQUIVALENTS**

All highly liquid investments purchased with an original maturity of three months or less are considered cash equivalents.

**RESTRICTED SHORT- TERM INVESTMENTS**

The Company's restricted short- term investments include two accounts which were set- up in connection with the U.S. Government guaranteed ship financing secured by the Company in 1995 and 1996. In 1995, restricted short- term investments included the balance of the escrow account, or $6.4 million, set- up as a result of the dispute with Newport News Shipbuilding and Dry Dock Company (the "Shipyard"). The dispute was settled in February 1996 and the escrow account was released to the Shipyard. As of December 31, 1996, the escrow account for remaining American Queen construction costs had a balance of $0.5 million and the six- month debt service deposit account related to the Independence had a balance of $2.2 million.

**PROPERTY AND EQUIPMENT**

Property and equipment primarily consists of vessels and leasehold improvements which are recorded at cost. Construction- in- progress represents expenditures for the vessels under construction, renovation, lay- up and/or drydock. In 1996, the Company reduced the cost of the Constitution to its salvage value as further discussed in Note 4 and removed the cost and related depreciation of the Hotel building and land upon the sale of the Hotel as discussed in Note 5. Depreciation is computed using the straight- line method based upon the estimated useful lives of the various classes of assets ranging from 3 to 40 years. Lay- up and drydock expenditures relating to vessel improvements or betterments are capitalized and depreciated over their estimated useful lives. In addition, lay- up and drydock expenditures relating to cleaning, repairs and maintenance are accrued evenly over the period to the next scheduled lay- up and/or drydock and are included in other accrued liabilities. Interest costs incurred during vessel construction periods were capitalized into the cost of the related vessels.

**GOODWILL**

In August 1993, the Company acquired substantially all the assets and certain liabilities of American Global Line Inc. (See Note 2.) The acquisition was accounted for as a purchase. In connection with this purchase, goodwill was recorded for the excess of purchase price over the fair value of the net assets acquired and is being amortized over its estimated useful life of 25 years using the straight- line method. Upon the finalization of purchase accounting, goodwill was decreased by approximately $5.0 million. Additionally, in 1995, goodwill was decreased by approximately $4.2 million due to the repurchase of equity from GHCL's minority interest shareholders for $0.1 million. In 1996, in connection with its decision not to return the Constitution to service, the Company wrote- off the remaining goodwill balance (see Note 4). Amortization expense for 1996, 1995 and 1994 was $52,000, $383,000 and $414,000, respectively.

**INCOME TAXES**

In April 1993, the Company adopted Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes", on a prospective basis. The adoption of SFAS No. 109 changed the Company's method of accounting for income taxes from the deferred method to an asset and liability approach. Previously, the Company accounted for income

taxes pursuant to Accounting Principles Board Opinion ("APB") No. 11. The asset and liability approach requires the recognition of deferred tax liabilities and assets for the expected future tax consequences of temporary differences between carrying amounts and the tax bases of other assets and liabilities. The adoption of SFAS No. 109 did not have a material effect on the Company's net income or financial position.

**REVENUE AND EXPENSE RECOGNITION**

The Company generally receives passenger fares up to 60 days prior to the cruise date. Prepaid passenger fares are deferred and recognized as revenue during the associated cruise. The Company is self- insured in respect of guaranteeing the Company's passenger cruise deposits. Advertising costs are expensed as incurred and are included in selling expense.

**EARNINGS PER SHARE INFORMATION**

Earnings per share have been computed by dividing net earnings by the sum of the weighted average number of shares of common stock outstanding plus common share equivalents principally in the form of employee stock option awards.

**FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company's financial instruments include restricted short- term investments, accounts receivable, accounts payable, other accrued expenses and long- term debt. The fair values of all financial instruments were not materially different from their carrying or contract values.

**ACCOUNTING STANDARDS ADOPTED**

SFAS No. 121, "Accounting for the Impairment of Long- Lived Assets and for Long- Lived Assets to Be Disposed of", was adopted by the Company effective January 1, 1996. SFAS No. 121 establishes accounting standards for recognizing the impairment of long- lived assets, identifiable intangibles and goodwill, whether to be disposed of or to be held and used. In general, SFAS No. 121 requires recognition of an impairment loss when the sum of undiscounted expected future cash flows is less than the carrying amount of such assets. In 1996, the Company recognized a $38.4 million impairment write- down related to its decision not to return the Constitution to service as further discussed in Note 4.

In October 1995, the Financial Accounting Standards Board issued SFAS No. 123, "Accounting for Stock- Based Compensation", effective for fiscal years beginning after December 15, 1995. The Company plans to continue its current accounting for employee stock- based compensation plans in accordance with APB No. 25, as permitted under SFAS No. 123. See Note 10 for the pro forma effect of the fair value accounting method.

**NOTE 2. MINORITY INTEREST**

In August 1993, the Company, through its then 80% owned subsidiary GHCL, acquired (the "Acquisition") the net assets and operations of American Global Line Inc. ("AGL") out of bankruptcy. Pursuant to the Acquisition and for its 80% interest in GHCL, the Company: (i) paid an aggregate of $2.5 million to the senior subordinated lenders of AGL and a former shareholder of AGL and (ii) contributed $30 million to GHCL to be used for capital expenditures and working capital requirements of GHCL. In addition, the Company assumed substantially all trade liabilities, accrued expenses and unearned passenger revenues of AGL aggregating $81.1 million. A significant portion of these liabilities were incurred prior to AGL's bankruptcy petition.

In December 1995, the minority interest in GHCL was redeemed through GHCL's purchase of 20% of the then outstanding shares for a purchase price of $0.1 million.

**NOTE 3. PROPERTY AND EQUIPMENT**

Property and equipment consisted of (in thousands):

| | December 31, | |
|---|---|---|
| | 1996 | 1995 |
| Vessels...................... | $196,347 | $218,994 |

| | | |
|---|---|---|
| Buildings.................... | 6,253 | 15,134 |
| Land......................... | -- | 2,600 |
| Construction-in-progress..... | 1,446 | 3,173 |
| Other........................ | 7,474 | 11,121 |
| | 211,520 | 251,022 |
| Less accumulated depreciation | (44,637) | (39,063) |
| | $166,883 | $211,959 |

The Company did not capitalize interest costs in 1996, as compared to 1995 when $2.2 million was capitalized. Property and equipment includes the estimated salvage value for the Constitution of $2.5 million. The Constitution will not be returned to service and will remain in wet berth at a shipyard in Portland, Oregon while the Company explores various other options for the vessel (see Note 4 for further information).

**NOTE 4. IMPAIRMENT WRITE- DOWN**

After evaluating the scope and cost of the Constitution reconstruction project as well as considering various alternatives, the Company announced on April 29, 1996 its decision not to renovate or return the Constitution to service. The Constitution was removed from service on June 27, 1995 and is currently in wet berth at a shipyard in Portland, Oregon. In the first quarter of 1996, in connection with the foregoing decision, the Company recognized an impairment write-down of $38.4 million, composed of (a) $36.1 million directly related to the write- down of the vessel and its allocated goodwill to an estimated salvage value of $2.5 million, and (b) $2.3 million which represented the remaining goodwill balance from the GHCL acquisition. The Company reserved for the estimated costs to be incurred on behalf of the Constitution until its eventual disposition. These costs include insurance, wet berthing fees and general maintenance of the vessel. As of December 31, 1996, the balance of this reserve was $2.8 million.

**NOTE 5. DISPOSITION OF ASSET**

On October 16, 1996, the Company sold its subsidiary which owned the Hotel in New Orleans for $22.0 million in cash (the "Disposition"). In addition, the Company entered into a Profit Participation Agreement with the buyer which will provide for future payments of up to $2.0 million based on the future performance of the Hotel within the next seven years. The Company will also receive preferred rates at the Hotel for its passengers and employees who require lodging in New Orleans for the next two years. In return, the Company has agreed to provide the buyer a minimum of $0.6 million of this business in each of these years.
Upon the sale of the Hotel, the Company was required to pay down its then outstanding borrowings, which were $9.5 million under its credit agreement with a group of financial institutions with The Chase Manhattan Bank (formerly Chemical Bank), as agent (the "Credit Agreement"). The borrowing availability under the Credit Agreement was reduced from $25.0 million to $15.0 million and the Company will be required every calendar year to maintain a 30- day period during which the outstanding borrowings cannot exceed $7.5 million (see Note 6). The balance of the Hotel sale proceeds will be used for general corporate purposes.

The following pro forma financial information for the years ended December 31, 1996 and 1995 has been prepared as if the Disposition had occurred as of the beginning of each comparative period. In management's opinion, the pro forma financial information is not necessarily indicative of results that would have occurred had the Disposition taken place at the beginning of each period. Amounts in thousands, except per share amounts:

| | Unaudited Pro Forma Years Ended December 31, | |
|---|---|---|
| | 1996 | 1995 |
| Revenues...... | $ 186,096 | $182,749 |
| Operating loss | (31,841) | (17,091) |
| Net loss...... | (17,940) | (3,435) |

Loss per share $ (1.30) $ (0.25)

The pro forma financial information includes adjustments applied to the historical statements of income of the Company to give effect to the Disposition as if it occurred at the beginning of the respective period. Such adjustments include: (i) re-establishment of intercompany revenues and expenses between the Company and the Hotel previously eliminated in consolidation; (ii) decreased depreciation expense due to a lower capitalized interest balance as proceeds received from the Disposition were used to repay amounts outstanding on the Company's long- term credit facility, and therefore, less interest expense was incurred and subject to capitalization; (iii) decreased interest expense due to reduced borrowings under the Company's credit facility as a result of the proceeds received from the Disposition.

**NOTE 6. LONG- TERM DEBT**

Long- term debt consists of (in thousands):

| | December 31, | |
|---|---|---|
| | 1996 | 1995 |
| U.S. Government Guaranteed Ship Financing Note, American Queen Series, floating rate notes due semi-annually beginning February 24, 1996 through August 24, 2005... | $21,812 | $ 24,236 |
| U.S. Government Guaranteed Ship Financing Bond, American Queen Series, 7.68% fixed rate, sinking fund bonds due semi-annually beginning February 24, 2006 through June 2, 2020.................................................................... | 36,353 | 36,353 |
| U.S. Government Guaranteed Ship Financing Note, Independence Series A, floating rate notes due semi-annually beginning June 7, 1996 through December 7, 2005....... | 11,892 | 13,214 |
| U.S. Government Guaranteed Ship Financing Bond, Independence Series A, 6.84% fixed rate sinking fund bonds due semi-annually beginning June 7, 2006 through December 7, 2015................................................................... | 13,215 | 13,215 |
| U.S. Government Guaranteed Ship Financing Note, Independence Series B, floating rate notes due semi-annually beginning December 7, 1996 through December 7, 2005................................................................... | 3,186 | -- |
| U.S. Government Guaranteed Ship Financing Bond, Independence Series B, 7.46% fixed rate sinking fund bonds due semi-annually beginning June 7, 2006 through December 7, 2015................................................................... | 3,540 | -- |
| Revolving credit facility ......................................................... | -- | 20,000 |
| | 89,998 | 107,018 |
| Less current portion................................................................. | 4,100 | 3,746 |
| | $85,898 | $103,272 |

Required principal payments on long- term debt over the next five years are $4.1 million for each of the years from 1997 to 2001.

During 1995, subsidiaries of both DQSC and GHCL issued debt guaranteed by the U.S. Government through MARAD. On August 24, 1995, a subsidiary of DQSC (the "Issuer Subsidiary- AQ") issued bonds in the amount of $36.4 million with a 25- year life bearing interest at a fixed rate of 7.68%, and issued notes in the amount of $24.2 million maturing in ten years with a floating interest rate equal to London Interbank Offered Rate ("LIBOR") plus .25%. Interest and level principal payments are due semi- annually beginning with the first payment made on February 24, 1996. This debt is secured by a first mortgage on the American Queen and contains various covenants which, among other things, requires the compliance with certain financial ratios at the end of each year. In the event these ratios are not satisfied, the Issuer Subsidiary- AQ would be prohibited from making distributions of cash to DQSC. In addition, the Issuer Subsidiary- AQ would be required to set aside funds equal to one- year's debt service and make certain reserve fund deposits, calculated as a percentage of the Issuer Subsidiary- AQ net income. These deposits could only be released with the permission of the Secretary of Transportation. On December 7, 1995, a subsidiary of GHCL (the "Issuer Subsidiary- SSI") issued bonds in the amount of $13.2 million with a 20- year life bearing interest at a fixed rate of 6.84%, and issued notes in the amount of $13.2 million maturing in ten years with a floating interest rate equal to LIBOR plus .27%. Interest and level principal payments are due semi- annually beginning with the first payment made on June 7, 1996. This debt is secured by a first mortgage on the Independence and contains various covenants which, among other things, requires the compliance with certain financial ratios at the end of each year. In the event these ratios are not satisfied, the Issuer Subsidiary- SSI would

be required to set aside funds equal to one- year's debt service.
On March 28, 1996, Issuer Subsidiary- SSI issued $6.9 million of debt guaranteed by the U.S. Government through MARAD. This debt is the second series ("Series B") of the $26.4 million issue that was completed on December 7, 1995 and therefore contains the same covenants and security as the original issue which was guaranteed by GHCL and secured by the first mortgage of the Independence. The Series B debt consists of $3.4 million of notes due December 7, 2005 with a floating interest rate equal to LIBOR plus .27% and $3.5 million of 7.46% fixed rate bonds due December 7, 2015. Interest payments on the notes and bonds, as well as principal payments on the notes, are payable semi- annually beginning with the first payment made on December 7, 1996. Principal payments on the bonds are payable semi- annually beginning June 7, 2006. In addition, these two series required Issuer Subsidiary- SSI to have $2.2 million on deposit, ($1.6 million was deposited on December 7, 1995 and $0.6 million with Series B) representing six months of debt service which will be released when either the Issuer Subsidiary- SSI or GHCL meets certain cash flow and debt to equity ratios. The debt service deposit is expected to be released to the Company in 1997 as GHCL has met the required cash flow and debt to equity ratios as of December 31, 1996.
The Company used a portion of the proceeds from the Series B financing to fund amounts owed to the Shipyard as part of the litigation settlement as discussed in Note 1. The remaining proceeds were used, in part, to pay down a portion of amounts outstanding under its revolving credit facility.
On April 22, 1996, the Company modified the total borrowing availability under its Credit Agreement. The Credit Agreement provides a revolving credit facility, subject to certain covenants, of up to $25.0 million with a final maturity on March 31, 1999. Upon the sale of the Hotel on October 16, 1996, the borrowing availability was reduced to $15.0 million and the Company will be required every calendar year to maintain a 30- day period during which the outstanding borrowings cannot exceed $7.5 million. Borrowings bear interest, at the option of the Company, equal to either (i) the greater of The Chase Manhattan Bank's prime rate or certain alternative base rates plus a margin ranging from 0% to 1.25%, or (ii) LIBOR plus a margin ranging from 1.0% to 2.25%. The Company is also required to pay a commitment fee on the unused portion of the facility at a rate ranging from 0.375% to 0.5% per annum. The Credit Agreement is guaranteed by AMCV and secured by substantially all the assets of DQSC, excluding the American Queen. The Credit Agreement contains various limitations, restrictions and financial covenants which, among other things, requires maintenance of certain financial ratios, restricts additional indebtedness, limits intercompany advances to $20.0 million and limits the payment of dividends from DQSC to AMCV to $2.0 million per annum.
For the years ended December 31, 1996 and 1995, the weighted average interest rate on outstanding borrowings was approximately 7.0% and 7.3%, respectively. As of December 31, 1996, the Company was in compliance with all covenants under its various debt agreements.

The Company believes it will have adequate access to capital resources, both internally and externally, to meet its short- term and long- term capital commitments. Such resources may include cash on hand and the ability to secure additional financing through the capital markets. The Company continually evaluates opportunities to increase capacity, particularly with regard to the American Hawaii business. In addition, the Company also evaluates opportunities to strategically grow the business. If it would elect to increase capacity or pursue a strategic business opportunity, the Company may seek to secure additional financing. Notwithstanding, there can be no assurances that the Company will choose to increase capacity or strategically grow the business, or, if it elects to do so, that it will obtain additional financing.

**NOTE 7. COMMITMENTS AND CONTINGENCIES**

The Company leases certain facilities and equipment under operating leases. The Company currently leases approximately 37,000 square feet from a partnership controlled by an affiliated company, at an annual rate of approximately $167,000. In addition, the DQSC headquarters is maintained pursuant to an assignment from local authorities. The Company paid approximately $172,000 and $174,000 under this arrangement for the years ended December 31, 1996 and 1995, respectively. This arrangement may be terminated at any time by the local authorities upon determination that a superior maritime use is deemed to exist. Rent expense for the years ended December 31, 1996, 1995 and 1994 was approximately $848,000, $854,000 and $1,082,000, respectively.

The future minimum lease commitments for the next five years under all noncancelable operating leases, including assignment payments, as of December 31, 1996 are $804,000, $579,000, $433,000, $422,000 and $425,000.

The Company is subject to litigation in the ordinary course of business. In the opinion of management, the outcome of such litigation will not have a material effect on the results of operations or financial position of the Company as most is covered by insurance, net of a deductible.

**NOTE 8. INCOME TAXES**

As stated in Note 1, the Company adopted SFAS No. 109 effective April 1, 1993 without any material effect on net income or financial position. As such, all income tax information presented below for 1996, 1995 and 1994 has been prepared pursuant to the requirements of SFAS No. 109.

The provision for income taxes consisted of (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| Current tax benefit: | | | |
| Federal......................... | $ -- | $ -- | $ -- |
| State........................... | (458) | -- | -- |
| | (458) | -- | -- |
| Deferred tax (benefit) provision: | | | |
| Federal......................... | (9,073) | (6,422) | (1,238) |
| State........................... | 1,232 | 114 | (213) |
| | (7,841) | (6,308) | (1,451) |
| Total tax benefit............... | $ (8,299) | $ (6,308) | $ (1,451) |



The (benefit) provision for income taxes differs from amounts computed by applying the U.S. statutory Federal income tax rate. The differences are summarized as follows (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| | 35% | 35% | 35% |
| Tax benefit at statutory rate.............. | $ (9,076) | $ (6,488) | $ (1,318) |
| State income taxes (net of Federal benefit) | 503 | 74 | (139) |
| Non-deductible expenses................... | 121 | 121 | 73 |
| Other..................................... | 153 | (15) | (67) |
| Total tax benefit......................... | $ (8,299) | $ (6,308) | $ (1,451) |

The tax effects of temporary differences that gave rise to significant portions of the deferred tax assets and deferred tax liabilities are presented below (in thousands):

| | December 31, | |
|---|---|---|
| Deferred tax assets: | 1996 | 1995 |
| Insurance costs and reserves........... | $ 681 | $ 442 |
| Non-recurring executive compensation... | 809 | 1,152 |
| Benefit cost accruals................. | 428 | 133 |
| Alternative minimum tax | | |
| credit carryforwards.................. | 2,196 | 2,196 |
| Drydock accruals...................... | 1,482 | -- |
| Net operating loss carryforward........ | 15,202 | 14,025 |
| Goodwill, due to basis differences..... | 1,383 | -- |
| Total deferred tax assets.............. | 22,181 | 17,948 |
| Deferred tax liabilities: | | |
| Capital construction fund.............. | 3,369 | 3,850 |
| Property plant and equipment, due to | | |
| basis differences and depreciation, net | 7,293 | 9,758 |
| Other................................. | 551 | 15 |
| Total deferred tax liabilities......... | 11,213 | 13,623 |

Net deferred tax asset................ $10,968 $ 4,325

At December 31, 1996, consolidated net operating losses of approximately $10.0 million, $30.0 million and $4.0 million expiring in 2009, 2010 and 2011, respectively, were available to offset future taxable income of the Company.
In 1993, the Company established a capital construction fund (the "CCF") pursuant to Section 607 of the Merchant Marine Act of 1936, into which it deposited approximately $12.0 million. This fund was primarily used to pay liabilities assumed in the Acquisition and allowed the Company to accelerate recognition of certain deductions for qualified capital expenditures for income tax purposes. As a result of the CCF, the Company has approximately a $2.2 million alternative minimum tax credit carryforward available with no expiration date.

**NOTE 9. RELATED PARTY**

Equity Group Investments, Inc. ("EGI") and its affiliates provided certain administrative support services for the Company, including but not limited to legal, accounting, tax and benefit services. In addition, as previously mentioned in Note 7, the Company leases office space from an affiliate of EGI. In the aggregate, the fees charged by EGI and its affiliates for such services and rent were approximately $1.5 million, $1.4 million and $2.8 million for the years ended December 31, 1996, 1995 and 1994, respectively. These arrangements with EGI and its affiliates are subject to approval by a majority of the non- affiliated members of the Company's board of directors, and are conducted on terms no less favorable to the Company than could be obtained from unaffiliated third parties.

The largest stockholder of the Company's common stock was Equity- DQSB, Inc., a wholly owned subsidiary of EGI which owns approximately 51.2% of the Company's common stock.
See Note 7 and 10 for discussion on other related party transactions.

**NOTE 10. EMPLOYEE BENEFIT PLANS**

**RETIREMENT PLANS**

The Company's non- union employees are eligible to participate in the ADVANTAGE Retirement Savings Plan (as amended and restated October 1, 1987, "ADVANTAGE Plan"), a profit- sharing plan with a salary deferral feature that qualifies under Section 401 of the Internal Revenue Code of 1986, as amended. The ADVANTAGE Plan allows participants to defer a portion of their eligible compensation on a pre- tax basis. Participant contributions are 100% vested at the time the contribution is made. Effective January 1, 1994, matching contributions are made by the Company in an amount equal to 100% of the amount of a participant's contribution with a maximum of 4% of such participant's annual eligible wages, subject to Internal Revenue Service maximums. Prior to 1994, the matching contribution was 50%. In addition, the Company may make discretionary profit- sharing contributions which are allocated to eligible employees based on eligible compensation. Company contributions vest over a five- year period. Matching and profit- sharing contributions approximated $708,000, $401,000 and $321,000 for the years ended December 31, 1996, 1995 and 1994, respectively.
The Company also contributes, under collective bargaining agreements, to funds designed to provide pension and health benefits for its union employees. The Company contributed $2,337,000, $2,312,000 and $2,291,000 to such plans for the years ended December 31, 1996, 1995 and 1994, respectively.
**EMPLOYEE STOCK PURCHASE PLAN**

The American Classic Voyages Co. 1995 Employee Stock Purchase Plan (the "ESP Plan") which commenced on July 1, 1995, allows eligible employees to purchase common stock of the Company, through payroll deductions, at a discounted price from the market price. The exercise price under the ESP Plan is deemed to be 85% of the lesser of the market value of the Company's common stock on the last business day of the offering period or the average market value during the offering period. There is a maximum of 500,000 shares authorized under the ESP Plan. There were 12,297 and 5,821

shares issued during 1996 and 1995, respectively, at an average price of $7.13 and $8.80 per share for 1996 and 1995, respectively. At December 31, 1996 and 1995, approximately 482,000 and 494,000 shares were available for offering under the ESP Plan, respectively.

**STOCK OPTION PLANS**

The Company granted, as of January 1, 1992, fully vested options to Messrs. S. Cody Engle, Patrick Fahey and Jeffrey D. Krida, the Company's then senior executive officers, to purchase up to 205,125 shares, 51,282 shares, and 153,846 shares of common stock, respectively, in lieu of bonus payments (the "Executive Stock Option Plan"). These options are exercisable, in whole or in part, at any time prior to January 2, 2002, at an exercise price of $3.25 per share. The Company recorded $4.0 million in the third quarter of fiscal 1992 as non- recurring executive compensation related to the above- mentioned options.

The Company adopted the 1992 Stock Option Plan effective January 2, 1992 (the "1992 Plan"). Pursuant to the 1992 Plan, certain officers, directors, key employees, and consultants will be offered the opportunity to acquire shares of the Company's common stock via stock option grants. In addition, the 1992 Plan provides for the granting of stock appreciation rights ("SARs"). The exercise price of options granted under the 1992 Plan cannot be less than the fair market value of the Company's common stock at the date of grant. As of December 31, 1996, 1,988,195 shares of the Company's common stock have been reserved for issuance under the 1992 Plan. Options granted under the 1992 Plan generally vest over a three- year period and expire 10 years from the date of grant. The per share weighted- average fair value of stock options granted during 1996 and 1995 was $3.48 and $3.39 on the date of grant using the Black- Scholes option- pricing model with the following weighted- average assumptions for 1996 and 1995, respectively: expected volatility of 50% and 47%, risk- free interest rates of 6.0% and 6.3%; expected lives of three years and dividend yield of 0% for both years.

In 1995, under the terms of the 1992 Plan, the Company granted SARs to key employees. All of the SARs were canceled in 1996.

During 1995, the Financial Accounting Standards Board issued SFAS No. 123, "Accounting for Stock Based Compensation," which defines a fair value based method of accounting for an employee stock option or similar equity instrument and encourages all entities to adopt that method of accounting for all of their employee stock compensation plans. However, it also allows an entity to continue to measure compensation cost for those plans using the method of accounting prescribed by APB No. 25, "Accounting for Stock Issued to Employees." Entities electing to remain with the accounting in APB No. 25 must make pro forma disclosures of net income and earnings per share, as if the fair value based method of accounting defined in this Statement has been applied.

The Company applies APB No. 25 in accounting for its plans and, accordingly, no compensation cost has been recognized for its stock options in the financial statements. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net loss and loss per share would have been increased to the pro forma amounts indicated below:

| In thousands, except per share amounts | | 1996 | 1995 |
|---|---|---|---|
| Net loss | As reported | $(17,636) | $(9,671) |
| | Pro forma | (18,033) | (9,766) |
| Loss per share | As reported | $ (1.28) | $ (0.70) |
| | Pro forma | (1.31) | (0.71) |

Pro forma net loss and loss per share reflect only options granted in 1996 and 1995. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma amounts presented above because compensation cost is reflected over the options' vesting period which is generally three years and compensation cost for options granted prior to January 1, 1995 is not considered.

The table below summarizes the activity for 1994, 1995 and 1996:

| Executive Stock Option Plan Shares Subject to Options | 1992 Plan Shares Subject to Options | 1992 Plan Shares Subject to SARs | Weighted-Average Exercise Price |
|---|---|---|---|

HMS0096671

| | | | | |
|---|---|---|---|---|
| Balance at December 31, 1993 | 360,253 | 989,410 | -- | $13.02 |
| Options granted............ | -- | 229,500 | -- | 18.88 |
| Options canceled........... | -- | (4,417) | -- | 15.93 |
| Options exercised.......... | (36,282) | (500) | -- | 3.39 |
| Balance at December 31, 1994 | 323,971 | 1,213,993 | -- | 14.11 |
| Options granted............ | -- | 245,000 | 280,000 | 11.11 |
| Options canceled........... | -- | (279,583) | -- | 15.34 |
| Balance at December 31, 1995 | 323,971 | 1,179,410 | 280,000 | 13.04 |
| Options granted............ | -- | 895,680 | -- | 9.50 |
| Options canceled........... | -- | (582,668) | (280,000) | 15.36 |
| Options exercised.......... | (85,840) | -- | -- | 3.25 |
| Balance at December 31, 1996 | 238,131 | 1,492,422 | -- | 10.54 |

The following table summarizes information about options outstanding at December 31, 1996:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Price | Outstanding at 12/31/96 | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Exercisable at 12/31/96 | Weighted-Average Exercise Price |
| $3.25 | 238,131 | 5 | $ 3.25 | 238,131 | $ 3.25 |
| 7.97 - 9.98 | 562,680 | 10 | 8.99 | 38,333 | 8.14 |
| 10.25 - 15.00 | 631,017 | 9 | 11.50 | 267,684 | 12.08 |
| 15.32 - 20.00 | 298,725 | 7 | 17.22 | 282,058 | 17.33 |
| $3.25 - $20.00 | 1,730,553 | 8 | $10.54 | 826,206 | $11.14 |

## NOTE 11. UNAUDITED QUARTERLY RESULTS OF OPERATIONS

Summarized unaudited quarterly results of operations for 1996 and 1995 are as follows:

Year Ended December 31, 1996
(Amounts in thousands, except per share data)

| | March 31, 1996 | June 30, 1996 | September 30, 1996 | December 31, 1996 |
|---|---|---|---|---|
| Revenues.................................. | $41,945 | $49,305 | $50,059 | $50,233 |
| Gross profit.............................. | 13,556 | 17,721 | 17,950 | 18,636 |
| Operating (loss) income.................... | (41,784) | 2,323 | 4,834 | 4,162 |
| Pre-tax (loss) income...................... | (43,668) | 329 | 3,029 | 14,375 |
| Net (loss) income.......................... | (43,271) | 381 | 2,851 | 22,403(a) |
| (Loss) earnings per share.................. | (3.14) | 0.03 | 0.21 | 1.62 |

<CAPTION>

Year Ended December 31, 1995

| (Amounts in thousands, except per share data) | March 31, 1995 | June 30, 1995 | September 30, 1995 | December 31, 1995 |
|---|---|---|---|---|
| Revenues.................................. | $44,253 | $45,731 | $51,964 | $47,873 |
| Gross profit.............................. | 7,941 | 9,366 | 18,662 | 15,926 |
| Operating (loss) income.................... | (7,599) | (12,092) | 4,185 | 971 |
| Pre-tax (loss) income before minority interest.......................... | (7,347) | (12,136) | 1,754 | (808) |
| Net (loss) income.......................... | (4,037) | (7,484) | 1,653 | 197 |
| (Loss) earnings per share.................. | (0.29) | (0.55) | 0.12 | 0.01 |

The sum of quarterly (loss) earnings per common share may differ from full- year amounts due to changes in the number of shares outstanding during the year.

(a) Includes a year- to- date tax adjustment of the federal tax benefit related to the first quarter impairment write- down.

HMS0096672

Schedule I

AMERICAN CLASSIC VOYAGES CO.

CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY)
BALANCE SHEETS

(AMOUNTS IN THOUSANDS)

| | December 31, 1996 | December 31, 1995 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents................. | $ 1,945 | $ 407 |
| Prepaid expenses and other current assets. | 219 | 91 |
| Property and equipment, net............... | 1,920 | 43 |
| Investment in and advances to subsidiaries | 57,403 | 78,958 |
| | $ 61,487 | $79,499 |
| LIABILITIES | | |
| Other liabilities......................... | $ 6,505 | $ 8,086 |
| STOCKHOLDERS' EQUITY | | |
| Common stock.............................. | 139 | 138 |
| Paid-in capital........................... | 75,252 | 74,048 |
| Accumulated deficit....................... | (20,409) | (2,773) |
| Total stockholders' equity................ | 54,982 | 71,413 |
| | $ 61,487 | $79,499 |

See accompanying notes to Condensed Financial Statements.

Schedule I

AMERICAN CLASSIC VOYAGES CO.

CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)
STATEMENTS OF INCOME

(AMOUNTS IN THOUSANDS)

| | Years Ended December 31, 1996 | 1995 | 1994 |
|---|---|---|---|
| Miscellaneous revenues.......... | $ 16 | $ 4,492 | $ 475 |
| Depreciation expense............ | (793) | -- | -- |
| Income tax benefit (expense).... | 295 | (1,752) | (182) |
| Equity in losses of subsidiaries | (17,154) | (12,411) | (1,276) |
| Net loss........................ | $ (17,636) | $ (9,671) | $ (983) |

See accompanying notes to Condensed Financial Statements.

Schedule I

AMERICAN CLASSIC VOYAGES CO.
CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)
STATEMENTS OF CASH FLOWS
(AMOUNTS IN THOUSANDS)

| | Years Ended December 31, 1996 | 1995 | 1994 |
|---|---|---|---|
| OPERATING ACTIVITIES | | | |
| Net loss.......................................... | $ (17,636) | $(9,671) | $ (983) |
| ADJUSTMENTS TO RECONCILE NET LOSS TO NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | | | |
| Depreciation...................................... | 793 | -- | -- |
| Equity in earnings of subsidiaries, net........... | 17,154 | 12,411 | 1,276 |
| Dividends received from subsidiaries.............. | -- | 1,100 | -- |
| Decrease (increase) in advances to subsidiaries.... | 1,817 | (5,594) | (17,295) |
| Prepaid expenses and other........................ | (128) | (91) | -- |
| (Decrease) increase in other liabilities.......... | (743) | 2,870 | 788 |
| Net cash provided by (used in) operating activities | 1,257 | 1,025 | (16,214) |
| INVESTING ACTIVITIES | | | |
| Investment in subsidiaries........................ | -- | -- | (15,000) |
| Capital expenditures.............................. | (87) | (43) | -- |
| Net cash used in investing activities............. | (87) | (43) | (15,000) |
| FINANCING ACTIVITIES | | | |
| Issuance of common stock.......................... | 368 | 80 | 148 |
| Dividends......................................... | -- | (1,101) | (2,199) |
| Net cash provided by (used in) financing activities | 368 | (1,021) | (2,051) |
| Increase (decrease) in cash and cash equivalents... | 1,538 | (39) | (33,265) |
| Cash and cash equivalents, beginning of period..... | 407 | 446 | 33,711 |
| Cash and cash equivalents, end of period.......... | $ 1,945 | $ 407 | $ 446 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Cash refunded during the period for: | | | |
| Income taxes...................................... | $ -- | $ 633 | $ -- |
| Non-cash investing activities: | | | |
| Conversion of advances to subsidiaries into investment in subsidiaries....................... | $ 30,000 | $14,000 | $ -- |

See accompanying notes to Condensed Financial Statements.

Schedule I

**AMERICAN CLASSIC VOYAGES CO.**

**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)**

**BASIS OF PRESENTATION**

In May 1994, the stockholders of The Delta Queen Steamboat Co. approved a change to the company's name to American Classic Voyages Co. (along with its subsidiaries, the "Company"). In connection with the name change, DQSC- 2, Inc., a subsidiary of the Company, adopted the name "The Delta Queen Steamboat Co."
**("DQSC").**

The Condensed Financial Information of American Classic Voyages Co. ("AMCV") has been prepared pursuant to Securities and Exchange Commission ("SEC") rules and regulations and should be read in conjunction with the Consolidated Financial Statements and Notes thereto for the years ended December 31, 1996, 1995 and 1994 included herein this Form 10- K. The balance sheets as of December 31, 1996 and 1995, respectively, and the related statements of income and cash flows have been prepared on an unconsolidated basis. AMCV's investment in its subsidiaries is recorded on the equity basis. In March 1992, AMCV completed the sale of 4,140,000 shares of common stock at an initial public offering price of $13.50 per share. In December 1993, AMCV sold an aggregate of 2,760,000 shares of its $0.01 par value common stock at a public offering price of $16.00 per share.

**DIVIDENDS FROM SUBSIDIARIES**

Cash dividends paid to AMCV by its consolidated subsidiaries were as follows (in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| Dividends received from subsidiaries | $ -- | $ 1.1 | $ -- |

**COMMITMENTS**

AMCV has guaranteed the credit agreement between one of its subsidiaries and a group of financial institutions which provides for a borrowing facility to such subsidiary for general corporate purposes. For information related to this credit agreement, see Note 6 of "Notes to Consolidated Financial Statements" included herein this Form 10- K.
The Federal Maritime Commission ("FMC") regulates passenger vessels with 50 or more berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. The Company has been approved as a self- insurer by the FMC, and therefore, subject to continued approval, is not required to post security for passenger cruise deposits. The FMC has recently reviewed its standards and in June 1996 issued proposed regulations to increase the financial responsibility requirements. The Company filed its position on the proposals, as it believes that the FMC's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. If implemented, these proposed regulations would be phased in over time and, among other things, require operators qualifying as a self- insurer, such as the Company, to satisfy a working capital test, in addition to the existing net worth test, and to provide third- party coverage for 25% of its unearned passenger revenue in the form of a surety bond or similar instrument. At this time, the Company cannot predict if the proposed changes will be approved as currently constituted, or at all. If they are implemented, the proposed changes would require that the Company establish a bond to cover a portion of its passenger deposits and payments, which may impact the Company's liquidity.

**AMERICAN CLASSIC VOYAGES CO.**

**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)**

INCOME TAXES - (Continued)

AMCV has also entered into tax sharing agreements with its subsidiaries which require each subsidiary to compute its Federal income tax liability on a separate company basis and to pay amounts so computed to AMCV. Amounts AMCV

remitted to and received from subsidiaries under the subsidiary tax sharing agreements were as follows (in millions):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1996 | 1995 | 1994 |
| Tax sharing received from the subsidiaries | $ -- | $ 3.4 | $ -- |
| Tax sharing paid to the subsidiaries...... | -- | (3.3) | -- |
| Net cash retained by AMCV................. | $ -- | $ 0.1 | $ -- |

In 1993, AMCV established a capital construction fund ("CCF") pursuant to section 607 of the Merchant Marine Act of 1936. The CCF allows AMCV to accelerate recognition of Federal income tax deductions for capital expenditures related to the American Hawaii vessels. A substantial portion of the income generated by AMCV is eligible for deposit into the CCF; however, expenditures for the vessels of DQSC are not qualified for this tax treatment. As such, on a consolidated tax return basis, AMCV was able to obtain the accelerated deduction treatment on a substantial portion of its taxable income.

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS**

**EXHIBIT NUMBER DESCRIPTION**

**2.(d)(1) Purchase Agreement among Blackland Vistas, Inc. and Great AQ Steamboat Co. as seller and Thayer Hotel Investments L.P. as purchaser (filed as Exhibit 2. to the Company's Form 8- K dated August 22, 1996 and incorporated herein by reference).

**2.(d)(2) Profit Participation Agreement made as of October 16, 1996 by and between THI FQ L.P. and Great AQ Steamboat Co. (filed as Exhibit 2.(d)(1) to the Company's Form 8- K dated October 31, 1996 and incorporated herein by reference).

**2.(d)(3) Preferred Provider Agreement executed as of October 16, 1996 by The Delta Queen Steamboat Co. and THI FQ L.P. (filed as Exhibit 2.(d)(2) to the Company's Form 8- K dated October 31, 1996 and incorporated herein by reference).

**3.(i) Amended and Restated Certificate of Incorporation of the Company (filed on January 17, 1992 as Exhibit 3.(a) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**3.(ii) By- Laws of the Company (filed on March 31, 1995 as Exhibit 3.(ii) to the Company's Form 10- K dated December 31, 1994 and incorporated herein by reference).

**4.(i) Proof of Common Stock Certificate (filed on February 14, 1992 as Exhibit 4.(i) to Amendment No. 2 to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**4.(ii)(a)(4) Stock Pledge Agreement dated as of August 3, 1993, by and between the Company and Chemical Bank, as agent for the Lenders (the "Agent") (filed on September 17, 1993 as Exhibit 4.(ii)(a)(9) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

**4.(ii)(a)(5) Stock Pledge Agreement dated as of August 3, 1993, by and between The Delta Queen Steamboat Co. and the Agent (filed on September 17, 1993 as Exhibit 4.(ii)(a)(10) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).
**4.(ii)(a)(6) Guaranty dated as of August 3, 1993, made by the Company, Creative Endeavors, Inc., Delta Queen Steamboat Development, Inc., Cruise America Travel, Incorporated, Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., Great River Transportation Co. and Blackland Vistas, Inc., in favor of the Lenders and the Agent (filed on September 17, 1993 as Exhibit 4.(ii)(a)(11) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).
**4.(ii)(a)(7) Security Agreement dated as of March 31, 1995, by and between the Company and the Agent (filed on May 15, 1995 as Exhibit 4.(ii)(a)(12) to the Company's Form 10- Q dated March 31, 1995 and incorporated herein by reference).
The following entities have entered into a security agreement with the Agent which is substantially identical in all material respects to the Security Agreement filed as Exhibit 4.(ii)(a)(12) to the Company's Form 10- Q dated March 31, 1995:

(i) The Delta Queen Steamboat Co.;
(ii) Blackland Vistas, Inc.;
(iii) Creative Endeavors, Inc.;
(iv) Delta Queen Steamboat Development, Inc.;
(v) Great River Transportation Co.;
(vi) Great Ocean Cruise Line, Inc.;
(vii) Cruise America Travel, Incorporated;
(viii) Great River Cruise Line, Inc.; and
(ix) AMCV Development Corp.

**4.(ii)(a)(8) Preferred Ship Mortgage dated August 3, 1993, executed by Great River Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $65,000,000 (filed on September 17, 1993 as Exhibit 4.(ii)(a)(13) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

**4.(ii)(a)(9) Preferred Ship Mortgage dated August 3, 1993, executed by Great Ocean Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $65,000,000 (filed on September 17, 1993 as Exhibit 4.(ii)(a)(14) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

**4.(ii)(a)(12) Multiple Indebtedness Mortgage, Pledge and Assignment of Leases and Proceeds and Security Agreement dated August 3, 1993, made by Blackland Vistas, Inc. in favor of the Agent (filed on September 17, 1993 as Exhibit 4.(ii)(a)(17) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

**4.(ii)(a)(13) Master Amendment to the Collateral Documents dated March 31, 1995, executed by the Delta Queen Steamboat Co., the Company, Creative Endeavors, Inc., Cruise America Travel, Incorporated, Great River Transportation Co., Delta Queen Steamboat Development, Inc., Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., Blackland Vistas, Inc., Great Hawaiian Cruise Line, Inc., and AMCV Development Corp. and the Agent for the benefit of the Agent and the Lenders in connection with the Amended and Restated Credit Agreement dated March 31, 1995 (filed on May 15, 1995 as Exhibit 4.(ii)(a)(19) to the Company's Form 10- Q dated March 31, 1995 and incorporated herein by reference).
**4.(ii)(a)(14) Amendment to Preferred Ship Mortgage dated March 31, 1995 executed by Great River Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $80,000,000 (filed on May 15, 1995 as Exhibit 4.(ii)(a)(20) to the Company's Form 10- Q dated March 31, 1995 and incorporated herein by reference).
**4.(ii)(a)(15) Amendment to Preferred Ship Mortgage dated March 31, 1995 executed by Great Ocean Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $80,000,000 (filed on May 15, 1995 as Exhibit 4.(ii)(a)(21) to the Company's Form 10- Q dated March 31, 1995 and incorporated herein by reference).
**4.(ii)(a)(16) Third Amended and Restated Credit Agreement dated as of April 22, 1996, among The Delta Queen Steamboat Co., as Borrower, and the Company, as Parent, the financial institutions from time to time a party hereto (collectively, the "Lenders") and Chemical Bank, as the Lenders' agent ("Agent") and Hibernia Bank as Co- Agent (filed on May 15, 1996 as Exhibit 4.(ii)(a)(16) to the Company's Form 10- Q dated March 31, 1996 and incorporated herein by reference).
**4.(ii)(a)(19) $11,000,000.00 Third Amended and Restated Revolving Loan Note dated April 22, 1996, by and between The Delta Queen Steamboat Co. and Chemical Bank (filed on May 15, 1996 as Exhibit 4.(ii)(19) to the Company's Form 10- Q dated March 31, 1996 and incorporated herein by reference).
The following Third Amended and Restated Loan Notes, each dated April 22, 1996 and executed by The Delta Queen Steamboat Co., as Borrower, are substantially identical in all material respects to the Third Amended and Restated Revolving Loan Note filed as Exhibit 4.(ii)(a)(3), except as to the named Lender and the stated amount, which are set forth below:

| LENDER | AMOUNT |
|---|---|
| Hibernia National Bank | $10,000,000.00 |
| Deposit Guaranty National Bank | $ 4,000,000.00 |

**4.(ii)(a)(20) Second Master Amendment to the Collateral Documents dated August 31, 1995, executed by The Delta Queen Steamboat Co., the Company, Creative Endeavors, Inc., Cruise America Travel, Incorporated, Great River Transportation Co., Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., and Blackland Vistas, Inc., and the Agent for the benefit of the Agent and the Lenders in connection with the Amended and Restated Credit Agreement dated March 31, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(a)(20) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(a)(21) Second Amendment to Preferred Ship Mortgage dated August 31, 1995 executed by Great River Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $40,000,000.00 (filed on November 14, 1995 as Exhibit 4.(ii)(a)(21) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(a)(22) Second Amendment to Preferred Ship Mortgage dated August 31, 1995 executed by Great Ocean Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $40,000,000.00 (filed on November 14, 1995 as Exhibit 4.(ii)(a)(22) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(a)(23) Third Master Amendment to the Collateral Documents dated April 22, 1996, executed by The Delta Queen Steamboat Co., the Company, Cruise America Travel, Incorporated, Great River Transportation Co., Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., and Blackland Vistas, Inc., and the Agent for the benefit of the Agent and the Lenders in connection with the Amended and Restated Credit Agreement dated March 31, 1995 (filed on May 15, 1996 as Exhibit 4.(ii)(a)(23) to the Company's Form 10- Q dated March 31, 1996 and incorporated herein by reference).

**4.(ii)(a)(24) Third Amendment to Preferred Ship Mortgage dated April 22, 1996 executed by Great River Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $25,000,000.00 (filed on May 15, 1996 as Exhibit 4.(ii)(a)(24) to the Company's Form 10- Q dated March 31, 1996 and incorporated herein by reference).

**4.(ii)(a)(25) Third Amendment to Preferred Ship Mortgage dated April 22, 1996 executed by Great Ocean Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $25,000,000.00 (filed on May 15, 1996 as Exhibit 4.(ii)(a)(25) to the Company's Form 10- Q dated March 31, 1996 and incorporated herein by reference).

**4.(ii)(a)(26) Acknowledgment of Trust Indenture dated as of April 22, 1996 entered into by and among Great River Cruise Line, Inc. and Chemical Bank as Agent for the Lenders (filed as Exhibit 4.(ii)(a)(26) to the Company's Form 10- Q dated June 30, 1996 and incorporated herein by reference).

**4.(ii)(a)(27) Acknowledgment of Trust Indenture dated as of April 22, 1996 entered into by and among Great Ocean Cruise Line, Inc. and Chemical Bank as Agent for the Lenders (filed as Exhibit 4.(ii)(a)(27) to the Company's Form 10- Q dated June 30, 1996 and incorporated herein by reference).

**4.(ii)(c)(1) Commitment to Guaranty Obligations by the United States of America accepted by Great AQ Steamboat Co. dated as of August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(1) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(2) Great AQ Steamboat Co. United States Government Guaranteed Ship Financing Obligations, American Queen Series Purchase Agreement dated August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(2) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(3) Trust Indenture relating to United States Government Guaranteed Ship Financing Obligations, American Queen Series, between Great AQ Steamboat Co. and the Bank of New York, dated as of August 24, 1995 (the "Trust Indenture") along with Schedule A and Exhibit 1 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(3) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(4) Form of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, American Queen Series (filed on November 14, 1995 as Exhibit 4.(ii)(c)(4) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(5) Form of 2020 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, American Queen Series (filed on November 14, 1995 as Exhibit 4.(ii)(c)(5) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(6) Authorization Agreement between the United States of America as represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great AQ Steamboat Co. dated as of August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(6) to the Company's Form 10- Q dated September 30,

1995 and incorporated herein by reference).

**4.(ii)(c)(7) Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great AQ Steamboat Co. and the United States of America dated as of August 24, 1995 (the "Security Agreement") along with Exhibit 1 and the Schedule of Definitions (filed on November 14, 1995 as Exhibit 4.(ii)(c)(7) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(c)(8) $60,589,000 Promissory Note dated August 24, 1995 by and between Great AQ Steamboat Co. and the United States of America (filed on November 14, 1995 as Exhibit 4.(ii)(c)(8) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(c)(9) Title XI Reserve Fund and Financial Agreement among Great AQ Steamboat Co. and the United States of America dated as of August 24, 1995 along with the General Provisions (filed on November 14, 1995 as Exhibit 4.(ii)(c)(9) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(10) Guaranty Agreement dated August 24, 1995 made by the Delta Queen Steamboat Co. in favor of the United States of America (filed on November 14, 1995 as Exhibit 4.(ii)(c)(10) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(d)(1) Commitment to Guaranty Obligations by the United States of America Accepted by Great Independence Ship Co. dated as of December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(1) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(2) Great Independence Ship Co. United States Government Guaranteed Ship Financing Obligations, Independence Series A Purchase Agreement dated December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(2) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(3) Trust Indenture relating to United States Government Guaranteed Ship Financing Obligations, Independence Series A, between Great Independence Ship Co. and the Bank of New York, dated as of December 7, 1995 (the "Trust Indenture") along with Schedule A and Exhibit 1 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(3) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(4) Forms of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States

Government Guaranteed Ship Financing Obligation,

Independence Series A (filed on April 1, 1996 as Exhibit 4.(ii)(d)(4) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(5) Forms of 2015 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, Independence Series A (filed on April 1, 1996 as Exhibit 4.(ii)(d)(5) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(6) Authorization Agreement between the United States of America represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great Independence Ship Co. dated as of December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(6) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(7) Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great Independence Ship Co. and the United States of America dated as of December 7, 1995 (the "Security Agreement") along with Exhibit 1 and the Schedule of Definitions (filed on April 1, 1996 as Exhibit 4.(ii)(d)(7) to the Company's Form 10- K dated December 31, 1995).

**4.(ii)(d)(8) $26,429,000 Promissory Note dated December 7, 1995 by and between Great Independence Ship Co. and the United States of America (filed on April 1, 1996 as Exhibit 4.(ii)(d)(8) to the Company's Form 10- K dated December 31, 1995).

**4.(ii)(d)(9) Title XI Reserve Fund and Financial Agreement between Great Independence Ship Co. and the United States of America dated as of December 7, 1995 along with the General Provisions (filed on April 1, 1996 as Exhibit 4.(ii)(d)(9) to the Company's Form 10- K dated December 31, 1995).

**4.(ii)(d)(10) Guaranty and Security Agreement dated December 7, 1995 made by the Great Independence Ship Co., Great Hawaiian Cruise Line, Inc. and Great Hawaiian Properties Corporation in favor of the United States of America (filed on April 1, 1996 as Exhibit 4.(ii)(d)(10) to the Company's Form 10- K dated December 31, 1995).

**4.(ii)(d)(11) Amendment to Commitment to Guarantee Obligations by the United States of America Accepted by Great Independence Ship Co. dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(11) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(12) Great Independence Ship Co. United Stated Government Guaranteed Ship Financing Obligations, Independence Series B Purchase Agreement dated March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(12) to the Company's Form 10-Q dated March 31, 1996).

**4.(ii)(d)(13) Supplemental Indenture No. 1 relating to United States Government Guaranteed Ship Financing Obligations, Independence Series B, between Great Independence Ship Co. and the Bank of New York, dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(13) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(14) Form of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, Independence Series B (filed on May 15, 1996 as Exhibit 4.(ii)(d)(14) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(15) Form of 2015 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, Independence Series B (filed on May 15, 1996 as Exhibit 4.(ii)(d)(15) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(16) Amendment No. 1 to Authorization Agreement between the United States of America represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great Independence Ship Co. dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(16) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(17) Amendment No. 1 to Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great Independence Ship Co. and the United States of America dated as of March 28, 1996 (the "Security Agreement") (filed on May 15, 1996 as Exhibit 4.(ii)(d)(17) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(18) Endorsement to $6,903,000 Promissory Note dated March 28, 1996 by and between Great Independence Ship Co. and the United States of America (filed on May 15, 1996 as Exhibit 4.(ii)(d)(18) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(19) Amendment No. 1 to Title XI Reserve Fund and Financial Agreement between Great AQ Steamboat Co. and the United States of America effective as of January 1, 1996 (filed on August 14, 1996 as Exhibit 4.(ii)(d)(19) to the Company's Form 10- Q dated June 30, 1996).

9. Not applicable.

**10.(i)(a)(1) Tax Sharing Agreement dated August 3, 1993 by and between the Company and Great Hawaiian Cruise Line, Inc. (filed on September 17, 1993 as Exhibit 10.(i)(a)(1) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

**10.(i)(a)(2) Tax Sharing Agreement dated August 3, 1993 by and between the Company and The Delta Queen Steamboat Co. (filed on September 17, 1993 as Exhibit 10.(i)(a)(2) to the Company's Registration Statement on Form S- 1 (Registration No.

33- 68996) and incorporated herein by reference).

**10.(i)(a)(3) Tax Sharing Agreement dated August 3, 1993 by and among the Company, The Delta Queen Steamboat Co., and Creative Endeavors, Inc. (filed on September 17, 1993 as Exhibit 10.(i)(a)(3) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

The following entities have entered into a Tax Sharing Agreement with the Company and The Delta Queen Steamboat Co., which is substantially identical in all material respects to the Tax Sharing Agreement filed hereunder as Exhibit 10.(i)(a)(3):

(i) Delta Queen Steamboat Development, Inc.;
(ii) Great River Transportation Co.;
(iii) Great River Cruise Line, Inc.;
(iv) Great Ocean Cruise Line, Inc.; and
(v) Cruise America Travel, Inc.

**10.(ii)(A)(1) Administrative Services Agreement by and between the Company and Equity Group Investments, Inc. (filed on March 2, 1993 as Exhibit 10.(i)(A) to Amendment No. 3 to the Company's Registration Statement on Form S- 1 (Registration No.

33- 45139) and incorporated herein by reference).

**10.(ii)(B)(1) Contract Air/Sea Fare and Marketing Agreement dated as of January 21, 1994 among American Airlines, Inc. and Great Hawaiian Properties Corporation, d.b.a. American Hawaii Cruises (filed as Exhibit 10.(ii)(B)(1) to the Company's Form 10- K dated March 31, 1994 and incorporated herein by reference).

**10.(ii)(D)(2) Preferential Assignment Agreement dated September 27, 1984, by and between the Board of Commissioners of the Port of New Orleans and the Company, including Assignment thereof and Amendments thereto (filed on January 17, 1992 as Exhibit 10.(ii)(D)(2) to the Company's Registration Statement on Form S-1 (Registration No. 33-45139) and incorporated herein by reference).

**10.(ii)(D)(3) Lease by and between Equity Office Properties, Inc. as agent for Beneficial Owner and Great Hawaiian Properties Corporation dated May 30, 1995 (filed on April 1, 1996 as Exhibit 10.(ii)(D)(3) to the Company's Form 10-K dated December 31, 1995).

**10.(ii)(D)(6) Lease dated May 31, 1993 by and between Hawaii Press Newspapers, Inc. and American Global Line, Inc. for the property located at 2100 North Nimitz, Honolulu, Hawaii (filed on September 17, 1993 as Exhibit 10.(ii)(D)(5) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).
**10.(iii)(A)(1) American Classic Voyages Co. 1992 Stock Option Plan (as amended) (filed on January 17, 1992 as Exhibit

10.(iii)(A)(1) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**10.(iii)(A)(2) Performance Management Objectives Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(A)(2) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**10.(iii)(A)(3) Discretionary Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(A)(3) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(4) Executive Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(A)(4) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(5) Advantage Retirement Savings Plan, as amended and further restated effective October 1, 1987, including Amendment thereto (filed on January 17, 1992 as Exhibit 10.(iii)(A)(5) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**10.(iii)(A)(6) American Classic Voyages Co. S. Cody Engle Stock Option Agreement (filed on January 17, 1992 as Exhibit 10.(iii)(A)(6) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(7) American Classic Voyages Co. Jeffrey D. Krida Stock Option Agreement (filed on February 7, 1992 as Exhibit 10.(iii)(A)(7) to Amendment No. 1 to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**10.(iii)(A)(8) Letter dated January 3, 1992 regarding Severance Agreement with Jeffrey D. Krida (filed on January 17, 1992 as Exhibit 10.(iii)(A)(10) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(10) American Classic Voyages Co. Dividend Reinvestment and Common Stock Purchase Plan (filed on June 22, 1994 as part of the Company's Registration Statement on Form S- 3 (Registration No. 33- 80614) and incorporated herein by reference).
**10.(iii)(A)(11) American Classic Voyages Co. 1995 Employee Stock Purchase Plan (filed on May 17, 1995 as part of the Company's Registration Statement on Form S- 8 (Registration No. 33- 92382) and incorporated herein by reference).

11. Not applicable.
12. Not applicable.
13. Not applicable.
16. Not applicable.

18. Not applicable.
21. Subsidiaries of the Company.
22. Not applicable.
23. Consent of KPMG Peat Marwick LLP.
24. Not applicable.
26. Not applicable.
27. Financial Data Schedule.
28. Not applicable.

**Previously filed.

**EXHIBIT 21**

**SUBSIDIARIES OF**

**AMERICAN CLASSIC VOYAGES CO.**

| Name of Subsidiary | Jurisdiction Under Which Organized | Percentage of Ownership |
|---|---|---|
| The Delta Queen Steamboat Co. | Delaware | 100% |
| DQSB II, Inc. | Delaware | (1) |
| Cruise America Travel, Inc. | Delaware | (1) |
| Great River Cruise Line, L.L.C. | Delaware | (2) |
| Great Ocean Cruise Line, L.L.C. | Delaware | (2) |
| Great AQ Steamboat, L.L.C. | Delaware | (2) |
| Great Hawaiian Cruise Line, Inc. | Delaware | 100% |
| Great Independence Ship Co. | Delaware | (3) |
| Great Constitution Ship Co. | Delaware | (3) |
| Great Hawaiian Properties Corporation | Delaware | (3) |
| American Hawaii Properties Corporation | Delaware | (3) |
| CAT II, Inc. | Delaware | (3) |

(1) 100% owned subsidiaries of The Delta Queen Steamboat Co. (2) 99% owned subsidiaries of The Delta Queen Steamboat Co. (3) 100% owned subsidiaries of Great Hawaiian Cruise Line, Inc.

**EXHIBIT 23**

Consent of Independent Auditors

The Board of Directors and Stockholders
American Classic Voyages Co.
We consent to incorporation by reference in the registration statement No. 33- 80614 on Form S- 3 and No. 33- 92382 on Form S- 8 of American Classic Voyages Co. of our report dated February 19, 1997, relating to the consolidated balance sheets of American Classic Voyages Co. and subsidiaries as of December 31, 1996 and 1995, and the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the years in the three- year period ended December 31, 1996, and the related financial statement schedule, which report appears in the December 31, 1996 annual report on Form 10- K of American Classic Voyages Co.

/s/ KPMG Peat Marwick LLP
KPMG Peat Marwick LLP

Chicago, Illinois
March 26, 1997

<ARTICLE> 5
<MULTIPLIER> 1,000
<PERIOD-TYPE> 12-MOS
<FISCAL-YEAR-END> DEC-31-1996
<PERIOD-END> DEC-31-1996
<CASH> 20,865<F1>

<SECURITIES> 0
<RECEIVABLES> 3,734
<ALLOWANCES> 0
<INVENTORY> 0
<CURRENT-ASSETS> 32,239
<PP&E> 211,520
<DEPRECIATION> 44,637
<TOTAL-ASSETS> 211,864
<CURRENT-LIABILITIES> 70,984
<BONDS> 85,898
<PREFERRED-MANDATORY> 0
<PREFERRED> 0
<COMMON> 139
<OTHER-SE> 54,843
<TOTAL-LIABILITY-AND-EQUITY> 211,864
<SALES> 0
<TOTAL-REVENUES> 191,542
<CGS> 0
<TOTAL-COSTS> 123,679
<OTHER-EXPENSES> 38,390
<LOSS-PROVISION> 0
<INTEREST-EXPENSE> 8,111
<INCOME-PRETAX> (25,935)
<INCOME-TAX> (8,299)
<INCOME-CONTINUING> (17,636)
<DISCONTINUED> 0
<EXTRAORDINARY> 0
<CHANGES> 0
<NET-INCOME> (17,636)
<EPS-PRIMARY> (1.28)
<EPS-DILUTED> (1.28)
<FN>
<F1>Includes restricted short-term investments of $2,957.
</FN>

# Exhibit 69

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
FORM 10-K
[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934 (FEE REQUIRED)
FOR THE YEAR ENDED DECEMBER 31, 2000
OR

**[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE**

**SECURITIES EXCHANGE ACT OF 1934 (NO FEE REQUIRED)**

**COMMISSION FILE NUMBER: 0- 9264**

**AMERICAN CLASSIC VOYAGES CO.**

(Exact name of registrant as specified in its charter)

**DELAWARE 31- 0303330**

(State or other jurisdiction of (I.R.S. Employer Identification No.) incorporation or organization)
**TWO NORTH RIVERSIDE PLAZA, CHICAGO, ILLINOIS 60606**
(Address of principal executive offices) (Zip Code)
(312) 258- 1890

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: NONE
Securities registered pursuant to Section 12(g) of the Act:

**COMMON STOCK, $.01 PAR VALUE**

(Title of Class)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S- K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10- K or any amendment to this Form 10- K. [ ]
The aggregate market value of voting stock held by non- affiliates of the registrant was $221.4 million based upon the last reported sale price of $16.25 per share on February 28, 2001 on The NASDAQ Stock Market. Using beneficial ownership of stock rules adopted pursuant to Section 13 of the Securities Exchange Act of 1934, certain persons designated as affiliates for purposes of this computation may not be held to be affiliates upon judicial determination.

As of February 28, 2001, there were 21,027,923 shares of Common Stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE:

PART III -- Portions of the registrant's definitive Proxy Statement, which will be filed with the Securities and Exchange Commission by April 27, 2001.

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX**

ITEM DESCRIPTION PAGE
Part I
Item 1 -- Business.................................................................. 3

Item 2 -- Properties........................................................ 13
Item 3 -- Legal Proceedings................................................. 14
Item 4 -- Submission of Matters to a Vote of Security Holders.............. 14

Part II

Item 5 -- Market for Registrant's Common Equity and Related Stockholder Matters.............................. 15
Item 6 -- Selected Financial Data........................................... 16
Item 7 -- Management's Discussion and Analysis of Financial Condition and Results of Operations............................ 17
Item 7A -- Quantitative and Qualitative Disclosures About Market Risk....... 23
Item 8 -- Financial Statements and Supplementary Data....................... 24
Item 9 -- Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.................................. 49

Part III

Item 10 -- Directors and Executive Officers of the Registrant............... 49
Item 11 -- Executive Compensation........................................... 49
Item 12 -- Security Ownership of Certain Beneficial Owners and Management.................................................... 49
Item 13 -- Certain Relationships and Related Transactions................... 49

Part IV

Item 14 -- Exhibits, Financial Statement Schedules, and Reports on Form 8-K............................................. 49

AMERICAN CLASSIC VOYAGES CO.

PART I

ITEM 1. BUSINESS

## GENERAL

American Classic Voyages Co. ("the Company") is the leading provider of overnight passenger cruises among the Hawaiian Islands and on the inland rivers and coastal waterways of North America. We currently operate four cruise lines under the names American Hawaii Cruises, The Delta Queen Steamboat Co., Delta Queen Coastal Voyages and United States Lines. American Hawaii, acquired in August 1993, operates the S.S. Independence, a U.S.- flagged ocean liner with 860 total passenger berths. American Hawaii provides inter- island cruises on a year- round basis among the Hawaiian Islands. The Delta Queen Steamboat Co. currently operates the Delta Queen, American Queen and Mississippi Queen, U.S.- flagged paddlewheel steamboats having 1,026 total passenger berths, and, as of May 27, 2000 introduced a fourth riverboat, the Columbia Queen, which has 157 passenger berths. This new vessel added the Columbia River system of the Pacific Northwest to Delta Queen's previously existing set of cruise vacations on the Mississippi, Ohio, Cumberland, Tennessee, Arkansas, Illinois and Atchafalaya Rivers. Delta Queen Coastal Voyages will operate the cv Cape May Light and cv Cape Cod Light, currently scheduled to be introduced in May and the fourth quarter of 2001 respectively. These new vessels will offer cruises along U.S. coastal waterways. United States Lines currently operates the ms Patriot, a 1,212- passenger vessel which was acquired from Holland America Line on October 18, 2000 and put into service on December 9, 2000. The ms Patriot offers seven- day cruise vacations throughout the Hawaiian Islands, sailing from Oahu to Kauai, Maui, and the island of Hawaii. We do not offer gaming on any of our vessels.

American Classic Voyages Co. is a Delaware corporation incorporated in 1985 as a holding company that owns and controls The Delta Queen Steamboat Co., which operates the Delta Queen riverboats and the Delta Queen Coastal Voyages vessels through various subsidiaries, Great Hawaiian Cruise Line, Inc., which operates American Hawaii through various subsidiaries, and Project America, Inc., which operates United States Lines through various subsidiaries.

American Classic Voyages Co.'s principal executive offices are located at Two North Riverside Plaza, Suite 200, Chicago, Illinois 60606. The principal administrative offices of Delta Queen, American Hawaii and United States Lines are located in New Orleans, Louisiana.

We are the largest owner and operator of U.S.- flag passenger vessels. Under the Passenger Vessel Act of 1886 and related U.S. laws, only U.S. ships that are (1) U.S. built, (2) owned by U.S. citizens, (3) operated by U.S. crews and officers, and (4) U.S.- flagged by the U.S. Coast Guard are permitted to operate exclusively among U.S. ports, including the islands of Hawaii. We are the only U.S.- flagged, large scale, overnight cruise line operator providing inter- island vacations among the Hawaiian Islands.

Accordingly, we believe our U.S.- flagged designation provides us with significant itinerary advantages. Our cruises can visit and explore the beauty and attractions of the various Hawaiian Islands without having to include a foreign port in our itineraries, which would involve at least three sailing days on the Pacific Ocean. On inland U.S. waterways, where Delta

Queen operates, the Passenger Vessel Act requirements effectively prohibit foreign- flagged vessels from offering competing itineraries.
The U.S. Flag Cruise Ship Pilot Project Statute was enacted in 1997 to develop the U.S.- flagged cruise ship industry and stimulate commercial construction of cruise ships in the U.S. In connection with our execution of a definitive agreement with Ingalls Shipbuilding to construct at least two new vessels in a U.S. shipyard (see page 6, Hawaii Expansion Plans for a more detailed discussion of our new Hawaii vessels), we believe that we will have (1) the exclusive right to operate large U.S.- flagged cruise ships in the domestic trade among the Hawaiian Islands for the life expectancy of the vessels and (2) the right to operate the ms Patriot as a U.S.- flagged ship in the Hawaiian Islands for a period of two years following delivery of the final new vessel under the contract. The terms of the statute require, among other things, that the new cruise ships are built with more than 867 berths each, that delivery of the first vessel be prior to January 1, 2005 and that the second vessel be delivered prior to January 1, 2008. The statute does not restrict the activities of small U.S.- flagged cruise ships with fewer than 275 passengers and fewer than 10,000 gross tons.

**CURRENT OPERATIONS**

**AMERICAN HAWAII**

American Hawaii's cruise ship, the S.S. Independence, operates inter- island cruise vacations among the Hawaiian Islands year round. Built in 1951, the S.S. Independence has 860 passenger berths. American Hawaii offers primarily seven- day itineraries with ports of call throughout the Hawaiian Islands. On November 11, 2000 the S.S. Independence was moved to a new homeport in Kahului, Maui and the ports of Hilo, Hawaii, Kona, Hawaii, Honolulu, Oahu and Nawiliwili, Kauai compose the vessel's remaining itinerary. The itinerary affords an opportunity to view Mount Kilauea, one of the world's few active volcanoes, and the soaring sea cliffs of the inaccessible Na Pali coast. Many cruise passengers also choose to extend their stay in Hawaii, purchasing hotel accommodations through American Hawaii. American Hawaii offers more than 50 optional shore excursion activities to passengers to showcase the spectacular Hawaiian scenery and local attractions.
Cruise fares on American Hawaii for a seven- day cruise, as stated in the 2000/2001 cruise brochure, range from luxurious suites at $3,549 per person to interior cabins with a single sofa bed and fold- away upper berth at $1,349 per person, based on double occupancy. The fare includes meals, nightly entertainment on the vessel and port charges. American Hawaii also offers seasonal youth programs to attract passengers with children, as the S.S. Independence has a large number of cabins that can accommodate three and four passengers.

**UNITED STATES LINES**

United States Lines' ms Patriot offers seven- day cruise vacations throughout the Hawaiian Islands, sailing from Oahu to Kauai, Maui, and the island of Hawaii. Guests on the 1,212- passenger ms Patriot are able to select numerous shore excursions featuring some of the Hawaiian Islands' most beautiful attractions. The ms Patriot cruises feature American and Hawaiian regional cuisine, a cultural enrichment program and nightly showplace entertainment.
Originally named the ms Nieuw Amsterdam, the vessel was acquired on October 18, 2000 from Holland America Line and renamed the ms Patriot upon its delivery to United States Lines. We are operating it as a U.S.- flagged vessel in the Hawaiian market, as we are permitted to do under the terms of the Pilot Project Statute. The vessel's inaugural voyage took place in December 2000. It has nine public decks with 607 passenger staterooms, 68% of which are outside cabins, and includes 20 suites. It features two outdoor swimming pools, a spa, a gymnasium, a two- deck main lounge and six additional lounges and bars, as well as a spacious dining room, an indoor/outdoor cafe, a boutique and seven passenger elevators. Upon taking delivery, we renovated portions of the vessel by adding a destination learning center, family activities center, and upgrading the conference and meeting facilities and other passenger facilities on board. The cost of the renovations amounted to approximately $20.4 million.
The cruise fares on the ms Patriot for a seven- day cruise, as stated in the 2000/2001 cruise brochure, range from luxurious suites at $4,099 per person to interior cabins with two or more berths at $1,699 per person, based on double occupancy during the peak travel season. The fare also includes meals and nightly entertainment on the vessel.
Our Hawaii cruise products are marketed as the best way to experience and enjoy Hawaii, and as a convenient and rewarding alternative to land- based multi- island vacations. We accomplish this by focusing on onboard dining, entertainment, and by offering an extensive package of shore excursions at all stops along the itinerary, as well as by providing a wide variety of activities, demonstrations and lectures designed to enhance passengers' overall experience of

the unique Hawaiian culture. In addition, United States Lines and American Hawaii offer additional services and products to its passengers, including bar services, beauty salon services, photography services, shore excursions and gift shop products. In order to facilitate and simplify passengers' travel planning process, we offer air transportation arrangements to and from the Hawaiian Islands through agreements with several major commercial airlines as well as trip cancellation insurance.
American Hawaii's and United States Lines' marketing efforts target consumers who are interested in Hawaii, cruise enthusiasts and other consumers who fit certain demographic or geographic profiles. We send out more than five million pieces of direct mail annually to reach these potential customers. The travel agency community receives cooperative direct mail and periodic fax broadcasts. In addition, we place advertisements in specialized publications and have been the subject of numerous feature articles in national travel and leisure magazines and newspaper travel sections.

**DELTA QUEEN STEAMBOAT CO.**

Delta Queen's three paddlewheel steamboats offer cruise itineraries for trips along the Mississippi, Ohio, Cumberland, Tennessee, Arkansas, Illinois and Atchafalaya Rivers, as well as the Intracoastal Waterway. Ports visited, which are typically locations of historical or cultural significance, include New Orleans, Memphis, St. Louis, St. Paul, Louisville, Cincinnati, Pittsburgh, Nashville, Chattanooga, Galveston, Vicksburg, and Hannibal. Delta Queen promotes special cruise packages revolving around specific themes which allow passengers to participate in activities, meet special guest lecturers, and enjoy entertainment relevant to the theme. Seasonal theme vacations include "Kentucky Derby" cruises that include attendance at the Kentucky Derby horse race, "Civil War" and "Cajun Culture" theme cruises.
In May 2000 we introduced the Columbia Queen riverboat as the fourth member of our Delta Queen fleet. The Columbia Queen operates approximately 9 months out of the year from its homeport of Portland, Oregon and traverses the Columbia, Snake and Willamette Rivers in the Pacific Northwest. Itineraries focus on providing passengers with an adventurous and educational cruise experience. Its 8- night vacation package features an overnight stay in Portland, a visit to Mount St. Helens National Monument, a 7- night cruise and many adventurous excursions from the coastal town of Astoria, Oregon to Hells Canyon in Lewiston, Idaho.
Delta Queen is marketed to mature adult travelers as a unique vacation experience aboard classic steamboats in which the people, sights, romance and history of heartland America and the Pacific Northwest are explored. We believe individuals are attracted to our riverboat cruises because of the quality of our service, dining, accommodations and entertainment, as well as the unique characteristics of the steamboat experience and its connection to American history.
The Steamboatin' cruise fare for an average five- day cruise, as stated in the 2001 cruise brochure, ranges from luxurious suites at $3,365 per person to interior cabins with lower and upper passenger berths at $1,465 per person, based on double occupancy. The Columbia Queen eight- night fare ranges from luxurious suites at $4,310 per person to interior cabins at $3,110 per person during the peak traveling season. The fares also include meals, day and night entertainment on the vessels and port charges.

**DELTA QUEEN COASTAL VOYAGES**

In order to capitalize upon its strong market position and brand name recognition, Delta Queen is expanding its current business by introducing at least two new vessels capable of offering cruises along U.S. coastal waterways. By extending the Delta Queen line beyond our country's heartland to the underserved coastal markets, Delta Queen offers its unique cruising experience to destinations of historical or cultural interest, as well as those known for their natural beauty. We are constructing the first two coastal cruise vessels at Atlantic Marine, Inc. of Jacksonville, Florida. The first vessel, the cv Cape May Light, is scheduled to be delivered in April 2001 and the second vessel, the cv Cape Cod Light, is expected to be delivered in the third quarter of 2001. Each coastal vessel will be approximately 300 feet long, have diesel- electric propulsion systems and "state- of- the- art" safety technology. The total project cost for each new vessel is approximately $40 to $42 million.
The new Delta Queen coastal cruise vessels have an historic design inspired by the Fall River Line vessels which traveled between New York and New England from 1847 through 1937 and became symbolic of elegant transportation and gracious service. The new vessels will be decorated in classic New England federal and nautical decor reminiscent of turn- of- the- century coastal ships, featuring the "first- class" amenities for which Delta Queen steamboats have come to be known. Approximately 90% of the passenger berths on each of the vessels will be in outside cabins. The new vessels will each have features such as elegant dining rooms with fine artwork, architectural embellishments and windows, a grand salon for entertainment, two bars, and other services typically offered on Delta Queen steamboats.

Atlantic Coast destinations featured in the 2001 cruise brochure include Martha's Vineyard, Halifax, Nova Scotia, Boston Harbor, the Chesapeake Bay, New York City, Washington, D.C., Charleston, SC and Savannah, GA. Itineraries for the 2001/2002 winter traveling season include Belize, Costa Rica, Honduras, Mexico and Panama.
To attract additional customers, Delta Queen has developed products which combine its riverboat and coastal cruises with escorted tours and overnight stays at historic port cities. As a convenience to its passengers, Delta Queen will also arrange hotel accommodations and air and land transportation to and from the cruise embarkation and disembarkation points.
Delta Queen annually welcomes back a large number of prior passengers through its relationship marketing program. New passengers are acquired through direct response advertising, advertising in trade and consumer publications and other promotional activity. Each year a significant number of new customers are referred by prior customers.

**SALES AND MARKETING**

We maintain one field sales force and one common reservation staff for Delta Queen, American Hawaii and United States Lines. We sell our cruise products primarily through two major channels, of which the most significant channel is travel agents operating throughout the U.S. We have programs that educate travel agents about the unique nature of our travel experiences, the vessels' itineraries, special programs, theme cruises and pricing policies. To assist in generating reservations from travel agents, we engage in both consumer and trade- oriented advertising, including direct mailings of our cruise lines' literature to travel agencies. We also maintain contact with travel agents through our field sales personnel who conduct educational seminars and attend trade shows. Our second major sales channel is group travel organizers, consisting of clubs, travel agencies and tour operators who arrange for the sale of cruise vacations at discounted fares. We provide a variety of incentives to these organizers, including fare discounts and promotional materials. During fiscal 2000, no single customer accounted for more than 10% of our consolidated revenues.

**PRICING AND ADVANCE RESERVATIONS**

We issue separate full color sales brochures for The Delta Queen Steamboat Co., American Hawaii, United States Lines and Delta Queen Coastal Voyages, which contain descriptive information, itineraries and fare schedules, prior to the beginning of each upcoming calendar year. We price our cruise fares, based on cabin category, using a single pricing schedule for each cruise line throughout the calendar year, except for the Columbia Queen and the ms Patriot, which are priced seasonally. As an inducement for passengers to book early, we generally offer an early booking discount which typically consists of the current year's fares to passengers who book more than six to eight months in advance for the upcoming year. In addition, we offer to group travel organizers and others limited discounts from our published fare schedules.
We actively market our cruises up to one year prior to the cruise year and the level of advance reservations at any given date provides us with an indication of our future fare revenue. A significant portion of such reservations is booked more than six months in advance of the cruise date. Generally, customers of each cruise line must pay a $300 refundable deposit within one week of booking a cruise with the balance of the cruise fare to be remitted 60 days in advance of the departure date. Depending upon the proximity of a cancellation to the cruise date, customers may lose some or all of their deposits or cruise fares. For a nominal fee, we also offer trip cancellation insurance through a third- party insurer, which allows the customers to reduce their exposure to cancellation charges. As of February 29, 2000, advance reservations for the 2000 cruise year were $58.5 million. As of February 28, 2001, advance reservations for the 2001 cruise year were $63.3 million. However, we cannot specifically determine the amount of revenues to be derived from advance reservations as we cannot guarantee that any particular advance reservation will result in any revenue to us. Capacity in the Hawaii cruise market has more than doubled in 2001 due to the introduction of the ms Patriot and additional visits by foreign flagged ships. As a result, we have been discounting our Hawaii cruises as we absorb this increase in capacity, and our gross fare revenue per passenger night ("gross fare per diems") in Hawaii for the first half of 2001 has declined by 24% as compared to the comparable period of a year ago, based on cruises reserved through February 28.

**HAWAII EXPANSION PLANS**

We believe that there is significant untapped market potential in the cruise industry and plan to realize some of this potential by expanding our cruise lines. In the Hawaii cruise market, we plan to leverage our U.S.- flagged designation and the unique competitive advantages offered to us under the Pilot Project Statute by introducing larger, more modern vessels into the Hawaii vacation market under the United States Lines banner. We intend to use this brand name to help us market our Hawaii business.

On March 9, 1999, we executed definitive agreements with Ingalls Shipbuilding to construct at least two new vessels for the Hawaii cruise market. Each of the new vessels is expected to measure approximately 840 feet in length, with 13 decks and approximately 950 cabins containing at least 1,900 passenger berths. The contract provides that Ingalls Shipbuilding deliver the first new ship in January 2003 and the second ship in January 2004. We currently estimate the new Hawaii cruise ships to cost approximately $495 million each, including the cost of furnishings, fixtures and equipment, as well as design, engineering and architectural fees, but excluding capitalized interest. Ingalls Shipbuilding is claiming that the Company should pay additional sums beyond the contract price for certain interior finish work and has requested a delay in the delivery schedule. The Company believes that the claims made by the shipyard for additional payments and a delay in the delivery of the ships are unwarranted and the Company intends to assert its rights under the original provisions of the contract.

Litton Industries, Ingalls Shipbuilding's parent company, has provided a performance guarantee of the contract. Ingalls Shipbuilding will provide a limited warranty for the design, material and workmanship of each vessel for one year after delivery. In addition, the shipbuilding contract provides us an option to build up to four additional vessels. The estimated contract price of the first option vessel is $487 million and the contract price for subsequent option vessels will be negotiated between the parties.

**OTHER**

**GOVERNMENT REGULATION**

Federal maritime law prohibits non- U.S.- flagged vessels from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port. Periodically there has been debate about the potential amendment or repeal of this law and the broader cabotage laws encompassed under the Passenger Vessel Act and related U.S. laws. In August 1995, we joined the Maritime Cabotage Task Force, a broad national coalition of several hundred companies, associations and unions representing all modes of domestic transportation. The task force is responsible for monitoring potential adverse changes in legislation that could affect the U.S. maritime industry and publicizing the economic and national security issues relevant to maintaining a strong U.S.- flagged vessel industry. Through the coalition's efforts, numerous legislators and key Congressional staff members have been made aware of the substantive issues and positions surrounding any changes to this legislation. In recent years bills have been introduced in Congress to modify the Passenger Vessel Act, including allowing foreign- flagged ships into a limited number of itineraries where there was no existing U.S.- flagged ship in service. One of these bills was approved by the relevant Senate Committee in 2000, but no further action was taken. The same bill was reintroduced in 2001.

One of the criteria for operating U.S.- flagged vessels in U.S. domestic trade is that holders of at least 75% of our shares must be U.S. citizens. In order to preserve the status of our U.S.- flagged vessels, our certificate of incorporation contains a provision restricting the transfer of shares of our common stock to non- U.S. citizens. In addition, we have created separate forms of stock certificates with legends to indicate whether the stockholder is a U.S. or non- U.S. citizen.

We are subject to various federal and state regulations that affect the operations of our vessels. Our U.S.- flagged vessels are subject to regulations promulgated by the U.S. Department of Transportation and enforced by the Coast Guard. The Coast Guard conducts both scheduled and unannounced inspections to determine compliance with these regulations and has the authority to delay or suspend cruises. The Delta Queen vessels must be dry- docked for an inspection of the hulls' exteriors every five years. The S.S. Independence and ms Patriot must be dry- docked approximately every 18 months for a similar procedure. The Coast Guard is empowered to increase the interval between inspections and accordingly, we have requested and received permission from the Coast Guard to lengthen the interval between dry- dockings for the S.S. Independence and ms Patriot to 30 months, subject to annual hull surveys.

Like other entities that operate vessels on U.S. waterways, we are also subject to certain federal, state and local health and safety laws, regulations and ordinances, including environmental laws. Periodically, we incur expenditures to keep our vessels in compliance with applicable laws, regulations and ordinances. Environmental compliance on the part of the cruise industry generally has been the subject of increasing attention by federal and state legislators as well as environmental groups, agencies and enforcement personnel. Particular attention has focused on vessel discharges. New federal or state laws, regulations or ordinances could be adopted as a result of this activity. We do not anticipate making any material expenditures in 2001 with respect to environmental matters. However, the coverage and the cost of complying with any such new (or modifications to current) environmental ordinances may result in future additional costs to our operations.

Federal law requires that vessels for 50 or more overnight passengers be constructed of fire retardant materials. Since 1968 Congress has granted the Delta Queen eight consecutive exemptions from the Safety at Sea Act requirement because of fire prevention and safety enhancements made to the vessel and the Delta Queen's historic status. The statute exempting the Delta Queen requires us to notify potential passengers that the Delta Queen does not comply with applicable fire standards and prohibits us from disclaiming liability for loss due to fire caused by our negligence. The current exemption has been extended to November 1, 2008. Our ability to operate the Delta Queen is dependent upon retaining our current Congressional exemption and obtaining additional exemptions subsequent to 2008. Ocean- going passenger vessels were required to make enhancements to life safety systems by October 1, 1997 in order to comply with federal law. The S.S. Independence was brought into compliance during its spring 1997 dry- dock, and the next improvements are not required until 2005.

The Federal Maritime Commission regulates passenger vessels with 50 or more passenger berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. We have been approved as a self- insurer by the Federal Maritime Commission, and therefore, subject to continued approval, are not required to post security for passenger cruise deposits. The Federal Maritime Commission has reviewed its standards and in June 1996 issued proposed regulations to increase significantly the financial responsibility requirements. We filed our objection to the proposals, as we believe that the Federal Maritime Commission's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. The Federal maritime Commission has taken no action on the proposed rulemaking, and at this time we cannot predict if the proposed changes will be approved as currently constituted, or at all.

7

The Company currently maintains liquor licenses for its steamboats operating on the Mississippi River system in Louisiana and for the Columbia Queen in Portland, Oregon. As a result of actions taken by Tennessee authorities, the Company has applied for an alcohol beverage license in the State of Tennessee as well as other neighboring states. The Company does not anticipate any material expenses or other material adverse developments with respect to these applications or licenses. However, in the event such developments do occur, the Company may be required to restrict the sale of alcoholic beverages on all or portions of its cruises. In connection with these applications or otherwise, the Company may be required to become qualified to do business in, or to pay or remit various types of taxes or fees to, certain states or political subdivisions thereof. In addition, the Company may be subject to fines or other penalties for failure to comply with laws and regulations of one or more states requiring licensing, qualification or other action. Neither the cost of compliance by the Company with such regulations, nor the penalties imposed or sought to be imposed on the Company for noncompliance have been material in the past. However, no assurance can be given that such costs or penalties may not increase or become material in the future.

**COMPETITION**

The vacation industry is highly fragmented and characterized by a significant degree of competition among a large number of participants, including cruise lines, land- based destination resorts, sightseeing tours and a wide range of other vacation options. Our vessels compete against all of these vacation options. Since leisure spending is discretionary, adverse economic conditions affecting our customer base, including uncertainty over inflation and interest rate fluctuations, may negatively impact our performance.

Within the cruise industry, we believe that cruise destination, cruise product, and pricing are the primary methods of competition. We also believe that our status as an operator of U.S.- flagged vessels provides us with a competitive advantage.

The Company, through its subsidiaries, is the sole U.S.- flagged overnight cruise ship operator and the largest provider of cruise vacations among the Hawaiian Islands. The Company competes with operators of foreign- flagged cruise ships that visit the Hawaiian Islands on voyages of seven days and greater. Under U.S. law, foreign- flagged ships must include a foreign port in each of their itineraries. This means that foreign- flagged ships visiting Hawaii, including ships operating seven day cruises, must spend at least three to four days sailing on the Pacific Ocean in order to visit a foreign port. Our cruises can visit and explore the beauty of the various Hawaiian Islands without having to visit a foreign port.

Delta Queen is the largest provider of overnight cruises in the domestic waterways and rivers cruise market. There are several other smaller U.S.- flagged providers of overnight domestic cruises, including two providers who primarily operate overnight river cruises. We believe that Delta Queen's principal competitive strengths include its strong brand recognition, the distinctive nature of its products, its luxurious accommodations, and its high level of service.

**SEASONALITY**

Delta Queen's operations are seasonal. Historically, we have had greater passenger interest and higher yields in the spring and fall months of the year. The vessels typically undergo their annual lay- ups in December or January. While American Hawaii has historically experienced greater passenger interest in the summer and fall months of the year, quarterly variations in its revenues are much smaller than those of Delta Queen. During the summer months, in particular, American Hawaii tends to have average occupancies in excess of 100% as the number of families sharing cabins with children increases significantly during this period. We expect the seasonal trends for United States Lines to be similar to those historically experienced by American Hawaii.

**INSURANCE**

We carry marine liability insurance on our vessels through Steamship Mutual Underwriting Association (Bermuda) Limited ("Steamship Mutual"), a non- profit, mutual protection and indemnity association. Our marine liability insurance arrangements are typical of common marine industry practices and, subject to certain deductibles, provide coverage for losses, other than hull physical damage losses, including casualty damage by the vessels and claims by crew members, passengers and other third parties. The policy has no maximum limit of liability coverage except for a $500 million limit, per occurrence, for oil pollution liability claims. As a member of Steamship Mutual, we pay our annual premiums based largely on our risk characteristics and loss experience, and the loss experience of other members. In addition, because Steamship Mutual and other maritime mutual indemnity associations around the world pool a portion of their loss experience in risk sharing arrangements, Steamship Mutual also may be affected by the loss experience of other mutual protection and indemnity organizations. Over and above this pooling arrangement, Steamship Mutual has additional independent reinsurance protection.

Our annual protection and indemnity insurance premium consists of a mutual premium, 70% of which is paid in the initial year of the policy period with installments of 15% being paid in years two and three of the policy period. We may be liable for a supplemental call in excess of the anticipated amount in the event that Steamship Mutual incurs heavy losses or experiences unusual circumstances.

We also carry a multi- line marine and non- marine package policy which is underwritten by various insurers. This package policy provides hull and machinery coverage, which insures against physical loss and damage to the vessels, subject to a $500,000 deductible. The vessels are insured for their appraised value. Although we believe the risk of a total loss of our vessels is remote, in all likelihood the replacement costs would exceed these coverage limits. Additionally, this package policy provides coverage against loss of revenue and extra expenses incurred in connection with a marine casualty or other covered interruption in service. The deductible for the loss of revenue coverage is 14 days of revenue for each occurrence, and the deductible for extra expenses incurred coverage is $125,000 per occurrence.

We believe our insurance coverage is adequate based on our assessment of the risks to be insured, the probabilities of loss and the relative cost of available coverages.

**EMPLOYEES**

We employed 1,857 persons as of December 31, 2000. Of the vessels' onboard employees, the American Maritime Officers of the AFL- CIO ("American Maritime Officers") represented approximately 212 individuals, and the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District of the AFL- CIO ("Seafarers") represented approximately 841 individuals. In 2000, the Company entered into ten year agreements with the American Maritime Officers and Seafarers International Union, relating to the vessels operated by the Company. The agreement with the American Maritime Officers expires on February 28, 2009 and the agreement with Seafarers International Union expires on December 31, 2009. Since 1986, we have not experienced any work stoppages, and we believe relations with our employees are good.

**RISK FACTORS AND FACTORS CONCERNING FORWARD LOOKING STATEMENTS**

Certain statements contained in "Risk Factors", "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere in this Annual Report on Form 10- K, in the Company's press releases and in oral statements and presentations made by or with the approval of an authorized executive officer of the Company constitute "forward- looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or

implied by such forward- looking statements. These forward- looking statements are not guarantees of future performance and are subject to certain risks, uncertainties, assumptions and other factors. Such factors include, among other things, the following: general economic and business conditions which may impact levels of disposable income of consumers and demand for the Company's cruise products; increases in cruise industry capacity; cruise and other vacation industry competition; changes to the U.S. Flag Cruise Ship Pilot Project Statute and related U.S. laws; the ability of the Company to implement its shipbuilding program; unscheduled ship repairs and dry- docking; and the Company's ability to obtain adequate financing at commercially acceptable levels to support its expansion plans.

Words such as "expect," "anticipate," "intend," "plan," "believe," "estimate" and variations of such words and similar expressions are intended to identify such forward- looking statements. We undertake no obligation to publicly update or revise any forward- looking statements, whether as a result of new information, future events or otherwise. In light of these risks, uncertainties and assumptions, the forward- looking events discussed in this document might not occur. As permitted by the Private Securities Litigation Reform Act of 1995, the Company is hereby filing the following cautionary statements identifying important factors which, among others, could cause the Company's actual results to differ materially from expected and historical results.

Our future financial condition, liquidity and operating results may adversely be affected by a number of factors, including the following:

**CONSTRUCTION DELAYS AND DEVIATIONS FROM SPECIFICATIONS FOR THE NEW HAWAII AND COASTAL VESSELS MAY ADVERSELY AFFECT EXPANSION PLANS AND FUTURE FINANCIAL PERFORMANCE**

We have entered into contracts to construct at least two new vessels for our Hawaii cruise business and two new coastal cruisers for the Delta Queen line. A delay or inability to deliver these new ships may adversely impact our future financial performance. Ingalls Shipbuilding, the builders of the new Hawaii cruise ships, has never built a modern passenger ship and, because no U.S. shipyard has built a passenger ship in more than 40 years, there is a limited base of experienced subcontractors for portions of the ships. As discussed previously, Ingalls Shipbuilding is claiming that the Company should pay additional sums beyond the contract price for certain interior finish work and has requested a delay in the delivery schedule. Although the Company believes that the claims made by the shipyard for additional payments and a delay in the delivery of the ships are unwarranted and the Company intends to assert its rights under the provisions of its shipbuilding contracts, we cannot assure you

that we will be able to successfully complete construction of the Hawaii cruise ships or the coastal cruisers or that we will be able to complete these projects within our budgets or expected time frames. Factors that could impact the construction or renovation of the new vessels include:

- construction delays or complications;
- cost overruns;
- labor stoppages, slowdowns or shortages; and
- compliance with U.S. Coast Guard regulations and classification society requirements.

A significant delay in delivering the vessels or a material deviation from the design specifications could have a material adverse effect on our cash flow and results of operations. Also, events out of the control of the shipyards constructing the vessels could delay delivery.

**IF WE DO NOT OBTAIN SIGNIFICANT AMOUNTS OF CAPITAL TO BUILD, PURCHASE AND RENOVATE VESSELS, OUR EXPANSION PLANS AND FUTURE OPERATING RESULTS MAY BE ADVERSELY AFFECTED**

Our expansion plans are based in part on the construction of several new vessels to be put into operation in both the Hawaii market and the U.S. coastal waterways market. Our expansion plans require us to spend significant amounts of capital in building, purchasing and renovating vessels. The final cost for these vessels may exceed our initial estimates and we may be required to seek additional sources of capital in order to complete the vessels. We cannot assure you that we will be able to obtain additional financing at commercially acceptable levels to finance this expansion or to pursue strategic business opportunities. We expect to be able to use our cash on hand and cash generated from our future operations to provide a significant portion of these funding needs. Our failure to obtain sufficient capital or generate sufficient funds from operations may require us to delay or abandon some of our expansion plans and could have a

material adverse effect on our financial condition and results of operations.

**INCREASED LEVERAGE MAY ADVERSELY AFFECT OUR FINANCIAL PERFORMANCE AND CASH FLOW**

We have substantially increased our indebtedness and will continue to do so as we finance a significant portion of the construction costs under existing and contemplated agreements to acquire, build, convert or renovate new vessels. This higher level of indebtedness will require us to devote an increased amount of our future cash flow from operations to the payment of principal and interest on indebtedness. At December 31, 2000, we had outstanding consolidated total debt of $359.2 million. We have and will continue to substantially increase our leverage with the debt required to finance:

- construction costs for each of the two Hawaii cruise ships projected to be approximately $495 million;
- construction costs for each of the first two coastal cruisers expected to be approximately $40 to $42 million;
- acquisition and renovation costs for the ms Patriot of approximately $135 million; and
- acquisition, renovation, relocation and start- up costs for the Columbia Queen of approximately $44 million.

We expect that approximately 87.5% of the total cost for the new Hawaii cruise ships and coastal vessels will be financed through Maritime Administration guaranteed private financing. The seller of the ms Patriot, Holland America Line, a non-U.S. citizen, provided us with financing for $84.5 million of the purchase price of the ship secured by a preferred mortgage on the vessel. Under our current expansion plans, and assuming we build, acquire, renovate and convert all of the ships we currently contemplate, we could increase our indebtedness to approximately $1.2 billion by 2004. Our increased leverage could adversely affect our liquidity, financial condition and working capital available for operations.

**IF WE ARE UNABLE TO MAINTAIN ADEQUATE MANAGERIAL RESOURCES DURING OUR EXPANSION,**
**OUR BUSINESS MAY BE ADVERSELY AFFECTED**

If we successfully execute our growth strategy, our expansion will place a significant strain on our managerial resources. Our future performance will depend upon management's ability to manage our growth effectively, which includes our ability to:

- expand sales and marketing to fill the passenger berths in our expanded fleet at profitable rates;
- operate, maintain and support a significantly expanded fleet of vessels; and
- hire and train additional personnel to staff our expanded fleet and support operations.

The process of expanding our fleet of vessels may result in unforeseen operating difficulties and may require management attention that would otherwise be available for the ongoing operation of our existing fleet of vessels. Our failure to

manage our growth effectively may cause us to delay or abandon some of our expansion plans and may have a material adverse effect on our business.

**IF WE ARE UNABLE TO MANAGE OUR FINANCIAL RESOURCES DURING OUR EXPANSION, OUR FINANCIAL PERFORMANCE MAY BE ADVERSELY AFFECTED**

Our plans for expansion call for significant capital expenditures that will not produce corresponding revenues in the near term, which may place a strain on our capital resources. The process of expanding our fleet of vessels may require additional financial resources that would otherwise be available for the ongoing operation of our existing fleet of vessels. Our failure to manage our financial resources effectively during our expansion could force us to delay or abandon some of our expansion plans and may have a material adverse effect on our liquidity, financial condition and results of operations.

**IF DEMAND FOR OUR NEW CRUISE PRODUCTS FAILS TO DEVELOP AS EXPECTED OR COMPETITION INCREASES, OUR BUSINESS MAY BE ADVERSELY AFFECTED**

The Hawaii, Pacific Northwest and coastal cruise markets where we intend to deploy our new vessels currently do not have a large supply of cruise operators. If demand for our new vessels does not develop, our financial performance may suffer. Our expected deployment of vessels will increase the supply of available cruises in these markets significantly. We engaged market research firms to assist us in making our decision to pursue expansion plans. We cannot assure you, however, that demand for our new cruise products, services and itineraries will develop. If the market for these new cruise products fails to develop, develops more slowly than expected or becomes saturated with competitors, it may adversely affect our liquidity, financial condition and results of operations.

**INCREASED CAPACITY IN HAWAII MAY REDUCE OCCUPANCY ON THE S.S. INDEPENDENCE,**

**ADVERSELY AFFECTING REVENUES**

The introduction of the ms Patriot or our new cruise ships into the Hawaii cruise market could cause occupancy or revenue levels on the S.S. Independence to decline. If revenue levels drop so much that the S.S. Independence generates operating losses, it may reduce our expected benefits from increased capacity in Hawaii and could have a material adverse effect on our financial condition and results of operations.

**IF WE CANNOT BENEFIT FROM THE EXCLUSIVE RIGHTS OF THE PILOT PROJECT STATUTE, OUR REVENUE GROWTH IN HAWAII WOULD BE ADVERSELY AFFECTED**

We believe the Pilot Project Statute provides us with the exclusive right to operate large U.S.- flagged cruise ships in the Hawaiian Islands for the life expectancy of our new ships. We will enjoy the benefits of the Pilot Project Statute, however, only if we comply with its terms. Our competitive advantage could be eliminated or diminished if the Pilot Project Statute were to be repealed or amended, if our interpretation of its terms is not upheld or if we fail to satisfy its requirements. This could have a material adverse effect on our financial condition and results of operations. For a more detailed discussion of the Pilot Project Statute, see "Business - General."

**MODIFICATION OF THE PASSENGER VESSEL ACT MAY ADVERSELY AFFECT OUR BUSINESS**

From time to time, proposals are made which would limit or eliminate the terms of the Passenger Vessel Act. If the Passenger Vessel Act is repealed or amended to allow foreign- flagged ships the same rights to transport passengers between U.S. ports as U.S.- flagged ships, we could face considerable competition in all our lines, including competition from entities with greater financial resources. Under the Passenger Vessel Act and related laws, only U.S.- flagged ships may transport passengers between U.S. ports. Consequently, only ships that are U.S. built, owned, operated and documented may operate between U.S. ports, including the islands of Hawaii. Foreign- flagged ships may transport passengers between U.S. ports only if their itineraries include a stop at a foreign port. This increased competition could have a material adverse effect on our financial condition and results of operations. For a more detailed discussion of the Passenger Vessel Act, see "Business - General."

**INCREASED COMPETITION IN THE HAWAII CRUISE MARKET AND FROM OTHER VACATION ALTERNATIVES, MAY ADVERSELY IMPACT OUR FINANCIAL PERFORMANCE**

We presently compete against a wide range of vacation alternatives, including other cruises, destination resorts and sightseeing vacations. Cruise lines or other entities, including those with greater resources, could introduce overnight U.S.- flagged vessels in direct competition with our Delta Queen vessels, which may adversely impact our financial performance. We may also face additional competition in the Hawaii cruise market from foreign- flagged vessels as the Hawaii cruise market expands. The entry of direct competition could make it more difficult for us to maintain or further increase occupancy

or prices for cruise vacations. This could result in lower margins and adversely effect our financial condition and results of operations.

**AS A MEMBER OF THE VACATION AND LEISURE INDUSTRY, OUR BUSINESS IS SENSITIVE TO GENERAL ECONOMIC AND BUSINESS CONDITIONS**

As a vacation and leisure company providing cruise vacations, we depend on our customers' leisure spending. Adverse change in the general economic or business environment could affect our customers by decreasing the amount of money they spend on leisure activities such as cruising. A decrease in leisure spending could affect passenger yields and occupancy rates on our ships, which could adversely affect our financial performance.

**IF WE DO NOT COMPLETE DRY- DOCKING ON SCHEDULE OR WITHIN BUDGETS, OR IF ANY OF OUR VESSELS REQUIRE UNSCHEDULED REPAIRS, OUR REVENUES MAY BE ADVERSELY IMPACTED**

Operation of our vessels is subject to regulations established by the U.S. Department of Transportation that are enforced by the U.S. Coast Guard. Among these regulations is the requirement that the vessels be taken out of operation and removed from the water for inspection of the exterior of the hull on a periodic basis, referred to as dry- docking. When we dry- dock one of our vessels as required, we lose the revenue from that vessel's operations for the period it is out of service. We also incur the additional cost of the dry- docking. The S.S. Independence, ms Patriot and the two new coastal vessels must be dry- docked every 30 months and the Delta Queen riverboats must be dry- docked every five years. For its last dry- docking, the S.S. Independence was out of service for 18 days beginning on January 5, 2000. Dry- docks of Delta Queen vessels take place in the winter months when our revenue yield is lowest. For its last regularly scheduled dry- docking, the Mississippi Queen was out of service for a period of approximately 24 days commencing January 3, 2001.

For its next scheduled dry- docking, the Delta Queen is expected to be out of service for a period of 28 days commencing in January 2002. The American Queen, which first entered service in 1995, was out of service for 10 days for its first dry-docking between January 10, 2000 and January 20, 2000. Its next dry- docking will occur in approximately four years. In years that we are not required to dry- dock our Delta Queen vessels, we remove each of these vessels from service to perform routine repairs and maintenance and capital projects. We refer to the period that each vessel is removed from service as a lay- up. The Delta Queen was out of service beginning on January 4, 2001 for 42 days, and the American Queen was out of service for a period of 18 days beginning February 5, 2001. The S.S. Independence, ms Patriot and the two new coastal vessels do not undergo lay- ups in years that they are not dry- docked. We cannot assure you that future dry- docks or lay- ups for any of our vessels will be completed on schedule or within their budgets.

The S.S. Independence will undergo an unscheduled dry- dock beginning March 24, 2001 to repair its bow thruster. The vessel is expected to be out of service for a period of seven days, and the expected cost of the repairs is expected to be between $400,000 and $500,000. On February 20, 2001, the ms Patriot was required to cancel a cruise that was in progress and return to its home port so that a thrust bearing in the vessel's generator drive train could be replaced. This resulted in refunds issued to passengers of approximately $1.6 million, and travel credits for a future cruise expected to cost approximately $0.5 million. Additional unscheduled repairs could have an adverse impact on the Company's results of operations and financial condition.

**RIVER AND OCEAN CONDITIONS AND WEATHER FACTORS CAN ADVERSELY AFFECT OPERATIONS AND OUR FINANCIAL PERFORMANCE**

River or ocean conditions and weather factors can adversely affect our operation and the financial performance of the Delta Queen and American Hawaii lines by disrupting schedules or reducing operating days. As a result of flooding and restrictions placed upon commercial travel along the inland rivers, we have, in the past, canceled or re- routed scheduled cruises. We operate the Hawaii cruise ships in and around the Hawaiian Islands. As a result, its schedules are subject to ocean and weather conditions, including hurricane conditions. Weather conditions could cause us to reschedule or cancel cruises, which could adversely affect our results of operations.

**THE LOSS OF VESSELS FROM SERVICE WOULD ADVERSELY IMPACT OUR BUSINESS**

The loss of any vessel from service due to weather, casualty, mechanical failure, extended or extraordinary maintenance, or otherwise, could adversely affect our operating results. We believe we have a commercially reasonable level of insurance coverage. In the event of a permanent or temporary loss of one or more of the vessels, however, our insurance would not provide the replacement costs of the vessels nor fully cover the impact of lost business.

**THE SEC HAS BEEN CONDUCTING AN INFORMAL INQUIRY OF OUR ACCOUNTING PRACTICES RELATING TO DIRECT RESPONSE ADVERTISING COSTS**

The SEC has been conducting an informal inquiry into our accounting practices with respect to direct response advertising costs. The informal inquiry relates to our adoption of a particular methodology effective as of January 1, 1999 and our subsequent rescission of that methodology in November, 1999 due to difficulties encountered implementing the new method. We restated our financial statements for the first and second quarters of 1999 and we believe that we are cooperating with the SEC in their informal inquiry. We are unable to predict the outcome or impact of the SEC's informal investigation. However, it is possible that the SEC's informal inquiry or a subsequent formal inquiry could result in orders, penalties or sanctions against the Company. Depending upon the resulting orders, penalties or sanctions, if any, our financial performance could be adversely affected, our ability to conduct our business could be impaired or we could be required to make further adjustments to our financial statements. For a more detailed description of the accounting rescission, see Note 13 to the Consolidated Financial Statements.

**ANTI- TAKEOVER AND TRANSFERABILITY LIMITATIONS OF U.S. OWNERSHIP REQUIREMENTS MAY ADVERSELY AFFECT THE LIQUIDITY OF OUR COMMON STOCK**

One of the requirements for having U.S.- flagged vessels operating in U.S. domestic trade is that 75% of our stockholders must be U.S. citizens and that non- U.S. citizens cannot exercise control of us. We have restrictions in our certificate of incorporation limiting the transferability of our common stock or control to non- U.S. citizens to preserve our U.S.-flagged status. These limitations may have the effect of decreasing the liquidity of our common stock, thereby making it more difficult for investors to dispose of their shares in an orderly manner. We have also added legends to our stock

certificates to indicate the citizenship of our stockholders. These provisions and the level of ownership by Equity Group Investments, Inc. and its affiliates, which we refer to as the "Equity Group," may deter a change in control and limit non-U.S. citizens', including corporations and individuals, purchases of our common stock.

**OUR CONTROLLING STOCKHOLDER MAY TAKE ACTIONS THAT ADVERSELY AFFECT OUR BUSINESS**

Affiliates of the Equity Group own an aggregate of approximately 35% of the outstanding shares of our common stock. The Equity Group's level of ownership may permit it to elect the members of our board of directors who will control our future direction and operations. This includes decisions regarding the issuance of securities, dividends, acquisitions and our sale. The Equity Group's stockholders are, directly or indirectly, trusts created for the benefit of Samuel Zell, Ann Lurie and their respective families. Mr. Zell is the Chairman of our board of directors.

**SALES OF OUR CONTROLLING STOCKHOLDER'S SHARES COULD HAVE AN ADVERSE EFFECT ON OUR COMMON STOCK PRICE OR OUR ABILITY TO RAISE CAPITAL**

The sale of a substantial number of shares of our common stock by the Equity Group, or the perception that such a sale could occur, could negatively affect the market price of our common stock. As of December 31, 2000, the Equity Group had pledged 4,603,000 of its 7,402,247 shares of our common stock to secure several loans. If the Equity Group were to default on these loans, the creditors could acquire the pledged shares. We have been advised by the Equity Group that it is presently in compliance in all material respects with all covenants and terms of these loans and has alternative resources with which to service the loans. Any sale, or the perception that such a sale may occur, could also materially impair our future ability to raise capital through an offering of securities.

**OUR CONTROLLING STOCKHOLDER MAY HAVE CONFLICTS OF INTEREST WITH COMPETING INTERESTS**

The Equity Group, our controlling stockholder, is an investor directly or indirectly in various business enterprises, both publicly and privately held. Mr. Zell is also an officer and/or director in many of these affiliated businesses. The Equity Group, Mr. Zell and/or these affiliated businesses may from time to time receive opportunities in various businesses that might compete with us in our current or future activities. Conflicts of interest may result from such opportunities. The Equity Group and Mr. Zell have informed us that neither it, he nor any of these affiliated businesses presently intends to make investments which would cause a conflict of interest with us.

**ITEM 2. PROPERTIES**

We currently operate vessels with a total of 3,255 passenger berths. The following table represents a list of our current vessels, the year they entered into service, their estimated passenger capacity based upon double occupancy per cabin, and their areas of operation:

| VESSEL | YEAR VESSEL ENTERED INTO SERVICE | PASSENGER CAPACITY | PRIMARY AREAS OF OPERATION |
|---|---|---|---|
| ms Patriot(1) ................. | 1982 | 1,212 | HAWAII |
| S.S. Independence(2) .......... | 1951 | 860 | HAWAII |
| American Queen ................ | 1995 | 436 | Mississippi River SYSTEM |
| Mississippi Queen ............. | 1976 | 416 | Mississippi River System |
| Delta Queen ................... | 1926 | 174 | Mississippi River System |
| Columbia Queen ................ | 2000 | 157 | Columbia River System |

(1) Acquired by the Company and substantially renovated in 2000. (2) Acquired by the Company in 1993 and substantially renovated in 1994.

The following table represents a list of the new vessels we currently plan to build together with their estimated dates for entering service, and based upon double occupancy per cabin, their estimated passenger capacity:

| | ESTIMATED DATE ENTERING INTO SERVICE | ESTIMATED PASSENGER CAPACITY |
|---|---|---|
| United States Lines Vessels: | | |
| Newbuild #1........................... | January 2003 | 1,900 |
| Newbuild #2........................... | January 2004 | 1,900 |
| Delta Queen Vessels: | | |
| cv Cape May Light..................... | May 2001 | 224 |
| cv Cape Cod Light..................... | Fourth Quarter 2001 | 224 |

See Note 8 to the Consolidated Financial Statements for a discussion of leased properties.

**ITEM 3. LEGAL PROCEEDINGS**

There are no material legal proceedings to which we are a party or of which any of our property is the subject, other than ordinary routine litigation and claims incidental to the business. We believe we maintain adequate insurance coverage and reserves for such claims.

The SEC has been conducting an informal inquiry into our accounting practices with respect to direct response advertising costs. The informal inquiry relates to our adoption of a particular methodology effective as of January 1, 1999 and our subsequent rescission of that methodology in November 1999 due to difficulties encountered implementing the new method. We restated our financial statements for the first and second quarters of 1999 and we believe that we are cooperating with the SEC in their informal inquiry. We are unable to predict the outcome or impact of the SEC's informal investigation. However, it is possible that the SEC's informal inquiry or a subsequent formal inquiry could result in orders, penalties or sanctions against the Company. Depending upon the resulting orders, penalties or sanctions, if any, our financial performance could be adversely affected, our ability to conduct our business could be impaired or we could be required to make further adjustments to our financial statements. For a more detailed discussion of the accounting rescission, see Note 13 to the Consolidated Financial Statements.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

None.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

(a) Our common stock trades on the NASDAQ National Market tier of The NASDAQ Stock Market under the symbol: "AMCV". On February 28, 2001, the last reported sale price for our common stock was $16.25 per share. The following table indicates the high and low sales price information for shares of our common stock as reported by The NASDAQ Stock Market:

| | | High | Low |
|---|---|---|---|
| QUARTER ENDED: | December 31, 2000................ | $ 16.75 | $ 11.00 |
| | September 30, 2000............... | 21.56 | 14.62 |
| | June 30, 2000.................... | 24.10 | 18.75 |
| | March 31, 2000................... | 34.87 | 23.37 |
| QUARTER ENDED: | December 31, 1999................ | $ 35.25 | $ 21.13 |
| | September 30, 1999............... | 24.94 | 19.81 |
| | June 30, 1999.................... | 24.00 | 15.63 |
| | March 31, 1999................... | 26.06 | 16.25 |

(b) The number of stockholders of record of common stock on February 28, 2001 was approximately 662.

(c) We did not pay cash dividends on our common stock during 1999 or 2000. We currently anticipate that all of our earnings will be retained for planned construction projects and ongoing business requirements. We do not anticipate paying any cash dividends in the foreseeable future.

**ITEM 6. SELECTED FINANCIAL DATA**

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2000 | 1999 | 1998 | 1997 | 1996 |
| INCOME STATEMENT DATA | | | | | |
| (In thousands) | | | | | |
| Revenues | $ 221,625 | $ 208,717 | $ 192,225 | $ 177,884 | $ 190,408 |
| Gross profit | 78,008 | 74,854 | 66,630 | 66,589 | 67,863 |
| One-time charges (1) | -- | -- | -- | -- | 38,390 |
| Operating income (loss) | (13,106) | 1,649 | 5,486 | 9,984 | (30,465) |
| Other (income) expense (2) | 18 | (10) | (300) | -- | (11,729) |
| Net income (loss) | $ (10,072) | $ (1,750) | $ 157 | $ 2,429 | $ (17,636) |
| PER SHARE INFORMATION | | | | | |
| Basic earnings (loss) per share | $ (0.49) | $ (0.10) | $ 0.01 | $ 0.17 | $ (1.28) |
| Diluted earnings (loss) per share | $ (0.49) | $ (0.10) | $ 0.01 | $ 0.17 | $ (1.28) |
| Cash dividends per share | $ -- | $ -- | $ -- | $ -- | $ -- |
| OPERATING STATISTICS | | | | | |
| Fare revenue per passenger night (3) | $ 232 | $ 225 | $ 218 | $ 228 | $ 216 |
| Total revenue per passenger night (3) | $ 324 | $ 316 | $ 306 | $ 302 | $ 287 |
| Weighted average operating days (4): | | | | | |
| Delta Queen | 318 | 342 | 341 | 337 | 347 |
| American Hawaii | 348 | 365 | 365 | 337 | 366 |
| United States Lines | 23 | -- | -- | -- | -- |
| Vessel capacity per day (berths) (5): | | | | | |
| Delta Queen | 1,183 | 1,026 | 1,026 | 1,026 | 1,024 |
| American Hawaii | 860 | 867 | 867 | 844 | 817 |
| United States Lines | 1,212 | -- | -- | -- | -- |
| Passenger nights (3,6) | 684,888 | 659,507 | 627,321 | 588,892 | 643,891 |
| Physical occupancy percentage (3,7) | 97% | 99% | 94% | 94% | 98% |
| BALANCE SHEET DATA (at period end) | | | | | |
| (In thousands) | | | | | |
| Total assets | $ 752,615 | $ 293,990 | $ 212,685 | $ 210,805 | $ 211,864 |
| Notes Payable | 125,000 | -- | -- | -- | -- |
| Current portion of long-term debt | 15,768 | 4,100 | 4,100 | 4,100 | 4,100 |
| Long-term debt | 218,420 | 80,463 | 77,388 | 81,488 | 85,898 |
| Total stockholders' equity | 173,503 | 129,800 | 61,907 | 59,129 | 54,982 |

---

(1) In 1996, we decided not to renovate and return the S.S. Constitution to service, resulting in write- down costs of $38.4 million ($1.89 per share - net of tax on both a basic and diluted basis).

(2) In 1996, we sold the Maison Dupuy Hotel located in New Orleans, Louisiana for a gain of $11.7 million ($0.57 per share - net of tax on both a basic and diluted basis). In 1998, we received $0.3 million ($0.01 per share - net of tax on both a basic and diluted basis) of final proceeds under a profit participation agreement associated with the 1996 sale.

(3) 1999 and 1998 figures have been recalculated to conform to the 2000 presentation, which includes passengers sailing on complimentary tickets.

(4) Weighted- average operating days for each cruise line is determined by dividing capacity passenger nights for each cruise line by the cruise line's total vessel capacity per day. Capacity passenger nights is determined by multiplying the actual operating days of the vessel by each vessel's capacity per day.

(5) Vessel capacity per day represents the number of passengers each cruise line can carry assuming double occupancy for cabins which accommodate two or more passengers. Some cabins on the Independence, Patriot and the American Queen can accommodate three or four passengers.

(6) A passenger night represents one passenger spending one night on a vessel; for example, one passenger taking a three-night cruise would generate three passenger nights.

(7) Physical occupancy percentage is passenger nights divided by capacity passenger nights.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

## OVERVIEW

American Classic Voyages Co. is a holding company which owns and controls The Delta Queen Steamboat Co., Great Hawaiian Cruise Line, Inc. and Project America, Inc. Through our various subsidiaries, we currently operate four cruise lines: Delta Queen Steamboat Co., which owns and operates the American Queen, Mississippi Queen and Delta Queen steamboats and the Columbia Queen riverboat; Delta Queen Coastal Voyages, which owns and will operate the cv Cape May Light and cv Cape Cod Light; American Hawaii, which owns and operates the S.S. Independence steamship; and United States Lines, which owns and operates the ms Patriot.

Our revenues are comprised of:

1. cruise fares;
2. onboard revenues, such as those from gift shops and shore excursions;
3. trip cancellation insurance and pre- and post-cruise hotel packages;

and

4. the sale of airplane tickets to and from points of embarkation and disembarkation.

Our cost of operations is comprised of:

1. passenger expenses, such as employee payroll and benefits and the cost of food and beverages;
2. vessel operating costs including lay-up and dry-docking costs for our vessels;
3. insurance costs;
4. commissions paid to travel agents; and
5. airplane tickets and hotel costs.

When we receive deposits from passengers for cruises, we establish a liability for unearned passenger revenue. We recognize these deposits as revenue on a pro- rata basis during the associated cruise. Our revenues and some of our expenses vary considerably when measured on a quarterly basis. This is due to the seasonality of our Delta Queen revenues, the timing of our Delta Queen and American Hawaii lay- ups and dry- dockings, and fluctuations in airfares. These variations are reflected in our fare revenues per passenger night, which are commonly referred to as fare per diems, and our occupancy rates.

Operations data expressed as a percentage of total revenue for years indicated is as follows:

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Revenues................................ | 100% | 100% | 100% |
| Costs and expenses: | | | |
| Operating expenses..................... | 65 | 64 | 65 |
| Selling, general and administrative..... | 34 | 27 | 23 |
| Depreciation........................... | 7 | 8 | 9 |
| Operating income ........................ | (6) | 1 | 3 |
| Net income (loss)........................ | (5) | (1) | 0 |

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (CONT'D.)**

**SEASONALITY**

Delta Queen's operations are seasonal. Historically, we have had greater passenger interest and higher yields in the spring and fall months of the year. The vessels typically undergo their annual lay- ups in December or January. While American Hawaii has historically experienced greater passenger interest in the summer and fall months of the year, quarterly variations in its revenues are significantly less than those of Delta Queen. During the summer months, in particular, American Hawaii tends to have average occupancies in excess of 100% as the number of families sharing cabins with children increases significantly during this period. We expect the seasonal trends for United States Lines to eventually be similar to those historically experienced by American Hawaii.

**LIQUIDITY, CAPITAL RESOURCES AND FINANCIAL CONDITION**

For the year ended December 31, 2000, cash provided by operations, before changes in unearned passenger revenue, was $9.7 million compared to $24.8 million in 1999 and $12.9 million in 1998. The decrease in 2000 is due primarily to lower earnings and increases in accounts receivable, inventory, prepaid expenses and deferred tax assets, partially offset by an increase in accounts payable. The increase in 1999 as compared to 1998 is due primarily to increases in accrued expenses and accounts payable. The increase in unearned passenger revenues was $5.9 million greater in 2000 than in 1999 as deposits pertaining to the ms Patriot, introduced in December 2000, more than offset decreases in unearned passenger revenues at American Hawaii and Delta Queen. The decrease in unearned passenger revenues at American Hawaii was mainly due to lower advance bookings for cruises taking place in the first quarter of 2001, and the decrease at Delta Queen was due to the dry- docking of the Mississippi Queen and the 42- day lay- up of the Delta Queen in January and February of 2001.

Cash used in investing activities totaled $426.6 million in 2000 as compared to $80.1 million in 1999 and $8.2 million in 1998. The increase is due primarily to capital expenditures of $356.1 million in 2000, as compared to $79.9 million in 1999 and $8.8 million in 1998. In addition to the $134.9 million cost for the purchase and renovation of the ms Patriot, acquired in October 2000, the Company spent $135.0 million in 2000 for the new Hawaii cruise ships under construction as compared to $53.5 million during 1999, $32.8 million in 2000 for the Columbia Queen as compared to $11.3 million in

1999, and $46.4 million on the Delta Queen coastal vessels in 2000 as compared to $7.4 million spent in 1999. Other capital expenditures of $7.0 million were mainly related to our existing vessels as the S.S. Independence and the American Queen were dry- docked in January 2000 and the Delta Queen and Mississippi Queen underwent lay- ups during that period. The increases in restricted investments and marketable securities in 2000 in the amount of $70.5 million was mainly a result of proceeds from Maritime Administration ("MARAD") guaranteed debt issuances that were held in escrow.
Cash received from financing activities was $418.6 million in 2000 as compared to $68.6 in 1999, and cash used in financing activities of $2.5 million 1998. The increase in 2000 is due primarily to the issuance of $125 million of short-term notes to finance construction of the new Hawaiian vessels, an $84.5 million note issued to Holland America Line for the purchase of the ms Patriot, $70.7 million of bonds, net of financing costs, issued to finance the two new Delta Queen Coastal vessels, $143.1 million of convertible preferred securities of a subsidiary trust and common stock (see below) issued in February 2000, as compared to $63.5 million of common stock issued in the prior year, and net repayments on the Company's credit facility of $7.2 million, as compared to $7.2 million of net borrowings in 1999. The Company also made scheduled principal payments of $4.1 million under the American Queen and S.S. Independence ship financing notes in both 2000 and 1999.
On February 22, 2000 the Company completed an offering of 2,000,000 trust convertible preferred securities. Each $50 security bears interest at 7% and is convertible at the holder's election into 1.6207 shares of common stock. The net proceeds, after underwriting fees and other expenses, were $96.3 million. A portion of the proceeds were used to fund the letter of credit facility related to the ms Nieuw Amsterdam purchase and to pay outstanding amounts on the Chase credit facility. The underwriters' overallotment option of 300,000 additional preferred securities was not exercised.

On February 22, 2000 the Company also completed an offering of an additional 2,000,000 shares of common stock. The net proceeds, after underwriting commissions and other expenses, were $46.8 million and are being used for construction of the second Hawaii vessel. The underwriters' overallotment option of 300,000 additional shares was not exercised.
For the Hawaii cruise market, we are constructing two new cruise ships over the next several years. On March 9, 1999 we signed a definitive agreement with Ingalls Shipbuilding to construct two passenger ships, each containing approximately 1,900 passenger berths, with options to build up to four additional vessels. The contract provides that Ingalls Shipbuilding deliver the first new ship in January 2003 and the second ship in January 2004. We currently estimate the new Hawaii cruise ships to cost approximately $495 million each, including the cost of furnishings, fixtures and equipment, as well as design, engineering and architectural fees, but excluding capitalized interest. Ingalls Shipbuilding is claiming that the Company should pay additional sums beyond the contract price for certain interior finish work and has requested a delay in the delivery schedule. The Company believes that the claims made by the shipyard for additional payments and a delay in the delivery of the ships are unwarranted, and the Company intends to assert its rights under the original provisions of the contract. During 2000 the Company spent $110.3 million on construction of the first Hawaii vessel and $24.7 million on construction of the second vessel. Over the next twelve months, we expect to spend approximately $301 million on building the two new Hawaii cruise vessels and completing construction of the cv Cape May Light and cv Cape Cod Light, excluding capitalized interest.
We will finance a significant portion of the construction cost of the Hawaii cruise ships through the Maritime Administration, which provides guarantees of private financing for new vessel construction projects conducted in U.S. shipyards. In April 1999 we received commitments from the Maritime Administration for financing guarantees for debt of up to 87.5% of the cost of the vessels. The guaranteed debt will be accessed during the construction period. Interest payments during that period are capitalized as part of the cost of construction as required by generally accepted accounting principles. During the 12 months ending December 31, 2000 the Company placed three separate issuances of short- term notes guaranteed by the Maritime Administration totaling $125 million. These notes bear interest ranging from the London Interbank Offer Rate, or LIBOR, minus 0.05% to LIBOR minus 0.10%. On January 31, 2001 the Company issued an additional $50 million of notes guaranteed by MARAD bearing interest at LIBOR minus 0.10% and due on January 31, 2002. A portion of the proceeds from this issuance was used to pay down $25 million of notes issued in 2000 that were due January 31, 2001.
The Company intends to refinance all of these notes on or before their maturity dates by issuing long- term bonds. In the current market, this type of debt generally bears interest at a rate of 100 to 175 basis points over the comparable U.S.

HMS0097027

government obligations and can have a term of up to 25 years from the date of delivery of the vessel. The loans generally amortize on either a straight- line basis or on a mortgage- style basis over the term of the loan, commencing after the delivery date. Fees associated with obtaining the financing guarantees included a one- time investigation fee of approximately $1.4 million, which we paid to the Maritime Administration in April 1999. In addition, the Maritime Administration imposes an annual guarantee fee of not less than 1/4 of 1% and not more than 1% of the indebtedness, reduced by any required escrow, based upon the obligor's ratio of long- term debt to stockholders' equity. The present value of the sum of the annual guarantee fees is payable at the closing of the long term Maritime Administration guaranteed financing and will be capitalized as part of the vessel cost.

We are constructing two new coastal cruise vessels for our Delta Queen Coastal Voyages line at Atlantic Marine, Inc. of Jacksonville, Florida. We expect each vessel to have a total project cost, including furnishing, fixtures and equipment, of approximately $40 million to $42 million. The coastal cruise vessels will be approximately 300 feet long and provide accommodations for up to 224 passengers. The first vessel, the cv Cape May Light, is scheduled to be delivered in April 2001. The second vessel, the cv Cape Cod Light, is expected to be delivered in the third quarter of 2001. Atlantic Marine will provide a limited warranty for the work, parts, and components of each vessel fabricated by the yard for one year after delivery. During 2000, the Company incurred $23.5 million and $22.9 million for construction costs pertaining to the Cape May Light and Cape Cod Light respectively, including capitalized interest. On October 16, 2000 the Company issued $37.9 million and $38.5 million of 7.25% long- term bonds to finance construction of the cv Cape May Light and cv Cape Cod Light respectively. Semi- annual principal payments commence six months after delivery of the ships. The bonds are guaranteed by MARAD pursuant to a commitment received by the Company from MARAD on March 31, 2000 for financing guarantees pertaining to the two ships.

Under the terms of an agreement finalized on October 15, 1999, the Company acquired on October 18, 2000 the ms Nieuw Amsterdam from Holland America Line ("HAL") for $114.5 million. Upon taking delivery of the vessel, the Company renamed it the ms Patriot and is operating it as a 1,212- passenger U.S.- flagged vessel serving the Hawaiian market. This is the first ship that the Company intends to operate under the United States Lines brand name. The purchase price was financed with $30 million of proceeds from the issuance of Trust Preferred Securities (see Note 7 to the Consolidated Financial Statements) and an $84.5 million promissory note issued to HAL by the Company. The promissory note bears interest at a floating rate equal to the prevailing prime rate, which was 9.5% at the time of purchase, and is payable monthly in arrears. Principal paydowns of $5.1 million are scheduled for each March 31st and September 30th, beginning with March 31, 2001, with a final payment of $23.7 million due on January 18, 2007. The Company also incurred $20.4 million in refurbishment, renovation, and other capital expenditures necessary to ready the vessel for service. This amount was funded from operating cash flow. The vessel was placed into service on December 9, 2000.

The 1999 purchase contract with HAL required the Company to make an earnest money deposit of $30 million by January 17, 2000. Persons and entities affiliated with Equity Group Investments, Inc. ("Equity"), the Company's largest stockholder, guaranteed the letter of credit facility for the Company with The Chase Manhattan Bank ("Chase") for up to $30 million, thereby allowing the Company to obtain the facility from its inception until February 22, 2000. Under an agreement dated October 15, 1999, as consideration for issuance of the guarantee, the Company paid Equity a commitment fee of $0.5 million in 1999 and agreed to pay Equity additional compensation in the form of stock appreciation units. Equity's rights to receive this additional compensation vested, on a monthly basis, during the period that the guarantee remained outstanding. On February 22, 2000, the Company deposited $30 million into a cash collateral account with Chase from proceeds received from the issuance of Trust Preferred Securities, thereby terminating the Equity guarantee. Equity may exercise its right to receive payment during the two years following the third anniversary of the date of the agreement, subject to the Company's rights to retire Equity's stock appreciation units, at escalating prices, prior to the third anniversary of the agreement. (See Note 8 to the Consolidated Financial Statements for further information).

In May 1999 we acquired a substantially complete riverboat originally built for the casino trade that we converted into the fourth Delta Queen riverboat. The vessel, known as the Columbia Queen, entered service on May 27, 2000 and operates weekly cruise vacations out of Portland, Oregon on the Columbia River system. The Company paid $3.2 million to acquire the vessel and incurred $32.8 million and $8.1 million of costs in 2000 and 1999 respectively, including capitalized interest, to convert the 218- foot boat into an overnight passenger vessel with 157 passenger berths. The conversion was financed primarily through borrowings on the Company's revolving credit facility.

HMS0097028

In February 1999, The Delta Queen Steamboat Co. ("DQSC") entered into a credit agreement with a group of lenders, with The Chase Manhattan Bank as agent. This agreement provided for a revolving credit facility of up to $70 million to fund the expansion of the Delta Queen line. Upon the completion of MARAD financing for the two Delta Queen coastal vessels, this facility was amended in the third quarter of 2000 whereby DQSC has a maximum of $30 million available to it in the amount of revolving credit loans until the maturity date of the facility, which is September 13, 2001. Any amounts outstanding on the maturity date will be converted to a non- amortizing term loan which matures on September 13, 2002. Borrowings under the facility bear interest at either (1) the greater of Chase Manhattan's prime rate or alternative base rates plus a margin ranging from 0.50% to 0.75%, or (2) LIBOR plus a margin ranging from 1.50% to 1.75%. The Company is also required to pay an unused commitment fee of 0.50% per annum. The facility is secured by all of the assets of DQSC, except for the American Queen, Cape May Light and Cape Cod Light. The terms of the facility require DQSC to maintain certain financial performance ratios and contain limitations on investments, additional indebtedness, construction costs of new vessels and other capital expenditures.

In the first quarter of 2000 the then three existing Delta Queen vessels' lay- ups were completed at a cost of approximately $6.7 million, including capital expenditures, repairs and maintenance. These amounts were funded from working capital and the Delta Queen credit facility. For its most recent dry- docking, the S.S. Independence was out of service for 18 days beginning January 5, 2000. This dry- docking cost approximately $5.9 million, including capital expenditures, repairs and maintenance and was funded from cash on hand. In the first quarter of 2001 the regularly scheduled dry- docking of the Mississippi Queen and lay- ups of the other Delta Queen riverboats were completed at a cost of approximately $7.8 million, including capital expenditures, repairs and maintenance and was funded from cash on hand.

As of December 31, 2000, we complied with all covenants under our various debt agreements.

Principal payments on long term debt due in 2001 amount to $15.8 million. Capital expenditures in 2001, including payments for vessels under construction, are expected to be approximately $308.5 million. We believe we will have adequate access to capital resources, both internally and externally, to meet our current short- term and long- term capital commitments and working capital needs. Such resources may include cash on hand, new borrowings from lenders, and the ability to secure additional financing through the capital markets. We continually evaluate opportunities to increase capacity at both Delta Queen and in Hawaii and to strategically grow our business. Although we believe that we have obtained sufficient equity and debt financing commitments from the capital markets, together with cash generated from operations, to satisfy our financial obligations relating to construction of the new vessels, there can be no assurance that the Company will be able to obtain additional financing, if necessary, at commercially acceptable levels to finance these projects and, if we so choose, to pursue strategic business opportunities. If we fail to obtain such financing, we may have to postpone or abandon some of our plans to increase capacity or pursue strategic growth opportunities.

Capacity in the Hawaii cruise market has more than doubled in 2001 due to the introduction of the ms Patriot and additional visits by foreign flagged ships. We have been discounting our Hawaii cruises as we absorb this increase in capacity. As a result, gross fare per diems in Hawaii for the first half of 2001 have declined by 24% as compared to the comparable period of a year ago.

**YEAR ENDED DECEMBER 31, 2000 COMPARED TO YEAR ENDED DECEMBER 31, 1999**

Total revenues were $221.6 million in 2000 compared to $208.7 million in 1999. Total revenue for 2000 represents a $10.3 million increase in fare revenues year over year and a $2.6 million increase in other revenues, primarily passenger air and onboard revenues. Fare per diems increased 3% year over year, while occupancy levels decreased from 99% in 1999 to 97% in 2000.

American Hawaii's fare revenues decreased by $1.2 million as a 5% increase in fare per diems was more than offset by a 9% decrease in passenger nights, due to the SS Independence being out of service for 18 days in January 2000. Delta Queen's fare revenues increased $6.8 million in 2000, primarily due to an increase in capacity from the late May Columbia Queen introduction, partially offset by a 1% decline in passenger nights at the other three riverboats. Fare per diems and occupancy levels for Delta Queen were flat in 2000 as compared to 1999. On December 9, 2000 the ms Patriot was introduced into service and contributed fare revenue of $4.7 million in 2000.

Consolidated cost of operations increased by $9.8 million, to $143.6 million in 2000 from $133.9 million in 1999. The increase is mainly due to the introduction of the ms Patriot in December 2000 and, to a lesser extent, the introduction of the Columbia Queen in May 2000. Operating costs were also negatively impacted by higher fuel costs, which increased by $2.3 million, or 49%, for vessels that were in service in 1999 and 2000.

HMS0097029

Selling, general and administrative expenses ("SG&A") increased by $17.9 million, from $56.8 million in 1999 to $74.7 million in 2000. The increase is due primarily to $11.1 million in marketing expenses associated with vessels that were not yet in service during the year, as compared to $1.3 million of comparable expenses in 1999. The Company also incurred $5.1 million in start- up expenses, of which $4.3 million was related to the ms Patriot, $0.6 million was related to the Columbia Queen and $0.2 million was related to the new Delta Queen Coastal vessels. No start- up expenses were incurred in 1999. Excluding these start- up and marketing expenses, SG&A increased by $3.1 million. As a percent of total revenues, excluding start- up costs and marketing expenses for vessels not in service, SG&A decreased from 26.6% in 1999 to 26.4% in 2000.

The operating loss in 2000 was $13.1 million compared to an operating profit of $1.6 million in 1999. The change is mainly due to the increase in marketing expenses and start- up costs previously discussed, as well as the increase in fuel costs which negatively impacted gross margin.

Interest income increased by $3.9 million to $7.0 million in 2000, primarily due to income generated from debt proceeds held in escrow prior to being released for payments to shipyards.

Interest expense decreased from $7.5 million in 1999 to $3.6 million in 2000 as $11.7 million of interest that was capitalized in 2000, as compared to $2.3 million in 1999, was partially offset by interest from higher debt levels in 2000.

Income tax benefit increased from $1.0 million in 1999 to $3.6 million in 2000, due to higher pre- tax losses.

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (CONT'D.)**

On February 22, 2000 the Company completed an offering of $100 million of convertible 7% preferred securities of a subsidiary trust (see Note 7 to the Consolidated Financial Statements), resulting in accrued distributions and amortization of related financing costs of $6.2 million.

**YEAR ENDED DECEMBER 31, 1999 COMPARED TO YEAR ENDED DECEMBER 31, 1998**

Consolidated revenues for 1999 increased $16.5 million to $208.7 million from $192.2 million for 1998. This represented an $11.3 million increase in fare revenues combined with a $5.2 million increase in other revenues. American Hawaii's fare revenues increased $3.8 million. Occupancy rates increased 6% to 106% while fare per diems of $183 were consistent with the prior year. Delta Queen's fare revenues increased $7.5 million. Occupancy rates increased 4 percentage points from 89% to 93% and fare per diems increased 5% to $268. As a result, consolidated fare per diems for 1999 increased 3% to $225. Of the $5.2 million increase in other revenues, $3.4 million was attributable to increases in passenger air and hotel revenue corresponding to the occupancy increase at both cruise lines. Air revenue per passenger night also increased due to higher air fares. As discussed below, the increase in air revenue was offset by a corresponding increase in related air expenses. American Hawaii's onboard revenue also increased by $1.8 million reflecting an 8% improvement in onboard revenue per passenger night combined with the 6% occupancy increase. As a result, consolidated total revenue per passenger night increased 3% to $316.

Consolidated cost of operations for 1999 increased $8.3 million to $133.9 million from $125.6 million for 1998. As noted above, higher air fare expenses accounted for $2.9 million of the increase. American Hawaii's operating costs, before air expenses, increased $2.8 million reflecting higher passenger and onboard expenses associated with the occupancy increase, and higher fuel costs. Delta Queen's operating costs, before air expenses, increased $2.6 million reflecting higher passenger and commission expenses associated with the occupancy increase, and higher fuel costs. Consolidated maintenance expenses increased $2.1 million. Consolidated gross profit increased $8.2 million in 1999 from 1998.

Consolidated SG&A expenses increased $12.5 million to $56.8 million for 1999 from $44.2 million in 1998. The increase reflects additional selling and marketing spending at both cruise lines during the year. Of the additional marketing spending, approximately $4.8 million was used to promote year 2000 sailings, whereas in the prior year, approximately $0.7 million was incurred for 1999 sailings. The third quarter of 1999 included marketing expenses for the Columbia Queen amounting to $1.3 million, with no comparable expenses in 1998. The remainder of the increase is mainly attributable to salary and benefits associated with new personnel hired during 1999 in connection with our capacity expansion efforts.

As a result of increases in expenses in excess of increases in revenues, consolidated operating income for 1999 was $1.6 million as compared to $5.5 million for 1998.

Interest income increased by $2.0 million as a result of proceeds received by us upon the sale of additional common stock during 1999. Interest expense and other financing costs increased during 1999 due to the accrual of $2.6 million payable to the guarantor of our letter of credit facility related to our agreed upon purchase of the ms Nieuw Amsterdam in October 2000. We also amortized $0.5 million of deferred financing fees related to this transaction. During the year, we also capitalized $2.3 million of interest expense related to our vessels under construction. We capitalized no interest expense in

the prior year.
Income tax benefit was $1.0 million in 1999 as compared to income tax expense $0.1 million in 1998 due to a pre- tax loss of $2.8 million in 1999, while 1998 had pre- tax income of $0.3 million.

**RESCISSION OF ACCOUNTING METHOD**

On November 2, 1999 we announced that we had rescinded our prior adoption of the American Institute of Certified Public Accountants Accounting Standards Executive Committee's Statement of Position ("SOP") No. 93- 7, "Reporting on Advertising Costs", relating to the deferral of direct response advertising costs. The deferral method provided for in SOP 93- 7 was adopted in 1999, and made effective as of January 1, 1999. Under SOP 93- 7, we deferred recognition of direct response advertising costs related to direct response advertising efforts for future cruises. These deferred costs were recognized in the periods that the cruises promoted by the efforts were completed, and the related cruise revenue recognized. We rescinded our adoption of SOP 93- 7 due to difficulties we encountered in implementing the new method. In rescinding SOP 93- 7, we returned to our prior method of recognizing expenses for direct response advertising costs

when those costs are incurred. As a result of the rescission of SOP 93- 7, we restated our earnings for the first quarter of 1999 to reflect a loss of $6.3 million, or ($0.44) per share, compared to our previously reported loss of $4.5 million, or ($0.32) per share. We also restated our earnings for the second quarter of 1999 to $2.5 million, or $0.14 per share, compared to our previously reported earnings of $2.4 million, or $0.13 per share. As previously disclosed, the Securities and Exchange Commission has been conducting an informal investigation into our adopting and then rescinding the AICPA's Statement of Position 93- 7 relating to the deferral of direct response advertising costs. While the SEC has not brought any formal proceedings against us, it is possible that the SEC's informal inquiry or a subsequent formal inquiry or proceeding could result in sanctions or orders against us. We cannot predict at this time whether any such sanctions would have a material impact.

**RECENT ACCOUNTING PRONOUNCEMENTS**

In June 1998, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standard ("SFAS") No. 133, "Accounting for Derivative Instruments and Hedging Activities". This statement establishes accounting and reporting standards for derivative instruments and for hedging activities. It requires that derivatives be recognized in the balance sheet at fair value and specifies the accounting for changes in fair value. In June 1999, the FASB issued SFAS No. 137, "Accounting for Derivative Instruments and Hedging Activities - Deferral of the Effective Date of FASB Statement No. 133" to defer the effective date of SFAS No. 133, until fiscal years beginning after June 15, 2000. At December 31, 1999, December 31, 2000 and February 28, 2001 the Company had no derivative financial instruments, nor does it engage in any hedging activities. Therefore, SFAS No. 133 is not expected to have a material impact on its results of operations or financial position. Should the Company elect to engage in derivative and hedging activities in the future, the impact of SFAS No. 133 on the consolidated financial statements would depend on a variety of factors including the level of future hedging activities, the types of hedging instruments used and the effectiveness of such instruments.

**OTHER MATTERS**

On September 8, 2000 the Company announced its intention to relocate its corporate and operational headquarters, from Chicago, IL and New Orleans, LA respectively, to a new leased facility which is being constructed in Sunrise, FL. In connection with the move, the Company is eligible to receive economic incentives from the State of Florida, Broward County and the City of Sunrise of up to $4.2 million once certain conditions are met. The economic benefits to be received by the Company include tax refunds beginning in 2002 under Florida's Qualified Target Industry Tax (QTI) Refund Program, state job training funds and certain cash grants approved by the local municipalities. These benefits will be recognized as they are earned. Construction of the new facility is expected to be completed in November 2001 and the relocation is expected to be largely complete by early 2002. The Company has offered to relocate most employees to the new location but the number of employees intending to relocate is largely undetermined as of December 31, 2000. The Company will incur severance and retention costs pertaining to those employees choosing not to relocate (see Note 14 to the Consolidated Financial Statements). The Company also expects to incur employee relocation costs and additional

relocation expenses to move equipment and furniture, which will be expensed as incurred. As of December 31, 2000 the Company has not recognized any expense for relocation of employees or Company assets, but has recognized $0.6 million in severance expenses for employees who have communicated to the Company in writing their intention not to relocate. The Company may also incur lease termination expenses or a write- off of leasehold improvements if it elects to vacate its Chicago or New Orleans facilities. At this time the Company has not determined whether it will completely vacate these facilities and therefore is unable to determine the potential costs, if any, it will incur in connection with terminating the leases or writing off the leasehold improvements.
On February 20, 2001, the ms Patriot returned to its home port so that a thrust bearing in the vessel's generator drive train could be replaced. This resulted in refunds issued to passengers of approximately $1.6 million, and travel credits for a future cruise expected to cost approximately $0.5 million. The S.S. Independence will undergo an unscheduled dry- dock beginning March 24, 2001 to repair its bow thruster. The vessel is expected to be out of service for a period of seven days, and the expected cost of the repairs is expected to be between $400,000 and $500,000.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**
Market risk is the risk of loss from adverse changes in market prices and rates. Our principal market risk is due to changes in interest rates which affects us directly in our borrowing activities. At December 31, 2000, the Company's outstanding variable rate debt had a carrying value of $229.8 million. The Company also had cash and cash equivalents of $165.0 million. The company invests its excess cash in highly liquid short- term investments. A hypothetical instantaneous 100 basis point change in interest rates from their levels of December 31, 2000 would impact the earnings and cash flows of the Company by approximately $1.1 million.
On January 31, 2001, the Company issued $50 million of one- year notes, which bear interest at LIBOR minus 0.10%.and used $25 million of the proceeds to retire previously issued notes which were due on January 31, 2001. We will be issuing up to $950 million in additional debt related to our shipbuilding program for the Hawaii cruise vessels. This debt will be subject to the prevailing market conditions at the time it is issued. The Company does not employ any interest rate hedging techniques to manage interest rate risk, nor does it hold or issue any derivative or other financial instruments for trading purposes. Should we commence using interest rate hedging techniques, we may not be successful in reducing or eliminating our interest rate risk in the future.
Other market risks to which we are exposed relate to bunker and diesel fuel and food commodity prices, which we do not typically manage through the use of financial instruments. Increases in food and fuel commodity prices could materially affect our operating results. In the year 2000, the Company's bunker and diesel fuel costs amounted to 3.6% of total revenues, as compared to 2.2% of revenues in 1999. Food costs did not materially change as percentage of revenues in 2000 as compared to 1999.
**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page Number |
|---|---|
| Independent Auditors' Report | 25 |
| Consolidated Financial Statements | |
| Consolidated Balance Sheets | 26 |
| Consolidated Statements of Operations | 27 |
| Consolidated Statements of Cash Flows | 28 |
| Consolidated Statements of Changes in Stockholders' Equity | 29 |
| Notes to Consolidated Financial Statements | 30 |
| Financial Statement Schedules | |
| Schedule I - Condensed Financial Information of Registrant | 44 |
| Schedule II - Valuation and Qualifying Accounts | 48 |

**INDEPENDENT AUDITORS' REPORT**

The Board of Directors and Stockholders
American Classic Voyages Co.

We have audited the accompanying consolidated balance sheets of American Classic Voyages Co. and subsidiaries as of December 31, 2000 and 1999, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the years in the three- year period ended December 31, 2000. In connection with our audits of the consolidated financial statements, we also have audited the financial statement schedules. These consolidated financial statements and financial statement schedules are the responsibility of management of American Classic Voyages Co. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of American Classic Voyages Co. and subsidiaries as of December 31, 2000 and 1999 and the results of their operations and their cash flows for each of the years in the three- year period ended December 31, 2000, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related financial statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ KPMG LLP
**KPMG LLP**

Chicago, Illinois
February 27, 2001

**AMERICAN CLASSIC VOYAGES CO.**

**CONSOLIDATED BALANCE SHEETS**

(In thousands except shares and par value)

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 52,073 | $ 42,399 |
| Restricted short-term investments | 62,954 | 289 |
| Marketable securities | 7,843 | -- |
| Accounts receivable | 4,552 | 1,205 |
| Inventory | 5,417 | 2,529 |
| Prepaid air tickets | 3,646 | 1,930 |
| Prepaid expenses and other current assets | 4,814 | 3,491 |
| Total current assets | 141,299 | 51,843 |
| Property and equipment, net (Note 3) | 320,657 | 150,797 |
| Vessels under construction (Notes 4 and 8) | 258,467 | 74,601 |
| Deferred income taxes, net (Note 10) | 19,744 | 12,446 |
| Other assets | 12,448 | 4,303 |
| Total assets | $ 752,615 | $ 293,990 |
| LIABILITIES | | |
| Accounts payable | 41,930 | $ 14,534 |
| Other accrued liabilities | 28,581 | 23,712 |
| Notes payable, current portion (Note 5) | 100,000 | -- |
| Current portion of long-term debt | 15,768 | 4,100 |
| Unearned passenger revenues | 49,413 | 41,381 |
| Total current liabilities | 235,692 | 83,727 |
| Notes payable, non current portion (Note 5) | 25,000 | -- |
| Long-term debt, less current portion (Note 6) | 218,420 | 80,463 |
| Total liabilities | $ 479,112 | $ 164,190 |
| Convertible preferred securities of a subsidiary trust holding solely 7% convertible subordinated debentures of the Company (Note 7) | $ 100,000 | $ -- |
| COMMITMENTS AND CONTINGENCIES (Note 8) | | |
| STOCKHOLDERS' EQUITY (Note 9) | | |
| Preferred stock, $0.01 par value (10,000,000 and 5,000,000 shares authorized, respectively; none issued and outstanding) | $ -- | $ -- |
| Common stock, $0.01 par value (100,000,000 and 40,000,000 shares authorized, | | |

| | | |
|---|---|---|
| respectively, 20,969,103 and 18,602,206 shares issued and outstanding, respectively) | 210 | 187 |
| Additional paid-in capital | 204,555 | 151,094 |
| Accumulated deficit | (29,645) | (19,573) |
| Common stock in treasury, at cost (51,000 shares) | (757) | (757) |
| Unearned restricted stock and stock units | (860) | (1,151) |
| Total stockholders' equity | 173,503 | 129,800 |
| Total liabilities and stockholders' equity | $ 752,615 | $ 293,990 |

The accompanying notes are an integral part of these consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except per share data)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| Revenues | $ 221,625 | $ 208,717 | $ 192,225 |
| Cost of operations (exclusive of depreciation shown below) | 143,617 | 133,863 | 125,595 |
| Gross profit | 78,008 | 74,854 | 66,630 |
| Selling, general and administrative expenses | 74,745 | 56,765 | 44,232 |
| Depreciation expense | 16,369 | 16,440 | 16,912 |
| Operating (loss) income | (13,106) | 1,649 | 5,486 |
| Interest income | 7,025 | 3,102 | 1,117 |
| Interest expense and other financing costs | 3,612 | 7,549 | 6,639 |
| Accrued distributions on convertible preferred securities and related financing costs | 6,247 | -- | -- |
| Other (income) expense | 18 | (10) | (300) |
| Income (loss) before income taxes | (15,958) | (2,788) | 264 |
| Income tax expense (benefit) | (5,886) | (1,038) | 107 |
| Net income (loss) | $ (10,072) | $ (1,750) | $ 157 |
| PER SHARE INFORMATION | | | |
| Basic: | | | |
| Weighted-average shares outstanding | 20,621 | 17,167 | 14,137 |
| Earnings (loss) per share | $ (0.49) | $ (0.10) | $ 0.01 |
| Diluted: | | | |
| Weighted-average shares outstanding | 20,621 | 17,167 | 14,777 |
| Earnings (loss) per share | $ (0.49) | $ (0.10) | $ 0.01 |

The accompanying notes are an integral part of these consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

(In thousands)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2000 | 1999 | 1998 |
| OPERATING ACTIVITIES | | | |
| Net (loss) income | $ (10,072) | $ (1,750) | $ 157 |
| ADJUSTMENTS TO RECONCILE NET (LOSS) INCOME TO NET CASH PROVIDED BY OPERATING ACTIVITIES | | | |
| Depreciation expense | 16,369 | 16,440 | 16,912 |
| Gain on sale of assets | -- | -- | (300) |
| Changes in certain working capital accounts and other | | | |
| Accounts receivable | (3,347) | 784 | (690) |
| Accounts payable | 13,424 | 1,039 | (789) |
| Other accrued liabilities | 5,015 | 8,210 | (529) |
| Other assets | (5,798) | (1,050) | (258) |
| Unearned passenger revenues | 8,032 | 2,084 | 5,584 |
| Prepaid expenses and other | (5,927) | 1,103 | (1,563) |
| Net cash provided by operating activities | 17,696 | 26,860 | 18,524 |
| INVESTING ACTIVITIES | | | |
| (Increase) decrease in restricted investments | (62,665) | (229) | 265 |

| | | | |
|---|---|---|---|
| Capital expenditures ........................................ | [illegible] | [illegible] | (8,789) |
| Proceeds from sale of assets ........................................ | -- | -- | 300 |
| Purchase of marketable securities ........................................ | (7,843) | -- | -- |
| Net cash used in investing activities ........................................ | (426,631) | (80,095) | (8,224) |
| FINANCING ACTIVITIES | | | |
| Proceeds from borrowings ........................................ | 302,200 | 12,200 | -- |
| Repayments of borrowings ........................................ | (27,575) | (9,125) | (4,100) |
| Issuance of convertible preferred securities of subsidiary trust ........................................ | 100,000 | -- | -- |
| Purchase of common stock ........................................ | -- | -- | (757) |
| Issuance of common stock, net of issuance costs .................. | 53,629 | 68,697 | 2,907 |
| Deferred financing fees ........................................ | (9,645) | (3,142) | (533) |
| Net cash provided by (used in) financing activities .............. | 418,609 | 68,630 | (2,483) |
| Increase in cash and cash equivalents ............................ | 9,674 | 15,395 | 7,817 |
| Cash and cash equivalents, beginning of period ................... | 42,399 | 27,004 | 19,187 |
| Cash and cash equivalents, end of period ......................... | $ 52,073 | $ 42,399 | $ 27,004 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Cash paid during the period for: | | | |
| Interest (net of capitalized interest) ........................ | $ -- | $ 4,189 | $ 6,438 |
| Income taxes ........................................ | $ 177 | $ 258 | $ 232 |

The accompanying notes are an integral part of these consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY

(In thousands)

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Treasury Stock | Unearned Restricted Stock And Stock Units | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| Balance, December 31, 1997 ................ | $ 140 | $ 77,059 | $ (17,980) | $ -- | $ (90) | $ 59,129 |
| Net income ................................ | -- | -- | 157 | -- | -- | 157 |
| Stock units earned ........................ | -- | -- | -- | -- | 90 | 90 |
| Stock units issued to Directors, net ....... | -- | 138 | -- | -- | (107) | 31 |
| Stock issued under option and benefit plans ............................ | 3 | 3,254 | -- | -- | -- | 3,257 |
| Purchase of treasury stock ................ | -- | -- | -- | (757) | -- | (757) |
| Balance, December 31, 1998 ................ | 143 | 80,451 | (17,823) | (757) | (107) | 61,907 |
| Net loss ................................ | -- | -- | (1,750) | -- | -- | (1,750) |
| Stock units earned ........................ | -- | -- | -- | -- | 107 | 107 |
| Stock units issued to Directors, net ....... | -- | 205 | -- | -- | (103) | 102 |
| Restricted stock grant .................... | -- | 1,397 | -- | -- | (1,048) | 349 |
| Stock issued under option and benefit plans ............................ | 4 | 4,336 | -- | -- | -- | 4,340 |
| Stock offering, net of expenses ........... | 40 | 63,464 | -- | -- | -- | 63,504 |
| Tax benefit from exercise of stock options .................................. | -- | 1,241 | -- | -- | -- | 1,241 |
| Balance, December 31, 1999 ................ | 187 | 151,094 | (19,573) | (757) | (1,151) | 129,800 |
| Net loss ................................ | -- | -- | (10,072) | -- | -- | (10,072) |
| Stock units earned ........................ | -- | -- | -- | -- | 103 | 103 |
| Stock units issued to Directors, net ....... | -- | 377 | -- | -- | (161) | 216 |
| Restricted stock grant vesting ............ | -- | -- | -- | -- | 349 | 349 |
| Stock issued under option and benefit plans ............................ | 3 | 5,435 | -- | -- | -- | 5,438 |
| Stock offering, net of expenses ........... | 20 | 46,709 | -- | -- | -- | 46,729 |
| Tax benefit from exercise of stock options .................................. | -- | 940 | -- | -- | -- | 940 |
| Balance, December 31, 2000 ................ | $ 210 | $ 204,555 | $ (29,645) | $ (757) | $ (860) | $ 173,503 |

The accompanying notes are an integral part of these consolidated Financial Statements.

AMERICAN CLASSIC VOYAGES CO.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

NOTE 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

## NATURE OF OPERATIONS

American Classic Voyages Co., ("the Company") through its subsidiaries, operates three cruise lines under the names of The Delta Queen Steamboat Co., American Hawaii Cruises and United States Lines. The Delta Queen Steamboat Co., through its subsidiaries, owns and operates the American Queen, Mississippi Queen, Delta Queen and Columbia Queen riverboats, which conduct overnight cruise operations on certain U.S. inland waterways. Great Hawaiian Cruise Line, Inc., doing business as American Hawaii Cruises, through its subsidiaries, owns and operates the S.S. Independence steamship providing overnight cruises among the Hawaiian Islands. Project America Inc., doing business as United States Lines ("USL"), through its subsidiaries, owns and operates the ms Patriot, which also provides overnight cruises among the Hawaiian Islands. USL will also operate the new Hawaii vessels currently under construction. Ocean Development Company, a wholly owned subsidiary of Project America Inc., oversees the design and construction of new vessels.

**PRINCIPLES OF CONSOLIDATION**

The accompanying Consolidated Financial Statements include the accounts of the Company and all of its subsidiaries, and have been prepared in accordance with accounting principles generally accepted in the United States of America. All significant intercompany accounts and transactions have been eliminated in consolidation. Certain previously reported amounts have been reclassified to conform to the 2000 presentation.

**USE OF ESTIMATES**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make certain estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses, and the disclosure of contingent assets and liabilities to prepare these consolidated financial statements. Actual results could differ from those estimates.

**CASH AND CASH EQUIVALENTS**

All highly liquid investments purchased with an original maturity of three months or less are considered cash equivalents.

**RESTRICTED SHORT- TERM INVESTMENTS**

At December 31, 2000 and 1999, restricted short- term investments primarily reflect proceeds from debt issuances that have been placed in escrow accounts and are related to the construction of new vessels.

**MARKETABLE SECURITIES**

Unrestricted short- term investments which are held to maturity and mature in less than one year are classified as marketable securities.

INVENTORIES

Inventories consists of provisions, supplies, fuel and gift shop merchandise carried at the lower of cost (weighted-average) or market.

PREPAID AIR TICKETS

Prepaid air tickets consist of air tickets purchased by the Company and resold to passengers in advance of sailings.

**PROPERTY AND EQUIPMENT**

Property and equipment primarily consists of vessels and leasehold improvements which are recorded at cost. Construction- in- progress represents expenditures for the vessels under lay- up and/or dry- dock. Depreciation is computed using the straight- line method based upon the estimated useful lives of the various classes of assets ranging from 3 to 40 years. Lay- up and dry- dock expenditures relating to vessel improvements or betterments are capitalized. In addition, lay- up and dry- dock expenditures relating to cleaning, repairs and maintenance are accrued evenly over the period to the next scheduled lay- up and/or dry- dock and are based on the best available estimate of total costs. The accrual for these costs is included in other accrued liabilities and was $4.0 and $5.1 million at December 31, 2000 and 1999 respectively.

For vessels acquired and put into service in 2000, transportation, renovation and other costs necessary for placing the vessels into service have been capitalized as part of the cost of the asset. Depreciation of these vessels reflects the estimated salvage values based on the expected recoverable amounts at the end of their depreciable lives.

**VESSELS UNDER CONSTRUCTION**

Vessels under Construction consists mainly of payments to shipyards as part of the Company's various new shipbuilding programs (see note 4 for further information). Additional capitalized costs include furniture, fixtures and equipment, technical design, engineering, and architectural fees and owner supplied items. Interest costs associated with the vessels under construction are capitalized during the construction period and were $11.7 million and $2.3 million for the years ended December 31, 2000 and 1999 respectively.

**IMPAIRMENT OF LONG- LIVED ASSETS**

Long- lived assets and certain identifiable intangibles are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceed their fair value.

**INCOME TAXES**

Deferred tax assets and liabilities are recognized for the expected future tax consequences of temporary differences between carrying amounts and the tax bases of assets and liabilities.

**REVENUE AND EXPENSE RECOGNITION**

The Company generally receives passenger fares up to 60 days prior to the cruise date, which are recorded as a liability for unearned passenger revenue. The liability is recognized as revenue on a pro- rata basis during the associated cruise. The Company is self- insured in respect of guaranteeing the Company's passenger cruise deposits. Revenues from the sale of airline tickets and land packages are recorded at the gross amount billed to customers when earned, with their corresponding costs included in cost of operations. Advertising costs are expensed as incurred except for brochure costs, which result in tangible assets. Brochure costs are recorded as prepaid expenses and charged to expense as consumed.

**EARNINGS PER SHARE**

Basic earnings per share is computed by dividing net income by the weighted- average number of common shares outstanding during the period. Diluted earnings per share is computed by dividing net income by the sum of weighted- average common shares outstanding during the period plus potentially dilutive common shares. Potentially dilutive common shares that are anti- dilutive are excluded from earnings per share.

Following is a reconciliation of the shares used in calculating basic and dilutive earnings per share (in thousands):

| | 2000 | 1999 | 1998 |
|---|---|---|---|
| Weighted-average common shares outstanding | 20,621 | 17,167 | 14,137 |
| Effect of dilutive securities - options and stock units | ---- | ---- | 640 |
| Weighted-average common equivalent shares outstanding - assuming dilution | 20,621 | 17,167 | 14,777 |

As the Company reported net losses for the years ended December 31, 2000 and 1999, diluted earnings per share was computed in the same manner as basic earnings per share.

**FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company's financial instruments include restricted short- term investments, marketable securities, accounts receivable, accounts payable, short- term notes payable, long- term debt and convertible preferred securities of a wholly owned subsidiary trust ("trust preferred securities"). At December 31, 2000 and 1999, the fair values of all financial instruments, with the exception of the trust preferred securities, were not materially different from their carrying or contract values. See Note 7 to the Consolidated Financial Statements for the fair value of these securities.

**STOCK- BASED COMPENSATION PLANS**

The Company accounts for its stock - based compensation plans in accordance with the provisions of Statement of Financial Accounting Standards ("SFAS") No. 123, "Accounting for Stock- Based Compensation." As permitted under this statement, the Company has chosen to apply the intrinsic value- based method of accounting as prescribed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees." See Note 9 for the pro forma effect of the fair value accounting method, as defined in SFAS No. 123.

**OPERATING SEGMENTS**

The nature of the Company's operations are such that the Company operates as a single business segment under the standards set forth in SFAS No. 131.

**NEW ACCOUNTING PRONOUNCEMENTS**

In June 1998, the FASB issued SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities". This statement establishes accounting and reporting standards for derivative instruments and for hedging activities. It requires that derivatives be recognized in the balance sheet at fair value and specifies the accounting for changes in fair value. In June 1999, the FASB issued SFAS No. 137, "Accounting for Derivative Instruments and Hedging Activities - Deferral of the Effective Date of FASB Statement No. 133" to defer the effective date of SFAS No. 133, until fiscal years beginning after June 15, 2000. As of December 31, 1999, December 31, 2000 and February 28, 2001 the Company had no derivative financial instruments and did not engage in hedging activities. Therefore, SFAS 133 is not expected to have a material impact on its results of operations or financial position. Should the Company elect to engage in derivative and hedging activities in the future, the impact of SFAS No. 133 on the consolidated financial statements would depend on a variety of factors including the level of future hedging activities, the types of hedging instruments used and the effectiveness of such instruments.

**RISKS AND UNCERTAINTIES**

The Company is subject to varying degrees of risk and uncertainty. The Company insures its vessels and other business assets against insurable risks in a manner it deems appropriate. The Company believes that there is no concentration of risk with any single customer. See Note 8 for a discussion of concentration of risk for suppliers, or a small group of suppliers, whose failure or non- performance would materially affect the Company's results.

**NOTE 2. SHIP ADDITIONS**

Under the terms of an agreement finalized on October 15, 1999, the Company acquired on October 18, 2000 the ms Nieuw Amsterdam from Holland America Line ("HAL") for $114.5 million. Upon taking delivery of the vessel, the Company renamed it the ms Patriot and is operating it as a 1,212- passenger U.S.- flagged vessel serving the Hawaiian market. The purchase price was financed with $30 million of proceeds from the issuance of Trust Preferred Securities (see Note 7) and an $84.5 million promissory note issued to HAL by the Company (see Note 6). The Company also incurred $20.4 million in renovation, refurbishment and other capital expenditures necessary to ready the vessel for service. This amount was funded from operating cash flow. The vessel was placed into service on December 9, 2000. The promissory note bears interest at a floating rate equal to the prevailing prime rate, which was 9.5% at the time of purchase. The ms Patriot is the first ship that the Company intends to operate under the United States Lines brand name.

In May 1999 the Company acquired a riverboat originally built for the casino trade. The Company paid $3.2 million to acquire the vessel and incurred $32.8 million and $8.1 million of costs in 2000 and 1999 respectively, including capitalized interest, to convert the ship into an overnight passenger vessel with 157 passenger berths. The vessel entered service on May 27, 2000 and operates weekly cruise vacations out of Portland, Oregon on the Columbia River system. The conversion was financed primarily through borrowings on the Company's revolving credit facility and through the Company's operating cash flow.

NOTE 3. PROPERTY AND EQUIPMENT

Property and Equipment consists of (in thousands):

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| Vessels | $ 408,598 | $ 222,666 |
| Buildings and leasehold improvements | 8,086 | 7,779 |
| Construction-in-progress | 1,407 | 3,278 |
| Other | 10,971 | 9,122 |
| | 429,062 | 242,845 |
| Less accumulated depreciation | (108,405) | (92,048) |
| | $ 320,657 | $ 150,797 |

NOTE 4. VESSELS UNDER CONSTRUCTION

The Vessels under Construction balance includes payments to shipyards, design and engineering fees, construction management and oversight costs, various owner- supplied items and capitalized interest. There are four vessels under construction as of December 31, 2000. See Note 8 for further information.

Vessels under construction consists of the following (in thousands):

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| New Hawaii Ship #1 | $ 175,223 | $ 54,333 |
| New Hawaii Ship #2 | 27,624 | 1,471 |
| cv Cape May Light | 30,479 | 5,067 |
| cv Cape Cod Light | 25,141 | 2,296 |
| Columbia Queen | -- | 11,280 |
| ms Patriot | -- | 154 |
| | $ 258,467 | $ 74,601 |

The balance for the ms Patriot in 1999 consisted of design and engineering fees and various owner supplied items which were purchased in advance of taking delivery of the ship.

NOTE 5. NOTES PAYABLE

On April 8, 1999, the Company received a commitment from the Maritime Administration ("MARAD") for up to $1.1 billion in financing guarantees. The commitment amount represents 87.5% of the estimated total cost of the initial two Hawaii vessels (see Note 8), including shipyard costs, design and engineering fees and capitalized interest.

During 2000, the Company issued $125 million of MARAD- guaranteed notes pertaining to the construction of the first Hawaii vessel as follows:

- February 10, $25 million bearing interest at LIBOR minus 0.05%, due January 31, 2001
- August 10, $50 million bearing interest at LIBOR minus 0.05%, due July 31, 2001
- November 9, $50 million bearing interest at LIBOR minus 0.10%, due October 31, 2001.

The Company intends to refinance all of these notes on or before the maturity date. On January 31, 2001 the Company issued an additional $50 million of notes guaranteed by MARAD bearing interest at LIBOR minus 0.10%. Interest is payable quarterly and the principal amount is due on January 31, 2002. A portion of the proceeds from this issuance was used to pay down the $25 million note due January 31, 2001. Thus, at December 31, 2000 the $25 million note is shown as a non- current liability in the Company's consolidated financial statements. The weighted average interest rates of the notes issued February 10, August 10, and November 9, 2000 were 6.45%, 6.67% and 6.66% respectively.

NOTE 6. LONG-TERM DEBT

Long- term debt consisted of (in thousands):

| | December 31, 2000 | December 31, 1999 |
|---|---|---|
| U.S. Government Guaranteed Ship Financing Note, American Queen Series, LIBOR+0.25% floating rate notes due semi-annually beginning February 24, 1996 through August 24, 2005 | $ 11,961 | $ 14,385 |
| U.S. Government Guaranteed Ship Financing Bond, American Queen Series, 7.68% fixed rate, sinking fund bonds due semi-annually beginning February 24, 2006 through June 2, 2020 | 36,198 | 36,198 |

| | | |
|---|---|---|
| U.S. Government Guaranteed Ship Financing Note, Independence Series A, LIBOR+0.27% floating rate notes due semi-annually beginning June 7, 1996 through December 7, 2005 | 6,604 | 7,926 |
| U.S. Government Guaranteed Ship Financing Bond, Independence Series A, 6.84% fixed rate, sinking fund bonds due semi-annually beginning June 7, 2006 through December 7, 2015 | 13,215 | 13,215 |
| U.S. Government Guaranteed Ship Financing Note, Independence Series B, LIBOR+0.27% floating rate notes due semi-annually beginning December 7, 1996 through December 7, 2005 | 1,770 | 2,124 |
| U.S. Government Guaranteed Ship Financing Bond, Independence Series B, 7.46% fixed rate, sinking fund bonds due semi-annually beginning June 7, 2006 through December 7, 2015 | 3,540 | 3,540 |
| U.S. Government Guaranteed Ship Financing Bond, Cape May Series, 7.25% fixed rate, sinking fund bonds due semi-annually beginning no later than October 16, 2002 through April 16, 2027 | 37,900 | -- |
| U.S. Government Guaranteed Ship Financing Bond, Cape Cod Series, 7.25% fixed rate, sinking fund bonds due semi-annually beginning no later than October 16, 2002 through April 16, 2027 | 38,500 | -- |
| Patriot promissory note, floating prime rate due semi-annually beginning March 31, 2001 with a final payment of $23.7 million due on January 18, 2007 | 84,500 | -- |
| Revolving credit facility (maximum availability of $30 million at December 31, 2000 and $70 million at December 31, 1999) | -- | 7,175 |
| | 234,188 | 84,563 |
| Less current portion | 15,768 | 4,100 |
| | $218,420 | $ 80,463 |

The American Queen Series, the Independence Series A and B, Cape May Series and Cape Cod Series debt are guaranteed by the U.S. Government through MARAD and are secured by first mortgages on the American Queen, the S.S. Independence, Cape May Light and Cape Cod Light, respectively. These Series contain various covenants which, among other things, require the maintenance of certain financial ratios measured at the end of each year. On October 16, 2000 the Company issued $37.9 million and $38.5 million of long- term bonds to finance construction of the cv Cape May Light and cv Cape Cod Light respectively (see Note 8). Semi- annual principal payments commence six months after delivery of the ships. The bonds are guaranteed by MARAD pursuant to a commitment received by the Company from MARAD on March 31, 2000 for financing guarantees pertaining to the two ships.

On October 18, 2000 the Company acquired the ms Nieuw Amsterdam from Holland America Line ("HAL") for $114.5 million (see Note 2). In connection with the purchase, the Company issued to HAL an $84.5 million promissory note. The promissory note bears interest at a floating rate equal to the prevailing prime rate, and is payable monthly in arrears. Principal paydowns of $5.1 million are scheduled for each March 31st and September 30th, beginning with March 31, 2001, with a final payment of $23.7 million due on January 18, 2007.

In the third quarter of 2000 DQSC, as borrower, amended its credit facility with The Chase Manhattan Bank, as agent, and several participant banks (the "Chase Facility"). The Company has a maximum of $30 million available to it in the form of revolving credit loans until the maturity date of the facility, which is September 13, 2001. Any loans outstanding on the maturity date are converted to non- amortizing term loans which mature September 13, 2002. Borrowings under the amended facility bear interest at a rate, at the option of the Company, equal to either (1) the greater of Chase's prime rate or certain alternative base rates plus a margin ranging from 0.50% to 0.75%, or (2) LIBOR plus a margin ranging from 1.50% to 1.75%. The Company is also required to pay an unused commitment fee at a rate of 0.50% per annum.

The Chase Facility will be used for general corporate purposes. The amended facility is guaranteed by AMCV and secured by all of the assets of DQSC except the American Queen, Cape May Light and Cape Cod Light and has various limitations and restrictions on investments, additional indebtedness, the construction costs of the new vessels, and other capital expenditures. DQSC is required to comply with certain financial covenants, including maintenance of minimum interest coverage ratios and maximum leverage ratios, as defined.

Maturities of long- term debt during the next five years ending December 31, 2001 through 2005 are $15,768,000, $17,296,000, $17,296,000, $17,296,000 and $17,131,000 respectively

HMS0097040

As of December 31, 2000, the Company was in compliance with all covenants under its various debt agreements.

NOTE 7. TRUST PREFERRED SECURITIES

On February 22, 2000, AMCV Capital Trust I (the "Trust"), a wholly owned subsidiary of the Company, completed an offering of 2,000,000 convertible preferred securities ("trust preferred securities"). Each $50 security bears interest at 7% and is convertible at the holder's election into 1.6207 shares of the Company's common stock. All outstanding preferred securities are redeemable by the Company upon maturity of the debentures issued to the trust, which is on February 15, 2015, or upon early redemption. The outstanding preferred securities may be redeemed for cash at the Company's option on or after February 19, 2003. The Trust used the proceeds of its offering to purchase certain junior convertible subordinated debentures from the Company, which now comprise the sole assets of the Trust. The net proceeds to the Company, after underwriting fees and other costs, were approximately $96.3 million. A portion of the proceeds were used to fund the $30 million letter of credit facility related to the ms Nieuw Amsterdam purchase (see Notes 2 and 8) and to pay down outstanding amounts on the Chase credit facility. The underwriters' overallotment option of 300,000 additional trust preferred securities was not exercised. The fair value of these securities at December 31, 2001, based on quoted market prices, was $27.75 per security, or $55.5 million.

**NOTE 8. COMMITMENTS AND CONTINGENCIES**

The Company leases certain facilities and equipment under operating leases. The Company currently leases approximately 21,000 square feet from a partnership controlled by an affiliated company, at an annual rate of approximately $100,000. In addition, the Company's mainland operations facility in New Orleans is maintained pursuant to an assignment from local authorities. The Company paid approximately $171,000, $168,000 and $165,000 under this arrangement for the years ended December 31, 2000, 1999 and 1998 respectively. This arrangement may be terminated at any time by the local authorities upon determination that a superior maritime use is deemed to exist. Rent expense for the years ended December 31, 2000, 1999 and 1998 was approximately $912,000, $662,000 and $842,000, respectively.

As of December 31, 2000 the Company is obligated to make minimum rental payments under all operating leases through 2016, excluding assignment payments, as follows:

| (in thousands) | |
|---|---|
| 2001 | $ 1,416 |
| 2002 | 2,379 |
| 2003 | 2,562 |
| 2004 | 2,475 |
| 2005 | 2,247 |
| thereafter | 28,678 |
| | $ 39,757 |

The Company is subject to litigation in the ordinary course of business. In the opinion of management, the outcome of such litigation will not have a material effect on the results of operations or financial position of the Company as most is covered by insurance, net of a deductible.

**HAWAII VESSELS**

On March 9, 1999, the Company executed definitive agreements with Ingalls Shipbuilding, Inc. to construct at least two new vessels for the Hawaii cruise market. The new Hawaii cruise ships will have the capacity to accommodate approximately 1,900 passengers each. The contract provides that Ingalls Shipbuilding deliver the first new ship in January 2003 and the second ship in January 2004. We currently estimate the new Hawaii cruise ships to cost approximately $495 million each, including the cost of furnishings, fixtures and equipment, as well as design, engineering and architectural fees, but excluding capitalized interest. Ingalls Shipbuilding is claiming that the Company should pay additional sums beyond the contract price for certain interior finish work and has requested a delay in the delivery schedule. The Company believes that the claims made by the shipyard for additional payments and a delay in the delivery of the ships are unwarranted, and the Company intends to assert its rights under the original provisions of the contract. In addition, the shipbuilding contract provides the Company an option to build up to four additional vessels. The estimated contract price

of the first option vessel is $487 million and the contract price for the subsequent option vessels will be negotiated between the parties. Ingalls Shipbuilding will provide a limited warranty for the design, material, and workmanship of each vessel for one year after delivery.

**COASTAL VESSELS**

We are constructing two new coastal cruise vessels for our Delta Queen Coastal Voyages line at Atlantic Marine, Inc. of Jacksonville, Florida. We expect each vessel to have a total project cost, including furnishing, fixtures and equipment, of approximately $40 million to $42 million. The coastal cruise vessels will be approximately 300 feet long and provide accommodations for up to 224 passengers. The first vessel, the cv Cape May Light, is scheduled to be delivered in April 2001. The second vessel, the cv Cape Cod Light, is expected to be delivered in the third quarter of 2001. Atlantic Marine will provide a limited warranty for the work, parts, and components of each vessel fabricated by the yard for one year after delivery.

**STOCK APPRECIATION UNITS**

In 1999, the Company finalized an agreement with Holland America Line ("HAL") to purchase the ms Nieuw Amsterdam for $114.5 million. The purchase agreement required the Company to make an earnest money deposit of $30 million by January 17, 2000. The Company arranged for an unsecured letter of credit facility with The Chase Manhattan Bank for up to $30 million and satisfied the deposit requirement by posting a letter of credit for $30 million.

In 1999, persons and entities affiliated with Equity Group Investments, Inc. ("Equity"), the Company's largest stockholder, guaranteed the letter of credit facility for the Company with The Chase Manhattan Bank ("Chase") for up to $30 million. Under an agreement dated October 15, 1999, as consideration for issuance of the guarantee, the Company paid Equity a commitment fee of $500,000 in 1999 and agreed to pay Equity additional compensation in the form of stock appreciation units contingent, in part, upon appreciation in the Company's common stock above $21.90 per share. Equity's rights to receive this additional compensation vested, on a monthly basis, during the period that the guarantee remained outstanding. On February 22, 2000, the Company deposited $30 million into a cash collateral account with Chase from proceeds received by the Company from the securities offering discussed in Note 7, thereby terminating the Equity guarantee. The Company has the right to retire Equity's stock appreciation units by paying a per unit price, which escalates each year, during the first three years after issuance. The price of the Company's right to retire Equity's stock appreciation units was $11 per unit if the

Company retired the units by October 15, 2000, $13 per unit if the Company retires the units by October 15, 2001, and $15 per unit if the Company retires the units by October 15, 2002. If the Company does not retire Equity's stock appreciation units during the first three years after issuance, Equity may exercise, during the fourth and fifth years after issuance, its right to receive payment based upon the market value of the Company's common stock at such time.

After giving consideration to the Company's then current stock price and other factors, the Company decided not to exercise its right to retire Equity's vested stock appreciation units by October 15, 2000. Accordingly, the Company accrued an additional $2 per vested unit, or $0.6 million, which was charged to other financing costs on that date. On or before the next two anniversary dates of the issuance of Equity's stock appreciation units, the Company will evaluate whether to exercise its right to retire the units based on the Company's then current stock price, its liquidity and other factors. It is currently the Company's intent to retire Equity's stock appreciation units prior to October 15, 2002.

NOTE 9. STOCKHOLDERS' EQUITY

COMMON STOCK OFFERINGS

In the second quarter of 1999, the Company completed a public offering of an additional 4,025,000 shares of common stock. The net proceeds to the Company, after issuance costs, of $63.5 million were used for construction of the initial Hawaii vessel.

On February 22, 2000, the Company completed an offering of an additional 2,000,000 shares of common stock. The net proceeds to the Company, after issuance costs, were $46.7 million and are being used for the construction of the second Hawaii vessel. The underwriters' overallotment option of 300,000 additional shares was not exercised.

**RESTRICTED STOCK**

In February 1999 the Company reserved and set aside 72,122 shares of restricted common stock as compensation for a key salaried employee. Issuance and sale of these shares is restricted prior to the employee's retirement from the Company. Unearned compensation was recorded at the date of the restricted stock award based on the market value of shares. Unearned compensation, which is shown as a separate component of stockholders' equity, is being amortized to expense over a four- year vesting period, which began in July 1999.

**EMPLOYEE STOCK PURCHASE PLAN**

The American Classic Voyages Co. 1995 Employee Stock Purchase Plan (the "ESP Plan") allows eligible employees to purchase common stock of the Company, through payroll deductions, at a discounted price from the market price. The purchase price under the ESP Plan is deemed to be 85% of the lesser of (i) the market value of the Company's common stock on the last business day of the offering period or (ii) the greater of (a) the average market value during the offering period and (b) the market value on the first business day of the offering period. There is a maximum of 500,000 shares authorized under the ESP Plan. There were 11,113, 9,749 and 11,622 shares issued during 2000, 1999 and 1998 respectively, at an average price of $14.86, $17.41 and $13.38 per share for 2000, 1999 and 1998 respectively. At December 31, 2000, approximately 440,000 shares were available for offering under the ESP Plan.

**STOCK- BASED COMPENSATION PLANS**

The Company granted, as of January 1, 1992, fully vested options to the Company's then senior executive officers, to purchase shares of common stock, in lieu of bonus payments (the "Executive Stock Option Plan"). These options are exercisable, in whole or in part, at any time prior to January 2, 2002, at an exercise price of $3.25 per share.

The Company adopted the 1992 Stock Option Plan effective January 2, 1992 (the "1992 Plan") and the 1999 Stock Option Plan effective June 24, 1999 (the "1999 Plan"). Pursuant to the 1992 and 1999 Plans, certain officers, directors, key employees, and consultants will be offered the opportunity to acquire shares of the Company's common stock via stock option grants. In addition, the 1992 Plan provides for the granting of stock units. The exercise price of options granted under the 1992 and 1999 Plans cannot be less than the fair market value of the Company's common stock at the date of grant. As of December 31, 2000, 2,174,130 and 2,965,167 shares of the Company's common stock have been reserved for issuance under the 1992 Plan and 1999 Plan respectively. Options granted under the 1992 and 1999 Plans generally vest over a three- year period and expire 10 years from the date of grant. The per share weighted- average fair value of stock options granted during

2000, 1999, and 1998 was $9.86, $9.21 and $7.86 respectively, on the date of grant using the Black- Scholes option-pricing model with the following weighted- average assumptions for 2000, 1999 and 1998 respectively: expected volatility of 52%, 50% and 53%, risk- free interest rates of 6.2%, 6.3% and 4.6%, expected lives of three years and dividend yield of 0% for all years.

In 2000, 1999 and 1998, under the terms of the 1992 Plan, the Company paid each non- employee director stock units as an annual retainer. The stock units in general vest at a rate of 25% on the first day of each calendar quarter. The fully vested stock units will be converted into an equal number of common stock shares at any time as selected by each director prior to each grant.

As permitted under SFAS No. 123, the Company continues to apply the provisions of APB Opinion No. 25 for stock-based awards granted to employees. Accordingly, no compensation cost has been recognized for stock option grants in the financial statements. Had compensation cost for the Company's stock- based compensation plans been recognized based on the fair value method prescribed under SFAS No. 123, the Company's net income (loss) and earnings (loss) per share would have been adjusted to the pro forma amounts indicated below (in thousands, except per share amounts):

| | | 2000 | 1999 | 1998 |
|---|---|---|---|---|
| Net income (loss) | As reported | $ (10,072) | $ (1,750) | $ 157 |
| | Pro forma | (11,706) | (4,396) | (2,487) |
| Basic earnings (loss) per share | As reported | $ (0.49) | $ (0.10) | $ 0.01 |
| | Pro forma | (0.57) | (0.26) | (0.18) |
| Diluted earnings (loss) per share | As reported | $ (0.49) | $ (0.10) | $ 0.01 |
| | Pro forma | (0.57) | (0.26) | (0.18) |

The table below summarizes the activity for the Company's stock-based compensation plans in 1998, 1999 and 2000:

| | Executive Stock Option Plan | 1992 Plan | 1992 Plan | 1999 Plan | Weighted Average Exercise Price For Options |
|---|---|---|---|---|---|
| | Shares Subject to Options | Shares Subject to Options | Shares Subject to Stock Units | Shares Subject to Options | |
| Balance at December 31, 1997 | 195,125 | 1,422,379 | 20,400 | -- | $ 10.74 |
| Granted.................... | -- | 1,618,000 | 14,000 | -- | 17.10 |
| Canceled................... | (19,512) | (151,236) | -- | -- | 13.44 |
| Exercised.................. | (50,000) | (215,047) | -- | -- | 9.29 |
| Converted.................. | -- | -- | (7,000) | -- | -- |
| Balance at December 31, 1998 | 125,613 | 2,674,096 | 27,400 | -- | 14.39 |
| Granted.................... | -- | 7,500 | 9,100 | 999,650 | 20.69 |
| Canceled................... | -- | (48,673) | -- | -- | 14.92 |
| Exercised.................. | (86,000) | (238,526) | -- | -- | 9.94 |
| Balance at December 31, 1999 | 39,613 | 2,394,397 | 36,500 | 999,650 | 16.65 |
| Granted.................... | -- | 55,000 | 18,150 | 117,900 | 23.91 |
| Canceled................... | -- | (153,683) | -- | (35,934) | 18.18 |
| Exercised.................. | (15,000) | (290,542) | -- | (34,833) | 13.59 |
| Balance at December 31, 2000 | 24,613 | 2,005,172 | 54,650 | 1,046,783 | $ 17.30 |

The following table summarizes information about options outstanding at December 31, 2000:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Price | Outstanding at 12/31/00 | Weighted-Average Remaining Contractual Life in Years | Weighted-Average Exercise Price | Exercisable at 12/31/00 | Weighted-Average Exercise Price |
| $3.25 | 24,613 | 1 | $ 3.25 | 24,613 | $ 3.25 |
| 7.97 - 9.88 | 300,649 | 6 | 8.79 | 300,649 | 8.79 |
| 10.25 - 15.00 | 210,750 | 5 | 11.82 | 210,750 | 11.82 |
| 15.32 - 20.00 | 2,174,673 | 7 | 17.33 | 1,185,731 | 17.17 |
| 21.13 - 33.14 | 365,883 | 9 | 28.21 | 85,500 | 28.96 |
| $ 3.25 -$33.14 | 3,076,568 | 7 | $17.30 | 1,807,243 | $15.52 |

NOTE 10. INCOME TAXES

The provision (benefit) for income taxes consisted of (in thousands):

| | Years Ended December 31, 2000 | 1999 | 1998 |
|---|---|---|---|
| Current tax provision (benefit): | | | |
| Federal............................ | $ -- | $ -- | $ -- |
| State.............................. | 435 | 150 | 213 |
| Total current tax provision......... | 435 | 150 | 213 |
| Deferred tax provision (benefit): | | | |
| Federal............................ | (4,856) | (712) | 89 |
| State.............................. | (1,465) | (476) | (195) |
| Total deferred tax provision........ | (6,321) | (1,188) | (106) |
| Total tax provision (benefit)....... | $ (5,886) | $ (1,038) | $ 107 |

The provision (benefit) for income taxes differs from amounts computed by applying the U.S. statutory income tax rate. The differences are summarized as follows (in thousands):

| | Years Ended December 31, 2000 | 1999 | 1998 |
|---|---|---|---|

| | 35% | 35% | 35% |
|---|---|---|---|
| Tax provision (benefit) at federal statutory rate | $ (5,584) | $ (975) | $ 93 |
| Effect of state income taxes (net of Federal benefit) | (669) | (297) | 12 |
| Non-deductible expenses | 367 | 234 | 221 |
| Other | -- | -- | (219) |
| Total tax provision (benefit) | $ (5,886) | $ (1,038) | $ 107 |

The tax effects of temporary differences that gave rise to significant portions of the deferred tax assets and deferred tax liabilities are presented below (in thousands):

| | December 31, 2000 | 1999 |
|---|---|---|
| Deferred tax assets: | | |
| Insurance costs and reserves | $ 1,508 | $ 1,173 |
| Non-recurring executive compensation | 84 | 135 |
| Benefit cost accruals | 907 | 716 |
| Finance cost accruals | 1,324 | 1,030 |
| Alternative minimum tax Credit carryforwards | 2,206 | 2,206 |
| Dry-dock accruals | 1,745 | 1,995 |
| Net operating loss carryforward | 47,985 | 36,823 |
| Goodwill, due to basis differences | 2,717 | 3,075 |
| Total deferred tax assets | 58,476 | 47,153 |
| Deferred tax liabilities: | | |
| Capital construction fund | 612 | 702 |
| Property plant and equipment, due to basis differences and depreciation, net | 38,120 | 34,005 |
| Total deferred tax liabilities | 38,732 | 34,707 |
| Net deferred tax asset | $ 19,744 | $ 12,446 |

At December 31, 2000, consolidated net operating losses of approximately $3.0 million, $10.0 million, $36.0 million, $14.0 million, $29.0 million, $5.0 million, $5.7 million and $23.4 million, expiring in 2008, 2009, 2010, 2011, 2012, 2018, 2019 and 2020 respectively, were available to offset future taxable income of the Company. The 2000 net operating loss of $23.4 million includes $2.7 million of deductions related to stock option exercises, the tax benefit of which was recorded as additional paid in capital.

There is no valuation allowance for deferred tax assets as of December 31, 2000 and 1999. In assessing whether the deferred tax assets are realizable, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which the temporary differences become deductible. Management considers, among other things, projected future taxable income, and tax planning strategies in making this assessment. Based upon the level of historical taxable income and projections for future taxable income over the periods during which the temporary differences that gave rise to those deferred tax assets are deductible, management believes it is more likely than not that the Company will realize the benefits of these deductible differences. The amount of the deferred tax asset considered realizable, however, could be reduced in the near term if estimates of future taxable income during the carryforward period are reduced.

In 1993, the Company established a capital construction fund (the "CCF") pursuant to Section 607 of the Merchant Marine Act of 1936, into which it deposited approximately $12.0 million. This fund was primarily used to pay liabilities assumed in the acquisition of American Global Line (now American Hawaiian Cruises) and allowed the Company to accelerate recognition of certain deductions for qualified capital expenditures for income tax purposes. As a result of the CCF, the Company has approximately a $2.2 million alternative minimum tax credit carryforward available with no expiration date.

**NOTE 11. RELATED PARTY TRANSACTIONS**

As of December 31, 2000, the largest stockholders of the Company's common stock were certain affiliates of EGI, including EGI Holdings, Inc. and EGIL Investments, Inc., which owned an aggregate of 35.2% of the Company's common stock. EGI and its affiliates provided certain administrative support services for the Company, including but not limited to legal, accounting, tax, benefit and insurance brokerage services. As previously mentioned in Note 8, the Company leases office space from an affiliate of EGI. In the aggregate, the fees charged by EGI and its affiliates for such services and rent were approximately $0.2 million, $0.4 million and $0.4 million for the years ended December 31, 2000, 1999 and 1998

respectively. At December 31, 2000 the Company had also accrued $0.5 million in connection with the assistance of several

40

AMERICAN CLASSIC VOYAGES CO.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT'D.)

EGI employees with recent debt and equity financing transactions undertaken by the Company. This amount was paid in the first quarter of 2001. In addition, as previously mentioned in Note 8, the Company obtained financing guarantees from EGI. Arrangements with EGI and its affiliates are subject to approval by a majority of the non- affiliated members of the Company's Board of Directors.

In late 1997, the Company subleased approximately 13,000 square feet of Chicago office space (the "sublease area") to Equity Office Properties Trust, an affiliate of EGI. For the years ended December 31, 1998 and 1997, approximately $78,000 and $23,000, respectively, was received by the Company under the sublease. In mid- 1998, the Company entered into an amended lease agreement covering the Chicago office space whereby the subleased area was removed from the lease. The Company was granted a $0.6 million reduction in future rent on its remaining office space, representing the value of undepreciated leasehold improvements of the sublease area.

The Company paid approximately $1.0 million, $0.6 million and $0.8 million during 2000, 1999 and 1998 respectively, for legal services to Preston Gates Ellis & Rouvelas Meeds ("Preston Gates"). Mr. Rouvelas, a Director of the Company since 1998, is a partner of Preston Gates. The Company paid approximately $0.3 million, $0.1 million and $0.1 million during 2000, 1999 and 1998 respectively, for legal services to Watanabe, Ing & Kawashima ("WIK"). Mr. Watanabe, a Director of the Company since 1998, is a partner of WIK. The Company paid approximately $13,000 and $0.2 million during 2000 and 1999 respectively for recruiting fees to Heidrick & Struggles ("H&S"). Mr. Berry, a Director of the Company since 1999, is a partner of H&S.

## NOTE 12. EMPLOYEE BENEFIT PLANS

### RETIREMENT PLANS

The Company's non- union employees are eligible to participate in the ADVANTAGE Retirement Savings Plan (as amended and restated October 1, 1987, "ADVANTAGE Plan"), a profit- sharing plan with a salary deferral feature that qualifies under Section 401 of the Internal Revenue Code of 1986, as amended. The ADVANTAGE Plan allows participants to defer a portion of their eligible compensation on a pre- tax basis. Participant contributions are 100% vested at the time the contribution is made. Matching contributions are made by the Company in an amount equal to 100% of the amount of a participant's contribution with a maximum of 4% of such participant's annual eligible wages, subject to Internal Revenue Service maximums. In addition, the Company may make discretionary profit- sharing contributions which are allocated to eligible employees based on eligible compensation. Company contributions vest over a five- year period. Matching and profit- sharing contributions approximated $562,000, $845,000 and $497,000 for the years ended December 31, 2000, 1999 and 1998 respectively.

The Company also maintains a non- qualified deferred compensation plan (the "Restoration Plan"), effective August 1, 1998. The purpose of the Restoration Plan is to provide deferrals for eligible employees that may not be made to the ADVANTAGE Plan because of certain restrictions and limitations in the Code. Benefits will be paid from employee contributions. The Company's liability under the Restoration Plan as of December 31, 2000 was $156,000.

The Company also contributes, under collective bargaining agreements, to funds designed to provide pension and health benefits for its union employees. The Company contributed approximately $3,059,000, $2,419,000 and $2,203,000 to such plans for the years ended December 31, 2000, 1999 and 1998, respectively.

41

AMERICAN CLASSIC VOYAGES CO.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONT'D.)

## NOTE 13. UNAUDITED QUARTERLY RESULTS OF OPERATIONS

HMS0097046

Summarized unaudited quarterly results of operations for 2000 and 1999 are as follows:

| Year Ended December 31, 2000 (In thousands, except per share data) | March 31, 2000 | June 30, 2000 | September 30, 2000 | December 31, 2000 |
|---|---|---|---|---|
| Revenues | $ 38,960 | $ 58,302 | $ 62,456 | $ 61,907 |
| Gross profit | 10,725 | 22,868 | 23,853 | 20,562 |
| Operating (loss) income | (9,580) | 2,045 | 1,614 | (7,185) |
| Pre-tax (loss) income | (10,119) | 2,101 | 1,556 | (9,496) |
| Net (loss) income | (6,380) | 1,324 | 980 | (5,996) |
| Basic (loss) earnings per share | (0.33) | 0.06 | 0.05 | (0.28) |
| Diluted (loss) earnings per share | (0.33) | 0.06 | 0.05 | (0.28) |

| Year Ended December 31, 1999 (In thousands, except per share data) | March 31, 1999 | June 30, 1999 | September 30, 1999 | December 31, 1999 |
|---|---|---|---|---|
| Revenues | $ 40,566 | $ 55,200 | $ 57,460 | $ 55,491 |
| Gross profit | 11,798 | 21,506 | 21,692 | 19,858 |
| Operating (loss) income | (9,222) | 4,735 | 3,714 | 2,422 |
| Pre-tax (loss) income | (10,470) | 4,124 | 3,479 | 79 |
| Net (loss) income | (6,283) | 2,475 | 2,091 | (33) |
| Basic (loss) earnings per share | (0.44) | 0.14 | 0.11 | 0.00 |
| Diluted (loss) earnings per share | (0.44) | 0.14 | 0.11 | 0.00 |

The pre- tax (loss) income amounts in the first three quarters of 2000 reflect the reclassification of accrued distributions on the trust preferred securities and their related income tax benefit.

The sum of quarterly (loss) earnings per common share differs from full- year amounts due to changes in the number of shares outstanding during the year.

On November 2, 1999 we announced that we had rescinded our prior adoption of the American Institute of Certified Public Accountants Accounting Standards Executive Committee's Statement of Position ("SOP") No. 93- 7, "Reporting on Advertising Costs,", relating to the deferral of direct response advertising costs. The deferral method provided for in SOP 93- 7 was adopted in 1999, and made effective as of January 1, 1999. Under SOP 93- 7, we deferred recognition of direct response advertising costs related to direct response advertising efforts for future cruises. These deferred costs were recognized in the periods that the cruises promoted by the efforts were completed, and the related cruise revenue recognized. We rescinded our adoption of SOP 93- 7 due to difficulties we encountered in implementing the new method. In rescinding SOP 93- 7, we returned to our prior method of recognizing expenses for direct response advertising costs when those costs are incurred. As a result of the rescission of SOP 93- 7, we restated our earnings for the first quarter of 1999 to reflect a loss of $6.3 million, or ($0.44) per share, compared to our previously reported loss of $4.5 million, or ($0.32) per share. We also restated our earnings for the second quarter of 1999 to $2.5 million, or $0.14 per share, compared to our previously reported earnings of $2.4 million, or $0.13 per share. As previously disclosed, the Securities and Exchange Commission has been conducting an informal investigation into our adopting and then rescinding the AICPA's Statement of Position 93- 7 relating to the deferral of direct response advertising costs. While the SEC has not brought any formal proceedings against us, it is possible that the SEC's informal inquiry or a subsequent formal inquiry or proceeding could result in orders, sanctions or penalties against us. We cannot predict at this time whether any such sanctions would have a material impact.

## NOTE 14. HEADQUARTERS RELOCATION (UNAUDITED)

In September 2000 the Company announced its intention to relocate its corporate and operational headquarters, from Chicago, IL and New Orleans, LA respectively, to a new leased facility in Sunrise, FL. In connection with the move, the Company will receive economic incentives from the State of Florida, Broward County and the City of Sunrise of up to $4.2 million once

certain conditions are met. Construction of the new facility is expected to be completed in November 2001 and the relocation is expected to be largely complete by early 2002. The Company has offered to relocate most employees to the

new location but the number of employees intending to relocate is largely undetermined as of December 31, 2000. The Company will incur severance and retention costs pertaining to those employees choosing not to relocate. The total amount of severance and retention costs is not expected to exceed $4.0 million. These costs will be expensed as certain criteria are met. As of December 31, 2000 the Company has recognized $0.6 million in severance expenses for employees who have communicated to the Company in writing their intention not to relocate. The Company also expects to incur employee relocation costs in the range of $0.5 million to $1.0 million, and additional relocation expenses to move equipment and furniture, which is expected to cost up to $0.5 million. These costs will also be expensed as certain conditions are met. As of December 31, 2000 the Company has not recognized any expense for relocation of employees or Company assets. The Company may also incur lease termination expenses or a write- off of leasehold improvements if it elects to vacate its Chicago or New Orleans facilities. At this time the Company has not determined whether it will completely vacate these facilities and therefore is unable to determine the potential costs, if any, it will incur in connection with terminating the leases or writing off the leasehold improvements.
The economic incentives to be received by the Company include tax refunds beginning in 2002 under Florida's Qualified Target Industry Tax (QTI) Refund Program, state job training funds and certain cash grants approved by the local municipalities. These benefits will be recognized as they are earned.

NOTE 15. SUBSEQUENT EVENTS (UNAUDITED)
On January 31, 2001 the Company issued an additional $50 million of notes guaranteed by MARAD bearing interest at LIBOR minus 0.10%. Interest is payable quarterly and the principal amount is due on January 31, 2002. A portion of the proceeds from this issuance was used to pay down the $25 million note due January 31, 2001.

On February 20, 2001 the ms Patriot was required to cancel a cruise that was in progress and return to its home port so that a thrust bearing in the vessel's generator drive train could be replaced. This resulted in refunds issued to passengers of approximately $1.6 million, and travel credits for a future cruise expected to cost approximately $0.5 million. No other cruises were cancelled as a result of the repair. The S.S. Independence will undergo an unscheduled dry- dock beginning March 24, 2001 to repair its bow thruster. The vessel is expected to be out of service for a period of seven days, and the expected cost of the repairs is expected to be between $0.4 million and $0.5 million.

Schedule I

AMERICAN CLASSIC VOYAGES CO.
CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY)
BALANCE SHEETS
(IN THOUSANDS)

| | December 31, 2000 | 1999 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 29,910 | $ 30,153 |
| Marketable Securities | 7,843 | -- |
| Prepaid expenses and other current assets | 580 | 339 |
| Property and equipment, net | 640 | 906 |
| Other assets | 3,879 | 493 |
| Investment in and advances to subsidiaries | 232,823 | 100,609 |
| | $ 275,675 | $ 132,500 |
| LIABILITIES | | |
| Other liabilities | $ 2,172 | $ 2,700 |
| Convertible preferred securities of subsidiary trust holding solely 7% convertible subordinated debentures of the Company | $ 100,000 | $ -- |
| STOCKHOLDERS' EQUITY | | |
| Common stock | 210 | 187 |
| Additional paid-in capital | 204,555 | 151,094 |
| Retained earnings (deficit) | (29,645) | (19,573) |
| Other | (1,617) | (1,908) |
| Total stockholders' equity | 173,503 | 129,800 |
| | $ 275,675 | $ 132,500 |

See accompanying notes to Condensed Financial Information.

Schedule I

**AMERICAN CLASSIC VOYAGES CO.**

**CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)**
**STATEMENTS OF OPERATIONS**

**(IN THOUSANDS)**

| | Years Ended December 31, 2000 | 1999 | 1998 |
|---|---|---|---|
| Miscellaneous expense (revenues).................... | $ (3,238) | $ (1,711) | $ 1,700 |
| Depreciation expense................................ | 279 | 608 | 880 |
| Accrued distributions on convertible preferred securities and related financing costs ............ | 6,247 | -- | -- |
| Income tax (benefit) expense........................ | (921) | 435 | (1,068) |
| Equity in earnings (losses) of subsidiaries......... | (7,705) | (2,418) | 1,669 |
| Net income (loss)................................... | $ (10,072) | $ (1,750) | $ 157 |

See accompanying notes to Condensed Financial Information.

Schedule I

AMERICAN CLASSIC VOYAGES CO.
CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)
STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

| | Years Ended December 31, 2000 | 1999 | 1998 |
|---|---|---|---|
| OPERATING ACTIVITIES | | | |
| Net income (loss) | $ (10,072) | $ (1,750) | $ 157 |
| ADJUSTMENTS TO RECONCILE NET INCOME (LOSS) TO NET CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | | | |
| Depreciation | 279 | 608 | 880 |
| Equity in (earnings) losses of subsidiaries, net | 7,705 | 2,418 | (1,669) |
| Increase in advances to subsidiaries | (139,919) | (40,961) | (570) |
| (Increase) decrease in prepaid expenses and other | (1,407) | 145 | (514) |
| (Decrease) increase in other liabilities | 1,191 | 678 | (1,326) |
| Net cash used in operating activities | (142,223) | (38,862) | (3,042) |
| INVESTING ACTIVITIES | | | |
| Purchase of marketable securities | (7,843) | -- | -- |
| Capital expenditures | (13) | (140) | (1,421) |
| Net cash used in investing activities | (7,856) | (140) | (1,421) |
| FINANCING ACTIVITIES | | | |
| Issuance of common stock | 53,629 | 68,697 | 2,907 |
| Issuance of convertible preferred securities of subsidiary trust | 100,000 | -- | -- |
| Purchase of common stock | -- | -- | (757) |
| Deferred financing fees | (3,793) | -- | (533) |
| Net cash provided by financing activities | 149,836 | 68,697 | 1,617 |
| Increase (decrease) in cash and cash equivalents | (243) | 29,695 | (2,846) |

| | | | |
|---|---|---|---|
| Cash and cash equivalents, beginning of period | 30,153 | 458 | 3,304 |
| Cash and cash equivalents, end of period | $ 29,910 | $ 30,153 | $ 458 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Non-cash investing activities: | | | |
| Cash paid for taxes | $ -- | $ 165 | $ -- |

Schedule I

AMERICAN CLASSIC VOYAGES CO.
NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT
(PARENT COMPANY) - (CONTINUED)

BASIS OF PRESENTATION

The Condensed Financial Information of American Classic Voyages Co. ("AMCV") has been prepared pursuant to Securities and Exchange Commission ("SEC") rules and regulations and should be read in conjunction with the Consolidated Financial Statements and Notes thereto for the years ended December 31, 2000, 1999 and 1998 included herein this Form 10- K. The balance sheets as of December 31, 2000 and 1999 and the related statements of operations and cash flows have been prepared on an unconsolidated basis. AMCV's investment in its subsidiaries is recorded on the equity basis. Certain previously reported amounts have been reclassified to conform to the 2000 presentation.

DIVIDENDS FROM SUBSIDIARIES

No dividends were paid to AMCV for the years ended December 31, 2000, 1999 and 1998.

INCOME TAXES

AMCV has entered into tax sharing agreements with its subsidiaries which require each subsidiary to compute its Federal income tax liability on a separate company basis and to pay amounts so computed to AMCV. No payments were made under the tax sharing agreement for the years ended December 31, 2000, 1999 and 1998.

Schedule II

AMERICAN CLASSIC VOYAGES CO.
SCHEDULE II - VALUATION AND QUALIFYING
ACCOUNTS FOR THE YEARS ENDED DECEMBER 31, 2000, 1999
AND 1998 (IN THOUSANDS)

| Accrual for Dry-dock and Lay-up Expenses | Balance at Beginning of Year | Charged to costs and Expenses | Charged to other Accounts | Deductions | Balance at End of Year |
|---|---|---|---|---|---|
| Year ended December 31, 2000 | 5,117 | 3,978 | | 5,063 | 4,022 |
| Year ended December 31, 1999 | 2,419 | 4,187 | | 1,489 | 5,117 |
| Year ended December 31, 1998 | 2,144 | 2,111 | | 1,836 | 2,419 |

ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

PART III

**ITEMS 10, 11, 12 AND 13 DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT, EXECUTIVE COMPENSATION, SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND CERTAIN**

HMS0097050

**RELATIONSHIPS AND RELATED TRANSACTIONS**

We will file a definitive proxy statement with the Securities and Exchange Commission, pursuant to Regulation 14A under the Securities Exchange Act of 1934 (the "Proxy Statement") and relating to the Company's Annual Meeting of Stockholders to be held on June 27, 2001, not later than April 30, 2001. Information required by Items 10 through 13 will appear in the Proxy Statement and is incorporated herein by reference.

PART IV

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(a)(1) Financial Statements.

The consolidated financial statements of the Company are set forth

in the "Index to Consolidated Financial Statements" on page 24.

(a)(2) Financial Statement Schedules.
Financial Statement Schedules, except those indicated in the "Index to Consolidated Financial Statements" on page 24, have been omitted because they are not applicable, not required under the instructions,
or all the information required is set forth in the financial

statements or the notes to the financial statements.
(a)(3) Exhibits are as set forth in the "Index to Exhibits" on page 51. (b) Reports on Form 8- K:
None.

**SIGNATURES**

Pursuant to the requirements of Section 13 and 15(d) of the Securities and Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date March 29, 2001

AMERICAN CLASSIC VOYAGES CO.
By / s / Philip C. Calian
Philip C. Calian
Chief Executive Officer

Pursuant to the requirements of the Securities and Exchange Act of 1934, as amended, has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

/s/ Samuel Zell Chairman of the Board
Samuel Zell
/s/ Philip C. Calian Chief Executive Officer and Director
------------------------------ (Principal Executive Officer)
Philip C. Calian

/s/ Randall L. Talcott Vice President- Finance and Treasurer - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - (Principal Financial and Accounting Officer) Randall L. Talcott
/s/ John R. Berry Director

---

John R. Berry

/s/ Bradbury Dyer, III Director
Bradbury Dyer, III
/s/ Laurence S. Geller Director

Laurence S. Geller

/s/ Terence C. Golden Director

---

Terence C. Golden

/s/ Arthur A. Greenberg Director

---

Arthur A. Greenberg

/s/ Jerry R. Jacob Director

---

Jerry R. Jacob

/s/ Emanuel L. Rouvelas Director

---

Emanuel L. Rouvelas

/s/ Mark Slezak Director

---

Mark Slezak

/s/ Jeffrey N. Watanabe Director

---

Jeffrey N. Watanabe

AMERICAN CLASSIC VOYAGES CO.
INDEX TO EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| **3.(i) | Second Amended and Restated Certificate of Incorporation of the Company (filed on March 31, 1999 as Exhibit 3.(i) to the Company's Form 10-K dated December 31, 1998 and incorporated herein by reference). |

**3.(ii) Third Amended and Restated By- Laws of the Company (filed on November 15, 1999 as Exhibit 3.(ii) to the Company's Form 10- Q dated September 30, 1999 and incorporated herein by reference).
**3.(iii) Certificate of Amendment to Second Amendment and Restated Certificate of Incorporation of the Company (filed on August 14, 2000 as Exhibit 3.(iii) to the Company's Report on Form 10- Q) and incorporated herein by reference).

**4.(i) Proof of Common Stock Certificate (filed on February 14, 1992 as Exhibit 4.(i) to Amendment No. 2 to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**4.(ii)(a)(1) Credit Agreement, dated as of February 25, 1999, among the Delta Queen Steamboat Co. (the "Borrower"), the financial institutions from time to time parties thereto as Lenders (the "Lenders"), The Chase Manhattan Bank, as Issuing Bank and as Administrative Agent thereunder (the "Agent"), and Hibernia National Bank, as Documentation Agent (filed on March 31, 1999 as Exhibit 4.(ii)(a)(1) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).
**4.(ii)(a)(2) Security Agreement, dated as of February 25, 1999, executed by the Borrower in favor of the Agent for the benefit of the Agent and the Lenders (filed on March 31, 1999 as Exhibit 4.(ii)(a)(2) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

The following entities also have entered into a similar security agreement with the Agent:

(i) DQSB II, Inc.;

(ii) Great Ocean Cruise Line, L.L.C.;

(iii) Cruise America Travel, Incorporated;

(iv) Great River Cruise Line, L.L.C.; and

(v) DQSC Property Co.

**4.(ii)(a)(3) Stock Pledge Agreement, dated as of February 25, 1999, executed by the Borrower in favor of the Agent, evidencing the pledge by the Borrower of all of its 100% interest in the capital stock of each of Cruise America Travel, Incorporated, DQSC Property Co. and DQSB II, Inc. (filed on March 31, 1999 as Exhibit 4.(ii)(a)(3) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**4.(ii)(a)(4) Limited Liability Company Pledge Agreement, dated as of February 25, 1999, executed by the Borrower in favor of the Agent evidencing the pledge by the Borrower of its 99% membership interest in each of Great River Cruise Line, L.L.C. and Great Ocean Cruise Line, L.L.C. (filed on March 31, 1999 as Exhibit 4.(ii)(a)(4) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**4.(ii)(a)(5) Guaranty executed by Cruise America Travel, Incorporated, DQSC Property Co., DQSB II, Inc., Great Ocean Cruise Line, L.L.C. and Great River Cruise Line, L.L.C. in favor of the Agent evidencing the guarantees of the obligations of the Borrower (filed on March 31, 1999 as Exhibit 4.(ii)(a)(5) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii)(a)(6) Trust Indenture among the Agent, the Lenders, Great River Cruise Line, L.L.C. and The Chase Manhattan Bank as trustee (the "DQ Trustee") covering the Delta Queen (a substantially identical Trust Indenture covering the Mississippi Queen has also been executed) (filed on March 31, 1999 as Exhibit 4.(ii)(a)(6) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**4.(ii)(a)(7) Preferred Ship Mortgage covering the Delta Queen executed by Great River Cruise Line, L.L.C. in favor of the DQ Trustee for the benefit of the Agent and the Lenders (a substantially identical Preferred Ship Mortgage covering the Mississippi Queen has also been executed) (filed on March 31, 1999 as Exhibit 4.(ii)(a)(7) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**4.(ii)(a)(8) Amended and Restated Credit Agreement dated as of September 14, 2000 among The Delta Queen Steamboat Co. ("Borrower"), the financial institutions listed on the signature pages as Lenders and each other financial institution which from time to time becomes a party thereto ("Lenders"), The Chase Manhattan Bank, as Issuing Bank and as Administrative Agent for the Lenders thereunder (in such latter capacity, the "Agent"), and Hibernia National Bank, as Documentation Agent. (filed on November 14, 2000 as Exhibit 4.(ii)(a)(8) to the Company's Report on Form 10- Q and incorporated herein by reference).

**4.(ii)(a)(9) Guaranty dated September 14, 2000 executed by American Classic Voyages Co. in favor of the Agent. (filed on November 14, 2000 as Exhibit 4.(ii)(a)(9) to the Company's Report on Form 10- Q and incorporated herein by reference).

**4.(ii)(a)(10) Amended and Restated Contribution Agreement dated September 14, 2000 executed by the Parent Guarantor and each Borrower Subsidiary that is a party to a Subsidiary Guaranty. (filed on November 14, 2000 as Exhibit 4.(ii)(a)(10) to the Company's Report on Form 10-Q and incorporated herein by reference).

**4.(ii)(a)(11) First Amendment to Trust Indenture dated September 14, 2000 among the Agent, the Lenders, Great River Cruise Line, L.L.C. and The Chase Manhattan Bank, as Trustee covering the Delta Queen (a substantially identical First Amendment to Preferred Ship Mortgage covering the Mississippi Queen and Columbia Queen has also been executed). (filed on November 14, 2000 as Exhibit 4.(ii)(a)(11) to the Company's Report on Form 10- Q and incorporated herein by reference).
**4.(ii)(a)(12) First Amendment to Preferred Ship Mortgage dated September 14, 2000 executed by Great River Cruise Line, L.L.C. for the benefit of The Chase Manhattan Bank, as Trustee covering the Delta Queen (a substantially identical First Amendment to Preferred Ship Mortgage covering the Mississippi Queen and Columbia Queen has also been executed). (filed on November 14, 2000 as Exhibit 4.(ii)(a)(12) to the Company's Report on Form 10- Q and incorporated herein by reference).

```
**4.(ii)(b)(1)        Commitment to Guaranty Obligations by the United States of
                      America accepted by Great AQ Steamboat Co. dated as of
                      August 24, 1995 (filed on November 14, 1995 as Exhibit
                      4.(ii)(c)(1) to the Company's Form 10-Q dated September 30,
                      1995 and incorporated herein by reference).
```

**4.(ii)(b)(2) Great AQ Steamboat Co. United States Government Guaranteed Ship Financing Obligations, American Queen Series Purchase Agreement dated August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(2) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(b)(3) Trust Indenture relating to United States Government Guaranteed Ship Financing Obligations, American Queen Series, between Great AQ Steamboat Co. and the Bank of New York, dated as of August 24, 1995 (the "Trust Indenture") along with Schedule A and Exhibit 1 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(3) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii)(b)(4) Form of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, American Queen Series (filed on November 14, 1995 as Exhibit 4.(ii)(c)(4) to the Company's Form 10- Q dated September 30,
1995 and incorporated herein by reference).

```
**4.(ii)(b)(5)        Form of 2020 Bond, Guarantee and Trustee's Authentication
                      Certificate Specimen Bond as it relates to United States
                      Government Guaranteed Ship Financing Bond, American Queen
                      Series (filed on November 14, 1995 as Exhibit 4.(ii)(c)(5)
                      to the Company's Form 10-Q dated September 30, 1995 and
                      incorporated herein by reference).
```

**4.(ii)(b)(6) Authorization Agreement between the United States of America as represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great AQ Steamboat Co. dated as of August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(6) to the Company's Form 10- Q dated September 30,

1995 and incorporated herein by reference).

**4.(ii)(b)(7) Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great AQ Steamboat Co. and the United States of America dated as of August 24, 1995 (the "Security Agreement") along with Exhibit 1 and the Schedule of Definitions (filed on November 14, 1995 as Exhibit 4.(ii)(c)(7) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(b)(8) $60,589,000 Promissory Note dated August 24, 1995 by and between Great AQ Steamboat Co. and the United States of America (filed on November 14, 1995 as Exhibit 4.(ii)(c)(8) to the Company's Form 10- Q dated September 30, 1995 and

incorporated herein by reference).

**4.(ii)(b)(9) Title XI Reserve Fund and Financial Agreement among Great AQ Steamboat Co. and the United States of America dated as of August 24, 1995 along with the General Provisions (filed on November 14, 1995 as Exhibit 4.(ii)(c)(9) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(b)(10) Guaranty Agreement dated August 24, 1995 made by the Delta Queen Steamboat Co. in favor of the United States of America (filed on November 14, 1995 as Exhibit 4.(ii)(c)(10) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(b)(11) Assumption and Supplement No. 1 to First Preferred Ship Mortgage effective as of December 31, 1996 made by and among Great AQ Steamboat, L.L.C., Great AQ Steamboat Co. and the United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator (filed on May 13, 1997 as Exhibit 4.(ii)(c)(11) to the Company's Form 10- Q dated March 31,

1997 and incorporated herein by reference).

**4.(ii)(b)(12) Modification and Assumption Agreement entered into March 25, 1997, effective as of December 31, 1996, among The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator, Great AQ Steamboat, L.L.C., and The Bank of New York (filed on May 13, 1997 as Exhibit 4.(ii)(c)(12) to the Company's Form 10- Q dated March 31, 1997 and

incorporated herein by reference).

**4.(ii)(b)(13) Confirmation of Guaranty Agreement effective as of December 31, 1996 made by The Delta Queen Steamboat Co. in favor of the United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator (filed on May 13, 1997 as Exhibit 4.(ii)(c)(13) to the Company's Form 10- Q dated March 31,

1997 and incorporated herein by reference).

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii)(b)(14) Endorsement No. 1 to Secretary's Note Form Great AQ Steamboat, L.L.C. to the United States of America executed on March 25, 1997, effective as of December 31, 1996 (filed on May 13, 1997 as Exhibit 4.(ii)(c)(14) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(b)(15) Subordination Agreement dated as of March 25, 1997 made by and among Great AQ Steamboat, L.L.C., The Delta Queen Steamboat Co. and DQSB II, Inc. and the United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator (filed on May 13, 1997 as Exhibit 4.(ii)(c)(15) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(c)(1) Commitment to Guaranty Obligations by the United States of America Accepted by Great Independence Ship Co. dated as of December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(1) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(2) Great Independence Ship Co. United States Government Guaranteed Ship Financing Obligations, Independence Series A Purchase Agreement dated December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(2) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(3) Trust Indenture relating to United States Government Guaranteed Ship Financing Obligations, Independence Series A, between Great Independence Ship Co. and the Bank of New York, dated as of December 7, 1995 (the "Trust Indenture") along with Schedule A and Exhibit 1 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(3) to the Company's Form 10-

K dated December 31, 1995).
**4.(ii)(c)(4) Forms of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, Independence Series A (filed on April 1, 1996 as Exhibit 4.(ii)(d)(4) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(5) Forms of 2015 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, Independence Series A (filed on April 1, 1996 as Exhibit 4.(ii)(d)(5) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(6) Authorization Agreement between the United States of America represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great Independence Ship Co. dated as of December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(6) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(7) Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great Independence Ship Co. and the United States of America dated as of December 7, 1995 (the "Security Agreement") along with Exhibit 1 and the Schedule of Definitions (filed on April 1, 1996 as Exhibit 4.(ii)(d)(7) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(8) $26,429,000 Promissory Note dated December 7, 1995 by and between Great Independence Ship Co. and the United States of America (filed on April 1, 1996 as Exhibit 4.(ii)(d)(8) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(9) Title XI Reserve Fund and Financial Agreement between Great Independence Ship Co. and the United States of America dated as of December 7, 1995 along with the General Provisions (filed on April 1, 1996 as Exhibit 4.(ii)(d)(9) to the
Company's Form 10- K dated December 31, 1995).

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii)(c)(10) Guaranty and Security Agreement dated December 7, 1995 made by the Great Independence Ship Co., Great Hawaiian Cruise Line, Inc. and Great Hawaiian Properties Corporation in favor of the United States of America (filed on April 1, 1996 as Exhibit 4.(ii)(d)(10) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(c)(11) Amendment to Commitment to Guarantee Obligations by the United States of America Accepted by Great Independence Ship Co. dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(11) to the Company's Form 10- Q dated March 31, 1996).

```
**4.(ii)(c)(12)      Great Independence Ship Co. United Stated Government
                     Guaranteed Ship Financing Obligations, Independence Series B
                     Purchase Agreement dated March 28, 1996 (filed on May 15,
                     1996 as Exhibit 4.(ii)(d)(12) to the Company's Form 10-Q
                     dated March 31, 1996).
```

**4.(ii)(c)(13) Supplemental Indenture No. 1 relating to United States Government Guaranteed Ship Financing Obligations, Independence Series B, between Great Independence Ship Co. and the Bank of New York, dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(13) to the Company's Form 10- Q dated March 31, 1996).
**4.(ii)(c)(14) Form of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, Independence Series B (filed on May 15, 1996 as Exhibit 4.(ii)(d)(14) to the Company's Form 10- Q dated March 31, 1996).
**4.(ii)(c)(15) Form of 2015 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, Independence Series B (filed on May 15, 1996 as Exhibit 4.(ii)(d)(15) to
the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(c)(16) Amendment No. 1 to Authorization Agreement between the United States of America represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great Independence Ship Co. dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(16) to the Company's Form 10- Q dated March 31, 1996).
**4.(ii)(c)(17) Amendment No. 1 to Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great Independence Ship Co. and the United States of America dated as of March 28, 1996 (the "Security Agreement") (filed on May 15, 1996 as Exhibit 4.(ii)(d)(17) to the Company's Form 10- Q dated March 31, 1996).
**4.(ii)(c)(18) Endorsement to $6,903,000 Promissory Note dated March 28, 1996 by and between Great Independence Ship Co. and the United States of America (filed on May 15, 1996 as Exhibit 4.(ii)(d)(18) to the Company's Form 10- Q dated March 31, 1996).
**4.(ii)(c)(19) Amendment No. 1 to Title XI Reserve Fund and Financial Agreement between Great AQ Steamboat Co. and the United States of America effective as of January 1, 1996 (filed on August 14, 1996 as Exhibit 4.(ii)(d)(19) to the Company's Form 10- Q dated June 30, 1996).
**4.(ii)(d)(1) Commitment to Guarantee Obligations dated February 10, 2000 by The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator, and accepted by Project America Ship I, Inc., the Shipowner. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(1) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii(d)(2) Note Purchase Agreement dated February 10, 2000 as it relates to United States Government Guaranteed Ship Financing Notes - Variable Rate Notes due January 31, 2001 signed by Project America, Inc., and accepted by Chase Securities, Inc. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(2) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| **4.(ii)(d)(3) | Trust Indenture Relating to United States Government Guaranteed Ship Financing Obligations dated February 10, 2000 between Project America Ship I, Inc., as Shipowner, and The Bank of New York, as Indenture Trustee. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(3) to the Company's Report on Form 10-Q and incorporated herein by reference). |

**4.(ii)(d)(4) Authorization Agreement dated February 10, 2000 between The United States of America, represented by the Maritime Administrator, and The Bank of New York, as the Indenture Trustee under the Trust Indenture dated February 10, 2000 between the Indenture Trustee and Project America Ship I, Inc., the Shipowner. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(4) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(d)(5) Security Agreement Relating to United States Government Guaranteed Ship Finaincing Obligations dated February 10, 2000 between Project America Ship I, Inc., as Shipowner, and The United States of America. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(5) to the Company's Report on Form 10- Q

and incorporated herein by reference).

**4.(ii)(d)(6) Promissory Note to United States of America dated February 2000 by Project America Ship I, Inc. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(6) to the Company's Report on Form

10- Q and incorporated herein by reference).

**4.(ii)(d)(7) Title XI Reserve Fund and Financial Agreement dated February 10, 2000 by Project America Ship I, Inc. and The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(7) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(d)(8) Guaranty Agreement in Favor of the United States of America dated February 10, 2000 by and between Project America, Inc., as Guarantor, and The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator. (filed on August 14, 2000 as Exhibit 4.(ii)(d)(8) to the Company's Report on Form

10- Q and incorporated herein by reference).

**4.(ii)(d)(9) Secretary's Determination, dated August 10, 2000, as it relates to $50,000,000 of United States Government Guaranteed Ship Financing Notes. (filed on November 14, 2000 as Exhibit 4.(ii)(d)(9) to the Company's Report on Form 10-Q and incorporated herein by reference).

**4.(ii)(d)(10) $50,000,000 Note Purchase Agreement dated August 10, 2000 as it relates to United States Government Guaranteed ship Financing Notes - Variable Rate Notes due July 31, 2001 signed by Project America, Inc. and accepted by Chase Securities, Inc. (filed on November 14, 2000 as Exhibit 4.(ii)(d)(10) to the Company's Report on Form 10-Q and incorporated herein by reference).

**4.(ii)(d)(11) $50,000,000 Promissory Note to United States of America dated August 10, 2000 by Project America Ship I, Inc. (filed on November 14, 2000 as Exhibit 4.(ii)(d)(11) to the Company's Report on Form 10-Q and incorporated herein by reference).

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii(e)(1) Commitment to Guarantee Obligations dated October 16, 2000 by The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator, and accepted by Cape May Light, L.L.C., the Shipowner. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(1) to the Company's Report on Form 10- Q and incorporated herein by reference).

**4.(ii)(e)(2) Bond Purchase Agreement dated October 16, 2000 as it relates to United States Government Guaranteed Ship Financing Bonds, 2000 Series - 7.25% Sinking Fund Bonds due April 15, 2027 in the aggregate principal amount of $37,900,000 signed by Cape May Light, L.L.C. and accepted by Chase Securities, Inc. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(2) to the Company's Report on Form 10- Q and incorporated herein by reference).

**4.(ii)(e)(3) $37,900,000 U.S. Government Guaranteed Ship Financing Bonds, 2000 Series, 7.25% Sinking Fund Bonds due April 15, 2027, issued by Cape May Light, L.L.C. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(3) to the Company's Report on Form 10- Q

and incorporated herein by reference).

**4.(ii)(e)(4) Trust Indenture Relating to United States Government Guaranteed Ship Financing Obligations dated October 16, 2000 between Cape May Light, L.L.C., as Shipowner, and The Bank of New York, as Indenture Trustee. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(4) to the Company's Report on Form

10- Q and incorporated herein by reference).

**4.(ii)(e)(5) Authorization Agreement dated October 16, 2000 between The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator, and The Bank of New York, as the Indenture Trustee under the Trust Indenture dated October 16, 2000 between the Indenture Trustee and Cape May Light, L.L.C., the Shipowner. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(5) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(e)(6) Security Agreement Relating to United States Government Guaranteed Ship Financing Obligations dated October 16, 2000 between Cape May Light, L.L.C., as Shipowner, and The United States of America. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(6) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(e)(7) Title XI Reserve Fund and Financial Agreement dated October 16, 2000 between Cape May Light, L.L.C. and The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(7) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii)(e)(8) Guaranty Agreement in Favor of the United States of America dated October 16, 2000 by and between Cape May Light, L.L.C., as Guarantor, and The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator. (filed on November 14, 2000 as Exhibit 4.(ii)(e)(8) to the Company's Report on Form 10- Q and incorporated herein by reference).
**4.(ii)(f)(1) Commitment to Guarantee Obligations dated October 16, 2000 by The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator, and accepted by Cape Cod Light, L.L.C., the Shipowner. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(1) to the Company's Report on Form 10- Q and incorporated herein by reference).

**4.(ii)(f)(2) Bond Purchase Agreement dated October 16, 2000 as it relates to United States Government Guaranteed Ship Financing Bonds, 2000 Series - 7.25% Sinking Fund Bonds due April 15, 2027 in the aggregate principal amount of $38,500,000 signed by Cape Cod Light, L.L.C. and accepted by Chase Securities Inc. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(2) to the Company's Report on Form 10- Q and incorporated herein by reference).
**4.(ii)(f)(3) $38,500,000 U.S. Government Guaranteed Ship Financing Bonds, 2000 Series, 7.25% Sinking Fund Bonds due April 15, 2027, issued by Cape Cod Light, L.L.C. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(3) to the Company's Report on Form 10- Q

and incorporated herein by reference).

**4.(ii)(f)(4) Trust Indenture Relating to United States Government Guaranteed Ship Financing Obligations dated October 16, 2000 between Cape Cod Light, L.L.C., as Shipowner, and The Bank of New York, as Indenture Trustee. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(4) to the Company's Report on Form

10- Q and incorporated herein by reference).

**4.(ii)(f)(5) Authorization Agreement dated October 16, 2000 between The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator, and The Bank of New York, as the Indenture Trustee under the Trust Indenture dated October 16, 2000 between the Indenture Trustee and Cape Cod Light, L.L.C., the Shipwowner. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(5) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(f)(6) Security agreement Relating to United States Government Guaranteed Ship Financing Obligations dated October 16, 2000 between Cape Cod Light, L.L.C., as Shipowner, and The United States of America. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(6) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(f)(7) Title XI Reserve Fund and Financial Agreement dated October 16, 2000 between Cape Cod Light, L.L.C. and The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(7) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**4.(ii)(f)(8) Guaranty Agreement in Favor of the United States of America dated October 16, 2000 by and between Cape Cod Light, L.L.C., as Guarantor, and The United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator. (filed on November 14, 2000 as Exhibit 4.(ii)(f)(8) to the Company's Report on Form 10- Q and incorporated herein by reference).
**4.(ii)(g)(1) Preferred Ship Mortgage dated October 18, 2000 executed by Oceanic Ship Co. (in connection with the purchase of the ms Patriot). (filed on November 14, 2000 as Exhibit 4.(ii)(g)(1) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**EXHIBIT NUMBER DESCRIPTION**

---

**4.(ii)(g)(2) $84,500,000 Promissory Note dated October 18, 2000 to Hal Antillen N.V. by Oceanic Ship Co. (in connection with the purchase of the ms Patriot). (filed on November 14, 2000 as Exhibit 4.(ii)(g)(2) to the Company's Report on Form 10- Q

and incorporated herein by reference).

**4.(iii)(a)(1) Junior Convertible Subordinated Indenture dated as of February 22, 2000 between the Company and The Bank of New York, as trustee (includes form of Subordinated Debenture) (filed on February 29, 2000 as exhibit 4.1 to the Company's

8- K and incorporated herein by reference).

```
**4.(iii)(a)(2)      Amended and Restated Declaration of Trust of AMCV Capital
                     Trust I among American Classic Voyages Co. (the "Company") ,
                     The Bank of New York, as Property Trustee, Philip C. Calian,
                     Randal L. Talcott and Jordan B. Allen, as Administrative
                     Trustee (includes form of Preferred Security) (filed on
                     February 29, 2000 as exhibit 4.2 to the company's 8-K and
                     incorporated herein by reference).
```

**4.(iii)(a)(3) Form of Preferred Security (included in exhibit 4.(iii) (a) (1)) (filed on February 29, 2000 as exhibit 4.3 to the Company's 8- K and incorporated herein by reference).
**4.(iii)(a)(4) Form of Subordinated Debenture (included in exhibit 4. (iii) (a) (2) ) (filed on February 29, 2000 as exhibit 4.4 to the Company's 8- K and incorporated herein by reference)
9. Not applicable.
**10.(i)(a)(1) Administrative Services Agreement by and between the Company and Equity Group Investments, Inc. (filed on March 2, 1993 as Exhibit 10.(i)(A) to Amendment No. 3 to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**10.(ii)(a)(1) Preferential Assignment Agreement dated September 27, 1984, by and between the Board of Commissioners of the Port of New Orleans and the Company, including Assignment thereof and Amendments thereto (filed on January 17, 1992 as Exhibit 10.(ii)(D)(2) to the Company's Registration Statement on Form S-1 (Registration No. 33-45139) and incorporated herein by reference).

**10.(ii)(a)(2) Lease dated May 30, 1995 by and between Equity Office Properties, Inc., as agent for beneficial owner, as Landlord, and Great Hawaiian Properties Corporation, d/b/a American Hawaii Cruises, as Tenant (filed on April 1, 1996 as Exhibit 10.(ii)(D)(3) to the Company's Form 10- K dated December 31, 1995).
**10.(ii)(a)(3) First Amendment dated March 12, 1997 by and between Equity Office Properties, Inc., as agent for beneficial owner, as Landlord, and Great Hawaiian Properties Corporation, d/b/a American Hawaii Cruises, as Tenant (filed on March 31, 1999 as Exhibit 10.(ii)(a)(3) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).
**10.(ii)(a)(4) Assignment and Assumption of Lease dated January 1, 1998 between Great Hawaiian Properties Corporation, d/b/a American Hawaii Cruises, as Assignor, and American Classic Voyages Co., as Assignee (filed on March 31, 1999 as Exhibit 10.(ii)(a)(4) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**10.(ii)(a)(5) Second Amendment dated August 10, 1998 by and between Equity Office Properties, Inc., as agent for beneficial owner, as Landlord, and American Classic Voyages Co., as Tenant (filed on March 31, 1999 as Exhibit 10.(ii)(a)(5) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).
**10.(ii)(a)(6) Lease dated October 16, 1998 by and between MFD Partners, as Landlord, and American Hawaii Properties Corporation, as Tenant (filed on March 31, 1999 as Exhibit 10.(ii)(a)(6) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).

**EXHIBIT NUMBER DESCRIPTION**

---

**10.(iii)(a)(1) Performance Management Objectives Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(A)(2) to the Company's Registration Statement on Form S- 1 (Registration No. 333- 44225) and incorporated herein by reference).
**10.(iii)(a)(2) Executive Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(a)(4) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(a)(3) American Classic Voyages Co. S. Cody Engle Stock Option Agreement (filed on January 17, 1992 as Exhibit 10.(iii)(A)(6) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(a)(4) American Classic Voyages Co. Dividend Reinvestment and Common Stock Purchase Plan (filed on June 22, 1994 as part of the Company's Registration Statement on Form S- 3 (Registration No. 33- 80614) and incorporated herein by reference).
**10.(iii)(a)(5) American Classic Voyages Co. 1992 Stock Option Plan (filed on January 14, 1998 as part of the Company's Registration Statement on Form S- 8 (Registration No. 333- 44225) and incorporated herein by reference).

**10.(iii)(a)(6) American Classic Voyages Co. Deferred Compensation Plan (filed on March 31, 1999 as Exhibit 10.(iii)(a)(6) to the Company's Form 10- K dated December 31, 1998 and incorporated herein by reference).
*10.(iv)(a)(1) Master Shipbuilding Contract for Construction of Two Passenger Vessels by and between Ingalls Shipbuilding, Inc. and Project America, Inc. for Hulls No. 7671 and 7672, dated March 9, 1999.*
Exhibit A - Shipbuilding Contract for Construction of One Passenger Vessel by and between Ingalls Shipbuilding, Inc. and Project America, Inc. for Hull No. 7671, dated March 9, 1999 (a substantially identical Shipbuilding Contract has been entered into for hull no.7672, with a delivery date of January 2004). (filed as Exhibit 10 to the Company's Form 8- K

dated March 26, 1999 and incorporated herein by reference).
*10.(iv)(a)(2) Construction Contract for Coastal Queen Class Vessel dated May 1, 1999 by and between Coastal Queen Holdings, L.L.C. and Atlantic Marine, Inc. (filed on May 14, 1999 as Exhibit 10.(iv)(a)(3) to the Company's Form 10- Q dated March 31,
1999 and incorporated herein by reference).*

Appendix One - Coastal Queen Milestone Payments Appendix Two - Affidavit for Exemption of Boat Sold for Removal from the State of Florida by a Nonresident Purchaser Appendix Three - Maker's List
**10.(iv)(a)(3) Guaranty dated May 1, 1999 made by The Delta Queen Steamboat Co. in favor of Atlantic Marine Inc. (filed on May 14, 1999 as Exhibit 10.(iv)(a)(4) to the Company's Form 10- Q dated March 31, 1999 and incorporated herein by reference).
**10.(iv)(a)(4) Asset Purchase and Sale Agreement dated April 29, 1999 by and between Capitol Queen & Casino, Inc., as Seller, and The Delta Queen Steamboat Co., as Purchaser (filed on May 14, 1999 as Exhibit 10.(iv)(a)(5) to the Company's Form 10- Q dated March 31, 1999 and incorporated herein by reference).
Exhibit A - Escrow Agreement
Exhibit B - Vessel Inventory
Exhibit C - Order Approving Sale of Personal Property Free
and Clear of Liens, Claims and Encumbrances

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| **10.(iv)(a)(5) | Letter of Credit Agreement dated October 15, 1999 between American Classic Voyages Co. and The Chase Manhattan Bank (filed on November 9, 1999 as Exhibit 10.(iv)(a)(6) of the Company's 10-Q/A dated March 31, 1999 and incorporated herein by reference). Exhibit A - Form of Irrevocable Letter of Credit |

**10.(iv)(a)(6) Amended and Restated Reimbursement Agreement dated October 15, 1999 by and among Samuel Zell, Samuel Zell Revocable Trust and American Classic Voyages Co. (filed on November 9, 1999 as Exhibit 10.(iv)(a)(7) of the Company's 10- Q/A dated March 31, 1999 and incorporated herein by reference).

| | |
| --- | --- |
| **10.(iv)(a)(7) | Memorandum of Agreement dated August 5, 1999 by and between American Classic Voyages Co., as Buyer, and Hal Antillen N.V., as Seller, as amended October 11, 1999 (filed on November 9, 1999 as Exhibit 10.(iv)(a)(6) of the Company's 10-Q/A dated March 31, 1999 and incorporated herein by reference). |

Exhibit A - Vessel Details Exhibit B - Form of Letter of Credit Exhibit C - Form of Escrow Agreement Exhibit D - Form of Promissory Note Exhibit E - Form of First Preferred Ship Mortgage Exhibit F - Form of General Assignment of Insurance Exhibit G - Form of Guarantee Exhibit H - Excluded Art
**10.(iv)(a)(8) Vessel Conversion Agreement dated August 20, 1999 between Nichols Brothers Boat Builders, Inc. and The Delta Queen Steamboat Co.* (filed on November 15, 1999 as Exhibit 10.(iv)(a)(8) to the Company's Form 10- Q dated September 30,
1999 and incorporated herein by reference).

| | |
| --- | --- |
| *10.(iv)(a)(9) | Amended and Restated Agreement dated as of December 22, 1999 by and between Cascade General, Inc. (Shipyard) and The Delta Queen Steamboat Co. (Owner) for the conversion of the Columbia Queen. (filed on March 30, 2000 as Exhibit 10.(iv)(a)(9) to the Company's Annual Report on Form 10-K and incorporated herein by reference). |

**10.(iv)(a)(10) Amendment "1" to May 1, 1999 Construction Contract between Coastal Queen Holdings, L.L.C. and Atlantic Marine, Inc. dated June 13, 2000. (filed on November 14, 2000 as Exhibit 10.(iv)(a)(10) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**10.(iv)(a)(11) Assignment and Assumption of Contract dated September 25, 2000 by and Between Delta Queen Coastal Voyages, L.L.C. (f/k/a Coastal Queen Holdings, L.L.C.), as Assignor, and Cape May Light, L.L.C. and Cape Cod Light, L.L.C., as Assignees. (filed on November 14, 2000 as Exhibit 10.(iv)(a)(11) to the Company's Report on Form 10- Q and

incorporated herein by reference).

**10.(iv)(a)(12) Amendment No. 2 to Construction Contract for Coastal Queen Class Vessel dated October 16, 2000 by and between Atlantic Marine, Inc. and Cape May Light, L.L.C. and Cape Cod Light, L.L.C. (filed on November 14, 2000 as Exhibit 10.(iv)(a)(12) to the Company's Report on Form 10- Q and incorporated herein by reference).
**10.(v) Trust Preferred Securities Guarantee Agreement dated February 22, 2000, by the Company and The Bank of New York, as trustee (filed on February 29, 2000 as exhibit 10.1 to the Company's 8- K and incorporated herein by reference).
10.(vi) Office lease executed November 30, 2000, by and between Duke- Weeks Realty Limited Partnership, an Indiana limited partnership ("Landlord"), and American Classic Voyages Co.,
a Delaware corporation ("Tenant").

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS (CONT'D.)**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 11. | Not applicable. |
| 12. | Not applicable. |
| 13. | Not applicable. |
| 16. | Not applicable. |
| 18. | Not applicable. |
| 21. | Subsidiaries of the Company. |
| 22. | Not applicable. |
| 23. | Consent of KPMG LLP |
| 24. | Not applicable. |
| 27. | Not applicable. |
| 28. | Not applicable. |

* Certain portions of this exhibit previously filed and incorporated by reference were omitted pursuant to an application for an order of confidential treatment pursuant to Rule 24b- 2 under the Securities and Exchange Act of 1934, as amended. This non- public information was filed separately with the Securities and Exchange Commission.
** Previously filed and incorporated by reference.

EXHIBIT 10(vi)

OFFICE LEASE

THIS OFFICE LEASE (this "LEASE") is executed this 30th day of November, 2000, by and between DUKE-WEEKS REALTY LIMITED PARTNERSHIP, an Indiana limited partnership ("LANDLORD"), and AMERICAN CLASSIC VOYAGES CO., a Delaware corporation ("TENANT").

**ARTICLE 1 - LEASE OF PREMISES**

Section 1.01. Basic Lease Provisions and Definitions.

A. Leased Premises (shown outlined on Exhibit A attached hereto):

Floors: 2, 3, 4 and 10,000 square feet of Rentable Area on Floor 1 Building Address: Tenant shall submit to Landlord Tenant's requested Building address and Landlord agrees to use reasonable efforts to have such address approved by the appropriate governmental agencies.

(the "BUILDING")

Land: Approximately seventeen (17) acres located in Sawgrass Commerce Center (the "PARK") bounded by Sawgrass Corporate Parkway on the west, N.W. 8th Street on the south, N.W. 136th Avenue on the east and N.W. 12th Street on the North and as more particularly described on Exhibit A attached hereto (the "LAND"; the Land, together with the Building, herein collectively referred to as the "Project");

B. Rentable Area: approximately 130,000 rentable square feet

C. Building Expense Percentage: Shall be calculated by dividing the total rentable square footage of the Leased Premises by the total rentable square footage of the Building;

D. Minimum Annual Rent:

| Lease Year | Minimum Annual Rent Per RSF |
|---|---|
| Year 1 | $15.50 |
| Year 2 | $15.97 |
| Year 3 | $16.45 |
| Year 4 | $16.94 |
| Year 5 | $17.45 |
| Year 6 | $17.97 |
| Year 7 | $18.51 |
| Year 8 | $19.07 |
| Year 9 | $19.64 |
| Year 10 | $20.23 |
| Year 11 | $20.84 |
| Year 12 | $21.47 |
| Year 13 | $22.11 |
| Year 14 | $22.77 |
| Year 15 | $23.45 |

(Rent does not include applicable Florida State Sales Tax or Additional Rent)

E. Initial Monthly Rental Installments:

| Lease Year | Monthly Rental Installments |
|---|---|
| Year 1 | $109,791.67 per month First Six Months of First Lease Year (based on 85,000 square feet occupied)<br>$167,916.67 per month Second Six Months of First Lease Year (based on 130,000 square feet occupied) |
| Year 2 | $173,008.33 per month |
| Year 3 | $178,208.33 per month |
| Year 4 | $183,516.67 per month |
| Year 5 | $189,041.67 per month |
| Year 6 | $194,675.00 per month |
| Year 7 | $200,525.00 per month |
| Year 8 | $206,591.67 per month |
| Year 9 | $212,766.67 per month |
| Year 10 | $219,158.33 per month |
| Year 11 | $225,766.67 per month |
| Year 12 | $232,591.67 per month |
| Year 13 | $239,525.00 per month |
| Year 14 | $246,675.00 per month |
| Year 15 | $254,041.67 per month |

(Rent does not include applicable Florida State Sales Tax or Additional Rent)

F. Term: Fifteen (15) years and zero (0) months
G. Target Completion Date: November 6, 2001
H. Security Deposit: $500,000.00 in the form of a Letter of Credit per Section 4 of the Lease
I. Broker(s): Julien J. Studley, Inc., representing Tenant
Codina Realty Services, Inc. - ONCOR International, representing Landlord
J. Permitted Use: General business and office purposes, including but not limited to, conference reservation center and computer facilities, employee and visitor cafeteria and dining areas (including related kitchen facilities), and any other legally permitted use consistent with the character of a similar type building
K. Target Plan Delivery Date: April 1, 2001

L. Address for payments and notices as follows:

Landlord:
Duke-Weeks Realty Limited Partnership
10150 Highland Manor Drive
Suite 150
Tampa, Florida 33610

With a copy to:
Duke-Weeks Realty Limited Partnership
3950 Shackleford Road
Suite 300
Duluth, Georgia 30096
Attn: Legal Department

With Rental Payments to:
Duke-Weeks Realty Limited Partnership
P.O. Box 945703
Atlanta, Georgia 30394-5703

Tenant:
Prior to the Commencement Date:
American Classic Voyages Co.
Two North Riverside Plaza
Suite 200
Chicago, Illinois 60606
Attention: Jordan Allen
After the Commencement Date:
American Classic Voyages Co.
[TO BE AGREED UPON BY LANDLORD AND TENANT AS SOON AS REASONABLY POSSIBLE AFTER THE DATE HEREOF]

Exhibits attached hereto:

| | |
|---|---|
| Exhibit A: | Legal Description of Land |
| Exhibit B: | Construction Agreement |
| Exhibit B-1: | Scope of Work Specifications |
| Exhibit B-2: | List of Comparable Buildings |
| Exhibit B-3 | Intentionally Omitted |
| Exhibit B-4 | Site Plan |
| Exhibit B-5 | Rendering of Building |
| Exhibit B-6 | Floor Plans |
| Exhibit B-7 | Approved Schedule |
| Exhibit B-8 | Coordination of Improvement Work by Landlord |
| Exhibit C: | Commencement Date Agreement |
| Exhibit D: | Rules and Regulations |
| Exhibit E: | Special Stipulations |
| Exhibit F: | Form of Tax Certification |
| Exhibit G: | Janitorial Specifications |
| Exhibit H: | Intentionally Omitted |

Exhibit I: Form of SNDA
Exhibit J: Form of Letter of Credit

Section 1.02. Lease of Premises.

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, under the terms and conditions herein, the Leased Premises. The leasing of the Leased Premises by Landlord to Tenant also shall include the appurtenant right of Tenant to use, without charge, in common with the other tenants of the Building, all driveways, accessways, sidewalks, landscaped areas, lobbies, elevators, entrances and other common areas on the Land, as well as all entrances and other similar areas in the Park which provide access from any public road to the Building and any and all appurtenances, rights, interests, easements and privileges relating thereto.

Subject to and in accordance with the terms and provisions set forth below, Tenant shall have the option (the "PRE- COMMENCEMENT EXPANSION OPTION"), exercisable at the time set forth below, to expand the Leased Premises by up to an additional 20,000 square feet of contiguous Rentable Area. To exercise such Pre- Commencement Expansion Option, Tenant must notify Landlord in writing at least six (6) months prior to the Commencement Date, and Tenant must specify in such written notice the proposed size (subject to the foregoing limit) of the additional space desired by Tenant. The exact location of the Rentable Area to be added to the Leased Premises as a result of the exercise by Tenant of the Pre- Commencement Expansion Option shall be determined by Landlord, but Landlord agrees that in designating the location of such space (the "PRE- COMMENCEMENT EXPANSION SPACE"), (i) such space shall be internally contiguous with the Leased Premises and (ii) such space shall have a configuration that is commercially usable and which shall have an approximately proportionate share of exterior window walls on the applicable floor of the Building. The Pre- Commencement Expansion Space shall be taken on the same terms and conditions as the original Leased Premises and Tenant shall be entitled to the same Tenant Improvement Allowance per square foot of Rentable Area contained within the Pre- Commencement Expansion Space on the same terms and conditions as provided for the original Leased Premises in Exhibit B. In the event that Tenant provides Landlord with Plans and Specifications for the Pre- Commencement Expansion Space on or prior to the Plan Delivery Date, Landlord agrees to complete the Improvement Work with respect to the Pre- Commencement Expansion Space on the same schedule as is provided for the initial Leased Premises. In the event that Tenant provides Landlord with its Plans and Specifications for the Pre- Commencement Expansion Space after the Plan Delivery Date, Landlord agrees to deliver the Pre- Commencement Expansion Space to Tenant in accordance with the Improvement Work for such space completed pursuant to the Work Letter within six (6) months from Tenant's delivery to Landlord of its Plans and Specifications for the Pre- Commencement Expansion Space; provided, however, that such six (6) month period shall be extended on a day- for- day basis to the extent that Landlord is unable, despite diligent good faith efforts, to obtain permits for such work within two (2) months after receipt of Tenant's Plans and Specifications for the Pre- Commencement Expansion Space. Landlord agrees to use good faith reasonable efforts to complete such Improvement Work promptly after Landlord's approval of the Plans and Specifications for such Pre- Commencement Expansion Space. Base Rent and Annual Rental Adjustment shall be payable by Tenant in the same manner as for the initial Leased Premises commencing on the first (1st) business day of the second (2nd) week following the Completion Date (as defined in Exhibit B hereto) for the Pre- Commencement Expansion Space.

Section 1.03. Rentable Area.

The term "Rentable Area", as used herein, shall refer to the rentable area of the Leased Premises as determined in accordance with the "Standard Method for Measuring Floor Area in Office Buildings," published by the Secretariat, Building Owners and Managers Association International (ANSI/BOMA Z65.1- 1996), approved June 7, 1996 and applying a "load" or "add on" factor of no more than 9% with respect to full floors and 15% with respect to partial floors. In the event Tenant initially occupies a partial floor but during the term hereof expands into a full floor, the rentable square footage shall be determined on a full floor basis. Unless otherwise specifically designated, all references to Rentable Area, square footage or square feet in this Lease are to rentable square footage or square feet.

The rentable area of the Leased Premises shall be calculated, on a preliminary basis, by Landlord's architect when floor plans for the Leased Premises are complete (subject to final, conclusive determination as described in the following paragraph), in accordance with the definitions and methodology contained in this Lease. Upon such determination by Landlord's architect, the Rentable Area of the Leased Premises (as well as other calculations herein which are based upon such Rentable Area including, without limitation, the Minimum Annual Rent, Tenant's Proportionate Share, Annual Rental Adjustment and the Tenant Improvement Allowance) shall be adjusted to reflect the number of square feet of Rentable Area determined by such calculation.

Within thirty (30) days after the Commencement Date (defined below), Landlord's architect shall field measure the Leased Premises, Landlord shall deliver to Tenant Landlord's proposed form of Exhibit C, attached hereto and incorporated herein, which shall contain an acknowledgment of the date upon which the Commencement Date of this Lease occurred, Tenant's Proportionate Share and Landlord's calculation of the exact number of square feet of Rentable Area within the

Leased Premises and the Building. Tenant shall have the right to object to Landlord's proposed Exhibit C and any of the factual information therein by delivering written notice to Landlord within twenty (20) days after Landlord delivers Exhibit C to Tenant, failing which Tenant shall be deemed to have agreed that all information contained in Exhibit C is correct. If Tenant objects to Landlord's proposed Exhibit C or any of the factual information therein within said twenty (20)- day period, Landlord and Tenant shall work together for thirty (30) days to resolve their differences and, if such differences are resolved within such thirty (30) day period, Landlord and Tenant shall execute Exhibit C. If Landlord and Tenant are unable to resolve their disagreement within such thirty (30) day period, the parties shall mutually agree upon an experienced, qualified architect to resolve such disagreement (concerning either the Rentable Area of the Leased Premises and/or the Building or concerning the correct Commencement Date). The architect must not have been employed by either party previously and must have ten (10) years experience immediately prior to the date in question designing multi- story office buildings in the suburban Ft. Lauderdale, Florida market area. If the parties are unable to agree on an architect within ten (10) days after the expiration of such thirty (30) day period, either party may apply to the Miami Chapter of the American Institute of Architects for designation of an architect. The architect shall resolve the disagreement within thirty (30) days of his/her selection. The decision of such architect shall be final and binding upon both Landlord and Tenant and shall be incorporated into Exhibit C. Upon execution by Landlord and Tenant of the agreed Exhibit C or the Exhibit C determined by arbitration, the Commencement Date as shown on Exhibit C shall be the Commencement Date for all purposes of this Lease and the Rentable Area of the Leased Premises as shown on Exhibit C shall replace the Rentable Area of the Leased Premises as shown in Section 1.01.B. and shall be deemed to be the Rentable Area of the Leased Premises for all purposes under this Lease. Further, all calculations, amounts and sums which are based upon the Rentable Area of the Leased Premises including, without limitation, Minimum Annual Rent and the Tenant Improvement Allowance shall be adjusted accordingly. All payments of Minimum Annual Rent, Annual Rental Adjustment and all other payments of rent and other sums of money required of Tenant herein shall be made as and when required herein, notwithstanding any unresolved objections to Exhibit C. All such payments shall be based upon the Landlord's proposed form of Exhibit C prepared by Landlord until such objections have been finally resolved, whereupon any overpayment or any underpayment theretofore made shall be adjusted by increasing or reducing, as the case may be, the next installment of Minimum Annual Rent coming due.

## ARTICLE 2 - TERM AND POSSESSION

Section 2.01. Term.

The term of this Lease shall commence on the Commencement Date and expire at 12:00 midnight on the last day of the calendar month in which the fifteenth (15th) anniversary of the Commencement Date occurs (the "LEASE TERM"). As used herein, "COMMENCEMENT DATE" means the later of (i) the delivery of Non- Disturbance Agreement(s) executed by all the prior encumbrancers of the Project; or (ii) the first (1st) business day of the second (2nd) week following the Completion Date (as defined in Exhibit B hereto).

Section 2.02. Construction of Building and Leased Premises.

Landlord agrees, at its sole cost and expense, to cause the Building to be constructed in a good and workmanlike manner in compliance with all Applicable Laws (as hereinafter defined). The Building shall be constructed in accordance with the Base Building Plans (as defined in Exhibit B), Exhibit B and generally in accordance with the renderings attached as Exhibit B- 5, subject, however to the finalization thereof as hereinafter described. The Leased Premises shall be constructed, and the Improvement Allowance (as defined in Exhibit B) shall be distributed, in accordance with the terms and provisions of Exhibit B.

Section 2.03. Surrender of the Premises.

Upon the expiration or earlier termination of this Lease, Tenant shall immediately surrender the Leased Premises to Landlord in broom- clean condition. Tenant shall remove its personal property in the Leased Premises at its sole cost and expense. Tenant shall, at its expense, promptly repair any damage caused by

any such removal, and shall restore the Leased Premises to the condition existing upon the Commencement Date, reasonable wear and tear, casualty, condemnation and permitted alterations excepted. Landlord acknowledges and agrees that Tenant shall not be required to remove any wiring or cabling except such that is contained within the Leased Premises (not above- ceiling). Following expiration or earlier termination of this Lease, all Tenant property which is required to be removed hereby and is not removed within ten (10) days following Landlord's written demand therefore shall be conclusively deemed to have been abandoned and Landlord shall be entitled to dispose of such property at Tenant's cost without incurring any liability to Tenant. The provisions of this section shall survive the expiration or other termination of this Lease.

Section 2.04. Holding Over.

If Tenant retains possession of the Leased Premises after the expiration or earlier termination of this Lease, such holdover shall be subject to and in accordance with all of the terms of this Lease, except that (i) the Monthly Rental Installment for the six (6) months of such holdover shall be equal to one hundred twenty- five percent (125%) of the Monthly Rental Installment payable during the last month of the Term (the "LAST MONTH'S RENT"), prorated for the period of such holdover and (ii) Tenant shall also be required to pay the monthly installment of the Annual Rental Adjustment, as prorated for such holdover period. If Tenant continues to retain possession of the Leased Premises for a period exceeding such six (6) month period, the Monthly Rental Installment for any such additional holdover period shall be equal to one hundred fifty percent (150%) of the last month's rent. In no event shall Tenant be liable for consequential damages as a result of any holdover. Acceptance by Landlord of rent after such expiration or earlier termination shall not result in a renewal of this Lease. This Section 2.04 shall in no way constitute a consent by Landlord to any holding over by Tenant upon the expiration or earlier termination of this Lease, provided, however, Landlord's monetary remedies for such holdover shall be limited to collection of holdover rental as specified above, provided, further that this shall not prevent Landlord from pursuing a dispossessory proceeding or other process to obtain possession of the Leased Premises.

Section 2.05. Short Term Extension Option.

Landlord hereby grants to Tenant the right and option to unilaterally extend the Lease Term for any period of time up to six (6) months following the expiration of the Lease Term. Tenant shall exercise the option granted hereby by giving Landlord notice of exercise at least twelve (12) months prior to the expiration of the Term. If Tenant shall exercise Tenant's rights under this section, then Tenant shall include in Tenant's notice of exercise a statement that Tenant is exercising Tenant's rights under this section and Tenant shall designate a date not later than the date six (6) months following the expiration of the Term to which Tenant elects to extend the expiration date of the Term. Thereupon, this Lease shall be extended to the date set forth in Tenant's notice of exercise. If the Term of this Lease shall be extended under this section, all terms and conditions of this Lease shall remain in full force and effect and Tenant shall continue to pay Monthly Rental Installments during such extension period calculated at a rate of increase of three percent (3.0%) of the last month's rent. Following expiration of the short term option period selected and exercised by Tenant pursuant to this section, the holdover provisions of Section 2.04 shall apply to any continued occupancy by Tenant.

ARTICLE 3 - RENT

Section 3.01. Base Rent.

Subject to Section 3.06 below, Tenant shall pay to Landlord the Minimum Annual Rent in the Monthly Rental Installments plus Florida State Sales tax in advance on the Commencement Date and on or before the first day of each and every calendar month thereafter during the Lease Term. The Monthly Rental Installments shall be paid, except as otherwise provided herein, without deduction or offset and, with respect to any partial calendar months, shall be prorated.

Section 3.02. Annual Rental Adjustment Definitions.

A. "Annual Rental Adjustment" - shall mean the amount of Tenant's Proportionate Share of Operating Expenses for a particular calendar year.

B. "Operating Expenses" - shall mean the amount of all of Landlord's costs and expenses paid or incurred in operating, repairing and maintaining the Building (including the Common Areas as defined below) in good condition and repair for a particular calendar year, including by way of illustration and not limitation: all Real Estate Taxes (as hereinafter defined); insurance premiums and deductibles; water, sewer, electrical and other utility charges other than the electrical charges incurred with respect to any space in the Building other than Common Areas; service and other charges incurred in the repair, operation and maintenance of the elevators and the heating, ventilation and air- conditioning system; cleaning and other janitorial services; tools and supplies; repair costs; landscape maintenance costs; security services; license, permit and inspection fees; management or administrative fees, not to exceed three percent (3%) of the Minimum Annual Rent for such calendar year; supplies, costs, wages and related employee benefits payable for the management, maintenance and operation of the Building; maintenance and repair of the driveways, parking and sidewalk areas (including snow and ice removal), landscaped areas; lighting; maintenance and repair costs, dues, fees and assessments incurred under that certain Declaration of Protective Covenants and Restrictions for Sawgrass Commerce Center, recorded in Book 15002, Page 0711 (the "DECLARATION"); and amortization (on a straight- line basis over the useful life of the item in question) of the cost of acquiring and installing any system, apparatus, device or equipment which is installed for the principal purpose of (i) reducing Operating Expenses (but the annual amortization included may not exceed the reasonable projected annual reduction), (ii) promoting safety or (iii) complying with governmental requirements which first become effective after the Commencement Date (the "PERMITTED CAPITAL EXPENSES"). Landlord agrees to provide Tenant promptly upon Tenant's request, copies of all tax bills, canceled checks (with respect to any tax payment) and other

evidence of billing and payment of Real Estate Taxes reasonably requested by Tenant.

At the request of Tenant, Landlord shall engage a security service on such terms and conditions as are reasonably specified by Tenant. Tenant acknowledges and agrees that Tenant shall be responsible for seventy- five percent (75%) of the cost of such security service during such period that any such security service is engaged as approved by Tenant (with the balance of such cost to be at the expense of Landlord or other tenants of the Building).

At the option of Tenant, Tenant may request a statement from Landlord indicating the amount of Tenant's Proportionate Share of Real Estate Taxes, in order for Tenant to be eligible for a Qualified Targeted Industry tax refund for Tenant's Proportionate Share of the Real Estate Taxes. Such certification shall be addressed to the State of Florida Office of Tourism, Trade and Economic Development and shall be signed by Landlord and delivered to Tenant within fourteen (14) days of request by Tenant. Landlord shall attach as exhibits to such certification a copy of the Real Estate Tax bill for the year in question and a copy (front and back) of the cancelled check for the payment of such Real Estate Taxes to the Broward County Tax Collector and shall be substantially in the form attached hereto as Exhibit F.

Notwithstanding the foregoing, specifically excluded from "Operating Expenses" are the following listed items:

(1) Costs associated with the operation of the business of the ownership or entity which constitutes "Landlord", as distinguished from the costs of building operations, including, but not limited to partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee, costs of selling, syndicating, financing, mortgaging or hypothecating any of Landlord's interest in the Project, costs of any disputes between Landlord and its employees (if any), disputes of Landlord with Project management, or outside fees paid in connection with disputes with other tenants;

(2) Costs incurred in connection with the original construction of the Project or in connection with any capital expenditure in the Project (except the Permitted Capital Expenditures) , including but not limited to the addition or deletion of floors;

(3) Costs of alterations or improvements to the Premises or the premises of other tenants (as compared to repairs or maintenance) (except the Permitted Capital Expenditures);

(4) Depreciation, interest and principal payments on mortgages and other debt costs (directly related to financing the Project, or any portion thereof), if any;

(5) Costs of correcting defects in or inadequacy of the initial design or construction of the Project;

(6) Expenses directly resulting from the negligence and/or willful misconduct of Landlord, its agents, servants or employees;

(7) Legal fees, space planners' fees, real estate brokers' leasing commissions and advertising expenses incurred in connection with the development or leasing of the Project;

(8) Costs for which Landlord is entitled to be reimbursed by its insurance carrier or any tenant's insurance carrier (excluding commercially reasonable deductibles);

(9) Any bad debt loss, rent loss or reserves for bad debts or rent loss;

(10) The expense of any services provided to other tenants in the Building which are in excess of the services made available to Tenant under this Lease;

(11) Wages and salaries of management or supervising employees offsite above the level of senior property manager; the wages of any employee who does not devote substantially all of his or her time to the Project shall be equitably apportioned among all projects for which such employee performed services based upon the time such employee spent on each project relative to the total time devoted by such employee to all projects;

(12) Fines and penalties;
(13) Amounts paid as ground rental by Landlord;
(14) Any recalculation of or additional Operating Expenses actually incurred more that two (2) years prior to the year in which Landlord proposes that such costs be included in Operating Expenses;

(15) Capital expenditures required by Landlord's failure to comply with laws enacted before the Commencement Date;

(16) Costs incurred by Landlord with respect to goods and services (including utilities sold and supplied to tenants and occupants of the Building) to the extent that Landlord is entitled to reimbursement for such costs directly from such tenant(s);
(17) Costs, including permit, license and inspection costs, incurred with respect to the installation of tenant improvements made for new tenants in the Building or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants of the Building;

(18) Costs incurred by Landlord for alterations which are considered capital improvements under generally accepted accounting principles, consistently applied, except for Permitted Capital Expenditures;

(19) Any costs paid to Landlord or subsidiaries or affiliates of Landlord for services in the Project to the extent the same exceeds the costs of such services rendered by unaffiliated third parties on a competitive basis;
(20) Rentals and other related expenses incurred in leasing air conditioning systems, elevators or other equipment ordinarily considered to be of a capital nature, except equipment not affixed to the Building which is used in providing janitorial or similar services and except for temporary rentals that are necessitated by an emergency;

(21) Electric power costs for any tenant or tenant space;
(22) Any costs to repair or restore any portion of the Project following a condemnation or a casualty (except to the extent of a commercially reasonable deductible amount);
(23) Legal fees, accounting fees or consulting fees, except those incurred directly in connection with Operating Expenses; and
(24) Costs incurred to remove, encapsulate or remediate asbestos or any Hazardous Substances (as defined in Section 15.01.B.).

It is understood that Operating Expenses shall be reduced by all cash discounts, trade discounts, or quantity discounts received by Landlord or Landlord's managing agent in the purchase of any goods, utilities, or services in connection with the operation of the Project. In the calculation of any expenses hereunder, it is understood that no expense shall be charged in duplicate. Landlord shall use commercially reasonable efforts to effect an equitable proportion of bills for services rendered to the Project and to any other property owned by Landlord. Landlord agrees to keep books and records showing the Operating Expenses in accordance with a system of generally accepted accounting practices consistently maintained on a year- to- year basis.
Notwithstanding any language contained herein to the contrary, Tenant hereby agrees that, during any calendar year in which the entire Building is not provided with Building Standard Services or is not at least ninety five percent (95%) occupied on average throughout the calendar year, Landlord shall compute all Variable Operating Costs (defined below) for such calendar year as though the entire Building were provided with Building Standard Services and were ninety- five percent (95%) occupied. For purposes of this lease the term "VARIABLE OPERATING COSTS" shall mean any operating cost that varies with the level of occupancy of the Building (e.g. tenant utilities and tenant cleaning services, but

the parties expressly agree that Real Estate Taxes are not included in Variable Operating Expenses). In the event that Landlord excludes from "Operating Expenses" any specific costs billed to or otherwise incurred for the particular benefit of specific tenants of the Building, or to other buildings or projects within the Park, Landlord shall have the right to increase "Operating Expenses" by an amount equal to the cost of providing standard services similar to the services for which such excluded specific costs were billed or incurred. In no event shall Landlord receive from all tenants of the Building more than one hundred percent (100%) of any Operating Expenses.

In the event that within six (6) months after Tenants' receipt of Landlord's statement of Operating Expenses for the prior calendar year, Tenant reasonably believes that certain of the Operating Expenses charged by Landlord include costs that are not properly included within the term "Operating Expenses" or the Landlord has erred in calculating same or that any of the amounts included therein are not commercially reasonable, Tenant or its agents shall have the right to audit Landlord's books and records and dispute any portion of such statement in accordance with this paragraph. Tenant shall exercise such audit right by providing Landlord with a written notice of Tenant's exercise of such audit right within such 6- month period and a statement enumerating reasonable detailed reasons for Tenant's objections to the statement issued by Landlord (the "AUDIT NOTICE"). Within ten (10) business days of the receipt by Landlord of an Audit Notice, Landlord shall cause its property manager at the Building to meet with a designated employee or agent of Tenant (the "TENANT REPRESENTATIVE") to discuss the objections set forth in the Audit Notice in order to attempt to resolve the issues raised by Tenant in the Audit Notice. At least five (5) business days prior to such meeting, Landlord shall provide the Tenant Representative with reasonable access during normal business hours to Landlord's books and records at the Building relating to Operating Expenses for the calendar year in question. If, within thirty (30) days after Landlord's receipt of the Audit Notice, Landlord and Tenant are unable to resolve Tenant's objections, then not later than fifteen (15) days after the expiration of such 30- day period, Tenant shall notify Landlord if Tenant wishes to employ an independent, reputable certified public accounting firm or a nationally recognized operating expenses audit firm to inspect and audit Landlord's books and records for the Building for the year in question. Tenant may not use an accounting firm operating on a contingency fee basis in such audit during the first five (5) years of the term of the Lease. Provided further however, after the first five (5) years of the term of the Lease, Tenant may use a nationally recognized operating expenses audit firm which operates on a contingency fee basis to inspect and audit Landlord's books and records no more than twice during the remaining term of the Lease or any independent, reputable certified public accounting firm. All costs and expenses of any such audit shall be paid by Tenant, unless such audit reveals (or it is ultimately determined by the Independent Accountant, as described below) that Landlord overstated Operating Expenses by five percent (5%) or more, in which case Landlord shall reimburse Tenant for the cost of such audit. Any audit performed pursuant to the terms of this section shall be conducted at the offices of Landlord's property manager at the Building during normal business hours and Landlord shall make its books and records conveniently available at the Building within ten (10) business days of Tenant's notice that it desires to perform such audit. If, based on such audit, Tenant believes that Landlord's statement includes improper or excessive charges for Operating Expenses for the year in question, Tenant shall notify Landlord, in writing, specifying the overcharges and including a copy of the audit. Tenant shall have the right, at any time up through the date one (1) year after Landlord's statement was delivered to Tenant, to submit the dispute to any of the "Big- Five" accounting firms that is not then employed by Landlord or Tenant (the "INDEPENDENT ACCOUNTANT"). Such Independent Accountant shall be asked to resolve the dispute within thirty (30) days. The decision of such Independent Accountant shall be final and binding on both Landlord and Tenant. If Landlord and Tenant agree pursuant to this paragraph that Tenant was overcharged or if the Independent Accountant determines that Tenant was overcharged, the overcharge amount, together with interest at the Default Rate (as hereinafter defined) from the date Tenant paid the amount shown on Landlord's statement, shall be applied as a credit to the next installments of Minimum Annual Rent and Annual Rental Adjustment due hereunder (or if the Lease has expired, promptly to Tenant in cash). Notwithstanding anything contained herein to the contrary, Tenant shall be entitled to exercise its audit right pursuant to this section only in strict accordance with the foregoing procedures no more often than once per calendar year and each such audit shall relate only to the calendar year most recently ended; provided, however, if Tenant discovers overcharges in Landlord's statement, Tenant shall be entitled to audit up to two (2) prior years' books and records with respect to the item(s) for which such overcharge is discovered; and provided further, that in the event any audit reveals evidence of fraud, Tenant shall be entitled to audit any and all prior years' books and records with respect to all items. In the event that Tenant fails to notify Landlord within the foregoing 6- month period that Tenant objects to the statement of Operating Expenses, then Tenant's right to audit such year's statement of Operating Expenses shall be null and void.

C. "Tenant's Proportionate Share of Operating Expenses" - shall be an amount equal to the product of Tenant's Building Expense Percentage times the Building Operating Expenses.

D. "Real Estate Taxes" - shall include any form of real estate tax or assessment or service payments in lieu thereof, and any license fee, commercial rental tax, improvement bond or other similar charge or tax (other than inheritance, personal income or estate taxes) imposed upon the Building or the Land by any authority having the power to so charge or tax, together with reasonable costs and expenses of contesting the validity or amount of Real Estate Taxes, which at Landlord's

option may be calculated as if such contesting work had been performed on a contingent fee basis (whether charged by Landlord's counsel or representative; provided, however, that said fees are reasonably comparable to the fees charged for similar services by others not affiliated with Landlord, but in no event shall said fees exceed thirty- three percent (33%) of the good faith estimated tax savings). Notwithstanding the foregoing, Real Estate Taxes shall not include the following types: income, business license, impact fees, capital, stock, succession, transfer, franchise, gift, estate, inheritance or taxes or assessments attributable to the personal property of other tenants.
E. "Common Areas" - shall mean the areas of the Building and the Land which are designed for use in common by all tenants of the Building and their respective employees, agents, customers, invitees and others, and includes, by way of illustration and not limitation, entrances and exits, hallways and stairwells, elevators, restrooms, sidewalks, driveways, parking areas, landscaped areas and other areas as may be designated by Landlord as part of the Common Areas of the Building. Tenant shall have the non- exclusive right, in common with others, to the use of the Common Areas.
Section 3.03. Payment of Annual Rental Adjustment for Operating Expenses.
In addition to the Minimum Annual Rent specified in this Lease, Tenant shall pay to Landlord as additional rent for the Leased Premises, in each calendar year or partial calendar year, during the Lease Term, an amount equal to the Annual Rental Adjustment for such calendar year, in an amount not to exceed $6.63 per rentable square foot for the first year of the Lease Term (net of Tenant's electric and security guard charges). The Annual Rental Adjustment shall be estimated annually by Landlord, and written notice thereof shall be given to Tenant prior to December 1 of the previous calendar year. Tenant shall pay to Landlord each month, at the same time the Monthly Rental Installment is due, an amount equal to one- twelfth (1/12) of the estimated Annual Rental Adjustment. If Real Estate Taxes or the cost of janitorial services or Common Area utility increase during a calendar year, Landlord may increase the estimated Annual Rental Adjustment once during such year by giving Tenant thirty (30) days written notice to that effect, and thereafter Tenant shall pay to Landlord, in each of the remaining months of such year, an amount equal to the amount of such increase in the estimated Annual Rental Adjustment divided
by the number of months remaining in such year. Within ninety (90) days after the end of each calendar year, Landlord shall prepare and deliver to Tenant a statement showing the actual Annual Rental Adjustment for the calendar year in question. Within thirty (30) days after receipt of the aforementioned statement, Tenant shall pay to Landlord, or Landlord shall credit against the next installment(s) of Minimum Annual Rent due from Tenant (or pay directly to Tenant if the Lease has expired or has been terminated), as the case may be, the difference between the actual Annual Rental Adjustment for the preceding calendar year and the estimated amount paid by Tenant during such year.
Section 3.04. Late Charges.
Tenant acknowledges that Landlord shall incur certain additional unanticipated administrative and legal costs and expenses if Tenant fails to timely pay any payment required hereunder. Therefore, in addition to the other remedies available to Landlord hereunder, if any payment required to be paid by Tenant to Landlord hereunder shall become overdue, such unpaid amount shall bear interest from the due date thereof to the date of payment at the Default Rate. As used herein, the term "DEFAULT RATE" shall mean the prime rate (as reported in the Wall Street Journal) of interest (the "PRIME RATE") plus four percent (4%) per annum.
Section 3.05. Maximum Increase in Operating Expenses.
Notwithstanding anything in this Lease to the contrary, Landlord agrees that the amount of the Annual Rental Adjustment calculated to be due under Section 3.03 hereunder attributable to Controllable Operating Expenses (as hereinafter defined) paid or incurred in (i) the first lease year shall not exceed $3.36 per square foot of Rentable Area and (ii) for any subsequent lease year, shall not exceed five percent (5%) of the amount attributable to Controllable Operating Expenses properly chargeable to Tenant under this Lease for the prior calendar year. As used herein, the term "CONTROLLABLE OPERATING EXPENSES" shall mean all Operating Expenses of any kind or nature other than Real Estate Taxes, service payments in lieu of real estate taxes, insurance premiums, charges for public utilities and management or administrative fees applicable to such expenses.
Section 3.06. Minimum Annual Rent and Annual Rental Adjustment During First Lease Year.
Minimum Annual Rent and Annual Rental Adjustment shall be payable by Tenant only on 85,000 square feet of Rentable Area of the Leased Premises for the period commencing on the Commencement Date and ending on the six (6) month anniversary of the Commencement Date to the extent that Tenant doesn't occupy for business purposes more than 85,000 square feet of Rentable Area during that portion of the Lease Term. To the extent that Tenant occupies for business purposes more than 85,000 square feet of Rentable Area during the initial six (6) months of the Lease Term, Tenant shall pay Minimum Annual Rent and Annual Rental Adjustment applicable to any portion of the Leased Premises above the 85,000 square feet of Rentable Area which it occupies for business purposes. Thereafter, Minimum Annual Rent and Annual Rental Adjustment shall be payable with respect to the entirety of the Leased Premises.

**ARTICLE 4 - SECURITY DEPOSIT**

Section 4.01. Letter of Credit.
(a) Tenant shall, within five (5) business days after the execution of this Lease, provide to Landlord an irrevocable unconditional letter of credit (the "LETTER OF CREDIT") in substantially the form attached hereto as Exhibit J or as otherwise reasonably acceptable to Landlord and issued by Chase Manhattan Bank or another bank reasonably acceptable to Landlord (the "LETTER OF CREDIT BANK"). The Letter of Credit shall be in the amount of Five Hundred Thousand and 00/100 ($500,000.00) Dollars and shall be held by Landlord as security for the full and faithful performance by Tenant of all of the terms, conditions and covenants contained in the Lease on the part of Tenant to be performed, including but not limited to the payment of rent.
(b) In the event of a default by Tenant in the payment of rent or performance or observance of any of the other terms, conditions or covenants of this Lease beyond the expiration of any notice and cure period, Landlord may, at its option and with notice to Tenant, present the Letter of Credit to the Letter of Credit Bank together with a certificate from Landlord executed by any officer of Landlord certifying that Tenant is in default under the Lease, has failed to cure such default within the time periods specified in the Lease for cure and that Landlord is entitled to draw upon the Letter of Credit. Upon such presentation, Landlord may draw upon the Letter of Credit and apply all or any part thereof to payment of rent or to cure any such default; and if Landlord does so, Tenant shall, upon request, deposit with Landlord the amount so applied so that Landlord will have on hand at all times during the Security Period (as hereinafter defined) the full amount of the Letter of Credit. If Landlord shall improperly draw under the Letter of Credit, Landlord shall immediately return the drawn amount (together with interest from the date drawn until repaid at the rate per annum which is the lesser of (i) the Default Rate or (ii) the highest rate permitted by law) and reimburse Tenant for any charges imposed by the issuer in connection with the draw or restoration of the letter of credit. The Letter of Credit shall be renewed on an annual basis during the Security Period (except with respect to the last year of the Security Period). If Tenant has not renewed the Letter of Credit as required at least forty five (45) days prior to the expiration date thereof, Landlord may immediately draw upon the Letter of Credit and hold the cash proceeds in lieu thereof. All sums held by Landlord pursuant to this section shall be without interest.
(c) Notwithstanding anything to the contrary in this Lease, if there has been no breach of any material undertaking by Tenant under the Lease beyond any applicable notice and grace period, at the end of the twelfth (12th) month of the Lease Term, the amount of the Letter of Credit shall be reduced by One Hundred Thousand and 00/100 ($100,000.00) Dollars. Thereafter, if there continues to be no breach of any material undertaking by Tenant under the Lease beyond any applicable notice and grace period, at the end of the twenty fourth (24th) month of the Lease Term, the amount of the Letter of Credit shall be reduced again by One Hundred Thousand and 00/100 ($100,000.00) Dollars. Thereafter, if there continues to be no breach of any material undertaking by Tenant under the Lease beyond any applicable notice and grace period, at the end of the thirty sixty (36th) month of the Lease Term, the amount of the Letter of Credit shall be reduced again by One Hundred Thousand and 00/100 ($100,000.00) Dollars. Thereafter, if there continues to be no breach of any material undertaking by Tenant under the Lease beyond any applicable notice and grace period, at the end of the forty-eighth (48th) month of the Lease Term, the amount of the Letter of Credit shall be reduced again by One Hundred Thousand and 00/100 ($100,000.00) Dollars. Thereafter, if there continues to be no breach of any material undertaking by Tenant under the Lease beyond any applicable notice and grace period, at the end of the sixtieth (60th) month of the Lease Term, the amount of the Letter of Credit shall be reduced again by One Hundred Thousand and 00/100 ($100,000.00) Dollars such that the Letter of Credit has been reduced to zero and Tenant shall thereafter have no further obligation under this Article 4 (the period of time during which the Letter of Credit is required to be posted is herein called the "SECURITY PERIOD").

ARTICLE 5 - OCCUPANCY AND USE

Section 5.01. Use.

The Leased Premises shall be used by Tenant for the Permitted Use and for no other purposes without the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned. Landlord represents and warrants to Tenant that the applicable laws, codes and regulations, as applicable to the Project, permit the Leased Premises to be used for general office use. Tenant shall have access to the Leased Premises twenty four (24) hours per day, seven (7) days per week.
Section 5.02. Covenants of Tenant Regarding Use.
Tenant shall (i) use and maintain the Leased Premises and conduct its business thereon in a safe, careful, reputable and lawful manner, (ii) comply with all laws, rules, regulations, orders, ordinances, directions and requirements of any governmental authority or agency, now in force or which may hereafter be in force ("APPLICABLE LAWS"), including without limitation those which shall impose upon Landlord or Tenant any duty with respect to or triggered by a change in the use or occupation of, or any improvement or alteration to, the Leased Premises, (iii) comply with and obey all Building Rules and Regulations attached hereto as Exhibit D and as may be reasonably modified from time to time by

Landlord on reasonable notice to Tenant (provided that such modifications do not materially and adversely affect Tenant's use and enjoyment of, or access to, the Leased Premises). Tenant shall not do or permit anything to be done in or about the Leased Premises which will in any way unreasonably obstruct or interfere with the rights of other tenants or occupants of the Building or create a nuisance. Landlord shall not be responsible to Tenant for the non- performance by any other tenant or occupant of the Building of any of the Building Rules and Regulations, but agrees to take reasonable measures to assure such other tenant's compliance. Tenant shall not use the Leased Premises, or allow the Leased Premises to be used, for any purpose or in any manner which would invalidate any policy of insurance now or hereafter carried on the Building or increase the rate of premiums payable on any such insurance policy unless Tenant reimburses Landlord for any increase in premium charged.

Section 5.03. Landlord's Rights Regarding Use.

In addition to the rights specified elsewhere in this Lease, Landlord shall have the following rights regarding the use of the Leased Premises or the Common Areas, each of which may be exercised without notice or liability to Tenant: (a) Landlord may install such signs, advertisements or notices or tenant identification information on the directory board as it shall deem reasonably necessary or proper; (b) Landlord shall have the right at any time to control, change or otherwise alter the Common Areas in such manner as it deems reasonably necessary or proper, provided that such control, change or alteration does not materially and adversely affect Tenant's use and enjoyment of, or access to, the Leased Premises or the nature of the Building as a first class building for the Sawgrass/Sunrise submarket; (c) Landlord, its employees and agents and any mortgagee of the Building shall have the right to enter any part of the Leased Premises at reasonable times upon reasonable notice except in the event of an emergency where no notice shall be required for the purposes of examining or inspecting the same, showing the same to prospective purchasers, mortgagees or, during the last twelve (12) months of the Lease Term, to prospective tenants and making such repairs, alterations or improvements to the Leased Premises or the Building as Landlord may deem necessary or desirable, provided, however, that any repairs made by Landlord shall be at Tenant's expense except as provided in Section 7.02 hereof. Except with respect to Landlord's gross negligence or intentional misconduct, Landlord shall incur no liability to Tenant for such entry, nor shall such entry constitute an eviction of Tenant or a termination of this Lease, or entitle Tenant to any abatement of rent therefor; provided, however, that Landlord agrees in its exercise of any
rights pursuant to this Section, to use good faith efforts to minimize Landlord's interference with Tenant's business operations.

## ARTICLE 6 - UTILITIES AND OTHER BUILDING SERVICES

Section 6.01. Services to be Provided.

Landlord shall furnish to Tenant, except as noted below, the following utilities and other building services at levels and in types customary for first- class office buildings in the Sawgrass/Sunrise, Florida submarket and as more particularly provided below. As a part of the Base Building Work, Landlord shall install electric meters for the Leased Premises and Tenant shall be responsible for and pay directly to the provider of such utility or service all charges for electrical service for the Leased Premises. Utility charges for services to the Common Areas shall be included in Operating Expenses.

(a) Heating, ventilation and air- conditioning in accordance with the specifications provided in the Work Letter attached hereto as required by Tenant with Landlord providing Tenant with independent control of such HVAC within the Leased Premises;

(b) Electric current for lighting equal to at least two (2) watts per square foot of Rentable Area plus electrical current for outlets and convenience power equal to at least four (4) watts per square foot of Rentable Area (on demand);

(c) Water in the Common Areas for lavatory and drinking purposes;

(d) Automatic elevator service twenty- four hours per day through not less than three (3) passenger cabs and one (1) non-dedicated freight elevator cab, except in emergencies or for routine maintenance and in any case, both passenger elevators won't be removed from service at one time for routine maintenance;

(e) Cleaning and janitorial service in the Leased Premises and Common Areas on Monday through Friday of each week, except legal holidays in accordance with Exhibit G attached hereto;

(f) Washing of windows at intervals reasonably established by Landlord (but not less than twice per year);

(g) Replacement of all lamps, bulbs, starters and ballasts in Building standard lighting as required from time to time as a result of normal usage;

(h) Cleaning and maintenance of the Common Areas, including the removal of rubbish, ice and snow;

(i) Access control for the Building comparable as to coverage, control and responsiveness to other similarly situated first-class multi- tenant office buildings in suburban Ft. Lauderdale, Florida;

(j) Security service for the Building as specified in Section 3.02; and

(k) Repair and maintenance to the extent specified elsewhere in this Lease.

In the event of utility deregulation, Landlord may choose the electric, natural gas or water service provider, provided, that the service provided by such provider and cost of such services and utilities shall be comparable to that provided and charged in other comparable buildings in the Sawgrass/Sunrise, Florida submarket. Charges for such utilities and services provided by Landlord, if any, shall not exceed the charges that would have been payable if such utilities and services had been directly billed by the utilities or service providers to Tenant.

Section 6.02. Additional Services.

If Tenant requests utilities or building services in addition to those identified above or any of the above utilities or building services in frequency, scope, quality or quantity substantially greater than those which Landlord determines are normally required by other tenants in the Building for the Permitted Use, then Landlord shall use reasonable efforts to attempt to furnish Tenant with such additional utilities or building services. In the event Landlord is able to and does furnish such additional utilities or building services, the actual costs thereof shall be borne by Tenant. Tenant shall reimburse Landlord monthly (except with respect to after- hours HVAC and electrical which Tenant shall pay directly to the utility provider) for the same as Additional Rent at the same time Monthly Rental Installments and other Additional Rent is due.

If any lights, density of staff, machines or equipment used by Tenant in the Leased Premises materially affect the temperature otherwise maintained by the Building's air- conditioning system or generate substantially more heat in the Leased Premises than that which would normally be generated by that typically used by other tenants in the Building or by tenants in comparable office buildings, then Tenant as part of the initial leasehold improvements shall install any machinery or equipment which Landlord considers reasonably necessary in order to restore the temperature balance between the Leased Premises and the rest of the Building, including equipment which modifies the Building's air-conditioning system. All costs expended to install any such machinery and equipment and any additional costs of operation and maintenance in connection therewith shall be borne by Tenant.

Section 6.03. Interruption of Services.

Notwithstanding anything to the contrary contained in this Lease, if Tenant cannot reasonably use all or any portion of the Leased Premises for Tenant's intended business operation by reason of any interruption in services to be provided by Landlord (and Tenant does not in fact use such portion of the Leased Premises) and such condition exists for three (3) or more consecutive business days or five (5) or more business days within any thirty (30) day period, then Tenant's Minimum Annual Rent and Annual Rental Adjustment shall be abated for that portion of the Leased Premises that Tenant is unable to use for Tenant's intended business operations until such service is restored to the Leased Premises, provided, however, that if and to the extent that the interruption in services is not a result of Landlord's negligence or failure to act, Tenant shall be entitled to an abatement of Tenant's Minimum Annual Rent and Annual Rental Adjustment only if and to the extent that such loss is covered by Landlord's property, rental loss or similar insurance. At the time of the loss of service, Tenant must give written notice promptly to Landlord of the loss of service and its claim for abatement and Tenant only shall be entitled to abatement of Minimum Annual Rent and Annual Rental Adjustment in proportion to the area rendered unusable. Landlord may prevent or stop abatement of Minimum Annual Rent and Annual Rental Adjustment by providing substantially the same service in similar quality and quantity by temporary or alternative means until the cause of the loss of service can be corrected. If any such interruption in services renders twenty- five percent (25%) or more of the Leased Premises unusable for ninety (90) or more consecutive days, Tenant shall have the right to terminate this Lease by written notice to Landlord at any time prior to the

restoration of such services. Tenant shall not be entitled to the rent abatement or termination rights set forth above if the service interruption is caused by the act or omission of Tenant.

## ARTICLE 7 - REPAIRS, MAINTENANCE AND ALTERATIONS

Section 7.01. Repair and Maintenance of Building.

Subject to Section 7.02, Landlord shall make all necessary repairs to the roof, structural elements, exterior walls, exterior doors, windows, corridors and other Common Areas, and Landlord shall keep the Building and the Land in a safe, clean and neat condition and use reasonable efforts to keep all equipment used in common with other tenants in good condition and repair. In addition to the foregoing, if, within three (3) years of the Commencement Date of the Lease, Tenant notifies Landlord of a latent defect, then Landlord, at Landlord's expense (without inclusion as an Operating Expense), will repair such latent defect as soon as practicable.

Section 7.02. Repair and Maintenance of Leased Premises.

Tenant shall keep and maintain the Leased Premises in good order, condition and repair. Except for ordinary wear and tear, casualty, condemnation and damage and repairs which Tenant is not obligated to make as provided elsewhere in this Lease, the cost of all repairs and maintenance to the Leased Premises shall be borne by Tenant. In the event Tenant fails to maintain the Leased Premises as required herein or fails to commence repairs (as required herein and as requested by Landlord in writing) within thirty (30) days after such request, or fails diligently to proceed thereafter to complete such

repairs, Landlord shall have the right in order to preserve the Leased Premises or portion thereof, and/or the appearance thereof, to make such repairs or have a contractor make such repairs and charge Tenant for the cost thereof as additional rent, together with interest at the rate of twelve percent (12%) per annum from the date of making such payments.

Section 7.03. Alterations.

Except for Permitted Alterations, Tenant shall not permit alterations in or to the Leased Premises unless and until the plans and the contractor have been approved by Landlord in writing, such approval not to be unreasonably withheld, delayed or conditioned. Landlord's failure to respond within ten (10) business days after Tenant's written request, shall be deemed a consent provided that such request specifically sets out the time limit for such response and specifies that Landlord shall be deemed to have consented if it fails to respond within such time period. All such alterations shall become a part of the realty and the property of Landlord, and shall not be removed by Tenant, except for trade fixtures and personalty, unless Landlord designates at the time of granting such consent that such alterations must be removed at the termination of the Lease. Tenant shall repair any damage caused by the removal of any alterations, trade fixtures and personalty from the Leased Premises. Tenant shall ensure that all alterations shall be made in accordance with all applicable laws, regulations and building codes, in a good and workmanlike manner and of quality equal to or better than the original construction of the Building. Upon completion of the work, Tenant shall provide lien waivers from the subcontractors or a final affidavit of lien waiver from the general contractor, and such lien waiver shall be in a form reasonably acceptable to Landlord. No person shall be entitled to any lien derived through or under Tenant for any labor or material furnished to the Leased Premises, and nothing in this Lease shall be construed to constitute a consent by Landlord to the creation of any lien. If any lien is filed against the Leased Premises for work claimed to have been done for or material claimed to have been furnished to Tenant, Tenant shall cause such lien to be discharged of record (by bonding or otherwise) within thirty (30) days after filing. Tenant shall indemnify Landlord from all costs, losses, expenses and reasonable attorneys' fees actually incurred in connection with any construction or alteration performed by or at the request of Tenant and any related lien.

Notwithstanding the foregoing, Tenant shall have the right to make non- structural, non- MEP (mechanical, electrical and plumbing) alterations (including painting and carpeting) without the consent of Landlord (a "PERMITTED Alteration"), so long as (i) Tenant notifies Landlord in writing of its intention to do such work at least ten (10) days prior to the initiation of such work, (ii) such alterations do not cause excessive loads on the Building and its systems and are not visible from the exterior of the Leased Premises and (iii) Tenant obtains and furnishes to Landlord any required building permits.

**ARTICLE 8 - CASUALTY**

Section 8.01. Casualty.

In the event of total or partial destruction of the Project or the Leased Premises by fire or other casualty, Landlord agrees to promptly restore and repair same; provided, however, Landlord's obligation hereunder shall be limited to the reconstruction of such of the Building and the payment toward restoration of Improvement Work in an amount equal to the Improvement Allowance. Rent shall proportionately abate during the time that the Leased Premises or part thereof are unusable because of any such damage. Notwithstanding the foregoing, if the Leased Premises are (i) so destroyed that they cannot be repaired or rebuilt within three hundred sixty five (365) days from the casualty date; or (ii) destroyed by a casualty which is not covered by the insurance required hereunder; then either Landlord or Tenant may, upon thirty (30) days' written notice to the other party, terminate this Lease with respect to matters thereafter accruing. Tenant waives any right under applicable laws inconsistent with the terms of this paragraph. Notwithstanding the provisions of this paragraph, if any material damage or destruction which renders the Leased Premises untenantable occurs within the final two (2) years of the Lease Term, then either Landlord or Tenant may, without regard to the aforesaid 365- day period, terminate this Lease by written notice to the other party.

Section 8.02. Fire and Extended Coverage Insurance.

During the Lease Term, Landlord shall maintain "all- risk" fire and extended coverage insurance on the Building in an amount equal to the full insurable value of the Building and the initial tenant improvements constructed pursuant to Exhibit B, but shall not protect Tenant's personal property on the Leased Premises; and, notwithstanding the provisions of Section 9.01 and Section 9.03, neither party shall be liable for any damage to the other's property, regardless of cause, including the negligence of either party and its employees, agents and invitees. Tenant hereby expressly waives any right of recovery against Landlord for damage to any personal property of Tenant located in or about the Leased Premises, however caused, including the negligence of Landlord and its employees, agents and invitees. Notwithstanding the provisions of Section 9.01 below, Landlord hereby expressly waives any rights of recovery against Tenant for damage to

the Leased Premises or the Building, however caused, including the negligence of Tenant and its employees, agents and invitees. All insurance policies maintained by Landlord or Tenant as provided in this Lease shall contain an agreement by the insurer waiving the insurer's right of subrogation against the other party to this Lease.

## ARTICLE 9 - LIABILITY INSURANCE

Section 9.01. Tenant's Responsibility.
Tenant shall assume the risk of, be responsible for, have the obligation to insure against, and indemnify Landlord and hold it harmless from any and all liability for any loss of or damage or injury to any person (including death resulting therefrom) or personal property occurring in the Leased Premises, regardless of cause, except for any loss or damage covered by Landlord's insurance as provided in Section 8.02 and except for that caused directly by the sole negligence of Landlord or its employees, agents, customers or invitees; and Tenant hereby releases Landlord from any and all liability for the same. Tenant's obligation to indemnify Landlord hereunder shall include the duty to defend against any claims asserted by reason of such loss, damage or injury and to pay any judgments, settlements, costs, fees and expenses, including
reasonable attorneys' fees, incurred in connection therewith. This provision shall survive the expiration or earlier termination of this Lease.
Section 9.02. Tenant's Insurance.
Tenant shall carry general public liability and property damage insurance, issued by one or more insurance companies reasonably acceptable to Landlord, with the following minimum coverages:
(a) Worker's Compensation: minimum statutory amount.
(b) Commercial General Liability Insurance, including blanket, contractual liability, broad form property damage, personal injury, completed operations, products liability, and fire damage: Not less than $3,000,000 Combined Single Limit for both bodily injury and property damage.
(c) All Risk Coverage, Vandalism and Malicious Mischief, and Sprinkler Leakage insurance, if applicable, for the full cost of replacement of Tenant's property.
The insurance policies shall protect Tenant and Landlord as their interests may appear, naming Landlord and Landlord's managing agent and mortgagee as additional insureds, and shall provide that they may not be canceled on less than thirty (30) days' prior written notice to Landlord. Tenant shall furnish Landlord with Certificates of Insurance evidencing all required coverages on or before the Commencement Date. If Tenant fails to carry such insurance and furnish Landlord with such Certificates of Insurance after a request to do so, Landlord may, upon written notice to Tenant, obtain such insurance and collect the cost thereof from Tenant.
Section 9.03. Landlord's Responsibility.
Landlord shall assume the risk of, be responsible for, have the obligation to insure against, and indemnify Tenant and hold it harmless from, any and all liability for any loss of or damage or injury to person (including death resulting therefrom) or property (other than Tenant's property as provided in Section 8.02) occurring in, on or about the Common Areas, regardless of cause, except for that caused by the sole negligence of Tenant or its employees, agents, customers or invitees; and Landlord hereby releases Tenant from any and all liability for the same. Landlord's obligation to indemnify Tenant hereunder shall include the duty to defend against any claims asserted by reason of such loss, damage or injury and to pay any judgments, settlements, costs, fees and expenses, including reasonable attorneys' fees, incurred in connection therewith. This provision shall survive the expiration or earlier termination of this Lease.

## ARTICLE 10 - EMINENT DOMAIN

If all or any substantial part of the Building or Common Areas shall be acquired by the exercise of eminent domain, Landlord may terminate this Lease by giving written notice to Tenant on or before the date possession thereof is so taken. If all or any part of the Leased Premises, the Building or the Common Areas shall be acquired by the exercise of eminent domain so that the Leased Premises shall become impractical for Tenant to use for the Permitted Use, Tenant may terminate this Lease by giving written notice to Landlord as of the date possession thereof is so taken. If this Lease is terminated as provided above, this Lease shall cease and expire as if the date of transfer of possession of the Leased Premises, the Project or any portion thereof, was the expiration date of this Lease. In the event that this Lease is not terminated by either Landlord or Tenant as aforesaid, Tenant shall pay the Minimum Annual
Rent and all other rentals up to the date of possession of such portion of the Leased Premises so taken or condemned and this Lease shall thereupon cease and terminate with respect to such portion of the Leased Premises so taken or condemned as if the date of transfer of possession of the Leased Premises was the expiration date of the term of this Lease relating to

such portion of the Leased Premises. Thereafter, the Minimum Annual Rental and Annual Rental Adjustment shall be adjusted on a pro rata, net rentable square foot basis. In the event of any such condemnation or taking and this Lease is not so terminated, Landlord shall promptly repair the Leased Premises or the Project, as the case may be, to Building Standard condition so that the remaining portion of the Leased Premises or the Project, as the case may be, shall constitute an architectural unit, fit for Tenant's occupancy and business. In the event of any temporary taking or condemnation for any public purpose of the Leased Premises or any portion thereof, this Lease shall continue in full force and effect except that Minimum Annual Rent and Annual Rental Adjustment shall be adjusted on a pro rata net rentable square foot basis for the period of time that the Leased Premises are so taken as of the date of transfer of possession of the Leased Premises. In the event of any condemnation or taking of the Leased Premises, Tenant hereby assigns to Landlord the value of all or any portion of the unexpired term of the Lease and all leasehold improvements and Tenant may not assert a claim for a condemnation award therefor; provided, however, Tenant may pursue a separate attempt to recover an award or compensation against or from the condemning authority for (i) the value of any fixtures, furniture, furnishings, improvements and other property which were condemned but which under the terms of this Lease Tenant is permitted to remove at the end of the Lease Term, (ii) the unamortized cost of any improvements to the Leased Premises made by Tenant, which are not so removable by Tenant at the end of the Lease Term but which were installed solely at Tenant's expense, (iii) relocation and moving expenses and (iv) compensation for loss to Tenant's business.

## ARTICLE 11 - ASSIGNMENT AND SUBLEASE

Except as otherwise permitted in this Article 11, Tenant shall not assign this Lease or sublet the Leased Premises in whole or in part without Landlord's prior written consent, which consent shall not be unreasonably withheld, delayed or denied. Landlord shall be deemed to have consented to any request for consent to an assignment or sublet if Landlord shall not have responded within ten (10) business days of such request, provided such request specifically sets out the time limit for such response and specifies that Landlord shall be deemed to have consented if it fails to respond within such time period. In the event of any permitted assignment or subletting, Tenant shall remain primarily liable hereunder. The acceptance of rent from any other person shall not be deemed to be a waiver of any of the provisions of this Lease or to be a consent to the assignment of this Lease or the subletting of the Leased Premises. Except in connection with an assignment or a subletting to an Affiliate (as hereinafter defined), in the event that Tenant sublets the Leased Premises or any part thereof, or assigns this Lease and at any time receives rent and/or other consideration which exceeds that which Tenant would at that time be obligated to pay to Landlord, Tenant shall pay to Landlord fifty percent (50%) of the Net Profit (as hereinafter defined) as such rent is received by Tenant. Tenant agrees to reimburse Landlord for reasonable accounting and attorneys' fees incurred in conjunction with the processing and documentation of any requested assignment, subletting or any other hypothecation of this Lease or Tenant's interest in and to the Leased Premises (not to exceed $500.00). As used herein, the term "Net Profit" shall mean rent and/or other consideration received by Tenant for such sublease or assignment less all of Tenant's costs and expenses actually incurred associated therewith, including market brokerage fees, attorneys' fees, free rent, lease takeover payments, moving allowances and the cost of remodeling or otherwise improving the Leased Premises or providing an improvement allowance for said sublessee or assignee.

Notwithstanding the foregoing, Tenant may freely transfer and assign this Lease or sublet all or any portion of the Leased Premises (i) to any entity that controls, is controlled by or is under common control with, Tenant, (ii) to any entity resulting from a merger, acquisition, consolidation or reorganization of or with Tenant; or (iii) in connection with the sale of all or substantially all of the stock or assets of Tenant (any of the foregoing herein called an "AFFILIATE"), without having to obtain any consent or approval of Landlord; provided, however, that any such assignment or subletting shall not result in Tenant being released or discharged from any liability under this Lease except to the extent Tenant ceases to exist following any such merger or consolidation. Tenant shall provide Landlord with written notice of such assignment or subletting prior to or promptly following the effective date of such assignment or subletting.
Notwithstanding anything to the contrary contained in this Article 11, provided Tenant gives Landlord at least fifteen (15) days advance written notice, Landlord's consent shall not be required to a subletting or assignment meeting the following criteria:

(i) The proposed use:
(a) is consistent with the Permitted Use hereunder and is comparable to the use of other Class A office buildings in the Sunrise/Sawgrass market area.

(b) does not require services which would unreasonably burden the

mechanical or electrical systems of the Building and which are not otherwise provided for in the Lease.
(ii) The proposed sublessee/assignee is not a governmental subdivision or agency or an entity which enjoys diplomatic or sovereign immunity.

**ARTICLE 12 - SUBORDINATION; ESTOPPELS; TRANSFERS BY LANDLORD**

Subject to execution by Landlord, Tenant and the holder of the interest in question of an SNDA in the form described below, Landlord shall have the right to subordinate this Lease to any mortgage presently existing or hereafter placed upon the Building. In the event of a sale or transfer of Landlord's interest in this Lease (except a mortgage or other transfer as security for a debt), the "Landlord" named herein, or in the case of a subsequent transfer, upon the express written assumption by the transferee of all of Landlord's obligations, duties and liabilities arising from and after the date of transfer, the transferor shall, after the date of such transfer, be automatically released from all personal liability for the performance or observance of any term, condition, covenant or obligation thereafter accruing against Landlord, but Landlord shall not be released from any duties, obligations or liabilities accruing prior to the date of transfer or arising out of events that occur prior to the date of transfer. Within ten (10) business days following receipt of a written request from Landlord, Tenant shall execute and deliver to Landlord, without cost, any instrument which Landlord deems reasonably necessary to confirm the subordination of this Lease so long as such instrument is consistent with this Lease and the executed SNDA and so long as each successor acknowledges all of Tenant's rights under this Lease in a manner consistent with the executed SNDA. In addition, within ten (10) business days following receipt of a written request from either party hereunder, the other party shall execute and deliver to the requesting party an estoppel certificate in such form as the requesting party may reasonably request certifying, if true (i) that this Lease is in full force and effect and unmodified or stating the nature of any modification, (ii) the date to which rent has been paid, (iii) that there are not, to the certifying party's knowledge, any uncured defaults or specifying such defaults if any are claimed, and (iv) any other factual matters or state of facts reasonably required respecting the Lease. Such estoppel may be relied upon by the requesting party. As a condition to Tenant's execution of this Lease, Landlord, Tenant and Landlord's mortgagee agree to execute a subordination, non- disturbance and attornment agreement in the form attached hereto as Exhibit I and by this reference made a part hereof (the "SNDA"). In addition, Tenant's agreement to subordinate to any future mortgage, deed of trust or ground lease shall be subject to the execution and delivery of a document substantially the same as the SNDA by Landlord, Tenant and each holder of a mortgage or deed of trust or ground lease, as the case may be, which may hereafter affect the Building or otherwise in form and substance reasonably satisfactory to Tenant; otherwise, this Lease shall be superior to any such future mortgage or deed of trust or ground lease.

**ARTICLE 13 - DEFAULT AND REMEDY**

Section 13.01. Default. The occurrence of any of the following shall be a "Default":
(a) Tenant fails to pay any Monthly Rental Installment or Additional Rent within five (5) business days after written notice from Landlord that the same is due, or Tenant fails to pay any other amounts due Landlord from Tenant within thirty (30) business days after written notice that the same is due. Tenant hereby expressly waives any additional notice required under ss. 83.20 of the Florida Statutes.
(b) Tenant fails to perform or observe any other term, condition, covenant or obligation required under this Lease for a period of thirty (30) days after notice thereof from Landlord; provided, however, that if the nature of Tenant's default is such that more than thirty days are reasonably required to cure, then such default shall be deemed to have been cured if Tenant commences such performance within said thirty- day period and thereafter diligently completes the required action within a reasonable time.
(c) All or substantially all of Tenant's assets in the Leased Premises or Tenant's interest in this Lease are attached or levied under execution (and Tenant does not discharge the same within sixty (60) days thereafter); a petition in bankruptcy, insolvency or for reorganization or arrangement is filed by or against Tenant (and Tenant fails to secure a stay or discharge thereof within sixty (60) days thereafter); Tenant is insolvent and unable to pay its debts as they become due; Tenant makes a general assignment for the benefit of creditors; Tenant takes the benefit of any insolvency action or law; the appointment of a receiver or trustee in bankruptcy for Tenant or its assets if such receivership has not been vacated or set aside within thirty (30) days thereafter; or, dissolution or other termination of Tenant's corporate charter if Tenant is a corporation.
Section 13.02. Remedies. Upon the occurrence of any Default, Landlord shall have the following rights and remedies, in addition to those allowed by law or in equity, any one or more of which may be exercised without further notice to Tenant:

(a) Landlord may apply the Security Deposit or re- enter the Leased Premises and cure any default of Tenant, and Tenant shall reimburse Landlord as additional rent for any costs and expenses which Landlord thereby incurs; and Landlord shall not be liable to Tenant for any loss or damage which Tenant may sustain by reason of Landlord's action except as provided in Article 4 above or otherwise as arising out of Landlord's gross negligence or intentional misconduct.
(b) Landlord may terminate this Lease or, without terminating this Lease, terminate Tenant's right to possession of the Leased Premises as of the date of such Default, and thereafter (i) neither Tenant nor any person claiming under or through Tenant shall be entitled to possession of the Leased Premises,
and Tenant shall immediately surrender the Leased Premises to Landlord; and (ii) Landlord may re- enter the Leased Premises and dispossess Tenant and any other occupants of the Leased Premises by any lawful means and may remove their effects, without prejudice to any other remedy which Landlord may have. Upon the termination of this Lease, Landlord may declare the present value (discounted at the Prime Rate) of all rent which would have been due under this Lease for the balance of the Lease Term to be immediately due and payable, whereupon Tenant shall be obligated to pay the same to Landlord, together with all other reasonable loss or damage which Landlord may sustain by reason of Tenant's default, which shall include without limitation expenses of preparing the Leased Premises for re- letting, demolition, repairs, tenant finish improvements, brokers' commissions and reasonable attorneys' fees, less the reasonable rental value of the Leased Premises for the remainder of the Lease Term had the Lease not been so terminated (the "DEFAULT DAMAGES"), it being expressly understood and agreed that the liabilities and remedies specified in this subsection (b) shall survive the termination of this Lease.
(c) Landlord may, without terminating this Lease, re- enter the Leased Premises and re- let all or any part thereof for a term different from that which would otherwise have constituted the balance of the Lease Term and for rent and on terms and conditions different from those contained herein, whereupon Tenant shall be immediately obligated to pay to Landlord as liquidated damages the present value (discounted at the Prime Rate) of the difference between the rent provided for herein and that provided for in any lease covering a subsequent re- letting of the Leased Premises, for the period which would otherwise have constituted the balance of the Lease Term, together with all of Landlord's Default Damages.
(d) Landlord may sue for injunctive relief or to recover damages for any loss resulting from the Default.
Notwithstanding anything to the contrary contained in the Lease, Landlord agrees to use commercially reasonable efforts to mitigate Landlord's damages..
Section 13.03. Landlord's Default and Tenant's Remedies.
(a) If Landlord fails to pay any amounts due to Tenant under this Lease and shall not cure such failure within ten (10) business days following Tenant's written notice to Landlord (and to the holder of any mortgage of which Tenant shall have been notified in writing) or, if Landlord fails to keep or perform any of its obligations under this Lease and shall not cure such failure within thirty (30) days following Tenant's written notice to Landlord (and to the holder of any mortgage of which Tenant shall have been notified in writing), Landlord shall be in default under this Lease; provided, however, if the failure is of a nature that such failure cannot be cured within thirty (30) days, Landlord shall not be in default so long as Landlord commences the cure within such thirty (30) day period and diligently and continuously pursues the cure to completion as soon as reasonably possible. Upon the occurrence of any default by Landlord hereunder, Tenant may, in addition to any rights and remedies allowed by law or in equity, pursue any one or more of the following remedies: (i) take any and all action reasonably necessary to cure Landlord's default; or (ii) if Tenant either (a) obtains a written decision from an arbitration tribunal in an arbitration proceeding providing for a monetary remedy (in whole or in part), or (b) obtains a monetary judgment against Landlord, then Tenant may offset the amount of such judgment or decision against Minimum Annual Rent and Annual Rental Adjustment or other payments thereafter coming due from Tenant to Landlord pursuant to this Lease, in an amount not to exceed fifty percent (50%) of any Minimum Annual Rent and Annual Rental Adjustments until such time as Tenant must offset against 100% of the remaining Minimum Annual Rent and Annual Rental Adjustment to recoup the amount of such judgment or decision.

(c) If and only if, as a result of a Landlord default in its obligations hereunder, Tenant's use of a substantial portion of the Leased Premises for normal business operations has been materially and adversely affected such that Tenant cannot conduct business within the Leased Premises (or any material portion thereof), Tenant may terminate this Lease; provided, however, Tenant may not exercise this termination right until after the thirty (30) day cure period provided to Landlord above has expired and Tenant has provided the holder of any mortgage (of which Tenant has been provided written notice) written notice of the Landlord default and afforded such holder an additional twenty (20) days opportunity to cure Landlord's failure (or if such failure cannot reasonably be cured within such twenty (20) day period, Tenant may not terminate if the holder of such mortgage commences the cure within such twenty (20) day period and diligently pursues the cure to completion.

Section 13.04. Limitation of Landlord's Liability. If Landlord shall fail to perform any term, condition, covenant or obligation required to be performed by it under this Lease and if Tenant shall, as a consequence thereof, recover a money judgment against Landlord, Tenant agrees that it shall look solely to Landlord's right, title and interest in and to the Building and the Land, the rent and other income derived therefrom, casualty insurance proceeds or condemnation awards not used for restoration and any proceeds of sale of the Building or the Land, for the collection of such judgment; and Tenant further agrees that no other assets of Landlord shall be subject to levy, execution or other process for the satisfaction of Tenant's judgment. Landlord hereby specifically acknowledges and agrees that Tenant may offset against Minimum Annual Rent and Annual Rental Adjustment any unsatisfied judgment against Landlord as provided in Section 13.03 above. The provision contained in the foregoing sentence is not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive relief against Landlord or Landlord's successors in interest or any suit or action in connection with enforcement or collection of amounts which become owing or payable under or on account of insurance maintained by Landlord.

Section 13.05. Nonwaiver of Defaults. Neither party's failure or delay in exercising any of its rights or remedies or other provisions of this Lease shall constitute a waiver thereof or affect its right thereafter to exercise or enforce such right or remedy or other provision. No waiver of any default shall be deemed to be a waiver of any other default. Landlord's receipt of less than the full rent due shall not be construed to be other than a payment on account of rent then due, nor shall any statement on Tenant's check or any letter accompanying Tenant's check be deemed an accord and satisfaction. No act or omission by Landlord or its employees or agents during the Lease Term shall be deemed an acceptance of a surrender of the Leased Premises, and no agreement to accept such a surrender shall be valid unless in writing and signed by Landlord.

Section 13.06. Attorneys' Fees. If either party defaults in the performance or observance of any of the terms, conditions, covenants or obligations contained in this Lease and the non- defaulting party obtains a judgment against the defaulting party, then the defaulting party agrees to reimburse the non- defaulting party for reasonable attorneys' fees incurred in connection therewith.

## ARTICLE 14 - LANDLORD'S RIGHT TO RELOCATE TENANT

Intentionally omitted.

## ARTICLE 15 - TENANT'S RESPONSIBILITY REGARDING ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES

Section 15.01. Environmental Definitions.

A. "Environmental Laws" - All present or future federal, state and municipal laws, ordinances, rules and regulations applicable to the environmental and ecological condition of the Leased Premises, the rules and regulations of the Federal Environmental Protection Agency or any other federal, state or municipal agency or governmental board or entity having jurisdiction over the Leased Premises.

B. "Hazardous Substances" - Those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances" "solid waste" or "infectious waste" under Environmental Laws.

Section 15.02. Compliance.

Tenant, at its sole cost and expense, shall promptly comply with the Environmental Laws including any notice from any source issued pursuant to the Environmental Laws or issued by any insurance company which shall impose any duty upon Tenant with respect to the use, occupancy, maintenance or alteration of the Leased Premises whether such notice shall be served upon Landlord or Tenant.

Landlord shall be obligated to deliver the Leased Premises to Tenant in compliance with all Applicable Laws, including all Environmental Laws, and Landlord shall be obligated, at Landlord's sole expense, to remedy any violations of Applicable Laws in the Base Building Condition including, without limitation, the Americans with Disabilities Act, that exist at the time the Leased Premises are delivered to Tenant; provided, however, that Landlord shall not be responsible for violations of Applicable Laws relating to the Improvement Work except to the extent that such Improvement Work is not constructed in accordance with the Plans and Specifications. Landlord shall comply with all Environmental Laws with respect to the operation of the Building and the Land. Landlord shall not cause or permit the use, generation, storage, release, disposal in or about the Building, or any portion thereof, of any Hazardous Substances. Landlord shall not permit the use of any Hazardous Substances, including without limitation, asbestos, in the construction of any portion of the

Building.

Section 15.03. Restrictions on Tenant.

Tenant shall operate its business and maintain the Leased Premises in compliance with all Environmental Laws. Tenant shall not cause the use, generation, release, manufacture, refining, production, processing, storage or disposal of any Hazardous Substances on, under or about the Leased Premises, or the transportation to or from the Leased Premises of any Hazardous Substances, except as necessary and appropriate for its Permitted Use in which case the use, storage or disposal of such Hazardous Substances shall be performed in compliance with the Environmental Laws and the highest standards prevailing in the industry.

Section 15.04. Notices, Affidavits, Etc.

Tenant and Landlord shall each immediately notify the other of (i) any violation of the Environmental Laws on, under or about the Leased Premises, the Land or the Building, or (ii) the presence or suspected presence of any Hazardous Substances on, under or about the Leased Premises, the Land or the Building and shall immediately deliver to the other any notice received by such party relating to (i) and (ii) above from any source. Tenant and Landlord shall execute affidavits, representations and the like within five (5) days of the other party's request therefor concerning such party's best knowledge and belief regarding the presence of any Hazardous Substances on, under or about the Leased Premises, the Land or the Building.

Section 15.05. Landlord's Rights.

Landlord and its agents shall have the right, but not the duty, upon advance notice (except in the case of emergency when no notice shall be required) to inspect the Leased Premises and conduct tests thereon to determine whether or the extent to which there has been a violation of Environmental Laws by Tenant or whether there are Hazardous Substances on, under or about the Leased Premises. In exercising its rights herein, Landlord shall use reasonable efforts to minimize interference with Tenant's business but such entry shall not constitute an eviction of Tenant, in whole or in part, and Landlord shall not be liable for any interference, loss, or damage to Tenant's property or business caused thereby.

Section 15.06. Indemnification.

Tenant shall indemnify Landlord and Landlord's managing agent from any and all claims, losses, liabilities, costs, expenses and damages, including reasonable attorneys' fees, costs of testing and remediation costs, incurred by Landlord in connection with any breach by Tenant of its obligations under this Article 15. Landlord shall indemnify Tenant from any and all claims, losses, liabilities, costs, expenses and damages, including reasonable attorneys' fees, costs of testing and remediation costs, incurred by Tenant in connection with Landlord's violation of Environmental Laws. The covenants and obligations under this Article 15 shall survive the expiration or earlier termination of this Lease.

Section 15.07. Existing Conditions.

Notwithstanding anything contained in this Article 15 to the contrary, Tenant shall not have any liability to Landlord under this Article 15 resulting from any conditions existing, or events occurring, or any Hazardous Substances existing or generated, at, in, on, under or in connection with the Leased Premises, the Land or the Building prior to the Commencement Date of this Lease, except to the extent Tenant exacerbates the same.

## ARTICLE 16 - MISCELLANEOUS

Section 16.01.  Benefit of Landlord and Tenant.
This Lease shall inure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns.
Section 16.02.  Governing Law.
This Lease shall be governed in accordance with the laws of the State where the Building is located.

Section 16.03. Secure Areas. Landlord acknowledges and agrees that the Premises shall from time to time include files, materials, information, documents, work product and similar items which are proprietary to Tenant and are strictly confidential (collectively, the "CONFIDENTIAL INFORMATION"). Landlord covenants and agrees that it shall take all reasonable steps to ensure that the Confidential Information is not disclosed, transferred, utilized, reproduced, disseminated to or discussed with any person by Landlord, its employees, invitees, independent contractors or any other representatives of Landlord, and Landlord shall take all steps necessary to prevent any employee, invitee, independent contractor or other representative of Landlord from violating the terms of this Section 16.03. Landlord acknowledges that disclosure of the Confidential Information would result in irreparable injury to Tenant and by reason thereof, Landlord

consents and agrees that Tenant shall be entitled to an injunction to be issued by any court of competent jurisdiction restraining Landlord and anyone covered by this Section 16.03 from committing or continuing such violation. The obligation of Landlord to maintain confidentiality shall survive the termination of this Lease. Further, Tenant shall have the right to designate certain areas of the Leased Premises as "Secured Areas" which Landlord shall not have access to, except in the event of an emergency. In that regard, Landlord hereby agrees that in the event Landlord deems it necessary to enter such Secured Areas due to an emergency, any documents, information or other items contained in such Secured Areas shall be deemed to be Confidential Information.


Section 16.04. Force Majeure.
Landlord and Tenant (except with respect to the payment of any monetary obligation) shall be excused for the period of any delay in the performance of any obligation hereunder when such delay is occasioned by causes beyond its control, including but not limited to work stoppages, boycotts, slowdowns or strikes; shortages of materials, equipment, labor or energy; unusual weather conditions; or acts or omissions of governmental or political bodies. Notwithstanding anything in this Lease to the contrary, any Force Majeure claim shall only be effective if written notice is provided by the party claiming the Force Majeure event to the other within two (2) business days after discovery of the event triggering the Force Majeure claim and any Force Majeure event shall only be grounds for a delay directly and reasonably attributable to such Force Majeure event.

Section 16.05. Examination of Lease.
Submission of this instrument for examination or signature to Tenant does not constitute a reservation of or option for Lease, and it is not effective as a Lease or otherwise until execution by and delivery to both Landlord and Tenant.

Section 16.06. Indemnification for Leasing Commissions.
The parties hereby represent and warrant that the only real estate brokers involved in the negotiation and execution of this Lease are the Brokers. Each party shall indemnify the other from any and all liability for the breach of this representation and warranty on its part and shall pay any compensation to any other broker or person who may be entitled thereto. The parties acknowledge that certain officers, directors, shareholders, or partners of Landlord or its general partner(s), are licensed real estate brokers and/or salesmen under the laws of the State of Florida. Tenant consents to such parties acting in such dual capacities. Landlord hereby agrees to pay Brokers their respective leasing commissions pursuant to a separate agreement between each Broker and Landlord.

Section 16.07. Notices.
Any notice required or permitted to be given under this Lease or by law shall be deemed to have been given if it is written and delivered in person or by overnight courier or mailed by certified mail, postage prepaid, to the party who is to receive such notice at the address specified in Article 1. If sent by overnight courier, the notice shall be deemed to have been given one (1) business day after sending. If mailed, the notice shall be deemed to have been given on the date which is three (3) business days following mailing. Either party may change its address by giving written notice thereof to the other party.

Section 16.08. Partial Invalidity; Complete Agreement.
If any provision of this Lease shall be held to be invalid, void or unenforceable, the remaining provisions shall remain in full force and effect. This Lease represents the entire agreement between Landlord and Tenant covering everything agreed upon or understood in this transaction. There are no oral promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof or in effect between the parties. No change or addition shall be made to this Lease except by a written agreement executed by Landlord and Tenant.


Section 16.09. Special Stipulations.
Attached hereto as Exhibit E are Special Stipulations which are incorporated herein by this reference. In the event of any inconsistency or conflict between the Special Stipulations and the provisions of the body of this Lease, the Special Stipulations shall control.

Section 16.10. Signage.
Tenant shall have the right to install Tenant's signage on two (2) of the exterior elevations (as selected by Tenant) of the Building (which may be illuminated). Landlord shall not permit any other Building signage; provided, however, in the event that Tenant fails to occupy at least 80,000 square feet of Rentable Area in the Building, Landlord shall be permitted to install signage on the two (2) remaining exterior elevations of the Building for any single tenant occupying at least the square feet of Rentable Area then occupied by Tenant in the Building. In addition to the foregoing, Landlord shall provide Tenant with internal directory signage and Tenant's prorata share of and top location on any multi- tenant exterior

monument signage constructed by Landlord. No internal Building or tenant signage shall otherwise be permitted. Such Building signage and monument panel shall be at Tenant's expense. Landlord shall provide a Building directory reasonably satisfactory to Tenant. Tenant shall place no other exterior signs on the Leased Premises without the prior written consent of Landlord. Any signs not in conformity with the Lease may be immediately removed by Landlord.

Section 16.11. Consent.

Except as may be expressly provided herein, where the consent of a party is required, such consent will not be unreasonably withheld, conditioned or delayed.

Section 16.12. Parking.

Tenant shall be entitled to use on a non- exclusive basis parking spaces in the Project based on a ratio of 5.7 parking spaces per thousand square feet of Leased Premises for the first 150,000 square feet of Rentable Area, based on a ratio of 5.0 parking spaces per thousand square feet for the next 40,000 square feet of additional Rentable Area and based on a ratio of 4.0 parking spaces per thousand square feet for any additional Rentable Area thereafter, and shall otherwise park in common with other tenants of Landlord. Included in the parking ratios, Landlord shall provide to Tenant ten (10) marked visitor parking spaces (in close proximity to the Building) for exclusive use by Tenant's visitors and guests. Subject to the immediately preceding sentence, Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use of parking facilities. Landlord reserves the right in its absolute discretion to determine whether parking facilities are becoming crowded and, in such event, to allocate parking spaces among Tenant and other tenants. In addition to the visitors spaces, but included within the parking ratio, for every thousand square feet of Leased Premises, Landlord shall designate one (1) reserved parking space for Tenant's exclusive use at a location reasonably determined by Landlord. Subject to the foregoing, there will be no assigned parking unless Landlord, in its sole discretion, may deem advisable. No vehicle may be repaired or serviced in the parking area and any vehicle deemed abandoned by Landlord will be towed from the project and all costs therein shall be borne by the Tenant. All driveways, ingress and egress, and all parking spaces are for the joint use of all tenants. There shall be no parking permitted on any of the streets or roadways located within the Park.

Section 16.13. Time.

Time is of the essence of each term and provision of this Lease.

Section 16.14. Representations and Warranties.

The undersigned represent and warrant that (i) such party is duly organized, validly existing and in good standing (if applicable) in accordance with the laws of the state under which it was organized; (ii) the Tenant is authorized to do business in the State where the Building is located; and (iii) the individual executing and delivering this Lease has been properly authorized to do so, and such execution and delivery shall bind such party.

Section 16.15. Radon Gas.

Radon Gas is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

Section 16.16. Compliance With Laws.

Landlord, at Landlord's sole cost and expense, shall ensure that as of the Commencement Date, the Building and the Leased Premises are in compliance with all Applicable Laws governing the Leased Premises (provided, however, that Landlord shall not be responsible for violations of Applicable Laws relating to the Improvement Work except to the extent that such Improvement Work is not constructed in accordance with the Plans and Specifications), including but not limited to, the Americans With Disabilities Act, excepting only that Tenant shall be responsible during the term of this Agreement for such costs and expenses as may be required as a direct result of Tenant's particular use of the Leased Premises or Tenant's alterations to the Leased Premises.

Section 16.17 Complete Agreement. There are no oral agreements between Landlord and Tenant affecting this Lease, and this Lease supercedes and cancels any and all previous negotiations, arrangements, agreements and understandings, if any, between Landlord and Tenant with respect to the subject matter of this Lease or the Building.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first above written.

| Signed and delivered as to Landlord, in the presence of: | LANDLORD: DUKE-WEEKS REALTY LIMITED |
| --- | --- |

PARTNERSHIP, an Indiana limited partnership

Unofficial Witness

By: Duke-Weeks Realty Corporation, its General Partner

Unofficial Witness

By:
Name:
Title:

Signed and delivered as to Tenant, in the presence of:

TENANT:

AMERICAN CLASSIC VOYAGES CO.

Unofficial Witness
--------------------------
Unofficial Witness

By:
Name:
-------------------------
Title:

**EXHIBIT A**

**LEGAL DESCRIPTION OF LAND**

**EXHIBIT B**

**CONSTRUCTION AGREEMENT**

EXHIBIT C
COMMENCEMENT DATE AGREEMENT

Re: Office Lease dated November ___, 2000, by and between Duke-Weeks Realty Limited Partnership, as Landlord, and American Classic Voyages Co., as Tenant (the "Lease")

Pursuant to Article 1 of the captioned Lease, the undersigned agree as follows:

1. The Commencement Date of the Lease is _______________________________, 200__.
2. The expiration date of the Lease is the ____ day of ___________________, _____, unless sooner terminated pursuant to the
Lease or unless extended pursuant to the Lease.

3. The number of square feet of Rentable Area within the Leased Premises is _____________.

4. The number of square feet of Rentable Area within the Building is ___________________.

5. Tenant's Proportionate Share of the Building is _______________.
6. The Building address is _____________________________________________.
This ____ day of _________________________, 200__.

Signed and delivered as to Landlord, in the presence of:

LANDLORD:

DUKE-WEEKS REALTY LIMITED PARTNERSHIP, an Indiana limited partnership

Unofficial Witness

By: Duke-Weeks Realty Corporation, its General Partner

Unofficial Witness

By:
Name:
Title:

Signed and delivered as to Tenant, in the presence of:

TENANT:

AMERICAN CLASSIC VOYAGES CO.

Unofficial Witness By:

___________________________ Name:
Unofficial Witness - - - - - - - - - - - - - - - - - - - - - - - - -

Title:

EXHIBIT D
RULES AND REGULATIONS

1. The sidewalks, entrances, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or used for any purpose other than ingress and egress.

2. No awnings or other projections shall be attached to the outside walls of the Building. No curtains, blinds, shades or screens shall be attached to or hung in, or used in connection with, any window or door of the Leased Premises other than Landlord standard blinds without Landlord's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned. All electric ceiling fixtures hung in offices or spaces along the perimeter of the Building must be fluorescent, of a quality, type, design and bulb color reasonably approved by Landlord. Neither the interior nor the exterior of any exterior windows shall be coated or otherwise sunscreened without written consent of Landlord.

3. No sign, advertisement, notice or handbill shall be exhibited, painted or affixed by any tenant on, about or from any part of the Leased Premises or the Building without the prior written consent of Landlord. In the event of the violation of the foregoing by any tenant, Landlord may remove or stop same without any liability, and may charge the expense incurred in such removal or stopping to tenant. Standard interior signs on doors and lobby directory shall be inscribed, painted or affixed for each tenant by Landlord, and shall be of a size, color and style reasonably acceptable to Landlord. The lobby directory will be provided exclusively for the display of the name and location of tenants only, and Landlord reserves the right to exclude any other names therefrom. Nothing may be placed on the exterior of corridor walls or corridor doors other than Landlord's standard lettering except as otherwise provided in the Lease.

4. The sinks and toilets and other plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags, or other substances shall be thrown therein. Subject to Section 8.02 of the Lease, all damages resulting from any misuse of the fixtures shall be borne by the tenant who, or whose subtenants, assignees or any of their servants, employees, agents, visitors or licensees shall have caused the same.

5. Tenant shall not cover or obstruct the windows or glass that is exposed to the common corridors or lobby area of the Building.

6. Except as otherwise permitted by the Lease, Tenant shall not mark, paint, drill into, or in any way deface any part of the Leased Premises or the Building. Except as otherwise permitted by the Lease, no boring, cutting or stringing of wires or laying of linoleum or other similar floor coverings shall be permitted, except with the prior written consent of the Landlord and as the Landlord may direct, which consent shall not be unreasonably withheld, delayed or conditioned. Landlord shall direct electricians as to where and how telephone or telegraph wires are to be introduced. The location of telephones, call boxes and other office equipment affixed to the Leased Premises shall be subject to the reasonable approval of Landlord.

7. No bicycles, vehicles, birds or animals of any kind (except seeing eye dogs) shall be brought into or kept in or about the Leased Premises. Tenant shall not cause any objectionable odors to be produced from and permeate the Leased Premises.

8. The Leased Premises shall not be used for manufacturing or for the storage of merchandise except as such storage may be incidental to the permitted use of the Leased Premises. No tenant shall occupy or permit any portion of the Leased Premises to be occupied as an office for the manufacture or sale of liquor, narcotics, or tobacco in any form, or as a medical office, or as a barber or manicure shop, or an employment bureau without the express written consent of Landlord. The Leased Premises shall not be used for lodging or sleeping or for any immoral or illegal purpose.

9. No tenant shall unreasonably disturb or interfere with occupants of the Building or those having business with them, whether by the use of any musical instrument, radio, phonograph, unusual noise, or in any other way. No tenant shall throw anything out of doors, windows or down the passageways.

10. No tenant, subtenant or assignee nor any of its servants, employees, agents, visitors or licensees, shall at any time bring or keep upon the Leased Premises any inflammable, combustible or explosive fluid, chemical or substance or firearm, except such cleaning materials or other materials customarily utilized in first class office buildings.

11. No additional locks or bolts of any kind shall be placed upon any of the doors or windows by any tenant, nor shall any changes be made in existing locks or the mechanism thereof. Each tenant must upon the termination of his tenancy, restore to the Landlord all keys of doors, offices, and toilet rooms, either furnished to, or otherwise procured by, such tenant and in the event of the loss of keys so furnished, such tenant shall pay to the Landlord the cost of replacing the same. Tenant may maintain certain secure areas so long as Landlord has access to such secure areas in the event of an emergency.

12. Tenant shall not overload the floors of the Leased Premises. Subject to Section 8.02 of the Lease, all damage to the floor, structure or foundation of the Building due to improper positioning or storage items or materials shall be repaired by Landlord at the sole cost and expense of Tenant, who shall reimburse Landlord immediately therefor upon demand. All removals or the carrying in or out of any safes, freight, furniture, or bulky matter of any description must take place during the hours which Landlord shall reasonably determine from time to time. The moving of safes or other fixtures or bulky matter of any kind must be done upon previous notice to the superintendent of the Building and under his supervision, and the persons employed by any tenant for such work must be reasonably acceptable to Landlord. Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part. The Landlord reserves the right to prescribe the weight and position of all safes, which must be placed upon supports approved by Landlord to distribute the weight.

13. No tenant shall purchase janitorial or maintenance or other like services, from any person or persons not approved by Landlord, which approval shall not be unreasonably withheld, delayed or conditioned.

14. Landlord reserves the right to require all persons entering the Building between the hours of 6 p.m. and 8 a.m. and at all hours on Sunday and legal holidays to register with Landlord's security personnel. Each tenant shall be responsible for all persons entering the Building at tenant's invitation, express or implied. Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person. In case of an invasion, mob riot, public excitement or other circumstances rendering such action advisable in Landlord's opinion, Landlord reserves the right without any abatement of rent to require all persons to vacate the Building and to prevent access to the Building

during the continuance of the same for the safety of the tenants and the protection of the Building and the property in the Building.

15. Any persons employed by any tenant to do janitorial work or other work in the Leased Premises shall, while in the Building and outside of the Leased Premises, be subject to and under the control and direction of the superintendent of the Building (but not as an agent or servant of said superintendent or of the Landlord), and tenant shall be responsible for all acts of such persons.

16. In the event Tenant has any questions or requests in regard to the Leased Premises, such questions or requests shall be initially directed to the Property Manager for the Building.

17. Canvassing, soliciting and peddling in the Building are prohibited, and each tenant shall cooperate to prevent the same.

18. All office equipment of any electrical or mechanical nature shall be placed by tenant in the Leased Premises in settings which will absorb or prevent any unreasonable vibration, noise and annoyance.

19. No air- conditioning unit or other similar apparatus shall be installed or used by any tenant without the written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned.

20. There shall not be used in any space, or in the public halls of the Building, either by any tenant or others, any hand trucks except those equipped with rubber tires and rubber side guards.

21. The scheduling of tenant move- ins shall be subject to the reasonable discretion of Landlord.

22. The Building is a smoke- free Building. Smoking is strictly prohibited within the Building. Smoking shall only be allowed in areas designated as a smoking area by Landlord. Tenant and its employees, representatives, contractors or invitees shall not smoke within the Building or throw cigar or cigarette butts or other substances or litter of any kind in or about the Building, except in receptacles placed in it for that purpose.

23. Parking spaces associated with the Building are intended for the exclusive use of passenger automobiles. Except for intermittent deliveries, no vehicles other than passenger automobiles may be parked in a parking space without the express written permission of Landlord.

24. Tenant shall be responsible for and cause the proper disposal of medical waste, if any, including hypodermic needles, created by its employees.

It is Landlord's desire to maintain in the Building the highest standard of dignity and good taste consistent with comfort and convenience for tenants. Any action or condition not meeting this high standard should be reported directly to Landlord. The Landlord reserves the right to make such other and further reasonable rules and regulations as in its judgment may from time to time be necessary for the safety, care and cleanliness of the Building, and for the preservation of good order therein.

**EXHIBIT E**

**SPECIAL STIPULATIONS**

1 . Expansion Options. Tenant shall have the option to expand the Leased Premises into the space and pursuant to the time schedules described as follows:

1.1 Fifth Year Expansion Option. Provided that, at the time of the exercise of this option, this Lease is in effect and no event of Default beyond any applicable cure period then exists, Tenant shall have the option to expand the Leased Premises by up to 20,000 square feet of Rentable Area (as determined by Tenant) (hereinafter the "FIFTH YEAR EXPANSION SPACE"). Tenant shall exercise this option, if at all, by written notice to Landlord on or before the forty-second (42nd) month anniversary of the Commencement Date. The Fifth Year Expansion Space shall be either internally contiguous or contiguous with other space leased by Tenant and on contiguous floors and shall have a configuration that is commercially usable and which shall have an approximately proportionate share of the exterior window walls on the applicable floor of the Building. The lease of the Fifth Year Expansion Space shall commence, at Landlord's option, at any time between the sixtieth (60th) and the sixty sixth (66th) month of the Lease Term, upon the same terms and conditions contained in the Lease except the Minimum Annual Rent for the Fifth Year Expansion Space shall be the Market Rate (as hereafter defined) and provided that the Minimum Annual Rent and Annual Rental Adjustment shall commence on the earlier to occur of (i) ninety (90) days following the date that Landlord delivers the Fifth Year Expansion Space to Tenant for commencement of construction of tenant improvements therein, or (ii) the date that Tenant occupies such Fifth Year Expansion Space for business purposes. All tenant improvements in all portions of the Fifth Year Expansion Space which have been previously improved for another tenant shall be delivered to and accepted by Tenant in an "as is" condition.

1.2 Seventh Year Expansion Option. Provided that Tenant has not exercised the option for the Fifth Year Expansion Space and, at the time of the exercise of this option, this Lease is in effect and no event of Default beyond any applicable cure period then exists, Tenant shall have the option to expand the Leased Premises by up to 20,000 square feet of Rentable Area (as determined by Tenant) (hereinafter the "SEVENTH YEAR EXPANSION Space"). Tenant shall exercise this option, if at all, by written notice to Landlord on or before the sixty- sixth (66th) month anniversary of the Commencement Date. The Seventh Year Expansion Space shall be either internally contiguous or contiguous with other space leased by Tenant and on contiguous floors and shall have a configuration that is commercially usable and which shall have an approximately proportionate share of the exterior window walls on the applicable floor of the building. The lease of the Seventh Year Expansion Space shall commence, at Landlord's option, at any time between the eighty- fourth (84th) and ninetieth (90th) month of the Lease Term, upon the same terms and conditions contained in the Lease except the Minimum Annual Rent for the Seventh Year Expansion Space shall be the Market Rate (as hereafter defined) and provided that the Minimum Annual Rent and Annual Rental Adjustment shall commence on the earlier to occur of (i) ninety (90) days following the date that Landlord delivers the Seventh Year Expansion Space to Tenant for commencement of construction of tenant improvements therein, or (ii) the date that Tenant occupies such Seventh Year Expansion Space for business purposes. All tenant improvements in all portions of the Seventh Year Expansion Space which have been previously improved for another tenant shall be delivered to and accepted by Tenant in an "as is" condition.

1.3 Tenth Year Expansion Option. Provided that, at the time of the exercise of this option, this Lease is in effect and no event of Default beyond any applicable cure period then exists, Tenant shall

have the option to expand the Leased Premises by up to 20,000 square feet of Rentable Area (as determined by Tenant) (hereinafter the "TENTH YEAR EXPANSION SPACE"). Tenant shall exercise this option, if at all, by written notice to Landlord on or before the one hundred second (102nd) month anniversary of the Commencement Date. The Tenth Year Expansion Space shall be either internally contiguous or contiguous with other space leased by Tenant and on contiguous floors and shall have a configuration that is commercially usable and which shall have an approximately proportionate share of the exterior window walls on the applicable floor of the building. The lease of the Tenth Year Expansion Space shall commence, at Landlord's option, at any time between the one hundred twentieth (120th) and the one hundred twenty sixth (126th) month of the Lease Term, upon the same terms and conditions contained in the Lease except the Minimum

Annual Rent for the Tenth Year Expansion Space shall be the Market Rate (as hereafter defined) and provided that the Minimum Annual Rent and Annual Rental Adjustment shall commence on the earlier to occur of (i) ninety (90) days following the date that Landlord delivers the Tenth Year Expansion Space to Tenant for commencement of construction of tenant improvements therein, or (ii) the date that Tenant occupies such Tenth Year Expansion Space for business purposes. All tenant improvements in all portions of the Tenth Year Expansion Space which have been previously improved for another tenant shall be delivered to and accepted by Tenant in an "as is" condition.

1.4 Result of Exercise. The Fifth Year Expansion Space, the Seventh Year Expansion Space and the Tenth Year Expansion Space are sometimes severally and collectively referred to in this Lease as the "Expansion Space". Any Expansion Space as to which Tenant has properly exercised its option in accordance with this Section 1 shall be leased by Tenant from Landlord for the balance of the Lease Term on the terms and conditions of this Lease then, and from time to time thereafter, in effect except as specifically set forth above. Tenant shall not have the right to exercise any expansion option for less than 5,000 square feet of Rentable Area. Landlord shall provide Tenant not less than six (6) month's written notice of the date that the applicable Expansion Space will be delivered to Tenant for commencement of construction of tenant improvements therein. Upon Tenant's exercise of its expansion option, Landlord and Tenant shall enter into an amendment to this Lease for the applicable expansion option space to reflect the addition of such expansion space to the Leased Premises. All tenant improvements in all portions of the Expansion Space which have been previously improved for another tenant shall be delivered to and accepted by Tenant in an "as is" condition. With respect to any other portions of Expansion Space which have not been previously improved for any other tenant (i) Landlord shall be responsible for the Base Building Work (as defined in Exhibit B) thereto and (ii) Landlord will complete such Base Building Work prior to the date that such Expansion Space is made available to Tenant for the commencement of the Improvement Work.

1.5 Market Rate. Market Rate, as used herein, shall mean the then (as of the date of such determination) fair market rental value of the Leased Premises or applicable Expansion Space, as the case may be, determined in accordance with the provisions set forth below. Following Tenant's exercise of an expansion option or the renewal option, Landlord and Tenant shall have thirty (30) days thereafter to agree upon the Market Rate to be paid by Tenant to Landlord for the Leased Premises or the applicable Expansion Space, as the case may be, it being intended that the rental for the Leased Premises or such Expansion Space shall be equal to one hundred percent (100%) of what a willing, comparable new non-equity tenant would pay and receive and what a willing, comparable landlord of a comparable Class A office building in the Sunrise/Sawgrass market area would give at arms length, as rent, concessions, tenant improvement allowances, other allowances, brokerage commissions, inducements and other economic considerations for the lease of space comparable to the Leased Premises or the Expansion Space, as the case may be, for which the Market Rate is being determined, taking into account all relevant factors applicable to the lease of such space for the duration of the Lease Term or the applicable renewal term, including without limitation, age and quality of the Building, size of space, length of term, creditworthiness of tenant, free rent, method of paying operating expenses, tenant improvement allowances, rent concessions and rental escalations and, with respect to an extension of the Lease Term, also taking into account that Landlord would not incur any "down- time" or marketing expense in connection with Tenant's extension of this Lease. In the event Landlord and Tenant are unable to agree on the Market Rate within such thirty (30) day period, each of Landlord and Tenant shall designate an appraiser holding the M.A.I. designation who has a minimum of ten (10) years experience in appraising similar properties in the submarket in which the Leased Premises is located. Each such appraiser shall determine the Market Rate of the Leased Premises or the applicable Expansion Space, as the case may be, based upon an analysis of similar buildings in the area in which the Leased Premises is located and considering all other factors provided above. In the event each appraiser identifies a Market Rate which is within five percent (5%) of the other appraiser's Market Rate, it shall be conclusively determined that the Market Rate of the Leased Premises shall be equal to the average of the two (2) amounts. In the event the two (2) appraisers' figures for Market Rate differ by more than five percent (5%), the two (2) appraisers shall jointly choose a third appraiser holding the same qualifications, which appraiser shall make a determination as to the Market Rate; in such event it shall be conclusively determined that the Market Rate shall be equal to the average of such third appraiser's Market Rate and the next closest Market Rate as determined by the first two (2) appraisers.

2. Option to Extend. Provided that, at the time of the exercise of this option, this Lease is in effect and no event of Default beyond any applicable cure period then exists, Tenant shall have the option to extend the Lease Term for two (2) successive periods of five (5) years each (each an "EXTENSION TERM"). Tenant shall exercise such option by delivering to Landlord, no later than twelve (12) months prior to the expiration of the initial term or the first Extension Term, as the case may be, written notice of Tenant's desire to extend the term of the Lease with respect to all or a portion (but not less than 94,998 square feet of Rentable Area) of the then existing Leased Premises. Such Extension Term shall

apply to Rentable Area which is internally contiguous or contiguous with other space leased by Tenant and on contiguous floors and shall have a configuration such that the portion of the Leased Premises that is surrendered is commercially usable. Tenant must indicate in the notice delivered to Landlord that Tenant exercises its option with respect to less than all of the Leased Premises and shall specify in such notice the particular portions of the Leased Premises which will be excluded from the Leased Premises during the applicable Extension Term. Unless Landlord otherwise agrees in writing, Tenant's failure to timely exercise such option shall waive it. If Tenant properly exercises its option to extend, Landlord and Tenant shall execute an amendment to the Lease reflecting the terms and conditions of the Extension Term. Each Extension Term shall be upon the same terms and conditions contained in the Lease except the Minimum Annual Rent for each Extension Term shall be at the Market Rate.

3. Right of First Offer. Provided that, at the time of the exercise of this option, this Lease is in effect, no event of Default beyond any applicable cure period then exists, Landlord shall have an ongoing obligation to notify Tenant in writing, after the initial lease- up of any space, ("LANDLORD'S NOTICE") of the availability of such space located within the Building on any floor contiguous to Tenant's floor(s) (the "OFFER SPACE") before marketing such Offer Space. Tenant shall have seven (7) business days from its receipt of Landlord's Notice to deliver to Landlord a written acceptance agreeing to lease the Offer Space on the terms and conditions contained herein except that the Minimum Annual Rent shall be, at Tenant's sole discretion, either:

a. At the Market Rate; or

b. At the same rate that Tenant is then paying for the original Leased Premises with an Improvement Allowance equal to the product of $27.00 per square foot of Rentable Area multiplied by a fraction, the numerator being the number of months remaining in the Lease Term and the denominator being 180.

In the event Tenant accepts the Offer Space on the terms and conditions specified in the Landlord's Notice, the term for the Offer Space shall be coterminous with the term for the original Leased Premises; provided, however, that the minimum term for the Offer Space shall be five (5) years and the Term for the original Leased Premises shall be extended, to be coterminous with the term for the Offer Space. The Minimum Annual Rent for the original Leased Premises during such extended term shall be an amount equal to the Minimum Annual Rent then being paid by Tenant on the original Leased Premises increased by 3.0% for each year of extension of the Original Lease Term. The Commencement Date of the Offer Space and the payment of Minimum Annual Rent and Annual Rental Adjustment shall be the earlier of (i) the date Tenant occupies the Offer Space for business purposes, or (ii) ninety (90) days following Landlord delivery of possession of the Offer Space to Tenant.

In the event Tenant fails to notify Landlord of its acceptance within said seven (7) business day period, such failure shall be conclusively deemed a waiver of Tenant's Right of First Offer with respect to such Offer Space, whereupon Tenant shall have no further rights with respect to the Offer Space (except as provided in Section 4 below) and Landlord shall be free to lease the Offer Space to a third party; provided, however, (i) if the Offer Space is not subsequently leased to another tenant within one hundred eighty (180) days after the expiration of such seven (7) business day period, Tenant's right of first offer with respect to the Offer Space shall be reinstated and (ii) if the Offer Space is leased to a third party within such one hundred eighty (180) day period, Tenant's right of first offer shall be reinstated with respect to such Offer Space only upon expiration of the term of such lease and any extensions thereof.

4. Right of First Refusal. Provided that, at the time of the exercise of this option, this Lease is in effect and no event of Default beyond any applicable cure period then exists, Tenant shall have a right of first refusal (the "REFUSAL OPTION") to lease any of the additional space in the Building (the "REFUSAL SPACE"). The Refusal Space shall be offered to Tenant upon the terms and conditions and at the rental rate then being offered by a specific third party prospective tenant for such space which terms, conditions and rental rate that Landlord is willing to accept. Upon notification in writing by Landlord that the Refusal Space is available, Tenant shall have seven (7) business days in which to notify Landlord in writing of its election to lease the Refusal Space at such rental rates and at such square footage described above, in which event this Lease shall be amended to incorporate such Refusal Space. If Tenant declines its Refusal Option, then this Refusal Option with respect to the applicable Refusal Space shall terminate and Landlord may lease the Refusal Space to the prospective third party on the terms offered to Tenant; provided, however, (i) if the Refusal Space is not subsequently leased to another tenant within one hundred twenty (120) days after the expiration of such seven (7) business day period, Tenant's right of first refusal with respect to the Refusal Space shall be reinstated and (ii) if the Refusal Space is leased to a third party within such one hundred twenty (120) day period, Tenant's right of first refusal shall be reinstated with respect to such Refusal Space only upon expiration of the term of such lease and any extensions thereof and the receipt by Landlord of a subsequent third party offer for such space. It is understood and agreed that this Refusal Option shall not be construed to prevent any tenant in the Building from extending or renewing its lease.

5. Sundry Shop. Landlord covenants and agrees that so long as Tenant is occupying the Leased Premises, Landlord shall use commercially reasonable efforts to cause to be provided in the Building a sundry shop that operates during business hours Monday through Friday.

6. Generator. Landlord hereby grants to Tenant the right, at its sole cost and expense, to erect, install and maintain a generator serving the Leased Premises, subject to the following terms and conditions:
a. The location, design, construction, size, capacity and all other aspects of such generator shall be subject to Landlord's prior approval, which approval shall not be unreasonably withheld, delayed or conditioned.
b. Tenant shall shield or screen the generator from public view. In the event the generator is located in the parking facility, any parking space(s) taken by the generator shall be counted towards the total number of parking spaces allocated to Tenant under this Lease.
c. The expense of installing, constructing, maintaining and removing the generator shall be at the sole cost and expense of Tenant and shall be paid directly by Tenant. Tenant shall be responsible for all costs and expenses associated with such generator and Tenant shall promptly repair any damage to the Building or the Land resulting from the installation, construction, maintenance or removal of such generator. Upon the termination or expiration of the Lease, Tenant shall promptly remove the generator at its sole cost and expense. Tenant shall restore any portion of the Building or Land affected by the generator to substantially the same condition existing prior to the installation of the generator, normal wear and tear excepted.
7. Antennae Equipment. Landlord hereby grants to Tenant the right to install, maintain and operate, free of charge, satellite dishes, communication equipment and related equipment (each dish not to exceed six (6) feet in diameter)(the "EQUIPMENT") on the roof of the Building (Tenant being entitled to use its pro rata share of the portion of the roof top allocated to communication equipment) subject to the following terms and conditions:
a. The location of the Equipment shall be approved by Landlord prior to Tenant's installation of the Equipment. Tenant shall deliver to Landlord Tenant's plans and specifications for the installation of the Equipment and the surrounding screening for review and approval by Landlord's engineer not less than thirty (30) days prior to commencing installation of the Equipment. Landlord's approvals hereunder shall not be unreasonably withheld, delayed or conditioned.
b. Tenant shall install the Equipment in an aesthetically neutral or pleasing manner and shall exercise all reasonable steps to shield or screen the Equipment from public view. Tenant shall fence or screen the Equipment so as to minimize any risks to ensure that the Equipment does not create a nuisance.
c. Tenant shall operate the Equipment in compliance with all Applicable Laws.
d. Upon expiration or earlier termination of this Lease, Tenant shall promptly remove the Equipment and repair all damage to the Building caused thereby.
e. Landlord shall cause any equipment installed by Landlord or other tenants of the Building not to hinder or unreasonably interfere with the operation of Tenant's Equipment.
f. Tenant shall have the right, subject to the reasonable supervision of the Building engineer, to use the Building risers to install cabling to connect the Equipment to the Leased Premises.

8. Partial Termination. Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the option to reduce the size of the Leased Premises by up to one (1) full floor (the "TERMINATION OPTION"), provided that the result of such reduction shall be that all remaining space shall be internally contiguous or contiguous with other space leased by Tenant and on contiguous floors. Such reduction shall be effective at the end of the tenth (10th) lease year (the "TERMINATION DATE"), by Tenant providing Landlord with written notice of such Termination Option election (the "TERMINATION NOTICE"). Such Termination Notice shall specify in such notice the particular portions of the Leased Premises to be excluded from the Leased Premises (the "TERMINATION PREMISES"). Such Termination Option shall be effective only if the Termination Notice is given to Landlord at least twelve (12) months prior to the Termination Date (the "TERMINATION NOTICE DEADLINE"); accordingly, if Tenant has not given its Termination Notice to Landlord prior to the ninth (9th) anniversary of the Commencement Date, this Termination Option shall expire and be of no further force or effect. Landlord shall deliver to Tenant written confirmation of Landlord's approval of the Termination Premises within thirty (30) days after the date of the Termination Notice. In the event of the failure by Landlord to so respond, Tenant's designation of the Termination Premises shall be deemed approved. As a condition precedent to any reduction of the Leased Premises, Tenant must deliver to Landlord on or before the thirty (30) days following Landlord's approval (or deemed approval)(or at such later date as Landlord shall specify in Landlord's approval notice) of the Termination Premises, a termination fee equal to the unamortized portion (amortized at 11.5 percent per annum) of the Improvement Allowance, leasing commissions paid by Landlord and attributable to the Termination Premises and a sum equal to three (3) month's of the then current monthly rental installments of Monthly Annual Rent attributable to the Termination Premises.

**EXHIBIT F**

**FORM OF TAX CERTIFICATION**

Certification of Payment of Real Estate Taxes

This Certification is being issued by Duke- Weeks Realty Limited Partnership ("LANDLORD"), in order to certify to the State of Florida Office of Tourism, Trade and Economic Development that American Classic Voyages Co. ("TENANT") has paid $_______________ in real estate taxes for the period beginning ________ and ending ___________________ pursuant to Section 3.02 of the Office Lease between Landlord and Tenant dated November ___, 2000, and that Landlord has in turn paid these real estate taxes to the Broward County Tax Collector, pursuant to the copy of the tax bill attached hereto as Schedule 1 and a copy of the cancelled check to the Broward County Tax Collector indicating payment of such taxes attached hereto as Schedule 2. Tenant's proportionate share of the real estate taxes represents ____ % of the entire real estate taxes assessed on the attached tax bill.

Landlord is issuing this certification to the Office of Tourism, Trade and Economic Development in order to establish the payment of real estate taxes by Tenant, so that Tenant will be eligible to offset such amounts of real estate taxes paid by Tenant pursuant to the Qualified Targeted Industries tax credit, as set out in Section 288.106(3)(c)2.d Florida Statutes.

This Certification is executed by the undersigned this ____ day of _____________, ________.

**DUKE- WEEKS REALTY LIMITED PARTNERSHIP**
An Indiana limited partnership
By: Duke- Weeks Realty Corporation
Its General Partner

By: ______________________________
Name: ______________________________
Title: ______________________________

**EXHIBIT G**

**JANITORIAL SPECIFICATIONS**

**CLEANING**

A. Office Area

Daily: (Monday through Friday, inclusive, holidays excepted)

Empty and clean all waste receptacles and ashtrays and remove waste

material from the Premises, wash receptacles as necessary.

Sweep and dust, mop all uncarpeted areas using a dust- treated mop.

Vacuum all rugs and carpeted areas.

Hand dust and wipe with treated cloths all horizontal surfaces

including furniture, office equipment, windowsills, door ledges, chair rails, and convector tops, within normal reach.
Wash clean all water fountains
Remove and dust under all desk equipment and telephones and replace same.
Wipe clean all brass and other bright work.
Hand dust all grill work within normal reach.
Upon completion of cleaning, all lights will be turned off and doors

locked, leaving the Premises in an orderly condition.

Weekly:
Dust coat racks, and the like.
Remove all finger marks from private entrance doors, light switches and doorways.
Quarterly:
Render high dusting not reached in daily cleaning to include:
Dusting all pictures, frames, charts, graphs, and similar wall hangings.
Dusting all vertical surfaces, such as walls, partitions, doors, and ducts.
Dusting of all pipes, ducts and high moldings.
Dusting of all venetian blinds.

B. Lavatories:

Daily: (Monday through Friday, inclusive, holidays excepted).

Sweep and damp mop floors.
Clean all mirrors, powder shelves, dispensers and receptacles, bright work, flushometers, piping, and toilet seat hinges.
Wash both sides of all toilet seats.
Wash all basins, bowls and urinals.
Dust and clean all powder room fixtures.

Empty and clean paper towel and sanitary disposal receptacles.

Remove waste paper and refuse.

Refill tissue holders, soap dispensers, towel dispensers, vending

sanitary dispensers; materials to be furnished by Landlord.

A sanitizing solution will be used in all lavatory cleaning.

Monthly:
Machine scrub lavatory floors. Wash all partitions and tile walls in lavatories.

C. Main Lobby, Elevators, Building Exterior and Corridors:

Daily: (Monday through Friday, inclusive, holidays excepted)

Sweep and wash all floors.
Wash all rubber mats.

Clean elevators, wash or vacuum floors, wipe down walls and doors.

Spot clean any metal work inside lobby.

Spot clean any metal work surrounding Building Entrance doors.

Monthly:
All resilient tile floors in public areas to be treated equivalent to spray buffing.

D. Window Cleaning:
Window of exterior walls will be washed on the inside and the outside twice per year.

E. Tenant requiring services in excess of those described above shall request same through Landlord, at Tenant's expense.

**EXHIBIT H**

INTENTIONALLY OMITTED

**EXHIBIT I**

**FORM OF SNDA**

**SUBORDINATION, NON- DISTURBANCE**

**AND ATTORNMENT AGREEMENT**

THIS AGREEMENT made this ___ day of ________, 200___, among ________________________________, a national banking association chartered pursuant to the laws of the United States of America (hereinafter referred to as "LENDER"), DUKE- WEEKS REALTY LIMITED PARTNERSHIP, an Indiana limited partnership (hereinafter referred to as "Landlord") and AMERICAN CLASSIC VOYAGES CO., a Delaware corporation (hereinafter referred to as "TENANT").

**WITNESSETH:**

WHEREAS, Landlord and Tenant have entered into a certain Office Lease (hereinafter referred to as the "Lease") dated November ___, 2000, relating to the premises (hereinafter referred to as the "PREMISES") located or to be located in Sawgrass Commerce Center, Sunrise Florida and constructed upon the real property described in Exhibit "A" attached hereto and by this reference made a part hereof (hereinafter referred to as the "PROJECT"); and

WHEREAS, Lender has made or has committed to make a loan to Landlord in the principal amount of $_________ secured by a deed of trust, assignment and security agreement (hereinafter referred to as the "SECURITY INSTRUMENT") which contains an assignment of leases and rents from Landlord to Lender covering, inter alia, the Premises; and

WHEREAS, Tenant has agreed that the Lease shall be subject and subordinate to the Security Instrument held by Lender, provided Tenant is assured of continued occupancy of the Premises under the terms of the Lease;

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the sum of Ten Dollars ($10.00) and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, and notwithstanding anything in the Lease to the contrary, it is hereby agreed as follows:

1. Lender, Tenant and Landlord do hereby covenant and agree that the Lease, with all rights, options, liens and charges created thereby, is and shall continue to be subject and subordinate in all respects to the Security Instrument and to any renewals, modifications, consolidations, replacements and extensions thereof and to all advancements made thereunder.

2. Lender does hereby agree with Tenant that, in the event Lender becomes the owner of the Premises by foreclosure, conveyance in lieu of foreclosure or otherwise, so long as no uncured event of default exists under the Lease following notice and the expiration of the applicable cure period, (a) Lender will take no action which will interfere with or disturb Tenant's possession or use of the Premises or other rights under the Lease, and (b) the Premises shall be subject to the Lease and Lender shall recognize Tenant as the tenant of the Premises for the remainder of the term of the Lease in accordance with all the provisions thereof (including, without limitation, assuming the obligation to fund the Tenant Improvement Allowance), provided, however, that Lender shall not be subject to any offsets or defenses which Tenant might have against any prior landlord except those which arose under the provisions of the Lease out of such landlord's default and accrued after Tenant had notified Lender and given Lender the opportunity to cure same as hereinbelow provided, nor shall Lender be liable for any act or omission of any prior landlord (but Lender shall be obligated to cure any Landlord default of a continuing, on- going nature), nor shall Lender be bound by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord nor shall it be bound by any amendment or modification of the Lease made without its consent.

3. Tenant does hereby agree with Lender that, in the event Lender becomes the owner of the Premises by foreclosure, conveyance in lieu of foreclosure or otherwise, then Tenant shall attorn to and recognize Lender as the landlord under the Lease for the remainder of the term thereof, and Tenant shall perform and observe its obligations thereunder, subject only to the terms and conditions of the Lease. Tenant further covenants and agrees to execute and deliver upon request of Lender, or its assigns, an appropriate agreement of attornment to Lender and any subsequent titleholder of the Premises.

4. Any option or rights contained in the Lease, or otherwise existing, to acquire any or all of the Project (or any superior leasehold interest therein) are hereby made subject and subordinate to the rights of Lender under the Security Instrument; and acquisition of any or all of the Project made by Tenant during the term of the Security Instrument shall be made subordinate and subject to the Security Instrument.

5. So long as the Security Instrument remains outstanding and unsatisfied, Tenant will mail or deliver to Lender, at the address and in the manner hereinbelow provided, a copy of all notices permitted or required to be given to Landlord by Tenant under and pursuant to the terms and provisions of the Lease. At any time within the time permitted Landlord for curing any default under the Lease as therein provided, Lender may, but shall have no obligation to, pay any taxes and assessments, make any repairs and improvements, make any deposits or do any other act or thing required of Landlord by the terms of the Lease; and all payments so made and all things so done and performed by Lender shall be as effective to prevent the rights of Landlord from being forfeited or adversely affected because of any default under the Lease as the same would have been if done and performed by Landlord.

6. Lender shall have no liability whatsoever hereunder prior to becoming the owner of the Premises; and Tenant agrees that if Lender becomes the owner of the Premises, Tenant shall look solely to the estate or interest of Lender in the Premises (and such other sources of funds as are described in Section 13.04 of the Lease) for satisfaction of any obligation which may be or become owing by Lender to Tenant hereunder or under the Lease.

7. Landlord and Tenant hereby certify to Lender that the Lease has been duly executed by Landlord and Tenant and is in full force and effect; that the Lease and any modifications and amendments specified herein are a complete statement of the agreement between Landlord and Tenant with respect to the leasing of the Premises or otherwise affecting the Project, and the Lease has not been modified or amended except as specified herein; that to the knowledge of Landlord and Tenant, no party to the Lease is in default thereunder; that no rent under the Lease has been paid more than thirty (30) days in advance of its due date; and that Tenant, as of this date, has no charge, lien or claim of offset under the Lease, or otherwise, against the rents or other charges due or to become due thereafter.

8. Unless and except as otherwise specifically provided herein, any and all notices, elections, approvals, consents, demands, requests and responses thereto ("COMMUNICATIONS") permitted or required to be given under this Agreement shall be in writing, signed by or on behalf of the party giving the same, and shall be deemed to have been properly given and shall be effective upon the earlier of receipt thereof or deposit thereof in the United States mail, postage prepaid, certified with return receipt requested, to the other party at the address of such other party set forth hereinabove or at such other address within the continental United States as such other party may designate by notice specifically designated as a notice of change of address and given in accordance herewith; provided, however, that the time period in which a response to any Communication must be given shall commence on the date of receipt thereof; and provided further that no notice of change of address shall be effective with respect to Communications sent prior to the time of receipt thereof. Receipt of Communications hereunder shall occur upon actual delivery (whether by mail, telecopy transmission, messenger, courier service, or otherwise) to an individual party or to an officer or general or limited partner of a party or to any agent or employee of such party at the address of such party set forth hereinbelow, subject to change as provided hereinabove. An attempted delivery in accordance with the foregoing, acceptance of which is refused or rejected, shall be deemed to be and shall constitute receipt; and an attempted delivery in accordance with the foregoing by mail, messenger, or courier service (whichever is chosen by the sender) which is not completed because of changed address of which no notice was received by the sender in accordance with this provision prior to the sending of the Communication shall also be deemed to be and constitute receipt. Any Communication, if given to Lender, must be addressed as follows, subject to change as provided hereinabove:

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

and, if given to Tenant, must be addressed to Tenant's notice addresses set forth in the Lease; and, if given to Landlord, must be addressed as follows, subject to change as provided hereinabove:

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

9. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, successors- in- title and assigns. When used herein, the term "landlord" refers to Landlord and to any successor to the interest of Landlord under the Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the date first above written.

LENDER:

Signed, sealed and delivered
In the presence of:

________________________________

_________________________ By:________________________
Witness Title:_________________

(BANK SEAL)

_________________________
Witness

**TENANT:**

Signed, sealed and delivered AMERICAN CLASSIC VOYAGES CO. in the presence of: a Delaware corporation
_________________________ By:_______________________ Witness Title:________________

---

Witness

**LANDLORD:**

Signed, sealed and delivered DUKE- WEEKS REALTY LIMITED in the presence of: PARTNERSHIP, a Delaware corporation

_________________________ By: Duke- Weeks Realty Corporation Witness Its: General Partner
_________________________ By:_________________________ Witness Title:______________________

EXHIBIT J
FORM OF LETTER OF CREDIT

Duke-Weeks Realty Limited Partnership
10150 Highland Manor Drive
Suite 150
Tampa, Florida 33610

Amount: USD 500,000
(Five Hundred Thousand and
00/100 United States Dollars)

**WE HEREBY ESTABLISH THIS IRREVOCABLE STANDBY LETTER OF CREDIT NO __________ IN YOUR FAVOR, FOR AN AGGREGATE AMOUNT NOT TO EXCEED THE AMOUNT INDICATED ABOVE, EXPIRING AT OUR COUNTERS IN NEW YORK WITH OUR CLOSE OF BUSINESS ON NOVEMBER ___, 2001 OR ANY AUTOMATICALLY EXTENDED EXPIRY DATE.**

**THIS LETTER OF CREDIT IS AVAILABLE WITH THE CHASE MANHATTAN BANK, NEW YORK AGAINST PRESENTATION OF YOUR DRAFT AT SIGHT DRAWN ON THE CHASE MANHATTAN BANK, NEW YORK WHEN ACCOMPANIED BY THE DOCUMENTS INDICATED HEREIN.**
**BENEFICIARY'S DATED STATEMENT PURPORTEDLY SIGNED BY ONE OF ITS OFFICIALS READING AS FOLLOWS:**

**"THIS DRAWING USD __________________ UNDER THE CHASE MANHATTAN BANK LETTER OF CREDIT NO. __________________ REPRESENTS FUNDS DUE US FOR PAYMENT OR PERFORMANCE DEFAULT BY AMERICAN CLASSIC VOYAGES CO. UNDER THE OFFICE LEASE DATED NOVEMBER ____, 2000 EXECUTED BY BENEFICIARY AND AMERICAN CLASSIC VOYAGES CO."**
**IT IS A CONDITION OF THIS IRREVOCABLE LETTER OF CREDIT THAT IT SHALL BE AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ADDITIONAL ONE YEAR PERIODS FROM**

**THE PRESENT OR EACH FUTURE EXPIRATION DATE, UNLESS AT LEAST 45 DAYS PRIOR TO SUCH DATE WE SEND YOU NOTICE IN WRITING BY REGISTERED MAIL, OR HAND DELIVERY AT THE ABOVE ADDRESS, THAT WE ELECT NOT TO RENEW THIS LETTER OF CREDIT FOR SUCH ADDITIONAL PERIOD. UPON SUCH NOTICE TO YOU, YOU MAY DRAW DRAFTS ON US AT SIGHT FOR AN AMOUNT NOT TO EXCEED THE BALANCE REMAINING IN THIS LETTER OF CREDIT WITHIN THE THEN APPLICABLE EXPIRY DATE, ACCOMPANIED BY YOUR DATED STATEMENT PURPORTEDLY SIGNED BY ONE OF YOUR OFFICERS READING: "THE AMOUNT OF THIS DRAWING USD __________ UNDER THE CHASE MANHATTAN BANK LETTER OF CREDIT NUMBER ____________ REPRESENTS FUNDS DUE US AS WE HAVE RECEIVED NOTICE FROM THE CHASE MANHATTAN BANK OF THEIR DECISION NOT TO EXTEND LETTER OF CREDIT NUMBER ___________ FOR AN ADDITIONAL YEAR.**

**PARTIAL DRAWINGS PERMITTED.**

**WE HEREBY AGREE WITH YOU THAT DRAFTS DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS LETTER OF CREDIT WILL BE DULY HONORED.**
**THIS CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1993 REVISION INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 500) AND ENGAGES US IN ACCORDANCE WITH THE TERMS THEREOF. THE NUMBER AND THE DATE OF OUR CREDIT AND THE NAME OF OUR BANK MUST BE QUOTED ON ALL DRAFTS REQUIRED.**

EXHIBIT 21

SUBSIDIARIES OF
AMERICAN CLASSIC VOYAGES CO.
AS OF DECEMBER 31, 2000

| Name of Subsidiary | Jurisdiction Under Which Organized | Percentage of Ownership |
|---|---|---|
| The Delta Queen Steamboat Co. | Delaware | 100% |
| DQSB II, Inc. | Delaware | (1) |
| Cruise America Travel, Incorporated | Delaware | (1) |
| Great River Cruise Line, L.L.C. | Delaware | (2) |
| Great Ocean Cruise Line, L.L.C. | Delaware | (2) |
| Great AQ Steamboat, L.L.C. | Delaware | (2) |
| Great Pacific NW Cruise Line, L.L.C. | Delaware | (2) |
| Delta Queen Coastal Voyages, L.L.C. | Delaware | (2) |
| Cape Cod Light, L.L.C. | Delaware | (5) |
| Cape May Light, L.L.C. | Delaware | (5) |
| AMCV Capital Trust I | Delaware | 100% |
| AMCV Holdings, Inc. | Hawaii | 100% |
| Great Hawaiian Cruise Line, Inc. | Delaware | (6) |
| Great Independence Ship Co. | Delaware | (3) |
| Great Hawaiian Properties Corporation | Delaware | (3) |
| American Hawaii Properties Corporation | Delaware | (3) |
| CAT II, Inc. | Delaware | (3) |
| Project America, Inc. | Delaware | (6) |
| Oceanic Ship Co. | Delaware | (4) |
| Project America Ship I, Inc. | Delaware | (4) |
| Project America Ship II, Inc. | Illinois | (4) |
| Ocean Development Co. | Delaware | (4) |

(1) 100% owned subsidiary of The Delta Queen Steamboat Co.
(2) 99% owned subsidiary of The Delta Queen Steamboat Co. and 1% owned subsidiary of DQSB II, Inc.
(3) 100% owned subsidiary of Great Hawaiian Cruise Line, Inc.
(4) 100% owned subsidiary of Project America, Inc.
(5) 99% owned subsidiary of Delta Queen Coastal Voyages, L.L.C. and 1% owned subsidiary of DQSB II, Inc.
(6) 100% owned subsidiary of AMCV Holdings, Inc.

**EXHIBIT 23**

Consent of KPMG LLP

The Board of Directors and Stockholders
American Classic Voyages Co.

We consent to incorporation by reference in the registration statements No. 33- 80614 on Form S- 3 and No. 333- 44225 on Form S- 8 of American Classic Voyages Co. of our report dated February 27, 2001, relating to the consolidated balance sheets of American Classic Voyages Co. and subsidiaries as of December 31, 2000 and 1999, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for each of the years in the three- year period ended December 31, 2000, and the related financial statement schedules, which report appears in the December 31, 2000 annual report on Form 10- K of American Classic Voyages Co.

/s/ KPMG LLP
**KPMG LLP**

Chicago, Illinois
March 29, 2000

# Exhibit 70

JOHN DODDS
CONSULTING MARINE SURVEYOR LLC
3253 63rd Avenue SW, Seattle WA 98116
Tel: 206 932 6201 Fax: 206 932 1785 Cell: 206 679 8595
E-mail; doddsmarine@comcast.net

**INSTRUCTION DATE: October 30, 2007.**

**SURVEY REPORT NO: 07-051**

**DATE: January 9, 2007**

**THIS IS TO CERTIFY**

That the undersigned Surveyor at this port did at the request of Majestic America Line, 2101 Fourth Avenue, Suite 1150, Seattle, WA 98121 survey the steel constructed passenger vessel;

**"American Queen"**
**3707 Gross Registered Tons of New Orleans, LA**
**(Operators; Majestic America Line)**

in order to carry out a "Condition and Valuation" inspection for Insurance purposes.

On, 2007 the undersigned Surveyor attended on the "American Queen" which was lying afloat at Julia Street Dock, New Orleans, LA and reports as follows;

**Particulars of passenger vessel, "American Queen" Official No.1030765.**

The "American Queen" is paddlewheel and Z-drive powered passenger vessel of all welded steel construction built in 1995 by McDermott Shipyard at Amelia, LA.

Dimensions; Length 386.2'
Beam 85'
Depth 13.5'

The vessel is powered by twin Z-drive units and a steam engine powered paddlewheel, with the Z-drive units each developing 1,000 BHP and the paddlewheel developing 1,500 HP.

Passenger Accommodation is on 4 decks from the Cabin Deck (02 deck) to the Promenade Deck (05 deck) and the crew accommodation is principally below the main deck in the crew hold.

The vessel has a total of 222 staterooms and suites with a passenger capacity of 436 persons.

At the time of our survey the vessel was still in cruise service and was disembarking and embarking passengers at New Orleans prior to a new cruise.

**Vessel Documentation.**
US Coast Guard Certificate of Documentation valid to May 31, 2008US Coast Guard Certificate of Inspection valid to March 7, 2008.
It was noted that the last dry dock and internal structure examinations had been carried out on January 15, 2005 with next exams due on January 14, 2010.
All boiler/piping and pressure vessel examinations were up to date.

**Passenger Decks and Public Spaces.**

**Sun or Bridge Deck.**

Forward is the Gazebo style Pilothouse.
The Pilothouse is mounted on a hydraulic scissor lift system which enables the Pilothouse to be lowered when passing under bridges (if required).

The Pilothouse has main engine, both paddlewheel and Z-drive controls, steering and bow thruster controls.
The Pilothouse is equipped with the following navigation and communications equipment;
2 radars.
3 VHF radios.
2 depth sounders.
1 rate of turn indicator.
Furuno Fog Horn.
AIS transmitter and receiver.
Satellite compass.

The Pilothouse is also equipped with a Cerberus Pyrotechnics Fire Protection monitoring system, watertight door indicators and controls.
Wheelhouse also equipped with emergency fuel oil and ventilation shut-offs and remote start for fire pumps and also remote fire door operation.
Remote control for raising and lowering the smokestacks is also located in the pilothouse.

On port and starboard bridge wings are engines, steering and bow thrust control units in enclosed boxes with protection lids.

Aft of the Pilothouse is a deckhouse with crew gym forward, emergency generator room and paint locker on starboard sides, 2 elevator machinery rooms, sore rooms and at the aft end the passenger gym/ fitness room.

Emergency generator is 300KW driven by a Caterpillar D3408 diesel engine.
The generator room was clean and tidy, well lit and well painted.
Both emergency generator room and paint locker have CO2 fire smothering systems.

Aft of the passenger fitness center is the swimming pool lounging area with the swimming pool on the Promenade Deck level.
At the aft end is an outside stairway to the Calliope Bar also on the Promenade Deck level.

The Sun Deck was found to be clean, tidy and well painted with non-skid paint on the deck.
Hand rail systems well painted and in good order with no deficiencies.

**Promenade Deck (05 deck)**

The Promenade Deck has a total of 40 passenger staterooms including 2 luxurious Owners verandah suites, Vista Verandah Suites, Superior outside staterooms and 4 inside staterooms.
All staterooms furnished and decorated to high standards and found clean and tidy.
At the forward end aft of the Pilothouse well is the Master's stateroom and 2 Pilots' staterooms
At mid-length on the deck is a central lobby area with highly decorated stairwells down to the main deck.
2 elevators of 2,600# capacity are sited on the starboard side of the lobby and they serve all decks down to the crew hold.

At the aft end of the Promenade deck is the Calliope Bar and outside lounge area.
The Calliope Bar is fitted with a bar, numerous tables and chairs inside and outside.
Bar equipped with liquor and soda dispensers, coffee and espresso machines, juice and soda dispensers and Popcorn machine.
Area also equipped with food serving area fitted with hot dog machine and heated trays for soups etc.
The Calliope Bar has opening canvas type surrounds with plastic windows.

The exterior deck is clean, tidy and well painted with non-skid coatings.
All hand rails are well painted and in good order.

There are 3 outside staircases on port and starboard sides to the deck below with the mid-length staircase also going up to the Sun or bridge deck.

Internal alleyway and lobby area clean, well decorated and carpeted.

**Observation Deck (04 deck)**
The Observation Deck has a total of 56 outside suites and staterooms, 11 inside staterooms and 8 inside single staterooms.
Again all staterooms furnished and decorated to high standards.

Passenger deck alleyways were all found clean and tidy, well decorated and carpeted.

At the forward end of the Observation deck is the Chartroom which is richly wood paneled, with comfortable seating and a chart table where river charts are laid out showing the daily progress. There is also a library containing riverboat theme books.

**Texas Deck (03 deck)**
The Texas Deck has a total of 55 outside staterooms and 33 inside staterooms.
The outside staterooms aft of the lobby have private outside balconies with folding screens between cabins.

On centerline aft of the lobby is a theatre/ meeting room.
At the forward end of the Texas Deck is the Front Porch of America Lounge and bar with outside seating area.
The lounge is fitted with a bar, comfortable tables and chairs.
In addition to the bar are Soda and Juice dispensers and coffee machines.
Lounge area was found clean, well decorated and exterior deck clean, tidy and well painted with non-skid coatings.
Internal passenger alleyways clean, tidy, well decorated and carpeted throughout.

**Cabin Deck (02 deck).**
The Cabin deck has a total of 22 outside passenger staterooms aft the lobby area.
Between the staterooms is the upper part of the Grand Saloon with plushly furnished and decorated box seating with service area at the forward end.

At the aft end is the Engine Room Bar with large mahogany bar with 12 bar stools, ample wood tables and chairs.
The bar is well decorated, clean and carpeted with numerous pictures on the bulkheads and large viewing windows.
The bar storeroom is on port side forward of the bar.
There are porch seating areas to port and starboard of the bar.
An internal stairway connects the bar to the engine room viewing area on the main deck.

Forward of the lobby is the Purser's Lobby which is decorated and furnished to a high standard.
On the port side of the Purser's Lobby are the Purser' Office, Tour Desk, Secure area, Conference Room and Hotel Manager's Office.
On the starboard side of the lobby is gift shop/retail store.

Forward of the Purser's Lobby is the Mark Twain Gallery along the centerline with viewing windows to the upper level of the Dining Room on the main deck.

The Mark Twain Gallery is sumptuously decorated with wood paneling, carpeting and with numerous seating areas.
The gallery contains an extensive collection of riverboat memorabilia throughout.

Forward of the Mark Twain Gallery are the Ladies Parlor to port and the Gentlemen's Card Room to starboard.
Both the Ladies Parlor and the Gentlemen's Card Room are plushly furnished, decorated to high standards with numerous paintings and artifacts displayed.

From the lobby to the main deck lounge is the Grand Staircase made of high quality timber with brass decorations.

Forward of the Ladies Parlor and the card room is the entry passage leading to the outside staircase to the main deck.

The outside deck in this area is clean, tidy and well painted with non-skid coating.

**Main Deck (01 deck)**

At the aft end forward of the upper Engine Room is the Grand Saloon.
The Grand Saloon is fitted with a stage and with stage floodlighting, a small dance area and comfortable seating and tables throughout.
The Saloon is richly decorated with both recessed and chandelier lighting.
At the forward end of the Grand Saloon is a service area for serving light lunches and also a cocktail bar.
Ladies and Gentlemen's bathrooms are located to starboard and port respectively at the lobby/elevator area.

Forward of the lobby area is main Deck Lounge with shop on port side and service bar on starboard side.
The fully fitted Captain's bar is on the starboard side of the lounge.
The lounge is decorated to a high standard with ample tables and seating throughout.

Forward of the main deck lounge is the J. M. White dining room which contains 75 dining tables with wood upholstered chairs and some banquettes at the outboard sides.

The attending Surveyor can only describe the Dining Room as magnificent with plush carpeting.
The wings of the dining room rise up 2 decks with tall attractively curtained windows and an ornately decorated overhead.
The dining room is spacious, airy and well lit with sconce lighting, recessed lighting and decorative chandeliers.

The dining room has 4 serving stations and was found to be spotlessly clean and very well prepared.

At the forward end of the dining room on centerline was the boiler room uptake area which was well disguised and decorated as part of the dining room.

Forward of the dining room was the spacious pantry area and galley.

In brief the galley and pantry were found clean and tidy and fitted with extensive stainless steel food preparation tables and equipment.
In brief the galley contained the following;
Walk in freezer and walk in refrigerator.
2 Grills and 2 flat top grills.
6 electric ovens and 2 auto stoves.
Double deep fryer.
2 heavy duty Hobart mixers.
2 small freezers and 1 blast freezer.
3 steam kettles.
6 low boy coolers.
Bread oven and bakery racks.
Galley stores forward.
Galley area also fitted with incinerator room, trash room and dishwashing sinks and dishwashers.

The galley flooring was of quarry tiles which were all clean without damage.

At the starboard side of the pantry was a 3,000# capacity service elevator with door to main deck for receiving stores.
The elevator ran from the crew hold to the 05 deck.

**Crew Hold.**

The crew accommodation is located in the aft half of the hold with crew galley, crew mess room, Officer's mess, crew lounge, TV lounge, boiler room, generator room, walk in freezer and coolers, passenger laundry, various store rooms and the bow thrust room forward.

Crew hold is sub-divide with watertight bulkheads, either continuous or with watertight doors.
Watertight doors with local and bridge controlled hydraulic operation.

Forward via watertight access hatch on main deck forward
is the bow thrust room which was found clean, tidy, well lit and well painted.
Storage lockers and shelving in the bow thrust room found tidy.

Aft of the bow thrust room is the passenger laundry with linen room. All found clean and tidy and equipped with industrial size washers, dryers and press.

Aft of the laundry area and between Frs.31 and 44 (with WT doors) are the dry food storeroom, liquor store, and mechanical room and Big 4 storage room.

Between Frs. 44 and 55 (with WT doors) are the main walk in freezer, 2 walk in coolers, thawing box and ice cream freezer.

Between Frs.55 and 72 (with WT doors) are the boiler/fire room with auxiliary generator room to port of fire room. Fire room is entered via watertight door in the starboard alleyway.
The generator room on port side of fire room is accessed by watertight door from the fire room.

The boiler fire room contains the Babcock and Wilcox Type D water tube boiler with 400# working pressure.
Auxiliary machinery in the boiler room included;
3 potable water pumps.
2 main fuel pumps.
2 fuel oil transfer pumps.
3 air receivers with 2 air compressors.
Oily water separator.
2 boiler feed pumps.
Reefer cooling pumps.
Refrigeration condenser.
Domestic hot water heater.
2 laundry supply pumps.
2 ice machine pumps.
Main fire pump.
Bilge and ballast pumps.
3 sewage pumps.
Orca main sanitation pump.
DC fuel oil heater and workshop area.

The boiler room was in very clean condition, tidy, well lit and well painted with no evidence of any fuel oil leakage,
Boiler exhaust lagging found clean and in sound condition.

To port of the boiler room is the auxiliary generator room.
There are 3 auxiliary generators each 2,100KW and each driven by a Caterpillar 3516 diesel engine.
Generator hours as follows;
No.1 with 4906 hours.
No.2 with 5335 hours.
No.3 with 2743 hours.
All generator diesel drive engines fully rebuilt during last lay-up period.

We advised that normally 2 auxiliary generators provide sufficient electric power when underway with a full passenger load.

The generator room was found well sound proofed, well lit, well painted and clean and tidy.

Aft of the boiler and fire room between Frs.72 and 90 ( with WT doors) are the crew galley, crew mess, Officers mess, TV lounge, crew lounge, conference room and entertainment office.
Crew galley fitted with 2 ovens, 2 grills, deep fryer, hot trays, salad bar and large freezer and also with soda and juice dispensers.
The crew accommodation starts aft of Fr.90 and continues to the lower engine room bulkhead at Fr.165 with intermediate watertight doors at Frs.115 and 130.
At mid-length of the crew accommodation is the crew laundry and linen room on starboard side outboard of the lobby area elevators lower stations.

There are a total of 107 crew staterooms, mainly single occupancy with some double occupancy and with 14 Officer staterooms on the 04 deck aft.

Between Frs.165 and 187 are the lower and upper engine rooms.

**Engine Room and Control Room.**
The upper machinery space contains the main paddlewheel engines, engine controls, steering gear, main switchboard etc.

Main engines are horizontal double acting steam engines, each driving a Pitman arm which drives the paddlewheel, each developing 750HP.
Main engines have a 15" diameter HP steam cylinder and a 30" diameter LP cylinder with a 7' stroke to the Pitman arm.
The paddlewheel is 30' wide, 28' diameter and weighs 50 tons and turns at 14RPM at full speed.

The engine control room was found immaculate, tidy, well lit and well painted.

Also in the upper engine room area is a passenger viewing area, machine shop, fan room, steering gear at aft end and Engineer's office.

The lower machinery space contains the following auxiliary machinery;
Fire and fire sprinkler pumps.
Main condenser.
Evaporator for boiler water.
River water pumps.
Chiller water pumps.
Contaminated water settling tank.
Main condensate tank.
Fuel transfer pumps.
Main circulating pumps.
Ballast and bilge pumps.
Z-drive DC motors.
Z-drive rooms are accessed by watertight doors and have an access maintenance hatches on the main deck aft pontoons.
Z-drive units are Aquamaster controlled with Schottel gears.

The lower engine room was found to be clean, tidy, well painted and well lit with bilges dry and clean.

It is evident that the Engineering Staff take great pride in the vessel and this is apparent from the high standards of cleanliness throughout.

**Inner Hull**
The inner hull is separated into various tanks and void spaces and contains;
Ballast tanks,
Potable water tanks.
Lube oil tanks.
Fuel oil storage tanks.
Dirty oil tanks and oily water tanks.
Grey water and sewage holding tanks.
Boiler feed water tanks.

Tank locations and capacities are retained on file.

**Fire Protection and Safety Equipment.**

The vessel is sub-divided into fire zones.

All cabins, public spaces and alleyways are fitted with smoke alarms and sprinkler systems.
A computerized mimic panel is located in the Pilothouse which shows the location of the sensor reporting a problem.

Every aspect of fire fighting arrangements including ventilation shut offs, fuel shut offs and starting of fire pumps are controlled from the Pilothouse.

A mimic panel also shows location of watertight doors with automatic shut down controls.

The vessel is equipped with inflatable life rafts with 450 person capacity on both sides.

A $CO_2$ smothering system protects the boiler room, auxiliary and emergency generator rooms, bow thrust room, incinerator room, paint locker and liquor storeroom.

Lifesaving and fire fighting arrangements comply with US Coast Guard regulations.

**Deck Machinery.**
On each aft pontoon outboard of the paddlewheel are electric drive mooring capstans.
Forward is an electric drive anchor windlass equipped with mooring line capstan.
On the centerline forward is a Samson post with derrick for handling the 60' boarding aluminum gangways (vessel equipped with 2 gangways)

Derrick topping lift and gangway lifting wire operated by electric winches and derrick fitted with manual guys for swinging.
Main deck sides protected with heavy duty timber fendering system which is retained by steel strapping.

**Surveyors Notes.**

1) The vessel was found to be clean, well painted with exterior decks with non-skid coatings. All hand rails in good order and well coated.
2) At the time of Survey the vessel was fully operational and was disembarking and embarking passengers at New Orleans
3) All carpeting in alleyways, public spaces and staterooms was found to be clean and tidy.
4) Owners have set up a comprehensive preventative maintenance schedule with weekly, monthly, semi-annual and annual schedules.
5) All passenger suites and staterooms were furnished to a high standard and were all clean and tidy.
6) High quality paintings, prints, photographs along with riverboat artifacts line the passenger deck alleyways and all passenger staterooms are fitted with framed pictures, prints and photographs.
7) The public spaces were outfitted to a very high standard and decorated to match the riverboat era. In particular both the Mark Twain Gallery and the J. M. White Dining Room were most impressive as were the Purser's Lobby and the Grand Saloon and the Ladies Parlor and Gentlemen's Card Room.
8) In general the vessel was found to be in excellent condition throughout, exhibiting high standards of maintenance and housekeeping and a credit to her crew and Owners.
9) During our inspection it was evident that vessel crew took great pride in the vessel and were most helpful to the attending Surveyor.
10) The galley, pantry and food preparation areas were found to be clean, tidy, well lit and well equipped with hand washing stations.
11) All outside decks including main deck were found clean and tidy and well painted.
12) Details of tank capacities and vessel scantlings are retained on file.

As can be seen from the above the attending Surveyor was highly impressed with the condition of the vessel, in particular with the high standards of maintenance and housekeeping exhibited.

Public space and passenger staterooms furnishings and decorations were of high quality throughout the vessel.

**Valuation.**

As previously noted there have been limited sales of this type of vessel reported.

As noted the vessel is in excellent condition, well maintained and outfitted to very high standards.
We estimate that the current market value of the vessel is in the range of $56,000,000.00 to $60,000,000.00 (56 million to 60 million dollars)

We estimate that the replacement value would be in the order of $100,000,000.00 (100 million dollars)
The replacement value is based on the new building costs of a similarly sized, equipped and outfitted vessel.

Surveyed without prejudice,

John Dodds,
Consulting Marine Surveyor.

**In Attendance.**
Vessel Chief Officer
Vessel 1st and 2nd.Engineers.
Mr. John Dodds Representing vessel owners for Insurance Purposes.

**Attached.**

Various photographs.

# Exhibit 71

REDACTED

# Exhibit 72
REDACTED

# Exhibit 73

Delta Queen Steamboat Company, Inc.
SINCE 1890
A DELAWARE NORTH COMPANY

News Request/Download a Brochure Contact Us Employment A

ABOUT STEAMBOATIN' PACKAGES & PROGRAMS OUR BOATS PORTS OF CALL E

**See Your Travel Agent or Call Today! 1-8**

THE STEAMBOATIN'®
EXPERIENCE
DELTA QUEEN
IT'S AMERICA'S ULTIMATE
VACATION VOYAGE!

THE STEAMBOATIN'® VACATION

HISTORY OF THE DELTA QUEEN STEAMBOAT COMPANY

THE STEAMBOATIN'® EXPERIENCE VIDEO

There's never been a better time to rediscover America! And The Delta Queen Steamboat Company, Inc., has the greatest — and most unique — way to see the heartland of our great nation! Step aboard the legendary ***Delta Queen***®, the magnificent ***Mississippi Queen***® and the grand ***American Queen***®, the only genuine, overnight paddlewheelers plying America's rivers, for a journey brimming with fun, discovery and all-American heritage.

Come savor Steamboatin'®: A unique blend of American beauty and history, its sumptuous river cuisine, lively "showboat" style entertainment, and the adventure of exploring Mark Twain's riverside America. Charming, historic river ports. Lively cities. Stately plantations. And what a unique way to discover them!

Call Today!

**1-800-543-1949**

*In September 2001 we boarded the Delta Quee in Pittsburgh and heade for Cincinnati. Her history made the time a the more wonder-filled!*

*–Lillian & Gene Bryson, Long Island, NY*

There's nothing quite like Steamboatin' on the rivers of America's Heartland. Gliding along at a stately 8 mph, your mind has time to wander—back to a time when life was a bit slower and more genteel, when these mighty rivers served as America's natural "highways," and an elegant paddlewheel steamboat was the epitome of travel.

A lot has changed since then. But Steamboatin' ha always remained the same. There's a certain thrill that comes with boarding the paddlewheel

steamboats of the Delta Queen Steamboat Company. As you cross the stage — the broad bov "gangplank" — you step into another era. It's a time of grace and civility, when people took the time to get to know one another among an ambience of luxury and elegance. When meals were triumphs of culinary arts, when service was impeccable, when the entertainment was lively and when each port of call afforded a unique glimpse into a America few experience.

Today you'll be pampered by an all-American crew ever at your beck and call, relax i an atmosphere of Victorian charm, dine on great American cuisine, explore historical charming ports of call, and clap your hands to nightly professional "showboat" style entertainment. And each night as you settle into your comfortable stateroom, lulled to sleep by the gentle, distant rhythm of the paddlewheel, you'll dream of the adventures that await you the next morning.

You'll explore the richness of riverside America as you step ashore at historic ports of call such as lively New Orleans and stately Natchez, Mark Twain's Hannibal or cosmopolitan St. Paul, bustling St. Louis and gracious Louisville, charming Chattanooga and tuneful Nashville, friendly Cincinnati and dynamic Pittsburgh. Along the way, you'll reflect on the great events and people that have contributed to America's story at each of these and our many other ports.

Book now! Your Steamboatin' voyage of discovery awaits! Our all-American staff and crew look forward to welcoming you aboard as you experience the United States as you've never seen it before — from the decks of a genuine paddlewheel steamboat.

© The Delta Queen Steamboat Company, Inc. 2005 • For further information call 1-800-543-1949
The Delta Queen Steamboat Company, Inc. is a wholly owned subsidiary of Delaware North Companies Inc.
Privacy Policy -- Terms Of Use

# Exhibit 74

Delta Queen Steamboat Company Inc.
SINCE 1890
SM
A DELAWARE NORTH COMPANY

News Request/Download a Brochure Contact Us Employment A

ABOUT STEAMBOATIN' PACKAGES & PROGRAMS OUR BOATS PORTS OF CALL B

**See Your Travel Agent or Call Today! 1-8**

CITYSCAPE PACKAGES

IT'S LIKE GETTING TWO VACATIONS IN

- OVERVIEW
- CITYSCAPE PACKAGES
- CITYSCAPE PLUS

**Discover The Great Cities Of The River**
**With A Pre- Or Post-Cruise CityScape Package**

Imagine, for a moment, that the great rivers that run through the heart of this country are a necklace. And the majestic cities that are strung on that graceful strand are the precious gems of the river. Each reflecting the wonder and rich treasures that this land has to offer.

The French Quarter in New Orleans, Beale Street in Memphis, the Grand Ole Opry in Nashville, The Gateway Arch in St. Louis. And that's just the beginning! The Delta Queen Steamboat Company, Inc. is offering you a remarkable opportunity to experience those wonderful cities. Sign up for one of these pre- or post-cruise CityScape Vacation Packages when you book your Steamboatin' Vacation. It's the perfect complement to your *Delta Queen*® river adventure. **It's like getting two vacation one.**

If you like to strike out on your own, our **Steamboatin'® CityScape Package** is fo It gives you the freedom to discover the city of your choice at your own pace. We su the hotel, full breakfast and all transfers.

Call Today!
**1-800-543-19**

*It was our privileg pleasure to go from Orleans to Natchez aboard the Americ Queen some years The experience, lon awaited, was so mu more than we anticipated!*

*–Lillian & Gene Br Long Island, NY*

But, if you'd prefer a touch of luxury and a more customized package, our **CityScap Plus Package** is just what you're looking for. With a Plus package, you get to exper your choice of some of the best-known attractions, as well as some of the best kept secrets in whatever city you choose. You'll eat at the finest restaurants and tour som the most interesting sites. You'll benefit from the Delta Queen Steamboat Company, vast knowledge of these wonderful river cities.

And remember, you could even get a pre- or post-cruise city/hotel package free or at a reduced price if you book your Steamboatin'® Vacation early.

**For more information, give us a call at 1-800-543-1949.**

*CityScape and CityScape Plus hotel rates are per person, per night, double occupancy, and are in addition to cruise fare. Extra night pricing includ hotel and breakfast only. Single and triple occupancy rates are available.*

© The Delta Queen Steamboat Company, Inc. 2005 • For further information call 1-800-543-1949
The Delta Queen Steamboat Company, Inc. is a wholly owned subsidiary of Delaware North Companies Inc.
Privacy Policy -- Terms Of Use

# Exhibit 75
# REDACTED

# Exhibit 76

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, DC 20549

# FORM 10- K

[ X ] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE YEAR ENDED DECEMBER 31, 1997
OR
[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
COMMISSION FILE NUMBER: 0-9264
AMERICAN CLASSIC VOYAGES CO.
(Exact name of registrant as specified in its charter)

| DELAWARE | 31-0303330 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| TWO NORTH RIVERSIDE PLAZA, CHICAGO, ILLINOIS | 60606 |
| (Address of principal executive offices) | (Zip Code) |

(312) 258-1890
(Registrant's telephone number, including area code)
Securities registered pursuant to Section 12(b) of the Act: NONE
Securities registered pursuant to Section 12(g) of the Act:
COMMON STOCK, $.01 PAR VALUE
(Title of Class)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [ X ] No [ ]
Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S- K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10- K or any amendment to this Form 10- K. [ ]
The aggregate market value of voting stock held by non- affiliates of the registrant was $146.8 million based upon the last reported sale price of $22.00 per share on March 23, 1998 on The Nasdaq Stock Market. Using beneficial ownership of stock rules adopted pursuant to Section 13 of the Securities Exchange Act of 1934, certain persons designated as affiliates for purposes of this computation may not be held to be affiliates upon judicial determination.

As of March 23, 1998, there were 14,061,904 shares of Common Stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE:

PART III -- Portions of the registrant's definitive Proxy Statement, which will be filed with the Securities and Exchange Commission by April 29, 1998.

## AMERICAN CLASSIC VOYAGES CO.

## INDEX

| ITEM DESCRIPTION | | PAGE |
|---|---|---|
| Part I | | |
| Item 1 - | Business | 3 |
| Item 2 - | Properties | 8 |
| Item 3 - | Legal Proceedings | 9 |
| Item 4 - | Submission of Matters to a Vote of Security Holders | 9 |
| Part II | | |
| Item 5 - | Market for Registrant's Common Equity and Related Stockholder Matters | 10 |
| Item 6 - | Selected Financial Data | 10 |
| Item 7 - | Management's Discussion and Analysis of Financial Condition and Results of Operations | 10 |
| Item 7A - | Quantitative and Qualitative Disclosures About Market Risk | 10 |
| Item 8 - | Financial Statements and Supplementary Data | 10 |
| Item 9 - | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 10 |
| Part III | | |
| Item 10 - | Directors and Executive Officers of the Registrant | 11 |
| Item 11 - | Executive Compensation | 11 |
| Item 12 - | Security Ownership of Certain Beneficial Owners and Management | 11 |
| Item 13 - | Certain Relationships and Related Transactions | 11 |
| Part IV | | |
| Item 14 - | Exhibits, Financial Statement Schedules, and Reports on Form 8-K | 12 |

AMERICAN CLASSIC VOYAGES CO.

PART I

ITEM 1. BUSINESS

GENERAL

American Classic Voyages Co. and its subsidiaries (the "Company") is the leading provider of overnight passenger cruises on inland waterways in the continental U.S. and among the Hawaiian Islands. The Company operates two cruise lines under the names of The Delta Queen Steamboat Co. ("Delta Queen") and American Hawaii Cruises ("American Hawaii"). Delta Queen currently operates three U.S. flag paddlewheel steamboats having 1,026 total passenger berths, providing three- to 14- night cruise vacations on the Mississippi River System as well as the Intracoastal Waterway. American Hawaii, acquired in August 1993, operates one U.S. flag ocean liner having 867 total passenger berths, providing three- , four- and seven- night inter- island cruises among the Hawaiian Islands. The Company does not offer gaming on its vessels.

The Company believes it is the largest owner and operator of U.S. flag passenger vessels. Since non- U.S. flag vessels are prohibited under Federal law from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port, the Company's U.S. flag designation, arising from having U.S. built, owned and crewed vessels, provides it with significant marketing and operating advantages. As an American flag carrier, there are certain restrictions on foreign ownership of the Company's common stock.

The Company, a Delaware corporation incorporated in 1985, is a holding company, which owns and controls: (i) The Delta Queen Steamboat Co., ("DQSC"), Inc., which operates Delta Queen through various subsidiaries; and (ii) Great Hawaiian Cruise Line, Inc. ("GHCL"), which operates American Hawaii, through various subsidiaries. DQSC also owned and operated the Maison Dupuy Hotel (the "Hotel"), located in New Orleans, prior to its sale in October 1996. GHCL also owned the Constitution steamship which was removed from service in June 1995 and sold on November 4, 1997. The Company employed 1,404 persons as of December 31, 1997. The Company's executive offices are located at Two North Riverside Plaza, Suite 200, Chicago, Illinois, 60606, and its telephone number is (312) 258- 1890.

**REVIEW OF 1997 AND RECENT EVENTS**

In 1997, the Company's results of operations were affected by the following factors: (i) the improved performance of Delta Queen's operations; (ii) the four week drydock of the Independence; and (iii) costs associated with the relocation and integration of American Hawaii's principal offices into Delta Queen's existing offices and costs incurred for planning to increase capacity at American Hawaii. At Delta Queen, cruise gross profit increased by $7.2 million over the prior year due to increases in fare revenue per passenger night while cruise operating costs were consistent with the prior year's levels. Additional cost control was achieved in cruise selling, general, and administrative expenses, which declined by 10% from the prior year. At American Hawaii, the Independence was out of service for a four- week period ending June 13, 1997 for its once every 30- month drydock, which was completed on time and within its budget. With the buildout of 25 new passenger cabins, the vessel's potential revenue producing capability was increased and passenger area enhancements improved the overall appearance of the vessel. During the drydock, the vessel was also brought into compliance with the applicable Safety of Life at Sea Convention ("SOLAS") fire safety amendments. During 1997, the Company incurred $1.6 million of expenses related to potential capacity expansion at American Hawaii (as further discussed below) and for the relocation of American Hawaii's principal offices from Chicago to New Orleans. These factors, among others, resulted in the Company reporting consolidated operating income of $10.0 million in 1997 compared to an operating loss of $30.5 million in 1996. The 1996 operating loss included a write- down of $38.4 million related to the Constitution and $1.4 million of operating income related to the Hotel which was sold in October 1996.
On October 17, 1997, the Company announced its plans to expand capacity at American Hawaii. The expansion plans have been made possible by a recently enacted law establishing a pilot project to develop the U.S.- flag cruise ship industry and stimulate commercial construction in U.S. shipyards. The shipbuilding pilot project was included in the Department of Defense Appropriations Act for Fiscal Year 1998. The law enables an operator of a U.S.- flag vessel, who commits to building two privately funded cruise ships in a U.S. shipyard, to temporarily operate an existing foreign- flag cruise ship while the new ships are under construction. The Company intends to construct two new cruise ships over the next seven years and plans for American Hawaii to introduce another vessel in the Hawaii market as early as mid- 1999 while awaiting construction of the new vessels.

**NARRATIVE DESCRIPTION OF BUSINESS**

Delta Queen
Delta Queen markets its steamboats as the "Legendary Delta Queen", the "Magnificent Mississippi Queen" and the "Grand American Queen" and the cruise experience using its Steamboatin'(R) registered servicemark. Delta Queen's steamboats travel along the Mississippi, Ohio, Cumberland, Tennessee, Arkansas, Illinois, Kanawha, Red and Atchafalaya Rivers, as well as the Intracoastal Waterway. Ports of embarkation/debarkation, which are typically locations of historical or cultural significance, include New Orleans, Memphis, St. Louis, St. Paul, Ottawa, Louisville, Cincinnati, Pittsburgh, Nashville, Chattanooga, Little Rock and Galveston. Other ports of call include such towns as Hannibal, Missouri; Prairie du Chien, Wisconsin; Vicksburg and Natchez, Mississippi; and Shiloh, Tennessee.
The Company promotes special cruise packages revolving around specific themes which allow passengers to participate in activities, meet special guest lecturers, and enjoy entertainment relevant to the theme. Seasonal theme cruises include: "Spring Pilgrimage", "Autumn in America - Fall Foliage" and "Old Fashioned Holidays" while geographic themes include "Dixie Fest", "Mark Twain Heartland", "Cajun Country Culture" and "Gardens of the River". Old standbys and continuing favorites are "Kentucky Derby" cruises that include attendance at the Kentucky Derby horse race and "The Great Steamboat Race", a reenactment of the famous 19th Century race between the Natchez and the Robert E. Lee steamboats. For nostalgia and history lovers, Delta Queen offers "Big Band", "The Year That Was...", "The Drama of the Civil War" and "Fabulous 50s" theme cruises. In a continuing effort to upgrade its cruise product, Delta Queen will introduce, in 1998, enhancements to the onboard dining, entertainment and shore excursions which will highlight America's heartland. In addition, several new theme cruises will be added, such as "Tramping on the River" cruises featuring impromptu river stops; and "The History of Steamboatin' Revisited", which will retrace the 1811 voyage of the first successful steamboat voyage down the Ohio and Mississippi Rivers to New Orleans.
The Steamboatin' cruise fare for an average five- night cruise, as stated in the 1998/1999 cruise brochure, ranges from luxurious suites at $648 per person per night to interior cabins with lower and upper berths at $262 per person per night, based on double occupancy. The fare also includes three full service meals per day, along with mid- afternoon snacks and a late evening buffet, day and night entertainment on the vessels and port charges.

To attract additional customers, Delta Queen has developed products which combine its steamboat cruises with escorted tours and overnight stays at historic port cities. Delta Queen offers additional services and products to its passengers, including trip cancellation insurance, bar services, beauty salon services, photographs, shore excursions and gift shop products. Delta Queen also distributes a line of specialty products through its onboard gift shops utilizing the Steamboatin' logo. As a convenience to its passengers, Delta Queen will also arrange hotel accommodations and air and land transportation to and from the cruise embarkation and/or debarkation point.

American Hawaii

American Hawaii features seven- night cruise vacations among the Hawaiian Islands. In addition, as part of its weekly itinerary, American Hawaii offers three and four night cruise vacations. Ports of call include Hilo and Kona on the Big Island of Hawaii; Kahului, Maui; Nawiliwili, Kauai; and Honolulu, Oahu. Many cruise passengers also choose to extend their stay in Hawaii, purchasing hotel accommodations through American Hawaii. American Hawaii offers more than 50 optional shore excursion activities of interest to its passengers, including helicopter rides, snorkeling, sea tours and other excursions to observe some of the spectacular natural Hawaiian sights. The itinerary also affords an opportunity to view Mount Kilauea, one of the world's few active volcanoes, and the soaring sea cliffs of the inaccessible Na Pali coast.

American Hawaii offers theme cruises organized around specific activities or seasons, including: "Whales in the Wild" cruises, in which passengers can observe whales that make Hawaii their winter playground; "Hawaiian Heritage" cruises, which emphasize native Hawaiian ceremonies and rituals; and "Big Band" cruises featuring 1940's Big Band orchestra music and Golden Age of Movies film screenings.

Cruise fares on American Hawaii for a seven- night cruise, as stated in the 1998 cruise brochure, range from luxurious suites at $469 per person per night to interior cabins with a single sofa bed and fold- away upper berth at $176 per person per night, based on double occupancy. The fare also includes three full service meals per day, along with mid- afternoon snacks and a late evening buffet, night entertainment on the vessel and port charges. American Hawaii also offers seasonal youth programs to attract passengers with children, as the Independence has a large number of cabins that can accommodate three and four passengers.

American Hawaii offers additional services and products to its passengers, including trip cancellation insurance, bar services, beauty salon services, photographs, shore excursions and gift shop products. American Hawaii also distributes a line of specialty products through its onboard gift shops utilizing the "American Hawaii Cruises" logo. American Hawaii also offers air transportation arrangements to and from the Hawaiian islands through agreements with several major commercial airlines as well as hotel accommodations on the Hawaiian islands.

**MARKETING**

The Company markets Delta Queen and American Hawaii as separate cruise brands.

Delta Queen is marketed to mature adult travelers as a unique vacation experience aboard classic steamboats in which the people, sights, romance and history of heartland America are explored. The Company believes individuals are attracted to its paddlewheel steamboat cruises because of the quality of its service, dining, accommodations and entertainment as well as the unique characteristics of the steamboat experience, including the connection to American history.

Delta Queen annually welcomes back a large number of prior passengers which is supported through a relationship marketing program. New passengers are acquired through targeted direct mail, direct response advertising and other promotional activity. Media coverage generated by public relations activity is another efficient and effective method of acquiring new customers and building brand awareness. In 1997, Steamboatin' vacations were featured or mentioned in more than 2,000 articles in such publications as Travel & Leisure, The New York Times, Travel Holiday, The Los Angeles Times and McCall's. Inquiries from advertising, promotional activity and media coverage are fulfilled via direct mail and a full color product brochure and promotional literature. In addition, a significant number of annual customers result from referrals given by prior customers. Nearly all Steamboatin' vacations are booked via travel agents, who receive frequent communications from the Company, and who are supported with collateral and mailing materials.

American Hawaii is marketed as the best and most convenient way to experience the Hawaiian Islands. The Company accomplishes this by gearing the onboard dining, entertainment, and the extensive offering of shore excursions towards an Hawaiian theme. Additionally, the Hawaiian vacation package is promoted as a convenient and rewarding alternative to land- based multi- island vacations.

American Hawaii targets consumers who are interested in Hawaii, as well as cruise enthusiasts, through strategically targeted direct mail campaigns, and the Holokai Hui News newsletter, aimed at repeat passengers. American Hawaii also places full color advertisements in specialized publications such as Modern Maturity, Car and Travel and Endless Vacation magazines and has been the subject of feature articles in national travel and leisure magazines and newspaper travel sections. To supplement and reinforce these efforts, full color sales brochures are distributed to prospective customers as well as travel agents. The travel agency community also receives periodic fax broadcasts and a quarterly newsletter, the Kuaihelani.

**SALES**

The Company maintains separate field sales and reservation staffs for Delta Queen and American Hawaii. The Company sells its cruise products primarily through two major channels, of which the most significant channel is travel agents operating throughout the U.S. The Company has programs which educate travel agents about the unique nature of the Company's travel experiences, the vessels' itineraries, special programs, theme cruises and pricing policies. To assist in obtaining reservations from travel agents, the Company engages in both consumer and trade- oriented advertising, including direct mailings of the Company's literature to travel agencies. The Company maintains contact with travel agents through each cruise line's 13 field sales personnel who conduct educational seminars and attend trade shows. The Company's second major sales channel is group travel organizers, consisting of clubs, travel agencies and tour operators who arrange for the sale of cruise vacations at discounted fares. The Company provides a variety of incentives to these organizers, including fare discounts and promotional materials. During 1997, one travel agency consortium accounted for 10.8% of the Company's revenues. The Company believes the loss of such customer would not have a material adverse effect on the Company's sales.

**PRICING AND ADVANCE RESERVATIONS**

The Company issues separate full color sales brochures for each of Delta Queen and American Hawaii, which contain descriptive information, itineraries and fare schedules, prior to the beginning of each upcoming calendar year. The Company prices its cruise fares, based on cabin category, using a single pricing schedule for each cruise line throughout the calendar year. As an inducement for passengers to book early, the Company generally offers an early booking discount which typically consists of the current year's fares to passengers who book more than six to eight months in advance for the upcoming year. In

addition, the Company offers to group travel organizers and others certain discounts from the Company's published fare schedule. To stimulate additional demand, the Company may offer discounts from the Company's published fare schedule. The Company actively markets its cruises up to one year prior to the cruise year and the level of advance reservations at any given date provides the Company with an indication of its future fare revenue. A significant portion of such reservations is booked more than six months in advance of the cruise date. Generally, customers of each cruise line must pay a $300 refundable deposit within one week of booking a cruise with the balance of the cruise fare to be remitted 60 days in advance of the departure date. Cancellations received after a certain date are subject to a loss of deposit and/or a cancellation charge ranging from 25% to 100% of the cruise fare. For a nominal fee, the Company also offers trip cancellation insurance through a third- party insurer which allows the customers to reduce their exposure to cancellation charges. As of December 31, 1997, advance reservations for the 1998 cruise year for both Delta Queen and American Hawaii combined were $76.2 million. However, the Company cannot specifically determine the amount of revenues to be derived from advance reservations as there can be no assurance that any particular advance reservation will result in any revenue to the Company.

**SEASONALITY**

Delta Queen's operations are seasonal. Historically, there is greater passenger interest and higher yields in the spring and fall months of the year. Accordingly, the vessels typically undergo their annual lay- up in January for repairs, maintenance and significant capital projects. American Hawaii's operations are moderately seasonal with greater passenger interest in the winter and summer months of the year. During the summer months in particular, American Hawaii tends to have average occupancy in excess of 100% as the number of families sharing cabins with children increases significantly during this period.

The Company's 1997 results are not comparable to 1996 due to (i) the Independence drydock for a four week period ended June 13, 1997, (ii) the March 1996 impairment write- down of the Constitution and (iii) the October 1996 sale of the Maison Dupuy Hotel.

**COMPETITION**

The vacation industry is highly fragmented and characterized by a significant degree of competition among a large number of participants, including cruise lines, land- based destination resorts, sightseeing tours and a wide range of other vacation options. The Company's vessels compete against all of these vacation options. Since leisure spending is discretionary, adverse economic conditions which affect the Company's customer base, including uncertainty over inflation and interest rate fluctuations, may negatively impact the Company's performance.

The Company believes that it is the largest provider of overnight cruise vacations on U.S. flag vessels, and that its cruise experience differentiates the Company's vacation packages from other overnight cruise vacations and other vacation alternatives. The Company further believes its principal competitive strengths include: (i) a high level of recognition by, and familiarity with, its customer base; (ii) the distinctive nature of its products as an opportunity to experience historical aspects of American heritage and the beauty of the Hawaiian islands; and (iii) the vessels' status as U.S. flag vessels with American crews.

All of the Company's vessels are registered under the U.S. flag for coastwide trade, which requires that they be U.S. built, owned and crewed. Federal maritime laws prohibit non- U.S. flag vessels from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port. Should the law be amended or repealed, other entities, including those with greater resources than the Company, could introduce overnight non- U.S. flag vessels on inland waterways and among the Hawaiian islands in direct competition with the Company's vessels. See "Government Regulation" below. The entry of direct competition could adversely affect the Company's ability to maintain or further increase occupancy or prices for cruise vacations and could result in lower margins, thereby adversely affecting the profitability of the Company's business.

**GOVERNMENT REGULATION**

Federal maritime law currently prohibits non- U.S. flag vessels from receiving and discharging passengers at any two U.S. ports without stopping at an intervening non- U.S. port. Periodically there has been debate about the potential amendment or repeal of this law and the broader cabotage laws encompassed under the Merchant Marine Act of 1920, also known as the Jones Act and the Passenger Vessel Services Act ("PVSA"). In August 1995, the Company joined the Maritime Cabotage Task Force ("MCTF"), a broad national coalition of 415 companies, associations and unions representing all modes of domestic transportation. The MCTF is responsible for monitoring potential adverse changes in legislation that could affect the U.S. maritime industry and publicizing the economic and national security issues relevant to maintaining a strong U.S. flag vessel industry. Through the coalition's efforts, numerous legislators and key Congressional staff members have been made

aware of the substantive issues and positions surrounding any changes to this legislation. In 1997, a bill was introduced to modify the PVSA by allowing foreign flagged ships in certain itineraries where there was no existing U.S.- flag ship in service. This bill, however, would not permit foreign flagged ships to compete with the Company's existing operations and itineraries. In October 1997, a hearing was held before the Surface Transportation and Merchant Marine subcommittee of the Senate Commerce Committee. Since such date, no further actions have been taken and no further hearings have been scheduled to date.

American Hawaii's expansion plans have been made possible by a recently enacted law establishing a pilot project to develop the U.S.- flag cruise ship industry and stimulate commercial construction in U.S. shipyards. The shipbuilding pilot project was included in the Department of Defense Appropriations Act for Fiscal Year 1998. The law enables an operator of a U.S.- flag vessel, who commits to building two privately funded cruise ships in a U.S. shipyard, to temporarily operate an existing foreign- flag cruise ship while the new ships are under construction.

The Company is subject to various Federal and state regulations which affect the operations of its vessels. Most importantly, the Company's vessels, as U.S. flag vessels, are subject to regulations promulgated by the U.S. Department of Transportation and enforced by the U.S. Coast Guard ("Coast Guard"). The Coast Guard conducts both scheduled and unannounced inspections to determine compliance with these regulations and has the authority to delay or suspend cruises. The Delta Queen vessels must be drydocked for an inspection of the hulls' exteriors every five years. Previously, American Hawaii was required to drydock the Independence approximately every 18 months for a similar procedure. The Coast Guard is empowered to increase the interval between inspections and accordingly, the Company has requested and received permission from the Coast Guard to lengthen the interval of the drydocking of the Independence to every 30 months, subject to annual hull surveys. In May 1997, the Independence was out of service for a four- week period for its once every 30- month drydock.

The Company, like other entities that operate vessels on U.S. waterways, is subject to certain Federal, state and local health and safety laws, regulations and ordinances, such as the Clean Air Act, Clean Water Act, Ocean Dumping Act, Occupational Safety and Health Act, Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation and Liability Act. Periodically, the Company incurs expenditures to keep its vessels in compliance with such environmental laws and regulations. The Company does not anticipate making any material expenditures in 1998 with respect to environmental matters. However, the coverage and attendant compliance costs associated with such laws, regulations and ordinances may result in future additional costs to the Company's operations.
SOLAS, to which the U.S. is a party, requires that passenger vessels for 50 or more passengers be constructed of fire retardant materials. Since the Delta Queen's superstructure is wood, the vessel requires a legislative exemption from the SOLAS requirement. Since 1968 Congress has granted the Delta Queen seven consecutive Congressional exemptions from this SOLAS requirement because of fire prevention and safety enhancements made to the vessel and the Delta Queen's historic status. The legislation exempting the Delta Queen requires the Company to notify potential passengers that the Delta Queen does not comply with applicable fire standards and prohibits the Company from disclaiming liability for loss due to fire caused by the Company's negligence. The current exemption has been extended to November 1, 2008. The Company's ability to operate the Delta Queen is dependent upon retaining its current Congressional exemption and obtaining additional exemptions subsequent to 2008. For ocean- going passenger vessels, fire safety amendments to SOLAS require that certain enhancements to life safety systems must be made by October 1, 1997. The Independence was brought into compliance during its spring 1997 drydock as discussed above.
The Company's vessels are also subject to regulation under the Federal Food, Drug and Cosmetic Act and the Public Health Service Act.
The Federal Maritime Commission ("FMC") regulates passenger vessels with 50 or more berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. The Company has been approved as a self- insurer by the FMC, and therefore, subject to continued approval, is not required to post security for passenger cruise deposits. The FMC has reviewed its standards and in June 1996 issued proposed regulations to increase the financial responsibility requirements. The Company filed its objection to the proposals, as it believes that the FMC's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. If implemented, these proposed regulations would be phased in over time and, among other things, would require operators qualifying as a self- insurer, such as the Company, to satisfy a working capital test, in addition to the existing net worth test, and to provide third- party coverage for 25% of its unearned passenger revenue in the form of a surety bond or similar instrument. At this time, the Company cannot predict if the proposed changes will be approved as currently constituted, or at all. If they are implemented, the proposed changes would require that the Company establish a bond to cover a portion of its passenger deposits and payments, which may impact the Company's liquidity.

**INSURANCE**

The Company carries marine liability insurance on its vessels through Steamship Mutual Underwriting Association (Bermuda) Limited ("Steamship Mutual"), a non- profit, mutual protection and indemnity association. The Company's marine liability insurance arrangements are typical of common marine industry practices and, subject to certain deductibles, provide coverage for losses, other than hull physical damage losses, resulting from its activities as a ship owner, including casualty damage by the vessels and claims by crew members, passengers and other third parties. The policy has no maximum limit of liability coverage, except for a $500 million limit, per occurrence, for oil pollution liability claims. As a member of Steamship Mutual, the Company pays its annual premiums based largely on its risk characteristics and loss experience, and the loss experience of other members. In addition, because Steamship Mutual and other maritime mutual indemnity associations around the world pool a portion of their loss experience in risk sharing arrangements, Steamship Mutual also may be affected by the loss experience of other mutual protection and indemnity organizations.
The Company's annual protection and indemnity insurance premium consists of an advance call which recently has approximated 71% of the expected total annual premium, and a supplemental call determined by Steamship Mutual's managing directors later in the year. The Company may be liable for a supplemental call in excess of the anticipated amount in the event that Steamship Mutual incurs heavy losses or experiences unusual circumstances.
The Company also carries hull and machinery coverage with various insurers, which insures against physical loss and damage to the vessels, subject to a $750,000 deductible and/or co- payment requirements per occurrence per vessel. Although the Company believes the risk of a total loss of the vessels is remote, in all likelihood the replacement costs

would exceed these coverage amounts.
The Company believes its insurance coverage is adequate based on the Company's assessment of the risks to be insured, the probabilities of loss and the relative cost of available coverages.

**EMPLOYEES**

The Company employed 1,404 persons as of December 31, 1997. Of the vessels' onboard employees, the American Maritime Officers of the AFL- CIO ("American Maritime Officers") represented approximately 118 individuals, and the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District of the AFL- CIO ("Seafarers") represented approximately 673 individuals. The American Maritime Officers' contracts for Delta Queen and American Hawaii expire in February 2004 and May 2000, respectively, and the Seafarers' contracts for Delta Queen and American Hawaii expire in December 2003 and May 2000, respectively. Since 1986, the Company has not experienced any work stoppages, and believes its relations with its employees are good.

**ITEM 2. PROPERTIES**

The Company's principal physical properties include the four vessels, the Delta Queen, Mississippi Queen, American Queen and Independence. In addition, the Company leases the Robin Street Wharf facility in New Orleans, Louisiana and office space in Chicago, Illinois and Honolulu, Hawaii.

DELTA QUEEN
The Delta Queen was constructed in 1926 and has undergone several refurbishments. The vessel is 285 feet long and is powered by twin reciprocating steam engines which generate 2,000 horsepower to drive its paddlewheel. It has a steel hull, a wooden superstructure and 174-passenger berths based on double occupancy.

**MISSISSIPPI QUEEN**

The Mississippi Queen was placed in service in 1976 and has 416- passenger berths based on double occupancy. The vessel is 382 feet long, has a steel hull and superstructure and is powered by twin reciprocating steam engines which generate 2,000 horsepower to drive its paddlewheel.

**AMERICAN QUEEN**

The American Queen, was placed in service in June 1995 and has 436- passenger berths based on double occupancy. The vessel is 418 feet long, has a steel hull and superstructure and is partially powered by twin reciprocating steam engines which, when combined with a supplemental propulsion system, generate 3,500 horsepower to drive a wooden/steel paddlewheel.

**INDEPENDENCE**

The Independence steamship was built in 1951 and has undergone several refurbishments. The vessel is 682 feet long, 89 feet wide, and is powered by twin steam turbines providing 5,100 horsepower. It has a steel hull and superstructure and has 867- passenger berths based on double occupancy. In the spring of 1997, the Independence was out of service for a four- week period for its Coast Guard mandated once very thirty- month drydock that included 1997 SOLAS upgrades, the addition of 25 passenger cabins and public area enhancements.

**ROBIN STREET WHARF FACILITY**

The New Orleans office building, which is located at Robin Street Wharf, contains approximately 46,000 square feet and houses Delta Queen's and American Hawaii's principal offices. The office building was expanded during 1997 for American Hawaii's passenger services and administrative offices relocated from Chicago, Illinois. The Company has been granted a preferential assignment and right to use the Robin Street Wharf by the Board of Commissioners of the Port of New Orleans (the "Board of Commissioners"). Of the approximately 158,000 square feet of property covered by the preferential assignment, approximately 1,000 linear feet represents river frontage access. The preferential assignment may

be terminated at any time by the Board of Commissioners, upon 60 days notice, provided that the Board of Commissioners determines that the wharf is needed for a non- passenger, superior maritime use. The Company believes it is unlikely that the Board of Commissioners will terminate the preferential assignment. If the assignment were to be terminated, the Board of Commissioners would be required to reimburse the Company for a portion of the unamortized cost of its wharf improvements. The Company believes that it could relocate its boarding, docking and office facilities to another location in New Orleans without a material adverse impact on the operations of the Company.

**CHICAGO LEASE**

The Company's principal executive offices are located at Two North Riverside Plaza, Chicago, Illinois. The Company currently leases approximately 37,000 square feet from Two North Riverside Joint Venture Limited Partnership, an Illinois limited partnership, controlled by an affiliated company, Equity Group Investments, Inc. After the relocation of American Hawaii's offices, the Company subleased, for a six month period, approximately 13,000 square feet to Equity Office Properties Trust, an affiliated company, at a rate which the Company believes to be competitive for comparable space from an unaffiliated landlord. The Company is marketing the subleased space for a long- term arrangement.

**HAWAII LEASE**

American Hawaii leases approximately 40,000 square feet of office, warehouse and parking space at 2100 Nimitz Highway, Honolulu, Hawaii.

**ITEM 3. LEGAL PROCEEDINGS**

There are no material legal proceedings, to which the Company is a party or of which any of its property is the subject, other than ordinary routine litigation and claims incidental to the business. The Company believes it maintains adequate insurance coverage and reserves for such claims.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

None.

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCKHOLDER MATTERS**

(a) The Company's common stock trades on the Nasdaq National Market tier of the Nasdaq Stock Market under the symbol: AMCV. On March 23, 1998, the last reported sale price for the Company's common stock was $22.00 per share. The following table indicates the high and low sales price information for shares of the Company's common stock as reported by The Nasdaq Stock Market:

| | | High | Low |
|---|---|---|---|
| QUARTER ENDED: | December 31, 1997.............. | $19.25 | $16.00 |
| | September 30, 1997............. | 18.25 | 10.25 |
| | June 30, 1997.................. | 11.88 | 9.88 |
| | March 31, 1997................. | 13.00 | 10.13 |
| QUARTER ENDED: | December 31, 1996.............. | 13.25 | 8.50 |
| | September 30, 1996............. | 10.00 | 6.75 |
| | June 30, 1996.................. | 9.50 | 7.38 |
| | March 31, 1996................. | 11.38 | 8.00 |

(b) The number of stockholders of record of common stock on March 23, 1998 was approximately 667.

(c) No dividends were declared in 1996 and 1997. The declaration and payment of future dividends will be within the discretion of the Company's Board of Directors. Payment of dividends will depend, among other things, upon the Company's operating performance and its planned capital requirements.

**ITEM 6. SELECTED FINANCIAL DATA**

Information with respect to the Company's selected financial data is set forth under "Selected Financial Data" on page 15.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

Management's discussion and analysis is set forth under "Management's Discussion and Analysis of Financial Condition and Results of Operations" on page 16.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Not Applicable.

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The consolidated financial statements and supplementary data are as set forth in the "Index to Consolidated Financial Statements" on page 14.

**ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**PART III**

**ITEMS 10, 11, 12 AND 13 DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT, EXECUTIVE COMPENSATION, SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

The Company will file a definitive proxy statement with the Securities and Exchange Commission pursuant to Regulation 14A under the Securities Exchange Act of 1934 (the "Proxy Statement") relating to the Company's Annual Meeting of Stockholders to be held on June 3, 1998, not later than April 29, 1998. Information required by Items 10 through 13 will appear in the Proxy Statement and is incorporated herein by reference.

**PART IV**

ITEM 14. EXHIBITS, FINANCIAL STATEMENT SCHEDULES AND REPORTS ON FORM 8-K

(a)(1) Financial Statements.
The consolidated financial statements of the Company are set forth in the "Index to Consolidated Financial Statements" on page 14.

(a)(2) Financial Statement Schedules.

Financial Statement Schedules, except those indicated in the "Index to Consolidated Financial Statements" on page 14, have been omitted because they are not applicable, not required under the instructions,

or all the information required is set forth in the financial statements or the notes to the financial statements.
(a)(3) Exhibits are as set forth in the "INDEX TO EXHIBITS" on page 40.

(b) Reports on Form 8- K:
None.

**SIGNATURES**

Pursuant to the requirements of Section 13 and 15(d) of the Securities and Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

```
Date  March 30, 1998
                                             AMERICAN CLASSIC VOYAGES CO.
                                             By  /s/  Philip C. Calian
                                                 Philip C. Calian
                                                 Chief Executive Officer
```

Pursuant to the requirements of the Securities and Exchange Act of 1934, as amended, has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

/s/ Samuel Zell Chairman of the Board

---

Samuel Zell

/s/ Philip C. Calian President and Chief Executive Officer - - - - - - - - - - - - - - - - - - - - - - - - - (Principal Executive Officer), Director Philip C. Calian

```
/s/ O. Ivy Wu              Treasurer and Chief Accounting Officer
-------------------------  (Principal Accounting Officer)
O. Ivy Wu
/s/ Sheli Z. Rosenberg     Director
Sheli Z. Rosenberg
/s/ Arthur A. Greenberg    Director
Arthur A. Greenberg
/s/ Ann Lurie              Director
Ann Lurie
/s/ Jerry R. Jacob         Director
Jerry R. Jacob
/s/ Joseph P. Sullivan     Director
Joseph P. Sullivan
```

**AMERICAN CLASSIC VOYAGES CO.**

# INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page Number |
|---|---|
| Selected Financial Data | 15 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 16 |
| Independent Auditors' Report | 21 |
| Consolidated Financial Statements | |
| Consolidated Balance Sheets | 22 |
| Consolidated Statements of Operations | 23 |
| Consolidated Statements of Cash Flows | 24 |
| Consolidated Statements of Changes in Stockholders' Equity | 25 |
| Notes to Consolidated Financial Statements | 26 |
| Financial Statement Schedules | |
| Schedule I - Condensed Financial Information of Registrant | 36 |

## AMERICAN CLASSIC VOYAGES CO.

## SELECTED FINANCIAL DATA

| | Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 1997 | 1996 | 1995 | 1994 | 1993(1) |
| INCOME STATEMENT DATA | | | | | |
| (Amounts in thousands) | | | | | |
| Revenues | $177,884 | $190,408 | $188,373 | $195,197 | $121,689 |
| Gross profit | 66,589 | 67,863 | 51,895 | 51,569 | 38,708 |
| One-time charges(2) | -- | 38,390 | 5,900 | 5,699 | -- |
| Operating income (loss) | 9,984 | (30,465) | (14,535) | (4,438) | 6,349 |
| Other income (3) | -- | 11,729 | -- | -- | -- |
| Net interest (expense) income | (5,935) | (7,199) | (4,002) | 672 | 577 |
| Net income (loss) | $ 2,429 | $(17,636) | $ (9,671) | $ (983) | $ 4,220 |
| PER SHARE INFORMATION | | | | | |
| Basic earnings (loss) per share | $ 0.17 | $ (1.28) | $ (0.70) | $ (0.07) | $ 0.38 |
| Diluted earnings (loss) per share | $ 0.17 | $ (1.28) | $ (0.70) | $ (0.07) | $ 0.36 |
| Cash dividends per share | $ -- | $ -- | $ 0.08 | $ 0.16 | $ 0.16 |
| OPERATING STATISTICS | | | | | |
| Fare revenue per passenger night | $ 228 | $ 216 | $ 208 | $ 202 | $ 220 |
| Total revenue per passenger night | $ 302 | $ 287 | $ 288 | $ 297 | $ 302 |
| Weighted average operating days(4): | | | | | |
| DELTA QUEEN | 337 | 347 | 263 | 339 | 339 |
| AMERICAN HAWAII | 337 | 366 | 272 | 303 | 147 |
| Vessel capacity per day (berths)(5): | | | | | |
| DELTA QUEEN | 1,026 | 1,024 | 1,024 | 588 | 596 |
| AMERICAN HAWAII | 844 | 817 | 1,594 | 1,544 | 1,526 |
| Passenger nights(6) | 588,892 | 643,891 | 628,660 | 632,373 | 382,823 |
| Physical occupancy percentage(7) | 93.5% | 98.4% | 89.6% | 94.8% | 89.8% |
| BALANCE SHEET DATA (at period end) | | | | | |
| (Amounts in thousands) | | | | | |
| Total assets | $210,895 | $211,864 | $247,473 | $227,798 | $192,598 |
| Current portion of long-term debt | 4,100 | 4,100 | 3,746 | -- | -- |
| Long-term debt | 81,488 | 85,898 | 103,272 | 65,000 | 15,000 |
| Total stockholders' equity | 59,219 | 54,982 | 71,413 | 82,105 | 84,786 |

(1) Includes the effects of the Mississippi River flooding and the acquisition of American Hawaii.

(2) In 1996, the Company decided not to renovate and return the Constitution to service, resulting in write- down costs of $38.4 million ($1.89 per share - net of tax on both a basic and diluted basis). In 1995, the Company incurred a $5.9 million ($0.28 per share- net of tax on both a basic and diluted basis) one- time charge that represented costs associated with the introduction of the American Queen in June of 1995. In 1994, the Company incurred $5.7 million ($0.20 per share- net of tax on both a basic and diluted basis) in one- time charges due to problems related to the renovation of the Independence.
(3) In 1996, the Company sold its Maison Dupuy Hotel located in New Orleans, Louisiana for a gain of $11.7 million ($0.57 per share - net of tax on both a basic and diluted basis).
(4) Weighted average operating days for each cruise line is determined by dividing capacity passenger nights for each cruise line by the cruise line's total vessel capacity per day. Capacity passenger nights is determined by multiplying the actual operating days of the vessel by each vessel's capacity per day.
(5) Vessel capacity per day represents the number of passengers each cruise line can carry assuming double occupancy for cabins which accommodate two or more passengers. Some cabins on the Independence and the American Queen can accommodate three or four passengers.
(6) A passenger night represents one passenger spending one night on a vessel; for example, one passenger taking a three-night cruise would generate three passenger nights.
(7) Physical occupancy percentage is passenger nights divided by capacity passenger nights.

**AMERICAN CLASSIC VOYAGES CO.**

**MANAGEMENT'S DISCUSSION AND ANALYSIS**

**OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW**

American Classic Voyages Co. ("AMCV", or along with its subsidiaries, the "Company"), is a holding company which owns and controls The Delta Queen Steamboat Co. ("DQSC") and Great Hawaiian Cruise Line, Inc. ("GHCL"). The Company, through its various subsidiaries, operates two cruise lines: The Delta Queen Steamboat Co. ("Delta Queen"), which owns and operates the American Queen, Mississippi Queen and Delta Queen steamboats; and American Hawaii Cruises ("American Hawaii"), which owns and operates the Independence steamship. Delta Queen also owned and operated the Maison Dupuy Hotel (the "Hotel") which is located in New Orleans, prior to its sale in October 1996. American Hawaii also owned the Constitution steamship which was removed from service in June 1995 and sold on November 4, 1997.
The following is a review of the Company's consolidated operating results, liquidity, capital resources and financial condition for the calendar years ended December 31, 1997, 1996 and 1995 (referred to herein as 1997, 1996 and 1995). Certain previously reported amounts have been reclassified to conform to the 1997 presentation.

**REVIEW OF 1997 AND RECENT EVENTS**

In 1997, the Company's results of operations were affected by the following factors: (i) the improved performance of Delta Queen's operations; (ii) the four week drydock of the Independence; and (iii) costs associated with the relocation and integration of American Hawaii's principal offices into Delta Queen's existing offices and costs incurred for planning to increase capacity at American Hawaii. At Delta Queen, cruise gross profit increased by $7.2 million over the prior year due to increases in fare revenue per passenger night ("fare per diems") while cruise operating costs were consistent with the prior year's levels. Additional cost control was achieved in cruise selling, general, and administrative expenses, which declined by 10% from the prior year. At American Hawaii, the Independence was out of service for a four- week period ending June 13, 1997 for its once every 30- month drydock, which was completed on time and within its budget. With the buildout of 25 new passenger cabins, the vessel's potential revenue producing capability was increased and passenger area enhancements improved the overall appearance of the vessel. During the drydock, the vessel was also brought into compliance with the applicable Safety of Life at Sea Convention fire safety amendments. During 1997, the Company incurred $1.6 million of expenses related to potential capacity expansion at American Hawaii (as further discussed below) and for the relocation of American Hawaii's principal offices from Chicago to New Orleans. These factors, among others,

HMS0096698

resulted in the Company reporting consolidated operating income of $10.0 million in 1997 compared to an operating loss of $30.5 million in 1996. The 1996 operating loss included a write- down of $38.4 million related to the Constitution and $1.4 million of operating income related to the Hotel which was sold in October 1996.
On October 17, 1997, the Company announced its plans to expand capacity at American Hawaii. The expansion plans have been made possible by a recently enacted law establishing a pilot project to develop the U.S.- flag cruise ship industry and stimulate commercial construction in U.S. shipyards. The shipbuilding pilot project was included in the Department of Defense Appropriations Act for Fiscal Year 1998. The law enables an operator of a U.S.- flag vessel, who commits to building two privately funded cruise ships in a U.S. shipyard, to temporarily operate an existing foreign- flag cruise ship while the new ships are under construction. The Company intends to construct two new cruise ships over the next seven years and plans for American Hawaii to introduce another vessel in the Hawaii market as early as mid- 1999 while awaiting construction of the new vessels.

**YEAR ENDED DECEMBER 31, 1997 COMPARED TO YEAR ENDED DECEMBER 31, 1996**
Consolidated revenues for 1997 decreased $12.5 million to $177.9 million from $190.4 million for 1996 representing a $6.6 million decrease in cruise revenues combined with a $5.9 million decrease in Hotel revenues as a result of the Hotel sale. Delta Queen's cruise revenues increased $7.1 million, reflecting an 12% increase in fare per diems combined with an 11% increase in revenue from air and land packages. The increase in fare per diems as compared to 1996 was attributable to a reduction in the use of discounts to fill open inventory close to a sailing date. American Hawaii's revenues decreased $13.7 million as a result of an 8% decrease in operating days due to the Independence drydock combined with a 3% decrease in fare per diems and a 9% decrease in occupancy. Consolidated fare per diems for 1997 increased 6% to $228, and consolidated total revenue per passenger night increased 5% to $302, as the increase in fare per diems at Delta Queen more than offset the decrease in fare per diems at American Hawaii.
Consolidated cost of operations decreased $11.2 million to $111.3 million for 1997 from $122.5 million for 1996. Hotel-related costs of operations represented $1.9 million of the 1996 costs. American Hawaii's operating costs decreased $9.2 million primarily as a result of the Independence drydock while Delta Queen's cruise operating costs decreased $0.1 million. Savings in Delta Queen's passenger and vessel expenses were offset by an increase in air and land package expense corresponding to the increased sales of air and land packages.
Consolidated SG&A decreased $4.4 million to $41.0 million for 1997 from $45.4 million for the prior year. Of the $4.4 million decrease, $2.3 million was attributable to the Hotel, with the remainder of the decrease primarily due to cost savings at Delta Queen. Also included in SG&A expenses for 1997 were $1.6 million of American Hawaii's office relocation costs and costs incurred for planning for capacity expansion in Hawaii. The $1.0 million increase in depreciation and amortization expense was primarily attributable to the recently completed Independence drydock and capital improvements on Delta Queen vessels during lay- ups earlier in the year.
In the first quarter of 1996, the Company recognized an impairment write- down of $38.4 million related to its decision not to renovate or return the Constitution to service. As the vessel was sold in November 1997 for net sale proceeds of $1.8 million, the salvage value of the vessel was written down from $2.5 million to $1.8 million. This write- down was offset by a reduction in the reserve set- up for the estimated costs to be incurred on behalf of the vessel until its eventual disposition.
Consolidated cruise operating income for 1997 was $10.0 million as compared to a cruise operating income of $6.5 million, excluding the Constitution write- down and Hotel operations in 1996. Hotel operating income in 1996 was $1.4 million.
Interest expense decreased $1.1 million due to a lower outstanding debt balance in 1997. The Company's consolidated effective tax rate increased to 40% in 1997 from 32% in the prior year as the Company recognized certain state tax expenses in 1997.
**YEAR ENDED DECEMBER 31, 1996 COMPARED TO YEAR ENDED DECEMBER 31, 1995**
Consolidated revenues increased $2.0 million to $190.4 million for 1996 from $188.4 million for 1995 representing a $3.6 million increase in cruise revenues offset by a $1.6 million decrease in Hotel revenues as a result of the Hotel being sold on October 16, 1996. American Hawaii's revenues decreased $10.2 million, or 10%. This decrease was mainly due to a 31% decrease in capacity as a result of the Constitution's removal from service on June 27, 1995, partially offset by improvements on the Independence in fare per diems which increased by 15% compared to 1995. Delta Queen's revenues increased $13.8 million, or 18%, reflecting a 32% increase in passenger nights for the period, offset by a 11% decrease in fare per diems. The decrease in fare per diems as compared to 1995 was attributable to management's strategy of

discounting fares in 1996 in an effort to maintain historically high occupancy levels and to help shift the booking cycle of when a majority of its cabin inventory is sold to its optimal schedule of six to nine months in advance. The consolidated fare per diems for 1996 increased 4% to $216 as the increase in American Hawaii's fare per diems more than offset the decrease in Delta Queen's fare per diems. Consolidated total revenue per passenger night decreased slightly to $287 due to a reduction in the percentage of passengers at both cruise lines electing to purchase air travel through the Company.

Consolidated cost of operations decreased to $122.5 million for 1996 from $136.5 million for the comparable period of 1995. Of this decrease, $0.5 million represents a reduction of Hotel related cost of operations. American Hawaii's operating costs decreased $24.3 million primarily due to the Constitution's removal from service and realization of operating cost savings on the Independence as a result of cost cutting efforts undertaken since the second half of 1995. Delta Queen's operating costs increased $10.9 million, or 23%, primarily due to the addition of the American Queen, which was placed in service in June 1995.

Consolidated SG&A decreased to $45.4 million for 1996 from $48.6 million for the same period in 1995. Delta Queen's additional capacity resulted in increased marketing and corporate overhead expenditures but was offset by the reduction in American Hawaii's marketing and corporate overhead expenditures as only one ship was in operation. The $2.7 million increase in depreciation and amortization expense represents a $3.0 million increase in depreciation expense offset by a $0.3 million decrease in amortization expense. The increase in depreciation was due to the addition of the American Queen while depreciation at American Hawaii remained unchanged as the increased depreciation on the Independence was offset by the suspension of depreciation on the Constitution upon its removal from service in 1995.

After evaluating the scope and cost of the Constitution reconstruction project as well as considering various alternatives, the Company announced in April 1996 its decision not to renovate or return the Constitution to service. In connection with this decision, the Company recognized an impairment write- down of $38.4 million in the first quarter of 1996.

The $38.4 million impairment write- down was composed of (i) $36.1 million directly related to the write- down of the vessel and its allocated goodwill to an estimated salvage value of $2.5 million, and (ii) $2.3 million which represented the remaining goodwill balance from the American Hawaii acquisition. The Company has reserved for the estimated costs to be incurred on behalf of the Constitution until its eventual disposition. These costs include insurance, wet berthing fees and general maintenance of the vessel. As of December 31, 1996, the balance of this reserve was $2.8 million. The impairment write- down was recognized in accordance with the Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long- Lived Assets and for Long- Lived Assets to be Disposed of", which the Company adopted effective January 1, 1996.

Excluding this write- down, the consolidated operating income for 1996 was $7.9 million as compared to an operating loss, before one- time pre- opening costs of $5.9 million, of $8.6 million in 1995.

Interest expense increased $2.4 million due to a greater outstanding debt balance in 1996 and capitalization of interest costs in 1995 related to the American Queen construction. The Company's consolidated effective tax rate was lower in 1996 as compared to 1995. As the minority interest in GHCL was redeemed in December 1995, the net loss for 1996 reflected 100% ownership of GHCL by the Company.

**LIQUIDITY, CAPITAL RESOURCES AND FINANCIAL CONDITION**

Operating Activities

Cash provided by operations was $22.4 million in 1997 compared to $15.0 million in 1996, reflecting the improved operating performance of Delta Queen. Cash used in operations in 1995 of $9.9 million reflected the lower operating performance of American Hawaii in that year and a one- time charge related to the launch of the American Queen in the summer of 1995.

Capital Expenditures

The Company's capital expenditures were $22.3 million in 1997 as compared to $15.4 million in 1996 and $45.2 million in 1995. The largest portion of the 1997 capital expenditures was related to the Independence drydock which cost $13.4 million, of which $1.0 million represented repairs and maintenance. Other significant vessel capital expenditures included $5.0 million related to Delta Queen lay- ups, which included the completion of the December 1997 Mississippi Queen lay- up.

In addition, as a result of the Company's decision to relocate the sales, marketing, and accounting departments of American Hawaii from Chicago to New Orleans, the current operating facility at Robin Street Wharf was expanded and upgraded at a capitalized cost of $2.5 million.

HMS0096700

The Company's significant planned capital commitments in 1998 include lay- ups of the American Queen and Delta Queen, in which certain renovations will be performed. The American Queen was out of service for 15 days, starting January 2, 1998 while the Delta Queen's scheduled 82 day lay- up began December 13, 1997. The lay- ups for these two vessels, including repairs and maintenance, are expected to cost $5.1 million and will be funded from cash on hand and cash from operations.

Debt

As of December 31, 1996, the Company's restricted short- term investments included an escrow account of $0.3 million for the remaining American Queen construction costs and a debt service deposit of $2.2 million related to the Independence Maritime Administration ("MARAD") debt. As American Hawaii met certain cash flow ratios as of December 31, 1996, the debt service deposit was released to the Company in April 1997. Additionally, the escrow balance related to the American Queen was released to the Company in October 1997 and was used to pay down the principal balance of the American Queen MARAD debt.

As of December 31, 1997, the Company complied with all covenants under its various debt agreements.

The Company believes it will have adequate access to capital resources, both internally and externally, to meet its short- term and long- term capital commitments. Such resources may include cash on hand and the ability to secure additional financing through the capital markets. The Company continually evaluates opportunities to increase capacity at both Delta Queen and American Hawaii and to strategically grow its business. As discussed above, the Company recently announced plans to expand capacity at American Hawaii. As it proceeds with such plans, the Company intends to seek additional financing, although it has not yet determined the nature or amount of such financing. Although the Company believes that it will be able to obtain sufficient funding from the capital markets to construct the new vessels, there can be no assurances that the Company will be able to obtain additional financing at commercially acceptable levels to finance such new construction and, if the Company so chooses, to pursue a strategic business opportunity.

Other

The sale of the Constitution was completed on November 4, 1997 when the vessel was delivered to the buyer and net sales proceeds of $1.8 million were received by the Company.

The Federal Maritime Commission ("FMC") regulates passenger vessels with 50 or more berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. The Company has been approved as a self- insurer by the FMC, and therefore, subject to continued approval, is not required to post security for passenger cruise deposits. The FMC has reviewed its standards and in June 1996 issued proposed regulations to increase the financial responsibility requirements. The Company filed its objection to the proposals, as it believes that the FMC's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. If implemented, these proposed regulations would be phased in over time and, among other things, would require operators qualifying as a self- insurer, such as the Company, to satisfy a working capital test, in addition to the existing net worth test, and to provide third- party coverage for 25% of its unearned passenger revenue in the form of a surety bond or similar instrument. At this time, the Company cannot predict if the proposed changes will be approved as currently constituted, or at all. If they are implemented, the proposed changes would require that the Company establish a bond to cover a portion of its passenger deposits and payments, which may impact the Company's liquidity.

On June 11, 1997, the Board of Directors of the Company approved a stock repurchase plan. The plan authorizes the Company to repurchase up to one million shares of its stock. These shares may be purchased from time to time in the public market or through privately negotiated transactions. As of December 31, 1997, the Company has not repurchased any shares under the plan.

Year 2000

The Company has conducted a preliminary review of its computer systems to identify the systems that could be affected by the "Year 2000" problem. The Year 2000 problem is the result of computer programs being written using two digits rather than four to define the applicable year. Any of the Company's programs that have time- sensitive software may recognize a date using "00" as the year 1900 rather than the year 2000. This could result in a major system failure, miscalculations and/or other unanticipated problems. The Company has conducted preliminary testing of its systems and believes that it has no significant Year 2000 compliance issues. The system review and testing will continue in 1998.

The Company has also taken steps to communicate with its vendors to coordinate Year 2000 compliance. The Company believes that the expense of the Year 2000 problem will not have a material effect on its financial position or results of operations. The costs, if any, will be expensed as incurred, in compliance with generally accepted accounting principles.

Factors Concerning Forward- Looking Statements

Certain statements in "Management's Discussion and Analysis of Financial Condition and Results of Operations" constitute "forward- looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward- looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements expressed or implied by such forward- looking statements. Such factors include, among others, the following: general economic and business conditions which may impact passenger yields and occupancy; weather patterns affecting either the inland waterways in the Continental U.S. or the Hawaiian Islands; unscheduled repairs and drydocking of the Company's vessels; construction delays and/or cost overruns during regularly scheduled lay- ups and/or drydocks; delays and/or costs overruns during the development and/or construction of new vessels; the impact of changes and/or repeal of laws and implementation of government regulations; an increase in capacity at American Hawaii or pursuit of a strategic business opportunity; and the ability to obtain additional financing, if necessary.

**INDEPENDENT AUDITORS' REPORT**

The Board of Directors and Stockholders
American Classic Voyages Co.

We have audited the consolidated balance sheets of American Classic Voyages Co. and subsidiaries as of December 31, 1997 and 1996, and the related consolidated statements of operations, changes in stockholders' equity and cash flows for each of the years in the three- year period ended December 31, 1997. In connection with our audits of the consolidated financial statements, we also have audited the financial statement schedule. These consolidated financial statements and financial statement schedule are the responsibility of management of American Classic Voyages Co. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of American Classic Voyages Co. and subsidiaries as of December 31, 1997 and 1996 and the results of their operations and their cash flows for each of the years in the three- year period ended December 31, 1997, in conformity with generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

/s/ KPMG Peat Marwick LLP
KPMG Peat Marwick LLP

Chicago, Illinois
February 20, 1998

**AMERICAN CLASSIC VOYAGES CO.**

## CONSOLIDATED BALANCE SHEETS

(In thousands, except shares and par value)

| | December 31, 1997 | 1996 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents................ | $ 19,187 | $ 17,908 |
| Restricted short-term investments........ | 325 | 2,957 |
| Accounts receivable...................... | 1,299 | 3,734 |
| Prepaid expenses and other current assets | 7,813 | 7,640 |
| Total current assets.................. | 28,624 | 32,239 |
| Property and equipment, net.............. | 171,105 | 166,883 |
| Deferred income taxes, net............... | 9,564 | 10,968 |
| Other assets............................. | 1,602 | 1,774 |
| Total assets.......................... | $210,895 | $211,864 |
| LIABILITIES | | |
| Accounts payable......................... | $ 14,282 | $ 10,683 |
| Other accrued liabilities................ | 18,093 | 24,532 |
| Current portion of long-term debt........ | 4,100 | 4,100 |
| Unearned passenger revenues.............. | 33,713 | 31,669 |
| Total current liabilities............. | 70,188 | 70,984 |
| Long-term debt, less current portion..... | 81,488 | 85,898 |
| Total liabilities..................... | 151,676 | 156,882 |
| COMMITMENTS AND CONTINGENCIES | | |
| STOCKHOLDERS' EQUITY | | |
| Preferred stock, $.01 par value (5,000,000 shares authorized, none issued and outstanding)................. | -- | -- |
| Common stock, $.01 par value (20,000,000 shares authorized, 14,006,015 and 13,867,829 shares issued and outstanding, respectively).............. | 140 | 139 |
| Additional paid-in capital............... | 77,059 | 75,252 |
| Accumulated deficit...................... | (17,980) | (20,409) |
| Total stockholders' equity............ | 59,219 | 54,982 |
| | $210,895 | $211,864 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except per share data)

| | Years Ended December 31, 1997 | 1996 | 1995 |
|---|---|---|---|
| Revenues............................................ | $177,884 | $190,408 | $188,373 |
| Cost of operations (exclusive of depreciation and amortization shown below)........................... | 111,295 | 122,545 | 136,478 |
| Gross profit........................................ | 66,589 | 67,863 | 51,895 |
| Selling, general and administrative expenses........... | 41,015 | 45,367 | 48,613 |
| Depreciation and amortization expense.................. | 15,590 | 14,571 | 11,917 |
| Impairment write-down (Note 4)......................... | -- | 38,390 | -- |
| One-time pre-opening costs............................. | -- | -- | 5,900 |
| Operating income (loss)................................ | 9,984 | (30,465) | (14,535) |

| | | | |
|---|---|---|---|
| Interest income | 1,028 | 912 | 1,706 |
| Interest expense | 6,963 | 8,111 | 5,708 |
| Other income | -- | 11,729 | -- |
| Income (loss) before income taxes and minority interest | 4,049 | (25,935) | (18,537) |
| Income tax (expense) benefit | (1,620) | 8,299 | 6,308 |
| Minority interest in loss | -- | -- | 2,558 |
| Net income (loss) | $ 2,429 | $(17,636) | $ (9,671) |
| PER SHARE INFORMATION: | | | |
| Basic: | | | |
| Basic weighted average shares outstanding | 13,952 | 13,802 | 13,763 |
| Earnings (loss) per share | $ 0.17 | $ (1.28) | $ (0.70) |
| Diluted: | | | |
| Diluted weighted average shares outstanding | 14,338 | 13,802 | 13,763 |
| Earnings (loss) per share | $ 0.17 | $ (1.28) | $ (0.70) |

The accompanying notes are an integral part of these Consolidated Financial Statements.

## AMERICAN CLASSIC VOYAGES CO.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

(Amounts in thousands)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| OPERATING ACTIVITIES | | | |
| Net income (loss) | $ 2,429 | $ (17,636) | $ (9,671) |
| ADJUSTMENTS TO RECONCILE NET INCOME (LOSS) TO NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | | | |
| Depreciation and amortization | 15,590 | 14,571 | 11,917 |
| Minority interest | -- | -- | (2,558) |
| Impairment write-down (Note 4) | -- | 38,390 | -- |
| Gain on sale of assets | -- | (11,729) | -- |
| Changes in certain working capital accounts and other | | | |
| Accounts receivable | 2,435 | (2,600) | 190 |
| Accounts payable | 3,599 | (2,305) | (3,971) |
| Accrued liabilities | (5,344) | (289) | 1,537 |
| Other assets | 1,576 | (6,400) | (6,869) |
| Unearned passenger revenues | 2,044 | 3,137 | (2,534) |
| Prepaid expenses and other | 85 | (123) | 2,012 |
| Net cash provided by (used in) operating activities | 22,414 | 15,016 | (9,947) |
| INVESTING ACTIVITIES | | | |
| Decrease in restricted investments | 2,632 | 7,724 | 9,706 |
| Capital expenditures | (22,326) | (15,355) | (45,227) |
| Proceeds from sale of assets | 1,830 | 21,522 | -- |
| Net cash (used in) provided by investing activities | (17,864) | 13,891 | (35,521) |
| FINANCING ACTIVITIES | | | |
| Proceeds from borrowings | -- | 6,903 | 117,018 |
| Repayments of borrowings | (4,410) | (23,923) | (75,000) |
| Purchase of subsidiary minority interest | -- | -- | (105) |
| Issuance of common stock | 1,139 | 368 | 80 |
| Dividends | -- | -- | (1,101) |
| Deferred financing fees | -- | (395) | (1,600) |

| | | | |
|---|---|---|---|
| Net cash (used in) provided by financing activities | (3,271) | (17,047) | 39,292 |
| Increase (decrease) in cash and cash equivalents | 1,279 | 11,860 | (6,176) |
| Cash and cash equivalents, beginning of period | 17,908 | 6,048 | 12,224 |
| Cash and cash equivalents, end of period | $19,187 | $ 17,908 | $ 6,048 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Cash paid (refunded) during the period for: | | | |
| Interest (net of capitalized interest) | $ 6,223 | $ 7,364 | $ 3,000 |
| Income taxes | $ 249 | $ 450 | $ (119) |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**AMERICAN CLASSIC VOYAGES CO.**

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

(Amounts in thousands)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| COMMON STOCK | | | |
| Balance, beginning of period | $ 139 | $ 138 | $ 138 |
| Issuance of common stock | 1 | 1 | -- |
| Balance, end of period | 140 | 139 | 138 |
| ADDITIONAL PAID-IN CAPITAL | | | |
| Balance, beginning of period | 75,252 | 74,048 | 73,968 |
| Issuance of common stock | 1,588 | 1,204 | 80 |
| Issuance of stock units, net | 219 | -- | -- |
| Balance, end of period | 77,059 | 75,252 | 74,048 |
| ACCUMULATED DEFICIT | | | |
| Balance, beginning of period | (20,409) | (2,773) | 7,999 |
| Net income (loss) | 2,429 | (17,636) | (9,671) |
| Dividends | -- | -- | (1,101) |
| Balance, end of period | (17,980) | (20,409) | (2,773) |
| Total stockholders' equity | $ 59,219 | $ 54,982 | $71,413 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

**AMERICAN CLASSIC VOYAGES CO.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**NOTE 1. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**NATURE OF OPERATIONS**

American Classic Voyages Co., through its subsidiaries, operates two cruise lines under the names of The Delta Queen teamboat Co. and American Hawaii Cruises. The Delta Queen Steamboat Co., through its subsidiaries, owns and operates the American Queen, Mississippi Queen and Delta Queen steamboats which conduct overnight cruise operations on

certain U.S. inland waterways ("Delta Queen"). Delta Queen also owned and operated the Maison Dupuy Hotel (the "Hotel") located in New Orleans, prior to its sale in October 1996. American Hawaii Cruises, through its subsidiaries owns and operates the Independence steamship providing overnight cruises among the Hawaiian Islands. American Hawaii also owned the Constitution steamship which was removed from service in June 1995 and was sold on November 4, 1997.

**PRINCIPLES OF CONSOLIDATION**

The accompanying Consolidated Financial Statements include the accounts of American Classic Voyages Co. ("AMCV") and its wholly owned subsidiaries, The Delta Queen Steamboat Co. ("DQSC"), and Great Hawaiian Cruise Line, Inc. ("GHCL") (collectively with such subsidiaries, the "Company"). The Company acquired an 80% interest in GHCL in August 1993 and subsequently in December 1995 acquired the remaining 20% interest from minority interest shareholders. The accompanying Consolidated Financial Statements have been prepared in accordance with generally accepted accounting principles. All significant intercompany accounts and transactions have been eliminated in consolidation. Certain previously reported amounts have been reclassified to conform to the 1997 presentation.

**USE OF ESTIMATES**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**CASH AND CASH EQUIVALENTS**

All highly liquid investments purchased with an original maturity of three months or less are considered cash equivalents.

**RESTRICTED SHORT- TERM INVESTMENTS**

As of December 31, 1997, the restricted short- term investments reflected cash pledged as collateral on outstanding letters of credit related to certain contracts with vendors. As of December 31, 1996, the balance also included deposits set- up in connection with the U.S. Government guaranteed ship financing secured by the Company. Those deposits were released to the Company in 1997, as further discussed in Note 6.

**PROPERTY AND EQUIPMENT**

Property and equipment primarily consists of vessels and leasehold improvements which are recorded at cost. Construction- in- progress represents expenditures for the vessels under construction, renovation, lay- up and/or drydock. Depreciation is computed using the straight- line method based upon the estimated useful lives of the various classes of assets ranging from 3 to 40 years. Lay- up and drydock expenditures relating to vessel improvements or betterments are capitalized. In addition, lay- up and drydock expenditures relating to cleaning, repairs and maintenance are accrued evenly over the period to the next scheduled lay- up and/or drydock and are included in other accrued liabilities. Interest costs incurred during vessel construction periods were capitalized into the cost of the related vessels. In 1996, the cost and related accumulated depreciation of the Hotel building and land were removed upon the sale of the Hotel as discussed in Note 5. The Company reviews long- lived assets, identifiable intangibles, goodwill, and reserves for impairment whenever events or changes in circumstances indicate the carrying amount of the assets may not be fully recoverable. In 1996 and 1997, the Company reduced the cost of the Constitution to its salvage value as further discussed in Note 4.

**GOODWILL**

In August 1993, the Company acquired substantially all the assets and certain liabilities of American Global Line Inc. The acquisition was accounted for as a purchase. In connection with this purchase, goodwill was recorded for the excess of purchase price over the fair value of the net assets acquired and was being amortized over its estimated useful life of 25 years using the straight- line method. In 1995, goodwill was decreased by approximately $4.2 million due to the repurchase of equity from GHCL's minority interest shareholders for $0.1 million. In 1996, in connection with its decision not to return the Constitution to service, the Company wrote- off the remaining goodwill balance (see Note 4). Amortization expense for 1996 and 1995 was $52,000 and $383,000 respectively.

**INCOME TAXES**

Deferred tax assets and liabilities are recognized for the expected future tax consequences of temporary differences between carrying amounts and the tax bases of other assets and liabilities.

**REVENUE AND EXPENSE RECOGNITION**

The Company generally receives passenger fares up to 60 days prior to the cruise date. Prepaid passenger fares are deferred and recognized as revenue during the associated cruise. The Company is self- insured in respect of guaranteeing the Company's passenger cruise deposits. Advertising costs are expensed as incurred and are included in selling expense.

**EARNINGS PER SHARE INFORMATION**

In February 1997, the Financial Accounting Standards Board issued Statement of Financial Standards ("SFAS") No. 128, "Earnings Per Share", which requires dual presentation of basic and diluted earnings per share. The Company has adopted the new standard and earnings per share information for prior years has been restated accordingly.
Basic earnings per share is computed by dividing net income by the weighted- average number of common shares outstanding. Diluted earnings per share is computed in a similar manner except that the denominator is increased to include dilutive potential common shares from stock options and stock units. See Note 2 for a reconciliation of basic and diluted earnings per share.

**FAIR VALUE OF FINANCIAL INSTRUMENTS**

The Company's financial instruments include restricted short- term investments, accounts receivable, accounts payable, other accrued expenses and long- term debt. At December 31, 1997 and 1996, the fair values of all financial instruments were not materially different from their carrying or contract values.

**STOCK- BASED COMPENSATION PLANS**

The Company has elected to account for employee stock- based compensation plans in accordance with Accounting Principles Board Opinion No. 25, as permitted under SFAS No. 123, "Accounting for Stock- Based Compensation". See Note 10 for pro forma effect for the fair value accounting method, as defined in SFAS No. 123.

**NEW ACCOUNTING PRONOUNCEMENT**

In June 1997, the Financial Accounting Standards Board issued SFAS No. 131 "Disclosure about Segments of an Enterprise and Related Information", which requires the reporting of certain information about operating segments and related disclosures about products and services, geographic areas, and major customers. The Company will adopt the new standard, as required, in 1998 and estimates its adoption will not have a material effect on the consolidated financial statements.

**NOTE 2. EARNINGS PER SHARE**

The earnings per share reconciliation presented below for the year ended December 31, 1997 has been prepared pursuant to the requirements of SFAS No. 128.

| In thousands, except per share amounts | Net Income (numerator) | Weighted Average Shares (denominator) | Per Share Amount |
|---|---|---|---|
| Basic earnings per share.................................. | $2,429 | 13,952 | $0.17 |
| Additional shares assuming exercise of dilutive stock options and immediate vesting of stock units......... | -- | 386 | |
| Diluted earnings per share................................ | $2,429 | 14,338 | $0.17 |

For the year ended December 31, 1997, options to purchase 119,000 shares of common stock at prices ranging from $18.88 to $20.00 were outstanding at December 31, 1997, but were not included in the computation of diluted earnings

per share because the options' exercise prices were greater than the average market prices of the common shares.
As the Company reported net losses for the years ended December 31, 1996 and 1995, diluted earnings per share was computed in the same manner as basic earnings per share. Therefore, at December 31, 1996 and 1995, outstanding options to purchase 1,730,553 and 1,503,381 shares of common stock, respectively, at prices ranging from $3.25 to $20.00, were not included in the computation of diluted earnings per share.

**NOTE 3. PROPERTY AND EQUIPMENT**

Property and equipment consisted of (in thousands):

| | December 31, 1997 | December 31, 1996 |
|---|---|---|
| Vessels.......................... | $210,715 | $196,347 |
| Buildings........................ | 8,590 | 6,253 |
| Construction-in-progress......... | 3,190 | 1,446 |
| Other............................ | 8,003 | 7,474 |
| | 230,498 | 211,520 |
| Less accumulated depreciation.... | (59,393) | (44,637) |
| | $171,105 | $166,883 |

During 1997, $0.8 million of fully depreciated assets that were no longer in use were written- off along with the related accumulated depreciation. At December 31, 1996, property and equipment included the estimated salvage value for the Constitution of $2.5 million. (see Note 4 for further information.)

**NOTE 4. IMPAIRMENT WRITE- DOWN**

The Constitution was removed from service on June 27, 1995 and was placed in wet berth at a shipyard in Portland, Oregon. In 1996, after evaluating the scope and cost of the Constitution reconstruction project as well as considering various alternatives, the Company announced its decision not to renovate or return the Constitution to service. The Company recognized an impairment write- down of $38.4 million, composed of (i) $36.1 million directly related to the write- down of the vessel and its allocated goodwill to an estimated salvage value of $2.5 million, and (ii) $2.3 million which represented the remaining goodwill balance from the GHCL acquisition. The Company reserved for the estimated costs to be incurred on behalf of the Constitution until its eventual disposition. These costs included insurance, wet berthing fees and general maintenance of the vessel.
On November 4, 1997, the Company sold the vessel for net sale proceeds of $1.8 million and as such, the salvage value of the vessel was written down from $2.5 million to $1.8 million. This write- down was offset by a reduction in the reserve set- up for the estimated costs to be incurred on behalf of the vessel, as mentioned above.

**NOTE 5. DISPOSITION OF ASSETS**

On October 16, 1996, the Company sold its subsidiary which owned the Hotel in New Orleans for $22.0 million in cash (the "Disposition"). In addition, the Company entered into a Profit Participation Agreement with the buyer which provided for future payments based on the future performance of the Hotel. The agreement was terminated in February 1998 when the Company received $0.3 million from the buyer. The Company also receives preferred rates at the Hotel for its passengers and employees who require lodging in New Orleans for two years from the date of the sale. In return, the Company has agreed to provide the buyer a minimum of $0.6 million of this business each year in the same time period.
Upon the sale of the Hotel, the Company paid down its then outstanding borrowings, which were $9.5 million under its credit agreement with a group of financial institutions with The Chase Manhattan Bank, as agent (the "Credit Agreement"). The balance of the Hotel sale proceeds were used for general corporate purposes.
The following pro forma financial information for the years ended December 31, 1996 and 1995 has been prepared as if the Disposition had occurred as of the beginning of each comparative period. In management's opinion, the pro forma financial information is not necessarily indicative of results that would have occurred had the Disposition taken place at the beginning of each period.

Unaudited Pro Forma

| In thousands, except per share amounts | Years Ended December 31, 1996 | 1995 |
|---|---|---|
| Revenues | $184,962 | $181,301 |
| Operating loss | (31,841) | (17,091) |
| Net loss | (17,940) | (3,435) |
| Loss per share-basic and diluted | $ (1.30) | $ (0.25) |

The pro forma financial information includes the following adjustments: (i) re- establishment of intercompany revenues and expenses between the Company and the Hotel previously eliminated in consolidation; (ii) decreased depreciation expense due to a lower capitalized interest balance as proceeds received from the Disposition were used to repay amounts outstanding on the Company's credit facility, and therefore, less interest expense was incurred and subject to capitalization; (iii) decreased interest expense due to reduced borrowings under the Company's credit facility as a result of the proceeds received from the Disposition.

**NOTE 6. LONG- TERM DEBT**

Long- term debt consists of (in thousands):

| | December 31, 1997 | 1996 |
|---|---|---|
| U.S. Government Guaranteed Ship Financing Note, American Queen Series, LIBOR+0.25% floating rate notes due semi-annually beginning February 24, 1996 through August 24, 2005 | $19,233 | $21,812 |
| U.S. Government Guaranteed Ship Financing Bond, American Queen Series, 7.68% fixed rate, sinking fund bonds due semi-annually beginning February 24, 2006 through June 2, 2020 | 36,198 | 36,353 |
| U.S. Government Guaranteed Ship Financing Note, Independence Series A, LIBOR+0.27% floating rate notes due semi-annually beginning June 7, 1996 through December 7, 2005 | 10,570 | 11,892 |
| U.S. Government Guaranteed Ship Financing Bond, Independence Series A, 6.84% fixed rate sinking fund bonds due semi-annually beginning June 7, 2006 through December 7, 2015 | 13,215 | 13,215 |
| U.S. Government Guaranteed Ship Financing Note, Independence Series B, LIBOR+0.27% floating rate notes due semi-annually beginning December 7, 1996 through December 7, 2005 | 2,832 | 3,186 |
| U.S. Government Guaranteed Ship Financing Bond, Independence Series B, 7.46% fixed rate sinking fund bonds due semi-annually beginning June 7, 2006 through December 7, 2015 | 3,540 | 3,540 |
| | 85,588 | 89,998 |
| Less current portion | 4,100 | 4,100 |
| | $81,488 | $85,898 |

Required principal payments on long- term debt over the next five years are $4.1 million for each of the years from 1998 to 2002. For the years ended December 31, 1997 and 1996, the weighted average interest rate on outstanding borrowings was approximately 6.9% and 7.0%, respectively.

The American Queen Series and the Independence Series A and B debt are guaranteed by the U.S. Government through the Maritime Administration ("MARAD") and are secured by first mortgages on the American Queen and the Independence, respectively. These Series contain various covenants which, among other things, require the compliance with certain financial ratios at the end of each year.

Upon the issuance of the Independence Series A and B debt in 1995 and 1996, $2.2 million was deposited into an account representing six months of debt service. The debt service deposit was released to the Company in 1997 as GHCL has met the required cash flow and debt to equity ratios as of December 31, 1996.

As of December 31, 1996, the Company's restricted short- term investments included an escrow account for remaining American Queen construction costs in the amount of $0.3 million, which was released to the Company in October 1997 and was used to pay down the principal balance of the American Queen Series.

The Company has a revolving credit facility under the Credit Agreement which provides for borrowings of up to $15.0 million with a final maturity on March 31, 1999. In 1997, no borrowings were outstanding at any time under this facility. Borrowings bear interest, at the option of the Company, equal to either a LIBOR rate or prime rate basis. The Company is also required to pay a commitment fee on the unused portion of the facility at a rate ranging from 0.375% to 0.5% per annum. The Credit Agreement is guaranteed by AMCV and secured by substantially all the assets of DQSC, excluding the American Queen. The Credit Agreement contains various limitations, restrictions and financial covenants which, among other things, requires maintenance of certain financial ratios, restricts additional indebtedness, limits intercompany advances to $20.0 million and limits the payment of dividends from DQSC to AMCV to $2.0 million per annum.

As of December 31, 1997, the Company complied with all covenants under its various debt agreements.

The Company believes it will have adequate access to capital resources, both internally and externally, to meet its short-term and long- term capital commitments. Such resources may include cash on hand and the ability to secure additional financing through the capital markets. The Company continually evaluates opportunities to increase capacity at both Delta Queen and American Hawaii and to strategically grow its business. The Company recently announced plans to expand capacity at American Hawaii and as it proceeds with such plans, the Company intends to seek additional financing, although it has not yet determined the nature or amount of such financing. Although the Company believes that it will be able to obtain sufficient funding from the capital markets to construct the new vessels, there can be no assurances that the Company will be able to obtain additional financing at commercially acceptable levels to finance such new construction and, if the Company so chooses, to pursue a strategic business opportunity.

**NOTE 7. COMMITMENTS AND CONTINGENCIES**

The Company leases certain facilities and equipment under operating leases. The Company currently leases approximately 37,000 square feet from a partnership controlled by an affiliated company, at an annual rate of approximately $173,000. In addition, the DQSC and GHCL headquarters is maintained pursuant to an assignment from local authorities. The Company paid approximately $160,000 and $172,000 under this arrangement for the years ended December 31, 1997 and 1996, respectively. This arrangement may be terminated at any time by the local authorities upon determination that a superior maritime use is deemed to exist. Rent expense for the years ended December 31, 1997, 1996 and 1995 was approximately $916,000, $848,000 and $854,000, respectively.

The future minimum lease commitments for the next five years and thereafter under all noncancelable operating leases, excluding assignment payments, as of December 31, 1997, are $565,000, $338,000, $325,000, $255,000, $215,000 and $421,000.

The Company is subject to litigation in the ordinary course of business. In the opinion of management, the outcome of such litigation will not have a material effect on the results of operations or financial position of the Company as most is covered by insurance, net of a deductible.

**NOTE 8. INCOME TAXES**

The provision (benefit) for income taxes consisted of (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| Current tax provision (benefit): | | | |
| Federal................................ | $ -- | $ -- | $ -- |
| State.................................. | 163 | (458) | -- |
| | 163 | (458) | -- |
| Deferred tax provision (benefit): | | | |
| Federal................................ | 1,323 | (9,073) | (6,422) |
| State.................................. | 134 | 1,232 | 114 |
| | 1,457 | (7,841) | (6,308) |
| Total tax provision (benefit).......... | $1,620 | $(8,299) | $(6,308) |

The provision (benefit) for income taxes differs from amounts computed by applying the U.S. statutory Federal income tax rate. The differences are summarized as follows (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| | 35% | 35% | 35% |
| Tax provision (benefit) at statutory rate.. | $1,417 | $(9,076) | $(6,488) |

| | | | |
|---|---|---|---|
| State income taxes (net of Federal benefit) | 193 | 503 | 74 |
| Non-deductible expenses.................... | 313 | 121 | 121 |
| Other...................................... | (303) | 153 | (15) |
| Total tax provision (benefit).............. | $1,620 | $(8,299) | $(6,308) |

The tax effects of temporary differences that gave rise to significant portions of the deferred tax assets and deferred tax liabilities are presented below (in thousands):

| | December 31, | |
|---|---|---|
| Deferred tax assets: | 1997 | 1996 |
| Insurance costs and reserves............... | $ 1,198 | $ 681 |
| Non-recurring executive compensation....... | 809 | 809 |
| Benefit cost accruals...................... | 483 | 428 |
| Alternative minimum tax credit carryforwards.................... | 2,196 | 2,196 |
| Drydock accruals........................... | 820 | 1,482 |
| Net operating loss carryforward............ | 33,041 | 23,559 |
| Goodwill, due to basis differences......... | 1,248 | 1,383 |
| Total deferred tax assets.................. | 39,795 | 30,538 |
| Deferred tax liabilities: | | |
| Capital construction fund.................. | 1,472 | 3,369 |
| Property plant and equipment, due to basis differences and depreciation, net.. | 28,759 | 15,650 |
| Other...................................... | -- | 551 |
| Total deferred tax liabilities............. | 30,231 | 19,570 |
| Net deferred tax asset..................... | $ 9,564 | $10,968 |

At December 31, 1997, consolidated net operating losses of approximately $3.0 million, $10.0 million, $36.0 million, $14.0 million and $29.0 million expiring in 2008, 2009, 2010, 2011, and 2012 respectively, were available to offset future taxable income of the Company.

In 1993, the Company established a capital construction fund (the "CCF") pursuant to Section 607 of the Merchant Marine Act of 1936, into which it deposited approximately $12.0 million. This fund was primarily used to pay liabilities assumed in the Acquisition and allowed the Company to accelerate recognition of certain deductions for qualified capital expenditures for income tax purposes. As a result of the CCF, the Company has approximately a $2.2 million alternative minimum tax credit carryforward available with no expiration date.

**NOTE 9. RELATED PARTY**

Equity Group Investments, Inc. ("EGI") and its affiliates provided certain administrative support services for the Company, including but not limited to legal, accounting, tax, benefit and insurance brokerage services. In addition, as previously mentioned in Note 7, the Company leases office space from an affiliate of EGI. In the aggregate, the fees charged by EGI and its affiliates for such services and rent were approximately $0.7 million, $1.5 million, and $1.4 million for the years ended December 31, 1997, 1996 and 1995, respectively. These arrangements with EGI and its affiliates are subject to approval by a majority of the non- affiliated members of the Company's Board of Directors, and are conducted on terms no less favorable to the Company than could be obtained from unaffiliated third parties.

In late 1997, the Company subleased approximately 13,000 square feet of Chicago office space to Equity Office Properties Trust, an affiliate of EGI. For the year ended December 31, 1997, approximately $23,000 was received by the Company under the sublease at a rate which it believes to be competitive for comparable space for an unaffiliated party.

As of December 31, 1997, the largest stockholders of the Company's common stock were certain affiliates of EGI, including EGI Holdings, Inc. and EGIL Investments, Inc., which collectively owned 53% of the Company's common stock.

See Note 7 and 10 for discussion on other related party transactions.

**NOTE 10. EMPLOYEE BENEFIT PLANS**

**RETIREMENT PLANS**

The Company's non- union employees are eligible to participate in the ADVANTAGE Retirement Savings Plan (as amended and restated October 1, 1987, "ADVANTAGE Plan"), a profit- sharing plan with a salary deferral feature that qualifies under Section 401 of the Internal Revenue Code of 1986, as amended. The ADVANTAGE Plan allows participants to defer a portion of their eligible compensation on a pre- tax basis. Participant contributions are 100% vested at the time the contribution is made. Matching contributions are made by the Company in an amount equal to 100% of the amount of a participant's contribution with a maximum of 4% of such participant's annual eligible wages, subject to Internal Revenue Service maximums. In addition, the Company may make discretionary profit- sharing contributions which are allocated to eligible employees based on eligible compensation. Company contributions vest over a five- year period. Matching and profit- sharing contributions approximated $550,000, $708,000, and $401,000 for the years ended December 31, 1997, 1996 and 1995, respectively.
The Company also contributes, under collective bargaining agreements, to funds designed to provide pension and health benefits for its union employees. The Company contributed $2,147,000, $2,337,000, and $2,312,000 to such plans for the years ended December 31, 1997, 1996 and 1995, respectively.

**EMPLOYEE STOCK PURCHASE PLAN**

The American Classic Voyages Co. 1995 Employee Stock Purchase Plan (the "ESP Plan") allows eligible employees to purchase common stock of the Company, through payroll deductions, at a discounted price from the market price. The exercise price under the ESP Plan is deemed to be 85% of the lesser of the market value of the Company's common stock on the last business day of the offering period or the average market value during the offering period. There is a maximum of 500,000 shares authorized under the ESP Plan. There were 9,718 shares, 12,297 shares and 5,821 shares issued during 1997, 1996 and 1995, respectively, at an average price of $10.70, $7.13 and $8.80 per share for 1997, 1996 and 1995, respectively. At December 31, 1997, approximately 472,000 shares were available for offering under the ESP Plan.

**STOCK- BASED COMPENSATION PLANS**

The Company granted, as of January 1, 1992, fully vested options to Messrs. S. Cody Engle, Patrick Fahey and Jeffrey D. Krida, the Company's then senior executive officers, to purchase up to 205,125 shares, 51,282 shares, and 153,846 shares of common stock, respectively, in lieu of bonus payments (the "Executive Stock Option Plan"). These options are exercisable, in whole or in part, at any time prior to January 2, 2002, at an exercise price of $3.25 per share.
The Company adopted the 1992 Stock Option Plan effective January 2, 1992 (the "1992 Plan"). Pursuant to the 1992 Plan, certain officers, directors, key employees, and consultants will be offered the opportunity to acquire shares of the Company's common stock via stock option grants. In addition, the 1992 Plan provides for the granting of stock units and stock appreciation rights ("SARs"). The exercise price of options granted under the 1992 Plan cannot be less than the fair market value of the Company's common stock at the date of grant. As of December 31, 1997, 2,925,245 shares of the Company's common stock have been reserved for issuance under the 1992 Plan. Options granted under the 1992 Plan generally vest over a three- year period and expire 10 years from the date of grant. The per share weighted- average fair value of stock options granted during 1997 and 1996 was $4.25 and $3.48 on the date of grant using the Black- Scholes option- pricing model with the following weighted- average assumptions for 1997 and 1996, respectively: expected volatility of 52% and 50%, risk- free interest rates of 5.7% and 6.0%; expected lives of three years and dividend yield of 0% for both years.
In 1997, under the terms of the 1992 Plan, the Company paid each non- employee director stock units as an annual retainer. The stock units in general vest at a rate of 25% on the first day of each calendar quarter. The fully vested stock units will be converted into an equal number of common stock shares at any time as selected by each director prior to each grant.
In 1995, the Company granted SARs to key employees. All of the SARs were canceled in 1996.
During 1995, the Financial Accounting Standards Board issued SFAS No. 123, "Accounting for Stock Based Compensation," which defines a fair value based method of accounting for an employee stock option or similar equity instrument and encourages all entities to adopt that method of accounting for all of their employee stock compensation plans. However, it also allows an entity to continue to measure compensation cost for those plans using the method of accounting prescribed by APB No. 25, "Accounting for Stock Issued to Employees." Entities electing to remain with the accounting in APB No. 25 must make pro forma disclosures of net income and earnings per share, as if the fair value

based method of accounting defined in this Statement has been applied.

The Company applies APB No. 25 in accounting for its plans and, accordingly, no compensation cost has been recognized for its stock options in the financial statements. Had the Company determined compensation cost based on the fair value at the grant date for its stock options under SFAS No. 123, the Company's net income (loss) and earnings (loss) per share would have been adjusted to the pro forma amounts indicated below:

| In thousands, except per share amounts | | 1997 | 1996 | 1995 |
|---|---|---|---|---|
| Net income (loss) | As reported | $2,429 | $(17,636) | $(9,671) |
| | Pro forma | 1,422 | (18,033) | (9,766) |
| Basic earnings (loss) per share | As reported | $ 0.17 | $ (1.28) | $ (.70) |
| | Pro forma | 0.10 | (1.31) | (.71) |
| Diluted earnings (loss) per share | As reported | $ 0.17 | $ (1.28) | $ (.70) |
| | Pro forma | 0.10 | (1.31) | (.71) |

Pro forma net income (loss) and earnings (loss) per share reflect only options granted since 1995. Therefore, the full impact of calculating compensation cost for stock options under SFAS No. 123 is not reflected in the pro forma amounts presented above because compensation cost is reflected over the options' vesting period which is generally three years and compensation cost for options granted prior to January 1, 1995 is not considered.

The table below summarizes the activities for 1995, 1996 and 1997:

| | Executive Stock Option Plan | 1992 Plan | | | Weighted-Average Exercise Price for Options and SARs only |
|---|---|---|---|---|---|
| | Shares Subject to Options | Shares Subject to Options | Shares Subject to Stock Units | Shares Subject to SARs | |
| Balance at December 31, 1994.... | 323,971 | 1,213,993 | -- | -- | $14.11 |
| Granted.................... | -- | 245,000 | -- | 280,000 | 11.11 |
| Canceled................... | -- | (279,583) | -- | -- | 15.34 |
| Balance at December 31, 1995.... | 323,971 | 1,179,410 | -- | 280,000 | 13.04 |
| Granted.................... | -- | 895,680 | -- | -- | 9.50 |
| Canceled................... | -- | (582,668) | -- | (280,000) | 15.36 |
| Exercised.................. | (85,840) | -- | -- | -- | 3.25 |
| Balance at December 31, 1996.... | 238,131 | 1,492,422 | -- | -- | 10.54 |
| Granted.................... | -- | 62,000 | 24,500 | -- | 12.36 |
| Canceled................... | -- | (71,753) | (1,450) | -- | 11.43 |
| Exercised.................. | (43,006) | (60,290) | -- | -- | 7.90 |
| Converted.................. | -- | -- | (2,650) | -- | -- |
| Balance at December 31, 1997.... | 195,125 | 1,422,379 | 20,400 | -- | 10.74 |

The following table summarizes information about options outstanding at December 31, 1997:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Price | Outstanding at 12/31/97 | Weighted-Average Remaining Contractual Life | Weighted-Average Exercise Price | Exercisable at 12/31/97 | Weighted-Average Exercise Price |
| $3.25 | 195,125 | 4 | $ 3.25 | 195,125 | $ 3.25 |
| 7.97 - 9.98 | 535,765 | 9 | 9.00 | 351,398 | 8.83 |
| 10.25 - 15.00 | 593,534 | 8 | 11.60 | 371,524 | 11.77 |
| 15.32 - 20.00 | 293,080 | 6 | 17.14 | 279,246 | 17.22 |
| $ 3.25 -$20.00 | 1,617,504 | 7 | $10.74 | 1,197,793 | $10.79 |

**NOTE 11. UNAUDITED QUARTERLY RESULTS OF OPERATIONS**

Summarized unaudited quarterly results of operations for 1997 and 1996 are as follows:

| Year Ended December 31, 1997 (Amounts in thousands, except per share data) | March 31, 1997 | June 30, 1997 | September 30, 1997 | December 31, 1997 |
|---|---|---|---|---|
| Revenues | $ 40,372 | $42,356 | $49,746 | $45,410 |
| Gross profit | 13,233 | 17,661 | 19,606 | 16,089 |
| Operating (loss) income | (1,869) | 3,451 | 6,098 | 2,304 |
| Pre-tax (loss) income | (3,314) | 1,962 | 4,617 | 784 |
| Net (loss) income | (1,988) | 1,177 | 2,770 | 470 |
| Basic (loss) earnings per share | (0.14) | 0.08 | 0.20 | 0.03 |
| Diluted (loss) earnings per share | (0.14) | 0.08 | 0.19 | 0.03 |

| Year Ended December 31, 1996 (Amounts in thousands, except per share data) | March 31, 1996 | June 30, 1996 | September 30, 1996 | December 31, 1996 |
|---|---|---|---|---|
| Revenues | $ 41,628 | $49,021 | $49,776 | $49,983 |
| Gross profit | 13,556 | 17,721 | 17,950 | 18,636 |
| Operating (loss) income | (41,784) | 2,323 | 4,834 | 4,162 |
| Pre-tax (loss) income | (43,668) | 329 | 3,029 | 14,375 |
| Net (loss) income | (43,271) | 381 | 2,851 | 22,403(a) |
| Basic (loss) earnings per share | (3.14) | 0.03 | 0.21 | 1.62 |
| Diluted (loss) earnings per share | (3.14) | 0.03 | 0.20 | 1.59 |

The sum of quarterly (loss) earnings per common share may differ from full- year amounts due to changes in the number of shares outstanding during the year.

---

(a) Includes a year- to- date tax adjustment of the federal tax benefit related to the first quarter impairment write- down.

Schedule I

**AMERICAN CLASSIC VOYAGES CO.**

**CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY)**
**BALANCE SHEETS**

**(AMOUNTS IN THOUSANDS)**

| | December 31, 1997 | December 31, 1996 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 3,304 | $ 1,945 |
| Prepaid expenses and other current assets | 301 | 219 |
| Property and equipment, net | 1,385 | 1,920 |
| Investment in and advances to subsidiaries | 59,850 | 57,403 |
| | $ 64,840 | $61,487 |
| LIABILITIES | | |
| Other liabilities | $ 5,621 | $ 6,505 |
| STOCKHOLDERS' EQUITY | | |
| Common stock | 140 | 139 |
| Paid-in capital | 77,059 | 75,252 |
| Accumulated deficit | (17,980) | (20,409) |
| Total stockholders' equity | 59,219 | 54,982 |
| | $ 64,840 | $ 61,487 |

See accompanying notes to Condensed Financial Statements.

Schedule I

**AMERICAN CLASSIC VOYAGES CO.**

**CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED) STATEMENTS OF OPERATIONS**

**(AMOUNTS IN THOUSANDS)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| Miscellaneous (expense) revenues.......... | $ (290) | $ 16 | $ 4,492 |
| Depreciation expense...................... | (713) | (793) | -- |
| Income tax benefit (expense).............. | 547 | 295 | (1,752) |
| Equity in earnings (losses) of subsidiaries | 2,885 | (17,154) | (12,411) |
| Net income (loss)......................... | $ 2,429 | $(17,636) | $ (9,671) |

See accompanying notes to Condensed Financial Statements.

Schedule I

AMERICAN CLASSIC VOYAGES CO.
CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)
STATEMENTS OF CASH FLOWS
(AMOUNTS IN THOUSANDS)

| | Years Ended December 31, | | |
|---|---|---|---|
| | 1997 | 1996 | 1995 |
| OPERATING ACTIVITIES | | | |
| Net income (loss).................................. | $ 2,429 | $ (17,636) | $ (9,671) |
| ADJUSTMENTS TO RECONCILE NET INCOME (LOSS) TO NET CASH PROVIDED BY OPERATING ACTIVITIES | | | |
| Depreciation........................................ | 713 | 793 | -- |
| Equity in (earnings) losses of subsidiaries, net.... | (2,885) | 17,154 | 12,411 |
| Dividends received from subsidiaries............... | -- | -- | 1,100 |
| Decrease (increase) in advances to subsidiaries..... | 438 | 1,817 | (5,594) |
| Decrease (increase) in prepaid expenses and other... | 168 | (128) | (91) |
| (Decrease) increase in other liabilities........... | (465) | (743) | 2,870 |
| Net cash provided by operating activities.......... | 398 | 1,257 | 1,025 |
| INVESTING ACTIVITIES | | | |
| Capital expenditures............................... | (178) | (87) | (43) |
| Net cash used in investing activities.............. | (178) | (87) | (43) |
| FINANCING ACTIVITIES | | | |
| Issuance of common stock........................... | 1,139 | 368 | 80 |
| Dividends.......................................... | -- | -- | (1,101) |
| Net cash provided by (used in) financing activities... | 1,139 | 368 | (1,021) |
| Increase (decrease) in cash and cash equivalents...... | 1,359 | 1,538 | (39) |

| | | | |
|---|---|---|---|
| Cash and cash equivalents, beginning of period........ | 1,945 | 407 | 446 |
| Cash and cash equivalents, end of period.............. | $ 3,304 | $ 1,945 | $ 407 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION | | | |
| Cash refunded during the period for: | | | |
| Income taxes........................................ | $ -- | $ -- | $ 633 |
| Non-cash investing activities: | | | |
| Conversion of advances to subsidiaries into investment in subsidiaries........................ | $ -- | $ 30,000 | $14,000 |

See accompanying notes to Condensed Financial Statements.

Schedule I

**AMERICAN CLASSIC VOYAGES CO.**

**NOTES TO CONDENSED FINANCIAL INFORMATION OF REGISTRANT (PARENT COMPANY) - (CONTINUED)**

**BASIS OF PRESENTATION**

The Condensed Financial Information of American Classic Voyages Co. ("AMCV") has been prepared pursuant to Securities and Exchange Commission rules and regulations and should be read in conjunction with the Consolidated Financial Statements and Notes thereto for the years ended December 31, 1997, 1996 and 1995 included herein this Form 10- K. The balance sheets as of December 31, 1997 and 1996, respectively, and the related statements of operations and cash flows have been prepared on an unconsolidated basis. AMCV's investment in its subsidiaries is recorded on the equity basis.

**DIVIDENDS FROM SUBSIDIARIES**

No dividends were paid to AMCV for the years ended December 31, 1997 and 1996. Cash dividends paid to AMCV by its consolidated subsidiaries were $1.1 million for the year ended December 31, 1995.

**COMMITMENTS**

AMCV has guaranteed the credit agreement between one of its subsidiaries and a group of financial institutions which provides for a borrowing facility to such subsidiary for general corporate purposes. For information related to this credit agreement, see Note 6 of "Notes to Consolidated Financial Statements" included herein this Form 10- K.

The Federal Maritime Commission ("FMC") regulates passenger vessels with 50 or more berths departing from U.S. ports and requires that operators post security to be used in the event the operator fails to provide cruise services, or otherwise satisfy certain financial standards. The Company has been approved as a self- insurer by the FMC, and therefore, subject to continued approval, is not required to post security for passenger cruise deposits. The FMC has reviewed its standards and in June 1996 issued proposed regulations to increase the financial responsibility requirements. The Company filed its objection to the proposals, as it believes that the FMC's current standards provide passengers with adequate protection in the event of an operator's non- performance and that further requirements may impose an undue burden on operators. If implemented, these proposed regulations would be phased in over time and, among other things, would require operators qualifying as a self- insurer, such as the Company, to satisfy a working capital test, in addition to the existing net worth test, and to provide third- party coverage for 25% of its unearned passenger revenue in the form of a surety bond or similar instrument. At this time, the Company cannot predict if the proposed changes will be approved as currently constituted, or at all. If they are implemented, the proposed changes would require that the Company establish a bond to cover a portion of its passenger deposits and payments, which may impact the Company's liquidity.

**INCOME TAXES**

AMCV has also entered into tax sharing agreements with its subsidiaries which require each subsidiary to compute its Federal income tax liability on a separate company basis and to pay amounts so computed to AMCV. No payments were made under the tax sharing agreement for the years ended December 31, 1997 and 1996. In 1995, AMCV remitted $3.3 million to subsidiaries and received $3.4 million from subsidiaries under the subsidiary tax sharing agreements.

In 1993, AMCV established a capital construction fund ("CCF") pursuant to section 607 of the Merchant Marine Act of 1936. The CCF allows AMCV to accelerate recognition of Federal income tax deductions for capital expenditures related to the American Hawaii vessels. A substantial portion of the income generated by AMCV is eligible for deposit into the CCF; however, expenditures for the vessels of DQSC are not qualified for this tax treatment. As such, on a consolidated tax return basis, AMCV was able to obtain the accelerated deduction treatment on a substantial portion of its taxable income.

**AMERICAN CLASSIC VOYAGES CO.**

**INDEX TO EXHIBITS**

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| **2.(d)(1) | Purchase Agreement among Blackland Vistas, Inc. and Great AQ Steamboat Co. as seller and Thayer Hotel Investments L.P. as purchaser (filed as Exhibit 2. to the Company's Form 8-K dated August 22, 1996 and incorporated herein by reference). |
| **2.(d)(2) | Preferred Provider Agreement executed as of October 16, 1996 by The Delta Queen Steamboat Co. and THI FQ L.P. (filed as Exhibit 2.(d)(2) to the Company's Form 8-K dated October 31, 1996 and incorporated herein by reference). |
| **3.(i) | Amended and Restated Certificate of Incorporation of the Company (filed on January 17, 1992 as Exhibit 3.(a) to the Company's Registration Statement on Form S-1 (Registration No. 33-45139) and incorporated herein by reference). |
| 3.(ii) | Amended and Restated By-Laws of the Company. |
| **4.(i) | Proof of Common Stock Certificate (filed on February 14, 1992 as Exhibit 4.(i) to Amendment No. 2 to the Company's Registration Statement on Form S-1 (Registration No. 33-45139) and incorporated herein by reference). |
| **4.(ii)(a)(1) | Stock Pledge Agreement dated as of August 3, 1993, by and between the Company and Chemical Bank, as agent for the Lenders (the "Agent") (filed on September 17, 1993 as Exhibit 4.(ii)(a)(9) to the Company's Registration Statement on Form S-1 (Registration No. 33-68996) and incorporated herein by reference). |
| **4.(ii)(a)(2) | Stock Pledge Agreement dated as of August 3, 1993, by and between The Delta Queen Steamboat Co. and the Agent (filed on September 17, 1993 as Exhibit 4.(ii)(a)(10) to the Company's Registration Statement on Form S-1 (Registration No. 33-68996) and incorporated herein by reference). |
| **4.(ii)(a)(3) | Guaranty dated as of August 3, 1993, made by the Company, Creative Endeavors, Inc., Delta Queen Steamboat Development, Inc., Cruise America Travel, Incorporated, Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., Great River Transportation Co. and Blackland Vistas, Inc., in favor of the Lenders and the Agent (filed on September 17, 1993 as Exhibit 4.(ii)(a)(11) to the Company's Registration Statement on Form S-1 (Registration No. 33-68996) and incorporated herein by reference). |
| **4.(ii)(a)(4) | Security Agreement dated as of March 31, 1995, by and between the Company and the Agent (filed on May 15, 1995 as Exhibit 4.(ii)(a)(12) to the Company's Form 10-Q dated March 31, 1995 |

and incorporated herein by reference).
The following entities have entered into a security agreement with the Agent which is substantially identical in all material respects to the Security Agreement filed as Exhibit 4.(ii)(a)(12) to the Company's Form 10-Q dated March 31, 1995:
(i) The Delta Queen Steamboat Co.;
(ii) Great River Transportation Co.;
(iii) Great Ocean Cruise Line, Inc.;
(iv) Cruise America Travel, Incorporated; and
(v) Great River Cruise Line, Inc.

**4.(ii)(a)(5) Preferred Ship Mortgage dated August 3, 1993, executed by Great River Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $65,000,000 (filed on September 17, 1993 as Exhibit 4.(ii)(a)(13) to the Company's Registration Statement on Form S-1 (Registration No. 33-68996) and incorporated herein by reference).

**4.(ii)(a)(6) Preferred Ship Mortgage dated August 3, 1993, executed by Great Ocean Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $65,000,000 (filed on September 17, 1993 as Exhibit 4.(ii)(a)(14) to the Company's Registration Statement on Form S-1 (Registration No. 33-68996) and incorporated herein by reference).

**4.(ii)(a)(7) Master Amendment to the Collateral Documents dated March 31, 1995, executed by the Delta Queen Steamboat Co., the Company, Creative Endeavors, Inc., Cruise America Travel, Incorporated, Great River Transportation Co., Delta Queen Steamboat Development, Inc., Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., Blackland Vistas, Inc., Great Hawaiian Cruise Line, Inc., and AMCV Development Corp. and the Agent for the benefit of the Agent and the Lenders in connection with the Amended and Restated Credit Agreement dated March 31, 1995 (filed on May 15, 1995 as Exhibit 4.(ii)(a)(19) to the Company's Form 10- Q dated March 31,

1995 and incorporated herein by reference).

**4.(ii)(a)(8) Third Amended and Restated Credit Agreement dated as of April 22, 1996, among The Delta Queen Steamboat Co., as Borrower, and the Company, as Parent, the financial institutions from time to time a party hereto (collectively, the "Lenders") and Chemical Bank, as the Lenders' agent ("Agent") and Hibernia Bank as Co- Agent (filed on May 15, 1996 as Exhibit 4.(ii)(a)(16) to the Company's Form 10- Q dated March 31, 1996 and incorporated herein by reference).

**4.(ii)(a)(9) Second Master Amendment to the Collateral Documents dated August 31, 1995, executed by The Delta Queen Steamboat Co., the Company, Creative Endeavors, Inc., Cruise America Travel, Incorporated, Great River Transportation Co., Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., and Blackland Vistas, Inc., and the Agent for the benefit of the Agent and the Lenders in connection with the Amended and Restated Credit Agreement dated March 31, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(a)(20) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(a)(10) Third Master Amendment to the Collateral Documents dated April 22, 1996, executed by The Delta Queen Steamboat Co., the Company, Cruise America Travel, Incorporated, Great River Transportation Co., Great River Cruise Line, Inc., Great Ocean Cruise Line, Inc., and Blackland Vistas, Inc., and the Agent for the benefit of the Agent and the Lenders in connection with the Amended and Restated Credit Agreement dated March 31, 1995 (filed on May 15, 1996 as Exhibit 4.(ii)(a)(23) to the Company's Form 10- Q dated March 31,

1996 and incorporated herein by reference).

**4.(ii)(a)(11) Third Amendment to Preferred Ship Mortgage dated April 22, 1996 executed by Great River Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $25,000,000.00 (filed on May 15, 1996 as Exhibit 4.(ii)(a)(24) to the Company's Form 10- Q dated March 31,

1996 and incorporated herein by reference).

**4.(ii)(a)(12) Third Amendment to Preferred Ship Mortgage dated April 22, 1996 executed by Great Ocean Cruise Line, Inc. in favor of the Agent for the benefit of the Lenders in the principal amount of $25,000,000.00 (filed on May 15, 1996 as Exhibit 4.(ii)(a)(25) to the Company's Form 10- Q dated March 31,

1996 and incorporated herein by reference).

**4.(ii)(a)(13) Acknowledgment of Trust Indenture dated as of April 22, 1996 entered into by and among Great River Cruise Line, Inc. and Chemical Bank as Agent for the Lenders (filed on August 13, 1996 as Exhibit 4.(ii)(a)(26) to the Company's Form 10- Q dated June 30, 1996 and incorporated herein by reference).

**4.(ii)(a)(14) Acknowledgment of Trust Indenture dated as of April 22, 1996 entered into by and among Great Ocean Cruise Line, Inc. and Chemical Bank as Agent for the Lenders (filed on August 13, 1996 as Exhibit 4.(ii)(a)(27) to the Company's Form 10- Q dated June 30, 1996 and incorporated herein by reference).

**4.(ii)(a)(15) Amendment Number 1 to the Third Amended and Restated Credit Agreement dated as of November 18, 1996 among The Delta Queen Steamboat Co., American Classic Voyages Co., the financial institutions from time to time party thereto and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent (filed on May 13, 1997 as Exhibit 4.(ii)(a)(28) to

the Company's Form 10- Q dated March 31, 1997 and

incorporated herein by reference).

**4.(ii)(a)(16) Amendment Number 2 to the Third Amended and Restated Credit Agreement dated as of March 26, 1997 among The Delta Queen Steamboat Co., American Classic Voyages Co., the financial institutions from time to time parties thereto and The Chase Manhattan Bank (formerly known as Chemical Bank), as agent (filed on May 13, 1997 as Exhibit 4.(ii)(a)(29) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).

**4.(ii)(a)(17) Master Assumption Agreement and Fourth Master Amendment to Collateral Documents made as of March 26, 1997 among The Delta Queen Steamboat Co., American Classic Voyages Co., Cruise America Travel, Incorporated, DQSB II, Inc., Great River Cruise Line, L.L.C., Great Ocean Cruise Line, L.L.C. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent for itself and the Lenders. (filed on May 13, 1997 as Exhibit 4.(ii)(a)(30) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).

**4.(ii)(a)(18) Second Amendment of Trust Indenture dated as of March 26, 1997 by and among Great Ocean Cruise Line, L.L.C. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent for itself and the Lenders (filed on May 13, 1997 as Exhibit 4.(ii)(a)(31) to the Company's Form 10- Q dated March

31, 1997 and incorporated herein by reference).

**4.(ii)(a)(19) Second Amendment of Trust Indenture dated as of March 26, 1997 by and among Great River Cruise Line, L.L.C. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent for itself and the Lenders (filed on May 13, 1997 as Exhibit 4.(ii)(a)(32) to the Company's Form 10- Q dated March

31, 1997 and incorporated herein by reference).

**4.(ii)(a)(20) Assumption of Preferred Ship Mortgage dated March 26, 1997 by and between Great Ocean Cruise Line, L.L.C. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Trustee and Agent (filed on May 13, 1997 as Exhibit 4.(ii)(a)(33) to

the Company's Form 10- Q dated March 31, 1997 and

incorporated herein by reference).

**4.(ii)(a)(21) Assumption of Preferred Ship Mortgage dated March 26, 1997 by and between Great River Cruise Line, L.L.C. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Trustee and Agent (filed on May 13, 1997 as Exhibit 4.(ii)(a)(34) to

the Company's Form 10- Q dated March 31, 1997 and

incorporated herein by reference).
**4.(ii)(a)(22) Third Amended and Restated Revolving Loan Note dated March 26, 1997 in the principal amount of $7,500,000.00 made by The Delta Queen Steamboat Co. in favor of The Chase Manhattan Bank (formerly known as Chemical Bank) (filed on May 13, 1997 as Exhibit 4.(ii)(a)(35) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(a)(23) Third Amended and Restated Revolving Loan Note dated March 26, 1997 in the principal amount of $7,500,000.00 made by The Delta Queen Steamboat Co. in favor of Hibernia National Bank (filed on May 13, 1997 as Exhibit 4.(ii)(a)(36) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(a)(24) Addendum to Stock Pledge Agreement made as of March 26, 1997 by and between The Delta Queen Steamboat Co. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent for itself and the other Lenders (filed on May 13, 1997 as Exhibit 4.(ii)(a)(37) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).

**4.(ii)(a)(25) Limited Liability Company Pledge Agreement made as of March 26, 1997 by The Delta Queen Steamboat Co., as Pledgor, and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent (filed on May 13, 1997 as Exhibit 4.(ii)(a)(38) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(a)(26) Limited Liability Company Pledge Agreement made as of March 26, 1997 by DQSB II, Inc., as Pledgor, and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent (filed on May 13, 1997 as Exhibit 4.(ii)(a)(39) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(a)(27) Security Agreement dated as of March 26, 1997 by and between DQSB II, Inc. and The Chase Manhattan Bank (formerly known as Chemical Bank), as Agent for itself and the Lenders (filed on May 13, 1997 as Exhibit 4.(ii)(a)(40) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).

**4.(ii)(c)(1) Commitment to Guaranty Obligations by the United States of America accepted by Great AQ Steamboat Co. dated as of August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(1) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(2) Great AQ Steamboat Co. United States Government Guaranteed Ship Financing Obligations, American Queen Series Purchase Agreement dated August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(2) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(3) Trust Indenture relating to United States Government Guaranteed Ship Financing Obligations, American Queen Series, between Great AQ Steamboat Co. and the Bank of New York, dated as of August 24, 1995 (the "Trust Indenture") along with Schedule A and Exhibit 1 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(3) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(4) Form of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, American Queen Series (filed on November 14, 1995 as Exhibit 4.(ii)(c)(4) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(5) Form of 2020 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, American Queen Series (filed on November 14, 1995 as Exhibit 4.(ii)(c)(5) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(6) Authorization Agreement between the United States of America as represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great AQ Steamboat Co. dated as of August 24, 1995 (filed on November 14, 1995 as Exhibit 4.(ii)(c)(6) to the Company's Form 10- Q dated September 30,

1995 and incorporated herein by reference).

**4.(ii)(c)(7) Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great AQ Steamboat Co. and the United States of America dated as of August 24, 1995 (the "Security Agreement") along with Exhibit 1 and the Schedule of Definitions (filed on November 14, 1995 as Exhibit 4.(ii)(c)(7) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(c)(8) $60,589,000 Promissory Note dated August 24, 1995 by and between Great AQ Steamboat Co. and the United States of America (filed on November 14, 1995 as Exhibit 4.(ii)(c)(8) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).
**4.(ii)(c)(9) Title XI Reserve Fund and Financial Agreement among Great AQ Steamboat Co. and the United States of America dated as of August 24, 1995 along with the General Provisions (filed on November 14, 1995 as Exhibit 4.(ii)(c)(9) to the Company's Form 10- Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(10) Guaranty Agreement dated August 24, 1995 made by the Delta Queen Steamboat Co. in favor of the United States of America (filed on November 14, 1995 as Exhibit 4.(ii)(c)(10) to the Company's Form 10-Q dated September 30, 1995 and incorporated herein by reference).

**4.(ii)(c)(11) Assumption and Supplement No. 1 to First Preferred Ship Mortgage effective as of December 31, 1996 made by and among Great AQ Steamboat, L.L.C., Great AQ Steamboat Co. and the United States of America, represented by the Secretary of

Transportation, acting by and through the Maritime

Administrator (filed on May 13, 1997 as Exhibit 4.(ii)(c)(11)

to the Company's Form 10- Q dated March 31, 1997 and

incorporated herein by reference).
**4.(ii)(c)(12) Modification and Assumption Agreement entered into March 25, 1997, effective as of December 31, 1996, among The United

States of America, represented by the Secretary of

Transportation, acting by and through the Maritime

Administrator, Great AQ Steamboat, L.L.C., and The Bank of New York (filed on May 13, 1997 as Exhibit 4.(ii)(c)(12) to

the Company's Form 10- Q dated March 31, 1997 and

incorporated herein by reference).
**4.(ii)(c)(13) Confirmation of Guaranty Agreement effective as of December 31, 1996 made by The Delta Queen Steamboat Co. in favor of the United States of America, represented by the Secretary of Transportation, acting by and through the Maritime

Administrator (filed on May 13, 1997 as Exhibit

4.(ii)(c)(13) to the Company's Form 10- Q dated March 31,

1997 and incorporated herein by reference).

**4.(ii)(c)(14) Endorsement No. 1 to Secretary's Note from Great AQ Steamboat, L.L.C. to the United States of America executed on March 25, 1997, effective as of December 31, 1996 (filed on May 13, 1997 as Exhibit 4.(ii)(c)(14) to the

Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(c)(15) Subordination Agreement dated as of March 25, 1997 made by and among Great AQ Steamboat, L.L.C., The Delta Queen Steamboat Co. and DQSB II, Inc. and the United States of America, represented by the Secretary of Transportation, acting by and through the Maritime Administrator (filed on May 13, 1997 as Exhibit 4.(ii)(c)(15) to the Company's Form 10- Q dated March 31, 1997 and incorporated herein by reference).
**4.(ii)(d)(1) Commitment to Guaranty Obligations by the United States of America Accepted by Great Independence Ship Co. dated as of December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(1) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(2) Great Independence Ship Co. United States Government Guaranteed Ship Financing Obligations, Independence Series A Purchase Agreement dated December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(2) to the Company's Form 10- K dated December 31, 1995).

**4.(ii)(d)(3) Trust Indenture relating to United States Government Guaranteed Ship Financing Obligations, Independence Series A, between Great Independence Ship Co. and the Bank of New York, dated as of December 7, 1995 (the "Trust Indenture") along with Schedule A and Exhibit 1 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(3) to the Company's Form 10-K dated December 31, 1995).

**4.(ii)(d)(4) Forms of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, Independence Series A (filed on April 1, 1996 as Exhibit 4.(ii)(d)(4) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(5) Forms of 2015 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, Independence Series A (filed on April 1, 1996 as Exhibit 4.(ii)(d)(5) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(6) Authorization Agreement between the United States of America represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great Independence Ship Co. dated as of December 7, 1995 (filed on April 1, 1996 as Exhibit 4.(ii)(d)(6) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(7) Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great Independence Ship Co. and the United States of America dated as of December 7, 1995 (the "Security Agreement") along with Exhibit 1 and the Schedule of Definitions (filed on April 1, 1996 as Exhibit 4.(ii)(d)(7) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(8) $26,429,000 Promissory Note dated December 7, 1995 by and between Great Independence Ship Co. and the United States of America (filed on April 1, 1996 as Exhibit 4.(ii)(d)(8) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(9) Title XI Reserve Fund and Financial Agreement between Great Independence Ship Co. and the United States of America dated as of December 7, 1995 along with the General Provisions (filed on April 1, 1996 as Exhibit 4.(ii)(d)(9) to the

Company's Form 10- K dated December 31, 1995).

**4.(ii)(d)(10) Guaranty and Security Agreement dated December 7, 1995 made by the Great Independence Ship Co., Great Hawaiian Cruise Line, Inc. and Great Hawaiian Properties Corporation in favor of the United States of America (filed on April 1, 1996 as Exhibit 4.(ii)(d)(10) to the Company's Form 10- K dated December 31, 1995).
**4.(ii)(d)(11) Amendment to Commitment to Guarantee Obligations by the United States of America Accepted by Great Independence Ship Co. dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(11) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(12) Great Independence Ship Co. United Stated Government Guaranteed Ship Financing Obligations, Independence Series B Purchase Agreement dated March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(12) to the Company's Form 10- Q dated March 31, 1996).
**4.(ii)(d)(13) Supplemental Indenture No. 1 relating to United States Government Guaranteed Ship Financing Obligations, Independence Series B, between Great Independence Ship Co. and the Bank of New York, dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(13) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(14) Form of 2005 Note, Guarantee and Trustee's Authentication Certificate Specimen Note as it relates to the United States Government Guaranteed Ship Financing Obligation, Independence Series B (filed on May 15, 1996 as Exhibit 4.(ii)(d)(14) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(15) Form of 2015 Bond, Guarantee and Trustee's Authentication Certificate Specimen Bond as it relates to United States Government Guaranteed Ship Financing Bond, Independence Series B (filed on May 15, 1996 as Exhibit 4.(ii)(d)(15) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(16) Amendment No. 1 to Authorization Agreement between the United States of America represented by the Secretary of Transportation and the Bank of New York as Indenture Trustee under the Trust Indenture between it and Great Independence Ship Co. dated as of March 28, 1996 (filed on May 15, 1996 as Exhibit 4.(ii)(d)(16) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(17) Amendment No. 1 to Security Agreement relating to the United States Government Guaranteed Ship Financing Obligation between Great Independence Ship Co. and the United States of America dated as of March 28, 1996 (the "Security Agreement") (filed on May 15, 1996 as Exhibit 4.(ii)(d)(17) to the Company's Form 10- Q dated March 31, 1996).

**4.(ii)(d)(18) Endorsement to $6,903,000 Promissory Note dated March 28, 1996 by and between Great Independence Ship Co. and the United States of America (filed on May 15, 1996 as Exhibit 4.(ii)(d)(18) to the Company's Form 10-Q dated March 31, 1996).

**4.(ii)(d)(19) Amendment No. 1 to Title XI Reserve Fund and Financial Agreement between Great AQ Steamboat Co. and the United States of America effective as of January 1, 1996 (filed on August 14, 1996 as Exhibit 4.(ii)(d)(19) to the Company's Form 10- Q dated June 30, 1996).

9. Not applicable.

**10.(ii)(A)(1) Administrative Services Agreement by and between the Company and Equity Group Investments, Inc. (filed on March 2, 1993 as Exhibit 10.(i)(A) to Amendment No. 3 to the Company's Registration Statement on Form S-1 (Registration No. 33-45139) and incorporated herein by reference).

**10.(ii)(D)(1) Preferential Assignment Agreement dated September 27, 1984, by and between the Board of Commissioners of the Port of New Orleans and the Company, including Assignment thereof and Amendments thereto (filed on January 17, 1992 as Exhibit 10.(ii)(D)(2) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).

**10.(ii)(D)(2) Lease by and between Equity Office Properties, Inc. as agent for Beneficial Owner and Great Hawaiian Properties Corporation dated May 30, 1995 (filed on April 1, 1996 as Exhibit 10.(ii)(D)(3) to the Company's Form 10-K dated December 31, 1995).

**10.(ii)(D)(3) Lease dated May 31, 1993 by and between Hawaii Press Newspapers, Inc. and American Global Line, Inc. for the property located at 2100 North Nimitz, Honolulu, Hawaii (filed on September 17, 1993 as Exhibit 10.(ii)(D)(5) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 68996) and incorporated herein by reference).

**10.(iii)(A)(1) Performance Management Objectives Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(A)(2) to the Company's Registration Statement on Form S- 1 (Registration No. 333- 44225) and incorporated herein by reference).

**10.(iii)(A)(2) Executive Bonus Plan (filed on January 17, 1992 as Exhibit 10.(iii)(A)(4) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(3) Advantage Retirement Savings Plan, as amended and further restated effective October 1, 1987, including Amendment thereto (filed on January 17, 1992 as Exhibit 10.(iii)(A)(5) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(4) American Classic Voyages Co. S. Cody Engle Stock Option Agreement (filed on January 17, 1992 as Exhibit 10.(iii)(A)(6) to the Company's Registration Statement on Form S- 1 (Registration No. 33- 45139) and incorporated herein by reference).
**10.(iii)(A)(5) American Classic Voyages Co. Dividend Reinvestment and Common Stock Purchase Plan (filed on June 22, 1994 as part of the Company's Registration Statement on Form S- 3 (Registration No. 33- 80614) and incorporated herein by reference).
**10.(iii)(A)(6) American Classic Voyages Co. 1995 Employee Stock Purchase Plan (filed on May 17, 1995 as part of the Company's Registration Statement on Form S- 8 (Registration No. 33- 92382) and incorporated herein by reference).

```
**10.(iii)(A)(7)  American Classic Voyages Co. 1992 Stock Option Plan (filed on
                  January 14, 1998 as part of the Company's Registration
                  Statement on Form S-8 (Registration No. 333-44225) and
                  incorporated herein by reference).
  11.             Not applicable.
  12.             Not applicable.
  13.             Not applicable.
  16.             Not applicable.
  18.             Not applicable.
  21.             Subsidiaries of the Company.
  22.             Not applicable.
  23.             Consent of KPMG Peat Marwick LLP.
  24.             Not applicable.
  27.             Financial Data Schedule.
  28.             Not applicable.
**Previously filed.
```

EX-3.(ii)

AMENDED AND RESTATED BY-LAWS
OF
AMERICAN CLASSIC VOYAGES CO.

## ARTICLE I

## OFFICES

The Corporation shall continuously maintain in the State of Delaware a registered office and a registered agent whose business office is identical with such registered office, and may have other offices within or without the State.

## ARTICLE II

## SHAREHOLDERS

SECTION 1. ANNUAL MEETING. An annual meeting of the shareholders shall be held on the third Wednesday in June of each year or at such time as the Board of Directors may designate for the purpose of electing directors and for the transaction of such other business as may come before the meeting. If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day. If the election of directors shall not be held on the day designated herein for any annual meeting, or at any adjournment thereof, the Board of Directors shall cause the election to be held at a meeting of the shareholders as soon thereafter as may be convenient.

SECTION 2. SPECIAL MEETINGS. Special meetings of the shareholders may be called either by the President, by the Board of Directors or by the holders of not less than a majority of all the outstanding shares of the Corporation entitled to vote, for the purpose or purposes stated in the call of the meeting.

SECTION 3. PLACE OF MEETING. The Board of Directors may designate any place, either within or without the State of Delaware, as the place of meeting for any annual meeting or for any special meeting called by the Board of Directors. A waiver of notice signed by all shareholders may designate any place, either within or without the State of Delaware, as the place for the holding of such meeting. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be at Two North Riverside Plaza, Chicago, Illinois 60606, except as otherwise provided in Section 5 of this Article II.

SECTION 4. NOTICE OF MEETINGS. Written notice stating the place, date, and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 nor more than 60 days before the date of the meeting, or in the case of a merger, consolidation, share exchange, dissolution or sale, lease or exchange of assets, not less than 20 nor more than 60 days before the date of the

meeting, either personally or by mail, by or at the direction of the President, or the Secretary, or the officer or persons calling the meeting, to each shareholder of record entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail addressed to the shareholder at his or her address as it appears on the records of the corporation, with postage thereon prepaid. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.

SECTION 5. MEETING OF ALL SHAREHOLDERS. If all of the shareholders shall meet at any time and place, either within or without the State of Delaware, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting any corporate action may be taken.

SECTION 6. CLOSING OF TRANSFER BOOKS OR FIXING OF RECORD DATE. For the purpose of determining the shareholders entitled to notice of or to vote at any meeting of shareholders, or shareholders entitled to receive payment of any dividend, or in order to make a determination of shareholders for any other proper purpose, the Board of Directors may fix in advance a date as the record date for any such determination of shareholders, such date in any case to be not more than 60 days and, for a meeting of shareholders, not less than 10 days or, in the case of a merger, consolidation, share exchange, dissolution or sale, lease or exchange of assets, not less than 20 days before the date of such meeting. If no record date is fixed for the determination of shareholders entitled to notice of or to vote at a meeting of shareholders, or shareholders entitled to receive payment of a dividend, the date on which notice of the meeting is mailed or the date on which the resolution of the Board of Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of shareholders. When a determination of shareholders entitled to vote at any meeting of shareholders has been made as provided in this Section, such determination shall also apply to any adjournment thereof.

SECTION 7. VOTING LISTS. The officer or agent having charge of the transfer book for shares of the Corporation shall make, within 20 days after the record date for a meeting of shareholders or 10 days before such meeting, whichever is earlier, a complete list of the shareholders entitled to vote at such meeting, arranged in alphabetical order, with the address of and the number of shares held by each, which list, for a period of 10 days prior to such meeting, shall be kept on file at the registered office of the Corporation and shall be subject to inspection by any shareholder, and to copying at the shareholder's expense, at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any shareholder during the whole time of the meeting. The original share ledger or transfer book, or a duplicate thereof kept in the State of Delaware, shall be prima facie evidence as to who are the shareholders entitled to examine such list or share ledger or transfer book or to vote at any meeting of shareholders.

SECTION 8. QUORUM. The holders of a majority of the outstanding shares of the Corporation entitled to vote on a matter, represented in person or by proxy, shall constitute a quorum for consideration of such matter at any meeting of

shareholders, but in no event shall a quorum consist of less than one- third of the outstanding shares entitled so to vote; provided that if less than a majority of the outstanding shares are represented at said meeting, a majority of the shares so represented may adjourn the meeting at any time without further notice. If a quorum is present, the affirmative vote of the majority of the shares represented at the meeting

shall be the act of the shareholders, unless the vote of a greater number or voting by classes is required by the General Corporation Law of Delaware (as now in effect or as amended from time to time, the "Act"), the certificate of incorporation or these by- laws. At any adjourned meeting at which a quorum shall be present, any business may be transacted which might have been transacted at the original meeting. Withdrawal of shareholders from any meeting shall not cause failure of a duly constituted quorum at that meeting.

SECTION 9. PROXIES. At all meetings of shareholders, a shareholder may vote by proxy executed in writing by the shareholder or by his duly authorized attorney- in- fact. Such proxy shall be filed with the Secretary of the Corporation before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

SECTION 10. VOTING OF SHARES. Unless otherwise provided in the articles of incorporation, each outstanding share shall be entitled to one (1) vote upon each matter submitted to vote at a meeting of shareholders.

SECTION 11. VOTING OF SHARES BY CERTAIN HOLDERS. Shares held by the Corporation in a fiduciary capacity may be voted and shall be counted in determining the total number of outstanding shares entitled to vote at any given time. Shares registered in the name of another corporation, domestic or foreign, may be voted by any officer, agent, proxy or other legal representative authorized to vote such shares under the law of incorporation of such corporation. The Corporation may treat the president or other person holding the position of chief executive officer of such other corporation as authorized to vote such shares, together with any other person indicated and any other holder of any office indicated by the corporate shareholder to the Corporation as a person or an officer authorized to vote such shares. Such persons and officers indicated shall be registered by the Corporation on the transfer books for shares and included in any voting list prepared in accordance with Section 7 of this Article II.

Shares registered in the name of a deceased person, a minor ward or a person under legal disability may be voted by his or her administrator, executor or court appointed guardian, either in person or by proxy without a transfer of such shares into the name of such administrator, executor or court appointed guardian. Shares registered in the name of a trustee may be voted by him or her, either in person or by proxy.

Shares registered in the name of a receiver may be voted by such receiver, and shares held by or under the control of a receiver may be voted by such receiver without the transfer thereof into his or her name if authority to do so is contained in an appropriate order of the court by which such receiver was appointed.

A shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred.

Any number of shareholders may create a voting trust for the purpose of conferring upon a trustee or trustees the right to vote or otherwise represent their shares, for a period not to exceed 10 years, by entering into a written voting trust agreement specifying the terms and

conditions of the voting trust and by transferring their shares to such trustee or trustees for the purpose of the agreement. Any such trust agreement shall not become effective until a counterpart of the agreement is deposited with the Corporation at its registered office. The counterpart of the voting trust agreement so deposited with the Corporation shall be subject to the same right of examination by a shareholder of the Corporation, in person or by agent or attorney, as are the books and records of the Corporation, and shall be subject to examination by any holder of a beneficial interest in the voting trust, either in person or by agent or attorney, at any reasonable time for any proper purpose.

Shares of its own stock belonging to the Corporation shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding shares at any given time, but shares of its own stock held by it

in a fiduciary capacity may be voted and shall be counted in determining the total number of outstanding shares at any given time.
SECTION 12. INSPECTORS. At any meeting of shareholders, the presiding officer may, or upon the request of any shareholder shall, appoint one or more persons as inspectors for such meeting.
Such inspectors shall ascertain and report the number of shares represented at the meeting, based upon their determination of the validity and effect of proxies; count all votes and report the results; and do such other acts as are proper to conduct the election and voting with impartiality and fairness to all the shareholders.
Each report of an inspector shall be in writing and signed by him or her or by a majority of them if there be more than one inspector acting at such meeting. If there is more than one inspector, the report of a majority shall be the report of the inspectors. The report of the inspector or inspectors on the number of shares represented at the meeting and the results of the voting shall be prima facie evidence thereof.
SECTION 13. INFORMAL ACTION BY SHAREHOLDERS. Any action required to be taken at a meeting of the shareholders, or any other action which may be taken at a meeting of the shareholders, may be taken without a meeting and without a vote if a consent in writing, setting forth the action so taken, shall be signed (a) if 5 days prior notice of the proposed action is given in writing to all of the shareholders entitled to vote with respect to the subject matter hereof, by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voting or (b) by all of the shareholders entitled to vote with respect to the subject matter thereof.
Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given in writing to those shareholders who have not consented in writing. In the event that the action which is consented to is such as would have required the filing of a certificate under any section of the Act if such action had been voted on by the shareholders at a meeting thereof, the certificate filed under such section shall state, in lieu of any statement required by such section concerning any vote of shareholders, that written consent has been given in accordance with the provisions of SECTION 229 of the Act and that written notice has been given as provided in such SECTION 229.

SECTION 14. VOTING BY BALLOT. Voting on any question or in any election may be by voice unless the presiding officer shall order or any shareholder shall demand that voting be by ballot.

## ARTICLE III

## DIRECTORS

SECTION 1. GENERAL POWERS. The business of the Corporation shall be managed by or under the direction of its Board of Directors.
SECTION 2. NUMBER, TENURE AND QUALIFICATIONS. The number of directors of the Corporation shall be not less than two (2) and not more than thirteen (13). Each director shall hold office until the next annual meeting of shareholders; or until his successor shall have been elected and qualified. Directors need not be residents of Delaware or shareholders of the Corporation. The number of directors may be increased or decreased from time to time by the amendment of this Section 2. No decrease shall have the effect of shortening the term of any incumbent director.
SECTION 3. REGULAR MEETINGS. A regular meeting of the Board of Directors shall be held, without other notice than this by- law, immediately after the annual meeting of shareholders. The Board of Directors may provide, by resolution, the time and place for holding of additional regular meetings without other notice than such resolution.
SECTION 4. SPECIAL MEETINGS. Special meetings of the Board of Directors may be called by or at the request of the President or any two directors. The person or persons authorized to call special meetings of the Board of Directors may fix any place as the place for holding any special meeting of the Board of Directors called by them.
SECTION 5. NOTICE. Notice of any special meeting shall be given at least two business days previous thereto by written notice to each director at his business address. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice be given by telegram, such notice shall be deemed to be delivered when the telegram is delivered to the telegram company. The attendance of a director at any meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Directors need be specified

in the notice or waiver of notice of such meeting.
SECTION 6. QUORUM. Unless otherwise provided in the articles of incorporation, a majority of the number of directors fixed by these by- laws shall constitute a quorum for transaction of business at any meeting of the Board of Directors, provided that if less than a majority of such number of directors are present at said meeting, a majority of the directors present may adjourn the meeting at any time without further notice.
Unless specifically prohibited by the articles of incorporation, members of the Board of Directors or of any committee of the Board of Directors may participate in and act at any

meeting of the Board or such committee through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such meeting shall constitute attendance and presence in person at the meeting of the person or persons so participating.
SECTION 7. MANNER OF ACTING. The act of the majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the act of a greater number is required by statute, these by- laws, or the articles of incorporation.
SECTION 8. VACANCIES. Any vacancy on the Board of Directors and any directorship to be filled by reason of an increase in the number of directors may be filled by election at the next annual or special meeting of shareholders. A majority of the Board of Directors may fill any vacancy prior to such annual or special meeting of shareholders.
SECTION 9. RESIGNATION OF DIRECTORS. A director may resign at any time upon written notice to the Board of Directors, its chairman, if any, or to the chief executive officer or Secretary of the Corporation.
SECTION 10. INFORMAL ACTION BY DIRECTORS. Unless specifically prohibited by the articles of incorporation or by other provisions of these by- laws, any action required to be taken at a meeting of the Board of Directors, or any other action which may be taken at a meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all the directors entitled to vote with respect to the subject matter thereof or by all the members of such committee, as the case may be. Any such consent signed by all the directors or all the members of the committee shall have the same effect as a unanimous vote, and may be stated as such in any document filed with the Secretary of State or with anyone else.
SECTION 11. COMMITTEES. A majority of the directors fixed by these by- laws may, by resolution, create one or more committees and appoint members of the Board to serve on any one or more of such committees. Each committee shall have two or more members who shall serve at the pleasure of the Board. A majority of any committee shall constitute a quorum and a majority of a quorum is necessary for committee action. Each committee, to the extent provided by the Board of Directors in such resolution, shall have and exercise all of the authority of the Board of Directors in the management of the Corporation, except that a committee may not: authorize distributions; approve or recommend to shareholders any act required by statute to be approved by shareholders; fill vacancies on the Board or on any of its committees; elect or remove officers or fix the compensation of any member of the committee; adopt, amend or repeal the by- laws; approve a plan of merger not requiring shareholder approval; authorize or approve the reacquisition of shares, except according to a general formula or method prescribed by the Board; authorize or approve the issuance or sale, or contract for sale, of shares or determine the designation and relative rights, preferences, and limitations of a series of shares, except that the Board may direct a committee to fix the specific terms of issuance or sale or contract for sale or the number of shares to be allocated to particular employees under an employee benefit plan; or, amend, alter, repeal, or take action inconsistent with any resolution or action of the Board of Directors when the resolution or action of the Board of Directors provides by its terms that it shall not be amended, altered or repealed by action of a committee. Vacancies in the membership of any committee shall be filled by the Board of Directors. Each committee shall keep regular minutes of its proceedings and report

the same to the Board when required. A committee may act by unanimous consent in writing without a meeting and, subject to action by the Board of Directors, each committee, by a majority vote of its members, shall determine the time and place of meetings and the notice therefor.
SECTION 12. COMPENSATION. The Board of Directors, by the affirmative vote of a majority of directors then in office, and irrespective of any personal interest of any of its members, shall have authority to establish reasonable compensation of all directors for services to the Corporation as directors, officers or otherwise notwithstanding any

director conflict of interest. By resolution of the Board of Directors, the directors may be paid their expenses, if any, of attendance at each meeting of the Board. No such payment previously mentioned in this Section shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

SECTION 13. PRESUMPTION OF ASSENT. A director of the Corporation who is present at a meeting of the Board of Directors at which action on any corporate matter is taken shall be conclusively presumed to have assented to the action taken unless his or her dissent shall be entered in the minutes of the meeting or unless he or she shall file his or her written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered or certified mail to the Secretary of the Corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a director who voted in favor of such action.

SECTION 14. REMOVAL OF DIRECTORS. One or more of the directors may be removed, with or without cause, at a meeting of shareholders by the affirmative vote of the holders of a majority of the outstanding shares then entitled to vote at an election of directors, except that no director shall be removed at a meeting of shareholders unless the notice of such meeting shall state that a purpose of the meeting is to vote upon the removal of one or more directors named in the notice, and then only the named director or directors may be removed at such meeting. If a director has been elected by a class or series of shares, he may be removed only by the shareholders of that class or series.

SECTION 15. DISINTERESTED DIRECTORS; VOTING. A majority of the Corporation's disinterested directors shall be required to approve any business dealing between the Corporation and (i) any one or more of the directors of the Corporation or (ii) any person affiliated with or under common control with any one or more of the directors of the Corporation. Any such person described in clauses (i) or (ii) of this Section 15 who enters into or intends to enter into a business dealing with the Corporation shall, for purposes of this Section 15, be referred to as an "interested person." For the purposes of this Section 15, the terms "affiliate," "control," "under common control with," "disinterested directors" and "business dealing" shall have the following meanings:

(a) an "affiliate" of, or person "affiliated" with, a specified person shall mean a person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the person specified;

(b) the word "control" (the meaning of which hereunder shall also be applicable to the term "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or

policies of the person, whether through board representation, the ownership of voting securities, by contract or otherwise;

(c) the word "person" shall mean any natural person, corporation, firm, association, trust, government, governmental agency or other entity, whether acting in an individual, fiduciary or other capacity;

(d) the term "disinterested directors" shall mean any director of the Corporation who is not (i) an employee, officer, director, trustee, partner, 5% shareholder (through beneficial ownership or otherwise) or fiduciary of a person (other than the Corporation) who is affiliated with or under common control with an interested person; or (ii) an employee, officer, director, trustee, partner or fiduciary of any of the persons described in subsection d(i) above; and

(e) the term "business dealing" shall mean any transaction providing for the sale, lease or exchange of property or the

rendering of any service, other than the sale, lease or exchange of property or the rendering of any service made or undertaken pursuant to and in accordance with an Administrative Services Agreement to be

executed between Equity Group Investments, Inc., an Illinois

corporation, and the Corporation in such form as the Board of

Directors shall approve.

## ARTICLE IV

## OFFICERS

SECTION 1. NUMBER. The officers of the Corporation shall be a President, a Treasurer and a Secretary and may include a Chairman of the Board (or one or more Co- Chairmen of the Board), Chief Executive Officer, one or more Vice Presidents, a Chief Operating Officer, a Chief Financial Officer, one or more Assistant Treasurers, and one or more Assistant Secretaries. In addition, the Board of Directors may, from time to time, appoint such other officers with such powers and duties as they shall deem necessary or desirable. Any two or more offices may be held by the same person.
SECTION 2. ELECTION AND TERM OF OFFICE. The officers of the Corporation shall be elected annually by the Board of Directors at the first meeting of the Board of Directors held after each annual meeting of shareholders. If the election of officers shall not be held at such meeting, such election shall be held as soon thereafter as conveniently may be. Vacancies may be filled or new offices created and filled at any meeting of the Board of Directors. Each officer shall hold office until his successor shall have been duly elected and shall have qualified or until his death or until he shall resign or shall have been removed in the manner hereinafter provided. Election of an officer shall not of itself create contract rights.
SECTION 3. REMOVAL AND RESIGNATION. Any officer elected or appointed by the Board of Directors may be removed by the Board of Directors whenever in its judgment the best interest of the Corporation would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Any officer of the Corporation may resign at any time by giving written notice thereof to the Board of Directors, the Chairman of the Board,

the President or the Secretary. Any resignation shall take effect at the time specified in the notice, or, if the time when it shall become effective is not specified therein, immediately upon its receipt. The acceptance of a resignation shall not be necessary to make it effective unless otherwise stated in the resignation.
SECTION 4. VACANCIES. A vacancy in any office because of death, resignation, removal, disqualification or otherwise may be filled by the Board of Directors for the unexpired portion of the term.
SECTION 5. CHAIRMAN OF THE BOARD. The Board of Directors may designate a Chairman of the Board (or one or more Co- Chairmen of the Board). The Chairman of the Board shall preside over the meetings of the Board of Directors and of the stockholders at which he shall be present. If there be more than one, the Co- Chairmen designated by the Board of Directors will perform such duties. The Chairman of the Board shall perform such other duties as may be assigned to him or them by the Board of Directors.
SECTION 6. CHIEF EXECUTIVE OFFICER. The Board of Directors shall designate a Chief Executive Officer. In the absence of such designation, the Chairman of the Board (or, if more than one, the Co- Chairmen of the Board in the order designated at the time of their election or, in the absence of any designation, then in the order of their election) shall be the Chief Executive Officer of the Corporation. The Chief Executive Officer shall have general responsibility for implementing the policies of the Corporation, as determined by the Board of Directors, and for the management of the business and affairs of the Corporation.
SECTION 7. PRESIDENT. The President or the Chief Executive Officer, as the case may be, shall be the principal executive officer of the Corporation and shall in general supervise and control all of the business and affairs of the Corporation. In the absence of a designation of a Chief Operating Officer by the Board of Directors, the President shall be the Chief Operating Officer. Subject to the direction and control of the Board of Directors, he/she shall, in general: supervise and control the business and affairs of the Corporation; see that the resolutions and directions of the Board of Directors are carried into effect except in those instances in which that responsibility is specifically assigned to some other

person by the Board of Directors; and discharge all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time. Except in those instances in which the authority to execute is expressly delegated to another officer or agent of the Corporation or a different mode of execution is expressly prescribed by the Board of Directors or these by- laws, he/she may execute for the Corporation certificates for its shares and any contracts, deeds, mortgages, bonds, or other instruments which the Board of Directors has authorized to be executed, and he/she may accomplish such execution either under or without the seal of the Corporation and either individually or with the Secretary, any Assistant Secretary, or any other officer thereunto authorized by the Board of Directors, according to the requirements of the form of the instrument. He/she may vote all securities which the Corporation is entitled to vote except as and to the extent such authority shall be vested in a different officer or agent of the Corporation by the Board of Directors.

SECTION 8. CHIEF OPERATING OFFICER. The Board of Directors may designate a Chief Operating Officer. The Chief Operating Officer shall have the responsibilities and duties as set forth by the Board of Directors or the Chief Executive Officer or President, as the case may be.

SECTION 9. CHIEF FINANCIAL OFFICER. The Board of Directors may designate a Chief Financial Officer. The Chief Financial Officer shall have the responsibilities and duties as set forth by the Board of Directors or the Chief Executive Officer or President, as the case may be.

SECTION 10. THE VICE PRESIDENTS. The Vice President (or in the event there be more than one Vice President, each of the Vice Presidents) shall assist the President in the discharge of his/her duties as the President may direct and shall perform such other duties as from time to time may be assigned to him/her by the President or by the Board of Directors. In the absence of the President or in the event of his/her inability or refusal to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board of Directors or by the President if the Board of Directors has not made such a designation or, in the absence of any designation, then in the order of seniority of tenure as Vice President) shall perform the duties of the President and, when so acting, shall have all the powers of and be subject to all the restrictions upon the President. Except in those instances in which the authority to execute is expressly delegated to another officer or agent of the Corporation or a different mode of execution is expressly prescribed by the Board of Directors or these by- laws, the Vice President (or each of them if there are more than one) may execute for the Corporation certificates for its shares and any contracts, deeds, mortgages, bonds or other instruments which the Board of Directors has authorized to be executed, and he/she may accomplish such execution either under or without the seal of the Corporation and either individually or with the Secretary, any Assistant Secretary, or any other officer thereunto authorized by the Board of Directors, according to the requirements of the form of the instrument, except when a different mode of execution is expressly prescribed by the Board of Directors or these by- laws.

SECTION 11. THE TREASURER. The Treasurer shall: (a) have charge of and be responsible for the maintenance of adequate books of account for the Corporation; (b) have charge and custody of all funds and securities of the Corporation and be responsible therefor and for the receipt and disbursement thereof; and (c) perform all the duties incident to the office of treasurer and such other duties as from time to time may be assigned to him/her by the President or by the Board of Directors. If required by the Board of Directors, the Treasurer shall give a bond for the faithful discharge of his duties in such sum and with such surety or sureties as the Board of Directors may determine.

SECTION 12. THE SECRETARY. The Secretary shall: (a) record the minutes of the shareholders' and of the Board of Directors' meetings in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of these by- laws; (c) be custodian of the corporate records and of the seal of the Corporation; (d) keep a register of the post office address of each shareholder which shall be furnished to the Secretary by such shareholder; (e) sign, with the President or a Vice President or any other officer thereunto authorized by the Board of Directors, certificates for shares of the Corporation, the issue of which shall have been authorized by the Board of Directors, and any contracts, deeds, mortgages, bonds, or other instruments which the Board of Directors has authorized to be executed, according to the requirements of the form of the instrument, except when a different mode of execution is expressly prescribed by the Board of Directors or these by- laws; (f) have general charge of the stock transfer books of the Corporation; (g) have authority to certify the by- laws, resolutions of the shareholders and Board of Directors and committees thereof, and other documents of the Corporation as true and correct copies thereof; and (h) perform all duties

incident to the office of secretary and such other duties as from time to time may be assigned to him/her by the President or by the Board of Directors.

**SECTION 13. ASSISTANT TREASURERS AND ASSISTANT SECRETARIES. The** Assistant Treasurers and Assistant Secretaries shall perform such duties as shall be assigned to them by the Treasurer or the Secretary, respectively, or by the President or the Board of Directors. The Assistant Secretaries may sign with the President or a Vice President, or any other officer thereunto authorized by the Board of Directors, certificates for shares of the Corporation, the issue of which shall have been authorized by the Board of Directors, and any contracts, deeds, mortgages, bonds, or other instruments which the Board of Directors has authorized to be executed, according to the requirements of the form of the instrument, except when a different mode of execution is expressly prescribed by the Board of Directors or these by- laws. The Assistant Treasurers shall, if required by the Board of Directors, give bonds for the faithful discharge of their duties in such sums and with such sureties as the board of directors shall determine.

SECTION 14. SALARIES. The salaries of the officers shall be fixed from time to time by the Board of Directors and no officer shall be prevented from receiving such salary by reason of the fact that he is also a director of the Corporation.

## ARTICLE V

## CONTRACTS, LOANS, CHECKS AND DEPOSITS

SECTION 1. CONTRACTS. The Board of Directors may authorize any officer or officers, agent or agents to enter into any contract or execute and deliver any instrument in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

SECTION 2. LOANS. No loans shall be contracted on behalf of the Corporation and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board of Directors.

SECTION 3. CHECKS, DRAFTS, ETC. All checks, drafts or other orders for the payment of money, notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers, agent or agents of the Corporation and in such manner as shall from time to time be determined by resolution of the Board of Directors.

SECTION 4. DEPOSITS. All funds of the Corporation not otherwise employed shall be deposited from time to time to the credit of the Corporation in such banks, trust companies or other depositories as the Board of Directors may select.

## ARTICLE VI

## SHARES AND THEIR TRANSFER

**SECTION 1. SHARES REPRESENTED BY CERTIFICATES AND UNCERTIFICATED SHARES.** The issued shares of the Corporation shall be represented by certificates or shall be uncertificated shares.

Certificates representing shares of the Corporation shall be signed by the appropriate officers and may be sealed with the seal or a facsimile of the seal of the Corporation. If a certificate is countersigned by a transfer agent or registrar, other than the Corporation or its employee, any other signatures may be facsimile. Each certificate representing shares shall be consecutively numbered or otherwise identified and shall also state the name of the person to whom issued, the number and class of shares (with designation of series, if any), the date of issue, and that the Corporation is organized under Delaware law. If the Corporation is authorized to issue shares of more than one class or of series within a class, the certificate shall also contain such information or statement as may be required by law.

Unless prohibited by the articles of incorporation, the Board of Directors may provide by resolution that some or all of any class or series of shares shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until the certificate has been surrendered to the Corporation. Within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send the registered owner thereof a written notice of all information that would appear on a certificate. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated shares shall be as identical to those of the holders of certificates representing shares of the same class and series.

The name and address of each shareholder, the number and class of shares held and the date on which the shares were

issued shall be entered on the books of the Corporation. The person in whose name shares stand on the books of the Corporation shall be deemed the owner thereof for all purposes as regards the Corporation.
SECTION 2. LOST CERTIFICATES. If a certificate representing shares has allegedly been lost or destroyed, the Board of Directors may, in its discretion, except as may be required by law, direct that a new certificate be issued upon such indemnification and other reasonable requirements as it may impose.
SECTION 3. TRANSFER OF SHARES. Transfer of shares of the Corporation shall be recorded on the books of the Corporation. Transfer of shares represented by a certificate, except in the case of a lost or destroyed certificate, shall be made on surrender for cancellation of the certificate for such shares. A certificate presented for transfer must be duly endorsed and accompanied by proper guaranty of signature and other appropriate assurances that the endorsement is effective. Transfer of an uncertificated share shall be made on receipt by the Corporation of an instruction from the registered owner or other appropriate person. The instruction shall be in writing or a communication in such form as may be agreed upon in writing by the Corporation.

ARTICLE VII
FISCAL YEAR

The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

ARTICLE VIII
DISTRIBUTIONS

The Board of Directors may authorize, and the Corporation may make, distributions to its shareholders, subject to any restrictions in its articles of incorporation or provided by law.

## ARTICLE IX

## SEAL

The corporate seal shall have inscribed thereon the name of the Corporation and the words "Corporate Seal, Delaware." The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced, provided that the affixing of the corporate seal to an instrument shall not give the instrument additional force or effect, or change the construction thereof, and the use of the corporate seal is not mandatory.

## ARTICLE X

## WAIVER OF NOTICE

Whenever any notice is required to be given under the provisions of these by- laws or under the provisions of the articles of incorporation or under the provisions of the Act, a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Attendance at any meeting shall constitute waiver of notice thereof unless the person at the meeting objects to the holding of the meeting because proper notice was not given.

## ARTICLE XI

## INDEMNIFICATION

Each person who at any time is or shall have been a director, officer, employee or agent of this Corporation, or is or shall have been serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified by this Corporation in accordance with and to the full extent permitted by the Act. The foregoing right of indemnification shall not be deemed exclusive of any other rights to which a person seeking indemnification may be entitled under

any by- law, agreement, vote of shareholders or disinterested directors or otherwise. If authorized by the Board of Directors, the Corporation may purchase and maintain insurance on behalf of any person to the full extent permitted by the Act. If the Corporation pays indemnity or makes an advance of expenses to a director, officer, employee or agent, the Corporation shall report the indemnification or advance in writing to the shareholders with or before the notice of the next shareholders' meeting.

**ARTICLE XII**

**AMENDMENTS**

Unless otherwise provided in the articles of incorporation, these by- laws may be made, altered, amended or repealed by the shareholders or the Board of Directors, but no by- law adopted by the shareholders may be altered, amended or repealed by the Board of Directors.

14

**EXHIBIT 21**

**SUBSIDIARIES OF**

**AMERICAN CLASSIC VOYAGES CO.**

| Name of Subsidiary | Jurisdiction Under Which Organized | Percentage of Ownership |
|---|---|---|
| The Delta Queen Steamboat Co. | Delaware | 100% |
| DQSB II, Inc. | Delaware | (1) |
| Cruise America Travel, Incorporated | Delaware | (1) |
| Great River Cruise Line, L.L.C. | Delaware | (2) |
| Great Ocean Cruise Line, L.L.C. | Delaware | (2) |
| Great AQ Steamboat, L.L.C. | Delaware | (2) |
| DQSC Property Co. | Delaware | (1) |
| Great Hawaiian Cruise Line, Inc. | Delaware | 100% |
| Great Independence Ship Co. | Delaware | (3) |
| Oceanic Ship Co. | Delaware | (3) |
| Great Hawaiian Properties Corporation | Delaware | (3) |
| American Hawaii Properties Corporation | Delaware | (3) |
| CAT II, Inc. | Delaware | (3) |

(1) 100% owned subsidiaries of The Delta Queen Steamboat Co. (2) 99% owned subsidiaries of The Delta Queen Steamboat Co. and 1% owned subsidiaries of DQSB II, Inc.
(3) 100% owned subsidiaries of Great Hawaiian Cruise Line, Inc.

**EXHIBIT 23**

Consent of Independent Auditors

---

The Board of Directors and Stockholders
American Classic Voyages Co.
We consent to incorporation by reference in the registration statement No. 33- 80614 on Form S- 3 and No. 333- 44225 on Form S- 8 of American Classic Voyages Co. of our report dated February 20, 1998, relating to the consolidated balance sheets of American Classic Voyages Co. and subsidiaries as of December 31, 1997 and 1996, and the related consolidated statements of operations, changes in stockholders' equity, and cash flows for each of the years in the three- year period ended December 31, 1997, and the related financial statement schedule, which report appears in the December 31, 1997 annual report on Form 10- K of American Classic Voyages Co.

/s/ KPMG Peat Marwick LLP
KPMG Peat Marwick LLP

Chicago, Illinois
March 30, 1998

<ARTICLE> 5
<MULTIPLIER> 1,000
<PERIOD-TYPE> 12-MOS
<FISCAL-YEAR-END> DEC-31-1997
<PERIOD-END> DEC-31-1997
<CASH> 19,512<F1>
<SECURITIES> 0
<RECEIVABLES> 1,299
<ALLOWANCES> 0
<INVENTORY> 0
<CURRENT-ASSETS> 28,624
<PP&E> 230,498
<DEPRECIATION> 59,393
<TOTAL-ASSETS> 210,895
<CURRENT-LIABILITIES> 70,188
<BONDS> 81,488
<PREFERRED-MANDATORY> 0
<PREFERRED> 0
<COMMON> 140
<OTHER-SE> 59,079
<TOTAL-LIABILITY-AND-EQUITY> 210,895
<SALES> 0
<TOTAL-REVENUES> 177,884
<CGS> 0
<TOTAL-COSTS> 111,295
<OTHER-EXPENSES> 0
<LOSS-PROVISION> 0
<INTEREST-EXPENSE> 6,963
<INCOME-PRETAX> 4,049
<INCOME-TAX> 1,620
<INCOME-CONTINUING> 2,429
<DISCONTINUED> 0
<EXTRAORDINARY> 0
<CHANGES> 0
<NET-INCOME> 2,429
<EPS-PRIMARY> 0.17
<EPS-DILUTED> 0.17
<FN>
<F1>Includes restricted short-term investments of $325.

</FN> Case 1:13-cv-00324-RGA Document 224 Filed 02/01/17 Page 223 of 300 PageID #: 15822

HMS0096736

# Exhibit 77

In October 2001, the Original Shipowner filed for Chapter 11 protection under the U.S. Bankruptcy Code. When the Original Shipowner failed to make its February 24, 2002 debt service payment, the Secretary assumed the Obligations pursuant to the Indenture, and made this payment, plus applicable interest. With the consent of the Bankruptcy Court, the Vessel was sold to DNPS Delta Queen Steamboat Company, Inc. ("DQSC") in April 2002, and DQSC designated its subsidiary, American Queen Steamboat LLC as the shipowner (the "Second Shipowner"). The Second Shipowner assumed the Indenture, the Obligations, the Secretary's Note and the Mortgage. It also executed and delivered to the Secretary its promissory note in the amount of $2,788,509.40 (the "Additional Note"), which was the amount the Secretary paid to assume the Obligations, plus interest; that certain security agreement, that certain Title XI Reserve Fund and Financial Agreement and that certain Depository Agreement.

Since April 2006, the Vessel was sold to AQ Boat, LLC (the "Third Shipowner"), which assumed the Indenture, Obligations, the Mortgage, the Secretary's Note and the Additional Note. It also executed and delivered to the Secretary that certain security agreement (the "Third Security Agreement"), that certain Title XI Reserve Fund and Financial Agreement (the "RFFA"), and that certain Depository Agreement the ("DA"). In order to secure the due and punctual payment of the Secretary's Note and the Additional Note, Ambassadors International, Inc., ultimate parent of the Third Shipowner ("Ambassadors"), executed and delivered to the Secretary its guaranty of the principal of and interest on the Secretary's Note and the Additional Note, up to a maximum of $7,257,095 (the "Parent Guaranty"). The Parent Guaranty specified that each time the Third Shipowner made a debt service payment, the maximum amount of the Parent Guaranty would be reduced by the principal amount thereof, or $1,212,000; and would be further reduced by any principal amounts paid on the Additional Note. Approximately $1.2M remains.

In the Spring of 2008, the Third Shipowner orally advised the Secretary that it would make the August 24, 2008 debt service payment, but would make no further such payments thereafter. The Third Shipowner ceased operating the Vessel on November 15, 2008, and plans to surrender possession to the Secretary on November 20 or 21.

The next date payments are due under the Secretary's Note and the Additional Note is February 24, 2009. The Indenture Trustee may make no demands on the Guarantee for thirty days following failure to pay.[1] Even if the Trustee were to demand payment on the thirty-first day, it is unlikely the Secretary would pay until the thirty-third or thirty-fourth day, or the beginning of April 2009. The Guarantee provides that interest accrues on the principal of the Obligations until the Secretary makes payment. As of this date there is more than $30M outstanding in principal and interest, at 6.5% on the Secretary's Note, and 2.3% on the Additional Note. In order to minimize the interest for which the Secretary is liable, the Secretary intends to declare a default under the Security Agreement the week of November 24, 2008, send

[1] The definition of a Payment Default involves a failure to pay principal or interest when due and such failure continues for thirty days. If the Secretary sends the Indenture Trustee a Secretary's Notice, which details a default under the Security Agreement other than a Payment Default, the Trustee may demand payment under the Guarantee at any time.



U.S. Department
of Transportation
**Maritime Administration**

1200 New Jersey Avenue, S.E.
Washington, DC 20590

November 19, 2008

**BY ELECTRONIC MAIL:**

Stephen Flynn, Esquire
Assistant Director, Admiralty Branch
Civil Division
United States Department of Justice
1425 New York Avenue, NW
Room 10100
Washington, D.C. 20005

stephen.flynn@usdoj.gov

**Re: Default of Title XI Obligations**

Dear Mr. Flynn:

The Secretary of Transportation, acting by and through the Maritime Administrator (the "Secretary") hereby requests that the United States Department of Justice, Civil Division, represent the Secretary in an impending foreclosure of a First Preferred Ship Mortgage.

Pursuant to the provisions of Title XI of the Merchant Marine Act, 1936 (46 U.S.C.A. Section 53701, *et seq.*), the Secretary, on August 24, 1995, guaranteed (the "Guarantee") approximately $60 million of principal of and interest on corporate bonds (the "Obligations") issued by Great AQ Steamboat Company (the "Original Shipowner") pursuant to that certain trust indenture (the "Indenture"), in order to finance, in part, construction of a passenger vessel, the AMERICAN QUEEN (the "Vessel"). The Original Shipowner executed and delivered to the Secretary its promissory note in the same principal and interest as the Obligations (the "Secretary's Note"). By the terms of the Secretary's Note, payment of the Bonds constituted payment of the Secretary's Note. As security for the due and timely payment of the Secretary's Note, the Original Shipowner executed and delivered to the Secretary that certain security agreement (the "Security Agreement"), and that certain first preferred ship mortgage relating to the Vessel (the "Mortgage"). Debt service payments under the Obligations are August 24 and February 24 of each year, and the Obligations mature on June 2, 2020.

a Secretary's Notice thereof to the Indenture Trustee, which would trigger a demand under the Guarantee, which the Secretary would promptly pay. After the Secretary makes payment under the Guarantee, it would so notify the Third Shipowner and the Guarantor and accelerate the maturity of both notes. Upon failure to receive payment from the Third Shipowner and/or the Guarantor, an *in rem* proceeding against the Vessel and an *in personam* proceeding against the Third Shipowner and, if necessary, against the Guarantor could commence as soon thereafter as possible. We will keep you advised as matters develop.

Thank you for your attention to this matter, and if any further information is needed, please contact Patricia E. Byrne, Office of Chief Counsel, Maritime Administration, at (202)-366-5172, or at patricia.byrne@dot.gov.

Very truly yours,

Elizabeth R. Megginson
Acting Deputy Maritime Administrator
And Chief Counsel

# Exhibit 78
REDACTED

# Exhibit 79



Hybrid Marine Solutions For Power, Performance, and Payback BAE SYSTEMS INSPIRED WORK www.hybridrive.com

Home Magazines Advertising Events Videos Contact us Special Reports

Search for...

MARINELINK
Monday, January 23, 2017

Shipbuilding/Repair Deepwater Offshore Coastal/Inland Government Equipment Training Law & Regulations

# PVA:The Return of the American Queen

January 28, 2003

0 Like Share 0 Share 0 G+1 Tweet Email

In late October 2001, three of America's six steam-driven paddlewheelers were suddenly tied up due to bankruptcy of the parent company, American Classic Voyages, and facing a very uncertain future. The management failures and cost excesses of the past owners that caused the company failure have been well documented and need not be recounted.

What is important is that out of the ashes of American Classic Voyages has come the Delta Queen Steamboat Company. It is back on America's rivers and moving forward with a full head of steam. Purchased last May by Delaware North Companies of Buffalo, NY for $80 million, the new company is "well positioned to resume it place as the premier provider of inland river vacations," said Tom Carmen, president of the new company. Carmen was one of a handful of executives with the former company that has formed the management nucleus of the new company.

While still under bankruptcy court control, the new management put the Mississippi Queen back into service in May of 2002 on 3-10 voyages on the Mississippi River. Less than a month after that, the deal with Delaware North was completed. In August, the Grand Dame of all passenger vessels, the Delta Queen, was back in service.

Now the company is at full strength with the return of the American Queen on January 18, 2003.

The work on the American Queen began in earnest as soon as the Delta Queen went back into service in August 2002.

Return to the River

"Although the boat has been out of service for over a year, we are handling the vessel the same as we do all three of our steamboats during the annual January downtime," said Scott Fassler, Delta Queen's Port Engineer, who is in charge of the maintenance of all three vessels.

"When the vessel returned to New Orleans, we didn't just tie her up and walk away," Fassler added. The vessel was carefully winterized draining certain fluids and carefully protecting the interior, Fassler remarked. Since the vessel remained at her dock next to company headquarters there was always someone close by if something needed attention as well as protection from vandalism.

'For example, the vessel rode out a hurricane and a tropical storm during the summer of 2002 without damage. A couple of deck drains were plugged, but those were easily cleared," Fassler said.

"The things we have done to ready the vessel for service have been the normal vessel maintenance items," Fassler added. "The American Queen annually spends 3-5 weeks out of service in January so we can refurbish the staterooms, public spaces and back of the house areas such as crew quarters and the galley," Fassler reported.

A lot of painting, carpet replacement, new wall coverings, stateroom renovations and public space upgrades headed the list of improvements on the American Queen.

In the engine room, the port side Pitman Arm driving one side of the paddlewheel was also replaced, but not due to the lay up. "We had that on our "to do" list before the shutdown anyway," Fassler said.

Special attention was paid to the galley hood exhausts to insure that all grease was removed prior to reactivating the stoves and the entire exterior of the vessel received a detailed pressure washing to wash away the nearly 15-months of inactivity.

The 418- x 89-ft. American Queen features a unique steam-electric propulsion system. To those who have seen the vessel, it looks like the paddlewheel is the only means of propulsion. Indeed the steam-driven paddlewheel is impressive. A pair of vintage tandem compound horizontal reciprocating steam engines generate 1,500 hp driving a 45-ton, 30-ft. wide by 28-ft. diameter bright red paddlewheel with a 36-ft. long shaft. The steam engines were found in the swamps of Mississippi aboard the U.S. Army Corp of Engineers dredge Kennedy.

However, flanking the paddlewheel at the stern are two 1,000 hp Z-drives offering extra thrust and outstanding stern maneuverability. Forward is a pair of 300 hp bow thrusters.

The power to drive the Z-drives, bow thrusters and all other electrical loads on the vessel comes from three Caterpillar (CAT) 3516 diesel engines generating 1450 KW each.

The vessel has six passenger decks and can hold 436 passengers in double occupancy. With all triple bedded staterooms full, total occupancy is 481 passengers in 222 staterooms. Chief among the public areas is the Grand Saloon, an opulent two-deck showroom that was built to resemble a miniature opera house in a prosperous river town of the 1890's.

By January 11, the full crew was back on board preparing for a couple of "practice" cruises before the first

Type approved by the U.S. Coast Guard

U.S. Coast Guard APPROVED
PureBallast is pure confidence in all waters

Naval Architects, Marine Engineers, Marine Surveyors
THE SHEARER GROUP INC

SCHUYLER COMPANIES
Fenders on the go.

Click here to learn more

**Maritime Reporter and Engineering News'** first edition was published in New York City in 1883 and became our flagship publication in 1939. It is **the world's largest audited circulation magazine serving the global maritime industry**, delivering more insightful editorial and news to more industry decision makers than any other source.

Subscribe For Free

Floating Production Database
START YOUR FREE TRIAL

**Maritime Reporter E-News** is the subsea industry's largest circulation and most authoritative ENews Service, delivered to your Email three times per week

**Subscribe for Maritime Reporter E-News**

Enter your email

Subscribe For Free

By January 11, the full crew was back on board preparing for a couple of "practice" cruises before the first passengers were welcomed aboard for a seven-day New Orleans round trip voyage.

Selling the "Experience"

Prepping the American Queen to return to service is only one part of the equation. Equally important is the sales and marketing effort to fill the steamboat.

"We faced a rather unique set of circumstances, " said Russ Varvel, sales and marketing manager for the Delta Queen Steamboat Company. "Anytime you suddenly shut down a cruise operation, passengers are upset and so are our partners the travel agents," Varvel added.

Soon after the three vessels suspended operations, a skeleton staff in New Orleans has been planning their return to the rivers. To help build consumer and industry confidence in the "new" Delta Queen Steamboat Company, deposits for cruises were escrowed. "We weren't going anywhere without the confidence that cruise payments were secure," Varvel said.

Varvel, who has spent 20 years with Delta Queen, retired in 2000. He returned as a consultant with a select group of other Delta Queen executives to get the company back in business again. .

Now he has once again assumed the position of heading up the sales and marketing effort for the three steamboats.

"Needless to say our financial credibility was greatly enhanced by the purchase by Delaware North," Varvel remarked.

Like its two steamboat sisters, the American Queen's main market is what Varvel describes as "50-50." That is, people over 50 years old that make more than $50,000 per year.

"Most of our business comes from the West Coast, Florida and the Northeast," Varvel said. Surprisingly, the home base of New Orleans and other river towns such as St. Louis, Memphis, Cincinnati and Pittsburgh do not generate a lot of business. "To people who live along the river, it is taken for granted...a given and many of our port calls have been visited previously by residents of these river towns, Varvel said.

"If you are from Boston, a trip on one of our steamboats is a real vacation, a chance to explore the unique culture and sights of America's rivers," Varvel added. A trip by a river town passenger is more of a getaway than a vacation.

Over 90% of the Delta Queen steamboat vacations are booked by travel agents, according to Varvel. "We have a call center in New Orleans staffed by 15 or so travel specialists (many who work exclusively on the telephone with travel agents) who not only book the steamboat trip but also arrange for airline transportation to New Orleans or any of our other port cities where our cruises depart," Varvel remarked.

To keep the call center busy, Varvel invests heavily in consumer advertising in travel-orientated magazines and in daily newspapers...all with the aim of a potential passenger calling his or her travel agent. To gauge the effectiveness of the various ads the company runs, a different 800-number is included in each ad. "We must have at least 50 toll-free 800 numbers we can use in different media," Varvel said.

It's all about selling the total experience, according to Varvel. "We are well known for our food, the Victorian ambiance in our staterooms and public areas as well as onboard and off-boat entertainment. " Our onboard entertainment the best and that is no idle boost," Varvel said. "The readers of several travel magazines published by Conde Nast have ranked our entertainment the best among all cruise lines and that includes the 'big blue water' companies," Varvel said. Varvel believes there has been a shift in the desires of his core customers, the older upscale traveler and he is changing his shore tours to some extent. "Today's upscale traveler is more active and more eclectic, wanting a wider choice of activities, Varvel said.

To met this need, the American Queen and her sister steamboats will be offering shore tours that feature more than bus rides through attractions. "When we get upriver the Scandinavian influence is strong, so we may offer a polka dance party ashore or in other areas it may be an archeological 'dig' or a Cajun meal and dance party in Southern Louisiana or at Lookout Mountain in Tennessee, touring the Civil War battlefields is OK, but how about a reenactment of the battle for increased passenger interest," Varvel noted. Currently the American Queen is running a series of 3, 6 and 7 night cruises on a roundtrip basis out of New Orleans. These cruises usually make port calls on Natchez and Vicksburg, Miss., St. Francisville, Oak Alley and Baton Rouge, La.

In April, the American Queen begins her trip up the Mississippi and Ohio river systems with voyages leaving from Memphis, St. Louis and St. Paul on the Mississippi River and Cincinnati, Louisville and Pittsburgh on the Ohio River before once again turning south working her way back to New Orleans in the late fall.

The Delta Queen and the Mississippi Queen also work the Ohio and Mississippi rivers but since these boats are smaller they also visit Nashville and Chattanooga on the Cumberland and Tennessee rivers as well as voyages on the Intercoastal Waterway between New Orleans and Galveston, Texas.

## Related News

**EMGS' Vessel Utilisation Soars**

Electromagnetic Geoservices ASA (EMGS) releases information on vessel activity and utilisation 4-5 working days

## Popular News

**Subsea 7 offer for Seaway Heavy Lifting**

Subsea 7 S.A. announced that one of its wholly owned subsidiaries has made an

after the close of each quarter.

### 0.5% Sulphur Cap Implementation on Agenda

Work to support the smooth and effective implementation of the 0.5% m/m global sulphur cap on fuel oil used by ships will...

### Catamaran Ferry Launched in China

A new 40-meter catamaran passenger ferry has been launched in China to be operated by Sea's Young in Hong Kong. Designed...

### Gladding-Hearn Delivers NYC Sightseeing Vessel

Gladding-Hearn Shipbuilding, Duclos Corporation, said it has delivered Circle Line Bronx, the first of three new sightseeing...

### Mining Wastes Report Identifies Research Gaps

More scientific research needs to be done to understand and assess the environmental impacts of wastes from mining operations...

### New Port Approach Guides for Singapore

The United Kingdom Hydrographic Office (UKHO) has launched three new Port Approach Guides with the support of the Maritime...

offer to acquire the 50% shareholding in Seaway Heavy Lifting Holding

### Rotterdam Offshore Expands Operational Capabilities

As of January 2017, Rotterdam Offshore Group has started to upgrade their facilities in the Waalhaven, Rotterdam.

### Van Oord inks Offshore Windfarm Deal

Van Oord has been awarded the contract for East Anglia ONE offshore windfarm by ScottishPower Renewables (part of the Iberdrola Group) for the

### Carnival to Build Two New Cruise Ships with Fincantieri

Two new ships to be built for company's Holland America Line and Princess Cruises brands will help meet growing demand for cruise vacations and

## Jobs

Search for Maritime Job... 

### Project Manager HVAC (m/f)

• Marine Technik Hamburg GmbH&Co.KG • Hamburg, Germany

### Chief Radio Electronics Technician

• Military Sealift Command

### Master Unlimited

• Transatlantic Lines LLC

### Chief Engineer Unlimited

• Transatlantic Lines LLC

### Vice President, European Government & Public Affairs

• Brussels, Belgium, Belgium

Post Resume | Employers – Post Jobs

- Subscribe to Maritime Reporter Magazine
- Subscribe to Marine News Magazine
- Subscribe to Maritime Reporter Email News
- Download Maritime Global News iPhone and Android app
- Maritime Directory
- Maritime Intelligence
- Terms and Conditions
- Copyright
- Privacy
- Archive

- MarineLink.com
- MaritimeProfessional.com
- MaritimeTechnologyNews.com
- WorldEnergyNews.com
- MaritimeJobs.com
- YachtingJournal.com
- MarineElectronics.com
- MaritimePropulsion.com

- Maritime Reporter Magazine
- Marine News Magazine
- Maritime Professional Magazine
- Marine Technology Magazine
- Maritime Magazines
- White Papers
- US Maritime Intelligence
- Maritime Directory



# Exhibit 80



DELTA QUEEN
STEAMBOAT COMPANY, INC.
River
2004
2005
BOOK EARLY AND SAVE!
Details Inside!
DELTA QUEEN

## The road to adventure

# ISN'T A ROAD AFTER ALL. IT'S A RIVER.

Since 1890, Americans have sought adventure on the rivers of Delta Queen. Now it's your turn. Stunning river scenery, picturesque ports, sumptuous dining, award-winning entertainment, and pampering by an all-American crew await. From the moment you step aboard one of our floating palaces, you'll feel like the guest of honor in a fine old home. You be surrounded by the wonder of America, the splendor of the Victorian era, and an intimate group of passengers who, li yourself, seek rejuvenation and relaxation on the river.

This year, the legendary *Delta Queen*® and the magnificent *Mississippi Queen*® offer magical 3- to 12-night adventu up and down the Mississippi, Ohio, Tennessee, Cumberland, and four other fascinating waterways. Come follow in the wake of trappers and traders, pirates and presidents, back to the heart of this great country. Many of these cruises are theme vacations, revolving around a particular kind of music, a time or event in history, a special time of year or a person hobby or interest. You're sure to find one that will fascinate you.

And down in New Orleans, the grand *American Queen*® continues to delight passengers most of the year with the New Orleans & Riverboat Adventure Week, the only riverboat adventure that comes with a FREE New Orleans vacation. This 7-night experience includes 3 or 4 nights at an exceptional New Orleans hotel, dinners at renowned restaurants suc as Arnaud's® and Emeril's®, and your choice of tickets to the very best attractions—all to be enjoyed before or after a 3- or 4-night river adventure through the Old South. What a week! In late December 2004 and Summer 2005, the *American Que* will offer longer vacations, journeying as far north as Memphis.

While the *Delta Queen* and the *Mississippi Queen* are more Mark Twain and the *American Queen* is more Mardi Gras, all three offer first-class fun all the way. To discover which vacation is righ for you, read on. You'll find there's something new around every ben with the Delta Queen Steamboat Company, Inc.

*Table of Contents*

The Steamboatin'® Experience ................
*American Queen*® ............................
New Orleans & Riverboat Adventure Week ......1(
The Steamboats
*Delta Queen*® ............................1(
*Mississippi Queen*® ......................1
America's River Regions ....................2(
Old South Ports ............................22
America's Heartland Ports ..................27
Wilderness Rivers Ports ....................31
Golfing on the River .........................
Riverbonding Family Program ................36
Theme Cruises ..............................38
CityScape Hotel Stay .......................48
Cruise Schedules ...........................50
Deck Plans .................................56
Important Information ......................62
Advance Purchase Program & Fares . . .Inside Back Co

# What's New On
# OLD MAN RIVER.

• **ADVANCE PURCHASE PROGRAM**—when you book a 2004, 2005 or 2006 Steamboatin'® vacation early, you may qualify for discounts of up to half off (2-for-1 fares), Free Airfare or more. See more information on the inside back cover of this brochure.

• **NEW ORLEANS & RIVERBOAT ADVENTURE WEEK**—the only riverboat adventure that comes with a FREE New Orleans vacation! Spend 3 or 4 nights in New Orleans including some meals and attractions and 3 or 4 nights on an *American Queen®* river cruise—a total of 7 nights—all for the price of a 4-night river cruise. Plus, book early and enjoy Free Roundtrip Airfare, too. See pages 10 and 11 of this brochure.

• **THEME VACATIONS**—New themes include *World War II Remembrance, Gardens of the River Vacations®, Springtime in Texas, Psychic Experience, Financial Planning, Patchwork in Paducah, St. Louis 4th of July* and the *Wonder of the Tenn-Tom*. See pages 38-47 for specifics.

• **"RIVERBONDING" Adventures for Families**—Unplug the TV and the video games and reconnect with your kids on the river. Come immerse your family in the history and wonder of this great country of ours. Book early and take advantage of Advance Purchase discounts, plus kids under the age of 18 travel free. See pages 36 and 37 for details.

• **STEAMBOATIN'® GOLF TRAIL VACATIONS**—Go Steamboatin' from course to course on these exciting vacations, now available on any of our three steamboats. See page 35.

***"We just completed our second seven-day trip, and I wanted you to know how impressed we were once again with the service, staff, food and entertainment. Thank you for your attention to detail!"***

***–June M. Clark, Henderson, Nevada***

America is a great land.

# COME ON. WE'LL TAKE YOU THERE.

There's something compelling about the river. Its many moods. Its shades sapphire blue and café au lait. The way the wind sweeps across it and nuzzl the trees along its banks. How the moonlight dances on the wavelets. Son places it courses quickly along, while elsewhere, it flows placidly, lazily. Ar along its entire length, it nourishes and nurtures the people who live along i banks and those who travel upon it.

America grew up along these great natural "highways." Frontier villag and pioneer settlements grew into bustling towns and thriving cities, each special place with a very special story to share.

A river adventure is like no other vacation. It's an opportunity to explo America's past, delight in her present and consider her future from unique perspective.



Delve into antebellum culture as you peer behind the façade of columns and Southern belles' hoopskirts. Explore an ancient Indian burial mound, then jump ahead several millennia to learn about today's satellite river navigation at a maritime museum. Visit the homes of America's most famous and most notorious. Climb the stockades of frontier forts and footpaths up to bluff-top lookouts. Or just relax in a deckside rocking chair and watch it all glide by.

From New Orleans to Minneapolis/St. Paul, Cincinnati to Pittsburgh, Nashville to Chattanooga, river country is filled with exciting destinations and hidden charms that arouse your spirit of adventure. Heed the river's call and come discover the America that lines its banks.

# Steamboats. There's a reason they're called FLOATING PALACES.

At one time, more than 1,200 steamboats plied the great rivers of America. It was America's Golden Age, and opulence was the name of the game. In the East, the rich were building their summer "cottages" in Newport—each trying to outdo the other. On the Mississippi River, a similar competition was in progress. Who could build the biggest, fastest, most luxurious steamboat, with the most breathtaking grand staircase, the most glittering chandeliers, and the most elegant staterooms? Whose grand dining room would outshine the others with the finest wait staff, linens, china and crystal—not to mention the richest cuisine? Which steamboat would put together the best show with the grandest orchestras of the day and the prettiest girls?

While the Delta Queen Steamboat Company, Inc. operates the only three remaining overnight steamboats on the heartland rivers, and has only the ghosts of former floating palaces to compete with, we do have a tradition to uphold. The luxury of America's great steamboats is legendary. We consider it our sacred duty to keep the legend alive.



The three ladies of the river, the legendary *Delta Queen*®, the magnificent *Mississippi Queen*® and the grand *American Queen*®, are as opulent as any riverboats in history. The food served in our steamboat dining rooms is comparable to the cuisine prepared in the most famous restaurants in the world. The dance music is superb. And when it comes to entertainment, prepare to be wowed. This ride is a kind of floating Broadway. Come see our stars!

A day aboard the steamboat is filled with lots of fun activities, including Riverlorian® chats, craft-making, talks with famous guests, and games with new friends. And, of course, a day can't go by without a little time spent in a rocker on deck with a cool drink. They say, if you've never been Steamboatin'®, you've never been pampered. Believe it.

## HONORS & ACCOLADES

- ***TRAVEL + LEISURE*® MAGAZINE**
  World's Top Ten Cruise Lines 2002®
- ***CONDÉ NAST TRAVELER*®**
  One of the World's Top 25 Cruise Lines®
- ***THE MATURE TRAVELER***
  Voted one of the world's top three most senior-friendly destinations
- ***CONDÉ NAST TRAVELER*®**
  The Delta Queen Steamboat Company has earned a berth on the Gold List
- **NATIONAL MARITIME HALL OF FAME**
  The *Delta Queen*
- ***THE GUINNESS BOOK OF WORLD RECORDS*®**
  The *American Queen* listed as the largest steamboat ever built



# The Grand *AMERICAN QUEEN*®

## Discover The Delights Of New Orleans And The South.

This year, we invite you to join us for the vacation of a lifetime on "the greatest steamboat the world has ever known®," the grand *American Queen*®.

Join us for the New Orleans & Riverboat Adventure Week—a complete 7-day vacation that includes a 3- or 4-night riverboat cruise combined with a free 4- or 3-night hotel package in New Orleans. Or, make plans to be on board during the summer months for a longer 5-, 6- or 7-night exploration of the Old South.

The *American Queen* is grand in every sense of the word. She is a fitting tribute to the very best in steamboat design. Enhanced by double landing stages, towering fluted smokestacks, a gazebo-style pilothouse and a colossal red paddlewheel, the *American Queen* will mesmerize you even before you step foot on board. Prepare to be entertained in the grandest of manners. To be wined and dined like a king or queen. To be pampered beyond belief. This $65 million steamboat will wrap you in uncompromising luxury.

*You'll enjoy a different show every night in the two-tiered Grand Saloon showroom. Jazz, the best of Broadway, Cajun comedy and music, Mardi Gras revelry, piano-bar entertainment, and late-night dancing...we've got it all.*

The New Orleans-inspired food served in the elegant *J.M. White* Dining Room is as enticing to the palate as her design and decor are to the eyes. We'll spoil you for any other vacation fare with choices like poached egg over crab cake with corn macque choux for breakfast, seafood platters for lunch, wild-rice-stuffed, praline-crusted boneless game hen for dinner—and we're not even talking dessert yet! There, you'll have a hard time choosing between Mississippi Mud Pie, Bananas Foster, and three kinds of bread pudding topped with hot bourbon sauce. And since we cook for 400, not 4,000, there's nothing institutional about our cuisine. Everything you're served is prepared just for you.

What could be better than the food? Well, how about the entertainment in the two-story Grand Saloon, inspired by Ford's Theater? During the cruise you'll experience the best of Broadway, New Orleans jazz and authentic Cajun music. You'll also be treated to a Cajun comic, Mardi Gras revelry, piano-bar entertainment, and late-night dancing. Our quintet plays everything from popular standards for slow dancing to vintage rock 'n' roll.

*Enjoy cool drinks, pleasant conversation and stunning views of the spray from the giant red paddlewheel.*

And when you're not eating or being entertained, you can curl up with a favorite novel in a window seat of the Ladies' Parlor, meet for a game of gin in the Gentlemen's Card Room or stop by the Engine Room Bar for happy hour or a game of musical TV trivia. All six decks of this dramatically beautiful "wedding cake on the water" offer numerous diversions and delights. And several of these cruises feature special themes. See page 9 for details.

Come experience the *American Queen*'s matchless luxury and grand ambience. You'll quickly realize there's never been a paddlewheel steamboat quite like this one.

*Enjoy a quiet moment or study the antique treasures on display in the beautiful Mark Twain Gall*



*Twilight might find you enjoying a peaceful poolside interlude.*

*The breathtaking grand staircase of the* American Queen.

The grand *American Queen®*
Length: 418 feet Staterooms: 222
Passenger capacity: 436
Elevators: 2 Crew: 160

*AMERICAN QUEEN* FEATURES:

- Athletic Club • Bathing Pool
- Calliope Bar • Chart Room
- Engine Room Bar • Front Porch of America®
- Gentlemen's Card Room • Grand Saloon
- *J.M. White* Dining Room • Ladies' Parlor
- Main Deck Lounge • Mark Twain Gallery
- Purser's Lobby • Theater • Captain's Bar
- Emporium Gift Shop • Beauty Salon

# YOUR *American Queen*® RIVERBOAT ADVENTURE

## *Paddlewheels. Plantations. And Pampering.*

*Oak Alley Plantation*

*Visit the garçonnière at Houmas House Plantation and Gardens.*

Whether you choose the New Orleans & Riverboat Adventure Week or one of the longer summer departures listed on pages 51 and 52 of this brochure, the *American Queen*® will give you a unique, behind-the-pillars glimpse of the Old South.

On the shorter 3- or 4-night Adventure Week cruises, you can visit magnificent Oak Alley, one of the most photographed plantation houses in the world; and Laura, close by, one of the last remaining Creole plantations. Further upriver in St. Francisville, Rosedown Plantation awaits with her gardens inspired by those at Versailles. St. Francisville is also home to The Myrtles, reputed to be one of the most haunted houses in America. If you're looking for Civil War history, you'll find plenty in this picturesque town on the river.

In Baton Rouge, choices include the *Cajun Heritage and Rural Life Museum Tour,* a visit to a restored World War II destroyer, and *Ann Vidrine's Cajun Fiddler Walking Tour.* Other highlights include tours of two "big houses"—Greenwood Plantation and the Louisiana State Penitentiary at Angola; a tour of the charming historic homes of Natchez; and a unique look at the Old South at Frogmore Plantation. You may also have a chance to walk the chilling Civil War battlefields of Vicksburg.

In the summer months, the *American Queen* will venture as far north as Memphis. The stretch of the river from New Orleans to Memphis is one of the most scenic and fascinating. Your captain will also stop at Houmas House in Burnside, Louisiana. Remember the movie *Hush...Hush, Sweet Charlotte*, starring Bette Davis as a crazy Southern belle who refused to leave the beloved plantation wh she murdered her beau many years before? That plantation wa Houmas House, and it's even more impressive in person than black and white.

In Memphis, music and the aroma of barbecue fill the air From Beale Street blues to Graceland℠, where Elvis still reign king, the city resonates with the sights and sounds of musical artists. If you choose a cruise departing from or ending in Memphis, it's worth staying over for a visit.

On the *American Queen*, you get introduced to the "real" South. This isn't a theme park—this is as authentic as it get See pages 23 and 24 of this brochure for a more complete list of shore tours or visit www.deltaqueen.com.

*The grand American Queen*

*For more than 75 years, visitors have flocked to see the march of the ducks in the lobby of the Peabody Hotel in*

# ★ American Queen® Theme Vacations ★

## Every Cruise With Sylvia Browne Is A "PSYCHIC EXPERIENCE"

*Psychic Sylvia Browne will entertain and amaze you.*

Something special is in the cards for *American Queen®* passengers on our *Psychic Experience* cruises, featuring guest appearances by renowned psychic medium Sylvia Browne, who will give a fascinating presentation followed by an audience reading.

One of the most popular spiritual mediums in the country—if not the world—Ms. Browne has been a working psychic for nearly 50 years, and now appears regularly on *Larry King Live* and *Montel*. Though many people wait as long as five years for a private reading by Ms. Browne, the cruise offers some passengers an opportunity to have their own individual reading (for an additional fee) while they are on board.* As a special treat, entertainment on our December 10 departure includes performances by Russian pianist Katya Grineva and British baritone Glyn Bailey.

**2004 DEPARTURES**

| | | |
|---|---|---|
| Dec. 10 | AQ | New Orleans/New Orleans—*Sylvia Browne, Katya Grineva, Glyn Bailey, Ed Taylor* |
| Dec. 13 | AQ | New Orleans/New Orleans—*Sylvia Browne, Ed Taylor* |

## Anybody Have A Corkscrew? "FOOD & WINE EXPERIENCE"

If wine is your passion, you'll savor this experience on the river. These cruises include vintner dinners coupling interesting wines from a variety of major vineyards with the renowned cuisine of New Orleans' best chefs. In addition, you'll be offered seminars on wine tasting; varietal, New World and Old World wines; guest chef demonstrations and more. There will be nightly winemaker dinners as well as contests and games where you can win wine dinners on shore, bottles of wine, glassware and wine accessories. Immerse yourself in wine culture, history, and in the delicious flavors of the wines themselves on the grand *American Queen.*

*Raise your glass! Here's to a fabulous getaway for wine lovers.*

**2004 DEPARTURES**

| | | |
|---|---|---|
| Nov. 15 | AQ | New Orleans-New Orleans |
| Nov. 19 | AQ | New Orleans-New Orleans |

**2005 DEPARTURES**

| | | |
|---|---|---|
| Feb. 21 | AQ | New Orleans-New Orleans |
| Nov. 14 | AQ | New Orleans-New Orleans |

*Please refer to item 18 on page 63 of the Terms and Conditions section.

## Feasting. Festivities. And Family. "OLD-FASHIONED HOLIDAYS"

*Father Christmas joins in the festivities.*

There's nothing like an *Old-Fashioned Holidays* vacation with our Steamboatin'® family on the grand *American Queen*, all decked out in her holiday finery. Along with the most fabulous holiday feasts Old Man River's ever seen, you'll enjoy wonderful holiday music; Southern customs, including the traditional bonfires built along the levee to guide Papa Noël; holiday craftmaking; caroling; and unique shopping and sightseeing in quaint towns in the Old South. Depending on the cruise you choose, you might be entertained by Ed Taylor, a Cajun storyteller; harpist Margaret Sanzo; Russian pianist Katya Grineva; and baritone Glyn Bailey. It doesn't get any merrier than this.

**2004 DEPARTURES**

| | | |
|---|---|---|
| Nov. 23 | AQ | New Orleans/New Orleans—*Thanksgiving* |
| Nov. 27 | AQ | New Orleans/New Orleans—*Margaret Sanzo, Ed Taylor* |
| Nov. 30 | AQ | New Orleans/New Orleans—*Margaret Sanzo, Ed Taylor* |
| Dec. 3 | AQ | New Orleans/New Orleans—*Margaret Sanzo, Ed Taylor* |
| Dec. 6 | AQ | New Orleans/New Orleans—*Margaret Sanzo, Ed Taylor* |
| Dec. 10 | AQ | New Orleans/New Orleans—*Katya Grineva, Glyn Bailey, Ed Taylor* |
| Dec. 13 | AQ | New Orleans/New Orleans—*Ed Taylor* |
| Dec. 17 | AQ | New Orleans/New Orleans—*Ed Taylor* |
| Dec. 20 | AQ | New Orleans/New Orleans—*Ed Taylor* |
| Dec. 27 | AQ | New Orleans/New Orleans—*New Year's* |

**2005 DEPARTURES**

| | | |
|---|---|---|
| Nov. 21 | AQ | New Orleans/New Orleans—*Thanksgiving* |
| Nov. 25 | AQ | New Orleans/New Orleans |
| Nov. 28 | AQ | New Orleans/New Orleans |
| Dec. 2 | AQ | New Orleans/New Orleans |
| Dec. 5 | AQ | New Orleans/New Orleans |
| Dec. 9 | AQ | New Orleans/New Orleans |
| Dec. 12 | AQ | New Orleans/New Orleans |
| Dec. 16 | AQ | New Orleans/New Orleans |
| Dec. 19 | AQ | New Orleans/New Orleans |
| Dec. 23 | AQ | New Orleans/New Orleans—*Christmas* |
| Dec. 26 | AQ | New Orleans/New Orleans |
| Dec. 30 | AQ | New Orleans/New Orleans—*New Year's* |

## Meet Your Heroes On The River. "LEGENDS OF AMERICAN HISTORY"

On these cruises, join true American legends—both famous and infamous. Statesmen, writers, politicians, soldiers, artists, patriots, desperados and performers will be on board in period dress to bring history to life for you. Depending on the cruise you choose, you'll meet impersonators of Harry Truman, Martha Washington, Douglas MacArthur, Meriwether Lewis, Sacajawea, Will Rogers, George Custer and Teddy Roosevelt.

You'll be both entertained and enlightened as you travel back on our floating time machine to meet "Who's Who in American History."

**2005 DEPARTURES**

| | | |
|---|---|---|
| Jul. 9 | AQ | New Orleans/New Orleans—*Harry Truman, Martha Washington, Douglas MacArthur* |
| Jul. 30 | AQ | New Orleans/New Orleans—*Meriwether Lewis, Sacajawea, Will Rogers* |
| Aug. 20 | AQ | New Orleans/New Orleans—*Meriwether Lewis, Sacajawea, Will Rogers* |
| Sep. 10 | AQ | New Orleans/New Orleans—*George Custer, Teddy Roosevelt, Patrick Henry* |

# JOIN US FOR THE NEW ORLEAN

## "THE ONLY RIVER ADVENTURE THAT COMES WITH A FREE NEW ORLEANS VACATION AND FREE ROUNDTRIP AIRFARE."

With our 7-night package you'll spend 3 or 4 nights on a roundtrip *American Queen*® river adventure from New Orleans and the rest of your week enjoying your New Orleans vacation for **FREE!** Imagine! A **FREE** New Orleans hotel stay—even if you come during the New Orleans Jazz & Heritage Festival®, Mardi Gras, French Quarter Festival or Christmas New Orleans Style.

This is your chance to really get to know the Crescent City. The sultry jazz on Bourbon Street. The spicy gumbo and jambalaya. The Mardi Gras spirit that lingers long after the last beads have been caught. You'll stay at a deluxe downtown hotel, dine at famous restaurants*, see the most exciting sites, and, before or after your hotel stay, you'll embark on a riverboat adventure on the grand *American Queen*. Step aboard our floating resort for a 3- or 4-night journey to the Old South, where you can tour plantations, Civil War battlefields and Cajun Country!

*Visit historic Jackson Square.*

Nobody brings the New Orleans and Mississippi River experience alive lik the Delta Queen Steamboat Company. And when yo book early, you'll receive **FREE Roundtrip Airfare!*** Spend some time with the information included here then see your travel agent. Or for more information, visi our Web site or give us a call, y'all! We can't wait to shov you ***New Orleans*** and a great time on the river.

## YOUR NEW ORLEANS VACATION EXPERIENCE

***Jazz. Jambalaya. And Juleps.***

***New Orleans*** is one of the top tourist destinatior in America and one of the most exciting ports on an river in the world. Now you're going to see it—and tast it—in style.

Food is nothing less than a main attraction in the Crescent City, and breakfast at the hotel and two meals* (choose from a select list of famous restaurants) are included in your package price. If you've always wanted to sample Emeril's cuisine for yourself, you can choose from three of his most renowned restaurants. Or, maybe you've always wanted to try Oysters Rockefeller at Antoine's®.

*Most restaurant meals are dinners, but a few are lunch.
**See more complete details regarding Advance Purchase discounts on the inside back cover.

# s & Riverboat Adventure Week.

Come learn how to eat crawfish. Fight over who makes the best gumbo in town. Every bite here is a wonderful adventure. Between meals, you'll have a list of things to see and do as big as the Mississippi.

Want to hear a little jazz? You've got it. Want to see plantations, magnificent Garden District homes and intimate French Quarter courtyards? Go for it! Or how about those fascinating aboveground cemeteries you've heard so much about? Come on. We'll take you there. Mardi Gras floats, white alligators, vampires, the grave of a voodoo queen…to say New Orleans is unique is an understatement. You'll have your choice of two attractions if you select a 3-night hotel stay, and four attractions if you choose a 4-night hotel stay.

*Explore the National D-Day Museum.*

And even though New Orleans is awake 24 hours a day, chances are you'll need some downtime. Included in your package price will be accommodations at one of the very best New Orleans hotels. The category of stateroom you choose on the *American Queen*® determines at which hotel you'll stay in New Orleans. No matter which category you choose, you'll have to agree—this is the life. This is **New Orleans.**

## Restaurant Choices

(choose two):

• Antoine's® • Arnaud's • Broussard's • GW Fins® • Dickie Brennan's Steakhouse • Bourbon House Seafood • Palace Café® • Mr. B's Bistro • Court of Two Sisters® • Emeril's® • Emeril's® Delmonico • NOLA • Palm Court Jazz Café • Muriel's Jackson Square • Restaurant August • Mulate's, The Original Cajun Restaurant • Michaul's Live Cajun Music Restaurant • Al Copeland's Cheesecake Bistro • Copeland's of New Orleans • Tujague's

## Attraction Choices

(choose two if your hotel stay is 3 nights, and four if your hotel stay is 4 nights):

• Audubon Aquarium of the Americas • Audubon Zoo℠ • Gray Line Cemetery and Gris-Gris Walking Tour • New Orleans Spirit Tours® • Cemetery and Voodoo Tour • Historic New Orleans Cemetery and Voodoo Tour • Cookin' Cajun Cooking School • National D-Day Museum • Historic New Orleans French Quarter Tour • Gray Line French Quarter Walking Tour • Historic New Orleans Garden District Tour • Gray Line Ghost and Spirit Tour • New Orleans Spirit Tours Ghost and Vampire Tour • Historic New Orleans Haunted French Quarter • Entergy IMAX® Theatre • Longue Vue House and Gardens • Blaine Kern's Mardi Gras World • Le Monde Creole Tour • *Natchez* Harbor Cruise • New Orleans School of Cooking® • Royal Carriage Tours • Southern Comfort® Cocktail Walking Tour • Gray Line Garden District Walking Tour • Blues Club • Patout's Cajun Bistro & Cajun Cabin • Donna's Bar & Grill • Dos Jefes Uptown Cigar Bar • Fritzel's European Jazz Pub • The Maison Bourbon • Jimmy Buffett's Margaritaville Café • Preservation Hall • Gray Line Crescent City Dinner Tour

## Hotel Choices:

Hotel choices vary according to the stateroom category you choose on the river portion of your vacation. For instance, if you book a AAA or AA category stateroom on the *American Queen*, you'll be a guest at the 5-star Windsor Court Hotel or an equivalent hotel. See chart on inside back cover for more information.

★★★ **Book Early And Save!** ★★★

## New Orleans & Riverboat Adventure Week Free Roundtrip Airfare ** When You Book By October 31, 2004!

**For reservations, see your Travel Agent.**
**For more information, call today or visit our Web site.**

**800.543.1949**

**www.freeneworleansvacation.com**

**See more complete details regarding Advance Purchase discounts on the inside back cover.

# 2004-2006

# PLAN YOUR ADVENTURE WEEK AROUND THESE EXCITING EVENTS & FESTIVALS!

**To participate in these events while you are in New Orleans, start your vacation on one of the dates indicated.**

You don't need a reason to come to New Orleans (a craving for great seafood is reason enough), but you may want to consider planning your New Orleans & Riverboat Adventure Week to coincide with one of the world-famous festivals, or cultural or sporting events. Along with Mardi Gras, Jazz Fest, the French Quarter Festival, and Christmas New Orleans Style, the city and the surrounding area offer several smaller, more intimate ways to celebrate life in and around the Big Easy. And if you like professional sports, there's always something going on at the Louisiana Superdome and the New Orleans Arena. Whenever you come, the gumbo's hot and the music's playing. To participate in these events while you are in New Orleans, start your vacation on one of the dates indicated.

**Mardi Gras 2005 & 2006, 1/18 - 2/8/05 and 2/17 - 2/28/06**
New Orleans' Mardi Gras is the world's most famous street party...and with good reason! The annual celebration of excess overtakes the French Quarter and crowds the streets with wildly costumed revelers! But don't think you have only one day to enjoy this one-of-a-kind celebration. Mardi Gras festivities begin in mid-January and last till Fat Tuesday on February 8, 2005. In 2006, Mardi Gras festivities begin in early February and last until Fat Tuesday, February 28, 2006. **Vacation Dates: February 4, 7, 2005; February 27, 2006**

**St. Patrick's Day Festivities, New Orleans Style, 3/11 - 3/20/05 and 3/10 - 3/17/06**
Come experience St. Patrick's Day the way New Orleanians do it. There are four "St. Patrick's Day" parades, March 11, 12, 13 and 20, 2005. Come enjoy the party at Parasol's in New Orleans or take it easy in the suburbs of Metairie. Either way, watch out for the cabbages and the green beer!
**Vacation Dates: March 7, 11, 14, 18, 2005; March 6, 10, 17, 2006**

**Tennessee Williams Literary Festival, 3/30 - 4/03/05**
The festival is an annual five-day celebration which showcases national and regional scholars, writers, and performing artists. Programs include panel discussions, theatrical performances, a one-act play competition, lectures, literary walking tours, musical performances, and a book fair.
**Vacation Dates: March 28, April 1, 2005**

**French Quarter Festival 2005 & 2006, 4/08 - 4/10/05 and 4/21 - 4/23/06**
The French Quarter Festival will showcase hundreds of local musicians on 14 stages throughout the historic Vieux Carré. Plus, you will be able to sample from 60 food and drink booths. Fireworks, art exhibits, children's activities and music workshops are all featured events.
**Vacation Dates: April 4, 8, 2005; April 17, 21, 2006**

**New Orleans Jazz & Heritage Festival® 2005 & 2006, 4/22 - 4/24/05, 4/28 - 5/1/05 and 4/28 - 4/30/06, 5/4 - 5/7/06**
For more than 35 years, the Jazz Festival has been drawing crowds from around the world to New Orleans. The festival celebrates the indigenous music and culture of New Orleans and Louisiana. The festival also features legendary local food fare with over 20 shrimp dishes, 27 crawfish selections, and over 40 dessert options, along with various other dishes.
**Vacation Dates: April 18, 22, 25, 29, 2005; April 25, 28, May 1, 5, 2006**

**The Greek Festival 2005 & 2006, 5/27 - 5/29/05 and 5/26 - 5/28/06**
This three-day event features Greek folk dancing, specialty foods, crafts, music, rock climbing, live entertainment, cathedral tours and more.
**Vacation Dates: May 23, 27, 2005; May 22, 26, 2006**

**The Annual New Orleans Wine and Food Experience, 5/27 - 5/30/05**
Experience New Orleans' rich cultural heritage through indigenous cuisine paired with fine wines from vineyards around the world.
**Vacation Dates: May 23, 27, 2005**

**Southern Decadence 2004 & 2005, 9/3 - 9/6/04 and 9/2 - 9/4/05**
This celebration of gay life, music and culture started out as a going-away party for some friends in 1972 and ha grown into "The Official Gay Mardi Gras One of the highlights is the tribe of costumed marchers who take to the streets of the French Quarter, followin a route only the Grand Marshal knows
**Vacation Dates: August 30, September 3, 2004; August 29, September 2, 2005**

**Oktoberfest 2004 & 2005, 9/24 - 10/30/04, 9/23 - 10/29/05 (Weekend**
The German Heritage Festival celebrates Oktoberfest in true New Orlea fashion. The festivities include live music, authentic German cuisine an a variety of German beers. There wil also be a parade featuring floats, bands, traditional German costumes, and throws for spectators.
**Vacation Dates: September 20 - October 29, 2004; September 19 - October 28, 2005**

**Gretna Heritage Festival 2004 & 20( 10/1 - 10/3/04 and 10/7 - 10/9/05**
Enjoy over 100 food items, games and carnival rides all weekend long. With several stages and a large variety of bands, you are sure to find all types of music to enjoy. There will also be a wide selection of arts and crafts and collectibles.
**Vacation Dates: September 27, October 1, 2004; October 3, 7, 200**

## 2004-2006 New Orleans Events And Festivals cont.

**Art for Arts' Sake, 10/2/04 and 10/1/05**
This event is known as the definitive showcase for the visual arts in the city of New Orleans. Galleries throughout the city will join forces in one massive art opening, with many extending their hours so that all can enjoy.
**Vacation Dates: September 27, October 1, 2004, and September 26, 30, 2005**

**Louisiana Swamp Festival 2004 & 2005, 10/2 - 10/3/04, 10/9 - 10/10/04 and 10/1 - 10/2/05, 10/8 - 10/9/05**

Girard Mouton III

This festival held at the Audubon Zoo has become one of the largest fall festivals in the city. See your favorite swamp critters, chow down on Cajun food, and dance to your favorite Cajun and zydeco music. You can even bring home a piece of Louisiana's rich arts and crafts heritage from the Craft Village.
**Vacation Dates: September 27, October 1, 4, 8, 2004; September 26, 30, October 3, 7, 2005**

**16th and 17th Annual New Orleans Film Festival 2004 & 2005, 10/7 - 10/14/04 and 10/6 - 10/13/05**
This festival has grown into a prominent vehicle for exhibitions and premieres of local, regional, national and international films and videos. Each year, this exciting event showcases the best new films, from major feature films to short works.
**Vacation Dates: October 4, 8, 11, 2004; October 3, 7, 10, 2005**

**Gumbo Festival 2004 & 2005, 10/8 - 10/10/04 and 10/14 - 10/16/05**
Over 2,000 gallons of Bridge City's "world famous" gumbo will be prepared for visitors during the festival. A variety of other native Louisiana cooking will also be available, along with entertainment.
**Vacation Dates: October 4, 8, 2004; October 10, 14, 2005**

**Mensaje Festival 2004, 10/8 - 10/10, 10/15 - 10/17/04**
Over 30,000 visitors will flock to this year's festival and delight in the lively sounds and flavors of Latin culture, food and music. The event will also feature rides, folk dancing, and performances by internationally acclaimed artists.
**Vacation Dates: October 4, 8, 11, 15, 2004**

**Fresh Art Festival 2004, 10/15 - 10/17/04**
Fabulous art from nationally recognized artists, amazing live music, and a hip outdoor scene are all part of the Fresh Art Festival. Taking place in the beautiful Warehouse District, the festival has been named one of the top art festivals in the country.
**Vacation Dates: October 11, 15, 2004**

**Voodoo Music® Festival 2004, 10/23 - 10/24/04**
This event features live musical acts all day long on three giant main stages that play host to some of the biggest names in the music industry. Just like everything else in New Orleans, this event is a gumbo of influences and musical genres that will satisfy all tastes.
**Vacation Dates: October 18, 22, 2004**

**Halloween in New Orleans 2004 & 2005, 10/31/04, 10/31/05**
From children's activities sponsored by the city zoo to a collaboration between many of the museums to provide specialty tours, there is something for all ages to enjoy. Oh, and New Orleans starts its Halloween celebration a couple of days early in order to pack in all the fun and events possible.
**Vacation Dates: October 25, 29, 2004; October 28, 31, 2005**

**Louisiana Renaissance Festival 2004, 10/30 - 10/31/04, November weekends**
It's a festival and a fair with Renaissance flair...lots of festivities, parades and all-around merriment. There is a royal parade, live performances, artisans displaying their crafts and food sparked with delicious medieval flavor.
**Vacation Dates: October 25, 29, and throughout the month of November 2004**

**N'Awlins Air Show 2004, 10/30 - 10/31/04**
Arrive early and beat the crowds. This year's show will feature carnival rides, rock-climbing walls, simulators, as well as a fabulous air show by the U.S. Air Force Thunderbirds or the Navy's Blue Angels and much more!
**Vacation Dates: October 25, 29, 2004**

**Fair Grounds Race Course®, Thanksgiving 2004 - Last Sunday in March, 2005; Louisiana Derby 3/5/05**
The Fair Grounds Race Course is the oldest site of racing in America still in operation. The track is open from late November through March, but you may want to visit during the Louisiana Derby, when 3-year-olds look to stay on the road to the Triple Crown, and ladies with clubhouse admission receive an orchid, the official flower of the Louisiana Derby.
**Vacation Dates: November 23, 2004 - March 28, 2005**

**Celebration in the Oaks, Thanksgiving - New Year's Day 2004 & 2005**
Come see New Orleans' historic City Park transformed into a holiday wonderland. Its ancient oak trees are aglow with massive ornaments along the two-mile drive tour that is spangled with over two million sparkling lights and lighted displays. It is considered to be one of the most beautiful holiday light exhibits in the country and attracts more than 500,000 visitors annually.
**Vacation Dates: November 23, 27, 30, and all of December 2004; November 21, 25, 28, and all of December 2005**

**Christmas New Orleans Style 2004 & 2005, All of December**
More than 100 festivities are planned during the month-long event, including "Caroling in Jackson Square" by candlelight, nightly motorcoach excursions through Celebration in the Oaks, levee bonfires, children's teas and craft workshops, caroling cruises, theatrical and musical performances, and special tours of private residences and antebellum homes dressed in holiday trim.
**Vacation Dates: November 27, 30, and all of December 2004; November 28, and all of December 2005**

**The New Orleans Bowl®, 12/14/04**
Come to the Crescent City to see one of the newest NCAA® College Football Bowl Games—the New Orleans Bowl. This is the first game of the college "bowl" season and pits the champion of the Sun Belt Conference against the mutually agreed upon team from the Conference USA.
**Vacation Dates: December 10, 13, 2004**

Note: Every effort was made to ensure accuracy. All information herein, for all dates, is provided by the local sites and attractions and cannot be guaranteed. Dates are subject to change.

### 2004 New Orleans Saints Football

Will this be the year the Saints go marching to the Super Bowl? Come see all of the hard-hitting action of the New Orleans Saints® and your other favorite NFL teams, up-close and personal, in the Louisiana Superdome! NFL Football promises to be as exciting as ever in 2004. Like they say, you "gotta be there."

| Date | Game | Vacation Dates |
|---|---|---|
| Sep. 12 | New Orleans vs. Seattle | Vacation Dates: Sep. 6, 10 |
| Sep. 19 | New Orleans vs. San Francisco | Vacation Dates: Sep. 13, 17 |
| Oct. 10 | New Orleans vs. Tampa Bay | Vacation Dates: Oct. 4, 8 |
| Oct. 17 | New Orleans vs. Minnesota | Vacation Dates: Oct. 11, 15 |
| Nov. 14 | New Orleans vs. Kansas City | Vacation Dates: Nov. 8, 12 |
| Nov. 21 | New Orleans vs. Denver | Vacation Dates: Nov. 15, 19 |
| Dec. 5 | New Orleans vs. Carolina | Vacation Dates: Nov. 30, Dec. 3 |

# Discover "The Original American Vacation" On The *Delta Queen*® And The *Mississippi Queen*®

Southern belles in big hats, ribbons blowing in the breeze. Dashing riverboat gamblers looking for a potential mark in every trapper and trader who crosses the landing stage. Young men like Mark Twain, boys really itchin' for adventure.

Along with bales of cotton, the steamboats of yesterday carried a nation of dreamers. We believe they still do. If a part of you has always wondered what lies up yonder beyond the bend, we invite you to join us this year on "The Original American Vacation."

While the *American Queen*® spends all her time down South and has more of a New Orleans feel, the legendary *Delta Queen*® and the magnificent *Mississippi Queen*® travel through several regions and offer more of a traditional Steamboatin'® experience. When you step onto one of these floating palaces, it could be 1850. Music plays, crystal clinks, teak and brass handrails shine—while the river, dappled by the sunlight through the trees, just keeps on rollin' along.

The dining rooms on these steamboats are comparable to the finest restaurants in the world. Our chefs offer gourmet specialties like lamb osso bucco, filet mignon, and prime rib, but we're also proud to serve fare that originated on 1800s steamboats, such as fried chicken, pecan pie, angel food cake and brownies.

After dinner, the river becomes a floating theater featuring a new and exciting show each night. We do it all—cabaret, jazz, Broadway show tunes and rock 'n' roll. And these boats offer almost 20 themes to choose from—many with big-name entertainment. See pages 38-47 of this brochure.

Along with informative lectures from our Riverlorians®, you'll enjoy wonderful activities on board. You can join the sing-along, try your hand at the calliope, go kite flying from the top deck, participate in the games, or just pull up a rocker and enjoy the scenery, as you wave to the folks along the riverbanks who watch the boat pass. There's much to keep your mind, body and spirit occupied on the river.

***"We've met so many wonderful people on Steamboatin'® trips. In fact, we still keep in touch with folks we've met and traveled with on the* Mississippi Queen *over twelve years ago."***

***—Jerry Pax,***
***New Orleans, Louisiana***

September 3

Even though we were up late dancing, I couldn't stay in bed another minute this morning! Words can't express the beauty of the early morning mist on the river. It was just as Mark Twain described it. This afternoon, we visited his hometown – Hannibal, Missouri. We actually went spelunking – cave exploring – and Jack tried his hand at whitewashing a fence!

When we got back to the boat, we played bridge for awhile before joining this nice couple we met from New Orleans for dinner and the show. Tonight when the vocalist sang "Ol' Man River," I actually had goosebumps. Goosebumps! After the fabulous filet mignon we had for dinner, I couldn't believe Jack wanted to head for the late-night buffet, but he said the bread pudding was calling to him.

Right now we're sitting on our veranda in our pajamas, watching the moon. As I gaze into its reflection on the water, I wonder what new adventure tomorrow will bring. (Jack is probably wondering if they'll have any more of those blueberry muffins at breakfast tomorrow!)

# The Legendary *DELTA QUEEN®*

She's the undisputed matriarch of the river and the last of her class. As the oldest steam-driven paddlewheeler with overnight accommodations, the *Delta Queen®*, not surprisingly, is designated a National Historic Landmark and is a member of the National Trust Historic Hotels of America. This honor makes her unique, but it's not the only distinction that sets her apart. When walking her decks, you'll follow in the footsteps of Presidents Hoover, Truman, and Carter as well as Lady Bird Johnson, Princess Margaret, Van Johnson, Helen Hayes, Charles Kuralt, Arlo Guthrie and countless others.

*You'll enjoy evenings with new friends in the Texas Lounge.*

Lovingly refurbished, the flagship of the Delta Queen Steamboat Company exudes the ambience of a fine Victorian home. Her gleaming brass, polished woods, and Tiffany-style stained glass windows create a warm and inviting atmosphere. And on the *Delta Queen*, each and every passenger forms a close and personal rapport with the river, for every stateroom is an outside room, with a view of America unlike any other.

The *Delta Queen* is a reminder of the days when shared journeys transformed strangers into lifelong friends. She provides the perfect setting for spending an afternoon playing cards, enjoying the Riverlorian's® presentations or simply curling up in a rocker on deck and watching the river. Her pace is relaxed, unhurried and stress-free.

*The best part about Steamboatin'—there's no stress.*

Come aboard the *Delta Queen* and experience Steamboatin'® as one of our passengers did: "We walked the decks and ran our hands along the smooth teakwood railing. We listened to the gentle lull of the paddlewheel, pulled up rocking chairs and sat close enough above it to feel the misty spray rising as it churned the river. We also discovered a secret: Outside on the Cabin Deck hang a pair of old-fashioned porch swings, where you can swing and gaze at the river from the same perspective as the pilot two decks above. With grace and good humor, the *Delta Queen* lets us think we discovered that peaceful place all for ourselves."

*The beautiful Grand Staircase is a vivid reminder of the great steamboats of the past.*

We invite you to take a step back in time and immerse yourself in the inspiring beauty, nostalgic adventure and captivating history of the *Delta Queen* to discover why our guests return again and again to experience the relaxed enjoyment and unhurried pleasures of this national treasure.



*Experience warm hospitality from the moment you board until your last morning breakfast.*

*As you leave your stateroom, your thoughts will be on a delicious dinner followed by lively entertainment.*

*Enjoy Broadway, cabaret and all that jazz on the river.*

The legendary *Delta Queen*®

Length: 285 feet
Staterooms: 87
Passenger capacity: 174
Crew: 80

*DELTA QUEEN* FEATURES:

- Betty Blake Library
- Forward Cabin Lounge
- Steamboatique Gift Shop
- Orleans Room
- Texas Lounge

# The Magnificent *MISSISSIPPI QUEEN*®

The magnificent *Mississippi Queen*® is a well-established favorite with our guests, who love her authentic Victorian atmosphere and outgoing personality. Her vivaciousness is reflected in the beautiful brass and mirrored Grand Staircase that awaits passengers on board.

*A typical AA category stateroom*

A floating palace filled with luxuries and pleasures, the *Mississippi Queen* is designed specifically for Steamboaters who like to kick up their heels. Passengers particularly enjoy late-night get-togethers in the multi-level Paddlewheel Lounge, where music, dancing and laughter go on 'til the wee hours of the morning. The two-story glass rear wall offers a magnificent view of the steamboat's giant paddlewheel and the lights reflected beyond.

Also aboard the *Mississippi Queen*, passengers delight in the Grand Saloon showroom with its dance floor and interactive design that provides the perfect venue for world-class entertainment, such as the Russ Morgan Orchestra (directed by Jack Morgan) or the Ink Spots®; live music from big band to doo-wop; and a variety of musical productions.

*Enjoy a relaxing moment poolside.*

And, as with every good hostess, she sees to it that her guests experience rest and relaxation as well as fun. Take a dip in her bathing pool on the Sun Deck, be pampered in the beauty salon, view a favorite film in the movie theater or simply sample the pleasures of the Calliope Bar. Elevators connect all decks, and individually climate-controlled staterooms are all masterfully blended to ensure that her 19th-century ambience is sustained while allowing her passengers comfort and convenience as well as fun and relaxation.

*The beauty of the* Mississippi Queen *is reflected in her Grand Staircase.*

For a style of travel that truly captures the spirit of Steamboatin'® combined with the contemporary amenities demanded by today's sophisticated traveler, come experience the many remarkable features that make the *Mississippi Queen* the late-night-experience boat of the Delta Queen Steamboat Company.



*Join the late-night fun in the Paddlewheel Lounge.*

*Try your hand at the calliope—play a few notes and receive a certificate.*

*The Forward Cabin Lounge is a great place to get information and socialize with friends.*

The magnificent *Mississippi Queen*®
Length: 382 feet Staterooms: 208
Passenger capacity: 416
Elevators: 2 Crew: 157

*MISSISSIPPI QUEEN* FEATURES:

- Bathing Pool • Beauty Salon
- Calliope Bar • Dining Room
- Exercise Room
- Forward Cabin Lounge
- Steamboatique Gift Shop
- Golden Antlers Bar • Grand Saloon
- Paddlewheel Lounge
- Port Gallery • Movie Theater
- Wheelhouse • Library



Steamboatin'®
AMERICA'S
MINNEAPOLIS/ ST. PAUL
Red Wing
ST. CROIX RIVER
Winona
La Crosse
MISSISSIPPI RIVER
Dubuque
OTTAWA
Davenport
Burlington
Peoria
Havana
ILLINOIS RIVER
Beardstown
Hannibal
Grafton
Alton
MISSOURI RIVER
ST. LOUIS
America's Heartland Region
Pages 27-30
CINCINNATI
Portsmouth
OHIO RIVER
Madison
Leavenworth
Maysville
Gallipolis
Point Pleas
Louisville
Mt. Vernon
Henderson
Smithland
Cave-In-Rock
Cape Girardeau
Columbus
Paducah
LAKE BARKLEY
New Madrid
Clarksville
KENTUCKY LAKE
Dover
NASHVILLE
CUMBERLAND RIVER
PITTSBU
East Liverpool
Whe
Marietta
Charl
KANAWHA RIVER
Fort Smith
ARKANSAS RIVER
Petit Jean
LITTLE ROCK
Tunica
Helena
Savannah/ Shiloh
MEMPHIS
Florence
TENNESSEE RIVER
CHATTANOOGA
Decatur
Huntsville
Oxford
Indicates ports where cruises begin and end
City of interest or shore stop
Pine Bluff
Greenville
Columbus
Monroe
Natchitoches
OUACHITA RIVER
MISSISSIPPI RIVER
Vicksburg
TENNESSEE-TOMBIGBEE WATERWAY
Demopolis
Pickensville
RED RIVER
BLACK RIVER
Natchez
Alexandria
St. Francisville
Baton Rouge
Biloxi/ Gulfport
MOBILE
Krotz Springs
Houmas House
PENSACOLA
Port Arthur
INTRACOASTAL WATERWAY
ATCHAFALAYA RIVER
Oak Alley
NEW ORLEANS
Port of Iberia
Houma
Morgan City
GALVESTON
Corpus Christi
GULF OF MEXICO
Old South Region
Pages 22-26

ACL 43767

# Destinations...
# RIVER REGIONS

*Wilderness Rivers Region* Pages 31-34

*We just returned home from our second trip on the* Delta Queen. *Some of the crew members remembered us from our trip five-and-a-half years ago! I certainly hope that we can return for another trip in the not-too-distant future.*

*–Cynthia Handel,*
*Willow Street, Pennsylvania*

The steamboats of the Delta Queen Steamboat Company, Inc. journey on some of America's great rivers. The *Delta Queen®, Mississippi Queen®,* and *American Queen®* travel nearly the full length of the Mississippi River system, which is the watershed for most of the eastern United States. You'll cruise these waterways through three very different regions we call the ***Old South, America's Heartland*** and the ***Wilderness Rivers.***

*All along the river's shoreline is nature's playground.*

Experience the romance of the antebellum era and the charm of Cajun Country as you travel the ***Old South Region.*** The distinctive scenery is ever-changing as the river winds through a land of fertile cotton fields, vast sugar plantations, moss-draped bayous and mysterious cypress swamps. See historic, majestic mansions surrounded by glorious gardens, ships loading their cargoes for international destinations, and the pristine wilderness of the Tenn-Tom.

Traveling the ***America's Heartland Region,*** you'll experience a rich tapestry of beauty as you cruise north on the upper Mississippi to Minneapolis/St. Paul. From pristine farms nestled in rolling terrain to steep bluffs rising from rivers dotted with wooded islands, this is where thousands of settlers forged a new life, establishing a legacy of industry, bustling ports and historic river towns.

In the ***Wilderness Rivers Region,*** you'll discover an area full of beauty, adventure and character. From the impressive accomplishments of local inventors and craftsmen to the sweet twang of bluegrass music from the Smoky Mountains, it's a region that gave birth to much that is distinctly American—the first steamboat on the western rivers, the adventures of Davy Crockett and Daniel Boone, and the horse farms of Bluegrass Country.



Steamboat explorations of the lower Mississippi River, Arkansas River, Red River, Ouachita River, Intracoastal Waterway and Tennessee-Tombigbee Waterway
OLD SOUTH
Fort Smith
ARKANSAS RIVER
Petit Jean
LITTLE ROCK
Tunica
Helena
MEMPHIS
Indicates ports where cruises begin and end
City of interest or shore stop
Pine Bluff
MISSISSIPPI RIVER
OUACHITA RIVER
Greenville
Columbus
Monroe
Natchitoches
Vicksburg
TENNESSEE TOMBIGBEE WATERWAY
Demopolis
Pickensville
RED RIVER
BLACK RIVER
Natchez
Alexandria
St. Francisville
Baton Rouge
Biloxi/ Gulfport
MOBILE
Krotz Springs
Houmas House
Port Arthur
INTRACOASTAL WATERWAY
ATCHAFALAYA RIVER
Oak Alley
NEW ORLEANS
PENSACOLA
Port of Iberia
Houma
Morgan City
GALVESTON
Corpus Christi
GULF OF MEXICO

The arrival of the steamboat *New Orleans* changed the lives of the people along the rivers of the Old South forever. The year was 1812, and from that moment on, nothing was the same. Great sugar and cotton plantations sprang up, and trade boomed along the entire Mississippi River system. It was the dawn of a new era.

Today you can visit magnificent, columned plantations in Louisiana, Arkansas, Mississippi and Alabama. Visit poignant cemeteries and memorials of the Civil War that still stir emotions almost 140 years after the last shots were fired. View the early settlements of the French Acadians. Get a taste of the Wild West in Fort Smith, Arkansas. Stroll the breathtaking beaches, golf courses, and historic districts of Biloxi, Mobile, Galveston and Pensacola. Discover the excitement and unique flavors of the bustling port cities such as New Orleans, Baton Rouge and Memphis. Come hear the music that was born of hardships and triumphs—Delta blues, Dixieland jazz, gospel and zydeco. Revel in Cajun and Creole cuisine as well as good old Southern cookin'.

Experience renowned hospitality in the land where the Cajuns say "laissez les bons temps rouler"—let the good times roll! There's no better way to describe a Steamboatin'® vacation, especially through the Old South!

*Oak Alley is one of the most photographed houses in America and features a quarter-mile avenue of 28 live oak trees that are more than 250 years old.*



*Stroll down the centuries-old streets of New Orleans.*

## THE LOWER MISSISSIPPI RIVER— From New Orleans to Memphis

On the lower Mississippi River, the steamboats travel from New Orleans to Memphis on voyages that immerse you in Southern hospitality, charm and culture. Here also is the land of Cajun intrigue, Creole food and New Orleans music, with excitement that still captures the imagination and lures you "way down yonder."

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

• **New Orleans, Louisiana**—Life in the "Big Easy" blends legendary jazz, lacy architecture, laid-back "laissez-faire" lifestyle and world-renowned cuisine—Cajun to Creole, beignets to jambalaya!

*Spend a few days before or after your cruise in New Orleans. See page 10 for more information on the New Orleans & Riverboat Adventure Week and page 48 for additional details regarding CityScape hotel stays.*

• **Vacherie, Louisiana**—Located in a peaceful area of grand Southern traditions, this community has several historic plantations including famous Oak Alley, where scenes from *Interview With the Vampire* were filmed, and Laura, where the *Br'er Rabbit* stories were first passed down to children in this country by African slaves.

- *Oak Alley Plantation*—Explore the lifestyle of wealthy 19th-century sugar planters.
- *Laura: A Creole Plantation*—Built in 1805, one of the last plantations of its kind.
- *Cajun Swamp Tour*—View Spanish-moss-covered cypress and even alligators!

• **Burnside, Louisiana**—This picturesque town near Baton Rouge was named for John Burnside, former owner of Houmas House Plantation, which at one time was one of the largest sugar plantations in the state, producing 20 million pounds of the sweet stuff per year.

- *Houmas House Plantation and Gardens*—The epitome of a Greek Revival-style mansion.

• **Baton Rouge, Louisiana**—The state capital, an important deepwater port, was once the stomping grounds for some of the state's most colorful political characters.

- *Cajun Heritage Tour*—Learn the history of the Cajun people.
- *Cajun Fiddler Walking Tour*—A folksy tour of the capital.
- *U.S.S.* Kidd—Tour a restored WWII Fletcher class destroyer.
- *The Untold Story: Rhythm and Views*—Meet a Cajun duck hunter, a Southern belle and more!

*The Myrtles is both hauntingly beautiful and just plain haunted.*

• **St. Francisville, Louisiana**—Peaceful and picturesque, this area is famous for its magnificent plantation homes, including Rosedown, with gardens inspired by those at Versailles, and The Myrtles, one of America's most haunted houses.

- *The Big House*—Tours of the famous Louisiana State Penitentiary at Angola and Greenwood Plantation.
- *Rosedown and The Myrtles*—Visit two breathtaking plantations.
- *Siege and Serenity*—Discover Civil War history in St. Francisville.

• **Natchez, Mississippi**—High on a bluff, more than 500 lovingly preserved antebellum and Victorian structures can still be seen here. Be the guest at a reenactment of a slave wedding at Frogmore Plantation, or get a glimpse into the lives of the Natchez Indians.

- *Historic Homes*—Visit two or three of the more than 200 antebellum structures in Natchez.
- *Music, Mistresses and Marriage*—Unique tour of Frogmore Plantation.
- *Historic Natchez Pageant*—Available on select *Spring Pilgrimage* departures only.

*Stanton Hall in Natchez was built in 1857 on an entire city block. It remains one of America's largest antebellum mansions.*





*A visit to the Illinois Memorial in Vicksburg National Military Park is a moving experience.*

• **Vicksburg, Mississippi**—Here, you can see one of the best-preserved Civil War battlefields in America, including the Vicksburg Battlefield Museum, a fitting tribute to the brave lads in the Blue and the Gray.

• *Battlefield and Siege Tour*—Explore the gunboat U.S.S. *Cairo* and the Vicksburg Battlefield Museum.
• *The Past Comes Alive!*—Learn about the famous people and ghosts of Vicksburg.

• **Greenville, Mississippi**—Mississippi's largest city in the Delta. It was the home of Hodding Carter, who won a Pulitzer Prize in 1946 for encouraging racial moderation in editorials published in his family's *Delta Democrat Times*, and Shelby Foote, writer of Civil War chronicles. Today you can tour a catfish farm and learn about farming cotton.

• *Catfish & Cotton*—A fascinating glimpse at both industries.

*Visit the gunboat U.S.S.* Cairo *and understand the hardships of sailors in the Civil War.*

• **Helena, Arkansas**—In *Life on the Mississippi*, Mark Twain wrote, "Helena occupies one of the prettiest situations on the river." The town was of strategic importance during the Civil War and the Confederates suffered a bloody defeat here in 1863. Tours having to do with the history of the blues are available from here.

• *The Arkansas Delta*—Visit "Blues Alley" and the Delta Cultural Center.
• *Clarksdale Delta Blues*—Tour of the Clarksdale Delta Blues Museum.

• **Tunica, Mississippi**—Once heavily forested, Tunica's flat land is dotted with a series of Indian mounds, some of the few remnants of an ancient civilization that once populated the area. As agriculture became increasingly important to the local economy, Tunica's "skyline" began evolving into a charming downtown with turn-of-the-century storefronts that residents still enjoy today. In 1990, the state legislature legalized gaming and changed the future of this town.

• **Memphis, Tennessee**—The third-largest inland port is famous for music and barbeque ribs. "America's Father of the Blues," W.C. Handy, and the "King," Elvis Presley, called this city home.

• *Elvis Presley's Graceland®*—Visit the former home of the "King of Rock 'n' Roll."

*Spend a few days before or after your cruise in Memphis.* *See page 48 for additional details regarding hotel stays.*

## RED RIVER— From the Mississippi River to Natchitoches

The Red River gets its name from its reddish silt. It is 1,200 miles long, rising in the Texas Panhandle and ending in Louisiana, where it flows into the Atchafalaya. Our stops here include Alexandria and Natchitoches, Louisiana.

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

• **Alexandria, Louisiana**—In 1864, Union General Nathaniel Banks burned almost every structure in the town. By the 1900s, Alexandria was reborn with lovely Victorian, Craftsman and American Renaissance architecture. This town in central Louisiana is home to the historic Hotel Bentley, where Generals Marshall, Patton and Eisenhowe mapped out strategies for World War II.

• *The Red River Campaign*—Tour haunting Fort DeRussy and the Mansura Battlefield.
• *Alexandria's Plantation Homes*—Visit Loy Hall and Kent House Plantation.

• **Natchitoches, Louisiana**—Establishe in 1714, this charming town is the oldest settlement in the Louisiana Purchase territo The quaint townhouses with lacy ironwork balconies will remind you of the New Orlea French Quarter, which was founded four years later.

• *The Battle of Mansfield and Pleasant Hill*—Pay homage at the sites of two Civil War battl
• *Life on the Plantation*—Call on Melrose a Oakland, rich in history and legend.
• *Natchitoches Historical Homes*—Visit the Guy House and the home where the movie *Steel Magnolias* was filmed.

*Memphis offers Beale Street, the memory of Elvis and the m of W.C. Handy.*

## OUACHITA RIVER— From Jonesville, Louisiana Hot Springs, Arkansas

The minute the ink on the Louisiana Purchase documents was dry, President Thomas Jefferson commissioned the Hunter-Dunbar Expedition to chart the entire length of the Ouachita River. Now i your turn to go exploring. Stories and leg-ends have passed down for generations about life along this scenic river, an area rich in Native American, steamboat-era, a Civil War history. Geologists and paleonto gists have unearthed whale bones, sharks teeth, and evidence of other marine life,

which leads them to believe that the Ouachita Valley was once part of the Gulf of Mexico. The largest Indian mound ever discovered in all of North America was discovered here, but it was tragically destroyed in the 1930s when the state built a bridge on the site. In many places along this river's banks, arrowheads can still be found today.

### Port highlights:

• **Monroe/West Monroe, Louisiana—** Highlights of these beautiful twin cities on the Ouachita include famous Antique Alley; Layton Castle, with its grand old oaks and 18th-century wine house; Winter Quarters State Historic Site, the only plantation in the area to be spared by Union troops; and the Emy-Lou Biedenharn Museum, with beautiful Elsong Garden.

## ARKANSAS RIVER— Crossroads of America

For thousands of years, the Arkansas River Valley served as a bountiful homeland for Native Americans. The first steamboat on the Arkansas River, the *Comet,* arrived in 1819, and activity in this area increased rapidly after 1830 with settlement in the adjoining Mississippi River Valley. Many pioneers came from Tennessee and Virginia; some even learned from the Quapaw Indians how to weave cornhusk seats for furniture. Today, this land looks much the way it did when they first ventured here.

Rolling plains and lush forests characterize the region where the Arkansas River meets the Mississippi. Navigable to Tulsa, Oklahoma, its depth and flow are controlled by more than 25 dams and a series of 15 locks which raise the water level 420 feet in steps from 14 to 54 feet. Our Steamboatin'® vacations visit Pine Bluff, Little Rock, Petit Jean State Park and Fort Smith.

Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.

### Port highlights:

• **Pine Bluff, Arkansas—**The world's biggest cotton plantation was once located here. Coincidentally, it was here that some of the first shots of the Civil War were fired.
 • *Land of Legends*—Visit the Delta Rivers Nature Center, the Arkansas Entertainers Hall of Fame, the Arts and Science Center, and more.

• **Little Rock, Arkansas—**The lovely capital of Arkansas is home to the historic Quapaw Quarter. Most of the popular architectural styles of the late 19th century are represented here.
 • *Romantic Hideaways, Southern Charm*—View one of the nation's most expansive Historic Districts.
 • *Plantation Country*—Visit Marlsgate Plantation, which takes you back to bygone times when gracious living was part of the heritage of the Old South.

• **Petit Jean (Morrilton, Arkansas)—** Home to the 3,741-acre Petit Jean State Park, filled with unmarred woods, streams, springs and geological formations. It was named for a beautiful French girl who disguised herself as a boy and secretly accompanied her sweetheart, an explorer, to America, where she died, revealing her true identity.
 • *Mystery on the Mountains*—Explore breathtaking Petit Jean Mountain.
 • *From the Ozarks to the World*—Excursion includes a hayride and a tour of the Global Village.

• **Fort Smith, Arkansas—**This colorful town on the border of Indian country was famous for shootouts, public hangings and bawdy saloons.
 • *Fort Smith: Where History Lives*—Learn about Judge Isaac C. Parker, the "Hangin' Judge."

*Nestled between the Ouachita and Ozark mountain ranges is breathtaking Petit Jean Mountain.*

*As you travel the Intracoastal Waterway, you'll see the bayou as a place of beauty and intrigue.*

## INTRACOASTAL WATERWAY— From Pensacola, Florida to Corpus Christi, Texas

The Intracoastal Waterway has been maintained by the U.S. Army Corps of Engineers since 1919. It extends along the Gulf Coast from Pensacola to the Texas coast. Explore this scenic waterway that links Florida to Louisiana and Texas.

### Port highlights:

• **Pensacola, Florida—**Settled in 1559, Pensacola has evolved through centuries of historic and cultural influence to become the beautiful and interesting city it is today. Pensacola offers culture, outdoor adventure, fine museums and attractions, and miles of beaches that have remained untouched over the centuries.
 • *Reach for the Sky*—Tour one of the three largest aviation museums in the world.
 • *Pensacola's Past Times*—Experience the colorful history of Pensacola.
 • *High Culture*—Discover the art and architecture of Pensacola.

*Spend a few days before or after your cruise in Pensacola. See page 48 for additional details regarding hotel stays.*

• **Mobile, Alabama—**History hangs upon Mobile like the Spanish moss that drapes her live oaks. Already old when the Civil War began, Mobile is distinguished from younger cities throughout the state by her rich Spanish, French, African and Creole heritage. History is reflected not only in her architecture, but in her cuisine and cultural diversity.
 • *Historic Mobile*—Explore the historic district of Mobile.
 • *U.S.S.* Alabama—Tour the mighty WWII battleship U.S.S. *Alabama,* a submarine, war planes and more.
 • *Bellingrath Home and Gardens*—Visit an estate built by the owner of the area's Coca-Cola® franchise.



*The snowy egret is a common yet magnificent sight in and around the bayous of the Old South.*

- *Eastern Shore of Mobile Bay*—View the Greek Orthodox Church, tour Seven Gables, and more.

*Spend a few days before or after your cruise in Mobile. See page 48 for additional details regarding hotel stays.*

- **Biloxi/Gulfport, Mississippi**—Located in America's Deep South, the Mississippi Gulf Coast has a historical and cultural ambience that sets it apart from any other southern destination. Situated along the sandy shores of the Gulf of Mexico, the Gulf Coast offers an excellent assortment of diverse attractions from the oldest golf course overlooking the Gulf waters to historic antebellum homes and museums, including the last home of Jefferson Davis, *Beauvoir,* and 26 miles of beach.
  - *A Day by the Bay*—Discover the best-kept secrets on the Mississippi Gulf Coast.
  - *Antebellum Biloxi*—Journey through 300 years of Southern history.

- **Krotz Springs, Louisiana**—A Cajun town located on the Atchafalaya River, just above the Intracoastal Waterway. Cajun culture, with its lovely French language and warm hospitality, abounds in the midst of cypress swamps and bayous.
  - *Miracles and Mistletoe*—Explore the Academy of the Sacred Heart and Chretien Point Plantation.

- **Port of Iberia, Louisiana**—This lovely point on the Intracoastal Waterway is known for hunting, fishing and Cajun cuisine.
  - *St. Martinville, Pride of Acadiana*—Discover the roots of the Cajun culture.

*Delight in the lively and friendly Cajun style of music.*

- *Vermilionville, A Cajun Village*—Tour a restored Cajun village.

- **Morgan City, Louisiana**—Located on the western Gulf Coast, the city is only 29 miles from the Gulf of Mexico. The port is uniquely situated to handle trade from throughout the United States and the world.
  - *Life on the Bayou*—Hear firsthand accounts of what it's like to live on the bayou.

- **Port Arthur, Texas**—On Sabine Lake, deep channels connect to the Gulf and contribute to the city's importance as a petroleum port.
  - *The Texas Gulf Coast*—Explore Sea Rim State Park and the Museum of the Gulf Coast.

- **Galveston, Texas**—Succulent seafood, sunny beaches and more than 1,500 Victorian structures attract visitors to the city once known as "The Wall Street of the Southwest."
  - *Dickens on the Strand*—On select sailings, experience a Victorian Christmas, complete with costumed Dickens street characters.
  - *Galveston Harbor Cruise*—A 90-minute harbor cruise aboard the *Seagull II.*
  - *Gracious Galveston*—Tour Ashton Villa and the Moody Mansion.

*Spend a few days before or after your cruise in Galveston. See page 48 for additional details regarding hotel stays.*

- **Corpus Christi, Texas**—Corpus Christi began as a frontier trading post, founded in 1838-39 by Colonel Henry Lawrence Kinney, an adventurer, impresario and colonizer. The city remained an obscure settlement until July 1845, when U.S. troops under General Zachary Taylor set up camp here in preparation for war with Mexico. Corpus Christi is now the largest city on the Texas Coast and is the sixth-largest port in the nation.
  - *Birthplace of American Ranching*—Guided tour of the famous King Ranch.
  - *The "Blue Ghost" and Aquarium*—Wander through the U.S.S. *Lexington* and the Texas State Aquarium.
  - *Highlights of Corpus Christi and Padre Island*—Tour the museum district, the port, the beach and more.

## TENNESSEE-TOMBIGBEE WATERWAY—
### From Mobile, Alabama to the Tennessee River

This mighty waterway carves a path through miles and miles of rolling hills, green pastures and towering forests. Its surging waters flow past old cotton kingdoms and through new timber empires. And, as it did in the past, th Tennessee-Tombigbee Waterway plays a vit role in the bustling economies of the cities along its banks.

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

- **Demopolis, Alabama**—This majestic sits proudly atop the white bluffs. Settled Napoleonic refugees seeking to establish "Vine and Olive Colony," it is rich in bea From handsome pavilions to breathtakin mansions, there's plenty to explore. Visit beautiful Gaineswood Mansion, built in by General Nathan Whitfield. Legend has that the ghost of the general's sister-in-l can be heard singing sweetly in the cella
  - *Demopolis: City of the People*—Learn ab the rich history and culture as you explore Bluff Hall and Gaineswood House.

*Nostalgic trolley cars connect the beach to Galveston's histo Strand/Bay area.*

- **Columbus, Mississippi**—Home to Wa Plantation, one of the biggest plantation the pre-Civil War South. It comprised 50 acres and housed hundreds of residents, including 200 slaves. The privately owne home boasts a three-story-high octagon gallery, marble mantels, molten-gold lea windows and ceiling-high mirrors. The and grounds are open for you to learn h life was lived in a bygone era.
  - *A Taste of the South*—Travel through th antebellum South and view the magnifice homes in the area.

- **Pickensville, Alabama**—Home of the in sive Tom Bevill Lock and Dam, which was named in honor of former Congressman Tom Bevill. The lock has a lift of 27 feet a the dam impounds the 8300-acre Aliceville The Tom Bevill Visitors Center is a majesti replica of a southern antebellum plantation

- **Mobile, Alabama**—See listing unde Intracoastal Waterway.



Steamboatin'® adventures along the
upper Mississippi River and Illinois River
AMERICA'S HEARTLAND
MINNEAPOLIS/
ST. PAUL
Red Wing
ST. CROIX RIVER
Winona
La Crosse
MISSISSIPPI RIVER
OTTAWA
Davenport
Burlington
Peoria
Havana
ILLINOIS RIVER
Beardstown
Hannibal
Grafton
Alton
MISSOURI RIVER
ST. LOUIS
Cape Girardeau
New Madrid
ARKANSAS RIVER
MEMPHIS
Indicates ports where cruises begin and end
City of interest or shore stop

*America's Heartland: a place of beauty, abundance, history and people who have labored to make it great*

Lured by stories of incredible opportunities to strike it rich in the lumber business, fur trade, wheat cultivation or lead mining, thousands of settlers headed to *America's Heartland.* Many immigrants had intended to go farther west, but seeing the fertile fields, rolling hills and clear waters of the region, they decided to end their journey in one of the many abundant and beautiful states along the rivers of *America's Heartland.*

Today, from Tennessee to Minnesota, Steamboatin'® cruises will take you to where settlers survived North America's greatest earthquake, to trading posts where they made friends with American Indians, to bustling river ports that became great cities, and to fascinating little river towns.

You'll be thrilled by the ever-changing scenery shaped by these mighty rivers. And you'll never forget the unique experience of "locking through" the series of locks and dams that controls the flow of *America's Heartland* rivers as they thread their way through a panorama of incredible scenery.

So come experience *America's Heartland,* with all of its rich history and heritage, its magnificent landmarks, its incredible natural beauty, and best of all, its most precious treasure—heartland people whose courage and character have shaped this country.



*The steamboats* Delta Queen® *and* Mississippi Queen® *arriving at the St. Louis waterfront.*

## UPPER MISSISSIPPI RIVER— From Memphis to Minneapolis/St. Paul

The steamboats head upriver into *America's Heartland*, where vast cotton fields give way to the rolling hills, valleys and fertile farming regions of our nation's breadbasket. Our *America's Heartland* Steamboatin'® vacations offer exciting ports of call filled with history and heritage.

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

• **New Madrid, Missouri**—Settlement began here in the late 1700s when lumbermen were attracted by the tall stands of timber in the area. In 1811, the most powerful earthquake ever to hit North America was centered in New Madrid. So powerful, the earthquake caused the river to run backwards for miles and the land from Cape Girardeau south into Arkansas to sink ten to 50 feet!

• **Cape Girardeau, Missouri**—Just 30 miles from the convergence of the Mississippi and Ohio rivers, this thriving river town was a trading post in the early 1800s.

- *The Trail of Tears*—Experience a moving program on this episode in history.
- *Tapestry of Time*—Discover the heritage and charm of one of Missouri's earliest settled areas.

• **St. Louis, Missouri**—Largest city in the state and "Gateway to the West." Following the Louisiana Purchase in 1803, the area became a center of exploration, commerce and military operations. St. Louis was chartered in 1822 and became a critically important port during the steamboat era.

*Spend a few days before or after your cruise in St. Louis. See page 49 for additional details regarding hotel stays.*

• **Alton, Illinois**—Nestled among magnificent limestone bluffs, Alton is home to many significant historical sites and events. Alton was a critical stop on the Underground Railroad, the site of an early skirmish of the Civil War, and the final site of the debates between Abraham Lincoln and Stephen Douglas in 1858. A visit to the new Lewis and Clark Interpretive Center will be a highlight of your visit.

- *Lewis and Clark: The Journey Begins*—Learn the story of the 154 days that the Corps of Discovery spent on the Wood River, training the men, building unity and discipline, preparing supplies and sharpening survival skills.

• **Hannibal, Missouri**—The boyhood home of Samuel Langhorne Clemens—better known as Mark Twain. Originally granted to a farmer by the government as compensation for the loss of his property during the 1811 New Madrid earthquake, the town is now a monument to Mark Twain. Located throughout the city are statues, museums and memorabilia bearing his name and those of his fictitious characters.

- *Mark Twain's Hannibal*—Board the train where your guide will share with you stories of Tom Sawyer and his gang.
- *Mark Twain Museum Complex*—Tour seven museums housing an impressive collection of Mark Twain memorabilia.
- *Mark Twain Cave*—Go exploring like Tom and Becky with an experienced guide.
- *Escape to Freedom*—Hear the story of the Underground Railroad.

• **Burlington, Iowa**—Limestone bluffs resound with the myths and memories of Native Americans who lived here in the Flint Hills. The Black Hawk Treaty of 183[illegible] opened the area for settlement, and in 18[illegible] it was named Burlington.

- *Historic Fort Madison*—Learn about life in the first military fort built on the Upper Mississippi from costumed interpreters.
- *Historic Nauvoo*—Explore this early Mormon settlement.

• **Davenport, Iowa**—Once the heartland [illegible] the Sauk and Mesquakie tribes, Davenpo[illegible] now one of America's great farming citie[illegible] It was named for Colonel George Davenp[illegible] who served at Fort Armstrong and later established a fur trading outpost here. It [illegible] also home, each July, to Dixieland bands that gather for the Bix Festival in honor [illegible] Bix Beiderbecke, the "Giant of Cornetist[illegible]

- *Legacy of John Deere*—View the largest agricultural exhibit in the world.
- *River, Prairie and People*—Visit the John Hauberg Indian Museum, and the Putnam Museum of History and Natural Science.

*Examine vintage and modern-day farming equipment at John Deere Commons.*

*Visit Mark Twain's hometown of Hannibal, Missouri.*

• **Dubuque, Iowa**—The oldest permanent settlement in Iowa, it became the state's largest city, famous for its lumber mills, which processed huge rafts of timber from upriver.

• *Dig Deep: A Miner's Heritage*—Tour the Bevens Lead Mine and the Platteville Mining Museum.

• *Delight in Dubuque*—View colorful Victorian mansions, stroll through a whimsical downtown area, and visit the National Mississippi River Museum and Aquarium.

• *An Adventure at Every Turn*—Become a barge pilot, control locks, and much more at the National Mississippi River Museum and Aquarium.

• **La Crosse, Wisconsin**—Native Americans originally called this area "Na Tani Ho Chira," three rivers. It is here that the Black and La Crosse rivers join the Mississippi. Atop Grandad Bluff, a dramatic 540-foot overlook, you can look out onto three states. La Crosse is also home to Riverside Park, where you'll find beautiful gardens, an outdoor performance center and inspiring sculpture.

• *Heart of Amish Country*—A trip to Wisconsin's Amish Country USA.

• *Heaven on Earth*—A pilgrimage to the Cathedral of Saint Joseph the Workman; the "Chapel of Angels," the mother house of the Franciscan Sisters of Perpetual Adoration; and the new Shrine of Our Lady of Guadalupe.

• **Winona, Minnesota**—Founded by a steamboat pilot and once a Sioux Indian village, it was a wheat and lumber shipping center and the nation's fourth-largest grain market.

• *The Wonders of Winona*—Stops include the Winona County Historical Society Armory Museum, the St. Stanislaus Koska Catholic Church, and the Watkins County Heritage Museum.

• **Red Wing, Minnesota**—Originally the site of a Sioux Indian village, Red Wing today boasts historic buildings and sites that form the backdrop for what was once "the greatest local wheat market in the world" and the home of Red Wing Shoes®.

• *The Real Red Wing*—Discover Red Wing's rich history and explore the area's many scenic vistas.

• **Minneapolis/St. Paul, Minnesota**—Contemporary urban vistas, old-world flavor and Native American heritage give the twin cities an atmosphere that harmonizes perfectly with the scenic splendor of timber and water.

*Spend a few days before or after your cruise in Minneapolis/St. Paul.* *See page 49 for additional details regarding hotel stays.*

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

*The Riverboat Museum complex in Dubuque*

*Begin or end your Steamboatin® vacation in Minneapolis/St. Paul—explore and discover how diverse the twin cities are.*

*The* Mississippi Queen® *passes through Red Wing, a quiet river town on the upper Mississippi River with friendly people and a beautiful waterfront.*



*The wildlife along the upper Mississippi will take your breath away.*

## THE ILLINOIS RIVER— From Grafton to Ottawa

With its majestic vistas, the Illinois River is one of the most spectacular attractions in the "Land of Lincoln." Its 273-mile course takes travelers through a favorite hunting and fishing region that the Native Americans called "Pimiteoui" (Pee-Mee-Twee)—land of great abundance.

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

• **Alton, Illinois**—Nestled among magnificent limestone bluffs, Alton is home to many significant historical sites and events. Alton was a critical stop on the Underground Railroad, the site of an early skirmish of the Civil War, and was the final site of the debates between Abraham Lincoln and Stephen Douglas in 1858. A visit to the new Lewis and Clark Interpretive Center will be a highlight of our visit.

• *Lewis and Clark: The Journey Begins*—Feel the excitement of the preparation for the journey into the unknown as you explore the Lewis and Clark site.

• **Grafton, Illinois**—Located at the confluence of the Mississippi and the Illinois River, along with numerous islands.

• *Along the Great River Road*—Experience the unparalleled beauty of limestone bluffs as you discover the history of Lincoln country.

• *A Ride in the Country*—Hop in a comfortable wagon and go apple picking!

• **Beardstown, Illinois**—Historic Lincoln County is famous for the Cass County Courthouse, which is still in use today. Abraham Lincoln practiced law here.

• *Lincoln in Springfield*—View one of the homes where Lincoln raised his family, and visit the tomb where he and his family are buried.

• **Havana, Illinois**—Home to the Dickson Mounds State Museum, site of 800-year-old burial mounds, and Rockwell Mound, the second-largest Indian mound in the Midwest, dating back 2,000 years. Today, Havana offers a charming downtown, featuring lots of shopping and dining opportunities, and Rockwell Park, one of the prettiest riverfront parks on the Illinois River and where Lincoln and Douglas both spoke to crowds in 1858 before their famous debates.

• *Lincoln's New Salem*—Stroll the village where young Lincoln came of age and began his education.

• *Eight Decades of Native Americans*—Explore the world of the American Indian a Dickson Mounds Museum.

*Walk in our 16th president's footsteps in historic to like Springfield, Illinois.*

• **Peoria, Illinois**—Situated at the wide part of the Illinois River and valley; Tedd Roosevelt once described its Grand River Drive as "The Grandest View in the Worl

• *Play in Peoria*—Hear about the city's co days as the "Whiskey Capital of America," stop at the Wheels of Time Museum.

• *David Davis: Clover Lawn*—Visit the David Mansion, a model of mid-Victorian style and t

• **Ottawa, Illinois**—This Chicago gate on the Illinois River features many hist homes and buildings as well as some of world's most productive farmland.

*The Mississippi River from Great River Bluffs State Park, Minnesota*

Steamboatin'® on the Ohio, Cumberland, Tennessee and Kanawha rivers

# WILDERNESS RIVERS

Here in the *Wilderness Rivers* region is where Steamboatin'® on the "western" rivers originated back in 1811. And that's just one of many historical firsts for an area extending from Pittsburgh in the east to the convergence of the Ohio and Mississippi rivers in the west, and on to Nashville and Chattanooga in the south. This region is home to the first capital of the Northwest Territory, the first Run for the Roses, the first battlefield of the American Revolution and the first major Union victory of the Civil War.

From the legends of Davy Crockett and Daniel Boone to the infamous exploits of river pirates, it's a region filled with tall tales and spellbinding stories. You'll relive the stories passed down through generations as you travel through an ever-changing country of precipitous cliffs, gently rolling hills, and farmlands where the architecture ranges from Lincoln-style log cabins to magnificent mansions.

Enjoy the hospitality of the people who make this region their home. Here you'll see firsthand the arts and crafts of Appalachia, experience the excitement of major river ports, enjoy regional specialties from Cincinnati chili to Kentucky burgoo, and you'll be transported back to where and when the Golden Age of Steamboatin' began.

East Liverpool
PITTSBURGH
Wheeling
Marietta
CINCINNATI
Portsmouth
Madison
OHIO RIVER
Point Pleasant
Leavenworth
Maysville
Gallipolis
KANAWHA RIVER
Charleston
Tell City
Louisville
Cave-In-Rock
Mt. Vernon
Henderson
Smithland
LAKE BARKLEY
Columbus
Paducah
Clarksville
KENTUCKY LAKE
Dover
CUMBERLAND RIVER
NASHVILLE
Indicates ports where cruises begin and end
City of interest or shore stop
Savannah/ Shiloh
Florence
TENNESSEE RIVER
CHATTANOOGA
Huntsville
Decatur

*The Mississippi Queen® travels through the Wilderness Rivers Region on the Ohio River near Henderson, Kentucky.*



*The Kentucky Derby®—a century-long tradition at Churchill Downs® in Louisville*

## THE OHIO RIVER— From the Mississippi River to Pittsburgh, Pennsylvania

At nearly a thousand miles long, "La Belle Riviere" is the principal tributary of the Mississippi River system. All along the scenic Ohio River Valley are peaceful rural vistas, quaint river towns and bustling cities that evolved as a direct result of their proximity to "the beautiful river." Swift mountain streams and soaring river bluffs along the route contribute to its current, and numerous islands enhance its natural beauty.

The starting point of the Ohio is in Pittsburgh, where it is formed at the confluence of the Allegheny and Monongahela rivers, and appropriately, it is also where the voyages of one of the first steamboats began heading the way to New Orleans.

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

• **Paducah, Kentucky**—Just below the Ohio and Tennessee rivers' convergence is where 42,000 Union soldiers boarded 173 steamboats and 12 gunboats for a military convoy up the Tennessee to Shiloh. Frequently displayed here are examples of your fellow steamboaters' stitchery that have been donated to the American Quilt Museum.

• *Follow Their Footsteps: A Civil War Walking Tour*—A Civil War soldier will take you back in time to the Battle of Paducah.

• *Step Back in Time: Adsmore's Many Faces*—Tour the Adsmore Museum, a Greek revival home mainly furnished with handcrafted American antiques.

• *Rollin' on the River*—Learn how to pilot a tugboat at the Seaman's Church Institute and visit the River Heritage Museum.

• **Smithland, Kentucky**—Established in 1780, the town was named for James Smith, an early explorer of the area. Today, Gower House, an inn erected in 1780, still stands along the riverfront. Guests have included Presidents James K. Polk and Zachary Taylor, plus Clara Barton, Charles Dickens and Aaron Burr.

• *Mantle Rock & Mandy Falls*—Hear about the Cherokee people who died here during the harsh winter of 1838 and were buried in rock-covered graves.

• *Steppin' out in Smithland*—A walking tour of Smithland's quaint downtown area, with a presentation of Civil War history by Rick Revel, renowned founder of the American Heritage Theater.

• **Cave-in-Rock, Illinois**—This infamous 55-foot-wide "hole in the limestone bluff" was where river pirates once robbed and murdered flatboatmen after luring them into their "house of entertainment."

• **Henderson, Kentucky**—Ten miles south of Evansville, Henderson was settled in 1784 as Red Banks and became a city in 1854, named for Colonel Richard Henderson. The city sits on a bluff overlooking the Ohio River near its confluence with the Green. Its most famous resident was naturalist John James Audubon.

• *Audubon Museum and Reitz Home*—Trace John James Audubon's residency in the Henderson area and visit an authentically restored Victorian mansion.

• **Mt. Vernon, Indiana**—Because of its advantageous location on the Ohio River, Mt. Vernon first grew as a shipping port. Grain and produce from the rich agricultural land surrounding the town were transported to Southern markets from Mt. Vernon's waterfront. Some of the earliest surviving structures in the town can be found along the river.

• *Historic New Harmony*—Visit a spiritual sanctuary that later became a haven for international scientists, scholars and educators.

• **Louisville, Kentucky**—Home of Churchill Downs® and the Kentucky Derb[y] the largest city in the state was settled in 1778 and from 1820 grew rapidly as a ma[jor] river port.

• *Spirits of Kentucky*—Call on the Kentucky Derby Museum at legendary Churchill Dow[ns] and view the Jim Beam American Outpost.

• *"La Belle Riviere": The Beautiful Ohio*—[V...] the 386-million-year-old fossil beds of the F[...] of the Ohio State Park, as well as the Howa[rd] Steamboat Museum.

• *A Day in Bluegrass Country*—Experience [the] sights and sounds of Kentucky Horse Park. Then visit The Labrot & Graham Distillery.

• *Shaker Village of Pleasant Hill*—A premie[r] living history museum where skilled artisan[s] work at 19th-century trades and employ hist[oric] farming techniques.

• **Madison, Indiana**—The "19th-centur[y] Williamsburg of America" features 133 blocks on the National Register of Histor[ic] Places that incorporate numerous buildin[gs] in a wide variety of architectural styles.

• *Historic Madison*—Visit fine Madison homes, displaying a variety of 19th-century architectural styles.

• *It Was All in the Family*—An eclectic tou[r] of historic Madison, featuring visits to the B[...] Schroeder Saddletree Company, the Madiso[n] Vineyard, and the factory where Betty Mun[...] Candies are made.

• **Cincinnati, Ohio**—During the Great Steamboat Era, the "Queen City of the West" was one of the river's busiest port[s] with hundreds of steamboats arriving an[d] departing daily.

*The Delta Queen® locking through the 58-foot-high lock at Kentucky Lake Dam*

ACL 43779

• *"Zinzinnati" Past and Present*—See Cincinnati's Mainstrasse Village, Riverboat Row, the Tyler Davidson Fountain, the Flying Pigs at Sawyer Point, as well as Krohn Conservatory, the Cincinnati Art Museum® and Riverview Hill.

*Spend a few days before or after your cruise in Cincinnati. See page 49 for additional details regarding hotel stays.*

• **Maysville, Kentucky**—The oldest landing place on the Ohio and the Ohio River crossing of the Natchez Trace. Early visitors included Daniel Webster and Zachary Taylor.

• *The Freedom Trail*—Visit the Harriet Beecher Stowe Slavery to Freedom Museum, and visit a home which was a refuge to more than 2,000 runaway slaves.

• *Strolling in Maysville*—Get to know small-town America at its most congenial with a walking tour and visit the Mason County Museum.

*Simon Kenton Bridge at Maysville was the model for the Oakland Bay Bridge in San Francisco.*

• **Gallipolis, Ohio**—Highest point on the Ohio River, it was settled by French colonists in 1790. During the Civil War, it was a center for treating wounded Union soldiers.

• *Life on the Farms*—Visit Green Valley Farm, which raises Grand Champion thoroughbreds, and Bob Evans Farm® of sausage fame.

• **Point Pleasant, West Virginia**—This area was explored by George Washington. His diary describes this land as a "pleasant point." It was inevitable that the pioneering settlers would collide with Native Americans over the control of the Ohio Valley. Here, the daylong Battle of Point Pleasant was fought.

• *Get to the "Point"*—Explore the Point Pleasant River Museum and the location of the "First Battle of the American Revolution."

• *Window to the Past*—Experience the day-to-day life of the early American frontier at historic Fort Randolph. You'll also visit the West Virginia State Farm Museum.

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

• **Marietta, Ohio**—The original settlers built a civilian fortification used as the government seat and to protect settlers during the Ohio Indian Wars. They named it Campus Martius. You'll visit the Campus Martius Museum. At the Ohio River Museum, you will explore the *W. P. Snyder, Jr.*, America's sole surviving, steam-powered, sternwheel towboat.

• *Discovering the Ohio Valley*—Visit historic houses and churches, the Campus Martius Museum, the Ohio River Museum, and the Fenton Art Glass Factory.

• *Parkersburg: West Virginia's Powerhouse*—Stroll the streets of the Julia-Ann Square Historic District, and tour the Oil and Gas Museum.

• **Wheeling, West Virginia**—An important commercial center of West Virginia's northern panhandle, Wheeling was a pre-revolutionary outpost. Its location along the National Road and the Ohio River made Wheeling a hub of trade and commerce in the 19th century. Its most historic landmark is the Wheeling Suspension Bridge, built in 1849.

• *The Good, the Bad and the Beautiful*—Explore the infamous Moundsville State Penitentiary and Oglesbay Park with the Oglesbay Mansion Museum.

• **East Liverpool, Ohio**—For more than 150 years, skilled potters of the East Liverpool area have produced countless cups, plates and saucers, gaining East Liverpool the proud title of "Ceramic City." Many of the beautiful old Victorian mansions in the area were built after the turn of the century with "pottery money," and are appointed with handsome woodwork and lead-glass windows.

• *Ceramics—The Legacy Continues*—Visit the Museum of Ceramics, as well as The Homer Laughlin China Company—makers of the ever-popular Fiesta Ware.

• **Pittsburgh, Pennsylvania**—Steamboatin'® originated here! In 1811, Robert Fulton built and Nicholas Roosevelt piloted the *New Orleans*, which eventually landed safely in the port of New Orleans, Louisiana.

*Spend a few days before or after your cruise in Pittsburgh. See page 49 for additional details regarding hotel stays.*

*America's river towns offer hospitality that says, "You're always welcome."*

*Pittsburgh, Pennsylvania, the "Steel City," where the Ohio River begins*

*The* Delta Queen® *will cruise to charming Charleston, West Virginia.*



A Civil War cannon overlooks Chattanooga, Tennessee, from Lookout Mountain.

## THE KANAWHA RIVER— From the Ohio River to Charleston, West Virginia

Formed by the New and Gauley rivers' junction, this lovely waterway crosses the Metro Valley of West Virginia and flows northwest to the Ohio River. From Huntington to Charleston, the natural, unspoiled beauty of the "Mountain State" delights the eye and the imagination.

### Port highlight:

• **Charleston, West Virginia**—The gleaming gold dome of the capitol building rises above the river, and the Governor's Mansion, the Cultural Center and the West Virginia State Museum line the shaded banks.

## THE TENNESSEE RIVER— From the Ohio River to Chattanooga, Tennessee

The 652-mile-long Tennessee River is the Ohio River's largest tributary. Remarkable for its influence on our nation's history as well as its value as a source of water power, the river courses through dramatically scenic countryside. From its formation at the confluence of the Holston and French Broad rivers near Knoxville to where it empties into the Ohio River below Paducah, you'll see high elevations rising precipitously from the water's edge and banks made of rock and clay, which give the river an unusually silt-free flow and contribute to its rugged beauty.

Visit Nashville—the country music capital of America.

### Port highlights:

• **Savannah, Tennessee, and Shiloh National Military Park**—Established on December 27, 1894, the park preserves the site of the largest battle of the 1862 Civil War. On 4,000 acres overlooking the Tennessee River, 151 monuments, 217 cannons and more than 450 historic tablets mark America's best-preserved battlefield and burial site.

• *Shiloh National Military Park*—Tour the museum and a 3,872-acre park commemorating the Battle of Shiloh.

• **Florence, Alabama**—The name Florence was chosen to honor the hometown of the Italian surveyor who planned and laid out the town in 1818. Your driving tour will include the National Historic Districts, the campus of the University of Alabama, and Pope's Tavern, Alabama's only example of Frank Lloyd Wright architecture.

• *Famous Alabamians*—This tour pays homage to W.C. Handy, Helen Keller, Nat "King" Cole, Hank Williams, Tammy Wynette and others.

• **Huntsville, Alabama**—Go from the 19th century to the 21st in this high-tech city sitting at the foot of a mountain. Visitors who want to be "astronauts for a day" can sample astronaut training activities at the U.S. Space and Rocket Center, home to the internationally known U.S. Space Camp. Enjoy a walking tour of the Twickenham historic district, with the state's largest collection of pre-Civil War homes.

• **Decatur, Alabama**—Chartered as a city in 1826, the area was devastated by the Civil War. Following the conflict, it was rebuilt and many well-preserved homes now grace the city's charming Victorian neighborhoods.

• *U.S. Space and Rocket Center Tour*—Explore the largest space museum in the world.

• *Battle of Day's Gap*—Hear a fascinating tale of courage, endurance, bravery and military skill.

• **Chattanooga, Tennessee**—Its name came from the Cherokee natives who were inspired by nearby majestic Lookout Mountain to call what was then their village "a rock rising to a point."

*Spend a few days before or after your cruise in Chattanooga. See page 49 for additional details regarding hotel stays.*

## THE CUMBERLAND RIVER From the Ohio River to Nashville, Tennessee

Formed in the mountains near Harlan Cou Kentucky, and flowing through isolated cou side, the now tranquil Cumberland River re wasn't always so peaceful. Discovered in 174 Virginians, its settlements were unprotected were often raided by Cherokees, Chickamau and Creeks. From these historic conflicts a legendary figures including Davy Crockett Sam Houston. The tales of their exploits are told today up and down the Cumberland Ri Later, the area along its lovely 687-mile len figured prominently in Civil War confrontati

**Brief shore tour descriptions are listed at each port. Visit www.deltaqueen.com for more information about these and other shore excursions.**

### Port highlights:

• **Dover, Tennessee**—Home to the rest Dover Hotel, where General Simon B. Bu formally surrendered to General Ulysses Grant following the fall of Fort Donelson.

• *Fort Donelson National Military Park*—S at the site where, in 1862, Union forces cla their first major victory of the Civil War.

• *Land Between the Lakes*—Call on Home Living History Farm, consisting of 16 origi and restored log structures, with interpret period dress.

• **Clarksville, Tennessee**—The city ro prominence as a major tobacco port in t early 1800s, only to be economically deva by the Civil War. But the resourcefulnes its residents led to a strong recovery tha boosted the "Queen City of Cumberland the age of industrialization.

• *Historic Collinsville*—Discover life at F Donelson in the 1800s when the work was but the rewards were great.

• *Sipping and Spelunking*—Explore Dunb Cave and Beachaven Winery and Vineyard

• **Nashville, Tennessee**—Once a maj hub and river port, "Music City, U.S.A." the mecca of country music and home o Grand Ole Opry.®

*Spend a few days before or after your cruise Nashville. See page 49 for additional details re hotel stays.*

# "Golfing Along The River"

## Featuring Premier Golf At Signature Courses

*The Bluffs on Thompson Creek*

When Mark Twain stated, "Golf is a good walk spoiled," he undoubtedly had not envisioned Steamboatin'® from course to course. And that's exactly what you can do on our *Steamboatin' Golf Trail* vacations. Along with great golf in port, on some departures in 2005 you'll travel with golf legend Lon Hinkle.

Your Steamboatin' golf package will include four or five rounds of premium golf at beautiful facilities in each port of call. Each day in port you will be greeted at the dock by buses waiting to take you for an enjoyable round of golf at scenic and challenging courses. Enjoy golf at signature courses along the Gulf Coast built by renowned golf course designers such as Robert Trent Jones, Jack Nicklaus, Arnold Palmer, Davis Love III, Pete Dye, and Ron Garl.

Your host on select departures will be PGA TOUR® legend and current Champions Tour player Lon Hinkle. Lon will share his stories and anecdotes from years on the TOUR as he joins you on the cruise and each of your rounds of golf. Lon has played in more than 500 PGA TOUR events over his career, but it was at the 1979 U.S. Open at the Inverness Club that his name became synonymous with a Black Hills spruce tree, ever since known as the Hinkle Tree. You'll hear this story and many more when you meet Lon on the river.

On our *Delta Queen*® Gulf Coast golf vacations, you'll play at The Moors in Pensacola. The signature hole is #3, a 198-yard par 3, designed after the famous "Postage Stamp" hole at Royal Troon in Scotland. In Mobile, you'll be a guest at the Magnolia Grove Golf Club. This facility is one of the seven facilities that make up the Robert Trent Jones Golf Trail through Alabama. In Biloxi/Gulfport, you'll experience either Shell Landing Golf Club or The Bridges Golf Club. Shell Landing, a Davis Love III design, is the newest course on the Mississippi Gulf Coast. *Golf Digest*® named Shell Landing among America's Best New Courses of 2002. The Bridges, a premier Arnold Palmer Design Group 18-hole championship golf course, is one of the area's finest. And in New Orleans, you will play at Money Hill Golf & Country Club, *Golf Digest*'s #1-rated course in Louisiana. One look at Money Hill's 18-hole championship course and you'll understand why it's changing the way golf is played in Louisiana!

On our *Mississippi Queen*® departure, courses include the Money Hill Golf & Country Club in New Orleans, and The Bluffs on Thompson Creek, an Arnold Palmer design, located in St. Francisville. From Vicksburg, you will take a scenic ride to Jackson to the Patrick Farms Golf Course, part of Mississippi's Magnolia Golf Trail. In Natchez, you'll discover Beau Pré Country Club, an 18-hole championship layout designed by Mike Young, also on the Magnolia Golf Trail. And in Baton Rouge, you'll tee off at Copper Mill Golf Club, a Max Maxwell and Nathan Crace design. Holes 9 and 18 play around two lakes with waterfalls.

For package pricing information, call today. Package includes all greens fees, carts, range balls, a box lunch with a drink each day, a gift bag at each course (including a sleeve of logo balls, logo bag tag and tees), transportation, bag storage and handling, taxes and gratuities. Premium rental clubs are available at an additional cost of $50 per day.

**Note: Individual rounds of golf can be arranged at most ports of call on any Steamboatin' vacation. Ask the shore tour manager when you check in.**

**2005 DEPARTURES**

| | | |
|---|---|---|
| Jan. 31 | DQ | New Orleans/New Orleans—*Lon Hinkle* |
| Feb. 14 | DQ | Pensacola/New Orleans—*Lon Hinkle* |
| Mar. 1 | MQ | New Orleans/New Orleans—*Lon Hinkle* |
| Jun. 2 | DQ | New Orleans/Pensacola—*Lon Hinkle* |
| Jun. 9 | DQ | Pensacola/New Orleans—*Lon Hinkle* |

**2006 DEPARTURES**

| | | |
|---|---|---|
| Feb. 17 | DQ | New Orleans/New Orleans—*To Come* |
| Feb. 24 | DQ | New Orleans/Pensacola—*To Come* |
| Mar. 3 | DQ | Pensacola/New Orleans—*To Come* |
| Jun. 5 | DQ | New Orleans/Pensacola—*To Come* |
| Jun. 12 | DQ | Pensacola/New Orleans—*To Come* |

# Delta Queen "Riverbonding" Adventures For Families. Unplug The Computer And Reconnect With One Another On The River.

Feel like your kids are growing up too fast—that you're all too busy to enjoy each other? Then a "Riverbonding" Adventure is for you. Imagine! A family vacation that's more than video games, fast food and long theme park lines. This roller-coaster ride goes 8 miles per hour and it's 100% real! Tom Sawyer and Huckleberry Finn loved the river—so will your kids.

If you're looking for a big arcade, you're on the wrong boat. Before your cruise, you'll be asked to choose board games (two per stateroom from a list of 20 or so). When you arrive, you'll find these games in your room (by the way, they're yours to keep when you go home).

But there's a lot more to do than play Scrabble®. Your family will enjoy a bevy of activities led by an enthusiastic Family Activity Coordinator. Along with Broadway-quality, family-friendly shows every evening, your kids will enjoy slumber

*Slow down and play board games with your kids.*

*Introduce your family to the real America.*

parties, classic family movies, kite flying off the back of the boat, ping-pong and mini-golf tournaments, craft making—you may even get to play *Family Feud*®! Plus, your kids will tour the engine room and learn how a steamboat works. They'll get a chance to earn their Cub Pilot Licenses by learning how to tie knots and read a river chart. They'll meet for a River Nightwatch lecture under the stars. And our Riverlorian® will weave tales about life on a steamboat then and now.

There will be special times and areas on the boat where you can play board games and enjoy snacks with other families. In fact, every night milk and a plate of cookies or snacks from the captain will be delivered to your room. And, since we're on the subject of food, if your kids would rather have chicken nuggets than prime rib and shrimp, just ask and our chef will prepare something just for them. And it wouldn't be a riverboat vacation if there weren't lots of hot dogs and soft-serve ice cream on board for between-meal snacking. Come on, mom—it's vacation!

## In Port, Enjoy Specia Family Shore Tours Fil With American Histo Culture And Fun!

Introduce your family to the A you explored as a kid—the real A On a "Riverbonding" Adventure, y be bombarded with "are we there from the backseat of your car be you're "always there" on the rive family vacation is luxurious, stre and full of authentic adventure.

For instance, Laura Plantatic the lower Mississippi offers a sp program allowing kids to explor

*There's nothing "little league" about The Louisville Slu*

*Whitewash a fence in Mark Twain's hometown, Hann*



*This is a vacation your family will treasure together.*

*You don't need batteries to have a good time.*

plantation life through the eyes of the children who once lived there. In St. Francisville, your family can tiptoe around The Myrtles, one of the most haunted houses in America.

Family adventures further north include Mark Twain's hometown of Hannibal, Missouri. You can go on a train ride with Tom Sawyer and Becky Thatcher, explore a Mark Twain Cave, pan for gems at the Rock Shop, and then go "Whitewash the Fence" just like Tom had to do years ago.

Look to the right for a list of family shore tours. Whatever you choose to do, your family album will be filled with memories. (By the way, you'll have the opportunity to pose for a family portrait on board, a free gift from us to you.)

## Book Your "Riverbonding" Adventure Today!

Departures on these one-of-a-kind experiences coincide with summer vacations and school holidays. On the magnificent *Mississippi Queen*® and the grand *American Queen*®, "Riverbonding" Adventures are offered June through August, and during Thanksgiving and Christmas 2004 and 2005. Book and deposit any 2004 or 2005 "Riverbonding" Adventure on the *Mississippi Queen* or *American Queen* and take advantage of the Advance Purchase discount that's in effect*, plus kids under the age of 18 cruise free. Just book by the Advance Purchase deadline. Offer is capacity controlled.

Turn off the computer and the video games and turn your kids on to America! Space for families is extremely limited, so hurry.

> ***"I cruised on the* Mississippi Queen *with my mom and grandma. We loved the cruise so much! I feel like I have fallen in love with the river!"***
>
> *— Chris Degnan, Age 11, La Crosse, Wisconsin*

**Note:** You won't need batteries for your video games, but make sure your camera's charged up (you're going to need proof this really happened, once you get home).

*To qualify for the "Riverbonding" discounts, book your *American Queen* or *Mississippi Queen* cruise by the Advance Purchase date shown on the inside back cover. A limited number of quad accommodations are available on the *American Queen* only in select categories. Triple accommodations are available in select categories on both the *Mississippi Queen* and *American Queen*.

*Enjoy all the luxuries of life aboard a floating palace.*

## Family Shore Tours

**WE'RE ADDING NEW FAMILY SHORE TOURS EVERY DAY!**

**VISIT WWW.DELTAQUEEN.COM FOR MORE INFORMATION ABOUT THESE SHORE EXCURSIONS AND OTHERS.**

### THE OLD SOUTH

**THE BAYOU AND BR'ER RABBIT:** Tour the bayou and Laura Plantation, home of Br'er Rabbit.

**HATS OFF TO YOU:** Garden at Houmas House Plantation, then join the "Hat Party."

**A CHILD'S DAY ON THE PLANTATION:** Play the games kids played in the 1800s.

**HAUNTED, HUDSON AND HISTORY:** Tour one of the most haunted houses in America and learn Civil War history.

**MOUNDS, MASKS AND MANSIONS:** Uncover the mysteries of Natchez Indians and tour a plantation home.

**PLAY IN THE COUNTRY:** Picnic at a plantation.

**HELENA HOEDOWN:** Go on a hayride, hear live blues, eat catfish and more!

### AMERICA'S HEARTLAND

**MOVEMENT, MUSIC AND MELODIES:** Explore traditional Native American music.

**TRAINS, TREASURES AND TWAIN:** Explore Hannibal, Missouri, from a train.

**REACH FOR THE STARR'S:** Explore the wonders of Starr's Cave and Preserve.

**A KINGDOM FOR KIDS:** Visit the Family Museum of Arts and Science.

**A WORLD OF WATER FUN:** Splash around at a Mississippi-themed water park.

**AN ADVENTURE AT EVERY TURN:** Become a barge pilot and control locks and dams at the National Mississippi River Museum and Aquarium.

**NATURE AT ITS BEST:** Get close to nature at Hixon Forest Nature Center.

### WILDERNESS RIVERS

**ACTING UP! MARKET HOUSE THEATER:** All the world's a stage in Paducah.

**AUDUBON DISCOVERY:** Check out The John James Audubon Park and Museum.

**BATS, BALLS AND BLAST OFF!:** Tour the Louisville Slugger Museum® and Science Center.

**CRANES, COLUMNS AND COOL NATURE STUFF:** A scavenger hunt in historic downtown Madison, Indiana.

**TOYS, GAMES AND CHILDREN'S CHORES:** Travel back to 1850 at Homeplace, a working farm.





Explore Your Interests On A

# Theme Vacation

Some people go Steamboatin'® because they love the river. Other people just like to be pampered. And still others love Steamboatin' because our theme cruises give them a chance to indulge in a special interest—and to meet people who share that interest. If you fall into the latter category, then we've got something just for you. Whatever it is that tickles your fancy, you'll find it on the river.

If you have a passion for music, you can rock 'n' roll to our *Legends of the '50s*, swing to the *Big Bands*, or have a foot-stompin' good time on our *Bluegrass Jamboree* vacations. These themes feature big-name entertainers and lots of dancing.

If you are a history buff, come walk the battlegrounds with our Civil War experts; experience firsthand the culture and traditions of the Native Americans; or retrace the momentous journey of the *New Orleans*, the first steamboat to travel all the way from Pittsburgh to New Orleans. Enjoy the scenic beauty and discover an engineering marvel as we explore *The Wonder of The Tenn-Tom*. Or, why not get together with your service buddies and reminisce on our *World War II Remembrance* and *Veterans Reunion* departures? On each of these historical cruises, you'll meet authors, lecturers, heroes and entertainers on board and on shore, as well as learn more about and remember those days past.

Some of our themes revolve around particular times of the year. Discover the beauty of *Springtime on the Bayou, Springtime in Texas,* or the glorious *Spring Pilgrimage* in Natchez. Stroll through some of the most beautiful *Gardens of the River* while picking up a tip or two to make your thumb a little greener from our gardening experts. And there is nothing more spectacular than riverbank hillsides painted in the colors of autumn on our *Fall Foliage* vacations.

How about celebrating a holiday or special event with us on the river? Join in the excitement of the "Run for the Roses" on a *Kentucky Derby*® vacation. Meet us at the Arch for a fun-filled *St. Louis 4th of July* extravaganza. Take a November or December break from the mall and join one of our *Old-Fashioned Holidays* vacations on the river. Events and holidays are even more enjoyable when celebrated while Steamboatin'.

Looking for a vacation that's just plain fun? Be on board as the *Delta Queen*® challenges the *Mississippi Queen*® in *The Great Steamboat Race*®. Looking for insight into your future? Join one of our *Psychic Experience* departures. Enjoy the art of fine quilt stitchery when you take the *Mississippi Queen* to the Quilt Show in Paducah. Have a spouse who wants to go on a cruise and you just want to play golf? Now you can do both with our *Golfing Along The River* vacations (see page 35).

Like we said, there's something for everybody. Read on for specific information

# ☆ ☆ ☆ Musical Themes ☆ ☆ ☆

Get Out Your Poodle Skirt.

## "LEGENDS OF THE '50s"

*We were cool in the '50s—we thought America would never change.*

*The '50s saw cars move into the fin era—and the bigger, the better.*

Who can forget the '50s? Twirling Hula-Hoops® and batons on the front lawn; swallowing goldfish and "souping up" cars; wearing letter sweaters, sorority pins and penny loafers. Girls loved Betsy McCall and wanted to be Sandra Dee. Boys wanted white bucks like Pat Boone's and dreamed of marrying a girl just like mom. James Dean and Marilyn Monroe sizzled on the big screen while Mickey Mantle sent baseballs flying out of the park.

Those were the days of champagne music from Lawrence Welk; smooth, soulful love songs from Nat "King" Cole and Harry Belafonte; and "Great Balls of Fire" from Jerry Lee Lewis. On board, you'll be entertained by legends like The Shirelles, The Crickets, The Dixie Cups, The Four Freshmen, Gogi Grant and The Four Lads.

During this cruise, we'll relive the good ole days through music, sports, and TV. Join us on board as we re-create the activities and events that escorted us through the transition years in America. Depending on the cruise you choose, you can meet Rick Busciglio, who will take us down memory lane with a presentation on the music of the era, or baseball great Bob Feller, a member of the Baseball Hall of Fame who pitched for the Cleveland Indians from 1936 to 1956.

*The Shirelles*

So, ladies, locate your popper beads and angora sweaters, and gentlemen, bring your white sport coats and pink carnations; get ready for superb entertainment and insightful conversation as we look back at America's golden era.

**2005 DEPARTURES**

**Jan. 23 MQ New Orleans/New Orleans**—*The Shirelles, The Crickets, Rick Busciglio*
**Jan. 30 MQ New Orleans/New Orleans**—*The Crickets, The Dixie Cups, Rick Busciglio*
**Sep. 2 MQ Chattanooga/Cincinnati**—*The Four Freshmen, Gogi Grant, Bob Feller, Rick Busciglio*
**Sep. 9 MQ Cincinnati/Cincinnati**—*Gogi Grant, The Four Lads, Bob Feller, Rick Busciglio*

**2006 DEPARTURES**

**Feb. 20 MQ New Orleans/New Orleans**—*To Come*
**Feb. 26 MQ New Orleans/New Orleans**—*To Come*

Fiddlin' Around On The River.

## "BLUEGRASS JAMBOREE"

*Come see Doyle Lawson and Quicksilver.*

You're in for a foot-stompin' good time on the river when you book these *Bluegrass Jamboree* vacations. Feel the heartbeat of the Appalachian and Smoky Mountain regions and watch the bows and fingers fly as musicians make fiddles, mandolins and banjos sing!

Thanks to Bill Monroe, this hard-driving, high-energy style of music took the Grand Ole Opry® by storm in 1939. Today, the music is performed around the world. In fact, the International Bluegrass Music Association lists members in all 50 states and 30 countries. On board our floating honky tonk, you'll be entertained by bluegrass superstars The Whites, one of the longest-lasting family harmony groups in country music. Also on board will be Straight Drive with mandolinist Todd Collins. Named for its hard-driving style, Straight Drive has attracted the attention of audiences at bluegrass festivals, music clubs, on radio broadcasts and on country music shows. And finally, Doyle Lawson and Quicksilver will be on board to move your bluegrass soul. The group has been playing bluegrass along with gospel for a little over twenty years. And every year, a Doyle Lawson and Quicksilver festival is held in North Carolina.

*Hear Bluegrass in Bluegrass Country with Straight Drive.*

*The Whites will perform many of your favorites including "If It Ain't Love (Let's Leave It Alone)."*

**2005 DEPARTURES**

**Aug. 13 MQ Memphis/Nashville**—*The Whites and Straight Drive with Todd Collins*
**Aug. 19 MQ Nashville/Cincinnati**—*The Whites and Straight Drive with Todd Collins*
**Aug. 26 MQ Cincinnati/Chattanooga**—*Straight Drive with Todd Collins, Doyle Lawson and Quicksilver*

# ★ ★ ★ Musical Themes ★ ★ ★

In The Mood For A Sentimental Journey?

## "BIG BAND"

Jack Morgan—leader of the Russ Morgan Orchestra

Dust off your dancing shoes and join us for a nostalgic voyage that will take you back to the era when swing was king! We'll Lindy Hop, foxtrot and jitterbug to some of the sounds made famous by those great bands from the '40s, including the Sammy Kaye Orchestra, Guy Lombardo's Royal Canadians®, Jack Morgan and the Russ Morgan Orchestra, and more. Great groups, as well as many other top-notch entertainers, will perform the original arrangements that kept us all dancing through the Depression and lifted our spirits throughout World War II. As an added bonus on the January 9 departure, Alan Gershwin will be on board talking about the life and music of his legendary father, George Gershwin.

It will be a time to reminisce, to dance and to relive once again the magic of those fun and memorable decades. And for single lady passengers, we'll have specially selected gentlemen dance hosts who'll keep you dancing too! We'll even have Bill and Pat Maxwell on board all cruises to teach you the dances you always wanted to learn.

*The Ink Spots are as good as ever.*

So don't sit this one out—for those of us who remember and the many of us who wish we'd been there, this is music that spans the generations, touches our hearts and brings us all together. From "String of Pearls" to "Tuxedo Junction," the big bands are back and playing all our favorite tunes on board the steamboats!

*Dance to the music you grew up with.*

**2005 DEPARTURES**

**Jan. 2 MQ New Orleans/New Orleans**—*The Sammy Kaye Orchestra directed by Roger Thorpe, The Ink Spots, The Russ Morgan Orchestra directed by Jack Morgan, The Maxwells*
**Jan. 9 MQ New Orleans/New Orleans**—*The Russ Morgan Orchestra directed by Jack Mo[rgan], The Ink Spots, Guy Lombardo's Royal Canadians with Al Pierson, The Maxwells, Alan Gershwin*
**Jan. 16 MQ New Orleans/New Orleans**—*Guy Lombardo's Royal Canadians with Al Pierson, The Ink Spots, The Bob Crosby Orchestra, The Maxwells*
**Mar. 1 MQ New Orleans/New Orleans**—*Jan Garber Orchestra directed by Howard Sch[...], Jimmy Dorsey Orchestra directed by Bill Tole, The Ink Spots, The Maxwells*
**Mar. 8 MQ New Orleans/Memphis**—*The Ink Spots, Jimmy Dorsey Orchestra directed by Bill Tole, Dick Jurgens Orchestra, The Maxwells*
**Apr. 18 MQ Memphis/Memphis**—*Harry James Orchestra directed by Art Depew, The Ink [Spots], The Maxwells*
**May 9 MQ New Orleans/Memphis**—*Benny Goodman Tribute directed by Terry Myers, The Maxwells, The Ink Spots*
**Sep. 12 MQ Cincinnati/Pittsburgh**—*The Russ Morgan Orchestra directed by Jack Morg[an], The Ink Spots, Sammy Kaye Orchestra directed by Roger Thorpe, The Maxwells*
**Sep. 17 MQ Pittsburgh/Cincinnati**—*The Sammy Kaye Orchestra directed by Roger Thorpe, The Ink Spots, The Maxwells*
**Sep. 21 MQ Cincinnati/St. Louis**—*Guy Lombardo's Royal Canadians with Al Pierson, The Ink Spots, The Maxwells*

**2006 DEPARTURES**

**Feb. 1 MQ New Orleans/New Orleans**—*To Come*
**Feb. 8 MQ New Orleans/New Orleans**—*To Come*
**Feb. 13 MQ New Orleans/New Orleans**—*To Come*
**Apr. 11 MQ New Orleans/New Orleans**—*To Come*
**Apr. 16 MQ New Orleans/Memphis**—*To Come*

# ★ ★ ★ Historical Themes ★ ★ ★

**NEW FOR 2005**

An Engineering Marvel Surrounded By Sheer Beauty

## "THE WONDER OF THE TENN-TOM"

In 1752, French explorer Marquis De Montcalm suggested that the King of France build a connecting link between the Tennessee River and the Tombigbee River, creating a water route to Mobile Bay. In 1985, the explorer's suggestion became reality when the Tennessee-Tombigbee Waterway opened for navigation. Perhaps one of the reasons this "short cut to the sea" took so long was because it is more than five times longer than the Panama Canal and involved moving more than one-third more earth.

You'll hear how the controversial Tenn-Tom came about and was constructed as you meander the fascinating countryside of the three states through which it flows, past magnificent plantations and timber empires. Don't miss this chance to see it fr[om] the decks of the *Delta Queen*®.

*The Tom Bevill Visitors Center in Pickens County, Alab[ama] houses a museum of river folklore.*

**2005 DEPARTURES**

**Sep. 3 DQ Nashville/Mobile**—*Donald Waldron, Ann Chilcutt, Ted Nelson*
**Sep. 11 DQ Mobile/Chattanooga**—*Alan Wise, Anna McIntyre, Jack Davis*

# ★ ★ ★ Historical Themes ★ ★ ★

Learn From Experts About America's Costliest War.

## "CIVIL WAR"

For a thought-provoking, soul-stirring journey back into this tumultuous time in our country's history, join us on a poignant *Civil War* vacation designed to broaden your knowledge of and to grant new insights into the times and causes of the "War Between the States."

Accompanying us on these emotion-filled voyages will be noted Civil War historians and authors including James "Bud" Robertson, Richard McMurry, Craig Symonds, Dennis Brown and John Marszalek. Also joining all departures will be Jim Getty, a Lincoln impersonator who puts on a moving one-man show. They'll join us on our optional tours to explore battlefields and experience living history demonstrations. This is your chance to experience the war's most hallowed sites. To walk the now still fields of battle. You'll hear, in the soldiers' own words, compelling descriptions of daily life on both sides of the front lines. You'll get to know "these brave lads in blue and gray" as though they were your own sons. You'll feel their pain, as well as their determination to fight for home and country.

You'll stand at the center of the fray, and as the battle rages around you, you will swear that you can still hear the cries of the wounded, smell the gunpowder and feel the impact of cannon shot hitting on all sides. You will leave the battlefield with a deeper appreciation of our young nation's struggle to become the "land of the free and the home of the brave." Throughout it all, your heart will be touched and your knowledge enriched.

*Gain new insight into the "War Between the States."*

**2005 DEPARTURES**

Apr. 14 DQ **New Orleans/New Orleans**—*Richard McMurry, Dennis Ringle*
May 12 DQ **Nashville/Chattanooga**—*Robert Krick, Jim Ogden, Jim Getty, Derek Warfield and the Sons of Erin*
May 19 DQ **Chattanooga/Memphis**—*James "Bud" Robertson, Jim Jobe, Jim Getty, Derek Warfield and the Sons of Erin*
Jun. 16 DQ **New Orleans/New Orleans**—*Richard McMurry, Gary Joiner, Jim Getty*
Jul. 23 MQ **St. Louis/Nashville**—*Dennis Brown, John Simon, Jim Getty, Cathy Barton and Dave Para*
Jul. 30 MQ **Nashville/Chattanooga**—*Craig Symonds, Robert Krick, Jim Getty*
Aug. 6 MQ **Chattanooga/Memphis**—*John Marszalek, Craig Symonds, Jim Getty, Cathy Barton and Dave Para*
Aug. 27 DQ **St. Louis/Nashville**—*John Simon, Geoffrey Perret, Jim Getty, Cathy Barton and Dave Para*
Sep. 18 DQ **Chattanooga/Cincinnati**—*Jack Coombe, Brian Wills, Jim Getty*

Powwows And Paddlewheelers

## "A NATIVE AMERICAN CELEBRATION"

*Meet author James Thom.*

Once this great land was populated with Native American tribes living in isolated regions along the Mississippi and Ohio rivers. Today these communities are gone, but during your Native American celebration, you will experience the rich culture of these first Americans, as scholars, artisans, musicians and dancers share their traditions and gifts with you on the legendary *Delta Queen*®. You'll visit the sites of sacred Indian mounds, villages and battles, as you imagine the land as it once was—teeming with wildlife and overgrown with indigenous plants.

You'll hear from noted authors James Alexander Thom and Dark Rain Thom, who will talk about the Shawnee Tribe, Dark Rain's ancestral people. They will cover topics from Indian wars to the native and pioneer ways of Native American life.

*Dark Rain Thom and James Alexander Thom*

**2005 DEPARTURES**

Jul. 5 DQ **St. Louis/Cincinnati**—*James Alexander Thom, Dark Rain Thom*
Jul. 10 DQ **Cincinnati/Pittsburgh**—*James Alexander Thom, Dark Rain Thom*

Journey Into The Past.

## "HISTORY OF STEAMBOATIN'®"

Join us as we retrace the momentous journey of the *New Orleans*, the first steamboat to travel from Pittsburgh to her namesake city. During their voyage, Nicholas Roosevelt and his wife Lydia survived an earthquake, fire and Indian attacks, and the birth of their baby on board! Historian William C. "Jack" Davis will help us grasp the significance of this event and its impact on a growing nation. There will also be special performances from the Lexington Vintage Dance Society and Cathy Barton and Dave Para.

*Follow in the wake of the first steamboat to travel the length of the Ohio and Mississippi rivers, the* New Orleans.

**2005 DEPARTURE**

Nov. 3 DQ **Pittsburgh/New Orleans**—*William C. "Jack" Davis, Lexington Vintage Dance Society, Cathy Barton and Dave Para*

# ★ ★ ★ Historical Themes ★ ★ ★

Experience The Thrill Of

## "STEAMBOAT RACING"

Joe Cahn and Bodine Bolasco

In 2005, *The Great Steamboat Race*® returns. Join us as the *Delta Queen*® and the *Mississippi Queen*® cruise from New Orleans to St. Louis in a fun-filled salute to the famous 1870 steamboat race between the *Rob't E. Lee* and the *Natchez.* En route, guests and crews compete for the coveted Commodore's Cup by taking part in events like the "Floozie Contest," "Captain Foghorn's Floating Follies" and more.

As a special treat, Jan and Mickey Rooney will be performing "Let's Put on a Show" for passengers of both steamboats in Natchez. Mickey's show weaves together songs, movie clips and one-liners about age and marriage. Also on board will be sports journalist and broadcaster Ronda Rich, who has written a book on another kind of racing, NASCAR®. Plus, comic Creole chef Joe Cahn and Bodine Bolasco, the Riverboat Gambler, veterans of many Great Steamboat Races, will be there to charm and entertain you.

*Guests on both steamboats will be entertained by the legendary Mickey Rooney.*

There's also the *Delta Queen* and *Belle of Louisville* race—this Memphis to Cincinnati cruise will feature the annual race with the *Belle of Louisville*. As Mark Twain said, there's nothing like a steamboat race "to make a body's very liver curl with enjoyment."

*Ronda Rich*

**2005 DEPARTURES**
**Apr. 29 DQ Memphis/Cincinnati**—Belle of Louisville *Race*
**Jun. 24 DQ New Orleans/St. Louis**—*Great Steamboat Race—Jan & Mickey Rooney (one performance in Natchez only), Joe Cahn, Ronda Rich, Bodine Bolasco*
**Jun. 24 MQ New Orleans/St. Louis**—*Great Steamboat Race—Jan & Mickey Rooney (one performance in Natchez only), Joe Cahn, Ronda Rich, Bodine Bolasco*

**2006 DEPARTURES**
**Apr. 28 DQ Memphis/Cincinnati**—Belle of Louisville *Race*
**Jun. 24 DQ New Orleans/St. Louis**—*Great Steamboat Race*
**Jun. 24 MQ New Orleans/St. Louis**—*Great Steamboat Race*

Reminisce With Your War Buddies.

## "WORLD WAR II REMEMBRANC[E] AND VETERANS REUNION"

*Mills Brothers*

Blue stamps and a "Little Brown Jug." The U.S.O. and "Hi-De Hi-De Hi-De Ho." Pearl Harbor and "String of Pearls." Happy days are here again on the *Mississippi Queen*®! Relive it all with heroes, historians and other special guests who will transport you back to those bittersweet, never-to-be-forgotten times with firsthand accounts of their experience and letters from home. Each of th[e] cruises features the eloquent sounds of the legendary Mil[ls] Brothers. Get ready for the sweet harmonies of "Glow Wor[m]" "Lazy River," "Paper Doll," and their first hit, "Tiger Rag."

Our November 7 departure is a special *Veterans Reuni[on]* cruise, a patriotic salute to veterans of all wars. Special guests include Dr. Lyle Bouck, commander of the 99th Division I & R Platoon that held off the German 6th SS Panzer Army for 24 hours during the Battle of the Bulge. You'll also meet Giles Norrington, a prisoner of war in the Hanoi Hilton for six years. And Ron Drez, assistant directo[r] of the Eisenhower Center at the University of New Orleans will be on board all of these cruises. His most recent book is entitled *Twenty-Five Yards of War.* Joining him on the November 14 and December 5 departures are two of the heroes he profiled in his book, Len Lomell and Arthur Abramson. You'll also get to hear from Gerry McCavera, who will share little-known stories about our flag.

If you've always wanted to organize a reunion with your war buddies, this may be the perfect opportunity.

*The boys are back in port again on* World War II Remembrance *and* Veterans Reunion *vacations.*

**2005 DEPARTURES**
**Nov. 7 MQ St. Louis/New Orleans**—*Veterans Reunion—Ron Drez, Giles Norrington, Lyle Bouck, The Mills Brothers*
**Nov. 14 MQ New Orleans/New Orleans**—*Ron Drez, Len Lomell, Gerry McCavera, Arthur Abramson, The Mills Brothers*
**Dec. 5 MQ New Orleans/New Orleans**—*Ron Drez, Len Lomell, Gerry McCavera, Arthur Abramson, The Mills Brothers*

# ★ ★ ★ Seasonal Themes ★ ★ ★

## The Old South Comes To Life In The Spring With "SPRING PILGRIMAGE"

*Stanton Hall, one of the featured homes during* Spring Pilgrimage

The "Pilgrimage Open House" tradition began in the 1940s, when members of the garden clubs in Natchez, Mississippi, began hosting tours of their gardens in the spring. Later, they also opened their lovely homes, and Pilgrimage became such a popular idea that it quickly spread throughout the Mississippi Delta. Now, on an optional *Spring Pilgrimage* vacation excursion, you can explore these magnificent mansions, some of which are only open during Pilgrimage. If you decide to see the annual Historic Natchez Pageant—a musical production presented by more than 200 local performers in elaborate period costumes—you'll receive a "behind-the-columns" glimpse of the region's romantic past. Fascinating speakers, lively entertainment and informative demonstrations will enhance your understanding of our antebellum legacy.

**2005 DEPARTURES**

| Date | | Route |
|---|---|---|
| Mar. 13 | DQ | New Orleans/New Orleans |
| Mar. 15 | MQ | Memphis/New Orleans |
| Mar. 20 | DQ | New Orleans/New Orleans |
| Mar. 21 | MQ | New Orleans/New Orleans |
| Mar. 25 | DQ | New Orleans/New Orleans |
| Mar. 28 | MQ | New Orleans/Memphis |
| Apr. 1 | DQ | New Orleans/Memphis |
| Apr. 4 | MQ | Memphis/New Orleans |
| Apr. 11 | MQ | New Orleans/Memphis* |

*Pageant not available on this cruise

**2006 DEPARTURES**

| Date | | Route |
|---|---|---|
| Mar. 11 | MQ | Memphis/New Orleans |
| Mar. 18 | MQ | New Orleans/New Orleans |
| Mar. 23 | MQ | New Orleans/New Orleans |
| Mar. 28 | MQ | New Orleans/Memphis |
| Mar. 31 | DQ | New Orleans/New Orleans |
| Apr. 4 | MQ | Memphis/New Orleans |
| Apr. 7 | DQ | New Orleans/New Orleans |

## A Season Of Rebirth "SPRINGTIME ON THE BAYOU"

Experience life along the Intracoastal Waterway during the most beautiful time of year. Local naturalists will guide us into the Atchafalaya Basin and Acadiana, the heart of Cajun culture, and will introduce us to bird life in the bayou. We will stop at Port Arthur and New Iberia, where you can choose to visit a restored Cajun community or learn about sugarcane production, the Evangeline Oak and the lifestyle of the Cajun people. On the February 28 departure, Les Freres Michot will be on board performing traditional Cajun music. We'll even join in a fais do do where you'll learn to dance and sing like a real Cajun.

*The snowy egret*

**2005 DEPARTURE**

Feb. 28 DQ New Orleans/Galveston—*Bob Faber, Les Freres Michot*

**2006 DEPARTURES**

Mar. 10 DQ New Orleans/Galveston
Mar. 24 DQ Galveston/New Orleans

## Soar Into Spring. "SPRINGTIME IN TEXAS"

Come discover the ornithology, ecology and rich history of the Intracoastal Waterway this spring. Hear stories of pirate Jean Lafitte and Robert Cavalier Sieur de La Salle. Learn about their dastardly deeds and how they used the swamp to escape capture. This trip includes a visit to the Aransas National Wildlife Refuge, home to a magnificent array of bird life including terns, sandpipers, herons, roseate spoonbills, ospreys, whitetail hawks, and peregrine falcons as well as migrating whooping cranes. Bring your binoculars and a sense of wonder.

*More than birds have flown over these waters.*

**2006 DEPARTURE**

Mar. 17 DQ Galveston/Galveston

## Spring Is Busting Out All Over! "GARDENS OF THE RIVER VACATIONS®"

Come stroll through some of the loveliest gardens in the South, accompanied by the nation's top gardening experts. Depending on the *Gardens of the River Vacation®* you choose, you can visit Stanton Hall and Rosalie in Natchez, Afton Villa and Rosedown in St. Francisville, Oak Alley in Vacherie, Houmas House in Burnside, and Longue Vue House and Gardens in New Orleans.

Joining you will be your favorite gardening show TV hosts, authors, horticulturists and landscape artists.

*Beautiful gardens surround the garçonnière at Houmas House Plantation.*

**2005 DEPARTURES**

Apr. 25 MQ Memphis/New Orleans—*Cathy Barash, Rosalind Creasy*
May 2 MQ New Orleans/New Orleans—*Roger Swain, Brent and Becky Heath*
May 9 MQ New Orleans/Memphis—*Neil Odenwald, Jim Wilson*
May 16 MQ Memphis/New Orleans—*Ed Hume, Felder Rushing*

# ★ ★ ★ Seasonal Themes ★ ★ ★

Experience The Most Prestigious Event
In The "Sport Of Kings."

## "KENTUCKY DERBY®"

*You'll be there for the running of the Kentucky Derby.*

As the immortal lyrics and melody of Stephen Foster's "My Old Kentucky Home" rise above the crowd, you'll see more than a few Derby Day racing fans wipe away a tear or two. When you travel aboard the *Delta Queen®* on our *Kentucky Derby* vacation, you'll feel a twinge of nostalgia for the good ole days of horse racing.

These cruises are a celebration of the most prestigious event in the sport of kings, and there'll be plenty of mint juleps available to put everyone in the spirit—properly prepare us, you might say—for the grand finale, the "Run for the Roses"!

This 6-night *Kentucky Derby* vacation on the *Delta Queen* will include tickets to the Derby. The race authority on the cruise in 2005 will be author and Northern Kentucky University professor Jim Claypoole, Kentucky Derby expert for the Smithsonian.

Join us to experience the fun of our *Kentucky Derby* vacation. From start to finish, this is one of the most exciting cruises we offer.

### 2005/2006 Kentucky Derby Pricing*

| | AAA | AA | A | C | E | G | I |
|---|---|---|---|---|---|---|---|
| 6 Nights—DQ | $5075 | $4685 | $4295 | $3705 | $3120 | $2530 | $1895 |

*Kentucky Derby tickets are included in the price.

**2005 DEPARTURE**
**May 6 DQ Cincinnati/Nashville**—*Jim Claypoole*

**2006 DEPARTURE**
**May 5 DQ Cincinnati/Nashville**—*To Come*

**NEW FOR 2005**

A Red, White & Blue Celebration

## "A ST. LOUIS 4TH OF JUL

Join us in St. Louis for a red, white & blue celebratio Independence Day with a 3-day, 2-night, pre-cruise hotel sta the Drury Plaza Hotel®, located in the shadow of the Gateway

On the day of your arrival, you'll experience "Americ Biggest Birthday Party," Fair St. Louis. This famous cele tion under the Arch features headline entertainment, ai shows, water shows and a carnival. That evening, there be dancing, entertainment, and a view of the fireworks i Arch Observation Room of the hotel. The theme will be "St. Louis: Taste of the Hill, Stan Musial Style."

On the following day, you'll board a deluxe motorcoa and head for the St. Louis Basilica for an Independence Da Ceremony and Blessing, as well as a tour of the basilica. Th afternoon, there will be more time to explore Fair St. Louis. that evening, you'll enjoy a Private Charter dinner cruise o board RailCruise America, departing from historic Union St Get ready for cocktails, dinner, dancing and a magnificent vi of the fireworks with the Arch as a backdrop.

And on your last day in St. Louis, before boarding your st boat, you'll enjoy a special VIP St. Louis city tour. You'll get to through the Missouri Botanical Gardens; tour Forest Park, sit the 1904 World's Fair; lunch at Ninth Street Abbey, which offers a stunning cathedral dining room and quiet get-away gardens; and lastly, stop at the Anheuser-Busch® Brewery, where you'll visit the Anheuser-Busch Clydesdales, and more.

Before your cruise, meet us in St. Louis for a spectacular 4th of July celebration!

This package is available free as an Advance Purchase discount with cruise purchase on departures below, when booked by December 31, 2004. Offer is capacity controlled, and not combinable with any other discounts or offers.

*Be there when the fireworks go off under at Fair St. Louis!*

**2005 DEPARTURES**
**Jul. 5 DQ St. Louis/Cincinnati**
**Jul. 5 MQ St. Louis/St. Louis**

ACL 43791



# ★ ★ ★ Seasonal Themes ★ ★ ★

*Autumn on the river is truly inspiring.*

## The Most Beautiful Time Of Year On The Rivers

# "FALL FOLIAGE"

Experience the captivating scenery of the Mississippi River, the rolling hills and manicured farmland of the Ohio Valley, or the serene beauty of the Tennessee and Cumberland rivers at one of the best times of the year, when Mother Nature puts on her spectacular coat of many colors! And there's no better way to see the fall foliage than from the deck of a majestic steamboat.

**2004 DEPARTURES**

| | | |
|---|---|---|
| Oct. 3 | MQ | St. Louis/St. Paul—*Charles Yates* |
| Oct. 5 | DQ | Chattanooga/Nashville—*Glynda Pryor* |
| Oct. 10 | MQ | St. Paul/St. Louis—*Charles Yates* |
| Oct. 12 | DQ | Nashville/Cincinnati—*Alan Bunker* |
| Oct. 17 | DQ | Cincinnati/Pittsburgh—*Karen Cody* |
| Oct. 17 | MQ | St. Louis/St. Paul—*Carol Mundy* |
| Oct. 22 | DQ | Pittsburgh/Cincinnati—*Karen Cody* |
| Oct. 24 | MQ | St. Paul/St. Louis—*Alan Bunker* |
| Oct. 26 | DQ | Cincinnati/Cincinnati—*Jim Williams* |
| Oct. 29 | DQ | Cincinnati/Pittsburgh—*Jim Williams* |
| Nov. 3 | DQ | Pittsburgh/Memphis—*Jim Williams* |

**2005 DEPARTURES**

| | | | | | |
|---|---|---|---|---|---|
| Sep. 26 | MQ | St. Louis/St. Paul | Oct. 16 | DQ | Nashville/Chattanooga |
| Oct. 2 | DQ | Cincinnati/Pittsburgh | Oct. 17 | MQ | St. Paul/St. Louis |
| Oct. 3 | MQ | St. Paul/St. Louis | Oct. 22 | DQ | Chattanooga/Cincinnati |
| Oct. 7 | DQ | Pittsburgh/Cincinnati | Oct. 24 | MQ | St. Louis/St. Paul |
| Oct. 10 | MQ | St. Louis/St. Paul | Oct. 29 | DQ | Cincinnati/Pittsburgh |
| Oct. 11 | DQ | Cincinnati/Nashville | Oct. 31 | MQ | St. Paul/St. Louis |

A knowledgeable naturalist will be on hand to help identify the flora and fauna as we steam leisurely along. Joining us on some of these popular cruises in 2004 will be perennial favorite Jim Williams, program director for the Hamilton County Agriculture Association and Park District. You may meet Karen Cody, who works for the Hamilton County Parks Department; Alan Bunker, a dedicated forester from the Ohio Division of Forestry; Carol Mundy of the Hamilton County Park District; Charles Yates, an interpreter/naturalist of the Missouri Department of National Resources, and others.

Throughout the cruise, you'll sip and sample the bounty of Heartland America at harvest time, from refreshing apple cider to spiced pumpkin pie. Amid all the comfort and hospitality of Steamboatin'®, your cruise through the heartland at harvest time will be filled with mile after mile of magical moments forming a lifetime of memories.

## ☆ ☆ ☆ Seasonal Themes ☆ ☆

# From Thanksgiving Through New Year's, Join Us For "OLD-FASHIONED HOLIDAYS®"

*There is no place like a steamboat to celebrate the holidays.*

At Thanksgiving, experience a cornucopia of heartland hospitality on an *Old-Fashioned Holidays®* vacation. At Christmastime, indulge in Southern customs, including the traditional bonfires on the levee to welcome Papa Noël.

On our *Dickens on the Strand* vacation, you'll experience an authentic Victorian Christmas vacation in Galveston. Entertaining on select departures will be guests such as international concert pianist Josef Verba, Italian American soprano Diana DiMarzio and English baritone Glyn Bailey.

In 2004, we're featuring *Cajun Christmas* on the *Delta Queen®*. Some of these departures feature Cajun storyteller Marcelle Lacouture and naturalist Bill Fontenot, artist and historian Elemore Morgan, and all include entertainment by Allen Fontenot and the Country Cajuns, arguably the best Cajun band today.

Aboard the *Mississippi Queen®* we'll celebrate *Christmas Around the World*, which takes a look at holiday customs and dishes from around the globe. These cruises feature presentations by some of your favorite Christmas experts and authors, including Gerry Bowler, author of *The World Encyclopedia of Christmas*; Bill Egan, who, according to Charles Osgood, is "the number one Christmas expert in the world"; and many more.

Or you can ring in the new year with a *New Orleans New Year's* vacation. Why watch the fun on TV when you can celebrate with big band dancing, champagne and noisemakers on an authentic paddlewheel steamboat? Join us for great food, great company and lots of festivities!

*Experience* **Dickens on the Strand** *in Galveston.*

*Come see the bonfires built along the levee to guide Papa Noël's pirogue.*

**2004 DEPARTURES**

**Nov. 19 DQ Little Rock/New Orleans**—*Thanksgiving*
**Nov. 22 MQ New Orleans/New Orleans**—*Thanksgiving*
**Nov. 26 DQ New Orleans/New Orleans**—*Cajun Christmas—Marcelle Lacouture, Allen Fontenot Band, Darrel Begnaud*
**Nov. 28 MQ New Orleans/New Orleans**—*Christmas Around the World—Bill Federer, Darrel Begnaud*
**Nov. 29 DQ New Orleans/Galveston**—*Dickens on the Strand—Josef Verba, Stan Garvey, Anne Dupont, Glyn Bailey, Darrel Begnaud*
**Dec. 3 MQ New Orleans/New Orleans**—*Christmas Around the World—Mary D. Lank, Darrel Begnaud*
**Dec. 6 DQ Galveston/New Orleans**—*Dickens on the Strand*—Anne Dupont, Darrel Begnaud, Diana DiMarzio*
**Dec. 8 MQ New Orleans/New Orleans**—*Christmas Around the World—Peter Roop, Darrel Begnaud*
**Dec. 11 DQ New Orleans/New Orleans**—*Cajun Christmas—Allen Fontenot Band, Marcelle Lacouture, Darrel Begnaud*
**Dec. 12 MQ New Orleans/New Orleans**—*Christmas Around the World—Gerry Bowler, Darrel Begnaud*
**Dec. 18 DQ New Orleans/New Orleans**—*Cajun Christmas—Allen Fontenot Band, Bill Fontenot, Darrel Begnaud*
**Dec. 19 MQ New Orleans/New Orleans**—*Christmas Around the World/Christmas—Bill E Darrel Begnaud*
**Dec. 22 DQ New Orleans/New Orleans**—*Cajun Christmas/Christmas—Allen Fontenot B Elemore Morgan, Darrel Begnaud*
**Dec. 26 MQ New Orleans/New Orleans**—*New Orleans New Year's*
**Dec. 28 DQ New Orleans/New Orleans**—*New Orleans New Year's*

**2005 DEPARTURES**

**Nov. 21 DQ New Orleans/New Orleans**—*Thanksgiving/Old-Fashioned Holidays*
**Nov. 21 MQ New Orleans/Memphis**—*Thanksgiving/Old-Fashioned Holidays*
**Nov. 28 DQ New Orleans/Galveston**—*Old-Fashioned Holidays/Dickens on the Strand*
**Nov. 28 MQ Memphis/New Orleans**—*Old-Fashioned Holidays*
**Dec. 5 MQ New Orleans/New Orleans**—*Old-Fashioned Holidays*
**Dec. 12 DQ Galveston/New Orleans**—*Old-Fashioned Holidays*
**Dec. 12 MQ New Orleans/New Orleans**—*Old-Fashioned Holidays*
**Dec. 17 DQ New Orleans/Mobile**—*Old-Fashioned Holidays*
**Dec. 19 MQ New Orleans/New Orleans**—*Old-Fashioned Holidays/Christmas*
**Dec. 22 DQ Mobile/New Orleans**—*Christmas/Old-Fashioned Holidays*
**Dec. 26 MQ New Orleans/New Orleans**—*Old-Fashioned Holidays/New Orleans New Ye*
**Dec. 28 DQ New Orleans/New Orleans**—*Old-Fashioned Holidays/New Orleans New Ye*

*Pre-cruise hotel stay required to enjoy *Dickens on the Strand*. See page 48 or call for details.



# ★ ★ ★ Just For Fun ★ ★ ★

**NEW FOR 2005**

### Is This New Theme In Your Future?

## "PSYCHIC EXPERIENCE"

*Is a Steamboatin'® vacation in your future? We predict it.*

Are there really people out there who can foresee the future? Think some people can actually communicate with the dead? Believers and skeptics alike will enjoy this exploration of such topics as we visit spots up and down the river that are reputed to be haunted.

Joining us on these spirited cruises will be a well-known psychic* who may be able to tell you a thing or two about your future or even communicate with loved ones from your past. Our February 21 departure features world-renowned visionary and medium Michele Livingston. On our March 7 departure, you'll be amazed by Leigh Grace, who has been a professional psychic for ten years and has the ability to read auras of those spirits who have passed over to the other side.*

On the February 21 departure, you can visit The Myrtles in St. Francisville, Louisiana, known as one of the most haunted houses in America. Take your camera and see if you can catch an image of Chloe, the one-eared slave, and her two charges, who, some say, like to swing from chandeliers.

*Michele Livingston*

*Leigh Grace*

**2005 DEPARTURES**
Feb. 21 DQ New Orleans/New Orleans—*Michele Livingston*
Mar. 7 DQ Galveston/New Orleans—*Leigh Grace*

*Please refer to item 18 on page 63 of the Terms and Conditions section.

**NEW FOR 2005**

### River Of Higher Returns

## "FINANCIAL PLANNING"

*Explore America and your financial options on the Delta Queen®.*

Navigating through today's complex financial maze is a daunting task for most of us. As with all things in this modern age, we have an overwhelming abundance of options to choose from. While it is impossible to foresee every eventuality that can affect the market, there are certain underlying principles to wise investing that can help steer us towards an informed decision. This cruise will feature lectures by experts* in the financial field. When you're not exploring ports, you can explore ways to improve your portfolio aboard the *Delta Queen.*

**2005 DEPARTURE**
Nov. 15 DQ New Orleans/New Orleans

**NEW FOR 2005**

### Go Quilting On The Queen.

## "PATCHWORK IN PADUCAH"

Think people who don't quilt are squares? This is the vacation for you! Grab your circle of friends and join us on this special cruise to spend two days at the American Quilt Society's Quilt Show in Paducah, Kentucky. There, you can view some of the most gorgeous quilts being made today. Learn new techniques and share your love of quilting with expert Judy Simmons. Hotel reservations are difficult to secure for this event. Here's your chance to stay on a luxurious riverboat, within short walking distance of all the action. This vacation was handmade just for you. Don't miss it!

*You'll be in stitches by the time you reach Paducah for the Quilt Show.*

**2005 DEPARTURE**
Apr. 18 MQ Memphis/Memphis—*Judy Simmons*

**2006 DEPARTURE**
Apr. 23 MQ Memphis/Memphis

# CITYSCAPE AND CITYSCAPE PLUS

If you want to spend more time in a major port before or after your cruise, vacation packages are available in 11 fascinating river cities. Our basic CityScape package features one night at a deluxe hotel, breakfast, and one-way transfer between the airport and hotel. Package also includes transfer between hotel and vessel with city tour en route. With a CityScape Plus package, you get all these features plus vouchers for an additional attraction and one meal at your choice of restaurants. For a complete list of hotel, restaurant and attraction choices, see your travel agent or visit www.deltaqueen.com.

## New Orleans

Welcome to the Crescent City, famous for Creole and Cajun cuisine, unique architecture and a rich cultural gumbo. Come roam the timeless streets of the French Quarter and ride a streetcar past gracious Garden District mansions.

Hotel choices include the Hotel InterContinental, The Fairmont®, or an equivalent hotel. With our CityScape Plus package, choose from over 30 attractions including French Quarter carriage tours and Preservation Hall. You'll also have your choice of 20 restaurants including Arnaud's and Emeril's®.

**CityScape: $160 (one night); $100 (extra night).**
**CityScape Plus: $280 (one night); $100 (extra night).**

## Mobile

Explore 300 years of history in this lovely Southern city. View artifacts recovered from a 1784 shipwreck at the El Cazador Museum. Tour gorgeous Bragg-Mitchell Mansion or stroll famous Bellingrath Gardens®.

You'll stay at the Riverview Plaza or an equivalent hotel. A city tour is included in your CityScape package, highlighting the new Exploreum Complex, the U.S.S. *Alabama*, and historic districts.

**CityScape: $165 (one night); $80 (extra night).**

## Pensacola

Outdoor adventure, spectacular museums and attractions, and 52 miles of pristine beaches are yours for the taking in Pensacola.

You'll stay at the Pensacola Grand Hotel or an equivalent hotel with our CityScape package. You'll enjoy a city tour including the National Museum of Naval Aviation and historic districts.

**CityScape: $165 (one night); $80 (extra night).**

## Galveston

This sunny city features 1,500 antebellum structures, gorgeous beaches and great seafood restaurants. Come see dolphins on a harbor cruise through Texas' oldest seaport or take a trolley car ride from the beach to the historic Strand/Bay area.

You'll stay at the Tremont House or an equivalent hotel and enjoy a city tour including the Texas Hero's Monument, the Moody Mansion, Ashton Villa, the infamous Balinese Room, Bishop's Palace and more.

**CityScape: $212 (one night); $120 (extra night).**

## Memphis

From Beale Street to barbeque Memphis serves up just what you need to satisfy your appetite for food and fun. Tour legendary Sun Studio® or grab a stool at a blues joint. Your city tour includes a pilgrimage to Graceland®, former home of Elvis Presley.

You'll stay at the Holiday Inn Select or an equivalent hotel. With our CityScape Plus package you can choose from attractions that include Mud Island River Park and the Memphis Rock 'n Soul Museum. Restaurant choices include Automatic Slim's℠ and Neely's Barbeque.

**CityScape: $175 (one night); $101 (extra night).**
**CityScape Plus: $285 (one night); $101 (extra night).**

# Nashville

Nashville is world-renowned for its principal export—country music. In addition to the Grand Ole Opry®, Nashville serves up a savory symphony for your taste buds as well as some eclectic shopping.

You'll stay at the Courtyard by Marriott® or an equivalent hotel. With our CityScape Plus package, you can choose from attractions including the Country Music Hall of Fame® and The Hermitage, former home of Andrew Jackson. You'll also get one meal at your choice of local restaurants.

**CityScape: $180 (one night); $89 (extra night).**
**CityScape Plus: $295 (one night); $89 (extra night).**

# Chattanooga

You've heard of Lookout Mountain, but have you ever heard of the Chattanooga Ducks? These amphibious vehicles will take you on one of the most interesting nature tours of your life. You'll have a great time exploring this friendly city.

You'll stay at the Courtyard by Marriott® downtown or an equivalent hotel. With our CityScape Plus package, you can choose from several attractions including the Chattanooga Regional History Museum and the Chattanooga Ducks. Restaurant choices include the South Side Grill and St. John's Restaurant.

**CityScape: $175 (one night); $86 (extra night).**
**CityScape Plus: $300 (one night); $86 (extra night).**

# St. Louis

Your exploration of St. Louis starts at the world-famous Gateway Arch—the nation's tallest man-made monument. Take a stroll through the world-famous Botanical Garden and the St. Louis Zoo. Or, take a tour of the headquarters of Anheuser-Busch®.

You'll stay at the Drury Plaza Hotel® or an equivalent hotel. With our CityScape Plus package, you can choose from attractions including the Gateway Arch, the City Museum, and the Eugene Field House & Toy Museum. You'll also get one meal at your choice of Carmine's Steakhouse, Top of the Riverfront or another local favorite.

**CityScape: $170 (one night); $64 (extra night).**
**CityScape Plus: $295 (one night); $64 (extra night).**

# Cincinnati

Every year, five million people visit the "Queen City of the West." Come see the home of Harriet Beecher Stowe, author of *Uncle Tom's Cabin*. Catch a Cincinnati Reds® game or take a walk along Sawyer Point on the Riverfront.

You'll stay at the Hilton® Netherland Plaza or an equivalent hotel. With our CityScape Plus package, you can choose from attractions including the Cincinnati Zoo and Botanical Garden and the Newport Aquarium. You have your choice of restaurants including Palm Court, Montgomery Inn Boathouse or another local favorite.

**CityScape: $175 (one night); $102 (extra night).**
**CityScape Plus: $290 (one night); $102 (extra night).**

# Minneapolis & St. Paul

Highlights of the Twin Cities include St. Paul's Summit Avenue, boasting one of the country's longest stretches of virtually uninterrupted Victorian architecture and the Mall of America,® the nation's #1 visited attraction.

You'll stay at the Radisson® Riverfront in St. Paul or an equivalent hotel. With our CityScape Plus package, you can choose from the Science Museum of Minnesota, the Alexander Ramsey House, or other historic homes. Restaurant choices include Kincaids and Forepaughs.

**CityScape: $180 (one night); $88 (extra night).**
**CityScape Plus: $285 (one night); $88 (extra night).**

# Pittsburgh

This city offers a wide variety of things to see and do. Stroll through quaint neighborhoods, shop for antiques and be sure to explore the city's well-known museums.

You'll stay at the Sheraton® Station Square or an equivalent hotel. With our CityScape Plus package, you can choose from attractions including either the Carnegie Museum of Art or a trolley tour. Restaurant choices include The Original Fish Market Restaurant and Pittsburgh Rare.®

**CityScape: $180 (one night); $79 (extra night).**
**CityScape Plus: $305 (one night); $79 (extra night).**

*CityScape and CityScape Plus hotel rates shown here are per person, per night, double occupancy, and are in addition to cruise fare. Extra night pricing includes hotel and breakfast only. Single and triple occupancy rates are available. Hotel taxes and transportation between hotel, restaurants and attractions not included. Gratuities for tour guides and drivers not included. Attractions and restaurants for CityScape Plus are subject to change.*

# THE MORE OF AMERICA YOU SEE, THE MORE YOU SAVE WITH A STEAMBOATIN'® ODYSSEY VACATION.

Take the ultimate Steamboatin'® adventure—the trip of a lifetime—a Steamboatin' Odyssey Vacation. Just combine two or more consecutive journeys highlighted in green on the following cruise schedule, and get 10% off all your departures after the first one.

Think about it. You can combine cruises and take a thrilling river adventure the entire length of the Mississippi, just like traders and travelers did more than 100 years ago! Or you can travel the Ohio River from beginning to end, as well as its tributaries. Maybe you'd like to travel parts of the Mississippi, then go on to the Ohio. The choice is yours. The combinations are many, as will be the ports, shore tours and wonderful memories. Make plans now to have the greatest all-American travel experience ever—a Steamboatin' Odyssey Vacation.

## 2004 Chronological Cruise Schedule for the *Delta Queen*®, *Mississippi Queen*® and *American Queen*®

| BOAT | DEPARTURE/ ARRIVAL DATES | NO. OF NIGHTS | CRUISE NO. | DEPARTURE CITY/ DISEMBARKATION CITY | THEME | PORT STOPS All cruises depart at 7:30 PM, except cruises noted. See legend at the bottom of the page. | BOOK BY 12/31/04 FOR THE FOLLOWING DISCOUNTS (Offers are capacity controlled.) |
|---|---|---|---|---|---|---|---|
| OCTOBER 2004 | | | | | | | |
| DQ | Oct. 05 - Oct. 12 | 7 | 436▲ | Chattanooga (South Pittsburg)/Nashville | *Fall Foliage* | Decatur, Savannah, Smithland, Paducah, Dover | |
| DQ | Oct. 12 - Oct. 17 | 5 | 437 | Nashville/Cincinnati | *Fall Foliage* | Henderson, Madison | |
| DQ | Oct. 17 - Oct. 22 | 5 | 438 | Cincinnati/Pittsburgh | *Fall Foliage* | Maysville, Point Pleasant, Marietta, Wheeling | |
| DQ | Oct. 22 - Oct. 26 | 4 | 439 | Pittsburgh/Cincinnati | *Fall Foliage* | Wheeling, Maysville | 50% Off 2nd Guest |
| DQ | Oct. 26 - Oct. 29 | 3 | 440* | Cincinnati/Cincinnati | *Fall Foliage* | Louisville, Madison | |
| DQ | Oct. 29 - Nov. 03 | 5 | 441 | Cincinnati/Pittsburgh | *Fall Foliage* | Maysville, Point Pleasant, Marietta, Wheeling | 50% Off 2nd Guest |
| MQ | Oct. 03 - Oct. 10 | 7 | 540 | St. Louis/St. Paul | *Fall Foliage* | Hannibal, Dubuque, La Crosse, Red Wing | |
| MQ | Oct. 10 - Oct. 17 | 7 | 541 | St. Paul/St. Louis | *Fall Foliage* | Winona, La Crosse, Dubuque, Davenport, Burlington, Hannibal | 2-For-1 Fares |
| MQ | Oct. 17 - Oct. 24 | 7 | 542 | St. Louis/St. Paul | *Fall Foliage* | Hannibal, Dubuque, La Crosse, Red Wing | |
| MQ | Oct. 24 - Oct. 31 | 7 | 543 | St. Paul/St. Louis | *Fall Foliage* | Winona, La Crosse, Dubuque, Davenport, Burlington, Hannibal | |
| MQ | Oct. 31 - Nov. 04 | 4 | 544 | St. Louis/Memphis | | Cape Girardeau, Paducah, New Madrid | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| NOVEMBER 2004 | | | | | | | |
| DQ | Nov. 03 - Nov. 12 | 9 | 442 | Pittsburgh/Memphis | *Fall Foliage* | Wheeling, Maysville, Cincinnati, Louisville, Paducah, New Madrid | |
| DQ | Nov. 12 - Nov. 19 | 7 | 443 | Memphis/Little Rock | | Pendleton, Little Rock, Petit Jean, Fort Smith | |
| DQ | Nov. 19 - Nov. 26 | 7 | 444 | Little Rock/New Orleans | *Thanksgiving* | Pendleton, Vicksburg, Natchez, Baton Rouge, Houmas House | Free Air Or 10% Off |
| DQ | Nov. 26 - Nov. 29 | 3 | 445 | New Orleans/New Orleans | *Cajun Christmas* | Oak Alley, Baton Rouge | 2-For-1 Fares |
| DQ | Nov. 29 - Dec. 06 | 7 | 446* | New Orleans/Galveston | *Dickens on the Strand* | Port of Iberia, Port Arthur, Galveston | 50% Off 2nd Guest |
| MQ | Nov. 04 - Nov. 10 | 6 | 545* | Memphis/New Orleans | | Helena, Vicksburg, Natchez, St. Francisville, Baton Rouge | 2-For-1 Fares |
| MQ | Nov. 10 - Nov. 16 | 6 | 546 | New Orleans/New Orleans | | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | 10% Off Plus Free Air |
| MQ | Nov. 16 - Nov. 22 | 6 | 547* | New Orleans/New Orleans | *Civil War Adventures* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | 2-For-1 Fares |
| MQ | Nov. 22 - Nov. 28 | 6 | 548✽ | New Orleans/New Orleans | *Thanksgiving* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | 2-For-1 Fares |
| MQ | Nov. 28 - Dec. 03 | 5 | 549 | New Orleans/New Orleans | *Christmas Around the World* | Oak Alley, Baton Rouge, Natchez, St. Francisville | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| DECEMBER 2004 | | | | | | | |
| DQ | Dec. 06 - Dec. 11 | 5 | 447* | Galveston/New Orleans | *Dickens on the Strand*†† | Port Arthur, Port of Iberia | 2-For-1 Fares |
| DQ | Dec. 11 - Dec. 18 | 7 | 448 | New Orleans/New Orleans | *Cajun Christmas* | Morgan City, Port of Iberia, Krotz Springs, St. Francisville, Baton Rouge | 2-For-1 Fares |
| DQ | Dec. 18 - Dec. 22 | 4 | 449 | New Orleans/New Orleans | *Cajun Christmas* | Oak Alley, St. Francisville, Baton Rouge | 50% Off 2nd Guest |
| DQ | Dec. 22 - Dec. 28 | 6 | 450 | New Orleans/New Orleans | *Cajun Christmas/Christmas* | Oak Alley, Natchez, Vicksburg, Baton Rouge | 2-For-1 Fares |
| DQ | Dec. 28 - Jan. 03, 2005 | 6 | 451 | New Orleans/New Orleans | *New Orleans New Year's* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | Free Air Or 10% Off |
| MQ | Dec. 03 - Dec. 08 | 5 | 550 | New Orleans/New Orleans | *Christmas Around the World* | Houmas House, St. Francisville, Natchez, Baton Rouge | 2-For-1 Fares |
| MQ | Dec. 08 - Dec. 12 | 4 | 551 | New Orleans/New Orleans | *Christmas Around the World* | Oak Alley, St. Francisville, Baton Rouge | 2-For-1 Fares |
| MQ | Dec. 12 - Dec. 19 | 7 | 552 | New Orleans/New Orleans | *Christmas Around the World* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Dec. 19 - Dec. 26 | 7 | 553✽ | New Orleans/New Orleans | *Christmas Around the World* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Dec. 26 - Jan. 02, 2005 | 7 | 554✽ | New Orleans/New Orleans | *New Orleans New Year's* | Houmas House, Baton Rouge, Vicksburg, Natchez, St. Francisville | 2-For-1 Fares |
| AQ | Dec. 20 - Dec. 27 | 7 | 687✽ | New Orleans/New Orleans | *Old-Fashioned Holidays/Christmas* | Oak Alley, Baton Rouge, Natchez, Vicksburg, St. Francisville | 2-For-1 Fares |
| AQ | Dec. 27 - Jan. 02, 2005 | 6 | 688✽ | New Orleans/New Orleans | *New Orleans New Year's* | Oak Alley, St. Francisville, Natchez, Baton Rouge, Houmas House | |
| For the ***American Queen***'s complete sailing schedule, please refer to **page 55** | | | | | | | |

Note: Dates for 3- and 4-night *American Queen* cruises are shown in the schedule on page 55. These are part of the New Orleans & Riverboat Adventure Week. Cruises highlighted in green can be taken as Steamboatin'® Odyssey Vacations. See above for details. Discounts listed are those available at time of printing. For more details on Advance Purchase discounts, see inside back cover.

▲ Departs 10:30 PM
▼ Departs 10:00 PM
✽ Riverbonding Cruise

* Departs 6:00 PM
** Departs 4:00 PM
*** Departs 12:00 Midnight

†† Requires pre-cruise hotel stay for *Dickens on the Stra*

# 2005 Chronological Cruise Schedule for the *Delta Queen*®, *Mississippi Queen*® and *American Queen*®

| BOAT | DEPARTURE/ ARRIVAL DATES | NO. OF NIGHTS | CRUISE NO. | DEPARTURE CITY/ DISEMBARKATION CITY | THEME | PORT STOPS All cruises depart at 7:30 PM, except cruises noted. See legend at the bottom of the page. | BOOK BY 12/31/04 FOR THE FOLLOWING DISCOUNTS (Offers are capacity controlled.) |
|---|---|---|---|---|---|---|---|
| **JANUARY 2005** | | | | | | | |
| DQ | Jan. 31 - Feb. 07 | 7 | 700 | New Orleans/New Orleans | *Golf* | Oak Alley, St. Francisville, Vicksburg, Natchez, Baton Rouge | 2-For-1 Fares |
| MQ | Jan. 02 - Jan. 09 | 7 | 800 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares Plus Free Air |
| MQ | Jan. 09 - Jan. 16 | 7 | 801 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares Plus Free Air |
| MQ | Jan. 16 - Jan. 23 | 7 | 802 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares Plus Free Air |
| MQ | Jan. 23 - Jan. 30 | 7 | 803 | New Orleans/New Orleans | *Legends of the '50s* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares Plus Free Air |
| MQ | Jan. 30 - Feb. 06 | 7 | 804 | New Orleans/New Orleans | *Legends of the '50s* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares Plus Free Air |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **FEBRUARY 2005** | | | | | | | |
| DQ | Feb. 07 - Feb. 14 | 7 | 701 | New Orleans/Pensacola | | Biloxi/Gulfport, Mobile | |
| DQ | Feb. 14 - Feb. 21 | 7 | 702 | Pensacola/New Orleans | *Golf/Valentine's Day* | Mobile, Biloxi/Gulfport | 2-For-1 Fares |
| DQ | Feb. 21 - Feb. 28 | 7 | 703 | New Orleans/New Orleans | *Psychic* | Houmas House, St. Francisville, Natchez, Vicksburg, Baton Rouge, Oak Alley | 2-For-1 Fares Plus Free Air |
| DQ | Feb. 28 - Mar. 07 | 7 | 704 | New Orleans/Galveston | *Springtime on the Bayou* | Houma/Morgan City, Port of Iberia, Port Arthur | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **MARCH 2005** | | | | | | | |
| DQ | Mar. 07 - Mar. 13 | 6 | 705 | Galveston/New Orleans | *Psychic* | Port Arthur, Port of Iberia | 2-For-1 Fares Plus Free Air |
| DQ | Mar. 13 - Mar. 20 | 7 | 706 | New Orleans/New Orleans | *Spring Pilgrimage* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 50% Off 2nd Guest Plus Free Air |
| DQ | Mar. 20 - Mar. 25 | 5 | 707 | New Orleans/New Orleans | *Spring Pilgrimage* | Oak Alley, St. Francisville, Natchez, Baton Rouge | 2-For-1 Fares |
| DQ | Mar. 25 - Apr. 01 | 7 | 708 | New Orleans/New Orleans | *Spring Pilgrimage* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 50% Off 2nd Guest |
| MQ | Mar. 01 - Mar. 08 | 7 | 805 | New Orleans/New Orleans | *Big Band/Golf* | Oak Alley, St. Francisville, Vicksburg, Natchez, Baton Rouge | Free Air |
| MQ | Mar. 08 - Mar. 15 | 7 | 806 | New Orleans/Memphis | *Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| MQ | Mar. 15 - Mar. 21 | 6 | 807 | Memphis/New Orleans | *Spring Pilgrimage* | Helena, Vicksburg, Natchez, Baton Rouge, Oak Alley | 2-For-1 Fares |
| MQ | Mar. 21 - Mar. 28 | 7 | 808* | New Orleans/New Orleans | *Spring Pilgrimage/Easter* | Natchez, Vicksburg, St. Francisville, Baton Rouge, Oak Alley | 2-For-1 Fares |
| MQ | Mar. 28 - Apr. 04 | 7 | 809* | New Orleans/Memphis | *Spring Pilgrimage* | Natchez, Vicksburg, Greenville, Helena | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **APRIL 2005** | | | | | | | |
| DQ | Apr. 01 - Apr. 08 | 7 | 709 | New Orleans/Memphis | *Spring Pilgrimage/April Fool's Day* | Houmas House, Baton Rouge, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| DQ | Apr. 08 - Apr. 14 | 6 | 710 | Memphis/New Orleans | | Vicksburg, Natchez, St. Francisville, Baton Rouge | |
| DQ | Apr. 14 - Apr. 22 | 8 | 711 | New Orleans/New Orleans | *Civil War/Red River* | Oak Alley, St. Francisville, Monroe, Alexandria, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| DQ | Apr. 22 - Apr. 29 | 7 | 712 | New Orleans/Memphis | | Houmas House, St. Francisville, Natchez, Vicksburg, Helena | 50% Off 2nd Guest |
| DQ | Apr. 29 - May 06 | 7 | 713 | Memphis/Cincinnati | *Belle of Louisville Race* | New Madrid, Paducah, Louisville, Madison | 50% Off 2nd Guest |
| MQ | Apr. 04 - Apr. 11 | 7 | 810 | Memphis/New Orleans | *Spring Pilgrimage* | Natchez, St. Francisville, Baton Rouge, Houmas House, Oak Alley | 2-For-1 Fares |
| MQ | Apr. 11 - Apr. 18 | 7 | 811 | New Orleans/Memphis | *Spring Pilgrimage* | Oak Alley, Baton Rouge, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| MQ | Apr. 18 - Apr. 25 | 7 | 812 | Memphis/Memphis | *Big Band/Quilting* | New Madrid, Cape Girardeau, Paducah | Free Air Or Travel Allowance |
| MQ | Apr. 25 - May 02 | 7 | 813 | Memphis/New Orleans | *Gardens of the River® Vacation* | Vicksburg, Natchez, St. Francisville, Baton Rouge, Houmas House | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **MAY 2005** | | | | | | | |
| DQ | May 06 - May 12 | 6 | 714* | Cincinnati/Nashville | *Kentucky Derby®/Mother's Day* | Louisville, Henderson, Paducah, Dover | |
| DQ | May 12 - May 19 | 7 | 716 | Nashville/Chattanooga | *Civil War* | Dover, Paducah, Savannah, Florence, Decatur | Free Air Or Travel Allowance |
| DQ | May 19 - May 26 | 7 | 717▲ | Chattanooga/Memphis | *Civil War* | Decatur, Savannah, Dover, Paducah, New Madrid | Free Air Or Travel Allowance |
| DQ | May 26 - Jun. 02 | 7 | 718 | Memphis/New Orleans | | Vicksburg, Natchez, St. Francisville, Baton Rouge, Houmas House | 50% Off 2nd Guest |
| MQ | May 02 - May 09 | 7 | 814 | New Orleans/New Orleans | *Gardens of the River® Vacation* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 50% Off 2nd Guest Plus Free Air |
| MQ | May 09 - May 16 | 7 | 815 | New Orleans/Memphis | *Gardens of the River® Vacation/Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| MQ | May 16 - May 22 | 6 | 816 | Memphis/New Orleans | *Gardens of the River® Vacation* | Helena, Vicksburg, Natchez, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | May 22 - May 29 | 7 | 817 | New Orleans/New Orleans | | Oak Alley, Baton Rouge, St. Francisville, Natchez, Vicksburg, Houmas House | 2-For-1 Fares |
| MQ | May 29 - Jun. 05 | 7 | 818 | New Orleans/New Orleans | *Memorial Day* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **JUNE 2005** | | | | | | | |
| DQ | Jun. 02 - Jun. 09 | 7 | 719 | New Orleans/Pensacola | *Golf* | Biloxi/Gulfport, Mobile, Pensacola | 2-For-1 Fares |
| DQ | Jun. 09 - Jun. 16 | 7 | 720 | Pensacola/New Orleans | *Golf* | Mobile, Biloxi/Gulfport | 2-For-1 Fares |
| DQ | Jun. 16 - Jun. 24 | 8 | 721 | New Orleans/New Orleans | *Civil War/Red River/Natchitoches* | Oak Alley, St. Francisville, Alexandria, Natchitoches, Baton Rouge | 2-For-1 Fares |
| DQ | Jun. 24 - Jul. 05 | 11 | 722 | New Orleans/St. Louis | *Great Steamboat Race/Independence Day* | Natchez, Vicksburg, Greenville, Tunica, Paducah, Cape Girardeau | 50% Off 2nd Guest Plus Free Air |
| MQ | Jun. 05 - Jun. 12 | 7 | 819❁ | New Orleans/Memphis | | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| MQ | Jun. 12 - Jun. 19 | 7 | 820❁ | Memphis/New Orleans | | Vicksburg, Natchez, St. Francisville, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Jun. 19 - Jun. 24 | 5 | 821*❁ | New Orleans/New Orleans | | Natchez, Baton Rouge, Oak Alley | 2-For-1 Fares |

Note: Dates for 3- and 4-night *American Queen* cruises are shown in the schedule on page 55. These are part of the New Orleans & Riverboat Adventure Week. Cruises highlighted in green can be taken as Steamboatin'® Odyssey Vacations. See above for details. Discounts listed are those available at time of printing. For more details on Advance Purchase discounts, see inside back cover.

▲ Departs 10:30 PM
▼ Departs 10:00 PM
❁ Riverbonding Cruise

* Departs 6:00 PM
** Departs 4:00 PM
*** Departs 12:00 Midnight

†† Requires pre-cruise hotel stay for *Dickens on the Strand*

ACL 43798

# 2005 Chronological Cruise Schedule for the *Delta Queen®*, *Mississippi Queen®* and *American Queen®*

| BOAT | DEPARTURE/ ARRIVAL DATES | NO. OF NIGHTS | CRUISE NO. | DEPARTURE CITY/ DISEMBARKATION CITY | THEME | PORT STOPS All cruises depart at 7:30 PM, except cruises noted. See legend at the bottom of the page. | BOOK BY 12/31/04 FOR THE FOLLOWING DISCOUNTS (Offers are capacity controlled.) |
|---|---|---|---|---|---|---|---|
| **JUNE 2005 CONTINUED** | | | | | | | |
| MQ | Jun. 24 - Jul. 05 | 11 | 822* ✽ | New Orleans/St. Louis | *Great Steamboat Race/Independence Day* | Natchez, Vicksburg, Greenville, Tunica, Paducah, Cape Girardeau | 2-For-1 Fares |
| AQ | Jun. 20 - Jun. 25 | 5 | 939 ✽ | New Orleans/New Orleans | | Natchez, Baton Rouge, Oak Alley | 2-For-1 Fares |
| AQ | Jun. 25 - Jul. 02 | 7 | 940 ✽ | New Orleans/Memphis | | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| **JULY 2005** | | | | | | | |
| DQ | Jul. 05 - Jul. 10 | 5 | 723* | St. Louis/Cincinnati | *Native American/St. Louis 4th of July* | Mt. Vernon, Madison | 50% Off 2nd Guest† |
| DQ | Jul. 10 - Jul. 15 | 5 | 724 | Cincinnati/Pittsburgh | *Native American* | Maysville, Point Pleasant, Marietta, Wheeling | 50% Off 2nd Guest Plus Free Air |
| DQ | Jul. 15 - Jul. 18 | 3 | 725 | Pittsburgh/Pittsburgh | | Wheeling, East Liverpool | 50% Off 2nd Guest |
| DQ | Jul. 18 - Jul. 22 | 4 | 726 | Pittsburgh/Cincinnati | | Wheeling, Maysville | 2-For-1 Fares |
| DQ | Jul. 22 - Jul. 25 | 3 | 727* | Cincinnati/Cincinnati | | Louisville, Madison | 50% Off 2nd Guest |
| DQ | Jul. 25 - Jul. 30 | 5 | 728* | Cincinnati/St. Louis | | Henderson, Paducah, Cape Girardeau | 2-For-1 Fares |
| DQ | Jul. 30 - Aug. 06 | 7 | 729 | St. Louis/St. Paul | | Alton, Hannibal, Dubuque, La Crosse, Red Wing | 50% Off 2nd Guest |
| MQ | Jul. 05 - Jul. 09 | 4 | 823 | St. Louis/St. Louis | *St. Louis 4th of July* | Grafton, Hannibal, Alton | 50% Off 2nd Guest† |
| MQ | Jul. 09 - Jul. 16 | 7 | 824 ✽ | St. Louis/St. Paul | | Alton, Hannibal, Dubuque, La Crosse, Red Wing | 50% Off 2nd Guest Plus Free Air |
| MQ | Jul. 16 - Jul. 23 | 7 | 825 ✽ | St. Paul/St. Louis | | Winona, La Crosse, Dubuque, Burlington, Hannibal | 50% Off 2nd Guest Plus Free Air |
| MQ | Jul. 23 - Jul. 30 | 7 | 826 ✽ | St. Louis/Nashville | *Civil War* | Alton, Cape Girardeau, Paducah, Cave-In-Rock, Dover, Clarksville | 50% Off 2nd Guest Plus Free Air |
| MQ | Jul. 30 - Aug. 06 | 7 | 827 ✽ | Nashville/Chattanooga | *Civil War* | Clarksville, Dover, Savannah, Florence, Decatur | 2-For-1 Fares |
| AQ | Jul. 02 - Jul. 09 | 7 | 941 ✽ | Memphis/New Orleans | *Independence Day* | Helena, Vicksburg, Natchez, St. Francisville, Baton Rouge, Oak Alley | 2-For-1 Fares |
| AQ | Jul. 09 - Jul. 16 | 7 | 942 ✽ | New Orleans/New Orleans | *Legends of American History* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| AQ | Jul. 16 - Jul. 23 | 7 | 943 ✽ | New Orleans/Memphis | | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| AQ | Jul. 23 - Jul. 30 | 7 | 944 ✽ | Memphis/New Orleans | | Helena, Vicksburg, Natchez, St. Francisville, Baton Rouge, Oak Alley | 2-For-1 Fares |
| AQ | Jul. 30 - Aug. 06 | 7 | 945 ✽ | New Orleans/New Orleans | *Legends of American History* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| **AUGUST 2005** | | | | | | | |
| DQ | Aug. 06 - Aug. 13 | 7 | 730 | St. Paul/St. Louis | | Winona, La Crosse, Dubuque, Burlington, Hannibal | 50% Off 2nd Guest Plus Free Air |
| DQ | Aug. 13 - Aug. 20 | 7 | 731 | St. Louis/St. Paul | | Alton, Hannibal, Dubuque, La Crosse, Red Wing | 50% Off 2nd Guest Plus Free Air |
| DQ | Aug. 20 - Aug. 27 | 7 | 732 | St. Paul/St. Louis | | Winona, La Crosse, Dubuque, Burlington, Hannibal | 50% Off 2nd Guest Plus Free Air |
| DQ | Aug. 27 - Sep. 03 | 7 | 733 | St. Louis/Nashville | *Civil War* | Alton, Cape Girardeau, Paducah, Cave-In-Rock, Dover, Clarksville | 50% Off 2nd Guest Plus Free Air |
| MQ | Aug. 06 - Aug. 13 | 7 | 828▲ ✽ | Chattanooga/Memphis | *Civil War* | Decatur, Savannah, Dover, Paducah, New Madrid | 2-For-1 Fares |
| MQ | Aug. 13 - Aug. 19 | 6 | 829 ✽ | Memphis/Nashville | *Bluegrass* | New Madrid, Paducah, Dover, Clarksville | 2-For-1 Fares |
| MQ | Aug. 19 - Aug. 26 | 7 | 830 ✽ | Nashville/Cincinnati | *Bluegrass* | Dover, Paducah, Henderson, Louisville, Madison | 2-For-1 Fares |
| MQ | Aug. 26 - Sep. 02 | 7 | 831 ✽ | Cincinnati/Chattanooga | *Bluegrass* | Henderson, Paducah, Savannah, Huntsville | 2-For-1 Fares |
| AQ | Aug. 06 - Aug. 13 | 7 | 946 ✽ | New Orleans/Memphis | | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| AQ | Aug. 13 - Aug. 20 | 7 | 947 ✽ | Memphis/New Orleans | | Helena, Vicksburg, Natchez, St. Francisville, Baton Rouge, Oak Alley | 2-For-1 Fares |
| AQ | Aug. 20 - Aug. 27 | 7 | 948 ✽ | New Orleans/New Orleans | *Legends of American History* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| AQ | Aug. 27 - Sep. 03 | 7 | 949 ✽ | New Orleans/Memphis | | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 2-For-1 Fares |
| **SEPTEMBER 2005** | | | | | | | |
| DQ | Sep. 03 - Sep. 11 | 8 | 734 | Nashville/Mobile | *Tenn-Tom* | Clarksville, Dover, Savannah, Columbus, Pickensville, Demopolis | Free Air Or Travel Allowance |
| DQ | Sep. 11 - Sep. 18 | 7 | 735 | Mobile/Chattanooga | *Tenn-Tom* | Demopolis, Pickensville, Columbus, Decatur | Free Air Or Travel Allowance |
| DQ | Sep. 18 - Sep. 25 | 7 | 736▲ | Chattanooga/Cincinnati | *Civil War* | Savannah, Paducah, Mt. Vernon, Madison | 50% Off 2nd Guest |
| DQ | Sep. 25 - Oct. 02 | 7 | 737 | Cincinnati/Cincinnati | | Ashland, Charleston, Ripley | |
| MQ | Sep. 02 - Sep. 09 | 7 | 832▲ | Chattanooga/Cincinnati | *Legends of the '50s* | Savannah, Paducah, Mt. Vernon, Madison | 50% Off 2nd Guest |
| MQ | Sep. 09 - Sep. 12 | 3 | 833 | Cincinnati/Cincinnati | *Legends of the '50s* | Louisville, Madison | Free Air Or Travel Allowance |
| MQ | Sep. 12 - Sep. 17 | 5 | 834 | Cincinnati/Pittsburgh | *Big Band* | Maysville, Point Pleasant, Marietta, Wheeling | Free Air Or Travel Allowance |
| MQ | Sep. 17 - Sep. 21 | 4 | 835 | Pittsburgh/Cincinnati | *Big Band* | Wheeling, Maysville | 2-For-1 Fares |
| MQ | Sep. 21 - Sep. 26 | 5 | 836 | Cincinnati/St. Louis | *Big Band* | Henderson, Paducah, Cape Girardeau | Free Air Or Travel Allowance |
| MQ | Sep. 26 - Oct. 03 | 7 | 837 | St. Louis/St. Paul | *Fall Foliage* | Alton, Hannibal, Dubuque, La Crosse, Red Wing | 2-For-1 Fares |
| AQ | Sep. 03 - Sep. 10 | 7 | 950 | Memphis/New Orleans | | Helena, Vicksburg, Natchez, St. Francisville, Baton Rouge, Oak Alley | 50% Off 2nd Guest Plus Free Air |
| AQ | Sep. 10 - Sep. 16 | 6 | 951 | New Orleans/New Orleans | *Legends of American History* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| For the ***American Queen***'s complete sailing schedule, please refer to **page 55** | | | | | | | |
| **OCTOBER 2005** | | | | | | | |
| DQ | Oct. 02 - Oct. 07 | 5 | 738 | Cincinnati/Pittsburgh | *Fall Foliage* | Maysville, Point Pleasant, Marietta, Wheeling | 50% Off 2nd Guest |
| DQ | Oct. 07 - Oct. 11 | 4 | 739* | Pittsburgh/Cincinnati | *Fall Foliage* | Wheeling, Maysville | 2-For-1 Fares |
| DQ | Oct. 11 - Oct. 16 | 5 | 740* | Cincinnati/Nashville | *Fall Foliage* | Henderson, Paducah, Dover | 50% Off 2nd Guest Plus Free Air |
| DQ | Oct. 16 - Oct. 22 | 6 | 741 | Nashville/Chattanooga | *Fall Foliage* | Dover, Savannah, Florence, Decatur | 50% Off 2nd Guest Plus Free Air |
| DQ | Oct. 22 - Oct. 29 | 7 | 742▲ | Chattanooga/Cincinnati | *Fall Foliage* | Savannah, Paducah, Mt. Vernon, Madison | Free Air Or Travel Allowance |

Note: Dates for 3- and 4-night *American Queen* cruises are shown in the schedule on page 55. These are part of the New Orleans & Riverboat Adventure Week. Cruises highlighted in green can be taken as Steamboatin'® Odyssey Vacations. See above for details. Discounts listed are those available at time of printing. For more details on Advance Purchase discounts, see inside back cover.

▲ Departs 10:30 PM
▼ Departs 10:00 PM
✽ Riverbonding Cruise

* Departs 6:00 PM
** Departs 4:00 PM
*** Departs 12:00 Midnight

† Free St. Louis 4th of Ju[ly] Package Included
†† Requires pre-cruise hot[el] stay for *Dickens on the S*[...]

# 2005-2006 Chronological Cruise Schedule for the *Delta Queen*®, *Mississippi Queen*® and *American Queen*®

| BOAT | DEPARTURE/ ARRIVAL DATES | NO. OF NIGHTS | CRUISE NO. | DEPARTURE CITY/ DISEMBARKATION CITY | THEME | PORT STOPS All cruises depart at 7:30 PM, except cruises noted. See legend at the bottom of the page. | BOOK BY 12/31/04 FOR THE FOLLOWING DISCOUNTS (Offers are capacity controlled.) |
|---|---|---|---|---|---|---|---|
| **OCTOBER 2005 CONTINUED** | | | | | | | |
| DQ | Oct. 29 - Nov. 03 | 5 | 743 | Cincinnati/Pittsburgh | *Fall Foliage* | Maysville, Point Pleasant, Marietta, Wheeling | 50% Off 2nd Guest Plus Free Air |
| MQ | Oct. 03 - Oct. 10 | 7 | 838 | St. Paul/St. Louis | *Fall Foliage* | Winona, La Crosse, Dubuque, Burlington, Hannibal | |
| MQ | Oct. 10 - Oct. 17 | 7 | 839 | St. Louis/St. Paul | *Fall Foliage* | Alton, Hannibal, Dubuque, La Crosse, Red Wing | |
| MQ | Oct. 17 - Oct. 24 | 7 | 840 | St. Paul/St. Louis | *Fall Foliage* | Winona, La Crosse, Dubuque, Burlington, Hannibal | |
| MQ | Oct. 24 - Oct. 31 | 7 | 841 | St. Louis/St. Paul | *Fall Foliage* | Alton, Hannibal, Dubuque, La Crosse, Red Wing | 50% Off 2nd Guest Plus Free Air |
| MQ | Oct. 31 - Nov. 07 | 7 | 842 | St. Paul/St. Louis | *Fall Foliage/Halloween* | Winona, La Crosse, Dubuque, Burlington, Hannibal | |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **NOVEMBER 2005** | | | | | | | |
| DQ | Nov. 03 - Nov. 15 | 12 | 744 | Pittsburgh/New Orleans | *History of Steamboatin'*® | Point Pleasant, Louisville, Paducah, Tunica, Natchez, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| DQ | Nov. 15 - Nov. 21 | 6 | 745 | New Orleans/New Orleans | *Financial Planning* | Oak Alley, Baton Rouge, St. Francisville, Natchez, Houmas House | 2-For-1 Fares |
| DQ | Nov. 21 - Nov. 28 | 7 | 746 | New Orleans/New Orleans | *Old-Fashioned Holidays/Thanksgiving* | Oak Alley, Baton Rouge, St. Francisville, Natchez, Vicksburg, Houmas House | 2-For-1 Fares |
| DQ | Nov. 28 - Dec. 05 | 7 | 747 | New Orleans/Galveston | *Old-Fashioned Holidays/Dickens on the Strand* | Port of Iberia, Port Arthur | 50% Off 2nd Guest Plus Free Air |
| MQ | Nov. 07 - Nov. 14 | 7 | 843 | St. Louis/New Orleans | *Veterans Reunion* | Memphis, Vicksburg, Natchez, St. Francisville | 50% Off 2nd Guest Plus Free Air |
| MQ | Nov. 14 - Nov. 21 | 7 | 844 | New Orleans/New Orleans | *World War II* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Nov. 21 - Nov. 28 | 7 | 845 ❄ | New Orleans/Memphis | *Old-Fashioned Holidays/Thanksgiving* | Natchez, Vicksburg, Greenville, Helena | 2-For-1 Fares |
| MQ | Nov. 28 - Dec. 05 | 7 | 846 | Memphis/New Orleans | *Old-Fashioned Holidays* | Natchez, St. Francisville, Baton Rouge, Houmas House, Oak Alley | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **DECEMBER 2005** | | | | | | | |
| DQ | Dec. 05 - Dec. 12 | 7 | 748 | Galveston/Galveston | *Old-Fashioned Holidays* | Freeport, Port O'Conner, Aransas Pass, Corpus Christi, Matagorda | |
| DQ | Dec. 12 - Dec. 17 | 5 | 749 | Galveston/New Orleans | *Old-Fashioned Holidays* | Port Arthur, Port of Iberia | 2-For-1 Fares |
| DQ | Dec. 17 - Dec. 22 | 5 | 750 | New Orleans/Mobile | *Old-Fashioned Holidays* | Biloxi/Gulfport | 2-For-1 Fares |
| DQ | Dec. 22 - Dec. 28 | 6 | 751 | Mobile/New Orleans | *Old-Fashioned Holidays/Christmas* | Pensacola, Biloxi/Gulfport | 2-For-1 Fares |
| DQ | Dec. 28 - Jan. 04, 2006 | 7 | 752 | New Orleans/New Orleans | *Old-Fashioned Holidays/New Year's* | Oak Alley, Baton Rouge, St. Francisville, Natchez, Vicksburg, Houmas House | 2-For-1 Fares |
| MQ | Dec. 05 - Dec. 12 | 7 | 847 | New Orleans/New Orleans | *Old-Fashioned Holidays/World War II* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Dec. 12 - Dec. 19 | 7 | 848 | New Orleans/New Orleans | *Old-Fashioned Holidays* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Dec. 19 - Dec. 26 | 7 | 849 ❄ | New Orleans/New Orleans | *Old-Fashioned Holidays/Christmas* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Dec. 26 - Jan. 02, 2006 | 7 | 850 ❄ | New Orleans/New Orleans | *Old-Fashioned Holidays/New Year's* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **FEBRUARY 2006** | | | | | | | |
| DQ | Feb. 17 - Feb. 24 | 7 | 100 | New Orleans/New Orleans | *Golf* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| DQ | Feb. 24 - Mar. 03 | 7 | 101 | New Orleans/Pensacola | *Golf* | Biloxi/Gulfport, Mobile | 2-For-1 Fares |
| MQ | Feb. 01 - Feb. 08 | 7 | 300 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Feb. 08 - Feb. 13 | 5 | 301 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Baton Rouge | 2-For-1 Fares |
| MQ | Feb. 13 - Feb. 20 | 7 | 302 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | 2-For-1 Fares |
| MQ | Feb. 20 - Feb. 26 | 6 | 303 | New Orleans/New Orleans | *Legends of '50s* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | 2-For-1 Fares |
| MQ | Feb. 26 - Mar. 04 | 6 | 304 | New Orleans/New Orleans | *Legends of '50s* | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **MARCH 2006** | | | | | | | |
| DQ | Mar. 03 - Mar. 10 | 7 | 102 | Pensacola/New Orleans | *Golf* | Mobile, Biloxi/Gulfport | 2-For-1 Fares |
| DQ | Mar. 10 - Mar. 17 | 7 | 103 | New Orleans/Galveston | *Springtime on Bayou* | Morgan City, Port of Iberia, Port Arthur | 2-For-1 Fares |
| DQ | Mar. 17 - Mar. 24 | 7 | 104 | Galveston/Galveston | *Springtime in Texas* | Freeport, Port O'Conner, Aransas Pass, Corpus Christi, Matagorda | 2-For-1 Fares |
| DQ | Mar. 24 - Mar. 31 | 7 | 105 | Galveston/New Orleans | *Springtime on Bayou* | Port Arthur, Port of Iberia, Morgan City | 50% Off 2nd Guest Plus Free Air |
| DQ | Mar. 31 - Apr. 07 | 7 | 106 | New Orleans/New Orleans | *Spring Pilgrimage* | Houmas House, St. Francisville, Natchez, Vicksburg, Baton Rouge, Oak Alley | 50% Off 2nd Guest Plus Free Air |
| MQ | Mar. 04 - Mar. 11 | 7 | 305 | New Orleans/Memphis | *Spring Pilgrimage* | Natchez, St. Joseph, Vicksburg, Helena | 2-For-1 Fares |
| MQ | Mar. 11 - Mar. 18 | 7 | 306 | Memphis/New Orleans | *Spring Pilgrimage* | Helena, Greenville, Vicksburg, Natchez, Baton Rouge, Oak Alley | 2-For-1 Fares |
| MQ | Mar. 18 - Mar. 23 | 5 | 307 | New Orleans/New Orleans | *Spring Pilgrimage* | Natchez, St. Francisville, Baton Rouge | 2-For-1 Fares |
| MQ | Mar. 23 - Mar. 28 | 5 | 308 | New Orleans/New Orleans | *Spring Pilgrimage* | Natchez, St. Francisville, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| MQ | Mar. 28 - Apr. 04 | 7 | 309 | New Orleans/Memphis | *Spring Pilgrimage* | Oak Alley, St. Francisville, Natchez, Vicksburg, Helena | 50% Off 2nd Guest Plus Free Air |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **APRIL 2006** | | | | | | | |
| DQ | Apr. 07 - Apr. 14 | 7 | 107 | New Orleans/New Orleans | *Spring Pilgrimage* | Houmas House, St. Francisville, Natchez, Vicksburg, Baton Rouge, Oak Alley | 50% Off 2nd Guest Plus Free Air |
| DQ | Apr. 14 - Apr. 21 | 7 | 108 | New Orleans/New Orleans | | Houmas House, St. Francisville, Natchez, Vicksburg, Baton Rouge, Oak Alley | 50% Off 2nd Guest Plus Free Air |
| DQ | Apr. 21 - Apr. 28 | 7 | 109 | New Orleans/Memphis | | Houmas House, St. Francisville, Natchez, Vicksburg, Helena | 50% Off 2nd Guest Plus Free Air |
| DQ | Apr. 28 - May 05 | 7 | 110 | Memphis/Cincinnati | Belle of Louisville *Race* | Paducah, Tell City, Louisville, Madison | 2-For-1 Fares |

Note: Dates for 3- and 4-night *American Queen* cruises are shown in the schedule on page 55. These are part of the New Orleans & Riverboat Adventure Week. Cruises highlighted in green can be taken as Steamboatin'® Odyssey Vacations. See above for details. Discounts listed are those available at time of printing. For more details on Advance Purchase discounts, see inside back cover.

▲ Departs 10:30 PM
▼ Departs 10:00 PM
❄ Riverbonding Cruise

* Departs 6:00 PM
** Departs 4:00 PM
*** Departs 12:00 Midnight

†† Requires pre-cruise hotel stay for *Dickens on the Strand*

# 2006 Chronological Cruise Schedule for the *Delta Queen*®, *Mississippi Queen*® and *American Queen*®

| BOAT | DEPARTURE/ ARRIVAL DATES | NO. OF NIGHTS | CRUISE NO. | DEPARTURE CITY/ DISEMBARKATION CITY | THEME | PORT STOPS All cruises depart at 7:30 PM, except cruises noted. See legend at the bottom of the page. | BOOK BY 12/31/04 FOR THE FOLLOWING DISCOUNTS (Offers are capacity controlled.) |
|---|---|---|---|---|---|---|---|
| **APRIL 2006 CONTINUED** | | | | | | | |
| MQ | Apr. 04 - Apr. 11 | 7 | 310 | Memphis/New Orleans | *Spring Pilgrimage* | Helena, Greenville, Vicksburg, Natchez, St. Francisville, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| MQ | Apr. 11 - Apr. 16 | 5 | 311 | New Orleans/New Orleans | *Big Band* | Oak Alley, St. Francisville, Natchez, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| MQ | Apr. 16 - Apr. 23 | 7 | 312 | New Orleans/Memphis | *Big Band* | Oak Alley, Baton Rouge, Natchez, Vicksburg, Helena | 50% Off 2nd Guest Plus Free Air |
| MQ | Apr. 23 - Apr. 30 | 7 | 313 | Memphis/Memphis | *Quilting* | New Madrid, Cape Girardeau, Paducah | 50% Off 2nd Guest |
| MQ | Apr. 30 - May 06 | 6 | 314 | Memphis/New Orleans | *Gardens of the River® Vacation* | Helena, Vicksburg, Natchez, Baton Rouge, Oak Alley | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **MAY 2006** | | | | | | | |
| DQ | May 05 - May 11 | 6 | 111 | Cincinnati/Nashville | *Kentucky Derby®* | Louisville, Henderson, Paducah, Dover | |
| DQ | May 11 - May 18 | 7 | 112 | Nashville/Chattanooga | *Civil War* | Dover, Paducah, Savannah, Florence, Decatur | 50% Off 2nd Guest Plus Free Air |
| DQ | May 18 - May 24 | 6 | 113 | Chattanooga/Memphis | *Civil War* | Decatur, Savannah, Paducah, New Madrid | 50% Off 2nd Guest Plus Free Air |
| DQ | May 24 - May 30 | 6 | 114 | Memphis/New Orleans | *Gardens of the River® Vacation* | Helena, Vicksburg, Natchez, St. Francisville, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| DQ | May 30 - Jun. 05 | 6 | 115 | New Orleans/New Orleans | *Gardens of the River® Vacation* | Oak Alley, St. Francisville, Natchez, Baton Rouge, Houmas House | 50% Off 2nd Guest Plus Free Air |
| MQ | May 06 - May 13 | 7 | 315 | New Orleans/New Orleans | *Gardens of the River® Vacation* | Oak Alley, Baton Rouge, Natchez, Vicksburg, St. Francisville, Houmas House | 50% Off 2nd Guest Plus Free Air |
| MQ | May 13 - May 20 | 7 | 316 | New Orleans/Memphis | *Gardens of the River® Vacation* | Oak Alley, Baton Rouge, Natchez, Vicksburg, Helena | 50% Off 2nd Guest Plus Free Air |
| MQ | May 20 - May 27 | 7 | 317 | Memphis/Nashville | *Civil War* | New Madrid, Paducah, Cave-In-Rock, Dover, Clarksville | 2-For-1 Fares |
| MQ | May 27 - Jun. 03 | 7 | 318 | Nashville/Memphis | *Civil War* | Clarksville, Dover, Savannah, Paducah, New Madrid | 2-For-1 Fares |
| For the ***American Queen***'s sailing schedule, please refer to **page 55** | | | | | | | |
| **JUNE 2006** | | | | | | | |
| DQ | Jun. 05 - Jun. 12 | 7 | 116 | New Orleans/Pensacola | *Golf* | Biloxi/Gulfport, Mobile | 50% Off 2nd Guest Plus Free Air |
| DQ | Jun. 12 - Jun. 19 | 7 | 117 | Pensacola/New Orleans | *Golf* | Mobile, Biloxi/Gulfport | 50% Off 2nd Guest Plus Free Air |
| DQ | Jun. 19 - Jun. 24 | 5 | 118 | New Orleans/New Orleans | | Oak Alley, St. Francisville, Natchez, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| DQ | Jun. 24 - Jul. 04 | 11 | 119 | New Orleans/St. Louis | *The Great Steamboat Race®* | Natchez, Vicksburg, Greenville, Memphis, Paducah, Cape Girardeau | 50% Off 2nd Guest Plus Free Air |
| MQ | Jun. 03 - Jun. 10 | 7 | 319 ❁ | Memphis/New Orleans | | Helena, Greenville, Vicksburg, Natchez, St. Francisville, Baton Rouge | 50% Off 2nd Guest Plus Free Air |
| MQ | Jun. 10 - Jun. 17 | 7 | 320 ❁ | New Orleans/New Orleans | | Oak Alley, Baton Rouge, Natchez, Vicksburg, St. Francisville, Houmas House | 50% Off 2nd Guest Plus Free Air |
| MQ | Jun. 17 - Jun. 24 | 7 | 321 ❁ | New Orleans/New Orleans | | Oak Alley, Baton Rouge, Natchez, Vicksburg, St. Francisville, Houmas House | 50% Off 2nd Guest Plus Free Air |
| MQ | Jun. 24 - Jul. 05 | 11 | 322 ❁ | New Orleans/St. Louis | *The Great Steamboat Race®* | Natchez, Vicksburg, Greenville, Memphis, Paducah, Cape Girardeau | 50% Off 2nd Guest Plus Free Air |
| AQ | Jun. 26 - Jul. 03 | 7 | 243 ❁ | New Orleans/New Orleans | | Oak Alley, St. Francisville, Natchez, Vicksburg, Baton Rouge, Houmas House | |
| For the ***American Queen***'s complete sailing schedule, please refer to **page 55** | | | | | | | |

Note: Dates for 3- and 4-night *American Queen* cruises are shown in the schedule on page 55. These are part of the New Orleans & Riverboat Adventure Week. Cruises highlighted in green can be taken as Steamboatin'® Odyssey Vacations. See above for details. Discounts listed are those available at time of printing. For more details on Advance Purchase discounts, see inside back cover.

▲ Departs 10:30 PM
▼ Departs 10:00 PM
❁ Riverbonding Cruise

* Departs 6:00 PM
** Departs 4:00 PM
*** Departs 12:00 Midnight

†† Requires pre-cruise hotel stay for *Dickens on the Strand*

## Stuff Happens.

### Protect Yourself With Our Steamboatin'® Travel Protection Program.

You're rear-ended by a teenager returning from just getting his driver's license. Your business partner needs an emergency appendectomy. Your connecting flight is snowed in. You get picked for jury duty and it's a long one. Because we've been in business for over a century, we know that stuff happens. That's why we offer a high-quality, low-cost Travel Protection Program, designed to protect your investment should you have to postpone or cancel your vacation. The plan also provides coverage for your belongings should they get lost, and, most important, it covers you, in the event of a medical emergency.

This plan must be purchased within seven days of making your initial deposit/payment for your Steamboatin'® vacation.

For more information see page 63. For costs and restrictions, ask your Travel Agent, visit www.deltaqueen.com or call 800.543.1949.

# 2004-2006 Cruise Schedule For The *American Queen*®

## These 3- & 4-Night Departures Can Be Taken As Part Of The *New Orleans & Riverboat Adventure Week* Or As A Sampler River Cruise Vacation

### 3-NIGHT RIVER VACATIONS

**Depart at 7:30 PM. Stop at Vacherie and Baton Rouge.**

#### 2004

| OCTOBER 2004 | No. |
|---|---|
| Oct. 01 - Oct. 04 | 664 |
| Oct. 08 - Oct. 11 | 666 |
| Oct. 15 - Oct. 18 | 668 |
| Oct. 22 - Oct. 25 | 670 |
| Oct. 29 - Nov. 01 | 672 |

| NOVEMBER 2004 | No. |
|---|---|
| Nov. 05 - Nov. 08 | 674 |
| Nov. 12 - Nov. 15 | 676 |
| Nov. 27 - Nov. 30 | 680 ✽ |
| Nov. 30 - Dec. 03 | 681 |

| DECEMBER 2004 | No. |
|---|---|
| Dec. 03 - Dec. 06 | 682 |
| Dec. 10 - Dec. 13 | 684 |
| Dec. 17 - Dec. 20 | 686 ✽ |

Note: December 20 & 27 departures shown on page 50

#### 2005

| FEBRUARY 2005 | No. |
|---|---|
| Feb. 04 - Feb. 07 | 900 |
| Feb. 11 - Feb. 14 | 902 |
| Feb. 18 - Feb. 21 | 904 |
| Feb. 25 - Feb. 28 | 906 |

| MARCH 2005 | No. |
|---|---|
| Mar. 04 - Mar. 07 | 908 |
| Mar. 11 - Mar. 14 | 910 |
| Mar. 18 - Mar. 21 | 912 |
| Mar. 25 - Mar. 28 | 914 |

| APRIL 2005 | No. |
|---|---|
| Apr. 01 - Apr. 04 | 916 |
| Apr. 08 - Apr. 11 | 918 |
| Apr. 15 - Apr. 18 | 920 |
| Apr. 22 - Apr. 25 | 922 |
| Apr. 29 - May 02 | 924 |

| MAY 2005 | No. |
|---|---|
| May 06 - May 09 | 926 |
| May 13 - May 16 | 928 |
| May 20 - May 23 | 930 |
| May 27 - May 30 | 932 |

| JUNE 2005 | No. |
|---|---|
| Jun. 03 - Jun. 06 | 934 ✽ |
| Jun. 10 - Jun. 13 | 936 ✽ |
| Jun. 17 - Jun. 20 | 938 ✽ |

| SEPTEMBER 2005 | No. |
|---|---|
| Sep. 16 - Sep. 19 | 964 |
| Sep. 23 - Sep. 26 | 966 |
| Sep. 30 - Oct. 03 | 968 |

| OCTOBER 2005 | No. |
|---|---|
| Oct. 07 - Oct. 10 | 970 |
| Oct. 14 - Oct. 17 | 972 |
| Oct. 21 - Oct. 24 | 974 |
| Oct. 28 - Oct. 31 | 976 |

| NOVEMBER 2005 | No. |
|---|---|
| Nov. 04 - Nov. 07 | 978 |
| Nov. 11 - Nov. 14 | 980 |
| Nov. 18 - Nov. 21 | 982 |
| Nov. 25 - Nov. 28 | 984 ✽ |

| DECEMBER 2005 | No. |
|---|---|
| Dec. 02 - Dec. 05 | 986 |
| Dec. 09 - Dec. 12 | 988 |
| Dec. 16 - Dec. 19 | 990 |
| Dec. 23 - Dec. 26 | 992 ✽ |
| Dec. 30 - Jan. 02, 2006 | 994 ✽ |

Note: Mid-June to early September departures shown on page 52

#### 2006

| JANUARY 2006 | No. |
|---|---|
| Jan. 06 - Jan. 09 | 201 |
| Jan. 13 - Jan. 16 | 203 |
| Jan. 20 - Jan. 23 | 205 |
| Jan. 27 - Jan. 30 | 207 |

| MARCH 2006 | No. |
|---|---|
| Mar. 03 - Mar. 06 | 210 |
| Mar. 10 - Mar. 13 | 212 |
| Mar. 17 - Mar. 20 | 214 |
| Mar. 24 - Mar. 27 | 216 |
| Mar. 31 - Apr. 03 | 218 |

| APRIL 2006 | No. |
|---|---|
| Apr. 07 - Apr. 10 | 220 |
| Apr. 14 - Apr. 17 | 222 |
| Apr. 21 - Apr. 24 | 224 |
| Apr. 28 - May 01 | 226 |

| MAY 2006 | No. |
|---|---|
| May 05 - May 08 | 228 |
| May 12 - May 15 | 230 |
| May 19 - May 22 | 232 |
| May 26 - May 29 | 234 |

| JUNE 2006 | No. |
|---|---|
| Jun. 02 - Jun. 05 | 236 ✽ |
| Jun. 09 - Jun. 12 | 238 ✽ |
| Jun. 16 - Jun. 19 | 240 ✽ |
| Jun. 23 - Jun. 26 | 242 ✽ |

✽ Riverbonding Cruise

### 4-NIGHT RIVER VACATIONS

**Depart at 4:00 PM. Stop at Natchez and Baton Rouge.** Dates in blue depart at 7:30 PM and stop at Vacherie, St. Francisville, and Baton Rouge.

#### 2004

| OCTOBER 2004 | No. |
|---|---|
| Oct. 04 - Oct. 08 | 665 |
| Oct. 11 - Oct. 15 | 667 |
| Oct. 18 - Oct. 22 | 669 |
| Oct. 25 - Oct. 29 | 671 |

| NOVEMBER 2004 | No. |
|---|---|
| Nov. 01 - Nov. 05 | 673 |
| Nov. 08 - Nov. 12 | 675 |
| Nov. 15 - Nov. 19 | 677 |
| Nov. 19 - Nov. 23 | 678 |
| Nov. 23 - Nov. 27 | 679 |

| DECEMBER 2004 | No. |
|---|---|
| Dec. 06 - Dec. 10 | 683 |
| Dec. 13 - Dec. 17 | 685 |

As part of the *New Orleans & Riverboat Adventure Week*, pay for a 4-night river cruise and your New Orleans vacation and FREE roundtrip air are included in the price. See chart inside the back cover and pages 6-13 for more details. Choose an *American Queen* cruise only and save up to 50% on select departures. Contact your travel agent or call today for the most up-to-date discount information on the 3- or 4-night departure of your choice.

#### 2005

| FEBRUARY 2005 | No. |
|---|---|
| Feb. 07 - Feb. 11 | 901 |
| Feb. 14 - Feb. 18 | 903 |
| Feb. 21 - Feb. 25 | 905 |
| Feb. 28 - Mar. 04 | 907 |

| MARCH 2005 | No. |
|---|---|
| Mar. 07 - Mar. 11 | 909 |
| Mar. 14 - Mar. 18 | 911 |
| Mar. 21 - Mar. 25 | 913 |
| Mar. 28 - Apr. 01 | 915 |

| APRIL 2005 | No. |
|---|---|
| Apr. 04 - Apr. 08 | 917 |
| Apr. 11 - Apr. 15 | 919 |
| Apr. 18 - Apr. 22 | 921 |
| Apr. 25 - Apr. 29 | 923 |

| MAY 2005 | No. |
|---|---|
| May 02 - May 06 | 925 |
| May 09 - May 13 | 927 |
| May 16 - May 20 | 929 |
| May 23 - May 27 | 931 |
| May 30 - Jun. 03 | 933 |

| JUNE 2005 | No. |
|---|---|
| Jun. 06 - Jun. 10 | 935 ✽ |
| Jun. 13 - Jun. 17 | 937 ✽ |

| SEPTEMBER 2005 | No. |
|---|---|
| Sep. 19 - Sep. 23 | 965 |
| Sep. 26 - Sep. 30 | 967 |

| OCTOBER 2005 | No. |
|---|---|
| Oct. 03 - Oct. 07 | 969 |
| Oct. 10 - Oct. 14 | 971 |
| Oct. 17 - Oct. 21 | 973 |
| Oct. 24 - Oct. 28 | 975 |
| Oct. 31 - Nov. 04 | 977 |

| NOVEMBER 2005 | No. |
|---|---|
| Nov. 07 - Nov. 11 | 979 |
| Nov. 14 - Nov. 18 | 981 |
| Nov. 21 - Nov. 25 | 983 ✽ |
| Nov. 28 - Dec. 02 | 985 |

| DECEMBER 2005 | No. |
|---|---|
| Dec. 05 - Dec. 09 | 987 |
| Dec. 12 - Dec. 16 | 989 |
| Dec. 19 - Dec. 23 | 991 ✽ |
| Dec. 26 - Dec. 30 | 993 ✽ |

Note: Mid-June to early September departures shown on page 52

#### 2006

| JANUARY 2006 | No. |
|---|---|
| Jan. 02 - Jan. 06 | 200 |
| Jan. 09 - Jan. 13 | 202 |
| Jan. 16 - Jan. 20 | 204 |
| Jan. 23 - Jan. 27 | 206 |
| Jan. 30 - Feb. 03 | 208 |

| FEBRUARY 2006 | No. |
|---|---|
| Feb. 27 - Mar. 03 | 209 |

| MARCH 2006 | No. |
|---|---|
| Mar. 06 - Mar. 10 | 211 |
| Mar. 13 - Mar. 17 | 213 |
| Mar. 20 - Mar. 24 | 215 |
| Mar. 27 - Mar. 31 | 217 |

| APRIL 2006 | No. |
|---|---|
| Apr. 03 - Apr. 07 | 219 |
| Apr. 10 - Apr. 14 | 221 |
| Apr. 17 - Apr. 21 | 223 |
| Apr. 24 - Apr. 28 | 225 |

| MAY 2006 | No. |
|---|---|
| May 01 - May 05 | 227 |
| May 08 - May 12 | 229 |
| May 15 - May 19 | 231 |
| May 22 - May 26 | 233 |
| May 29 - Jun. 02 | 235 |

| JUNE 2006 | No. |
|---|---|
| Jun. 05 - Jun. 09 | 237 ✽ |
| Jun. 12 - Jun. 16 | 239 ✽ |
| Jun. 19 - Jun. 23 | 241 ✽ |

✽ Riverbonding Cruise

★ ★ ★ **BOOK BY DEC. 31, 2004 FOR ADVANCE PURCHASE SAVINGS!**† ★ ★ ★

SEE INSIDE BACK COVER FOR DETAILS.

For reservations, see your Travel Agent.
For more information, call today or visit our Web site.

**800.543.1949**
**www.deltaqueen.com**

†Discounts listed are those available at time of printing and all offers are capacity controlled. For more details on Advance Purchase discounts, see inside back cover.

# American Queen® Deck Plans and Accommodations

SUN DECK
PROMENADE DECK
OBSERVATION DECK
TEXAS DECK
CABIN DECK
MAIN DECK

□ QUADRUPLE STATEROOMS
▿ TRIPLE STATEROOMS

## PROMENADE DECK

AAA 501, AAA 502, AA 503, AA 504, AA 505, AA 506, B 508, AA 507, AA 509, AA 510, AA 511, AA 512, AA 513, AA 514, AA 515, AA 516, AA 517, AA 518, AA 519, AA 520, 540, 541, 542, 543

C 521, C 522, C 523, C 524, C 525, C 526, C 527, C 528, C 529, C 530, C 531, C 532, C 533, C 534, C 535, C 536

Elevators, Lobby

Athletic Club and Bathing Pool are entered on the Sun Deck

Calliope Bar

## OBSERVATION DECK

Chart Room

AA401, AA402, A403, A404

C405, C406, C407, C408, C409, C410, C411, C412, C413, C414, C415, C416, C417, C418, C419, C420, C421, C422, C423, C424, C425, C426, C427, C428, C429, C430

G457, G458, G459, G460, G461, G462, G463, G464, G465, G466, G467

Elevators, Passenger Laundry, Lobby

H 468, H 469, H 470, H 471, H 472, H 473, H 474, H 475

E429, E431, E432, E433, E434, E435, E436, E437, E438, E439, E440, E441, E442, E443, E444, E445, E446, E447, E448, E449, E450, E452

B451, B454, AA 453, AA 455, AA 456

## TEXAS DECK

Front Porch of America

C301, C302, C304

E305, E306, E307, E308, E309, E310, E311, E312, E313, E314, E315, E316, E317, E318, E319, E320, E321, E322, E323, E324, E325, E326, E327, E328

G 353, G 354, G 355, G 356, G 357, G 358, G 359, G 360, G 361, G 362, G 363, G 364, G 365, G 366, G 367, G 368, G 369, G 370, G 371, G 372, G 373, G 374

Elevators, Lobby, Theater

G375, G376, G377, G378, G379, G380, G 381, G382, G384

A329, A330, A331, A332, A333, A334, A335, A336, A337, A338, A339, A340, A341, A342, A343, A344, A345, A346, A347, A348, A349, A350

AAA 351, AAA 352, A 383, A 385, A 386

## CABIN DECK

Gentlemen's Card Room, Ladies' Parlor, Porch, Mark Twain Gallery, Emporium, Purser's Lobby, Purser, Tours, Elevators, Lobby, Balcony, Grand Saloon, Box Seats, A, B, C, D, E, F, Access to Engine Room Viewing Area, Engine Room Bar

D201, D202, D203, D204, D205, D206, D207, D208, D209, D210, D211, D212, D213, D214, D215, D216, D217, D218, D219, D220, D221, D222

## MAIN DECK

Galley, *J.M. White* Dining Room, Main Deck Lounge, Captain's Bar, Women, Men, Elevators, Lobby, Grand Saloon, Engine Room Viewing Area

*These staterooms are specifically designed for wheelchair accessibility.

Note: Amenities available on the Sun Deck (not pictured) include a Bathing Pool, the Athletic Club and a recreation area.



Deck and Number of Staterooms per Category

**AAA Large Outside Luxury Suites.** The best of Steamboatin'® accommodations, each of these richly furnished suites features a sweeping view of the river, an antique double bed or a queen bed with a sofa-bed conversational group, and a private bathroom including a tub and shower. Beautiful windowed French doors open from the two pilothouse suites (501 & 502) onto the deck. Each of the two gracious paddlewheel suites (351 & 352) opens to an expansive private veranda.

Promenade-2
Texas-2

**AA Outside Superior Suites.** Exceptional suites feature beautiful windowed French doors that open onto the deck. They have two single beds or a queen bed and a private bathroom including a tub with shower.

Promenade-17
Observation-5

**A Large Luxury Outside Staterooms with Private Veranda.** These outstanding staterooms feature French doors that open to the deck or a private veranda. They feature two single beds and a private bathroom including a tub and shower.

Texas-25
Observation-2

**B Large Superior Outside Staterooms with Semi-Private Deck Area.** These large exceptional staterooms feature French doors opening directly onto the deck. They feature two single beds and a private bathroom including a tub and shower.

Promenade-1
Observation-2

**C Large Outside Deluxe Staterooms with Semi-Private Deck Area.** These extra-spacious staterooms feature French doors that open directly onto the deck. They feature two single beds and a private bathroom including a tub and shower. Some rooms connect to a G stateroom to form a family suite.

Observation-25
Texas-3
Promenade-16

**D Large Outside Staterooms with Bay Windows.** Extra-spacious staterooms feature a large bay window for constant river views and provide an inside entrance. Rooms also feature two single beds and a private bathroom with a tub and shower.

Cabin-22

**E Outside Standard Staterooms with Semi-Private Deck Area.** These spacious staterooms open onto the deck via French doors. They feature two single beds and a private bathroom with shower.

Observation-22
Texas-24

**G Large Inside Staterooms.** These spacious staterooms offer comfortable accommodations with two single beds, a large mirror, ample storage space and a private bathroom with shower. Some rooms have an additional single upper bunk. Some rooms connect to a C stateroom to form a family suite.

Observation-11
Texas-31

**H Inside Single Staterooms.** These cozy single-occupancy staterooms feature a single bed and a private bathroom with shower.

Observation-8

**I Inside Standard Staterooms.** These inside staterooms feature two single beds and a private bathroom with shower.

Promenade-4

Category F is not available. Room size and layout may differ within a particular category. See your professional travel agent for details about the accommodations of your choice. Select rooms are available for triple (▿) or quadruple (▫) occupancy.



Mississippi Queen® Deck Plans and Accommodations
MAIN DECK
CABIN DECK
TEXAS DECK
OBSERVATION DECK
PROMENADE DECK
Officers' Quarters
Passenger Laundry Facility
Forward Cabin Lounge
Service Area
Paddlewheel Lounge
Wheel House
Grand Saloon
Library
Gift Shop
Coffee
Port Gallery
Golden Antlers Bar
Galley
Dining
Upper Paddlewheel Lounge
Observation Area
Calliope Bar
Engine Room Viewing Windows
□ QUADRUPLE STATEROOMS
▽ TRIPLE STATEROOMS
SUN DECK
PROMENADE DECK
OBSERVATION DECK
TEXAS DECK
CABIN DECK
MAIN DECK
*This stateroom is specifically designed for wheelchair accessibility.
Note: A Bathing Pool is available on the Sun Deck (not pictured). There is a theater and beauty salon on the lower deck.
60



| | Deck and Number of Staterooms per Category |
|---|---|
| **AAA Large Outside Luxury Suites.** These spacious suites offer an expansive private veranda, sofa-bed conversational group, two twin beds or a queen bed and a private bathroom with tub and shower. | Promenade-2<br>Cabin-2 |
| **AA Outside Superior Suites.** These luxurious accommodations are graciously furnished and reminiscent of times gone by. Each suite offers windows for viewing America, two single beds convertible to a king, a sofa bed or trundle bed, a comfortable chair and desk, and a private bathroom with shower. | Promenade-8<br>Texas-2 |
| **A Large Luxury Outside Staterooms with Private Veranda.** These superb accommodations offer large windows and a private veranda for a wonderful view of the river, two single beds and a private bathroom with tub and shower. | Promenade-4<br>Texas-8 |
| **B Large Superior Outside Staterooms with Private Veranda.** These extra-spacious staterooms offer two single beds, a private veranda, as well as a private bathroom with shower. | Texas-34<br>Cabin-37 |
| **C Outside Large Staterooms with Private Veranda.** These outside staterooms feature two single beds or a double bed, a private veranda and a private bathroom with shower. | Texas-2<br>Cabin-2 |
| **D Outside Standard Staterooms with Private Veranda.** These outside staterooms feature two single beds, a private veranda and a private bathroom with shower. | Cabin-3 |
| **E Large Outside Staterooms.** These outside staterooms offer an expansive river view through a large window. They feature two single beds or a double bed and a private bathroom with shower. | Main-11 |
| **F Outside Standard Staterooms.** These staterooms provide river views via portholes or windows and feature two single beds or a double bed and a private bathroom with shower. | Texas-2<br>Cabin-2<br>Main-16 |
| **G Large Inside Staterooms.** These inside staterooms offer two single beds and feature a private bathroom with shower. | Texas-14<br>Cabin-18<br>Main-20 |
| **I Inside Standard Staterooms.** These inside staterooms offer comfortable accommodations with single lower and single upper berths. They feature a private bathroom with shower. | Texas-12<br>Cabin-7<br>Main-2 |

Category H is not available. Room size and layout may differ within a particular category. See your professional travel agent for details about the accommodations of your choice. Select rooms are available for triple (▾) or quadruple (◘) occupancy.

# TERMS AND CONDITIONS OF PASSAGE

**Terms and Conditions of Passenger Contract**

**PLEASE CAREFULLY READ THE FOLLOWING TERMS AND CONDITIONS, WHICH GOVERN ALL DEALINGS BETWEEN YOU AND CARRIER AND CONTAIN CERTAIN LIMITATIONS ON CARRIER S LIABILITY.**

*1. General.*

The transportation of Passengers and baggage on board the *Delta Queen*®, the *Mississippi Queen*® and/or the *American Queen*® (hereinafter "Steamboat" and/or "Steamboats") is governed by these Terms and Conditions of Passage, the Terms and Conditions printed on the Invoice/Confirmation (the "Confirmation"), which will be sent to You approximately one (1) week after your reservation is made, and the Passenger Ticket Contract (the "Ticket"), which will be sent to You approximately four (4) weeks prior to your vacation. The Ticket and the Confirmation restate in part and incorporate by reference all of the Terms and Conditions stated herein. In the event of any conflict between these Terms and Conditions and the Confirmation, Ticket, any advertisement or offer, and/or the oral or written representation of any representative of Carrier, these Terms and Conditions shall control. Your acceptance or use of the Ticket or payment of deposit or full fare constitutes agreement to these Terms and Conditions, which include limitations and exonerations of the liabilities and obligations of Carrier. You should read and understand these Terms and Conditions carefully before making a deposit or accepting or using the Ticket.

*2. Definitions.*

The terms "You" and "Passenger" refer to any and all person(s) named on the front of the Confirmation and/or the Ticket, and include all children or others under the care or control of the named person(s). The Ticket is valid only for the named Passengers. The term "Carrier" includes the Delta Queen Steamboat Company, Inc., its parent and affiliated entities, the Steamboats, the Steamboats' owners, charterers, operators, agents, and master and crew, any substituted or connecting ship, the owners, charterers and operators of any such ship, and all launches belonging to any such ship or owned or operated by the owners, charterers or operators. The term "Vacation Package" means any Cruise, hotel, car rental, or air package purchased from Carrier. The term "Cruise" means the voyage from port of embarkation to the port of disembarkation.

*3. Information Subject To Change.*

Accommodations and fares will be confirmed with your Confirmation. Verbal quotations will not be honored. Carrier reserves the right to change all fares and other charges, prices, schedules, ports of call, hours of arrival and departure, and all other information appearing in this or any other publication without prior notice. Carrier may change a stateroom assignment or Steamboat at any time. If Carrier assigns Passenger a higher stateroom category, there will be no charge for the upgrade. If Carrier assigns Passenger a lower stateroom category, Carrier will refund the difference in Cruise fare, except when downgrade is made at Passenger's request. Such a refund discharges Carrier of any liability for such reassignment.

*4. Deposit, Final Payment.*

For confirmation of individual reservations, a deposit of $300 per person is due within seven (7) days from the date of reservation. Failure to pay in a timely manner will result in the cancellation of the reservation. The balance of the Cruise and/or Vacation Package fare is due ninety (90) days before departure date, and all reservations not fully paid at such time will be canceled and subject to the cancellation provisions set forth in paragraph 7 below. Carrier accepts agency or personal checks and most major credit cards. No agency or personal checks will be accepted less than fifteen (15) days before departure date. Reservations made ninety (90) days or less before departure date will require payment in full by credit card at the time of booking.

*5. Additional Costs.*

The Cruise fare only includes passage, food and accommodations unless otherwise indicated in writing in the Confirmation. The Cruise fare does not include gift shop purchases, shore excursions, alcoholic or special beverages, miscellaneous extras and optional personal services provided by independent contractors. Unpaid amounts for such additional charges must be paid prior to disembarkation.

*6. Advance Purchase Program.*

Carrier offers certain promotions through its Advance Purchase Program, which provides discount fares as an incentive for early booking. All Advance Purchase offers are capacity controlled, subject to availability and may change at any time without notice. Savings may decrease or be closed for specific stateroom categories, Cruises and/or Vacation Packages. Advance Purchase offers cannot be combined with any other special offer, and certain Cruises and Vacation Packages are excluded from the Advance Purchase Program. Further restrictions apply. Please contact your Travel Agent or Carrier's Reservation Department for further information.

*7. Cancellation Policy.*

Should you need to cancel your Cruise or Vacation Package, You or your Travel Agent should contact Carrier's Reservations Department. Carrier reserves the right to cancel all bookings for which final payment is not received ninety (90) days prior to the departure date. All cancellations are subject to a $25-per-person administrative fee and the following charges:

- Cancellations received ninety (90) days or more before departure date: Passenger will be refunded entire Cruise and/or Vacation Package fare including deposit, but not travel insurance premium.
- Cancellations received 89–46 days before Commencement Date: Passenger will be refunded 50% of Cruise and/or Vacation Package fares.
- Cancellations received forty-five (45) days or fewer before Commencement Date: No refund; Passenger will forfeit 100% of all money paid.

No refund will be made in the event of interruption or cancellation by the Passenger after departure date, or for a Passenger who must leave the Cruise and/or Vacation Package prematurely for medical or any other reason. In the event You change or cancel airfare booked through Carrier, You may be subject to an additional charge. All appropriate refunds will be made directly to the Passenger, to the Passenger's credit card account or through the Passenger's Travel Agent. Carrier is not responsible for refunds by Travel Agents to Passenger. Carrier recommends the purchase of Passenger Protection Insurance at the time of booking (see next page for details).

*8. Medical Attention And Special Needs.*

By boarding the Steamboat, You represent that You are physically and otherwise fit to travel. If You would like to request accommodations for Passengers with disabilities, please advise Carrier of any special needs at the time of booking. This will allow our crew to better serve You. Certain safety regulations (raised thresholds, for example) may cause minor difficulty for the mobility impaired. Increased wheelchair-accessible accommodations are available on the *Mississippi Queen* and the *American Queen*, which have elevators and hallways that aid convenience. However, the *Delta Queen*, a National Historic Landmark, was constructed in 1927, and it has no elevators. Mobility-impaired passengers may find it difficult to traverse the *Delta Queen*. Carrier reserves the right to refuse or revoke passage to anyone who is, in the sole judgment of Carrier, physically or mentally incapable of traveling on the Steamboat or who may require care beyond that which Carrier can reasonably provide. No medical facilities, personnel or treatment of any kind is available on board any of the Steamboats. In an emergency, professional medical assistance may take several hours to reach the Steamboat. Please bring along any prescribed medicine and all necessary items for your comfort. If, in the opinion of Carrier, Passenger is in need of medical assistance and is unable to request it, Passenger hereby consents to and accepts treatment from any available physician or medical personnel.

*9. Arrival—Baggage, Valuables And Possessions.*

Passengers should arrive at least two (2) hours before scheduled sailing. Baggage is limited to two (2) pieces per person (other than carry-on luggage) and should otherwise comply with airline restrictions. Carrier's liability for loss of or damage to property of Passenger is limited to $250 per Passenger, unless a higher value is declared by Passenger in writing and Passenger pays a fee equal to 3% of the true value declared in excess of $250 to Carrier prior to boarding the Steamboat, in which case Carrier's liability will be limited to the true value declared not to exceed $5,000. All settlements will be made based on actual cash value (replacement cost less depreciation) up to the $250/$5,000 limits of liability. Carrier is not responsible for loss or damage caused by airlines or the independent tour operators who handle transfer arrangements, and any such loss, damage or delays incurred should be reported directly to the airline or tour operator involved. Carrier recommends the purchase of Passenger Protection Insurance at the time of booking (see next page for details).

*10. Substitution, Cancellation, Delay Or Deviation Of Cruise.*

Carrier reserves the right, at its sole option and discretion and that of the Captain of the Steamboat, without notice and without liability for damages or refund of any kind, to substitute Steamboat, to delay, advance, cancel or change any sailing, to omit or change ports of call, to otherwise deviate from the advertised or ordinary route, to deny Passenger a stateroom even if Passenger has a confirmed or guaranteed reservation, and to cause Passenger to disembark from the Steamboat temporarily or permanently. Under such circumstances, Passenger shall have no claim for damages against Carrier, including without limitation for any resulting hotel, food, travel or other expenses, delay, inconvenience, or other damages whatsoever. Carrier may for any reason whatsoever cancel any sailing at any time before departure date. Under such circumstances, Passenger shall have no claim against Carrier other than for reimbursement of unearned Cruise and/or Vacation Package fare. Reimbursement discharges Carrier from all liability.

*11. Deviation From Route—Change Or Omit Ports Of Call After Sailing.*

If, after sailing, the Cruise is interrupted by a fortuitous event, force majeure, any other act not shown to be caused by Carrier's negligence, or any other cause beyond Carrier's reasonable control, or the Steamboat is or will be unduly delayed or prevented from proceeding in the ordinary course, Carrier reserves the right to terminate the Cruise. Further, Carrier reserves the right to deviate from the advertised route and call or omit to call at any port or place, and Passenger shall not be entitled to any refund of Cruise and/or Vacation Package fare or compensation of any kind and shall have no other claim against Carrier. Carrier is not responsible for any failure to adhere to the arrival and departure times published in this brochure and any other publication. Carrier reserves the right to tow and be towed, to assist vessels and offer or render assistance to preserve life or property, to comply with all orders given by governmental authorities and the underwriters of the Steamboat or Carrier, and to perform any act which, in its sole judgment and discretion and/or that of the Captain of the Steamboat, is justified for any reason. Passenger shall have no claim whatsoever against Carrier in such circumstances.

*12. Safety Of Life At Sea Act.*

Passengers embarking on the *Delta Queen* acknowledge that the wooden construction of the *Delta Queen's* superstructure and passenger berthing areas prevent it from complying with applicable fire standards and with the Safety Of Life At Sea Act. In this regard, the *Delta Queen* operates under a special Congressional exemption.

*13. Limitations Of Carrier's Liability And Passenger's Responsibility.*

In addition to other limitations detailed in other sections of these Terms and Conditions, Carrier shall not be liable for death, injury, illness, sickness, damage or other loss to person or property caused by a fortuitous event, force majeure, any other act not shown to be caused by Carrier's negligence, or any other cause beyond Carrier's reasonable control. Carrier shall not be liable to Passenger for damages for emotional distress, mental anguish or psychological injury of any kind under any circumstances, unless it is shown that such damages were the result of a physical injury to Passenger caused by the negligence of Carrier, the result of Passenger having been at actual risk of physical injury where such risk was caused by the negligence of Carrier, or such damages were intentionally inflicted by Carrier. Nothing contained herein shall be construed to limit or deprive Carrier of the benefit of any applicable statute or law of the United States, or any individual state, providing for exoneration from or limitation of liability. By using the athletic or recreational equipment, facilities and supplies on board the Steamboat, Passenger assumes the risk of injury, death,

# AND OTHER IMPORTANT INFORMATION

illness or other loss on account of such use and Carrier shall not be liable or responsible for any such loss. Passenger agrees to hold harmless and indemnify Carrier for all claims, damages, losses, costs and expenses arising as a result of any act, omission or violation of law by Passenger.

*14. Notice Of Claims And Suits, Time Limitation, And Venue.*

No claim shall be brought against Carrier in cases involving death, injury, illness, sickness, damage or other loss to person or property of Passenger unless: (a) written notice providing particulars of the claim is served upon Carrier within six (6) months after the date of the event upon which such claim is based, and (b) any lawsuit arising from such claim is filed within one (1) year from the date of the event upon which such claim is based, notwithstanding any law to the contrary. All disputes and legal actions arising out of or relating to the Cruise and/or Vacation Package shall be brought, if at all, in a court located in the State of Louisiana, City of New Orleans. No suit or action arising out of the Cruise and/or Vacation Package may be brought in rem or against the Steamboat. Passenger agrees that any suit or action arising out of the Cruise and/or Vacation Package shall be brought only against Delta Queen Steamboat Company, Inc. in its corporate capacity.

*15. Third-Party Providers.*

Carrier neither controls nor is responsible for the actions of third-party service providers and independent contractors You may encounter on your Cruise and/or Vacation Package, such as the airlines, hotels, shore excursion and transportation operators and other service providers (collectively "Third-Party Providers"). Carrier shall not be responsible or liable for late arrival of Passenger's flight or for illness, injury, damage, loss or other irregularities resulting from the acts or omissions of any Third-Party Provider. Carrier shall not be liable for any occurrence taking place outside or beyond the Steamboat. You are responsible for arriving at the port on time for embarkation or for joining the Steamboat at its next port of call if, for any reason, You miss a scheduled sailing.

*16. Compliance With Law; Unauthorized Activities.*

It is Passenger's sole responsibility and risk to comply with all applicable laws, rules, and regulations. Passenger is not allowed to bring on board the Steamboat, without previous written consent of Carrier, firearms or weapons of any kind, ammunition, explosive devices or any goods of a dangerous nature.

*17. Refusal Of Passage.*

Carrier reserves the right to refuse or discontinue passage to anyone who Carrier considers a risk to his own well-being or that of any other passenger. Carrier may refuse to transport or may disembark at any port any Passenger who may be suffering from a contagious or infectious disease or illness. Carrier reserves the right to refuse passage to women who have entered their 24th week of pregnancy as of their departure date and cannot be held liable for any complications relating to pregnancy.

*18. Guest Speakers.*

Delta Queen Steamboat Company, Inc. offers guest speakers aboard cruises for entertainment purposes only. Guest speakers are independent contractors, and are not affiliated with Delta Queen Steamboat Company, Inc., and the company makes no representations or warranties of any kind, express or implied, as to the information, content, materials, products, or services provided. Delta Queen Steamboat Company, Inc. shall not be liable for any damages arising from or caused by any information, suggestions, or advice provided by guest speakers.

### Other Important Information

**Children**—One or two children (18 years old or younger) cruise free in some staterooms on the *Mississippi Queen*® and on the *American Queen*®, when sharing the stateroom with two full-fare adults. Children under 18 aboard any of the Steamboats must be accompanied by an adult.

**Clothing**—Attire for daytime is casual; slacks and shorts are acceptable in all public areas. For evenings, dress is usually more formal.

**Communications**—You can retrieve telephone messages from a message center while aboard the Steamboats. Credit card telephone calls may be placed from Steamboat staterooms on board the *Mississippi Queen* and the *American Queen*, and from the Betty Blake Library on board the *Delta Queen*®.

**Diets**—Each menu has at least one "Heart Healthy" and one vegetarian meal, and special diets can usually be accommodated with advance notice.

**Dining Arrangements**—There are two seatings for dining. To make a seating request, please call your Travel Agent, group leader, or our Reservations Department at your earliest convenience after booking. While we make every effort to honor requests, actual seating assignments are not guaranteed and can only be confirmed at cruise departure.

**Electrical Outlets**—All steamboats' electrical systems are 110V AC.

**Embarkation**—Boarding time information will be sent with your Ticket.

**Gambling**—Gambling is not available on the Steamboats. However, in many ports where we dock, gambling is available nearby.

**Gift Shop**—There is one on board each boat.

**Parking**—Parking is available near each port. Details will be sent with your travel documents.

**Pets**—Other than necessary service animals of a disabled Passenger, which require Carrier's prior written approval, no pets or other animals are permitted on board.

**Religious Services**—Non-denominational services are held on board each Sunday.

**Optional Shore Excursions**—Optional shore tours are offered at most shore stops. Tickets are available on board at an additional cost.

**Smoking**—Smoking is permitted only in staterooms aboard the *Mississippi Queen* and *American Queen*, and outdoors.

**Special Services**—Advance orders for flowers, champagne, wine, food, etc., for bon voyage gifts and special occasions may be made through your Travel Agent or Carrier's Reservations Department at an additional cost.

The *Delta Queen, Mississippi Queen* and *American Queen* are owned and operated by the Delta Queen Steamboat Company, Inc., are regularly inspected by the U.S. Coast Guard, are of American registry, and employ American officers, crew, and staff.

*Delta Queen, Mississippi Queen, American Queen*, Steamboatin', The Greatest Steamboat The World Has Ever Known, The Great Steamboat Race, Steamboat A Comin', and Front Porch of America are registered service marks and/or trademarks of the Delta Queen Steamboat Company, Inc. *Big Band* vacations, *Gardens of the River* vacations, *Spring Pilgrimage* vacations, *Old-Fashioned Holidays* vacations, *Fall Foliage* vacations, America's Steamboat, Fulfillment of Mark Twain's Dreams, and Riverlorian are service marks of the Delta Queen Steamboat Company, Inc.

## Passenger Protection Plan

Because unfortunate events can occur, a travel protection plan offered and administered by Trip Mate is available with all the Delta Queen Steamboat Company, Inc. travel arrangements. This high-quality travel protection plan covers Your Steamboatin'® investment, Your belongings, and most importantly, You. The travel protection plan covers You even if You must cancel or interrupt Your trip due to a pre-existing medical condition, if You purchase the plan within 7 days of Your initial deposit for Your Steamboatin' trip and You are not disabled from travel at the time Your plan payment is received.

**Passenger Protection Plan Schedule of Benefits:**

| **Travel Arrangements Protection-Part A** | ***Maximum Benefit** |
|---|---|
| Pre-Departure Trip Cancellation | Up To Trip Cost |
| **Travel Insurance Benefits-Part B** | ***Maximum Benefit** |
| Post-Departure Trip Interruption | Up To Trip Cost |
| Medical Expense/Emergency Assistance | $25,000 |
| Travel Delay (Up to $100 Per Day) | $1,000 |
| Baggage & Personal Effects Baggage Delay | $100 |

* Part A Benefits are provided by the Delta Queen Steamboat Company, Inc. and Part B Benefits are provided by the insurers listed below.

This plan does not cover a loss that results from an illness, disease, or other condition (of You, an Immediate Family Member, Traveling Companion or Business Partner), event or circumstance which occurs at a time when this plan is not in force for You. For full details, see the Certificate of Coverage which will be mailed or faxed with Your initial invoice and is available, upon request, at any time prior to Your purchase of the plan. Certain exclusions and limitations apply and are detailed in the Certificate of Coverage. For example, coverage does not apply to: any sickness or condition of You, a Traveling Companion or an Immediate Family Member traveling with You that existed during the 60 days prior to the effective date of the coverages (this exclusion is waived if Your plan payment is received within 7 days of Your initial deposit for Your trip and You are not disabled from travel at the time Your plan payment is received), suicide, normal pregnancy, war or any act of war, or mental or nervous disorders.

**This plan is administered by:** Trip Mate (in CA DBA Trip Mate Insurance Agency), 9225 Ward Parkway, Kansas City, MO 64114, 800-888-7292.

**Part B Benefits of the Travel Protection Plan are underwritten by:** Stonebridge Casualty Insurance Company, Columbus, Ohio; (all states except as otherwise noted) and Monumental General Casualty Company, Baltimore, Maryland; (CT, HI, IL, IN, MS, SD and VA).

464-03

## Homeland Security

The Delta Queen Steamboat Company (DQSC) is committed to the security and protection of our passengers, employees and property. DQSC is operating in accordance with the Maritime Transportation Security Act (MTSA). The Department of Homeland Security enforces this act. **DQSC prohibits weapons of any kind on board our steamboats.** In addition, DQSC must obtain the home address, city, state, ZIP code and home phone number for each passenger.

During a Steamboatin'® vacation, passengers may encounter short periods of delay while we conduct identification checks and random screening of baggage, persons and carry-on items. On occasion the Department of Homeland Security may elevate the security level requiring additional security measures to be taken.

**Note:** All passengers who book through a Travel Agent or direct must provide Delta Queen Steamboat Company their home address, city, state, home phone number and ZIP at time of deposit to the reservations agent for each port's homeland security. Any passenger or Travel Agent not providing Delta Queen Steamboat Company this information will be denied boarding and deposit will be denied until information is given.

# LET DELTA QUEEN GET YOU THERE!
## AIR/RIVER PROGRAM

Delta Queen Steamboat Company's Air/River Program makes getting to your steamboat vacation stress-free. Book your cruise and we'll take care of the rest. We can arrange flights from more than 75 gateway cities in the continental United States and Canada. When you purchase your air travel from us with your cruise, you get a great rate (see below), plus transfers are provided between the airport and your steamboat on the day of embarkation and/or disembarkation (and hotel, if you purchase a CityScape package). Also, should your flight get delayed or changed, we'll work with the airlines to get you rerouted to your destination. We do the worrying so you don't have to.

To determine your fare, find your city of departure and corresponding airfare zone. Then, on the chart, find your fare under the region you have chosen. For example, if you are departing from Newark, NJ (Zone 1), for an Old South vacation, your roundtrip airfare will be $499. All fares listed include taxes, administrative and processing fees.

For additional airfare information, call your travel agent or 800.543.1949.

## *Gateway Cities and Zones*

| Gateway | Zone | Gateway | Zone | Gateway | Zone | Gateway | Zone |
|---|---|---|---|---|---|---|---|
| Albany, NY | 1 | Detroit, MI | 4 | Milwaukee, WI | 4 | Providence, RI | 1 |
| Albuquerque, NM | 3 | Ft. Lauderdale, FL | 1 | Minneapolis/St. Paul, MN | 4 | Raleigh/Durham, NC | 1 |
| Allentown, PA | 1 | Ft. Myers, FL | 1 | Montreal, CANADA | 5 | Richmond, VA | 1 |
| Atlanta, GA | 2 | Grand Rapids, MI | 4 | Nashville, TN | 2 | Rochester, NY | 1 |
| Austin, TX | 3 | Greensboro, NC | 2 | New Orleans, LA | 2 | Sacramento, CA | 5 |
| Baltimore, MD | 1 | Greenville/Spartanburg, SC | 2 | New York, NY (Kennedy) | 1 | San Diego, CA | 5 |
| Birmingham, AL | 2 | Harrisburg, PA | 1 | New York, NY (LaGuardia) | 1 | San Francisco, CA | 5 |
| Boston, MA | 1 | Hartford, CT | 1 | Newark, NJ | 1 | San Jose, CA | 5 |
| Buffalo, NY | 1 | Houston, TX | 3 | Norfolk, VA | 1 | Seattle, WA | 5 |
| Charleston, SC | 2 | Indianapolis, IN | 4 | Oakland, CA | 5 | St. Louis, MO | 4 |
| Charlotte, NC | 2 | Jackson, MS | 2 | Oklahoma City, OK | 4 | Tampa, FL | 1 |
| Chattanooga, TN | 2 | Jacksonville, FL | 1 | Omaha, NE | 4 | Toronto, CANADA | 5 |
| Chicago, IL (O'Hare) | 4 | Kansas City, MO | 4 | Ontario, CA | 5 | Tucson, AZ | 5 |
| Cincinnati, OH | 1 | Knoxville, TN | 2 | Orange County, CA | 5 | Tulsa, OK | 3 |
| Cleveland, OH | 1 | Las Vegas, NV | 5 | Orlando, FL | 1 | Vancouver, CANADA | 6 |
| Columbus, OH | 1 | Little Rock, AR | 2 | Philadelphia, PA | 1 | Washington, DC (Dulles) | 1 |
| Dallas/Ft. Worth, TX | 3 | Los Angeles, CA | 5 | Phoenix, AZ | 5 | Washington, DC (National) | 1 |
| Dayton, OH | 1 | Louisville, KY | 2 | Pittsburgh, PA | 1 | West Palm Beach, FL | 1 |
| Denver, CO | 5 | Memphis, TN | 2 | Portland, ME | 1 | Wichita, KS | 3 |
| Des Moines, IA | 4 | Miami, FL | 1 | Portland, OR | 5 | Wilmington, NC | 1 |

## *Zones, Regions and Airfares*

| | The Old South Region | America's Heartland Region | The Wilderness Rivers Region |
|---|---|---|---|
| ZONE 1 | $499 | $499 | $399 |
| ZONE 2 | $399 | $399 | $399 |
| ZONE 3 | $399 | $499 | $499 |
| ZONE 4 | $499 | $399 | $399 |
| ZONE 5 | $599 | $599 | $599 |
| ZONE 6 | $699 | $699 | $699 |

*Canadian and other international cities outside the 48 contiguous United States are not eligible for FREE airfare offers. Airfares are per person, roundtrip, capacity controlled and include taxes. One-way airfare and transfers are available in all of our turnaround ports. Contact your travel professional for information.*

Space may be limited for certain gateway cities, and availability of any gateway city may be restricted or withdrawn without notice.

Air prices are based on airfares in effect at time of printing and are subject to change. Carrier (Delta Queen Steamboat Company, Inc.) reserves the right to schedule air itineraries in accordance with cruise schedule and flight availability and to designate the air carrier, including commuter and charter service, connections, routing and schedule from each city.

Airfares may include contract, promotional, non-refundable or group fares. Penalties assessed by an airline for cancellations, rebookings or itinerary changes resulting from voluntary change made by Passenger are the responsibility of the Passenger.

Connections from certain cities to select ports may require a one-night, pre-cruise hotel stay at the Passenger's expense.

Special air requests, including first-class air, non-stop flights, extended stays and early or late flights are made subject to availability and confirmation, and are subject to additional charges. Any changes made after ticketing will result in a reissue fee.

Air arrangements made within 90 days of departure may result in additional cost and are subject to availability. Air cancellations made 90 days or less prior to departure will result in cancellation penalties. Airline tickets issued by Carrier have restrictions and cannot be exchanged for an alternate air carrier or routing. Seat assignments and special requests such as meals, wheelchairs, frequent flyer information or other flight-related matters are Passenger's responsibility and must be made directly with air carrier(s). Flight schedules are subject to change by Carrier and are confirmed upon ticketing. Guests are advised to reconfirm flights and times within 48 hours of departure. Name on airline ticket must match name on picture ID. Name changes cannot be made after ticketing.

Carrier is not responsible for any penalties, costs or losses incurred to Passengers holding air tickets not issued by its air department.

BUSINESS REPLY MAIL
First-Class Mail Permit No. 672 New Orleans, LA
POSTAGE WILL BE PAID BY ADDRESSEE

DELTA QUEEN STEAMBOAT COMPANY, INC.
Fulfillment Center
1380 Port of New Orleans Place
New Orleans, Louisiana 70130-9912

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

## Have a group of 10 or more interested in traveling together on the river?

See your travel agent or ask a vacation specialist about special group rates!

DELTA QUEEN STEAMBOAT COMPANY, INC.
*A Delaware North Company*

Robin Street Wharf
1380 Port of New Orleans Place
New Orleans, Louisiana 70130-1890

For reservations, see your Travel Agent.

For additional information, call 1.800.543.1949
FAX Number: 504.585.0630
Visit our Web site at deltaqueen.com

MK00119

*... and include taxes. One-way airfare and transfers are available in all of our turnaround ports. Contact your travel professional for information.*

Space may be limited for certain gateway cities, and availability of any gateway city may be restricted or withdrawn without notice.

Air prices are based on airfares in effect at time of printing and are subject to change. Carrier (Delta Queen Steamboat Company, Inc.) reserves the right to schedule air itineraries in accordance with cruise schedule and flight availability and to designate the air carrier, including commuter and charter service, connections, routing and schedule from each city.

Airfares may include contract, promotional, non-refundable or group fares. Penalties assessed by an airline for cancellations, rebookings or itinerary changes resulting from voluntary change made by Passenger are the responsibility of the Passenger.

Connections from certain cities to select ports may require a one-night, pre-cruise hotel stay at the Passenger's expense.

Special air requests, including first-class air, non-stop flights, extended stays and early or late flights are made subject to availability and confirmation, and are subject to additional charges. Any changes made after ticketing will result in a reissue fee.

Air arrangements made within 90 days of departure may result in additional cost and are subject to availability. Air cancellations made 90 days or less prior to departure will result in cancellation penalties. Airline tickets issued by Carrier have restrictions and cannot be exchanged for an alternate air carrier or routing. Seat assignments and special requests such as meals, wheelchairs, frequent flyer information or other flight-related matters are Passenger's responsibility and must be made directly with air carrier(s). Flight schedules are subject to change by Carrier and are confirmed upon ticketing. Guests are advised to reconfirm flights and times within 48 hours of departure. Name on airline ticket must match name on picture ID. Name changes cannot be made after ticketing.

Carrier is not responsible for any penalties, costs or losses incurred to Passengers holding air tickets not issued by its air department.

# Advance Purchase Values Book Early And Save!

Mark Twain once said, "Never put off till tomorrow, what you can do the day after tomorrow," but even he would agree that procrastination is a bad idea when it comes to booking a Steamboatin'® cruise. Book by December 31, 2004, and you can save with offers including 2-for-1 pricing, Free Airfare, Travel Allowances and other great deals on select departures (see details below). What's more, the earlier you book, the better your choice of staterooms. See pages 50-55 for the Advance Purchase discount available at the time of printing. With offers like these, space will fill up quickly, so hurry!

## 2-FOR-1 Pricing

- Book and deposit select Steamboatin' departures by December 31, 2004, and the second person goes free. Offer is capacity controlled.

## 50% Off Second Passenger Plus Free Roundtrip Airfare* For Two!

- Book and deposit select Steamboatin' departures by December 31, 2004, and receive 50% off the second passenger's cruise fare, plus Free Roundtrip Airfare for two. Offer is capacity controlled. Not all air gateways are available for Free Air offer.

## 50% Off Second Passenger!

- Book and deposit select Steamboatin' departures by December 31, 2004, and receive 50% off the second passenger's cruise fare. Offer is capacity controlled.

## Free Roundtrip Airfare* Or Travel Allowance!

- Book and deposit select Steamboatin' departures by December 31, 2004, and receive your choice of Free Roundtrip Airfare or a Travel Allowance. Offer is capacity controlled. Not all air gateways are available for Free Air offer.

## Free Roundtrip Airfare* With The New Orleans & Riverboat Adventure Week!

- Book and deposit select 2004, 2005, and 2006 New Orleans & Riverboat Adventure Week vacations by December 31, 2004, and receive Free Roundtrip Airfare. Offer is capacity controlled. Not all air gateways are available for Free Air offer.

## Kids Cruise Free With Our "Riverbonding" Adventure Program!

- Book and deposit any cruise-only "Riverbonding" Adventure in June, July, August, Thanksgiving or Christmas 2004 or 2005 on the *Mississippi Queen*® or the *American Queen*® by December 31, 2004, and one or two children under the age of 18 travel free in the same stateroom. Only certain categories of rooms qualify for triple or quadruple accommodations. For families with three or more children, buy the first room at full price and the second room of equal or lesser value is free when the applicable Advance Purchase discount is 2-for-1. Free Air offers are not included for children. On the New Orleans & Riverboat Adventure Week package, a $149-per-child fee is charged to cover meals and attractions on the land portion of the vacation.

**Please Note: All Advance Purchase offers are capacity controlled and based on availability at the time of deposit.**

- All Advance Purchase offers are capacity controlled, subject to availability and may change at any time without notice. Savings may decrease or be closed for specific stateroom categories, Cruises and/or Vacation Packages. The Advance Purchase offer applicable to each departure at the time of printing is listed in the schedules on pages 50-55. Cruises are not guaranteed to be offered at that discounted rate.
- Advance Purchase Program offers cannot be combined with each other or with any other special offer.
- The *Delta Queen*® *Kentucky Derby*® cruise and the chartered departures are excluded from early booking offers.
- All Advance Purchase Programs as well as 2005 published fares apply to 2006 reservations made by December 31, 2004.

*When Free Airfare is provided, a $50-per-person air ticketing and administrative fee will be charged.

To book a Steamboatin' Cruise Vacation see your Travel Agent, visit www.deltaqueen.com or call 800.543.1949 for more information!

Open Flap For Cruise Fares And New Orleans & Riverboat Adventure Week Rates

# 2004/2005/2006
# New Orleans & Riverboat Adventure Week Fares

**Get Free Roundtrip Airfare when you book 2004, 2005, or 2006 vacations by December 31, 2004.**

Your 7-night vacation includes your choice of a 3- or 4-night riverboat cruise plus a 3- or 4-night New Orleans experience, including accommodations at a selected New Orleans hotel • breakfast daily • two or three meals depending on length of hotel stay • choice of two selected New Orleans attractions (with 3-night hotel stay) or three selected New Orleans attractions (with 4-night hotel stay). Roundtrip transfers between Louis Armstrong International Airport, hotel, and the *American Queen*®, (city tour between vessel and hotel) are included.

| Purchase an American Queen® River Cruise: Choose a Stateroom Based on These Categories and Room Descriptions | Cruise Pricing: Cruise Fare 3 or 4 Nights | New Orleans Vacation: Your Stay in This New Orleans Hotel for 3 or 4 Nights Included FREE |
|---|---|---|
| AAA Large Outside Luxury Suites | 2004 $2595<br>2005/2006 $2900 | Windsor Court, Ritz-Carlton or equivalent hotel |
| AA Outside Superior Suites | 2004 $2395<br>2005/2006 $2680 | Windsor Court, Ritz-Carlton or equivalent hotel |
| A Outside Luxury Staterooms with Private Veranda | 2004 $2195<br>2005/2006 $2455 | New Orleans Marriott or equivalent hotel |
| B Outside Large Superior Staterooms | 2004 $2095<br>2005/2006 $2340 | InterContinental New Orleans, Fairmont, Astor Crowne Plaza, or equivalent hotel |
| C Outside Deluxe Staterooms | 2004 $1895<br>2005/2006 $2120 | InterContinental New Orleans, Fairmont, Astor Crowne Plaza, or equivalent hotel |
| D Outside Large Staterooms with Bay Windows | 2004 $1795<br>2005/2006 $2010 | InterContinental New Orleans, Fairmont, Astor Crowne Plaza, or equivalent hotel |
| E Outside Standard Staterooms | 2004 $1595<br>2005/2006 $1785 | InterContinental New Orleans, Fairmont, Astor Crowne Plaza, or equivalent hotel |
| G Inside Large Staterooms | 2004 $1295<br>2005/2006 $1450 | Courtyard by Marriott–Convention Center, SpringHill Suites by Marriott–Arts District, or equivalent hotel |
| H Inside Single Staterooms | 2004 $1195<br>2005/2006 $1335 | Courtyard by Marriott–Convention Center, SpringHill Suites by Marriott–Arts District, or equivalent hotel |
| I Inside Standard Staterooms | 2004 $995<br>2005/2006 $1110 | Courtyard by Marriott–Convention Center, SpringHill Suites by Marriott–Arts District, or equivalent hotel |

**CHOICES INCLUDED FREE WITH ALL CRUISES**

| Attractions: Choice of Two with 3-Night Hotel Stay; Choice of Three with 4-Night Hotel Stay | Dining: Breakfast Served Each Morning; Choice of Two with 3-Night Hotel Stay; Choice of Three with 4-Night Hotel Stay |
|---|---|
| Audubon Aquarium of the Americas | Arnaud's® |
| Audubon Zoo℠ | Broussard's |
| Gray Line Cemetery and Gris-Gris Walking Tour | GW Fins® |
| New Orleans Spirit Tours® Cemetery and Voodoo Tour | Dickie Brennan's Steakhouse |
| Historic New Orleans Cemetery and Voodoo Tour | Bourbon House Seafood |
| Cookin' Cajun Cooking School | Palace Café® |
| Cajun Cabin | Mr. B's Bistro |
| National D-Day Museum | Court of Two Sisters® |
| Historic New Orleans French Quarter Tour | Emeril's® |
| Gray Line French Quarter Walking Tour | Emeril's® Delmonico |
| Historic New Orleans Garden District Tour | Emeril's® NOLA |
| Gray Line Ghost and Spirit Tour | Palm Court Jazz Café |
| New Orleans Spirit Tours Ghost and Vampire Tour | Muriel's Jackson Square |
| Historic New Orleans, Haunted New Orleans | Restaurant August |
| Entergy IMAX® Theatre | Michaul's Live Cajun Music Restaurant |
| Longue Vue House & Gardens | New Orleans Grill |
| Mardi Gras World | Copeland's Cheesecake Bistro |
| Le Monde Creole Tour | Copeland's of New Orleans |
| *NATCHEZ* Harbor Cruise | Remoulade's |
| New Orleans School of Cooking® | Tujague's |
| Royal Carriage Tours | ZydeQue Bayou Barbeque |
| Southern Comfort® Cocktail Walking Tour | |
| Fritzel's European Jazz Pub | |
| The Maison Bourbon | |
| Jimmy Buffett's Margaritaville Café | |
| Preservation Hall | |
| Gray Line Crescent City Dinner Tour | |

**CHOICES INCLUDED FREE WITH ALL CRUISES**

**Note: Advance Purchase Free Airfare offer is capacity controlled.** Prices shown are per person, double occupancy. Price includes a 4-Night New Orleans/3-Night River Adventure or a 3-Night New Orleans/4-Night River Adventure. All vacation prices and fees are subject to change without notice. Offers are capacity controlled and some restrictions apply. Bookings are valid for all stateroom categories available aboard the *American Queen*. Hotel selection in New Orleans is subject to availability and is at the discretion of the Delta Queen Steamboat Company, Inc. Offers are valid for new individual bookings on departures indicated. Fares include full use of onboard amenities, all meals and entertainment aboard the *American Queen* and hotel accommodations in New Orleans, with choices of attractions and restaurant dining in New Orleans as indicated. At some restaurants, meals are only available at lunch. Delta Queen Steamboat Company, Inc. may use additional hotels in peak seasons. In 2004, the dining choices are for two restaurants for both the 3-night hotel stay and 4-night hotel stay and four attractions are offered for the 4-night hotel stay. Airfare offer is available from over 75 cities in the contiguous United States when purchased by December 31, 2004. Free Airfare is not available from Canada and other international cities. When free airfare is provided, a $50-per-person air ticketing and administrative fee will be charged. Pricing does not include hotel taxes or transportation between hotels, restaurants and attractions in New Orleans, nor beverage service, gift shop purchases, gratuities, shore excursion tickets and other personal expenses on board the steamboat. On Riverboat Adventure Week the rate is $149 per child under 18 when sharing accommodations with parents. Restaurants and attractions subject to change for Adventure Week. © 2004 Delta Queen Steamboat Company, Inc.