**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | C.A. No. 13-cv-00324-RGA |
| HMS AMERICAN QUEEN | ) | |
| STEAMBOAT COMPANY LLC, and | ) | **CONFIDENTIAL** |
| AMERICAN QUEEN STEAMBOAT | ) | **FILED UNDER SEAL** |
| OPERATING COMPANY, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

\* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT AND BRIEF IN SUPPORT OF
DEFENDANTS' CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Richard A. Barkasy (#4683)
**SCHNADER HARRISON SEGAL & LEWIS LLP**
824 N. Market Street, Suite 800
Wilmington, DE 19801
Phone:  (302) 888-4554
Fax:  (302) 888-1696
rbarkasy@schnader.com

-and-

Dennis D. Murrell (*pro hac vice*)
Brian P. McGraw (*pro hac vice*)
**MIDDLETON REUTLINGER**
401 S. 4th Street, Suite 2600
Louisville, Kentucky 40202
Phone: (502) 584-1135
Fax: (502) 561-0442
dmurrell@middletonlaw.com
bmcgraw@middletonlaw.com

*Attorneys for Defendants*
**January 25, 2017**

## TABLE OF CONTENTS

I.    NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

II.   SUMMARY OF ARGUMENT ........................................................................ 2

III.  COUNTERSTATEMENT OF FACTS ............................................................... 4

      A.   The Parties ............................................................................................. 4

      B.   HMS's Acquisition of the *American Queen* and All Related
           Trademarks ............................................................................................ 6

      C.   HMS's Use of *Great American Steamboat Company* as the
           Operating Company Name ..................................................................... 7

      D.   HMS's Dispute with ACL Over the Use of Great American
           Steamboat and the First Litigation Between the Parties ....................... 9

      E.   Settlement of the First Action ............................................................. 11

      F.   HMS Complies with the Settlement Agreement .................................. 13

      G.   ACL Files this Lawsuit over HMS's Alleged Use of *Great
           American* and Later Objects to the Use of *American Queen* and
           *American Queen Steamboat Company* .............................................. 15

      H.   Many of the Facts Set Forth as "Undisputed" in ACL's Opening
           Brief are in Dispute ............................................................................ 17

IV.   ARGUMENT ............................................................................................. 27

      A.   ACL CANNOT ESTABLISH ITS CLAIMS FOR TRADEMARK
           INFRINGEMENT AND SUMMARY JUDGMENT SHOULD ENTER IN
           FAVOR OF HMS ...................................................................................... 27

           1.   ACL's Infringement Claim Based on HMS's Use of the
                Name *American Queen Steamboat Company* is Barred by the
                Acquiescence and/or Equitable Estoppel Defense ........................ 27

           2.   HMS Has Priority as to the term "American" as Against ACL
                ....................................................................................................... 31

           3.   There is a Material Fact Dispute as to Whether There is a
                Likelihood of Confusion Based on HMS's Use of *American
                Queen Steamboat Company* ......................................................... 32

                a.   *American Cruise Lines* is not a strong mark ...................... 33

i

b. *American Cruise Lines* and *American Queen Steamboat Company* are not confusingly similar .................................... 36

c.  There is no evidence of actual confusion based on HMS's Use of *American Queen Steamboat Company* or its bidding on *American Cruise Lines* as a paid search term ................................................................................. 37

i.  There is no evidence that the documented instances of confusion can be attributed to HMS's use of *American Queen Steamboat Company* .................................................................................. 37

ii.  Mr. Poret's survey does not demonstrate actionable confusion related to HMS's use of *American Queen Steamboat Company* .......................................... 38

iii.  There is no evidence of actual confusion stemming from HMS's paid search advertising ...................................................................... 39

d.  There is no evidence that HMS is intending to infringe or harm ACL ................................................................ 41

B.     ACL CANNOT ESTABLISH BREACH OF CONTACT AND SUMMARY JUDGMENT SHOULD ENTER IN FAVOR OF HMS ........................................ 43

1.  Elements of Breach of Contract Under Delaware Law ................................. 43

2.  ACL Breached the Settlement Agreement Prior to HMS ................................... 44

3.  The Settlement Agreement Did Not Require the Transfer of Domain Names ......................................................................................... 45

4.  HMS's Recent Use of *Great American* as a Paid Search Term is Not a Material Breach of the Settlement Agreement ........................................ 47

5.  There is No Evidence that ACL Has Suffered any Damages or Harm as Result of the Alleged Breach ............................................. 48

V.     CONCLUSION ................................................................................................. 50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1-800 Contacts, Inc. v. Lens.Com, Inc.*
722 F.3d 1229 (10th Cir. 2013) ............................................................................40-41

*815 Tonawanda Street Corp. v. Fay's Drug Co.*
842 F.2d 643 (2d Cir. 1988)......................................................................................33

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*
967 F.2d 852 (3d Cir. 1992)......................................................................................32

*A.J. Canfield Co. v. Honickman.*
808 F.2d 291 (3d Cir. 1986)......................................................................................34

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*
616 F.2d 440 (9th Cir. 1980)......................................................................................34

*Armstrong Cork Co. v. World Carpets, Inc.*
597 F.2d 496 (5th Cir. 1979)......................................................................................35

*Biolife Solutions, Inc. v. Endocare, Inc.,*
838 A.2d 268 (Del. Ch. 2003)....................................................................................43

*CareFirst of Maryland, Inc. v. First Care, P.C.,*
434 F.3d 263 (4th Cir. 2006)......................................................................................41

*Carey v. Estate of Myers,*
2015 Del. Super. LEXIS 325, 2015 WL 4087056 (Del. Super. Ct. July 1, 2015) ...............43-44

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,*
433 F.2d 686 (2d Cir. 1970)......................................................................................28

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.,*
350 F. Supp. 2d 582 (D. Del. 2004). ..........................................................................48

*Citizens In. Grp. v. Citizens Nat'l Bank of Evans City,*
383 F.3d 110 (3d Cir. 2004)......................................................................................35

*Citizens Nat'l Bank of Meridian v. Citizens Bank of Philadelphia Miss.*
35 Fed. Appx. 391 (5th Cir. 2002)..............................................................................38

*Cuban Cigar Brands N.V v. Upmann Int'l Inc.*
457 F. Supp. 1090 (S.D.N.Y. 1978)............................................................................33

*Dieter v. B&H Industries of Southwest Fl., Inc.*
880 F.2d 322 (11th Cir. 1989) ...................................................................................34

*Downing v. Abercrombie & Fitch*
265 F.3d 994 (9th Cir. 2001)......................................................................................32

*Dranoff-Perlstein Assoc. v. Sklar*
967 F.2d 852 (3d Cir. 1992)......................................................................................32

*Elvis Presley Enterprises Inc. v. Capece*
141 F.3d 188 (5th Cir. 1998)......................................................................................28

*Facenda v. N.F.L. Films, Inc*,
542 F.3d 1007, 1024 (3d Cir. Pa. 2008) ........................................................................32

*First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc*.,
896 F. Supp. 456 (E.D. Pa. 1995) ............................................................................33, 38

*Goldfaden v. Miss World (Jersey) Ltd.*,
No. Civ. A. 02-712, 2005 U.S. Dist. LEXIS 49543 (D.N.J. July 18, 2005) ................32

*H.G. Shopping Centers, L.P. v. Birney*,
59 U.S.P.Q.2d 1109, 2000 WL 33538621 (S.D. Tex. Nov. 29, 2000).........................28

*Henri's Food Prods. Co., Inc. v. Kraft, Inc.*,
717 F.2d 352 (7th Cir. 1993)........................................................................................41

*Inteam Assocs., LLC v. Heartland Payment Sys.*,
2016 Del. Ch. LEXIS 151 (Del. Ch. Sept. 30, 2016) ...................................................45

*Interpace Corp. v. Lapp, Inc.*,
721 F.2d 460 (3d Cir. 1983)..........................................................................................27

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*,
931 F.2d 1519 (11th Cir. 1991) ....................................................................................34

*Kinbook, LLC v. Microsoft Corp.*,
866 F. Supp. 2d 453 (E.D. Pa. 2012)......................................................................35, 38

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
725 F.2d 1240 (9th Cir. 1984) ......................................................................................42

*Lydon Millwright Services, Inc. v. Ernest Bock & Sons, Inc.*,
2013 WL 1890355 (E.D. Penn. May 7, 2013) ..............................................................30

*Matthew v. Laudamiel*,
2012 Del. Ch. LEXIS 145, 2012 WL 2580572 (Del. Ch. June 29, 2012) ...................43

*National Fire & Marine Ins. Co. v. Robin James Const., Inc.*,
478 F. Supp. 2d 660 (D. Del. 2007).............................................................................43

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ......................................................................................42

*Norfolk Southern Ry. Co. v. Basell USA, Inc.*,
512 F.3d 86 (3d Cir. 2008)............................................................................................43

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*,
143 F.3d 800 (3d Cir. 1998)..........................................................................................28

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*,
520 F.3d 109 (2d Cir. 2008)..........................................................................................30

*Sabinsa Corp. v. Creative Compounds*,
609 F.3d 175 (3d Cir. 2010)..........................................................................................34

*Universal Money Ctrs. Inc. v. American Tel. & Tel. Co*,
22 F. 3d 1527 (10th Cir. 1994) .....................................................................................41

*Washington Speakers Bureau, Inc. v. Leading Authorities, Inc*,
49 F. Supp. 2d 496 (E.D.Va. 1999). .............................................................................45

iv

**Statutes**

15 U.S.C. § 1065.................................................................................33
15 U.S.C. § 1115.................................................................................27
15 U.S.C. § 1117.................................................................................49

**Treatises**

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION

§ 23:48 (2001.................................................................................34
§ 31.41 (2015)................................................................................28
§ 31:42 (2008)................................................................................30

Defendants, HMS American Queen Steamboat Company, LLC and American Queen Steamboat Operating Company, LLC (collectively "HMS"), by counsel, hereby submit the following answering brief in support of their opposition to the motion [D.I. 172] for partial summary judgment on Counts I, II, V, VII, and VIII of the Fourth Amended Complaint filed by Plaintiff, American Cruise Lines, Inc. ("ACL") and corresponding cross-motion for partial summary judgment as to those claims.

## I.    NATURE AND STAGE OF PROCEEDINGS

ACL has moved for partial summary judgment on (1) its claim that HMS engaged in trademark infringement and unfair competition through its use of the name *American Queen Steamboat Company* (*see* Counts II, V, VII, and VIII of the Fourth Amended Complaint [D.I. 129]);[1] and (2) its claim that HMS breached the 2012 settlement agreement between the parties through its continued ownership of a domain name incorporating the term *Great American* and recent use of *Great American* as an paid search term (*see* Count I of D.I. 129). HMS now seeks summary judgment on these claims (including Count IV of D.I. 129) to the extent ACL objects to HMS's use of the terms *American Queen* or *American Queen Steamboat Company* and to the extent ACL claims that the 2012 Settlement Agreement has been breached.

HMS previously moved for partial summary judgment [D.I. 170] on its own claim for trademark infringement and unfair competition based on HMS's priority ownership of the *American Queen* marks and ACL's subsequent use of the names *American Eagle*, *American Pride*, *America* and *American* as the leading term as vessel names and marks in direct competition with

---

[1] ACL does not seek summary judgment on Count IV of D.I. 129, which alleges common law infringement based on HMS's use of the name *American Queen Steamboat Company* and ACL's ownership of common law marks incorporating the term *American* or *America*. As set forth herein, HMS cross moves for summary judgment on all claims asserted by ACL based on HMS's use of the names and marks *American Queen* and *American Queen Steamboat Company*.

HMS (Counts II, III, IV, V, and VI of HMS's Answer and Counterclaim to the Fourth Amended Complaint [D.I. 132]); as well as on ACL's claim for cybersquatting (Count VI of D.I. 129) and on ACL's trademark abandonment defense.

## II.    SUMMARY OF ARGUMENT

ACL seeks to rewrite history by ignoring the longstanding, successful operation of the *American Queen* vessel by HMS's predecessors and HMS's subsequent acquisition and operation of the famous vessel – including the lawful acquisition of all rights in and to the *American Queen* trademarks.  There is great value in and to the *American Queen* marks and HMS started its business to capitalize on that value – not to somehow try and trade off ACL as it would have the Court believe.  HMS's entire business model and company, and now vessel naming convention, stems from its iconic flagship vessel – adopting a theme which evolved from the singular name *American Queen*, to *American Queen Steamboat Company* and later with the addition of other female royalty vessels such as *American Empress*.  HMS's success has nothing to do with ACL, and everything to do with its famous vessel and the high quality service associated with HMS.

ACL seeks to rewrite the history between the parties –  ignoring the fact that <u>it gave HMS express permission to use the name *American Queen Steamboat Company*</u> back in 2011 and then again in 2012.  ACL gave HMS permission to use that name and then waited years to renege on the permission it gave, sue HMS, sue HMS and, in turn, seek hundreds of millions of dollars in damages for which it unequivocally should not be entitled to recover.  Because ACL gave HMS express permission to use the *American Queen Steamboat Company* name and because HMS relied upon that permission to spend millions in developing and marketing its brand, ACL is barred by the equitable defenses of acquiescence and estoppel from arguing that HMS has engaged in trademark infringement or unfair competition based on that term.  In any event, by virtue of its

rights to the incontestable and presumed valid *American Queen* marks, HMS has priority as against ACL to the term "American" in the cruise industry. HMS's priority claim further precludes ACL from arguing that HMS's use of *American Queen Steamboat Company* constitutes trademark infringement or unfair competition. All HMS did was add the generic terms "Steamboat Company" to its already iconic *American Queen* name. For these reasons, summary judgment should be entered in favor of HMS on ACL's infringement and unfair competition claims based on HMS's use of *American Queen Steamboat Company*.

Even if ACL were to somehow overcome the fact that it gave HMS permission to use the name *American Queen Steamboat Company* and the fact that HMS owns priority rights to "American," there is a still a material question of fact as to the application of the likelihood of confusion factors to this case. HMS disputes many of the facts asserted by ACL as being "undisputed" – especially those facts relevant to the alleged strength of the *American Cruise Lines* mark, the similarities between *American Cruise Lines* and *American Queen Steamboat Company*, the evidence of actual confusion, and the intent of HMS in selecting the name *American Queen Steamboat Company*. Because of this material fact dispute, summary judgment cannot be granted in favor of ACL.

Finally, ACL seeks to rewrite the settlement agreement entered between the parties in 2012. When the parties entered that agreement, it was contemplated that HMS would cease all use of the term *Great American* in any fashion within the time frame set forth in the agreement. That is what the agreement says, what HMS agreed to, and what HMS did. HMS ceased all use of the term *Great American*, including as part of its domain names, when it was required to do so under the agreement. That should be the end of the story. However, ACL seeks to change the agreement to include a term whereby HMS agreed to transfer its domain names to ACL following the expiration

of the settlement deadline.  HMS was not required to transfer domain names as an express or implied term of the agreement – it was only required to stop using any domain names that incorporated the term *Great American*.  Nonetheless, ACL's breach of contract claim cannot possibly succeed since ACL breached the agreement well before HMS and failed to prove that it suffered any damages as a result of the alleged breach by HMS.  For these reasons, summary judgment should enter in favor of HMS on ACL's claim for breach of contract.

## III.    COUNTERSTATEMENT OF FACTS

A detailed statement of facts is further set forth in HMS's opening brief in support of its motion for partial summary judgment [D.I. 171, pp. 5-19].  HMS incorporates those facts by reference herein and further provides this additional counterstatement of facts.

### A.  The Parties

HMS is in the business of providing overnight, passenger cruising and excursions aboard riverboats in, primarily, the Mississippi and Ohio Rivers, as well as the Columbia and Snake Rivers.  HMS owns the luxury paddlewheel vessels named the *American Queen* (426 passenger capacity) and the *American Empress* (223 passenger capacity) – which are operated by the Defendant, American Queen Steamboat Operating Company (d/b/a *American Queen Steamboat Company*) as the licensed operating entity owned by HMS.  *See* Ex. 1 to HMS's Opening Brief in Support of its Motion for Partial Summary Judgment ["D.I. 171"], pp. 3-4, 10, 22.  The *American Queen* operates along the Mississippi and Ohio Rivers while the *American Empress* operates along the Columbia and Snake Rivers.  *Id*., pp. 17, 24.[2]

---

[2] A detailed history of the *American Queen* vessel is set forth in D.I. 171, pp. 5-10.



*Image of the American Queen[3]*



*Image of the American Empress[4]*

ACL is also in the business of providing overnight, passenger cruising on "small luxury cruise ships" throughout the United States – including along the Mississippi, Ohio, Columbia and Snake Rivers.  ACL is the primary competitor of HMS.  ACL currently operates the vessels named *America* and *Queen of the Mississippi* along the Mississippi River (and operated the *American Eagle* on the Mississippi in 2015) and operates the vessel named *American Pride* along the Columbia and Snake Rivers and up to Alaska (it previously operated the *Queen of the West* vessel in the Columbia/Snake River market).  *See* Ex. 37 to HMS's Opening Brief; *see also* Deposition of Charles B. Robertson, 7/13/16 ("C.B. Robertson Depo. #2"), pp. 47-50.[5]  ACL also operates the vessels named *American Spirit*, *American Star*, *American Glory*, and *Independence*, which operate

---

[3] Image of the *American Queen* taken from the 2016 HMS brochure (HMS 100517-100592).
[4] Image of the *American Empress* taken from the 2017 HMS brochure (HMS 100593-100668).
[5] Cited portions of Mr. Robertson's deposition are attached as **Exhibit 1**.

through itineraries primarily on the coast of Maine, the New England Islands, the Hudson River, the Chesapeake Bay, and the rivers of Florida and South Carolina. *Id.*[6] ACL opened its doors and began marketing its cruises in 1999 – though its first cruise wasn't until 2000. *Id.*; *see also* C.B. Robertson Depo. #2, pp. 121-122.



*Image of ACL's Paddle Wheel Vessels*[7]



*American Star*



*American Spirit*



*Independence*



*American Glory*

*Images of ACL's Coastal Vessels*[8]

**B. HMS's Acquisition of the *American Queen* and All Related Trademarks**

The *American Queen* began operating on the Mississippi River in 1995 under the Delta Queen Steamboat Company ("Delta Queen"). *See* Deposition of Rick Simonson ("Simonson Depo."), p. 98.[9]  In 2006, the *American Queen* was sold to Ambassadors International, Inc.

---

[6] ACL's vessels are significantly smaller than the *American Queen* and *American Empress*. ACL's coastal vessels average a capacity of about 50 passengers as compared to the *American Queen* having the capacity for 436 passengers and the *American Empress* the capacity for 223 passengers. Even the *Queen of the Mississippi* and *Queen of the West* had a passenger capacity of under 150 passengers. *See* ACL 6278, attached as **Exhibit 2**.
[7] Image of various ACL paddle wheelers taken from document bates labeled ACL 20154.
[8] Images taken from Ex. 2, hereto.
[9] Cited portions of Mr. Simonson's deposition are attached as **Exhibit 3**.

("Ambassadors") and Ambassadors, in turn, operated the vessel in the Mississippi River market during the 2007 and 2008 sailing seasons. *Id.*, p. 123. Ambassadors surrendered the *American Queen* to the U.S. Government following the 2008 sailing season. *See* Deposition of Diane Moore, 2/11/14 ("Diane Moore Depo."). pp. 55-56, 92.[10] Soon thereafter, the vessel was acquired by the U.S. Maritime Administration ("MARAD"). *See* D.I. 171, pp. 10-11. By December, 2010, the *American Queen* was acquired by HMS from MARAD by agreement – though the closing on the vessel did not take place until August of 2011.[11]

Back in 1993 Delta Queen applied for, and in 1996 obtained, U.S. trademark registrations with the U.S. Patent & Trademark Office ("PTO") for the *American Queen* marks covering a variety of goods and services. *See* HMS Opening Brief, pp. 6-7. Those registrations were maintained by Delta Queen and then transferred to Ambassadors in April, 2006. *See* Ex. 2 to HMS's Opening Brief (chain of title documents). In February, 2011, a little less than two months after the agreement was entered for the sale of the *American Queen*, HMS acquired from Ambassadors all trademark rights to the *American Queen* marks, still in the name of Ambassadors in the PTO, for payment of $15,000 – though the common law rights had likely already transferred to HMS through its acquisition of the *American Queen* vessel. *See* Exs. 25 and 2 to D.I 171.

**C. HMS's Use of *Great American Steamboat Company* as the Operating Company Name**

In anticipation of purchasing the *American Queen* and needing an operating entity for the vessel, HMS formed a Delaware limited liability company under the name *Great American Steamboat Company* on June 8, 2010.[12] The *Great American Steamboat Company* name was

---

[10] Cited portions of Ms. Moore's deposition are attached as **Exhibit 4**.

[11] *See* Exs. 21 and 22 to D.I. 191.

[12] *See* Ex. 39 and Ex. 1 to D.I. 171.

proposed by former owner and President of HMS, Christopher Kyte, who had registered a business entity in that name in Louisiana in 2010 with the intention of operating a riverboat. *See* Deposition of Christopher Kyte ("Kyte Depo."), p. 36.[13] Shortly after deciding to move forward with the name, in July, 2010, Mr. Kyte began registering domain names, including the domain name greatamericansteamboatcompany.com ("GASC.com").[14] By December, 2010, the *Great American Steamboat Company* name appeared on the "splash" website for the return of the *American Queen* – located at GASC.com. *See* Ex. 29 to D.I 171. By February, 2011, it was becoming known in the cruise industry that the *Great American Steamboat Company* was going to be re-launching the *American Queen*. *See e.g.,* Ex. 41 to D.I. 171.[15] By May, 2011, HMS was sending out email advertisements touting the return of the *American Queen*. *See* Ex. 28 to HMS's Opening Brief. On May 2, 2011, HMS filed a trademark application with the PTO to register the term *Great American Steamboat Company*.[16]

While HMS had moved forward with its plan to use the operating name *Great American Steamboat Company*, it had previously engaged in some activities using the name *American Queen Steamboat Company*. In fact, HMS's CEO, John Waggoner, had informally referred to the potential company as *American Queen Steamboat Company* prior to the acquisition of the vessel and prior to the involvement of Christopher Kyte and the original *Great American Steamboat Company* entity. *See* Deposition of John Waggoner, 6/10/14 ("Waggoner Depo."), pp. 105-106.[17] For example, one of the early investment documents issued to potential investors in December,

---

[13] Cited portions of Mr. Kyte's deposition are attached hereto as **Exhibit 5**.

[14] Mr. Kyte eventually transferred all of those domain names to HMS. Kyte Depo., pp. 35-36; *see also* HMS 2538-2544, attached as **Exhibit 6**.

[15] *See also* February 26, 2011 article, attached as **Exhibit 7**.

[16] TESS record for the *Great American Steamboat Company* application is attached as **Exhibit 8**.

[17] Cited portions of Mr. Waggoner's deposition are attached as **Exhibit 9**.

2010 referred to the company as *American Queen Steamboat Company*.[18] There had even been some discussions internally about *American Queen Steamboat Company* being the name of the operating entity instead of *Great American Steamboat Company*.[19] With that in mind, around the same time that HMS filed its trademark application for *Great American Steamboat Company*, it filed an application with the PTO to register the mark *American Queen Steamboat Company*.[20] That application was filed on April 26, 2011 (and eventually went on to registration).

### D. HMS's Dispute with ACL Over the Use of *Great American Steamboat* and the First Litigation Between the Parties

By at least February 26, 2011, ACL learned that the *Great American Steamboat Company* was going to be operating the *American Queen* on the Mississippi River starting in 2012. *See* Ex. 41 to HMS's Opening Brief; *see also* Deposition of Charles B. Robertson, 2/10/15 ("C.B. Robertson Depo."), p. 23.[21] Only days later, starting on March 1, 2011, ACL began filing multiple intent to use trademark applications for a variety of terms including: *Great American Steamboat Cruise*, *Great American Steamboat Company*, *Mississippi Riverboat Company*, *Mississippi Steamboat Company*, *Great American River Lines*, *American River Lines*, *American Steamboat Company*, and *Great American River Cruises*.[22]

After learning of ACL's attempted registration of the marks *Great American Steamboat Company* and *Great American Steamboat Cruise*, HMS sent ACL a cease and desist letter on May 9, 2011.[23] In this letter, HMS objected to ACL's pending trademark applications for *Great*

---

[18] *See* Ex. 3 to HMS's Opening Brief; *see also* article from April, 2011, attached as **Exhibit 10**.
[19] *See e.g.*, May, 2011 email chain, attached as **Exhibit 11**.
[20] *See* Certificate of Registration, attached as **Exhibit 12**.
[21] Cited portions of Mr. Robertson's deposition are attached as **Exhibit 13**.
[22] *See* Deposition of Mark Harrison ("Harrison Depo."), pp. 33-38, 41, 44-46, 48-49, 52-53, and 59-60. Cited portions of Mr. Harrison's deposition are attached as **Exhibit 14**. Mr. Harrison is trademark counsel for ACL who filed the above referenced trademark applications; *see also* TESS records, attached as **Exhibit 15**.
[23] *See* May 9, 2011 letter, attached as **Exhibit 16**.

*American Steamboat Cruise* and *Great American Steamboat Company* and to any use by ACL of those terms. ACL responded on May 11, 2011, and first acknowledged HMS's pending application for *American Queen Steamboat Company*.[24] *Id.* ACL claimed that HMS had never actually used the term *Great American* and objected to any future use by HMS of that term. *Id.* ACL demanded that HMS cease all use and abandon any pending trademark applications for *Great American Steamboat Company* and *American Queen Steamboat Company*. In exchange, according to ACL, it would not object to HMS's continued ownership and use of the *American Queen* marks. *Id.* ACL further argued that it had exclusive rights to the term "American" and that no one else could use that term in the cruise industry. *Id.* HMS replied to ACL on May 20, 2011, and denied that ACL had exclusive rights to the term "American" – a term that is geographically descriptive and has been rampantly used in the cruise industry for years.[25] HMS further continued its objections to ACL's use of the *Great American* marks. *Id.* Finally, in a reply letter dated August 18, 2011, ACL maintained its objection to HMS's use of the name *Great American Steamboat Company*.[26] In that letter, ACL proposed as follows:

> In that spirit, we propose the following: Your client will terminate its use of THE GREAT AMERICAN STEAMBOAT COMPANY and withdraw its pending trademark application for that mark. My client will refrain from objecting to your client's use and registration of the name and mark THE AMERICAN QUEEN STEAMBOAT COMPANY by your client.

*See* Ex. 18.

Ultimately, HMS did not change the name of its company and continued to use the name *Great American Steamboat Company*. As a result, ACL filed a lawsuit against HMS in the U.S. District Court for the District of Delaware alleging trademark infringement (the "First Action").

---

[24] *See* May 11, 2011 letter, attached as **Exhibit 17**.
[25] See May 20, 2011 letter, attached as **Exhibit 18**.
[26] *See* August 18, 2011 letter, attached as **Exhibit 19**.

In its complaint, ACL claimed that HMS's use and attempted registration of the *Great American Steamboat Company* mark infringed upon its alleged prior rights to the mark *Great American Steamboat Cruise* and/or related use of the term *Great American*. The complaint in the First Action was filed on September 30, 2011. There were no claims asserted in the First Action with respect to HMS's use of the *American Queen* marks or its pending trademark application for *American Queen Steamboat Company*.

### E. Settlement of the First Action

After the litigation was initiated, the parties engaged in informal settlement discussions and, on December 15, 2011, conducted a settlement meeting in Baltimore. During this meeting, which was attended by John Waggoner and Bob Herre on behalf of HMS and Charles Robertson and Mark Harrison on behalf of ACL, the parties discussed terms of a possible settlement. The parties contemplated that either party could pay the other in exchange for an agreement to cease use of the *Great American* marks and allow the other to claim rights. *See* Deposition of Bob Herre ("Herre Depo."), pp. 64-67, 72.[27] Further, during this meeting Mr. Robertson indicated to Mr. Waggoner that ACL would not object to HMS's use of the name *American Queen Steamboat Company* should HMS be willing to change its name. Herre Depo., pp. 71-72; Waggoner Depo., p. 182. The parties continued to discuss settlement terms with each side proposing terms and Mr. Herre acting as a scribe to document the parties' respective proposals. Herre Depo., pp. 71-72.

Soon after the meeting, Mr. Herre forwarded to ACL a proposed settlement agreement that reflected the principle discussion of the parties at the December 15, 2011 meeting.[28] The proposal gave ACL the option of either surrendering its rights to the *Great American* marks or HMS

---

[27] Cited portions of Mr. Herre's deposition are attached as **Exhibit 20**.
[28] *See* email chain, attached as **Exhibit 21**.

surrendering its rights to the *Great American* marks in exchange for a monetary payment from the other. *See* <u>Ex. 20</u>. ACL selected "Option B" whereby it would pay $125,000 to HMS in exchange for HMS surrendering its rights to the *Great American* marks. The settlement agreement specifically sets forth as follows:



*See* Settlement Agreement, <u>Ex. 46</u> to D.I. 171. The essence of the agreement was that HMS would cease using the phrase and mark *Great American Steamboat Company*" (and anything confusingly similar thereto) and transition to a new business name and/or brand – in exchange for a monetary payment. The final deadline for HMS to complete the transition to a new name under the Settlement Agreement was November 5, 2012. In turn, ACL agreed that it would not use the term

*Great American* in any fashion for one year following the effective date of the agreement (February 9, 2012 through February 9, 2013).

### F.  HMS Complies with the Settlement Agreement

In compliance with the Settlement Agreement, HMS filed an express abandonment of its *Great American Steamboat Company* trademark application on March 2, 2012 and formally changed the name of the operating company to *American Queen Steamboat Operating Company* (*d/b/a American Queen Steamboat Company*) on March 7, 2012.[29] HMS then took steps to effectuate the transition to its new name, *American Queen Steamboat Company*.  On June 20, 2012, HMS issued a press release announcing the name change.[30] By June 22, 2012, the website had been rebranded to *American Queen Steamboat Company*.[31] It was around this time that HMS's print marketing materials started using *American Queen Steamboat Company* as opposed to *Great American Steamboat Company*. Waggoner Depo., pp. 116-117.[32]  On July 6, 2012, HMS eliminated all use of *Great American* on social media, including primarily on Facebook. *See* TMR Depo., pp. 48-49, 54-56.  On July 18, 2012, all references to the term *Great American* were removed from HMS's website and the website was moved to the domain name americanqueensteamboatcompany.com ("AQSC.com").  *See* TMR Depo., pp. 49-50.[33]  HMS continued to use the GASC.com website as a mirror site so that consumers searching for the GASC.com domain name would be redirected to the AQSC.com website.  TMR Depo., pp. 53-54.

---

[29] *See* Notice of Abandonment, attached as **Exhibit 22**; *see* Name Change, attached as **Exhibit 23**.
[30] *See* June 20, 2012 Press Release, attached as **Exhibit 24**.
[31] *See* Deposition of Travel Marketing Resources, 2/12/14 ("TMR Depo.") (cited portions attached as **Exhibit 25**), *see also* Email of 6/22/12, attached as **Exhibit 26**.
[32] *See also* Email of 6/20/12, attached as **Exhibit 27**.
[33] *See also*, Email of 7/18/12, attached as **Exhibit 28**.

By the end of July, HMS had effectively rebranded to *American Queen Steamboat Company*. TMR Depo. pp. 77-78.

Despite these efforts, ACL contacted HMS in October, 2012, concerned about what it perceived to be lingering use of *Great American* in some form.[34] ACL complained that ACL was still maintaining the GASC.com domain name, that the term *Great American* still appeared in the source code of the HMS website, and that 411-directory assistance in Memphis was still directing callers searching for *Great American Steamboat Company* to HMS. *Id*. The parties thereafter engaged in dialogue in order to address these issues – with HMS committing to resolve the situation prior to the settlement deadline. *See* Ex. 47 to D.I. 171. During these conversations, ACL demanded that HMS transfer to it the GASC.com domain name – arguing that those domain names should be transferred pursuant to the Settlement Agreement. *Id*. HMS refused to transfer the domain names since the transfer of domain names was not an express provision of the Settlement Agreement and such a transfer was never discussed or contemplated during the settlement negotiations. *See* Deposition of Tim Rubacky ("Rubacky Depo."), pp. 139-141;[35] Herre Depo., pp. 56-57, 73; and C.B. Robertson Depo., p. 39. ACL never once during these discussions raised objections to HMS's use of the *American Queen Steamboat Company* name, which had at least been of public record since June 20, 2012 (though ACL admitted knowledge of that name and the pending trademark application back as early as May, 2011). Nor did ACL raise any objections to HMS's use of the *American Queen* marks. *See* Ex. 47 to D.I. 171.

By November 5, 2012, HMS removed all references to the term *Great American* in any website links, website redirects, meta-data, text, alt tags, and source code. TMR Depo., p. 78.[36]

---

[34] *See* Oct. 26, 2012 letter included as part of Ex. 47 to D.I. 171.
[35] Cited portions of Mr. Rubacky's deposition are attached as **Exhibit 29**.
[36] *See* 11/5/12 email chain, attached as **Exhibit 30**.

14

HMS also deactivated the GASC.com domain name and it has remained deactivated ever since – no longer resolving to an active website. *Id*. HMS ceased all use of *Great American* as a paid search term. *Id*. HMS even went as far as employing a "negative keyword" for the term *Great American* so that consumers searching for that term on the Internet would not be directed to any links to HMS's website. TMR Depo., p. 58.[37] By November, 2012, HMS had also removed all references to *Great American* on collateral items on the *American Queen* – such as napkins, pens, glasses, and shirts. Waggoner Depo., pp. 114-115. HMS's then head of marketing contacted Memphis 411 and informed it of the company's name change and instructed it not to direct callers searching for *Great American Steamboat Company* to HMS.[38] HMS maintained its refusal to hand over the GASC.com domain name to ACL. By the settlement deadline, HMS had ceased all use of the term *Great American* and completely rebranded to *American Queen Steamboat Company*.[39]

### G. ACL Files this Lawsuit over the Use of *Great American* and Later Objects to the Use of *American Queen* and *American Queen Steamboat Company*

Not content with the actions of HMS to comply with the Settlement Agreement, ACL filed the present case on February 26, 2013. *See* D.I. 1. ACL asserted claims against HMS for (a) breach of the settlement agreement (based on HMS's continued ownership of the GASC.com domain name and based on 411 in Memphis continuing to direct calls to HMS) (Count I); (b) unregistered trademark infringement and unfair competition under §1125(a) of the Lanham Act (based on the continued ownership of the GASC.com domain name and alleged use of *Great American* by HMS after the settlement deadline) (Count II); cybersquatting under §1125(d) of the Lanham Act (based on the continued ownership and refusal to transfer the GASC.com domain

---

[37] *See* 11/6/12 email chain, attached as **Exhibit 31**.
[38] *See* document HMS 4, attached as **Exhibit 32**.
[39] *See* Ex. 1 to D.I. 171, p. 30; Waggoner Depo., pp. 120-121; Rubacky Depo., pp. 142-143; TMR Depo., p. 58; *see also* Email of 3/25/13, attached as **Exhibit 33.**

name) (Count III); violation of the Delaware Uniform Deceptive Trade Practices Act (based on all of the above referenced actions of HMS related to *Great American*) (Count IV); and violation of the Delaware common law of unfair competition (also based solely on HMS's actions with respect to the term *Great American*) (Count V).  *See* D.I. 1.

ACL filed an Amended Complaint on June 10, 2013.  *See* D.I. 22. The Amended Complaint contained the same *Great American* allegations as the original Complaint but added a claim for unregistered trademark infringement and unfair competition under §1125(a) of the Lanham Act based on HMS's proposed use of the name *American Empress* for its vessel operating in the Columbia/Snake River market (Count II).  *See* D.I. 22.  Then again, on July 29, 2013, over two years after learning of HMS's use and/or registration of *American Queen* and *American Queen Steamboat Company*, ACL filed a Second Amended Complaint keeping the claims from the first two complaints and adding a claim for unregistered trademark infringement and unfair competition under §1125(a) of the Lanham Act based on HMS's use of the *American Queen* marks and the company name *American Queen Steamboat Company* (Count II).  *See* D.I. 29.  ACL further added allegations related to its defense that HMS, or its predecessors, abandoned the trademark rights to the *American Queen* marks.  *Id.*

On December 2, 2015, ACL amended its complaint a fourth time, again keeping its previous claim but this time asserting a claim for <u>registered</u> trademark infringement under § 1114 of the Lanham Act (related to HMS use of the various "American" names and marks) (Counts III and IV) and registered and unregistered trademark infringement based on HMS's paid search internet advertising (related to HMS' alleged use of terms such as *Queen of the Mississippi*, *Queen of the West*, and *Mississippi Queen* as paid search terms) (Counts III and IV).  *See* D.I. 108.

Finally, ACL amended its complaint a fifth time on February 26, 2016.  *See* D.I. 129.  ACL added facts related to the alleged prior use of the term "American" by another entity to which ACL for the first time claimed to have a legal relationship.  *See* D.I. 129, ¶¶ 1, 28-31.  ACL amended all of its other claims in some fashion.  The breach of contract claim was amended to assert, for the first time, that HMS's use of *American Queen Steamboat Company* violated the settlement agreement (Count I); the registered and unregistered "American" trademark claims were amended to focus more on HMS's use of the company name *American Queen Steamboat Company* – though the other claims remained (Count II); ACL added a claim for trademark infringement based on HMS's use of the term "American Cruise Lines" in its paid search program (Count II); and ACL added a claim for infringement of the alleged mark American Steamboat Company (Count IV).

### H. Many of the Facts Set Forth as "Undisputed" in ACL's Opening Brief are in Dispute

ACL begins the statement of facts section in its opening brief (pp. 2-24) by stating that "[t]he following facts are <u>not</u> undisputed."  *See* ACL Brief, p. 2 (emphasis added).  We can assume that ACL meant to state that the facts are not in dispute but the misstatement here is telling.  That is, many of ACL's alleged "undisputed" facts are in dispute, or are nothing more than legal arguments masked as facts.  The egregiousness of ACL's misstatement in this regard is illustrated by the following chart outlining the disputed facts which ACL claims are "undisputed."

| ALLEGED UNDISPUTED FACT | COUNTERVAILING EVIDENCE |
|---|---|
| **BRANDING/OWNERSHIP FACTS** ||
| ACL began emphasizing the term "American" "long before" AQSC. ACL Brief, p. 3. | HMS owns presumptively valid, incontestable trademark registrations incorporating the term "American" for cruise ship-related services that pre-date any trademark or trade name rights asserted by this Plaintiff. *See* <u>Ex. 2</u> to D.I. 171. HMS, therefore, has priority to the term "American" as against ACL. *See* D.I. 171, pp. 23, 35-43. Use of the term "American" by an entity that went bankrupt and no longer exists does not inure to the benefit of ACL. |

| | There is no evidence that ACL has placed "emphasis" on the term "American" in its advertising and marketing. The term "American Cruise Lines" is always used together and there is no evidence that ACL ever refers to itself as solely as "American". |
|---|---|
| There was continuity between the "Old ACL" and the current ACL. ACL Brief, p. 5. | In the mid 1980's, the "Old ACL" converted to a public entity after a sale and soon thereafter filed for bankruptcy in and around 1988. That entity eventually dissolved in 1997 and did not operate any vessels after the bankruptcy. *See* Deposition of Charles A. Robertson, 12/11/14 ("C.A. Robertson Depo. #2"), pp. 22-23, 25-26, 31-32, 51-52, 62 (cited portions attached as **Exhibit 34**). Following bankruptcy, some of the vessels that were owned and operated by the "Old ACL" were converted to excursion boats operating on the Great Lakes. C.A. Robertson Depo. #2, pp. 19-20. Others ended up sailing on the Yangtze River in China for unrelated entities. *Id.*, pp. 33-34. Others ended up in South America. *Id.*, p. 56. No significant tangible assets of the "Old ACL" were transferred to the current ACL as part of the bankruptcy or otherwise. *Id.*, pp. 71-72. In the meantime, in and around 1986, Mr. Robertson formed an entity named Camelot Cruises, Inc. – operating dinner cruises on the Connecticut River. *See* Deposition of Susan Renner, 5/19/14 ("Renner Depo."), pp. 12-15 (cited portions attached as **Exhibit 35**). This entity operated until 2004, when all its assets were sold. *Id.* In 1991, an entity named *American Lines Limited* was formed as a Delaware corporation. C.A. Robertson Depo. #2, pp. 40-41. In 1999, *American Lines Limited's* name was changed to *American Cruise Lines*. *Id.*, pp. 53-54. At least 10 years passed between the time in which the "Old ACL" ceased operating and the current ACL began sailing on the East Coast. What is more, the current ACL has never claimed the benefit of the "Old ACL's" use of the term "American" as part of any of the current trademark registrations and/or applications filed with the PTO on ACL's behalf – an effective admission that the prior use of "American" by that different entity could not be attributed to the current Plaintiff. |
| ACL has consistently promoted itself using the term "American". ACL Brief, p. 7. | While it is true that the term "American" is used in all of ACL's promotional activity, there is no evidence that the term is used by itself apart from the full term "American Cruise Lines." |

| | |
|---|---|
| "American" appears in "much larger font" than "cruise lines".  ACL Brief, p. 6. | There has been no evidence presented as to the font size of the terms "American" and "Cruise Lines" in ACL's logo. A plain eyesight review of the logo does not show that "American" is depicted in a font that is significantly larger than "Cruise Lines." |
| Trade professionals and national publications often refer to ACL as "American." ACL Brief, p. 8. | ACL cites to seven (7) instances of trade professionals and national publications between 2005 and 2016 (one from 2005, one from 2006, one from 2010, two from 2011, one from 2015 and one from 2016) as evidence that ACL is "often" referred to as "American."  HMS disputes that this constitutes conclusive evidence that ACL is <u>often</u> referred to simply as "American". Further, ACL cites to only one article from 1986 which refers to the "Old ACL" as "American."  Such instances appear to be isolated in nature. |
| Diane Moore of Ambassadors said that the vessel names were not brands. ACL Brief, p. 7. | It is HMS's position that vessel names can and do function as trademarks and as brands. *American Queen* is a registered trademark and is considered to be a brand of HMS. *See* Deposition of Ted Sykes ("Sykes Depo."), pp. 86-88 (cited portions attached as **Exhibit 36**); Deposition of Jeff Krida ("Krida Depo."), pp. 70-71(cited portions attached as **Exhibit 37**) (recognizing *American Queen* as a company trademark).  With respect to Ms. Moore's testimony, she further testified that the *American Queen* trademarks were used by Ambassadors to market the company's products and services.  *See* Deposition of Diane Moore, 5/24/16 ("Moore Depo. #2"), pp. 28-29 (cited portions attached as **Exhibit 38**). In fact, Ambassadors had brochures and other marketing materials directed entirely to the *American Queen* as a product <u>and</u> brand.  *Id*., pp. 55-57; *see also* Moore Depo., pp. 93-94.  Finally, Ms. Moore was only involved with the *American Queen* trademarks and their respective use for a short one-to-two year window from 2007 through 2008 and cannot possibly provide testimony as to how either Delta Queen or HMS considered the *American Queen* marks to function and/or their importance in marketing.  *See* Moore Depo. #2, pp. 50-51. Mr. Waggoner testified that he believed *American Queen* was a famous brand. Waggoner Depo., p. 296.  Nearly all of the marketing materials for the *American Queen* over time have featured the use of *American Queen* as a mark and brand – with emphasis placed on the term and the trademark symbol appearing next to the term. *See e.g.*, |

19

| | Delta Queen advertisement, attached as **Exhibit 39**; Ambassadors advertisement, attached as **Exhibit 40**; and HMS advertisement, attached as **Exhibit 41**. |
|---|---|
| The word "American" is distinctive to ACL. ACL Brief, p. 29. | There is evidence that there have been many entities over the years which have used the term "American" as part of the company name of a passenger cruise-related company. *See* Ex. 6 to HMS's Opening Brief in Support of its *Daubert* Motion (D.I. 183), p. 9. |
| For most of the past 9 years, ACL has achieved the greatest market share of U.S. coastal and inland waterways cruise market. ACL Brief, p. 11. | Since 2012, HMS had the biggest market share, in terms of passenger capacity, in the Mississippi and Columbia/Snake River markets. Further, from 2014 until 2015, HMS had the biggest market share, in terms of total passenger capacity (total of 659 berths as compared to a total of 622 berths for ACL during that time), in the <u>entire</u> U.S. inland river cruising market. *See* Ex. 1 and Ex. 2 to D.I. 171. |
| The American Cruise Lines mark and the American family of vessels "have achieved widespread public recognition throughout the U.S. in connection with overnight passenger cruise ship services." ACL Brief, p. 11. | There is no evidence which supports this conclusion and ACL does not cite any. Even ACL's own expert, Christine Duffy, testified that American Cruise Lines is not well known among the general consuming public. *See* Deposition of Christine Duffy ("Duffy Depo."), p. 218 (attached as **Exhibit 42**). |
| "All the vessels American Cruise Lines has placed into service since 2000, other than one it purchased and one referring to the river system where it operates, are named under an 'American' patriotic theme…." ACL Brief, p. 8. | Until 2015, the vessel operated by ACL on the Mississippi River was named *Queen of the Mississippi* and the vessel operated by ACL on the Columbia/Snake Rivers was named *Queen of the West*. *See* Ex. 37 to D.I. 171. ACL did not start using *American* named vessels in those markets until 2015. |
| American Cruise Lines is a conceptually strong trademark. ACL Brief, pp. 31-41. | ACL confuses the concept of conceptual strength and commercial strength in its brief. Conceptual strength relates solely to the mark's inherent classification as either fanciful, arbitrary, suggestive, descriptive, or generic. At best, the term *American Cruise Lines* is a descriptive mark that is conceptually weak in that it is describing to consumers that ACL is an American-based cruise line. |
| The dominant portion of both American Cruise Lines mark and *American Queen Steamboat Company* marks is the term "American". ACL Brief, p. 29. | There is no evidence that the dominant portion of HMS's *American Queen* or *American Queen Steamboat Company* marks is the single term "American." It is more likely that these marks are either considered in full as "American Queen" or, as is the case with *American Queen Steamboat Company*, shortened to the dominant term(s) *American Queen*. *See* Deposition of Bruce Silverman ("Silverman |

| | |
|---|---|
| | Depo."), pp. 186-187 (cited portions attached as **Exhibit 43**) (confirming that it is not always the first word that consumers will shorten a company name to and that it is often the first two words as well). There is no evidence that the *American Queen* or the *American Queen Steamboat Company* is referred to simply as "American." Further, ACL's own expert conducted an "informal" survey wherein HMS was always referenced by travel agents as *American Queen* or "AQ" and not "American." *See* Ex. 7 to D.I. 183. |
| ACL owns trademark rights to the term "American Steamboat Company." ACL Brief, pp. 13-14, 16. | While ACL is seeking registration with the PTO for the term *American Steamboat Company*, that application is at present under a rejection from the PTO as being geographically descriptive and incapable of serving as a trademark. *See* Office Actions, attached hereto as **Exhibit 44**. In response to these rejections, ACL has even attempted to argue that *Great American Steamboat Company* was essentially the same as *American Steamboat Company* and the PTO has rejected this argument as well. *Id*. Further, this application was filed on an intent to use basis, meaning that ACL has never actually used this trademark in commerce. When asked during a deposition, ACL's head of marketing indicated that ACL does not use the term *American Steamboat Company* at all. *See* C.B. Robertson Depo. #2, p. 99. Without use, ACL cannot possibly own any trademark rights to the term *American Steamboat Company*. |
| CONFUSION ISSUES/FACTS || 
| Confusion began in 2012 shortly after Defendant began using the name *American Queen Steamboat Company*. ACL Brief, pp. 3, 17. | ACL has been aware of confusion in the market since "they [HMS] began marketing" in 2010. C.B. Robertson Depo., p. 32. Mr. Robertson admitted that they even saw confusion as soon as *Great American Steamboat Company* was formed to operate the *American Queen* in 2010. *Id*., pp. 177-178. ACL has maintained regular confusion logs from Oct., 2011 through the end of 2014. *See e.g.* Ex. 59 to D.I. 171 (showing that at least 29 of the approximately 100 examples of confusion documented by ACL occurred before July, 2012). Confusion began and was documented by ACL well before HMS began using the name *American Queen Steamboat Company* as the name of the operating entity in June, 2012. |
| ACL has documented 100 instances of confusion related to HMS's use of "American Queen Steamboat | There is no evidence that the confusion documented by ACL relates to HMS's use of *American Queen Steamboat Company*. ACL's own witnesses testified |

| | |
|---|---|
| Company." ACL Brief, p. 18. Confusion is being caused by Defendants' use of *American Queen Steamboat Company* as the company name. ACL Brief, pp. 41-43. | that employees were instructed to document instances of confusion where consumers were looking specifically for the *American Queen* (not *American Queen Steamboat Company*). C.B. Robertson Depo., pp. 179-180. ACL's representatives could not provide with a reasonable degree of certainty why exactly any of the consumers who contacted it were confused. As indicated above, at least 29 (and there are more) of the instances of confusion documented by ACL could not possibly be attributed to HMS's use of the name *American Queen Steamboat Company* since that company name was not even used by HMS when those instances of confusion were documented. Finally, ACL's own expert survey on confusion shows that when company names are taken out of the equation there is still a confusion rate of 34.5%. *See* Deposition of Hal Poret ("Poret Depo."), pp. 150-151, and 148 (cited portions attached as **Exhibit 45**). HMS's expert, Basil Englis, opines that the confusion documented by ACL shows that it is the actions of ACL which are implicated as the cause of the confusion since most of the instances of documented confusion are consumers contacting ACL believing they are contacting HMS. *See* Englis Report, Ex. 56 to D.I. 171, pp. 11-12. Similarly, with respect to HMS's witnesses and/or third party witnesses, none could testify with certainty as to what the confusion was over. For example, former sales representative of HMS, Rick Simonson, testified that the confusion could be over both parties' use of the term "American," or based on similar images that appear in advertisements (especially the red paddlewheel images), or based on the company names. Simonson Depo., pp. 59-61. However, Mr. Simonson admitted he did not know what exactly caused the confusion and would just be guessing. *Id.*, p. 145. HMS's former head of marketing, Tim Rubacky, testified that he also did not know what the confusion was over and that it could have been a number of factors that contributed to any confusion that existed. Rubacky Depo., pp. 145-146. |
| Repeat passengers of ACL who were members of the Eagle Society have cruised with Defendants thinking it was affiliated with ACL. ACL Brief, p. 42. | The evidence cited by ACL does not all show that the alleged confused passengers cited therein ever actually cruised with HMS. For example, Ex. 53 to Charles B. Robertson's declaration consists of an email from an ACL sales rep to the ACL head of sales describing an instance where someone who had previously sailed |

| | |
|---|---|
| | with ACL had booked with HMS and then contacted ACL about that booking. The sales rep indicated that the consumer eventually realized he was confused and was given all of ACL's information. There is no evidence as to whether this consumer continued with and did not cancel his booking with HMS to sail on an ACL cruise. The second instance cited in Exhibit 54 of the Robertson declaration would appear to show that there was a passenger who was an ES member who sailed on the *American Empress* and later thought there may have been some affiliation. However, there is no follow up beyond a second-hand account from the ACL sales rep. There is no indication that this individual booked on the *American Empress* because of a belief as to affiliation. |
| Defendants' witnesses testified that confusion was over the respective uses of American. ACL Brief, p. 18. | ACL cites the testimony of Jeremy Batson to support the fact that confusion existed between the company names. ACL misrepresents the testimony of Mr. Batson. Mr. Batson actually testified that the confusion could have occurred because the two companies operate on the same waterways, have similar looking vessels, and both start with the term "American." *See* Deposition of Jeremy Batson ("Batson Depo."), pp. 95-96 (cited portions attached as **Exhibit 46**). Mr. Batson clarified that "it's just not clear what the source of the confusion was." *Id.*, pp. 120-121. ACL then cites the testimony of Tim Rubacky as supposedly supporting the conclusion that confusion was solely based on the respective company names. However, as cited above, Mr. Rubacky indicated that he did not know what the confusion was over and that it could be attributed to any number of factors. Finally, HMS's CEO indicated that confusion could be attributed to any number of factors, including similar vessels, similar itineraries, similar looking brochures and advertising, both use "American" as part of the company name, internet searches and ACL's use of *American Queen* as a paid search term – but ultimately he could not confirm with any degree of certainty why a particular consumer was confused. Waggoner Depo., pp. 67-71, 84-85. |
| ACL's survey shows that consumers were confused over the term American. ACL Brief, p. 4. | The verbatim survey responses provided along with Mr. Poret's surveys and report do not support the conclusion that confusion existed <u>solely</u> over the respective use of the term "American" as part of the company name of the parties. *See* <u>Ex. 61</u> to D.I. 171. |

| | |
|---|---|
| | Only 24 of the 110 survey respondents who indicated confusion as to source could even be remotely construed as indicating that their confusion was over the company names in some form.  Of these, only 8 respondents indicated that the confusion was based solely on name.  This represents only 4% of the survey respondents – a minimal amount of confusion. |
| **"GREAT AMERICAN"/SETTLEMENT AGREEMENT ISSUES** | |
| The settlement agreement was prepared by HMS. ACL Brief, p. 14. | While HMS does not dispute that it presented the final Settlement Agreement to ACL for execution, there is testimony that the terms of the settlement agreement were proposed and crafted by both parties working together. HMS's general counsel, Bob Herre, was involved with those discussions and testified that during a settlement meeting between the parties in Baltimore, it was discussed that one party would sell their rights to the *Great American* marks to the other and that he prepared handwritten notes on the mechanisms discussed by the parties to effectuate that settlement. Herre Depo., pp. 64-67. Mr. Herre testified that ACL proposed some of the terms and he memorialized the proposals of the parties at that meeting for the version of the settlement agreement that was executed by ACL. *Id*. He considered the agreement to be "jointly authored". *Id*., p. 72. |
| ACL fully performed its obligations under the Settlement Agreement. ACL Brief, p. 15. | HMS does not dispute that ACL satisfied its payment obligations under the Settlement Agreement. However, it is HMS's understanding that ACL gave permission to it to use the company name *American Queen Steamboat Company* as a term of the Settlement Agreement. *See e.g*., Herre Depo., pp. 71-72; *see also* Waggoner Depo., p. 182. In any event, the evidence establishes that ACL breached the Settlement Agreement before the alleged breach by HMS in that ACL used the term *Great American Steamboat* in advertising and promotional material prior to Feb., 2013 in violation of the express terms of the agreement. *See* Trademark Certificate of Registration claiming first use date of **October 20, 2012**, attached as Ex. 44 to D.I. 171; *see also* Statement of Use, attached as **Exhibit 47**, which ACL affirmed under oath were in use as of October 20, 2012.  Moreover, there is evidence that ACL used the term *Great American* as a paid search term throughout 2012 in direct violation of the agreement. *See* paid |

| | search report, ACL 9816-9864 (pages 9816 and 9852), attached as **Exhibit 48**. |
|---|---|
| ACL did not use the *Great American Steamboat* marks for a period of one year from Feb. 9, 2012 through Feb. 9, 2013.  ACL Brief, pp. 14-15. | *See* above regarding ACL's use of *Great American Steamboat* in advertising and as a paid search term between February 9, 2012 and Feb. 9, 2013 in violation of the express terms of the agreement. |
| ACL originally intended to use GASC as a sub-brand, filed fictitious name registrations, and has been prevented from effectively using as a sub-brand because of Defendants' continued ownership of the .com domain name. ACL Brief, p. 16. | There is no evidence that ACL has been prevented from doing anything other than using the GASC.com domain name. Even so, ACL's own internet marketing expert confirmed that it would be confusing for ACL to use two different company names and that it would not be a good idea from an internet marketing perspective to do so.  *See* Deposition of Peter Kent ("Kent Depo."), pp. 70-72 (cited portions attached as **Exhibit 49**).  ACL was not prevented from using the term *Great American* as part of its search engine optimization strategies, including paid search and was not prevented from using the term in email marketing. Kent Depo., pp. Kent 73-74; *see also* evidence of use of *Great American* by ACL, *supra*. ACL was able to and did use the term as a paid search term and in print advertising. |
| AQSC's retention of the GASC.com domain name has prevented ACL from effective use of the *Great American Steamboat* marks in internet marketing. ACL Brief, pp. 15-16. | This conclusion stems solely from the *ipset dixit* of ACL's expert, Peter Kent and is contradicted by the evidence discussed above. |
| Consumers are searching for ACL when they type in the term Great American Steamboat Company in search engines. ACL Brief, p. 17. | There is no evidence that ACL is known by consumers as the *Great American Steamboat Company* and no evidence that consumers would be searching for ACL if they were entering that term into search engines. |
| **ACTIONS OF DEFENDANTS** | |
| Defendants intentionally chose the name *American Queen Steamboat Company* to trade on ACL goodwill. ACL Brief, p. 43-44. | The evidence and testimony show that the *American Queen* is an iconic vessel and that the *American Queen* marks are strong marks in which there is a high degree of consumer recognition. *See e.g,* D.I. 171, pp. 11, 18, 32-34. HMS purchased the *American Queen* and wanted to operate that vessel, in large part, because of the strong goodwill and customer loyalty attached to it. Waggoner Depo., pp. 101-102. Much like what the *Delta Queen Steamboat Company* did in terms of naming its company after its flagship vessel, the *American Queen Steamboat Company* name stems from the name of the iconic *American Queen* vessel – and that name was selected by HMS only after it was forced change its name by ACL and after HMS |

25

| | |
|---|---|
| | received permission of ACL to use that name. Waggoner Depo., pp. 97-98, 182, 185. |
| HMS copied ACL by changing the name of the *Empress of the North* to *American Empress*. ACL Brief, p. 23. | The testimony shows that HMS chose the name *American Empress* because it fell logically in line with the branding related to *American Queen* in that both *Queen* and *Empress* are associated with female royalty. Rubacky Depo., pp. 47-49. HMS further believed that the name *American Empress* would help differentiate the companies since, at the time of the name change, ACL was using the name Queen of the West in the market in which the *American Empress* was to operate. Waggoner Depo., p. 238. |
| HMS did not begin to operate *the American Queen* in commerce until April, 2012, when it first provided overnight cruising under the Great American Steamboat Company brand. ACL Brief, p. 13. | This is a legal conclusion masked as an "undisputed fact." And an incorrect conclusion at that. HMS began marketing services under the *American Queen* mark nationwide in September, 2011 (limited marketing activities took place earlier). HMS sold its first ticket for a cruise on the *American Queen* at the end of September, 2011. By the end of October, 2011, HMS had ▮▮▮▮▮▮▮▮▮▮ for the *American Queen* and had spent over ▮▮▮▮▮▮ in pre-launch marketing expenses. *See* <u>Exs. 34</u> and <u>35</u> to D.I. 171. Even ACL's own marketing expert, Bruce Silverman, testified that a trademark becomes significant and meaningful to consumers when the mark is used in marketing. Silverman Depo., pp. 98-99. What is more, ACL itself claims first use dates for its vessel and company name trademarks that relate to the first marketing for those vessels and/or the company – the exact same basis for any use in commerce by HMS of the *American Queen* marks. |
| Mr. Waggoner wanted to harm ACL. ACL Brief, p. 45. | There is no evidence that HMS intentionally sought to harm ACL by any of the actions taken by the company in this case – much less by HMS's CEO, John Waggoner. There is not one piece of evidence or testimony of record supporting the argument that Mr. Waggoner (or HMS) intended to harm ACL – and ACL does not cite to any evidence in its brief. |
| Defendants have used 105 paid keywords incorporating ACL trademarks. ACL Brief, p. 21. | ACL attaches a list of 105 terms that it alleges to be trademarks owned by ACL. However, many of those terms are not ACL trademark terms at all. For example, there is no evidence that ACL has ever used the term *Mississippi Queen* and, therefore, any claim to ownership it may make to such term is invalid or contrary to law. Further, ACL attempts to claim exclusive rights to generic or descriptive terms such as |

| | |
|---|---|
| | "America" or "American" or "cruise" or "cruises" or "cruise ship" and prevent HMS from using those generic words as paid search terms. In addition, many of the marks asserted by ACL as part of this list are marks which HMS claims ACL does not properly own and/or were not properly granted to ACL by the PTO. *See e.g., American Eagle* and *American Pride*. |
| Defendants' paid search ads use ACL trademarks. ACL Brief, p. 22. | ACL references a single paid search advertisement featuring the phrase "America – cruises" as indicating that HMS was using ACL trademark terms in its ad text.  However, the ad text at issue was in no way referring to a company – it was simply using the generic terms "America" and "cruises" to say that Americans are cruising.  ACL does not have exclusive trademark rights to the terms "America" or "cruises." |

## IV.   ARGUMENT

### A.  ACL CANNOT ESTABLISH ITS CLAIMS FOR TRADEMARK INFRINGEMENT AND SUMMARY JUDGMENT SHOULD ENTER IN FAVOR OF HMS

ACL seeks summary judgment on its claim that HMS's use of the company name *American Queen Steamboat Company* is likely to cause confusion with ACL's *American Cruise Lines* name.  For the reasons discussed below, ACL's claim with respect to HMS's use of *American Queen Steamboat Company* fail as a matter of law and summary judgment should enter against ACL.[40]

### 1.  ACL's Infringement Claim Based on HMS's Use of the Name *American Queen Steamboat Company* is Barred by the Acquiescence and/or Equitable Estoppel Defense

The Lanham Act provides for, and courts around the country have recognized, certain equitable defenses that are available to bar claims for trademark infringement.  *See* 15 U.S.C. §1115 (b)(9) (setting forth the equitable defenses of laches, estoppel, and acquiescence).  Here, the equitable defenses of acquiescence and equitable estoppel serve to bar all of ACL's trademark

---

[40] The elements of a trademark infringement claim, as well as an analysis of the likelihood of confusion factors set forth in *Interpace Corp. v. Lapp, Inc*., 721 F.2d 460, 462 (3d Cir. 1983) were addressed in HMS's Opening Brief, pages 20-21 and 35-43.

infringement (and related unfair competition) claims with respect to HMS's use of the company name *American Queen Steamboat Company* as well as the vessel name and associated trademarks for *American Queen*. The doctrine of acquiescence applies when the trademark owner, by affirmative word or deed, conveys its implied consent to another to use a particular mark. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998), citing *McCarthy on Trademarks* § 31.41[1]. The acquiescence defense "involves the plaintiff's implicit or explicit assurances to the defendant which induce reliance by the defendant." *Elvis Presley Enterprises Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998); *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir. 1970) ("… acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant."). Similarly, to assert equitable estoppel, a defendant must show that (1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit. *H.G. Shopping Centers, L.P. v. Birney*, 59 U.S.P.Q.2d 1109, 1115, 2000 WL 33538621 (S.D. Tex. Nov. 29, 2000). Equitable estoppel requires a misleading communication made by plaintiff with the plaintiff's knowledge of the true facts. *Id*.

Here, HMS began using the name *American Queen Steamboat Company* in some form as early as December, 2010. *See* Ex. 3 to D.I. 171. HMS had even filed a trademark application for that name back in April, 2011. *See* Ex 12. In the least, ACL was on constructive notice that HMS might use *American Queen Steamboat Company* as early as April, 2011. Then, starting in May, 2011, when HMS and ACL became embroiled in a dispute related primarily to HMS's use of the

name *Great American Steamboat Company*, ACL admitted having actual knowledge of HMS's trademark application for *American Queen Steamboat Company* and even objected to the application. *See* Ex. 17. On August, 11, 2011, ACL went as far as sending HMS an offer to resolve the dispute with a material term of the resolution being **ACL giving permission to HMS to use the name *American Queen Steamboat Company***. *See* Ex. 19.

Then, once litigation ensued, ACL never raised HMS's proposed use of *American Queen Steamboat Company* or its actual use of the name *American Queen* as an issue. Nor did ACL object to the use of the name and mark *American Queen* during the operation of the *American Queen* by HMS's predecessors in the preceding years. Of critical, if not dispositive, import here, however, is that following initiation of the First Action by ACL, representatives of ACL and HMS met to try and resolve the case. During this meeting, which took place in December, 2012, **ACL's CEO gave express permission to HMS to move forward with the name *American Queen Steamboat Company***. Relying on this representation, HMS then agreed to change its name.

Moreover, even when ACL initiated the present lawsuit in February, 2013, no objections were raised as to HMS's use of *American Queen Steamboat Company* or *American Queen*. Nor were objections raised when ACL filed its first amended complaint in June, 2013. It was only in July, 2013, when ACL filed its second amended complaint, that ACL's objections to HMS's use of *American Queen Steamboat Company* and *American Queen* was made known. This was well after HMS relied on ACL's express permission.[41]

ACL's express permission, given both in August, 2011 and in December, 2012 – and buttressed by ACL's failure to ever object to HMS's use of *American Queen Steamboat Company*

---

[41] The attached timeline is illustrative of the pattern of complicity, failure to object, and express permission activities of ACL. *See* **Exhibit 50**.

after granting this permission and raising other objections to actions of HMS – serve to bar ACL's claims based on HMS's use of *American Queen Steamboat Company* and *American Queen* under the acquiescence and equitable estoppel defenses. *See e.g.*, *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 113 (2d Cir. 2008) (citing 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:42 (4th ed.2008)).[42]

In addition, once permission was given to HMS to use the *American Queen Steamboat Company* name, it relied upon ACL's representation to both settle the First Action and then proceed with marketing and operating its business under the approved name. Over the years, HMS spent millions of dollars to further develop its *American Queen* and *American Queen Steamboat Company* brands. In fact, since 2012, HMS has spent over ████████ in marketing – all of which was done using *American Queen Steamboat Company*.[43] Had it not been for ACL's permission to use that name, HMS would not have moved forward with the name and certainly would not have spent millions of dollars to market itself using that name.

Because of the affirmative actions by ACL in consenting to the use of the *American Queen Steamboat Company* name and mark and the *American Queen* marks, summary judgment cannot enter on ACL's claims for trademark infringement based on the use of those terms by HMS. Since

---

[42] In *PRL USA*, the court allowed evidence of settlement negotiations to come in to support a claim of estoppel noting that "it is well established that if a trademark owner tells a potential defendant that it will not assert a claim of infringement based on the use of a particular mark, and the recipient of that assurance relies on the assurance to its substantial detriment, … estoppel will bar the trademark owner from subsequently claiming infringement." Settlement evidence may be offered for another purpose such as demonstrating undue delay in bringing a claim or an affirmative defense, such as estoppel by acquiescence, which "depends on issues distinct from the elements of the claim of infringement." *Id.* at 114-115; *see also Lydon Millwright Services, Inc. v. Ernest Bock & Sons, Inc.,* 2013 WL 1890355, at *8 (E.D. Penn. May 7, 2013).

[43] *See* documents demonstrating advertising expenditures, attached as **Exhibit 51**.

there can be no material dispute that the defenses of acquiesce and equitable estoppel apply, summary judgment should enter in favor of HMS on ACL's claims.

### 2. HMS Has Priority as to the term "American" as Against ACL

Even assuming ACL's claims are not barred by acquiescence and/or equitable estoppel, the infringement claim based on HMS's use of the name *American Queen Steamboat Company* must fail as HMS has priority rights to the term "American" through its ownership of the *American Queen* marks – which predate any use or registration of the term "American" by ACL. HMS's priority argument is addressed in detail in D.I. 171, pp. 2-4, 20, and 35-43. Since there is no material issues of fact that HMS has priority rights to the term *American Queen* (and the *American Queen* marks), at issue then is whether those priority rights extend to HMS's use of the term *American Queen Steamboat Company*. There is little doubt that they do.

In adopting the name and mark *American Queen Steamboat Company*, all HMS has done is add the generic phrase "Steamboat Company" to its longstanding and strong trademark, *American Queen*. In its trademark application for *American Queen Steamboat Company*, HMS claimed prior rights to the term *American Queen* based on its ownership of the incontestable *American Queen* marks and the PTO accepted that claim – even granting acquired distinctiveness status from the outset based on the longstanding rights to *American Queen* owned by HMS.[44] HMS was further required to disclaim the term "steamboat company" as the Trademark Office determined that that term was descriptive and incapable of serving a trademark function.[45] The marks *American Queen* and *American Queen Steamboat Company* should be treated the same under the law in that the dominant and protectable portion of the marks is the phrase *American*

---

[44] *See* Prosecution file documents, attached as **Exhibit 52**.
[45] *See* Office Action, attached as **Exhibit 53**.

*Queen*.  Therefore, if the Court here holds that HMS has priority to the term "American" based on its ownership of the *American Queen* marks, then the finding of priority must extend from the *American Queen* marks to the similar *American Queen Steamboat Company* mark.

### 3. There is a Material Fact Dispute as to Whether There is a Likelihood of Confusion Based on HMS's Use of *American Queen Steamboat Company*

Through the present motion ACL has limited its infringement argument to the claim that HMS's use of *American Queen Steamboat Company* is likely to cause confusion with the *American Cruise Lines* name and mark.  Likelihood of confusion is a question of fact.  *See, e.g.*, A&*H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 191, 194 (3d Cir. 1999); *Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992); and *Facenda v. N.F.L. Films, Inc*., 542 F.3d 1007, 1024 (3d Cir. Pa. 2008).  Summary judgment is inappropriate when a jury could reasonably conclude that there was no likelihood of confusion.  *See Facenda,* 542 F.3d at 1024 (citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001)).

In *Goldfaden v. Miss World (Jersey) Ltd*., No. Civ. A. 02-712, 2005 U.S. Dist. LEXIS 49543, *12-14 (D.N.J. July 18, 2005), for example, the court held that where there are genuine issues of fact concerning the *Lapp* factors then the issue of likelihood of confusion is for the finder of fact to resolve.  The court in *Goldfaden* found that there was a material dispute over a number of *Lapp* factors, including the similarity of the marks and the strength of the senior mark, and ultimately refused to grant summary judgment in favor of the plaintiff on its claim for infringement.  *Id*.

Similarly, there is a material dispute over a number of *Lapp* factors in this case including the similarity of the marks, strength of the *American Cruise Lines* mark, evidence of actual confusion, and the intent of HMS in selecting and using the name *American Queen Steamboat Company*.  Each of these factors will be addressed below.

### a. *American Cruise Lines* is not a strong mark.

ACL claims that the *American Cruise Lines* mark is a strong mark, both conceptually and commercially.  ACL Brief, pp. 31-37.  ACL further claims that the *American Cruise Lines* mark's incontestability status requires there to be a presumption that it is a strong mark.  *Id*.  ACL broadly claims, without citing evidence, that "[t]oday, when one sees or hears the name 'American' within the cruise line industry one immediately thinks of American Cruise Lines."  *Id*., p. 34.

As an initial matter, HMS disputes that ACL's *American Cruise Lines* registrations are incontestable as against HMS since HMS enjoys priority rights to the term "American" based on its ownership of the *American Queen* marks (as discussed herein and in HMS's Opening Brief).  Since HMS has priority rights to "American", ACL cannot claim incontestability status pursuant to the Lanham Act, 15 U.S.C. §1065 (a mark is not incontestable if the mark infringes upon rights to a trademark which was used prior to the registration of the alleged incontestable mark); *Cuban Cigar Brands N.V v. Upmann Int'l Inc.*, 457 F. Supp. 1090, 1100 (S.D.N.Y. 1978) (since plaintiff was the prior, nationwide user of a similar mark, then defendant's mark was not incontestable as against plaintiff); and *815 Tonawanda Street Corp. v. Fay's Drug Co*., 842 F.2d 643, 646 (2d Cir. 1988) ("The plain meaning of the §1065 exception is that if a party has acquired … rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable.").  Even if ACL's *American Cruise Lines* mark was properly incontestable, incontestable status alone does not create a strong trademark.  *See First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc*., 896 F. Supp. 456, 461 (E.D. Pa. 1995) (recognizing that the strength of an incontestable mark can be attacked and that incontestability is but one of many factors to consider when determining a mark's strength).

ACL also confuses and blurs the concepts of conceptual and commercial strength. *See* discussion on pages 31-34 of ACL's brief. Conceptual strength relates solely to the mark's inherent classification as either fanciful, arbitrary, suggestive, descriptive, or generic. *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 185 (3d Cir. 2010); *see also Dieter v. B&H Industries of Southwest Fl., Inc.*, 880 F.2d 322, 327 (11th Cir. 1989) ("Generic terms represent the weaker end of the [trademark] spectrum, and arbitrary terms represent the stronger."); and *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc*., 616 F.2d 440, 445 (9th Cir. 1980) ("A 'weak' mark is a mark that is a meaningful word in common usage or is merely a suggestive or descriptive trademark. A strong mark is entitled to a greater degree of protection than is a weak one, because of its unique usage."). Along this spectrum, descriptive marks convey an immediate idea of the ingredients, qualities or characteristics of the goods. *Sabinsa*, 609 F.3d at 185. Generic marks "function as the common descriptive name of a product class." *Id*. (internal citations omitted); *see also A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d. Cir. 1986). Here, the term "cruise lines" is a generic phrase which is incapable of independently functioning as a trademark. At best, the entire phrase *American Cruise Lines* is a descriptive or geographically descriptive name that is conceptually weak in that it is describing to consumers that ACL is an American-based cruise line. *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C*., 931 F.2d 1519, 1522 (11th Cir. 1991) (holding geographically descriptive mark is considered not inherently distinctive, but weak, and given a narrow range of protection).

In this case the *American Cruise Lines* mark is further weakened by the pervasive third party use of the term "American" in the passenger cruise industry over the years. *A & H Sportswear*, 237 F.3d at 222. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:48 (4th ed. 2001) ("If the common element of conflicting marks is a word that

is 'weak' then this reduces the likelihood of confusion. A portion of a mark may be 'weak' in the sense that such portion is descriptive, highly suggestive, or is in common use by many other sellers in the market."). *See also Citizens In. Grp. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 123 (3d Cir. 2004) ("[A]s a general rule, widespread use of even a distinctive mark may weaken the mark."); *Kinbook, LLC v. Microsoft Corp*., 866 F. Supp. 2d 453, 466 (E.D. Pa. 2012) ("the prevalence of marks with the prominent term 'kin' in the online social networking service sphere renders the 'Kinbox' mark weak in this context"); and *Armstrong Cork Co. v. World Carpets, Inc*., 597 F.2d 496, 505 (5th Cir. 1979) (holding that wide use of mark "World" resulted in little likelihood of confusion). The evidence and testimony has revealed a substantial number of third parties who have used the term "American" in the passenger cruise industry – with many of those references including companies which start their respective company name with the term "American." *See e.g.*, Rubacky Depo., pp. 146-147; Waggoner Depo., p. 44-46. Some of the passenger cruise industry companies which have used the term "American" include the following: *American West Steamboat Company*, *American Safari Cruises*, *American Canadian Caribbean Line*, *Majestic America Line*, *French America Line*, *American Hawaii Cruises* and *Holland America Line*. *See* Ex. 6 to D.I. 183. Many of these entities operated passenger cruises at the same time as ACL was operating cruises under the name *American Cruise Lines*. *See e.g., American West Steamboat Company* (predating ACL, coexisting between 2000 and 2006 and operating overnight passenger cruises on the Columbia/Snake Rivers); *American Classic Voyages* (predating ACL by a number of years and coexisting between 2000 and 2001 operating overnight passenger cruises on the Mississippi River); *American Safari* (predating ACL, coexisting from 2000 to 2013 and operating competing cruises); *American Canadian Caribbean Line* (predating ACL, coexisting between 2000 and 2011 and operating competing cruises); *American Hawaii Cruises*

35

(predating ACL, coexisting from 2000 to the present and offering overnight passenger cruises to Hawaii); and *Majestic America Line* (coexisting during 2007 and 2008 sailing seasons and operating competing cruises). *Id*.

Moreover, a review of the U.S. Coast Guard Merchant Marine Database as of June, 2016, reveals that there are at least twenty-three unique entities using the term "American" as part of a company name for the operation of vessels registered as passenger cruise vessels.[46] Some of these include the following names: *American River Transportation Company*, *American Riverboat Company*, *American Sailing Tours, Inc*., *American Eagle Charters Corp*., *American Spirit, Inc*., and *American Classic Schooner LLC*.  *Id*.

Despite the marketing and revenue numbers cited by ACL, along with its unsupported conclusory statements as to alleged strength, the pervasive use of the term "American" by multiple entities belies any contention that the *American Cruise Lines* mark is strong.  This factor weighs heavily against a finding of likelihood of confusion.

> **b. *American Cruise Lines* and *American Queen Steamboat Company* are not confusingly similar.**

With respect to the similarity of the marks, the comparison here is between the full terms *American Cruise Lines* and *American Queen Steamboat Company*.  The common use of the term "American" is the only similarity between the marks.  In any event, the dominant portion of HMS's mark is the full term *American Queen* – not just the word "American."  Since the term "American" in descriptive and weak, there is little likelihood of confusion based on the respective uses that term by the parties as company names – especially where there are further distinguishing terms

---

[46] *See* database screenshot, attached as **Exhibit 54**; *see also* Duffy Depo., pp. 72, 172-174.

being used (i.e. "Cruise Lines" versus "Queen Steamboat Company"). This factor weighs against a finding of likelihood of confusion in favor of ACL.

### c. There is no evidence of actual confusion based on HMS's Use of *American Queen Steamboat Company* or its bidding on *American Cruise Lines* as a paid search term.

With respect to actual confusion, ACL argues that the evidence of actual confusion that exists in this case is attributed solely to HMS's use of *American Queen Steamboat Company*. ACL cites to both the documented evidence of actual confusion and the survey performed by its expert, Hal Poret. In addition, though ACL does not seek summary judgment as to its paid search infringement claims, it adds argument in its section on actual confusion related to HMS's use of alleged ACL trademarks as part of its paid search Internet marketing program – alleging that such use has resulted in actual confusion and otherwise increases the likelihood of confusion.

### i. There is no evidence that the documented instances of confusion can be attributed to HMS's use of *American Queen Steamboat Company*.

ACL falsely suggests that actual confusion in this case began in 2012 right after HMS changed its company name to *American Queen Steamboat Company*. This is not true. ACL's witnesses testified that the company has been aware of confusion between the two companies as soon as HMS was formed and began marketing its services in 2010 – nearly <u>two years before</u> HMS ever adopted the *American Queen Steamboat Company* name. C.B. Robertson Depo., pp. 32, 177-178. ACL maintained regular confusion logs from October, 2011 through 2014 – and stopped logging confusion soon after HMS asserted its own infringement claim against it. ACL was logging confusion being directed to it well before HMS ever adopted the name *American Queen Steamboat Company*. Of the approximately 100 instances of confusion logged and cited by ACL in its brief, at least twenty-nine (29) of those instances took place before HMS's name change so those entries could not have involved confusion between the terms *American Cruise Lines* and

37

*American Queen Steamboat Company*.  For the remainder of the entries, witnesses for ACL could not, with any reasonable degree of certainty, explain what exactly the confusion was over.  Other witnesses have attributed any number of factors to the confusion, including the similarity of appearance of the vessels, the similarity of the parties' marketing materials, or based on the company names or similar vessel names.  Simonson Depo., pp. 59-60, Rubacky Depo., pp. 145-146, and Waggoner Depo., pp. 67-71, 84-85.

Almost all the evidence cited by ACL in support of the present motion reflects instances where consumers have contacted ACL thinking they were contacting the owners of the *American Queen* vessel.  By their very nature, in that the confusion was/is being directed to ACL, this evidence could not possibly evidence situations where a consumer was confused over HMS's use of *American Queen Steamboat Company* (or HMS's paid search advertising).  For the other isolated instances cited by ACL, there is no evidence that the consumers' alleged confusion is over the name *American Queen Steamboat Company* at all – there is no direct evidence as to what this general confusion was over.  ACL cannot simply cite to general confusion being directed to it as evidence of actual confusion based on ACL's alleged use of *American Cruise Lines* and/or other ACL terms in its paid search program.  *See First Keystone*, 923 F. Supp. at 705 ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions."); *see also Citizens Nat'l Bank of Meridian v. Citizens Bank of Philadelphia Miss*., 35 Fed.Appx. 391, *2 (5th Cir. 2002); and *Kinbook, LLC*, 866 F. Supp. 2d at 469.

### ii.   Mr. Poret's survey does not demonstrate actionable confusion related to HMS's use of *American Queen Steamboat Company*.

As to ACL's survey expert, a closer look at the verbatim responses provided by the survey respondents shows there was minimal confusion that could be attributed solely to the parties' respective company names.  *See* <u>Ex. 61</u> to D.I. 171.  Indeed, only 4% of the survey respondents (8

of the 200 respondents) could even remotely be considered to have indicated that their confusion was <u>solely</u> over the company names. *Id*. This is not an actionable level of confusion even by the 15% confusion standard cited in ACL's Brief. Representative examples of the responses of the survey respondents are as follows:

- Website and advertisements had a "similar feel"
- "Similar boat and company name. Mississippi river cruise"
- "same itineraries"
- "both ads feature a Mississippi River cruise on what appears to be the same or a similar steam boat"
- "Riverboats are the same with cruises the same"
- "My guess is because they are both river cruises in the us."
- "the ad layout are similar on the page, same use of color, very busy"
- "It looks like they offer the same experiences and the design looks very similar as well"
- "The boats are all paddle boats and the locations/trips appear to be the same"
- "Cruise ships and deals were identical"
- "Offer very similar types of river cruises and uses similar types of boats"

*See* <u>Ex. 61</u> to D.I. 171. These are just a few of many examples showing confusion over just about anything other than the company name.

> ### iii. There is no evidence of actual confusion stemming from HMS's paid search advertising.

ACL claims without support from the factual record that HMS's "pervasive use of American Cruise Lines' trademarks as paid keywords has caused and is causing actual confusion." ACL Brief, p. 41. It is telling that ACL does not cite any evidence to support this conclusory statement since there is no evidence that any of the documented instances of actual confusion in this case relate to HMS's use of *American Cruise Lines* (or any other alleged ACL term) as a paid search term.

While it is true that, starting in 2016[47], HMS began bidding on the term *American Cruise Lines* as a competitive paid search term to generate sponsored links, such action is not *per se* prohibited nor is it presumed that such actions create confusion. *See 1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229 (10th Cir. 2013) (recognizing that "a defendant's purchase of a search-engine keyword cannot, by itself, create the likelihood of confusion that is necessary for infringement liability" and reviewing the pertinent confusion factors in finding no likelihood of confusion). In addition, while ACL does not cite this as a basis for actual confusion in its brief, some courts have looked to the "click through rate" percentage to determine whether there is actionable confusion based on the use of the paid search term at issue in a particular case. *See e.g., 1-800 Contacts*, 722 F.3d at 1244. The "click through rate" is the number of clicks to the website divided by the number of impressions on the advertisement. *See* Deposition of Vincent Van Oss ("Van Oss Depo."), p. 126.[48] An "impression" is when someone searches for that particular term through a search engine while a "click" represents someone actually clicking on the search result advertisement and visiting the website at issue. *Id.*, p. 81; *see also* Welter Depo., pp. 126-127.

In *1-800 Contacts*, the court held that a 1.5% click through rate was insufficient to find a likelihood of confusion and, therefore, granted summary judgment in favor of the defendant. *1-800 Contacts*, 722 F.3d at 1244, 1249. The court in *1-800 Contacts* looked to other decisions finding lower confusion percentages to constitute minimal evidence of confusion, and thus not

---

[47] ACL's argument that HMS has been using the term *American Cruise Lines* as a paid search term since 2011 is misleading. The evidence of record shows that the term *American Cruise Lines* was used minimally as a paid search term from the end of 2011 through February, 2013 (when HMS's paid search program was suspended altogether), not used at all from February, 2013 through January, 2015, used minimally in 2015. Only recently did such use rise above a minimal level. *See* paid search traffic report, attached as **Exhibit 55**; *see also* Deposition of Eric Welter, 11/20/14 ("Welter Depo."), p. 136. Cited portions of Mr. Welter's deposition are attached as **Exhibit 56**.
[48] Cited portions of Mr. Van Oss's deposition are attached as **Exhibit 57**.

actionable, including: *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358-59 (7th Cir. 1993) (finding 7.6% confusion percentage weighed against finding of confusion); *Universal Money Ctrs. Inc. v. American Tel. & Tel. Co.*, 22 F. 3d 1527, 1534 (10th Cir. 1994) (characterizing a 2.6% confusion rate as *de minimus*); and *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 268 (4th Cir. 2006) (confusion rate of 2% insufficient to show actual confusion); *Cf* cases cited by ACL indicating a 15% confusion rate was generally required to show confusion, ACL Brief, pp. 39-40.

Here, the alleged evidence cited by ACL to support the finding that HMS used a number of ACL trademarked terms as paid search terms shows that, for the term *American Cruise Lines*, there was only a roughly 3.5% click through rate to HMS's website related to searches of that term. *See* Ex. 48 to Xu Declaration in support of ACL's Brief. Similarly, for the entirety of the 105 terms which HMS used and which ACL claims are ACL trademarks, the click through rate was only around 3.7%. Neither of these percentages reflect actionable levels of confusion. As a result, this factor weighs against a finding of likelihood of confusion.[49]

### d. There is no evidence that HMS is intending to infringe or harm ACL.

With respect to the intent factor, the evidence shows that HMS owns trademark rights in and to the *American Queen* marks. *See* D.I. 171, pp. 11, 18, 32-34. HMS acquired the famous

---

[49] ACL falsely suggests that HMS's paid search advertising text is deceptive and purposefully designed to confuse consumers. ACL cites to a single instance where an advertisement appeared for HMS which used the term "America – Cruises" within the ad text. *See* Ex. 1, ¶¶ 213-214 to Kent Declaration. This advertisement does not show that HMS was using ACL trademarked terms in its advertisement text. To the contrary, this ad simply shows that HMS was using the term "America" in a descriptive sense referring to the people of America and the term "cruises" to signify that the people of America cruise (and not to a vessel or a company). The ad clearly identifies *American Queen Steamboat Company* as the source of the ad. ACL cannot claim that any use of the generic and/or descriptive terms "America" and "cruises" are deceptive or misleading or otherwise likely to cause confusion.

*American Queen* vessel and intended to continue using the name *American Queen* because of the strong customer goodwill that existed with respect to that name. Waggoner Depo., pp. 101-102. The evidence demonstrates that HMS chose the name *American Queen Steamboat Company* in order to associate the company name with its famous flagship vessel. *Id*., pp. 97-98, 182, 185. There is no evidence that HMS sought to trade off of ACL's customers or any goodwill that may exist to the *American Cruise Lines* name based on its adoption and use of the *American Queen Steamboat Company* name. HMS sought and <u>obtained</u> formal protection from the PTO for that name. *See* <u>Ex. 12</u>. Evidence further shows that HMS sought and obtained permission from ACL to use the name *American Queen Steamboat Company* – negating any possible claim that HMS moved forward with that name in bad faith.

ACL argues that the mere bidding on alleged ACL terms as keywords itself evidences wrongful intent on the part of HMS. However, there is no case law which supports this position nor facts of record showing that HMS's paid search program has been implemented in bad faith. *See e.g., Network Automation*, *Inc. v. Advanced Sys. Concepts, Inc.* 638 F.3d 1137, 1153 (9th Cir. 2011) ("Infringement may not be imposed for using a registered trademark in connection with truthful comparative advertising.") (citing *Lindy Pen Co., Inc. v. Bic Pen Corp*., 725 F.2d 1240, 1248 (9th Cir. 1984). Here, HMS's witnesses testified that they believed it was proper to bid on a competitor's trademark as a paid search term as long as the term was not used in the ad-text – and it was not so used in this case. *See* Deposition of Eric Welter, 6/15/16 ("Welter Depo. #2"), pp. 122-123.[50]  HMS sought the opinion of experts in the internet marketing field and, in good faith, believed its actions to be lawful and steered clear of any issues with ACL.

---

[50] Cited portions of Mr. Welter's deposition are attached as **<u>Exhibit 58</u>**.

Finally, it is worth emphasizing the testimony of Tim Rubacky, who stated that all of HMS's actions in this case with respect to ACL were done in good faith in order to avoid litigation. Rubacky Depo., p. 92 ("[W]e acted in good faith …. We had no reason to want to ire ACL….we wanted both parties to go away and be happy …. We wanted to act in good faith. We didn't want further litigation, because it doesn't serve anyone."). This factor also weighs against a finding of likelihood of confusion.

## B. ACL CANNOT ESTABLISH BREACH OF CONTRACT AND SUMMARY JUDGMENT SHOULD ENTER IN FAVOR OF HMS

ACL asserts that HMS has breached the 2012 Settlement Agreement by its refusal to transfer the GASC.com domain name to it and based on HMS's apparent use of the term *Great American Steamboat* in connection with its recent paid search advertising campaign.

### 1. Elements of Breach of Contract Under Delaware Law

Under Delaware law, a breach of contract requires a showing of the existence of a contract, the breach of an obligation imposed by that contract, and resultant damage to the plaintiff. *National Fire & Marine Ins. Co. v. Robin James Const., Inc.*, 478 F. Supp. 2d 660, 662 (D. Del. 2007). Courts in the Third Circuit further hold that a breach must be material, meaning the breach must "go[ ] to the essence of the contract." *Norfolk Southern Ry. Co. v. Basell USA, Inc.*, 512 F.3d 86, 92 (3d Cir. 2008). In other words, the breach must be "of sufficient importance to justify non-performance by the non-breaching party." *Id.* (citing *Biolife Solutions, Inc. v. Endocare, Inc.,* 838 A.2d 268, 278 (Del. Ch. 2003)). It is equally well-established that a prior, material breach of the contract excuses the other party's obligation to perform under a contract and serves as a defense to a claim for breach. *See Matthew v. Laudamiel*, 2012 Del. Ch. LEXIS 145 *9, 2012 WL 2580572 (Del. Ch. June 29, 2012); and *Carey v. Estate of Myers*, 2015 Del. Super. LEXIS 325 *20, 2015

43

WL 4087056 (Del. Super. Ct. July 1, 2015) (party is excused from performance under a contract if the other party is in material breach thereof).

### 2.  ACL Breached the Settlement Agreement Prior to HMS

It is undisputed that a material term of the Settlement Agreement was that ACL was required to refrain from using the term *Great American Steamboat* from February 9, 2012 through February 9, 2013.  *See* Ex. 46 to D.I. 171.  Evidence shows that ACL did not refrain from using the term *Great American Steamboat* during that time period.  For example, ACL issued print and email marketing materials to consumers using both terms *Great American Steamboat Company* and *Great American Steamboat Cruise* between February 9, 2012 and February 9, 2013.  *See* Ex. 47. In prosecuting its application for the *Great American Steamboat Cruise* mark ACL affirmed to the PTO that it was using the term *Great American* as of October 20, 2012, in connection with advertising and marketing materials.  *Id.*  ACL specifically affirmed as follows:

> Applicant asserts that the mark was first used in connection with the services at least as early as October 20, 2012; was first used in commerce in connection with the services at least as early as October 20, 2012; and is now in use in commerce.

*See* Ex. 48.[51] This affirmation to the PTO is conclusive evidence of ACL's breach of the Settlement Agreement prior to any breach by HMS which ACL alleges.  Moreover, there is evidence of record showing that ACL used the term *Great American* as part of its paid search Internet advertising program throughout 2012 in breach of this same provision.  *See* Ex. 48.  ACL seemingly disregarded its obligations under the Settlement Agreement and breached it well before any alleged breach by HMS.  As a result, HMS was excused from having to perform under the Settlement Agreement and cannot itself have breached.

---

[51] ACL cites the Declaration of Charles A. Robertson, ¶ 43, to support its claim that ACL complied with the Settlement Agreement by not using the term *Great American* from between February 2012 and February, 2013.  However, the cited paragraph does not so state and ACL points to no facts supporting its position that the term *Great American* was not used by ACL during that time.

### 3.   The Settlement Agreement Did Not Require the Transfer of Domain Names

Even assuming ACL's breach claim is not barred by the prior breach defense, ACL cannot succeed on its claim because HMS did not breach the express terms of the agreement in that the Settlement Agreement did not expressly or impliedly require the transfer of any domain names. Domain names were not at issue or even discussed in the First Action.[52]

Under Delaware law, "a contract's express terms provide the starting point in approaching a contract dispute." *Inteam Assocs., LLC v. Heartland Payment Sys.*, 2016 Del. Ch. LEXIS 151, *14 (Del. Ch. Sept. 30, 2016). Further, "in upholding the intention of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *Id.*

The plain language of the Settlement Agreement required HMS to "surrender" or "cease to use" its "Rights" to the term *Great American Steamboat* within 270 days, voluntarily withdraw any pending trademark applications using the term *Great American* within 30 days, and change the name of its Delaware limited liability company within 30 days. *See* Ex. 46 to HMS's Opening Brief. The spirit of the agreement was always that HMS would cease using the term *Great American* – and it indisputably did so.[53]

---

[52] With respect to domain names, nothing in trademark law requires that title to domain names that incorporate trademarks or portions of trademarks be provided to trademark holders. Instead, the law simply prevents others from making use of a company's trademarks in a manner likely to confuse the consuming public. *See Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 49 F. Supp. 2d 496 (E.D.Va. 1999). Even if there was some validity to ACL's argument that the domain names were impliedly included as part of the definition of "Rights" under the Settlement Agreement, it would go against established law to require HMS to transfer those domain names to ACL absent an express provision in the agreement requiring such transfer.

[53] As to ACL's argument that a domain name is "derivative" of trademark rights under the agreement, there have been differing interpretations of "derivative" throughout the litigation and no one can seem to settle on a consistent definition. On the one hand, ACL contends that a

Pursuant to the agreement, HMS abandoned its trademark application and changed the name of its limited liability company within 30 days. By July, 2012, HMS had effectively rebranded to *American Queen Steamboat Company* in that it had announced to the public its name change, switched its primary domain name to the <u>AQSC.com</u> domain name, changed print and electronic marketing materials to reflect the new brand, and was generally doing business under the new brand. The only real use of *Great American* at that point was that the <u>GASC.com</u> domain name continued to redirect to the HMS website.

Importantly, there was no use of the <u>GASC.com</u> domain name or the term *Great American* following the November, 2012 settlement deadline – and ACL points to no such use in its brief (aside from recent paid search use, discussed below). ACL's argument for breach is strictly limited to the argument that HMS's continued maintenance or ownership of that domain name violated the agreement. Since, by the settlement deadline, HMS had ceased all use of the term *Great American Steamboat* and completely rebranded. As of early November, 2012, the <u>GASC.com</u> domain name did not resolve to active websites. HMS ceased using the term *Great American* in any commercial or intentional sense and fully complied with the express language and spirit of the Settlement Agreement. HMS's mere ownership, without use, does not violate the express terms of the Settlement Agreement.

---

"derivative" of *Great American* includes any other trademarks that are confusingly similar to *Great American* as well as any domain names that might include *Great American* as part of the name. ACL even tried to expand the definition of derivatives to include the name *American Queen Steamboat Company* in the fifth version of the Complaint. HMS witness, Bob Herre, who took part in the settlement negotiations, testified that "derivatives" meant variations of *Great American Steamboat Company* including *Great American Steamboat Cruise* or *Great American Steamboat Cruise Company*. Herre Depo., p. 91. HMS's former head of marketing testified that, as he understood it, domain names were not included in the agreement because domain names were expressly not included and left open for interpretation. Rubacky Depo., p. 99. The Court need not interpret the term "derivative" here since the issue is only whether HMS was required to cease using the domain name or actually transfer it to ACL.

### 4.  HMS's Recent Use of *Great American* as a Paid Search Term Is Not a Material Breach of the Settlement Agreement

In its brief, ACL cites to evidence showing that the term *Great American Steamboat* was used by HMS as a paid search term starting sometime in January, 2016.  HMS concedes that the evidence shows that it used this term as part of its paid search program in 2016.  Such use began in 2016 after discussions between HMS and its third party paid search manager as to terms to use in the competitor campaign.[54]  HMS did not recall that it was using the term "Great American" until ACL filed the present motion. *Id*., ¶ 6. As soon as HMS learned that it had been using this term it immediately ceased all use.  *Id*., ¶ 7.

To put the extent of this use in context, for the entirety of 2016, HMS spent a total of ███████ in advertising costs related to the use of the term *Great American* as a paid search term. *Id*., ¶ 10.  This is compared to over ███████ in costs for the remainder of HMS's paid search campaign.  *Id*.  Paid searches for the term *Great American* yielded only ██████impressions (ads displayed in Google) and ███ clicks (website visits) in all of 2016. *Id*., ¶ 8.  By way of comparison, this represented only .1% of all paid search impressions for HMS.  *Id*., ¶ 9.

The following graph, taken from an HMS paid search analytic report, illustrates the historical results of HMS's paid search program related specifically to the term *Great American*:[55]



---

[54] *See* Affidavit of Eric Welter, ¶ 6, attached as **Exhibit 59**.
[55] *See* paid search report, attached as **Exhibit 60**.

This shows HMS's proper use of the term as a paid search term prior to the settlement deadline of November, 2012, and the recent, minimal use in 2016.  This next graph illustrates historical organic search traffic to HMS's website, and is taken from an organic search analytic report:[56]



 There has been virtually no traffic to HMS's website resulting from searches for the term *Great American* since HMS changed its name to *American Queen Steamboat Company* in 2013.

HMS's use of *Great American Steamboat* as a paid search term can be said to be below minimal and almost nonexistent.  Therefore, there is no reasonable argument that such use constitutes a material breach of the Settlement Agreement.  This was not an intentional breach of the Settlement Agreement and is not a basis for summary judgment, especially given ACL's own conduct.

### 5.  There is No Evidence that ACL Has Suffered any Damages or Harm as a Result of the Alleged Breach

Delaware law requires a plaintiff to prove damages from a breach of contract "with reasonably certainty that [the] defendant's breach caused the loss." *Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.*, 350 F. Supp. 2d 582, 596-97 (D. Del. 2004).  ACL failed to prove or even articulate damages suffered as a result of HMS's alleged breach of the Settlement Agreement.  ACL doesn't even attempt to make an argument that it proved damages in its brief –

---

[56] *See* organic search report, attached as **Exhibit 61**.

much less make an argument that it proved damages for the breach with any reasonable degree of certainty.[57]

The only damages ACL even attempted to prove or articulate in this case relate solely to ACL's claim for trademark infringement based on HMS's use of *American Queen Steamboat Company*. For example, ACL's damages expert limits damages in his report to HMS's profits and ACL's alleged lost profits as defined in §1117(a) of the Lanham Act.[58] ACL's expert testified that, in calculating damages, he did not separately calculate damages for the breach of contract claim. His damages analysis was limited only to damages available under the Lanham Act. *See* Deposition of Christopher Rosenthal ("Rosenthal Depo."), pp. 60-62.[59]

In its initial disclosures, ACL did not attempt to articulate damages based on its breach of contract claim and it never supplemented its initial disclosures during the course of the litigation.[60] With respect to ACL's witnesses attempting to articulate damages, no one could articulate any damages. For example, in its recently supplemented responses to HMS's First Set of Interrogatories, ACL identifies the following people as having knowledge of damages suffered by ACL resulting from Defendants' acts and omissions: Tim Beebe, Susan Renner, Charles B. Robertson, and Charles A. Robertson.[61] However, a review of these individuals' deposition

---

[57] The only argument even remotely related to damages raised by ACL relates to the self-serving and speculative statements made by ACL representatives that HMS's continued ownership of the GASC.com domain name kept ACL from effectively marketing under the *Great American Steamboat* brand. *See* ACL Brief, p. 16. There is no evidence beyond this testimony that ACL has been prevented from using *Great American Steamboat* as a brand. It would not make rational business sense for ACL to operate two primary domain names. Further, evidence has shown that ACL has effectively used the term *Great American* through print and email marketing despite HMS's continued ownership of the GASC.com domain name.

[58] *See* Expert Report and Rebuttal Report of R. Christopher Rosenthal, attached as **Exhibit 62**.

[59] Cited portions of Mr. Rosenthal's deposition attached as **Exhibit 63**.

[60] *See* ACL's initial disclosures, attached as **Exhibit 64**.

[61] ACL's Amended Answers to Defendant's First Set of Interrogatories, attached as **Exhibit 65**.

testimony reveals that no one was prepared to testify as to damages as a corporate representative on behalf of ACL and no one had performed any calculations for the alleged damages in any way. Mr. Beebe could not provide testimony as to any damages ACL claims to have suffered. *See* Deposition of Tim Beebe ("Beebe Depo."), pp. 9-10, 15.[62]  Ms. Renner stated in her deposition that she was not designated to provide testimony on ACL's claims for damages and, therefore, did not do so.  Renner Depo., pp. 6-7.  Charles B. Robertson provided testimony as to where ACL "feel[s] the damages have come from" but could not quantify those damages. C.B. Robertson Depo., pp. 11-14. Lastly, ACL's CEO testified that he wasn't competent and didn't have the expertise to discuss how ACL was financially damaged by the allegations against HMS. Deposition of Charles A. Robertson, 12/11/14 ("C.A. Robertson Depo."), pp. 46-47.[63]

ACL is required to show, with at least a reasonable degree of certainty, that the alleged breach of contract caused a loss.  However, ACL failed to offer any evidence regarding the damages it suffered from the alleged breaches of the Settlement Agreement.  Without any other proof, this Court should grant summary judgment on ACL's breach of contract claim.

## V.    CONCLUSION

For the foregoing reasons, ACL's motion for partial summary judgment should be denied and the Court should enter partial summary judgment in favor of HMS on ACL's claim for breach of contract (Count I of D.I. 129) and claims for trademark infringement and unfair competition based on HMS's use of the terms *American Queen* and *American Queen Steamboat Company* (Counts II, IV, V, VII and VIII of D.I. 129).

---

[62] Cited portions of Mr. Beebe's deposition are attached as **Exhibit 66**.
[63] Cited portions attached as **Exhibit 67**.

Dated: January 25, 2017

Respectfully submitted,

s/Richard A. Barkasy

_____

Richard A. Barkasy (#4683)
**SCHNADER HARRISON SEGAL &  LEWIS LLP**
824 N. Market Street, Suite 800
Wilmington, DE 19801
Phone:  (302) 888-4554
Fax:  (302) 888-1696
rbarkasy@schnader.com

-and-

Dennis D. Murrell (*pro hac vice*)
Brian P. McGraw (*pro hac vice*)
**MIDDLETON REUTLINGER**
401 S. 4th Street, Suite 2600
Louisville, Kentucky 40202
Phone: (502) 584-1135
Fax: (502) 561-0442
dmurrell@middletonlaw.com
bmcgraw@middletonlaw.com

*Attorneys for Defendants*

51