# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERICAN CRUISE LINES, INC.,

    Plaintiff,

v.

HMS AMERICAN QUEEN
STEAMBOAT COMPANY LLC and
AMERICAN QUEEN STEAMBOAT
OPERATING COMPANY, LLC.,

    Defendants.

No. 13-cv-324 (RGA)

## MEMORANDUM OPINION

Mary B. Graham, Stephen J. Kraftschik, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Del.; David Williams (argued), Michael R. Naccarato, Wayne H. Xu, GORMAN & WILLIAMS, Baltimore, Md., attorneys for Plaintiff American Cruise Lines, Inc.

Richard A. Barkasy, SCHNADER HARRISON SEGAL & LEWIS LLP, Wilmington, Del.; Dennis D. Murrell (argued), Brian P. McGraw, MIDDLETON REUTLINGER, Louisville, Ky., attorneys for Defendants HMS American Queen Steamboat Company LLC and American Queen Operating Company, LLC.

August 14, 2017

*Ruhard G. Andrews*
**ANDREWS, U.S. DISTRICT JUDGE:**

Just sit right back and you'll hear a tale, a tale of two competing cruise lines. Plaintiff American Cruise Lines operates the vessels America, American Pride, American Spirit, American Star, American Glory, Independence, Queen of the West, and Queen of the Mississippi with the American Constellation soon to come. Defendant American Queen Steamboat Company[1] operates the American Queen and American Empress vessels. Their boats[2] sail on, among others, the Mississippi River and the Columbia and Snake Rivers, as well as along the United States coast.

The weather started getting rough between the parties when Defendant, after purchasing the American Queen from the Government, adopted the name Great American Steamboat Company ("GASC"). Plaintiff sued; the suit settled, giving Plaintiff the rights to the GASC trademark; and Defendant changed its operating name to American Queen Steamboat Company ("AQSC"). Having settled, it would seem the disagreement over the GASC mark would be water under the bridge. Apparently not.

Here is the three hour tour of the dispute between the parties. Plaintiff claims Defendant breached the settlement agreement and is cybersquatting on its GASC mark. The dispute over the GASC mark was again the basis of this suit. (D.I. 1). Plaintiff's complaint stirred the waters. Now, the case has spiraled into a full-blown trademark dispute.

---

[1]     There are two Defendants HMS American Queen Steamboat Company LLC and American Queen Steamboat Operating Company LLC. For purposes of this opinion I will refer to them collectively as Defendant American Queen Steamboat Company or AQSC.

[2]     Whose fate we hope is better than the Minnow's.

2

Plaintiff claims Defendant's use of the AQSC mark infringes Plaintiff's

American Cruise Lines ("ACL") mark. Plaintiff's ACL mark is senior to Defendant's

AQSC mark. Defendant, in turn, claims Plaintiff's ACL and American vessel marks

infringe Defendant's senior American Queen mark.

Looking for any port in the storm, the parties turned to attacking the validity

of each other's marks. Plaintiff claims Defendant's American Queen mark was

abandoned when the vessel sat in dry dock under government control for over three

years. Defendant claims Plaintiff's American Eagle mark was fraudulently

procured.

Plaintiff (D.I. 172, 216) and Defendant (D.I. 170, 212) have filed cross-

motions for summary judgment on various issues. Each party has also moved to

exclude expert witnesses proffered by the other. (D.I. 167, 182).

I will begin with a voyage through the *Daubert* motions. Those resolved, I will

set sail for the summary judgment motions.

## I.    *DAUBERT* MOTIONS

Defendant proffers, and Plaintiff lodges (D.I. 167) *Daubert* challenges at, the

testimony of two expert witnesses: Dr. Basil Englis and Cate Elsten. Likewise,

Defendant brings *Daubert* challenges[3] (D.I. 182) to the testimony of four of

Plaintiff's experts: Gary Krugman, Bruce Silverman, Christine Duffy, and Peter

---

[3]    In several places, Defendant challenges Plaintiff's experts as offering irrelevant testimony.
For example, Defendant argues that Duffy and Silverman's discussion of the operation of the
American Cruise Lines company in the 1970s and 1980s is not relevant to the case at hand.
Defendant also challenges portions of Kent's opinion as lacking relevance. These arguments are not
*Daubert* arguments so much as early motions *in limine*. As such, I will address them, if raised again,
as a part of the pretrial conference.

3

Kent. After reviewing the relevant legal standard, I will address the fitness to sail

of each expert's proffered testimony.[4]

## A.  Legal Standard

"[T]he district court acts as a gatekeeper" to ensure that expert testimony is

reliable and helpful. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "The

primary locus of this obligation is [Federal Rule of Evidence] 702...." *Daubert v.*

*Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993). It reads:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of
> the case.

Fed. R. Evid. 702.

Rule 702 codified the Supreme Court's holding in *Daubert. Calhoun v.*

*Yamaha Motor Corp.*, 350 F.3d 316, 320 (3d Cir. 2003). The *Daubert* Court rejected

the then widely used *Frye* test. *See Daubert*, 509 U.S. at 589. The *Frye* test required

an expert's theory or process be "generally accepted as reliable in the relevant

scientific community." *Id.* at 584. The test was seen as imposing too "rigid" a

---

[4]     Defendant's experts' reports are cited as follows. Dr. Basil Englis's expert report is cited as
Englis and is available at D.I. 168-1 at 2. Cate Elsten's opening expert report is cited as Elsten and
is available at D.I. 168-1 at 127. Elsten's rebuttal expert report is cited as Elsten Rebuttal and is
available at D.I. 168-1 at 251.

        Plaintiff's experts' reports are cited as follows. Gary Krugman's expert report is cited as
Krugman and is available at D.I. 184-1. Bruce Silverman's expert report is cited as Silverman and is
available at D.I. 184-4. Silverman's rebuttal report is available at D.I. 184-5. Christine Duffy's expert
report is cited as Duffy and is available at D.I. 185-3. Duffy's rebuttal report is available at D.I. 185-
4. Peter Kent's expert report is cited as Kent and is available at D.I. 185-6. Kent's rebuttal report is
cited as Kent Rebuttal and is available at D.I. 185-7.

requirement. *See id.* at 588. This rigidity was "at odds with the liberal thrust of the Federal Rules and their general approach of relaxing traditional barriers to opinion testimony." *Id.* at 588.

### i. *Burden of Proof*

*Daubert* replaced the *Frye* test with a "trilogy" of requirements: (1) qualification, (2) reliability, and (3) fit. *Schneider*, 320 F.3d at 404. My determination that proffered testimony complies with these prerequisites is governed by Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592. As such, I must find *Daubert*'s trilogy of requirements is met by a preponderance of the evidence. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

On the one hand, this showing requires the party proffering expert testimony do more than make a *prima facie* case of reliability. *Id.* at 743. On the other hand, the "evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* The proffering party does not "have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* at 744.

### ii. *Qualification*

The first prerequisite, qualification, "refers to the requirement that the witness possess specialized expertise." *Schneider*, 320 F.3d at 404. While the language of *Daubert* is couched in terms of scientific expertise and knowledge, the qualification requirement, as well as the fit and reliability requirements, are

5

imposed on other technical or specialized knowledge. *Calhoun*, 350 F.3d at 321
(citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

The Third Circuit has interpreted the qualification requirement "liberally"
and has "eschewed imposing overly rigorous requirements of expertise...." *Paoli*, 35
F.3d at 741. Generalized qualifications are sufficient, *id.*, but "more specific
knowledge is required to support more specific opinions," *Calhoun*, 350 F.3d at 322.

### iii. *Reliability*

"[A]n expert's testimony is admissible so long as the process or technique the
expert used in formulating the opinion is reliable." *Paoli*, 35 F.3d at 742. Reliability
does not require certainty, *Daubert*, 509 U.S. at 590, but does require "validity,"
*Paoli*, 35 F.3d at 742.

As with all of the *Daubert* requirements, I have a gatekeeping role to play in
assessing the reliability of the expert testimony. "When there is a serious question
of reliability of evidence, it is appropriate for the court to exercise to some degree an
evidentiary screening function." *Paoli*, 35 F.3d at 743 (quoting *United States v.
Downing*, 753 F.2d 1224, 1240 n. 21 (3d Cir. 1985)).

That being said, the Third Circuit has warned that "the reliability
requirement must not be used as a tool by which the court excludes all questionably
reliable evidence." *Id.* at 744. An expert's opinion must be founded on good grounds,
not perfect ones. *Id.* I can conclude there are good grounds for the opinion even if I
"think[] there are better grounds for some alternative conclusion" or that the
expert's methodology "has some flaws such that if they had been corrected, the

6

scientist would have reached a different result." *Id.* The Third Circuit has directed that a "judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Id.* at 744-45.

### iv. *Fit*

For expert testimony to be admitted, it must be capable of "help[ing the jury to] understand the evidence or to determine a fact in issue...." Fed. R. Evid. 702. This fit requirement asks whether the proffered testimony is sufficiently helpful. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."). "[H]elpfulness requires more than bare logical relevance, but there is a strong preference for admission." *Paoli*, 35 F.3d at 745. The same liberalness in evaluating reliability applies in evaluating fit. *Id.* at 745. "Once again, [the Third Circuit] emphasize[s] that the standard is not that high." *Id.*

### v. *Rule 403*

Assuming an expert meets the requirements of qualification, reliability, and fit, there is still "some room for Rule 403 to operate independently." *Paoli*, 35 F.3d at 746. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

7

On the one hand, the Supreme Court has explained, "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge ... exercises more control over experts than over lay witnesses" under Rule 403. *Daubert*, 509 U.S. at 595 (citations omitted). On the other hand, the Third Circuit has warned: "[A] district court cannot exclude a scientific technique as too confusing and overwhelming simply based on its conclusion that scientific techniques by their very nature confuse and overwhelm the jury." *Paoli*, 35 F.3d at 746. Instead, in order to exclude expert evidence under Rule 403, there "must be something about the particular [] technique such as its posture of mythic infallibility that makes is especially overwhelming." *Id.*

## B. Dr. Basil Englis

Defendant proffers, and Plaintiff challenges, Dr. Basil Englis as an expert on likelihood of confusion. Dr. Englis is a long-time marketing professor at Berry College, where he chairs the Marketing Department. (Englis at ¶ 1). He has a doctorate in experimental social psychology from Dartmouth College. (Englis Ex. A). Dr. Englis has authored over 100 published and refereed conference papers. (*Id.*).

Dr. Englis is not an expert in the cruise industry specifically or travel industry generally. He has had two prior engagements in the travel industry: one for an airline where he studied the use of trademark terms as paid search keywords and one for a hotel booking website. (D.I. 168-1 at 65, 75).

Dr. Englis proffers an opinion that there is a likelihood of confusion between Plaintiff's and Defendant's marks. As is a regular practice in trademark cases, Dr.

8

Englis often conducts surveys to measure consumer confusion. (*Id.* at 77). He did not conduct such a survey here. (*Id.* at 78). Instead, his opinions are based on his review of qualitative evidence. (*Id.* at 84–85).

I am excluding Dr. Englis's likelihood of confusion opinion except that I will allow Dr. Englis to testify on Plaintiff's use of paid search keywords and confusion.

Dr. Englis fails to moor his conclusions in reliable methodology or reasoned analysis. Outside of his discussion of paid search keywords. Dr. Englis's expert report is nothing more than a recitation of facts paired with bare assertions. For example, in his actual confusion opinion, once factual accounts of confused consumers and travel agents are removed, all he offers is an assertion that "actual confusion is occurring in the marketplace" and that "the activities of [Plaintiff] are implicated as causes of confusion in that consumers are contacting [Plaintiff] believing they are contacting [Defendant]...." (*See* Englis at ¶¶ 28–52). His other opinions do not offer more than facts and conclusions either.

The jury is capable of assessing the facts narrated by Dr. Englis in his report and he offers no analysis to help them in doing it. *Cf. Cheesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 397–98 (9th Cir. 1982) (stating a district court could have excluded an expert testifying on likelihood of confusion because his testimony touched on matters of "common knowledge and experience"). Conclusory statements of basic facts will not help the jury and fail to offer a reliable methodology. *See Betterbox Commc'ns v. BB Tech., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (suggesting expert's methodology in a likelihood of confusion case involving computer product

catalogues was flawed because he simply evaluated the catalogues, "informally surveyed colleagues," and looked at the target market). Thus, I am excluding Dr. Englis's testimony on likelihood of confusion under Rule 703.

Plaintiff asserts other grounds for me to exclude Dr. Englis's testimony, including his assumption that the vessel name American Queen is iconic without citation to evidence or analysis and his questionable use of data to calculate revenues and marketing expenditures. Because I am excluding his testimony as unhelpful, I need not address those arguments.

Dr. Englis's opinion on Plaintiff's use of Defendant's marks as paid search keywords stands in contrast to his other proffered opinions. This use is part of Defendant's infringement case. In broad strokes, Plaintiff paid search engines like Google to have its own ads appear as sponsored content when consumers entered Defendant's marks in the search engine.

In opining on Plaintiff's use of paid search keywords, Dr. Englis offers more than mere recitation of facts; he offers explanation. For example, in opining on the significance of using Defendant's marks as a paid search keyword, he references and explains the funnel effect, a concept related to how consumers search for products. His opinions cite and incorporate research to provide context. Thus, I find that Dr. Englis's opinion on Plaintiff's use of paid search keywords would be helpful to the jury. He is qualified to offer this opinion having previously studied and published on the topic.

10

While Dr. Englis can testify on Plaintiff's use of Defendant's mark in creating

confusion, he cannot opine on Plaintiff's intent. Dr. Englis, in his report, proffers an

opinion that Plaintiff's use of Defendant's marks demonstrates Plaintiff intended to

cause and to benefit from consumer confusion. (Englis at ¶¶ 97–101).[5] Intent is not

a proper topic for expert testimony. *E.g., AstraZeneca LP v. TAP Pharma. Products*,

444 F. Supp. 2d 278, 293 (D. Del. 2006). Thus, while Dr. Englis can testify that

Plaintiff's paid search keyword practices caused confusion, he cannot proffer an

opinion on how Plaintiff's practices speak to its intent.

## C.    Cate Elsten

Plaintiff challenges Defendant's damages expert, Cate Elsten, as offering

opinions outside of her expertise and as expanding on facts unnecessary to her

opinion.

Elsten is a finance and licensing expert with a focus on intellectual property.

(Elsten at App. C). She currently serves as the Managing Director of Ocean Tomo,

"an integrated intellectual property consulting firm providing financial products

and services including expert testimony, valuation, investments, risk management

and transactions." (*Id.* at p. 1).

While most of Elsten's two reports, an opening report and a rebuttal report,

are appropriate and supported, her opinions sometimes drift outside of her area of

expertise. For example, Elsten analyzes product differentiation between the two

companies. (Elsten Rebuttal at pp. 11–19). Defendant has not satisfied its burden to

---

[5]    In its brief, Defendant appears to disavow this testimony. (*See* D.I. 211 at 15).

11

show Elsten is qualified to opine on how consumers make purchasing decisions. Likewise, Elsten has not been qualified to interpret the survey results proffered by Hal Poret, Plaintiff's expert.

Elsten also offers up factual accounts with questionable relevance to her damages opinion. For example, she summarizes instances of actual confusion, discusses Plaintiff's use of paid search keywords, and recounts all of the facts relevant to abandonment.[6] To the extent Elsten's factual narratives exceed that necessary to explain the opinions actually proffered and she proffers opinions for which she has not been qualified, her opinions are excluded. Her opinions are otherwise allowed.

### D. Gary Krugman

Gary Krugman is a trademark attorney who previously served as an examiner in the U.S. Patent and Trademark Office and as an attorney examiner and then administrative trademark judge at the Trademark Trial and Appeal Board. (Krugman at ¶¶ 4–7, 9). Plaintiff proffers Krugman to explain the policies and procedures of the USPTO and the intricacies of trademark law.

Defendant moves to exclude Krugman because his "testimony would usurp the role of the Court in instructing the jury...." (D.I. 183 at 7). Plaintiff responds

---

[6]     Elsten deciphers financial documents related to Defendant's spending on American Queen after its acquisition of the vessel from the Government. (Elsten Rebuttal at pp. 8–9). She is qualified to offer this opinion even if it primarily relates to the merits question. She is not otherwise qualified to opine on the abandonment issue. For example, she summarizes press coverage of Defendant's efforts. This is outside of her area of expertise.

that courts frequently allow intellectual property lawyers to testify on the policies
and practices of the USPTO. (D.I. 215 at 8–9). Both are correct.

Krugman's testimony on the policies and procedures of the USPTO is of the
type courts generally admit. *See Sam's Wines & Liquors, Inc. v. Wal-Mart Stores,
Inc.*, 1994 WL 529331, at \*8–9 (N.D. Ill. Sept. 27, 1994) (stating "[c]ourts generally
have admitted expert testimony from intellectual property lawyers in trademark
cases" and allowing an expert to testify "about the technical aspects of applying for
and obtaining a federal trademark registration"). But Krugman's testimony on
substantive trademark law, for example, on distinctiveness, impermissibly usurps
my role, which is to instruct the jury on the law. *See id.* (""[C]ourts have rejected
expert testimony by a lawyer when the testimony is only intended to instruct as to
the applicable trademark law.").

Krugman's testimony is admissible to the extent it is relevant, if at all, and to
the extent it focuses on the policies and practices of the USPTO. It is excluded to the
extent it explains the law.

## E.     Bruce Silverman

Plaintiff's expert, Bruce Silverman, is a veteran in the marketing industry
with significant experience working for clients in the travel and tourism industry.
(Silverman Ex. B). Silverman offers opinions on the strength of the marks in the
case and on likelihood of confusion.

Silverman has worked in advertising since 1967. His jobs have run the gamut
from working as a copywriter, to serving as creative director in an advertising

13

agency, to running the domestic division of "the then world's largest ($22 billion in annual billings) media planning and buying agency...." (Silverman at ¶¶ 7–9). Silverman lists thirty-two prior clients engaged in the travel and tourism industry, including two other cruise lines. (Silverman Ex. B at pp. 74–75).

Defendant challenges Silverman's qualification because he does not have experience in the "U.S. inland river cruising industry...." (D.I. 183 at 11). Defendant's argument runs aground of *Daubert*'s liberal spirit. Silverman is qualified to offer the opinions presented in his expert report. Silverman has not only broadly applicable experience but also experience in the travel and tourism industry specifically.

Defendant argues that Silverman's opinions lack basis. I disagree. Silverman supports his opinions with analysis based on his wealth of experience and with citation to factual support. For example, Defendant specifically challenges Silverman's opinion that the term "'American' is the distinctive and most important word in [Plaintiff's] brand name." (Silverman at ¶ 56 (challenged by Defendant at D.I. 183 at 11–13)). To support this opinion, he leans on his experience working with other travel and tourism companies, and looks to comparable markets like the river cruise market in Europe. (*See* Silverman at ¶¶ 49–53). He also cites specific instances of publications and persons using only American to refer to Plaintiff. (*Id.* at ¶¶ 54–55).

Defendant also attempts to challenge Silverman's testimony by citing to contradictory evidence. This attempt also fails. Contradiction is proper fodder for cross-examination. *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004).

Defendant's arguments on Silverman's proposed intent testimony and his "informal survey" are a different kettle of fish. These arguments are meritorious. Silverman, like Dr. Englis, is not permitted to testify on the opposing party's intent.[7]

Silverman's "informal survey" is also excluded because it lacks indicia of reliability. Silverman offers the "informal survey" to "bolster[]" his conclusion that a "reasonably careful consumer" could confuse Plaintiff and Defendant even if that consumer uses a travel agent to book her cruise. (Silverman at ¶¶107–08). The informal survey consisted of Silverman directing "an experienced market research professional" to contact travel agents in nine states to ask the question, "Do you or your customers ever get confused as to which company is which?" (Silverman at ¶ 108).[8]

Plaintiff failed to provide any information on how these agents were selected, whether they are representative, and how their responses were categorized. (*See* D.I. 215 at 23; Silverman at ¶ 108). While Plaintiff is correct, the survey "need not be a scientific survey" in any formal sense, to be admissible, the survey must be

---

[7]     The same is true for Plaintiff's experts Duffy and Kent. To the extent those experts offer a conclusion on Defendant's intent, those opinions are excluded. For example, Kent cannot offer the opinion that Defendant's paid search keyword bidding demonstrates Defendant's intent, but can explain what its behavior was.

[8]     I would think that asking a leading question is not only "informal" and unscientific, but also makes the responses unreliable.

15

moored in some reliable process that can be tested on cross-examination. *See United States v. Mitchell*, 365 F.3d 215, 244–45 (3d Cir. 2004). Thus, Silverman's informal survey is excluded.

## F.    Christine Duffy

Christine Duffy is a leader in the American cruising industry. Plaintiff proffers Duffy to opine on likelihood of confusion. Duffy is the President of Carnival Cruise Lines, previously served as the President and CEO of a cruise trade association, and has worked in various positions in the travel industry since working as a travel agent in 1982. (Duffy at ¶¶ 1–6, App. I). Duffy proffers an opinion on general practices in the cruising industry, on the two parties' positions in the industry, and on the similarities in the two parties' operations. (Duffy at ¶¶ 12–15). Defendant seeks exclusion of Duffy's testimony, in whole or in part, on four grounds. None are meritorious.

First, Defendant argues that Duffy is unqualified to proffer the opinions articulated in her expert report. Defendant primarily argues that the river cruising industry is "niche." (D.I. 183 at 17). Thus, it argues, her experience in the cruising industry is insufficient. Defendant's argument is dead in the water. The Third Circuit has warned against "imposing overly rigorous requirements of expertise" *Paoli*, 35 F.3d at 741, and Duffy has especially relevant experience in the American cruising industry. She is more than qualified to proffer an opinion in this case.

Second, Defendant argues that Duffy provides excessive factual narrative in her reports. Having reviewed her opening and rebuttal reports, I disagree. Duffy ties factual accounts to specific opinions they support.

Third, Defendant challenges Duffy's opinions as unsupported. For example, Defendant argues her opinions on the position of each party's brand in the industry lack support. Defendant also argues that her opinion that the American Queen vessel is not iconic is unsupported. I disagree. Not only does Duffy's experience undergird her opinions, but she supports her opinions with reasoning and facts.

Fourth, Defendant argues that Duffy's opinions are contradicted by other evidence. Defendant is welcome to challenge Duffy on cross-examination but, again, contradictory evidence is not grounds for a *Daubert* motion.

Defendant also challenges Duffy's testimony as cumulative of Silverman's and both as cumulative of Hal Poret's proffered testimony because all three proffer opinions on likelihood of confusion. (D.I. 183 at 8–9). Poret conducted a consumer survey and, on that basis, proffers an opinion on likelihood of confusion. (*See* D.I. 181-1). Defendant has not challenged his proffered testimony individually.

The three experts are not necessarily cumulative of one another because each reaches a conclusion on likelihood of confusion via a different route. Poret offers quantitative analysis. Thus, his testimony is decidedly not cumulative. Both Silverman and Duffy base their opinions on qualitative evidence, but Silverman's opinion is focused on marketing and branding generally, whereas Duffy's analysis focuses on the cruise industry specifically. Thus, at this point, I do not find Duffy's

17

and Silverman's opinions inadmissibly cumulative of each other. Final resolution of this matter, though, is better reserved for trial.

## G. Peter Kent

Peter Kent's expertise is in online advertising and e-commerce activity. (Kent at ¶¶ 3–12, App. B). He brings that expertise to bear on Plaintiff's behalf, analyzing both parties' online activity and presence.

Kent's report provides background on how the Internet and websites operate, on how companies select and use domain names, on how search engines work, and on how companies seek advantage from search engines. (Kent at ¶¶ 15–92). Defendant challenges this part of Kent's report as unnecessary. (D.I. 183 at 21). In the parlance of *Daubert*, Defendant argues that expert testimony on these subjects is unhelpful. I disagree. These topics are complicated and not within the bailiwick of a layperson.

Defendant also challenges Kent's opinions as unreliable and unsupported. For example, Defendant argues Kent's "opinion that the *American Queen* vessel was not iconic in 2011" is inadmissible because it is "based solely" on his "review of general Internet traffic." (D.I. 183 at 24 (citing Kent Rebuttal at p. 44)). Defendant mischaracterizes Kent's proffered opinion.

The cited portion of Kent's rebuttal report looks at exact match keyword searches and click through rates for the vessel, "American Queen," versus the company name, "Great American Steamboat Company." (Kent Rebuttal at ¶¶ 139–42). The company name garnered a much higher volume of searches and clicks than

18

the vessel name did. Kent analyzed data from 2011, an important year because Defendant claims to have started selling cruises on the American Queen then. Kent argues his analysis counters the suggestion by Defendant's experts that the American Queen's iconic status drove sales in 2011. Defendant presents no argument that the way Kent analyzed keyword traffic is unreliable and I disagree with their characterization of the testimony as "jump[ing]" to a conclusion. Defendant's other reliability arguments are similarly unavailing.

Finally, Defendant moves to exclude a portion of Kent's rebuttal report where he summarizes case law. (D.I. 183 at 22 (citing Kent Rebuttal at pp. 7–13)). To the extent Kent attempts to explain the legality of paying to use a competitor's trademark as a paid search keyword, that testimony is excluded. It is my role to instruct the jury on the law, not Kent's.

In sum, Plaintiff's motion (D.I. 167) to exclude Dr. Englis and Elsten is granted in part and denied in part. Similarly, Defendant's motion (D.I. 182) to exclude Krugman, Silverman, Duffy, and Kent is granted in part and denied in part. Having resolved the *Daubert* motions, I turn to the summary judgment motions.

## II. SUMMARY JUDGMENT

Plaintiff has moved (D.I. 172, 216) for summary judgment in its favor on its breach, abandonment, and infringement claims and on Defendant's fraudulent procurement claim. Defendant has moved (D.I. 170, 212) for summary judgment in its favor on Plaintiff's breach, cybersquatting, abandonment, and infringement claims and on its own infringement claim.

19

To resolve these motions, this opinion makes the following stops. First, I will summarize the legal standard governing summary judgment motions. Then, I will address the motions on Plaintiff's breach of contract and cybersquatting claims. Next, I will address the motions on Defendant's fraudulent procurement claim and Plaintiff's abandonment claim. Finally, I will address the motions on each parties' trademark infringement claims.

## A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The moving party may discharge its burden by pointing out that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## B. GreatAmericanSteamboatCompany.com

After purchasing the American Queen vessel in 2011, Defendant initially chose to name its company and brand Great American Steamboat Company ("GASC"). As part of its marketing, Defendant registered domain names with the GASC mark.

Both Plaintiff and Defendant claimed a right to use the GASC mark. In March 2011, Plaintiff filed an application to register the mark. A few months later, Defendant filed an application to register the GASC mark as well. This contest over

21

rights to the mark led to litigation. *See American Cruise Lines, Inc. v. HMS American Queen Steamboat Company LLC,* 1:11-cv-889-JEI-KW (D. Del. filed Sept. 30, 2011).

That suit was settled by Agreement dated January 31, 2012. (D.I. 174-1 Ex. 21). Plaintiff was required to pay $125,000 in exchange for Defendant surrendering and discontinuing its use of the rights to "the 'Great American Steamboat' trademarks and derivatives thereof" within 270 days. Plaintiff also agreed to stop using the marks for one year, from February 9, 2012 to February 9, 2013, while Defendant worked to surrender the marks.

Both parties complied with the agreement, at least in part. Plaintiff paid Defendant $125,000 and Defendant mostly ceased use of the marks.

Defendant did not cede control of the domain name greatamericansteamboatcompany.com and even filed to extend its registration several times after 2012. (D.I. 179-1 Ex. 1 at 47–48). While Plaintiff asked Defendant to cast off the registration, Defendant refused. (D.I. 177-1 Ex. 35 at p. 16). Plaintiff argues Defendant's refusal left it marooned without the full use of its marks.

Defendant submits that Plaintiff failed to cease use of the GASC mark from February 9, 2012 to February 9, 2013. (D.I. 213 at 50).

Plaintiff filed this suit alleging that Defendant breached the Settlement Agreement by failing to transfer the domain name and that Defendant was liable for cybersquatting. (D.I. 1 Counts I (breach) and III (cybersquatting)). Each party

22

has moved for summary judgment in its favor on Plaintiff's breach claim (D.I. 172, 212) and Defendant has moved for summary judgment on Plaintiff's cybersquatting claim. (D.I. 170).

### i. *Breach of the Settlement Agreement*

"A settlement agreement is a contract and is interpreted according to local law." *Wilcher v. Wilmington*, 139 F.3d 366, 372 (3d Cir. 1998). Since the Agreement at issue settled a suit in the District of Delaware, Delaware law applies. *Id.*

Under Delaware law, to establish a breach of contract claim, Plaintiff must demonstrate that (1) there was a valid contract, (2) Defendant breached an obligation imposed by that contract, and (3) there was a resulting damage to Plaintiff. *VLIW Tech., LLC, v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). In order to recover damages, Plaintiff must show substantial compliance with all of its obligations. *E.g., E. Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.*, 1987 WL 9610, at \*4 (Del. Super. Ct. April 7, 1987); *see also AQSR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*, 2009 WL 1707910, at \*7 n. 25 (Del. Ch. Jun. 16, 2009).

If Plaintiff committed a material breach of the Agreement, Defendant could refuse to perform. *E. Elec. & Heating, Inc.*, 1987 WL 9610, at \*4. An immaterial breach by Plaintiff gives rise to damages, but does not allow Defendant to terminate the agreement. *Id.* A material breach is one that "go[es] to the essence of the contract" and is "of sufficient importance to justify non-performance by the non-breaching party." *Norfolk S. Ry. Co. v. Basell USA, Inc.*, 512 F.3d 85, 92 (3d Cir. 2008). Whether a breach of contract is material is a question of fact, but when there

23

are insufficient facts to support a claim that a breach is material or there is no dispute over the facts, the issue may be treated as a question of law. *Id.*

## Breach by Plaintiff

Defendant argues that Plaintiff committed a material breach by failing to cease use of the GASC mark during the Agreement's one year non-use period. (D.I. 213 at 50). Thus, Defendant's performance was excused and judgment should enter in its favor. Plaintiff asserts that it did discontinue use of the mark for a year, citing a statement by its Chief Executive to that effect. (D.I. 174 at ¶ 42). Because there is a genuine dispute whether Plaintiff used the GASC mark in mailings between February 9, 2012 and February 9, 2013, I am denying both Plaintiff's motion for summary judgment.

To support its argument, Defendant cites Plaintiff's September 13, 2013 Statement of Use for the GASC mark filed with the USPTO. (D.I. 214-29). In the Statement, Plaintiff attested, under oath, that it used the GASC mark "at least as early as October 20, 2012." Plaintiff attached to the Statement mailers and advertisements showing its use of the GASC mark.

Defendant's position is taking on water, but there is enough evidence to keep it afloat, at least for now. On the one hand, as Plaintiff points out, at least one of the documents attached to the Statement is clearly dated April 4, 2011 (*id.* at 6), and "at least as early as" does not mean "on." It means, "on or before."

On the other hand, there is evidence suggesting Plaintiff used the GASC mark during the non-use period. First, a mailer attached to the Statement touts a

24

2012 industry award, won by Plaintiff, for "World's Leading Small Ships Cruise

Line." (*Id.* at 4). The advertised cruise was to take place starting July 13, 2013. The

two dates on the mailer suggests it was used some time in 2012 or early 2013, most

of which overlaps with the non-use period. Second, Plaintiff's corporate

representative, the person who signed the Statement, testified in his deposition:

| Q | [W]hat is the date of first use that's identified in [the Statement of Use]? |
|---|---|
| A | October 20th, 2012. |
| Q | And what is the basis for the filing of this statement of use and claiming October 20th as the date of first use. |
| [...] | |
| [A] | My understanding is that that would be the time that we – what's the word? Mailed a direct mail piece out or placed an advertisement. |

(D.I. 245-1 at 3–4).

Together, this evidence is enough to create a genuine dispute over whether

Plaintiff used the mark in advertisements or mailings within the non-use period.

Thus, I am, in part, denying Plaintiff's motion for summary judgment on its breach

claim.

## Breach by Defendant

The question remains, was defendant's failure to turn over

greatamericansteamboatcompany.com a breach of the Agreement? Because I find it

was, I am denying Defendant's motion for summary judgment on Plaintiff's breach

claim and entering partial summary judgment for Plaintiff.

Defendant argues that the Settlement Agreement does not cover the right to

use the GASC mark in a domain name. (D.I. 213 at 52). In the Agreement,

25

Defendant agreed to "cease to use" the "rights" to the GASC mark. (D.I. 174-1 at
65).

Courts have repeatedly found a link between domain names and trademarks.
For example, in *Sutherland v. Gordon*, the Fourth Circuit found that a contract
giving a party the right to use the tradename "C.C. Pace" included the right to use it
as a domain name. 294 F.App'x 754, 755–56 (4th Cir. 2008). In a dilution case, a
district court found domain names that were the same or substantially similar to a
famous mark would impair the distinctiveness of the mark. *Minnesota Min. & Mfg.
Co. v. Taylor*, 21 F. Supp. 2d 1003, 1005 (D. Minn. 1998). And in *Brookfield
Communications v. West Coast Entertainment*, the Ninth Circuit noted that domain
names indicate a source and users are likely to associate a domain name containing
a mark with the mark itself. 174 F.3d 1036, 1055 (9th Cir. 1999).

Because I find Defendant's use of the GASC mark is an exercise of a right in
the mark, I am denying its motion for summary judgment in its favor and entering
partial summary judgment for Plaintiff on this issue.[9] The jury will decide whether
Plaintiff preemptively breached the agreement, excusing Defendant's performance.

---

[9]     Defendant also argues that Plaintiff has insufficient evidence it was damaged by Defendant's
breach. It is undisputed Plaintiff was unable to make use of its GASC mark as a domain name and
that Defendant's use of greatamericansteamboatcompany.com diverted traffic to Defendant's
website. This is sufficient to show harm. Further, Plaintiff paid $125,000 for the rights to GASC
mark. That amount provides some basis for a damages request.

26

### ii. Cybersquatting

Defendant's failure to surrender greatamericansteamboatcompany.com is also the basis for Plaintiff's cybersquatting claim. Defendant moves (D.I. 170) for summary judgment in its favor on this claim.

Claims for cybersquatting are anchored in the Anti-Cybersquatting Consumer Protection Act. 15 U.S.C. §1125(d). The Act makes it "illegal for a person to register or use with the bad faith intent to profit from an internet domain that is identical to or confusingly similar to the distinctive or famous trademark or Internet domain name of another person or company." *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001). To successfully assert a cybersquatting claim, Plaintiff must prove: (1) that it owns a "distinctive or famous mark entitled to protection," (2) Defendant's "domain name[] is 'identical or confusingly similar to' the [distinctive] mark," and (3) Defendant "registered the domain name with the bad faith intent to profit from [it]." *Id.* (citing § 1125(d)(1)(A)).

Defendant first registered greatamericansteamboatcompany.com on July 4, 2010. (D.I. 179-1 at 47; 171 at 50). It then re-registered the domain name annually. (D.I. 179-1 at 47–48). The last date of re-registration in the record is April 15, 2016. (*Id.* at 48).

Plaintiff filed its application to register the GASC mark with the USPTO on March 1, 2011. The mark was not registered until April 12, 2016. *See* GREAT AMERICAN STEAMBOAT COMPANY, Registration No. 4,936,950.

Both the distinctiveness of the mark and the intent of the registrant is measured at the time the domain name was registered. *Shields*, 254 F.3d at 485. The GASC mark went on the Federal Register, gaining a presumption of distinctiveness, after the first registration but before the last re-registration. Plaintiff also did not have clear ownership of the mark until after the initial registration. Because of this timeline, Plaintiff's claim will sink or swim based on what qualifies as a registration under the Act.

Defendant argues that registration is limited to when the domain name was initially registered. Plaintiff argues that re-registration counts as registration under the Act. First, I will resolve the argument over what qualifies as a registration. Second, I will evaluate Plaintiff's evidence of distinctiveness. Third, I will evaluate Plaintiff's evidence of bad faith intent.

In other scenarios, courts have found that registration is not limited to when the domain name was initially registered. Registration may include re-registration by a "new contract at a different registrar and to a different registrant." *Schmidheiny v. Weber*, 319 F.3d 581, 581 (3d Cir. 2003). Expiration of a registration followed by re-registration may also count as a form of registration. *Jysk Bed'N Linent v. Dutta-Roy*, 810 F.3d 767, 778 (11th Cir. 2005).

Defendant argues those cases should be interpreted narrowly. Since the domain name was not registered by a new owner and was not expired, Defendant contends that the relevant registration is the original registration of the domain name in 2010.

28

The cases on this point are not so limited. Courts have based their conclusion that re-registration qualifies under the statute on the intent and on the text of the Act.

Counting any registration as registration for the purposes of the Act gives force to Congress's intent to make "rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration." *Storey v. Cello Holdings, LLC*, 347 F.3d 370, 385 (2d Cir. 2003); *see also Ricks v. BMEzine.com LLC*, 727 F. Supp. 2d 936, 954 (D. Nev. 2010).

More so, the statutory language does not support limiting registration to the initial registration. The Third Circuit explicitly stated as much in *Schmidheiny*: "[W]e conclude that the language of the statute does not limit the word 'registration' to the narrow concept of creation registration." 319 F.3d at 583. In support of this conclusion, the court observed, "The words 'initial' and 'creation' appear nowhere in § 1129, and Congress did not add an exception for 'non-creation registrations'" in the Act's safe harbor provisions. *Id.* at 582.

Each re-registration extended Defendant's period of control over the domain name. (*See* D.I. 179-1 at 47–48). Under Defendant's theory a party could use another's mark to its own benefit and in bad faith indefinitely so long as the first registration was legal. That result conflicts with the text and purpose of the statute. *Cf. Schmidheiny*, 319 F.3d at 583 (rejecting a theory that "would permit the domain names of living persons to be sold and purchased without the living persons'

consent, ad infinitum, so long as the name was first registered before the effective date of the Act").

Consistent with the purpose and text of the Act, re-registration is a qualifying registration for liability. Thus, distinctiveness and bad faith can be determined at the time of any of the re-registrations, including Defendant's most recent extension of the domain name registration.

Because the distinctiveness of the mark can be measured at the time of the most recent re-registration, April 15, 2016, Plaintiff has sufficient evidence to survive summary judgment on distinctiveness. If a mark is federally registered, legal protectability and distinctiveness are presumed. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 291 (3d Cir. 1991). Plaintiff's GASC mark was federally registered on April 12, 2016. Since the federal registration of GASC provides a prima facie case of distinctiveness, Defendant's motion for summary judgment on the basis that Plaintiff's GASC mark lacks distinctiveness is denied.

Defendant argues Plaintiff has insufficient evidence to create a genuine issue of fact about whether Defendant had a bad faith intent to profit from the domain name. Plaintiff's bad faith case has holes, but it still floats. Two key pieces of evidence support Plaintiff. First, Defendant unquestionably knew that Plaintiff had the rights to the GASC marks and that it did not. (D.I. 174-1 Ex. 21); *see* 15 U.S.C. § 1125(d)(1)(B)(i)(I) (Use of another's trademark in a domain name is evidence of bad faith intent). Second, instead of simply relinquishing the domain name when asked to do so by Plaintiff, Defendant offered to sell it to Plaintiff instead. (D.I. 236-8); *see*

30

§ 1125(d)(1)(B)(i)(VI) ("[O]ffer to... sell... the domain name to the mark owner... for financial gain" is evidence of bad faith intent). Having found sufficient evidence to support the distinctiveness and bad faith elements of cybersquatting, I find Plaintiff's claim is seaworthy. Thus, I am denying Defendant's motion for summary judgment that it did not cybersquat.

## C. Fraudulent Procurement

Plaintiff has moved (D.I. 216) for summary judgment on Defendant's claim that Plaintiff fraudulently procured the American Eagle vessel mark. (D.I. 217 at 57). Defendant argues that Plaintiff fraudulently procured the American Eagle mark. In support of its application for the mark, Plaintiff's Vice President Tim Beebe signed an oath stating no other entity had a superior right in a mark with which the American Eagle mark was likely to cause confusion.

To prove fraudulent procurement generally, Defendant must prove, by clear and convincing evidence, that Plaintiff "knowingly ma[de] false, material representations of fact in connection with an application for a registered mark." *Sovereign Military Hospitaller v. Fla. Priory*, 702 F.3d 1279, 1289 (11th Cir. 2012). To prevail, Defendant must also show that Plaintiff had "a purpose or intent to deceive the PTO...." *Id.* Because Defendant's fraud claim is based on the oath, it must show Plaintiff was aware of Defendant's use of the "mark (either in an identical form or a near resemblance)" and that Plaintiff "knew or believed [Defendant] had a right to use the mark." *Id.* at 1290; *see Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001).

31

To prove Mr. Beebe believed there was a likelihood of confusion between American Queen and American Eagle, Defendant relies on Plaintiff's concern that there was confusion between the two companies: American Queen Steamboat Company and American Cruise Lines. (*See* D.I. 233 at 33). Belief of confusion between AQSC and ACL is not sufficiently probative of a belief of likelihood of confusion between American Queen and American Eagle, on its own, to support a fraudulent procurement claim, particularly where Defendant bears the burden of proving fraudulent procurement by clear and convincing evidence. Thus, I am granting Plaintiff's motion (D.I. 216) for summary judgment on Defendant's fraudulent procurement claim.

## D. Abandonment

Plaintiff seeks cancellation of Defendant's incontestable American Queen mark on two bases. First, Plaintiff argues that the mark was abandoned when the vessel was turned over to the Government. Second, Plaintiff argues that the mark is void *ab initio,* that is, there was a defect in the chain of title at the time it was registered. Defendant and Plaintiff have both moved for summary judgment in their favor on this claim. (D.I. 170, 216).

"American Queen" is the name of a vessel owned and operated by Defendant. That vessel bore the name American Queen under prior owners as well. The mark American Queen was registered on January 30, 1996, but the registration was filed

in 1993.[10] The mark is registered for transporting customers on steamboats and providing entertainment. *See* AMERICAN QUEEN, Registration Nos. 1,953,532; 1,953,533.

### i. *American Queen Sits in Dry Dock*

Plaintiff argues that the American Queen mark was abandoned because its prior owner terminated the vessel's operation and it sat in dry dock, in the possession of the U.S. Maritime Commission ("MARAD"), from 2008 to 2012. A mark is abandoned when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. There is a statutory presumption of abandonment after three years of non-use. *Id.* Use is defined in the statute as "bona fide use... in the ordinary course of trade...." *Id.*

The American Queen was previously operated by Ambassadors International as part of its Majestic America Line. In Spring 2008, Ambassadors decided to discontinue the Majestic America Line and cruises on the American Queen vessel with it. In November 2008, the American Queen embarked on its last voyage for Ambassadors and on November 15, 2008 the boat was turned over to MARAD. MARAD eventually sold the vessel to Defendant. The American Queen returned to the waterways in April 2012.

The parties dispute whether the statutory presumption of abandonment applies here. Defendant has evidence that it began booking cruises on the American

---

[10]    There are five American Queen marks registered with the same or similar registration and application dates. The other marks are for selling paraphernalia like glassware, jewelry, and clothing. (*See* D.I. 186-2 at 2–6).

Queen as early as September 28, 2011. (D.I. 187-14, 187-15, 233-1). Plaintiff has evidence calling Defendant's evidence into question. (D.I. 219-1 Ex. 116) (internal AQSC sales records). The date Defendant began booking cruises is critical because that is when the period of non-use ends.[11] *Cf. Int'l Bancorp, LLC v. Société des Bains de Mer et du Cercle des Étrangers à Monaco*, 329 F.3d 359, 364–65 (4th Cir. 2003) (finding no use because bookings were not for the casino associated with the mark in question). Thus, there is a genuine dispute of material fact making summary judgment on this issue unavailable.

On the whole, there is evidence supporting both parties' positions. It's an uphill climb for Plaintiff to prove abandonment. Abandonment, "being in the nature of a forfeiture, must be strictly proved." *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139 (3d Cir. 981). That said, Plaintiff has a strong case. Plaintiff has evidence of a long period of non-use, either just over or just under three years. Plaintiff has an executive of Ambassadors, the then-owner of the vessel, on record stating that Ambassadors never intended to resume use of the mark. (D.I. 186-10, 218-2 Ex. 86). That testimony is buttressed by the uncontested facts that Ambassadors decided to stop offering cruises on the American Queen, stopped trying to pay back the loans on the vessel, and turned it over to MARAD.

---

[11]     Defendant appears to argue that the efforts of MARAD to sell the American Queen vessel count as "use" under the statute. MARAD's use of American Queen, as the name of the vessel, to sell the vessel itself is not "use… in the ordinary course of trade." The American Queen mark is registered for providing steamboat services and accompanying entertainment. MARAD was simply naming the asset, not using the marks in a way that connotes the related services.

Defendant has countervailing evidence that, for now, keeps its head above water. For example, Defendant has evidence MARAD intended to sell the vessel, including for continued use as a cruise ship. (D.I. 187-2). There is also evidence suggesting that the American Queen mark retained value. (D. I. 186-5 at 3; *see also* D.I. 186-17, 187-6 at p. 214, 219-1 Ex. 115).

Defendant's motion for summary judgment of no abandonment for non-use and Plaintiff's cross-motion for summary judgment of abandonment for non-use are denied.

ii. *Chain of Title*

Plaintiff argues that Defendant's American Queen mark should be cancelled because there was a defect in the chain of title of the mark at the time the verified Statement of Use was filed. (D.I. 246 at 5–7). The American Queen mark is incontestable. Under 15 U.S.C. § 1064 and § 1065, an incontestable mark may be cancelled only if it (1) becomes generic (2) is functional (3) is abandoned (4) was obtained fraudulently or (5) misrepresents the source of the goods.

A void *ab initio* challenge, claiming a defect in the chain of title, is notably missing from that list. Thus, it is not a ground for cancellation of an incontestable mark. *See, e.g., Netjets Inc. v. Intelliget Group, LLC*, 678 F. App'x 343, 347–48 (6th Cir. 2017); *Collectable Promotional Products, Inc. v. Disney Enters., Inc.*, 2009 WL 1543449 (W.D. Okla. June 9, 2009). Plaintiff tries to fit its void *ab initio* challenge into an abandonment framework. (*See* D.I. 246 at 5). Abandonment, however, is defined in the statute. 15 U.S.C. § 1127. Plaintiff's theory does not fit the statutory

35

framework. Thus, to the extent that Plaintiff seeks cancellation of the American Queen mark on the ground that there is a defect in the chain of title, Defendant's motion for summary judgment is granted.

## E. Infringement

Plaintiff has moved (D.I. 172) for summary judgment that Defendant's AQSC mark infringes Plaintiff's ACL mark. Defendant moved (D.I. 170, 212) for summary judgment on Plaintiff's infringement claim in its favor on the basis of priority and estoppel and on its claim that Plaintiff's ACL mark and American vessel marks infringe Defendant's American Queen mark.

### i. Priority

Defendant argues summary judgment should issue in its favor on Plaintiff's claim that its AQSC mark infringes Plaintiff's ACL mark because the AQSC mark has priority through Defendant's American Queen mark. The AQSC mark itself is junior to the ACL mark. Thus, Defendant's claim of priority rests on its ownership of the American Queen mark. There is no basis in the law for Defendant to claim priority. It does not contest that its AQSC mark is junior to the ACL mark. It further concedes that tacking,[12] a doctrine that allows a newer mark to claim priority from an older mark if the marks are legal equivalents, does not apply. (D.I. 245 at 6 n. 6). Defendant instead argues that use of AQSC is a "natural expansion" of its rights in American Queen, but cites no authority for this uncharted proposition. (*Id.* at 7; *see also* D.I. 213 at 37–38). To the extent Defendant's motion

---

[12] This is the actual name of the doctrine. To quote Dave Barry, "I am not making this up."

(D.I. 212) moves for summary judgment of no infringement on the basis of priority, that motion is denied.

## ii. *Estoppel or Acquiescence*

The statute allows a defendant in an infringement action to assert the defenses of estoppel and acquiescence. 15 U.S.C. § 1115(b)(9). Defendant argues both defenses apply here and seeks summary judgment on those bases. (D.I. 213 at 33–36). "The doctrine of acquiescence applies when the trademark owner, by affirmative word or deed, conveys its implied consent" to the defendant's use of the infringing mark. *Pappan Enters., Inc. v. Hardee's Food Sys.*, 143 F.3d 800, 804 (2d Cir. 1998). "The essence of an estoppel defense is that the defendant changed its position in reliance upon the misleading representation of the plaintiff." *Guardian Life Ins. Co. v. Am. Guardian Life Assurance Co.*, 943 F. Supp. 509, 517 n. 5 (E.D. Pa. 1996) (citing *Anheuser-Busch, Inc. v. Du Bois Brewing Co.*, 175 F.2d 370, 375 (3d Cir. 1949)).

To support its contention it had permission to use the AQSC mark, Defendant cites statements made in May 11 and August 18, 2011 letters from Plaintiff's attorney to Defendant's attorney seeking to resolve the prior litigation over the GASC mark. Defendant also cites deposition testimony describing a comment made in negotiations to resolve the same. I am denying Defendant's motion for summary judgment of non-infringement on the basis of estoppel or acquiescence.[13]

---

[13]   Plaintiff argues that both the settlement offer and statements made during negotiation are inadmissible under Federal Rule of Evidence 408. Rule 408 does not ban all evidence related to

37

As for the letters, Defendant cannot lay claim to the benefit of a bargain it never made. In the August 18 letter relied on by Defendant, Plaintiff's attorney proposed a settlement whereby Defendant would cease to use GASC and Plaintiff would not object to Defendant's use of AQSC. (D.I. 213-21). Defendant never accepted this offer. (D.I. 213-1 at 18).

Defendant's reliance on the May 11 letter is similarly flawed. More so, in this letter, Plaintiff clearly informs Defendant it believes Defendant's use of AQSC is improper and likely to cause consumer confusion. (*See* D.I. 213-19 ("[M]y client believes that your clients' adoption of... HMS American Queen Steamboat Company... [is] likely to lead consumers to believe that they are affiliated with American Cruise Lines.")). Plaintiff explicitly requested Defendant "change [its name] to something that does not include the term AMERICAN." No reasonable actor would rely on those statements as permission to use the AQSC mark. Thus, they cannot form the basis of Defendant's estoppel and acquiescence defenses.

As for the comment made during negotiation, there is a genuine dispute whether it was ever made. Defendant alleges that Plaintiff's CEO, Charles Robertson, told Defendant that it could use the AQSC name. Defendant supports this allegation with two depositions by its own representatives present at the negotiation. (D.I. 213 at 16 (citing D.I. 213-11 at p. 71 and 213-22 at p. 182)). Plaintiff counters with a sworn declaration by Robertson that he never "made any

---

settlements. *See* Fed. R. Evid. 408(b). By its own language, Rule 408 only prohibits use of evidence of a settlement offer or a statement made during negotiation to "prove or disprove the validity" of the underlying claim. Thus, evidence of a settlement offer or negotiations can be used to prove or disapprove the validity of some unrelated claim.

such statement...." (D.I. 232 at 7 n. 3 (citing D.I. 235 at ¶ 2)). Having found a genuine dispute over the key fact, I am denying Defendant's motion (D.I. 212) for summary judgment of non-infringement on estoppel and acquiescence grounds.

### iii. Likelihood of Confusion

Likelihood of confusion is the keystone of trademark infringement. For liability under § 1114, the accused mark must be "likely to cause confusion" with the asserted mark. A key element of proof of likelihood of confusion for both Plaintiff's and Defendant's infringement cases is actual confusion in the market place. Proof of actual confusion is "highly probative" of likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.270, 291 (3d Cir. 2001). While both parties point to instances of actual confusion, the source of the highlighted confusion is hotly debated, with evidence on both sides. (*Compare e.g.* D.I. 177-1 Ex. 4 at p. 25, 175-5 Ex. 54 *with e.g.* D.I. 213-15 at p. 180, 187-45). Thus, summary judgment on either party's infringement claim is unavailable.[14] Summary judgment on Defendant's infringement claim is also unavailable in light of the genuine dispute over whether Defendant's American Queen mark, its claim to priority, was abandoned.

## III. CONCLUSION

Having resolved few of the disputes through summary judgment, the parties should batten down the hatches, as the hurricane of trial is on the horizon. Plaintiff's motion (D.I. 216) for summary judgment that it did not fraudulently

---

[14]     Neither party has made unique arguments on the unfair competition claims. Thus, I am denying summary judgment on those claims as well.

procure its American Eagle registrations is granted. Plaintiff's motion (D.I. 172) for summary judgment that Defendant breached the Settlement Agreement is granted-in-part. Defendant's motion (D.I. 170) that summary judgment it did not abandonment its mark is granted-in-part and denied-in-part. The motions for summary judgment (D.I. 172, 212, 170, 216) are otherwise denied.

Plaintiff's motion (D.I. 167) to exclude the expert testimonies of Dr. Englis and Elsten is granted in part and denied in part. Likewise, Defendant's motion (D.I. 182) to exclude the expert testimonies of Krugman, Silverman, Duffy, and Kent are granted in part and denied in part.

An order consistent with this opinion will follow.