## EXHIBIT 1

## PLAINTIFF'S STATEMENT OF THE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

**EXHIBIT 1**
**PLAINTIFF'S STATEMENT OF**
**THE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED**

Plaintiff identifies the following issues of fact to be addressed by the Jury in this trial:

1.    **Whether Plaintiff owns valid and protectible marks and rights in the U.S. domestic cruise industry in Plaintiff's AMERICAN CRUISE LINES tradename and brand marks and its "American" family of vessel marks, including AMERICAN EAGLE, AMERICAN GLORY, AMERICAN SPIRIT, AMERICAN STAR, AMERICA, AMERICAN PRIDE, AMERICAN CONSTITUTION, AMERICAN CONSTELLATION, AMERICAN SONG, and AMERICAN HARMONY.**

   a.  Whether Plaintiff has valid and incontestable rights in its AMERICAN CRUISE LINES tradename and brand marks and its AMERICAN GLORY, AMERICAN SPIRIT, and AMERICAN STAR marks for cruise ship services; transportation of passengers by ship.

   b.  Whether Plaintiff has valid and protectable rights in its registered marks AMERICAN EAGLE, AMERICA, and AMERICAN CONSTITUTION for cruise ship services; transportation of passengers by ship; arranging and conducting cruises for others.

   c.  Whether Plaintiff has valid and protectable rights in its registered mark AMERICAN PRIDE for cruise ship services offered by riverboat; transportation of passengers by ship; arranging and conducting cruises for others by riverboat.

   d.  Whether Plaintiff has valid and protectable rights in its unregistered common-law marks AMERICAN CONSTELLATION, AMERICAN SONG, and

1

AMERICAN HARMONY for cruise ship services; transportation of passengers by ship; arranging and conducting cruises for others.

e.  Whether Plaintiff has used its AMERICAN CRUISE LINES tradename and brand marks to distinguish Plaintiff's overnight passenger cruise ship services since beginning in 1999 and continuously since then.

f.  Whether Plaintiff has used its AMERICAN CRUISE LINES tradename and brand marks in extensive national advertising resulting in significant sales of Plaintiff's overnight passenger cruising services to passengers in all states throughout the United States.

g.  Whether Plaintiff's use of its AMERICAN CRUISE LINES tradename and brand marks to distinguish Plaintiff's overnight passenger cruising services has increased significantly in quantity of advertising, types of media used, and funds spent on marketing over the years since beginning in 1999 and Plaintiff became the market leader in the U.S. domestic overnight passenger cruise industry with significant market penetration throughout the United States.

h.  Whether the sales of Plaintiff's domestic overnight passenger cruise services to passengers in all states resulting from Plaintiff's use of its AMERICAN CRUISE LINES tradename and brand marks to distinguish Plaintiff's overnight passenger cruising services has steadily will increased the size of Plaintiff's marketing and customer database, the number of vessels in Plaintiff's overnight passenger fleet, the extent of itineraries offered by Plaintiff, the numbers of passengers carried each year, and the annual total sales by Plaintiff.

i. Whether Plaintiff's AMERICAN CRUISE LINES tradename and brand marks have become well recognized throughout the United States as distinguishing Plaintiffs' overnight passenger cruise ship services and had achieved such recognition prior to 2011.

j. Whether Plaintiff promoted and advertised its overnight passenger cruise services on the Columbia and Snake River system aboard riverboats under its AMERICAN CRUISE LINES tradename and brand marks to its national customer base in 2009 before Defendants marketed overnight passenger cruise services for that river system.

k. Whether Plaintiff promoted and advertised its overnight passenger cruise services on the Mississippi River system aboard riverboats under its AMERICAN CRUISE LINES tradename and brand marks to its national customer base in 2011 before Defendants marketed overnight passenger cruise services for that river system.

2. **Whether Plaintiff owns valid and protectible marks and rights in the U.S. domestic cruise industry in Plaintiff's "American" family of vessel marks, including AMERICAN EAGLE, AMERICAN GLORY, AMERICAN SPIRIT, AMERICAN STAR, AMERICA, AMERICAN PRIDE, AMERICAN CONSTITUTION. AMERICAN CONSTELLATION, AMERICAN SONG, and AMERICAN HARMONY.**

a. Whether use of a "family of marks" is common in the cruise industry, particularly with common elements in the names of ships and trade names and brands, to establish common elements in the mind of the public to identify a

single source of cruise services and distinguish that source from services provided by others.

b.  Whether Plaintiff has used one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks," i.e., in such a way that the public associates not only the individual marks, but the common "American" first word of each mark, as a common characteristic of a "family of marks" indicative of Plaintiff as the common source of the cruise ship services offered under those marks.

c.  Whether Plaintiff has used one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" to distinguish Plaintiff's overnight passenger cruise ship services since beginning in 1999 and continuously since then.

d.  Whether Plaintiff has used one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" in extensive national advertising resulting in significant sales of Plaintiff's overnight passenger cruising services to passengers in all states.

e.  Whether Plaintiff's use of one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" to distinguish Plaintiff's overnight passenger cruising services has increased both in quantity and in types of media used over the years since beginning in 1999 to become the market leader in the domestic overnight

passenger cruise industry with significant market penetration throughout the United States.

    f.   Whether the sales of Plaintiff's overnight passenger cruising services to passengers in all states resulting from Plaintiff's use of one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" to distinguish Plaintiff's overnight passenger cruising services has steadily increased the size of Plaintiff's marketing and customer database, the number of vessels in Plaintiff's overnight passenger vessel fleet, the extent of itineraries offered by Plaintiff, the numbers of passengers carried each year, and the annual total sales revenue each year to customers throughout the United States since beginning in 1999.

    g.   Whether Plaintiff's use of one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" has become well recognized throughout the United States as distinguishing Plaintiffs' overnight passenger cruise ship services and had achieved such recognition prior to 2011.

**3.    Whether Defendants' use of the tradename and mark AMERICAN QUEEN STEAMBOAT COMPANY as a brand is likely to cause confusion as to source, sponsorship, or affiliation with Plaintiff's AMERICAN CRUISE LINES tradename and mark.**

    a.   Whether the common characteristic of having the term "American" as the first word of both the AMERICAN CRUISE LINES tradename and mark and the AMERICAN QUEEN STEAMBOAT COMPANY tradename and mark was

unusual or widely shared with other companies in the domestic overnight passenger cruise industry at the time the Defendants entered the market.

b.  Whether the AMERICAN CRUISE LINES mark is and was a strong mark with wide recognition in the market for domestic overnight passenger cruise services, or a weak mark, now and at the time the Defendants entered the market.

c. Whether the parties' customers or potential customers are relatively sophisticated as to the domestic overnight passenger cruise industry or unsophisticated as to that industry.

d. Whether the parties market through the same or similar trade and media channels.

e. Whether the parties sell overnight passenger cruise services through the same or similar trade channels

f. Whether the types of riverboats, itineraries, and services provided by the parties are the same or similar.

g. Whether as used by Defendants in their marketing, the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand is similar in sight, sound, meaning, and/or commercial impression with the AMERICAN CRUISE LINES tradename and brand as used by Plaintiff in its marketing.

h. Whether there is a likelihood of confusion in the market for domestic overnight passenger cruise services between Defendants' tradename and brand AMERICAN QUEEN STEAMBOAT COMPANY and Plaintiffs tradename and brand AMERICAN CRUISE LINES.

6

i.  Whether the likelihood of confusion in the market for domestic overnight passenger cruise services between Defendants' tradename and brand AMERICAN QUEEN STEAMBOAT COMPANY and Plaintiffs tradename and brand AMERICAN CRUISE LINES is increased by Defendants' choice of a tradename and brand having the term "American" as the first word.

j.  Whether Defendants intentionally chose the tradename and brand AMERICAN QUEEN STEAMBOAT COMPANY to create confusion in the market and capitalize off Plaintiff's goodwill in the market.

4.  **Whether Defendants' use of its AMERICAN EMPRESS vessel name and mark, its AMERICAN DUCHESS vessel name and mark, and its AMERICAN COUNTESS vessel name and mark, as a family of "American" vessel marks in combination with the tradename and mark AMERICAN QUEEN STEAMBOAT COMPANY, is likely to cause confusion as to source, sponsorship, or affiliation with Plaintiff's AMERICAN CRUISE LINES tradename and mark and Plaintiff's family of "American" vessel marks.**

a.  Whether the conduct of Defendants, including their change of the name of the vessel *Empress of the North* to *American Empress,* and their use of the mark AMERICAN EMPRESS in connection with marketing domestic overnight passenger cruise services, emphasizes the term "American" shared by that mark with Defendants' AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

b.  Whether the conduct of Defendants, including their change of the name of the vessel *Isle of Capri* to *American Duchess,* and their use of the mark AMERICAN DUCHESS in connection with marketing domestic overnight

passenger cruise services, emphasizes the term "American" shared by that mark with Defendants' AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

c.  Whether the conduct of Defendants, including their change of the name of the vessel *Kanesville Queen* to *American Countess,* and their use of the mark AMERICAN COUNTESS in connection with marketing domestic overnight passenger cruise services, emphasizes the term "American" shared by that mark with Defendants' AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

d.  Whether the conduct of Defendants with respect to the selection and use of the vessel names and marks AMERICAN EMPRESS, and AMERICAN DUCHESS, and AMERICAN COUNTESS, in combination with Defendants' use of their AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand, creates an "American" family of marks with respect to Defendants' domestic overnight passenger cruise services.

e.  Whether the Defendants' selection and use of their "American" family of marks for domestic overnight passenger cruise services is likely to cause confusion as to source, sponsorship, or affiliation with Plaintiffs' family of "American" vessel marks used in combination with Plaintiff's AMERICAN CRUISE LINES tradename and mark.

f.  Whether the likelihood of confusion in the market for domestic overnight passenger cruise services between Defendants' "American" family of vessel names and marks and Plaintiff's "American" vessel names and marks is

8

increased by Defendants' choice of the term "American" as the first word of its family of vessel names and marks.

g.   Whether Defendants' intentionally chose to create an "American" family of vessel marks for use in combination with Defendants' AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand in order to create confusion in the market for domestic overnight passenger cruise services and capitalize off Plaintiff's goodwill in the market.

**5.     Whether Plaintiff acquiesced to Defendants' use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY or is estopped from asserting infringement and unfair competition based on Defendants use of that tradename and mark and associated use of defendants' "American" vessel marks.**

a.    Whether Plaintiff's CEO, by affirmative word or deed prior to Defendants submitting a written settlement agreement at the end of January 2012, conveyed his implied consent that Defendants might use the "American Queen Steamboat Company" name as an AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

b.   Whether Plaintiff's CEO had actual knowledge of the true facts at the time of his alleged oral assurance of implied consent that Defendants might use the "American Queen Steamboat Company" name as an AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

c.   Whether Defendants reasonably relied on the oral assurances alleged to have been made to them prior to Defendants submitting a written settlement

agreement offer to Plaintiff at the end of January 2012, in which there was no mention of the name "American Queen Steamboat Company."

d. Whether Plaintiff, by affirmative word or deed subsequent to Defendants submitting a written settlement agreement offer at the end of January, 2012, conveyed its implied consent that Defendants might use the "American Queen Steamboat Company" name as its AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

e. Whether, after sending Plaintiff a written settlement agreement offer at the end of January, 2012, making no mention of "American Queen Steamboat Company," Defendants reasonably relied on the oral assurances alleged to have been previously made to them as to use of the "American Queen Steamboat Company" name as its AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

f. Whether Defendants reasonably relied on any affirmative word or deed by Plaintiff made after Defendants sent Plaintiff the written settlement agreement making no mention of "American Queen Steamboat Company" name or its use as Defendants' AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

g. Whether, at the time of the alleged acquiescence, Plaintiff had a present obligation to sue Defendants for infringement by reason of evidence of actual confusion or likelihood of confusion distinct from confusion arising from Defendants' prior use of the GREAT AMERICAN STEAMBOAT COMPANY mark.

h.  Whether Plaintiff's delay in filing suit as to Defendants' use of AMERICAN QUEEN STEAMBOAT COMPANY as Defendants' tradename and brand during the period of the parties' attempt to resolve disputed rights resulting from the Settlement Agreement signed February 9, 2012 was outrageous, unreasonable, and inexcusable delay.

i.  Whether Plaintiff's delay in filing suit as to Defendants' use of a "family of marks" sharing the common characteristic of "American" as the dominant first word of the marks was outrageous, unreasonable, and inexcusable delay.

j.  Whether Defendants reasonably relied on Plaintiff's alleged delay in filing suit as to Defendants' use of a "family of marks" sharing the common characteristic of "American" as the dominant first word of the marks.

k.  Whether Defendants have suffered prejudice as a result of Plaintiff's delay in claiming trademark infringement based on Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY name.

**6.    Whether Plaintiff's claim for trademark infringement is barred by the unclean hands defense.**

a.  Whether Plaintiff has engaged in inequitable conduct of an "egregious" nature in connection with its alleged trademark rights and its allegations against Defendants in this case.

b.  Whether Defendants can prove clear, convincing evidence of the alleged "egregious" misconduct by Plaintiff.

c.  Whether Defendants have been harmed as a result of Plaintiff's alleged "egregious" misconduct.

d.  Whether the public has been harmed as result of Plaintiff's alleged "egregious" misconduct.

**7.      If infringement is found on Plaintiff's trademark infringement claim, whether Defendants' infringement was willful or intentional.**

a.  Whether, when Defendants entered the market, they knew that the vessel *American Queen* had been marketed by its prior owners as one of three sister ships whose names shared the common element "Queen" with each other and with the tradename DELTA QUEEN STEAMBOAT COMPANY under which they were marketed.

b.  Whether, when Defendants entered the market, they knew of Plaintiff's use of its AMERICAN CRUISE LINES tradename and brand, and its "American" family of vessel marks to promote and advertise Plaintiff's overnight passenger cruise services since beginning in 1999 and the steady growth, market penetration, and goodwill Plaintiff had achieved to become the market leader prior to Defendants' entry into the market.

c.  Whether Defendants acted with bad faith, fraud, malice, or with knowledge of infringement with respect to their selection and use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY as their tradename and brand.

d.  Whether Defendants acted with bad faith, fraud, malice, or with knowledge of infringement with respect to their selection and use of the vessel names and marks AMERICAN EMPRESS, and AMERICAN DUCHESS, and AMERICAN COUNTESS, in combination with Defendants' use of their

AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand, to create an "American" family of vessel marks with respect to Defendants' domestic overnight passenger cruise services.

e.  Whether defendants acted with bad faith, fraud, malice, or with knowledge of infringement with respect to their selection of a tradename and brand and "American" vessel names which share the common element quote American" that was also a common element shared by Plaintiff in its trade name brand and its "American" vessel names.

**8.   If infringement is found, whether Plaintiff is entitled to recover monetary damages under the Lanham Act.**

a.  Whether Defendants have been unjustly enriched through their use of the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

b.  Whether Defendants have been unjustly enriched through their use of their "American" family of vessel names and marks in combination with their use of their AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand

c.  Whether it would be inequitable to Plaintiff not to be compensated with money damages for Defendant's infringement.

d.  Whether an award of damages to compensate Plaintiff for Defendant's infringement would be inequitable as to Defendant.

**9.   Whether Plaintiff is entitled to recover actual damages in the form of lost profits by reason of Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand and Defendants' "American" family of vessel marks.**

a.  Whether Plaintiff has suffered actual damages or harm based on Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand and Defendants' "American" family of vessel marks.

b.  Whether any losses alleged to have been suffered by Plaintiff were caused by Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand and Defendants' "American" family of vessel marks.

c.  Whether Plaintiff has proven a non-speculative amount of actual damages.

10.  **Whether Plaintiff is entitled to disgorgement of Defendants' profits from their use of the AMERICAN QUEEN STEAMBOAT COMPANY mark and Defendants' "American" family of vessel marks.**

a.  Whether Plaintiff has proven Defendants' sales revenues resulting from Defendants' cruise services promoted and advertised under the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

b.  Whether Defendants have proven any elements of cost or deduction from sales revenues resulting from Defendants' cruise services promoted and advertised under the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand.

c.  Whether Defendants had the intent to deceive or confuse the public through their selection and use of the AMERICAN QUEEN STEAMBOAT COMPANY tradename and brand and Defendants' "American" family of vessel marks.

d.  Whether it is likely that sales have been diverted from Plaintiff to Defendants.

e.  Whether an injunction would be sufficient to address Plaintiff's injuries.

14

f.  Whether Plaintiff's delayed in asserting its rights against Defendants with respect to Defendants' use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY or Defendant's "American" family of vessel marks was "outrageous, unreasonable, and inexcusable" so as to bar Plaintiff's claims for relief.

g.  Whether there is a public interest in making Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY name unprofitable to deter others from engaging in infringement of other's names and marks.

11.  **Whether Plaintiff's use of the vessel names and marks AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY AND AMERICA are likely to cause confusion as to source, sponsorship, or affiliation with Defendants' AMERICAN QUEEN mark.**

a.  Whether the common characteristic of having the term "American" as the first word of the name of a vessel on U.S. waters was unusual or widely shared with other vessels at the time the Defendants entered the market.

b.  Whether the AMERICAN QUEEN mark is or was a strong or weak mark in the domestic overnight passenger cruise industry at the time Plaintiff introduced its vessels named *American Eagle*, *American Pride*, *American Song*, *American Harmony* and *America* to the market.

c.  Whether owners of the vessel *American Queen* prior to Defendants used the name of the vessel *American Queen* merely as the name of a vessel and not as a trademark to identify and distinguish a source of services for transporting passengers and goods by steamers.

15

d.  Whether members of the public in the domestic U.S. overnight passenger cruise market generally make purchase selections based on the name of the vessel or based on other factors.

e.  Whether the *American Queen* vessel was and is physically distinctive in its large size.

f.  Whether the parties' customers or potential customers are relatively sophisticated as to the domestic overnight passenger cruise industry or unsophisticated as to that industry.

g.  Whether the parties' customers or potential customers are generally careful in distinguishing vessels having the word "American" as the first word of their name because of the great number of such vessels.

h.  Whether as the Plaintiff's *American* vessel names and marks are marketed by Plaintiff, they are similar in sight, sound, meaning, and commercial impression with the vessel name and mark AMERICAN QUEEN as marketed by Defendants.

i.  Whether there was actual confusion in the U.S. domestic overnight passenger cruise services market between Defendants' AMERICAN QUEEN mark and Plaintiff's *American* vessel marks based specifically on Plaintiff's use of its *American* vessel names.

j.  Whether an inference adverse to Defendants can be drawn as to the existence of a likelihood of confusion in the U.S. domestic overnight passenger cruise services market between Defendants' AMERICAN QUEEN mark and

16

Plaintiff's *American* vessel marks by reason of Defendant's failure to conduct a market survey on the issue.

k.  Whether Plaintiff chose its *American* vessel names to intentionally create confusion in the market and capitalize off the goodwill of Defendants.

**12.    Whether the AMERICAN QUEEN mark has been abandoned.**

a.  Whether the last use of the AMERICAN QUEEN marks by Ambassadors ended upon surrender of the vessel to MARAD no later than November 15, 2008.

b.  Whether upon surrendering the *American Queen* vessel the owner of the AMERICAN QUEEN marks had any intent to resume the use of those marks at any time in the future, or any plans whatsoever to that effect.

c.  Whether after surrender of the vessel to MARAD, the first use of the AMERICAN QUEEN marks in connection with the services for which the marks were registered "transporting passengers and goods by steamers" or "hotel, restaurant, and bar services provided onboard a riverboat" occurred on April 13, 2012.

d.  Whether there was a three-year period of non-use of the AMERICAN QUEEN marks at issue because they were not used in connection with the actual rendering of the services for which the marks were registered during the time the *American Queen* vessel was surrendered to the U.S. Maritime Administration.

e.  Whether after surrender of the *American Queen* vessel to MARAD and ceasing to use the AMERICAN QUEEN marks, there was any intent to resume use of

17

the AMERICAN QUEEN marks by any owner of the marks or creditor holding a security interest in the marks or trustee in bankruptcy.

f.  Whether the surrender of the *American Queen* vessel and cessation of use of the AMERICAN QUEEN marks by Ambassadors was part of a voluntary decision by Ambassadors to cease its domestic overnight passenger cruise services while continuing to operate its international overnight passenger cruise services.

g.  Whether by surrendering the *American Queen* vessel to MARAD and ceasing to use the AMERICAN QUEEN marks without intent to ever resume their use, Ambassadors abandoned any residual goodwill in and to the AMERICAN QUEEN marks.

h.  Whether after surrender of the *American Queen* vessel to MARAD and ceasing to use the AMERICAN QUEEN marks, there was any intent to exploit any residual goodwill in the AMERICAN QUEEN marks by any owner of the marks or creditor holding a security interest in the marks or trustee in bankruptcy.

**13.    Whether the assignment of the AMERICAN QUEEN marks from Ambassadors Cruise Group to Defendants was an assignment in gross and, therefore, invalid.**

a.  Whether Ambassadors closed its Majestic America Line domestic overnight passenger cruise business when it surrendered the vessel *American Queen* to MARAD and never restarted that business or intended to restart it or assigned any right to restart it.

18

b.   Whether Defendants acquired the goodwill associated with the AMERICAN QUEEN marks and the *American Queen* vessel from Ambassadors in 2011 about three years after Ambassadors had voluntarily surrendered the *American Queen* vessel, closed the business in which the vessel had been operated, and had no ability to recover the vessel or restart the business or resume use of the marks.

**14.    If infringement is found on Defendants' trademark infringement claim against Plaintiff, whether that infringement was willful or intentional.**

a.   Whether Plaintiff's use of one or more of its "American" vessel marks in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" had become well recognized throughout the United States as distinguishing Plaintiffs' overnight passenger cruise ship services prior to 2011.

b.   Whether Plaintiff had a reasonable belief that it was entitled to continue to build its family of "American" vessel marks for use in the domestic overnight passenger cruise ship services market at the time that introduced its *American Eagle*, *American Pride*, *American Song*, *American Harmony* and *America* vessels to the market.

c.   Whether Plaintiff acted with bad faith, fraud, malice, or with knowledge of infringement with respect to its use of its *American* vessel names in direct competition with Defendants on the same rivers.

**15.    If infringement is found, whether Defendants are entitled to recover monetary damages under the Lanham Act.**

  a. Whether Plaintiff has been unjustly enriched through its use of the *American* vessel names in direct competition with Defendants.

  b. Whether Plaintiff's infringement was willful or intentional.

  c. Whether an award of damages would be punitive in nature.

  **16.**  **Whether Defendants are entitled to disgorgement of Plaintiff's profits from its use of the *American* vessel names in competition with Defendants.**

  a. Whether plaintiff's profits can be attributed to the use of its "American" family of vessel marks or some other factor or factors.

  b. Whether Plaintiff had the intent to deceive or confuse the public through its use of the *American* vessel names in direct competition with Defendants.

  c. Whether sales have been diverted from Defendants to Plaintiff.

  d. Whether an injunction would be sufficient to address Defendants' injuries.

  e. Whether Defendants unreasonably delayed in asserting their rights against Plaintiff with respect to Plaintiff's use of its competing *American* vessel names.

  f. Whether there is a public interest in making Plaintiff's use of the *American* vessel names unprofitable.

# **EXHIBIT 2**

## **DEFENDANTS' STATEMENT OF THE ISSUES OF FACT WHICH REMAIN TO BE LITIGATED**

## DEFENDANTS' STATEMENT OF THE ISSUES OF FACT
## TO BE DECIDED AT TRIAL

Defendants identify the following issues of fact to be addressed by the Jury in this trial:

1.      **Whether Plaintiff has established ownership in and to a valid and protectable family of "American" trademarks.**

      a.   Whether Plaintiff or Defendants were the first to use the term "American" in commerce.

      b.   Whether the term "American" is distinctive to Plaintiff and/or has otherwise developed secondary meaning.

      c.   Whether Plaintiff had rights to its alleged "American" family at the time the AMERICAN QUEEN first entered the market.

      d.   Whether Plaintiff's alleged family of "American" trademarks were promoted in such a way as to create a public perception of the family as an indicator of source.

2.      **Whether Defendants' use of the vessel names AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS and/or AMERICAN COUNTESS are likely to cause confusion with Plaintiff's alleged family of "American" trademarks.**

3.      **Whether Defendants' use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY is likely to cause confusion as to source, sponsorship, or affiliation with Plaintiff's AMERICAN CRUISE LINES mark.**

      a.   Whether the AMERICAN CRUISE LINES mark is a strong or weak mark.

      b.   Whether the term AMERICAN QUEEN STEAMBOAT COMPANY is similar in sight, sound, meaning, and/or commercial impression with the term AMERICAN CRUISE LINES such that confusion is likely.

c.  Whether the parties' customers or potential customers are sophisticated such that confusion is unlikely.

d.  Whether there is actual confusion based on Defendants' use of the name AMERICAN QUEEN STEAMBOAT COMPANY.

e.  Whether the confusion that exists in the market is based solely on Defendants' use of AMERICAN QUEEN STEAMBOAT COMPANY.

f.  Whether Defendants chose the name AMERICAN QUEEN STEAMBOAT COMPANY to intentionally create confusion in the market and capitalize off any goodwill of Plaintiff.

g.  Whether the parties market through the same or similar trade channels such that confusion is more likely.

h.  Whether the services provided by the parties are sufficiently similar such that confusion is more likely.

**4.     Whether Plaintiff acquiesced to Defendants' use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY or AMERICAN QUEEN.**

a.  Whether Plaintiff, through action or inaction, conveyed implied or express consent to Defendants to use the AMERICAN QUEEN STEAMBOAT COMPANY and/or AMERICAN QUEEN names.

b.  Whether Defendants relied on the assurances made to them by Plaintiff.

c.  Whether Plaintiff had a valid excuse for its delay in taking action on Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY and/or AMERICAN QUEEN names.

    d.   Whether Defendants have suffered prejudice as a result of Plaintiff's delay in claiming trademark infringement based on Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY and/or AMERICAN QUEEN names.

**5.    Whether Plaintiff is estopped from asserting trademark infringement based on Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY and/or AMERICAN QUEEN names.**

    a.   Whether Plaintiff had knowledge of Defendants' use, proposed use, and/or application to register the name and mark AMERICAN QUEEN STEAMBOAT COMPANY and/or AMERICAN QUEEN.

    b.   Whether Plaintiff led Defendants to believe that it would not enforce its trademark rights against Defendants with respect to Defendants' use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY and/or AMERICAN QUEEN.

    c.   Whether Defendants relied on Plaintiff's conduct.

    d.   Whether Defendants would be prejudiced if Plaintiff were permitted to bring suit now.

**6.    Whether Plaintiff's claim for trademark infringement is barred by the unclean hands defense.**

    a.   Whether Plaintiff has engaged in inequitable conduct in connection with its alleged trademark rights and its allegations against Defendants in this case.

    b.   Whether Defendants have been harmed as a result of Plaintiff's inequitable conduct.

    c.   Whether the public has been harmed as result of Plaintiff's inequitable conduct.

3

**7.     If infringement is found on Plaintiff's trademark infringement claims, whether that infringement was willful or intentional.**

    a.   Whether Defendants acted with bad faith, fraud, malice, or with knowledge of infringement with respect to their use of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS, and/or AMERICAN COUNTESS.

**8.     If infringement is found, whether Plaintiff is entitled to recover monetary damages under the Lanham Act.**

    a.   Whether Defendants have been unjustly enriched through their use of the names AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS, and/or AMERICAN COUNTESS.

    b.   Whether Defendants infringement was willful.

    c.   Whether an award of damages would be punitive in nature.

**9.     Whether Plaintiff is entitled to disgorgement of Defendants' profits from their use of the AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS and/or AMERICAN COUNTESS names.**

    a.   Whether Defendants' profits can be attributed to the use of the AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS and/or AMERICAN COUNTESS names or some other factor or factors.

b.   Whether Defendants had the intent to deceive or confuse the public through their use of the AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS and/or AMERICAN COUNTESS names.

c.   Whether sales have been diverted from Plaintiff to Defendants.

d.   Whether an injunction would be sufficient to address Plaintiff's injuries.

e.   Whether Plaintiff unreasonably delayed in asserting its rights against Defendants with respect to Defendants' use of the names and marks AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS, and/or AMERICAN COUNTESS.

f.   Whether there is a public interest in making Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS, and/or AMERICAN COUNTESS names unprofitable.

g.   Whether Defendants were attempting to palm-off their services as those of Plaintiff through their use of the AMERICAN QUEEN STEAMBOAT COMPANY, AMERICAN QUEEN, AMERICAN EMPRESS, AMERICAN DUCHESS, and/or AMERICAN COUNTESS names.

**10.     Whether Plaintiff's use of the vessel names *American Eagle*, *American Pride*, *American Song*, *American Harmony* and *America* are likely to cause confusion as to source, sponsorship, or affiliation with Defendants' AMERICAN QUEEN mark.**

a.   Whether the AMERICAN QUEEN mark is a strong or weak mark.

5

    b.   Whether the Plaintiff's *American* vessel names are similar in sight, sound, meaning, and commercial impression with the term AMERICAN QUEEN such that confusion is likely.

    c.   Whether there is actual confusion based on Plaintiff's use of its *American* vessel names.

    d.   Whether Plaintiff chose its *American* vessel names to intentionally create confusion in the market and capitalize off the goodwill of Defendants.

    e.   Whether the parties market through the same are similar trade channels such that confusion is more likely.

    f.   Whether the services provided by the parties are sufficiently similar such that confusion is more likely.

**11.    Whether the AMERICAN QUEEN mark has been abandoned.**

    a.   Whether there was a three-year period of non-use of the AMERICAN QUEEN marks.

    b.   Whether there was an intent not to resume use by any actual owner or prospective purchaser of the rights in and to the AMERICAN QUEEN marks.

    c.   Whether any non-use of the AMERICAN QUEEN marks was excusable.

    d.   Whether there is residual goodwill in and to the AMERICAN QUEEN marks.

**12.    Whether the assignment of the AMERICAN QUEEN marks from Ambassadors Cruise Group to Defendants was an assignment in gross and, therefore, invalid.**

    a.   Whether Defendants acquired the goodwill associated with the AMERICAN QUEEN marks and the *American Queen* vessel.

b.   Whether, following the assignment, Defendants carried on operations similar in nature and quality to the operations associated with the *American Queen* vessel by Ambassadors Cruise Group.

**13.    If infringement is found on Defendants' trademark infringement claim against Plaintiff, whether that infringement was willful or intentional.**

a.   Whether Plaintiff acted with bad faith, fraud, malice, or with knowledge of infringement with respect to its use of its *American* vessel names in direct competition with Defendants on the same rivers.

**14.    If infringement is found, whether Defendants are entitled to recover monetary damages under the Lanham Act.**

a.   Whether Plaintiff has been unjustly enriched through its use of the *American* vessel names in direct competition with Defendants.

b.   Whether Plaintiff's infringement was willful or intentional.

c.   Whether an award of damages would be punitive in nature.

**15.    Whether Defendants are entitled to disgorgement of Plaintiff's profits from its use of the *American* vessel names in competition with Defendants.**

a.   Whether Plaintiff had the intent to deceive or confuse the public through its use of the *American* vessel names in direct competition with Defendants.

b.   Whether sales have been diverted from Defendants to Plaintiff.

c.   Whether an injunction would be sufficient to address Defendants' injuries.

d.   Whether Defendants unreasonably delayed in asserting their rights against Plaintiff with respect to Plaintiff's use of its competing *American* vessel names.

e.  Whether there is a public interest in making Plaintiff's use of the *American* vessel names unprofitable.

f.  Whether Plaintiff was attempting to palm-off its services as those of Defendants through its use of the *American* vessel names in direct competition with Defendants.

## EXHIBIT 3

**PLAINTIFF'S STATEMENT OF THE ISSUES OF LAW WHICH REMAIN TO BE LITIGATED**

**EXHIBIT 3**
**PLAINTIFF'S STATEMENT OF**
**THE ISSUES OF LAW WHICH REMAIN TO BE LITIGATED**

**I.     Infringement of ACL's Brand Name AMERICAN CRUISE LINES Marks by AQSC's AMERICAN QUEEN STEAMBOAT COMPANY Brand Name**

AQSC's adoption and use of "American Queen Steamboat Company" as a corporate brand and tradename mark under which it advertises and sells cruise services is likely to cause - and actually is causing - confusion regarding source of overnight passenger cruise services and infringes American's cruise line brand and incontestable, registered, AMERICAN CRUISE LINES marks in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a).

**A.   Ownership, Validity, and Priority of ACL's Brand Name Marks**

To state a claim for both trademark infringement and unfair competition under the Lanham Act, a plaintiff must prove the following elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc*., 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. §1114, and federal unfair competition, 15 U.S.C. §1125, by identical standards").

The first two requirements for infringement – ACL's ownership and the validity of the marks – are clearly established. Federal registration of a mark is *prima facie* evidence of validity, protectability, and ownership.  *See* 15 U.S.C. § 1057(b).  Additionally, "[if a mark] is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved." *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). Stated differently, once a party asserting trademark rights has presented a certificate of registration to the court then there is a presumption under the law that the party is the owner of valid and protectable trademark rights. *Sylvania Elec. Prods. v. Dura Elec. Lamp Co*., 247 F.2d

1

730, 732 (3d Cir. 1957) ("the registration of a trade-mark by the Patent Office furnishes an evidentiary presumption of validity."). ACL's registrations on the Principal Register issued for the AMERICAN CRUISE LINES word mark, Registration No. 3,019,486, on November 29, 2005, and became incontestable on March 9, 2011, under 15 U.S.C. §§ 1058 and 1065, and issued for the AMERICAN CRUISE LINES word and design mark, Registration No. 3,025,982, on December 13, 2005, and became incontestable on March 17, 2011, both with a first use date of July 30, 1999.

ACL's AMERICAN CRUISE LINES marks also have senior priority over AQSC's brand name AMERICAN QUEEN STEAMBOAT COMPANY mark, which was not registered until February 5, 2013. As the Court has noted in its August 14, 2017 Memorandum Opinion, there is no basis in the law for AQSC to claim priority resting on its ownership of the AMERICAN QUEEN mark. D.I. 258 at 36. AQSC concedes that the "tacking" doctrine does not apply (D.I. 245 at 6, n.6) and this Court properly rejected AQSC's argument for a "natural expansion" of its rights in the AMERICAN QUEEN marks. *Id.* at 7; *see also* D.I. 213 at 37-38; *Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 961 (3d Cir. 1992) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail.").

**B. Ownership, Validity, and Priority of ACL's Family of "American Marks**

The evidence in this case will establish that ACL has used one or more of its "American" vessel marks, including AMERICAN EAGLE, AMERICAN GLORY, AMERICAN SPIRIT, AMERICAN STAR, AMERICA, AMERICAN PRIDE, AMERICAN CONSTITUTION. AMERICAN CONSTELLATION, AMERICAN SONG, and AMERICAN HARMONY, in combination with its AMERICAN CRUISE LINES tradename and brand marks as a "family of marks" to identify and distinguish ACL as the common source of the services offered under each

of the marks in the family. *See J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991) ("a family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.")

The existence of a family of marks is a question of fact based on the family "surname," the nature of the use, advertising and promotion of the alleged family of marks, and the extent of joint advertising and promotion in a manner designed to create an association of common origin for all the marks in the family. *See J&J Snack Foods*, 932 F.2d at 1463 ("Simply using a series of similar marks does not of itself establish the existence of a family. Recognition of the family is achieved when the pattern of usage of the common element is sufficient to be indicative of the origin of the family."); *Oriental Financial Group, Inc., v. Cooperativa de Ahorro Y Credito Oriental*, 832 F.3d 15, 29 (1st Cir. 2016) ("'[T]he purchasing public recognizes that the common characteristic,' the word ORIENTAL, 'is indicative of a common origin of the goods.'" (quoting *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336 (Fed. Cir. 2001)).

Testimony in the present case will establish that a "family" of marks involving a common element in the names of a fleet of cruise vessels and the cruise lines tradename and brand is common in the cruising industry.

### C. AQSC's Use of the Brand Name Mark AMERICAN QUEEN STEAMBOAT COMPANY in Marketing and Advertising Cruise Ship Services is Likely to Cause Confusion and Mistake, and to Deceive.

AQSCs' use of "American Queen Steamboat Company" as its cruise line brand name creates a high likelihood of confusion with ACL's AMERICAN CRUISE LINES brand name and service mark. Consumers and travel agents viewing AQSC's cruise line brand name are likely to

assume that the cruise services it represents are associated with ACL's cruise services provided under its AMERICAN CRUISE LINES mark. *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) (citation omitted).

### a. Lapp Factor 1: The Degree of Similarity Between American's Mark and AQSC's Infringing Mark

The first Lapp factor weighs in favor of finding a likelihood of confusion because the marks AMERICAN CRUISE LINES and AMERICAN QUEEN STEAMBOAT COMPANY have a high degree of similarity in that they both utilize the same dominant first word, "American," and "create the same overall impression when viewed separately." *Fisons Horticulture*, 30 F.3d at 476. If the services are directly competitive, which they are here, "the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004) (citing J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:20.1 (5th ed. 2018) (hereinafter "McCarthy").

In comparing two marks, "each must be viewed in its entirety" and "it is proper to give greater force and effect to [a] dominant feature." *Alliance Bank v. New Century Bank*, 742 F.Supp.2d 532, 556 (E.D. Pa. 2010) (quoting *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570 (Fed. Cir. 1983)). If the dominant portions of the two marks are the same, confusion is likely. *Country Floors, Inc. v. Gepner*, 930 F.3d 1056, 1065 (3d Cir. 1991) (finding confusion likely where dominant portions of two marks, "Country," in "Country Floors" and "Country Tiles," are the same); *see also Checkpoint Sys., Inc. v. Check Point Software Tech., Inc.*, 269 F.3d 270, 281-82 (3d Cir. 2001) (upholding District Court's finding that "Check Point Software Technologies, Inc." was very similar to "Checkpoint Systems," because dominant portion of each parties' mark was first word, "Checkpoint."); *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183-85 (3d Cir. 2010) (finding an over impression of similarity

between the marks "ForsLean" and "Forsthin"); *Lapp*, 721 F.2d at 463 ("Lapp" and "Lapp Cable" are identical for all practical purposes); *Tree Tavern Prods., Inc. v. Conagra, Inc.*, 640 F. Supp. 1263, 1270 (D. Del. 1986) ("[S]imilarity between the marks 'Side Dish' and 'Bankquet Side Dish for One' is obvious.").

In this case, ACL claims there is also a similarity of the marks arising because the dominant first word of ACL's AMERICAN CRUISE LINES brand is reinforced by its commonality with ACL's family of "American" vessel marks. *Oriental Financial*, 832 F.3d at 29 ("If an opposer is found to own a family of marks for a range of goods, that is an <u>additional</u> factor – beyond the similarities between the applicant's marks and goods, and any <u>one</u> of opposers mark and goods – weighing in favor of a likelihood of confusion.") (citation omitted). A family of marks may have a synergistic recognition that is greater than the sum of each mark. *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F. Supp. 198, 212 (D. Md. 1988).

### b. Lapp Factor 2: AMERICAN CRUISE LINES Is a Strong Mark Entitled to Protection

When measuring the strength of an owner's mark, the Court must evaluate: (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition). *Pennzoil-Quaker State Co. v. Smith*, 2008 WL 4107159, at *11 (W.D. Pa. Sept. 2, 2008); *see also A & H Sportswear*, 237 F.3d at 221. Of these two considerations, commercial strength is more important, because (i) a conceptually weak but commercially strong mark can obtain secondary meaning, as illustrated by such examples as AMERICAN Airlines, PAYLESS Drug Stores and KENTUCKY FRIED CHICKEN; and, (ii) conceptual distinctiveness alone does not inform the degree to which a mark is associated with a particular source. *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc*., 405 F.Supp.2d 680, 690–91 (E.D. Va., 2005) (citations omitted).

### 1. *Conceptual Strength*

ACL's marks are incontestable and therefore "conclusively presumed to be either non-descriptive or to have acquired secondary meaning." *Pennzoil-Quaker State*, 2008 WL 4107159, at *11–12 (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 924 (10th Cir. 1986)). Secondary meaning is acquired when the mark is "not only an identification of the product or services, but also a representation of the origin of those products or services." *Commerce Nat'l Ins. Servs.*, 214 F.3d at 438. "That is, a term that has achieved secondary meaning identifies the source of the product rather than the product itself." *Id.*

The evidence will show that the AMERICAN CRUISE LINES marks have acquired a strong secondary meaning within the cruise industry and are distinctive. ACL's principal, Charles A. Robertson, marketed, sold, and operated cruises to a national market under the AMERICAN CRUISE LINES brand in the 1970's and 1980's, along different U.S. waterways, including the Mississippi River. Mr. Robertson and his company were pioneers in the U.S. cruise industry and were well-known and respected. A 1986 publication refers to ACL simply as "American."

The evidence at trial will further show that since restarting ACL in 1999 after the bankruptcy of the first company concluded, ACL has continuously used the AMERICAN CRUISE LINES service mark in interstate commerce in connection with marketing and selling overnight passenger cruise ship services nationally. During 1999 through 2011, ACL expanded its fleet, introduced new itineraries, and significantly grew cruise offerings. For most of the past 9 years, ACL has achieved the greatest market share of the US domestic waterways cruise market.

Trial evidence will prove that, similar to the old company, the reborn ACL has long been identified by industry professionals and national publications simply as "American." *See Sanofi-Aventis v. Advancis Pharmaceutical Corp.*, 453 F.Supp.2d 834, 851 (D. Del. 2006) (finding mark

referenced in national publications, industry awards, and knowledge of party within the industry to be evidence of marketplace recognition and strength of mark). ACL claims that in the US domestic overnight passenger cruising market, the term "American" has become synonymous with American Cruise Lines.

## 2. *Commercial Strength*

When determining whether a mark has "commercial strength" courts typically find that sales revenues and advertising expenditures are important evidence of marketplace recognition. *See A&H Sportswear,* 237 F.3d at 224; *see also, Fisons,* 30 F.3d at 479 (strength may be shown through consumer awareness and financial investment in the mark). By this measure, the AMERICAN CRUISE LINES marks are strong.

The evidence will show that between 1999 and 2011, ACL invested over $27 million in promoting and advertising its cruise ship services nationally under the AMERICAN CRUISE LINES brand and service mark in various trade and consumer publications, the Internet (including social media sites), email blasts, direct mail, television, trade shows, and through its sales staff and network of travel agents. The total investment has grown dramatically since then. ACL's investment in its identification in the national market for US cruise services has been successful; annual cruise revenues have grown dramatically.

After ACL began advertising and selling nationally under its AMERICAN CRUISE LINES brand beginning in 2010 for cruises on the Mississippi River, for more than a year it was the only cruise line marketing overnight passenger Mississippi River itineraries. By September 15, 2011, when AQSC asserts it began marketing cruises (under the Great American Steamboat Company brand) on the Mississippi, ACL had sold 1,183 passenger tickets in 47 states valued at approximately $5.1 million.

### c. Lapp Factor 3: Price Of The Goods And Other Factors Indicative Of The Care And Attention Of Consumers When Making A Purchase

Generally, when the price of a service is higher, consumers tend to exercise a heightened level of care in evaluating service providers before making purchase decisions. The prices of competing cruise ship services are significant – typically thousands of dollars per guest for a week-long cruise. The high price of cruises would seem to indicate that consumers would exercise care when making purchase decisions, but purchasing a cruise vacation is quite different from other significant purchases, such as vehicles.

The evidence will show that many consumers purchase cruises with ACL and AQSC through intermediaries, such as travel agents and third-party websites. Travel agents can influence purchasing decisions, and there is ample evidence of travel agents being confused between the cruise ship services offered by ACL and AQSC. *In re Shell Oil Co.*, 992 F.2d 1204, 1208 (Fed. Cir. 1993) (indicating that "even sophisticated purchasers can be confused by very similar marks"). Although the average travel agent may have more knowledge about service providers and are arguably less susceptible to confusion, the lower standard of care relevant to consumers should apply to them. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 293 (3d Cir. 1991) ("When the buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class."). The Lanham Act protects against the use of trademarks which are likely to cause confusion of any kind, not merely of purchasers nor simply as to source of origin. *Arrowpoint Capital Corp. v. Arrowpoint Asset v. Mgmt., LLC*, 793 F.3d 313 (3d Cir. 2015) (confusion among broker dealers).

### d. Lapp Factors 4 and 6: Immediacy of Confusion from AQSC's Use of Mark; Evidence Of Actual Confusion

Lapp Factors number 4 and 6 concern the length of time AQSC has used its brand mark

without evidence of actual confusion arising and whether such use resulted in actual confusion. *Kos Pharm.*, 369 F.3d at 709. Although evidence of actual confusion is not required to prove likelihood of confusion, such evidence strengthens ACL's case. *Checkpoint Sys.*, 269 F.3d at 291.

In this case, evidence of confusion arose after AQSC first began using its AMERICAN QUEEN STEAMBOAT COMPANY brand name mark. There will be significant evidence of actual confusion in this matter, including testimony and documentary evidence provided by employees, customers, travel agents and vendors, as well as survey evidence identifying AQSC's use of "American" as the first term of its corporate brand name as a significant source of confusion.

### i. Survey Evidence Identifies AQSC's Use of "American" as the First Word in Its Brand Name as a Significant Source of Confusion

The Third Circuit Court of Appeals and other courts have held that survey evidence of 15% confusion is sufficient to demonstrate actual confusion. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co*., 290 F.3d 578, 594 (3d Cir. 2002); *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 466–67, 467 n.15 (4th Cir.1996) (15–20% confusion was sufficient to establish "actual confusion ... to a significant degree"); *Mut. of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 400-01 (8th Cir. 1987) (survey showing 10–12% confusion sufficient); *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1061 (2d Cir. 1979) (15–20% confusion sufficient); *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% confusion sufficient); *Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F. Supp. 453, 457 n.7 (S.D.N.Y. 1990) (9–10% confusion was sufficient to demonstrate "meaningful evidence of actual confusion").

In this matter, only ACL had a survey prepared. Dr. Hal Poret conducted a scientific online sequential lineup survey focused on the specific cause of the confusion. Poret Dec. Ex 1, 3-74. The survey explains how use of two randomized survey respondent groups produces measure of

net confusion. Dr. Poret's survey found that 55.0% of the Test Group respondents who were shown the website for AQSC mistakenly answered that it was a website for the same company whose advertising they had been shown earlier, which was American Cruise Lines. Of the Control Group, 34.5% of respondents answered that the altered "National" Queen Steamboat Company website was a website for the same company whose advertising they had been shown earlier, which was American Cruise Lines. By subtracting the 34.5% Control Group response from the gross Test Group confusion level of 55.0%, Dr. Poret determined a 20.5% net confusion rate of source confusion with respect to the name "American Cruise Lines" specifically attributable to the first word of the name "American Queen Steamboat Company." The 20.5% net confusion rate is 37% greater than the 15% confusion rate found by the Third Circuit in *Novartis* to be sufficient to demonstrate actual confusion. *Novartis*, 290 F.3d at 594. AQSC's use of "American" as the first term of its corporate brand is a significant source of confusion.

### ii.   AQSC's Pervasive Use of American Cruise Lines' Trademarked Terms as Paid Keywords is Likely to Cause Confusion

ACL submits that if permitted to present evidence of AQSC's pervasive use of American's trademarked terms in this case, it would prove a substantial cause of likely confusion. Because of the Court's instructions as to available trial time and trial bifurcation, however, that evidence will not be presented at this trial.

### iii.   Instances of Actual Confusion

AQSC issued a press release in late June 2012 regarding its 2013 crew season and buried in the announcement the change of its corporate brand name to AMERICAN QUEEN STEAMBOAT COMPANY effective July 1, 2012. The evidence will show that confusion resulted thereafter and has continued subsequently. More than 100 instances of actual confusion were documented by ACL.

It is believed that AQSC concedes that actual confusion exists. AQSC's expert witness, Dr. Basil Englis, wrote of such confusion in his Expert Report at ¶ 26 ("[T]here is ample evidence of actual confusion in this matter…"). The evidence of confusion will show that American has lost sales and suffered a diminishment of its goodwill and reputation.

### e. Lapp Factor 5: AQSC Intended to Benefit From American Cruise Lines' Goodwill in Adopting the Mark

In evaluating the "intent" factor, courts look at whether the defendant chose the mark to promote confusion to capitalize on the senior users' goodwill and whether defendant gave adequate care to investigating its proposed mark or had knowledge of similar marks or allegations of potential confusion. *Kos Pharm.,* 369 F.3d at 721. For instance, in *McNeil Labs. Inc. v. American Home Prods. Corp.,* 416 F. Supp. 804, 807 (D.N.J. 1976), the court held that defendant intended to trade upon the goodwill in plaintiffs' TYLENOL mark when the defendant selected the mark EXTRANOL for its extra-strength pain reliever *after* confirming by survey that EXTRANOL would remind consumers of TYLENOL. The court observed that "courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them." *McNeil*, 416 F. Supp. at 807.

The evidence in this case will demonstrate that AQSC adopted the AMERICAN QUEEN STEAMBOAT COMPANY brand and mark and began building a family of "American" named vessels in part in order to establish an association with the word "American." This decision was made in preference to emphasizing the term "Queen" in the name of the *American Queen,* a means by which the Delta Queen Company, long the owner of the *American Queen*, previously built a family of marks involving the Delta Queen Steamboat Company name and the vessels *Delta Queen* and the *Mississippi Queen.*

The purpose of AQSC's change to emphasize "*American*" was to usurp and trade on the goodwill and reputation developed by ACL as the industry leader under its AMERICAN CRUISES LINES brand and its growing "*American*"-named vessel fleet. AQSC had full knowledge of the AMERICAN CRUISE LINES brand and ACL's family of "American" marks and previously established and expanding fleet of "American" named vessels operating on an expanding array of US river itineraries prior to its decision to begin building its own family of "American" marks. Subsequently AQSC purchased other vessels, changed their names to begin with the word "*American*," and began marketing its own fleet of "American" vessels under a family of "American" marks. Evidence at trial will show that ACL objected to AQSC's use of any brand name incorporating the word "American as early as May 2011, before AQSC had conducted its first cruise.

### f.  Lapp Factor 7: American Cruise Lines and AQSC Market And Advertise Through The Same Trade Channels And Media

There is no factual dispute that ACL and AQSC use the same commerce channels to market their services to the same people. Because customers could reasonably conclude that one company offers both competing cruise services, this factor favors a finding of likelihood of confusion. *Fisons*, 30 F.3d at 481 ("The question is whether the consumer might . . . reasonably conclude that one company would offer both of these related products."). The seventh Lapp Factor therefore favors a finding of likelihood of confusion. *Kos Pharm., Inc.*, 369 F.3d at 722 ("The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion").

### g.  Lapp Factor 8: American Cruise Lines and AQSC Sales Efforts are Directed to the Same Target Market

ACL and AQSC are direct competitors, offer substantially similar overnight paddlewheel cruises, and share the same target markets. There is no factual dispute that ACL and AQSC's target

markets consist of the same demographic and psychographic profiles. Both American Cruise Lines' and AQSC's target demographic profile consist of educated, affluent Americans, age 55 and over. Both ACL and AQSC also draw customers from the same population centers around the country. In addition, both market to those with similar psychographic profiles – people who are "intellectually curious or still wish to learn" and have "the desire and time to visit historical and cultural sites or unique cruise itineraries."

### h.  Lapp Factor 9: Relationship Of The Goods In The Minds Of Consumers

The similarity of AQSC's and American's operations also results in a high likelihood of confusion. *Lapp*, 721 F.2d at 462 ("The closer the relationship between the products, … the greater the likelihood of confusion.").  The evidence will show that both American and AQSC provide overnight passenger cruise ship services and offer cruises on paddlewheel riverboats operating on the Mississippi, Snake, and Columbia rivers. Both offer similar itineraries, pre-cruise hotel stays, shore excursions, and various forms of entertainment. AQSC has extended the similarities even to the naming convention of their boats by incorporating "American" followed by a term such as "Empress" or "Duchess", although ACL's management was the first to adopt this naming convention in the 1970's, starting with the *American Eagle*.

### D.  ACL Did Not Acquiesce in AQSC's Adoption of the AMERICAN QUEEN STEAMBOAT COMPANY Brand Name, Is Not Estopped, and Is Not Guilty of Unclean Hands.

AQSC seeks to raise the defenses of estoppel and acquiescence. 15 U.S.C. § 1115(b)(9). Acquiescence and estoppel are affirmative equitable defenses on which AQSC bears the burden of proof. *Analytic Recruiting, Inc. v. Analytic Resources, LLC*, 156 F.Supp.2d 499, 515-16 (E.D. Pa. 2001). As this Court noted, D.I. 258 at 37, "The doctrine of acquiescence applies when the trademark owner, by affirmative word or deed, conveys its implied consent" to the defendant's use

of the infringing mark. *Pappan Enters., Inc. v. Hardee's Food Sys.*, 143 F.3d 800, 804 (2d Cir. 1998). The doctrine is much like that of laches, which requires undue prejudice resulting from inexcusable delay in bringing suit. *Seller Agency Council, Inc. v. Kennedy Center for Real Estate Education, Inc.*, 621 F.3d 981, 989-90 (9th Cir. 2010)."The essence of an estoppel defense is that the defendant changed its position in reliance upon the misleading representation of the plaintiff." *Guardian Life Ins.* Co. *v. Am. Guardian Life Assurance* Co., 943 F. Supp. 509, 517 n.5 (E.D. Pa. 1996) (citing *Anheuser-Busch, Inc. v. Du Bois Brewing* Co., 175 F.2d 370, 375 (3d Cir. 1949)).

AQSC's acquiescence and estoppel defenses are based on two settlement communications, (1) a letter dated May 28, 2011 (ACL 52973-52975) sent by American's counsel to AQSC's counsel and objecting to AQSC's use of the term "American" in its brand name and offering to open settlement discussions on certain terms and (2) a letter dated August 18, 2011 (D.I. 213, Ex. 19), sent by American's counsel to AQSC's counsel offering possible settlement terms; AQSC also rests on (3) an alleged statement made by American's CEO, Charles A. Robertson, at a settlement meeting on December 15, 2011. Unless admissible to prove the validity of some unrelated claim notwithstanding their potentially prejudicial effect (D.I. 258 at 37 n.13) all are inadmissible at trial by reason of FRE 408 because they were made (or, in the case of the oral statement, allegedly made) during compromise negotiations concerning AQSC's use of *Great American Steamboat Company* marks ("GASC" Marks).

The settlement discussion in the two letters sent by counsel should not be admissible at trial because they are potentially prejudicial and confusing to the jury and are normally excluded with good reason under FRE 408 and in this case cannot support AQSC's defense of acquiescence or estoppel. As was stated by this Court:

> As for the letters, Defendant cannot lay claim to the benefit of a bargain it never made. In the August 18 letter relied upon by Defendant, Plaintiff's attorney

proposed a settlement whereby defendant would cease to use GASC and Plaintiff would not object to Defendant's use of AQSC. (D.I. 213-21). Defendant never accepted this offer. (D.I. 212-1 at 18).

Defendant's reliance on the May 11 letter is similarly flawed. More so, in this letter, Plaintiff clearly informs Defendant it believes Defendant's use of AQSC is improper and likely to cause consumer confusion. *(See* D.I. 213-19 ("[M]y client believes that your clients' adoption of ... HMS American Queen Steamboat Company ... [is] likely to lead consumers to believe that they are affiliated with American Cruise Lines.")). Plaintiff explicitly requested Defendant "change [its name] to something that does not include the term AMERICAN." No reasonable actor would rely on those statements as permission to use the AQSC mark. Thus, they cannot form the basis of Defendant's estoppel and acquiescence defenses.

D.I. 258 at 38. ACL filed a motion *in limine* on the inadmissibility of this evidence.

If testimony about Mr. Robertson's alleged statement at the settlement meeting is admitted at trial, it will nevertheless be insufficient to establish a defense of acquiescence for AQSC. The alleged statement, not confirmed in the Settlement Agreement drafted by the AQSC's lawyer or otherwise, was not something on which AQSC could reasonably rely for a change in tradename made months later. *Cf. Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F.Supp.3d 1368 (S.D. Fla. 2014) (reliance on mark holder's statement of "no problem" with alleged infringer using subject mark was unreasonable).

Not only is the alleged verbal consent not a form of consent on which a reasonable actor could rely, the evidence at trial will show that AQSC in fact did not rely on any such consent.

AQSC also has no basis to claim prejudice by reason of any delay in filing suit. *Omag Optik Und Mechanik A.G. v. Weinstein*, 85 F. Supp. 631, 636 (S.D.N.Y. 1949) ("[M]ere delay, even though protracted, will not necessarily create an estoppel against the enforcement of trademark rights."). Delay in instituting a lawsuit must be "inexcusable," and delay alone, no matter how egregious, is insufficient to bar prospective relief. *Univ. of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1044, 1046 (3d Cir. 1982).

The equitable doctrine of unclean hands allows the Court to deny equitable relief to a party that itself has committed an act in bad faith or unconscionably immediately related to the equity the party seeks in the litigation. *Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 245 (1933). In the Third Circuit, the unclean hands defense requires "clear, convincing evidence of 'egregious' misconduct before invoking the doctrine of unclean hands." *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004). Furthermore, "the extent of actual harm caused by the conduct in question, either to the defendant or to the public interest, is a highly relevant consideration." *Id.* (citations omitted). *See Sanofi-Adventis v. Advancis Pharmaceutical Corp*., 453 F. Supp.2d 834, 855-56 (D. Del. 2013) ("While plaintiffs may have had competitive reasons for initiating the action when it did, the court concludes that this does not constitute outrageous behavior.").

### E.  Remedies

#### a.  Proof of Damages – Infringer's Profits

ACL seeks monetary damages, including recovery of reasonable attorney's fees, pursuant to 15 U.S.C. §§1114(1)(a), 1117(a), 1125(a)(1), 6 Del C. §2531. *et seq.*, and common law.

The provisions of the Lanham Act set out a straightforward means of calculation of the profits a registrant may recover from a defendant infringing the rights of a trademark registrant under 15 U.S.C. §1114 or violating the false advertising provisions of 15 U.S.C. § 1125(a): the plaintiff registrant must prove the defendant infringer's sales only; then the defendant infringer must prove all elements of cost or deduction claimed:

> The plaintiff shall be entitled . . . **subject to the principles of equity**, to recover (1) **defendant's profits**, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction.  **In assessing**

> **profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.**

15 U.S.C. §1117(a) (emphasis added).

In addition to specifying that the damages award is "subject to the principles of equity," the statute empowers the Court with considerable discretion in regard to a recovery based on profits:

> If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances [either (1) defendant's profits or (2) any damages sustained by the plaintiff] shall constitute compensation and not a penalty.

15 U.S.C. §1117(a).

In *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005), the court in relied on the observation of the Second Circuit that "an accounting of the infringer's profits is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement." *Id.* at 178 (citing *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992)). These three rationales are independent of each other, and "any one will do." *Id.*

Here the evidence will establish that ACL is entitled to recover AQSC's profits. AQSC has been unjustly enriched by actual confusion resulting in ACL losing sales to AQSC – sales attributable to AQSC's infringement of the AMERICAN CRUISE LINES marks. *George Basch*, 968 F.2d at 1538. ACL has sustained damages by reason of losing sales to AQSC, together with certain damage to its goodwill attributable to consumer dissatisfaction with AQSC's services. An award of AQSC's profits may serve as a rough proxy measure of ACL's damages. *George Basch*,

968 F.2d at 1539. Finally, an award of defendant's profits that deters future infringement will serve to protect the public at large. *Id*.

In addition to the foregoing three independent rationales for awarding disgorgement of profits, the *Banjo Buddies* court identified factors applied in the Fifth Circuit to assist in evaluation whether equity supports disgorging the infringer's profits. *Banjo Buddies*, 399 F.3d at 175 (citing *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002)). *See also George Basch*, 968 F.2d at 1540. The *Banjo Buddies* court held that, subsequent to the 1999 amendments to the Lanham Act,[1] the willfulness of the defendant's infringement is a factor but not a prerequisite to the recovery of the defendant infringer's profits under the statute. *Banjo Buddies,* 399 F.3d at 175 (*SecuraComm Consulting, Inc. v. SecuraComm Inc.*, 166 F.3d 182 (3d Cir. 1999) (abrogated by 1999 amendment to Lanham Act)). The *Banjo Buddies* court itemized the 5th Circuit's factors to

> include, but are not limited to (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Banjo Buddies,* 399 F.3d at 175 (citing *Quick Techs.*, 313 F.3d at 349). Third Circuit has found it appropriate to allow a disgorging of defendant's profits where plaintiff's sales were diverted to defendant because plaintiff's lost profits would be difficult to calculate and there were no other adequate remedies. *World Entertainment Inc. v. Brown*, 487 Fed. Appx. 758, 762 (3d Cir. 2012).

Here, the evidence will show that both ACL and AQSC have benefited from increasing public demand for overnight passenger cruising on US rivers and coastal waters. In the circumstance of rising profits, the amount of actual damages suffered by reason of loss sales is

---

[1] Pub. L. No. 106-43, § 3(b), 113 Stat. 219 (Aug. 5, 1999).

speculative and difficult to prove. Yet the evidence will be clear that ACL has lost sales attributable to AQSC's brand name infringement, highlighted by AQSC's intentional choice of the AMERICAN QUEEN STEAMBOAT COMPANY brand name mark and its decision to mimic ACL by beginning to create a family of vessel name marks emphasizing the term "American" as their first word. Although injunctive relief should issue in favor of ACL, that remedy is not adequate to address the monetary loss suffered by ACL because of AQSC's intentional infringements. The domestic riverboat cruising public also has an interest in deterring AQSC from further confusing infringement.

The calculation of infringer's profits is determined by the finder of fact. *George Basch*, 968 F.2d at 1535 (discussing jury award of defendant's profits); *see generally,* Model Jury Instructions: Copyright, Trademark and Trade Dress Litigation, American Bar Association, §§ 2.8, 2.9 (2008). The court retains discretion in the final determination of the relief based upon the equitable factors discussed above. *George Basch*, 968 F.2d at 1537; *Banjo Buddies*, 399 F.3d at 175; 15 U.S.C. § 1117(a).

### b. Declaratory and Injunctive Relief

ACL seeks declaratory and injunctive relief pursuant to 15 U.S.C. §1116(a) and 6 Del C. § 2533. et seq., and common law.

The Lanham Act is explicit in giving federal courts the power to grant injunctive relief in cases of trademark infringement, unfair competition, and other violations of the Act. Section 1116(a) states:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.

15 U.S.C. § 1116(a).

> ACL is entitled to a permanent injunction upon a showing that:

>> (1) that it has suffered any irreparable injury; (2) that remedies available at law, such as monetary damages, are in adequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendants, a remedy in equity is warranted; and (4) as a public interest would not be disturbed by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837, 1840, 164 L.Ed.2d 641 (2006), *cited in Soo Bahk Do Mo Moo Duk Kwan Federation, Inc. v. Tang Soo Karate School, Inc.*, 2015 WL 4920306 at *31 (M.D. Pa. 2015).

> "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Lack of control over one's mark creates the potential for damage to reputation. Thus, trademark infringement amounts to irreparable injury as a matter of law." *Kos Pharm,* 369 F.3d at 726. "Once the likelihood of confusion caused by trademark has been established, the inescapable conclusion is that there was also irreparable injury." *Id.* (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)). The evidence at trial will show that ACL has lost trade, lost control of its reputation, and lost goodwill. There is a likelihood of confusion with AQSC's brand in the national market for domestic US overnight passenger cruising. ACL has suffered irreparable harm.

> Further, money damages will not protect ACL against future infringement by AQSC's marketing under its brand and with its growing family of overnight passenger river cruise ships having names beginning with the word "American." "Therefore, money damages are inadequate to remedy AQSC's trademark infringement. Most district courts dealing with these issues in the context of a permanent injunction restraining trademark infringement have concluded the same." *Soo Bahk Do Mo Moo Duk Kwan Federation,* 2015 WL 4920306 at *32 (citations omitted).

The balance of the harms also weighs in favor of granting a permanent injunction against AQSC. An injunction will only prevent AQSC from persisting in unlawful conduct. AQSC's intention to continue to emphasize the word "American" in its brand name mark by renaming the vessel *Empress of the North* as *American Empress,* renaming its "*Kanesville Queen*" vessel as *American Duchess,* and announcing its plans to rename the "*Isle of Capri*" vessel as *American Countess* all make clear that ACL stands to suffer the serious, intangible, and irreparable losses of control over its reputation and goodwill if AQSC's infringement is not stopped.  *Cf. Soo Bahk Do Mo Moo Duk Kwan Federation,* 2015 WL 4920306 at *32-33.

Finally, the public interest favors an injunction. "In a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.' Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest." *S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 379 (3d Cir. 1992) (citing *Opticians Assoc. of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 197-98 (3d Cir. 1990)).

For these reasons, the Court should enter injunctive relief in favor of ACL.

### c.  Cancellation of Marks.

ACL seeks cancellation of AQSC's registrations of the AMERICAN QUEEN STEAMBOAT COMPANY mark and the AMERICAN QUEEN mark pursuant to 15 U.S.C. §§ 1064 and 1119.  Under § 1119, the Court has the power to cancel a registered mark:

> In any action involving a registered mark the court may determine the right to registration, order the cancellation of the registration, in whole or in part, restored to canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action.

15 U.S.C. § 1119.  *See Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 873 (3d Cir. 1992).

Under 15 U.S.C. §1064(1), a party damaged by registration of a mark may seek cancellation of a registered mark on any of the grounds on which the registration may have been prevented in the first instance if that party files for cancellation within five years from the date of the registration of the mark. 15 U.S.C. § 1064(1). *See* McCarthy § 20:42.

ACL's complaint seeking cancellation of the registration of AQSC's AMERICAN QUEEN STEAMBOAT COMPANY mark was filed within 5 years of the registration of that mark on February 5, 2013. ACL is therefore entitled to cancel that registration on the ground itemized in 15 U.S.C. § 1052 (d), i.e., when the mark is used on or in connection with the goods or services of the applicant, is likely to cause confusion, or to cause mistake, or to deceive. *See* McCarthy § 20:53. The evidence at trial in this case will show that when used in connection with the cruise services of AQSC, the AMERICAN QUEEN STEAMBOAT COMPANY is likely to cause confusion, or to cause mistake, or to deceive.

For these reasons, the Court should order the cancellation of the registration of AQSC's AMERICAN QUEEN STEAMBOAT COMPANY mark.

### d.  Recovery of Attorney's Fees, Costs.

ACL seeks recovery of its reasonable attorney's fees under 15 U.S.C. § 1117(a): "The court in exceptional cases may award reasonable attorney's fees to the prevailing party." One court found helpful guidance on the meaning of that provision in section 1117(a) in identical language in § 285 of the Patent Act, on which the Supreme Court ruled in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1755–56 (2014). *Soo Bahk Do Mo Moo Duk Kwan Federation,* 2015 WL 4920306 at *37.

In *Octane Fitness* the Supreme Court construed the term "exceptional ... in accordance with its ordinary meaning" at the time of the Patent Act's passage as "uncommon, rare, or not

ordinary." *Octane Fitness, 134 S.Ct.* at 1756 (quoting Webster's New International Dictionary 889 (2d ed.1934)). The Supreme Court then concluded that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.*

While *Octane Fitness* directly concerns the scope of a district court's discretion to award fees for 'exceptional' cases under § 285 of the Patent Act, the case controls our interpretation of § [1117(a)] of the Lanham Act. Not only is § 285 identical to § [1117(a)], but Congress referenced § 285 in passing § [1117(a)]." *Fair Wind Sailing, Inc. v. Dempster,* 764 F.3d 303, 314-15 (3d Cir. 2014), *quoted in Soo Bahk Do Mo Moo Duk Kwan Federation*, 2015 WL 4920306 at *37. *See* S.Rep. No. 93-1400, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7133.

## II.    Defenses to AQSC's Claim of Infringement of Its AMERICAN QUEEN Marks by ACL's "American" Vessels

AQSC claims that ACL's operation and marketing of its "American" vessels on the Mississippi River system and on the Columbia and Snake Rivers infringes its AMERICAN QUEEN vessel name marks and its AMERICAN QUEEN STEAMBOAT COMPANY brand name mark. ACL denies any such infringement and denies that AQSC is entitled to the relief it seeks.

### A.    AQSC Cannot Prove Likelihood of Confusion With Its AMERICAN QUEEN Vessel Marks

#### 1.    As Weak Marks in a Crowded Field, the Scope Of Protection Afforded The AMERICAN QUEEN Marks Is Narrow

AQSC essentially contends that its purported ownership of two AMERICAN QUEEN service mark registrations gives it a priority right to exclusive use of the term "American" in

marketing services in the US overnight passenger cruise market. This contention is legally wrong for several reasons.

### a. AQSC Does Not Have Priority Right to Exclusive Use of The Term "American" in the US Cruise Industry

AQSC's AMERICAN QUEEN vessel name marks are a "composite mark" – that is, they incorporate otherwise separable words into a single mark. *In re Save Venice New York, Inc*., 259 F.3d 1346, 1349 n.1 (Fed Cir. 2001). It is well-settled that the registration of a composite mark like "AMERICAN QUEEN" creates presumptive rights in the whole mark only and does not create rights in any component part. *See Dranoff-Perlstein Assoc.,* 967 F.2d at 861 ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail"). The evidence at trial will establish no basis to support AQSC's claim of priority right to the term "American" as a component term of the registered mark.

Geographically descriptive terms, such as "American," are not legally capable of protection as trademarks absent proof of acquired distinctiveness or secondary meaning. To demonstrate ownership or priority right to use the term "American" standing alone, AQSC must prove that secondary meaning or acquired distinctiveness was established in the term "American" at the time and place that American Cruise Lines first began using its marks.[2] *Commerce Nat. Ins. Services*, 214 F.3d at 438 (citations omitted). Given that "American" is not a registered mark, AQSC must also prove (1) priority of use of the term "American" as a service mark and (2) sufficient market penetration to establish rights in the mark. *See Lucent Information Management, Inc. v. Lucent*

---

[2] To establish secondary meaning or "acquired distinctiveness," a party must show that, in the minds of the public, the *primary* significance of a term is to identify the source of the product rather than the product itself. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc*., 456 U.S. 844, 851 (U.S. 1982).

*Technologies, Inc.*, 186 F.3d 311, 316–17 (3d Cir.1999); *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394, 1397 (3d Cir.1985). The evidence at trial will not meet this burden.

### b. Rights Granted by Registration of a Mark are Limited to Services Described.

The scope of rights granted by registering a mark is construed narrowly because registration gives the owner of a mark a form of "monopoly." *Natural Footwear Ltd.,* 760 F.2d at 1396 (quoting *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978)). The AMERICAN QUEEN registrations neither create rights in the term "American" nor cover services not described in the registrations.

The two AMERICAN QUEEN marks in question are registered for only very specific services:

- "**transporting passengers and goods by steamers**" (Reg. No. 1,953,532) and

- "**hotel, restaurant and bar services provided onboard a riverboat**" (Reg. No. 1,953,533).

The Lanham Act provides that protection afforded by registration of a mark extends to "goods or services specified in the registration subject to any conditions or limitations stated therein." 15 U.S.C. §1115(a). Given this language, the Third Circuit has concluded that the presumption of validity and ownership of a mark based on registration "extends only so far as the goods or services noted in the registration certificate." *Natural Footwear Ltd.*, 760 F.2d at 1396. *See also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc*., 469 U.S. 189, 204 (U.S. 1985) ("a mark may not be expanded beyond the good or service for which it was originally designated").

The law thus prohibits expansion of the protection afforded by registration beyond the services described in those registrations as provided on the vessel: transportation, hotel, and bar services. The registrations do not provide a presumptive right to use the marks for services not

described in the registrations, such as cruise planning, pre-cruise and post-cruise air travel and accommodation services, excursions, educational seminars, loyalty programs, and other types of cruise services.

The evidence at trial will show that, in this case, services provided by AQSC other than the transportation, hotel, and bar services provided on the vessel are services associated in the mind of the public with the cruise line operating the vessel or vessels, not with the vessels themselves.

### c.  Rights in a Crowded Field Are Construed Narrowly

The evidence at trial will show that although only primarily to overnight passenger cruise lines in the United States have brand names beginning with the word "American," the names of literally hundreds of US flag vessels start with the first word "American." Three are even named "American Queen." These circumstances create what is known as a "crowded field" in which only narrow protection is afforded. Professor McCarthy refers to Ninth Circuit authority as an example of a crowded field of beauty pageants:

> We view the beauty pageant industry's marks as a "crowded field": In a "'crowded' field of similar marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd." *J. McCarthy, [Trademarks and Unfair Competition]*, § 11:26, at 511 [(2d Ed. 1984)]. Simply put, "a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Id.*

*Miss World (UK) Ltd. v. Mrs. American Pageants, Inc.*, 856 F.2d 1445 (9th Cir. 1988) (citations omitted), *quoted in part at* McCarthy, § 11.85. *See also In re Hartz Hotel Services Inc.*, 102 U.S.P.Q.2d 1150, 2012 WL 1193704 (T.T.A.B. 2012) ("[W]e conclude that consumers are able to distinguish between different GRAND HOTEL marks based on small differences in the marks, including the addition of a geographic term." and "we find that the addition of NYC to applicant's

mark is sufficient to render applicant's mark distinguishable from the mark in the cited registration.").

### d. The Association Between ACL's Strong AMERICAN CRUISE LINES brand mark and ACL's Family of American Vessel Marks Lessens the Likelihood of Confusion with a Different Source of Services

The combination of ACL's family of "American" vessel name marks combined with ACL's strong AMERICAN CRUISE LINES tradename and brand mark also reduces the likelihood of confusion between ACL's vessel names and AQSC's AMERICAN QUEEN mark. Essentially all ACL's advertising and promotional materials listing the names of one or more of ACL's "American" – named vessels reflect ACL's incontestable AMERICAN CRUISE LINE trade name mark as the most prominent element of the advertising or promotional material. The Company tradename and brand are used either alone or with associated advertising of one or more of ACL's American" – named vessels. The strength of ACL's tradename and brand diminishes the likelihood of confusion regarding the vessel names associated with it. *See, e.g.*, *A & H Sportswear*, 237 F.3d at 218-19 (citing *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) ("[W]hen a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened.")); *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355-56 (7th Cir. 1983) ("even Kraft agrees that a prominent house mark may also tend to lessen confusion.").

### 2. The AMERICAN QUEEN Marks Were Abandoned

The registration of a mark which is incontestable under 15 U.S.C. § 1065 is nevertheless subject to cancellation under 15 U.S.C. § 1064(3) if the mark has been abandoned.

### a. Non-use for Over 3 Years is Prima Facie Abandonment

Abandonment is defined for purposes of the Act at §45 of the Lanham Act, 15 U.S.C §1127, which states in pertinent part that "[A] mark shall be deemed abandoned …

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. ***Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.*** "Use" of a mark means ***the bona fide use of such mark made in the ordinary course of trade*** and not made merely to reserve a right in a mark."
***
Purchaser motivation shall not be a test for determining abandonment under this paragraph.

*See* 15 U.S.C. §1127 (emphasis added).

Cases define two elements for abandonment: (1) nonuse of the mark by the legal owner and (2) lack of intent to resume use by that owner of the mark within the reasonably foreseeable future. *ITC Ltd. v. Punchgini,* 482 F.3d 135, 147 (2d Cir. 2007).

Nonuse for three consecutive years creates a rebuttable presumption of abandonment imposing on the party defending the mark a burden of production of evidence of use and intent to resume use within a reasonably foreseeable time. *ITC,* 482 F.3d at 148.

In the present case, the key AMERICAN QUEEN marks, '532 Reg. and the '533 Reg., are "service marks."[3] For purposes of abandonment, "use" is defined in §1127 to require "bona fide use of such mark made in the ordinary course of trade and not made merely to reserve a right in the mark." *Silverman v. CBS, Inc.*, 870 F.2d 40, 47-48 (2d Cir. 1989), *cert. denied*, 492 U.S. 908 (1989) ("Amos 'n' Andy" marks held abandoned). For a service mark to be "used" in commerce for purposes of the law, including "use in the ordinary course of trade" within the definition of "abandonment," it must be:

… used or displayed in the sale or advertising of services ***and the services are rendered in commerce,*** *or the services are rendered* in more than one State, or in the United States and a foreign country

---

[3] Under the Lanham Act, 15 U.S.C. § 1127, a "service mark" is defined to mean "any work, name, symbol, or device, or combination thereof – (1) used by a person, … to identify or distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if the source is unknown."

> and *the person rendering the services is engaged in commerce in connection with the services*.

15 U.S.C. §1127 (emphasis added). That is, the "use" of a mark sufficient to toll the non-use provision for *prima facie* evidence of abandonment must be "use" in "the ordinary course of trade" in which the services with which the mark is to be used are "actually rendered." *See Couture v. Playdom, Inc.,* 778 F.3d 1379, 1382 (Fed Cir. 2015) (quoting §1127 and collecting cases); 15 U.S.C. §1127.

In the case of the two AMERICAN QUEEN service marks, the services to be rendered are, for the '532 Reg., "**transporting passengers and goods by steamers in class 39**" (emphasis added) and for the '533 Reg., "**hotel, restaurant, and bar services provided aboard a riverboat in class 42**" (emphasis added). "Use" of the AMERICAN QUEEN marks "in the ordinary course of trade" under §1127 sufficient to forestall a *prima facie* case of abandonment therefore requires that the marks be used in connection with the operation of the *American Queen* vessel for "transporting passengers and goods by steamers" and for "hotel, restaurant and bar services provided aboard a riverboat" such that the referenced services are *actually rendered*.

The evidence at trial will establish that the *American Queen* was not operated in the ordinary course of trade, nor were the described services rendered, at any time between the date of her surrender, November 15, 2008, and the date of her first voyage under AQSC's management, April 13, 2012.

Accordingly, the evidence will establish that the period of nonuse of the AMERICAN QUEEN marks was a period of 41 months, or more than 3 years. The burden of production of evidence to rebut that *prima facie* case under 15 U.S.C. § 1127 therefore falls on AQSC, the party now claiming earlier priority rights under the more recently acquired marks.

29

### b.  Ambassadors' Abandonment Was Express

Abandonment is a question of fact with "intent not to resume use" judged under an objective standard. *Natural Answers, Inc. v. SmithKline Beecham, Am. Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008). The standard is an "intent not to resume use," not an "intent to abandon." *Exxon Corp. v. Humble*, 695 F.2d 96, 102 (5th Cir. 1983). Once a mark is abandoned, subsequent use cannot retroactively cure abandonment. *ITC Ltd.,* 482 F.3d at 147; *AmBrit, Inc. v. Kraft, Inc.*, 812 F. 2d 1531, 1551 (11th Cir. 1986) (citing cases); McCarthy, §17.2.

A public announcement of a name change is the type of circumstance from which intent not to resume use may be inferred. *Cumulus Media, Inc. v. Clear Channel Communications, Inc.,* 304 F.3d 1167, 1178 n.17 (11th Cir. 2002); *see also Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.*, 585 F. Supp. 17 (S.D. Iowa 1982), *aff'd*, 720 F.2d 981 (8th Cir. 1983). An "intent to resume use" requires the trademark owner to have *plans* to resume commercial use of the mark in the reasonably foreseeable future. *Silverman*, 870 F.2d at 47. Warehousing of marks with no definite intention to use is not permitted. *Id.*; *Emmpresa Cabana Del Tabaco v. Culbro Corp.*, 213 F.Supp.2d 247, 268 (S.D.N.Y. 2002) ("objective, hard evidence of actual 'concrete plans to resume use' in the reasonably foreseeable future" is required).

Evidence at trial will establish that upon surrender of the *American Queen* to MARAD, Ambassadors had no intention whatever to resume any use of the AMERICAN QUEEN marks. Ambassadors was prohibited from reacquiring the vessel *American Queen* after surrender. Nor could Ambassadors simply try to preserve the marks in hopes of some future sale. 15 U.S.C. §1127. Warehousing of marks with no definite intention to use is not permitted. In the present case, even if Ambassadors was open to the possibility of some future sale of the AMERICAN QUEEN marks,

30

there was never any plan to use them in the ordinary course of trade. *Silverman v. CBS, Inc.*, 870 F.2d at 47; *Emmpresa Cabana Del Tabaco*, 213 F.Supp.2d at 270 n.38.

### c.   MARAD Could Not And Did Not Use The Marks In The Ordinary Course Of Trade

MARAD had no security interest or preferred mortgage lien in the AMERICAN QUEEN marks under its preferred mortgage on the *American Queen* vessel. Although a preferred mortgage must cover "whole of the vessel," 46 U.S.C. §31322(a)(1), including "appurtenances," a trademark on a vessel name is not maritime and is not a "specifically identifiable item that is destined for use aboard a specifically identifiable vessel and [is] essential to the vessel's navigation, operation, or mission." *See Gonzales v. M/V Destiny Panama*, 102 F.Supp.2d 1352 (S.D. Fla. 2000).

MARAD had no right to, and did not, acquire, control, or dispose of the AMERICAN QUEEN marks upon Ambassadors' default, had no right to acquire, offer, or sell the marks, and did not even mention the marks or use them in connection with attempts to sell the *American Queen* vessel following the surrender and subsequent foreclosure.  As this Court noted, "MARAD was simply naming the asset, not using the marks in a way that connotes the related services."  D.I. 258 at 34 n.11.

### d.   AQSC's Intent to Use the Marks is Irrelevant.

AQSC claims to be the purchaser of the AMERICAN QUEEN marks under a February 25, 2011 agreement with Ambassadors. The intention of AQSC to use the marks is, however, explicitly not "a test for determining abandonment" under the paragraph defining "abandonment" in 15 U.S.C. § 1127 ("Purchaser motivation shall not be a test for determining abandonment under this paragraph.").

The proof of intent required under § 1127 to establish abandonment is "intent not to resume" use of the mark proven "[w]hen its use has been discontinued. The provision that

purchaser motivation is not a test for determining abandonment makes good sense because in the absence of such a rule, dormant marks could be revised almost indefinitely by purchasers with no prior interest in the mark or the business but intent on using them in a new enterprise while enjoying an earlier registration  priority.

**e.   Ambassadors' Assignment of the Marks to AQSC Conveyed No Goodwill and Was Void**

AQSC relies on claims of "residual goodwill" in the AMERICAN QUEEN marks. Nothing in the statutory definition of abandonment in § 1127 suggests that the existence or non-existence of goodwill has any relevance to the charge of abandonment.

The law permits proof of lingering goodwill in a mark to "suggest… [an] intent to resume use of the mark" in cases <u>unlike</u> the present one in which the mark owner's decision to discontinue use was unequivocally made with intent not to resume such use. *Cf. Exxon Corp. v. Humble Exploration Co.*, 695 F.2d at 102 (goodwill in the HUMBLE mark, coupled with a trademark maintenance program, "could suggest Exxon's intent to resume use of the mark…."). The *Exxon* case made abundantly clear that a trademark owner may abandon the mark even though it retains goodwill and value.  *Id.*

In considering the relevance of goodwill to analysis of abandonment, the Court should note the change in the statute wrought by the Trademark Law Revision Act of 1988, Pub. L. 100-667, §134 (100 Stat. 3935, 3948) (Nov. 16, 1988) (the "TLRA"), in which Congress not only added 15 USC §1051(b) permitting applications for trademarks not yet in use in commerce, but also added the explicit <u>disapproval</u> of "use" which is "made merely to reserve a right in a mark" in the definition of abandonment now found in §1127.

Use "made merely to reserve a right in a mark," now disapproved, would not occur unless there was perceived to be some goodwill value in the mark. Yet by virtue of the TLRA, the statute

32

clearly intends that such a mark in which some residual goodwill value may remain shall nevertheless be subject to being abandoned if use of the mark "has been discontinued with intent not to resume such use." That is what occurred with the AMERICAN QUEEN marks.

Even if goodwill may temporarily survive the cessation of business, *Hough Mfg. Corp. v. Va. Metal Indus.*, 453 F. Supp. 496, 500 (E.D. Va. 1978), it remains the law that regardless whether they have some value, trademarks may be abandoned, 15 U.S.C. § 1127, *Silverman v. CBS, Inc.*, 870 F.2d at 48. Use after abandonment cannot "revive" prior rights in the mark. *See* McCarthy §17.2. The evidence at trial will show that the AMERICAN QUEEN marks were abandoned.

### f. The AMERICAN QUEEN marks were assigned in gross, i.e., without goodwill.

The evidence at trial will establish that the prior owner of the AMERICAN QUEEN marks, Ambassadors, regarded the registrations for the AMERICAN QUEEN marks as essentially "valueless." The view was justified by a variety of facts to be presented at trial, including most importantly that Ambassadors had completely closed its Majestic America Line, had stopped paying on its debt secured by the *American Queen* vessel, had surrendered the *American Queen* vessel to MARAD, had sold the *American Queen* passenger list, and had ceased all business under that line.

The present case bears similarity to *Hough Mfg. Corp. v. Va. Metal Indus.*, 453 F. Supp. 496 (E.D. Va. 1978), *Reconstruction Finance Corp., v. J.G. Menihan Corp.*, 28 F. Supp. 920 (W.D.N.Y. 1939), and *In Re Jaysee Corset Co.*, 201 F. 779 (S.D.N.Y. 1911), because in all those cases the assets of the business were sold without any sale of the trademark or goodwill. The *Hough* court quotes the Callman treatise:

> If no one acquires the bankrupt's good will or tradename after a receiver's sale, the exclusive property rights thereto will vanish; they then lie in the public domain … No rights arise by succession from a later sale of the good

33

will as a separate item. Any new rights must be established by the new user.

*Hough Mfg. Corp.*, 453 F. Supp. at 500; 3 Callman §788.5(a) at 498. *See also Pilates v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 309 (S.D.N.Y. 2000) (transferor of assets was a defunct business and had no goodwill at time of transfer).

As in *Hough Mfg.* and its progeny, in this case MARAD foreclosed and sold a boat, not a business, and had no residual goodwill to convey to AQSC as to the services for which the AMERICAN QUEEN marks were registered. Majestic America Line had no residual goodwill with respect to the *American Queen* to convey to AQSC in 2011; the vessel was gone and its business lost, Majestic America Line had long ceased to exist as a separate business of Ambassadors, and Ambassadors could only convey the bare mark to AQSC, not the associated goodwill. The AMERICAN QUEEN marks had been abandoned by their owner and its creditors; an abandoned mark may not be assigned. *Auburn Farms, Inc. v. McKee Foods Corp.*, 51 U.S.P.Q. 2d 1439, 1444 (TTAB 1999). As a result the purported assignment to AQSC under the February 25, 2011, agreement was an assignment in gross of a mark with no goodwill, and therefore invalid.

For these reasons the AMERICAN QUEEN marks were, as of 2012, abandoned in the public domain and available for appropriation by the parties in accordance with their trademark rights. *Kirkland v. National Broadcasting Co.*, 425 F. Supp. 1111, 1117-18 (E.D. Pa. 1976) *aff'd mem.* 565 F.2d 152 (3d Cir. 1977); *McKay v. Mad Murphy's*, 899 F. Supp. 872, 878-81 (D. Conn. 1995).

### g.  AQSC Has Unclean Hands

It is axiomatic that a party seeking equity litigation must have done equity and cannot come to court with unclean hands. Where an unconscionable act by a complainant has immediate and necessary relation to the equitable relief that is sought in the matter in litigation, the court will

deny the equitable relief. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933).

In this case ACL claims the evidence of AQSC's inequitable conduct is "clear, convincing, and unequivocal." The facts are beyond dispute. *See Sanofi-Aventis v. Advancis Pharmaceutical Corp.*, 463 F. Supp. 2d 834, 856 (D. De. 2006) (citing *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 129 (3d Cir. 2004)).

The conduct which ACL claims to have been inequitable is the chronology of events by which AQSC, and its principles, have directly, intentionally, and very willfully sought to usurp and capitalize on the goodwill ACL has built in its "American" family of marks, including its AMERICAN CRUISE LINES tradename and its family of "American"- named fleet of vessels. In particular, AQSC rejected the long history of prior owners of the vessel *American Queen* marketing the vessel as part of a "Queen" family of vessels and instead emphasized the word "American" in the vessel name by electing the AMERICAN QUEEN STEAMBOAT COMPANY brand and tradename. Further, AQSC chose to rename the *Empress of the North* as the *American Empress,* rename its "*Kanesville Queen*" vessel as *American Duchess,* and announced its plans to rename the *Isle of Capri* vessel as *American Countess,* thereby beginning a new "family" of "American" vessel marks intended for no other reason than to trade on the goodwill of the only existing "American" vessel family in the domestic cruise industry, ACL.

Furthermore, when AQSC took these actions, they knew full well of ACL's history of its growing "American" family of vessels, its progression to develop new itineraries on new rivers on those vessels, its operation of a newly acquired riverboat on the Columbia and Snake River system, its intention to operate on the Mississippi River system (later fulfilled), and the objections stated by ACL's lawyer in a letter to AQSC's counsel in May 2011 to any use by AQSC of the term

35

"American" in AQSC's tradename. Actions taken which increase the possibility of confusion between the parties, exactly what AQSC did, has been held "clear evidence of unclean hands…." *Citizens Fin. Group*, 383 F.3d at 129.

ACL claims these actions are indeed sufficiently "egregious" to warrant the court refusing AQSC the equitable relief it seeks in regard to such issues as acquiescence, estoppel, and diminution of ACL's damage claim.

**h. Morehouse Defense**

The "Morehouse" defense is an equitable defense of laches or acquiescence applicable where a petitioner had a previous opportunity to oppose or cancel a registration of the same or substantially identical mark on the same or substantially identical goods or services by the same party who is now applicant. *Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 U.S.P.Q. 715 (C.C.P.A. 1969).

As ACL has grown its growing fleet of "American" vessels advertised in the national domestic overnight passenger cruise market throughout the United States under marks protecting their names, the owner of the *American Queen* had numerous opportunities to object to the registrations if it had good grounds to do so. But the owner of the *American Queen* never contested the registration of ACL's "American" vessel name marks, some of which (AMERICAN GLORY, AMERICAN SPIRIT, and AMERICAN STAR) have now even become incontestable. Accordingly, AQSC should be precluded in equity from now attacking ACL's newer "American" vessel name marks.

**i. AQSC Cannot Show Infringement of AMERICAN QUEEN Marks Under Lapp**

Even if AQSC can establish ownership and validity (non-abandonment) of the AMERICAN QUEEN marks at trial, in order to make a case of infringement of the AMERICAN

QUEEN marks by ACL's "American" vessel marks, AQSC must have proof of the "Lapp factors" recognized in the Third Circuit. *Lapp*, 721 F.2d at 463. The evidence at trial will not support AQSC's claims of infringement.

The weakness of the AMERICAN QUEEN marks is evident for a number of reasons which include, but are not limited to, the fact that there are many, many other vessels with the first name "American." Third parties use the terms "American," and even "American Queen," for commercial operations without complaint by AQSC. *See* McCarthy, §§ 11.88, 17:17.

The evidence at trial will show that the vessel *American Queen* and its AMERICAN QUEEN marks were not at all "iconic" or famous as AQSC has asserted. Demonstrating iconic or famous status of a mark is extremely difficult to do. The minimum threshold survey response to demonstrate that a mark is widely recognized throughout the United States should be in the range of 75%. *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 69 F.Supp.3d 175, 222 (D.D.C. 2014) (citations omitted).  AQSC has provided no consumer surveys or other credible evidence to demonstrate the vessel name acquired national fame. [4]

The evidence at trial will show that the vessel *American Queen* was not in operation on at least three extended occasions, each a year or more in length, before the vessel was surrendered to MARAD in 2008. The American Queen then ceased to operate for over three years before her first voyage under AQSC's operation in April, 2012. Even when not sufficient to constitute an abandonment, such gaps significantly weaken any strength the mark may have had. *See Boo, Inc. v. Boo.com Group Ltd.*, CIV. 00-1872(PAM/JGL), 2002 WL 334417 at *2 (D. Minn. 2002).

---

[4] The failure to conduct a survey justifies an inference "that the [party] believes the results of the survey will be unfavorable." *Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 475 (3d Cir. 1990).

The evidence at trial will specifically prove the weakness of the AMERICAN QUEEN marks. It will show that ACL began offering overnight passenger cruises on US rivers and coastal waters, including the Columbia and Snake Rivers and the Mississippi, on a growing fleet of vessels, many of which had the first name "American," without complaint from AQSC or its predecessor, Great American Steamboat Company. The evidence will show Internet traffic, first on the greatamericansteamboatcompany.com website, and later on the americanqueensteamboatcompany.com website, giving much greater attention to the brand name of the company than the vessel name. Further, survey participants on the AQSC website indicated very few who had traveled on or even had a prior awareness of the *American Queen*.

Further, evidence at trial of the marketing of the *American Queen* by the vessel's prior owners will show that it was only the dramatic change in marketing begun by AQSC's choice of the "American Queen Steamboat Company" brand name, followed by the change of the name of the *Empress of the North* vessel to "*American Empress*," that emphasized AQSC's use of the term "American" and created a likelihood of confusion between the brand names. The key factor in the public mind was the brand name, not the vessel name.

Expert witness testimony, including the unrebutted survey conducted by Dr. Hal Poret, in combination with the testimony of ACL's other experts, will confirm the conclusion that the similar brand names, not the vessel names, are the most significant source of confusion between ACL and AQSC as the source of their respective services in US river and coastal waters overnight passenger cruising.

38

### B. AQSCs' Damages Claim

In evaluating AQSC's claim for damages, the 3rd Circuit's recent teaching in *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 177 (3d Cir. 2017), as to the limits of the court' discretion under 15 U.S.C. § 1117(a) should be kept in mind:

> A district court's discretion, wide as it may be, is not unbounded, and a bare showing of gross sales is not sufficient to fashion an equitable award without some anchor in the record to support a reasonable estimation of actual profits. Indeed, Covertech's approach would render equitable considerations—and by extension, our review for abuse of discretion—a nullity. We will not interpret the Lanham Act's statutory burden-shifting mechanism in such a nonsensical manner.
>
> * * *
>
> … where a district court endeavors to calculate damages under the Lanham Act on the basis of the defendant's actual profits, rather than awarding statutory damages, it must ground its estimate in the record—*e.g.*, business records, credible witness testimony, expert testimony, or industry data—in order to pass muster as a reasonable estimate and an appropriate exercise of discretion.

*Covertech Fabricating*, 855 F.3d at 177.

ACL incorporates herein by reference its briefs filed in support of its motion for partial summary judgment and its cross-motion for partial summary judgment, and in opposition to AQSC's motions for partial summary judgment and cross motions for partial summary judgment, D.I. 173, D.I. 217, D.I. 232, and D.I. 246.

## **EXHIBIT 4**

## **DEFENDANTS' STATEMENT OF THE ISSUES OF LAW WHICH REMAIN TO BE LITIGATED**

## EXHIBIT 4
## DEFENDANTS' STATEMENT OF ISSUES OF LAW FOR TRIAL

Defendants, HMS American Queen Steamboat Company, LLC and American Queen Steamboat Operating Company, LLC (collectively "Defendants"), identify the following issues of law to be decided at the trial of this matter.[1]  The following provides a short summary outline of the legal issues, with the remaining sections setting forth Defendants' detailed position on the law associated with those issues.

### SUMMARY OUTLINE OF LEGAL ISSUES FOR TRIAL

| CLAIMS/DEFENSES/ISSUES | PAGES |
|---|---|
| **PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM** …………………… | 4 |
| WHETHER DEFENDANTS HAVE INFRINGED PLAINTIFF'S AMERICAN CRUISE LINES TRADEMARK(S) THROUGH THE USE OF THE AMERICAN QUEEN STEAMBOAT COMPANY NAME ……………………………….. | 5 |
| WHETHER PLAINTIFF OWNS A FAMILY OF "AMERICAN" TRADEMARKS …….. | 6 |
| WHETHER THERE IS A LIKELIHOOD OF CONSUMER CONFUSION BETWEEN THE NAMES AMERICAN CRUISE LINES AND AMERICAN QUEEN STEAMBOAT COMPANY ……………………………………………… | 12 |
| WHETHER DEFENDANTS' INFRINGEMENT WAS WILLFUL OR INTENTIONAL IF THERE IS A FINDING OF TRADEMARK INFRINGEMENT ……………………….. | 23 |
| **DEFENDANTS' AFFIRMATIVE DEFENSES TO PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM** ……………………………………… | 25 |
| WHETHER PLAINTIFF ACQUIESCED TO DEFENDANTS' USE AND REGISTRATION OF THE AMERICAN QUEEN STEAMBOAT COMPANY NAME AND MARK ……………………………………………… | 26 |
| WHETHER PLAINTIFF IS ESTOPPED FROM ALLEGING THAT THE AMERICAN QUEEN STEAMBOAT COMPANY NAME AND MARK IS INFRINGING ……. | 27 |

---

[1] Note that some of the more narrow issues discussed herein are ultimately questions of fact for the Jury.  Nonetheless, relevant law associated with all the legal claims at issue in this case are set forth in detail herein.

1

WHETHER THE *MOREHOUSE* DEFENSE PRECLUDES PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM ……………………………………………………. 28

WHETHER THE PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM IS BARRED BY THE UNCLEAN HANDS DEFENSE ……………………………………….... 30

**PLAINTIFF'S DEMAND FOR MONETARY DAMAGES FOR ITS TRADEMARK INFRINGEMENT CLAIM** …………………………………….. 31

WHETHER PLAINTIFF IS ENTITLED TO RECOVER MONETARY DAMAGES IF INFRINGEMENT IS FOUND ……………………………………………………… 32

WHETHER PLAINTIFF IS ENTITLED TO RECOVER ACTUAL DAMAGES IN THE FORM OF LOST PROFITS ……………………………………………………… 34

WHETHER PLAINTIFF IS ENTITLED TO DISGORGEMENT OF DEFENDANTS' PROFITS ……………………………………………………………………… 35

**DEFENDANTS' COUNTERCLAIM FOR TRADEMARK INFRINGEMENT AGAINST PLAINTIFF** ……………………………………………………... 37

WHETHER PLAINTIFF HAS INFRINGED DEFENDANTS' AMERICAN QUEEN TRADEMARKS THROUGH ITS USE OF "AMERICAN" VESSEL NAMES IN DIRECT COMPETITION WITH DEFENDANTS …………………………………... 38

WHETHER DEFENDANTS ARE LIMITED TO PROTECTION AND/OR ENFORCEMENT OF RIGHTS TO THE GOODS/SERVICES IDENTIFIED IN THE AMERICAN QUEEN REGISTRATIONS …………………………..………… 38

WHETHER THERE IS A LIKELIHOOD OF CONFUSION BETWEEN THE VESSEL NAMES AMERICAN PRIDE, AMERICAN EAGLE, AMERICAN SONG, AMERICAN HARMONY, AMERICA AND AMERICAN QUEEN ….....… 39

WHETHER PLAINTIFF'S INFRINGEMENT WAS WILLFUL OR INTENTIONAL IF THERE IS A FINDING OF TRADEMARK INFRINGEMENT ……………………….. 40

**PLAINTIFF'S AFFIRMATIVE DEFENSES TO DEFENDANTS' TRADEMARK INFRINGEMENT COUNTERCLAIM** ……………………….. 40

WHETHER THE AMERICAN QUEEN TRADEMARKS HAVE BEEN ABANDONED ……………………………………………………………………… 40

WHETHER THE ASSIGNMENT OF THE AMERICAN QUEEN TRADEMARKS TO DEFENDANTS WAS INVALID …………………………………………………… 49

**DEFENDANTS' CLAIM FOR MONETARY DAMAGES FOR THEIR TRADEMARK INFRINGEMENT COUNTERCLAIM AGAINST PLAINTIFF** ………………………………………………………………..    51

WHETHER DEFENDANTS ARE ENTITLED TO RECOVER MONETARY DAMAGES FROM PLAINTIFF ……………………………………………………..    52

WHETHER DEFENDANTS ARE ENTITLED TO DISGORGEMENT OF PLAINTIFF'S PROFITS FROM THE USE OF THE INFRINGING VESSEL NAMES …………………    52

## I.   PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM

Plaintiff asserts a claim against Defendants for trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (*see* Count II of Fourth Amended Complaint), as well as related claims for unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (Count V), common law unfair competition and trademark infringement (Counts IV and VIII), and for violation of the Delaware Uniform Deceptive Trade Practices Act ("DUDTPA), 6 Del. C. §§ 2531 *et seq*. (Count VII).  These claims are all based on the identical allegation that Defendants' use and registration of the name and mark AMERICAN QUEEN STEAMBOAT COMPANY infringes upon Plaintiff's rights to its AMERICAN CRUISE LINES name and marks.  At the outset, it is important to note that all of these claims are decided under the same legal standard(s) – which will be discussed herein.  *See e.g.*, *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. §1114, and federal unfair competition, 15 U.S.C. §1125, by identical standards"); *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799 (D. Del. 2012), citing *Sanofi–Aventis v. Advancis Pharm., Corp.*, 453 F. Supp. 2d 834, 847 (D. Del. 2006) (holding claims under Delaware common law and DUDPTA are decided under the same standard as the Lanham Act claims).  Therefore, there is no need for a separate legal analysis with respect to each legal claim at issue as part of Plaintiff's case.

Defendants allege that they have not infringed on Plaintiff's trademark rights through the use of the *American Queen Steamboat Company* name and have asserted certain affirmative defenses to Plaintiff's infringement claim (discussed herein).

A. **ISSUE**: WHETHER DEFENDANTS HAVE INFRINGED PLAINTIFF'S AMERICAN CRUISE LINES TRADEMARK(S) THROUGH THE USE OF THE AMERICAN QUEEN STEAMBOAT COMPANY NAME AND MARK.

With respect to Plaintiff's trademark-related claim, the primary legal issue is whether the Defendant's use of the company name and trademark AMERICAN QUEEN STEAMBOAT COMPANY constitutes infringement of Plaintiff's AMERICAN CRUISE LINES name and trademark. The party asserting infringement bears the burden of proof and must establish the elements of infringement by a preponderance of the evidence. *Cridlebaugh v. Rudolph*, 131 F.2d 795, 801 (3d Cir. 1942); *A & H Sportswear,* 237 F.3d at 210–11.

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Fisons Horticulture, Inc. v. Vigoro Indust., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) (citing *Interpace Corp. v. Lapp, Inc*., 721 F.2d 460, 462 (3d Cir. 1983) (hereinafter "*Lapp*")). A trademark is defined in the Lanham Act, 15 U.S.C. § 1127 as including "any word, name, symbol, or device or any combination thereof" used "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). The purpose of a trademark is to allow "buyers to identify the goods to which it is affixed as from a particular source and distinguishes those goods from similar merchandise of others." *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986).

To state a claim for both trademark infringement and unfair competition, a plaintiff must prove the following elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear*, 237 F.3d at 210.

"If the mark at issue is federally registered and has become incontestable, then validity, legal protectability, and ownership are proved." *Commerce Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 438 (3d Cir. 2000). Stated differently, once a party asserting trademark rights has presented a certificate of registration to the court then there is a presumption under the law that the party is the owner of valid and protectable trademark rights. *Sylvania Elec. Prods. v. Dura Elec. Lamp Co.*, 247 F.2d 730, 732 (3d Cir. 1957) ("the registration of a trade-mark by the Patent Office furnishes an evidentiary presumption of validity.").

Here, there is no dispute as to Plaintiff's ownership of its AMERICAN CRUISE LINES marks and/or that those marks are valid and protectable. Therefore, the only issue to be decided at trial, aside from Defendants' affirmative defenses to this claim, is whether there is a likelihood of confusion between the marks at issue. However, Plaintiff has also set forth allegations related to its ownership of an alleged family of "American" trademark registrations – which Plaintiff claims gives it exclusive rights to the term "American" and, in turn, creates a situation where, according to Plaintiff, any competing use of the term "American" is likely to cause confusion. As discussed herein, Defendants dispute that Plaintiff has established a family of "American" trademarks under the applicable law.

**B. ISSUE: WHETHER PLAINTIFF OWNS A FAMILY OF "AMERICAN" TRADEMARKS**

Plaintiff claims ownership of a family of "American" trademarks and, as a result, claims to have exclusive rights to use the word "American" in the cruise industry. Defendants dispute that Plaintiff owns a family of trademarks under the law and disputes that Plaintiff has exclusive rights to the term "American." Plaintiff has the burden of establishing its ownership of a family of trademarks by a preponderance of the evidence.

A "family of marks" is defined as:

> a group of marks having a recognizable common characteristic, wherein the marks are comprised and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.

*McDonald's Corp. v. Druck & Gerner, DDS., P.C.*, 814 F. Supp. 1127, 1131 (N.D.N.Y. 1993) (quoting *J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 1462 (Fed. Cir. 1991)).

Showing ownership of a valid family of trademarks requires the party asserting ownership of the family to establish: (1) prior use of marks that share a common characteristic (the family "surname"); (2) the family surname is distinctive and not highly descriptive or suggestive and is not so commonly used as not to constitute a distinguishing feature; and (3) prior to defendant's first use of its mark, plaintiff's marks were used in advertising or sales so as to create common exposure to and recognition by purchasers of the common characteristic as indicating origin. *Wise F&I, LLC v. Allstate Insurance Company*, 120 U.S.P.Q.2d 1103, 1109, 2016 WL 6777774 (T.T.A.B. 2016) (listing the three elements required and finding that opposer failed to properly allege them.).

### 1. Whether Plaintiff is the "Prior User" of the Alleged Family Term "American".

As to the first element, Plaintiff must prove that it is the prior user of the surname which constitutes the alleged family term – in this case the term "American."  In other words, Plaintiff must establish by a preponderance of the evidence that it has priority against Defendants as to the term "American."

The "basic rule of trade-mark ownership in the United States is priority." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 16:1, at 16-4 (2015). Priority, in both common law and registration rights, all "build upon this foundation of **first-in-time, first in-right**."  *Id.* (Emphasis added).  As between two parties who claim rights to the same term, the general rule is that "priority of appropriation determines the question."  *United Drug Co.*

*v. Theodore Rectanus Co*., 248 U.S. 90, 100, 39 S. Ct. 48 (1918).  The first to use a mark or term in commerce has priority.  *B & B Hardware, Inc. v. Hargis Industries, Inc.,* 135 S. Ct. 1293, 1299, 1310, 191 L. Ed. 2d 222, 113 U.S.P.Q.2d 2045 (2015) ("One who first uses a distinct mark in commerce thus acquires rights to that mark."); *Hana Financial, Inc. v. Hana Bank*, 135 S. Ct. 907, 909, 190 L. Ed. 2d 800, 113 U.S.P.Q.2d 1365 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users.").

Here, Defendants claim priority as against Plaintiff as to the use of the alleged family term "American" by virtue of their ownership of the AMERICAN QUEEN trademarks – which were assigned to Defendants by a prior owner of the registrations covering the AMERICAN QUEEN trademarks.

It is beyond dispute that a trademark owner may assign his trademark.  *See* 15 U.S.C. § 1060(a)(1) ("A registered mark ... shall be assignable ..."); *see also Electro Source, LLC v. Brandess–Kalt–Aetna Grp., Inc.*, 458 F.3d 931, 941 (9th Cir. 2006) ("Indeed, it is not unusual for a troubled or failing business to sell and assign its trademark...."); Restatement (Third) of Unfair Competition § 34 (1995) ("The owner of a trademark ... may transfer ownership of the designation to another through an assignment.").  When a trademark is assigned, "the assignee steps into the shoes of the assignor." *Premier Dental Prod. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 853 (3d Cir. 1986);  *ICEE Distribs., Inc. v. J&J Snack Foods Corp*., 325 F.3d 586, 593 (5th Cir. 2003).

**2.   Whether the Alleged Family Term "American" is Distinctive.**

"Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 815 (7th Cir. 2002); *see J*

*& J Snack Foods Corp.*, 932 F.2d at 1463 (stating that it is "necessary to consider the use, advertisement, and distinctiveness of the marks, including assessment of the contribution of the common feature to the recognition of the marks as of common origin.").

If the alleged family surname is descriptive it may be not be protected absent evidence of secondary meaning in and to the specific surname. *Ft. Howard Paper Co. v. Nice-Pak Products, Inc.*, 127 U.S.P.Q. 431 (T.T.A.B. 1960) (no NAP family of marks for napkins, since NAP is obviously derived from "napkin"); *Servo Corp. of America v. Servo-Tek Products Co.*, 289 F.2d 955, 129 U.S.P.Q. 352 (C.C.P.A. 1961) (no SERVO family, as is descriptive or generic); *Motorola, Inc. v. Griffiths Electronics, Inc.*, 317 F.2d 397, 137 U.S.P.Q. 551 (C.C.P.A. 1963) (GOLDEN family held proper and GOLDEN non-descriptive of electronics components); *Cambridge Filter Corp. v. Servodyne Corp.*, 189 U.S.P.Q. 99 (T.T.A.B. 1975) (no CAP or FLO family for air filters); *In re Globe-Union, Inc.,* 189 U.S.P.Q. 158 (T.T.A.B. 1975) (no CAP family for capacitors); *Champion International Corp. v. Plexowood, Inc.*, 191 U.S.P.Q. 160 (T.T.A.B. 1976) (no FLEX family for flexible sheet material); *American Standard, Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q. 457 (T.T.A.B. 1978) (no AQUA family for water faucets).  Some courts add that the showing of secondary meaning for a descriptive family surname must be a <u>strong</u> showing.  *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 24 U.S.P.Q.2d 1181 (7th Cir. 1992) (no "-JET" suffix family was found because it is a descriptive term for spray nozzles and has no secondary meaning)..  Some family "surnames" may be so non-distinctive as to be almost incapable of ever achieving any family significance. *Quaker Oats Co. v. General Mills, Inc.*, 134 F.2d 429, 56 U.S.P.Q. 400 (7th Cir. 1943); *Creamette Co. v. Merlino*, 299 F.2d 55, 132 U.S.P.Q. 381 (9th Cir. 1962) (no family of ETTE in CREAMETTES, KIDETTES, SALADETTES, etc.).

9

Courts are reluctant to find secondary meaning for an alleged family surname where there is extensive third party use of the term and/or granting exclusive rights to the term would have anti-competitive results. *See Primedia Intertec Corp. v. Technology Marketing Corp.*, 35 F. Supp. 2d 809, 50 U.S.P.Q.2d 1079 (D. Kan. 1998) (extensive third party use); *In re LC Trademarks, Inc.*, 121 U.S.P.Q.2d 1197, 2016 WL 7655545 (T.T.A.B. 2016) (cautioning against anti-competitive use of descriptive family terms).

### 3. Whether Plaintiff Used the Alleged Family Term "American" in a Manner Creating Consumer Recognition as Indicating Source.

The party asserting family ownership must prove that, <u>prior</u> to the junior user's entry into the market, all or many of the marks in the alleged family were used and promoted in such a way as to create a public perception of the family as an indicator of source. *Pfizer Inc. v. Astra Pharmaceutical Products*, *Inc.,* 858 F. Supp. 1305, 1329, 33 U.S.P.Q.2d 1545 (S.D. N.Y. 1994) ("[T]he issue of the existence of the family of marks should be judged at the time that the junior user entered the marketplace."); *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 819 (7th Cir. 2002) ("[The junior user] can't be said to have infringed a family of marks that did not exist when its [accused trade dress] entered the market….").Further, "[s]imply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods." *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 432–33 (D.N.J. 2008) (citing *J & J Snack Foods Corp.*, 932 F.2d at 1462 *and AM Gen. Corp.*, 311 F.3d at 814).

"Merely adopting and using—and even registering—a group of marks with a common feature does not create a family of marks, even if the user intended to create a family." *AM Gen. Corp.*, 311 F.3d at 816; *see also Consolidated Foods Corporation v. Sherwood Medical Industries Inc.*, 177 U.S.P.Q. 279, 1973 WL 20088 (T.T.A.B. 1973) ("[O]wnership of a large number of

registrations for marks containing a common prefix or suffix is insufficient, *per se*, to establish recognition of a 'family' of marks." No "-SICLE" family proven); *Eveready Battery Company, Inc. v. Green Planet, Inc.,* 91 U.S.P.Q.2d 1511, 2009 WL 2176668 (T.T.A.B. 2009) ("The fact that opposer has used and registered several marks including SCHICK is not in itself sufficient to establish the existence of a family of marks."); *Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*, 91 U.S.P.Q.2d 1671, 2009 WL 959775, *4 (S.D. N.Y. 2009) ("Merely adopting and using—and even registering—a group of marks with a common feature does not create a family of marks, even if the user intended to create a family."); *In re LC Trademarks, Inc*., 121 U.S.P.Q.2d 1197, 1204, 2016 WL 7655545, *8 (T.T.A.B. 2016) (holding that evidence of many registrations "alone do not demonstrate the extent to which customers have been exposed to the marks….").

For the surname to qualify for family trademark protection, the party asserting rights must prove that the alleged family surname is in fact recognized by the public as a trademark in and of itself. This requires some proof that the family surname has been so extensively advertised that buyers would be likely to think that defendant's product originates with plaintiff. *Witco Chemical Co. v. Chemische Werke Witten G.m.b.H.*, 158 U.S.P.Q. 157 (T.T.A.B. 1968) (No WIT- prefix family for industrial chemicals) ("[W]e look primarily to the nature and character of opposer's advertising and promotional material."); *Moore Business Forms, Inc. v. Roger-Snap Business Forms, Inc*., 163 U.S.P.Q. 303 (T.T.A.B. 1969); *Polaroid Corp. v. American Screen Process Equipment Co*., 166 U.S.P.Q. 151 (T.T.A.B. 1970) (No POLA- prefix family in photographic field) (holding that advertising and promotion must create "an association of common ownership" and leads buyers to "ascribe all trademarks in the field bearing the prefix 'POLA' with Polaroid."); *White Heather Distillers, Ltd. v. American Distilling Co.*, 200 U.S.P.Q. 466 (T.T.A.B. 1978)

11

(holding that marks "WHITE HEATHER" and "PRECIOUS HEATHER" could not constitute a family where the record failed to indicate that marks had ever been advertised together).

Plaintiffs must show that there were advertising and promotional expenditures that actually resulted in consumer recognition of the mark. *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.,* No. 05–5259, 2006 U.S. Dist. LEXIS 16672 at *21–22, 2006 WL 892718, *11 (D.N.J. Apr. 4, 2006); *see also Primepoint*, 545 F. Supp. 2d at 433-34 (finding no evidence of family where party asserting rights simply identified advertising numbers but did not show that any consumer recognition resulted). For example, where a party advertises the family of marks together and there was evidence of consumer recognition there could be evidence that a family of marks exists. *See 7–Eleven, Inc. v. Wechsler*, No. 91117739, 2007 WL 1431084, 83 U.S.P.Q.2d 1715 (T.T.A.B. 2007).

### C. ISSUE: WHETHER THERE IS A LIKELIHOOD OF CONFUSION BETWEEN THE NAMES AMERICAN CRUISE LINES AND AMERICAN QUEEN STEAMBOAT COMPANY

Plaintiff alleges that Defendants' use of the AMERICAN QUEEN STEAMBOAT COMPANY name and mark is likely to cause confusion among consumers with Plaintiff's AMERICAN CRUISE LINES name and mark. Defendants dispute that there is a likelihood of confusion.

Likelihood of confusion is said to exist "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Commerce Nat'l Ins. Servs.,* 214 F.3d at 438-39. In the Third Circuit, trademark infringement cases typically turn on the "likelihood of confusion," which is determined by use of a number of factors. *See Lapp*, 721 F.2d at 439. The *Lapp* factors include the following:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to expand into the defendant's market.

*Id*. No single factor is dispositive and any combination of factors can be considered in determining whether there is a likelihood of confusion. *Fisons Horticulture, Inc.*, 30 F.3d at 476. That is, the *Lapp* factors are best understood as "tools to guide a qualitative decision." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004) (quoting *A & H Sportswear*, 237 F.3d at 216). Each factor should be "weighed and balanced" based on the particular facts of the case. *Id*. (quoting *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001)). *See also Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 320 (3d Cir. 2015).

A determination of whether there is a likelihood of confusion is generally a fact question for the jury. *See, e.g.*, A&H *Sportswear*, 166 F.3d at194; *Dranoff-Perlstein Assoc. v. Sklar*, 967 F.2d 852, 862 (3d Cir. 1992); *Facenda v. N.F.L. Films, Inc*., 542 F.3d 1007, 1024 (3d Cir. 2008). Nonetheless, legal principles govern what evidence may, or must, be considered by the District Court (and Jury) in reaching a conclusion on likelihood of confusion and what standards apply to its application. *A & H Sportswear, Inc*., 237 F.3d at 210. The legal standards for each of these factors are addressed below.[2]

---

[2] There is no need to address the market expansion factor as the parties are already competing in the same market.

### 1.  Similarity of the Marks

To assess whether the trademarks at issue are similar such that there is a greater likelihood of confusion, the parties' marks must be considered in their entireties and in their commercial settings.  *See Opryland USA Inc. v. Great Am. Music Shop, Inc.*, 970 F.2d 847, 851 (Fed. Cir. 1992).  Marks are confusingly similar "if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010) (citing *Fisons Horticulture, Inc.,*, 30 F.3d at 477).  The proper test of similarity is not a side-by-side comparison but, rather, "whether the labels create the same overall impression when viewed separately."  *Sabinsa Corp.*, 609 F.3d at 183 (citing *Kos Pharms, Inc.*, 369 F.3d at 713). "[I]f the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians Assn. of Am.*, 920 F.2d at 195 (quoting J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition, § 23:7 (2d ed. 1984)).

In applying this test, courts attempt to "move into the mind of the roving consumer," *A & H Sportswear*, 237 F.3d at 216, and determine "whether the labels create the same overall impression when viewed separately." *Fisons Horticulture, Inc.*, 30 F.3d at 476; *see also Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988).  Courts must "compare the appearance, sound and meaning of the marks," *Harlem Wizards Entm't. Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1096 (D.N.J. 1997), to determine whether the "average consumer, on encountering one mark in isolated circumstances of marketplace and having only [a] general recollection of the other, would likely confuse or associate the two." *Fisons Horticulture, Inc.*, 30 F.3d at 477–78.

14

"Use of a strong, well-known mark as a part of a composite name reduces the likelihood that the remainder of the composite name will create a commercial impression distinct from that mark." *A & H Sportswear*, 237 F.3d at 218–19 (citing *Four Seasons Hotels Ltd. v. Koury Corp.*, 776 F. Supp. 240, 247 (E.D.N.C. 1991)); *see also W.W.W. Pharm. Co., Inc. v. Gillette Co*., 984 F.2d 567, 573 (2d Cir. 1993) ("[W]hen a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened."); *Astra Pharm. Prods, Inc. v. Beckman Instruments, Inc*., 718 F.2d 1201, 1205 (1st Cir. 1983) ("[O]therwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name <u>and/or logo</u> of the manufacturer.") (emphasis added); *Henri's Food Prods. Co., Inc. v. Kraft, Inc*., 717 F.2d 352, 355–56 (7th Cir. 1983) ("Yet even Kraft agrees that a prominent housemark may also tend to lessen confusion."). Further, courts hold that if the only common element in the marks at issue is a generic term, "such similarity is generally insufficient to cause a likelihood of confusion because the generic matter is not likely to be understood by the public as an indication of common affiliation or trade identity, but rather is likely to be viewed as indicative or characteristic of the products." *Tonka Corp. v. Rose Art Indus., Inc*., 836 F. Supp. 200, 205 (D.N.J. 1993); *see also Henri's Food Prods. Co., Inc.*, 717 F.2d at 355-56 (affirming finding of no likelihood of confusion where only common element of parties' MIRACLE WHIP and YOGOWHIP marks was the descriptor "whip"); *Dawn Donut Co., Inc. v. Day*, 450 F.2d 332, 333 (10th Cir. 1972) (finding no likelihood of confusion despite common use of "donut" in marks DAWN DONUT and DAYLIGHT DONUTS).

In *A & H Sportswear*, 237 F.3d at 217, for example, the marks at issue were MIRACLESUIT and THE MIRACLE BRA. The plaintiff argued that the marks both shared the dominant portion "MIRACLE" and the remaining terms were all generic in nature, therefore, the marks should be held confusingly similar. *Id*. at 217-218. However, the district court disagreed,

holding that the two marks sounded different when spoken out loud, had visual distinctions when viewed in the market context, and had different meanings or connotations. *Id.* (citing *A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*, 57 F. Supp. 2d 155, 167 (E.D. Pa. 1999)). The Third Circuit affirmed the district court's finding with respect to this factor. *A & H Sportswear*, 237 F.3d at 217-218.

## 2. The Strength of the AMERICAN CRUISE LINES Mark

Courts have recognized that:

[a] strong trademark is...one that carries widespread, immediate recognition that one producer (even if unknown) is associated with the mark, and so with the product. If a second comer adopts a mark substantially identical to a strong mark, there is a correspondingly high likelihood that consumers will mistakenly associate the newcomer's product with the owner of the strong mark.

*Checkpoint Sys.*, 269 F.3d at 282 (citing *Versa Prod. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 203 (3d Cir. 1995*)*.

With respect to this *Lapp* factor, mark strength is measured by (1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of "marketplace recognition." *Fisons Horticulture, Inc.*, 30 F.3d at 479.

Conceptual strength relates solely to the mark's inherent classification as either fanciful, arbitrary, suggestive, descriptive, or generic. *Sabinsa Corp.*, 609 F.3d at 185; *see also Dieter v. B&H Industries of Southwest Fl., Inc.*, 880 F.2d 322, 327 (11th Cir. 1989) ("Generic terms represent the weaker end of the [trademark] spectrum, and arbitrary terms represent the stronger."); *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 445 (9th Cir. 1980) ("A 'weak' mark is a mark that is a meaningful word in common usage or is merely a suggestive or descriptive trademark. A strong mark is entitled to a greater degree of protection than is a weak

16

one, because of its unique usage."). Along this spectrum, descriptive marks convey an immediate idea of the ingredients, qualities or characteristics of the goods. *Sabinsa Corp.,* 609 F.3d at 185. Generic marks "function as the common descriptive name of a product class." *Id*. (internal citations omitted); *see also A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986*)*. A geographically descriptive mark is considered weak and not inherently distinctive – and given a narrow range of protection. *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C*., 931 F.2d 1519, 1522 (11th Cir. 1991).

A trademark's commercial strength is determined by considering two primary factors: (1) the level of public awareness and recognition of the mark; and (2) the steps a mark owner has taken to increase commercial and market awareness, including the amount of money spent on such efforts. *A & H Sportswear*, 237 F.3d at 224 (explaining that, although relevant to the commercial strength inquiry, "evidence of money spent does not automatically translate into consumer recognition.").

Evidence of extensive registration and use by others of a term on the same or very similar goods can be "powerful" evidence of weakness. *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 U.S.P.Q.2d 1129, 1136 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enterprises LLC*, 794 F.3d 1334, 115 U.S.P.Q.2d 1671, 1674 (Fed. Cir. 2015). The commercial strength of mark can be undermined by third party use. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 U.S.P.Q.2d 1693 (Fed. Cir. 2005). Marks are considered weak when there is third party use of the same or similar marks in the same or related industries. *A & H Sportswear*, 237 F.3d at 222; *See* McCarthy § 23:48 (4th ed. 2001) ("If the common element of conflicting marks is a word that is 'weak' then this reduces the likelihood of confusion. A portion of a mark may be 'weak' in the

sense that such portion is descriptive, highly suggestive, or is in common use by many other sellers in the market.").  Courts in this Circuit even hold that use of the same or similar marks in other markets is relevant to a determination of the strength of a mark.  *A & H Sportswear, Inc*., 237 F.3d at 224 (emphasis added)*; see also Citizens In. Grp. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 123 (3d Cir. 2004) ("[A]s a general rule, widespread use of even a distinctive mark may weaken the mark."); *Kinbook, LLC v. Microsoft Corp*., 866 F. Supp. 2d 453, 466 (E.D. Pa. 2012) ("[T]he prevalence of marks with the prominent term 'kin' in the online social networking service sphere renders the 'Kinbox' mark weak in this context"); *One Indus., LLC v. Jim O'Neal Distrib., Inc*., 578 F.3d 1154, 1164 (9th Cir. 2009) ("In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd."); *Armstrong Cork Co. v. World Carpets, Inc*., 597 F.2d 496, 505 (5th Cir. 1979) (holding that wide use of mark "World" resulted in little likelihood of confusion).

Finally, even if Plaintiff's AMERICAN CRUISE LINES mark was properly incontestable, incontestable status alone does not create a strong trademark.  *See First Keystone Federal Sav. Bank v. First Keystone Mortg., Inc*., 896 F. Supp. 456, 461 (E.D. Pa. 1995) (recognizing that the strength of an incontestable mark can be attacked and that incontestability is but one of many factors to consider when determining a mark's strength).

### 3.  The Price of the Services and Sophistication of the Customers

When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. *Checkpoint Sys*., 269 F.3d at 284–85.  Where the relevant products (or services) are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations. *Id*., (citing *Versa Prods*., 50 F.3d at 204) ("Inexpensive goods

18

require consumers to exercise less care in their selection than expensive ones. The more important the use of the product, the more care that must be exercised in its selection."); *Ford Motor Co. v. Summit Motor Prod., Inc*., 930 F.2d 277, 293 (3d Cir. 1991) ("Professional buyers, or consumers of very expensive goods, will be held to a higher standard of care."); *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 128 (4th Cir. 1990) ("[I]n a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone.");*see Oreck Corp. v. U.S. Floor Sys., Inc*., 803 F.2d 166, 173–74 (5th Cir. 1986) (holding that business purchasers of expensive products not likely to confuse goods with similar marks); *see also* MCCARTHY, § 23:101.

### 4.  Evidence of Actual Confusion – Coexistence Without Confusion

According to the Third Circuit, evidence of actual confusion is highly probative of a likelihood of confusion. *Sabinsa Corp.*, 609 F.3d at 187.  However, general confusion does not necessarily equate to actual confusion under the trademark laws.  *See First Keystone Fed. Sav. Bank v. First Keystone Mortg., Inc.,* 923 F. Supp. 693, 705 (E.D. Pa. 1996) ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions."); *see also Citizens Nat'l Bank of Meridian v. Citizens Bank of Philadelphia Miss*., 35 Fed. Appx. 391, *2 (5th Cir. 2002); *Kinbook, LLC v. Microsoft Corp*., 866 F. Supp. 2d 453, 469 (E.D. Pa. 2012).

Indeed, "[o]wnership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with a common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978).  Although some cases hold that, given the difficulty of proving actual confusion, relatively little showing on the part of the plaintiffs is required, other

cases warn against using isolated instances of confusion to buttress a claim. *Compare World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971), with Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980); *see also A & H Sportswear*, 237 F.3d at 227 (explaining that isolated and idiosyncratic evidence of actual confusion does not give rise to a finding of likelihood of confusion); *Nippondenso Co. v. Denso Distribs*., Civ. No. 86–3982, 1987 WL 10703 at *5 (E.D. Pa. May 11, 1987) (citing Scott Paper Co., 589 F.2d at 1225) ("The weight attributed to instances of actual confusion depends to some extent upon the circumstances of the case, including the volume of sales of the goods involved. If isolated instances of actual confusion result from the sale of a substantial number of goods, the weight given to the evidence of actual confusion is markedly reduced."); *Universal Money Ctrs. v. AT & T*, 22 F.3d 1527, 1535 (10th Cir. 1994) (finding that a few instances of confusion over a long period of time are insufficient to support a finding of confusion); *Centaur Communications, Ltd. v. A/S/M Communications, Inc*., 830 F.2d 1217, 1227 (2d Cir. 1987) (holding that newspaper mis-attributions were isolated incidents not probative of actual confusion).

In *Checkpoint Sys*., 269 F.3d at 298–99, for example, the district court held that 20 examples of initial interest confusion in the form of misdirected calls and other communications over the number of years in which the parties coexisted was nothing more than *de minimus* confusion that did not support a finding of likelihood of confusion. *Id*. at 298. The court reasoned that there was no evidence of confusion with the actual purchase of products as the evidence showed that the confusion had actually dissipated over the years instead of grown. *Id*. at 298-99. On appeal, the Third Circuit agreed with the district court and further evaluated the misdirected calls at issue and determined that it was uncertain what the confusion was over. *Id*. *See also Duluth News–Tribune v. Mesabi Publ'g Co*., 84 F.3d 1093, 1098 (8th Cir. 1996) (misdirected

communications are not evidence of confusion where the sender knows which party he or she wished to send his communication but erred in the delivery of the message).

### 5. Intent of the Party Adopting the Alleged Infringing Mark

This *Lapp* factor weighs in favor of a finding of likelihood of confusion when evidence shows that the defendant adopted the mark with the intent of promoting confusion and appropriating the prior user's goodwill. *Fisons Horticulture, Inc.*, 30 F.3d at 479-80; *see also Savin Corp. v. Savin Group*, 391 F.3d 439, 460 (2d Cir. 2004) (explaining that this factor "considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product.") (internal quotation marks omitted).  In evaluating this factor, "courts must look at whether the defendant chose the mark to intentionally confuse consumers, and thereby capitalize on the senior user's goodwill, and whether the defendant gave adequate care to investigating its proposed mark." *Sabinsa Corp.*, 609 F.3d at 187 (citing *Kos Pharm., Inc.*, 369 F.3d at 721).  Going a step further, the Third Circuit holds that a defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.  *See Versa Prods., Inc.*, 50 F.3d at 205–06; *see also Checkpoint Sys.*, 269 F.3d at 286 ("[t]here is no evidence or even inference that defendant chose its name with plaintiff's name or products in mind.").

In *A & H*, for example, the court held there was no evidence of intent to confuse where the defendant was attempting to trade on the reputation its own mark had developed in connection with the sale of unrelated products as opposed to there being evidence that it was trying to ride on the coattails of plaintiff's name.  *A & H Sportswear, 237 F.3d at 225-26*.

### 6. Similarity in Channels of Trade and Sales Efforts

Courts have recognized that "the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 288-89 (citing *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 502 (D. Del. 1998)). Applying this factor, courts must examine the trade exhibitions, publications and other media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers. This is a fact intensive inquiry. *Checkpoint Sys.,* 269 F.3d at 289.Similarly, when parties target their sales efforts to the same consumers, there is a higher likelihood of confusion. *Id.* This is also an intensely factual issue. *Id. See also Kos Pharm., Inc.*369 F.3d at 722.

### 7. Similarity of Services

Finally, under this *Lapp* factor, courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship. *Fisons Horticulture, Inc.*, 30 F.3d at 481 ("The question is whether the consumer might ... reasonably conclude that one company would offer both of these related products."). The test is essentially whether the goods are similar enough that a customer would assume they were offered by the same source. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988).

According to the Third Circuit in *Checkpoint Sys.*, goods may fall under the same general product category but operate in distinct niches. When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark. *See Checkpoint Sys.*, 269 F.3d at 286;*see also Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 441 (holding marks held by company operating in banking industry and company operating in insurance industry did not create consumer confusion because the two companies were involved in distinct highly regulated industries); *Astra Pharm.*

22

*Prods.*, 718 F.2d at 1207 (finding no product similarity in medical technology sold to different departments in hospital because "'the hospital community' is not a homogeneous whole, but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products."); *Harlem Wizards*, 952 F. Supp. at 1095 (finding no product similarity between professional competitive basketball team and "show basketball" team).

### D. __ISSUE__: WHETHER DEFENDANTS' INFRINGEMENT WAS WILLFUL OR INTENTIONAL IF THERE IS A FINDING OF TRADEMARK INFRINGEMENT.

If the Jury finds that there is a likelihood of confusion between the AMERICAN QUEEN STEAMBOAT COMPANY name and mark on one hand and the AMERICAN CRUISE LINES name and mark on the other, and thus, trademark infringement, then it will need to be determined whether this infringement was willful or intentional on the part of Defendants. Plaintiff takes the position that Defendants' alleged infringement was willful or intentional. Defendants dispute this allegation.

In the Third Circuit, willful trademark infringement must be shown by clear and convincing evidence. *See Versa Prods*, 50 F.3d at 208. In order for there to be a finding of willful or intentional infringement, there must be a finding that the defendant acted with culpable conduct, meaning bad faith, fraud, malice, or knowing infringement. O'Malley, Grenig & Lee, 3A FEDERAL JURY PRACTICE AND INSTRUCTIONS §§ 159.93 (5th ed. 2001); *see also Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 280 (3d Cir. 2000) ("[C]ulpable conduct on the part of the losing party," meaning "bad faith, fraud, malice, or knowing infringement …."). The Second Circuit has aptly described willful infringement as involving "an aura of indifference to plaintiff's rights" or a "deliberate[ ] and unnecessar[y] duplicating [of a] plaintiff's mark ... in a way that was calculated to appropriate or otherwise benefit from the good will the plaintiff had nurtured." *W.E.*

*Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970) (citation omitted); *see also Rolex Watch USA, Inc. v. Meece*, 158 F.3d 816, 823 (5th Cir. 1998) (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993), *abrogated on other grounds by Sun Earth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016) ("willful infringement carries a connotation of deliberate intent to deceive."). The actions of a defendant must involve "truly egregious, purposeful infringement, or other purposeful wrongdoing." *Badger Meter, Inc. v. Grinnel Corp.*, 13 F.3d 1145, 1159 (7th Cir. 1994).

Indeed, courts have recognized the principal that "something more" is required other than simply having knowledge of a plaintiff's claim to rights under the Lanham Act. *See Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 501 (7th Cir. 2008) (finding of willfulness was upheld where the infringer made sales using an infringing mark after attempting to register the mark and being turned down by the PTO because the mark was potentially confusing).

Knowing or willful infringement consists of more than the accidental encroachment of another's rights. It involves an intent to infringe or a deliberate disregard of a mark holder's rights. *SecuraComm Consulting Inc.*, 166 F.3d at 187. In the *SecuraComm* case, the defendant reasonably believed that the use of its mark did not infringe. The court held that "[i]nfringement is not willful if the defendant might have reasonably thought that its proposed usage was not barred by the statute." *Id.* (citing *Blockbuster Videos, Inc. v. City of Tempe*, 141 F.3d 1295, 1300 (9th Cir. 1998)). The court further held that the failure to cease use of the mark after receiving a cease and desist letter from the plaintiff does not demonstrate willful infringement. *SecuraComm Consulting Inc.*, 166 F.3d at 188-89; *see also Green v. Fornario*, 486 F.3d 100, 104-05 (3d Cir. 2007) (holding that defendant's refusal to comply to cease and desist demand was "consistent with the belief that his use of the trade name was legitimate.").

24

## II.    DEFENDANTS' AFFIRMATIVE DEFENSES TO PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM

Defendants have asserted various affirmative defenses to Plaintiff's trademark infringement claim in this case, including the equitable defenses of acquiescence and estoppel (Thirteenth Affirmative Defense, *see* D.I. 132) (*see also* Twelfth Affirmative Defense – "Plaintiff expressly or impliedly authorized some or all of the actions of Defendants about which it now complains."), that Plaintiff's claims are barred by the equitable defense of unclean hands or Plaintiff's own bad faith (Eighth Affirmative Defense), and all other defenses available under the Lanham Act, 15 U.S.C. §1051, *et seq*. (Third Affirmative Defense).

The Lanham Act provides for, and courts around the country have recognized, certain equitable defenses that are available to bar claims for trademark infringement. *See* 15 U.S.C. §1115(b)(9) (setting forth the equitable defenses of laches, estoppel, and acquiescence). The equitable defenses under the Lanham Act must be proven by the party asserting the defenses by a preponderance of the evidence. *See Copy Cop, Inc. v. Task Printing, Inc*., 908 F. Supp. 37, 47 (D. Mass. 1995) (applying preponderance of the evidence standard to laches defense); *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166, 1168 (C.D. Cal. 1986) (applying preponderance of the evidence standard to the acquiescence defense); *Kelley Blue Book v. Car–Smarts, Inc*., 802 F. Supp. 278, 292 (C.D. Cal. 1992) (applying a preponderance of the evidence standard to the unclean hands defense).

Defendants assert that Plaintiff's trademark infringement claims are barred by the defenses of acquiescence, equitable estoppel, the *Morehouse* defense, and unclean hands. Plaintiff denies that any of these defenses serve to bar its claims. The legal standards for each of these equitable defenses are set forth below.

A.  <u>ISSUE</u>: Whether Plaintiff Acquiesced to Defendants' Use and Registration of the AMERICAN QUEEN STEAMBOAT COMPANY Name and Mark.

Acquiescence is an equitable doctrine that permits the court to deny relief when the trademark owner, by affirmative word or deed, conveys its implied consent to another to use a particular mark.  *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998) (citing McCarthy § 31.51[1]).  The defense prevents a trademark owner from impliedly permitting another's use of his mark and then attempting to enjoin that use after the junior user has invested substantial resources to develop the mark's goodwill.  *See TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997).. As Judge Learned Hand once asked rhetorically with respect to the laches and acquiescence defenses, "how [plaintiff] can expect us to stifle a competition which with complete complaisance, and even with active encouragement, it has allowed for years to grow like the mustard tree; why we should destroy a huge business built up with its connivance and consent: this we find it impossible to understand." *Dwinell–Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825–26 (2d Cir. 1943).

The acquiescence defense "involves the plaintiff's implicit or explicit assurances to the defendant which induce reliance by the defendant." *Elvis Presley Enterprises Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998); *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir. 1970) ("As distinguished from laches, acquiescence constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant.").  Acquiescence focuses on the plaintiff's "response" to defendant's alleged infringing actions.  *See Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 276 (S.D.N.Y. 2002).

According to the Third Circuit, relevant considerations to the application of the acquiescence defense include whether "(1) the senior user actively represented that it would not assert a right or a claim; (2) the [senior user's] delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice."[3] *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 175 (3d Cir. 2017) (citing *Hyson USA, Inc. v. Hyson 2U, Ltd*., 821 F.3d 935, 941 (7th Cir. 2016)); *see also Seller Agency Council, Inc. v. Kennedy Ctr. for Real Estate Educ., Inc*., 621 F.3d 981, 989 (9th Cir. 2010); *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 67 (2d Cir. 2002); *SunAmerica Corp. v. Sun Life Assurance Co. of Can*., 77 F.3d 1325, 1334 (11th Cir. 1996).

### B. ISSUE: WHETHER PLAINTIFF IS ESTOPPED FROM ALLEGING THAT THE AMERICAN QUEEN STEAMBOAT COMPANY NAME AND MARK IS INFRINGING.

To assert a defense of equitable estoppel, a defendant must show that "(1) plaintiff's misleading communication, with plaintiff's knowledge of the true facts, prompted the defendant to infer that the plaintiff would not enforce its rights against the defendant; (2) the defendant relied on that conduct; and (3) the defendant would be prejudiced if the plaintiff were allowed to bring suit." *H.G. Shopping Centers, L.P. v. Birney*, 59 U.S.P.Q.2d 1109, 1115, Case No. H-99-0622, 2000 WL 33538621 (S.D. Tex. Nov. 29, 2000). The essence of an estoppel defense is that the defendant changed its position in reliance upon the misleading representation of the plaintiff. *Guardian Life Ins. Co. v. Am. Guardian Life Assurance Co*., 943 F. Supp. 509, 517 n. 5 (E.D. Pa.

---

[3] Once use becomes infringing, the relevant date for quantifying the "delay" is when the trademark owner either knew or should have known of the existence of a provable claim of infringement, and an owner's claim does not ripen until the defendant's infringement is sufficiently far-reaching to create a likelihood of confusion. *See, e.g., What-A-Burger of Va., Inc. v. Whataburger, Inc. Of Corpus Christi, Tex*., 357 F.3d 441, 449-50 (4th Cir. 2004).

1996) (citing *Anheuser-Busch, Inc. v. Du Bois Brewing Co*., 175 F.2d 370, 375 (3d Cir. 1949)).

*See e.g*., *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 113 (2d Cir. 2008) ("it is well established that if a trademark owner tells a potential defendant that it will not assert a claim of infringement based on the use of a particular mark, and the recipient of that assurance relies on the assurance to its substantial detriment, as by spending substantial sums in the development of the mark on which it received the assurance, estoppel will bar the trademark owner from subsequently claiming infringement."). *See also Lydon Millwright Services, Inc. v. Ernest Bock & Sons, Inc.,* Case No. 11-7009, 2013 WL 1890355, at *8 (E.D. Penn. May 7, 2013). Equitable estoppel requires a misleading communication made by plaintiff with the plaintiff's knowledge of the true facts. *See Emmpresa Cubana,* 213 F. Supp. 2d at 276.

### C. ISSUE: WHETHER THE *MOREHOUSE* DEFENSE PRECLUDES PLAINTIFF'S INFRINGEMENT CLAIM.

The *Morehouse* Defense, also known as the "prior registration defense," is an equitable defense and a form of laches or acquiescence that applies to trademark proceedings in which the party asserting rights did not oppose or seek to cancel a prior registration of the applicant for a mark that is substantially the same for substantially similar goods/services. *See Morehouse Mfg. Corp. v. J. Strickland & Co*., 407 F.2d 881, 160 U.S.P.Q. 715 (C.C.P.A. 1969); MCCARTHY §20:38 and §20.78. The reasoning for the defense is that a party cannot be "damaged" within the meaning of §13 of the Lanham Act by the registration of a mark for particular goods or services if that same party owns an existing registration for the same of substantially identical mark. *Morehouse*, 407 F.2d at 953-54.

In the *Morehouse* case, Morehouse opposed an application for BLUE MAGIC owned by Strickland, filed in 1962. Although there were minor differences in the mark and goods, Strickland already owned a registration covering substantially identical goods for a substantially identical

28

mark, registered since 1954.  Morehouse had not challenged the earlier registration previously, and did not seek to cancel the registration until more than a year after it received actual notice of that registration (in the form of the Answer to the Notice of Opposition).  The Board's decision to deny the petition to cancel and dismiss the opposition was affirmed because "opposer cannot suffer legal damage from the additional registration, over and above any damage it may suffer from the existing registration." *Id.* at 884.

For the *Morehouse* Defense to apply, the following elements must be established: (1) there is an opposition/cancellation proceeding, (2) against a trademark owner who filed an application for a mark that is identical or nearly identical to a trademark for which it already owns a registration, both of which cover identical or nearly identical goods/services, and (3) the opposer/petitioner sat on its rights and did nothing about the first trademark registration, but then decided to take action for the later trademark.  *Tillamook Country Smoker, Inc. v. Tillamook Cty. Creamery Ass'n.*, 333 F. Supp. 2d 975, 986 (D. Or. 2004).

For example, in *Place for Vision, Inc. v. Pearle Vision Center, Inc.*, 218 U.S.P.Q. 1022 (T.T.A.B. 1983), the Trademark Trial and Appeal Board found that the opposer had suffered no "damage" by the issuance of a registration for PEARLE VISION CENTER where applicant already had two registrations for VISION CENTER for similar goods and services. Opposer's challenge rested only upon alleged prior use of the VISION CENTER portion of the mark, which was common to applicant's application and existing registrations.  *Id*.

When the differences between the registered and currently unregistered marks do not meaningfully contribute to the challenger's alleged harm, it makes little sense to allow the challenging party to defeat registration of the second mark.  Focusing on marketplace impressions and the basis for the registration challenge makes sense in light of the primary reason underlying

29

*Morehouse*: an opponent should not be allowed to challenge registration when it will not cause the opponent to suffer any additional harm. *Tillamook*, 333 F. Supp. 2d at 987.

**D.  <u>ISSUE</u>: WHETHER THE PLAINTIFF'S TRADEMARK INFRINGEMENT CLAIM IS BARRED BY THE UNCLEAN HANDS DEFENSE.**

The equitable doctrine of unclean hands allows a court to deny relief to a party that itself has acted in bad faith or inequitably.  Unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933).  The doctrine is applicable in actions seeking relief under the Lanham Act.  *Ames Pub. Co. v. Walker–Davis Publ'n, Inc.*, 372 F. Supp. 1, 13 (E.D. Pa. 1974).

 "Unclean hands" is a doctrine that prevents the plaintiff from recovering on its claims where the plaintiff has engaged in inequitable conduct that is directly related to the subject matter of the plaintiff's claims currently before the court.  *Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 856–57 (D. Del. 2006) (refusing to apply unclean hands defense under the facts presented).  Where the plaintiff has violated conscience, or good faith, or any other principle of fairness in his prior conduct, it cannot obtain the relief it seeks.  *Id.*  The unclean hands defense requires "convincing evidence of 'egregious misconduct." *Id.* (quoting *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004) ."Egregious misconduct" can take the form of "fraud, unconscionability, or bad faith on the part of the plaintiff." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n. 7 (3d Cir. 1992).  Further, the nexus "between the misconduct and the claim must be close."  *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001) (citing *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999)).

Finally, to establish a defense of unclean hands, the defendant must allege that the defendant was injured "as a result of the misconduct." *Pharmacia Corp. v. GlaxoSmithKline*

*Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 610 (D.N.J. 2003).  The Third Circuit has also

held that injury to the public interest is a relevant consideration in application of the defense.

*Citizens Financial Group, Inc.*, 383 F.3d at 129 (noting that "the extent of actual harm caused by

the conduct in question, either to the defendant or to the public interest, is a highly relevant

consideration") (quoting *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347, 349–50

(9th Cir. 1963)).

    In *Citizens Fin. Group*, 383 F.3d at 129, for example, the Third Circuit affirmed the

application of the unclean hands defense where the plaintiff had taken affirmative actions aimed

at increasing the possibility of confusion between the parties.  The court held that this was "clear

evidence of unclean hands…." *Id*. at 129; *see also Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 991 (9th

Cir. 1995) (finding that plaintiff's modification of its logo to look more like defendant's logo to

increase the likelihood of confusion constituted unclean hands).  Additionally, in  *Zurco, Inc. v.

Sloan Valve Co*., 785 F. Supp. 2d 476, 501–02 (W.D. Pa. 2011), the court held that it was for the

jury to decide whether the unclean hands defense applied where the defendants alleged that

plaintiff engaged in a concerted effort to impede the free descriptive use of the term "PINT" in

order to wrongfully obtain a competitive advantage in the market by aggressively enforcing its

alleged trademark rights beyond the scope of what was actually owned knowing full well that it

could not legally prevent competitors from using terms which it knew to be generic or descriptive.

*Id*.

## III.    PLAINTIFF'S DEMAND FOR MONETARY DAMAGES FOR ITS TRADEMARK INFRINGEMENT CLAIM

    Should Plaintiff succeed on its trademark infringement claim against Defendants, Plaintiff

seeks to recover monetary damages under the Lanham Act.  It is Defendants' position that Plaintiff

is not entitled to recover monetary damages even if it succeeds on its claim.  In the alternative, Defendants believe that Plaintiff has overstated its claimed damages.

### A. <u>ISSUE</u>: Whether Plaintiff is Entitled to Recover Monetary Damages if Infringement is Found.

With respect to monetary damages, § 35 of the Lanham Act provides in relevant part:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office [or] a violation under section 43(a) or (d) of this title…shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled … subject to the principles of equity ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*See* 15 U.S.C. § 1117(a).  The statute thus provides "two distinct forms" of monetary relief to a successful plaintiff: (a) an accounting or disgorgement of profits, pursuant to Section 35(a)(1), and (b) actual damages, pursuant to Section 35(a)(2).  *Members 1st Federal Credit Union v. Metro Bank*, Case No. 1:09–cv–1171, 2010 WL 4318839 (M.D. Pa. Oct. 22, 2010) (citing McCarthy § 30:57).  However, although the Lanham Act allows a plaintiff to recover both its damages and the defendant's profits, courts usually reject an award of both remedies as an impermissible double recovery.  *See United Phosphorus, Ltd. v. Midland Fumigant, Inc*., 205 F.3d 1219, 1227-28 (10th Cir. 2000).

As used in § 1117, "damages" means "an award based on either actual damages to the plaintiff or actual profits of the infringer, measurable in dollars and cents."  *Caesars World, Inc. v. Venus Lounge, Inc*., 520 F.2d 269, 274 (3d Cir. 1975).  Thus, in order to make any award under § 1117, the plaintiff must have experienced monetary harm or the infringer must have reaped monetary gain.  *Id.; see also Donsco, Inc. v. Casper Corp*., 587 F.2d 602, 607–08 (3d Cir. 1978).

The Lanham Act requires all courts to consider the equities of the case when assessing whether to award monetary relief (15 U.S.C. § 1117(a)).  Courts generally evaluate whether and to what extent one or more of the following equitable principles justify monetary relief: (1)

compensation for a plaintiff's loss; (2) preventing a defendant's unjust enrichment; (3) deterring a defendant's willful conduct; and/or (4) any monetary relief granted may not be punitive in nature. 15 U.S.C. § 1117(a); *see ALPO Petfoods, Inc. v. Ralston Purina Co*., 913 F.2d 958, 970 (D.C. Cir. 1990).

Monetary relief to a prevailing plaintiff in a trademark case is not automatic. *See Lindy Pen Co.*, 982 F.2d at 1404-05 (emphasis added). Under § 35(a) of the Lanham Act, damages for trademark infringement are not awarded as a matter of right, but "subject to the principles of equity." 15 U.S.C. § 1117(a). Indeed, judges have broad discretion to determine whether a monetary award is appropriate or an injunction is sufficient, as well as broad discretion to determine the proper amount of any monetary award. *See Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 350 (5th Cir. 2002); *Tamko Roofing Prods., Inc. v. Ideal Roofing Co*., 282 F.3d 23, 39 (1st Cir. 2002); *Shell Oil Co. v. Commercial Petroleum, Inc*., 928 F.2d 104, 108 (4th Cir. 1991)).

A plaintiff does not need to show a precise calculation of its damages and the calculation of damages is not always an exact science. *See Aronowitz v. Health-Chem Corp*., 513 F.3d 1229, 1241 (11th Cir. 2008). However, courts cannot award arbitrary or speculative damage awards. *See Broan Mfg. Co. v. Associated Distribs., Inc*., 923 F.2d 1232, 1236 (6th Cir. 1991); *see also Paper Converting Machine Co. v. Magna-Graphics Corp*., 745 F.2d 11, 22 (Fed. Cir. 1984) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)).

Here, Plaintiff claims to be entitled to both actual damages in the form of lost profits as well as disgorgement of Defendants' profits under its use of the AMERICAN QUEEN STEAMBOAT COMPANY name. Defendants dispute that Plaintiff is entitled to either award.

**B.  ISSUE: WHETHER PLAINTIFF IS ENTITLED TO RECOVER ACTUAL DAMAGES IN THE FORM OF LOST PROFITS.**

The Lanham Act allows for recovery of any actual damages sustained by the plaintiff.  *See* 15 U.S.C. § 1117(a).  Because actual damages are difficult to prove, actual damage awards are rare in trademark cases.  *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 194 (1st Cir. 2012).  Courts award monetary relief to compensate plaintiffs for a variety of financial harms and typically will award monetary relief in the form of actual damages for: (1) lost profits; (2) lost royalties; (3) loss of goodwill; and/or (4) costs of corrective advertising.  Plaintiff only seeks actual damages in the form of lost profits in this case.

Generally, in order to recover actual damages under the Lanham Act, a plaintiff must show: actual damage caused by the defendant's conduct; the amount of the damage; and that equity justifies a damages award.  *Lindy Pen Co.*, 982 F.2d at 1404-07.  The same principles that apply to proving damages in tort actions apply to proving damages in trademark cases.  That is, a plaintiff must generally show that it actually suffered harm, the harm was caused by the defendant's wrongful act, and that the harm is not remote or speculative.  *See e.g., La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 342 (6th Cir. 2010); *Lindy Pen Co.*, 982 F.2d at 1407; *Road Dawgs Motorcycle Club of the U.S., Inc. v. Cuse Road Dawgs, Inc*., 679 F. Supp. 2d 259, 293 (N.D.N.Y. 2009).

Importantly, in order for a plaintiff to be able to recover lost profits, they have to show that the alleged losses are directly attributable to the defendant's unlawful use of the plaintiff's trademark, and not for some other reason.  *Gucci America, Inc. Appellant v. Daffy's, Inc.*, 354 F.3d 228, 242-43 (3d Cir. 2003); *see also Caesars*, 520 F.2d at 274 (holding that a plaintiff must prove the existence of actual damages to receive an award of such damages); *Brand v. NCC Corp*., 540 F. Supp. 562, 565 (E.D. Pa. 1982).

Finally, a plaintiff must prove lost profits with reasonable certainty and must provide a reasonable basis for their computation. *Lindy Pen Co.*, 982 F.2d at 1407-08. Courts often deny lost profit awards as overly speculative when the plaintiff cannot prove it actually lost sales.

### C. <u>ISSUE</u>: WHETHER PLAINTIFF IS ENTITLED TO DISGORGEMENT OF DEFENDANTS' PROFITS.

As stated above, § 1117 of the Lanham Act allows a plaintiff to recover, subject to the principles of equity, a defendant's profits. 15 U.S.C. § 1117. As per the plain language of the statute, courts do not automatically award profits; they are granted only in light of equitable considerations. *See SecuraComm*, 166 F.3d at 189–90; *Acxiom Corp.*, 27 F. Supp. 2d at 505–506. "An accounting of [defendant's] profits is never automatic. The courts carefully retain the right to withhold the remedy if, in view of the overall facts and equities of the case, it is not appropriate." MCCARTHY, §30:59 (4th Ed. 2006). The Third Circuit has developed a set of six factors to apply in determining whether "principles of equity" warrant disgorgement of an infringer's profits:

> (1) Whether the defendant had the intent to confuse or deceive;
> (2) Whether sales have been diverted;
> (3) The adequacy of other remedies;
> (4) Any unreasonable delay by the plaintiff in asserting his rights;
> (5) The public interest in making the misconduct unprofitable; and
> (6) Whether it is a case of palming off.

*Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 175 (3d Cir. 2005) (quoting with approval *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002)). While willfulness is not required for an award of defendant's profits, it is an important equitable factor in the analysis. *See Banjo Buddies*, 399 F.3d at 171.

Even assuming Plaintiff can establish that it is entitled to disgorge Defendants' profits in some amount, it is well established that a plaintiff is "only entitled to those profits attributable to the unlawful use of its mark." *Gucci America, Inc. v. Daffy's, Inc.,* 354 F.3d 228, 242 (3d Cir.

2003) (affirming the district court's decision not to award defendant's profits). Where the infringing mark does not factor into the customer's purchasing decision, or is only incidental to that decision, a court may appropriately refuse to grant the plaintiff any portion of the defendant's profits. *Id.* (upholding District Court's decision to deny an award of lost profits where there was no evidence "about whether purchasers were attracted to the handbags because of the GUCCI mark as opposed to quality, price and appearance.").

If a plaintiff shows that it is entitled to recover a defendant's profits and that the profits were attributed to the use of the infringing mark, the amount of those profits still needs to be established. Under the Lanham Act, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). This provision has been interpreted to give the plaintiff the burden to prove a defendant's gross sales under the infringing mark. *Banjo Buddies*, 399 F.3d at 176. Although courts are generally lenient concerning the plaintiff's burden, the plaintiff's proof of gross sales attributable to the infringement must be based on evidence in the record of sales of the infringing good or service. A court may not speculate based on general data, such as an arbitrary fraction of the defendant's industry-wide sales. *Covertech Fabricating, Inc.,* 855 F.3d 176-77.

Once a plaintiff establishes the infringer's gross sales, the burden shifts to the defendant to prove deductions from the gross sales including those expenses attributable to the infringing activity. Courts will allow the following expenses to be deducted: shipping costs[4], costs of goods sold/services provided[5], advertising expenses[6], retailer discounts[7], overhead costs attributed to the

---

[4] *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp*., 642 F. Supp. 2d 276, 294 (S.D.N.Y. 2009).
[5] *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd*., 885 F.2d 1, 7 (2d Cir. 1989).
[6] *Nutrivida, Inc. v. Immuno Vital, Inc*., 46 F. Supp. 2d 1310, 1316 (S.D. Fla. 1998).
[7] *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015)

infringement[8], and sales not attributed to the infringing mark[9].  By contrast, some courts have rejected deductions associated with fixed costs[10], overhead costs that would have been incurred even without the infringement[11], income taxes (if there is a finding of willful infringement)[12], royalties paid to related companies[13], or an apportionment when the infringing and non-infringing elements are inseparable[14].

## IV.  DEFENDANTS' COUNTERCLAIM FOR TRADEMARK INFRINGEMENT AGAINST PLAINTIFF

Defendants have asserted a Counterclaim against Plaintiff for registered trademark infringement under 15 U.S.C. § 1114 (Count II of D.I. 132); unfair competition and false designation of origin under 15 U.S.C. § 1125(a) (Count IV); common law trademark infringement and unfair competition under Delaware law (Count VI); and for violation of the Delaware Uniform Deceptive Trade Practices Act, 6 Del. C. §§ 2531 et seq, (Count V).[15]  These claims are all based on the allegation that Plaintiff's use of the vessel names *American Eagle*, *American Pride*, *American Song*, *American Harmony*, *America* and *American (plus another term)* on directly competing waterways infringes upon Defendants' rights in and to their various AMERICAN QUEEN trademarks.  Defendants assert that Plaintiff's use of these vessel names in direct competition with Defendants is likely to cause confusion and, therefore, constitutes trademark infringement and unfair competition.  Plaintiff disputes that it has engaged in trademark infringement or unfair competition.

---

[8] *Manhattan Indus.*, 885 F.2d at 7-8.

[9] *Minn. Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F. Supp. 506, 516 (D. Minn. 1993).

[10] *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989).

[11] *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980).

[12] *Mary Kay, Inc. v. Webe*r, 661 F. Supp. 2d 632, 639 (N.D. Tex. 2009).

[13] *Fifty-Six*, 778 F.3d at 1076.

[14] *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994).

[15] As stated above, these claims are all decided under the same legal standards.

**A.  <u>ISSUE</u>: WHETHER PLAINTIFF HAS INFRINGED DEFENDANTS' AMERICAN QUEEN TRADEMARKS THROUGH ITS USE OF "AMERICAN" VESSEL NAMES IN DIRECT COMPETITION WITH DEFENDANTS.**

The elements of a trademark infringement claim are set forth on pages 5-23, above. Defendants' Counterclaim for trademark infringement will be decided under the same legal standards and there is no need to restate the law herein.

**B.  <u>ISSUE</u>: WHETHER DEFENDANTS ARE LIMITED TO PROTECTION AND/OR ENFORCEMENT OF RIGHTS TO THE GOODS/SERVICES IDENTIFIED IN THE AMERICAN QUEEN REGISTRATIONS.**

Plaintiff's affirmative defenses to Defendants' trademark infringement claim are set forth below.  Aside from those defenses, the only issue as to ownership of a valid trademark that has been raised by Plaintiff is its argument that the protection afforded to Defendants under the AMERICAN QUEEN marks should be limited to the specific goods and services identified in the certificates of registration.  Plaintiff's arguments on this point are more appropriately discussed in the context of the issue of whether there is a likelihood of confusion as opposed to the issue of whether Defendants own valid trademark rights.  In any event, relevant law on the issue is set forth herein.

A mark registered on the Principal Register is presumed to be valid. 15 U.S.C. § 1057(b). *See also Sylvania Elec. Prods.*, 247 F.2d at 732 ("when a party asserting trademark rights presents a registration, that party is the owner of valid and protectable trademark rights.").

The implication from Plaintiff's argument is that alleged infringing services must be identical to the services listed in the registration at issue in order for there to be infringement. Plaintiff cites no case law to support this novel position.  Nor could it.  That is, while it may be true that presumptive rights only exist with respect to the specific goods/services listed in the registration, the remedies of an owner of a trademark are not limited to the goods specified in the

certificate of registration and extend to any services on which the use of an infringing mark is
likely to cause confusion. *See Louis Rich, Inc. v. Horace W. Longacre, Inc*., 423 F. Supp. 1327,
1338-39 (E.D. Pa. 1976) (citing *Pure Foods, Inc. v. Minute Maid Corp*., 214 F.2d 792 (5th Cir.
1954)). According to the court in *Louis Rich, Inc.*, the owner's interest in a trademark can be
protected against infringement not only on competing goods or services, but on goods/services
related in the market to the owner's goods/services. *Louis Rich, Inc.*., 423 F. Supp. at 1338-39.

Further, one can have and assert <u>both</u> common law and federally registered trademark
rights, just as Defendants have done in this case. *See Natural Footwear Ltd. v. Hart, Schaffner &
Marx,* 760 F.2d 1383, 1396 (3d Cir. 1985) (holding plaintiff has the opportunity to demonstrate
common-law rights to use of the trademark on unregistered goods or in unregistered form).

C. <u>ISSUE</u>: WHETHER THERE IS A LIKELIHOOD OF CONFUSION BETWEEN THE VESSEL
NAMES AMERICAN PRIDE, AMERICAN EAGLE, AMERICAN SONG,
AMERICAN HARMONY, AMERICA <u>AND</u> AMERICAN QUEEN.

The question here is whether Plaintiff's use of the vessel names *American Eagle*, *American
Pride*, *America*, *American Song, American Harmony* and *American (plus another term),* in direct
competition with Defendants on the same rivers*,* is likely to cause confusion among the relevant
consuming public. Defendants assert that Plaintiff's use of these vessel names is likely to cause
confusion. Plaintiff disputes that there is a likelihood of confusion.

The *Lapp* factors cited on pages 12-23, above, will be considered by the Jury in deciding
whether there is a likelihood of confusion based on Defendants' Counterclaim. There is no need
to repeat those factors herein.

D. **ISSUE:** WHETHER PLAINTIFF'S INFRINGEMENT WAS WILLFUL OR INTENTIONAL IF THERE IS A FINDING OF INFRINGEMENT.

The same legal standards for determining whether infringement is willful or intentional, set forth on pages 17-18, above, apply to Defendants' Counterclaim for trademark infringement against Plaintiff.

## V. PLAINTIFF'S AFFIRMATIVE DEFENSES TO DEFENDANTS' TRADEMARK INFRINGEMENT COUNTERCLAIM

Plaintiff asserts two affirmative defenses against Defendants' counterclaim for trademark infringement: trademark abandonment and invalid assignment of trademarks. Specifically, Plaintiff claims that the AMERICAN QUEEN marks were abandoned and that the trademark assignment agreement entered between Defendants and Ambassadors Cruise Group was invalid as a naked assignment in gross.

A. **ISSUE:** WHETHER THE AMERICAN QUEEN TRADEMARKS HAVE BEEN ABANDONED.

Trademark abandonment is extremely difficult to prove. Being in the nature of a forfeiture of rights, the elements of abandonment must be "strictly proved." *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981). In the Third Circuit, the "strictly proved" standard means that abandonment must be shown by clear and convincing evidence. *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (recognizing that because it constitutes the forfeiture of a property right, abandonment must be proven by clear and convincing evidence and finding no abandonment where the owner of the mark sought to sell the business under the mark); *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006) (holding that party seeking abandonment has high burden of proof); *Cash Processing Servs. v. Ambient Entm't, Inc.*, 418 F. Supp. 2d 1227, 1231-32 (D. Nev. 2006);; *interState Net Bank v.*

*NetB@nk, Inc*., 348 F. Supp. 2d 340, 352 (D.N.J. 2004); *EH Yacht, LLC v. Egg Harbor, LLC*, 84 F. Supp. 2d 556, 564 (D.N.J. 2000); MᴄCᴀʀᴛʜʏ, §§ 17:12, 17:3.

The issue of abandonment is governed by § 45 of the Lanham Act, 15 U.S.C. § 1127, which provides in pertinent part as follows:

> *A mark shall be deemed 'abandoned' . . .*
>
> *(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.*

*See* 15 U.S.C. §1127.  A party asserting abandonment of trademark must prove (1) discontinuance of use of the mark and (2) an intent not to resume use within a reasonably foreseeable time in the future. *Eh Yacht, LLC*, 84 F. Supp. 2d at 564 (citing *Exxon Corp. v. Humble Exploration Co*., 695 F.2d 96 (5th Cir. 1984)).

The elements of abandonment are questions of fact for the Jury to decide.  Nonetheless, guidance can be taken based on the legal decisions associated with each of the required elements.

### 1. Whether There is a Three-Year Period of Non-Use of the AMERICAN QUEEN Marks.

Under the first prong of the abandonment test, Plaintiff must establish by clear and convincing evidence that there has been a discontinuance of use of the mark.  *See Eh Yacht, LLC*, 84 F. Supp. 2d at 565.  The Lanham Act defines use of a mark as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127.  It is not the law that "the slightest cessation of use causes a trademark to roll free, like a fumbled football, so that it may be pounced on by any alert opponent."  *Continental Distilling Corp. v. Old Charter Distillery Co*., 188 F.2d 614, 619 (D.C. Cir. 1950).  The statutory standard calls for complete disuse. Temporary non-use has been found insufficient to support a finding of

abandonment.  *See Beech-Nut Packing Co. v. P. Lorillard Co.,* 273 U.S. 629 (1927); *United States Jaycees,* 639 F.2d at 139. "If there is continued use, a prospective intent to abandon the mark or business does not decide the issue of abandonment." *Electro Source, LLC v. Brandess-Kalt-Aetna Group, Inc.*, 458 F.3d 931, 937 (9th Cir. 2006).

In *Aycock Eng'g, Inc. v. Airflite, Inc.,* 560 F.3d 1350, 1359 (Fed. Cir. 2009), the Federal Circuit Court of Appeals held that "an open and notorious public offering of the services" would be sufficient use to avoid a finding of abandonment.  To that end, this Court has already held that the date Defendants began booking cruises is the date on which any alleged period of non-use of the AMERICAN QUEEN mark ends.  *See* D.I. 258, p. 34.

The Ninth Circuit recently emphasized that the second element, intent, only comes into play when non-use has been established, and that the Lanham Act requires "complete discontinuance of use" for there to be a finding of abandonment.  *See Burgess v. Gilman*, 475 F. Supp. 2d 1051, 1060 (D. Nev. 2007) (citing *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 937-939 (9th Cir. 2006)).  In other words, a single legitimate use will rebut a claim of abandonment, and "**a prospective declaration of intent to cease use in the future, made during a period of legitimate trademark use, does not meet the intent not to resume standard**." *Id.*  (emphasis added).

Plaintiff claims that there was a three-year period of non-use of the AMERICAN QUEEN marks and calls into question evidence submitted by Defendants that tickets were sold prior to the expiration of the alleged three-year non-use period.  Defendants claim that there was not a three-year period of non-use of the AMERICAN QUEEN marks.

### 2. Whether There Was Intent Not to Resume Use or Excusable Non-Use of the AMERICAN QUEEN Marks.

As to the second element of the abandonment test--intent not to resume use--ACL must show that the circumstances clearly and convincingly establish an intent not to resume use of the AMERICAN QUEEN marks by one of the marks' owners. *Eh Yacht, LLC*, 84 F. Supp. 2d at 565. It is well established that the cessation of a business does not "automatically and immediately terminate its rights to a mark." *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985) ("[N]either the separation from tangible assets, by itself, nor the termination of a business, by itself, will necessarily and immediately vitiate a mark or its goodwill."). Further, the goodwill of an insolvent's mark is not automatically destroyed upon the bankruptcy and/or ceasing of operations of the owner. *Merry Hull & Co. v. Hi-Line Co., Inc.*, 243 F. Supp. 45, 50 (S.D.N.Y. 1965).

In *Seidelmann Yachts, Inc. v. Pace Yacht Corp.*, No. CIV. JH-87-3490, 1989 WL 214497, at *1 (D. Md. Apr. 26, 1989), *aff'd*, 898 F.2d 147 (4th Cir. 1990), for example, the mark at issue was used and eventually registered by the original owner in connection with the manufacture of yachts. The original owner later transferred the trademark rights, along with the associated yacht lines, to Mission Marine Associates. *Id.* at *3. Three years after the acquisition, Mission Marine began to suffer financial difficulties unrelated to the line of yachts sold under the mark. *Id.* As a result, Mission Marine filed for bankruptcy and ceased all advertising and manufacturing. Mission Marine representatives admitted that the company had no intent to resume operations under the mark and were ceasing all operations. *Id.* at *4. As part of the bankruptcy, Mission Marine unsuccessfully attempted to sell the specific yacht line at issue, with the associated trademark rights, as a separate asset. Five years after the bankruptcy and after use of the mark had ceased,

43

Mission Marine separately sold the trademark rights to the plaintiff, who also manufactured yachts but did not purchase any of the Mission Marine physical assets during the bankruptcy. *Id.* at *6.

In the subsequent infringement action, the defendant claimed that the mark at issue was abandoned by Mission Marine when it ceased operations and declared bankruptcy. The court disagreed and held there was no abandonment, finding that the defendant failed to show there was not intent to resume use of the mark. *See also Saratoga*, 625 F.2d at 1037 (holding intent to resume business operations was not required to overcome the presumption of abandonment and finding no abandonment where owner was forced to involuntarily close its bottling facility and did not resume operations for over seven-years since, during the use hiatus, the owner continuously attempted to sell the business, goodwill and trademark).

Acknowledging that abandonment is fact specific, the district court in *Seidelmann* considered the fact that Mission Marine was forced to file bankruptcy due to financial problems "with a division unrelated" to the mark at issue. *Seidelmann Yachts, Inc*., No. CIV. JH-87-3490, 1989 WL 214497, at *1. The court recognized that goodwill was still associated with the mark, there was intent to manufacture the yachts in substantially the same nature and quality as the earlier yachts, and the purchaser of the mark intended to resume operations within a reasonable time, leading to the logical conclusion that the mark was never abandoned. *Id.* at 25-26.

Similarly, in *Eh Yacht,*, 84 F. Supp. 2d at 557, the plaintiff acquired a yacht-building business which included the business' trademarked name, EGG HARBOR, from the statutory receiver court-appointed to wind up the financial affairs of Marine Acquisitions, Inc. ("Marine"). Marine obtained ownership of the mark following the purchase of Egg Harbor Yacht Co. after it suffered financial setbacks. *Id.* at 559-560. Marine ceased operation in November of 1997 after several cash flow issues caused temporary suspensions of production. *Id.* at 560. Plaintiff

44

eventually purchased all of Marine's assets in September of 1999. The defendant claimed that the original mark was abandoned by Marine when Marine ceased operation and had no intent to reopen or use the trademark. *Id.*

Despite the fact that Marine closed its doors, the EGG HARBOR name continued to be in the marketplace and carried substantial goodwill. The court looked for objective evidence of the intent to abandon and found ambiguous testimony regarding the plaintiff's decision to cease production due to financial constraints. In granting preliminary injunction to plaintiff, the Court found that the "defendants have failed to show by clear and convincing evidence that there was no intent to resume use of the EGG HARBOR mark, and the EGG HARBOR mark did not begin to 'roll free' at the moment that Marine ceased manufacture of the boats." *Id.* at 567. The Court granted temporary injunction in favor of the plaintiff finding it likely that the trademark remained with the assets when purchased through the receivership even after the closing of Marine. *Id.*

The requisite intent under §1127 can be the former owner of a mark, such as Ambassadors, but it also may be the intent of a third party as well. As Professor McCarthy points out, citing to *EH Yacht*, "if a manufacturer got into financial difficulty and closed its doors, the manufacturer may have not intended to resume business under the mark, but the creditors might very well have an intention to resume use within a reasonable time after seizing the assets to help defray the debts owed them." MCCARTHY, § 17.11, at 17-19 (2015); (citing *EH Yacht, LLC*, 84 F. Supp. 2d at 566) ("[A] determination of intent not to resume use should be based on the totality of objective evidence of intent to resume use, not simply the intent of the registered trademark owner. Under this standard, so long as there is power to do so, any valid intent to resume use within a reasonable time becomes relevant.")).

45

The court in *Cash Processing* also relied on *Eh Yacht* in confirming that the test for abandonment can rest on a third party's intent to use the mark and "*any* valid intent to resume use within a reasonable time becomes relevant." *Cash Processing*, 418 F. Supp. 2d at 1234 (quoting *EH Yacht, LLC*, 84 F. Supp. 2d at 566). In analyzing the intent requirement, the court should look not just to the intentions of Ambassadors, but also to the intentions of the U.S. Government and MARAD in seizing the *American Queen* with the intention to sell the vessel to continue its services and Defendants' intent to resume its use. *See Burgess*, 475 F. Supp. 2d at 1060 ("Where there are future and successor interests in a property, the intent of all of the parties is relevant in evaluating whether there is intent to resume use.").

In *Cash Processing*, the court did look to the intent of the party who had purchased the marks and goodwill in determining whether there was abandonment. *Cash Processing*, 418 F. Supp. 2d at 1234. In fact, the court held that the party who acquired the property and the marks after the property had been seized had provided "ample evidence" sufficient to avoid a finding of abandonment where, despite the relatively short time frame in which it owned rights, it always intended to use the mark in connection with the relevant services and made efforts to do so, including sending out marketing materials. *Id*. The court found no abandonment where the Government took its time to attempt to assess the assets it had purchased, determine what it could and could not use, and ultimately sell the mark and goodwill to a party who did intend to resume using the mark for the same services. *Id*., at 1235.

As to excusable non-use, courts have excused non-use and rejected the abandonment defense when the mark owner's non-use was due to circumstances beyond its control such as a

bankruptc,[16] time taken by owner to determine how to sell a mark and its related property after

acquiring the property following government seizure,[17] or depressed market conditions rendering

use unprofitable.[18][19] The Second Circuit, for example, found the presumption of abandonment to

be rebutted where New York stopped operating a water business due to a legislative decision, and

where the state had sought continuously thereafter to sell the business with its goodwill and

trademark. *Saratoga*, 625 F.2d at 1044.

### 3. Whether There is Residual Goodwill to the AMERICAN QUEEN Marks Sufficient to Preclude Application of the Abandonment Defense.

Even if it were determined that there was a three-year period of non-use and/or an intent

not to resume use of the AMERICAN QUEEN marks, Defendants contend that abandonment

cannot be found where there is significant residual goodwill associated with those marks.

Defendants contend that there is a high level of residual goodwill in and to the AMERICAN

QUEEN marks. Plaintiff disputes that residual goodwill is relevant and that there is residual

goodwill in and to the AMERICAN QUEEN marks. As an initial matter, the Court has already

held that evidence suggesting the AMERICAN QUEEN marks have "retained value" is relevant

to whether there is a finding of abandonment. *See* D.I. 258, p. 35.

Under the law, the concept of "goodwill" is critical to an understanding of abandonment

as it can apply to both the concept of use and intent to resume use. A trademark symbolizes the

goodwill that a party has built in a product or business. *McLean v. Fleming*, 96 U.S. 245 (1877).

---

[16] *See Kim v. Ferry*, Case No. CV 08-05433, 2009 WL 10671424, at *3 (C.D. Cal. Mar. 25, 2009).

[17] *See Burgess*, 475 F. Supp. 2d 1060.

[18] *See Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985).

[19] *See also* MCCARTHY § 17:16 (citing myriad cases and summarizing the rule as follows: "[a]bandonment does not result from a temporary forced withdrawal from the market due to causes such as war, prohibition, a labor strike, bankruptcy, import problems, unprofitable sales, being sued for patent infringement, or some other involuntary action.").

Goodwill in a mark describes the consumer recognition or drawing power of a trademark.  *See* McCarthy, 2:15 at 2-36.  A trademark "has no independent significance apart from the goodwill it symbolizes."  *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984).  When goodwill persists for some time in the minds of the consuming public the mark is said to have residual goodwill.

Residual goodwill relates to abandonment when use of a mark is discontinued but the consuming public still believes there is a continuity of the source of the goods or services. If residual goodwill exists, courts have held that the public interest should be protected by refusing to allow appropriation of even a long abandoned mark.  *See e.g., American Motors Corp. v. Action Age, Inc.,* 178 U.S.P.Q. 377, 379 (1973) (holding finding of residual goodwill prevented finding of abandonment); *Ferrari S.P.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 11 U.S.P.Q. 2d 1843 (S.D. Cal. 1989) (holding strong goodwill in mark prevented finding of abandonment); *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947 (7th Cir 1992) (holding no abandonment even where the mark was out of use for a long period of time and/or the original use was sporadic because of the existence of residual goodwill); *Defiance Button*, 759 F.2d at 1060 (applying the concept of residual goodwill to prevent abandonment of mark even after long period of non-use).

While there are decisions holding that residual goodwill is only relevant in the "intent to resume use" analysis, other cases have allowed residual goodwill, standing alone, to defeat an abandonment finding.  *See e.g. Peter Luger Inc. v. Silver Star Meats Inc*., No. 01-1557, 2002 WL 1870066 (W.D. Pa. May 17, 2002).  In *Peter Luger*, the court relied upon the residual goodwill argument because "[t]o hold otherwise would result in unfair competition through intentionally creating public confusion as to the source and origin of the products…." *Id*. at *2. Legal scholars have agreed that this approach better serves the purposes of the Lanham Act – i.e. to protect the

48

consuming public – because the focus is on public perception of the marks as opposed to the subjective intent of a non-user.  *See* MCCARTHY, §17.15.  Residual goodwill can be considered under either scenario in this case to preclude abandonment.

Courts generally look to the following as evidence of goodwill: length of prior use of the mark; extent of sales and advertisement of the trademarked products; length of typical customer interaction with the product; reaction of customers and dealers on resumption of use; and continued consumer interaction with product. *See* Johanna F. Sistek, *Goodwill Hunting(r) the Role of Residual Goodwill in the Analysis of Trademark Abandonment*, 22 Ent. & Sports L., 8, 9 (2004). Further, where a party is willing to pay money for a mark even after assets associated with the mark were already transferred, courts hold that is indicative of residual goodwill.  *Seidelmann Yachts,* 1989 WL 214497, at *9.

### B. <u>ISSUE</u>: WHETHER THE ASSIGNMENT OF THE AMERICAN QUEEN TRADEMARK REGISTRATIONS TO DEFENDANTS WAS INVALID.

Also being in the nature of a forfeiture of rights, it is the party asserting invalidity's burden to prove the existence of an assignment in gross by clear and convincing evidence.

It is a basic tenet of trademark law that in order to determine whether a trademark has been invalidly assigned in gross, i.e. without the associated goodwill, the test is whether the assets bought by the assignee are sufficient to enable the assignee to operate the business in continuity with the past. *See Merry Hull & Co. v. Hi–Line Co.,* 243 F. Supp. 45, 51 (S.D.N.Y. 1965); MCCARTHY, § 18.9, at 818–19.  The Lanham Act states that a registered mark is assignable along with either (1) the goodwill of the business in which the mark is used; or (2) the part of the goodwill of the business connected with the use and symbolized by the mark. 15 U.S.C. § 1060. The basis for this longstanding rule is that assignee's use of a mark in connection with a product and goodwill different from those of the assignor misleads the public.  *See Marshak*, 746 F.2d at 929.

Courts allow an alleged naked assignment to stand where the assignee did not acquire the physical assets of the business <u>as long as the mark is used on goods or services that are substantially similar in both nature and quality</u> to those on which the mark had previously been used. *Am. Sleek Craft, Inc. v. Nescher*, 131 B.R. 991, 1000 (D. Ariz. 1991) (emphasis added); *see also Marshak*, 505 F. Supp. at 1054; *Sterling Brewers, Inc. v. Schenley Industries, Inc*., 441 F.2d 675, 679 (C.C.P.A. 1971).

Along these lines, courts have generally analyzed whether an assignment is an invalid assignment in gross under two tests.  The first of these tests is the "real continuity test", which examines the nature of business assets obtained by the assignee from the assignor and whether they permit the assignee to continue in real continuity with the previous business of the assignor. *See Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339, 1350-51 (E.D.N.Y. 1994).  The second test is the "substantial similarity test", which examines whether the assignee is producing a product or service substantially similar to that of the assignor so that consumers would not be deceived by the assignee's use of the mark.  The analysis assesses whether the assignee's goods or services under the mark are of the same quality and nature as those of the assignor.  *See Defiance Button*, 759 F.2d at 1059-60.

Finally, under the common law, when a business is conveyed, its trade name and goodwill are also conveyed unless expressly set forth otherwise.  *See Plitt Theatres, Inc. v. American Nat'l Bank & Trust Co.,* 697 F. Supp. 1031, 1034-35 (N.D. Ill. 1988) ("Ownership of trademarks and service marks passes impliedly with ownership of the pertinent building or business with which the mark is associated, absent express provision to the contrary.").  If all of a business' goodwill is transferred, the sale implicitly includes the marks even if they are not mentioned in the paperwork. *Pereyra v. Sedky*, 148 F. Supp. 3d 134, 143 (D. Mass. 2015); *Berni v. International*

*Gourmet Restaurants of America, Inc.*, 838 F.2d 642, 647 (2d Cir. 1988) (mark was transferred along with the appurtenant business even though the mark was omitted from a listing of the assets transferred).  A seller may also transfer the physical assets of a business but expressly retain the business' marks and goodwill.  The retained marks are not abandoned provided the seller intends to sell these intangible assets to another, or intends to continue the business by other means.  *See* 4 CALLMANN ON UNFAIR COMP., TR. & MONO. § 20:39 (4th Ed.).  In such situations, even where an assignment agreement transferring the relevant trademark rights was entered later in time than the actual transfer of goodwill, such an assignment is still valid since it is nothing more than a formality that was a natural by-product of the real economic transaction.  *See J. Atkins Holdings Ltd. v. English Discounts, Inc.*, 729 F. Supp. 945, 952 (S.D.N.Y. 1990).

Defendants claim that the assignment agreement from Ambassadors to Defendants, assigning rights to the AMERICAN QUEEN marks and associated goodwill, was not an invalid assignment.  Defendants claim that they acquired to necessary goodwill associated with those marks and carried on a substantially similar business under those marks.  Plaintiff disputes that any goodwill associated with the AMERICAN QUEEN marks transferred to Defendants.

## VI.    DEFENDANTS' CLAIM FOR MONETARY DAMAGES FOR ITS INFRINGEMENT CLAIM AGAINST PLAINTIFF

Should they succeed on their claim against Plaintiff for trademark infringement, Defendants seek to recover monetary damages against Plaintiff under § 35 of the Lanham Act, 15 U.S.C. § 1117(a).  Plaintiff disputes that Defendants are entitled to recover monetary damages and disputes the amount of damages proffered by Defendants.

**A. ISSUE: WHETHER DEFENDANTS ARE ENTITLED TO RECOVER MONETARY DAMAGES FROM PLAINTIFF IF INFRINGEMENT IS FOUND.**

Defendants seek monetary damages for its trademark infringement Counterclaim under the same provisions of the Lanham Act set forth above with respect to Plaintiff's trademark infringement claim. *See* pp. 31-37, above. Those same standards apply here.

**B. ISSUE: WHETHER DEFENDANTS ARE ENTITLED TO DISGORGEMENT OF PLAINTIFF'S PROFITS FROM THE USE OF ITS INFRINGING VESSEL NAMES.**

The same legal standards for disgorgement of profits under the Lanham Act set forth on pages 35-37 above, are used with respect to Defendants' Counterclaim.