```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4    AMERICAN CRUISE LINES, INC.,     )
                                       )
 5                    Plaintiff,       )
                                       )
 6                                     ) C.A. No. 13-324-RGA
      v.                               )
 7                                     )
      HMS AMERICAN QUEEN STEAMBOAT     )
 8    COMPANY LLC, and AMERICAN        )
      QUEEN STEAMBOAT OPERATING        )
 9    COMPANY, LLC,                    )
                                       )
10                    Defendants.      )

11
                                      J. Caleb Boggs Courthouse
12                                    844 N. King Street
                                      Wilmington, Delaware
13
                                      Friday, October 26, 2018
14                                    1:32 p.m.
                                      Pretrial Conference Hearing
15

16    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

17    APPEARANCES:

18                STEPHEN J. KRAFTSCHIK, ESQUIRE
                  MORRIS NICHOLS ARSHT & TUNNELL LLP
19
                            -and-
20
                  DAVID WILLIAMS, ESQUIRE
21                CHARLES L. SIMMONS, ESQUIRE
                  MICHAEL R. NACCARATO, ESQUIRE
22                TAYLOR W. BECKHAM, ESQUIRE
                  GORMAN & WILLIAMS
23
                            For the Plaintiffs
24
                                      Heather M. Triozzi
25                                    Official Court Reporter
```

APPEARANCES CONTINUED:

                    DANIEL M. PEREIRA, ESQUIRE
                    SCHNADER HARRISON SEGAL & LEWIS LLP

                            -and-

                    DENNIS D. MURRELL, ESQUIRE
                    BRIAN P. McGRAW, ESQUIRE
                    MIDDLETON REUTLINGER

                                For the Defendant

01:32:56   1                    THE COURT:  All right.  Good afternoon.  Please

01:32:58   2    be seated.

01:33:00   3                    (Everyone said, Good afternoon, Your Honor.)

01:33:00   4                    THE COURT:  Actually off the record.  All right.

01:33:19   5                    So good afternoon.  Why don't we have on the

01:33:21   6    record who's here for American Cruise Lines versus HMS

01:33:27   7    American Queen Steamboat Company, Number 13-324.

01:33:31   8                    For plaintiff, Mr. Kraftschik.

01:33:33   9                    MR. KRAFTSCHIK:  Yes.  Good afternoon, Your

01:33:35  10    Honor.  Stephen Kraftschik for Morris Nichols.

01:33:37  11                    I have with me, David Williams, Charlie Simmons,

01:33:40  12    Michael Naccarato, and Taylor Beckham from Gorman &

01:33:42  13    Williams.  I have from my firm, Jack Lyons.

01:33:46  14                    THE COURT:  Okay.  All right.

01:33:48  15                    MR. PEREIRA:  Good afternoon, Your Honor.

01:33:49  16    Daniel Pereira.  From Schnader Harrison Segal & Lewis with

01:33:53  17    me are Brian McGraw and Dennis Murrell from Middleton.

01:33:56  18                    MR. MURRELL:  In the proper order on your

01:33:59  19    sign-in sheet, Your Honor.

01:34:00  20                    THE COURT:  I was going to say the way

01:34:03  21    Mr. Pereira said it, but you are Mr. Murrell?

01:34:05  22                    MR. MURRELL:  I am.

01:34:08  23                    MR. KRAFTSCHIK:  We tried to be careful.

01:34:10  24                    THE COURT:  For some reason or another, I'm

01:34:12  25    better able to remember who you are.

01:34:14  1          Okay.  So I had a few things here.  First thing

01:34:20  2   is this, so we've got right now the jury selection scheduled

01:34:26  3   for Friday morning, January 4th.  Unfortunately, something

01:34:32  4   has come up.  I can't do it on Friday morning of

01:34:36  5   January 4th.

01:34:37  6          I can do it Thursday.  I can do it the Friday

01:34:43  7   afternoon, but I can't do it on Friday morning.  My

01:34:53  8   preference would be to try to do it on Thursday, but --

01:35:00  9          MR. MURRELL:  So I have a final pretrial in

01:35:03 10   another case that I just got the Court to move it back to

01:35:06 11   Wednesday.  It's in Eastern Kentucky.  Getting here from an

01:35:10 12   afternoon day to a morning here is almost impossible.  And

01:35:14 13   so I would prefer to do it Friday afternoon just because I'd

01:35:17 14   have to call my Court back again, and it's another federal

01:35:20 15   court and ask them to move it again.

01:35:21 16          THE COURT:  Well, so I don't want to impose on

01:35:24 17   you or the Court like that.  How about if we did it on

01:35:27 18   Thursday afternoon?

01:35:28 19          MR. MURRELL:  Oh, I could get here Thursday

01:35:30 20   afternoon.

01:35:31 21          THE COURT:  Why don't we do -- Mr. Simmons, did

01:35:34 22   you want to --

01:35:35 23          MR. SIMMONS:  Well, I was going to say, Your

01:35:37 24   Honor, would there be an opportunity to utilize Friday

01:35:40 25   afternoon for whatever in the case, either openings if we

01:35:45  1    haven't gotten those done on Thursday and pick up some

01:35:48  2    testimony?

01:35:48  3                THE COURT:  I don't think it would be for

01:35:49  4    openings.  If it turns out that there are issues, and I'm

01:35:54  5    sure there will be, yeah, I'm available Friday afternoon.

01:35:59  6    And that's part of the reason why I was actually thinking

01:36:03  7    Thursday would be better was just so that we could do

01:36:06  8    whatever fine tuning would be useful after that.

01:36:10  9                All right.  So why don't we say one o'clock on

01:36:15 10    the Thursday.  That would work for you, Mr. Murrell?

01:36:18 11                MR. MURRELL:  Can I look at flight schedules

01:36:20 12    really quickly --

01:36:21 13                THE COURT:  Yes.

01:36:22 14                MR. MURRELL:  -- just to make sure?

01:36:33 15                THE COURT:  While he's doing that, Mr. Kraftschik,

01:36:35 16    I'm designating you to write up an Order.

01:36:39 17                MR. KRAFTSCHIK:  Yes, Your Honor.

01:36:40 18                THE COURT:  Okay.

01:37:14 19                MR. MURRELL:  Because I can get here by

01:37:16 20    11:00 a.m. to Baltimore.  Let's see Philly.

01:37:21 21                MR. WILLIAMS:  So we figure it's about an hour

01:37:24 22    and a half from Downtown Baltimore.

01:37:27 23                THE COURT:  I could say 1:30 rather than 1:00.

01:37:31 24                MR. MURRELL:  The earliest flight from Southwest

01:37:33 25    is 1:20, but I could get to Baltimore before 11 so I could

01:37:37 1    be here by 1:00.

01:37:38 2              THE COURT:  Well, why don't we say 1:00.  And if

01:37:40 3    it turns out your flight is a little delayed, that will not

01:37:44 4    be a problem.

01:37:44 5              MR. MURRELL:  Okay.  Thank you.

01:37:47 6              THE COURT:  All right.  So that was the first

01:37:56 7    thing.

01:37:57 8              So the next thing is -- well, I guess the -- so

01:38:07 9    actually the next thing is, as I was looking at the jury

01:38:12 10   instructions and at the verdict form, and one thing that I

01:38:21 11   was -- and I was also considering the plaintiff's suggestion

01:38:28 12   that there was not enough time here.  And I was also

01:38:33 13   considering my own concern that things are too complex, and

01:38:43 14   so I was considering all those things.

01:38:45 15             And I went back and looked at the Order.  I

01:38:53 16   forget what you call it, but the Stipulated Order as to when

01:38:57 17   we were going to have this trial on.  And so the Stipulated

01:38:59 18   Order refers to counts that have common law trademark,

01:39:03 19   unfair competition, violations of Delaware Uniform Trade

01:39:12 20   Practices Act.  And somebody, I believe the defendant, said

01:39:15 21   in one of the many things I looked at, something to the

01:39:18 22   effect of -- actually I think you said it in connection with

01:39:24 23   jury instructions.

01:39:28 24             And you didn't say it like this, but why are we

01:39:30 25   messing around with all of these things?  Shouldn't this

01:39:34  1    trial be your, the plaintiff's federal trademark claims and

01:39:42  2    defenses, and the defendants' federal trademark claims and

01:39:47  3    defenses?  And wouldn't that resolve -- it may not do all

01:39:53  4    the remedies, but wouldn't that resolve common law

01:39:57  5    trademark, and unfair competition, and the Delaware Uniform

01:40:07  6    Trade Practices Act?

01:40:07  7              MR. WILLIAMS:  I think you've hit it right with

01:40:09  8    the remedies.  I think that's one area of difference.

01:40:12  9              THE COURT:  But remedies, I mean, some of those

01:40:14 10    things are equitable remedies.  That's not going to be a

01:40:17 11    jury thing anyhow.  That if what I took from what the

01:40:21 12    defendants said -- but that's part of the reason I'm

01:40:26 13    bringing it up was that essentially in terms of liability,

01:40:30 14    deciding the federal trademark issues decides the liability

01:40:36 15    for each of these things.

01:40:41 16              MR. SIMMONS:  For the most part.

01:40:42 17              MR. WILLIAMS:  We think that the proof will be

01:40:45 18    pretty much the same for the liability case.

01:40:49 19              THE COURT:  Well, so I guess what I'm wondering

01:40:52 20    is, and I say this with nobody having submitted any jury

01:40:59 21    instructions for unfair competition, Delaware Uniform Trade

01:41:05 22    Practices Act, and hardly any for common law trademark

01:41:09 23    infringement, to the extent that the -- can't we essentially

01:41:17 24    stipulate that if that -- to the extent one side or the

01:41:22 25    other or somebody wins on federal trademark claims that

01:41:27  1    they -- essentially the parties stipulate to, they win on

01:41:31  2    whatever the related claims are?

01:41:35  3            MR. WILLIAMS:  The only hesitancy I would

01:41:37  4    have -- and for the record, this is David Williams for the

01:41:39  5    plaintiff -- is the fact we have advanced strongly a theory

01:41:44  6    of violation of a family of marks.  Family of marks is not

01:41:49  7    per se recognized as a per se legal existence under federal

01:41:55  8    law, but it is recognized under common law.  And we think

01:42:00  9    that that aspect is actually very important here.

01:42:04 10            THE COURT:  Okay.  Hold that thought.

01:42:05 11            MR. WILLIAMS:  So that's why, in other words, my

01:42:08 12    sense was about the proof rather than the division, federal

01:42:10 13    or common so much.

01:42:12 14            THE COURT:  All right.  So I independently

01:42:16 15    wondered what the family of marks business was all about.

01:42:23 16    The family of marks, that's not a federal trademark thing?

01:42:28 17            MR. McGRAW:  It's not.  I guess the claim could

01:42:29 18    be recognized under 1125(a), the Lanham Act.  But our

01:42:35 19    position all along has been if that claim was gone, this

01:42:37 20    would be a much simpler trial.  And by gone, I mean reserved

01:42:44 21    to a later date.

01:42:45 22            THE COURT:  So I was trying not to reserve it to

01:42:47 23    a later date, so -- but I guess that actually is -- so tell

01:42:56 24    me what the proving the family of claims involves.  I mean,

01:43:03 25    I understand --

01:43:05  1          MR. WILLIAMS:  Family of marks.

01:43:07  2          THE COURT:  Right.  Family of marks.  And I

01:43:08  3   understand it's about American this, American that, I guess,

01:43:12  4   but what is the significance of that?

01:43:15  5          MR. WILLIAMS:  So the significance of that is,

01:43:17  6   particularly in the maritime industry, where it is a common

01:43:21  7   practice that --

01:43:24  8          THE COURT:  Okay.  Yeah.  Yeah.  I saw that in,

01:43:26  9   I don't know, the jury instructions or somewhere --

01:43:27 10          MR. WILLIAMS:  Christine Duffy.

01:43:28 11          THE COURT:  -- or, yeah, okay, in relation to

01:43:30 12   her, you proffering that.  But so how does this common

01:43:41 13   practice relate back to the issues in the case?

01:43:45 14          MR. WILLIAMS:  So we are saying that that

01:43:49 15   augments the confusing aspect of their brand name and

01:43:56 16   infringes our preexisting family of vessel name marks which

01:44:01 17   have been growing since 2000.

01:44:08 18          THE COURT:  Hold on a minute.  Okay.  So I had

01:44:36 19   been looking at the plaintiff's Proposed Verdict Form

01:44:41 20   submitted on October 22nd, and I had noticed that question

01:44:46 21   number three on the verdict form, which is essentially

01:44:51 22   infringing the family of trademarks or more properly is

01:44:57 23   likely to cause confusion with the family of trademarks as a

01:45:02 24   question to which there was no counterpart in the

01:45:06 25   defendants' Proposed Verdict Form.

01:45:11 1                And is it --

01:45:18 2                MR. MURRELL:  I think there is, Your Honor.  We

01:45:21 3    sent our own version of it.

01:45:23 4                MR. WILLIAMS:  There were two versions.

01:45:24 5                MR. MURRELL:  But we organized it differently.

01:45:26 6    Instead of having liability, liability, liability,

01:45:29 7    liability, and then damages, we put each of the claims

01:45:32 8    independently together.  So I think our family mark comes

01:45:36 9    later.

01:45:38 10               THE COURT:  But I'm not so sure.  You had a

01:45:40 11   question number two because it has ACL established it owns a

01:45:46 12   valid and legally protective family of American trademarks.

01:45:50 13               MR. MURRELL:  Right.

01:45:50 14               THE COURT:  But I don't think there was any

01:45:54 15   follow-up question.

01:46:02 16               MR. MURRELL:  It's question ten.

01:46:03 17               THE COURT:  Question ten is about profits.

01:46:09 18               MR. McGRAW:  Your Honor, I think you may be

01:46:10 19   looking at the original verdict form that we submitted and

01:46:14 20   not the one we submitted this week.

01:46:15 21               THE COURT:  Oh, that would be true.  Sorry about

01:46:17 22   that.

01:46:18 23               MR. MURRELL:  Yeah.

01:46:19 24               THE COURT:  All right.  So in any event, you

01:46:22 25   have a question about it now?

01:46:24 1        MR. MURRELL:  We do.  We'll say that the

01:46:26 2   evidence on this at trial will be interesting in that, as I

01:46:31 3   understand when you're trying to prove a family mark, you've

01:46:34 4   got to prove the secondary meaning, and it's going to be

01:46:37 5   measured at the time that we entered the marketplace.  And

01:46:40 6   so all of their ships that come after 2012 can't be evidence

01:46:45 7   of family of marks because it had to be in place when we

01:46:49 8   entered the market.  So I think a lot of the evidence and

01:46:52 9   some of the jury instructions they have confused that issue.

01:46:55 10        MR. WILLIAMS:  So I can comment we did see that

01:46:58 11  issue a little differently.  We think that the defendants

01:47:01 12  began to build their own family of American vessel marks.

01:47:06 13  And when they announced the transformation of the Empress of

01:47:09 14  the North to become the American Empress --

01:47:12 15        MR. MURRELL:  Right.

01:47:13 16        MR. WILLIAMS:  -- which happened in July or, no,

01:47:14 17  it happened, I think, in March of 2013.

01:47:17 18        MR. MURRELL:  2013.

01:47:18 19        THE COURT:  Well, so a family of marks infringed

01:47:22 20  by a single thing or by a family of --

01:47:25 21        MR. WILLIAMS:  Well, they then had two.

01:47:27 22        MR. MURRELL:  To the extent that you can

01:47:29 23  establish a legally recognized family, it can be either.

01:47:33 24        THE COURT:  Okay.

01:47:35 25        MR. WILLIAMS:  They then had two.  It would be

01:47:38 1     my comment there, and I just -- I think, honestly, we see

01:47:41 2     our family as being national in scope.  We were marketing

01:47:45 3     nationally for our entire fleet which then I'm going to say

01:47:48 4     maybe six vessels.  I'm not positive of that.

01:47:52 5              THE COURT:  And so what exactly is it if you get

01:47:58 6     their -- because you don't have any family of marks claim

01:48:04 7     against them, right, or do you?

01:48:06 8              MR. McGRAW:  No, Your Honor.  It's strictly

01:48:09 9     based on the registration for American Queen.

01:48:12 10             THE COURT:  So what exactly is it that you get,

01:48:16 11    Mr. Williams, if you get a finding that they infringe your

01:48:21 12    family of marks?

01:48:23 13             MR. WILLIAMS:  We may be entitled, for instance,

01:48:29 14    to an injunction against their creation of more vessels

01:48:32 15    within the first name, American.

01:48:35 16             THE COURT:  But you wouldn't get that if you win

01:48:36 17    on federal trademark infringement?

01:48:39 18             MR. WILLIAMS:  Our claim, our federal trademark

01:48:44 19    infringement claim is against their brand name, American

01:48:47 20    Queen Steamboat Company.

01:48:49 21             THE COURT:  Okay.  So --

01:48:52 22             MR. WILLIAMS:  So --

01:48:53 23             THE COURT:  So you have no federal trademark

01:48:55 24    claim against any of their boats?

01:48:58 25             MR. MURRELL:  Registered.

01:48:59   1          MR. WILLIAMS:  So our -- I won't say that's

01:49:04   2    necessarily true, Your Honor, because in other words, the

01:49:07   3    idea of when they entered the market, they've kept putting

01:49:10   4    boats on the water.  They put them -- since then, I think

01:49:12   5    two more, as have we.

01:49:15   6          So you could look at those separately.  Those

01:49:17   7    are all -- and I think all of those boats' names are

01:49:20   8    registered.  That gets perhaps unduly complicated.  We

01:49:24   9    thought that the family of marks idea would address the

01:49:27  10    problem, let's put it that way.

01:49:29  11          THE COURT:  But so the family of marks then,

01:49:35  12    that introduces this concept of secondary meaning?

01:49:38  13          MR. WILLIAMS:  It does.

01:49:39  14          THE COURT:  But without the family of marks,

01:49:40  15    there is no secondary meaning issues in this case?

01:49:44  16          MR. WILLIAMS:  I think with respect to the

01:49:47  17    federally-registered marks, that the validity of the mark

01:49:50  18    and the fact that it is a designation of source is

01:49:53  19    established by the federal registration.  Particularly here,

01:49:56  20    we have incontestable registrations that have been --

01:50:01  21          MR. MURRELL:  So I think that means, yes, we

01:50:02  22    don't have secondary meaning evidence on the American Cruise

01:50:06  23    Lines versus American Queen Steamboat Company claims.

01:50:09  24          MR. WILLIAMS:  Yes.  I think that's not true.

01:50:13  25    We do not agree that the American Queen vessel is

01:50:18  1  federally-registered properly.

01:50:21  2          THE COURT:  Yeah.  So I'm not too familiar with

01:50:27  3  a lot of this.  And I'm sorry, just to go back, this family

01:50:40  4  of marks business, this is based on common law?

01:50:46  5          MR. WILLIAMS:  Well, Mr. McGraw is correct.

01:50:51  6  Section 1125(a) is unfair competition as a result of,

01:50:56  7  including common law marks.  So it would be cognizable under

01:51:00  8  1125(a).

01:51:04  9          THE COURT:  Okay.  But it's a different kind of

01:51:10 10  beast than the rest of the claims in the case or the rest of

01:51:16 11  the claims that are scheduled for trial?

01:51:18 12          MR. WILLIAMS:  I think what the testimony will

01:51:20 13  be is that the existence of these fleets throughout the

01:51:24 14  industry and in our fleet are they strengthen the importance

01:51:30 15  of the key term in the brand name.  The names of the boats

01:51:35 16  that are in common do that.

01:51:38 17          And they establish secondary meaning for the

01:51:43 18  fleet as relevant under common law or under 1125(a), if it's

01:51:48 19  relevant there.

01:51:48 20          THE COURT:  But in terms of the you infringe my

01:51:52 21  trademark, is it relevant to that?

01:51:54 22          MR. WILLIAMS:  To the federal mark, yes.  I

01:51:57 23  would say it also strengthens part of the strength of our

01:52:00 24  federal mark, absolutely, which is relevant.

01:52:03 25          THE COURT:  Okay.

01:52:05  1            MR. WILLIAMS:  I mean, in fact, that is part of

01:52:08  2    why companies do it, so that, you know, that the vessels

01:52:12  3    that are of the seas are all of a class of ships of Carnival

01:52:17  4    and strength in that Carnival mark because they're

01:52:20  5    associated with it.  Or maybe a better example is the

01:52:24  6    Celebrity Cruise marks.

01:52:24  7            THE COURT:  Okay.

01:52:28  8            MR. WILLIAMS:  I mean, it's not uncommon in the

01:52:30  9    industry is all I can say, and it's what Mr. Robertson was

01:52:34 10    practicing with the plaintiff company, even since the old

01:52:37 11    company.

01:52:39 12            THE COURT:  All right.  So here's --

01:52:41 13            MR. WILLIAMS:  Now --

01:52:42 14            THE COURT:  So hold that thought.

01:52:44 15            MR. WILLIAMS:  Yeah.

01:52:44 16            THE COURT:  So I guess based on what you're

01:52:56 17    saying, let's assume that the family of marks stays in this

01:53:02 18    trial.  It still doesn't bring up any reason why the jury

01:53:10 19    has to hear anything at all about common law trademarks,

01:53:13 20    Delaware unfair trade practices, or unfair competition;

01:53:19 21    right?

01:53:21 22            MR. SIMMONS:  Right.

01:53:27 23            MR. WILLIAMS:  There would be evidence of the

01:53:30 24    market penetration of the family of marks that would be

01:53:34 25    different than what you would typically put forward in a

01:53:38  1    case that was simply only about the two -- the

01:53:42  2    federal-registered marks.

01:53:44  3                THE COURT:  Right, but so that's not really my

01:53:46  4    question.

01:53:47  5                MR. WILLIAMS:  I'm not sure --

01:53:48  6                THE COURT:  The question is:  Doing whatever it

01:53:55  7    is you want to do with the family of marks, you could do

01:54:00  8    that without the jury ever hearing about what is prohibited

01:54:07  9    by common law trademarks, and the Delaware Unfair Trade

01:54:15 10    Practices Act, or unfair competition?

01:54:19 11                MR. WILLIAMS:  I think another way of putting

01:54:22 12    that, Your Honor, would be when we put on our case with

01:54:25 13    respect to the infringement of their family of marks by

01:54:28 14    their growing family of marks, those elements, under those

01:54:34 15    statutes and under common law, would be presented as

01:54:38 16    evidence.

01:54:38 17                THE COURT:  Right.  Right.

01:54:40 18                MR. WILLIAMS:  In other words --

01:54:41 19                THE COURT:  But I'm not asking that.  What I'm

01:54:43 20    asking is:  Is there any reason why the jury, to decide what

01:54:48 21    they have to decide and give you all what you need to find

01:54:51 22    out, is there any reason why they have to be told about

01:54:56 23    common law trademarks, Delaware Unfair Trade Practices, or

01:55:01 24    unfair competition?

01:55:02 25                MR. WILLIAMS:  Such as in jury instructions.

01:55:04 1          THE COURT:  Yes.

01:55:05 2          MR. WILLIAMS:  Okay.  I think we are okay with

01:55:08 3   the jury instructions we put in which did not get into the

01:55:11 4   details of Delaware law or other aspects of common law other

01:55:16 5   than the existence of a family of marks.

01:55:19 6          THE COURT:  Okay.

01:55:19 7          MR. WILLIAMS:  And I think there are

01:55:20 8   instructions in the jury instructions as to what a family of

01:55:23 9   marks is.

01:55:23 10         THE COURT:  And there might be.

01:55:25 11         MR. WILLIAMS:  I believe there are.

01:55:28 12         MR. McGRAW:  There's other instructions in there

01:55:29 13  related to common law claims.

01:55:30 14         THE COURT:  Well, I think there were three.  And

01:55:32 15  so when I was just looking through them, because I did look

01:55:36 16  through them for various reasons, partly I was thinking,

01:55:44 17  boy, these stand out like a sore thumb because we've got

01:55:47 18  three of them about common law trademark.  And they don't

01:55:48 19  ever seem to come back to anything.

01:55:52 20         And it's only because I was also thinking about

01:55:55 21  what's this case actually going to be about at trial --

01:55:57 22         MR. MURRELL:  Right.

01:55:58 23         THE COURT:  -- that I was saying, well, you

01:56:00 24  know, one of the things that would at least present some

01:56:03 25  measure of simplification is if they're not being told about

01:56:08  1    the law, many different statutes that say the same thing.

01:56:12  2    So at least based on what I'm hearing, and maybe you all

01:56:20  3    would like to talk about it some more after today, but I

01:56:22  4    would like to basically work on the assumption that the

01:56:27  5    federal trademark, including at least for now the family of

01:56:32  6    marks, will resolve all of the common law unfair competition

01:56:40  7    and Delaware Uniform Trade Practices Act relating to those,

01:56:45  8    so that those will be resolved.

01:56:49  9        Do you understand what I'm saying?

01:56:50 10        MR. WILLIAMS:  I think I do, and I think I just

01:56:52 11    looked at the jury instructions that I could see very

01:56:56 12    quickly.  And the ones that I worked on, I think as long as

01:56:59 13    we have an instruction on the family of marks, I think the

01:57:03 14    rest of it is covered.

01:57:04 15        THE COURT:  Okay.  So let's just talk about the

01:57:07 16    family of marks for a second.  Putting the family of marks

01:57:14 17    in this case, you know, let's assume as a base, you have

01:57:18 18    your trademark claims against them.  They have their

01:57:21 19    trademark claims against you.  Plus, the defenses.

01:57:24 20        How much extra is the family of marks beyond

01:57:30 21    what would be involved in proving or disproving, whatever

01:57:37 22    the case may be, the trademark cases?

01:57:39 23        MR. WILLIAMS:  And I would submit very little.

01:57:41 24    In other words, our --

01:57:42 25        THE COURT:  Okay.  That's actually all I need to

01:57:46  1    hear from you.  Do you have a different point of view on

01:57:48  2    that, Mr. Murrell?

01:57:48  3                  MR. MURRELL:  I don't necessarily because I

01:57:50  4    think in proving up a strength of the mark, which is one of

01:57:53  5    the elements, I think would be a lot of the same proof.

01:57:56  6                  THE COURT:  Okay.  All right.

01:57:57  7                  MR. MURRELL:  Now, I'm not agreeing that there's

01:57:59  8    a family of marks, or there should be a claim.

01:58:01  9                  THE COURT:  No.  No, I understand that.  But in

01:58:02 10    terms of -- so part of what I was doing, and maybe I'm not

01:58:07 11    explaining myself very well was, you know, I was trying to

01:58:11 12    see whether what you all were arguing about that could come

01:58:17 13    out.  And so here's what I'm inclined to do with, you know,

01:58:28 14    having the jury selection the week before and within mind

01:58:37 15    having the closing arguments on the Monday following the

01:58:42 16    trial.

01:58:42 17                  I will give you, or it's not really mine to

01:58:47 18    give, but we can have trial for the entire week of

01:58:53 19    January 7th or whatever the Monday is that starts that week

01:59:00 20    with starting with openings on the morning of January 7th

01:59:06 21    and going through to the end of testimony on the Friday.  We

01:59:13 22    would get approximately six hours a day of actual time not

01:59:21 23    counting breaks, and lunch, and such.

01:59:24 24                  And so that would add up six times five, 30.  So

01:59:27 25    each side would have 15 hours to do your openings, do your

01:59:36 1    directs, do your crosses.  And we'll decide about closing

01:59:42 2    argument later, but that would be extra time on the Monday.

01:59:46 3              MR. MURRELL:  So that is not part of the

01:59:48 4    30 hours?

01:59:48 5              THE COURT:  Not part of the 30 hours.

01:59:50 6              MR. WILLIAMS:  Thank you, Your Honor, for that.

01:59:53 7              THE COURT:  Can you live with that, Mr. Williams?

01:59:55 8              MR. WILLIAMS:  Yeah.  I think one of the big

02:00:01 9    issues from our side, Your Honor, is we do not agree with,

02:00:05 10   from what I saw in their papers, concerning the time needed

02:00:09 11   for the equitable defenses.  So --

02:00:11 12             THE COURT:  Well, so here's what I'm thinking

02:00:13 13   about -- well, in any event, so, yeah.  I'm thinking -- so

02:00:21 14   they wrote a proffer.

02:00:24 15             MR. WILLIAMS:  On one little part of one issue.

02:00:27 16             THE COURT:  Well, it was an issue that related

02:00:29 17   to, I think, the motion in limine.  But tell me what you

02:00:34 18   think about equitable defenses, or you know, tell me what

02:00:40 19   you were about to tell me.

02:00:41 20             MR. WILLIAMS:  So they have three equitable

02:00:45 21   defenses that they've pled and that I've seen some evidence

02:00:48 22   of.  I don't exactly know really what they claim is unclean

02:00:53 23   hands.  I know the standard of proof in this jurisdiction is

02:00:55 24   high.  We haven't thought that it deserved or needed

02:00:59 25   necessarily a lot of jury instruction, but -- special

02:01:03  1    verdict, I mean, but that's one issue.

02:01:07  2          They also have equitable estoppel which is a

02:01:10  3    different issue which has to do with that.

02:01:14  4          THE COURT:  Well, I thought acquiescence laches

02:01:16  5    and equitable -- unclean hands.

02:01:18  6          MR. WILLIAMS:  Laches is the kind of -- they've

02:01:20  7    characterized it as equitable estoppel, but I think it

02:01:24  8    actually is laches.  But laches to their prejudice, to be

02:01:27  9    fair to them.

02:01:27 10          THE COURT:  Okay.

02:01:28 11          MR. WILLIAMS:  That's what they called it.  They

02:01:29 12    haven't flat out called it, I don't believe, laches, but the

02:01:32 13    case law in this jurisdiction makes clear it's very close to

02:01:35 14    there's an estoppel by acquiescence and an estoppel by

02:01:38 15    laches.  They're essentially, I think, arguing the estoppel

02:01:41 16    by laches and an estoppel by acquiescence.

02:01:44 17          THE COURT:  Okay.

02:01:45 18          MR. WILLIAMS:  So the estoppel by laches would

02:01:47 19    have to do -- and I'm prepared -- I even have documents to

02:01:50 20    show Your Honor why there was delay in the filing of the

02:01:53 21    suit that actually accused them of wrongfully naming the

02:01:58 22    vessel brand, American Queen Steamboat Company.

02:02:02 23          THE COURT:  Right.  Right.  I know what you're

02:02:03 24    talking about.

02:02:04 25          MR. WILLIAMS:  And that is, you know, something

02:02:07 1    that has to do over time and had to do with lawyers

02:02:09 2    involved, and had to do with confusion, experience by the

02:02:11 3    client, and had to do with a lot of things that we think

02:02:13 4    have nothing to do with the basic case of liability.

02:02:17 5            THE COURT:  But never -- go ahead.

02:02:20 6            MR. WILLIAMS:  Sorry.  And then there's the

02:02:21 7    third issue which has to do with the letters which Your

02:02:25 8    Honor has already ruled about.  And the --

02:02:28 9            THE COURT:  Which letters?

02:02:30 10           MR. WILLIAMS:  Sorry.  So there were two letters

02:02:32 11   from a counsel then for American Queen for -- sorry, for --

02:02:38 12   there was exchange of correspondence.

02:02:40 13           THE COURT:  Oh, you're talking about the two

02:02:41 14   letters in connection with settlement?

02:02:43 15           MR. WILLIAMS:  Correct.

02:02:43 16           THE COURT:  Okay.  Sorry.  Two letters.  You

02:02:46 17   know, I get two letters in most cases every day from lots of

02:02:49 18   different people.

02:02:50 19           MR. WILLIAMS:  And Your Honor, we spend so much

02:02:52 20   time in this case.  You talk about letters, we think about

02:02:55 21   them a lot.

02:02:56 22           So there's the issues about those and how you

02:03:00 23   rule there.  And then -- but then there's the question about

02:03:03 24   what was said or not said at a meeting in December, and then

02:03:06 25   maybe at a later phone call --

02:03:08  1          THE COURT:  Right.

02:03:09  2          MR. WILLIAMS:  -- that they come up with now.

02:03:11  3          THE COURT:  Well, so here's what I think would

02:03:13  4   be good about that, which is why don't you put in writing

02:03:20  5   when -- they've made a very nice proffer, easy to follow,

02:03:24  6   coherent.  Why don't you submit your own proffer as to what

02:03:38  7   you -- so before we actually go further, so you're telling

02:03:44  8   me, yeah, there's all these reasons why we don't agree with

02:03:48  9   their equitable defenses?

02:03:50 10          MR. WILLIAMS:  Yes.

02:03:50 11          THE COURT:  So I get that.  And his point right

02:03:57 12   now is what?

02:03:58 13          MR. WILLIAMS:  So I think my point would be that

02:04:00 14   the equitable defenses ought to be heard or decided by Your

02:04:04 15   Honor.

02:04:04 16          THE COURT:  Okay.

02:04:05 17          MR. WILLIAMS:  And my point is, my further point

02:04:08 18   is there are a number of issues that are involved in those

02:04:12 19   equitable defenses.  The acquiescence thing, for instance,

02:04:15 20   the scope of the acquiescence, the reasonableness of their

02:04:18 21   reliance, the way they relied, various things like that that

02:04:21 22   had to do with evidence which is not relevant to the basic

02:04:25 23   infringement case.

02:04:27 24          THE COURT:  Okay.

02:04:28 25          MR. WILLIAMS:  And so if we bifurcate that, yes,

02:04:31  1    that would cut time, and then I think we would feel much

02:04:34  2    better about the time required.  You know, now we still have

02:04:39  3    a lot of history to bring forward, and we have, you know,

02:04:42  4    experts.

02:04:43  5              THE COURT:  So a lot of history, you know.

02:04:46  6              MR. WILLIAMS:  Which goes to the strength of the

02:04:48  7    mark.

02:04:48  8              THE COURT:  Yeah.  Well, not all the history

02:04:50  9    from the beginning of time actually, in my opinion, does,

02:04:53 10    but we'll get there.  But as long as you're bringing up the

02:04:58 11    equitable defenses, I stumbled across this beauty.  This is

02:05:06 12    from the Seventh Circuit Federal Jury Instructions,

02:05:11 13    instruction number 13.5.3.  And it's entitled Affirmative

02:05:20 14    Defenses, Laches/Acquiescence.

02:05:22 15              And the comment is, "The Lanham Act recognizes

02:05:25 16    laches, acquiescence, and other equitable defenses to

02:05:29 17    trademark infringement actions."  Citation:  "No

02:05:33 18    instructions are provided on the defenses of laches or

02:05:36 19    acquiescence because they are issues for the Court, not the

02:05:38 20    jury."

02:05:40 21              And I took it from the various briefing back and

02:05:44 22    forth that, in fact, at the end, everybody was agreed that

02:05:51 23    they are "issues for the Court."  They are equitable

02:05:56 24    defenses, and therefore, issues for the Court.

02:05:58 25              What I took that the parties were disagreed on

02:06:01  1    was what impact this would have on presentation of evidence

02:06:06  2    to the jury, and depending on what evidence was presented to

02:06:12  3    the jury, whether or not the jury should be rendering

02:06:19  4    findings, verdicts, or something else in relation to these

02:06:22  5    issues.

02:06:23  6            And so what I'm thinking -- so first off,

02:06:30  7    Mr. Murrell, am I correctly posing where we are?

02:06:34  8            MR. MURRELL:  Well, we cited you cases where

02:06:37  9    Courts have submitted these, or there are factual disputes

02:06:43 10    that decide whether there was acquiescence or estoppel, have

02:06:44 11    provided to jury -- have provided jury instructions.

02:06:47 12            THE COURT:  But I thought your final letter

02:06:48 13    said, We recognize you don't have to do that.

02:06:50 14            MR. MURRELL:  You don't have to do it, except

02:06:52 15    the parties agree one other time, and it was in their moving

02:06:55 16    paper.  It was at Page 3.  It was in ours as well, which is

02:06:59 17    when there are common issues of fact --

02:07:00 18            THE COURT:  But that's kind of, I think, a

02:07:02 19    different thing.  That has to really do with what is

02:07:06 20    submitted to the jury.  And I took it -- and that's the

02:07:09 21    reason why I was characterizing there is because I

02:07:12 22    understand, for example, you want to present the testimony

02:07:17 23    that's in your proffer as to Mr. Robertson said, Yeah, go

02:07:21 24    ahead.  They indicate that, for example, any infringement is

02:07:26 25    not willful.

02:07:27  1          MR. MURRELL:  And as to the actual defining of

02:07:29  2   infringement when the Lapp factors is our intent.

02:07:33  3          THE COURT:  Okay.  All right.  But there's

02:07:35  4   multiple reasons.

02:07:36  5          MR. MURRELL:  The same proof would come in.

02:07:38  6          THE COURT:  So some of the same proof will come

02:07:41  7   in.  And of course, that's what we say in patent cases when

02:07:46  8   there's inequitable conduct is the evidence that only

02:07:51  9   relates to inequitable conduct, that doesn't get presented

02:07:55 10   to the jury.  But if there's something that's related to

02:07:57 11   that that is relevant to some jury issue, yeah, it gets

02:08:01 12   presented, and the jury does whatever it does.

02:08:03 13          And so that's kind of the way I'm looking at

02:08:05 14   this which is, you know, for example, you know, if one of

02:08:12 15   your people is going to say, Mr. Robertson said, I have no

02:08:16 16   interest in this mark, you go ahead and do what you want

02:08:18 17   with it.

02:08:19 18          Yeah.  I'm going to let you put that into

02:08:21 19   evidence, but that doesn't mean that I then have to say;

02:08:27 20   Okay.  Let's argue about whether or not there was

02:08:28 21   unreasonable delay in filing the Complaint, which is a bad

02:08:32 22   issue to be putting in front of the jury anyhow because then

02:08:37 23   we're starting to talk about what the lawyers, who are now

02:08:40 24   standing in front of them, were doing.  You know, which

02:08:43 25   is --

02:08:44  1        MR. MURRELL:  May not have been the same

02:08:45  2   lawyers, but --

02:08:46  3        THE COURT:  Well --

02:08:47  4        MR. MURRELL: -- I understand, Your Honor.

02:08:49  5        THE COURT:  So that's kind of what I'm thinking

02:08:52  6   of doing is just saying if we have evidence that relates to

02:08:57  7   a legal issue, yeah, you're going to -- nobody is going to

02:09:03  8   be prohibited from presenting it because it also relates to

02:09:06  9   an equitable issue.  And we'll figure out a way to resolve

02:09:11 10   the equitable issues, but without taking up the jury's time

02:09:17 11   on them.

02:09:18 12        And I have an open mind on this.  If there's

02:09:27 13   some fact that you want a special interrogatory about, you

02:09:31 14   know, do you find that American Cruise Lines or

02:09:46 15   Mr. Robertson gave permission, you'd have to word it to fit

02:09:52 16   whatever.  But if there's some actual fact there --

02:09:54 17        MR. MURRELL:  If we could have that special

02:09:56 18   interrogatory, and then you decide how that fits into the

02:09:58 19   equitable defense, I think we're fine with that, Your Honor.

02:10:01 20        THE COURT:  Well, I -- so I -- that's what I'm

02:10:07 21   thinking about, but I don't want to commit to that because,

02:10:10 22   for one thing, I haven't heard Mr. Williams on that, and I

02:10:13 23   don't really want to hear him on that today just because we

02:10:16 24   don't have all that much time.  But that's what I'm

02:10:18 25   thinking.

02:10:19 1        MR. MURRELL:  Okay.

02:10:20 2        THE COURT:  I don't mind asking for them to find

02:10:24 3    facts that they can find based on hearing all of the

02:10:27 4    relevant evidence on that particular fact, but I -- not just

02:10:35 5    because we're going to be trying to do a lot in a relatively

02:10:42 6    short amount of time, in any event, but because I also think

02:10:48 7    there's a reason why you don't want to present equity to a

02:10:57 8    jury.

02:10:57 9        MR. MURRELL:  Okay.

02:10:58 10       THE COURT:  And so to the extent there are just

02:11:01 11   pure factual issues or something, then I'll let you all try

02:11:04 12   to work that out sometime before too long.

02:11:08 13       All right.  So that's what I think I'm going to

02:11:11 14   do on the equitable defenses.

02:11:17 15       Mr. McGraw, you said that you had submitted new

02:11:20 16   jury instructions, and I'm sorry, I missed those.  When did

02:11:24 17   you submit those?

02:11:26 18       MR. McGRAW:  We submitted new joint jury

02:11:28 19   instructions earlier this week on Monday, but --

02:11:32 20       THE COURT:  Wait a second.

02:11:33 21       MR. WILLIAMS:  The jury instructions.

02:11:34 22       THE COURT:  Oh, no.  I've got the jury

02:11:36 23   instructions from this week.  What I don't have is the

02:11:38 24   verdict form.  But you submitted a verdict form, revised

02:11:41 25   verdict form, too?

02:11:44  1                  MR. McGRAW:  Yes, Your Honor.  It's docket item

02:11:46  2     number 288.

02:11:46  3                  THE COURT:  Yeah.  I'm sure it is.

02:11:48  4                  MR. MURRELL:  There's been a lot of docket

02:11:50  5     numbers.

02:11:51  6                  THE COURT:  Hold on just one minute.  All right.

02:12:09  7     Well, in any event, I was looking at the verdict form mostly

02:12:12  8     to try to figure out what the case was about, and we're not

02:12:15  9     going to resolve that today.

02:12:16 10                  In terms of the joint jury instructions, how

02:12:25 11     much effort did you put into trying to actually come up with

02:12:29 12     joint jury instructions?  Because, honestly, it looks like

02:12:33 13     none.

02:12:36 14                  MR. SIMMONS:  You'd be surprised, Your Honor.

02:12:39 15                  MR. WILLIAMS:  Everything about this case is

02:12:40 16     taking a lot of effort, Your Honor.

02:12:42 17                  MR. SIMMONS:  There was a tremendous effort, but

02:12:44 18     I think there's still some additional refining that can be

02:12:47 19     done.

02:12:47 20                  THE COURT:  So let me just ask one thing which

02:12:49 21     is:  One of the things that caught my attention, other than

02:12:54 22     from the final jury instructions, instructions number seven

02:13:10 23     through 45, there were exactly two joint proposals.  I've

02:13:19 24     never seen anything like that before in my life.

02:13:25 25                  And so I was trying to figure out why that was.

02:13:27 1    And not to be picking on one side or the other and given,

02:13:37 2    you know, when I saw this is instruction number 21, this is

02:13:42 3    plaintiff's proposed jury instruction.  They've got a

02:13:46 4    paragraph.

02:13:47 5            And then the defense's objection is, "Defendants

02:13:49 6    object to this instruction to the extent that plaintiff

02:13:51 7    offers an incomplete and or inaccurate statement of the

02:13:55 8    law."

02:13:59 9            You know, that's not a helpful objection.  But,

02:14:08 10   in any event, I'm not here -- because we are a long time in

02:14:12 11   front of trial, and most of the time I don't get final jury

02:14:15 12   instructions until we've actually started the trial.  So I'm

02:14:18 13   not here to criticize.

02:14:19 14           But one of the things that I was wondering about

02:14:21 15   was it seemed like the parties were trying to create these

02:14:24 16   things from scratch and from case law.  And my impression

02:14:28 17   is, though you raise some issues, and which there may not be

02:14:33 18   standard instructions out there, but that a lot of these

02:14:35 19   things, there are standard instructions.  And I was kind of

02:14:38 20   curious why you don't start with the standard instructions,

02:14:40 21   which usually is satisfactory to one side or the other.

02:14:44 22   Then the other person, you know, says what special

02:14:47 23   modification they need or something.

02:14:53 24           But, you know, in this number 21, likelihood of

02:15:05 25   confusion on intent, both of you -- or no, actually you cite

02:15:09  1    two different cases, three different cases.  And you're just

02:15:16  2    ships passing in the night.  There's no chance that I have

02:15:20  3    enough time to resolve, you know, 38 disputed jury

02:15:29  4    instructions where neither one of you is giving me what I'm

02:15:33  5    likely to go back to what I find in a book called Standard

02:15:37  6    Jury Instructions.

02:15:37  7            MR. MURRELL:  The problem, Your Honor, having

02:15:39  8    gone through this before, the Seventh Circuit is the only

02:15:42  9    one that's gone out there to try to do pattern.  It's very

02:15:46 10    thin.  When they got that group together to come up with the

02:15:48 11    patterned jury instructions, it's apparent that they didn't

02:15:52 12    send anybody who had dealt much time with the practice in

02:15:56 13    trademark law.

02:15:57 14            There's just not a lot of patterned jury

02:15:58 15    instructions, especially when you get into the world of

02:16:01 16    family marks.  There's just not.  And when you get into some

02:16:03 17    of these other issues, they're just not.

02:16:06 18            THE COURT:  Well, what about Devitt and

02:16:09 19    Blackmar?

02:16:09 20            MR. SIMMONS:  There are some, Your Honor, but

02:16:12 21    for instance, in the Third Circuit, we're confined within

02:16:15 22    the Checkpoint and Lapp Factors.  Lapp Factors.  And then as

02:16:20 23    expended by Checkpoint which defines them, and that's a huge

02:16:24 24    section of these jury instructions that are dealing with the

02:16:29 25    Third Circuit's requirements and Lapp check.

02:16:30  1        Now, we may not agree on interpretations of

02:16:34  2   those, and that's what you're kind of seeing.

02:16:36  3        MR. MURRELL:  There's no Third Circuit pattern.

02:16:37  4   There's not something for us.

02:16:39  5        THE COURT:  No.  I understand there's no Third

02:16:41  6   Circuit patterns because that's the first thing I looked

02:16:42  7   for.

02:16:44  8        MR. MURRELL:  Us, too.

02:16:45  9        THE COURT:  You know, I didn't go far on my

02:16:49 10   collection of these lovely volumes from various circuits.  I

02:16:53 11   saw that you cited the Seventh Circuit.  I think the

02:16:57 12   Eleventh Circuit had a very thick volume, so I looked there.

02:17:00 13   And they have something, though.

02:17:04 14        But I looked at one or two others, and they

02:17:07 15   didn't have anything.  But I didn't take a full survey and

02:17:09 16   just --

02:17:12 17        MR. MURRELL:  If someone wants to write a book,

02:17:14 18   there's, obviously, a need.

02:17:17 19        THE COURT:  I'm sure it will be a best seller.

02:17:19 20        MR. MURRELL:  That's probably the problem.

02:17:28 21        THE COURT:  All right.  I guess the other

02:17:29 22   thing --

02:17:29 23        MR. MURRELL:  We can take another shot.  To let

02:17:31 24   the Court know after our last hearing, we did spend a full

02:17:35 25   day together working through our exhibits issues.

02:17:38  1          MR. WILLIAMS:  That's right.

02:17:39  2          MR. MURRELL:  We made a lot of progress and

02:17:41  3   mostly resolved, pending your rulings on motions in limine.

02:17:44  4   We're planning on doing that on the deposition designations

02:17:47  5   in the next week.  And we found it a lot more helpful for us

02:17:50  6   all to sit in the same room and do it.

02:17:52  7          THE COURT:  Yes.

02:17:53  8          MR. MURRELL:  And maybe we can do it on the jury

02:17:55  9   instructions.

02:17:55 10          MR. WILLIAMS:  That would be a good idea.

02:17:57 11          MR. MURRELL:  Maybe we can bring them to

02:17:59 12   Louisville next time, but that's helpful.  We'll continue to

02:18:03 13   work towards it.

02:18:05 14          THE COURT:  Okay.  So I would like to spend no

02:18:21 15   more time on the set that I already have.  To the extent

02:18:30 16   that there are -- and I very much understand what you're

02:18:32 17   saying about -- I accept that the Seventh Circuit jury

02:18:40 18   instructions were written by a panel that did not have any

02:18:43 19   trademark experts on it, which I think was what you said.  I

02:18:47 20   expect that's very likely true.

02:18:51 21          But I would like to have another date sometime,

02:18:57 22   and it can be, you know -- certainly, as far as I'm

02:19:04 23   concerned, it could actually be -- well, I think it needs to

02:19:08 24   be before Christmas, but another date after which you've

02:19:13 25   spent at least a day, or you've spent some time in the same

02:19:20  1    room trying to resolve these.  I'm not going to try to tell

02:19:23  2    you how much time you have to spend, but I just cannot

02:19:27  3    believe that this is the best you can do.

02:19:33  4           I guess the other thing is it was my impression,

02:19:36  5    but it was hard for me -- I wasn't entirely sure that even

02:19:55  6    if I went through and resolved all of your disputes about

02:19:58  7    various instructions that I would have anything resembling a

02:20:02  8    coherent story to tell the jury.

02:20:04  9           MR. WILLIAMS:  Is there a format you would like

02:20:06 10    us to put these in?  It occurs to me that you may have

02:20:09 11    experience with what works for you.

02:20:12 12           THE COURT:  Well, I mean, my favorite format,

02:20:15 13    which I'm pretty sure Mr. Kraftschik has seen a few times,

02:20:18 14    is plaintiff says first claim is that American Queen

02:20:30 15    Steamboat Company violates the trademark of plaintiff for

02:20:39 16    "X."  In order to prove the claim, plaintiff must prove one,

02:20:43 17    two, three.

02:20:47 18           You know, probably, one, they have a registered

02:20:50 19    trademark that was stipulated to.  Two, they own the

02:20:55 20    trademark that was stipulated to.  Three, okay, likelihood

02:20:59 21    of confusion.

02:21:00 22           So here's, jury, how you're going to figure out

02:21:03 23    likelihood of confusion.  You have to consider these eight

02:21:06 24    things, ten things, seven things, however many things.  And,

02:21:10 25    you know, here they are.

02:21:13  1          Here's, if we need to, what they mean.  Here's

02:21:17  2   the very helpful, use this to figure out whether they are

02:21:21  3   likelihood of confusion.  There's no set number you have to

02:21:23  4   check off, but basically just lay them out in --

02:21:27  5          MR. WILLIAMS:  Yeah.

02:21:28  6          THE COURT:  -- logical order.  And presumably

02:21:30  7   once you get through with -- and, you know, part of the

02:21:37  8   creativity is, and it makes it easier or maybe not so easy

02:21:42  9   here is that on like the infringement, I mean, you basically

02:21:48 10   have competing things.  So whatever the instruction is that

02:21:51 11   I give for the one, I'm going to give for the other, I

02:21:54 12   think.  But that's it.

02:22:00 13          It's to give them a roadmap through what they

02:22:02 14   need to decide.  And you know, it's possible there's more of

02:22:07 15   a roadmap here than seemed to me based on --

02:22:15 16          MR. WILLIAMS:  These may be more weigh stations

02:22:18 17   than the overall roadmap.

02:22:20 18          THE COURT:  And so, you know, formally not so

02:22:23 19   much in patent cases, but in other cases, I mean, usually at

02:22:27 20   the end, you know, I do -- I'm hoping Mr. Kraftschik won't

02:22:36 21   contradict me -- but I do try to round off the rough edges

02:22:45 22   because, in my general experience, jury instructions are

02:22:49 23   usually the last thing that gets a lot of time and attention

02:22:54 24   from the lawyers.  So even when the law is all correct,

02:22:57 25   there's duplication and silliness that makes its way in.

02:23:06  1          But, you know, it's the proverbial story that I

02:23:11  2  can only advance the ball so far from what I get, even on my

02:23:16  3  best day.  So the closer I get to something that doesn't

02:23:21  4  require much, the better I can make it for the jury.

02:23:27  5          But in any event, how about if we say that

02:23:40  6  you'll get a revised version of final jury instructions in

02:23:44  7  on December 21st or before then.  Any time before

02:23:49  8  December 21st.

02:23:50  9          MR. MURRELL:  All right.

02:23:51 10          MR. WILLIAMS:  Could I ask a question?

02:23:52 11          THE COURT:  Sure.

02:23:53 12          MR. WILLIAMS:  Does the Court envision in this

02:23:54 13  case that the rulings -- I think we're agreed that the

02:23:58 14  rulings on the motions in limine, the decisions, maybe we've

02:24:01 15  heard some, got a sense of your mind on the equitable legal

02:24:04 16  issue today, that may impact kind of where we go.

02:24:08 17          Does the Court envision another session with us?

02:24:11 18          THE COURT:  No, not unless when we're through

02:24:13 19  here today, you tell me that's how you'd like to spend your

02:24:16 20  time.  I forget whether Mr. Kraftschik is in on this.  I

02:24:22 21  forget.

02:24:23 22          Were you supposed to be in trial with me next

02:24:26 23  week?

02:24:26 24          MR. BLUMENFELD:  We were supposed to be in trial

02:24:29 25  with you next week.

02:24:30 1          THE COURT:  So I have some free time opening up

02:24:33 2   here and there, and so if you need me, I will be here.  And

02:24:40 3   believe me I would rather get these things done in advance

02:24:43 4   of trial then on the fly.  But in any event, you can bring

02:24:50 5   that up later.

02:24:51 6          So I have some other miscellaneous things.  We

02:24:57 7   will get to the motions in limine today.  But by the way,

02:25:00 8   actually my plan is that I have some other people that I

02:25:07 9   have to meet at three o'clock.  I have a guilty plea at

02:25:12 10  3:30.  If that all goes smoothly, I will be available again

02:25:17 11  about a little after 4:00.

02:25:19 12         So assuming that we're making progress on doing

02:25:23 13  things, we'll take a break.  Maybe you can talk to each

02:25:25 14  other, and we'll keep going until we run out of things to do

02:25:30 15  here.  Okay.

02:25:32 16         All right.  So in the Pretrial Order that was

02:25:42 17  submitted, the Revised Pretrial Order which I did get that,

02:25:47 18  Mr. McGraw, so there were only really two things that I

02:25:52 19  noticed in it that I wanted to bring to your attention.  One

02:25:56 20  is on Page 31 where it says, "The party calling the witness

02:26:02 21  shall provide the Court with two copies of the transcript of

02:26:05 22  the designations."  I'd actually like you to provide what I

02:26:11 23  would call the Court with three copies.  One for me, one for

02:26:14 24  my law clerk, one for the court reporter.

02:26:17 25         Okay.  And then the other thing was on page --

02:26:29 1    oh, so actually I've just taken care of this.  Page 47, the

02:26:33 2    to be discussed at the pretrial conference time for trial

02:26:37 3    presentation is basically going to be 15 hours per side not

02:26:49 4    counting closing arguments.

02:26:51 5          MR. MURRELL:  Your Honor, there was one other

02:26:52 6    thing in that kind of thing that we discussed at our meeting

02:26:55 7    last week among counsel --

02:26:57 8          THE COURT:  Yes.

02:26:58 9          MR. MURRELL: -- which was also to help move

02:26:59 10    things along, subject to the Court's approval, the parties

02:27:03 11    agreeing that scope of cross will not be limited to the

02:27:06 12    scope of direct.

02:27:07 13          THE COURT:  In other words, you don't want to

02:27:09 14    have people coming on and then --

02:27:10 15          MR. MURRELL:  Having to recall.

02:27:11 16          THE COURT:  -- coming back in?  Yeah, that's the

02:27:13 17    way I usually prefer it, so that's good.  You may have to

02:27:19 18    remind me at the time, but that's fine.  So that was the

02:27:25 19    only thing that I noticed in the Revised Pretrial Order,

02:27:31 20    those two things.

02:27:32 21          Now, we have what Mr. Murrell's just added.  Is

02:27:34 22    there anything else about the Pretrial Order that you want

02:27:36 23    to talk about?

02:27:37 24          MR. SIMMONS:  Your Honor, inadvertently in our

02:27:39 25    last session, Your Honor was going to look through the

02:27:43 1    Memorandum Opinion of the Proposed Stipulations of Law.  And

02:27:45 2    in an inadvertent manner, the whole section of that was

02:27:48 3    removed from the pretrial I submitted.

02:27:51 4            I do have these provisions here.  They were in

02:27:53 5    the prior, and I know Your Honor was considering looking at

02:27:57 6    them.  We did print them again.

02:27:58 7            THE COURT:  So I didn't.  Sorry about that.  But

02:28:07 8    in any event, you're giving them to me to remind me that

02:28:10 9    you'd like me to do this now; right?

02:28:13 10            MR. SIMMONS:  Or at some point, Your Honor.

02:28:14 11            THE COURT:  Yeah, Stipulations of Law.

02:28:17 12            MR. SIMMONS:  And those are as limited.  Last

02:28:19 13    time we had identified that there were too many.

02:28:22 14            MR. MURRELL:  As we mentioned last time, we

02:28:23 15    didn't tender any because they were not provided for any

02:28:27 16    Proposed Pretrial Order.

02:28:27 17            THE COURT:  Okay.  So I guess actually,

02:28:46 18    Mr. Murrell, I take it you have looked at what says

02:28:55 19    Plaintiff's Proposed Stipulations of Law, which I think is

02:28:56 20    essentially an attempt to memorialize rulings that I have

02:29:01 21    purportedly made earlier for ease of reference.  Perhaps I'm

02:29:05 22    wrong about that.

02:29:07 23            But have you looked at these to see whether

02:29:12 24    plaintiffs are just making it up as they go along, or are

02:29:16 25    these more or less things that I have said?

02:29:18  1          MR. MURRELL:  To be fair, the prior Proposed

02:29:20  2     Stipulations, we started going through them.  We considered

02:29:22  3     some of them to be mischaracterizations of the prior ruling

02:29:25  4     or incomplete.

02:29:26  5          To be fair, in getting ready for today, since

02:29:28  6     the Court indicated last time that you don't normally accept

02:29:31  7     these, I had not gone back through this revised set.

02:29:34  8          THE COURT:  Okay.  So why don't we do this:  Can

02:29:36  9     I ask, and there's no urgency in this at all, I think, but

02:29:40 10     can I ask that you go through -- so I don't normally do

02:29:48 11     anything like this, but I don't think it's a bad idea here

02:29:53 12     to have things written down, both because my memory of

02:30:02 13     rulings that I made a year-and-a-half ago is not likely to

02:30:04 14     be at the top of my head, and also, I think it's actually

02:30:07 15     helpful for you all to have all the rulings collected or all

02:30:12 16     the rulings that are likely to be that you want the other

02:30:16 17     side to remember collected in one place.

02:30:17 18          So I'm just wondering if I could ask you to go

02:30:20 19     through this, I don't know, within two weeks, write me a

02:30:25 20     letter saying which ones of these you think are fair

02:30:28 21     characterizations, whether there's any you want to add.  And

02:30:33 22     the ones that are not fair characterizations, you know,

02:30:37 23     because it's really just they cite your opinion, Judge, and

02:30:40 24     we read it differently, you know, you don't have to make an

02:30:45 25     argument.

02:30:46  1          I can go back and read my own opinion, but it

02:30:48  2    would be helpful to know which ones I can skip over when I'm

02:30:51  3    looking at the opinion.  Okay?

02:30:52  4          MR. MURRELL:  We will do that.

02:30:53  5          THE COURT:  Plus, as I said, if there's things

02:30:55  6    that you think should be added, because right now I think

02:30:57  7    this is pretty much just directed to what defendant cannot

02:31:00  8    do.

02:31:02  9          MR. MURRELL:  We will, Your Honor.

02:31:03 10          THE COURT:  Okay.

02:31:09 11          MR. MURRELL:  By "we," I mean Mr. McGraw.

02:31:22 12          THE COURT:  Okay.  So I have one little thing

02:31:28 13    and then I have the motions in limine, at least in terms of

02:31:32 14    actually things that I have here.  So I had gone through the

02:31:40 15    voir dire, and I posted sometime earlier today in the voir

02:31:44 16    dire that I intended to ask.

02:31:45 17          And there was one thing where there's a question

02:31:51 18    in the voir dire, number 19, that basically lists, as far as

02:31:54 19    I can see, every cruise company in the world saying they may

02:31:58 20    be mentioned in testimony.  Do you have any personal

02:32:01 21    familiarity with any of these?  And I don't really want to

02:32:05 22    have everyone coming up and telling me about their cruise

02:32:07 23    experience.

02:32:10 24          On the other hand, maybe the Paul Gauguin

02:32:14 25    cruises, that sounds pretty good.  But what is the point of

02:32:17 1    this question, and what is it you're trying to get at here,

02:32:22 2    whoever's question this is?

02:32:24 3            MR. WILLIAMS:  So it struck me that -- and I put

02:32:38 4    the question in after receipt of their earlier original

02:32:41 5    version which I thought had more open-ended questions.  I

02:32:44 6    heard your comments.  You didn't want too many questions

02:32:47 7    that too many people would say yes to, and then tell a long

02:32:51 8    story.  And I understand that.

02:32:52 9            It did seem to me that people who were familiar

02:32:56 10   with these cruise lines might have more knowledge than the

02:33:02 11   average person.

02:33:03 12           THE COURT:  Well, but having more knowledge than

02:33:05 13   the average person, I mean, it's certainly not a

02:33:12 14   disqualifier.

02:33:12 15           MR. WILLIAMS:  No.

02:33:13 16           THE COURT:  And of course, we do have questions

02:33:15 17   that are designed to find out whether anybody has any

02:33:20 18   personal experience with either American Cruise Lines or, on

02:33:24 19   the other hand, the American Queen Steamboat Company, Great

02:33:27 20   American Steamboat Company, Delta Queen Steamboat Company.

02:33:31 21           MR. WILLIAMS:  Right.

02:33:32 22           THE COURT:  But I was just wondering why -- I

02:33:35 23   mean, so really then this is what it looked like is just an

02:33:38 24   attempt to list every cruise line in the world except for

02:33:42 25   Norwegian Cruise Line for some reason.

02:33:44  1                MR. WILLIAMS:  Well, we do have Carnival,

02:33:48  2      obviously, is where our key expert, president of, as the

02:33:53  3      Court knows.

02:33:54  4                THE COURT:  No, the Court doesn't know that.

02:33:56  5                MR. WILLIAMS:  Well, it was in -- all right.

02:33:58  6                THE COURT:  I mean --

02:33:59  7                MR. WILLIAMS:  It was in your ruling on the --

02:34:02  8      any way.

02:34:03  9                THE COURT:  Yeah.  I said he was qualified;

02:34:05 10      right?

02:34:06 11                MR. WILLIAMS:  Yeah, you did.

02:34:07 12                THE COURT:  That's what I remember.

02:34:08 13                MR. WILLIAMS:  And it also has AMA Capital

02:34:12 14      Partners which is not a cruise line at all.  Hornblower

02:34:17 15      Marine Services which I think runs a number -- which is

02:34:20 16      affiliated with the defendants, or maybe it's the parent or

02:34:23 17      was the parent corporation of defendants, and operates a

02:34:27 18      number of enterprises around the country, I believe.  I

02:34:32 19      don't know exactly what, but ferry boats in various

02:34:35 20      different places.  And it looks like somebody who may have

02:34:38 21      extensive knowledge of that company, may know more about the

02:34:41 22      defendant than we'd like to know about.

02:34:47 23                There are some others here that are not -- that

02:34:50 24      are more in that nature.  Pitco is a company that was

02:34:54 25      involved in the case.

02:35:02  1          MR. KRAFTSCHIK:  Are we looking at the same

02:35:03  2  thing?  I just want to make sure we're on the same version.

02:35:06  3  I think this is what was submitted by Your Honor, DI-295.

02:35:10  4          THE COURT:  Yeah.  Right.

02:35:11  5          MR. KRAFTSCHIK:  This is the version that was

02:35:12  6  uploaded to the docket.

02:35:13  7          MR. WILLIAMS:  I'm sorry.

02:35:14  8          THE COURT:  I don't think it's any --

02:35:16  9          MR. MURRELL:  Same list.

02:35:17  10         THE COURT:  Yeah.  I don't think it's any

02:35:18  11 different --

02:35:18  12         MR. WILLIAMS:  In other words, this --

02:35:19  13         THE COURT:  -- except.

02:35:21  14         MR. KRAFTSCHIK:  It's the same.

02:35:22  15         MR. WILLIAMS:  Sorry.  I hadn't seen this, but

02:35:30  16 let me see.  I think the ones I've mentioned are still,

02:35:33  17 nevertheless, in here.

02:35:37  18         THE COURT:  So in order of things that you think

02:35:44  19 might actually be pertinent here, just tell me again

02:35:49  20 because --

02:35:50  21         MR. WILLIAMS:  Well, the ones that have sort of

02:35:53  22 more than just being another part of the industry --

02:35:56  23         THE COURT:  Right.

02:35:57  24         MR. WILLIAMS:  -- are the ones, AMA Capital

02:35:59  25 Partners.

02:35:59  1                    THE COURT:  Which is what, a venture capital

02:36:01  2     firm?

02:36:01  3                    MR. WILLIAMS:  It was some New York capital firm

02:36:05  4     that was engaged by the Maritime Administration, I believe.

02:36:10  5     And you see there the U.S. Maritime Administration known as

02:36:14  6     MARAD is on the list.

02:36:20  7                    THE COURT:  So all right.  So you say MARAD, and

02:36:26  8     what else did you say?  Okay.  AMA Capital Partners.

02:36:30  9                    MR. WILLIAMS:  The first one.

02:36:31 10                    THE COURT:  Yes, I'm --

02:36:32 11                    MR. WILLIAMS:  Ambassadors International is a

02:36:35 12     prior owner of the vessel, American Queen.

02:36:37 13                    THE COURT:  Right.  Weren't they selling it

02:36:40 14     because they were going out of business?

02:36:42 15                    MR. WILLIAMS:  Actually they continued on in

02:36:44 16     business for a while, and then they later went bankrupt.

02:36:50 17                    THE COURT:  All right.  What else?

02:36:53 18                    MR. WILLIAMS:  We have CLIA Cruise Lines

02:36:56 19     International Association.  I mentioned Carnival is where

02:37:02 20     our expert witness works.

02:37:04 21                    MR. SIMMONS:  And Your Honor, if I could amplify

02:37:07 22     on that from a litigator's perspective --

02:37:08 23                    THE COURT:  From a what?

02:37:09 24                    MR. SIMMONS:  From a litigator's perspective.

02:37:11 25                    THE COURT:  Yes.

02:37:12  1         MR. SIMMONS:  I know that Carnival may generate

02:37:13  2   a number of responses, but the reality is that if someone

02:37:16  3   has gone on a Carnival cruise, and they've either had a

02:37:20  4   particularly favorable or a particularly unfavorable

02:37:22  5   experience on that cruise, that's going to, in my belief,

02:37:25  6   impact their listening and interpretation of Christine

02:37:35  7   Duffy's testimony which is critical in this case.

02:37:37  8         And so I know that that question is going to

02:37:39  9   generate a lot of responses, but I think it is important.

02:37:42 10   It's important for fairness on both sides.

02:37:45 11         If they had a particularly good experience on

02:37:48 12   Carnival, they may think she's particularly credible.  If

02:37:51 13   they had a particularly bad experience on Carnival, they may

02:37:54 14   think the opposite.

02:37:56 15         THE COURT:  So one of the questions right now is

02:37:58 16   number 17, have you ever been involved in a dispute with a

02:38:02 17   cruise company?  If you'd like me to pair that with have you

02:38:05 18   ever sent a love letter to a cruise company?

02:38:08 19         MR. SIMMONS:  Well, my concern is, Your Honor,

02:38:10 20   you may not have a dispute with a company, but you may have

02:38:13 21   gone on and said, This is the best thing ever since sliced

02:38:17 22   bread.  So an executive of that entity, I'm going to give a

02:38:19 23   lot of weight.

02:38:19 24         Or alternatively, God forbid you had the

02:38:24 25   Rotavirus, you didn't file a complaint against them, but you

02:38:27  1    think, This is an executive of this company, and I don't

02:38:29  2    believe anything she says.

02:38:33  3               THE COURT:  All right.  So what's, for example,

02:38:40  4    Delaware North Partnership?

02:38:42  5               MR. WILLIAMS:  They actually are the prior owner

02:38:45  6    of the vessel, American Queen.

02:38:47  7               MR. MURRELL:  They actually still exist, I

02:38:49  8    believe.  Your Honor, this was their proposed question, but

02:38:54  9    in all fairness, you know, in using our discretionary

02:38:57 10    strikes, I mean, I think what you're going to get is blank

02:39:03 11    stares to almost this entire question.

02:39:06 12               MR. WILLIAMS:  Right.

02:39:07 13               MR. MURRELL:  I think the jurors will be looking

02:39:08 14    at us all going, Why are you wasting my time asking all

02:39:11 15    these questions?  But if we were to get a hit on any of

02:39:14 16    these, however unlikely, it's something I probably would

02:39:16 17    want to know.

02:39:19 18               THE COURT:  Okay.  All right.  Well, all right.

02:39:30 19    I'll ask it.

02:39:31 20               The only thing I'm actually going to do is I

02:39:35 21    noticed I had failed to cross out Delta Queen Steamboat

02:39:39 22    Company, and they're covered somewhere else.  So, okay.

02:39:44 23               All right.  And so I think that only on my

02:39:53 24    agenda here leaves the motions in limine.  Well, actually we

02:40:02 25    also had this thing about Mr. Silverman and Ms. Duffy.  And

02:40:11 1   based on the representations that are in the docket,

02:40:15 2   Item 299, and you know, basically saying these two people

02:40:27 3   are not going to overlap, I'm going to exercise my

02:40:41 4   discretion not to prohibit the plaintiff from calling both

02:40:50 5   Mr. Silverman and Ms. Duffy.  Well, so that's basically how

02:41:01 6   I'm going to resolve that.

02:41:03 7          All right.  So in the motions in limine, I read

02:41:12 8   these before the first pretrial conference.  I read them

02:41:17 9   again after the first pretrial conference.  And this second

02:41:25 10  time I read them, I had a better understanding of what was

02:41:28 11  in them.

02:41:32 12         And so I have my notes, and let me -- so

02:41:44 13  basically we had plaintiff's motions in limine, and so I

02:42:01 14  guess what I'm wondering is the defendant wants to introduce

02:42:08 15  these two letters and the back and forth with Mr. Robertson.

02:42:22 16         MR. WILLIAMS:  The defendant wants to introduce

02:42:24 17  these letters.

02:42:25 18         MR. MURRELL:  Right.

02:42:25 19         THE COURT:  Did I say that backwards?

02:42:27 20         MR. MURRELL:  The two letters.

02:42:28 21         MR. WILLIAMS:  I'm not sure, but after I thought

02:42:30 22  a minute, I wasn't sure what I had heard.

02:42:31 23         THE COURT:  Okay.  Well, I'm not sure what I

02:42:33 24  said, either, but that's the reason we have a court

02:42:35 25  reporter.

02:42:38  1          And so the two letters that the defendant wants

02:42:45  2     to introduce, as I gather it, they want to say that these

02:42:52  3     are being offered for the state of mind of plaintiff; is

02:42:59  4     that right?

02:43:00  5          MR. MURRELL:  Kind of.  One to show that the

02:43:03  6     issue of whether or not Mr. Robertson said what we said he

02:43:06  7     told our people in December and a phone call in February.

02:43:11  8     One, it shows that that was on the table.  We didn't accept

02:43:14  9     it.  As you notice in summary judgment, we didn't accept

02:43:18 10     that offer.

02:43:19 11          But for them to say we would never have offered

02:43:21 12     that, for Mr. Robertson to say, I think as he said, he would

02:43:25 13     have never offered that, it was offered.  It was put on the

02:43:28 14     table.  And so it makes it more likely, in our view, as

02:43:31 15     evidence that a jury could find it more likely that that

02:43:33 16     statement was made by Mr. Robertson later in December.

02:43:36 17          THE COURT:  So there is a deposition, I suppose,

02:43:41 18     maybe more than one of Mr. Robertson.  Did he say at some

02:43:47 19     point, I never ever ever would have permitted use of the

02:43:52 20     American Queen Steamboat Company name, no matter how many

02:43:56 21     millions of dollars they offered me?

02:43:58 22          MR. MURRELL:  I think he did in his declaration.

02:43:59 23     As I sit here, Your Honor, I went back to his declaration

02:44:03 24     preparing.  But I think subsequently somewhere in the

02:44:05 25     summary judgment, and I apologize, I don't have that in

02:44:07  1    front of me, but I think he subsequently did in the

02:44:10  2    declaration.

02:44:11  3                THE COURT:  So what do you think he's going to

02:44:12  4    say at trial, Mr. Williams?

02:44:16  5                MR. WILLIAMS:  I don't think he's going to say

02:44:17  6    the way Mr. Murrell just characterized it.  I think he's

02:44:21  7    going to say that he believes that he did not say that, that

02:44:25  8    he doesn't recall any such statement, but that he does

02:44:28  9    recall some other things that were said.  And that later he

02:44:31 10    felt -- when he was told, he felt this very strongly that

02:44:37 11    they were naming the brand American Queen Steamboat Company

02:44:42 12    that he had then had.  And that is because I think he

02:44:46 13    thought they were going to select and pursue the name of

02:44:50 14    Delta Queen Steamboat Company, which I think the evidence is

02:44:53 15    to the effect that they did pursue.

02:44:55 16                THE COURT:  But is he going to say anything like

02:44:56 17    saying -- because what you just said, I think that was in

02:45:01 18    the proffer.  I read it somewhere of what Mr. Robertson

02:45:08 19    presumably had said in the deposition.

02:45:10 20                Do you expect him to say at trial, or are you

02:45:14 21    going to be trying to get him to say, I never would have

02:45:16 22    done that?  Because it seems to me that the arguments the

02:45:26 23    defendant has could change depending on what it is he

02:45:32 24    actually says.

02:45:33 25                MR. WILLIAMS:  Maybe.  I think what is true is

02:45:36  1   that there was the letter in May of 2011 where the lawyer

02:45:41  2   objected to the use of, among other things, American

02:45:44  3   Steamboat Company.  I think the facts are and this shall --

02:45:48  4   you know, it's not in these papers particularly -- is that

02:45:51  5   there was a dispute about Great American Steamboat Company.

02:45:54  6          THE COURT:  Right.

02:45:54  7          MR. WILLIAMS:  There were issues about whether

02:45:56  8   that was creating confusion, and we thought it was.  And I

02:45:59  9   think we've now through the -- well, we think there was

02:46:03 10   confusion as a result of, and we've since learned from the

02:46:06 11   traffic, and the keyword traffic, Your Honor, actually

02:46:10 12   referred to in connection with the Daubert motion on Peter

02:46:14 13   Kent that there were more hits on Great American Steamboat

02:46:18 14   Company than on American Queen.

02:46:20 15          And so we think there is evidence that there was

02:46:23 16   confusion related to American, to Great American Steamboat

02:46:26 17   Company.  And more interesting, in that mark, which is

02:46:29 18   why -- and when you see, in fact, the way when they -- you

02:46:35 19   know, I just don't think it was particularly an issue in his

02:46:38 20   mind.  He wasn't really thinking about American Queen

02:46:41 21   Steamboat Company in the way that Mr. Murrell, you know, for

02:46:44 22   millions of dollars, you wouldn't sell it.  But rather what

02:46:47 23   he was thinking is, Let's get rid of this problem with Great

02:46:51 24   American Steamboat Company.

02:46:52 25          THE COURT:  And maybe it's not fair because we

02:47:00  1   are more than two months from trial, but based on what

02:47:12  2   you've said, I take it your expectation, what you'd like to

02:47:17  3   do with him is to say, On these two dates that are

02:47:24  4   identified in the proffer, January 15th of 2000 and --

02:47:31  5              MR. WILLIAMS:  I think it's December.

02:47:32  6              MR. MURRELL:  December 15th, Your Honor.

02:47:34  7              MR. WILLIAMS:  December 15th.

02:47:35  8              THE COURT:  And then in February, the next year

02:47:37  9   when there are conversations --

02:47:38  10             MR. WILLIAMS:  Right.

02:47:39  11             THE COURT:  -- that he's going to say what you

02:47:42  12  just said, which is, yeah, they talked about some names.

02:47:46  13  The names that they gave, they didn't concern me.  But one

02:47:50  14  of the names they gave me was not American Queen Steamboat

02:47:53  15  Company, and I didn't agree to that.

02:47:58  16             MR. WILLIAMS:  I think that's more like it.  I

02:48:00  17  think he also came away with the impression of what they

02:48:03  18  were really going to do was go after Delta Queen Steamboat

02:48:07  19  Company.

02:48:08  20             THE COURT:  Okay.

02:48:09  21             MR. MURRELL:  Your Honor, when he says and when

02:48:12  22  I found out they were using American Queen Steamboat

02:48:15  23  Company, his testimony has been, And I thought I was had.

02:48:17  24             THE COURT:  Right.

02:48:17  25             MR. MURRELL:  I think the letter from the

02:48:19  1    counsel saying that we could use American Queen Steamboat

02:48:24  2    Company is relevant to test that that testimony that he said

02:48:26  3    he had been had, it was on the table.

02:48:29  4                THE COURT:  But it wasn't on the table.

02:48:31  5                MR. MURRELL:  It was.  That's -- but it was on

02:48:34  6    the table.  We didn't accept that offer, but it was on the

02:48:37  7    table.  It was being discussed as a potential remedy.

02:48:41  8                Our people say then we had the very, very

02:48:43  9    specific conversation with him that relied upon when we went

02:48:46 10    out.

02:48:46 11                THE COURT:  And so your people are going to say

02:48:48 12    that, and the jury may believe them and may believe

02:48:53 13    Mr. Robertson.  But between the earlier letter, the two

02:49:02 14    letters being definitely part of settlement discussions, and

02:49:08 15    being parts that you did not accept, it certainly appears to

02:49:15 16    me that, I mean, they were part of the proposed resolution

02:49:31 17    of a dispute; right?

02:49:33 18                MR. MURRELL:  Right.  And the fact that ACL made

02:49:38 19    that offer several months before the conferences, it doesn't

02:49:43 20    prove it.  But isn't it evidence that it was more likely

02:49:47 21    that Mr. Robertson would have agreed to that request since

02:49:51 22    he had previously or ACL had previously offered it?

02:49:54 23                That's my point.  It doesn't prove it by itself.

02:49:56 24                THE COURT:  No, it doesn't.

02:49:57 25                MR. MURRELL:  But it's --

02:49:58  1                THE COURT:  And --

02:49:59  2                MR. WILLIAMS:  I think Rule 406 for that kind of

02:50:02  3     logic excludes it.

02:50:03  4                THE COURT:  Well, I don't think it's habit.

02:50:06  5                MR. WILLIAMS:  It's certainly not a habit, but

02:50:08  6     it might be -- I don't know.  It's also not a routine

02:50:11  7     practice of a business organization.

02:50:13  8                THE COURT:  Yeah.  No.  I don't think -- I mean,

02:50:16  9     I understand, I think, the logic of Mr. Murrell's argument

02:50:24 10     which is it had some lesser importance to Mr. Robertson back

02:50:35 11     when they were trying to resolve the other dispute because

02:50:37 12     he was willing to trade it away for something else of some

02:50:41 13     value.  So it wasn't, you know, an over-my-dead-body kind of

02:50:49 14     thing.

02:50:51 15                But I am both concerned that, A, it seems to me

02:51:08 16     kind of wrong that an offer or compromise is then used

02:51:14 17     against the person which is what that seems to be.

02:51:19 18                And then the second thing is it is in a way a

02:51:23 19     sideshow because then you have to get into what the

02:51:28 20     underlying dispute is that they were talking about back in

02:51:33 21     the year before.  And that's sort of some amount of

02:51:41 22     satellite litigation on this issue.

02:51:51 23                And what's more is, you know, at best I'm saying

02:51:59 24     here under the current way that I look at things, I'm not

02:52:06 25     going to admit the letters because, in the end, I do think

02:52:09 1    their probative value is substantially outweighed by their

02:52:16 2    taking up explanation and being unfairly prejudicial without

02:52:24 3    a substantial amount of context.

02:52:26 4         But I do think that Mr. Robertson is limited in

02:52:29 5    what he can say.  And, you know, I think the more that he

02:52:37 6    says something that's sort of contrary which is, no, you

02:52:44 7    know, I would never have done this.  You know, I will

02:52:49 8    reconsider if he says that.

02:52:52 9         Let me put it more like this:  I will reconsider

02:52:54 10   if he says that because either the plaintiff brings it out

02:52:58 11   or because, though, Mr. Murrell is not trying to bring it

02:53:02 12   out, it comes out anyhow while he's talking to the man.  So

02:53:07 13   that's what think I'm going to do there.

02:53:24 14        On the other hand, testimony about what

02:53:26 15   Mr. Robertson said on December 15th and again in February,

02:53:33 16   at least as presented in the proffer, the way it's

02:53:42 17   presented, it's not tied to potential settlement.  And, you

02:53:57 18   know, I think what I get is that defendants' witnesses are

02:54:01 19   going to say there were no strings attached, and again, he

02:54:05 20   just didn't care about it.

02:54:07 21        So I have trouble seeing why that should be

02:54:11 22   excluded because I think it certainly goes to the

02:54:15 23   defendants' state of mind and maybe other issues.  So that's

02:54:21 24   what I think about that.

02:54:23 25        Mr. Williams, I think you may have raised this

02:54:31  1    at some place somewhere.  I understand your client's view

02:54:41  2    is, I didn't say that.

02:54:47  3             Do you have an alternative position that if he

02:54:49  4    did say it, it was part of settlement negotiations or --

02:54:53  5             MR. WILLIAMS:  Oh, I think it was part of

02:54:55  6    settlement.  I mean, the meeting in December was, in fact,

02:54:58  7    the proffer.  I believe it was said at a settlement

02:55:02  8    conference.

02:55:02  9             THE COURT:  Yeah.  It was said at a settlement

02:55:04 10    conference, but that's the thing.  When you have the

02:55:06 11    principals there, that doesn't mean that everything that

02:55:08 12    happens there is settlement negotiations.

02:55:12 13             So I think you could have maybe asked, you could

02:55:15 14    have a hearing, see what Mr. Robertson actually has to say

02:55:18 15    about this.  If you want to pursue that, I think you need to

02:55:24 16    submit to me some version that makes me think it could

02:55:28 17    possibly be protected by Rule 408, some proffer of --

02:55:34 18             MR. WILLIAMS:  Okay.  So, in other words, the

02:55:37 19    whether really is part of a settlement discussion as opposed

02:55:39 20    to just something else instead.

02:55:41 21             THE COURT:  Well, however it is that you want to

02:55:45 22    get it out.  You want to get into getting covered by

02:55:47 23    Rule 408 --

02:55:48 24             MR. WILLIAMS:  Yeah.

02:55:48 25             THE COURT:  -- because the way it's presented

02:55:50  1    through the proffer, I don't think it is, and it seems to me

02:55:54  2    to be relevant.  And so can I ask that if you want to make

02:56:05  3    the argument, and you know, it's a hard argument to make,

02:56:12  4    but presumably your argument is, Well, when we were talking

02:56:15  5    about these other two steamboat companies -- well, actually

02:56:19  6    I'm not going to tell you how to make an argument.  You know

02:56:22  7    how to make an argument.

02:56:23  8            But submit something that's a factual proffer of

02:56:26  9    what people would say about this event in December or about

02:56:31 10    the telephone call in February that would bring the

02:56:37 11    statements that are disputed into Rule 408.  And if I think

02:56:43 12    I need to have a hearing about it, we can have a hearing

02:56:46 13    about it.  But right now, I don't see a need for that.

02:56:52 14            MR. WILLIAMS:  Will do.

02:56:54 15            THE COURT:  All right.  So in two weeks.  All

02:56:59 16    right.

02:57:00 17            So do you all really want to talk about this

02:57:04 18    statutory trademark?  Because I looked at the statute, and I

02:57:10 19    think defendants are right on this one.

02:57:14 20            MR. WILLIAMS:  This is to do with the

02:57:17 21    abandonment?

02:57:18 22            THE COURT:  Yes.

02:57:21 23            MR. WILLIAMS:  So there are two motions.

02:57:23 24            THE COURT:  Right.  Right.  So let's just talk

02:57:25 25    about first off your motion, which is that the intent of the

02:57:33  1    purchaser is irrelevant.  And that's based on your reading

02:57:39  2    of Paragraph 2 of this particular statute about abandonment.

02:57:57  3              MR. WILLIAMS:  So this is the part where at the

02:58:00  4    end where it says, Purchaser motivation shall not be a

02:58:06  5    tester determining abandonment under this paragraph?

02:58:07  6              THE COURT:  Yes.

02:58:07  7              MR. WILLIAMS:  Is that what you're referring to?

02:58:09  8              THE COURT:  Yes.

02:58:10  9              MR. WILLIAMS:  So we think that the intent

02:58:16 10    should not be admissible for reasons, in addition to the

02:58:20 11    existence of that sentence, and that is because the

02:58:35 12    purchaser would always want to have -- if they're going to

02:58:38 13    acquire something, walking along a beach and find something

02:58:43 14    that's useful to them, they're going to say, It's great, and

02:58:45 15    I like it, and I want to use it, and it's my intent to use

02:58:48 16    it.  And I kind of see that as being a bit like what this

02:58:52 17    is.

02:58:52 18              They find a mark that they can assert as that as

02:58:57 19    American Queen which was always marketed as a Queen.  They

02:59:00 20    decide somewhere along the line, you know, it's a little

02:59:04 21    unclear when, that they want to mark it as American with

02:59:08 22    emphasis on American.

02:59:09 23              And so they have sought to use it.  And it's the

02:59:12 24    boat that that mark was acquired a long time ago.  I looked

02:59:18 25    very carefully at the cases, including the ones that have

02:59:24 1    stretched this to the outer boundaries, the doctrine of

02:59:26 2    abandonment, to minimize what is abandoned.  So back sliding

02:59:30 3    on the purpose, which is the declared purpose of Congress in

02:59:33 4    the trade law, Trademark Reform Act, and there's no idea in

02:59:40 5    any of that statute, but that it was intended to clear out

02:59:43 6    the dead wood in the registry.

02:59:46 7            And so it should not, I think, in accordance

02:59:50 8    with that purpose, be interpreted that anybody who sees an

02:59:56 9    opportunity to acquire a previously-used mark can say, My

02:59:59 10   intent to use it matters.  What the cases have said is that

03:00:03 11   the person of interest in the mark, the owner and the

03:00:06 12   creditors, their intents matter.

03:00:10 13           And then the courts have expanded that to

03:00:13 14   include, say, a trustee in bankruptcy, or in the case of the

03:00:16 15   Mustang Ranch, the state that acquired it under a forfeiture

03:00:21 16   statute.  You know, and we don't disagree with that.

03:00:28 17           But to say that John Waggoner's intent mattered,

03:00:31 18   but when he saw an opportunity to acquire this, along with

03:00:34 19   artwork and other things for which he paid a very small

03:00:38 20   amount of money matters, we think is contrary to the

03:00:42 21   statutory purpose.

03:00:44 22           THE COURT:  Okay.  Well, I'm going to rule

03:00:46 23   against you on this one.

03:00:48 24           MR. WILLIAMS:  Okay.

03:00:48 25           THE COURT:  So then we also have defendants' --

03:00:51 1    and I'm going to write an Order.  It's mostly written

03:00:55 2    already.  But there are cases that basically seem to suggest

03:01:07 3    totality of evidence doesn't really place someone on who's

03:01:13 4    evidence it is.  Obviously, somebody, say Ambassadors,

03:01:20 5    could, I think, abandon the mark before John Waggoner ever

03:01:25 6    comes around, but whether or not that happened here is a

03:01:29 7    question of fact for the jury.

03:01:31 8         So I also have the cross motion.

03:01:34 9         MR. WILLIAMS:  So that means that the evidence

03:01:37 10   of that testimony is not affected by this ruling.  It could

03:01:43 11   still come in?

03:01:43 12        THE COURT:  Yes.  But then we also have the

03:01:48 13   cross motion, which I really didn't understand, trying to

03:01:53 14   say that Ambassador's statement of intent should be

03:01:59 15   excluded.

03:02:01 16        MR. McGRAW:  Statements of intent that may have

03:02:03 17   been made, intent to say no longer use the mark that may

03:02:07 18   have been made before they stopped using it, that's based on

03:02:12 19   The Money Store case.  And the case law --

03:02:13 20        THE COURT:  But when you say I'm going to do

03:02:15 21   something tomorrow.  Then tomorrow comes, you say, I'm going

03:02:18 22   to do something now.  Doesn't logically when you say the day

03:02:23 23   before count towards understanding what you meant on the

03:02:27 24   next day?

03:02:28 25        MR. McGRAW:  Well, logically it would, but under

03:02:30  1    the case law which says that there actually has to be

03:02:33  2    non-use before any of those statements are actually relevant

03:02:36  3    to whether there's abandonment.

03:02:39  4         THE COURT:  All right.  Well, I'm going to deny

03:02:41  5    your motion, too.

03:02:44  6         MR. MURRELL:  Your Honor, if I can, the

03:02:46  7    statement you just made about why that would be relevant

03:02:48  8    might apply to settlement letters.

03:02:50  9         THE COURT:  Thank you.  All right.  So I

03:02:55 10    probably have to go do these other people now, so why don't

03:03:00 11    you all -- off the record.

03:03:00 12         (Discussion held off the record:)

03:03:22 13         THE COURT:  I will take these things and try to

03:03:24 14    get back here relatively soon, but I most likely won't be

03:03:32 15    before 4:00.

03:03:32 16         (Hearing in chambers was adjourned until 4:36

04:36:39 17    p.m.)

04:36:39 18         THE COURT:  So I was going to just turn back and

04:36:44 19    go through the rest of these motions in limine.  Aside from

04:36:49 20    that, is there things that I haven't brought up that you all

04:36:53 21    want to discuss while you're here?

04:36:55 22         MR. MURRELL:  No.  I think the scope of direct

04:36:57 23    was the only thing that we had other than I have a 7:30

04:37:02 24    flight out of BWI tonight.

04:37:04 25         THE COURT:  Okay.  Well, you tell me:  When

04:37:06  1    would you like to leave?  I will make sure.

04:37:08  2                    MR. MURRELL:  5:00.

04:37:08  3                    THE COURT:  5:00.

04:37:08  4                    MR. MURRELL:  I have the impression that you've

04:37:11  5    probably already decided on these, and you're just being

04:37:13  6    polite.

04:37:14  7                    THE COURT:  Well, yes, I have something written

04:37:16  8    down, and I've talked with my law clerk.  And so I have, but

04:37:22  9    if I really -- you know, I have other things to do than chat

04:37:26 10    with you.

04:37:27 11                    MR. MURRELL:  Absolutely.

04:37:28 12                    THE COURT:  So when I'm sitting here listening,

04:37:29 13    I am listening, and at least one thing has been said already

04:37:33 14    that it's something I know I need to follow up on.  So I'm

04:37:37 15    not doing this just for sport.

04:37:40 16                    MR. MURRELL:  All right.  We had just dealt with

04:37:52 17    the statutory trademark on abandonment and our cross.

04:37:56 18                    THE COURT:  Yeah.  So we were moving along, as

04:38:16 19    Mr. Murrell just said, after abandonment.

04:38:22 20                    So we have this thing about which has to do

04:38:25 21    with, I guess, when the time starts --

04:38:29 22                    MR. WILLIAMS:  Yes, for non-use.

04:38:31 23                    THE COURT:  For non-use ends.  And so there's a

04:38:34 24    dispute over whether it's when -- I forgot who's here, but

04:38:46 25    whatever party it is, started to sell services as opposed to

04:38:52  1    when they actually started putting people on boats and

04:38:56  2    moving them around.

04:38:57  3                MR. WILLIAMS:  Transporting passengers.

04:38:59  4                THE COURT:  Transporting passengers.

04:39:00  5                MR. WILLIAMS:  Being the service stated in the

04:39:03  6    registration.

04:39:03  7                THE COURT:  Right.  So this is the plaintiff's

04:39:10  8    motion.

04:39:11  9                MR. WILLIAMS:  It was our motion, and I can just

04:39:13  10   make this point in the sense it's a very small motion

04:39:18  11   because while it addresses these provisions in the statute,

04:39:21  12   what it really asks is to bar evidence of when these early

04:39:27  13   sales -- they came back and said, You're trying to prevent

04:39:30  14   us from putting evidence in about the fact that we sold

04:39:33  15   tickets, you know, beginning sometime in the fall of 2011.

04:39:42  16   And they didn't carry passengers until 2012.

04:39:45  17                So our point is that for purposes of the

04:39:49  18   statutory interpretation, you know, the statute says, in

04:39:51  19   connection with the services specified on the registration,

04:39:55  20   and the law in the Third Circuit follows that, rather

04:39:59  21   specifically the National Footwear case.

04:40:02  22                THE COURT:  Right.

04:40:03  23                MR. WILLIAMS:  So we're simply saying that they

04:40:06  24   sold the tickets some time or another.  It shouldn't be said

04:40:09  25   when they sold the tickets or argued when they sold the

04:40:12  1    tickets until they carry the passengers.  And that would

04:40:17  2    have the effect, I believe, in creating that shift of the

04:40:21  3    presumption that's in the statute.

04:40:23  4            THE COURT:  So the Natural Footwear was about a

04:40:27  5    mark for shoes.  It didn't cover non-shoes; right?

04:40:32  6            MR. WILLIAMS:  Right.

04:40:32  7            THE COURT:  Isn't that kind of different than

04:40:34  8    what we're dealing with here?

04:40:36  9            MR. WILLIAMS:  Well, it has been understood, and

04:40:38 10    there have been cases, and I think there's cases in our

04:40:41 11    papers, and I can get into more detail here, that say that

04:40:45 12    the Third Circuit very specifically follows the importance

04:40:49 13    of the description in the registration.

04:40:53 14            THE COURT:  Well, right.  But that makes sense

04:40:55 15    in shoes are not socks, but it doesn't mean that travel

04:41:00 16    services are not travel services because they're being paid

04:41:06 17    for as opposed to actually being delivered.  I mean, they're

04:41:12 18    two different -- isn't that -- I mean, it's --

04:41:16 19            MR. WILLIAMS:  So they did not register for

04:41:19 20    cruise services.  They did not register for travel services.

04:41:22 21    What they registered for was transporting passengers by

04:41:26 22    steamers.

04:41:28 23            THE COURT:  Okay.  But so they are selling

04:41:30 24    tickets to transport passengers by steamers; right?

04:41:33 25            MR. WILLIAMS:  Right.  So my point is, and I

04:41:36  1    think a more recent case than Natural Footwear is Couture

04:41:40  2    versus Playdom.  I think it's in our --

04:41:43  3                    THE COURT:  What is it called again?

04:41:44  4                    MR. WILLIAMS:  Couture, C-O-U-T-U-R-E versus

04:41:50  5    Playdom.

04:41:50  6                    THE COURT:  All right.

04:41:52  7                    MR. WILLIAMS:  778 F. 3d 1379.

04:41:56  8                    THE COURT:  Okay.

04:41:57  9                    MR. WILLIAMS:  And basically the Third Circuit,

04:41:59 10    as I think properly both followed the statute and has

04:42:06 11    pointed out and followed the jurisprudence that a trademark

04:42:10 12    is, in essence, a monopoly, and it shouldn't be expanded.

04:42:15 13    If you say transporting passengers, you don't mean services

04:42:19 14    generally arranging cruises, marketing cruises, that kind of

04:42:24 15    thing, which, frankly, is why others have chosen to describe

04:42:31 16    the registration services more broadly.  But that didn't

04:42:35 17    happen here.

04:42:36 18                    My point is -- it's sort of going back to the

04:42:39 19    argument I was making earlier, Your Honor, about the fact

04:42:41 20    that this was, in essence, sort of a shiny nickel that John

04:42:46 21    Waggoner picks up on the beach, got for nothing, is now

04:42:48 22    exploiting.

04:42:50 23                    THE COURT:  Okay.  All right.  Let's move on to

04:42:55 24    plaintiff's last motion.  Oh, so this is the one where

04:42:58 25    you're saying claim preclusion is evidence preclusion?

04:43:05 1          MR. SIMMONS:  Well, I'll take this one, Your

04:43:08 2   Honor.  In the 2011 lawsuit, affirmative defenses were

04:43:12 3   raised and then are resolved by way of settlement.  And

04:43:16 4   those affirmative defenses included an encounter claim,

04:43:20 5   included things like the fact that there were serial

04:43:22 6   preemptive filings.  All of that was dealt with in the

04:43:26 7   context of the 2011 suit which was then settled.

04:43:29 8          Now, what we're doing is repackaging some of

04:43:34 9   those allegations and defenses in the affirmative defenses

04:43:37 10  in this case, and we're going to relitigate them in the

04:43:41 11  guise of an unclean hands analysis.  Now, depending on what

04:43:44 12  Your Honor decides to do with the equitable issues, and I

04:43:47 13  think --

04:43:48 14         THE COURT:  I think I've already indicated what

04:43:50 15  I was going do about or maybe you mean something different

04:43:53 16  than me.  I just thought -- keep going.

04:43:56 17         MR. SIMMONS:  So the question will be if Your

04:43:58 18  Honor says I'm dealing with the unclean hands claims, and

04:44:02 19  there's going to be limitation of evidence that's going to

04:44:05 20  be presented to the jury on those claims with respect to the

04:44:08 21  unclean hands argument, our belief is Your Honor wants to

04:44:14 22  look back at preemptive filings that were made at the time

04:44:18 23  that the remarks were being obtained back in 2011.  That's

04:44:22 24  one thing.

04:44:22 25         But to present those to the jury, these are

04:44:24 1    issues that have already been ruled on, already been

04:44:26 2    settled. Well, they haven't been ruled on. It was through

04:44:30 3    a stipulation of dismissal.

04:44:31 4         THE COURT: So the general proposition what I

04:44:42 5    got out of your motion was that you wanted to keep out

04:44:47 6    evidence because the evidence had some relation to claims

04:44:52 7    that were decided or could have been decided in the first

04:44:56 8    case. But I didn't think that's the way claim preclusion

04:45:02 9    works.

04:45:04 10        The serial filings he's talking about, that

04:45:07 11   doesn't register much with me as something I saw in the

04:45:10 12   motion, but it's been a while since I actually looked at it.

04:45:13 13   Do you know what he's talking about?

04:45:15 14        MR. MURRELL: We do. It's a list. And what

04:45:17 15   they attach in their motion was they took a list and took a

04:45:21 16   30(b)(6) and asked for our evidence, either willfulness or

04:45:24 17   unclean hands, and we brought a list to the 30(b)(6)

04:45:27 18   deposition.

04:45:28 19        THE COURT: So the serial filings, is that

04:45:30 20   basically only related to equitable issues?

04:45:33 21        MR. MURRELL: We believe it's -- no. We believe

04:45:34 22   it's also relevant to intent. We have a claim of

04:45:37 23   willfulness against them. So we think this is all relevant

04:45:42 24   to whether they have willfully infringed by showing their

04:45:45 25   anti-competitive behavior all along.

04:45:47  1                    THE COURT:  So, wait.  So the serial filings are

04:45:51  2      then serially -- who's doing the serial filing?  They are.

04:45:57  3      Okay.

04:45:57  4                    Right.  What is it they're serially filing?

04:46:00  5                    MR. MURRELL:  Everything that could go on a

04:46:02  6      steamboat on the river.  I mean, from --

04:46:03  7                    THE COURT:  You mean in terms of claiming

04:46:05  8      trademarks?

04:46:07  9                    MR. MURRELL:  Claiming trademark registration.

04:46:09 10      And it's our evidence that that was done with an intent to

04:46:11 11      specifically harm American Queen Steamboat Company, that

04:46:14 12      they were doing that as a blocking.

04:46:16 13                    THE COURT:  And the -- oh, I'm sorry.  You go

04:46:18 14      ahead.

04:46:18 15                    MR. MURRELL:  No.  I'm sorry.  That they were

04:46:20 16      trying to block it so they could control it.  And that their

04:46:23 17      use then -- so when they do that, and then when we bring the

04:46:28 18      American Queen on the river, their vessel was called Queen

04:46:31 19      of the Mississippi.  Didn't even have American in it.

04:46:33 20                    After we go in and start doing well, then they

04:46:36 21      have American Eagle they bring on the river, and American

04:46:39 22      Song, and American everything else.  Right.

04:46:41 23                    They came to us, is our claim, and that they

04:46:43 24      were doing all of this to harm us and drive us out of

04:46:46 25      business so they could have essentially the monopoly.

04:46:48  1    That's their claim.

04:46:50  2              THE COURT:  So how would you present this to a

04:46:52  3    jury?

04:46:55  4              MR. MURRELL:  We took the deposition of Mark

04:46:56  5    Harrison, their trademark lawyer, and walked through the

04:46:59  6    serial filings, and the fact that they were all subsequently

04:47:01  7    abandoned.  So we've already taken the deposition.  I think

04:47:07  8    the designation is probably 45 minutes of testimony max.  It

04:47:10  9    would be eating up our time.

04:47:12 10              THE COURT:  Well, it would be eating up your

04:47:13 11    time.  I mean, I do have a question as to --

04:47:27 12              MR. SIMMONS:  Your Honor, just one more minute

04:47:29 13    with this.  If you look back at the Complaint, the

04:47:31 14    counterclaim that was filed in the original suit, not only

04:47:34 15    were these raised as affirmative defenses, but they were

04:47:38 16    also counterclaims against, in Paragraph 18, serial filings

04:47:41 17    on these particular applications which is docket entry

04:47:41 18    number six.

04:47:45 19              MR. WILLIAMS:  What year?

04:47:47 20              MR. SIMMONS:  2011.

04:47:48 21              THE COURT:  But that's not how claim preclusion

04:47:51 22    works.  The only reason I might keep it out is if I thought

04:47:53 23    it was irrelevant or more likely that it was Rule 403 sort

04:47:58 24    of material.  And you know, that's not a decision I'm going

04:48:04 25    to make today.  But I think it's pretty likely I'm going to

04:48:08  1    be denying the sort of broad principle that I thought you

04:48:12  2    were advancing in the motion in limine.

04:48:14  3            So American Queen.  We're now on the defendants'

04:48:23  4    three motions.

04:48:24  5            So you want to bar plaintiff from using the paid

04:48:33  6    advertising to establish the strength of its mark.  And I

04:48:38  7    guess what we were wondering, what I was wondering is

04:48:50  8    there's going to be a lot of evidence about the strength of

04:48:52  9    the mark, isn't there?

04:48:58 10            There's going to be expert testimony.  There's

04:49:00 11    going to be things about consumer awareness.  There's going

04:49:04 12    to be marketplace recognition.  There's even going to be

04:49:13 13    just advertising ahead which is --

04:49:19 14            MR. MURRELL:  This is, though, their wanting to

04:49:21 15    introduce evidence of us doing paid advertising for their

04:49:26 16    marks.  So they did this as well to us.  We have claims for

04:49:32 17    that, and those claims were bifurcated from this trial.

04:49:35 18            And so we're saying -- because we could -- if

04:49:38 19    you say it's coming in, we would put in our evidence of

04:49:40 20    their doing paid search terms as well.  It's just we thought

04:49:44 21    this was being streamlined, and that was out.

04:49:46 22            THE COURT:  Well, so one of the things that's

04:49:50 23    going to be in is what consumers actually do in terms of

04:49:53 24    what they type in to search for; right?

04:49:55 25            MR. MURRELL:  Right.

04:49:55  1        THE COURT:  So isn't that much more germane to

04:50:06  2   the strength of the mark?

04:50:08  3        MR. SIMMONS:  We believe so.

04:50:11  4        MR. MURRELL:  We don't think it is.  We don't

04:50:12  5   know.  We don't know exactly what they're searching for when

04:50:14  6   they're searching for American Cruise Lines.

04:50:17  7        Is it for the plaintiff, or is it for something

04:50:19  8   else?  That's one you can't just look at these records in a

04:50:21  9   vacuum and --

04:50:22 10        THE COURT:  But all of what you're trying to do

04:50:26 11   is to show that they are aware that a lot of people search

04:50:29 12   for American Cruise Lines or vice versa, whoever; right?

04:50:33 13        MR. MURRELL:  Right.  But it's not that

04:50:35 14   evidence.  It's the evidence where they're trying to make us

04:50:38 15   look bad because we paid at a point in time for the right of

04:50:43 16   someone to put in, you know, American Cruise Lines to have

04:50:46 17   our ad pop up.  That's what we meant by paid search terms.

04:50:49 18        And they did the same thing on ours.  And that's

04:50:52 19   what we're talking about with paid search terms.  We're not

04:50:55 20   talking about the testimony of Peter Kent of people doing

04:50:58 21   searches and things popping up.  We're talking about

04:51:01 22   competitive behavior of both parties.  Those are separate

04:51:03 23   claims.

04:51:03 24        THE COURT:  So hold on a minute.  So it is true

04:51:05 25   what Mr. Murrell has said like three times, so that makes it

04:51:08 1    mean it has to be true, that this is sort of common business

04:51:14 2    practice to pay for this sort of thing, right, and something

04:51:20 3    that both parties have done?

04:51:24 4                MR. SIMMONS:  But it's, also, Your Honor, what

04:51:28 5    were the parties' knowledge at relevant periods of time in

04:51:32 6    2011 when Great American Steamboat Company was paying for

04:51:38 7    ads to pop up based on search terms?  What were they paying

04:51:42 8    for?

04:51:42 9                They were paying for their ad to appear on

04:51:45 10   American Cruise Lines.  It's not that it's wrongful, but

04:51:48 11   what was it that was driving traffic?  What was it that was

04:51:50 12   driving consumer attention to their products and services?

04:51:54 13   And that started in 2011, and it continues through today.

04:51:57 14               And that shows -- and it's the order in ranking

04:52:01 15   of the returns on those keyword searches if you looked at

04:52:05 16   the exhibit that was attached.

04:52:07 17               THE COURT:  So what is this?  This is relevant

04:52:11 18   to the strength of the mark; right?

04:52:14 19               MR. SIMMONS:  Strength of the mark.  And what

04:52:15 20   was driving consumer attention to Great American Steamboat

04:52:20 21   Company, and ultimately, American Queen Steamboat Company's

04:52:23 22   advertisements?  It was American Cruise Lines.

04:52:26 23               The strength of that was appearing in the top

04:52:28 24   one or two of every one of these paid searches.  So when

04:52:32 25   someone would type in the exact words --

04:52:35  1          THE COURT:  But whether it appears in the top

04:52:38  2    one or two, can't you say that without saying, And they paid

04:52:43  3    to put their ads near this?

04:52:46  4          MR. SIMMONS:  But what other evidence is there

04:52:48  5    in the case that, you know, it's the traffic reports that --

04:52:51  6          THE COURT:  But don't you have your own traffic

04:52:54  7    reports?

04:52:56  8          MR. McGRAW:  Yes, they do.

04:52:56  9          MR. WILLIAMS:  Not their mark.

04:52:57 10          THE COURT:  Right.  But who cares whose traffic

04:53:00 11    report it is to prove that it's popular, that it appears at

04:53:05 12    the top of the list?

04:53:08 13          MR. NACCARATO:  It would show their use of

04:53:09 14    American Cruise Lines' name because it had such a good

04:53:13 15    benefit.  It would show their belief in the strength of our

04:53:15 16    mark.

04:53:17 17          THE COURT:  But what is the importance of their

04:53:19 18    belief in the strength of your mark?  Isn't that question,

04:53:21 19    what is the strength of your mark?

04:53:23 20          MR. NACCARATO:  Correct.  Their belief adds to

04:53:28 21    that, the strength of the mark.  It's a competitor that uses

04:53:31 22    your mark, but --

04:53:33 23          THE COURT:  But you also use theirs; right?

04:53:36 24          MR. NACCARATO:  Correct.

04:53:37 25          THE COURT:  So what have we proved here?

04:53:42  1          MR. NACCARATO:  We only use the mark for a very

04:53:45  2    short period of time.  It was of no benefit.  It was not

04:53:48  3    strong.

04:53:49  4          THE COURT:  Okay.  All right.  So I think it's

04:53:52  5    likely I'm going to exclude that.

04:53:57  6          All right.  We've got -- oh, we've got old ACL,

04:54:03  7    and I don't understand -- I guess I'm directing this at the

04:54:07  8    plaintiff.  I don't understand what the fact that some other

04:54:09  9    company existed back in the 1980s or whenever exactly we're

04:54:15 10    talking about, it was called American Cruise Lines, the

04:54:19 11    business, how that's relevant to anything.

04:54:22 12          MR. NACCARATO:  Well, old American Cruise Lines

04:54:24 13    is part of Charlie Robertson's story.  Charlie Robertson --

04:54:27 14          THE COURT:  Well, so saying it's part of

04:54:31 15    someone's story, part of what I get to do as judge is edit

04:54:36 16    people's story to keep out the irrelevant parts.

04:54:41 17          MR. NACCARATO:  Charlie Robertson, when he

04:54:42 18    started at American Cruise Lines in 1973, his first boat was

04:54:48 19    called the American Eagle.  And he also had a boat called

04:54:50 20    America.

04:54:50 21          He's being sued in this case for using those

04:54:53 22    names, and he's been accused of willfulness in using those

04:54:56 23    names.

04:54:57 24          THE COURT:  But isn't it the case that we're not

04:54:59 25    going to see that these boats are -- that you have priority

04:55:02  1   because of these 1973 things; right?

04:55:05  2          MR. NACCARATO:  No, there's no priority.  It

04:55:08  3   goes to Charlie's state of mind, the reason why he chose

04:55:11  4   those names.  He has a history of those names.  He has a

04:55:15  5   history on the Mississippi River, and planning itineraries,

04:55:18  6   and conducting cruises.  So American Cruise Lines, coming

04:55:21  7   back to Mississippi River, doesn't demonstrate copying off

04:55:26  8   of defendants, be it naming vessels, be it planning

04:55:26  9   itineraries.

04:55:31 10          The old American Cruise Line, the names of the

04:55:33 11   vessel, the cruise line, and even the advertising, the

04:55:37 12   advertising elements were carried forward with the new

04:55:41 13   entity.

04:55:41 14          THE COURT:  But so what you want to do is

04:55:44 15   present all this evidence that he had these things in the

04:55:47 16   past, which has no legal relevance to who's got priority

04:55:53 17   now.  It seems pretty confusing for no good point.

04:55:58 18          MR. NACCARATO:  It goes -- Charlie Robertson was

04:56:05 19   a pioneer in the industry.

04:56:07 20          THE COURT:  Well, so you can say he was a

04:56:08 21   pioneer in the industry, and I think you can say he was

04:56:11 22   doing cruises on the Mississippi.  I don't think they're

04:56:13 23   going to object to like what his life story is, but the

04:56:16 24   very -- you know, you want to start in 1973 in terms of what

04:56:20 25   his state of mind is, I'm kind of thinking, you know, I

04:56:25  1    really don't want to try 45 years of history.

04:56:28  2              MR. NACCARATO:  When he's asked when did he

04:56:30  3    first use the name American Eagle for a vessel, he should be

04:56:33  4    able to testify that he used it in 1973, and that he used it

04:56:38  5    again in 1999 when he restarted the company.

04:56:41  6              THE COURT:  But why?

04:56:42  7              MR. NACCARATO:  Because he's being sued for

04:56:44  8    using it.

04:56:44  9              THE COURT:  Yeah.  Yeah, but the only time it's

04:56:46 10    relevant is 1999; right?

04:56:50 11              MR. NACCARATO:  No.  He has a history of using

04:56:53 12    it.

04:56:54 13              MR. WILLIAMS:  The third time.

04:56:55 14              MR. NACCARATO:  It's the third time he's used

04:56:57 15    the name.  He's being alleged to have purposely changed the

04:57:00 16    name of one vessel to this historic name that he's used for

04:57:03 17    decades on a vessel.

04:57:09 18              THE COURT:  All right.  Well, I understand.

04:57:11 19              MR. NACCARATO:  It is a factor, the Lapp factor

04:57:13 20    for infringement.

04:57:13 21              THE COURT:  Yeah, but I don't think something

04:57:15 22    that happened in 1973 is very germane to intent in whatever

04:57:22 23    the relevant time period is here.  And I do think it's an

04:57:27 24    incredible sideshow to explain that it's only offered for

04:57:36 25    his state of mind and 30 years later or, what, 40 years

04:57:41  1    later, whatever it is we're talking about.

04:57:43  2         So I think I'm probably going to be excluding

04:57:46  3    that.  And in fact, probably going to exclude any reference

04:57:51  4    to American Cruise Line having existed by that name before

04:57:57  5    the one that's at issue in this case.

04:58:02  6         So trying to get Mr. Murrell out of here in a

04:58:06  7    few minutes.  So the defendants' last one, as I recall, is

04:58:15  8    this the one where you incorporated by reference a whole

04:58:18  9    bunch of other stuff and expected me to do something with

04:58:21 10    it?

04:58:22 11         MR. MURRELL:  This is the expert related.

04:58:23 12         THE COURT:  Yes.

04:58:24 13         MR. MURRELL:  It's the expert motion.  I think

04:58:26 14    you've ruled on the prior issue which was the cumulative

04:58:30 15    nature.  And I think they've agreed to not present claims,

04:58:33 16    present testimony as to the deferred claims, so I think

04:58:37 17    we're good on that.

04:58:38 18         THE COURT:  Okay.  All right.  Okay.  So it's

04:58:49 19    just about 5:00.  I guess I've addressed a few problems or

04:58:57 20    probably addressed one or two concerns.

04:58:59 21         There will be an Order on these motions in

04:59:01 22    limine fairly soon.  And so we have the various things

04:59:08 23    Mr. Kraftschik is going to document in an Order.

04:59:14 24         MR. KRAFTSCHIK:  To be clear, Your Honor, I take

04:59:16 25    it just kind of procedural --

04:59:18  1                    THE COURT:  Yeah.  Yeah.  I'm not expecting you

04:59:20  2    to be my motion in limine scriber, but thank you for asking.

04:59:24  3                    Would you like that job?

04:59:25  4                    MR. KRAFTSCHIK:  I'm busy enough as it is, Your

04:59:28  5    Honor.  Thank you.

04:59:28  6                    THE COURT:  All right.  Just checking.

04:59:30  7                    All right.  So right now the way things are

04:59:34  8    scheduled is I have no plans to see you until the Thursday

04:59:38  9    before trial.  But as I said, if either of you all think

04:59:44 10    that you ought to be seeing me, let me know.  I've got time.

04:59:48 11    If for some reason or another, I think I need to see you, I

04:59:51 12    will let you know --

04:59:52 13                    MR. MURRELL:  All right.

04:59:53 14                    THE COURT:  -- and we'll deal with it.

04:59:54 15                    MR. MURRELL:  Very good.

04:59:55 16                    THE COURT:  Well, thank you for your time this

04:59:56 17    afternoon.  Sorry we didn't have more time.  We'll be in

05:00:04 18    recess.

05:00:05 19                    (Everyone said, Thank you, Your Honor.)

05:00:05 20                    (Pretrial conference hearing was concluded at

05:00:05 21    5:00 p.m.)

05:00:05 22

05:00:05 23

         24

         25