## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-324 (RGA) |
| | ) | |
| HMS AMERICAN QUEEN STEAMBOAT | ) | |
| COMPANY LLC, and AMERICAN QUEEN | ) | |
| STEAMBOAT OPERATING COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

****************

### JOINT PROPOSED JURY INSTRUCTIONS AND OBJECTIONS

Plaintiff, American Cruise Lines, Inc. ("ACL"), and Defendants, HMS American Queen Steamboat Company LLC and American Queen Steamboat Operating Company, LLC (collectively "HMS"), by counsel, submit the following joint proposed jury instructions to be used at the trial of this matter as well as objections to the proposed jury instructions submitted by the other party where the parties were unable to agree on a joint instruction.

Jeremy A. Tigan (#5239)
Stephen J. Kraftschik (#5623)
MORRIS, NICHOLS, ARSHT &
TUNNEL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
JTigan@mnat.com
skraftschik@mnat.com

OF COUNSEL:
David McI. Williams
Charles L. Simmons
Michael R. Naccarato
GORMAN & WILLIAMS

Richard A. Barkasy (#4683)
Daniel M. Pereira (#6450)
SCHNADER HARRISON SEGAL &
LEWIS LLP
824 N. Market Street, Suite 800
Wilmington, DE 19801
(302) 888-4554
rbarkasy@schnader.com
dpereira@schnader.com

OF COUNSEL:
Dennis D. Murrell
Brian P. McGraw
MIDDLETON REUTLINGER
401 S. 4th Street, Suite 2600

36 S. Charles Street, Suite 900
Baltimore, MD 21201-3114
(410) 528-0600
DMWilliams@GW-law.com
CLSimmons@GW-law.com
MRNaccarato@GW-law.com

*Attorneys for Plaintiff*

Louisville, Kentucky 40202
(502) 584-1135
DMurrell@middletonlaw.com
BMcGraw@middletonlaw.com

*Attorneys for Defendants*

### INDEX OF PROPOSED JURY

### INSTRUCTIONS

| Instruction | Page |
|---|---|
| **GENERAL JURY INSTRUCTIONS** …………………………………………………… | 7 |
| Joint General Instruction No. 1: Introduction …………………………………………………………... | 7 |
| Joint General Instruction No. 2: Jurors Duties ………………………………………………..….…..……….. | 8 |
| Joint General Instruction No. 3: Burdens of Proof …………………………….……………..………..…………. | 9 |
| Joint General Instruction No. 4: Evidence Defined ………………………………………….…..…..……… | 10 |
| Joint General Instruction No. 5: Consideration of Evidence ………………………………..….…..……… | 11 |
| Joint General Instruction No. 6: Credibility of Witnesses …………………………………………..……. | 12 |
| Joint General Instruction No. 7: Number of Witnesses …………………………………………..……… | 13 |
| Joint General Instruction No. 8: Expert Witnesses ……………………………………………….. | 14 |
| Joint General Instruction No. 9: Demonstrative Exhibits ……………………………..……………………... | 15 |
| Joint General Instruction No. 10: Use of Notes ……………………………………………….……..…….……… | 16 |
| Joint General Instruction No. 11: Stipulation of Fact ……………………………………….…………………… | 17 |
| Joint General Instruction No. 12: Use of Depositions ……………………………………….……………..…... | 18 |

**FINAL JURY INSTRUCTIONS** …………………….…………..……….……..…….     19

Joint Jury Instruction No. 1:
Introduction ……………………………………………………………….…..…….     19

Joint Jury Instruction No. 2:
Trademark – Definition ……………………………………………………………     20

Joint Jury Instruction No. 3:
Obtaining a Trademark …………………………………………………...…………     21

Joint Jury Instruction No. 4:
Rights in Unregistered Trademarks - Ownership …………………………………     22

Joint Jury Instruction No. 5:
Rights in Unregistered Trademarks - Validity …………………………..…………     23

Joint Jury Instruction No. 6:
Trademark Rights – Secondary Meaning ………………………………………     24

Joint Jury Instruction No. 7:
Trademark – Registrations ………………………………………………………     25

Joint Jury Instruction No. 8:
Presumptions Enjoyed by Registrant of a Trademark ………………………………     26

Joint Jury Instruction No. 9:
Incontestable Trademark Registrations ………………………………………………     27

Plaintiff's Proposed Jury Instruction No. 10:
Score of the Federal Registration ……………………………………………………     28

Proposed Jury Instruction No. 11:
Trademark Rights – Family of Trademarks Defined ………………………………..     30

Plaintiff's Proposed Jury Instruction No. 12:
Likelihood of Confusion – "Family of Marks" – Considerations …………………..     31

Proposed Jury Instruction No. 13:
Trademark – Family of Marks – Ownership and Validity …………………………     32

Joint Jury Instruction No. 14:
Trademark – Assignment of Rights …………………………………………………     36

Plaintiff's Proposed Jury Instruction No. 15:
Trademark – Seniority of Tradename ………………………………………………     37

4

Joint Jury Instruction No. 16:
Trademark Infringement – Elements …………….………............................ 38

Proposed Jury Instruction No. 17:
Trademark Infringement – Likelihood of Confusion Factors ………….……….. 39

Joint Jury Instruction No. 18:
ACL's Claims …………………………………………….….…………….. 47

Joint Jury Instruction No. 19:
ACL's Claims – Brand Trademark Infringement ……………………….…....... 48

Plaintiff's Proposed Jury Instruction No. 20:
Likelihood of Confusion  – Family of Marks – Significance ……………………... 49

Joint Jury Instruction No. 21:
ACL's Claims – Family Infringement Claim …………………………………… 50

Joint Jury Instruction No. 22:
HMS's Counterclaim ……………………………………………………….. 51

Joint Jury Instruction No. 23:
HMS's Counterclaim – Trademark Infringement ……………………………... 52

Joint Jury Instruction No. 24:
Trademark Infringement – Affirmative Defenses  ………………………………. 53
.

Proposed Jury Instruction No. 25:
Trademark Infringement – Affirmative Defense – Trademark Abandonment ……… 54

Proposed Jury Instruction No. 26:
Affirmative Defense – Trademark Abandonment – Elements ……………………. 55

Proposed Jury Instruction No. 27:
Affirmative Defense – Trademark Abandonment – Presumptions and Burden of     56
Proof ………………………………………………………………………….....

Defendants' Proposed Jury Instruction No. 28A:
Affirmative Defense – Abandonment – Elements – Non-Use ……………………. 58

Plaintiff's Proposed Jury Instruction No. 28B:
Affirmative Defense – Abandonment – Elements – Non-Use ……………………. 59

Defendants' Proposed Jury Instruction No. 29A:
Affirmative Defense – Abandonment – Elements – Intent Not to Resume Use …….. 60

Plaintiff's Proposed Jury Instruction No. 29B:
Affirmative Defense – Abandonment – Elements – Intent Not to Resume Use ........   62

Defendants' Proposed Jury Instruction No. 30A:
Affirmative Defense – Abandonment – Elements – Residual Goodwill ...............   63

Plaintiff's Proposed Jury Instruction No. 30B:
Affirmative Defense – Abandonment – Elements – Residual Goodwill ...............   64

Proposed Jury Instruction No. 31:
Affirmative Defense – Invalid Assignment of Trademark ..............................   66

Joint Jury Instruction No. 32:
Willful Trademark Infringement ..............................................................   68

Joint Proposed Jury Instruction No. 33:
No Need to Consider Monetary Damages ..................................................   69

Proposed Jury Instruction No. 34:
Remedies – Monetary Damages ..............................................................   70

Proposed Jury Instruction No. 35:
Disgorgement of Profits ........................................................................   71

**GENERAL POST-TRIAL INSTRUCTIONS** ...........................................   73

Joint General Post-Trial Instruction No. 1:
Deliberations and Verdict - Introduction ..................................................   73

Joint General Post-Trial Instruction No. 2:
Unanimous Verdict ..............................................................................   74

Joint General Post-Trial Instruction No. 3:
Duty to Deliberate ...............................................................................   75

Joint General Post-Trial Instruction No. 4:
Social Media ......................................................................................   76

Joint General Post-Trial Instruction No. 5:
Court Has No Opinion ..........................................................................   77

## GENERAL INSTRUCTIONS

### JOINT GENERAL INSTRUCTION NO. 1
### *INTRODUCTION*

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions you must follow all of them and not single out some and ignore others. They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## JOINT GENERAL INSTRUCTION NO. 2
### *JURORS' DUTIES*

You have two main duties as jurors.  The first one is to decide what the facts are from the evidence that you saw and heard here in court.  Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on any given issue.  It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them.  This includes the instructions that I gave you before and during the trial, and these instructions.  All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly.  Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

## JOINT GENERAL INSTRUCTION NO. 3
### *BURDENS OF PROOF*

When I say a particular party must prove something by "a preponderance of the evidence," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that what a party is claiming is more likely so than not so. To say it differently: if you were to put the evidence favorable to one side of the argument and the evidence favorable to the other side of the argument on opposite sides of the scales, the party with the burden of proof would have to make the scales tip somewhat on its side.

When I say a particular party must prove something by "clear and convincing evidence", this is what I mean:  When you have considered all the evidence in the case, you must have in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases.

## JOINT GENERAL INSTRUCTION NO. 4
### *EVIDENCE DEFINED*

You must make your decision based only on the evidence that you saw and heard here in court.  Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, deposition testimony that was presented to you, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and any other evidence that I have judicially noticed.

Nothing else is evidence.  The lawyers' statements and arguments are not evidence.  The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts.  Their questions and objections are not evidence.  My legal rulings are not evidence.  My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked.  I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see.  And sometimes I may have ordered you to disregard things that you saw or heard, or I struck things from the record.  You must completely ignore all of these things.  Do not even think about them.  Do not speculate about what a witness might have said or what an exhibit might have shown.  These things are not evidence, and you are bound by your oath not to let them influence your decision in any way.  Sometimes testimony and exhibits are received only for a limited purpose.  When I give instructions regarding that limited purpose, you must follow it.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

## JOINT GENERAL INSTRUCTION NO. 5
### *CONSIDERATION OF EVIDENCE*

You should use your common sense in weighing the evidence.  Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves.  If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## JOINT GENERAL INSTRUCTION NO. 6
### *CREDIBILITY OF WITNESSES*

You are the sole judges of each witness's credibility.  You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, so as to make one harmonious story of it all.  But if you cannot do this, then it is your duty    and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at the trial.  You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.  People may tend to forget some things or remember other things inaccurately.  If a witness has made a misstatement you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail.  This instruction applies to all witnesses, including expert witnesses.

## JOINT GENERAL INSTRUCTION NO. 7
### *NUMBER OF WITNESSES*

One more point about the witnesses.   Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified.  What is more important is how believable the witnesses were, and how much weight you think their testimony deserves.  Concentrate on that, not the numbers.

## JOINT GENERAL INSTRUCTION NO. 8
### *EXPERT WITNESSES*

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters.  However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case.  You are free to accept or reject the testimony of experts, just as with any other witness.

## JOINT GENERAL INSTRUCTION NO. 9
### *DEMONSTRATIVE EXHIBITS*

During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses. These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

## JOINT GENERAL INSTRUCTION NO. 10
### *USE OF NOTES*

You may use notes taken during trial to assist your memory. However, you should use caution in consulting your notes.  There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later on in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

## JOINT GENERAL INSTRUCTION NO. 11
### *STIPULATION OF FACT*

      The parties have stipulated that certain facts are true, and those stipulations have been read to you during this trial. You must therefore treat these facts has having been proved for the purposes of this case.

## JOINT GENERAL INSTRUCTION NO. 12
### *USE OF DEPOSITIONS*

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

Depositions were taken in this case and certain depositions have been presented to you by a video and/or by reading the transcript.   Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers from written deposition transcripts.

**END: GENERAL JURY INSTRUCTIONS**

## JOINT JURY INSTRUCTION NO. 1
### *INTRODUCTION*

I will now review for you the positions that you will have to consider in reaching your verdict.  I will then provide you with detailed instructions on trademark law and on what each side must prove to win on each of its contentions.

In this case you are going to decide issues according to these instructions and the instructions will control your deliberations and decision.

**JOINT JURY INSTRUCTION NO. 2**
***TRADEMARK - DEFINITION***

A trademark is a word, symbol, or device or any combination thereof used by a person or entity to identify and distinguish his or her goods from those manufactured or sold by others and to indicate the source of the goods.  A service mark is similar to a trademark, but applies to services rather than goods. For example, a trademark used to identify a retail store service provider is considered a service mark. Trademarks and service marks can also simply be called "marks."  Sometimes all of these terms -- trademarks, service marks and marks -- are used interchangeably.

The purpose of a trademark is to prevent confusion among consumers about the source of products or services and to permit trademark owners to show ownership of their products and services and control their reputation.  Trademarks support informed purchasing decisions and prevent confusion among consumers about the source of products or services.

This case concerns both claims and counterclaims involving registered and unregistered trademarks.

20

## JOINT JURY INSTRUCTION NO. 3
### *OBTAINING A TRADEMARK*

A person acquires the right to exclude others from using a trademark by being the first to use the trademark in the marketplace to indicate the source of goods or services.  Rights in a trademark are obtained only through actual and continuous commercial use of the trademark in a market. The owner of a trademark has the right to exclude others unless the trademark has been abandoned.

Trademarks may be registered with the United States Patent and Trademark Office but need not be registered to be entitled to protection under the law.

## JOINT JURY INSTRUCTION NO. 4
### *RIGHTS IN UNREGISTERED TRADEMARKS - OWNERSHIP*

Trademark rights in unregistered marks are acquired through adoption and actual continuous use of a mark in a market. Use in a market is determined by market penetration, significant enough to show clear entitlement for protection.

To determine whether the market penetration of a trademark in an area is sufficient to warrant protection of a mark, you must consider (1) the volume of sales of the trademarked good or service; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the good or service in relation to the potential number of customers; and (4) the amount of advertising of the product or service in the area.

Determining ownership may require determining which of two competing users is the senior and junior user of the mark in connection with a particular good or service.

## JOINT JURY INSTRUCTION NO. 5
### *RIGHTS IN UNREGISTERED TRADEMARKS - VALIDITY*

Unregistered trademarks can be valid and provide the trademark owner with the exclusive right to use that mark.  In order to establish ownership of an unregistered trademark, the party asserting rights must prove by a preponderance of the evidence that the mark is valid.  A valid trademark is a mark that is either:

1. Inherently distinctive; or

2. Descriptive, but has acquired distinctiveness or secondary meaning.

**JOINT JURY INSTRUCTION NO. 6**
*TRADEMARK RIGHTS - SECONDARY MEANING*

Whether a mark has "secondary meaning" or "acquired distinctiveness" depends on the recognition that the mark has among prospective purchasers. A mark has secondary meaning when the public associates it with the source of the service even though the mark itself does not distinguish the service.

A party must establish secondary meaning in a mark at the time and place that the alleged infringer began using the mark.

To determine whether secondary meaning has attached to a party's common law mark, you must consider (1) whether the extent of sales and advertising by the party has led to consumers associating the mark with the party; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals and association with the party; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) whether evidence of actual confusion exists.

## JOINT JURY INSTRUCTION NO. 7
### *TRADEMARK – REGISTRATIONS*

Once the owner of a trademark has obtained the right to exclude others from using the trademark, the owner may obtain a certificate of registration issued by the United States Patent and Trademark Office.  Afterwards, when the owner brings an action for infringement, the owner may rely on the registration certificate as evidence to prove the owner has the right to exclude others from using the trademark in connection with the type of goods or services specified in the certificate.

There are two registers in the U.S. Patent and Trademark Office: the Principal Register and the Supplemental Register. In short, the Principal Register contains trademarks, while the Supplemental Register contains terms that the user considers capable of becoming trademarks if the term acquires distinctiveness or secondary meaning.

## JOINT JURY INSTRUCTION NO. 8
### *PRESUMPTIONS ENJOYED BY REGISTRANT OF A TRADEMARK*

This case involves trademarks that are registered with the United States Patent and Trademark Office.  A federal registration entitles the registrant to three presumptions:  (1) the trademark is presumed valid; (2) the registrant is presumed to be the owner of the mark; and (3) the registrant is presumed to have the exclusive right to use the mark nationwide in commerce in connection with the goods and services specified in the certificate of registration.

## JOINT JURY INSTRUCTION NO. 9
### *INCONTESTABLE TRADEMARK REGISTRATIONS*

It is undisputed that certain trademarks in this case are now "incontestable" under our trademark laws.  This means that the registrant's registration of the mark is conclusive evidence of three things:  (1) of the validity of the mark; (2) of the registrant's ownership of the mark; and (3) of the registrant's exclusive right to use the mark.

Further, an incontestable mark is conclusively presumed to be either non-descriptive or to have acquired secondary meaning.

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 10
### *SCOPE OF THE FEDERAL REGISTRATION*

A registrant's presumptive rights in a trademark are limited to the specific goods or services listed in the registration certificate. A registrant's rights may not be expanded beyond the goods or services for which it was originally designated. The grant of a form of monopoly should not be liberally construed.

**PLAINTIFF'S AUTHORITY**: Plaintiff understands the Court has ruled that the arranging of transportation for others and the marketing and selling of tickets constitutes the rendering of services in connection with the AMERICAN QUEEN service marks. Plaintiff includes this statement to preserve the record. *Nat. Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir. 1985) ("The Lanham Act provides that the protection afforded by registration extends to "*the goods or services specified in the registration* subject to any conditions or ***1396*** limitations stated therein." 15 U.S.C. § 1115(a). The Second Circuit has concluded that, given this language, "even if a mark is registered, the presumptive right to use it extends only so far as the goods or services noted in the registration certificate. . . . We conclude that the Second Circuit's approach is correct based on both the statutory language construed by that court as well as the purpose of the statute. We have already explained how the Lanham Act is intended to order the use of trademarks in the market place. We believe that this purpose is best served by limiting the impact of a registered mark to only the specific terms of the registration so as to allow parties interested in marketing products with a new mark to rely as fully as possible on the registry. This rule, unlike the rule adopted in *Key Chemicals,* will appropriately encourage registrants who wish to receive the full scope of the Act's protection in regard to the new use of the mark to file a new application covering the new products and making reference to the earlier registration once they begin to sell a new line of products under their registered mark. Additionally, we believe that the grant of a form of monopoly should not be liberally construed. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1231 (3d Cir.1978) ("The right granted to the owner of a registered trademark is a monopoly and should not be extended unless the owner is clearly entitled thereto." (quoting *S.C. Johnson & Son, Inc. v. Johnson,* 266 F.2d 129, 136 (6th Cir.), *cert. denied,* 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959)).")") (emphasis in original); *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. at ----- -, 135 S. Ct. 1293, 1300 (2015); *Am. Int'l Group, Inc. v. Am. Int'l Airways, Inc.*, 726 F. Supp. 1470, 1477 n. 4 (E.D. Pa. 1989). Defendants' objection relies on *See Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F. Supp. 1327 (E.D. Pa. 1976), a case decided long before *Natural Footwear* and which addresses issues other than the scope of protection of a trademark registration, i.e., common law rights.

**DEFENDANTS' OBJECTION:** Defendants object to this instruction on the grounds that it is not an accurate statement of the law and does not relate to a fact question for the jury to decide. The implication from Plaintiff's argument is that alleged infringing services must be identical to the services listed in the registration at issue in order for there to be infringement. That is not the law and Plaintiff cites no case law to support this novel position. While it may be true that

presumptive rights only exist with respect to the specific goods/services listed in the registration (as set forth in the above in instruction proposed by Plaintiff), the remedies of an owner of a trademark are not limited to the goods specified in the certificate of registration and extend to any services on which the use of an infringing mark is likely to cause confusion. *See Louis Rich, Inc. v. Horace W. Longacre, Inc.*, 423 F. Supp. 1327, 1338-39 (E.D. Pa. 1976) (citing *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792 (5th Cir. 1954)). According to the court in *Louis Rich, Inc.*, the owner's interest in a trademark can be protected against infringement not only on competing goods or services, but on goods/services related in the market to the owner's goods/services. *Louis Rich, Inc.*., 423 F. Supp. at 1338-39. This is a highly technical, legal issue for the Court, not the jury and this instruction as given would serve to confuse the jury into believing it cannot find infringement if the good/services involved do not match up exactly to the wording set forth in the registration description.

## PROPOSED JURY INSTRUCTION NO. 11
### *TRADEMARK RIGHTS – FAMILY OF TRADEMARKS DEFINED*

**[PLAINTIFF:_A trademark owner with a plurality of marks with a common prefix or surname may establish that it has a "family of marks."]**

A "family of marks" is a group of marks having a recognizable common characteristic, where the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.

**PLAINTIFF'S AUTHORITY:** McCarthy on Trademarks and Unfair Competition §23:61, 4th Ed., June 2013; *J&J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991); *Oriental Financial Group, Inc., v. Cooperativa de Ahorro Y Credito Oriental*, 832 F.3d 15, 29 (1st Cir. 2016). ).  *Motorola, Inc. v. Griffiths Electronics, Inc.*, 317 F.2d 397, 400–01 (C.C.P.A. 1963) ("if opposer has a family of six marks all starting with the non-descriptive word 'Golden,' it still has that family notwithstanding there may be some others using the same word to some undisclosed extent.") (cited by *AM General Corp. v. DaimlerChrysler Corp.*, 331 F.3d 796 (7th Cir. 2002).  *See also Am Gen.*, 311 F.3d at 816 (citing *Am. Standard Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q. (BNA) ¶ 457 (T.T.A.B. Aug. 18, 1978) ("But, in any event, since opposer is relying herein on its "AQUA" marks in more or less the concept of a "family" of marks, it is manifest that, to support this theory, it is not necessary that all members of the "family" be in existence prior to the entry in the field of another party with a mark containing the common prefix portion. That is, if the evidence establishes the existence of a "family" of marks characterized by a common portion, the cloak of the "family" will extend to and cover other members of the "family" that are born and come into existence at a future date, even though there may be an intervening use.")).

**DEFENDANTS' OBJECTION:**  Defendants object to Plaintiff's proposed language within the instruction to the extent that it does not reflect a correct statement of the law on establishing a family of trademarks.  The law is clear that simply owning a plurality of marks with a common term is not enough in and of itself to establish a family of protectable marks.  *See Am Gen.*, 311 F.3d at 816 ("Merely adopting and using—and even registering—a group of marks with a common feature does not create a family of marks, even if the user intended to create a family."). Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks. *Id. See* Defendants' instruction, below.  Even if Plaintiff's statement was correct, the statement itself belongs in an elements instruction and not within a simple definition of what a family of marks is.  In any event, Plaintiff's proposed language is contrary to the law and likely to mislead the jury into believing that a family of marks has been established simply by the fact that Plaintiff owns and/or uses a number of marks which incorporate the term "American."

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 12

### *LIKELIHOOD OF CONFUSION – "FAMILY OF MARKS" - CONSIDERATIONS*

Whether ACL has a family of marks is determined by considering (1) whether, prior to HMS naming its second vessel "American Empress," the American Cruise Lines tradename and "American" vessel marks in the alleged "American" family were used and promoted in such a way as to create public perception of the word "American" as an indication of source and (2) whether as used in ACL's advertising and promotion the word "American" is distinctive.

In determining whether ACL has a family of "American" marks you should consider the use, advertisement, and distinctiveness of the marks. One relevant consideration is the ownership by ACL of a number of registered and unregistered marks including the word "American" and the manner of ACL's use, advertising, and promotion of those marks.

**PLAINTIFF'S AUTHORITY:** McCarthy on Trademarks and Unfair Competition §23:61, 4th Ed., June 2013; *Thoip v. Walt Disney Co.*, 736 F. Supp. 2d 689, 707 (S.D.N.Y. 2010); *McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1272 (S.D.N.Y. 1986); *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1463-64 (Fed. Cir. 1991). *General Cable Corp. v. Republic Wire & Cable Corp.*, 327 F.2d 1019 (C.C.P.A 1964) ("[P]roof of a public awareness of the individual marks and their identity as to source" supports the establishment of a family of marks. (citing *Motorola, Inc. v. Griffiths Electronics, Inc.*, 317 F.2d 397 (C.C.P.A. 1963)). *Motorola, Inc. v. Griffiths Electronics, Inc.*, 317 F.2d 397, 400–01 (C.C.P.A. 1963) ("if opposer has a family of six marks all starting with the non-descriptive word 'Golden,' it still has that family notwithstanding there may be some others using the same word to some undisclosed extent.") (cited by *AM General Corp. v. DaimlerChrysler Corp.*, 331 F.3d 796 (7th Cir. 2002).

**DEFENDANTS' OBJECTION:** Defendants object to this instruction to the extent that is an incomplete and inaccurate statement of the law. As stated above, simply owning multiple federal trademark registrations does not equate to owning a valid and protectable family of marks. *AM Gen.*, 311 F.3d at 816. Defendants also object to this instruction in that it leaves out important elements relevant to establishing a family of trademarks, including primarily that the party asserting the family rights must have used the alleged family surname prior to a defendant's (or third party's) use of the family surname and tries to limit the issue to when the American Empress entered the market when that is not the only relevant date at issue. This instruction also ignores the factor that it is the family surname that must be used or emphasized in advertising and developed secondary meaning – not the entire mark or marks which contain the family surname. Plaintiff's instruction is worded incorrectly. Defendants' instruction and authority cited below more accurately reflects the law on family of trademarks. Defendants also object to the title of this instruction as a "likelihood of confusion" instruction in that, as worded, the instruction actually relates to whether Plaintiff can establish ownership of a valid and protectable family of trademarks. Finally, Defendants further object in that it is unclear under these instructions whether Plaintiff is claiming that the name American Queen Steamboat Company infringes upon the alleged family of trademarks.

## PROPOSED JURY INSTRUCTION NO. 13

### *TRADEMARK – FAMILY OF MARKS – OWNERSHIP AND VALIDITY*

A party asserting ownership of a family of trademarks must establish the following by a preponderance of the evidence in order to demonstrate that it owns a valid and legally protectable family of trademarks:

(1) That they are the prior user of multiple trademarks that share a common characteristic (the common characteristic known as the family surname);

(2) That the family surname is distinctive and not descriptive or highly suggestive and is not so commonly used in the trade as not to constitute a distinguishing feature of any party's mark; and

(3) Prior to the infringer's first use of its mark, the family of marks were used in advertising or sales as to create common exposure to and recognition by the purchasing public such that the family surname is itself indicative of a common origin of goods or services or has otherwise developed secondary meaning.

[DEFENDANTS: In determining whether the family surname term is distinctive or has secondary meaning, you may consider whether there is third party use of the family term in the market.  If there is significant third party use of the term you may determine that the family surname is not distinctive and/or does not have secondary meaning.  You may also consider whether granting exclusive rights to an otherwise descriptive family surname would result in an anti-competitive effect to the market.

The party asserting family ownership must prove that, prior to the junior user's entry into the market, all or many of the marks in the alleged family were used and promoted in such a way as to create a public perception of the family as an indicator of source.  If the junior user used the family surname term prior to the party asserting rights' use of the term then you may find against the party asserting family trademark rights.

Further, simply using a series of similar marks does not of itself establish the existence of a family. You must consider whether there is actual evidence of a recognition among the purchasing public that the family surname term is indicative of a common origin of the goods.  You may consider that merely adopting and using—and even registering—a group of marks with a common feature does not in and of itself create a family of marks, even if the user intended to create a family.

You may consider whether the family surname term is in fact recognized by the public as a trademark in and of itself. In making this determination, you may consider whether the family surname term has been extensively advertised, whether the family was the focus of advertisements, and whether the advertising has resulted in consumer recognition of the family term as being associated with the party asserting rights.]

**DEFENDANTS' AUTHORITY:**  To assert ownership of a family of marks a plaintiff must allege, and ultimately prove: (1) prior use of marks sharing a recognizable common characteristic; (2) that the common characteristic is distinctive (i.e., not descriptive or highly suggestive or so commonly used in the trade that it cannot function as the distinguishing feature of any party's mark); and (3) that prior to the defendant's first use (or constructive first use) of its involved mark, plaintiff's marks have been used and advertised in promotional material or in everyday sales activities in such a manner as to create common exposure and thereafter recognition among the purchasing public such that the common characteristic is itself indicative of a common origin of the goods or services. *Wise F&I, LLC v. Allstate Insurance Company*, 120 U.S.P.Q.2d 1103, 1109, 2016 WL 6777774 (T.T.A.B. Sept. 23, 2016).  The Trademark Trial and Appeal Board also agreed with the previous authority cited by Defendants that "[s]imply using a series of similar marks does not of itself establish the existence of a family." *Id.*, citing *J & J Snack Foods*, 18 USPQ2d at 1891-92; *see also Consolidated Foods Corporation v. Sherwood Medical Industries Inc.*, 177 U.S.P.Q. 279, 1973 WL 20088 (T.T.A.B. 1973) (ownership of a large number of registrations does not per se establish recognition of a family); *Eveready Battery Company, Inc. v. Green Planet, Inc.*, 91 U.S.P.Q.2d 1511, 2009 WL 2176668 (T.T.A.B. 2009) ("The fact that opposer has used and registered several marks including SCHICK is not in itself sufficient to establish the existence of a family of marks."); *Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC*, 91 U.S.P.Q.2d 1671, 2009 WL 959775, *4 (S.D. N.Y. 2009) ("Merely adopting and using—and even registering—a group of marks with a common feature does not create a family of marks, even if the user intended to create a family."); *In re LC Trademarks, Inc.*, 121 U.S.P.Q.2d 1197, 1204, 2016 WL 7655545, *8 (T.T.A.B. 2016) (holding that evidence of many registrations "alone do not demonstrate the extent to which customers have been exposed to the marks….").

Further, Plaintiff must show that it has priority to the alleged family term.  The "basic rule of trade-mark ownership in the United States is priority." J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16:1, at 16-4 (2015).  Priority, in both common law and registration rights, all "build upon this foundation of **first-in-time, first in-right**." *Id.* (Emphasis added).  As between two parties who claim rights to the same term, the general rule is that "priority of appropriation determines the question." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100, 39 S. Ct. 48 (1918).  The first to use a mark or term in commerce has priority. *B & B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S. Ct. 1293, 1299, 1310, 191 L. Ed. 2d 222, 113 U.S.P.Q.2d 2045 (2015) ("One who first uses a distinct mark in commerce thus acquires rights to that mark."); *Hana Financial, Inc. v. Hana Bank*, 135 S. Ct. 907, 909, 190 L. Ed. 2d 800, 113 U.S.P.Q.2d 1365 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users.").

"Whether a family of marks exists is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in party's other marks." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 815 (7th Cir. 2002); *see J & J Snack Foods Corp.*, 932 F.2d at 1463 (stating that it is "necessary to consider the use, advertisement, and distinctiveness of the marks, including assessment of the contribution of the common feature to the recognition of the marks as of common origin."). Courts are reluctant to

find secondary meaning for an alleged family surname where there is extensive third party use of the term and/or granting exclusive rights to the term would have anti-competitive results. *See Primedia Intertec Corp. v. Technology Marketing Corp*., 35 F. Supp. 2d 809, 50 U.S.P.Q.2d 1079 (D. Kan. 1998) (extensive third party use); *In re LC Trademarks, Inc*., 121 U.S.P.Q.2d 1197, 2016 WL 7655545 (T.T.A.B. 2016) (cautioning against anti-competitive use of descriptive family terms and just owning multiple registrations does not establish a family).

The party asserting family ownership must prove that, prior to the junior user's entry into the market, all or many of the marks in the alleged family were used and promoted in such a way as to create a public perception of the family as an indicator of source. *Pfizer Inc. v. Astra Pharmaceutical Products, Inc.,* 858 F. Supp. 1305, 1329, 33 U.S.P.Q.2d 1545 (S.D. N.Y. 1994) ("[T]he issue of the existence of the family of marks should be judged at the time that the junior user entered the marketplace."); *AM Gen. Corp. v. DaimlerChrysler Corp*., 311 F.3d 796, 819 (7th Cir. 2002) ("[The junior user] can't be said to have infringed a family of marks that did not exist when its [accused trade dress] entered the market….").

For the surname to qualify for family trademark protection, the party asserting rights must prove that the alleged family surname is in fact recognized by the public as a trademark in and of itself. This requires some proof that the family surname has been so extensively advertised that buyers would be likely to think that defendant's product originates with plaintiff. *Witco Chemical Co. v. Chemische Werke Witten G.m.b.H.*, 158 U.S.P.Q. 157 (T.T.A.B. 1968) (No WIT- prefix family for industrial chemicals) ("[W]e look primarily to the nature and character of opposer's advertising and promotional material."); *Moore Business Forms, Inc. v. Roger-Snap Business Forms, Inc*., 163 U.S.P.Q. 303 (T.T.A.B. 1969); *Polaroid Corp. v. American Screen Process Equipment Co*., 166 U.S.P.Q. 151 (T.T.A.B. 1970) (No POLA- prefix family in photographic field) (holding thatadvertising and promotion must create "an association of common ownership" and leads buyers to "ascribe all trademarks in the field bearing the prefix 'POLA' with Polaroid."); *White Heather Distillers, Ltd. v. American Distilling Co.*, 200 U.S.P.Q. 466 (T.T.A.B. 1978) (holding that marks "WHITE HEATHER" and "PRECIOUS HEATHER" could not constitute a family where the record failed to indicate that marks had ever been advertised together). A party asserting rights must show that there were advertising and promotional expenditures that actually resulted in consumer recognition of the family surname. *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.,* No. 05–5259, 2006 U.S. Dist. LEXIS 16672 at *21–22, 2006 WL 892718, *11 (D.N.J. Apr. 4, 2006); *see also Primepoint*, 545 F. Supp. 2d at 433-34 (finding no evidence of family where party asserting rights simply identified advertising numbers but did not show that any consumer recognition resulted). For example, where a party advertises the family of marks together and there was evidence of consumer recognition there could be evidence that a family of marks exists. *See 7–Eleven, Inc. v. Wechsler*, No. 91117739, 2007 WL 1431084, 83 U.S.P.Q.2d 1715 (T.T.A.B. 2007).

**PLAINTIFF'S OBJECTION:** Defendants' proposed additions to the instruction are overstated and confusing on the law of family of marks. Further, the proposed language includes advocacy and is not balanced on certain material issues, e.g. third-party use of a formative element does not necessarily defeat rights in family of marks. *J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 1462 (Fed. Cir. 1991); *Motorola, Inc. v. Griffiths Elec. Inc.,* 317 F.2d 397 400 (C.C.P.A. 1963). Further, Defendants' assertion of anti-competitive effect ignores the exclusivity

of use provided by trademark law and relies on a TTAB opinion in which the family of marks was denied on repeated common descriptive words punctuated by exclamation points. *In re LC Trademarks Inc.,* 121 U.S.P.Q.2d 1197 (T.T.A.B. 2016) (considering whether marks such as Pizza! Pizza! Crispy! Crispy! And Big! Big! Create a family of marks). Plaintiff believes its family of marks instruction provide clear and concise statements of law applicable to families of marks.

## JOINT JURY INSTRUCTION NO. 14
### *TRADEMARK – ASSIGNMENT OF RIGHTS*

A trademark symbolizes the public's confidence or goodwill in a particular product or service. The owner of a trademark may transfer to another the owner's interest in the trademark, including the right to exclude others from using the trademark, provided the trademark is transferred along with the goodwill of the business. This transfer is called an assignment, and the person to whom this right is transferred is called an assignee.  An assignment can be of a trademark for an entire business or for a distinct and separate part of a business.

Following a proper assignment, the assignee steps into the shoes of the assignor, and the assignee acquires all of the legal advantages and obligations of the mark that the assignor enjoyed.

**PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 15**
***TRADEMARK – SENIORITY OF TRADENAME***

Plaintiff's AMERICAN CRUISE LINES brand name and two trademarks have seniority over Defendants' AMERICAN QUEEN STEAMBOAT COMPANY brand name and trademark.

**PLAINTIFF'S AUTHORITY:** The Court ruled that HMS cannot rely on the doctrine of "tacking" and that the AMERICAN QUEEN STEAMBOAT COMPANY mark is junior to the AMERICAN CRUISE LINES mark. .Memorandum Opinion dated August 16, 2017 (D.I. 258) at 36.

**DEFENDANTS' OBJECTION:** Defendants object to this instruction to the extent that it is contrary to the Court's actual summary judgment ruling in this case [DI 258]. The Court denied Defendants' motion for summary judgment on the issue of priority but did not rule that Defendants could not establish priority at trial.  Defendants also object to this instruction to the extent that it is unnecessary and designed to prejudice the rights of Defendants. The jury need not decide priority with respect to this particular claim and neither party has asked the jury to make such a determination in their respective verdict forms. Priority is only relevant in this case with respect to Plaintiff's family infringement claim.  The priority instruction relevant to the family infringement claim is contained in Defendants' proposed family instructions set forth above.

## JOINT JURY INSTRUCTION NO. 16
### *TRADEMARK INFRINGEMENT—ELEMENTS*

To succeed on a claim or counterclaim for trademark infringement, the party asserting infringement must prove the following by a preponderance of the evidence:

1) There is a valid and legally protectable trademark;

2) It owns that mark; and

3) The other party uses the mark to identify goods or services and causes a likelihood of confusion.

## PROPOSED JURY INSTRUCTION NO. 17
### *TRADEMARK INFRINGEMENT- LIKELIHOOD OF CONFUSION FACTORS*

The core of a trademark infringement claim is likelihood of confusion. To establish whether a likelihood of confusion exists, you must look to a multi-factor test. Each factor analyzes the trademark and use of both the trademark owner and the alleged infringer to establish whether consumers are likely to be confused if both parties are permitted to use their trademarks. As you consider whether there is a likelihood of confusion, examine the following factors (in no particular order of importance):

1. **Degree of Similarity Between the Marks at Issue.** If the overall impression created by the trademark owner's trademark in the marketplace is similar to that created by the alleged infringer's trademark in appearance, sound, or meaning, there is a greater chance of a likelihood of confusion. Similarities in appearance, sound or meaning weigh more heavily than differences in finding the marks are similar. **[PLAINTIFF: When products compete mark similarity is the most of the factors to be considered when determining likelihood of confusion. It is proper to give greater force and effect to a dominant feature. When the dominant portions of the two marks are the same, confusion is likely. In circumstances where a weak mark is used in conjunction with a strong brand mark, the likelihood of confusion with other marks is lessened. Similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer or provider of services.]** **[DEFENDANTS: The parties' marks should be considered in their entireties and in their commercial settings and you may look at the trademarks as a whole as opposed to comparing their individual features.].**

2. **Strength of the Trademark Being Infringed.** Some trademarks are stronger than others. The stronger the trademark, the more protection should be given to it. A strong trademark is one that carries widespread, immediate recognition that one party is associated with the mark, and so with the product or service provided. The more the consuming public recognizes the owner's trademark as an indication of origin of their goods or services, the more likely that it is that consumers would be confused about the source of the alleged infringer's goods or services if the alleged infringer uses a similar mark. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd. Use of similar marks by others in the market at issue weighs in favor of finding that a mark is relatively weak and that a likelihood of confusion does not exist.

3. **The Price of the Goods and the Sophistication of the Purchasers.** The more sophisticated the potential buyers of the goods or services or the more costly the goods or services, the more careful and discriminating the potential purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the trademarks at issue. **[PLAINTIFF: Whether a likelihood of confusion exists should be determined by an examination of likely confusion**

among the class of least sophisticated consumers of the goods or services. Even sophisticated purchasers can be confused by very similar marks.]

4.  **Evidence of Actual Confusion.** If use by the alleged infringer of the trademark owner's trademark has led to instances of actual confusion, this strongly suggests a likelihood of confusion. Because proving actual confusion is difficult, relatively little showing is required on the part of the party attempting to prove actual confusion. However, actual confusion is not required for a finding of likelihood of confusion.  Even if actual confusion did not occur, the alleged infringer's use of the trademark may still be likely to cause confusion.  As you consider whether the trademark used by the alleged infringer, you should weigh any instances of actual confusion against the opportunities for such confusion.  If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion.  If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.  [PLAINTIFF: An inference can be drawn that survey results would be unfavorable to a Plaintiff or Counter-Plaintiff if that party fails to conduct a survey where it has the financial resources to do so.]

5.  **Length of Time the Alleged Infringer has Used the Mark Without Evidence of Actual Confusion.**  If you find that one or more marks were used for an extended period of time without evidence of actual confusion, it can be inferred that continued marketing will not lead to consumer confusion in the future.

6.  **Intent of the Alleged Infringer.** Knowing use by the alleged infringer of the trademark at issue to identify similar services may show an intent to benefit from the reputation of the trademark owner – suggesting an intent to cause a likelihood of confusion.  Evidence of a party's intentional use of another party's mark to cause confusion is not a prerequisite to proving infringement.  However, evidence of intentional, willful and admitted adoption of a mark closely similar to an existing mark weighs in favor of finding a likelihood of confusion. [DEFENDANTS: There is no intent to cause confusion where the alleged infringer was attempting to trade on the reputation of its own name or mark that it had already developed.]

7.  **Similarity of Channels of Trade.** The greater the similarity in advertising and marketing campaigns, the greater likelihood of confusion. If the parties' goods or services are sold in the same or similar outlets, or advertised in similar media, there is a greater likelihood of confusion.

8.  **The Extent to Which the Targets of the Parties' Sales Efforts are the Same.** If the parties' services are sold or offered for sale to the same or similar customers, this may increase the likelihood of confusion.  The parties agree that their respective sales efforts are targeted to the same class of consumers.

**9.    Similarity of the Services.**  The more similar the services offered by the parties, the greater the likelihood of confusion.  **[DEFENDANTS: However, if the services are in the same general category, but distinct niches, they may be sufficiently distinct that consumers will not assume an association.  Thus, when two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark.]**

**10.**    [OTHER FACTORS EITHER PARTY CONTENDS SHOULD BE CONSIDERED BASED ON THE EVIDENCE ADDUCED AT TRIAL]

The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion.

**Parties' Positions:**

**1.  Similarity of Marks**

**PLAINTIFF'S AUTHORITY AND OBJECTION:** Defendants' primary objection is that the mark must be viewed in its entirety.  Plaintiff does not disagree.  However, Plaintiff will present evidence that the word "American" is the dominant portion of both marks.  If the Jury agrees, then the jury should be instructed on what to do with that determination.  The Courts considering the issue have made clear that it is proper to give greater force and effect to the dominant feature and that where the dominate portions of two marks are the same, confusion is likely.  *Checkpoint Sys., Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 281 (3d Cir. 2001); *A & H Sportswear v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210; 218-19 (3d Cir. 2000); *Alliance Bank v. New Century Bank*, 742 F. Supp. 2d 532, 556 (E.D. Pa. 2010) (quoting *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570 (Fed. Cir. 1983) ("it is proper to give greater force and effect to that dominant feature")); *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991) ("When the dominant portions of the two marks are the same, confusion is likely"); *www. Pham.com, Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993); *Henri Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352 (7th Cir. 1983); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983).

**DEFENDANTS' AUTHORITY AND OBJECTION:** Defendants' proposed language comes from the Eleventh Circuit's Pattern Jury Instructions, No. 5.13 ("plaintiff must demonstrate by a preponderance of the evidence, that defendant's use of its trademark is, when viewed in its entirety, likely to cause confusion") (emphasis added).  This same principle is reflected in the case law. *See Opryland USA Inc. v. Great Am. Music Shop, Inc.*, 970 F.2d 847, 851 (Fed. Cir. 1992) (holding marks must be considered in their entireties and in their commercial settings.  The case law is further clear that it is the overall impression of the marks that matters.  *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010).

Defendants object to Plaintiff's instruction on the "dominant portion of the mark." For example, in *A & H Sportswear*, 237 F.3d at 217, the marks at issue were MIRACLESUIT and THE MIRACLE BRA. The plaintiff argued that the marks both shared the dominant portion "MIRACLE" and the remaining terms were all generic in nature, therefore, the marks should be held confusingly similar. *Id*. at 217-218. However, the district court disagreed, holding that the two marks sounded different when spoken out loud, had visual distinctions when viewed in the market context, and had different meanings or connotations. *Id*. (citing *A & H Sportswear Co. v. Victoria's Secret Stores, Inc*., 57 F. Supp. 2d 155, 167 (E.D. Pa. 1999)). The Third Circuit affirmed the district court's finding with respect to this factor. *A & H Sportswear*, 237 F.3d at 217-218. Defendants maintain that the marks must be looked at their entireties and the jury cannot focus solely on the fact that both parties' marks use the term "American" as the only basis for a finding of infringement in this case.

## 2. Price and Sophistication of Consumers

**PLAINTIFF'S AUTHORITY:** The Third Circuit has weighed in expressly on this issue. The "appropriate standard of care to be exercised" should be "equal to that of the least sophisticated consumer in the class." *Sabsina Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 186-87 (3d Cir. 2010); *see also, In re Shell Oil Co.,* 992 F.2d 1204, 1208 (Fed. Cir. 1993); *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 293 (3d Cir. 1991). The evidence in this case will be that consumers of cruise services are both sophisticated and unsophisticated. Further, the evidence will be that there is confusion among individual consumers as well as travel agents, i.e., trained professionals whose job it is to advise consumers and to differentiate between cruise products and services available in the marketplace. The jury should be instructed, in accordance with *Sabsina*, that they are to consider confusion from the perspective of the least sophisticated consumer in the class.

**DEFENDANTS' OBJECTION:** Defendants object to the language proposed by Plaintiff with respect to this factor. The law is clear that when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. *Checkpoint Sys*., 269 F.3d at 284–85. Similarly, where the relevant products (or services) are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations. *Id*., (citing *Versa Prods*., 50 F.3d at 204) ("Inexpensive goods require consumers to exercise less care in their selection than expensive ones. The more important the use of the product, the more care that must be exercised in its selection."); *Ford Motor Co. v. Summit Motor Prod., Inc*., 930 F.2d 277, 293 (3d Cir. 1991) ("Professional buyers, or consumers of very expensive goods, will be held to a higher standard of care."); *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 128 (4th Cir. 1990) ("[I]n a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone."); *see Oreck Corp. v. U.S. Floor Sys., Inc*., 803 F.2d 166, 173–74 (5th Cir. 1986)

(holding that business purchasers of expensive products not likely to confuse goods with similar marks); *see also* MCCARTHY, § 23:101.

Plaintiff argues that the standard should be that of the least sophisticated consumer. That would not be a proper application of the *Checkpoint* decision. In *Checkpoint*, the court actually held that where evidence is presented that the purchasing class is mixed, courts would generally not hold the class to a higher standard of care but would apply the care of the least sophisticated consumer. The evidence here will show that the sophisticated consumer heightened standard should be applied in this case. Further, the evidence will show that consumers actually exercise heightened care here because of the expensive nature of the services provided.

3. **Actual Confusion**

**PLAINTIFF'S AUTHORITY:** The evidence will be that Defendants' failed to conduct a survey concerning whether there is consumer confusion between the marks "American Cruise Lines" and "American Queen Steamboat Company." The evidence will be clear that Defendants had the financial resources to conduct a survey had they chosen to do so. While affirming the trial court's refusal to give a jury charge on failure of a party to conduct a survey, the Third Circuit stated that a failure to conduct a survey could lead a jury to infer that the party failing to conduct the survey believes the results would be unfavorable. *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467, 475 (3d Cir. 1990) ("a plaintiff's failure to conduct such a survey where it has the financial resources to do so could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable.") (citing *Eagle Snacks, Inc. v. Nabisco Brands, Inc*., 625 F.Supp. 571, 583 (D.N.J. 1985) (inferences made during a bench trial). Here, Defendants are both a plaintiff on the counterclaim and a defendant on ACL's claims. In their role as counterclaim plaintiffs, Defendants failed to procure a survey and the jury should be advised concerning the applicable inference. With respect to their role as a defendant to ACL's claims, the converse of the *Destileria* case should also should hold true. That is, where the defendant fails to conduct a survey, in the face of a plaintiff's survey showing consumer confusion, and the defendant has the financial resources to procure a survey, a jury should be entitled to infer that defendant believes the survey results would be unfavorable. Here, Plaintiff will present expert witness Hal Poret on this issue. Defendant retained no expert to prepare its own independent survey and failed to counter Mr. Poret's opinions.

**DEFENDANTS' OBJECTION:** Plaintiff takes the position that the jury instructions should include a statement indicating that there is an inference of no confusion where a party does not present survey evidence when it has the resources to do so. Not surprisingly, Defendants cannot locate a single decision that stands for this proposition. Binding Third Circuit law confirms that a consumer survey is not mandatory to establish likelihood of confusion in a Lanham Act case. *Charles Jacquin*, 921 F.2d at 475-76. In that case, the court in dicta indicated that in some limited circumstances an inference could be made where a plaintiff (or a party with the burden of proof) did not hire a survey expert (NOT A DEFENDANT). In any event, the law cited by Plaintiff confirms that

there is no requirement to present survey evidence in order to establish a likelihood of confusion. In fact, in the *Charles Jacquin* case cited by Plaintiff, the Third Circuit affirmed the district court's refusal to instruct the jury as to an inference based on plaintiff's failure to introduce a survey as part of its case. The court reasoned that "[w]hile consumer surveys are useful, and indeed the most direct method of demonstrating secondary meaning and likelihood of confusion, they are not essential where, as here, other evidence exists." *Id.* at 476.

### 4. Intent of Infringer

**PLAINTIFF's OBJECTION:** Defendants' additional language seeks an instruction that there is no intent to cause confusion where the defendant was attempting to trade on the reputation of its own name or mark that it had developed. Defendants' intent must necessarily be determined at the time Defendants chose their brand/mark. The evidence will be that Defendants' chose the mark "American Queen Steamboat Company" within a few months following the settlement of the prior litigation on February 9, 2012. The evidence will be that at that time of their selection of the brand/mark, Defendants had never used the "American Queen Steamboat Company" mark in commerce. Thus, there will be no evidence that Defendants were attempting to trade on the reputation of its own name or mark that it had developed at that time because there could be no reputation at that time.

Any argument that Defendants' additional language relates to its reliance on an asserted reputation of the vessel that it had rights to purchase (as of December 31, 2010) but had not closed on (August 3, 2011) misses the mark. This position simply recasts an argument previously addressed by this Court. Defendant argued at summary judgment that it should be entitled to rights associated with the American Queen vessel trademark under the theory "natural expansion" while conceding that the doctrine of tacking was not applicable in this case. The Court's opinion on these theories appears at D.I. 258 at 36-37:

> The AQSC mark itself is junior to the ACL mark. Thus, Defendant's claim of priority rests on its ownership of the American Queen [vessel] mark. There is no basis in the law for Defendant to claim priority. It does not contest that its AQSC mark is junior to the ACL mark. It further concedes that tacking, a doctrine that allows a newer mark to claim priority from an older marks are legal equivalents, does not apply (D.I. 245 at 6 n.6). Defendant instead argues that use of AQSC is a "natural expansion" of its rights in American Queen but cites no authority for this uncharted proposition. (*Id.* at 7; *see also* D.I. 213 at 37-38). To the extent Defendant's motion (D.I. 212) moves for summary judgment of no infringement on the basis of priority, that motion is denied.

44

If Defendants can claim no priority of use related to the vessel name, it should likewise receive no jury instruction that trading on the vessel's prior reputation is an avoidance to finding intent.  The jury is not being asked whether confusion exists in the use of the American Queen vessel mark when compared to the American Cruise Lines mark.  The jury is being asked whether confusion exists in the use of the American Queen Steamboat Company mark when compared to the American Cruise Lines mark.  The existing vessel mark for the American Queen is irrelevant to the issue of intent and Defendants' proposed additional language should be rejected.

**DEFENDANTS' AUTHORITY:** The Third Circuit holds that a defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's.  *See Versa Prods., Inc*., 50 F.3d at 205–06; *see also Checkpoint Sys*., 269 F.3d at 286 ("[t]here is no evidence or even inference that defendant chose its name with plaintiff's name or products in mind.").  In *A & H*, for example, the court held there was no evidence of intent to confuse where the defendant was attempting to trade on the reputation its own mark had developed in connection with the sale of unrelated products as opposed to there being evidence that it was trying to ride on the coattails of plaintiff's name.  *A & H Sportswear, 237 F.3d at 225-26*.  Defendant chose the name American Queen Steamboat Company, in part, because the company name was to draw from the iconic *American Queen* vessel – the company's flagship vessel.  This is similar to what Defendants' predecessor, the Delta Queen Steamboat Company did in that the Delta Queen Steamboat Company named itself after its flagship vessel – the *Delta Queen*.  Defendant also chose the name because Plaintiff indicated it would not object to that name on multiple occasions.

5. **Similarity of Services**

**PLAINTIFF's OBJECTION:**  There is no serious debate in this case that Plaintiff and Defendants offer very similar services.  As Defendants conceded in the summary judgment briefing "The parties here offer virtually identical services from the standpoint that they both generally operate overnight cruise ship services using the same itineraries on the Mississippi River and Columbia/Snake Rivers.  Both companies use similar types of vessels (paddle wheel style vessels) for these cruises.  D.I. 171 at 36.  As Defendants concede, there are no "distinct niches" or "distinct sectors" applicable in this case.  To instruct the jury concerning these issues would only serve to cause confusion.  A review of Defendants' authorities shows they do not support Defendants' position.   For example, in *Checkpoint Sys*., 269 F.3d at 286-288, the Appellate Court upheld a finding that the products offered where in the same general product category but operated in different niches.  There, one product was closed circuit television and related products while the other was computer firewall technology.  *Id.* at 288.  In *Commerce Nat'l Ins. Servs., Inc.,* 214 F.3d at 441, one party provided services in the banking industry while the other provided insurance services.  In *Astra Pharm. Prods*., 718 F.2d at 1207, on party provided pharmaceuticals and medical products while the other distributed laboratory instrumentation and hospital and laboratory supplies and equipment.  *Id.* at 1203.  Finally, in *Harlem Wizards*, 952 F. Supp. at 1095, one party provided professional,

45

competitive NBA basketball under the mark Washington Wizards, while the other provided basketball shows with "comedy routines and fancy tricks." *Id.* In the present case, both parties provide overnight cruising services on the Mississippi and Columbia/Snake rivers.  Both use the same itineraries and similar types of vessels.  Both cater to the same customers.   There are no niche markets between these two direct competitors on the rivers on which they compete.   Defendants' proposed additional language would not assist the jury in reaching a fair resolution but rather would cause confusion.

**DEFENDANTS's AUTHORITY:** According to the Third Circuit in *Checkpoint Sys.*, goods may fall under the same general product category but operate in distinct niches. When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark.   *See Checkpoint Sys.*, 269 F.3d at 286; *see also Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 441 (holding marks held by company operating in banking industry and company operating in insurance industry did not create consumer confusion because the two companies were involved in distinct highly regulated industries); *Astra Pharm. Prods.*, 718 F.2d at 1207 (finding no product similarity in medical technology sold to different departments in hospital because "'the hospital community' is not a homogeneous whole, but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products."); and *Harlem Wizards*, 952 F. Supp. at 1095 (finding no product similarity between professional competitive basketball team and "show basketball" team).

## JOINT JURY INSTRUCTION NO. 18
### *ACL'S CLAIMS*

ACL brings two claims for trademark infringement and unfair competition against HMS. The first claim is a claim for infringement of the AMERICAN CRUISE LINES tradename and brand marks. The second claim is a claim for infringement of a family of "American" trademarks.

## JOINT JURY INSTRUCTION NO. 19
### *ACL'S CLAIMS – BRAND TRADEMARK INFRINGEMENT*

In order to succeed on its claim of brand mark infringement ACL must prove:

1)  That the AMERICAN CRUISE LINES marks are valid and legally protectable;

2)  That it is the owner of the AMERICAN CRUISE LINES marks; and

3)  That HMS's use of the name AMERICAN QUEEN STEAMBOAT COMPANY causes a likelihood of confusion.

In this case there is no dispute that the AMERICAN CRUISE LINES marks are valid and legally protectable or that ACL is the owner of the AMERICAN CRUISE LINES marks.  ACL claims that there is a likelihood of confusion based on HMS's tradename and brand mark AMERICAN QUEEN STEAMBOAT COMPANY.  HMS denies that there is a likelihood of confusion. You are directed to consider the likelihood of confusion factors previously addressed in Instruction No. 17.

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 20
### *LIKELIHOOD OF CONFUSION – "FAMILY OF MARKS" - SIGNIFICANCE*

If you find that ACL has a family of "American" marks, that may be an additional factor beyond any similarities between HMS's brand name and services and vessel names and ACL's brand name, vessel names, and services weighing in favor of a likelihood of confusion.

The questions is whether the use by ACL of its AMERICAN CRUISE LINES brand name and marks in combination with its "American" vessel marks as a family of marks increases the likelihood of confusion between that family of marks and AMERICAN QUEEN STEAMBOAT COMPANY and its "American" vessels. The question is not simply whether an HMS mark is similar to any one of ACL's individual marks, but whether HMS's marks would likely be viewed as members of ACL's American family of marks.

**PLAINTIFF'S AUTHORITY:** McCarthy on Trademarks and Unfair Competition §23:61, 4th Ed., June 2013; *McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1272 (S.D.N.Y. 1986) ("it is clearly established … that likelihood of confusion refers to confusion *of any type*"); *Oriental Financial Group, Inc., v. Cooperativa de Ahorro Y Credito Oriental*, 832 F.3d 15, 29 (1st Cir. 2016) (plaintiff may show similarity of the marks by comparing specific marks or that the marks share the same root or formative element); *J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 1463-64 (Fed. Cir. 1991).

**DEFENDANTS' OBJECTION:** Defendants object to this instruction to the extent that is unnecessary and confusing and not a correct statement of the law on likelihood of confusion. The family infringement claim should be treated separate and distinct from the brand infringement claim and this instruction blurs the two into a confusing concept that will not be helpful for the jury. Plaintiff's brand infringement claim relates solely to the claim that Defendants are infringing upon Plaintiff's rights to its AMERICAN CRUISE LINES mark(s) and there is not a separate element related to family trademarks within that brand infringement claim. Further, a family infringement claim, like any infringement claim, necessarily involves an analysis of the likelihood of confusion factors. *See McDonalds*, 649 F. Supp. at 1273-1279 (in depth review of all relevant factors in order to determine whether there is a likelihood of confusion). Plaintiff has created a standard for family trademark infringement and likelihood of confusion that is not supported under the law and does not exist. Defendants have offered an alternative family law instructions as set forth herein. Defendants do not believe this instruction is necessary or helpful in light of earlier instructions on the separate family claim and the likelihood of confusion standard.

## JOINT JURY INSTRUCTION NO. 21
### *ACL CLAIMS – FAMILY INFRINGEMENT CLAIM*

In order to succeed on its claim of infringement of a family of "American" trademarks ACL must prove:

    1)  That a family of "American" trademarks is valid and legally protectable;

    2)  That it is the owner of a family of "American" trademarks; and

    3)  That HMS's use of the vessel names AMERICAN EMPRESS, AMERICAN DUCHESS and/or AMERICAN COUNTESS causes a likelihood of confusion with the family of "American" trademarks.

In this case ACL claims that it owns a family of "American" trademarks including vessel name marks each containing the word "American" as the first word of the vessel name and that HMS's use of "American" for its fleet branding and the vessel name marks AMERICAN EMPRESS, AMERICAN DUCHESS and AMERICAN COUNTESS causes a likelihood of confusion. HMS denies that ACL has established a valid and legally protectable family of "American" trademarks and denies that there is a likelihood of confusion. You are directed to consider the family of trademarks instructions previously addressed in Instruction Nos. 11 and 13 and the likelihood of confusion factors previously addressed in Instruction No. 17.

## JOINT JURY INSTRUCTION NO. 22
### *HMS'S COUNTERCLAIM*

HMS brings a counterclaim for trademark infringement and unfair competition against ACL. The claim is for infringement of the AMERICAN QUEEN marks.

## JOINT JURY INSTRUCTION NO. 23
### *HMS'S COUNTERCLAIM – TRADEMARK INFRINGEMENT*

In order to succeed on its counterclaim of trademark infringement HMS must prove:

1)  That the AMERICAN QUEEN marks are valid and legally protectable;

2)  That it is the owner of the AMERICAN QUEEN marks; and

3)  That ACL's use of the vessel names AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY and/or AMERICA causes a likelihood of confusion.

ACL disputes that the AMERICAN QUEEN marks are valid and legally protectable or that HMS is the owner of the AMERICAN QUEEN marks based on its affirmative defenses addressed in Instruction Nos. 24-31.  HMS claims that there is a likelihood of confusion based on ACL's vessel names AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY and/or AMERICA.  ACL denies that there is a likelihood of confusion based on its vessel names. You are directed to consider the likelihood of confusion factors previously addressed in Instruction No. 17.

## JOINT JURY INSTRUCTION NO. 24
### *TRADEMARK INFRINGEMENT- AFFIRMATIVE DEFENSES*

An affirmative defense is defined as a matter asserted by a party against who a claim or counterclaim is made, which assuming the claim or counterclaim to be true, constitutes a defense to the claim.

In this case ACL denies that HMS has asserted a valid counterclaim and ACL  asserts two affirmative defenses to that counterclaim.   The first affirmative defense is that the AMERICAN QUEEN trademark registrations have been abandoned and are no longer valid. The second affirmative defense is that the assignment of the AMERICAN QUEEN trademarks to HMS was invalid.

**PROPOSED JURY INSTRUCTION NO. 25**
*TRADEMARK INFRINGEMENT - AFFIRMATIVE DEFENSE –*
*TRADEMARK ABANDONMENT*

ACL asserts the affirmative defense to HMS' trademark infringement counterclaim in this case that the AMERICAN QUEEN trademarks have been abandoned. ACL bears the burden of proving this defense by clear and convincing evidence.

An entity can lose its rights to a trademark if the trademark has been abandoned. **[DEFENDANTS: If you determine that the AMERICAN QUEEN registrations have been abandoned then the registrations can no longer be used by HMS in its counterclaim against ACL and HMS must, therefore, rely on any unregistered or common law trademark rights in order to succeed on its counterclaim against ACL.] [PLAINTIFF: If HMS must rely on unregistered or common law trademark rights, it must prove the elements addressed in Instruction Nos. [   ]. Once a mark is abandoned, subsequent use cannot retroactively cure abandonment. If the mark is abandoned, it goes back to the public domain, where it can be used by others in the marketplace in accordance with normal rules of priority.]**

**PLAINTIFF'S OBJECTION AND AUTHORITY:** *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981); *ITC v. Punchgini, Inc*. 482 F.3d 135, 147 (2d Cir. 2007) (mark returns to the public domain); *AmBrit, Inc. v. Kraft, Inc.*, 812 F. 2d 1531, 1551 (11th Cir. 1986)(subsequent use of an abandoned mark does not retroactively cure past abandonment).

**DEFENDANTS' OBJECTION AND AUTHORITY:**   As to the language proposed by Plaintiff in the second paragraph, the language may cause confusion in the jury as to the implications of a finding of abandonment in this case.  Neither the public domain nor the rules of priority have relevance to Defendants' potential common law trademark claim for the AMERICAN QUEEN trademarks should there be a finding of abandonment since the marks used by Plaintiff which Defendants claim infringe upon the AMERICAN QUEEN trademark rights were first used by Plaintiff in 2015 – over three years after Defendants first started using any common law trademark rights that would exist to the term American Queen should there be a finding of abandonment.  Defendants' proposed language accurately informs the jury of what it means if it were to find abandonment in this case and is likely to be more helpful to the jury.

**GIVEN:**

**WITHDRAWN:**

**REFUSED:**

## PROPOSED JURY INSTRUCTION NO. 26
### *AFFIRMATIVE DEFENSE – TRADEMARK ABANDONMENT – ELEMENTS*

To succeed on its abandonment defense, ACL must prove that: (1) the use of the AMERICAN QUEEN mark was discontinued in the ordinary course of trade; and (2) with the intent not to resume use in the reasonably foreseeable future.

**[PLAINTIFF: HMS's intent to use the AMERICAN QUEEN marks should not be considered. The intent of Ambassadors International, the assignor of the AMERICAN QUEEN marks to HMS, should be considered.][1]**

---

[1] Plaintiff understands that the Court has ruled the intent of a purchaser of a trademark may be considered, but includes this statement to preserve the record.

**PROPOSED JURY INSTRUCTION NO. 27**
*AFFIRMATIVE DEFENSE – TRADEMARK ABANDONMENT – PRESUMPTIONS AND*
*BURDEN OF PROOF*

**[DEFENDANTS: If non-use of the trademark continues for three consecutive years, a presumption of abandonment is triggered. If you find that there was a three year period of non-use, then HMS must show by a preponderance of the evidence that there was an intent to resume use of the AMERICAN QUEEN trademark by its owner or assignee or that there was excusable non-use of the mark during the non-use period. If you find there was not a three year period of non-use, then the presumption is not triggered and ACL must show by clear and convincing evidence that there was an intent not to resume use of the AMERICAN QUEEN trademark by its owner or assignee and that there were no valid reasons for the non-use.]**

**[PLAINTIFF: If no use of the trademark in the ordinary course of trade – and not merely to reserve a right in the mark - occurs for three consecutive years, a presumption of abandonment is triggered. To rebut this presumption of abandonment, the party against whom the defense is asserted must show that, within the three year period, the mark was used or displayed in the sale or advertising of the services for which it is registered and the services are actually rendered or that the owner or a creditor of the owner with rights in the mark had plans or engaged in activities to resume use of the mark.]**

**PLAINTIFF'S OBJECTION AND AUTHORITY:** Plaintiff objects to the language proposed by Defendants in that it contains an incomplete and inaccurate statement of law applicable to abandonment. Plaintiff does not have the burden of proving no valid reason exists for non-use of a trademark. A trademark may not be warehoused; and, an owner may not preserve trademark rights through infrequent use of the mark. *Exxon Corp. v. Humble Expl. Co.*, 695 F.2d 96, 99, 102-03 (5th Cir. 1983). *Couture v. Playdom,* 778 F.3d 1379, 1381-82 ("actually rendered"); *Silverman v. CBS Inc.*, 870 F.2d 40. 47 (2d Cir. 1989) ("plans to resume use" required); 15 U.S.C. §1127 (elements).

**DEFENDANTS' OBJECTION AND AUTHORITY:** Defendants object to the language proposed by Plaintiff in that it is unnecessarily confusing and vague with respect to language such as "ordinary course of trade" and "not merely to reserve a right in the mark". These terms, and the proposed language that services "must actually be rendered" are unnecessary and unhelpful in light of the Court's ruling that the booking of tickets and marketing activities constitute the rendering of services in connection with the AMERICAN QUEEN marks. Therefore, the only issue before the jury in connection with the non-use prong of the abandonment provision is whether there were bookings and marketing activities prior to the expiration of the alleged three-year non-use period.

Defendants otherwise rely on the decision of the district court in *Cash Processing,* 418 F. Supp. 2d at 1231-32, as setting forth a good explanation for the presumptions and burdens involved in a trademark abandonment defense under the Lanham Act. In that case, the court held that "[i]f the party alleging abandonment establishes a three-year period of non-use, then the burden shifts to

56

the other party to rebut the presumption by presenting evidence of actual use, intent to resume use 'in the reasonably foreseeable future,' or valid reasons for nonuse." *Id*.  (citing *Emergency One, Inc. v. Am. FireEagle Ltd*., 228 F.3d 531, 535–37 (4th Cir. 2000) and *Star–Kist Foods, Inc. v. P.J. Rhodes & Co*., 769 F.2d 1393, 1396 (9th Cir.1985)).  Further, the court held that "[w]hen the alleged period of nonuse is less than three years, no presumption attaches and the challenging party has the same burden as would a party for which a prima facie case had been rebutted: clear and convincing evidence of nonuse and intent not to resume use in the reasonably foreseeable future."  *Id*. (citing *Stetson v. Howard D. Wolf & Assocs*., 955 F.2d 847, 850 (2nd Cir.1992)).

## DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 28A
### *AFFIRMATIVE DEFENSE- ABANDONMENT – ELEMENTS – NON-USE*

To prove the first element of abandonment, ACL must prove that there was a period of complete disuse of the AMERICAN QUEEN trademark. A temporary period of non-use is insufficient and even a single good faith use of the mark during the alleged non-use period may rebut an assertion that the mark is no longer in use.  Use of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

The Court has previously determined in this case that booking cruises and marketing services using the AMERICAN QUEEN name or trademark would satisfy the requirement of "use."  The parties dispute whether HMS began booking cruises and marketing services using the AMERICAN QUEEN name or trademark on or before November, 2011. You are to determine whether HMS was booking cruises and marketing services using the AMERICAN QUEEN name or trademark or otherwise engaging in use of the AMERICAN QUEEN trademark on or before November 15, 2011.  If so, you shall find that there was not a three-year period of non-use of the AMERICAN QUEEN trademark.

**DEFENDANTS' AUTHORITY:** Court's Summary Judgment Opinion [D.I. 258] and Court's Opinion on Motions in Limine [D.I. 322].  *See also Beech-Nut Packing Co. v. P. Lorillard Co.*, 273 U.S. 629 (1927); *United States Jaycees*, 639 F.2d at 139; *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 938 (9th Cir. 2006) (citing *Carter-Wallace*, 434, F.2d 794, 804 (9th Cir. 1970).

**PLAINTIFF'S OBJECTION:** Plaintiff objects to this instruction. It contains an incomplete and inaccurate statement of law applicable to abandonment. The instruction contains inappropriate advocacy.  "Use" of the mark must be within the scope of the services defined in the registration or the trademark owner must prove common law trademark rights in connection with the services not listed in the registration for which the mark is used.  *See, Nat. Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir. 1985). See also. *Specht v. Google, Inc.*, 747 F.3d 929, 935 (7th Cir. 2014) (isolated, unsustained, sporadic sales efforts insufficient); *Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F. 2d 96, 100 (5th Cir. 1983) (limited sales to targeted customers, arranged sales, failure to use trademark as an source identifier, insufficient); *International Bancorp, LLC v. Société Des Bains de Mer*, 329 F.3d 359, 364 (4th Cir. 2003) ("mere advertising" is not use); *Couture v. Playdom,* 778 F.3d 1379, 1381-82 ("actually rendered").  Plaintiff believes its instructions on abandonment are complete and concise statements of law applicable to abandonment.

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 28B
### *AFFIRMATIVE DEFENSE- ABANDONMENT – ELEMENTS –*
### *NON-USE*

To prove the first element of abandonment, ACL must show that there was a period of time when the AMERICAN QUEEN trademark was not used. Use of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark. Limited or arranged sales to reserve a right in the mark are insufficient uses to avoid prima facie abandonment under the statute.

Sales which were made without using the AMERICAN QUEEN trademark are not "use" of the mark for purposes of the statute. That is, if the sales were made using the name of the vessel *American Queen* simply to identify an asset, and not to identify the source of the services provided, that does not represent "use" of the mark.

Because a mark is used in commerce only if it accompanies services rendered in commerce, mere advertising of that mark does not establish its protectability. The services for which the mark is registered must be actually rendered.

**PLAINTIFF'S AUTHORITY:** *See* 15 U.S.C. §1127 (definition of abandonment); *Beech-Nut Packing Co. v. P. Lorillard Co.*, 273 U.S. 629 (1927); *United States Jaycees*, 639 F.2d at 139; *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 938 n.5 (9th Cir. 2006) (citing *Carter-Wallace*, 434, F.2d 794, 804 (9th Cir. 1970 *Specht v. Google, Inc.*, 747 F.3d 929, 935 (7th Cir. 2014)(isolated, unsustained, sporadic sales efforts insufficient); *Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F. 2d 96, 100 (5th Cir. 1983) (limited sales to targeted customers, arranged sales, failure to use trademark as an source identifier, insufficient); *International Bancorp, LLC v. Société Des Bains de Mer*, 329 F.3d 359, 364 (4th Cir. 2003) ("mere advertising" is not use); *Couture v. Playdom,* 778 F.3d 1379, 1381-82 ("actually rendered").

**DEFENDANTS' OBJECTION:** The statements made by Plaintiff in the second and third paragraphs are inaccurate statements of the law which directly contradict this Court's summary judgment ruling as well as the ruling on Plaintiff's subsequent motion *in limine*. This language is also more in the form of advocacy or argument as opposed to a helpful jury instruction. Defendants believe their instruction on the element of non-use is a more accurate reflection of the law, is less confusing, and does not contain unnecessary advocacy or argument.

**DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 29A**
*AFFIRMATIVE DEFENSE- ABANDONMENT – ELEMENTS –*
*INTENT NOT TO RESUME USE*

In determining whether there was intent to resume use you may consider the totality of evidence of intent to resume use, including the intent of the trademark owner as well as the intent of any future successor in interest to the property and/or trademark and/or any subsequent owner, purchaser or assignee of rights.

The cessation of a business does not automatically and immediately terminate rights to a trademark. You may consider whether the non-use of the mark was due to circumstances beyond the control of the owner, such as a bankruptcy, attempts to sell the business, or failures in the market.

If you find that there was either an intent to resume use of the mark or valid reasons for non-use of the mark then you may find that the AMERICAN QUEEN trademarks were not abandoned in this case.

**DEFENDANTS' AUTHORITY:** The Court has already ruled in this case that the jury may consider the totality of evidence of intent in determining whether there was intent to resume use under the Lanham Act. *See* D.I. 322, pp. 3-4. In terms of the excusable non-use or valid reasons for non-use portion of the instructions, this is a well-established standard for avoiding a finding of abandonment under the law. *See* 15 U.S.C. § 1127. Indeed, courts have excused non-use and rejected the abandonment defense when the mark owner's non-use was due to circumstances beyond its control such as a bankruptcy (*Kim v. Ferry*, Case No. CV 08-05433, 2009 WL 10671424, at *3 (C.D. Cal. Mar. 25, 2009)), time taken by owner to determine how to sell a mark and its related property after acquiring the property following government seizure (*Burgess*, 475 F. Supp. 2d 1060), or depressed market conditions rendering use unprofitable (*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985)). The Second Circuit, for example, found the presumption of abandonment to be rebutted where New York stopped operating a water business due to a legislative decision, and where the state had sought continuously thereafter to sell the business with its goodwill and trademark. *Saratoga*, 625 F.2d at 1044. *See also* MCCARTHY, § 17.11, at 17-19 (2015) (outlining examples of excusable non-use sufficient to avoid a finding of abandonment).

**PLAINTIFF'S OBJECTION:** Plaintiff objects to this instruction. It contains an incomplete and inaccurate statement of law applicable to abandonment. *See* 15 U.S.C. § 1127; *EH Yacht, LLC v. Egg Harbor, LLC*, 84 F. Supp. 2d 556, 564 (D.N.J. 2000); *Cash Processing Servs. v. Ambient Entm't, Inc.*, 418 F. Supp. 2d 1227, 1231-32 (D. Nev. 2006); *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985); *Burgess*, 475 F. Supp. 2d at 1060; *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 937-939 (9th Cir. 2006); *Kim v. Ferry*, Case No. CV 08-05433, 2009 WL 10671424, at *3 (C.D. Cal. Mar. 25, 2009); *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985); *Saratoga*, 625 F.2d at 1037; McCarthy, § 17.11, at 17-19 (2015); *Cumulus Media, Inc. v. The. Clear Channel Communications, Inc.*, 304 F.3d 1167, 1174 (11th Cir. 2002) (the element of

intent can be established inferentially by the same facts that establish non—use). Further, Defendants' instruction contains statements of purported law that are inapplicable, including law on excusable non-use (here Ambassadors voluntarily elected to cease operating cruises in the United States while continuing to operate cruises internationally).   Plaintiff believes its instructions on abandonment are complete and concise statements of law applicable to abandonment.

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 29B
### *AFFIRMATIVE DEFENSE- ABANDONMENT – ELEMENTS –*
### *INTENT NOT TO RESUME USE*

If you find that there was a three year period of non-use, you must then consider whether HMS has shown that there was an intent by the owner of the AMERICAN QUEEN trademark to resume use of the AMERICAN QUEEN trademark within a reasonable time in the future.

If you find there was not a three year period of non-use, then ACL must prove that Ambassadors intended not to resume use of the AMERICAN QUEEN trademark.

Intent not to resume may be inferred from circumstances. In determining whether there was intent not to resume use, you may consider statements and announcements made while the mark was still being used.  HMS' intent, as assignee of the AMERICAN QUEEN trademark, is irrelevant concerning whether the mark is abandoned.

The cessation of a business does not automatically and immediately terminate rights to a trademark.

**PLAINTIFF'S AUTHORITY:** 15 U.S.C. § 1127; *EH Yacht, LLC v. Egg Harbor, LLC*, 84 F. Supp. 2d 556, 564 (D.N.J. 2000); *Cash Processing Servs. v. Ambient Entm't, Inc.*, 418 F. Supp. 2d 1227, 1231-32 (D. Nev. 2006); *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985); *Burgess*, 475 F. Supp. 2d at 1060; *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 937-939 (9th Cir. 2006); *Kim v. Ferry*, Case No. CV 08-05433, 2009 WL 10671424, at *3 (C.D. Cal. Mar. 25, 2009); *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985); *Saratoga*, 625 F.2d at 1037; McCARTHY, § 17.11, at 17-19 (2015); *Cumulus Media, Inc. v. The. Clear Channel Communications, Inc.,* 304 F.3d 1167, 1174 (11th Cir. 2002) (the element of intent can be established inferentially by the same facts that establish non—use).

**DEFENDANTS' OBJECTION:** Defendants object to this instruction to the extent that it offers an incomplete and inaccurate instruction on the law.  The Court has already ruled in this case that the jury may consider the totality of evidence of intent in determining whether there was intent to resume use under the Lanham Act.  *See* D.I. 322, pp. 3-4. As such, the intent element should not be limited solely to the Ambassadors' entity.  Further, Plaintiff's proposed instruction disregards long-sanding law on excusable non-use or valid reasons for non-use. That is a recognized element which rebuts and/or precludes a finding of abandonment as set forth above.

**GIVEN:**

**WITHDRAWN:**

**REFUSED:**

**DEFENDANTS' PROPOSED JURY INSTRUCTION NO. 30A**
*AFFIRMATIVE DEFENSE – ABANDONMENT – ELEMENTS –*
*RESIDUAL GOODWILL*

If you determine that the AMERICAN QUEEN trademark has retained residual goodwill, then you can find that the trademark has not been abandoned even if there was a period of non-use or an intent not to resume use by one of the owners or assignees of the trademark. A trademark is a symbol of goodwill. Goodwill is the favor which a business wins from the public. The goodwill symbolized by a trademark has been said to be synonymous with the term "reputation."

Residual goodwill relates to abandonment when use of a mark is discontinued but the consuming public still believes there is a continuity of the source of the goods or services when the mark is later used again. In assessing whether there is "residual goodwill", you may consider the length of prior use of the AMERICAN QUEEN trademark; the extent of sales and advertisement of the AMERICAN QUEEN trademark and services; the length of typical customer interaction with the AMERICAN QUEEN services and trademark; the reaction of customers and dealers upon the resumption of use; and continued consumer interaction with the trademark and services. Where a party is willing to pay money for a mark even after assets associated with the mark were already transferred, then that may be indicative of residual goodwill.

**DEFENDANTS' AUTHORITY:** *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) (for a general discussion of goodwill); *American Motors Corp. v. Action Age, Inc.,* 178 U.S.P.Q. 377, 379 (1973) (if residual goodwill exists the public interest should be protected and holding no abandonment because of existence of residual goodwill); *Ferrari S.P.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 11 U.S.P.Q. 2d 1843 (S.D. Cal. 1989) (strong residual goodwill precludes a finding of abandonment); *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947 (7th Cir 1992) (no abandonment even where the mark was out of use for a long period of time based on existence of residual goodwill); *Peter Luger Inc. v. Silver Star Meats Inc*., No. 01-1557, 2002 WL 1870066 (W.D. Pa. May 17, 2002) (residual goodwill, standing alone, is sufficient to preclude abandonment); *See* Johanna F. Sistek, *Goodwill Hunting(r) the Role of Residual Goodwill in the Analysis of Trademark Abandonment*, Ent. & Sports Law., Fall 2004, at 8, 9 (explaining evidence showing residual goodwill); *Seidelmann Yachts, Inc. v. Pace Yacht Corp*., No. JH-87-3490, 1989 U.S. Dist. LEXIS 17486 (D. Md. Apr. 26, 1989) (willingness to pay money for a mark even after assets already transferred shows residual goodwill exists).

**PLAINTIFF'S OBJECTION:** Plaintiff objects to this instruction. It contains an incomplete and inaccurate statement of law applicable to abandonment. Defendant provides an unsupported assertion of law concerning the intent of an assignee. Plaintiff incorporates by reference its Motion in Limine No. 2 – motion to exclude evidence and argument as to matters of intent which are irrelevant to the issue of abandonment. Plaintiff believes its instructions on abandonment and residual goodwill are complete and concise statements of law applicable to abandonment.

## PLAINTIFF'S PROPOSED JURY INSTRUCTION NO. 30B

### *AFFIRMATIVE DEFENSE – ABANDONMENT – ELEMENTS –*
### *RESIDUAL GOODWILL*

Intent not to resume may be inferred from circumstances. If you find that Ambassadors may have had some intent to resume use of the mark within a reasonable time in the future, and if you determine that the AMERICAN QUEEN trademark retained residual goodwill after surrender of the vessel *American Queen* to MARAD, then you may infer that Ambassadors had an intent to resume use and can find that the trademark was not been abandoned.

If you find that Ambassadors did not have an intent to resume use of the mark within a reasonable time in the future, then you should not consider the matter of possible residual goodwill in the mark after surrender of the vessel *American Queen.* The law permits a party to abandon a mark even if that mark may have residual goodwill value.

**PLAINTIFF'S AUTHORITY:** *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984); *American Motors Corp. v. Action Age, Inc.,* 178 U.S.P.Q. 377, 379 (1973); *Ferrari S.P.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 11 U.S.P.Q. 2d 1843 (S.D. Cal. 1989) (continued authorized production of vehicle parts, refurbishing of vehicles and extensive use of previously manufactured vehicles by the public are factors supporting no intent to abandon its rights in trademark); *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947 (7th Cir 1992); *Peter Luger Inc. v. Silver Star Meats Inc*., No. 01-1557, 2002 WL 1870066 (W.D. Pa. May 17, 2002) ("[O]bjective evidence of abandonment may outweigh self-serving testimony of an intention to resume use of the mark."); *See* Johanna F. Sistek, *Goodwill Hunting(r) the Role of Residual Goodwill in the Analysis of Trademark Abandonment*, Ent. & Sports Law., Fall 2004, at 8, 9; *Seidelmann Yachts, Inc. v. Pace Yacht Corp*., No. JH-87-3490, 1989 U.S. Dist. LEXIS 17486 (D. Md. Apr. 26, 1989). *Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 102 (5th Cir. 1983) (mark with "immense value" held abandoned, warehousing not permitted.).

**DEFENDANTS' OBJECTION:** Defendants object to this instruction to the extent that it offers an incorrect statement of the law on abandonment and residual goodwill. The Court has already determined that that the jury may consider the totality of evidence of intent in determining whether there was intent to resume use under the Lanham Act. *See* D.I. 322, pp. 3-4. Evidence of intent and the abandonment analysis should not be limited to the Ambassadors entity. Defendants further object to the extent this instruction applies residual goodwill only as it relates to the intent to resume use element and cannot independently form the basis for the preclusion of the abandonment defense. In some cases, such as the cases cited above by Defendants, residual goodwill, standing along, can prevent a finding of abandonment. *See e.g., Ferrari S.P.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 11 U.S.P.Q. 2d 1843 (S.D. Cal. 1989) (strong residual goodwill precludes a finding of abandonment); *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947 (7th Cir 1992) (no abandonment even where the mark was out of use for a long period of time based on existence of residual goodwill); *Peter Luger Inc. v. Silver Star Meats Inc*., No. 01-1557, 2002 WL 1870066 (W.D. Pa. May 17, 2002) (residual goodwill, standing alone, is sufficient to preclude abandonment); *See* Johanna F. Sistek,

*Goodwill Hunting(r) the Role of Residual Goodwill in the Analysis of Trademark Abandonment*,
Ent. & Sports Law., Fall 2004, at 8, 9 (explaining evidence showing residual goodwill).

## PROPOSED JURY INSTRUCTION NO. 31
### *AFFIRMATIVE DEFENSE – INVALID ASSIGNMENT OF TRADEMARK*

ACL asserts as an affirmative defense that the assignment of the AMERICAN QUEEN trademarks from Ambassadors to HMS is an invalid assignment. ACL has the burden of establishing an invalid assignment, or an assignment in gross, by clear and convincing evidence.

A purported assignment of a trademark without goodwill is invalid. A trademark symbolizes the public's confidence or goodwill in a particular product or service. Because a trademark is symbolic, it may be transferred or assigned only to represent the transfer of goodwill connected with a particular business and cannot be transferred separately from the goodwill of a business. [PLAINTIFF: Goodwill is a business's reputation, patronage, and other intangible assets that are considered by consumers when making a purchase.] [DEFENDANTS: In the context of an assignment of trademarks, goodwill is that portion of a business, service or product which consumers associate with the trademark].

The fact that an agreement purports to assign goodwill along with the trademark is insufficient to demonstrate that goodwill has actually been transferred.

[DEFENDANTS: Even if goodwill is not expressly included as being transferred as part of a written assignment agreement, if you determine that HMS is providing services that are substantially similar in nature and quality to those services previously provided under the AMERICAN QUEEN trademarks by Ambassadors or other predecessors in interest, then you must find that the AMERICAN QUEEN trademarks were properly assigned to HMS.]

**PLAINTIFF'S OBJECTION AND AUTHORITY:** Plaintiff objects to this proposed instruction because it provides no instruction concerning the definition of an assignment in gross and it provides no guidance to the jury on the implications of making an assignment in gross. Any proper instruction should include the definition and effect of an assignment in gross. *See, e.g., Beauty Time, Inc. v. VU Skin Systems, Inc.*, 118 F.3d 140, 43 U.S.P.Q.2d 1225 (3d Cir. 1997) (because an oral assignment was in gross and invalid, "assignee" did not acquire any ownership rights in the mark and had no standing to bring a claim for infringement); *Hough Mfg. Corp. v. Va. Metal Indus., Inc.*, 453 F. Supp. 496, 500 (E.D. Va. 1978); 6 McCarthy on Trademarks §18:17. 15 U.S.C. § 1060; *Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986); *InterState Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 348 (D.N.J. 2004). Plaintiff objects to Defendant's use of the phrase "or other predecessors in interest" in that Defendants attempt to tack its use of the mark to all uses of the AMERICAN QUEEN marks by any person. Doing so would confuse the jury and require marshalling detail evidence of each predecessor's use of the mark, provision of services, expertise of management, and other characteristics recognized by courts as comprising goodwill.

**DEFENDANTS' OBJECTION AND AUTHORITY:** As to the burden of proof, Defendants could find no case law on the burden of proof at trial for proving an invalid trademark assignment. This could be because this is an issue that has rarely, if ever, been addressed at a

trial on the merits.   However, Defendants take the position that this affirmative defense, if successfully applied, would result in a forfeiture of rights.   Therefore, the Court should apply the clear and convincing standard applied in forfeiture situations – for example, in cases where a trademark abandonment defense is asserted.

Further, courts allow an alleged assignment in gross to stand <u>as long as the acquired mark is used on goods or services that are substantially similar in both nature and quality</u> to those on which the mark had previously been used. *See Am. Sleek Craft, Inc. v. Nescher*, 131 B.R. 991, 1000 (D. Ariz. 1991) (emphasis added); *see also Marshak*, 505 F. Supp. at 1054; *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 679 (C.C.P.A. 1971). Along these lines, courts have generally analyzed whether an assignment is an invalid assignment in gross under two tests.  The first of these tests is the "real continuity test", which examines the nature of business assets obtained by the assignee from the assignor and whether they permit the assignee to continue in real continuity with the previous business of the assignor.  *See Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339, 1350-51 (E.D.N.Y. 1994). The second test is the "substantial similarity test", which examines whether the assignee is producing a product or service substantially similar to that of the assignor so that consumers would not be deceived by the assignee's use of the mark.  The analysis assesses whether the assignee's goods or services under the mark are of the same quality and nature as those of the assignor.  *See Defiance Button*, 759 F.2d at 1059-60.

## JOINT JURY INSTRUCTION NO. 32
### *WILLFUL TRADEMARK INFRINGEMENT*

If you find that either party has infringed the other's trademark, then you must also determine whether the party asserting infringement has proven by clear and convincing evidence that the infringement was willful.

An infringer has acted willfully if they knew they were infringing the trademark at issue or if they acted with indifference to the trademark rights of the other party.  A party that acts with an intention to benefit from the goodwill or reputation of another acts willfully.  Infringement is not willful if the alleged infringer reasonably believed that its use of the mark at issue was not infringing.

## JOINT JURY INSTRUCTION NO. 33
### *NO NEED TO CONSIDER MONETARY DAMAGES*

If you decide that ACL has not established trademark infringement, then you should not consider the question of monetary damages as to that claim.

If you decide that HMS has not established trademark infringement or that one of ACL's affirmative defenses applies, then you should not consider the question of monetary damages as to that claim.

## PROPOSED JURY INSTRUCTION NO. 34
### *REMEDIES – MONETARY DAMAGES*

If you decide for either party on the question of liability for their claim or counterclaim for trademark infringement and unfair competition, then you should consider the amount of money to award that party for the infringement.  Awarding monetary relief is not automatic.

**[DEFENDANTS: In deciding whether a party is entitled to monetary damages, you may consider whether one or more of the following factors justifies an award of monetary damages: (1) whether the party asserting rights has suffered a loss; (2) whether the infringer has been unjustly enriched; (3) whether an award would deter willful conduct on the part of the infringer; and/or (4) whether the monetary award would be punitive in nature.]**

**DEFENDANTS' AUTHORITY:** As to the elements cited by Defendants in determining whether a monetary award is appropriate, courts generally evaluate whether and to what extent one or more of the following principles justify monetary relief: (1) compensation for a plaintiff's loss; (2) preventing a defendant's unjust enrichment; (3) deterring a defendant's willful conduct; and/or (4) any monetary relief granted may not be punitive in nature.  *See* 15 U.S.C. § 1117(a); *see ALPO Petfoods, Inc. v. Ralston Purina Co*., 913 F.2d 958, 970 (D.C. Cir. 1990).  These four factors may be considered by the jury to help it determine whether monetary relief is warranted in this case based on either party's infringement claims.

**PLAINTIFF'S OBJECTION:**  Plaintiff objects to Defendants' proposed instruction because it contains statements of law that are not applicable in this case.  For instance, neither party is seeking actual damages in this case; both parties seek only alleged infringer's profits.  Thus, "whether the party asserting rights has suffered a loss" is irrelevant.  Further, willful infringement is not a requirement for the assessment of damages for infringer's profits in the Third Circuit.  *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005); *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1531 (2d Cir. 1992).  None of the cases cited by Defendant establishes the four-part consideration proposed by Defendants.

## PROPOSED JURY INSTRUCTION NO. 35
### *DISGORGEMENT OF PROFITS*

A trademark owner may recover infringer's profits attributable to the infringement. Profit is determined by deducting expenses from gross revenue. Gross revenue is all of the money the infringer received due to its use of the trademarks in question. The trademark owner is required only to prove the infringer's gross revenue. The infringer is required to prove any expenses that it argues should be deducted in determining its profits. A trademark owner is entitled to recover the infringer's total profits from its use of the trademarks in question, unless the infringer proves that a portion of the profit is due to factors other than the use of the trademarks in question.

In deciding whether the trademark owner is entitled to disgorgement of the infringer's profits, you may consider the following factors:

1) whether the infringer had the intent to confuse or deceive,
2) whether sales have been diverted to the infringer,
3) the adequacy of other remedies,
4) any unreasonable delay by the trademark owner in asserting its rights,
5) the public interest in making the misconduct unprofitable, and
6) whether it is a case of palming off. **[PLAINTIFF: ACL does not believe this factor is relevant and should be excluded]**

The presence or absence of any one of these factors is not determinative in and of itself whether you should award infringer's profits to the trademark owner.

**DEFENDANTS' AUTHORITY:** The Third Circuit in *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 174-75 (3d Cir. 2005), recognized these factors as relevant to a determination of whether disgorgement of profits was warranted under the Lanham Act. One of the articulated elements is whether or not the case involves a palming off situation. If this case is not a case of palming off, then this factor is relevant to support Defendants' argument that disgorgement damages are not available for Plaintiff's infringement claims.

**PLAINTIFF'S OBJECTION:** In *Banjo Buddies*, the Third Circuit reviewed a non-exhaustive list of factors considered by trial <u>courts in evaluating whether equity supports disgorgement of infringer's profits. *Id*. at 175. Listing equitable considerations that do not apply to the instant matter creates unnecessary complications. In order for the jury to determine whether "palming off" occurred, an additional instruction explaining what conduct constitutes palming off would be necessary.</u>

**END: PROPOSED JURY INSTRUCTIONS**

**POST-TRIAL INSTRUCTIONS**

**JOINT PROPOSED GENERAL POST-TRIAL INSTRUCTION NO. 1**
*DELIBERATIONS AND VERDICT-INTRODUCTION*

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence.  Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages.  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

## JOINT PROPOSED GENERAL POST-TRIAL INSTRUCTION NO. 2
### *UNANIMOUS VERDICT*

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of you deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form.  You will then return to the courtroom and your foreperson will give your verdict.

## JOINT PROPOSED GENERAL POST-TRIAL INSTRUCTION NO. 3
### *DUTY TO DELIBERATE*

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that-your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

## JOINT PROPOSED GENERAL POST-TRIAL INSTRUCTION NO. 4
### *SOCIAL MEDIA*

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, blackberry or computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, MySpace, Linkedin, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

## JOINT PROPOSED GENERAL POST-TRIAL INSTRUCTION NO. 5
### *COURT HAS NO OPINION*

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case yourselves based on the evidence presented.