## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN CRUISE LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 13-324 (RGA) |
| | ) | |
| HMS AMERICAN QUEEN STEAMBOAT | ) | |
| COMPANY LLC, and AMERICAN QUEEN | ) | |
| STEAMBOAT OPERATING COMPANY, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

****************

# FINAL JURY INSTRUCTIONS

# INDEX

1. GENERAL JURY INSTRUCTIONS.................................................................... 5

   INSTRUCTION 1.1: JURORS' DUTIES ........................................................... 6

   INSTRUCTION 1.2: BURDENS OF PROOF ................................................... 7

   INSTRUCTION 1.3: EVIDENCE DEFINED ..................................................... 8

   INSTRUCTION 1.4: CONSIDERATION OF EVIDENCE.................................. 9

   INSTRUCTION 1.5: CREDIBILITY OF WITNESSES..................................... 10

   INSTRUCTION 1.6: NUMBER OF WITNESSES ............................................ 11

   INSTRUCTION 1.7: EXPERT WITNESSES ................................................... 12

   INSTRUCTION 1.8: DEMONSTRATIVE EXHIBITS ...................................... 13

   INSTRUCTION 1.9: USE OF NOTES.............................................................. 14

   INSTRUCTION 1.10: STIPULATION OF FACT.............................................. 15

   INSTRUCTION 1.11: USE OF DEPOSITIONS................................................ 16

2. OVERVIEW OF TRADEMARK LAW ........................................................... 17

   INSTRUCTION 2.1: DEFINITION OF "TRADEMARK" ............................... 17

   INSTRUCTION 2.2: OBTAINING A TRADEMARK....................................... 18

   INSTRUCTION 2.3: SECONDARY MEANING............................................... 19

   INSTRUCTION 2.4: TRADEMARK REGISTRATIONS ................................. 20

   INSTRUCTION 2.5: PRESUMPTIONS ENJOYED BY REGISTRANT OF A

   TRADEMARK ............................................................................................. 21

   INSTRUCTION 2.6: ASSIGNMENT OF TRADEMARKS.............................. 22

2

3. "FAMILY OF MARKS" .................................................................... 23

    INSTRUCTION 3.1: DEFINED ..................................................... 23

    INSTRUCTION 3.2: OWNERSHIP AND VALIDITY ...................... 24

4. TRADEMARK INFRINGEMENT ................................................... 25

    INSTRUCTION 4.1: ELEMENTS OF TRADEMARK INFRINGEMENT ..................... 26

    INSTRUCTION 4.2: LIKELIHOOD OF CONFUSION FACTORS ................ 27

5. ACL'S CLAIMS ............................................................................ 30

    INSTRUCTION 5.1: BRAND INFRINGEMENT CLAIM ................. 31

    INSTRUCTION 5.2: FAMILY INFRINGEMENT CLAIM ................ 32

6. HMS'S TRADEMARK INFRINGEMENT COUNTERCLAIM ....... 33

7. ACL'S AFFIRMATIVE DEFENSES ............................................ 34

    INSTRUCTION 7.1.1: TRADEMARK ABANDONMENT - GENERAL ...................... 35

    INSTRUCTION 7.1.2: TRADEMARK ABANDONMENT - PRESUMPTIONS AND BURDEN OF PROOF ................. 36

    INSTRUCTION 7.1.3: TRADEMARK ABANDONMENT - ELEMENTS ..................... 37

    INSTRUCTION 7.1.4: ABANDONMENT – ELEMENTS – NON-USE ......................... 38

    INSTRUCTION 7.1.5: ABANDONMENT – ELEMENTS – INTENT NOT TO RESUME USE ................. 39

    INSTRUCTION 7.1.6: ABANDONMENT – RESIDUAL GOODWILL ......................... 40

    INSTRUCTION 7.2: INVALID ASSIGNMENT OF TRADEMARK .............................. 41

8. UNREGISTERED OR COMMON LAW MARK................................. 42

INSTRUCTION 8.1: RIGHTS IN UNREGISTERED TRADEMARKS – OWNERSHIP 43

INSTRUCTION 8.2: RIGHTS IN UNREGISTERED TRADEMARKS - VALIDITY .... 44

9.   WILLFUL TRADEMARK INFRINGEMENT ................................................................ 45

10.  DISGORGEMENT OF PROFITS ...................................................................... 46

INSTRUCTION 10.1: WHEN TO CONSIDER DISGORGEMENT OF PROFITS ........ 46

INSTRUCTION 10.2: DISGORGEMENT OF PROFITS ................................................. 47

11.  FINAL INSTRUCTIONS AND REMINDERS................................................................ 48

INSTRUCTION 11.1: DELIBERATIONS AND VERDICT-INTRODUCTION ............. 48

INSTRUCTION 11.2: UNANIMOUS VERDICT ............................................................ 49

INSTRUCTION 11.3: DUTY TO DELIBERATE ............................................................ 50

INSTRUCTION 11.4: SOCIAL MEDIA.......................................................................... 51

INSTRUCTION 11.5: COURT HAS NO OPINION ........................................................ 52

# 1. <u>GENERAL JURY INSTRUCTIONS</u>

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case.

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. Finally, I will explain the rules that you must follow during your deliberations in the jury room, and the possible verdicts that you may return.

Please listen very carefully to everything I say. In following my instructions, you must follow all of them and not single out some and ignore others. They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

## INSTRUCTION 1.1: JURORS' DUTIES

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide, under the appropriate burden of proof, which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy, or prejudice that you may feel toward one side or the other influence your decision in any way.

## INSTRUCTION 1.2: BURDENS OF PROOF

When I say a particular party must prove something by "a preponderance of the evidence," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that what a party is claiming is more likely so than not so. To say it differently: if you were to put the evidence favorable to one side of the argument and the evidence favorable to the other side of the argument on opposite sides of the scales, the party with the burden of proof would have to make the scales tip somewhat on its side.

When I say a particular party must prove something by "clear and convincing evidence", this is what I mean:  When you have considered all the evidence in the case, you must have in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases.

## INSTRUCTION 1.3: EVIDENCE DEFINED

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way.

The evidence in this case includes only what the witnesses said while they were testifying under oath, deposition testimony that was presented to you, the exhibits that I allowed into evidence, the stipulations that the lawyers agreed to, and any other evidence that I have judicially noticed.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. My comments and questions are not evidence.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ordered you to disregard things that you saw or heard, or I struck things from the record. You must completely ignore all these things. Do not even think about them. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Sometimes testimony and exhibits are received only for a limited purpose. When I give instructions regarding that limited purpose, you must follow it.

Make your decision based only on the evidence, as I have defined it here, and nothing else.

8

## INSTRUCTION 1.4: CONSIDERATION OF EVIDENCE

You should use your common sense in weighing the evidence. Consider the evidence in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

## INSTRUCTION 1.5: CREDIBILITY OF WITNESSES

You are the sole judges of each witness's credibility. You should consider each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witness's biases, prejudices, or interests; the witness's manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

If you find the testimony to be contradictory, you must try to reconcile it, if reasonably possible, to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to believe the portions of testimony that, in your judgment, are most believable and disregard any testimony that, in your judgment, is not believable.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely about some important fact, or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something that was different from the testimony he or she gave at the trial. You have the right to distrust such witness's testimony in other particulars and you may reject all or some of the testimony of that witness or give it such credibility as you may think it deserves.

You should remember that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth. People may tend to forget some things or remember other things inaccurately. If a witness has made a misstatement you must consider whether it was simply an innocent lapse of memory or an intentional falsehood, and that may depend upon whether it concerns an important fact or an unimportant detail. This instruction applies to all witnesses, including expert witnesses.

## INSTRUCTION 1.6: NUMBER OF WITNESSES

One more point about the witnesses. Sometimes jurors wonder if the number of witnesses who testified makes any difference.

Do not make any decisions based only on the number of witnesses who testified. What is more important is how believable the witnesses were, and how much weight you think their testimony deserves. Concentrate on that, not the numbers.

## INSTRUCTION 1.7: EXPERT WITNESSES

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field – called an expert witness – is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it.

In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

## INSTRUCTION 1.8: DEMONSTRATIVE EXHIBITS

During the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations. The other exhibits (including charts and animations presented by attorneys and witnesses) were offered to help illustrate the testimony of the various witnesses. These illustrations, called "demonstrative exhibits," have not been admitted as evidence, are not evidence, and should not be considered as evidence. Rather, it is the underlying testimony of the witness that you heard when you saw the demonstrative exhibits that is the evidence in this case.

## INSTRUCTION 1.9: USE OF NOTES

You may use notes taken during trial to assist your memory. However, you should use caution in consulting your notes. There is always a tendency to attach undue importance to matters that you have written down. Some testimony that is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory, and you should not compare notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be the greatest asset when it comes time to deliberate and render a decision in this case.

## INSTRUCTION 1.10: STIPULATION OF FACT

The parties have stipulated that certain facts are true, and those stipulations have been read to you during this trial. You must therefore treat these facts has having been proved for the purposes of this case.

## INSTRUCTION 1.11: USE OF DEPOSITIONS

Depositions were taken in this case and certain depositions have been presented to you by a video and/or by reading the transcript. Deposition testimony is entitled to the same consideration and is to be judged, insofar as possible, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers from written deposition transcripts.

## 2. <u>OVERVIEW OF TRADEMARK LAW</u>

### INSTRUCTION 2.1: DEFINITION OF "TRADEMARK"

A trademark is a word, symbol, or device or any combination thereof used by a person or entity to identify and distinguish his or her goods from those manufactured or sold by others and to indicate the source of the goods. A service mark is like a trademark, but applies to services rather than goods. For example, a trademark used to identify a retail store service provider is considered a service mark. Trademarks and service marks can also simply be called "marks." Sometimes all these terms -- trademarks, service marks and marks -- are used interchangeably.

The purpose of a trademark is to prevent confusion among consumers about the source of products or services and to permit trademark owners to show ownership of their products and services and control their reputation. Trademarks support informed purchasing decisions and prevent confusion among consumers about the source of products or services.

## INSTRUCTION 2.2: OBTAINING A TRADEMARK

A person acquires the right to exclude others from using a trademark by being the first to use the trademark in the marketplace to indicate the source of goods or services. Rights in a trademark are obtained only through actual and continuous commercial use of the trademark in a market. The owner of a trademark has the right to exclude others unless the trademark has been abandoned.

Trademarks may be registered with the United States Patent and Trademark Office but need not be registered to be entitled to protection under the law.

18

## INSTRUCTION 2.3: SECONDARY MEANING

For ACL's family of marks claim and for HMS's common law mark claim you will be asked to decide if a mark has "secondary meaning."

Whether a mark has "secondary meaning" or "acquired distinctiveness" depends on the recognition that the mark has among prospective purchasers. A mark has secondary meaning when the public associates it with the source of the service even though the mark itself does not distinguish the service.

A party must establish secondary meaning in a mark at the time and place that the alleged infringer began using the mark.

To determine whether secondary meaning has attached to a party's common law mark, you must consider (1) whether the extent of sales and advertising by the party has led to consumers associating the mark with the party; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals and association with the party; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) whether evidence of actual confusion exists.

19

## INSTRUCTION 2.4: TRADEMARK REGISTRATIONS

Once the owner of a trademark has obtained the right to exclude others from using the trademark, the owner may obtain a certificate of registration issued by the United States Patent and Trademark Office. Afterwards, when the owner brings an action for infringement, the owner may rely on the registration certificate as evidence to prove the owner has the right to exclude others from using the trademark in connection with the type of goods or services specified in the certificate.

## INSTRUCTION 2.5: PRESUMPTIONS ENJOYED BY REGISTRANT OF A TRADEMARK

This case involves trademarks that are registered with the United States Patent and Trademark Office. A federal registration entitles the registrant to three presumptions: (1) the trademark is presumed valid; (2) the registrant is presumed to be the owner of the mark; and (3) the registrant is presumed to have the exclusive right to use the mark nationwide in commerce in connection with the goods and services specified in the certificate of registration.

## INSTRUCTION 2.6: ASSIGNMENT OF TRADEMARKS

A trademark symbolizes the public's confidence or goodwill in a particular product or service. "Goodwill" is that part of the value of a business that reflects the propensity of buyers to continue doing business with that seller because the buyer likes and/or needs what the seller is selling.

The owner of a trademark may transfer to another the owner's interest in the trademark, including the right to exclude others from using the trademark, provided the trademark is transferred along with the goodwill of the business. This transfer is called an assignment, and the person to whom this right is transferred is called an assignee. An assignment can be of a trademark for an entire business or for a distinct and separate part of a business.

Following a proper assignment, the assignee steps into the shoes of the assignor, and the assignee acquires all the legal advantages and obligations of the mark that the assignor enjoyed.

# 3. "FAMILY OF MARKS"

## INSTRUCTION 3.1: DEFINED

A "family of marks" is a group of marks having a recognizable common characteristic, where the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.

## INSTRUCTION 3.2: OWNERSHIP AND VALIDITY

A party asserting ownership of a family of marks must establish the following by a preponderance of the evidence to demonstrate that it owns a valid and legally protectable family of trademarks:

(1) That they are the prior user of multiple trademarks that share a common characteristic (the common characteristic is known as the family surname);

(2) That the family surname has secondary meaning and is not so commonly used in the trade as not to constitute a distinguishing feature of any party's mark; and

(3) Prior to the infringer's first use of its mark, the family of marks were used in advertising or sales as to create common exposure to and recognition by the purchasing public such that the family surname is itself indicative of a common origin of goods or services or has otherwise developed secondary meaning.

# 4. **TRADEMARK INFRINGEMENT**

In this case you are being asked to decide three separate questions of trademark infringement: (1) whether HMS's AMERICAN QUEEN STEAMBOAT COMPANY mark infringes the AMERICAN CRUISE LINES marks; (2) whether HMS's fleet of "American" ships (i.e. the American Empress, the American Duchess and the American Countess) infringe ACL's family of "American" marks; and (3) whether ACL's AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY, or AMERICA marks infringe HMS's AMERICAN QUEEN mark.

## INSTRUCTION 4.1: ELEMENTS OF TRADEMARK INFRINGEMENT

To succeed on a claim for trademark infringement, the party asserting infringement must prove the following by a preponderance of the evidence:

1) There is a valid and legally protectable trademark;

2) It owns that mark; and

3) The other party uses the mark to identify goods or services and causes a likelihood of confusion.

## INSTRUCTION 4.2: LIKELIHOOD OF CONFUSION FACTORS

The core of a trademark infringement claim is likelihood of confusion. To establish whether a likelihood of confusion exists, you must look to a multi-factor test. Each factor analyzes the trademark and use by both the trademark owner and the alleged infringer to establish whether a significant number of people who buy or use, or consider buying or using, the product or service are likely to be confused if both parties are permitted to use their trademarks. As you consider whether there is a likelihood of confusion, examine the following factors:

1. **Degree of Similarity Between the Marks at Issue.** In evaluating the similarity or dissimilarity of the respective marks, each mark must be considered as a whole. A finding of similarity between the respective marks cannot be based on dissection of a mark, that is, on only part of a mark. Although there is nothing improper in giving more or less weight to a particular feature of a mark, the ultimate conclusion as to the similarity or dissimilarity of the marks must rest on consideration of the marks in their entireties. You should consider the overall impression created by the marks, keeping in mind all the things that the general buying public will likely perceive and remember about the marks, including their similarities in sight, sound, and meaning, as well as designs, fonts, colors, and other elements.

2. **Strength of the Trademark Being Infringed.** Some trademarks are stronger than others. The stronger the trademark, the more protection should be given to it. A strong trademark is one that carries widespread, immediate recognition that one party is associated with the mark, and so with the product or service provided. The more the consuming public recognizes the owner's trademark as an indication of origin of their goods or services, the more likely that it is that consumers would be confused about the source of the alleged

infringer's goods or services if the alleged infringer uses a similar mark. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd. Use of similar marks by others in the market at issue weighs in favor of finding that a mark is relatively weak and that a likelihood of confusion does not exist.

3.     **The Price of the Goods and the Sophistication of the Purchasers.** The more sophisticated the potential buyers of the goods or services or the costlier the goods or services, the more careful and discriminating the potential purchaser exercising ordinary caution may be. They may be less likely to be confused by similarities in the trademarks at issue.

4.     **Evidence of Actual Confusion.** If use by the alleged infringer of a similar trademark has led to instances of actual confusion, this strongly suggests a likelihood of confusion. Because proving actual confusion is difficult, relatively little showing is required on the part of the party attempting to prove actual confusion. However, actual confusion is not required for a finding of likelihood of confusion. Even if actual confusion did not occur, the alleged infringer's use of the trademark may still be likely to cause confusion. As you consider whether the trademark used by the alleged infringer is confusing, you should weigh any instances of actual confusion against the opportunities for such confusion. If the instances of actual confusion have been relatively frequent, you may find that there has been substantial actual confusion. If, by contrast, there is a very large volume of sales, but only a few isolated instances of actual confusion you may find that there has not been substantial actual confusion.

5. **Length of Time the Alleged Infringer Has Used the Mark Without Evidence of Actual Confusion.** If you find that one or more marks were used for an extended period of time without evidence of actual confusion, it can be inferred that continued marketing will not lead to consumer confusion in the future.

6. **Intent of the Alleged Infringer.** Knowing use by the alleged infringer of the trademark at issue to identify similar services may show an intent to benefit from the reputation of the trademark owner – suggesting an intent to cause a likelihood of confusion. Evidence of a party's intentional use of another party's mark to cause confusion is not a prerequisite to proving infringement. However, evidence of intentional, willful and admitted adoption of a mark closely similar to an existing mark weighs in favor of finding a likelihood of confusion.

7. **Similarity of Channels of Trade.** The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion. If the parties' goods or services are sold in the same or similar outlets, or advertised in similar media, there is a greater likelihood of confusion.

8. **The Extent to Which the Targets of the Parties' Sales Efforts are the Same.** If the parties' services are sold or offered for sale to the same or similar customers, this may increase the likelihood of confusion. The parties agree that their respective sales efforts are targeted to the same class of consumers.

9. **Similarity of the Services.** The more similar the services offered by the parties, the greater the likelihood of confusion.

The weight to be given to each of these factors is up to you to determine. No particular factor or number of factors is required to prove likelihood of confusion.

# 5. **ACL'S CLAIMS**

ACL brings two claims for trademark infringement against HMS.  The first claim is a claim for infringement of the AMERICAN CRUISE LINES tradename and brand marks. The second claim is a claim for infringement of a family of "American" trademarks.

## INSTRUCTION 5.1: BRAND INFRINGEMENT CLAIM

To succeed on its claim of brand mark infringement ACL must prove:

1) That the AMERICAN CRUISE LINES marks are valid and legally protectable;

2) That it is the owner of the AMERICAN CRUISE LINES marks; and

3) That HMS's use of the name AMERICAN QUEEN STEAMBOAT COMPANY causes a likelihood of confusion.

In this case there is no dispute that the AMERICAN CRUISE LINES marks are valid and legally protectable or that ACL is the owner of the AMERICAN CRUISE LINES marks. ACL claims that there is a likelihood of confusion based on HMS's tradename and brand mark AMERICAN QUEEN STEAMBOAT COMPANY. HMS denies that there is a likelihood of confusion.

## INSTRUCTION 5.2: FAMILY INFRINGEMENT CLAIM

To succeed on its claim of infringement of a family of "American" trademarks ACL must prove:

1) That a family of "American" trademarks is valid and legally protectable;

2) That it is the owner of a family of "American" trademarks; and

3) That HMS's fleet of "American" ships (i.e. the American Empress, the American Duchess and the American Countess) causes a likelihood of confusion with the family of "American" trademarks.

In this case ACL claims that it owns a family of "American" trademarks including vessel name marks each containing the word "American" as the first word of the vessel name and that HMS's use of "American" for its fleet branding and the vessel name marks AMERICAN EMPRESS, AMERICAN DUCHESS and AMERICAN COUNTESS causes a likelihood of confusion. HMS denies that ACL has established a valid and legally protectable family of "American" trademarks and denies that there is a likelihood of confusion.

# 6.  HMS'S TRADEMARK INFRINGEMENT COUNTERCLAIM

HMS brings a counterclaim for trademark infringement and unfair competition against ACL. The claim is for infringement of the AMERICAN QUEEN marks.

To succeed on its counterclaim of trademark infringement HMS must prove:

1) That the AMERICAN QUEEN marks are valid and legally protectable;

2) That it is the owner of the AMERICAN QUEEN marks; and

3) That ACL's use of the vessel names AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY and/or AMERICA causes a likelihood of confusion.

ACL disputes that the AMERICAN QUEEN marks are valid and legally protectable or that HMS is the owner of the registered AMERICAN QUEEN marks.  HMS claims that there is a likelihood of confusion based on ACL's vessel names AMERICAN EAGLE, AMERICAN PRIDE, AMERICAN SONG, AMERICAN HARMONY and/or AMERICA.  ACL denies that there is a likelihood of confusion based on its vessel names.

# 7. <u>ACL'S AFFIRMATIVE DEFENSES</u>

An affirmative defense is defined as a matter asserted by a party against whom a claim or counterclaim is made, which, assuming the claim or counterclaim to be true, constitutes a defense to the claim.

In this case ACL denies that HMS has asserted a valid counterclaim and ACL asserts two affirmative defenses to that counterclaim. The first affirmative defense is that the AMERICAN QUEEN trademark registrations were abandoned and are no longer valid. The second affirmative defense is that the assignment of the AMERICAN QUEEN trademarks to HMS was invalid.

## INSTRUCTION 7.1.1: TRADEMARK ABANDONMENT - GENERAL

ACL asserts that the AMERICAN QUEEN trademarks have been abandoned as an affirmative defense to HMS's trademark infringement counterclaim. ACL bears the burden of proving this defense by clear and convincing evidence.

An entity can lose its rights to a trademark if the trademark has been abandoned. If you determine that the AMERICAN QUEEN registrations have been abandoned, then the registrations can no longer be used by HMS in its counterclaim against ACL and HMS must, therefore, rely on any unregistered or common law trademark rights to succeed on its counterclaim against ACL.

## INSTRUCTION 7.1.2: TRADEMARK ABANDONMENT - PRESUMPTIONS AND BURDEN OF PROOF

If a trademark is not used for three consecutive years, a presumption of abandonment is triggered. If you find that there was a three year period of non-use of the AMERICAN QUEEN trademark, then HMS must show by a preponderance of the evidence that there was an intent to resume use of the trademark by its owner or assignee or that there was excusable non-use of the mark during the non-use period.

If you find there was not a three year period of non-use, then the presumption of abandonment is not triggered, and ACL must show by clear and convincing evidence that there was an intent not to resume use of the AMERICAN QUEEN trademark by its owner or assignee.

## INSTRUCTION 7.1.3: TRADEMARK ABANDONMENT - ELEMENTS

To succeed on its abandonment defense, ACL must prove that: (1) the use of the AMERICAN QUEEN mark was discontinued in the ordinary course of trade; and (2) with the intent not to resume use in the reasonably foreseeable future.

## INSTRUCTION 7.1.4: ABANDONMENT – ELEMENTS – NON-USE

To prove the first element of abandonment, ACL must show that there was a period of time when the AMERICAN QUEEN trademark was not used. Use of a mark means the genuine use of such mark made in the ordinary course of trade, and not made merely to reserve a right in the mark.

In this case, the booking of cruises constitutes use of a mark registered in connection with "transporting passengers and goods by steamers."

## INSTRUCTION 7.1.5: ABANDONMENT – ELEMENTS – INTENT NOT TO RESUME USE

If you find that there was a three year period of non-use, you must then consider whether HMS has shown that there was an intent by the owner or purchaser of the AMERICAN QUEEN trademark to resume use of the AMERICAN QUEEN trademark within a reasonable time in the future.

The cessation of a business does not automatically and immediately terminate rights to a trademark. You may consider whether the non-use of the mark was due to circumstances beyond the control of the owner, such as a bankruptcy, attempts to sell the business, or failures in the market.

If you find there was not a three year period of non-use, then ACL must prove that the owner or purchaser of the AMERICAN QUEEN trademark intended not to resume use of the AMERICAN QUEEN trademark. Intent not to resume may be inferred from circumstances.

# INSTRUCTION 7.1.6: ABANDONMENT – RESIDUAL GOODWILL

Intent not to resume use may be inferred from the circumstances. One circumstance you may consider when deciding whether the AMERICAN QUEEN mark was abandoned is whether AMERICAN QUEEN retained residual goodwill. Residual goodwill means that a mark had a continued, favorable association among the consuming public. If you find that there was residual goodwill in the AMERICAN QUEEN trademark during or after the alleged period of non-use, you may consider that fact when inferring whether Ambassadors had an intent not to resume use of the AMERICAN QUEEN mark.

However, residual goodwill must be considered along with the other facts and circumstances proved in the case. The law permits a party to abandon a mark even if that mark has residual goodwill.

## INSTRUCTION 7.2: INVALID ASSIGNMENT OF TRADEMARK

ACL asserts as an affirmative defense that the assignment of the AMERICAN QUEEN trademarks from Ambassadors to HMS is an invalid assignment. ACL has the burden of establishing an invalid assignment by clear and convincing evidence.

An assignment of a trademark without goodwill is invalid. A trademark symbolizes the public's confidence or goodwill in a product or service. Because a trademark is symbolic, it may be transferred or assigned only to represent the transfer of goodwill connected with a particular business and cannot be transferred separately from the goodwill of a business.

The fact that an agreement says it assigns goodwill along with the trademark is insufficient to demonstrate that goodwill has been transferred.

Even if the agreement does not expressly include goodwill as being transferred, if you determine that HMS is providing services that are substantially similar in nature and quality to those services previously provided under the AMERICAN QUEEN trademarks by Ambassadors then you must find that the AMERICAN QUEEN trademarks were properly assigned to HMS.

41

## 8. <u>UNREGISTERED OR COMMON LAW MARK</u>

If you find that the AMERICAN QUEEN mark was abandoned or improperly assigned, you

must consider HMS's infringement counterclaim based on its unregistered marks.  To do so, you

must determine whether HMS has rights in an unregistered mark.

## INSTRUCTION 8.1: RIGHTS IN UNREGISTERED TRADEMARKS – OWNERSHIP

Trademark rights in unregistered marks are acquired through adoption and actual continuous use of a mark in a market. Use in a market is determined by market penetration, significant enough to show clear entitlement for protection.

To determine whether the market penetration of a trademark in an area is sufficient to warrant protection of a mark, you must consider (1) the volume of sales of the trademarked good or service; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the good or service in relation to the potential number of customers; and (4) the amount of advertising of the product or service in the area.

## INSTRUCTION 8.2: RIGHTS IN UNREGISTERED TRADEMARKS - VALIDITY

Unregistered trademarks can be valid and provide the trademark owner with the exclusive right to use that mark. To establish ownership of an unregistered trademark, the party asserting rights must prove by a preponderance of the evidence that the mark is valid.

For HMS to establish it has rights in a valid common law AMERICAN QUEEN mark it must prove by a preponderance of the evidence that AMERICAN QUEEN has secondary meaning.

## 9.  WILLFUL TRADEMARK INFRINGEMENT

If you find that either party has infringed the other's trademark, then you must also determine whether the party asserting infringement has proven by clear and convincing evidence that the infringement was willful.

An infringer has acted willfully if the infringer knew it was infringing the trademark at issue or if it acted with indifference to the trademark rights of the other party.  A party that acts with an intention to benefit from the goodwill or reputation of another acts willfully.  Infringement is not willful if the alleged infringer reasonably believed that its use of the mark at issue was not infringing.

# 10.  <u>DISGORGEMENT OF PROFITS</u>

## INSTRUCTION 10.1: WHEN TO CONSIDER DISGORGEMENT OF PROFITS

If you decide that ACL has not established trademark infringement as to its claims, then you should not consider the question of disgorgement of profits as to any claim it has not established.

If you decide that HMS has not established trademark infringement or that one of ACL's affirmative defenses applies, then you should not consider disgorgement of profits as to that claim.

## INSTRUCTION 10.2: DISGORGEMENT OF PROFITS

A trademark owner may recover an infringer's profits attributable to the infringement. Profit is determined by deducting expenses from gross revenue. Gross revenue is all the money the infringer received due to its use of the trademarks in question. The trademark owner is required only to prove the infringer's gross revenue. The infringer is required to prove any expenses that it argues should be deducted in determining its profits. A trademark owner is entitled to recover the infringer's total profits from its use of the trademarks in question, unless the infringer proves that a portion of the profit is due to factors other than the use of the trademarks in question.

# 11.  FINAL INSTRUCTIONS AND REMINDERS

## INSTRUCTION 11.1: DELIBERATIONS AND VERDICT-INTRODUCTION

That concludes the part of my instructions explaining the rules for considering some of the testimony and evidence. Now let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case. If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take me some time to get back to you. Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is juror No. 1.

One more thing about messages. Do not ever write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be. That should stay secret until you are finished.

## INSTRUCTION 11.2: UNANIMOUS VERDICT

Your verdict must represent the considered judgment of each juror. For you as a jury to return a verdict, it is necessary that each juror agree to the verdict. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so consistent with your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict. Remember at all times that you are not partisans. You are judges of the facts. Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date and sign the form. You will then return to the courtroom and your foreperson will give your verdict.

## INSTRUCTION 11.3: DUTY TO DELIBERATE

Now that all the evidence is in and the arguments are completed, you are free to talk about the case in the jury room. In fact, it is your duty to talk with each other about the evidence, and to make every reasonable effort you can to reach unanimous agreement. Talk with each other, listen carefully and respectfully to each other's views, and keep an open mind as you listen to what your fellow jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong.

But do not ever change your mind just because other jurors see things differently, or just to get the case over with. In the end, your vote must be exactly that-your own vote. It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say. So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

## INSTRUCTION 11.4: SOCIAL MEDIA

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, blackberry or computer, the internet, any internet service, any text or instant messaging service, any internet chat room, blog, or website such as Facebook, Myspace, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.

## INSTRUCTION 11.5: COURT HAS NO OPINION

Let me finish up by repeating something that I said to you earlier. Nothing that I have said or done during this trial was meant to influence your decision in any way. You must decide the case yourselves based on the evidence presented.